# EXHIBIT 7

Westlaw.

Not Reported in A.2d                                                                                                  Page 1
Not Reported in A.2d, 1993 WL 155493 (Del.Ch.), 19 Del. J. Corp. L. 424
(Cite as: 1993 WL 155493 (Del.Ch.), 19 Del. J. Corp. L. 424)

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.
Kenneth M. WEISS, Plaintiff,
v.
LEEWARDS CREATIVE CRAFTS, INC.,
Prudential-Bache Interfunding, Inc.,
Prudential-Bache Capital Partners I, L.P., Mutual Life Insurance Company of New York, John A. Popple, David E. Bolen, John M. Kirkeide, Stephen J. Berman, Samuel J. Parker, Benjamin J. Zintak, Prudential Securities Incorporated and
Dean Witter Reynolds, Inc., Defendants.
Civ. A. No. 12384.

Submitted: Feb. 16, 1993.
Decided: April 29, 1993.
**429 Joseph A. Rosenthal, of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington (Arthur T. Susman, Terry Rose Saunders, Terrence Buehler and Robert E. Williams, of Susman, Saunders & Buehler, Chicago, IL., of counsel, plaintiff

Stephen P. Lamb, Edward P. Welch and Stuart M. Grant, of Skadden, Arps, Slate, Meagher & Flom, Wilmington, for defendant Leewards Creative Crafts, Inc.

Henry E. Gallagher, Jr., of Connolly, Bove, Lodge & Hutz, Wilmington (Steven H. Reisberg, of Willkie Farr & Gallagher, New York City, of counsel, for defendants Prudential-Bache Capital Partners I, L.P. and Prudential-Bache Interfunding, Inc.

M. Duncan Grant and David M. Fournier, of Pepper, Hamilton & Scheetz, Wilmington, for defendant The Mutual Life Ins. Co. of New York.

**430 Stephen E. Jenkins, of Ashby & Geddes, Wilmington, for defendants John A. Popple, David E. Bolen, John M. Kirkeide, Stephen J. Berman, Samuel J. Parker and Benjamin J. Zintak.

R. Franklin Balotti and Sean P. McDevitt of Richards, Layton & Finger, Wilmington, for defendants Prudential Securities Inc. and Dean Witter Reynolds, Inc.

CHANDLER, Vice Chancellor.

MEMORANDUM OPINION

*1 Plaintiff Kenneth M. Weiss ("Weiss") has filed an amended complaint (the "complaint") alleging that defendants breached duties owed him and others similarly situated regarding a "deal that did not close"--an unsuccessful offering of stock of defendant Leewards Creative Crafts, Inc. ("Leewards") during October, 1991. Plaintiff alleges he and a class of similarly situated individuals were injured as a result of the cancellation of stock delivery, and that either the defendant corporation or the stock's underwriters are at fault for the offer's failure to close.

Weiss claims he was injured under a variety of theories, including breach of fiduciary duty, tortious interference, conversion, breach of contract, and violations of federal and state securities laws. He asserts the claims against four groups of defendants: 1) Leewards, the corporation issuing the stock; 2) the selling stockholders, Prudential-Bache Interfunding, Inc. ("PBIF"), Prudential-Bache Capital Partners I, L.P. ("PBCP"), and Mutual Life Insurance Co. of New York ("MONY"); 3) the underwriters, Prudential Securities, Inc. ("PSI") and Dean Witter Reynolds, Inc. ("Dean Witter"); and 4) individuals alleged to be directors of Leewards, John A. Popple ("Popple"), David E. Bolen ("Bolen"), John M. Kirkeide ("Kirkeide"), Stephen J. Berman ("Berman"), Samuel J. Parker ("Parker"), and Benjamin J. Zintak ("Zintak") (collectively, the "individual defendants"). All defendants--including Leewards, the selling stockholders, the underwriters, and the individual defendants--have moved to dismiss the various counts of Weiss's complaint for failure to state claims under Rule 12(b)(6). [FN1] This is my decision on defendants' motions to dismiss.

> FN1. Alternatively, some defendants have moved for a more definite statement. For the reasons set forth below, I need not consider this alternative motion.

**431 I. FACTS
Plaintiff is not a current stockholder of Leewards. On October 24, 1991, he agreed to purchase (and claims that he did purchase) 1000 shares of Leewards stock to be offered at the public offering price of $13

Not Reported in A.2d  
Not Reported in A.2d, 1993 WL 155493 (Del.Ch.), 19 Del. J. Corp. L. 424  
**(Cite as: 1993 WL 155493 (Del.Ch.), 19 Del. J. Corp. L. 424)**

Page 2

per share. One day later, October 25, 1991, plaintiff sold his shares, or more accurately sold his rights to purchase the shares, at a rate of $14 1/8 per share. Delivery of the shares never occurred because the offering was cancelled.

Leewards, a specialty retailer of craft products and related merchandise, planned a capital expansion through an initial public offering of 2.3 million shares of common stock, 1.7 million directly from Leewards and 600,000 from the selling stockholders, PBIF, PBCP, and MONY. The final registration statement became effective on October 24, 1991. Between this date and October 31, 1991, shares were sold to the public pursuant to agreements between the underwriters (PSI and Dean Witter) and the investing public, including the plaintiff, and were traded on the over-the-counter market. On October 31, 1991, the underwriters announced that the offering had been postponed. The offering was later cancelled, apparently due to underwriters' doubts about Leewards' financial prospects.

*2 Weiss claims that cancellation of the offering was wrongful and that he and others similarly situated have been directly injured from the cancellation. His complaint alleges seven counts of wrongs by the various defendants. They are: count I, breach of fiduciary duty; count II, tortious interference; count III, conversion; count IV, breach of contract; counts V and VI, violations of federal securities laws; and count VII, violations of Illinois securities laws. Defendants assert that the plaintiff has failed to assert a cognizable claim for relief under Chancery Court Rule 12(b)(6). I will address the arguments in order.

II. STANDARD FOR DISMISSAL
A complaint should be dismissed for failure to state a claim when it appears on its face that the plaintiff cannot prove facts which will entitle him to relief. *Rabkin v. Philip A. Hunt Chem. Corp.*, Del.Supr., 498 A.2d 1099, 1104 (1985). If it is apparent that plaintiff cannot correct the defective nature of the complaint by repleading, denial of leave to amend is warranted. *Kahn Bros. v. Fischbach Corp.*, Del.Ch., C.A. No. 8987, Allen, C. (Sept. 19, 1989), slip op. at 7-8. Similarly, denial is warranted when a plaintiff has already had a chance to cure such defects. *In re Sea-Land Corp Shareholders Litig.*, **432 Del.Ch., C.A. No. 8453, Jacobs, V.C. (May 13, 1988), slip op. at 12.

Well-pleaded allegations of fact shall be deemed true. *Lofron v. Amoco Chemical Corp.*, Del.Supr., 441 A.2d 226, 227. However, allegations must be more than merely conclusory. *Norman v Paco Pharmaceutical Services, Inc.*, Del. Ch., C.A. 10417, Hartnett, V.C. (Sept. 22, 1989), slip op. at 10-11

III. BREACH OF FIDUCIARY DUTIES
Count I of the complaint alleges that defendants breached fiduciary duties owed to the plaintiff and the class, and as a result they have suffered injury in the form of loss of shares and inability to complete sales within the week of October 24-31, 1991.

Weiss "purchased" the stock after the effective date of registration, October 24, 1991, but before the delivery or distribution date of October 31, 1991. The issue presented is whether he became a record owner of Leewards at the time of purchase or was merely a prospective shareholder subject to conditions stated in the prospectus.

The final prospectus for the offering states on its first page:
> The shares of Common Stock are offered by the several Underwriters subject to delivery by the Company and the Selling Stockholders and acceptance by the Underwriters, to prior sale and to withdrawal, cancellation or modification of the offer without notice. Delivery of the shares to the Underwriters is expected to be made at the office of Prudential Securities Incorporated ... on or about October 31, 1991.

