# TAB 4

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 133741 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

Page 1

C
Only the Westlaw citation is currently available.
United States District Court, M.D. Florida.
Brenda G. ELKINS and Jerry Bedenbaugh, Individually and On Behalf of A Class of Persons Similarly Situated, Plaintiffs,
v.
EQUITABLE LIFE INSURANCE COMPANY OF IOWA, Equitable of Iowa Companies and Equitable American Life Insurance Company, Defendants.
**No. CivA96-296-Civ-T-17B.**

Jan. 27, 1998.

Barry A. Weprin, Melvyn I. Weiss, Brad N. Friedman, Milberg, Weiss, Bershad, Hynes & Lerach, LLP, New York City, John Ray Newcomer, Jr., W. Christian Hoyer, James, Hoyer, Newcomer, Forizs, & Smiljanich, P.A., Tampa, FL, Ronald R. Parry, Arnzen, Parry & Wentz, P.S.C., Covington, KY, John J. Stoia, Jr., Andrew Hutton, Ted J. Pintar, Milberg, Weiss, Bershad, Hynes, & Lerach, San Diego, CA, Andrew S. Friedman, H. Sullivan Bunch, Bonnett, Fairbourn, Friedma, Hienton, Miner & Fry, P.C., Pheonix, AZ, Stephen L. Hubbard, Cantilo, Maisel & Hubbard, Dallas, TX, David W. Dunn, Davis, Brown, Koehn, Shors, & Roberts, P.C., Des Moines, IA, for Brenda G. Elkins, individually and on behalf of a class of persons similarly situated, plaintiff.
Barry A. Weprin, Melvyn I. Weiss, Brad N. Friedman, John Ray Newcomer, Jr., W. Christian Hoyer, Ronald R. Parry, John J. Stoia, Jr., Andrew Hutton, Ted J. Pintar, Andrew S. Friedman, H. Sullivan Bunch, Stephen L. Hubbard, David W. Dunn, (See above), for Jerry Bedenbaugh, individually and on behalf of a class of persons similarly situated, plaintiff.
Robert V. Williams, R. Marshall Rainey, Ricardo A. Roig, Williams, Reed, Weinstein, Schifino & Mangione, P.A., Tampa, FL, Thomas M. Zurek, Randall G. Horstmann, Nyemaster, Goode, McLaughlin, Voigts, Des Moines, IA, for Equitable Life Insurance Company of Iowa, defendant.
R. Marshall Rainey, Thomas M. Zurek, Randall G. Horstmann, (See above), Gerald J. Newbrough, Nyemaster, Goode, McLaughlin, Voigts, Des Moines, IA, for Equitable of Iowa Companies, defendant.
Sheri Kephart, Irving, CA, movant pro se.
Kyle E. Stewart, Dubuque, IA, movant pro se.
John Hoppey, Jr., Hazleton, PA, movant pro se.
Patrick A. Staloch, Hartland, MN, movant pro se.
Mark R. Kerfeld, Tewksbury, Kerfeld L Zimmer, for Eugene R. Olson, movant.
David H. Fleck, Law Office of David H. Fleck, Whitefish Bay, WI, for David H. Fleck, movant.

FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER NUNC PRO TUNC
KOVACHEVICH, J.

## INTRODUCTION

*1 1. The matter of the final approval of the proposed settlement of this class action lawsuit came on for hearing on December 19, 1997. The hearing ("Fairness Hearing"), as set forth in the Court's Hearing Order dated August 14, 1997 ("Hearing Order"), was convened at 10:25 a.m., with plaintiffs appearing through counsel and defendants appearing through counsel and by a company representative. Although the Fairness Hearing was well publicized, as described below, no Class Members attended the Fairness Hearing. The proposed settlement, embodied in the parties' First Amended Stipulation of Settlement (including Exhibits A through L), dated July 18, 1997 and filed with the Court on August 8, 1997, was thoroughly briefed by the parties, and was supported with affidavits and declarations of fact and of expert witnesses. Oral presentations of plaintiffs' and defendants' counsel were received at the Fairness Hearing. At the conclusion of the Fairness Hearing, with the parties having met their burden for final approval of the settlement and for the proposed award of attorneys' fees and expenses, the Court requested and received from the parties a proposed form of order, called Final Order and Judgment, finally approving the settlement, certifying the Class, and awarding plaintiffs' counsel the requested fees and expenses, which the Court then signed, to be effective December 19, 1997. The Court also informed the parties it would be supporting the Final Order and Judgment with additional findings of fact and conclusions of law, to be entered *nunc pro tunc*, and instructed the parties to present proposed findings of fact and conclusions of law for the Court's consideration.

2. Now, having further considered the evidence and other submissions of the parties, and all objections to the settlement, the Court makes the following findings of fact and conclusions of law, effective as of December 19, 1997, to be added to and made a part of the Court's Final Order and Judgment dated December

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 133741 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

Page 2

19, 1997, *nunc pro tunc.* Further, the Final Order and Judgment dated December 19, 1997 is also modified as follows, as of December 19, 1997, *nunc pro tunc:*

a. The date December 19, 1997 in clause (iv) in the second sentence of paragraph 2 of the Final Order and Judgment is changed to the correct and actual date, August 14, 1997;

b. The sixteen subparagraphs numbered B.1.(b)(i) through B.1.(b)(xvi) in paragraph 8 (Release and Waiver) of the Final Order and Judgment are renumbered B.1.(b)(1) through B.1.(b)(16), to reflect their correct and actual numbers;

c. The words "and enjoined," unintentionally omitted before, are added to the first clause following the semicolon in the first sentence of paragraph 10 of the Final Order and Judgment, immediately following the words "and all persons are barred"; and

d. The first sentence of paragraph 15 of the Final Order and Judgment is changed to read as follows:
Neither this Final Order and Judgment (including the Court's Findings of Fact and Conclusions of Law thereto and therefor) nor the Stipulation of Settlement (including any document referred to in the Stipulation of Settlement and any action taken to implement the Stipulation of Settlement) is, may be construed as, or may be used as an admission by or against defendants of: (i) the validity of any claim, or (ii) any actual or potential fault, wrongdoing or liability, or (iii) any fact or legal issue in another case.

***2** e. Clause (i) beginning on the first line of paragraph 1 of the Final Order and Judgment is changed to read as follows:
(i) the First Amended Stipulation of Settlement, dated as of July 18, 1997 and filed with the Court on August 8, 1997; and

Otherwise, the Court's Final Order and Judgment is unchanged, and remains effective as of December 19, 1997.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I. *BACKGROUND*

#### A. *The Complaint*

3. Representative plaintiffs Brenda G. Elkins and Jerry Bedenbaugh ("plaintiffs" or "named plaintiffs") filed this action on behalf of themselves and a putative nationwide class on February 14, 1996. They amended their complaint on July 26, 1996, and filed their Second Amended Class Action Complaint (hereinafter the "Complaint" or "Compl. ¶ ___") on July 17, 1997.

4. Defendant Equitable Life Insurance Company of Iowa ("Equitable of Iowa") answered plaintiffs' amended Complaint on August 22, 1996, and all three defendants, including Equitable of Iowa, Equitable of Iowa Companies and Equitable American Life Insurance Company (collectively the "defendants") answered the Second Amended Class Action Complaint on August 6, 1997.

5. This action is brought on behalf of a nationwide class of persons or entities (the "Class" or "Class Members") who have or had an ownership interest in certain life insurance policies upon which Equitable of Iowa was or is obligated and that were issued between January 1, 1984 and December 31, 1996 (the "Class Period"), with certain persons and entities excluded by definition. The Class is fully described in the Final Order and Judgment. The Complaint asserts claims based upon, among other things, negligent misrepresentation, negligent supervision, breach of contract, breach of duty of good faith and fair dealing, breach of fiduciary duty, fraudulent inducement and common law fraud. It seeks (i) compensatory and punitive damages, (ii) attachment, impounding, disgorgement or the imposition of a constructive trust, (iii) declaratory and injunctive relief, and (iv) expenses and attorneys' fees.

6. At the heart of the Complaint are plaintiffs' allegations that defendants induced Class Members to purchase whole life and universal life insurance policies issued by Equitable of Iowa based upon uniform, misleading and deceptive sales practices. In particular, the Complaint alleges: (i) that defendants misled Class Members into believing that their life insurance policies would remain in force after the payment of a single out-of-pocket premium or a fixed or limited number of out-of-pocket premiums; (ii) that defendants induced Class Members to use the cash values of existing permanent life insurance policies to purchase new Equitable of Iowa policies; and (iii) that defendants sold life insurance principally as an investment, savings or retirement plan, without adequately disclosing that the product being sold was life insurance. Plaintiffs also allege: (a) that defendants injured Class Members through its policies,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 133741 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

Page 3

practices and actions concerning dividend scales, interest crediting rates and monthly deduction rates, as well as how it administered and serviced the life insurance policies owned by Class Members; (b) that defendants misled Class Members to believe that the dividend scales and interest rates illustrated at the time their policies were sold were reasonable, were not likely to change, or would not change in an amount sufficient to cause the policies to perform differently than was represented at the time of sale; (c) that defendants improperly decreased dividend scales and interest crediting rates on Class Members' policies to compensate for the "Deferred Acquisition Cost" or "DAC tax," when the policies did not permit such decreases; and (d) that defendants' "direct recognition practices" (*i.e.,* its reduction of dividends or interest credits on Class Members' policies with outstanding policy loans) were improper.

FN1. Almost all of the life insurance policies involved in this action and the settlement were issued by Equitable of Iowa. The others were issued by defendant Equitable American Life Insurance Company and were assumed by Equitable of Iowa in 1984.

*3 7. Defendants strongly deny the wrongdoings alleged by plaintiffs. These denials, including defendants' explanation of Equitable of Iowa's conduct and practices, are set out in § 3 of the Notice of Class Action (Ex. A to the Declaration of Jeffrey D. Dahl ("Dahl Decl."). *See also* Declaration of Richard L. Bailey ("Bailey Decl.") (No. 2), ¶¶ 10-14.

B. *The Parties*

1. *The Class Representatives*

8. **Plaintiff Brenda G. Elkins ("Ms.Elkins").** Ms. Elkins is a resident of Arizona. When she purchased her four Equitable of Iowa life insurance policies in 1990, and when she filed this class action lawsuit in 1996, she was a resident and citizen of Florida. Ms. Elkins claims she was induced to buy her policies based on misrepresentations that after five additional annual premiums were paid, no more premiums would be necessary, *i.e.,* her premiums would "vanish." She also claims to be a "twisting" (replacement) victim, in that she was improperly induced to terminate her existing life insurance policies, having cumulative death benefits of $200,000, to purchase new cash value life insurance policies from Equitable of Iowa, having cumulative death benefits of $700,000. In addition, she claims the four Equitable of Iowa policies were sold to her not as life insurance but as a retirement plan for herself and as investment plans for her daughters.

9. **Plaintiff Jerry Bedenbaugh ("Mr.Bedenbaugh").** Mr. Bedenbaugh is a resident and citizen of the State of Florida. He bought his $350,000 Equitable of Iowa life insurance policy in 1992, based on an allegedly misleading and inaccurate vanishing premium presentation. Like Ms. Elkins, Mr. Bedenbaugh also claims he was twisted, in that an existing cash value life insurance policy was cashed out to fund the purchase of his Equitable of Iowa policy. He also claims the Equitable of Iowa policy was sold to him as a retirement vehicle. Mr. Bedenbaugh, like Ms. Elkins, further alleges that the substantial commission and surrender charges attending the purchase of the Equitable of Iowa policy were not disclosed to him.

10. **Class Counsel.** Ms. Elkins, Mr. Bedenbaugh and the Class are represented by the law firms of Milberg Weiss Bershad Hynes & Lerach LLP and James, Hoyer & Newcomer, P.A. (collectively and individually "Co-Lead Counsel"). Plaintiffs and the Class are also represented by the law firms of Bonnett, Fairbourn, Friedman & Balint, P.C.; Arnzen, Parry & Wentz, P.S.C.; Cantilo, Maisel & Hubbard, LLP; and Davis, Brown, Koehn, Shors & Roberts, P.C. All are experienced plaintiffs' counsel with expertise in the insurance, consumer and class action litigation fields. *See* Affidavit of Melvyn I. Weiss and John J. Stoia, Jr. in Support of Final Certification of the Class, Approval of Settlement and Award of Fees and Expenses ("Weiss/Stoia Aff.") ¶ 5.

2. *Defendants*

11. Defendant Equitable Life Insurance Company of Iowa is a stock life insurance company incorporated under the laws of the State of Iowa. Its principal place of business is Des Moines, Iowa. Defendant Equitable American Life Insurance Company was an Iowa corporation before it was merged into Equitable Life Insurance Company of Iowa in 1984. Defendant Equitable of Iowa Companies was an Iowa corporation with its principal place of business in Des Moines, Iowa until October of 1997, when it was merged into Equitable of Iowa Companies, Inc., a Delaware corporation. Bailey Decl. (No. 1) ¶ 6. Defendants are represented by their outside attorneys, Nyemaster, Goode, Voigts, West, Hansell & O'Brien, P.C., in the persons of Thomas M. Zurek and Gerald J. Newbrough.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 133741 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

Page 4

C. *History Of The Litigation*

*4 12. The claims of plaintiffs and the defenses of defendants have been vigorously contested in this case, and in precursor litigation in the Iowa District Court for Polk County in 1995. The parties' factual and legal skirmishes, plus numerous discovery disputes, are well-chronicled in their adversary papers and more recently in their submissions respecting the proposed settlement. Weiss/Stoia Aff. ¶ ¶ 20-25, 32-43; Bailey Decl. (No. 2) ¶ ¶ 10-15. *See also* Plaintiffs' Memorandum in Support of Application for Final Certification of the Class and of Approval of the Proposed Settlement ("Plaintiffs' Mem."). It is not necessary for the Court to itemize these contests and disputes in this Order.