Prospectus at 1. Defendants claim that this disclosure statement signifies that all "purchasers" of Leewards stock received the stock subject to possible cancellation and, therefore, do not have the right to bring actions for damages regarding the cancellation

*3 Defendants argue that the stock was conditionally sold on a "when-issued" basis, and that since the stock was not issued, plaintiff's "purchase" was never effectuated. Much has been made by both plaintiff and defendants as to whether this stock can be classified as "when-issued" stock, presumably due to existing law regarding such stock. Under Delaware law, owners of when-issued stock have no fiduciary duties owed them until the actual issuance of the stock. *Anadarko Petroleum Corp v Panhandle Eastern Corp.*, Del. Ch., C.A. No. 8738, Berger, V.C. (July 7, 1987), slip op. at 7-13, aff'd, **433 Del.Supr., 545 A.2d 1171, 1174-77 (1988) ("*Anadarko II*"); and Del. Ch., 521 A.2d 624, 628-30 (1987) ("*Anadarko II*"). However, in this case I need not conclusively determine whether or not the Leewards stock can be classified as "when-issued", for I find the reasoning of the *Anadarko* decisions a compelling analogy to the present circumstances in any event.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00360-SLR    Document 40-7    Filed 10/19/2005    Page 4 of 17

Not Reported in A.2d                                                                Page 3
Not Reported in A.2d, 1993 WL 155493 (Del.Ch.), 19 Del. J. Corp. L. 424
**(Cite as: 1993 WL 155493 (Del.Ch.), 19 Del. J. Corp. L. 424)**

The *Anadarko* decisions held that the defendant's corporate directors, who were attempting a spin-off in creating Anadarko, owed no fiduciary relationship to the prospective shareholders of Anadarko until the distribution date--the actual day that the transfer agent was to issue and mail the stock certificates to each shareholder. *Anadarko I*, C.A. No. 8738, slip op. at 8.

Just as the Anadarko shareholders' interest was conditional upon the completion of the spin-off, the plaintiff's interest in the instant case was conditional upon the closing of the offer. The contingency of plaintiff's interest is evidenced in the plain language of the final prospectus: his purchase was subject to, among other things, "withdrawal, cancellation or modification of the offer without notice." Prospectus at 1. Comparably, the first page of the Anadarko prospectus contained a disclosure statement substantially similar to that of the Leewards prospectus quoted above. Like the present offer, the Anadarko offer failed to close. Thus, in accordance with the *Anadarko* decisions, whatever conditional interest plaintiff may have had in the shares lapsed before Leewards or its directors ever entered into a fiduciary relationship with the plaintiff.

Plaintiff challenges on a number of grounds an application of the *Anadarko* rationale. He asserts that because defendants allowed Leewards stock to be traded on a national exchange, NASDAQ, that he and the class were not "prospective" shareholders. However, the Delaware Supreme Court held in *Anadarko* that, while "a distinct interest was created by providing a market for Anadarko stock prior to distribution, we conclude that the interest does not rise to the level of a beneficial interest for purposes of imposing fiduciary duties." *Anadarko I*, 545 A.2d at 1176. The key issue for ownership purposes is not trading on a national exchange, but the actual issuance of the interest. At the time that Leewards stock was trading on NASDAQ, the plaintiff could not exercise voting rights, nor could he compel the stock's delivery. Because that delivery never occurred, fiduciary duties never arose. See *Anadarko II*, 521 A.2d at 630.

*4 Weiss also argues that his receipt of a prospectus confirmation from the underwriters makes him a record owner of Leewards stock, and thus the *Anadarko* reasoning should not apply. Contrary to his **434 argument, however, the receipt of a confirmation from the underwriters is not a document sufficient to give rise to fiduciary duties by Leewards' directors. The Delaware Supreme Court in *Anadarko* similarly reasoned that the existence of a stock ledger containing the names of individuals who had an expectation of becoming stockholders in the company did not create fiduciary duties owed to those individuals. *Anadarko I*, 545 A.2d at 1175.

Weiss further asserts that these unconditional prospectus confirmation statements he and the class received are the functional equivalent of a stock subscription, and thus act as an acceptance by the corporation of the stock "purchase." A subscription agreement, however, contemplates a direct contractual relationship between the subscriber and the corporation. These confirmation statements, on the other hand, were agreements among Leewards, the selling stockholders and the underwriters. The plaintiff's interest was dependent upon the underwriters' interest, and since the underwriters never obtained any interest under the confirmation statements, it follows that the plaintiff could not have received any such interest, according to basic agency principles. See, e.g., 6 Del.C. § 8-301(1) ("Upon transfer of a security ... the purchaser acquires the rights in the security which his transferor had or had actual authority to convey," absent fraud or illegality.) As I address more fully below, the complaint fails to allege fraud or illegality on defendants' part.

I conclude that none of plaintiff's arguments sufficiently distinguish plaintiff's case from the reasoning in the *Anadarko* decisions. Therefore, plaintiff has failed to state a cognizable claim as to breach of fiduciary duty and I will dismiss that claim.

IV. TORTIOUS INTERFERENCE
Count II of the complaint alleges that Leewards and the selling stockholders tortiously interfered with plaintiff's reasonable expectation of entering into a business relationship by cancelling the offering. Plaintiff claims such tortious interference with a prospective business advantage is actionable, while defendants assert that plaintiff fails to plead the required element of malice.

I will assume, as does the plaintiff, that under Delaware's "most significant relationship" analysis, the law of Illinois will apply to this claim, as well as other state law claims. [FN2] Consequently, I will **435 rely on Illinois law in my determination of the sufficiency of plaintiff's allegations.

> FN2. Under Delaware law, the local law of the state with the most significant

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1993 WL 155493 (Del.Ch.), 19 Del. J. Corp. L. 424
(Cite as: 1993 WL 155493 (Del.Ch.), 19 Del. J. Corp. L. 424)

Page 4

relationship to the occurrence and parties governs the rights of litigants with respect to tort claims. *Travelers Indem. Co. v. Lake,* Del.Supr., 594 A.2d 38 (1991). Plaintiff is an Illinois resident, Illinois is Leewards' principal place of business, and the tort allegedly took place in Illinois. Therefore, Illinois law will most likely apply under the "most significant relationship" test. *Id.*

The leading Illinois case addressing tortious interference is *Fellhauer v. City of Geneva,* Ill.Supr., 568 N.E.2d 870, 878 (1991). It states the requirements for prevailing on a claim for tortious interference with prospective economic advantage as follows: a plaintiff must allege

> *5 (1) his reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such interference.

*Fellhauer,* 568 N.E.2d at 878 (citations omitted). [FN3]

> FN3. For substantially similar factors under Delaware law, see *DeBonaventura v. Nationwide Mut. Ins. Co.,* Del.Supr., 428 A.2d 1151, 1153 (1981).

Plaintiff has failed to allege facts sufficient to meet the third requirement of the *Fellhauer* test, a purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening. [FN4] Illinois courts have interpreted this factor to require an element of malice. *See, e.g., Amerisystems, Inc. v. Keneco Fin. Group, Inc.,* No. 89-C-6505, 1990 WL 93279 at *4 (N.D.Ill. June 18, 1990) ("[t]o plead a cause of action for tortious interference with prospective business expectancies [plaintiff] must allege ... intentional and malicious interference"). Plaintiff does not allege that any of the defendants acted improperly in failing to issue the stocks in question. *See Fellhauer,* 568 N.E.2d at 878-79; *see also, DeBonaventura,* 428 A.2d at 1153. The Appellate Court of Illinois has stated:

> FN4. I need not address, therefore, whether the remaining requirements have been sufficiently plead.

The purpose of imposing liability in tort upon persons who interfere with the contractual relations of others is to protect a person's interest in his contractual relations against forms of interference which, on balance, the law finds repugnant. *Langer v. Becker,* Ill.App., 531 N.E.2d 830, 833 (1988). Considering the purpose of this cause of **436 action, the *Langer* Court recognized that persons may interfere with contractual relations if "socially sanctioned;" for instance, when defendants "act to protect a conflicting interest which is considered to be of equal or greater value than that accorded to the contractual rights involved." *Id.* at 833. *See also Belden Corp. v. Internorth, Inc.,* Ill.App., 413 N.E.2d 98, 102 (1980) (Plaintiff's prospective economic advantage claim is based on "a mere expectancy, and must therefore forbear other parties' pursuit of legitimate business goals"). Therefore, a plaintiff must allege wrongful conduct by a defendant to assert a valid claim.