13. It is also not necessary for the Court to recount the lengthy discussions and negotiations between the parties precipitating the proposed settlement, other than to note that these discussions and negotiations, which did not proceed substantively until plaintiffs had virtually completed their broad and thorough discovery, were intense, continuous and hard fought, and involved numerous capable and experienced attorneys on both sides. These negotiations took over a year to complete and ultimately culminated in the Stipulation of Settlement filed with this Court on July 18, 1997. Weiss/Stoia Aff. ¶ ¶ 49-54; Bailey Decl. (No. 2) ¶ 20. The discussions and negotiations respecting plaintiffs' attorneys' fees did not commence until all material terms of the proposed settlement had been agreed to by the parties. Weiss/Stoia Aff. ¶ ¶ 54, 56; Bailey Decl. (No. 2) ¶ 21.

14. By the end of the discovery process, Equitable of Iowa had produced and plaintiffs' counsel had reviewed voluminous materials, *e.g.*, papers, computer media and videotapes, relevant to the issues in this case. These materials included, *inter alia*, policy forms, product materials, training materials, sales illustrations software, other sales material, pricing and interest crediting materials, agent files, complaint files and relevant communications between Equitable of Iowa and its agents. In addition, plaintiffs' counsel deposed five officers of Equitable of Iowa familiar with its products, sales and marketing activities, pricing and interest crediting practices, complaint resolution procedures and other relevant matters. They also conducted extensive and on-going interviews of a senior actuary in the company, and interviewed the actuarial consulting firm retained by Equitable of Iowa on several occasions. Plaintiffs' counsel also conducted extensive informal discovery, including, *inter alia*, obtaining complaint files from various departments of insurance, and the review and analysis of media reports, SEC filings, state regulatory filings, industry bulletins and periodicals. They also utilized an expert for evaluation of Equitable of Iowa's sales illustrations. Bailey Decl. (No. 2) ¶ 19; Weiss/Stoia Aff. ¶ ¶ 32-43.

15. The Stipulation of Settlement, dated July 18, 1997, including Exhibit A thereto, was presented to the Court by the parties on July 18, 1997 at a previously scheduled status conference. The Stipulation of Settlement was presented with a proposed form of hearing order (now Exhibit K to the Stipulation of Settlement), which, *inter alia*, scheduled a fairness hearing on the proposed settlement and described the form and procedures of notice to the Class respecting the proposed settlement. The Court took the Stipulation of Settlement and the proposed hearing order under advisement.

*5 16. On August 8, 1997, the parties filed their First Amended Stipulation of Settlement ("Stipulation of Settlement"), dated as of July 18, 1997, which was identical to their original Stipulation of Settlement, except Exhibits B through L to the Stipulation of Settlement were now also attached.

17. On August 14, 1997, after reviewing the Stipulation of Settlement, the Court signed the Hearing Order that, among other things, (i) preliminarily certified, for settlement purposes, the Class described in the Stipulation of Settlement, (ii) found that the Stipulation of Settlement was sufficient to warrant providing notice to the Class, and scheduled a final hearing to consider approval of the proposed settlement, (iii) directed the forms and methods of notice to the Class, (iv) authorized defendants to retain one or more class action administrators, (v) set forth procedures whereby Class Members could exclude themselves from the Class or object to any aspect of the proposed settlement, (vi) appointed Co-Lead Counsel for the Class and directed Co-Lead Counsel to make available to all Class Members the documents produced to Co-Lead Counsel by defendants as well as the deposition transcripts and accompanying exhibits generated in this action, and (vii) preliminarily enjoined Class Members who had not timely excluded themselves from the Class from participating in any lawsuit relating to the claims in this action or their underlying transactions, and preliminarily enjoined all persons from commencing or prosecuting a lawsuit as a class action in any jurisdiction, based on or relating to the claims or causes of action in this case and/or the "Released Transactions" (as defined in the Stipulation of Settlement). Paragraph 6(a) of the Hearing Order was

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 133741 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

Page 5

corrected *nunc pro tunc* on September 2, 1997.

18. After issuance of the Hearing Order, extensive notice, describing the proposed settlement and Class Members' options in connection with the settlement, was provided to the Class, using the forms and methods proscribed in the Hearing Order. Among other things, this notice consisted of (i) comprehensive individual notice sent by first class mail to the approximately 109,000 Class Members (respecting the approximately 130,000 policies covered by the proposed settlement), and (ii) publication notice that appeared in the national editions of *The Wall Street Journal, USA Today* and *The Chicago Tribune* and also in *The Tampa Tribune, The Arizona Daily Star* and *The Arizona Citizen.* In addition, Equitable of Iowa established and operated a toll-free telephone information center-in consultation with and monitored by Co-Lead Counsel-staffed with trained operators who provided Class Members with additional information about the proposed settlement. As of November 21, 1997, the class action information center had received approximately 6,627 calls on its policyowner hotline. The Court's findings concerning the notice provided to the Class are set forth in Part IV below.

D. *The Fairness Hearing*

***6** 19. On December 19, 1997, this Court held the Fairness Hearing to hear argument and consider evidence concerning the fairness, adequacy and reasonableness of the proposed settlement, which the parties had fully briefed and documented with declarations and affidavits, including extensive exhibits, in support of the settlement.

20. The Court considered all of the written objections of Class Members who objected to the settlement, including objections to plaintiffs' counsel's request for attorneys' fees and expenses. Although all objectors had the opportunity to appear in person or through counsel and present objections at the Fairness Hearing, no objectors availed themselves of that opportunity.

21. The Court considered the testimony submitted by plaintiffs in support of the settlement through (i) the joint affidavit of Melvyn I. Weiss and John J. Stoia, Jr. of Milberg Weiss Bershad Hynes & Lerach LLP; (ii) the affidavit of Terry M. Long of Lewis & Ellis, Inc. ("Long Aff."); (iii) the declaration of Geoffrey P. Miller, Professor of Law, New York University Law School ("Miller Decl."); and (iv) the affidavits of Co-Lead Counsel and other counsel (collectively, "Plaintiffs' Counsel Declarations") in support of plaintiffs' application for attorneys' fees and expenses.

22. The Court also considered the testimony submitted by Equitable of Iowa in support of the settlement through (i) the declarations of Richard L. Bailey; (ii) Exhibit A to the declaration of John Snyder of Milliman & Robertson, Inc. ("M & R Report") and the Declaration of Dale S. Hagstrom of Milliman & Robertson, Inc. ("Hagstrom Decl."); (iii) the declaration of Professor George L. Priest ("Priest Decl."), the John M. Olin Professor of Law and Economics, Yale Law School; (iv) the declaration of Thomas Tew ("Tew Decl."), former outside litigation counsel to the Florida Department of Insurance and presently with the law firm of Tew & Beasley, L.L.P.; and (v) the declaration of Jeffrey D. Dahl ("Dahl Decl."), of Rust Consulting, Inc., the Administrator retained in this action.

23. The Court has also considered the reaction of the state insurance departments to the proposed settlement. *See* Bailey Decl. (No. 2) ¶¶ 24-25.

24. At the conclusion of the Fairness Hearing, this court entered its Final Order and Judgment, which, among other things: (i) approved the settlement as fair, adequate and reasonable, (ii) certified the Class, (iii) approved plaintiffs' request for attorneys' fees and expenses totalling $5 million, and (iv) ordered the parties to submit proposed findings of fact and conclusions of law for the Court's consideration.

II. *THE SETTLEMENT*

A. *Overview*

25. The settlement provides the Class with an innovative package of relief options that are specifically responsive to the allegations of the Complaint. Although the basic structure of the settlement resembles that employed in court-approved settlements of other life insurance sales practices class actions across the country-*see, e.g., Spitz v. Connecticut General Life Ins. Co.,* MDL No. 1136, Nos. CV95-3566-HLH & CV96-8484-HLH, Order (C.D.Cal. Jan. 13, 1997) (Weiss/Stoia Aff. Ex. 4); *In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 962 F.Supp. 450 (D.N.J.1997); *Michels v. Phoenix Home Life Mut. Ins. Co.,* No. 95/5318, 1997 N.Y.Misc. LEXIS 171 (N.Y.Sup.Ct. Jan. 3, 1997) (Weiss/Stoia Aff. Ex. 2); *Willson v. New York Life Ins. Co.,* No. 94/127804, 1995 N.Y.Misc. LEXIS 652 (N.Y.Sup.Ct. Nov. 8, 1995), 228 A.D.2d 368 (1996), *appeal denied,* 677 N.E.2d 289

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 133741 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

Page 6

(1997) (Weiss/Stoia Aff. Ex. 1); *Natal v. Transamerica Life Insurance Co.,* Case No. 694829 (San Diego Superior Ct., July 28, 1997) (Weiss/Stoia Aff. Ex. 3)-that structure has been substantially modified to address the allegations in the Complaint and to meet the particular needs of individual Class Members. *See* Weiss/Stoia Aff. ¶¶ 8, 10-17.

*7 26. Under the settlement, each Class Member will be offered the choice of Individual Claim-Review Relief through a Claim-Review Process or General Policy Relief. The Claim-Review Process provides all Class Members with the opportunity to submit policy-related claims to a two-tiered claim resolution system that is designed to be a fair, efficient and cost-free alternative to court litigation. Class Members who choose not to participate in the Claim-Review Process will be eligible to apply for one or more forms of General Policy Relief, which require no showing of fault or wrongdoing on defendants' part. The forms of relief made available under the settlement are summarized below and are described in detail in the Stipulation of Settlement.

B. *The Claim-Review Process*

27. Any Class Member who believes that he or she was misled by a misrepresentation or omission of material information or otherwise harmed by wrongdoing in connection with a policy covered by the settlement will have the opportunity to submit a claim for relief to the Claim-Review Process. The Claim-Review Process is described in detail at § IV of the Stipulation of Settlement.

28. Under the Claim-Review Process, which is provided to individual Class Members at no cost, the Class Member will submit a claim form describing his or her claim, along with all documents in his or her possession relating to the claim. The agent who sold the policy will be asked to provide a sworn statement about the claim and documents relating to the claim. Equitable of Iowa is obligated to investigate the Class Member's claim, as described in the Stipulation of Settlement, and to provide information obtained through that investigation, including relevant documents, to the Claim-Review Team that initially reviews the claim.

29. Under the Claim-Review Process, claims will initially be reviewed and scored, and relief (if any) will be awarded, by a Claim-Review Team appointed by Equitable of Iowa. The Claim-Review Team will evaluate claims using procedures, including detailed substantive evaluation and relief criteria, agreed to by plaintiffs and Equitable of Iowa and set forth in the Stipulation of Settlement (particularly, Exhibits A and B to the Stipulation of Settlement). For each claim, scores will be assigned to the several claim-resolution factors set forth in the Stipulation of Settlement for that type of claim, based on scoring guidelines set forth in the Stipulation of Settlement. The score ultimately assigned to a claim-resolution factor may not be averaged with the score assigned to any other claim-resolution factor; instead, relief will be awarded based on the highest score merited by any claim-resolution factor. Once scoring is complete, decisions to award relief must be based only on the relief criteria set forth in the Stipulation of Settlement.

30. The relief available through the Claim-Review Process varies depending on the type of claim and the highest score awarded it. The various types of relief are designed to provide substantial compensation that addresses the harm associated with each type of claim. If a Class Member submits a claim that alleges more than one type of misrepresentation, he or she may be able to choose between different relief options, depending on the scores awarded to the claim. Punitive or exemplary damages may not be awarded.

*8 31. Importantly, there is no cap on the aggregate relief for which Equitable of Iowa may be liable by way of awards made pursuant to the Claim-Review Process. Equitable of Iowa will provide relief to all Class Members who submit claims and establish their entitlement to relief under the Claim-Review Process, and each Class Member's award under the process will be determined without regard to the value of awards provided to other Class Members. Weiss/Stoia Aff. ¶ 10; Priest Decl. ¶ 35; Tew Decl. ¶ 10. c.

32. Claim-Review Team decisions will be binding on Equitable of Iowa. However, a Class Member who is dissatisfied with the Claim-Review Team's disposition of his or her claim may appeal, at Equitable of Iowa's expense, to a Claim-Appeal Panel, a panel of independent arbitrators selected by Co-Lead Counsel from a list approved by the parties. The Claim-Appeal Panel that reviews a claim on appeal may first attempt to informally resolve the claim. If this attempt is unsuccessful, the Claim-Appeal Panel will review the claim *de novo,* using the same criteria employed by the Claim-Review Team. A Class Member who appeals a decision of a Claim-Review Team will have the right to appear at an appeal hearing, either in person, by telephone, or through an attorney retained at the Class Member's expense. Equitable of Iowa may appear at such a hearing only through the method chosen by the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 133741 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

Page 7

Class Member. The outcome of an appeal is binding on the Class Member; Equitable of Iowa may seek reconsideration only if the Claim-Appeal Panel awards relief that is not specified under the Stipulation of Settlement.

33. To help ensure that claims are fairly evaluated and that relief is awarded in accordance with the Stipulation of Settlement, a Policyowner Representative selected by Co-Lead Counsel and compensated by Equitable of Iowa will participate as each Class Member's advocate throughout the Claim-Review Process. Among other things, the Policyowner Representative will be able to participate (but not vote) in Claim-Review Team discussions, submit materials from the discovery record and written statements for consideration in connection with individual claims, and, under circumstances specified in the Stipulation of Settlement, appear and present oral argument at appeal hearings.

34. The Claim-Review Process is not restricted to claims expressly alleged in the Complaint. Rather, so long as they comply with the requirements set forth in the Stipulation of Settlement, Class Members may, if they so desire, submit to the Claim-Review Process any claim with respect to a policy included in the Class definition. Stipulation of Settlement, Ex. A (Parts VIII.A.1(i) and VIII.A.2).