In the present action, plaintiff has not alleged that the offering was cancelled maliciously or that the cancellation was otherwise wrongfully motivated. Furthermore, the alleged "interference" was an act contractually reserved by defendants on the front page of the prospectus. Therefore, plaintiff has failed to state a valid claim as to tortious interference with a prospective economic advantage.

## V. CONVERSION

Plaintiff claims that the defendants wrongfully converted shares to which he and the class were entitled. Under both Illinois and Delaware law, the first two requirements for a valid claim of conversion are: 1) that a plaintiff had a property interest in the converted goods; and 2) that the plaintiff had a right to possession of the goods. *Goodrich v. E.F. Hutton Group, Inc.,* Del.Ch., 542 A.2d 1200, 1203 (1988); *Katz v. Belmont Nat'l Bank of Chicago,* Ill.Supr., 491 N.E.2d 1157, 1158-59 (1986), citing *Farns Assocs. v. Sternback,* Ill.App., 395 N.E.2d 1103, 1106 (1979). Plaintiff has failed to meet these two requirements.

*6 Plaintiff presumably asserts that he was entitled to the shares because he "purchased" them. *See* Complaint ¶ 33 ("Defendants have wrongfully assumed unauthorized control, dominion, and ownership over the Leewards shares of common stock which were sold to plaintiff and members of the class during the week of October 24 through October 31, 1991."). Plaintiff also claims that he had a right to possession of the stock because he received an "unconditional" confirmation of this trade. However, the Leewards final prospectus clearly states that the purchase was conditional. Prospectus at 1. Therefore, plaintiff cannot demonstrate that he had a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                          Page 5
Not Reported in A.2d, 1993 WL 155493 (Del.Ch.), 19 Del. J. Corp. L. 424
**(Cite as: 1993 WL 155493 (Del.Ch.), 19 Del. J. Corp. L. 424)**

right to possession as a matter of law.

Even assuming that the plaintiff had some cognizable property right in the shares, he has not sufficiently plead a right to possess **437 the shares. The conditional nature of his interest prevents him from claiming any possessory property rights. *See Anadarko I*, C.A. No. 8738, slip op. at 7- 8; *see also Katz*, 491 N.E.2d at 1159. Plaintiff was not a record shareholder of Leewards stock under the conditional contract which he entered with the selling stockholders. Therefore, plaintiff's claim for conversion should be dismissed because he has not sufficiently alleged a valid right to possess Leewards' stock. He must allege specific facts which suggest his right to possess the shares was superior to Leewards'. This he has failed to do.

### VI. BREACH OF CONTRACT

Count IV of the complaint alleges that the underwriters breached their agreements to sell Leewards stock to Weiss and the class. Namely, the plaintiff alleges that the underwriters breached their contracts with him and the class by "refusing to accept delivery of the Leewards common stock." Complaint ¶ 40. This allegation, however, is not sufficient to establish the elements of breach of contract under Illinois law. In order to successfully plead breach of contract an aggrieved party must allege: 1) the making of a specific contract, 2) the obligation thereby assumed, and 3) the breach. 61A Am.Jur.2d *Pleadings* § 89 (1981); 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1235 (1990) ("A complaint in a contract action must allege the existence of a valid and binding contract"); *see also Goodrich v. E.F. Hutton Group, Inc.*, Del.Ch., 542 A.2d 1200, 1203-04 (1988). The complaint does not allege facts sufficient to demonstrate that a contract came into existence.

Most notably, the prospectus itself includes on its first page a statement of conditions of the alleged contract. As I determined in Part III, the contingency of plaintiff's interest is evidenced by the plain language of the prospectus: plaintiff's purchase was subject to, among other things, "withdrawal, cancellation or modification of the offer without notice." Prospectus at 1.

Plaintiff argues that the underwriters "prevented" the occurrence of the condition and invokes the general rule that a party is not excused from its contractual duties if it unjustly prevents the performance or happening of a condition precedent to those duties. *Shear v. National Rifle Assoc. of America*, 606 F.2d 1251, 1254-55 (D.C.Cir.1979). Plaintiff's invocation of the prevention doctrine is misplaced. The specific allegations of the complaint do not indicate that the underwriters unjustly "prevented" the satisfaction of any condition to performance under the prospectus. Furthermore, an exception **438 to the prevention doctrine exists "where the hinderance is due to some action of the promisor which under the terms of the contract ... was permitted." 5 *Williston on Contracts* § 677A at 235 (footnote omitted); *Shear*, 606 F.2d at 1256 ("there is no prevention when the contract authorizes a party to prevent a condition from occurring").

*7 Under Illinois law, the failure to allege wrongfulness precludes application of the prevention doctrine as a matter of law. *Botti v. Avenue Bank & Trust Co. of Oak Park*, Ill.App., 432 N.E.2d 295, 298 (1982). Weiss' failure to allege any bad faith on the part of the underwriters is consequently fatal to his claim. As a result, I find plaintiff has failed to allege specific facts supporting the breach of contract claim in Count IV.

### VII. VIOLATIONS OF FEDERAL SECURITIES LAWS

In count V of the complaint, plaintiff alleges that all defendants violated § 11 of the Securities Act of 1933 (the "1933 Act"), 15 U.S.C. § 77k. Plaintiff further alleges in count VI of the complaint that certain defendants--the individual defendants, Leewards and the selling stockholders-- violated § 12(2) of the 1933 Act, 15 U.S.C. § 77l(2). Defendants challenge plaintiff's standing to bring the action under the 1933 Act, as well as the sufficiency of the allegations in regard to the 1933 Act's requirements of elements of causation, damages, and applicability to certain defendants. Because I conclude that the plaintiff does not have standing to bring claims under the 1933 Act, I will grant defendants' motion to dismiss counts V and VI.

Section 11(a) confers standing to sue on "any person acquiring such security". The United States Supreme Court has explained that "a § 11 action must be brought by a purchaser of a registered security". *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). Similarly, § 12(2) requires that a person "purchasing" a security may seek damages against the seller. *Gutter v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 644 F.2d 1194, 1196 (6th Cir.1981), *cert. denied*, 455 U.S. 909 (1982); *Thomas v. Roblin Indus.*, 520 F.2d 1393 (3d Cir.1975). Thus, § 12(2) also requires plaintiff to be a purchaser in order to have standing.

Not Reported in A.2d                                                                                                    Page 6
Not Reported in A.2d, 1993 WL 155493 (Del.Ch.), 19 Del. J. Corp. L. 424
**(Cite as: 1993 WL 155493 (Del.Ch.), 19 Del. J. Corp. L. 424)**

Plaintiff asserts he is a purchaser as defined in the Securities Exchange Act of 1934 (the "1934 Act"), which is to be read *in pari materia* with the 1933 Act. Section 3(a)(13) of the 1934 Act defines the terms "buy" and "purchase" as including "any contract to **439 buy, purchase, or otherwise acquire" securities. Therefore, plaintiff argues, his conditional contract conferred "purchaser" status upon him. I determined above, however, that plaintiff was not a purchaser of Leewards stock for purposes of determining if fiduciary duties attached to prospective Leewards stockholders. I find this reasoning convincing regarding the securities claims as well. As the 1934 Act states, one who enters into a contract to buy securities is a "purchaser"; one who enters into a contract to buy securities contingent upon the occurrence of an offering has merely purchased a contingent interest in securities, not the securities themselves. Therefore, I determine that plaintiff has demonstrated only that he entered into a contract for an option to buy securities subject to the conditions stated in the prospectus, and as a result he has no standing to assert claims under Sections 11 and 12(2) of the 1933 Act. *Collins v. Signetics Corp.*, 605 F.2d 110, 114 (3d Cir.1979) (dismissing § 12(2) claims for lack of standing); *In re Storage Technology Corp. Sec. Litig.*, 630 F.Supp. 1072, 1078 (D.Colo.1986) (dismissing § 11 claims for lack of standing).

*8 Furthermore, the plaintiff is relying on his position as a *seller*, rather than a buyer, in claiming these violations. That is, Weiss seeks damages from injuries due to his inability to *resell* securities to which he claims he has a right, not to *purchase* those securities. As the *Gutter* court explicitly stated, the 1933 Act's "provisions simply are not designed to protect sellers, and this is obvious from the face of the statutes." *Gutter*, 644 F.2d at 1196. Therefore, the claims under Counts V and VI will be dismissed.