35. The settlement also provides for the resolution of certain claims outside the Claim-Review Process. Specifically, the settlement provides that Equitable of Iowa may require Class Members to resolve certain claims other than those submitted to the Claim-Review Process through certain procedures, called "Part VIII.A.ii Claim-Review Procedures," described in Part VIII of Exhibit A to the Stipulation of Settlement. *See* Stipulation of Settlement, Ex. A, Parts VIII.A. (ii) and VIII.A.3. In addition, if a Class Member can demonstrate that, through the exercise of reasonable care, he or she could not have known at the time the settlement became final of a released claim involving the administration or servicing of a policy (included within the Class definition) after its purchase, under the settlement Equitable of Iowa will be required to resolve that claim through the Part VIII.A.ii Claim-Review Procedures, even though the deadline for submission of claims to the Claim-Review Process has passed. *Id.; see also* Stipulation of Settlement, § § IV.B and IX.B.4.

C. *General Policy Relief*

*9 36. As an alternative to Individual Claim-Review Relief through the Claim-Review Process, the settlement makes six types of General Policy Relief available to Class Members. General Policy Relief is described in detail in § V of the Stipulation of Settlement. It is also described in the individual notice sent to Class Members pursuant to the Hearing Order. *See* Dahl Decl.Ex. A.

37. Depending on eligibility, every Class Member who does not choose to submit a claim to the Claim-Review Process may obtain or apply for one or more of the six types of General Policy Relief. Eligibility for specific types of General Policy Relief is based on characteristics of the policy that makes each policyowner a member of the Class, such as policy type, face amount and status (in-force or terminated) Class Members need not show fault, injury or damages to be entitled to General Policy Relief. Eligibility criteria are set forth in § V.B of the Stipulation of Settlement. They are also described in the individual notice to Class Members. *See* Dahl Decl.Ex. A.

38. The six types of General Policy Relief may be generally described as follows:

a. **Dividend Enhancement.** Eligible Class Members will receive Dividend Enhancement on each of their policies equal to a 60 basis-point enhancement to the unloaned interest component of the annual base dividend for the policy, plus another 60 basis-point enhancement to the unloaned interest component of the annual paid-up additions dividend for the policy (if it has paid-up additions), for the policy year ending on the policy's anniversary date following the date 120 days after the settlement is final. For policies that terminate after July 31, 1997, and before they are credited with dividend enhancement, Equitable of Iowa will pay dividend enhancement directly to the Class Members within 30 days after the date their policies would have been credited dividend enhancement had they not terminated.

b. **Interest Enhancement.** Eligible Class Members will receive Interest Enhancement on each of their policies. For policies where excess interest is used to purchase paid-up additions, Equitable of Iowa will pay interest enhancement by crediting each such policy with an amount equal to a 60 basis-point enhancement to the current interest rate applied to the unloaned policy value of the policy, including the unloaned value of any paid-up additions for the policy (if it has paid-up additions) for the policy year ending on the policy's anniversary date first following the date 120 days after the settlement is final. For policies where interest is applied to the policy account value or policy

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 133741 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**
Page 8

accumulation value, Equitable of Iowa will pay, within 120 days of the date the settlement is final, interest enhancement by crediting each such policy with an amount equal to a 60 basis-point enhancement of the policy's unloaned account value as it existed on July 31, 1997.

C. **Optional Premium Loans.** Eligible Class members may obtain Optional Premium Loans at a rate substantially equivalent to Equitable of Iowa's cost of borrowing. Optional premium loans are a special type of loan and are not policy loans pursuant to the policy loan provisions of the Class Members' policies. The maximum number of Optional Premium Loans an eligible Class Member may obtain will depend on the year his or her policy was issued. Optional Premium Loans can only be used to pay all or portions of one or more premiums due under the policies that make the Class Members eligible for Optional Premium Loans.

***10** d. **Enhanced Value Policies.** Eligible Class Members may apply for Enhanced Value Policies. Enhanced Value Policies are whole life and universal life insurance policies, issued by Equitable of Iowa from its current product line, enhanced with a financial contribution from Equitable of Iowa equal to 50% of the first year premium and, if the Class Member keeps the enhanced value policy in force for five years, an additional 25% of the first year premium. Enhanced Value Policies have relaxed underwriting requirements and special contestability and suicide provisions. Failure to make a timely election disqualifies otherwise eligible Class Members from this type of General Policy Relief.

e. **Enhanced Value Deferred Annuities.** Eligible Class Members may obtain Enhanced Value Deferred Annuities, which are non-qualified, single-premium, fixed, deferred annuities issued by Equitable of Iowa from its current product line, and enhanced with contributions from Equitable of Iowa. Each Enhanced Value Deferred Annuity will receive from Equitable of Iowa, at the end of its first policy year, a contribution equal to 2% or 3% of the annuity's premium, depending on the size of the premium, plus another contribution at the end of the fifth policy year equal to 1% or 1.5% of the annuity's premium, depending on the size of the premium. Each Enhanced Value Deferred Annuity will have its applicable surrender charge waived when the Class Member reaches age 59 1/2 or the annuity has been in force for four years, whichever is later. Failure to make a timely election disqualifies otherwise eligible Class Members for this type of General Policy Relief.

f. **Enhanced Value Immediate Annuities.** Eligible Class Members may obtain Enhanced Value Immediate Annuities, which are non-qualified, single-premium, fixed, life-contingent, immediate annuities issued by Equitable of Iowa from its current product line, and enhanced with contributions from Equitable of Iowa. Each Enhanced Value Immediate Annuity will receive, at the time of issue, a contribution equal to 2.5% of the annuity's premium. Failure to make a timely election disqualifies otherwise eligible Class Members for this type of General Policy Relief.

39. The parties designed each of the six types of General Policy Relief to respond to the various circumstances described in the Complaint and to assist Class Members (who do not wish to participate in the Claim-Review Process) in achieving financial security objectives that might have influenced their original purchasing decisions. The purpose of Dividend Enhancement is to enhance the dividend accumulation component of Class Members' in-force policies and thereby increase the policies' ability to bear the cost of future premiums. The purpose of Interest Enhancement is to enhance the cash accumulation component of Class Members' policies and thereby increase the policies' ability to bear the cost of mortality and administrative charges or future premiums. The purpose of Optional Premium Loans is to lessen the burden to Class Members of additional out-of-pocket premiums, which may be due beyond those originally illustrated. Enhanced Value Policies are designed for Class Members who terminated their policies, or who have borrowed heavily against their policies and want a fresh start, to obtain new policies, enhanced by Equitable of Iowa, to help them attain their original insurance objectives. Enhanced Value Deferred Annuities and Enhanced Value Immediate Annuities are intended to address the savings and investment or income and cash flow objectives of Class Members whose need for life insurance death benefits may be outweighed by other considerations. *See* Stipulation of Settlement § V.A; Plaintiffs' Mem. pp. 14-15.

D. *Release*

***11** 40. In exchange for the settlement benefits described above, the Stipulation of Settlement releases defendants from all claims covered by the Release, which is set forth in full in § IX of the Stipulation of Settlement and in Appendix A (pp. 28-31) to the individual notice mailed to Class Members. Dahl Decl.Ex. A.

III. *CLASS CERTIFICATION*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 133741 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

Page 9

A. *Introduction*

41. The legitimacy of a settlement class was recently confirmed by the Supreme Court in *Amchem Prods. v. Windsor*, 521 U.S. 591 117 S.Ct. 2231, 2252 (1997). There, the Court established that not only is the proposed settlement and its terms relevant to the class certification analysis, it alleviates the need to address potential management problems that might arise were the case to be tried. *Id.* at 2252. Most importantly, the Supreme Court reiterated the "dominant concern" that governs the proper analysis under each Rule 23 subsection: "whether a proposed class has sufficient unity so that absent members can fairly be bound by decisions of class representatives." *Id.* at 2248. Here the proposed Class satisfies this dominant concern, as well as all other prerequisites to certification set forth in *Amchem* and Eleventh Circuit precedent.

B. *The Requirements Of Rule 23(a) Are Satisfied*

42. The four prerequisites of Rule 23(a) are that:
(1) the class be so numerous that joinder of all members is impracticable;
(2) there be questions of law or fact common to the class;
(3) the claims or defenses of the representative parties be typical of the claims or defenses of the class; and
(4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a); *Amchem*, 521 U.S. at ----, 117 S.Ct. at 2240.

a. *Numerosity*

43. The class must be so numerous that "joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). To meet this requirement, the class representatives need only show that it is difficult or inconvenient to join all the members of the class. *Phillips v. Joint Legis. Comm.*, 637 F.2d 1014, 1022 (5th Cir. Feb.23, 1981).

FN2. The decisions of the former Fifth Circuit before October 1, 1981 have been adopted as binding precedent in this Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc* ).

44. Here, members of the Class live nationwide and number approximately 109,000. *See* Bailey Decl. (No. 1) ¶ 10. In these circumstances, joinder is impractical and the numerosity requirement is easily satisfied. *Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir.1986) (generally, more than 40 class members satisfies numerosity).

b. *Commonality*

45. There must be "questions of law *or* fact common to the class." Fed.R.Civ.P. 23(a)(2) (emphasis added). Rule 23(a) does not require that *all* questions of law or fact be common to *all* class members. "The claims actually litigated in the suit must simply be those fairly represented by the named plaintiffs." *Cox*, 784 F.2d at 1557. Accordingly, the main inquiry is whether at least one issue exists that affects all or a significant number of proposed class members. *Kreuzfeld A.G. v. Carnehammar*, 138 F.R.D. 594, 599 (S.D.Fla.1991).

*12 46. The commonality requirement is also satisfied where plaintiffs allege common or standardized conduct by the defendant directed toward members of the proposed class. *See Kennedy v. Tallant*, 710 F.2d 711, 718 (11th Cir.1983) ("a single conspiracy and fraudulent scheme against a large number of individuals is particularly appropriate for class action"). One indicia of a common scheme to deceive alleged in the Complaint is the existence of uniform written materials on which the oral representations were based. *See, e.g., Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 724-25 (11th Cir.1987) (observing that where oral communications are based on and consistent with, deceptive written materials, the fact that individual brokers provided information through oral communications does not preclude class certification). In such cases, any factual distinctions that may exist among class members are "far less important than the common issues bearing on the existence of a 'common scheme' of misrepresentations and omissions." *CV Reit, Inc. v. Levy*, 144 F.R.D. 690, 696 (S.D.Fla.1992) (citation omitted).

47. Plaintiffs allege that defendants engaged in a common course of conduct intended to defraud all Class Members through the use of substantially uniform omissions and misrepresentations. The Complaint alleges 22 common issues of fact and law, based on alleged standardized omissions and misrepresentations emanating from Equitable of Iowa. *See* Compl. ¶ 15. These common issues are susceptible to classwide proof that will not vary appreciably from one Class Member to another. The common issues include, *inter alia:*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 133741 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

Page 10

• Whether defendants routinely engaged in fraudulent and deceptive acts and practices and courses of business in the sale of its life insurance policies;
• Whether defendants failed to supervise and train its agents who engaged in the schemes described in the Complaint and also failed to prevent its agents from violating uniformly applicable state insurance laws and regulations;
• Whether defendants engaged in deceptive acts and practices in the sale of "vanishing premium" policies by representing through policy illustrations, marketing materials and uniform sales presentations approved and prepared by it that the single prepayment of premiums made by Class Members at the time of purchase, or that the fixed number of premiums paid during a fixed period of years, would be sufficient to carry the cost of the policies for the life of the insured or to maturity;
• Whether defendants failed to disclose to those Class Members who believed they were purchasing "investment," "retirement" or "savings" plans, instead of life insurance, that a substantial part of their "investment" would be used to pay mortality charges for life insurance, pay agents' commissions and pay administrative charges to Equitable of Iowa and, thus, would not earn any interest or investment income whatsoever;
***13** • Whether defendants concealed from plaintiffs and Class Members that the dividends payable and excess interest crediting rates as illustrated in the uniform sales presentations and policy illustrations approved and prepared by them were not guaranteed at the illustrated levels and would likely decrease in future payment periods;
• Whether the dividend scales, excess interest crediting rates, values, assumptions, mortality experience, expenses, lapse rates, interest rate and investment return projections underlying Equitable of Iowa's policy illustrations lacked any reasonable basis in fact and were so flawed as to have an adverse impact on plaintiffs and Class Members; and
• Whether defendants failed to disclose to plaintiffs and Class Members material information concerning the impact or results of using some or all of an existing policy's cash value to purchase a new policy issued by Equitable of Iowa by means of a surrender or withdrawal/partial surrender of, or loan(s) from, the existing policy.

48. The primary theory of plaintiffs' Complaint is that defendants devised and implemented a scheme to sell, service and administer permanent life insurance policies through a nationwide common course of deceptive conduct that emanated from Equitable of Iowa's home offices in Des Moines, Iowa and was implemented through its nationwide sales force. *See* Compl. ¶ ¶ 24-28. Plaintiffs allege that all Class Members were injured, separately or in combination, by a broad array of centrally-orchestrated deceptive practices that permeated Equitable of Iowa's marketing and sales presentations (Compl.¶ ¶ 4, 24-25), agent training and supervision (Compl.¶ 28), illustration, dividend and interest crediting practices (Compl.¶ ¶ 26, 34) and investment strategies (Compl.¶ 34).

49. As alleged by plaintiffs, all of these practices and policies allegedly were determined and implemented in a uniform fashion by Equitable of Iowa's home office management and would be proven at trial through common evidence. All Class Members thus share a common interest in establishing that defendants knew that deceptive sales practices were being utilized, and that Class Members suffered losses as a consequence of that conduct. In sum, the Complaint's allegations of a centralized scheme raise issues common to every Class Member, amply satisfying the commonality requirement of Rule 23(a)(2).