## VIII. VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD ACT

In count VII of the complaint Weiss asserts that defendants' "misstatements and omissions" violated § 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act (the "Illinois Act"), Ill.Rev.Stat.1989, ch. 121 1/2, ¶ 262. [FN5] Paragraph 46 of the complaint states that the defendants falsely implied that the **440 financial outlook for the Company was very good and that they knew this was a false statement. [FN6]

FN5. Section 2 of the Illinois Act states in pertinent part: Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, pretense, false promise, misrepresentation or the concealment, suppression or omission of such material fact ... in the practice of any trade or commerce are hereby declared unlawful.... Ill.Rev.Stat.1989, ch. 121 1/2, ¶ 162.

FN6. Paragraph 46 of the complaint states: Defendants sought to sell the Leewards common shares by falsely implying that the financial outlook for the Company was very good when, in fact, they knew that Leewards earnings for the quarter ended September 30, 1991 reflected poor profitablity and poor prospects for future growth. Realizing that the Prospectus contained false and misleading material, the underwriters refused to take possession of the stock which Leewards and the Selling Stockholders had issued. Plaintiff and the Class had purchased their Leewards common stock pursuant to the representations and projections made in the Prospectus and had sold their shares at a profit. Defendants' conduct as alleged herein prevented plaintiff and the Class from realizing their gain due to the underwriters refusal to accept the stock.

Claims of fraud must be alleged with particularity Ch.Ct.R. 9(b); Fed.R.Civ.P. 9(b). This rule undoubtedly applies to claims under the Illinois Act. *Geddes v. John Hancock Mut. Life Ins. Co.*, 712 F.Supp. 692, 702 (N.D.Ill.1989) (construing the Illinois Act under Fed.R.Civ.P. 9(b)). The "particularity" requirement has been defined as follows:
> In order to allege fraud sufficiently, a plaintiff must delineate the time, place and particular contents of the false representations, as well as the identity of the party making the misrepresentation, and what was obtained or given up thereby
> Id. at 702 (citation omitted).

Delaware cases also illustrate the "particularity" requirements of Rule 9(b). *E.g.*, *Nutt v. A.C. & S., Inc.*, Del.Supr., 466 A.2d 18 (1983). For instance, it is not sufficient to simply use the word "fraud" or its equivalent in a complaint. *Halpern v. Barran*, Del.Ch., 313 A.2d 139, 143-44 (1973). A plaintiff must provide a statement of sufficient facts to make

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00360-SLR   Document 40-7   Filed 10/19/2005   Page 8 of 17

Not Reported in A.2d                                                                                               Page 7
Not Reported in A.2d, 1993 WL 155493 (Del.Ch.), 19 Del. J. Corp. L. 424
**(Cite as: 1993 WL 155493 (Del.Ch.), 19 Del. J. Corp. L. 424)**

the basis of the charge reasonably apparent. *Id.*, *Dann v. Chrysler Corp.*, Del.Ch., 174 A.2d 696 (1961).

Plaintiff's pleadings do not meet these requirements. Even assuming that ¶ 46 states the time, place, and identity of the "false" statements, he has failed to sufficiently allege actionable damages. It is undisputed that a plaintiff must plead specific damages in his complaint. *Duran v. Leslie Automobile, Inc.*, Ill.App., 594 N.E.2d 1355, 1364 (1992); Ill.Rev.Stat.1989, ch. 121 1/2, ¶ 270a(a). In *Duran*, the Court dismissed a plaintiff's claim for damages in purchasing a car because she returned the car before beginning payments on it. Similarly, here plaintiff entered into a contingent sales contract which was later cancelled, thus his investment was returned to him. Therefore, I find that the damages Weiss claims are illusory. Consequently I find that the failure to make specific, **441 cognizable allegations in this regard renders his claim insufficient as a matter of law and appropriate for dismissal [FN7]

> FN7. I also note that § 10b of the Illinois Act precludes actions more specifically regulated by federal statutes. *See, e.g.*, *Lanier v. Associates Fin. Inc.*, Ill.Supr., 499 N.E.2d 440, 447 (1986).

### VIII. CONCLUSION

*9 Plaintiff has failed to allege sufficiently a cause of action against defendants. He has failed to demonstrate that fiduciary duties attached to his contingent interest in Leewards. He also has failed to allege adequately that defendants purposefully or maliciously interfered with plaintiff's purported business interest in Leewards. He has failed to allege a cognizable claim of breach of contract or prevention of contract by defendants. He also has failed to demonstrate standing under federal securities claims. Finally, plaintiff has failed to allege facts sufficient to support a claim under the Illinois Consumer Fraud Act. Consequently, defendants' motions to dismiss are granted as to all counts of the complaint.

IT IS SO ORDERED.

Not Reported in A.2d, 1993 WL 155493 (Del.Ch.), 19 Del. J. Corp. L. 424

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 8

Westlaw.

Not Reported in A.2d                                                                                                   Page 1
Not Reported in A.2d, 1995 WL 411319 (Del.Super.)
**(Cite as: 1995 WL 411319 (Del.Super.))**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware, New Castle County.
KIRKWOOD KIN CORP. and John O'Connor, Plaintiffs,
v.
DUNKIN' DONUTS, INC., Sean O'Hanlon and O'Hanlon, Inc., Defendants.
Civ. A. No. 94C-03-189.

Submitted: March 20, 1995.
Decided: June 30, 1995.

Upon Defendants' Motion to Dismiss and for Partial Summary Judgment--Granted in part, Denied in part.

Stephen Horn, and Robert L. Zisk, Schmeltzer, Aptaker & Shepard, P.C., Washington, DC, Edward F. Eaton, Connolly, Bove, Lodge & Hutz, Wilmington, for defendant Dunkin' Donuts, Inc.

James S. Green, and Robert J. Valihura, Jr., Duane, Morris & Heckscher, Wilmington, for plaintiffs Kirkwood Kin Corp. and John O'Connor.

Jonathan B. Taylor, Wilmington, for defendant, Sean O'Hanlon and O'Hanlon, Inc.

OPINION

SILVERMAN, Judge.

*1 This case involves a dispute between the former operator of two donut shop franchises and its franchisor and a competing franchise. Although it has not progressed very far, the litigation here already is sprawling. The franchisee filed a complaint alleging ten counts against the franchisor embracing Delaware's Franchise Security Law, 6 Del. C. Ch. 25, and various derivative contract and tort claims, and four counts against the competitor franchisee involving related tort claims. The franchisor has counterclaimed against the franchisee, moved for summary judgment of that counterclaim, and moved for dismissal and/or partial summary judgment of the franchisee's claims. In what is likely to be the first of several pretrial rulings, the Court will try to advance the case by addressing the franchisor's dispositive motions insofar as that will help define the scope of the litigation. The undeveloped record precludes the Court's doing more, now.

I. FACTUAL AND PROCEDURAL BACKGROUND

As yet, many of the facts here are unclear. In some instances they are unknown and in other instances the facts are unnecessarily complicated. However, generally it appears that Plaintiffs, John O'Connor, and O'Connor's corporate counterpart, Kirkwood Kin Corporation, operated two Dunkin' Donuts franchises, one on the Kirkwood Highway between Stanton and Newark, Delaware, the other at 112 West Ninth Street in downtown Wilmington, Delaware. Plaintiffs claim that by various means, Defendants, Dunkin' Donuts, Inc. (Dunkin'), their franchisor, and Sean O'Hanlon and O'Hanlon, Inc., operators of another Dunkin' franchise, drove them out of business.

Only Plaintiffs' claims against Dunkin' are at issue, since only Dunkin' has sought summary disposition here. As suggested by the following summary of those claims, it appears that the heart of the dispute arises out of Dunkin's decision to open two franchises, the "Pike Creek" and "O'Hanlon" shops, which allegedly competed directly with Plaintiffs' former Kirkwood Highway franchise. Counts I through IV of Plaintiffs' Amended Complaint allege violations of 6 Del. C. § 2252. Count I is a claim of "continuing unjust termination" based on Dunkin's alleged charging of excessive rent under the First and Second Amendments to its Sub-Lease for the Kirkwood Highway shop. Count II is a charge of "de facto unjust termination" arising from Dunkin's granting of the purportedly competing O'Hanlon and Pike Creek franchises. Count III charges "de facto unjust termination" based on Dunkin's alleged granting to the O'Hanlon franchise "special incentives, considerations and exceptions to the...Dunkin' system." Count IV claims "continuing unjust termination" due to Dunkin's alleged refusal to meet with Plaintiffs' to resolve certain issues, and Dunkin's institution of legal action to terminate Plaintiffs' franchises.