C. *Typicality*

50. The typicality requirement of Rule 23(a) is satisfied where the claims of the class representatives arise from the same broad course of conduct that gives rise to the claims of the other class members and are based on the same legal theory. *Appleyard v. Wallace,* 754 F.2d 955, 958 (11th Cir.1985) (typicality requirement met where named plaintiffs' claims have same essential characteristics as claims of class even if there are factual distinctions among the claims of the plaintiffs of the class); *Powers v. Stuart-James Co.,* 707 F.Supp. 499, 503 (M.D.Fla.1989) (Kovachevich, J.) ("The reasoning behind this requirement is that where all interests are sufficiently parallel, all interests will enjoy vigorous and full presentation."). Here, Ms. Elkins and Mr. Bedenbaugh are representative of both current and former Equitable of Iowa policyowners allegedly defrauded by the same deceptive sales practices and schemes allegedly utilized by defendants against other Class Members. *See* Miller Decl. ¶ 13 ("The claims of the representative class plaintiffs are typical of those of the Class as a whole."). Any slight factual differences that may exist between the named class representatives and other Class Members will not defeat typicality. *Appleyard,* 754 F.2d at 958.

d. *Adequacy Of Representation*

***14** 51. Rule 23(a)(4) requires that "the representative

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 133741 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

Page 11

parties will fairly and adequately protect the interests of the class." This requirement serves to protect the legal rights of absent class members. As the Supreme Court recently observed in *Amchem,* the adequacy "inquiry [under Rule 23(a)(4) ] serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem,* 521 U.S. at ----, 117 S.Ct. at 2236. The adequacy-of-representation requirement under Rule 23 is a two-prong test. First, the named class representatives must appear to be capable of prosecuting the actions through qualified, experienced and competent counsel. Second, there can be no antagonism or disabling conflict between the interests of the named class representatives and the interests of the members of the class. *See, e.g., Kirkpatrick,* 827 F.2d at 726, (citing *Griffin v. Carlin,* 755 F.2d 1516, 1532 (11th Cir.1985)).

52. This action meets both prongs of the "adequacy" test. First, plaintiffs' counsel are well-qualified to prosecute this litigation effectively and efficiently on behalf of plaintiffs and the Class. *See, e.g., In re Prudential,* 962 F.Supp. at 519-20 (finding the same legal counsel "extremely qualified" and "extremely committed to the class"); *Willson,* 1995 N.Y.Misc. LEXIS 652, at *28 (finding the same legal counsel competent and zealous, in a "vanishing premium" case that produced settlement for policyowners conservatively valued in excess of $300 million) (Weiss/Stoia Aff.Ex. 1); *In re Prudential Sec. Inc. Ltd. Partnerships Litig.,* 163 F.R.D. 200, 208 (S.D.N.Y.1995) (finding the same legal counsel "have successfully conducted numerous class actions, including class actions under the federal securities laws and RICO, in this Court and in federal district courts throughout the United States").

53. Second, there are no conflicts or antagonisms here between the named plaintiffs and the Class Members. All Class Members can claim to be harmed by defendants' alleged misconduct and all Class Members have the mutual incentive to establish the alleged fraudulent scheme. Consequently, plaintiffs' interests are co-extensive with those of other Class Members, and thus plaintiffs have every incentive to vigorously pursue these claims as representatives of the Class. *See In re Corrugated Container Antitrust Litig.,* 643 F.2d 195, 208 (5th Cir. Apr.1981) (" 'so long as all class members are united in asserting a common right, such as achieving the maximum possible recovery for the class, the class interests are not antagonistic for representation purposes' ") (citation omitted).

54. Furthermore, unlike personal injury actions, here the restitution and/or money damages sought are subject to objective quantification and are reasonably calculable without speculation.

FN3. Unlike *Amchem,* this case presents no set of class members comparable to the "exposure only" plaintiffs who "claimed no damages and no present injury." *Amchem,* 521 U.S. at ---- - ----, 117 S.Ct. at 2240-43. Here all Class Members can claim to have suffered a quantifiable, existing injury from defendants' alleged practices, as typified by the named plaintiffs. *See* Miller Decl. ¶ 15 ("All class members [here] suffered pecuniary and financial injury, in contrast to the diverse and complex individual medical conditions for which recovery was sought in *Amchem.* There are no significant fissures in this class, much less the chasm which was presented in *Amchem* between present and future claimants.").

*15 55. Nor is any impermissible intra-Class conflict or antagonism created by the settlement. *See Amchem,* 521 U.S. at ----, 117 S.Ct. at 2236. The settlement affords all eligible Class Members relief unfettered by monetary or numerical "caps." The settlement does not discriminate or allocate relief among different segments of the Class; every Claim Member is eligible for General Policy Relief or Individual Claim-Review Relief tailored to his or her individual circumstances. Under the settlement, Class Members are entitled to compensation based on the strength of their individual claims, and no theoretical subgroup's interest (such as Class Members with replacement claims) have been traded off to the benefit of any other theoretical subgroup (such as Class Members with vanishing premium claims). *Contrast Amchem,* 521 U.S. at ----, 117 S.Ct. at 2236 (finding interest of currently injured Class Members not aligned with that of potentially injured Class Members). Nor is the settlement geared to protecting one part of the class at the expense of the other. Those were the sorts of class conflicts that alarmed the Supreme Court in *Amchem,* but they are absent here.

56. The settlement also incorporates procedural and substantive protections that virtually insure adequate representation. The settlement establishes specific and uniform criteria under which all claims for Individual Claim-Review Relief will be administered. Importantly, these criteria include rebuttable and conclusive presumptions favoring the claimants, and objective factors that operate to increase the claimants' scores in many cases. The settlement also provides

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 133741 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

Page 12

individual representation to claimants through a Policyowner Representative appointed by plaintiffs' counsel and an independent, simplified appeals process. As the end product of plaintiffs' efforts on behalf of the Class, the settlement resoundingly confirms that all Class Members have been adequately represented in this litigation.

C. *The Requirements Of Rule 23(b)(3) Are Satisfied*

57. Rule 23(b)(3) authorizes certification where common questions of law or fact predominate over individual questions and the class action is superior to other available means of adjudication. *Amchem*, 521 U.S. at ---- - ----, 117 S.Ct. at 2232-35.

a. *Common Legal And Factual Questions Predominate In This Action*

58. Where confronted with a class of purchasers allegedly defrauded over a period of time by a similar common thread or scheme to which all alleged non-disclosures or misrepresentations relate, "courts have taken the common sense approach that the class is united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable, which is not defeated by slight differences in class members' positions, and that the issue may profitably be tried in one suit." *Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir.1975); *Kirkpatrick*, 827 F.2d at 725; *In re Prudential*, 962 F.Supp. at 510-11.

***16** 59. In this case, plaintiffs and the Class have allegedly been defrauded by the same common course of conduct. Although Class Members purchased their policies separately, plaintiffs allege that defendants induced them to do so through a uniform marketing scheme that was standardized, coordinated and ultimately deceptive. First, proof of defendants' alleged common course of conduct insures that common questions would predominate over individual issues at trial. *See, e.g., Davis v. Avco Corp.*, 371 F.Supp. 782, 791-92 (N.D.Ohio 1974) (the fact that some of the class members received oral rather than written statements creates no impediment to class certification). Second, proof of defendants' alleged fraudulent concealment, the appropriateness of equitable relief and feasibility of classwide damages methodologies likewise insure predominance. *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 517 (S.D.N.Y.1996); *In re Prudential*, 962 F.Supp. at 512. Likewise, the damages issues in this case are suited for classwide resolution because Equitable of Iowa maintains computerized records of transactions with the Class Members. *In re NASDAQ*, 169 F.R.D. at 522; *see also In re Prudential*, 962 F.Supp. at 516 (use of class damage calculation methodology raised common question).

60. This is therefore not a case, as in *Amchem*, where the class members' claims vary widely in character. There, the class purported to preclude members who were exposed to different asbestos-containing products, for different amounts of time, in different ways, and over different periods, such that some class members suffered no physical injury, some had only asymptomatic pleural changes, others had lung cancer (some of whom were smokers), other disabling asbestosis, and still others mesothelioma-a disease with a latency period of 15 to 40 years. *Amchem*, 521 U.S. at ----, 117 S.Ct. at 2240. Indeed, as to some class members, it was unclear whether they would ever contract an asbestos-related disease and, if so, which one. *Id.*

61. Additionally, this case is distinguishable from *Motel 6*, which required individualized proof of "highly case-specific factual issues." *Jackson, et al. v. Motel 6 Multi-Purpose, Inc., et al.*, 130 F.3d 999, 1997 U.S.App. LEXIS 36132 (11th Cir.1997). There, specific fact inquiries included:

[N]ot only whether a particular plaintiff was denied a room or was rented a substandard room, but also whether there were any rooms vacant when that plaintiff inquired; whether the plaintiff had reservations; whether unclean rooms were rented to the plaintiff for reasons having nothing to do with the plaintiff's race; whether the plaintiff, at the time that he requested a room, exhibited any non-racial characteristics legitimately counseling against renting him a room; and so on.... Indeed, we expect that most, if not all, of the plaintiffs' claims will stand or fall, not on the answer to the question whether Motel 6 has a practice or policy of racial discrimination, but on the resolution of these highly case-specific factual issues.

***17** *Id.*, at *18.

62. Here, by contrast, the Class is limited to purchasers of a particular product (a life insurance policy) from a particular company (Equitable of Iowa or Equitable American) through allegedly uniform and fraudulent sales practices, including uniform misrepresentations and omissions of material information, at the time of sale and thereafter, which was common to all Class Members. Furthermore, the Class Members are readily identifiable, and all can claim to have already suffered injury in the purchase of a product that was other than

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 133741 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

Page 13

as represented. In short, defendants' alleged intentional company-wide development and implementation of fraudulent sales practices involving uniform misrepresentations and omissions of material fact provides the "single central issue" lacking in *Amchem* and avoids the predominance concerns of *Motel 6*, 1997 U.S.App. LEXIS 36132, at *15-*20. *See* In re Prudential, 962 F.Supp. at 511 n. 45. *See also* Miller Decl. ¶ 15 (contrasting personal injury claims in *Amchem* with economic damages here).

63. Defendants' alleged deceptive sales practices consisted, in part, of oral misrepresentations, which arguably may be susceptible to individual variation. However, these individual issues do not outweigh the substantial number of common questions, and therefore the commonality requirement has been met. *See* In re Carbon Dioxide, 149 F.R.D. 229, 234 (M.D.Fla.1993); Walco Invs. v. Thenen, 168 F.R.D. 315 (S.D.Fla.1996). Allegations of a common scheme of deception can establish predominance even where the scheme is implemented through oral misrepresentations by sales agents. *See, e.g.,* In re Prudential, 962 F.Supp. at 512-16; In re American Continental Corp./Lincoln Sav. & Loan Sec. Litig., 140 F.R.D. 425, 430-31 (D.Ariz.1992); Davis, 371 F.Supp. at 792. *See also* Amchem, 521 U.S. at ----, 117 S.Ct. at 2250 ("Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws.").

64. Predominance is not undermined by any theoretical choice of law issues that might also arise if this case were to be litigated. At the certification stage, the Court need only determine which state law is "likely" to apply. *See* Randle v. SpecTran, 129 F.R.D. 386, 393 (D.Mass.1988); Gruber v. Price Waterhouse, 117 F.R.D. 75, 82 (E.D.Pa.1987); In re Pizza Time Theatre Sec. Litig., 112 F.R.D. 15, 19 (N.D.Cal.1986). Here, one option available to the Court, were this case to be tried, would be to apply the law of Iowa-the location of Equitable of Iowa's headquarters and principal place of business, and the source of the challenged marketing policies. *See, e.g.,* Randle, 129 F.R.D. at 393 ("high likelihood" that law of state where defendant's offices located and in which decisions regarding the timing and context of corporate disclosures were made would apply). Iowa is the state from which Equitable of Iowa conducted its nationwide activities and from which its alleged campaign of fraud emanated. The relationship of other states, by contrast, is limited to protecting the interests of policyowners residing in those states-interests that would be served by application of Iowa law.

FN4. *See also* Fry v. UAL Corp., 136 F.R.D. 626, 631 (N.D.Ill.1991) (choice of law no obstacle to certification of class claims where law of state in which defendant maintained its corporate offices and from which alleged misrepresentations issued would be applied); Kirschner, 139 F.R.D. at 84 (law of the state of defendant's principal place of business and from which many of the allegedly false statements were made may apply); Martin v. Heinold Commodities, Inc., 117 Ill.2d 67, 109 Ill.Dec. 772, 510 N.E.2d 840, 847 (Ill.1987) (law of defendant's principal place of business applied); In re ORFA Sec. Litig., 654 F.Supp. 1449 (D.N.J.1987).

FN5. Under Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 821-22, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985), Iowa law constitutionally may be applied to class members nationwide so long as Iowa has a sufficient aggregation of contacts to the class members' claims to ensure that application of Iowa law would not be arbitrary or unfair. Those conditions are satisfied when, as here, the named defendants maintain their business offices in Iowa, many of the alleged fraudulent statements emanated from that state, many Class Members are Iowa residents, and Iowa has a strong policy in preventing fraud from within its borders.

***18** 65. Also, any state-by-state variations on the legal standards are neither particularly great nor insurmountable. In re School Asbestos Litigation, 789 F.2d 996 (3d Cir.1986); Pizza Time, 112 F.R.D. at 20 ("It is evident that the similarities in [the various states' common law concerning fraud] vastly outweigh any differences."). Plaintiffs' counsel have already successfully done so in other cases involving the same legal theories asserted here. *See, e.g.,* In re Prudential, 962 F.Supp. at 524-26. *See also* Miller Decl. ¶ 27 (applicable state law can be grouped into two or three categories and is not so great as to undermine predominance of common questions of law or fact).

FN6. This is not a case, such as Castano v. American Tobacco Co., 84 F.3d 734, 747-48 (5th Cir.1996), where a novel or "immature" tort is alleged. A definite "track record" exists for these types of cases against insurers. Such cases have been litigated through trial. *See, e.g.,* Cartwright v. The Equitable Life Assurance Society, 276 Mont. 1, 914 P.2d 976

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(Mont.1996) (vanishing premium case tried to jury and affirmed on appeal).