Count V is a claim of bad faith violation of a Mediation Agreement between Dunkin' and the Center for Public Resources, Inc. (CPR), to which

Case 1:05-cv-00360-SLR   Document 40-7   Filed 10/19/2005   Page 11 of 17

Not Reported in A.2d                                                                                                 Page 2
Not Reported in A.2d, 1995 WL 411319 (Del.Super.)
(Cite as: 1995 WL 411319 (Del.Super.))

Plaintiffs were third party beneficiaries. Count VI appears to be a tort claim alleging that Dunkin' engaged in "misrepresentation, breaches, and unjust actions," by charging excessive rent for the Kirkwood Highway franchise, granting the O'Hanlon and Pike Franchises, and awarding "special privileges and concessions to at least one of those franchises." Counts VII and VIII are tort claims of intentional interference with business relationships and prospective business advantage, respectively, based on Dunkin's "allowing, encouraging, and facilitating" the Pike Creek and O'Hanlon shops. Count IX is a breach of contract claim alleging that Dunkin' breached contractual covenants, representations, and warranties by charging excessive rent for the Kirkwood Highway franchise, granting the O'Hanlon and Pike Creek franchises, awarding special privileges to the O'Hanlon and Pike Creek franchises, refusing to meet with Plaintiffs to resolve certain disputes, and instituting three actions to terminate its franchises. Finally, Count X is a claim of unjust enrichment, based on Dunkin's alleged charging of excessive rent and fees for Plaintiffs' Kirkwood Highway franchise.

*2 Dunkin' implicitly denies Plaintiffs' allegations; it has filed a counterclaim for breach of contract based on Plaintiffs' purported defaults under various rental and fee agreements associated with Plaintiffs' Kirkwood Highway and downtown, Wilmington franchises. Dunkin' now seeks summary judgment of that counterclaim, which would effectively eliminate Plaintiffs' Count IV. At the same time, Dunkin' seeks dismissal or partial summary judgment of Counts I, II, III, VI, VII, VIII, IX, and X. The gravamen of Dunkin's argument is that the statute of limitations in 10 Del. C. § 8106 bars most of these claims.

The Court now will decide Dunkin's challenges to Plaintiffs' Complaint based on the statute of limitations bar. In addition, the Court will address: Dunkin's claim that it did not violate the Delaware Franchise Security Law's prohibition on unjust termination of franchise agreements; Dunkin's request for dismissal or partial summary judgment of Count V on the basis that it committed "no wrong" vis-a-vis Plaintiffs with regard to its Mediation Agreement with CPR; and, briefly, Dunkin's alternative bases for seeking summary disposition of certain of Plaintiffs' claims, and request for summary judgment on its counterclaim.

II. DELAWARE FRANCHISE SECURITY LAW
CLAIMS -- COUNTS I-IV [FN1]

FN1. The parties, in their supplemental memoranda on the Delaware Franchise Security Law issues, do not specifically discuss Count IV. However, the parties' arguments concerning Counts I-III and the Court's holding implicitly cover Count IV, as well as Counts I-III.

Plaintiffs' presentation of their claim that Dunkin' violated Delaware's Franchise Security Law, 6 Del Ch 25, exemplifies the nascent and evolving nature of this litigation. Originally, Plaintiffs cast their complaint in terms of Dunkin's having unjustly terminated Plaintiffs' franchise agreements in violation of 6 Del. C. § 2553(a)(1) [FN2] Tacitly recognizing that they continued to operate their franchises after Dunkin's supposedly wrongful acts, Plaintiffs also alleged that their unjust termination was "continuing" or "de facto". However, as Dunkin' began to focus on the anomalies in Plaintiffs' position, Plaintiffs, in a supplemental memorandum requested by the Court, refined their arguments so as to rely on the Delaware Franchise Security Law's prohibition on a franchisor threatening unjustly to terminate a franchise. 6 Del. C. § 2553(a)(3) [FN3] Specifically, in that supplemental memorandum filed on December 2, 1994, Plaintiffs argue:

> FN2. Six Del C § 2553(a)(1) and (3) provides in pertinent part:
> (a) If a franchisor (1) unjustly terminates a franchise, ... or (3) threatens, or attempts, or gives notice that it intends to attempt unjustly to terminate a franchise ... then the franchised distributor whose franchise is threatened shall be entitled to recover damages from the franchisor ....

> FN3. See n.2.

Certainly, Plaintiffs' allegations are sufficient to put Dunkin on notice of the facts which support Plaintiffs' claims that Dunkin has violated the Franchise Security Act.... by proving at trial that Dunkin's actions were threatening or, in fact, caused the unjust termination of Plaintiffs' franchise, Plaintiffs will be entitled to a remedy under § 2553(a) of the Franchise Security Act.

The Court will assume without deciding that 6 Del. C. § 2553(a)(1) can be violated de facto or constructively. However, the current record lends little support to Plaintiffs' claim of a constructive or de facto termination. To the contrary, the facts seem to support the finding that Plaintiffs continued to

Not Reported in A.2d
Not Reported in A.2d, 1995 WL 411319 (Del.Super.)
(Cite as: 1995 WL 411319 (Del.Super.))

Page 3

operate Dunkin' franchises after Dunkin' supposedly terminated them. Dunkin' even suggests that Plaintiffs' franchises expanded after they were supposedly terminated. In any case, there is insufficient evidence, so far, from which to find that while Dunkin' maintained the franchises in form, its conduct substantively ended the relationship.

*3 To the extent that Plaintiffs' claims are based on their notion of a "continuing unjust termination," the Court finds nothing in the Delaware Security Franchise Law that supports such a cause of action. Simply put, a continuing termination is a contradiction in terms. For purposes of 6 Del. C. § 2553(a)(1) a termination is necessary. While the Court, as indicated above, will leave open the question as to what it takes to constitute a termination, until such a termination actually has occurred 6 Del. C. § 2553(a)(1) cannot apply and once a termination has occurred, by definition, the franchise thereafter cannot continue.

Plaintiffs make a point that Dunkin' is on notice that Dunkin' violated 6 Del. C. § 2553(a)(3) by threatening unjustly to terminate their franchises. And it is possible, in theory, for a franchisee to continue to operate a franchise under an unlawful threat of termination by the franchisor. However, Plaintiffs have not pleaded the case that they are now arguing. Accordingly, the Court will give Plaintiffs an opportunity to amend their complaint promptly to conform with their developing evidentiary record. In this regard, the Court rejects Dunkin's suggestion that *Globe Liquor Co. v. Four Roses Distillers Co.*, Del. Supr., 281 A.2d 19 (1971); cert. denied, 404 U.S. 873 (1971), holds that all threatened terminations are not actionable. It is not clear that Plaintiffs are trying to use the Franchise Security Law to force Dunkin' to deal with Plaintiffs indefinitely or otherwise prevent Dunkin' from asserting its contractual rights. 291 A.2d at 21. Therefore, *Globe Liquor* and its progeny may not apply.

### III. THE DUNKIN'-CPR MEDIATION AGREEMENT -- COUNT V

Dunkin's alleged failure to inform Plaintiffs of Dunkin's Mediation Agreement with CPR when Dunkin' sought to terminate Plaintiffs' Kirkwood Highway and downtown, Wilmington shops (based on its claims that Plaintiffs had defaulted on certain payments), and later when Plaintiffs requested a meeting with Dunkin' to discuss the O'Hanlon and Pike Creek franchise locations and modification of the rent provisions of the Sub-Lease for the Kirkwood Highway shop, is the basis of Plaintiffs' bad faith breach of contract claim in Count V. Pursuant to the Mediation Agreement, Dunkin' voluntarily agreed to mediation designed to help franchisors and franchisees resolve disputes without litigation.