FN7. Any significant variations in state law encountered in a theoretical trial could be handled by the use of available management techniques. *See generally* L. Kramer, *Class Actions and Jurisdictional Boundaries: Choice of Law in Complex Litigation,* 71 N.Y.U.L.Rev. 547, 584-585 (1996) (application of multiple states laws feasible through "sensible use of the tools available to manage litigation," including the grouping of substantive laws as in *School Asbestos,* "careful [jury] instructions and the availability of special verdicts ...").

b. *A Class Action Is The Superior Means To Adjudicate Plaintiffs' Claims*

66. Rule 23(b)(3) considers whether "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Rule 23(b)(3) lists four nonexclusive factors bearing on the superiority determination. *Amchem,* 521 U.S. at ----, 117 S.Ct. at 2246. Applied here, these factors show that a class action is the only feasible method for the fair and efficient adjudication of the claims of most Class Members.

FN8. The majority rule is that a district court should consider the settlement when evaluating the superiority of a class action under Rule 23(b)(3). *In re Asbestos Litig.,* 90 F.3d 963, 975 (5th Cir.1996); *see also In re Dennis Greenman Sec. Litig.,* 829 F.2d 1539, 1543 (11th Cir.1987).

(1) *Interest In The Case*

67. The first superiority factor identified in Rule 23(b)(3) is "the interest of members of the class in individually controlling the prosecution or defense of separate actions." This factor addresses whether the interest of most class members in conducting separate lawsuits is so strong as to require denial of class certification. *See, e.g., Bonilla v. Trebol Motors Corp.,* No. 92-1795(JP), 1993 U.S.Dist. LEXIS 5775, at *4 (D.P.R.1993) (class action superior where individual class members have no interest in controlling litigation) (Weiss/Stoia Aff.Ex. 9); *In re Prudential,* 962 F.Supp. at 523-24 (same); *McClendon v. Continental Group, Inc.,* 113 F.R.D. 39, 45 (D.N.J.1986) (same). Considerations relevant to this inquiry include the degree of "cohesion" among class members, whether "the amounts at stake for individuals ... [are] so small that separate suits would be impracticable" and the extent to which "separate suits would impose ... [burdens] on the party opposing the class, or upon the court calendars...." *Amendments to Rules of Civil Procedure,* 39 F.R.D. 69, 104 (1966) (Rule 23, Advisory Committee's Notes).

68. Most Class Members in this case have little incentive or ability to prosecute their claims against defendants in separate individual actions. The Class is estimated to encompass approximately 109,000 former and current Equitable of Iowa policyowners located throughout the United States. Unlike the personal injury claims in *Amchem,* many of the policyowners' claims present "negative value" actions, as it would not be economically feasible for them to retain attorneys to pursue individual litigation against defendants.

FN9. *See, e.g., In re General Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 784 (3d Cir.), cert. denied, 516 U.S. 824, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995) ("Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class-action device." (quoting *Deposit Guar. Nat'l Bank v. Roper,* 445 U.S. 326, 339, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980)).

*19 69. The likelihood that Class Members could obtain meaningful redress through individual actions is further diminished by the legal defenses available to defendants, defenses that would prevent or deter individual actions by Class Members. For example, most of the policies at issue were sold by Equitable of Iowa during the 1980s. As a consequence, should the benefits of tolling be lost upon a refusal to certify, many thousands of Class Members could find their claims time-barred by applicable statute of limitations, even if they eventually could find lawyers willing to represent them in separate lawsuits. *See General Motors Corp. v. Bloyed,* 916 S.W.2d 949, 957 (Tex.1996) ("[T]here was a strong likelihood that a large proportion of the class members' claims ... would have been barred by the statute of limitations.").

70. The relative absence of policyowner suits presently pending against Equitable of Iowa compared to complaints lodged by policyowners with the Company confirms that individual Class Members lack any

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 133741 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

Page 15

compelling interest to control the prosecution of separate actions. *See, e.g.,* Basile v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 105 F.R.D. 506, 510 (S.D.Ohio 1985) (finding that existence of small number of suits pending in other courts as a result of same underlying action represented that individual investors were not interested in pursuing suit alone).

(2) *Other Pending Proceedings*

71. In determining the superiority issue, the Court should also consider "the extent and nature of any litigation concerning the controversy already commenced by or against members of the class." The existence of other litigation may either indicate the availability of other methods to adjudicate the controversy or the superiority of class certification. 1 Herbert B. Newberg & Alba Conte *Newberg on Class Actions* § 4.30 at 4-121 (3d Ed.1992). In addition to the companion action in Arizona, two other class action lawsuits were filed against defendants seeking to recover damages for putative classes similar to the Class in this case. *See* Weiss/Stoia Aff. ¶ 48. These two class actions, filed substantially *after* this case, have been resolved as part of this settlement. As a result, the existence of these suits does not undermine the propriety of class certification in this litigation.

72. The several individual actions pending against defendants will not, separately or collectively, "adjudicate ... the controversy" that underlies this class action litigation. Traditional alternatives to the class action device-joinder, intervention and consolidation-are not feasible and in any event would not permit resolution of the entire controversy.

c. *Manageability In This Forum*

73. Another factor set forth on Rule 23(b)(3) is "the desirability or undesirability of concentrating the litigation of the claims in the particular forum." However, this factor is not significant and is conceptually irrelevant in the context of settlement. *See* Amchem, 521 U.S. at ----, 117 S.Ct. at 2248 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems ... for the proposal is that there be no trial.").

***20** 74. With the settlement in hand, the desirability of concentrating the litigation in one forum is obvious; and for this purpose this forum is as good or better than any other, given the parties' and many of the Class Members' close ties to the forum. Without a settlement, the issue might be closer, but not controlling, in the Court's view, with other weightier factors all favoring certification.

75. Even if considered, however, the inquiry is whether reasonably foreseeable difficulties render some other method of adjudication superior to class certification. In re Prudential, 962 F.Supp. at 524-26; In re Antibiotic Antitrust Actions, 333 F.Supp. 278, 282 (S.D.N.Y.1971) ("defendants, after reciting potential manageability problems, seem to conclude that no remedy is better than an imperfect one"); *see also* In re NASDAQ 169 F.R.D. at 527 ("Manageability problems are significant only if they create a situation that is less fair and efficient than other available techniques.") (citation omitted). Because the Class includes only current or former Equitable of Iowa policyowners, identifying the Class Members and providing them with notice has not proved difficult.

*IV. NOTICE AND JURISDICTION*

A. *The Settlement Notice*

76. Upon consideration of the extensive record concerning the manner in which notice was provided to the Class, the Court reiterates its earlier findings (Hearing Order ¶ 7) and concludes that the form and methodology of notice in this case satisfied the requirements of applicable law, the rules of this Court, and due process under the federal constitution.

1. *Content of Notice*

77. The notice package mailed to each Class Member included at least one 31-page Class Notice (entitled "Notice of Class Action, Proposed Settlement, Fairness Hearing and Right to Appear"), at least one two-page cover letter and six-page question-and-answer brochure, and at least one customized Policy Information Statement, all as specified and required in paragraph 6(a) of the Hearing Order and § § VI.A through VI.D of the Stipulation of Settlement. *See* Dahl Decl. ¶ 11 and Ex. A.

78. The 31-page Class Notice included (i) the case caption; (ii) a description of the litigation; (iii) a description of the Class; (iv) identification of Co-Lead Counsel for the Class; (v) a description of the proposed settlement, including the relief available to the Class Members and the Release to be given to defendants;

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 133741 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

Page 16

(vi) the date and time of the Fairness Hearing; (vii) information about how Class Members could appear at the Fairness Hearing, individually or through counsel; (viii) the procedure and deadline for filing objections to any aspect of the proposed settlement; (ix) the manner in which Class Members could obtain access to discovery materials produced in this action and companion litigation; (x) information about obtaining a complete copy of the Stipulation of Settlement; (xi) the procedure and deadline for filing requests for exclusion from the Class; (xii) the consequences of being excluded from the Class; (xiii) the consequences of remaining in the Class; (xiv) a description of Equitable of Iowa's responsibility for plaintiffs' attorneys' fees and expenses, and of its agreement to pay attorneys' fees and expenses awarded by the Court up to a maximum of $5 million; (xv) a description of the preliminary injunction issued by the Court in the Hearing Order; and (xvi) the procedure for obtaining additional information, including the toll-free number established to respond to Class Member inquiries. *See* Dahl Decl.Ex. A.

*21 79. The individual notice materials provided to Class Members are clear and comprehensive documents that presented, in plain language and a reader-friendly format, detailed and accurate information about this action, the proposed settlement and the options available to Class Members. *See* Priest Decl. ¶ 25.

80. Individual notice of the settlement was supplemented by publication notice. This plain-language publication notice (called the "Summary Notice" in the Stipulation of Settlement and the Hearing Order) included (i) the case caption; (ii) a description of the Class; (iii) a brief description of the proposed settlement, including Individual Claim-Review Relief through the Claim-Review Process and General Policy Relief; (iv) identification of Co-Lead Counsel for the Class; (v) the date, time and location of the Fairness Hearing; (vi) information about appearing at the Fairness Hearing; (vii) information about and the deadline for filing objections to the settlement; (viii) information about and the deadline for filing requests for exclusion from the Class; (ix) the consequences of exclusion from the Class; (x) the consequences of remaining in the Class; (xi) a description of Equitable of Iowa's responsibility for plaintiffs' attorneys' fees and expenses, and of its agreement to pay attorneys' fees and expenses awarded by the Court up to a maximum of $5 million; (xii) a description of the preliminary injunction issued by the Court in the Hearing Order; (xiii) the procedure for obtaining additional information, including the toll-free number established to respond to Class Member inquiries; and (xiv) the manner in which Class Members could secure the notice package (individual notice materials) described above. *See* Dahl Decl.Ex. B.

81. Based on its review of the individual and publication notice materials and the expert testimony concerning those materials, the Court concludes that the notices provided to the Class were more than adequate, equalling or exceeding the requirements of Federal Rule of Civil Procedure 23 and due process. The individual and publication notices fairly apprised Class Members of the existence of this action, the terms of the proposed settlement and the three options available to Class Members, *i.e.*, remaining in the Class and not objecting to the proposed settlement, remaining in the Class and objecting to the settlement and electing out of the Class. The notices also set forth, in clear, precise and neutral language, all information material to making an informed and intelligent decision respecting the Class Members' three options, how to elect each of the options, and the effect of each option on electing Class Members. Fed.R.Civ.P. 23(c)(2); *In Re Prudential*, 962 F.Supp. at 526-29; *Mendoza v. United States*, 623 F.2d 1338, 1351-52 (9th Cir.1980); see also Priest Decl. ¶ 25.

2. *Form Of Notice*

82. The Hearing Order (as corrected *nunc pro tunc* ) required that individual notice be sent, by first-class mail, postage prepaid at Equitable of Iowa's expense, no later than 60 days before the Fairness Hearing, to the last known address of each reasonably identifiable Class Member. Hearing Order ¶ 6(a). In accordance with the Hearing Order, approximately 133,000 notice packages (containing the individual notice materials described above) were mailed to the approximately 109,000 Class Members (respecting the approximately 130,000 separate policies involved in this action) by Rust Consulting, Inc., the Class Action Administrator, prior to October 20, 1997. In fact, almost all of these notice packages were mailed by September 10, 1997. Approximately 2,300 notice packages were mailed on or before October 3, 1997, and the final 116 notice packages were mailed on October 15, 1997. Dahl Decl. ¶¶ 10-16. In addition, Rust Consulting mailed additional notice packages to Class Members who requested them by mail or through telephone calls to the policyowner hotline. Dahl Decl. ¶ 22.

*22 83. Also in accordance with the Hearing Order (¶¶ 6(c) and 6(d)), Rust Consulting caused notice packages that were returned by the United States Postal Service to be remailed to Class Members.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 133741 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

Page 17

a. Approximately 491 notice packages were returned to Rust Consulting, Inc. by the United States Postal Service with forwarding addresses. These notice packages were promptly remailed in accordance with the Hearing Order. Dahl Decl. ¶ 19.

b. Approximately 16,804 notice packages were returned by the Postal Service without forwarding addresses. In accordance with the Hearing Order, Rust Consulting, Inc. caused the addresses for these notice packages to be researched, and new addresses were found for 9,464 of them; and they were remailed to the new addresses at least 40 days prior to the Fairness Hearing, as required in the Hearing Order. The balance of the returned notice packages (many of them duplicates) did not have reasonably obtainable forwarding addresses. Dahl Decl. ¶¶ 20, 21.

84. The Hearing Order further provided that the publication notice be published in certain newspapers at Equitable of Iowa's expense no later than 50 days before the Fairness Hearing. Hearing Order ¶ 6(b). In accordance with the Hearing Order, Equitable of Iowa published the publication notice on September 16, 1997 in the national editions of *The Wall Street Journal, USA Today,* and the *Chicago Tribune;* and also *The Tampa Tribune, The Arizona Daily Star* and *The Arizona Citizen.* These newspapers had a combined average daily circulation of approximately 4.9 million. Dahl Decl. ¶ 24.

85. As contemplated by the Stipulation of Settlement, Rust Consulting, Inc. also established and maintained a toll-free information hotline for Class Members to call for further information about the proposed settlement. The hotline was available Monday through Friday, from 8:00 a.m. to 10:00 p.m. Central Time, beginning on September 8, 1997. The telephone number for the hotline was included in the individual notice materials and publication notice. As of the close of business on November 21, 1997, Rust Consulting, Inc. had received 6,627 calls on the hotline. Hotline calls were monitored both on-site and off-site by plaintiffs' counsel, and Class Members using the hotline were given the opportunity to speak to Class Counsel. Dahl Decl. ¶¶ 26-37; Weiss/Stoia Aff. ¶ 30.