Plaintiffs assert that "[a]s a result of Dunkin's intentional and wilful disregard of its obligations under the Mediation Agreement, Plaintiffs suffered damages, including attorney's fees, costs and expenses incurred in defending against Dunkin's Three Termination Actions." In response, Dunkin' contends that "[t]he parties did try mediation, during which all litigation was stayed, but it failed to resolve their dispute."

The "Certification of Jack Laudermilk," Dunkin's Legal Counsel and Assistant Secretary, submitted by Dunkin' in support of its contention that it complied with the Mediation Agreement, indicates that Dunkin' notified Plaintiffs of the availability of the CPR program on or about April 14, 1994, *when Plaintiffs filed this lawsuit*. Accordingly, Dunkin' has not been directly responsive to the claims in Count V, which, as stated above, concern Dunkin's failure to inform Plaintiffs of the Mediation Agreement during conflicts preceding the instant lawsuit. As a consequence, the Court will assume without deciding that Dunkin' did not notify Plaintiffs about the Mediation Agreement, as alleged. However, for the reasons stated below, the Court's assumption does not preclude summary judgment on Count V.

*4 Count V essentially is a damage claim for Plaintiffs' having lost an opportunity to mediate certain complaints before they filed suit. Only through speculation could damages be awarded on that basis. Specifically, for Plaintiffs to recover, the fact-finder would have to conclude that Plaintiffs would have succeeded in mediation, Dunkin' would have accepted the result and would not have exercised its appeal rights, or such an appeal would have failed, since the mediation process contemplated by the CPR program is non-binding. *See* Section F, "Ground Rules," in CPR's "Procedure for Resolution of Franchise Disputes." Damage claims cannot rest on such a tenuous foundation. [FN4] *See, e.g., American General Corp. v. Continental Airlines Corp.*, Del. Ch., 622 A.2d 1, 7 (1992), aff'd 620 A.2d 856 (1992). Moreover, while the Court will not weigh the evidence now, Dunkin's contention that the parties eventually tried mediation without success lends support to the notion that Plaintiffs cannot establish a claim in their Count V

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00360-SLR   Document 40-7   Filed 10/19/2005   Page 13 of 17

Not Reported in A.2d                                                                Page 4
Not Reported in A.2d, 1995 WL 411319 (Del.Super.)
(Cite as: 1995 WL 411319 (Del.Super.))

> FN4. Perhaps, Plaintiffs had a claim for specific performance in equity. *See Pettinaro Const. Co. v. Henry C. Partridge, Etc.*, Del. Ch., 408 A.2d 957, 962 (1979); *Leason v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, Del. Ch., C.A. No. 6914, Walsh, V.C. (Aug. 23, 1984).

## IV. STATUTE OF LIMITATIONS -- CLAIMS VI-X

Plaintiffs' claims flow from six different contracts: Plaintiffs' Franchise Agreement for the Kirkwood Highway shop; Plaintiffs' Sub-Lease for the Kirkwood Highway shop; Plaintiffs' Satellite Franchise Agreement for their downtown, Wilmington shop; Dunkin's franchise agreement with Rudy Tiberi for the Pike Creek shop; Dunkin's franchise agreement with the O'Hanlon defendants for the O'Hanlon shop; and, Dunkin's Mediation Agreement with CPR. The franchise and lease agreements for the Kirkwood Highway shop, and the franchise agreement for the Pike Creek shop, were executed and renewed more than three years ago. [FN5] Dunkin' argues that Plaintiffs' claims based on those agreements accrued on or near the time that the agreements were executed or renewed, and accordingly are barred by 10 *Del. C.* § 8106, [FN6] the statute of limitations.

> FN5. Plaintiffs took assignment of the Franchise Agreement for the Kirkwood Highway shop on March 22, 1984, and subsequently renewed that contract on August 25, 1986, and again, on August 7, 1987. Plaintiffs' Sub-Lease for the Kirkwood Highway shop was assigned to Plaintiffs on March 22, 1984, and amended on August 25, 1986 and August 7, 1987. Dunkin's franchise agreement with Pike Creek was signed on April 9, 1990, and the franchise opened on November 9, 1990, approximately.
> Dunkin's franchise agreement for the O'Hanlon shop, Mediation Agreement with CPR, and Satellite Franchise Agreement with Plaintiffs for Plaintiffs' downtown, Wilmington shop, were all executed in 1992 or later and therefore are not subject to Dunkin's statute of limitations argument.

> FN6. Ten *Del. C.* § 8106 provides, in part:
> [N]o action to recover a debt not evidenced by a record or by an instrument under seal, no action based on a detailed statement of the mutual demands in the nature of debit and credit between parties arising out of contractual or fiduciary relations, no action based on a promise, no action based on a statute, and no action to recover damages caused by an injury unaccompanied with force or resulting indirectly from a the act of the defendant shall be brought after the expiration of 3 years from the accruing of the cause of such action.

### A. Are the Franchise and Lease Agreements Contracts Under Seal?

In response to Dunkin's pleading the statute of limitations bar, Plaintiffs first argue that, according to *State v. Regency Group, Inc.*, Del. Super., 598 A.2d 1123, 1129 (1991), and *Leiter v. Carpenter*, Del. Ch., 22 A.2d 393, 397 (1941), their franchise and lease agreements for the Kirkwood Highway shop are contracts under seal. Consequently, § 8106 does not apply. Dunkin' counterargues that since "none of the claims alleged by Plaintiffs is a breach of contract claim," whether these agreements are sealed is "irrelevant." [FN7]

> FN7. Dunkin' also argues that any sealing of the contract is insignificant because Plaintiffs waived their claims by continuing as franchises despite Dunkin's alleged transgressions. The Court will address waiver in Section IV, *infra*.

Dunkin' overlooks Count IX. As stated above, Count IX is a breach of contract claim based on Dunkin's alleged violation of contractual covenants, representations, and warranties. Plaintiffs therefore raise the "seal" issue in the appropriate context. Nevertheless, Plaintiffs' reliance on the instrument under seal exception fails here because the franchise and lease agreements do not constitute contracts under seal in either form or substance.

*5 As early as 1741, with the approbation of His Majesty, then King George II, Delaware had a statute of limitations providing:

> [A]ll actions of debt grounded upon any ... contract without specialty shall be commenced and sued ... within three years after the cause of such actions or suits and not after.

It may be that the colonial legislation of 1741 merely codified common law that was ancient even then.

Since the statute of limitations' adoption, Delaware's courts consistently have held that it does not apply to contracts under seal. *See, e.g., Monroe Park v. Metro.*

Not Reported in A.2d                                                                                          Page 5
Not Reported in A.2d, 1995 WL 411319 (Del.Super.)
**(Cite as: 1995 WL 411319 (Del.Super.))**

*Life Ins. Co.,* Del. Supr., 457 A.2d 734, 734 (1983); *Leiter v. Carpenter,* Del. Ch., 22 A.2d 393 (1941). Indeed, by 1938, *Garber v Whittaker,* Del. Ch., 2 Ad. 85, 88 (1938), held without need for citation:

> An obligation that arises out of a sealed instrument appears to be left by our statutory law, so far as limitations of action are concerned, to the common law. And that law prescribes no absolute bar due to the lapse of time, but only a presumption of satisfaction after twenty years.

Thus, if the franchise and lease agreements are contracts under seal, the limitation of actions in 10 *Del. C.* § 8106 does not apply to them and, under common law going back to long before Delaware was a State, Plaintiffs seemingly may sue for their breach in perpetuity.

Whether a particular instrument is under seal presents a mixed question of law and fact, as discussed below. At this point, the Court will consider the record in the light most favorable to the non-moving party, Plaintiffs, and apply the facts to the law. In terms of the current record, the only support for a finding that the franchise and lease agreements are under seal is the presence of a corporate seal after the parties' signatures in the agreements, and the phrase (or a variant thereof), in their respective testimonium clauses: "IN WITNESS HEREOF the parties... have set their hands and seals." [FN8] Nothing in the body of these documents evidences any substantive intent that the parties expected that the documents were sealed. Moreover, so far, there is no extrinsic evidence proving that the parties intended that their agreements were sealed.