86. Notice of a proposed class action settlement is adequate when it is the best notice practicable, reasonably calculated, under the circumstances, to reach absent class members. Fed.R.Civ.P. 23(c)(2); *see also* *Phillips Petroleum,* 472 U.S. at 812; *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 173-77, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314-15, 318, 70 S.Ct. 652, 94 L.Ed. 865 (1950); and *Mendoza,* 623 F.2d at 1351. Here the court finds that the combination of the individual and publication notices described above clearly satisfied this standard.

***23** 87. A small percentage of the Class could not be located through reasonable effort, and for various reasons some individual notices that were mailed may not have been received. Supplementing individual notice with publication notice represents an appropriate balance between protecting Class Members and making class actions workable. *See* *Gross v. Barnett Banks, Inc.,* 934 F.Supp. 1340, 1345 (M.D.Fla.1995).

88. As a result of the parties' efforts, extensive and comprehensive notice of the proposed settlement was provided to the Class. This notice not only complied in full with the terms of the Hearing Order, but was the most effective and best practicable notice, reasonably calculated, under all the circumstances, to apprise Class Members of the pendency of this action, the issues before the parties, the terms of the proposed settlement, the effects of staying in the Class and the options available to Class Members, including their right to exclude themselves from the Class, object to any aspect of the proposed settlement, participate in the action *pro se* or through counsel, and appear at the Fairness Hearing. Accordingly, the notice provided to the Class constituted due, adequate and sufficient notice to all persons entitled to be provided with notice, and it exceeded the requirements of applicable law, the rules of this Court, and due process under the federal constitution.

89. In the course of implementing the settlement, the parties will provide an extensive second round of notice to Class Members, informing them of their options under the settlement and enabling them to take advantage of those options. Stipulation of Settlement, §§ VI.G-VI.I and Exs. C, G, H & I. The Court finds that the materials to be provided to the Class in the implementation of the settlement (the Post-Settlement Notice, the Post-Settlement Summary Notice, the Election Forms and the Claim Forms), together with the post-settlement notice methodology set forth in the Stipulation of Settlement, are reasonably calculated, under all the circumstances, to apprise Class Members of their rights pursuant to the settlement; constitute due, adequate and reasonable notice to all Class Members; and otherwise satisfy the requirements of applicable law, the rules of this Court, and due process under the federal constitution.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

3. *Exclusion Requests*

90. As of November 19, 1997, the deadline for exclusions, only 191 Class Members, respecting only 260 separate life insurance policies, had timely excluded themselves from the Class. See Dahl Decl. ¶ ¶ 38-40 and Exs. A-D thereto. The Court finds that the individuals and entities listed on Exhibit C to the Declaration of Jeffrey D. Dahl are excluded from the Class, and from this date forward are no longer bound by prior orders of the Court in this action and, unless otherwise ordered, will not be bound by the Final Order and Judgment (or any further orders in this action). Any other requests for exclusion are denied as untimely or improperly made.

FN10. The procedures for a current or former policyowner excluding himself or herself from the Class were set out in the Hearing Order and the individual and publication notices discussed above. Hearing Order ¶ 10; Dahl Decl.Exs. A-B thereto.

*24 91. The Court has reviewed the exclusion requests and cannot infer from them a general dissatisfaction with the proposed settlement. They cover less than one-fifth of one percent of the life insurance policies covered by the settlement. Also, 21 of the 260 policies covered by the exclusion requests were owned by insurance companies (competitors of Equitable of Iowa), and 84 of the policies were owned by persons represented by several Alabama lawyer groups.

4. *Objections*

92. Not including any of the exclusion requests described above, a total of only six written communications were served upon counsel and/or filed with the Court in compliance with, or in an apparent attempt to comply with, the procedures for objecting to the proposed settlement. Of these six communications, only four are proper objections, since two of the objections were not properly made. *See* Plaintiffs' Mem. pp. 58-63. The communication from Class Member David H. Fleck was by far the lengthiest and most detailed objection filed. *See id.* As discussed in detail in Part V.F. below, the objections, including the objection of Mr. Fleck, do not warrant disapproval of the settlement.

FN11. These objection procedures were established in the Hearing Order and communicated to the Class, in clear and precise language, in the individual and publication notices discussed above. Hearing Order ¶ 11; Dahl Decl.Exs. A-B thereto.

B. *Jurisdiction*

1. *This Court Has Original Jurisdiction To Implement The Settlement*

93. This Court has diversity jurisdiction under 28 U.S.C. § 1332. First, complete diversity exists between the named plaintiffs and defendants. *See* Compl. ¶ ¶ 8, 10, 11. Second, plaintiffs have alleged in good faith damages in excess of the $50,000 amount in controversy requirement in effect at the time the original pleadings were filed. *See* Compl. ¶ 8 and pp. 45-57; *see generally St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288-89, 58 S.Ct. 586, 82 L.Ed. 845 (1938) (the sum claimed by the plaintiff controls if the claim is apparently made in good faith).

FN12. Because the original federal Complaint was filed in this Court on February 14, 1996, when jurisdiction is measured, the new amount in controversy threshold of $75,000 effective as of January 17, 1997 is inapplicable. *See* 28 U.S.C.A. § 1332 (1997 Supp.), Historical and Statutory Notes.

FN13. The question whether the jurisdictional amount is satisfied is answered by referring to the complaint, not to the ultimate outcome of the case. *Suber v. Chrysler Corp.*, 104 F.3d 578, 583 (3d Cir.1997) ("Once a good faith pleading of the amount in controversy vests the district court with diversity jurisdiction, the court retains jurisdiction even if the plaintiff cannot ultimately prove all of the counts of the complaint or does not actually recover damages in excess of $50,000.") (citing *St. Paul*, 303 U.S. at 288); *In re Prudential*, 962 F.Supp. at 502-03.

94. With complete diversity and the requisite amount in controversy established among the named parties, subject matter jurisdiction extends to the balance of the Class Members' claims under 28 U.S.C. § 1367. *See In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 607 (7th Cir.1997); *Stromberg Metal Works, Inc. v. Press Mechanical, Inc.*, 77 F.3d 928, 931 (7th Cir.1996); *In re Abbott Labs.*, 51 F.3d 524, 528-29 (5th Cir.1995); *In re Prudential*, 962 F.Supp. at 503-05

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 133741 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

Page 19

(and authorities cited therein). With the enactment of § 1367, in the diversity jurisdiction context, there is no need for each Class Member to meet the required jurisdictional amount individually so long as there is complete diversity among the named parties, and the named plaintiffs have alleged claims that exceed the requisite amount in controversy. *Id.* That is the case here.

FN14. The amount in controversy requirement is also met in this case by aggregating the Class Members' punitive damages claims in the Complaint. *See* *Tapscott v. MS Dealer Serv. Corp.*, 77 F.3d 1353, 1357 (11th Cir.1996).

2. *The Court Has Personal Jurisdiction Over The Class Members*

***25** 95. The court acquires personal jurisdiction over present and absent class members so long as class members have been afforded, through adequate notice, the right to exclude themselves from the class. *See* *Phillips Petroleum*, 472 U.S. at 811-12. As described above, notice to the Class has been more than adequate. Accordingly, this Court has acquired personal jurisdiction over present and absent Class Members who have not opted out of the Class. *See* *In re Prudential*, 962 F.Supp. at 507.

V. THE SETTLEMENT IS FAIR, ADEQUATE AND REASONABLE AND SATISFIES CRITERIA APPLIED BY THE ELEVENTH CIRCUIT AND THIS COURT

96. The Eleventh Circuit and this Court consider seven factors in determining whether to approve settlements of class actions:

a. The likelihood of success at trial and potential recovery;

b. The complexity, expense and duration of litigation;

c. The terms of the settlement;

d. The procedures afforded to notify the class members of the proposed settlement, and to allow them to present their views;

e. The judgment of experienced counsel for the plaintiff class;

f. The substance and amount of opposition to the settlement; and

g. The stage of the proceedings at which the settlement was achieved.

*Warren v. City of Tampa*, 693 F.Supp. 1051, 1055 (M.D.Fla.1988); *In re Corrugated Container*, 643 F.2d at 212. Application of these criteria to the instant settlement compels the conclusion that the proposed Settlement is fair, adequate and reasonable.

A. *The Likelihood Of Success At Trial And Potential Recovery*

97. It is not necessary to try the merits of the case in connection with reviewing the settlement. *In re Corrugated Container*, 643 F.2d at 212; *Meyer v. Citizens & Southern Nat'l Bank*, 677 F.Supp. 1196, 1201 (M.D.Ga.1988). Thus, the Court can limit its inquiry to determining "whether the possible rewards of continued litigation with its risks and costs are outweighed by the benefits of the settlement." *Ressler v. Jacobson*, 822 F.Supp. 1551, 1553 (M.D.Fla.1992); *see also* *Mashburn v. National Healthcare, Inc.*, 684 F.Supp. 660, 670 (M.D.Ala.1988) (in the class action settlement context, courts do not decide the merits of the case or resolve unsettled legal questions). This inquiry is premised upon "balancing the probabilities, not assuring that the plaintiff class receives every benefit that might have been won after a full trial." *In re Chicken Antitrust Litig.*, 560 F.Supp. 957, 960 (N.D.Ga.1980) The expense of achieving a more favorable result for the class at trial must be considered. *Ressler*, 822 F.Supp. at 1555; *Young v. Katz*, 447 F.2d 431, 433 (5th Cir.1971). Factually, this was a complicated case. Plaintiffs and their counsel believe that their case was exceedingly strong; however, defendants nevertheless had a number of potentially strong defenses.

***26** 98. Plaintiffs are not required to justify the terms of their settlement based on speculation of what they might have obtained. " '[I]nherent in compromise is a yielding of absolutes and an abandoning of highest hopes.' " *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir.1977) (citation omitted); *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir.1984). The risks of maintaining this litigation as a class action through trial and appeal weigh in favor of approving this settlement with its certain outcome, especially where, as here, the Class Members' individual claims are relatively small, and where Class Members have the right to opt-out and pursue their own remedy, if they so desire.

99. As for risks attendant to litigation, the following are examples of issues that could potentially present obstacles to plaintiffs' success at trial, if this case were not settled:

a. Proving that the practices complained of were

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

systemic in nature;

b. Establishing the elements of the various causes of action and, in particular, overcoming defendants' contentions, among others, that: (i) the contract rights that plaintiffs assert are contradicted by the plain and unambiguous language of the policies that constitute their contracts with Equitable of Iowa, and thus are barred by the parol evidence rule and the contract merger doctrine; (ii) the fraud, negligent misrepresentation and other fraud-related claims asserted by plaintiffs are not tenable because (a) plaintiffs would not be able to establish actual, reasonable or justifiable reliance on the alleged misrepresentations, and (b) plaintiffs have alleged promises of future conduct or opinions rather than misrepresentations of existing fact; (iii) plaintiffs' cause of action for breach of fiduciary duty is defective because plaintiffs cannot show that Equitable of Iowa is a fiduciary to its insureds; and (iv) plaintiffs' cause of action for breach of the implied covenant of good faith and fair dealing is defective because the precontractual conduct alleged by the plaintiffs cannot provide the basis for such a claim;

c. Establishing that Class Members' claims are timely under applicable statutes of limitation;

d. Proving that Class Members were unaware that dividend scales, interest crediting rates or monthly deduction rates could fluctuate, and that such fluctuations would affect planned premium amounts, and the number of out-of-pocket premiums needed to maintain policy values;

e. Proving that Class Members were unaware of the economic effects of using existing policy values to fund the purchase of new insurance policies;

f. Proving that Class Members were unaware that they had purchased life insurance or that, because of the costs associated with providing the guaranteed benefits of life insurance, their cash values would not accumulate at the rates they might accumulate in other investment vehicles;

g. Proving that Equitable of Iowa's decision to reduce dividends or interest credits on certain policies due to the so-called "DAC Tax" was improper in light of the written provisions of those policies; and

*27 h. Proving that Equitable of Iowa's "direct recognition practices" were improper or contrary to express policy language.

B. *The Complexity, Expense And Duration Of Litigation*

100. The federal courts have long recognized that "[c]ompromises of disputed claims are favored by the courts." *Williams v. First Nat'l Bank,* 216 U.S. 582, 595, 30 S.Ct. 441, 54 L.Ed. 625 (1910). "Particularly in class action suits, there is an overriding public interest in favor of settlement." *Cotton,* 559 F.2d at 1331.

101. This litigation involves the marketing and sale of a variety of Equitable of Iowa life insurance products over a 13-year period of time involving approximately 130,000 insurance policies. Among other things, plaintiffs challenge the methods used to market Equitable of Iowa's products to consumers, the adequacy of its disclosures, and the training and supervision of its agents. The work necessary to prepare this case for trial would be complicated, enormous in scope, logistically difficult, time-consuming and expensive. Continued litigation, just to the point of trial, would be lengthy, complex and expensive.

102. In addition, the life insurance policies at issue in this case are complex and would require extensive actuarial and financial expert testimony to evaluate the assumptions underlying these policies and the illustrations through which they were marketed to consumers, and also arcane actuarial standards, statutory and insurance accounting practices, and sophisticated financial theory.

103. Trial of this case, which would likely last for many months, would require additional time and expense for consultation with additional experts (whom the jury might or might not believe), preparation of trial memoranda on various legal issues, and post-trial memoranda and appeals that would inevitably follow rulings on any final judgment, which could prolong the case for many years. Judicial economy and public policy will be well served, because the settlement will result in an efficient and economical procedure for aggrieved Class Members to obtain appropriate relief.

C. *The Terms Of The Settlement*

104. The terms of the settlement need not provide the optimal relief, so long as there appears to be a genuine *quid pro quo*. *Warren,* 693 F.Supp. at 1059. Here, *all* Class Members have a right to multiple types of relief based upon their individual circumstances.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 133741 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

Page 21

Additionally, the terms of the settlement were carefully crafted to tailor relief for those Class Members who felt they were harmed by defendants. Finally, this result was achieved through extensive negotiation by experienced and capable attorneys. Weiss/Stoia Aff. at § § I-III.