> FN8. The parties stipulated to these features in a three-and-one-half page letter to the Court dated November 22, 1994 that summarizes possible seal indicia on the face of the contracts. Curiously, the copies of the franchise and lease agreements in the Court's possession, contrary to the parties' stipulation, do not carry any embossed corporate seals.
> The parties also stipulated that the lease agreements contain a notary's raised seal (accompanying the notary's certification that certain officers executed the agreements and affixed their corporate seal thereto), and that the franchise agreements contain an appended "Personal Guaranty of Officers, Shareholders, and Directors of a Corporation" stating: "This guaranty is intended to take effect as a sealed instrument." Again, the Court's copies of the lease agreements carry no embossed notary seals, the parties stipulation notwithstanding. Moreover, the notary's signature noticeably is absent from two certification sections in the March 22, 1984 assignment of lease agreement.
> Regardless of these inconsistencies, the Court considers the notary seals irrelevant to the seal issue. Likewise, there is no suggestion in the record that Plaintiffs' claims in any way rely on the appendant guaranty. See *Cheswold Volunteer Fire Co. V. Lambertson Const. Co.,* Del. Super., 462 A.2d 416, 426-27 (1983) (six-year limitation in 10 *Del. C.* § 8127 applied despite twenty-year warranty and warranty bond where breach of warranty was not pressed). The Court considers the guaranty in its analysis of the seal issue only to the extent that the absence of similar language in the underlying agreements suggests, by comparison, that the parties did *not* intend that the underlying agreements were sealed; the parties' use of language evidencing intent to seal the guaranty is consistent with the nature of guarantees, as opposed to that of the underlying contracts. See discussion of mortgages, *infra*

If the agreements here were mortgages, the mere presence of the preprinted word "seal" next to the signatures likely would be enough to seal them. See *In re Beyea's Estate,* Del. Orph., 15 A.2d 177, 180 (1940); *see also American Tel. & Tel Co v Harris Corp.,* Del. Super., C.A. No. 92C-01-27, Jacobs, V.C. (Sept. 9, 1993), Mem. Op. at 14 n.6 (discussing line of cases requiring less strict proof of intent to seal mortgages, including *In Re Beyea's Estate* and *Monroe Park*). The rationale behind accepting incantations and symbols as evidence of substantive intent where mortgages are concerned probably involves the fact that parties to mortgages generally have come to expect that such instruments will be treated as being under seal. *Id.* Mortgages are conveyances that typically involve an unequivocal debt secured by specific realty in a recorded instrument. Moreover, mortgages usually are operative for decades. [FN9] Thus, claims arising out of mortgages are readily susceptible to proof even decades after their execution. [FN10]

> FN9. The terms of the agreements here were ten years or less
>
> FN10. Of course, under *Monroe Park v.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00360-SLR    Document 40-7    Filed 10/19/2005    Page 15 of 17

Not Reported in A.2d                                                                                          Page 6
Not Reported in A.2d, 1995 WL 411319 (Del.Super.)
(Cite as: 1995 WL 411319 (Del.Super.))

*Metropolitan Life Insurance Co., 457 A.2d 734*, even where mortgages are concerned, actual recitals in the instruments will not make them specialties unless they also bear at least symbolic evidence of an actual seal.

*6 The agreements here are not mortgages. So in order to avoid § 8106, the Court must find more than the preprinted word "seal" on their face. *American Telephone & Telegraph* involved a license agreement that not only carried the word "seal, it bore the actual corporate seal." Nevertheless, quoting the Third Circuit's articulation of Delaware law in *Aronow Roofing Co. v. Gilbane Building Co., 902 F.2d 1127, 1129 (3d. Cir. 1990)*, *American Telephone & Telegraph* held:

> In Delaware, for an instrument other than a mortgage to be under seal, "it must contain language in the body of the contract, a recital affixing the seal, and extrinsic evidence showing the parties' intent to conclude a sealed contract .... the mere existence of the corporate seal and the use of the word "seal" in a contract do not make the document a specialty ....
>
> Mem. Op. at 13 (citations omitted).

The Court recognizes that, unlike *Aronow* and *American Telephone & Telegraph,* some of the agreements here bear testimonium clauses, as well as symbolic seals. Nevertheless, the weight of the cases in this area favors the conclusion that the absence of even a symbolic seal precludes invoking the exception to § 8106, while the mere presence of a seal and a testimonium clause are not enough to create a sealed instrument. Except where mortgages are concerned, the simple use of formalities and boilerplate unaccompanied by substantive evidence of the parties' intent to seal it is not enough to turn an ordinary contract into a specialty. *American Tel & Tel*, Mem. Op. at 14 n.6; *but see Peninsula Methodist Homes and Hosp., Inc. V. Architect's Studio, Inc.*, Del. Super., C.A. No. 83C-AV-118, Gebelein, J. (Aug. 28, 1985) Let. Op. at 3 (contract bearing testimonium clause and printed "seal" near signatures is under seal even without language in the body or extrinsic evidence of parties' intent).

In concluding that the agreements here are not contracts under seal, the Court recognizes that the facts of this case are still in bud. Accordingly, the Court will allow discovery to develop extrinsic evidence of the parties' intent with respect to sealing the agreements. It is well established that the use of extrinsic evidence in this context is not only permitted, it is encouraged. *Aronow, 902 F.2d at 1129; American Tel & Tel*, Mem Op at 13. However, Plaintiffs must remember that evidence of any intent on Plaintiffs' part to seal the agreements is insufficient unless they communicated their desire to Dunkin'. *American Tel & Tel*, Mem. Op. at 12-13. In short, the Court preliminarily holds that the common law exception to the three year statute of limitations will not apply here.

B. *Does the Doctrine of Continuing Wrongs Apply to Plaintiffs' Claims?*

Plaintiffs suggest that, irrespective of the Court's resolution of the "seal" issue, their claims based on the Kirkwood Highway shop franchise and lease agreements, and the Pike Creek shop franchise, still escape the statute of limitations bar. They allege that in fact no statute of limitations has yet attached to any of their claims, as Dunkin's "monthly charging of unreasonable rent and ...daily operation of two Dunkin Donuts Shops in close proximity to Plaintiffs' shop"--the subjects of most of those claims--constitute "continuing wrongs." In make weight fashion, Plaintiffs cite *Office Structures, Inc v Aetna Casualty and Surety Co*, Del. Super., C.A. No. 82C-MY-6-33-A, (Oct. 17, 1984) Mem. Op., and *Oliver B. Cannon and Son, Inc. v. Fidelity and Casualty Co., 484 F. Supp. 1375, 1390 (D.Del. 1980)*. Dunkin' suggests that none of the wrongs alleged by Plaintiffs can be characterized as continuing. Relying on *Kahn v. Seaboard Corp., Del. Ch., 625 A.2d 269 (1993)*, Dunkin' argues that Plaintiffs claims "could have been brought at the time of the act in question," which disqualifies them from continuing wrong status. [FN11]

> FN11. Dunkin' seemingly concedes that the "continuing wrong" is part of contract law. Typically, "continuing wrong" applies to torts where the injury is on-going, *see e.g. Oakes v. Gilday* While courts, on occasion, have applied the "continuing wrong," or a variant thereof, to contract claims, as yet the "continuing wrong" is not a fixture of contract law and there are analytical reasons why that is so.

*7 Wrongs can be construed as "continuing" where they "involve injuries whose damages cannot be determined until the cessation of the wrong," *Office Structures*, Mem. Op at 24 (citing *Oakes v. Gilday, Del. Super., 351 A.2d 85 (1976)*); where they are inherently unknowable, *Mastellone v. Argo Oil Corp., Del. Supr., 82 A.2d 379, 383 (1951)*; or, where they can be proved "by reference only to actions within the [statutory] limitations period," *Kahn, 625*

Case 1:05-cv-00360-SLR   Document 40-7   Filed 10/19/2005   Page 16 of 17

Not Reported in A.2d                                                                                                                Page 7
Not Reported in A.2d, 1995 WL 411319 (Del.Super.)
(Cite as: 1995 WL 411319 (Del.Super.))

A.2d at 271. The wrongs that Plaintiffs allege do not appear to fit into any of those recognized categories.