D. *The Procedures Afforded To Notify The Class Members Of The Proposed Settlement, And To Allow Them To Present Their Views*

105. As discussed in detail in § IV.A. above, the procedures afforded to notify the Class of the proposed settlement and of the opportunity to exclude themselves and present their views have been more than adequate.

E. *Judgment Of Experienced Counsel For The Class*

***28** 106. Counsel for plaintiffs and the Class are experienced in this type of litigation. *See* Weiss/Stoia Aff. ¶ ¶ 5-7. *See also* Plaintiffs' Mem. § IV.B.4. Counsel have voiced their beliefs that the proposed settlement is fair, adequate and reasonable.

107. Even in class action contexts, "the trial court is entitled to rely upon the judgment of experienced counsel for the parties.... Indeed, the trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel." *Ressler*, 822 F.Supp. at 1555 (quoting *Cotton*, 559 F.2d at 1330); *Holmes v. Continental Can Co.*, 706 F.2d 1144, 1149 (11th Cir.1983) (deference afforded to opinions of class counsel in class actions); *Behrens v. Wometco Enters.*, 118 F.R.D. 534, 539 (S.D.Fla.1988) (the court can rely upon the judgment of experienced counsel and should not substitute its judgment for that of counsel, absent fraud).

108. Absent the settlement, the plaintiffs faced a protracted, expensive, and uncertain trial. Weiss/Stoia Aff. at § V.D. Likewise, the settlement strikes a balance that protects the interests of all Class Members. Considering the wealth of experience of plaintiffs' counsel, their endorsement of the settlement strongly militates in favor of approval of the settlement.

F. *The Substance And Amount Of Opposition To The Settlement*

109. The settlement should be examined in light of the objections raised by Class Members. *Cotton*, 559 F.2d at 1331; *Meyer*, 677 F.Supp. at 1210. There have been only six objections received from a Class of approximately 109,000 policyowners, which is a *de minimus* number relative to the settlement. *Hill v. Art Rice Realty Co.*, 66 F.R.D. 449, 456 (N.D.Ala.1974) (receipt of only one objection is compelling evidence that the attitude of the overwhelming percentage of the class affected by the settlement supports the reasonableness and appropriateness of the settlement), *aff'd without op.*, 511 F.2d 1400 (5th Cir.1975).

110. The "general objection" of *Kyle Stewart* is that he does not want to "purchase" something additional from Equitable of Iowa, apparently referring to General Policy Relief. He also says he has no evidence to introduce, which may be an objection, or it may be an acknowledgement he has no claim. Whatever, the objection does not recognize that relief is available without documentary evidence, even under the Claim-Review Process, and the settlement does not require Class Members to purchase anything. Plaintiffs' counsel sent Mr. Stewart a letter offering to discuss his objection and further explain the favorable presumptions of the Claim-Review Process. Mr. Stewart did not respond and ultimately excluded himself from the Class. Therefore, Mr. Stewart's objection to the settlement also lacks standing, because only Class Members have standing to object. For all these reasons, Mr. Stewart's objection is overruled.

***29** 111. The objection of *Sheri Kephart* is that her options are limited to purchasing a new policy from Equitable of Iowa. Ms. Kephart's objection is an apparent reference to the types of relief available to former policyowners as General Policy Relief. This objection reflects a misunderstanding of the settlement's terms. Additional purchases are not required, and aggrieved policyowners may obtain significant relief in the form of Individual Claim-Review Relief through the Claim-Review Process. Weiss/Stoia Aff. ¶ 12. As with Mr. Kyle, plaintiffs' counsel wrote Ms. Kephart to offer to clarify and discuss the options available to her under the Claim-Review Process, but she did not respond to the offer. Weiss/Stoia Aff. ¶ 64. Accordingly, Ms. Kephart's objection is overruled.

112. The objection of *Patrick A. Staloch* concerns a policy purchased in 1981, *before* the Class Period. Therefore, because Mr. Staloch is not a Class Member with respect to this policy, he does not have standing to object. Moreover, the Class Period was determined based upon plaintiffs' investigation, discovery and conclusion that the alleged wrongdoing did not occur on a classwide basis before that time. Weiss/Stoia Aff. ¶ ¶ 44-47. Mr. Staloch's objection is overruled.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

113. The objection of *Tom Kluzak* is that he feels it is "distasteful" that someone would "file a lawsuit on his behalf without [his] knowledge." Mr. Kluzak's objection is not an objection to the settlement itself, but to the class action device generally. The benefits of the settlement-obtained at no out-of-pocket expense to any policyowner-should not be denied to those policyowners who wish to participate, and, of course, Mr. Kluzak had the opportunity to opt-out. Mr. Kluzak's objection is overruled.

114. The objection of *John Hoppey, Jr.* does not appear to be an objection at all, but an "object[ion] to making any more premium payments." Like other Class Members, Mr. Hoppey will have an opportunity to submit a claim in the Claim-Review Process and support his contention that he should not have to make any more premium payments. Accordingly, Mr. Hoppey's objection is also overruled.

115. The sixth objection, that of David D. Fleck, is more substantial than the others, in size and in effort, and has received the Court's careful consideration. Mr. Fleck's objection is also an endorsement of the proposed settlement. He states on page two of his objection:

I wish to compliment the parties and their attorneys for bringing these actions to this point and fashioning a Settlement Agreement under which the defendants offer the whole class member group benefits sufficient to merit the conclusion that, as to such group as a whole, the settlement is fair, adequate and reasonable.

116. Mr. Fleck does not complain about what is arguably the most important, at least most valuable, aspect of the proposed settlement, that being Individual Claim-Review Relief through the Claim-Review Process. His objection is only to General Policy Relief.

***30** 117. Mr. Fleck's objection to General Policy Relief is twofold-General Policy Relief should be different or more valuable, and it discriminates between Class Members. To correct these perceived problems, Mr. Fleck has drafted, and proposes to the Court for its consideration, a number of material changes to the Stipulation of Settlement.

118. Like the Court, the parties did not take Mr. Fleck's objection lightly. In their point-by-point responses they dealt with his objection, including his proposed modifications, explaining in reasonable and persuasive terms why, for practical, financial, and legal reasons, they could not or would not change the settlement to meet his specifications. Several of Mr. Fleck's proposed changes would have made General Policy Relief more like Individual Claim-Review Relief, in relief to Class Members and in expense to Equitable of Iowa, even though Class Members electing General Policy Relief would not have to demonstrate any wrongdoing by defendants or any harm to themselves. It is understandable why-the parties would not agree to these changes. Also, his personal claim of prejudice for not being eligible for Optional Premium Loans ignores the purpose of that particular type of General Policy Relief. Optional Premium Loans are to provide policyowners, whose policies have required modal premium, with special low interest loans to assist them in making out-of-pocket premium payments beyond those originally anticipated. However, Mr. Fleck's policy is a flexible premium universal life insurance policy. It does not have required premiums, and he can withdraw cash value from the policy without having to make a policy loan. Plaintiffs' Mem. pp. 59-62; Defendants' Mem. pp. 45-51.

119. It is not appropriate that the settlement be restructured to fit Mr. Fleck's real or perceived personal circumstances, and his proposed changes are not necessary to make the settlement fair, adequate and reasonable as to the Class. Mr. Fleck had the option to elect out of the Class, and he still has the option to elect Individual Claim-Review Relief and pursue a claim through the Claim-Review Process, if he believes he has been harmed by wrongdoings in connection with his policy. Class certification and approval of the proposed settlement cannot be denied on the strength of Mr. Fleck's objection. It is therefore overruled.

120. The Court finds that there is a rational basis for the parties' allocation of General Policy Relief. It is not discriminatory, in design or effect. *See* Holmes, 706 F.2d at 1148 (allocation permissible if "rationally based on legitimate considerations"; to provide different relief for different claims/needs).

121. Likewise, the issue here is whether the relief provided in the settlement, taken as a whole, is adequate and reasonable, not whether something more lucrative might make the settlement more favorable to Class Members or certain Class Members. *See In re Warner Communications Sec. Litig.*, 798 F.2d 35, 37 (2d Cir.1986) ("it is not a district judge's job to dictate the terms of a class settlement; he should approve or disapprove a proposed agreement as it is placed before him and should not take it upon himself to modify its terms"); *Cotton*, 559 F.2d at 1333 ("the settlement must stand or fall as a whole"); *Jeff D. v. Andrus*, 899

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 133741 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

Page 23

F.2d 753, 758 (9th Cir.1989) ( "[C]ourts are not permitted to modify settlement terms or in any manner to rewrite agreements reached by parties."); *In re Domestic Air Trans. Antitrust Litig.*, 148 F.R.D. 297, 305 (N.D.Ga.1993) ("Court may only approve or disapprove the settlement as presented ... [i]t [ ] may not rewrite the settlement as requested by numerous objectors.").

***31** 122. Here, the settlement offers a range of valuable and innovative relief that corresponds to the allegations and claims asserted in the Complaint and to the separate needs of the individual Class Members. *See In re Xoma Corp. Sec. Litig.*, Master File No. C-91-2252 TEH, 1992 U.S.Dist. LEXIS 10502, at *10 (N .D.Cal. July 10, 1992) ("The Court must be concerned with ensuring fairness to the class as a whole, rather than with satisfying any particular plaintiffs' demands.") (Weiss/Stoia Aff. Ex. 11).

123. Finally, the Court finds the fact that so very few objections-only four with legal standing-were received from approximately 109,000 Class Members demonstrates that the response of the Class to the proposed settlement has been overwhelmingly positive.

124. The Court also notes that no governmental entities have appeared in this litigation. Before notifying Class Members of the proposed settlement, Equitable of Iowa met with staff insurance officials in Iowa, its state of domicile, and briefed them on this action and proposed settlement. Equitable of Iowa characterizes the Iowa Insurance Department's reception to the settlement as positive. Equitable of Iowa also notified the insurance departments in the other states in which it does business of this action and the proposed settlement by mail, and none of these departments expressed reservations about the settlement to Equitable of Iowa or the Court. These reactions by the state insurance departments, although not essential, favor approval of the settlement.

G. *The Stage Of Proceedings At Which This Settlement Was Achieved*

125. This litigation had reached the stage at which "the parties certainly ha [d] a clear view of the strengths and weaknesses of their cases." *In re Warner Communications Sec. Litig.*, 618 F.Supp. 735, 745 (S.D.N.Y.1985), *aff'd* 798 F.2d 35 (2d Cir.1986).

126. "[P]laintiffs have conducted sufficient discovery to be able to determine the probability of their success on the merits, the possible range of recovery, and the likely expense and duration of the litigation." *Ressler*, 822 F.Supp. at 1554-55; *Mashburn*, 684 F.Supp. at 669. This is particularly true when it is remembered that settlements are strongly encouraged. *Id.* Since settlements are to be encouraged, it follows that "only some reasonable amount of discovery should be required to make these determinations." *Ressler*, 822 F.Supp. at 1555; *Mashburn*, 684 F.Supp. at 669; *In re Corrugated Container*, 643 F.2d at 211 (lack of presettlement discovery does not in itself invalidate settlement, since plaintiffs' negotiators had access to a plethora of information regarding the facts of their case); *Cotton*, 559 F.2d at 1332.

***32** 127. The investigation and thorough discovery undertaken by plaintiffs' counsel in this case illuminated the strengths and weaknesses of both claims and defenses. The benefits achieved by plaintiffs' counsel's investigation and discovery will also accrue to Class Members during the administration phase of the settlement. Significantly, the fruits of plaintiffs' counsel's investigation, discovery and analysis will benefit Class Members who elect to participate in the Claim-Review Process.

VI. *VALUATION OF THE SETTLEMENT*

128. The value of the settlement consists of the following elements: (i) the value of the Claim-Review Process, including the value of the process itself and the value of the uncapped, aggregate relief to be paid successful claimants; (ii) the value of the General Policy Relief; (iii) the attorneys' fees and expenses that Equitable of Iowa will pay to plaintiffs' counsel, which will not reduce the amount of relief being made available to the Class; and (iv) the substantial amounts that Equitable of Iowa has paid and expects to pay in settlement and administrative expenses for the benefit of the Class.

129. Although the innovative nature of the settlement makes it difficult to put a maximum value on the benefits to be provided to the Class, it is clear that the value of those benefits is substantial, and the Court so finds.

A. *Claim-Review Process*

130. Defendants' actuarial experts, Milliman & Robertson, have analyzed the potential recoveries under the Claim-Review Process for three hypothetical Class Members (claimants), each a male nonsmoker, age 40, and each owning a different one of Equitable of Iowa's more popular life insurance policies, all with $100,000

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 133741 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

Page 24

face amounts. Assuming scores of 4 (the highest available under the process), and depending on the age of the policy, the type of claim (performance, replacement or retirement/investment) and other factors that vary among claimants, Milliman & Robertson valued Individual Claim-Review Relief for these hypothetical claimants from a minimum of $3,990 up to a maximum of $23,554. M & R Report § III. Lewis & Ellis, Inc., plaintiffs' actuarial experts, have reviewed Milliman & Robertson's valuations and found them to be reasonable. Long Aff. ¶ 8.

131. Using Milliman & Robertson's analysis as a starting point, Lewis & Ellis, Inc., plaintiffs' experts, have estimated the potential value of relief awarded through the Claim-Review Process to a sample of one percent of Class Members who submit claims and whose scores exceed a "1." Depending on the distribution of the types of claims submitted and the scores awarded on those claims, Lewis & Ellis have determined that the value of Claim-Review Process awards to the one-percent sample would range from $2.8 million to $4 .1 million. Long Aff. ¶ 9 and App. 2 thereto.