*Kahn* lacks the dispositive effect urged by Dunkin'. Plaintiff in *Kahn* alleged that defendants forced one of the parties into an agreement, and then interfered with the structuring of the agreement such that it was "not negotiated on an arm's length basis." Defendants moved to dismiss on the ground that plaintiff's claim was barred by the three-year statute of limitations of 10 Del. C. § 8106. Plaintiff resisted defendants' motion, contending that the wrongs allegedly arising from the agreement were not time-barred, in part because they were continuing wrongs. The Court rejected plaintiff's argument and concluded that plaintiff's action was untimely, determining:

> The wrong attempted to be alleged is the use of control over [defendant company] to require it to enter into a contract that was detrimental to it and beneficial, indirectly, to the [individual] defendants. Any such wrong occurred at the time that enforceable legal rights against [defendant company] were created.
>
> * * *
>
> Thus, unlike a continuing wrong the only liability matter to be litigated involves defendants' 1986 actions in authorizing the creation of these contract rights and liabilities.

In categorizing contract-related wrongs, *Kahn* effectively distinguishes those that occur at the contract-formation stage from those that occur later in the contractual relationship, holding that as to the former, the parties have three years to bring their claims. By extension, it appears that claims involving the other category of wrongs--breach of an ongoing contractual relationship--ordinarily are cognizable for three years from the breach. [FN12]

> FN12. Traditionally, courts have analyzed these issues in terms of whether the contract is entire or severable, e.g. *Thorpe v. Schoenbrun*, Pa. Super., 195 A.2d 870, 872-873 (1963), cited (incorrectly) in *Office Structures, Inc v Aetna Casualty and Surety Co*.

Plaintiffs in the instant case provide no evidence of the chronology underlying their claims. They simply serialize Dunkin's alleged wrongs--calling Dunkin's charging of allegedly excessive rent, and operation of the Pike Creek and O'Hanlon franchises, "monthly" and "daily" abuses, respectively--and demand application of the continuing wrong doctrine. This begs the question, as "continuing wrong" status turns on the substantive nature of the contract and the alleged wrongs.

Dunkin's argument, that all of Plaintiffs' claims matured at the signing of the various contracts at issue and accordingly they are time barred under *Kahn*, is equally faulty, at least at this stage. Dunkin' presumes that the contract is entire and that Plaintiffs' claims flow directly from the contract-formation stage. Accordingly, they should have been asserted earlier; the undeveloped nature of the current record does not support any such presumption.

*8 The Court will allow the parties to provide additional facts directed towards resolving whether Plaintiffs' claims challenge the initial formation of the franchise and lease agreements, or subsequent events (or both). If it turns out that Plaintiffs' claims involve nothing more than complaints regarding the formation of the contracts, they will be considered time-barred, pursuant to *Kahn*. [FN13] However, if Plaintiffs' claims involve more recent breaches, they may be allowed, provided that they were asserted within three years of the applicable breach.

> FN13. To the extent that it turns out that Plaintiffs' claims arise from the renewals or amendments of the franchise agreement and lease agreement, respectively, see n.5, *supra*, they, too, will be subject to this treatment.

## V. DUNKIN'S ALTERNATIVE BASES FOR SUMMARY JUDGMENT, AND COUNTERCLAIM

### A. Waiver

Relying on *Flavors of Greater Delaware Valley, Inc. v. Bresler's 33 Flavors, Inc.*, 475 F. Supp. 217, 229-30 (D. Del. 1979), *Gaffin v. Teledyne, Inc.*, Del. Ch., C.A. No. 5786, Hartnett, V.C. (Dec. 4, 1990), and *McAlpine v. AAMCO Transmissions, Inc.*, 461 F. Supp. 1232 (E.D. Mich. 1978), Dunkin' contends that Plaintiffs waived any claims that they may have had regarding the Sub-Lease provisions and the Pike Creek and O'Hanlon franchises by "happily continu[ing] as franchisees, making sales under Dunkin's trademarks and paying for the privilege"; if Plaintiffs objected to the Sub-lease and competing franchises, they should have rescinded their franchise contracts long ago. In response, Plaintiffs challenge the relevance of *Flavors*, *Gaffin*, and *McAlpine*. More significantly, Plaintiffs invoke *Realty Growth Investors v. Council of Unit Owners*, Del. Supr., 453 A.2d 450, 456 (1982), which defines waiver as "a

Not Reported in A.2d  Page 8
Not Reported in A.2d, 1995 WL 411319 (Del.Super.)
**(Cite as: 1995 WL 411319 (Del.Super.))**

voluntary and intentional relinquishment of a known right." According to Plaintiffs, Dunkin' has not established that they voluntarily, intentionally, and with knowledge of all material facts, gave up their claims against Dunkin'.

Voluntariness is the factual crux of the waiver issue here. [FN14] Given the current undeveloped state of the record, and the leitmotif of this litigation-- Plaintiffs' allegation that they were at the mercy of Dunkin'--the Court is unwilling to rule as a matter of law that Plaintiffs voluntarily waived their claims against Dunkin' by continuing as franchisees. If further discovery reveals that Plaintiffs' characterization of their case as an economic David versus Goliath situation is apt, that in fact Plaintiffs did not assert their claims earlier due to Dunkins' overbearing behavior, Plaintiffs are on their way to knocking out Dunkin's waiver defense. On the other hand, if Dunkin' proves its contention that Plaintiffs' continuing to perform and accept the benefits of their contracts with Dunkin' was "happy" and volitional, Plaintiffs' case may collapse on itself. In summary here, the question of Plaintiffs' waiver appears, at this point, to turn on material facts that are in dispute.

> FN14. In light of Plaintiffs' claims under the Franchise Security Law, it is difficult to see how Plaintiffs' continuing to perform as franchisees was not intentional and knowing, even on this record.

*B. Unjust Enrichment -- Count X*

Dunkin' contends that Plaintiffs "have not alleged and cannot allege that Dunkin' secured a benefit that it would be unreasonable for it to retain," and "have retained the benefits of [their] contracts [with Dunkin']." Accordingly, under *R.M. Williams Co v Frabizzio,* Del. Super., C.A. No 90C-MY-10, Goldstein, J. (Feb. 8, 1993) Mem. Op., they have failed to state a claim for unjust enrichment.

*9 Notwithstanding Dunkin's intimations to the contrary, the facts surrounding the benefits that Dunkin' and Plaintiffs conferred and collected require further development. Those present in the record are hotly contested. It is therefore premature for the Court to consider summary judgment with respect to Count X. It is not premature to observe, however, that this unjust enrichment claim likely is coextensive with Plaintiffs' other claims. Thus, if Plaintiffs cannot prevail on the other claims, it is difficult to see how they will prevail on Count X.

*C. Tortious Interference with Business Relationships and Prospective Business Advantage -- Counts VII & VIII*

Counts VII and VIII purport to state claims for tortious interference with business relationships and prospective business advantage, respectively. However, as Dunkin' points out, they identify no specific contract or potential business opportunity allegedly compromised by Dunkin', a prerequisite for application of the tortious interference theories. If Plaintiffs can cite to actual or potential contracts, other than between themselves, possibly affected by Dunkin's behavior, the Court will allow them to amend their complaint to include the tortious interference claims. [FN15] Meanwhile, Dunkin's motion for summary judgment is granted as to Counts VII and VIII.

> FN15. Plaintiffs contend that "the Complaint clearly alleges particular facts which would entitle Plaintiffs to relief under the theories they have alleged"; under *American Insurance Co. v. Material Transit, Inc.,* Del. Super., 446 A.2d 1101, 1104 (1982) that would be sufficient to make Counts VII and VIII cognizable. However, no such "particular facts" appear.

*D. Dunkin's Counterclaim*

As indicated previously, Dunkin's counterclaim essentially repudiates Plaintiffs' entire complaint. The same limitations that prevent the Court from granting summary judgment on most of Plaintiffs' claims - the underdeveloped factual record and material factual disputes - apply to that counterclaim and preclude summary disposition of it now.

**VI. CONCLUSION**

If the parties choose, they may confer and present an Order consistent with this Opinion. In any event, the Court will contact the parties to arrange a scheduling conference. Meanwhile, the Court urges the parties to narrow their claims so that the Court can focus on the essence of their dispute. So far, the presentation of this case has not leant itself to adjudication.

Not Reported in A.2d, 1995 WL 411319 (Del.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works