B. *General Policy Relief*

132. Milliman & Robertson and Lewis & Ellis have both estimated that the General Policy Relief will make in excess of $271 million in economic value available to the Class. M & R Report p. 11; Long Aff. ¶ 6. Milliman & Robertson further estimated that, based on utilization rates consistent with historical marketing results for each form of General Policy Relief, it is likely that the total value of General Policy Relief that will actually be realized by the Class is $22.9 million. M & R Report p. 24. Lewis & Ellis has determined that "the best estimate of the economic value of the benefits that are likely to be utilized by Class Members under General Policy Relief" is $28.9 million. Long Aff. ¶ 7.

*33 133. The Court finds these expert analyses credible and well-reasoned. No opponent of the settlement has proffered evidence disputing these analyses.

134. Without adopting any of the particular value estimates provided by these experts, the Court finds that the parties have established that significant and substantial value will be provided to the Class through this settlement. Although the actual amount of value that will be realized by the Class cannot be foretold with precision, the Court finds that it is reasonable to expect that as much as $28.9 million in economic value will actually be realized by the Class through General Policy Relief alone, plus the value of relief to be provided through the Claim-Review Process, for which Equitable of Iowa's aggregate liability is unlimited.

135. The Court notes several other factors that enhance the value of the settlement for the Class.

a. The Claim-Review Process provides every Class Member with an opportunity to have his or her individual claim reviewed in a timely, cost-free manner, with an assurance that claims will be evaluated in accordance with fair and objective evidentiary and relief criteria that have been agreed upon by the parties and approved by this Court. The involvement of a Policyowner Representative throughout the process and the right to appeal initial determinations to independent arbitrators enhance the fairness of the Claim-Review Process. Because every Class Member has access to the Claim-Review Process, every class Member therefore receives value from the settlement.

b. There is no cap on the aggregate value of the relief to be afforded claimants in the Claim-Review Process. Thus, every claimant who demonstrates his or her claim will receive the full relief to which he or she is entitled, as determined by the criteria specified in the Stipulation of Settlement, without regard to the value of relief provided to other Class Members. This aspect of the settlement distinguishes it from the usual class action settlement, in which a defendant agrees to pay a fixed sum of money that is then allocated among members of the class, and renders the settlement "a far superior approach to that taken in most fraud class action settlements." *Connecticut General,* MDL No. 1136, Order p. 3 (Weiss/Stoia Aff. Ex. 4); *see also* Tew Decl. ¶ 10; Priest Decl. ¶ 35.

C. Unlike class action settlements where the value of the relief provided depends entirely on future purchases that are highly contingent in nature and suspect in value, the General Policy Relief here is tailored to meet the allegations of the Complaint and the specific insurance and investment needs of the Class Members. *See* Priest Decl. ¶ ¶ 29-34; Tew Decl. ¶ 9.a.

136. The Court hereby approves the settlement and finds that it is fair, adequate and reasonable, in the best interests of the Class, and fully in accord with constitutional dictates.

VII. *FINDINGS OF FACT AND CONCLUSIONS OF LAW WITH RESPECT TO PLAINTIFFS' ATTORNEYS' FEES AND EXPENSES*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 133741 (M.D.Fla.)
**(Cite as: Not Reported in F.Supp.)**

Page 25

A. *Overview*

*34 137. Only after all substantive terms of the proposed settlement were agreed upon, counsel for the parties negotiated terms under which Equitable of Iowa agreed to pay plaintiffs' counsel's fees and to reimburse plaintiffs' counsel's expenses up to a total of $5 million, subject to approval by the Court. *See* Weiss/Stoia Aff. ¶ ¶ 54, 56, 76; Bailey Decl. (No. 2) ¶ 21. The particulars of the fee agreement are set out in § X of the Stipulation of Settlement.

138. In accordance with the Stipulation of Settlement, plaintiffs' counsel have requested attorneys' fees and expenses in the total aggregate amount of $5 million. *See* Weiss/Stoia Aff. ¶ ¶ 56, 75.

139. The Court finds that the fee negotiations in this case were conducted at arm's-length, and only after all material terms of the settlement had been agreed upon. Weiss/Stoia Aff. ¶ 56. Because the previously negotiated settlement structure provided that the fee awarded would be paid by Equitable of Iowa, separate and apart from any recovery to the Class, Equitable of Iowa had a particular incentive to bargain strenuously to keep the fee as low as possible. There is absolutely no evidence in this case that the settlement was in any way collusive.

140. Under these circumstances, the Court gives great weight to the negotiated fee in considering the fee request. Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 720 (5th Cir.1974) ("In cases of this kind, we encourage counsel on both sides to utilize their best efforts to understandingly, sympathetically, and professionally arrive at a settlement as to attorney's fees."); *In re First Capital Holdings Corp. Fin.Prods.Sec.Litig.*, [1992 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,937, at 93,969 (C.D.Cal. June 10, 1992).

B. *The "Percentage of Recovery" or "Common Fund" Method*

141. The approach to determining an appropriate fee award in the Eleventh Circuit is the percentage of recovery approach. In Camden I Condominium Ass'n v. Dunkle, 946 F.2d 768 (11th Cir.1991), the Eleventh Circuit observed:

The majority of common fund fee awards fall between 20% to 30% of the fund.... [A]n upper limit of 50% of the fund may be stated as a general rule, although even larger percentages have been awarded.

*Id.* at 774-75 (citations omitted). Even though the fees sought in this case are are less than 1.7% of the estimated total values of the settlement and less than 14.5% of the utilization value of GPR, they are well *below* the range of reasonableness set forth in *Camden I*, where the court recognizes that "[t]here is no hard and fast rule mandating a certain percentage of a common fund which may reasonably be awarded as a fee because the amount of any fee must be determined upon the facts of each case." *Id.* at 774.

142. The court in *Camden I* enumerated the "*Johnson* factors" (established in Johnson, 488 F.2d 714) that the court may consider in determining the appropriate percentage of the fund to be applied to each case. In the instant case, a very favorable result was obtained as the result of the intensive, yet efficient, efforts of plaintiffs' counsel.

1. *The Results Obtained*

*35 143. This settlement involves a creative and innovative two-part settlement structure to carefully craft relief for Class Members, tailored to the particular and complex facts of this action. Weiss/Stoia Aff. ¶ 17. Plaintiffs' counsel have carefully assessed the strengths and weaknesses of their case. Weiss/Stoia Aff. ¶ ¶ 44-47. Plaintiffs and their counsel felt that, based on their investigation, they could prove their case at trial-but a host of risks were involved, including the substantial risk of *no relief* for the Class. Weiss/Stoia Aff. ¶ ¶ 65-69. When all these factors are weighed, plaintiffs' counsel have obtained a very good result for the Class. These factors support the fee requested.

FN15. While the requested fee would, at this point in time, represent a modest multiplier over the lodestar, that multiplier is justified by the substantial settlement benefits obtained, efficiency in achieving them, and concerted effort by all counsel to avoid wasted time and expense. Plaintiffs' counsel in this case sought to achieve a good result for the Class, irrespective of how much, or how little, time it took.

2. *Economics Involved In The Prosecution Of The Class Action And The Experience Of Counsel*

144. "[T]he economics involved in prosecuting a class action" is one of the factors to be considered by the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

court in determining a fee. Camden I, 946 F.2d at 775. This action was prosecuted by plaintiffs' counsel on an "at-risk" contingent fee basis. Weiss/Stoia Aff. ¶ 85. Counsel would be paid only if they achieved a successful result for the Class. Courts have long recognized, particularly in this Circuit, that the attorneys' contingent risk is an important factor in determining the fee award. *See* Jones v. Central Soya Co., 748 F.2d 586, 591 (11th Cir.1984); *see also* Ressler, 149 F.R.D. at 656.

145. Plaintiffs' counsel in this case are experienced class action and complex action attorneys, including extensive class action experience relating to life insurance company deceptive sales practices. Weiss/Stoia Aff. ¶ 5. Courts have recognized the importance of providing incentives to experienced counsel who take on complex litigation cases on a contingent fee basis so those cases can be prosecuted effectively. Weiss/Stoia Aff. ¶ ¶ 4-9. Conversely, defendants' counsel in this case are highly respected in the area of class action life insurance litigation, and were paid on a current basis. Plaintiffs' counsel, who assumed the risk of a successful result, should likewise be compensated for their efforts by a premium above their hourly rates. *See* Ressler, 149 F.R.D. at 654 (competence of opposing counsel is a factor in establishing plaintiff's counsel's fee award).

3. *The Customary Fee For Similar Cases*

146. The requested fee is below the typical range of common fund awards to counsel in other class actions in the Southern and Middle Districts of Florida since the percentage-of-fund approach was adopted by the Eleventh Circuit in *Camden I. See, e.g., Lopez v. Checkers Drive-In Restaurants, Inc.*, 94-282-CIV-T-17C (M.D.Fla.1996) (awarding 30%) (Weiss/Stoia Aff. Ex. 13); *Minnick v.. Pages, Inc.*, 95-277-CIV-T-21C (M.D.Fla.1996) (awarding 30%) (Weiss/Stoia Aff. Ex. 14); *In Re: Belmac Corp. Sec. Litig.*, 92-1814-CIV-T-23-(C) (M.D.Fla.1994) (awarding 31%) (Weiss/Stoia Aff. Ex. 15); and Ressler, 149 F.R.D. at 653 (awarding 30%). Thus, this Court on at least four prior occasions awarded a percentage fee in a common fund case in excess of 30%-far more than counsel are seeking here.

4. *The Time And Labor Required*

*36 147. The hours expended by plaintiffs' counsel in this litigation are set forth in the Affidavit of Melvyn I. Weiss and John J. Stoia, Jr. and Plaintiffs' Counsel Declarations. The total amount of time expended-particularly with regard to investigation and settlement negotiations-reflects the complexity of this action. Administration of the settlement will require additional time and expense. Under regular hourly rates the "lodestar" of plaintiffs' counsel in this action totals $2,038,170.13. Thus, even under the lodestar method, the fee requested would result in a multiplier much lower than the midrange of the multipliers in contingent fee awards in such cases. The multiplier here would be only 2.34, not including the extensive future work required by plaintiffs' counsel. *See* Weiss/Stoia Aff. ¶ 73. *See also* Behrens 118 F.R.D. at 548 ("the range of lodestar multipliers in large and complicated class actions runs from a *low* of 2.26 ... to a *high* of 4.5") (citations omitted, emphasis added).

148. Plaintiffs' counsel seek reimbursement of $227,513.13 in expenses incurred in this action as part of the entire $5 million negotiated fee and expense payment. Plaintiffs' counsel's expenses incurred to date for which reimbursement is sought appear reasonable.

5. *The Reaction Of The Class Confirms That The Requested Fee Is Reasonable*

149. The individual notice mailed to approximately 109,000 Class Members and the publication notice published in national newspapers across the country advised Class Members that counsel would apply for an award of fees and expenses not to exceed $5 million and that Class Members could object to the fee and expense application. Only *one* objection to the fee request has been made. The lack of objections is itself important evidence that the requested fees are fair. *See,* e.g., Ressler, 149 F.R.D. at 656 (noting that the lack of objections is "strong evidence of the propriety and acceptability" of fee request); *Mashburn*, 684 F.Supp. at 695.

FN16. David H. Fleck objects to "the provisions of the proposed settlement under which the Defendants abandon responsibility for policing the amount of plaintiff attorney's fees and disbursements and impose the entire burden upon the Courts." Such a "policing by defendants" is not necessary-this Court may act as expert in such matters. *See* Loranger v. Stierheim, 10 F.3d 776, 781 (11th Cir.1994) (noting that court is expert in such matters and may use own judgment and experience in determining reasonable fees (citing Norman v. Housing Auth. of City of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

> *Montgomery*, 836 F.2d 1292, 1303 (11th Cir.1988)). Also, the amount of attorneys' fees that the Court ultimately awards to plaintiffs' counsel does not affect whether the Court should approve the settlement and the fees and expenses paid to plaintiffs' counsel will *not* reduce or otherwise affect the relief available to Class Members.

150. The evidence in this case, including the expert affidavits and declarations submitted by the parties, establishes that the General Policy Relief will make in excess of $271 million in economic value available to the Class. *See* Long Aff. ¶ 6; M & R Report p. 11. Milliman & Robertson estimate that the economic value of the General Policy Relief likely to be utilized by the Class will be $22.9 million. M & R Report p. 24. Lewis & Ellis further estimate that the economic value of the General Policy Relief likely to be utilized by the Class will be $28.9 million. Long Aff. ¶ 7. These estimates do not include the benefits conferred under the uncapped Claim-Review Process, estimated by Lewis & Ellis at between $2.8 million and $4.1 million per one percent of Class Members who participate in the process and obtain a score higher than "1." *Id.* at ¶ 9. They also do not include certain other substantial benefits to the Class, including the costs Equitable of Iowa has incurred and will continue to incur in providing notice to the Class, a cost which is ordinarily borne by plaintiffs; administering the class action information center; and implementing and administering the settlement. Moreover, it is important to note that the amount of fees and expenses to be paid by Equitable of Iowa are separate and apart from any recovery by the Class, and will in no way diminish the value of settlement benefits to be provided to the Class. *See* Weiss/Stoia Aff. ¶ 57.

*37 151. Accordingly, the Court overrules the one objection to plaintiffs' request for $5 million in attorneys' fees and expenses, and hereby grants that request, with the fees and expenses to be paid in accordance with the Stipulation of Settlement. Furthermore, the Court hereby authorizes Milberg Weiss Bershad Hynes & Lerach LLP, Co-Lead Counsel herein and the primary law firm responsible for prosecution, coordination and oversight of this lawsuit and settlement, to allocate, in its sole discretion, the award of attorneys' fees and expenses.

The foregoing being the findings of fact and conclusions of law of this Court,

IT IS SO ORDERED.

M.D.Fla.,1998.
Elkins v. Equitable Life Ins. of Iowa
Not Reported in F.Supp., 1998 WL 133741 (M.D.Fla.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.