# TAB 5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

MARJORIE FERRELL, et al,               :     Case No. C-1-01-447

      Plaintiffs,                      :     Judge Sandra S. Beckwith
                                             Magistrate Judge Timothy S.
v.                                     :     Hogan

WYETH-AYERST LABORATORIES,             :
INC., et al,
                                       :
      Defendants
                                       :

## ORDER

Before the Court are the following motions:

Plaintiffs motion for class certification (Doc. 40),

Defendants opposition (Doc. 57) and Plaintiffs reply (Docs. 63

and 64);

Defendants motion for evidentiary hearing on class

certification (Doc. 61), and Plaintiffs opposition (Doc. 62); and

Defendants motion for leave to file supplemental brief on

class certification (Doc. 68), Plaintiffs opposition (Doc. 69)

and Defendants reply (Doc. 70).

## BACKGROUND

Wyeth[1] manufactures Premarin, an estrogen replacement

product that has been sold since 1943. (Compl.¶ 25)[2]  The FDA

_____

[1] Unless otherwise indicated and for ease of reference,
"Wyeth" refers to the defendants Wyeth-Ayerst Pharmaceuticals
Inc. and American Home Products Corporation (the latter
apparently now known simply as "Wyeth").

[2] All references to the Complaint (or "Compl.") are to the
Corrected Consolidated Amended Class Action Complaint (Doc. 31),
unless otherwise indicated.

approved Premarin for several uses, including relief from
menopausal vasomotor symptoms, vulvar and vaginal atrophy, and
prevention of osteoporosis. Premarin is used for both estrogen
replacement therapy ("ERT") and hormone replacement therapy
("HRT"). Duramed Pharmaceuticals manufactures Cenestin. After
Duramed unsuccessfully sought FDA approval to market Cenestin as
a generic substitute for Premarin, it sought approval for
Cenestin as a new, branded product. On March 24, 1999, the FDA
approved Cenestin for a single indication: the treatment of
vasomotor symptoms of menopause.

Duramed later filed suit against Wyeth in this district,
contending that Wyeth engaged in monopolistic and anti-
competitive practices designed to keep Cenestin from the market
and/or from gaining market share. (Case No. C-1-00-735)    Other
lawsuits against Wyeth followed Duramed's, including the "direct
purchaser" action (Case No. C-1-01-704), and these consolidated
actions brought by "indirect purchasers" (or "end payors") of
Premarin.

The Complaint generally alleges that, both before and after
the FDA approved Cenestin, Wyeth engaged in a public campaign to
tout the benefits of Premarin, while unfairly and untruthfully
denigrating Cenestin. (Compl. ¶46-50) Plaintiffs allege that,
after Cenestin gained FDA approval, Wyeth engaged in a systematic
attempt to keep Cenestin from growing market share, by entering
into "exclusive" contracts with health insurers and pharmacy
benefit managers (PBMs) in the United States. These exclusive

-2-

contracts require that Premarin be the only conjugated estrogen product on the plans' drug formulary. Wyeth is able to procure these exclusive contracts by offering rebates, discounts, fees and other financial incentives to the plans and PBMs. (Compl. ¶61) Thus, Plaintiffs allege, the plans or PBMs would incur substantial financial losses by adding Cenestin to their formularies, as they would lose their bargained for rebates, discounts or fees if the plans failed to meet their sales targets for Premarin.

The "indirect purchaser" Plaintiffs in this case generally allege that Wyeth's monopolistic and anti-competitive conduct relative to Duramed's marketing of Cenestin has injured them in two ways: (1) Wyeth's conduct caused plaintiffs to pay more for conjugated estrogens than they otherwise would have paid, and (2) Wyeth's conduct excluded Duramed (and other unnamed potential competitors) from the market, "thereby restricting consumers' access to alternative conjugated estrogen products." (Compl. ¶35(b) and (c))

Plaintiff's motion (Doc. 40) seeks an order certifying a class of "end payors" (indirect purchasers) defined as:

The National Consumer Class: All persons in the United States (except California) who purchased or paid for Premarin at any time from March 24, 1999 to the present (the "Class Period").

The State Consumer Subclass: All members of the National Consumer Class who purchased or paid for Premarin in Arizona, District of Columbia, Florida, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nevada, New Jersey, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia, or Wisconsin (the "Indirect Purchaser States").

-3-

The National Third Party Payor Class: All persons or
entities in the United States (except California) who, in whole
or in part, purchased, paid for, or reimbursed for Premarin
prescribed to covered individuals (including members,
beneficiaries, employees and insureds) at any time during the
Class Period.

The State Third-Party Payor Subclass: All members of the
National Third Party Payor Subclass who, in whole or in part,
purchased, paid for, or reimbursed for Premarin prescribed to
covered individuals (including members, beneficiaries, employees
and insureds) in the Indirect Purchaser States.

Excluded from all of the above definitions are Defendants

and their subsidiaries and affiliates, all governmental entities,

and anyone that purchased Premarin either for resale or directly

from any of the Defendants.

## ANALYSIS

A.   Fed. Rule Civ. Proc. 23

The proposed class representative must establish that

each of the four requirements of Rule 23(a) is satisfied with

respect to the proposed class.   See In re American Medical

Systems, Inc., 75 F.3d 1069, 1079 (6th Cir. 1996); Senter v.

General Motors Corp., 532 F.2d 511 (6th Cir.), cert. denied, 429

U.S. 870 (1976); Kutschbach v. Davies, 885 F. Supp. 1079, 1083

(S.D.Ohio 1995).   Within the framework of Rule 23, the Court has

broad discretion to determine whether an action is maintainable

as a class action.   See Kentucky Educators Public Affairs Council

v. Kentucky Registry of Election Finance, 677 F.2d 1125, 1135

(6th Cir. 1982).   The four requirements are as follows:

(1)   the members of the class must be so numerous that
      joinder of all members is impracticable (the
      "numerosity requirement");

-4-

(2)  questions of law or fact must be common to the
     entire class (the "commonality requirement");

(3)  the claims or defenses of the named representative
     must be typical of the claims or defenses of the
     class (the "typicality requirement"); and

(4)  the named representative must fairly and
     adequately represent the interests of the class as
     a whole (the "adequacy of representation"
     requirement).

Fed. R. Civ. P. 23(a).

In determining whether to certify a class, the Court must

not consider the merits of the action.  See Eisen v. Carlisle &

Jacquelin, 417 U.S. 156, 178 (1974).  For purposes of a class

certification motion, the Court must accept as true the

allegations of the complaint.  See Shelter Realty Corp. v. Allied

Maintenance Corp., 574 F.2d 656, 661 n.15 (2d Cir. 1978); Blackie

v. Barrack, 524 F.2d 891, 901 n.17 (9th Cir. 1975), cert. denied,

429 U.S. 816 (1976).  The Court "may consider reasonable

inferences drawn from facts before [it] at that stage of the

proceedings."  Senter, 532 F.2d at 523.  While the court must not

determine the merits, "Actual, not presumed, conformance with

Rule 23(a) remains ... indispensable."  General Telephone Co. v.

Falcon, 457 U.S. 147, 160 (1982).

1.  Numerosity.

To satisfy Rule 23(a)(1), plaintiff must establish that

"the class is so numerous that joinder of all members is

impracticable."  Fed. R. Civ. P. 23(a)(1).  Here, numerosity is

not seriously challenged.  The Complaint alleges that some ten

million women in America take, or have taken, Premarin during the

class period.  The record establishes that the number of third

party payors who may have paid for Premarin during the class

period is sufficiently large to satisfy Rule 23(a)(1).

    2.   Commonality of Issues.

    The essential question, common to all members of the

proposed classes, is whether Wyeth's conduct as alleged in the

Complaint violates the antitrust laws.  For the state law claims,

an essential question is whether or not class members paid a

supracompetitive price for Premarin, and are thereby entitled to

damages.  Those issues are common across the classes as defined.

A "perfect fit" is not required.  Rather, the commonality test

under 23(a)(2) is "qualitative rather than quantitative, that is,

there need be only a single issue common to all members of the

class."  In re American Med. Systems, 75 F.3d 1069, 1080 (6th

Cir. 1996).  The common issue identified should advance the

litigation if resolved.  Sprague v. General Motors Corp., 133

F.3d 388, 397 (6th Cir. 1998).  That test is met here.

    3.   Typicality.

    Rule 23(a)(3) requires that the named class representatives'

claims be "typical" of the absent class members claims.  Claims

in antitrust price-fixing cases generally satisfy Rule 23(a)(3)'s

typicality requirement, even if members purchase different

quantities and pay different prices. See  In re Potash Antitrust

Litig., 159 F.R.D. 682, 691 (D. Minn. 1995).  Differences among

the named representatives and the absent class members in the

amount of their damages, or variations in mathematical

-6-

computations of those damages, will not defeat typicality.  In re Playmobil Antitrust Litig., 35 F.Supp.2d 231, 241 (E.D.N.Y. 1998).

This case does not involve a "per se" price-fixing conspiracy, nor does it involve agreements that are challenged as per se illegal.  However, the Court finds that plaintiff Ferrell's claim is typical, for Rule 23(a)(3) purposes, of other consumers who purchased Premarin at the allegedly supracompetitive price caused by Wyeth's challenged monopolistic practices.  The Funds' claims are typical of the "Third Party Payor" subclass defined in the plaintiff's Motion, in that they paid for Premarin under pricing formulas that allegedly incorporated the supracompetitive price.

4.    Adequacy of Representation.

Rule 23(a)(4) requires that the "representative parties will fairly and adequately protect the interests of the class."  To satisfy this subsection of the Rule, plaintiffs must show that the class representatives' interests do not conflict with the absent class members' interest, and that the representatives and their attorneys are able to and will vigorously prosecute the action on behalf of the class.  To defeat "adequacy," Wyeth must point to a "fundamental conflict" that exists between the named class representatives and the absent class members.  See Valley Drug Co. v. Geneva Pharmaceuticals, 350 F.3d 1181 (11th Cir. 2003), reversing certification of direct purchaser class due to economic conflict between those who benefitted from market

-7-

exclusion of a generic drug and those who did not.  See also,
Pickett v. IBP, Inc., 209 F.3d 1276 (11th Cir. 2000).

Ms. Ferrell, the individual named class representative,
testified that she purchased Premarin from various retail
pharmacies during the class period.  She was not insured for
medications for most of the period (although she apparently
acquired some coverage prior to her deposition).  She testified
that she never considered switching to Cenestin (or another
drug), as she took Premarin in large part for prevention of
osteoporosis.  Cenestin is not FDA-approved for osteoporosis
prevention.  Thus Ms. Ferrell cannot demonstrate that she
sustained any injury that would have been redressed by the
availability of Cenestin at any price.  See, In re Terazosin
Hydrochloride Antitrust Litigation, 2004 U.S. Dist. LEXIS 6176
(S.D. Fla. April 8, 2004), at *32 (class representative who
admitted he "never gave any thought" to substituting the generic
form of Hytrin when it became available does not have standing to
bring claim based on illegal agreement suppressing the
availability of a generic substitute).

But Plaintiffs concede that they are not alleging a
"substitution impact" theory in this case.  Plaintiffs admit they
are relying exclusively upon the theory that Premarin was
supracompetitively priced during the class period.  (See Doc. 63,
pp. 27-28)  Given this concession, Ms. Ferrell is an adequate
representative for consumers who bought Premarin during the class
period and fully paid the allegedly supracompetitive price.

-8-

The two Funds seek to represent the National and State Third
Party Payor Class and Subclass.  They purport to represent all
entities who "in whole or in part" purchased, paid for, or
reimbursed their members, beneficiaries, employees and/or
insureds for Premarin at any time during the Class Period.  The
definition of the Third Party Payor Class and Subclass in
Plaintiff's class certification motion differs significantly from
the definition contained in the Complaint, which is:  "All
employee welfare benefit plans and employee benefit plans
maintained pursuant to section 302(c)(5) of the LMRA, 29 U.S.C.
§186(c)(5), and as defined by section 1002(1) and (3) of ERISA,
29 U.S.C. §1001, which are associated with passive formularies[3]
and which have paid for or reimbursed their participants' and
beneficiaries' purchases of Premarin in the United States, other
than in California, at any time during the Class Period."
(Compl. ¶28)

The "Third-Party Payor Class" defined by Plaintiffs'
certification motion includes not only union or employer benefit
plans like the Funds, but also would include private health
insurers, managed care organizations, and pharmacy benefit
managers.  This is a diverse mix of entities and interests.

_____

[3]The Complaint does not define the term "passive formulary"
and the Court is unable to discern its precise meaning from the
parties' pleadings.  Testimony from the TCBW representative
Johnson described a passive formulary as a pricing system:  ". .
.[F]or brand name drugs our pricing is on AWP minus 10 percent.
For generic drugs we use MAC pricing.  So it's not brand
specific."

Moreover, the putative class is not limited to plans with "passive" formularies, as the parties' pleadings make clear.

Wyeth argues there is an inherent, fundamental conflict within the class defined in Plaintiffs' motion, because some third party payors (apparently including the named class representative TCBW) receive rebates from Wyeth under the challenged "exclusive" contracts.[4] Wyeth suggests that UCBW and TCBW do not "derive substantial benefit" from Wyeth's rebate system, and therefore cannot adequately represent Third Party Payors who do substantially benefit from the rebates. And, Wyeth contends that any class member who is a party to one of Wyeth's contracts has a conflict with both individual consumers, and with third party payors who lack a Wyeth incentive contract.

Plaintiffs respond that no member of the putative Third-Party Payor class is alleged to have conspired with Wyeth in entering into these rebate contracts. Nor is there any allegation that the putative class members' receipt of rebates was itself illegal. Plaintiffs contend that rebates would simply affect the calculation of damages for those class members, but would not create any fundamental, inherent conflict preventing class certification.

Similar challenges were raised in In re Terazosin Hydrochloride Antitrust Lit., supra. There, the defendants

---

[4] TCBW's contract with its pharmacy benefit manager, NPA, provides that manufacturer rebates are paid to TCBW, less a "formulary management fee" retained by NPA.

argued that the presence of pharmacy benefit managers and third-party private insurers in the same class with individual consumers was fraught with potential, irreconcilable conflicts. The district court rejected this argument, noting that actual evidence of **fundamental** conflicts among class members (and not a generalized "tension" that might exist between consumers and their medical insurers) was required to deny certification on this basis.

The Court has reviewed Wyeth's evidence, particularly the Snyder Affidavit, and is unable to discern the sort of fundamental conflict between consumers, on the one hand, and third party payors on the other, that would prevent certification at this juncture. The fact that some TPPs "may" have received "substantial" Wyeth rebates does not, standing alone, create a fundamental conflict among the Third Party Payors at this juncture. By way of contrast, in <u>Valley Drug</u>, the Eleventh Circuit noted that just three national wholesalers that together represented 50% of plaintiffs' total claims, experienced a net economic benefit during the time that generic Hytrin was kept off the market. This presented a fundamental conflict between the three "giants" and other wholesalers. Evidence was also presented that retailers will often bypass the national wholesalers in order to purchase generics when they enter the market, as the retailers can buy directly from the generic manufacturers. Since the wholesalers and the retailers were both included in the proposed class, a fundamental economic conflict

-11-

presented itself. Here, the evidence presented to date does not disclose a fundamental conflict like that shown in <u>Valley Drug</u>.

The Court takes note, however, of the record suggesting that there are over 800 managed care plans in the United States, but that only thirteen of those entities account for almost 137 million covered lives, more than 50 percent of the entire United States population. It is not clear if, and to what extent, these thirteen experienced a "net economic benefit" from the Wyeth contracts. The Court also notes that Plaintiffs' expert assumes that the challenged rebate contracts would be prohibited in his "but for" world. Should the evidence in this case establish a fundamental conflict among differently-situated members of the Third Party Payor class with respect to the economics of the challenged rebate system, the Court will revisit this issue. See Rule 23(c)(1)(C) [certification order may be altered or amended any time before final judgment].

Finally, the adequacy of representation inquiry encompasses whether counsel is qualified to represent the class and has no conflicts with any member of the class. The record establishes that Plaintiffs' counsel is well qualified to prosecute this complex antitrust action, and has experience in several other large antitrust class actions. (Doc. 40, Exhibits B - E) Wyeth alleges, however, that class counsel has created a conflict, by arguing that both consumers and third party payors can recover treble damages for the same conduct. (See Plaintiff's Opposition to Wyeth's Motion for Leave to File Supplemental Memo re Motion

-12-

to Dismiss, Doc. # 56). Counsel's zealous advocacy, and citation of a case that may support that argument, do not render counsel inadequate to represent the Plaintiffs.[5]

The Court therefore finds that, with the exceptions noted, Plaintiffs have satisfied the requirements of Rule 23(a) at this juncture.

B.    Rule 23(b)

If the proposed class representative establishes that each of the requirements of Rule 23(a) is satisfied, he must also demonstrate that the class is an appropriate one for certification under one of the three subsections of Rule 23(b). See Kutschbach, 885 F. Supp. at 1083-84. Plaintiffs urge the Court to certify the proposed classes and subclasses pursuant to Rule 23(b)(2) and 23(b)(3). They argue that the federal claims in Counts I and II, which seek only injunctive relief, should be certified under b(2), and the state law claims in Counts III and IV should be certified under b(3).

Authorities discussing hybrid or dual class certification

---

[5] Plaintiffs cite Goda v. Abbott Laboratories, D.C. Sup. Ct., 1997 WL 156541 (Feb. 3, 1997) for the proposition that consumers and their insurers can both recover damages, because the "collateral source" rule would not apply. That argument overstates what Goda actually held. In Goda, the D.C. superior court granted class certification, but specifically reserved the "collateral source" issues for the damages portion of the case. The court noted that the consumer's insurance company or managed care plan "may be entitled to indemnification" from the class consumer, but third party payors were not part of the Goda plaintiffs' proposed class. Furthermore, the court created separate subclasses for consumers without "collateral source" benefits (e.g., uninsured consumers) and those with such benefits.

-13-

are not legion.  This Court previously certified a hybrid
settlement class under Rule (b)(2) and required notice and opt
out rights to the absent class members.    In Re Cincinnati
Radiation Litigation, 187 F.R.D. 549 (S.D. Ohio 1999).   Other
courts have granted dual certification within the same lawsuit.
See, e.g., Wilson v. United International Investigative Services,
2002 U.S. Dist. LEXIS 7235 (E.D. Pa. 2002), certifying a (b)(2)
and (b)(3) class in a suit challenging defendants' method for
depositing employer 401k contributions, which sought both
injunctive relief and monetary damages.

     Assuming the Court can certify under two subsections,
Plaintiffs must satisfy the requirements for each.

     1.    23(b)(2) Certification:  Rule 23(b)(2) applies when
"the party opposing the class has acted or refused to act on
grounds generally applicable to the class, thereby making
appropriate final injunctive relief or corresponding declaratory
relief with respect to the class as a whole."  The putative
National Consumer Class and National Third Party Payor Class seek
injunctive relief under federal antitrust law - the prohibition
of the Wyeth anti-competitive rebate contracts.  This relief
would apply "to the class as a whole."

     Wyeth argues that Plaintiffs' "primary" claim is for money
damages, making b(2) certification inapplicable.  As noted in
Lemon v. International Union of Operating Engineers, 216 F.3d
577, 580-81 (7th Cir. 2000), 23(b)(2) certification assumes that
the interests of all class members are cohesive and homogenous,

-14-

and that the remedy sought would not materially differentiate
among the class members. Thus, due process rights are not
violated in the absence of notice to the class, which is not
required for a 23(b)(2) class. A claim for money damages
certified under b(3) does require notice and opt out rights, in
order to protect the due process rights of the absent class
members.

Here, the "national" classes for which b(2) certification is
sought encompass an enormous variety of people and entities. As
noted above, the Court is concerned that there may in fact be
differences among the class members with respect to Plaintiffs'
challenge to Wyeth's conduct. And, as a practical matter, in
order to prove that final injunctive relief is "appropriate,"
Plaintiffs will have to prove antitrust impact, an element of
antitrust liability. Where the questions of liability
significantly overlap (and appear to be virtually identical),
judicial economy is not well-served by certification of separate
'injunction' and 'damage' classes. Plaintiffs' proposed 'damage'
classes can serve as an appropriate mechanism to pursue the
remedy of injunctive relief should that prove warranted. See,
e.g., In Re Northwest Airlines Corp. Antitrust Lit., 208 F.R.D.
174, 183 (E.D. Mich. 2002), noting that dual certification is
unnecessary where equitable relief sought by the 'damages' class
would also accrue to the benefit of the proposed 'injunctive
only' class. Accordingly, the Court will address whether
Plaintiffs have satisfied the requirements of Rule 23(b)(3).

2.   23 b(3) Certification:   Plaintiffs must demonstrate
"that the questions of law or fact common to the members of the
class predominate over any questions affecting only individual
members, and that a class action is superior to other available
methods for the fair and efficient adjudication of the
controversy."  Fed. R. Civ. P. 23(b)(3).  Factors pertinent to
the superiority requirement are (A) the interest of class members
in individual control of prosecution of an action; (B) the extent
of other pending litigation; (C) the desirability of litigating
the claims in this forum; and (D) the difficulties likely to be
encountered in the management of a class action.  Manageability
is a consideration that is "peculiarly within the court's
discretion."   In re Visa Check/MasterMoney Antitrust Litig., 280
F.3d 124, 141 (2nd Cir. 2001) (citation omitted).

To succeed on their antitrust claims, Plaintiffs will have
to prove: (1) that Wyeth violated the antitrust laws; (2) that
the alleged violations caused plaintiffs to suffer injury (the
antitrust "impact"); and (3) that the extent of this injury can
be quantified with requisite precision.  See generally, Zenith
Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 114 n.9,
89 S. Ct. 1562 (1969), rev'd on other grounds, 401 U.S. 321
(1971); see also Associated Gen. Contractors of Cal., Inc v.
California State Council of Carpenters, 459 U.S. 519, 103 S. Ct.
897 (1983).

It is here that the parties devote the bulk of their
arguments for and against certification.  Plaintiffs contend they

-16-

have presented an adequate method for demonstrating class-wide impact and quantifying damages to class members. They contend that differences among class members concerning the calculation of individual damages do not prevent certification when the issues concerning liability are suited to class determination. Predictably, Wyeth disputes both of these contentions.

(a)  Common Method of Proof of Impact.

The Court's task at this point is not to determine which expert's opinion has merit, but rather to determine if Plaintiffs' proffered method for common proof of impact is "colorable" and "not fatally flawed." In re Visa Check/MasterMoney Antitrust Litigation, 280 F.3d at 135. On the other hand, the mere existence of a "battle of the experts" does not require the court to certify a class. The Court must be satisfied that the proposed method to determine impact, an element of antitrust liability common to all of Plaintiffs' claims, meets basic prerequisite standards, and is not mere speculation or conjecture.

Both parties agree that in this indirect purchaser action, a class member is "impacted" if the class member bought Premarin at a supracompetitive price during the class period.[5] The issue then becomes whether the supracompetitive price Wyeth charged to

---

[5] Plaintiffs assert the class period should start on the day the FDA approved Cenestin, March 24, 1999. Actual sales of Cenestin did not begin until May 12, 1999. This fact may require adjustment of the dates of the class period, but the Court assumes for purposes of this Order that the operative date is March 24, 1999.

its direct purchasers was "passed on" to the indirect purchasers, and whether that impact can be demonstrated on a class-wide basis.

As the Court understands the parties' arguments, Plaintiffs' expert, Dr. Gary French, assumes that the "but-for" average wholesale price (AWP) for Premarin would have been lower by some ascertainable percentage in the absence of Wyeth's alleged anticompetitive conduct. He also assumes that a lowered AWP would be "passed through" to all members of the plaintiff class through standard pharmaceutical pricing formulas. For third party payors, Dr. French asserts that their base prices are keyed to the AWP. For cash-paying consumers, he states that average retail price (ARP) is "directly related" to the AWP.

French states that he will be able to calculate the "but-for" AWP by reference to a "competitive benchmark." This benchmark could be derived in several proposed ways: by using previous studies of substitute drug marketplace introduction; using rebate renegotiations with certain large MCOs; utilizing tax incidence analysis; or using "some other method" he does not specifically describe. French asserts that all information necessary to construct any of these proposed models is available either from Wyeth or from public sources.

For individual consumers, French proposes to use the same benchmark derived for the third party payors, apparently based on his assumption that the ARP is directly related to the AWP. He then intends to calculate the aggregate retail value of Premarin

-18-

sold during the class period, and to reduce that amount to reflect the average percentage of the United States' uninsured population during the class period.

Wyeth objects to this proposed methodology, arguing that French's assumptions are fatally flawed in several key respects. Wyeth contends that its expert Snyder's "real-world statistics" (based on data from IMS, which both experts agree provides reliable empirical data about pharmaceutical pricing) disprove French's basic assumptions. The proposed "competitive benchmark" studies are all critically flawed and do not apply to the facts concerning Cenestin's introduction to the market, especially because Cenestin is not a true "substitute" for Premarin. Wyeth contends there are critical distinctions between "average" retail prices (which French proposes to use) and "actual" retail prices, that vary widely. And, Wyeth argues that Plaintiffs fail to account for the real-world impact of consumer insurance coverage and drug "co-pays" on the proposed consumer class members who have insurance.

Plaintiffs' expert French has not actually constructed the pricing model he describes, nor has he actually calculated the "competitive benchmark" he describes. This makes "rigorous analysis"[7] of the facts and assumptions he will **actually** use to derive that benchmark somewhat difficult. The Court expresses no opinion on the ultimate validity of his proposed model, or

---

[7] See General Tel. Co. of S.W. v. Falcon, 457 U.S. 147, 161 (1982).

whether his actual "competitive benchmark" method will be able to demonstrate "common impact" under Rule 23. The "reasonable quantification" of damages may also be more difficult here than in cases involving agreements among competitors to restrain the introduction of true generic substitutes for a branded pharmaceutical. Finally, the Court expresses no opinion on the validity of "fluid recovery" or "class-wide damage calculations" which Wyeth posits as evils inherent in Dr. French's proposals. It is beyond dispute that Plaintiffs must prove not only antitrust impact but quantifiable, actual damages flowing from that impact. These subjects will no doubt be addressed in later proceedings.

Although this is a close question on the record presented to date, the Court cannot find that French's proposed methodology is so fatally flawed that Plaintiffs should be denied class certification at this point.

(b) Consumers With Co-Pays:

Wyeth asserts that the original named class representatives who were withdrawn by Plaintiffs (Doc. 49) were all members of health plans that charge subscribers "flat copays" for medications. Wyeth asserts these people were not "impacted" by Wyeth's alleged anticompetitive conduct, because their cost for Premarin was not affected by Wyeth's pricing. French apparently agrees, as he testified that he found it "hard to see" that someone with a flat co-pay was injured. He also acknowledged that his proposed model will not account for damages allegedly

sustained by insured consumers with partial co-pays of any sort.
(French Depo. pp. 475-479)  Despite this, Plaintiffs argue that
the issue of co-pays is not relevant under the "collateral
source" doctrine, or at worst may be relevant only to individual
damage calculations.

It is conceivable that Wyeth's alleged anti-competitive
price for Premarin had some economic "impact" on consumers with
flat co-pays; premiums for health insurance, for example, might
be affected by higher pharmaceutical prices paid by the insurer.
But, the evidentiary difficulties involved in such an inquiry
would overwhelm the common issues of proof of the
supracompetitive price, and the pass-on to indirect purchasers.
The Court finds that consumers who paid a fixed copayment for
brand name drugs should be excluded from the class.  See In re
Cardizem CD Antitrust Lit., 200 F.R.D. 326, 347 (E.D. Mich.
2001); In Re Relafen Antitrust Litigation, 2004 U.S. Dist. LEXIS
8539 (D. Mass. 2004), at *33-39.  Similarly, consumers whose
health plans fully cover their medication costs were not
"impacted" and should be excluded." These individuals are
excluded from the National Consumer Class and State Consumer
Subclass.

(c)  Predominance of State Law Questions:

---

" The same result applies to any consumer who received
Premarin at no cost to herself, such as Medicaid recipients.
Furthermore, Dr. French acknowledged the issue of cash-paying
patients who purchased Premarin during a hospital stay, at fixed
per-dose prices exceeding all market-driven prices.  The Court
finds these consumers should also be excluded.

-21-

Plaintiffs assert that all of the "Indirect Purchaser States" antitrust statutes are essentially the same, and that the law of "unjust enrichment" is substantially the same in all 50 states. Plaintiffs also suggest that the law of one state - Pennsylvania - could apply to their unjust enrichment claims for class members throughout the 50 states. Thus, Plaintiffs argue, common issues of law predominate for purposes of the state law Subclasses.

Ohio choice-of-law rules apply to this case. <u>Cole v. Mileti</u>, 133 F.3d 433, 437 (6th Cir. 1998). For tort actions, the law of the state where the injury took place will apply unless another state has a more significant relationship to the claim. <u>Morgan v. Biro Mfg. Co.</u>, 15 Ohio St.3d 339, 342, 474 N.E.2d 286 (1984). The factors set forth in the Restatement (Second) of Conflict of Laws, Section 6 (1998) apply to determine whether another state has a more significant relationship. Those factors include the needs of the interstate system; relevant policies of both the forum and other interested states; the protection of justified expectations; and certainty and uniformity of result.

The "injury" here is a plaintiff's payment of the allegedly supracompetitive price for Premarin. Thus, at least for purposes of class certification, it appears that the law of the state where the consumer or third-party payor paid for Premarin will apply to that class member's state law claims. The Court rejects Plaintiffs' suggestion that it should apply the law of just one state - Pennsylvania - to the unjust enrichment claims.

-22-

Class actions governed by the laws of multiple states have been viewed with serious reservations. See In re American Med. Systems, Inc., 75 F.3d 1069, 1085 (6th Cir. 1996); In re Bridgestone/Firestone, Inc., 288 F.3d 1012, 1015 (7th Cir. 2002). If state law is uniform, however, the fact that multiple states' laws will be applied does not raise manageability issues that would militate against certification. See, e.g., Stirman v. Exxon Corp., 280 F.3d 554, 563-64 (5th Cir. 2002) [court must consider whether variations in state law defeat predominance under Rule 23(b)(3)]. Moreover, the Court can create subclasses to properly address state law variation without destroying the superiority of the class action device, assuming some degree of uniformity in the "critical" state law issues. See, e.g., In Re Telectronics Pacing Systems, 172 F.R.D. 271 (S.D. Ohio 1997), creating subclasses to account for state law variations in negligence and strict liability laws.

(i) Count III (State Law Antitrust Claims):

Plaintiffs' survey of state statutes (Doc. 63, Exhibit A) attempts to illustrate uniformity among the twenty-two states listed there.[3] A closer inspection reveals this is not necessarily the case. It is not enough that a state statute is

---

[3] The Court has dismissed the state law claims under New Jersey and Louisiana law, leaving the following states for which Plaintiffs seek certification: Arizona, District of Columbia, Florida, Iowa (raised for the first time in Plaintiffs' Reply Memorandum based on recent case law), Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin.

"generally" in harmony with federal antitrust law.  Rather, the
state laws at issue must be substantially similar with respect to
important issues such as required proof of individual injury,
statutes of limitation, or remedies available (especially with
regard to treble or exemplary damages), in order to establish
"predominance" for purposes of Rule 23(b)(3).

A review of some of these questions reveals some significant
differences.  For example:

• The District of Columbia antitrust statute appears to be
unique in its express language regarding the required quantum of
proof: "In any class action brought under this section by
purchasers or sellers, the fact of injury and the amount of
damages sustained by members of the class may be proven on a
class-wide basis, without requiring proof of such matters by each
individual member of the class."  D.C. Code Section 28-4508(c).
Other "indirect purchaser states" appear to require proof of
injury to each class member.  See, e.g., In re Florida Microsoft
Antitrust Lit., 2002 WL 31423620 (Fla. Cir. Ct. Aug. 26, 2002)
[granting certification to indirect purchaser class because
plaintiffs' economist presented plausible method to demonstrate
that overcharges "were passed on to every class member"]; Melnick
v. Microsoft Corp., 2001 WL 1012261 (Me. Super.Ct., Aug. 24,
2001) [denying class certification because plaintiff's expert had
not undertaken an analysis on Maine data that could prove impact
to each class member]; A&M Supply v. Microsoft Corp., 252
Mich.App. 580, 654 N.W.2d 572 (2002) [reviewing Michigan cases

and denying class certification]; and <u>Gordon v. Microsoft Corp.</u>,
2001 WL 366432 (Minn. Dist. Ct. Mar. 30, 2001) [discussing
Minnesota cases, and granting certification because plaintiffs
presented viable method for proving individual damages].

Given this critical distinction, the Court will not certify
the District of Columbia claim.

• New York law expressly provides that any action to recover a
statutory penalty may not be maintained as a class action, unless
the statute at issue specifically authorizes class certification.
N.Y. C.P.L.R. §901(b). New York's antitrust statute (the "Donnelly
Act") authorizes treble damages recovery, which has been held to be
a "penalty" covered by §901(b). See <u>Cox v. Microsoft Corp.</u>, 290
A.D.2d 206, 737 N.Y.S.2d 1, 2 (N.Y. App. Div. 2002); and <u>Asher v.
Abbott Labs.</u>, 290 A.D. 208, 737 N.Y.S.2d 4 (N.Y. App. Div. 2002).
This is not merely a state procedural requirement which, under <u>Hanna
v. Plumer</u>, 380 U.S. 460, 471-74 (1965), would yield to federal
procedure embodied in Rule 23. Rather, Section 901(b) is a
substantive law of the state of New York, which under the <u>Erie</u>
doctrine this Court cannot ignore in analyzing Rule 23's
predominance question. Plaintiffs' claims under New York law, if
certified, could proceed only for actual damages. This would
require the class representatives to waive all claims for treble
damages or other "penalties" within the meaning of CPLR §901(b) on
behalf of all New York class members. Imposing such a waiver at the
outset would raise inherent conflicts in the putative class, along
with manageability issues at trial. The Court will not certify the

-25-

Count III claim under New York law.

• Plaintiffs purport to bring some of their state law claims under "consumer protection" statutes, rather than state antitrust statutes that presumably mirror the federal antitrust laws. These states appear to be Florida, Massachusetts and Vermont. While cases from those jurisdictions have permitted indirect purchaser suits under those consumer protection statutes, Plaintiffs do not discuss any potential differences in the qualitative conduct covered by the statute, nor any differences in the proofs required or remedies available.

• At least one state - Nevada - has a fairly recent statutory amendment permitting indirect purchaser actions. See N.R.S. §598A.210, effective October 1, 1999. The only Nevada case cited by the parties indicates that the amendment is not retroactive, and the Court is unable to find any contrary authority. Thus, Nevada class members have no claim prior to that date. This conflicts with the Class Period Plaintiffs seek, which begins on March 24, 1999.[10]

• Finally, at least one state antitrust statute seems to proscribe only "concerted action." Compare: Kan. Stat. Ann. §50-132: "No person . . . shall conspire or combine with any other persons, within or without the state for the purpose of monopolizing any line of business. ..." with 9 Vt. Stat. Ann. 2453(a),

_____

[10] The Nevada statute also requires the complaint to be mailed to the Nevada Attorney General "simultaneously" with the filing of the Complaint. This requirement may be a substantive requirement of Nevada law, as the pre-1999 history of Nevada's antitrust statute makes clear that only the state had the right to bring antitrust damage actions.

proscribing "unfair method of competition or unfair or deceptive acts . . .". It is not clear that the challenged rebate contracts, which are not per se illegal, are the type of "conspiracy" or "combination" that the Kansas statute (and any others like it) are intended to reach.

In sum, the Court finds:

(1) a State Subclass will be certified in those "Indirect Purchaser States" with an antitrust statute and that do not substantially vary in critical aspects of substantive law. These states preliminarily appear to be: Arizona, Iowa, Maine, Michigan, Minnesota, Mississippi, New Mexico, North Carolina, North Dakota, South Dakota, Tennessee, West Virginia and Wisconsin. Kansas shall be included in this group, assuming that the "concerted action" language in its statute can reach the conduct challenged in this case. This certification will be amended or revoked should this conclusion prove unsound.

(2) A State Subclass for the states of Florida, Massachusetts and Vermont will be certified, for the Plaintiffs' claims arising under these states' "consumer protection" statutes. Further briefing will be necessary concerning the critical issues discussed above.

(3) A Nevada Subclass will have to be certified for the Nevada plaintiffs, as there will have to be separate treatment of the Nevada consumers due to the unique statutory situation there.

(b) Unjust Enrichment Claims:

Plaintiffs seek certification of a nationwide class, of all

-27-

Premarin consumers and TPP's in all fifty states, for the equitable claim of unjust enrichment. Plaintiffs argue that the law of unjust enrichment is substantially similar in all fifty states, justifying a "nationwide" class. Plaintiffs do not address in a meaningful way the question of whether states that do not recognize indirect purchaser antitrust suits would permit indirect purchasers to seek the equitable remedy of unjust enrichment as an alternative. It is clear that, at least in some states, the answer to that question is no. See, e.g., Johnson v. Microsoft Corp., 155 Ohio App.3d 626, 2003 Ohio 7153 (Ohio App. Dec. 30, 2003), review granted, 2004 Ohio 2763, 2004 Ohio LEXIS 1189 (May 27, 2004) [indirect purchasers' unjust enrichment claim was essentially an "antitrust claim in a different guise" and prohibited by Ohio's bar on antitrust indirect purchaser suits]. See also, Abbott Labs. v. Segura, 907 S.W.2d 503 (Tex. 1995) [indirect purchasers barred from suit under Texas antitrust act cannot bring similar action under Texas consumer protection act, but no explicit discussion of availability of unjust enrichment remedy].

The Court finds that certifying an unjust enrichment claim in a state where no antitrust claim is being certified gives rise to a multitude of manageability and due process issues. The Court is also concerned that the contrary approach is inconsistent with the superiority requirements of Rule 23. For example, if the Court certified the New York unjust enrichment claim, a judgment in this case could be found to be a waiver of the New York class members' antitrust claims, which this Court is not certifying. Providing

-28-

notice to the purported "nationwide" class poses serious problems. Ongoing management of this case would devolve into a procedural morass. Considering all of the Rule 23 factors, it appears appropriate and fair to all parties that the unjust enrichment claims be certified only in those states where the antitrust claims are being certified. See, e.g., <u>In Re Relafen Antitrust Lit.</u>, 2004 U.S. Dist. LEXIS at *70-71.

<u>CONCLUSION</u>

Plaintiffs' motion for class certification is granted in part and denied in part. Defendants' motion for an evidentiary hearing is denied. Defendants' motion for leave to file supplemental brief in opposition to Plaintiffs' motion for certification is granted.

DATED:    <u>June 30, 2004</u>         <u>s/ Sandra S. Beckwith</u>
                                Sandra S. Beckwith
                                United States District Judge

-29-

# TAB 6

Westlaw.

--- A.2d ----
--- A.2d ----, 2006 WL 827285 (N.J.Super.A.D.)
**(Cite as: — A.2d ----)**

Page 1

# H

--- A.2d ----Only the Westlaw citation is currently available.

Superior Court of New Jersey,Appellate Division.
INTERNATIONAL UNION OF OPERATING
ENGINEERS LOCAL # 68 WELFARE FUND,
Plaintiff-Respondent,
v.
MERCK & CO., INC., Defendant-Appellant.
Argued Jan. 31, 2006.
Decided March 31, 2006.

### SYNOPSIS

**Background:** Third-party payor of healthcare benefits plan brought action against prescription drug manufacturer, alleging violation of Consumer Fraud Act (CFA). The Superior Court, Law Division, Atlantic County, Higbee, J., certified nationwide class of third-party payors who had paid any person or entity for the purchase of the drug. Manufacturer appealed.

**Holdings:** The Superior Court, Appellate Division, Lefelt, J.A.D., held that:

10(1) certification was warranted, as common questions predominated over individual questions, and

20(2) New Jersey consumer fraud law would apply to all claims.

Affirmed.

[1] Appeal and Error 30 ☞949

30 Appeal and Error
    30XVI Review
        30XVI(I1) Discretion of Lower Court
            30k949 k. Allowance of Remedy and Matters of Procedure in General. Most Cited Cases
Review standard for grant of class certification focuses on whether the certifying judge has abused her discretion.

[2] Appeal and Error 30 ☞893(1)

30 Appeal and Error

30XVI Review
    30XVI(F) Trial De Novo
        30k892 Trial De Novo
            30k893 Cases Triable in Appellate Court
                30k893(1) k. In General. Most Cited Cases
Judge's legal decisions in granting class certification, including choice of law, are reviewed de novo.

[3] Parties 287 ☞35.37

287 Parties
    287III Representative and Class Actions
        287III(B) Proceedings
            287k35.37 k. Consideration of Merits. Most Cited Cases
Class certification should generally not be denied based on the complaint's merits, and plaintiff's allegations must be considered to be true and accorded every favorable view; question is not whether plaintiff can prevail on its claims, but whether the prosecution and defense of the claims are best addressed on a class-wide basis.

[4] Consumer Protection 92H ☞3

92H Consumer Protection
    92HI In General
        92Hk2 Constitutional and Statutory Provisions
            92Hk3 k. Purpose, Intent, and Construction in General. Most Cited Cases
Consumer Fraud Act (CFA) was enacted to protect the consumer against fraudulent and unconscionable practices in the sale of consumer goods and services. N.J.S.A. 56:8-2.

[5] Consumer Protection 92H ☞34

92H Consumer Protection
    92HII Remedies of Consumer
        92Hk34 k. Fraud, Knowledge, Intent, or Reliance as Necessary Elements. Most Cited Cases
If the alleged violation of Consumer Fraud Act (CFA) is an affirmative act, it is not necessary to prove that the defendant intended to commit the unlawful act; if the alleged violation involves an omission, as contrasted with an affirmative act, then the plaintiff must show that the defendant acted with knowledge and intended to commit the deception. N.J.S.A. 56:8-2.

[6] Consumer Protection 92H ☞3

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- A.2d ----                                                                    Page 2
--- A.2d ----, 2006 WL 827285 (N.J.Super.A.D.)
**(Cite as: --- A.2d ----)**

92H Consumer Protection
   92HI In General
      92Hk2 Constitutional and Statutory Provisions
         92Hk3 k. Purpose, Intent, and Construction in
General. Most Cited Cases

**Consumer Protection 92H** &#9901;40

92H Consumer Protection
   92HIII Remedies of Consumer
      92Hk36 Actions
         92Hk40 k. Judgment and Relief. Most Cited
Cases

**Consumer Protection 92H** &#9901;42

92H Consumer Protection
   92HIII Remedies of Consumer
      92Hk36 Actions
         92Hk42 k. Costs and Fees. Most Cited Cases
Consumer Fraud Act (CFA) is intended to be applied
liberally and has three main purposes: to compensate
the victim; to punish the wrongdoer through the award
of treble damages; and, by way of the counsel
provision, to attract competent counsel to counteract the
community scourge of fraud. N.J.S.A. 56:8-2.

**[7] Parties 287** &#9901;35.71

287 Parties
   287III Representative and Class Actions
      287III(C) Particular Classes Represented
         287k35.71 k. Consumers, Purchasers,
Borrowers, or Debtors. Most Cited Cases
Consumer fraud class actions should be liberally
allowed where consumers are attempting to redress a
common grievance under circumstances that would
make individual actions uneconomical to pursue.
N.J.S.A. 56:8-2.

**[8] Parties 287** &#9901;35.1

287 Parties
   287III Representative and Class Actions
      287III(A) In General
         287k35.1 k. In General. Most Cited Cases
Purpose of class certification is to save time and money
for the parties and the public and to promote consistent
decisions for people with similar claims.

**[9] Consumer Protection 92H** &#9901;4

92H Consumer Protection

   92HI In General
      92Hk4 k. Prohibited Practices, in General. Most
Cited Cases
As a prerequisite to the right to bring a private action
under Consumer Fraud Act (CFA), a plaintiff must be
able to demonstrate that he or she suffered an
ascertainable loss as a result of the unlawful conduct.
N.J.S.A. 56:8-2.

**[10] Parties 287** &#9901;35.73

287 Parties
   287III Representative and Class Actions
      287III(C) Particular Classes Represented
         287k35.73 k. Insurance Claimants. Most Cited
Cases
Requirements for class action certification, that
common questions predominate over individual
questions and that class action be superior to other
litigation methods, were satisfied, and thus certification
of nationwide class of third-party payors of healthcare
benefits was warranted in action against prescription
drug manufacturer, alleging that manufacturer's
misrepresentations relating to drug safety violated
Consumer Protection Act; manufacturer's alleged
misrepresentation was a cause of loss that would not
require individualized proof, loss was not dependent on
any injury to individual patients, and damages owed to
individual members could be easily calculated, and
New Jersey consumer fraud law, rather than consumer
fraud law of any other state, was applicable to claims.
N.J.S.A. 56:8-2.

**[11] Consumer Protection 92H** &#9901;34

92H Consumer Protection
   92HIII Remedies of Consumer
      92Hk34 k. Fraud, Knowledge, Intent, or Reliance
as Necessary Elements. Most Cited Cases
While common law fraud requires proof of reliance,
consumer fraud under Consumer Fraud Act (CFA)
requires only proof of a causal nexus between the
misrepresentation or concealment of the material fact
by a defendant and the loss, suffered by "any person."
N.J.S.A. 56:8-2.

**[12] Consumer Protection 92H** &#9901;4

92H Consumer Protection
   92HI In General
      92Hk4 k. Prohibited Practices, in General. Most
Cited Cases
Finding of liability under Consumer Fraud Act (CFA)
does not require that wrongful conduct be the sole

--- A.2d ----
Page 3
--- A.2d ----, 2006 WL 827285 (N.J.Super.A.D.)
**(Cite as: — A.2d —)**

cause of the loss, but merely that it be a cause. N.J.S.A. 56:8-2.

**[13] Consumer Protection 92H ☜4**

92H Consumer Protection
   92HI In General
      92Hk4 k. Prohibited Practices, in General. Most Cited Cases
"Ascertainable loss," for purposes of Consumer Fraud Act (CFA), means either out-of-pocket loss or a loss in value; term is defined as more than a monetary loss, and encompasses situations where a consumer receives less than what was promised. N.J.S.A. 56:8-2.

**[14] Parties 287 ☜35.17**

287 Parties
   287III Representative and Class Actions
      287III(A) In General
         287k35.17 k. Community of Interest; Commonality. Most Cited Cases
In actions involving nationwide class, variations in state law may overwhelm common issues and preclude class certification.

**[15] Action 13 ☜17**

13 Action
   13II Nature and Form
      13k17 k. What Law Governs. Most Cited Cases
To determine which law applies in a multi-state dispute, courts employ a flexible governmental interest analysis to determine which state has the greatest interest in governing the specific issue that arises in the underlying litigation.

**[16] Action 13 ☜17**

13 Action
   13II Nature and Form
      13k17 k. What Law Governs. Most Cited Cases
First prong of "governmental interest" choice-of-law analysis requires determination of whether there is actual conflict between laws of states involved.

**[17] Action 13 ☜17**

13 Action
   13II Nature and Form
      13k17 k. What Law Governs. Most Cited Cases
Second prong of "governmental interest" choice-of-law analysis is to identify the governmental policies underlying the law of each state and how those policies

are affected by each state's contacts to the litigation and to the parties; it is the qualitative, not the quantitative, nature of a state's contacts that ultimately determines whether its law should apply.

**[18] Action 13 ☜17**

13 Action
   13II Nature and Form
      13k17 k. What Law Governs. Most Cited Cases
Under "governmental interest" choice-of-law analysis, if state's contacts with the litigation are not related to the policies underlying its law, then that state does not possess an interest in having its law apply.

**[19] Action 13 ☜17**

13 Action
   13II Nature and Form
      13k17 k. What Law Governs. Most Cited Cases
Choice of law analysis is not a simple tabulation of contacts between the litigation and the respective states; analysis must be geared toward determining how the contacts relate to and affect the governmental policies underlying each state's statute. Restatement (Second) of Conflict of Laws § 145.

**[20] Consumer Protection 92H ☜1**

92H Consumer Protection
   92HI In General
      92Hk1 k. In General. Most Cited Cases
New Jersey consumer fraud law, rather than consumer fraud law of any other state, would apply in class action against prescription drug manufacturer by nationwide class of third-party payors who had paid any person or entity for the purchase of the drug; plaintiff class representative was organized and operating in New Jersey, manufacturer's corporate home was located in New Jersey, drug was developed and tested in New Jersey, fraud allegedly was conceived of and executed from New Jersey, application of New Jersey law would not undermine other states' interests, and New Jersey's strong interest in the litigation was present across the entire class. N.J.S.A. 56:8-2.

**[21] Consumer Protection 92H ☜3**

92H Consumer Protection
   92HI In General
      92Hk2 Constitutional and Statutory Provisions
         92Hk3 k. Purpose, Intent, and Construction in General. Most Cited Cases
Consumer Fraud Act (CFA) was enacted to address

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- A.2d ----
--- A.2d ----, 2006 WL 827285 (N.J.Super.A.D.)
(Cite as: --- A.2d ---)

Page 4

rampant consumer complaints about fraudulent practices in the marketplace and to deter such conduct by merchants. N.J.S.A. 56:8-2.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Docket No. L-3015-03.

Christopher J. Michie and John H. Beisner argued the cause for appellant (Dechert LLP, attorneys; Diane P. Sullivan and Richard Jasaitis, III, on the brief).

Christopher A. Seeger argued the cause for respondent, International Union of Operating Engineers Local # 68 Welfare Fund (Seeger, Weiss, LLP, attorneys; Mr. Seeger, David R. Buchanan, Diogenes P. Kekatos, James A. O'Brien, III, and Jeffrey S. Grand, on the brief; and Lynch, Keefe, Bartels, LLC, attorneys; John E. Keefe, Jr., of counsel and on the brief, and Goforth, Lewis, Sanford, LLP, attorneys; Carlene Rhodes Lewis and Shelley Sanford, of counsel and on the brief).

Michael Dore argued the cause for respondent Pharmaceutical Research & Manufacturers of American (Lowenstein Sandler, attorneys; Mr. Dore and Rosemary E. Ramsay, of counsel and on the brief). Porzio, Bromberg & Newman, attorneys for amicus curiae, Product Liability Advisory Council, Inc. (Hugh F. Young, Jr., of counsel; Anita Hotchkiss, Linda Pissott and Michael Rowan, on the brief).

Theodore M. Lieverman, of the Philadelphia Bar, admitted pro hac vice, argued the cause for amici curiae, AARP, American Federation of State, County & Municipal Employees, and Center For Medical Consumers, Central New York Citizens In Action, Citizen Action of New York, Commonwealth Care Al/alliance, Inc., Florida Chain, Gray Panthers of Sacramento, Health Care For All, Lynn Health Task Force, Medicare Rights Center, New Jersey Citizen Action, New Jersey PIRG Law & Policy Center, Pennsylvania Employees Benefit Trust Fund, Prescription Access Litigation Project, United Senior Action of Indiana, Elaine Kleinman, and Ronald Martin (Spector, Roseman & Kodroff; Hagens, Berman, Sobol, Shapiro; and Christopher M. Cosley, attorneys; Mr. Lieverman, Thomas M. Sobol, Steve W. Berman, Elizabeth A. Fegan and Christopher Cosley, on the brief).

Before Judges LEFELT, R.B. COLEMAN and SELTZER.

Christopher J. Michie and John H. Beisner argued the cause for appellant (Dechert LLP, attorneys; Diane P. Sullivan and Richard Jasaitis, III, on the brief). Christopher A. Seeger argued the cause for respondent, International Union of Operating Engineers Local # 68 Welfare Fund (Seeger, Weiss, LLP,

attorneys; Mr. Seeger, David R. Buchanan, Diogenes P. Kekatos, James A. O'Brien, III, and Jeffrey S. Grand, on the brief; and Lynch, Keefe, Bartels, LLC, attorneys; John E. Keefe, Jr., of counsel and on the brief, and Goforth, Lewis, Sanford, LLP, attorneys; Carlene Rhodes Lewis and Shelley Sanford, of counsel and on the brief). Michael Dore argued the cause for respondent Pharmaceutical Research & Manufacturers of American (Lowenstein Sandler, attorneys; Mr. Dore and Rosemary E. Ramsay, of counsel and on the brief). Porzio, Bromberg & Newman, attorneys for amicus curiae, Product Liability Advisory Council, Inc. (Hugh F. Young, Jr., of counsel; Anita Hotchkiss, Linda Pissott and Michael Rowan, on the brief). Theodore M. Lieverman, of the Philadelphia Bar, admitted pro hac vice, argued the cause for amici curiae, AARP, American Federation of State, County & Municipal Employees, and Center For Medical Consumers, Central New York Citizens In Action, Citizen Action of New York, Commonwealth Care Al/alliance, Inc., Florida Chain, Gray Panthers of Sacramento, Health Care For All, Lynn Health Task Force, Medicare Rights Center, New Jersey Citizen Action, New Jersey PIRG Law & Policy Center, Pennsylvania Employees Benefit Trust Fund, Prescription Access Litigation Project, United Senior Action of Indiana, Elaine Kleinman, and Ronald Martin (Spector, Roseman & Kodroff ; Hagens, Berman, Sobol, Shapiro ; and Christopher M. Cosley, attorneys; Mr. Lieverman, Thomas M. Sobol, Steve W. Berman, Elizabeth A. Fegan and Christopher Cosley, on the brief).

**\*1** The opinion of the court was delivered by
LEFELT, J.A.D.

Plaintiff, International Union of Operating Engineers Local # 68 Welfare Fund, is a joint union-employer Taft-Hartley trust fund, organized and operating in New Jersey as a third-party payor sponsoring a healthcare benefits plan, which provides prescription drug coverage to its members and is administered by Horizon Blue Cross/Blue Shield of New Jersey. Plaintiff accused the maker of the prescription drug Vioxx, Merck & Co., a New Jersey corporation, of misrepresenting the safety of Vioxx as well as concealing information relating to serious health risks associated with the drug thereby violating New Jersey's Consumer Fraud Act (the Act), N.J.S.A. 56:8-1 to -20. Plaintiff claims that, had Merck not committed fraud in violation of the Act, it and all third-party payors in the United States would not have paid to cover the high cost of Vioxx (also known as rofecoxib) because its purported safety and cost-effectiveness would have been revealed as false. We granted leave to appeal after Judge Higbee certified a nationwide class of plaintiffs under R. 4:32-1, thereby allowing plaintiff to sue Merck

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

in New Jersey on behalf of itself and all third-party payors in the fifty states and the District of Columbia who have paid any person or entity for the purchase of Vioxx since May 1, 1999, when Vioxx was approved by the Federal Food & Drug Administration (FDA) for "the relief of signs and systems of osteoarthritis [degenerative joint disease], management of acute pain in adults, and treatment of primary dysmenorrhea [difficult and painful menstruation]." We affirm.

I.

Before we address the specific class action questions confronting us, we explain some of the basic facts, terms, and concepts necessary to understand the dispute. Plaintiff alleges that while attempting to market and sell Vioxx, Merck fraudulently misrepresented and suppressed material information regarding the drug and its comparative safety and efficacy as compared with traditional competitors. According to plaintiff, third-party payors across the nation were specifically targeted with this false marketing, advertising, and promotion in an attempt to justify the high cost that was being charged for the new drug. Plaintiff claimed that Vioxx was introduced "at a wholesale cost of approximately $72 for a 30-day supply. In contrast, traditional [competitor pain medications] wholesaled for $9.00 or less for the same 30-day supply."

Besides Taft-Hartley funds like plaintiff, third-party payors of health benefit plans can be health maintenance organizations (HMOs), self-insured employers, insurance companies, and governments on the federal, state, and local levels. The plaintiffs' class Judge Higbee approved consists of all "third-party non-government payors [in all States and the District of Columbia] who have paid any person or entity for the purchase of [Vioxx]."

As with most health care plans that provide prescription drug benefits, plaintiff's plan utilizes a drug "formulary," which lists prescription and non-prescription drugs and the extent to which they are covered under the plan. For instance, a drug listed on the formulary may be paid for in full or partially by the plan while drugs not listed must be paid for entirely by the patient.

*2 To place drugs on the formulary, third-party payors rely upon the services of prescription benefit managers, or PBMs. According to plaintiff's expert, "roughly 95% of all patients with drug coverage receive benefits administered through [PBMs]. PBMs manage

approximately 70% of the 3 billion prescriptions filed in the United States each year[.]" In particular, in 2002, 65% of the prescriptions that were handled by PBMs were processed by four dominant companies: Merck-Medco (22%), Advance PCS (18%), Walgreen's Health Initiatives (13%), and Express Scripts (12%)."

The PBMs use pharmacy and therapeutics committees (P & T Committees) to develop and maintain the formulary of approved drugs. The P & T Committees consist of actively practicing physicians, pharmacists, and other healthcare professionals. Although the P & T Committees may operate in different fashion and perhaps even consider some different information, the overriding goals are to evaluate a drug's effectiveness, safety, and cost.

Merck's expert pointed out that different drug prescription plans often provide different levels of coverage and benefits for the same drug. For example, when disclosures occurred regarding potential cardiovascular risks associated with Vioxx, some plans moved Vioxx from the tier it shared with Celebrex, a competitor of Vioxx, to a higher tier, thus increasing the patient co-pay for Vioxx, and discouraging its use. Other plans recommended additional restrictions such as requiring prior authorization and still others made no changes following the disclosure of the cardiovascular risks associated with Vioxx.

In any event, Merck voluntarily withdrew Vioxx from the market on September 30, 2004. The company's decision was effective immediately and ostensibly based, at least in part, on a three-year clinical trial that disclosed "an increased risk for confirmed cardiovascular events, such as heart attack and stroke, beginning after 18 months of treatment in the patients taking Vioxx compared to those taking [a] placebo." Thus, this appeal involves the time period from May 1999, when the drug was introduced, until it was withdrawn at the end of September 2004.

II.

Basically, the issue framed for review by Merck's interlocutory appeal is whether Judge Higbee properly certified a nationwide class in this matter and correctly found that the common issues among all members of the class predominated and that resolution of the entire consumer fraud dispute was subject to New Jersey's Act.

[1][2] Preliminarily, before we detail the principles governing class actions in New Jersey, we note that our

review standard focuses on whether the judge has abused her discretion. *Muise v. GPU, Inc.,* 371 *N.J.Super.* 13, 29-30, 851 *A.*2d 799 (App.Div.2004). Thus, for example, Judge Higbee's decisions certifying the nationwide class of plaintiffs and finding that common issues of law and fact predominate are reviewed on this basis. *See In re Cadillac V8-6-4 Class Action,* 93 *N.J.* 412, 436-39, 461 *A.*2d 736 (1983). The judge's legal decisions, however, including her choice of New Jersey law to govern the entire class, is reviewed de novo. *See Manalapan Realty v. Tp. Comm.,* 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995).

*3 [3] As another preliminary matter, we note, as did the motion judge, that class certification should generally not be denied based on the complaint's merits. *Olive v. Graceland Sales Corp.,* 61 *N.J.* 182, 189, 293 *A.*2d 658 (1972). In fact, plaintiff's allegations must be considered to be true and accorded "every favorable view." *Delgozzo v. Kenny,* 266 *N.J.Super.* 169, 181, 628 *A.*2d 1080 (App.Div.1992) (quoting *Blackie v. Barrack,* 524 *F.*2d 891, 901 n. 17 (9th Cir .1975), *cert. denied,* 429 *U.S.* 816, 97 *S.Ct.* 57, 50 *L. Ed.*2d 75 (1976), and *Riley v. New Rapids Carpet Center,* 61 *N.J.* 218, 223, 294 *A.*2d 7 (1972)). The question is not whether plaintiff can prevail on its claims, but whether the prosecution and defense of these claims are best addressed on a class-wide basis. *Riley, supra,* 61 *N.J.* at 226-28, 294 *A.*2d 7. Thus, in reviewing Judge Higbee's decision, we assume that plaintiff will be able to prove the serious and extensive allegations of fraud allegedly perpetrated by Merck.

Under New Jersey's class action rules, there are four general prerequisites to such an action: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class," and finally, "(4) the representative parties will fairly and adequately protect the interests of the class." *R.* 4:32-1(a).

Besides satisfying the general prerequisites, the class action applicant must also meet an additional requirement. *See R.* 4:32-1(b)(1),(2) and (3). Here, the additional requirement at issue is whether "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." *R.* 4:32-1(b)(3).

There is no challenge in this appeal to Judge Higbee's finding that the trial of this matter presents common

questions of law and fact. These common questions include, for example, whether Merck committed consumer fraud; whether Merck concealed or suppressed material information concerning Vioxx's safety and efficacy; whether Merck engaged in deceptive or misleading promotional campaigns designed to induce P & T Committees to place Vioxx on their formularies and have third-party payors pay for the drug; and whether, as a result of Merck's misrepresentations and omissions, third-party payors were damaged.

In fact, Merck and the amici curiae supporting its position, including Pharmaceutical Research & Manufacturers of America and Product Liability Advisory Council, Inc., do not challenge, on appeal, Judge Higbee's determination that the proposed class meets any of the general prerequisites to a class action under *R.* 4:32-1(a). They do not contest numerosity of parties, common questions of law or fact, typicality of the claims or defenses, or adequate representation of the class by plaintiff. *Ibid.*

*4 Instead Merck, supported by the amici, challenges only whether the trial judge correctly found that common questions predominate and that a class action would be superior to other methods of adjudicating this controversy. *R.* 4:32-1(b)(3). In support of its position, Merck argues that the consumer fraud laws of the various third-party payors' home states must be applied to evaluate their claims of fraud against Merck and that each third-party payor must separately establish causation and ascertainable loss. According to Merck, therefore, the common questions do not predominate over questions affecting each individual third-party payor, certification of the class must be reversed, and regular trial procedures utilized to dispose of each third-party payor's claims. *See Saldana v. City of Camden,* 252 *N.J.Super.* 188, 196-97, 599 *A.*2d 582 (App.Div.1991).

Plaintiff, along with the American Association of Retired Persons and other amici, strongly disagree with Merck's position and contend that the common issues do predominate and that a class action is the preferred method of resolving this dispute. Amici further argue that Merck seeks to "defeat class certification" solely to "make it less likely that class members will be able to effectively and efficiently challenge [Merck's] conduct in any court."

We explain our disagreement with Merck's position by first addressing in Part III, whether individual causation or ascertainable loss proof requirements override the predominance of the common questions of law and fact

--- A.2d ----
--- A.2d ----, 2006 WL 827285 (N.J.Super.A.D.)
**(Cite as: — A.2d —)**

Page 7

that all parties agree are present. We then address in Part IV whether the trial court correctly held that the New Jersey Consumer Fraud Act shall apply to all claims of the entire nationwide class.

### III.

[4] New Jersey's Act was enacted "to protect [the consumer] against fraudulent and unconscionable practices in the sale of consumer goods and services." *Marascio v. Campanella,* 298 *N.J.Super.* 491, 500, 689 *A.*2d 852 (App.Div.1997). The Act imposes liability upon any person who uses "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission[.]" *N.J.S.A.* 56:8-2.

[5] Unlawful practices under the Act "fall into three general categories: affirmative acts, knowing omissions, and regulation violations." *Cox v. Sears Roebuck & Co.,* 138 *N.J.* 2, 17, 647 *A.*2d 454 (1994). If the alleged violation is an affirmative act, it is not necessary to prove that the defendant intended to commit the unlawful act. *Id.* at 17-18, 647 *A.*2d 454; *see Fenwick v. Kay Am. Jeep, Inc.,* 72 *N.J.* 373, 378 (1977) (concluding that intent is not required when defendant affirmatively omits information required to be disclosed by regulation). If the alleged violation involves an omission, as contrasted with an affirmative act, then the plaintiff must show that the defendant acted with knowledge and intended to commit the deception. *Cox, supra,* 138 *N.J.* at 18, 647 *A.*2d 454. While not involved in this case, any violation of a regulation does not require a showing of intent as the violation constitutes strict liability. *Ibid.* "The capacity to mislead is the prime ingredient of all types of consumer fraud." *Id.* at 17, 647 *A.*2d 454 (citing *Fenwick, supra,* 72 *N.J.* at 378, 371 *A.*2d 13).

*5 [6] The Act is intended to be applied liberally, *Lemelledo v. Beneficial Mgmt. Corp. of Am.,* 150 *N.J.* 255, 268, 696 *A.*2d 546 (1997), and "has three main purposes: to compensate the victim ...; to punish the wrongdoer through the award of treble damages ...; and, by way of the counsel provision, to attract competent counsel to counteract the community scourge of fraud [.]" *Lettenmaier v. Lube Conn.,* 162 *N.J.* 134, 139, 741 *A.*2d 591 (1999) (internal citations omitted). Thus, the Act seeks "not only to make whole the victim's loss, but also to punish the wrongdoer and to deter others from engaging in similar fraudulent practices." *Furst v. Einstein Moomjy, Inc.,* 182 *N.J.* 1, 12, 860 *A.*2d 435

(2004) (citing *Cox, supra,* 138 *N.J.* at 21, 647 *A.*2d 454). "The available legislative history demonstrates that the Act was intended to be one of the strongest consumer protection laws in the nation." *New Mea Const. Corp. v. Harper,* 203 *N.J.Super.* 486, 501-02, 497 *A.*2d 534 (App.Div.1985) (citing *Skeer v. EMK Motors, Inc.,* 187 *N.J.Super.* 465, 471-73, 455 *A.*2d 508 (App.Div.1982) (internal quotations omitted)).

[7][8] Furthermore, we prefer that consumer fraud class actions "be liberally allowed where consumers are attempting to redress a common grievance under circumstances that would make individual actions uneconomical to pursue." *Varacallo v. Mass. Mut. Life Ins. Co.,* 332 *N.J.Super.* 31, 45, 752 *A.*2d 807 (App.Div.2000). The purpose of class certification is to "save time and money for the parties and the public and to promote consistent decisions for people with similar claims." *In re Cadillac, supra,* 93 *N.J.* at 430-31, 461 *A.*2d 736 (citing *Fed.R.Civ.P.* 23 Advisory Committee Note, 39 *F.R.D.* 98, 102-03 (1966)). There is also "little doubt that the New Jersey Legislature intended its Consumer Fraud Statute to apply to sales made by New Jersey sellers even if the buyer is an out-of-state resident and some aspect of the transaction took place outside New Jersey." *Boyes v. Greenwich Boat Works, Inc.,* 27 *F.Supp.*2d 543, 547 (D.N.J.1998).

[9] The Act permits recovery, however, only by persons, whether or not New Jersey residents, who suffer "any ascertainable loss." *N.J.S.A.* 56:8-19. "As a prerequisite to the right to bring a private action," under the Act, "a plaintiff must be able to demonstrate that 'he or she suffered an 'ascertainable loss ... as a result of the unlawful conduct.' " *Theidemann v. Mercedes-Benz,* 183 *N.J.* 234, 246, 872 *A.*2d 783 (2005) (internal citations and quotations omitted)).

[10] Here, Merck claims that Judge Higbee erred in certifying the class action because each plaintiff "would have to establish that Merck's alleged misrepresentations and omissions caused individual doctors to prescribe Vioxx and individual P & T Committees to include Vioxx on health plan formularies." The class action litigation format is inferior to individual lawsuits, according to Merck, because all of the P & T Committees relied on differing factors in reaching their conclusions on formulary placement.

*6 To establish consumer fraud in this case, plaintiff must prove either that Merck affirmatively misrepresented a fact material to the placement of Vioxx on a formulary or that Merck omitted a material fact knowing and intending that others would rely on

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- A.2d ----
--- A.2d ----, 2006 WL 827285 (N.J.Super.A.D.)
(Cite as: --- A.2d ----)

Page 8

the omission to place the drug on their formularies. *See Fenwick, supra,* 72 *N.J.* at 377, 371 *A.*2d 13. Proof of actual reliance upon the fraud by P & T Committees or third-party payors would not be necessary. The Act permits a private civil action by "[a]ny person who suffers any ascertainable loss ... as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act [.]" *N.J.S.A.* 56:8-19.

[11] While common law fraud "requires proof of reliance[,] consumer fraud requires only proof of a causal nexus between the [misrepresentation or] concealment of the material fact [by a defendant] and the loss," suffered by "any person." *Varacallo, supra,* 332 *N.J.Super.* at 43, 752 *A.*2d 807; *N.J.S.A.* 56:8-2; *see also Gennari v. Weichert Co. Realtors,* 148 *N.J.* 582, 607-08, 691 *A.*2d 350 (1997). It is not necessary to prove that each class member specifically relied upon Merck's omissions or misrepresentations. *See Union Ink Co. v. AT & T Corp.,* 352 *N.J.Super.* 617, 646, 801 *A.*2d 361 (App.Div.), *certif. denied,* 174 *N.J.* 547, 810 *A.*2d 66 (2002).

[12] Plaintiff must prove only that its ascertainable loss was "attributable to conduct made unlawful by the [Act]." *Thiedemann, supra,* 183 *N.J.* at 246, 872 *A.*2d 783 (citing *Meshinsky v. Nichols Yacht Sales, Inc.,* 110 *N.J.* 464, 472-73, 541 *A.*2d 1063 (1988) (citing *Daaleman v. Elizabethtown Gas Co.,* 77 *N.J.* 267, 271, 390 *A.*2d 566 (1978))); *N.J.S.A.* 56:8-19. It is not necessary that the wrongful conduct be the sole cause of the loss, but merely that it be a cause. *Varacallo, supra,* 332 *N.J.Super.* at 48, 752 *A.*2d 807.

As Judge Higbee explained, plaintiff alleged "that Merck has engaged in a long-term, widespread, uniform pattern of deception to cover up known adverse side effects of Vioxx in order to gain a profit" by obtaining a favorable position on drug formularies. Among the various means employed to accomplish this goal, plaintiff alleges that defendant avoided studies revealing the negative side effects of Vioxx, engaged in "heavy-handed negotiating tactics with the FDA in order to get approval for Vioxx, and even us[ed] threats and intimidation tactics to silence[ ] critics in the medical profession." It was these allegations, according to the judge, that "suggest[ed] the elements of fraud pervaded every aspect of Merck's actions in developing and marketing Vioxx."

Plaintiff argues that Merck's fraud induced P & T Committees to place Vioxx on healthcare plans' formularies, thereby encouraging physicians to prescribe the medication for patients, which resulted

eventually in the ultimate payment for the prescribed drug by plaintiff third-party payors. Although the causal chain appears somewhat elongated, we cannot say that the alleged fraud was not a cause of the third-party payors' loss.

*7 Because P & T Committees commonly consider information supplied by drug-makers, no P & T Committee could have been completely isolated from Merck's extensive development and marketing efforts. Assuming plaintiff can prove the alleged fraud, it would be unlikely for Vioxx to have received the same treatment by P & T committees absent the wrongful conduct. Even for "open" formularies, which automatically include any FDA-approved drug, the P & T Committee must still choose the drug's placement on the formulary or whether to impose any prescription preconditions to establish the extent to which the plan would cover the cost of the drug.

Once Vioxx was placed on a drug formulary and assigned to a tier, as Judge Higbee noted, "the third-party payor would be contractually obligated to pay for the drug if a plan participant received a prescription for it." Thus, even though other causes for the third-party loss may be germane, the fraudulently induced placement of the drug on the formulary was at least one of the causes for the loss.

Under these circumstances, plaintiff may establish a sufficient nexus between the alleged fraud and ascertainable loss by showing via expert proof that, for example, Merck's overarching scheme of omissions and misrepresentations about Vioxx allowed the company to achieve more favorable placement on the formularies than it otherwise might have. Alternatively, plaintiff could present expert proof that absent Merck's misconduct, Vioxx would not have been on the market at all. Therefore, it would not be necessary to prove causation individually.

[13] Merck further claims Judge Higbee "erred in concluding that each individual class member's 'ascertainable loss' attributable to Merck's conduct could be established through common, class-wide proof." Ascertainable loss means "either out-of-pocket loss or a ... loss in value[.]" *Thiedemann, supra,* 183 *N.J.* at 248, 872 *A.*2d 783. Ascertainable loss "has been broadly defined as more than a monetary loss" and encompasses situations where "a consumer receives less than what was promised." *Union Ink Co., supra,* 352 *N.J.Super.* at 646, 801 *A.*2d 361 (citing *Miller v. Am. Fam. Publishers,* 284 *N.J.Super.* 67, 89-91, 663 *A.*2d 643 (1995)).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- A.2d ----                                                                                    Page 9
--- A.2d ----, 2006 WL 827285 (N.J.Super.A.D.)
**(Cite as: --- A.2d ----)**

Here, it is alleged that Merck represented to doctors, patients, third-party payors, and health care plans alike, that Vioxx was not only safe, but superior to other available pain-killers because of its improved gastrointestinal protection. In reality, Vioxx was not appreciably better than other, less expensive, competitors and actually posed significant additional cardiovascular risks. Plaintiff thus suffered a "loss in value" when, on behalf of its participants, it paid for a drug with serious health risks that Merck did not disclose, rather than choosing, based on full and truthful information, to select competitors' products instead.

In short, when third-party payors paid for Vioxx, they got something less valuable than what was paid for and what had been promised. This loss is not dependent on any injury to individual patients who were prescribed Vioxx and also is not a disguised "fraud-on-the-market" theory, as argued by Merck. *Compare N.J. Citizen Action v. Schering-Plough Corp., 367 N.J.Super. 8, 16, 842 A.2d 174 (App.Div.), certif. denied, 178 N.J. 249, 837 A.2d 1092 (2003).*

*\*8* Although the amounts of loss may differ among putative class members, plaintiff can prove ascertainable loss by classwide expert opinion. Individual variations in the amount of ascertainable loss would not render a class action inferior to individual lawsuits because common questions of liability and the fact of ascertainable loss predominate. *Muise, supra, 371 N.J.Super. at 46, 851 A.2d 799; Delgozzo, supra, 266 N.J.Super. at 190, 628 A.2d 1080.*

Such complications as average manufacturer price, wholesale acquisition cost, rebates and other benefits such as dispensing fees, stocking discounts, and buy back programs, which were raised by amici, may be considered, if necessary, in the remedy portion of the trial. Damages "may be determined on a classwide, or aggregate, basis ... where the computerized records of the particular industry, supplemented by claims forms, provide a means to distribute damages to injured class members in the amount of their respective damages." *In re NASDAQ Market-Makers Antitrust Litig., 169 F.R.D. 493, 526 (S.D.N.Y.1996).* Once aggregate damages are ascertained, a mechanism can easily be established to calculate whatever damages are due individual class members. *See e.g., In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 141 (2d Cir.2001)* (collecting cases that describe management tools available to address individualized damages issues that might arise in a class action).

Therefore the common issues of law and fact relating to

whether Merck committed consumer fraud remain predominant despite plaintiff's need to prove causation and ascertainable loss. *See Varacallo, supra, 332 N.J.Super. at 42, 752 A.2d 807* (finding predominance requires an analysis of plaintiff's underlying theory of liability and the "predictable defenses to the legal claims"); *Saldana, supra, 252 N.J.Super. at 197, 599 A.2d 582.* We remain convinced that the "common nucleus of operative facts" predominates over questions affecting only individual members of the class. *Varacallo, supra, 332 N.J.Super. at 42, 752 A.2d 807* (citing *In re Cadillac, supra, 93 N.J. at 431, 461 A.2d 736* (quoting 7A *Wright & Miller, Federal Practice & Procedure* § 1778 at 53 (1972))). And we move on to decide which state's law must be applied to this dispute.

IV.

[14] When considering a nationwide class, one of the major concerns in the predominance determination is "which state's law should apply to each member of the class." *Fink v. Ricoh Corp., 365 N.J.Super. 520, 568, 839 A.2d 942 (Law Div.2003).* "[V]ariations in state law may overwhelm common issues and preclude a finding of predominance." *Carroll v. Cellco P'ship, 313 N.J.Super. 488, 496, 713 A.2d 509 (App.Div.1998)* (citation omitted). In effect, by having to instruct the jury on the law of numerous states, the class action is often rendered unmanageable, and certification defeated. *Id. at 496-97, 713 A.2d 509* (discussing cases involving state law variances that presented insurmountable obstacles to class certification).

*\*9* [15] To determine which law applies in a multi-state dispute, we "employ a flexible 'governmental interest' analysis to determine which state has the greatest interest in governing the specific issue that arises in the underlying litigation." *Erny v. Estate of Merola, 171 N.J. 86, 94, 792 A.2d 1208 (2002)* (citing *Fu v. Fu, 160 N.J. 108, 117-18, 733 A.2d 1133 (1999)*). The broad common issue arising in this litigation is whether Merck committed consumer fraud in marketing and advertising Vioxx, which caused loss to third-party payors.

[16][17] The first step in applying the governmental interest test to this issue is "to determine whether there is an actual conflict between the laws of the states involved." *Erny, supra, 171 N.J. at 100, 792 A.2d 1208* (citing *Gantes v. Kason Corp., 145 N.J. 478, 484, 679 A.2d 106 (1996)* and *Veazey v. Doremus, 103 N.J. at 244, 248, 510 A.2d 1187 (1986)*). If a conflict exists regarding a pertinent issue, the second step is to "identify the governmental policies underlying the law

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of each state and how those policies are affected by
each state's contacts to the litigation and to the parties."
*Veazey, supra,* 103 *N.J.* at 248, 510 *A.*2d 1187. It is
"the qualitative, not the quantitative, nature of a state's
contacts [that] ultimately determines whether its law
should apply." *Ibid.* We will usually apply a particular
State's law when doing so "will advance the policies
that the law was intended to promote." *Pfizer v.
Employers Ins. of Wausau,* 154 *N.J.* 187, 198, 712 *A.*2d
634 (1998).

When applying the first step of the governmental
interest test, Judge Higbee analyzed the consumer fraud
laws of every state and the District of Columbia and
found that "there are sufficient variations between the
laws of the varying states and [New Jersey's Act] to
constitute an actual conflict." This determination is
eminently correct. *See Fink, supra,* 365 *N.J.Super.* at
570-84, 839 *A.*2d 942.

Indeed, both parties concede that a conflict exists. For
example, New Jersey allows and often encourages
private class actions for consumer fraud while several
other states prohibit private class action consumer fraud
suits. *E.g., Miss.Code Ann.* § 75-24-15(4); *S.C.Code
Ann.* § 39-5-140(a); *Ala.Code* § 8-19-10(f). Our law
finds actionable fraud in connection with the sale of
goods or services for commercial or business uses,
whereas some states "confine their consumer fraud
statute remedies to items purchased 'primarily for
personal, family or household purposes.' " *Fink, supra,*
365 *N.J.Super.* at 572, 839 *A.*2d 942 (citing *Mo. Ann.
Stat.* § 407.025(1); 73 *P.S.* § 201-9.2; *Miss.Code Ann.*
§ 75-24-15(4)). Some states require proof that the
defendant willfully or knowingly made false
representations "with specific intent to deceive," while
New Jersey does not requires such a showing. *Fink,
supra,* 365 *N.J.Super.* at 576, 839 *A.*2d 942.
Furthermore, variations exist in the award of damages,
especially the decision or ability of a court to award
punitive or treble damages. *Id.* at 579-84, 839 *A.*2d
942.

*10 [18] Because there are conflicts present, we
proceed to the second step and "identify the
governmental policies underlying the law of each state
and how those policies are affected by each state's
contact to the litigation and to the parties." *Veazey,
supra,* 103 *N.J.* at 248, 510 *A.*2d 1187; *see Restatement
(Second) of Conflict of Laws* § 6(2)(c)(1971). Notably,
if the state's contacts with the litigation "are not related
to the policies underlying its law, then that state does
not possess an interest in having its law apply." *Veazey,
supra,* 103 *N.J.* at 248, 510 *A.*2d 1187.

In performing the governmental-interest analysis in tort
actions, which include consumer fraud cases, *see
Holmin v. TRW, Inc.,* 330 *N.J.Super.* 30, 35, 748 *A.*2d
1141 (App.Div.2000), we generally consider the
contacts set forth in § 145 of the Restatement (Second)
Conflict of Laws. *Erny, supra,* 171 *N.J.* at 102-03, 792
*A.*2d 1208; *Fu, supra,* 160 *N.J.* at 122, 733 *A.*2d 1133.
These contacts are the place of injury; where the
conduct causing injury occurred; the domicile,
residence, nationality, place of incorporation, and place
of business of the parties; and where the relationship, if
any, between the parties is centered. *Erny, supra,* 171
*N.J.* at 102-03, 792 *A.*2d 1208 (citing *Fu, supra,* 160
*N.J.* at 125, 733 *A.*2d 1133 (citing *Restatement, supra,*
§ 145(2))).

When dealing with fraud and misrepresentations, the
Restatement provides additional guidance. *Restatement,
supra,* § 148. This provision informs that "[w]hen the
plaintiff's action involves fraud or in relation took place in whole or in
part in a state other than that where the false
representations were made," as is the case here, there
are several relevant contacts to determine which state
"has the most significant relationship to the occurrence
and the parties." *Id.* § 148(2)(a)-(f). The Restatement
enumerates six contacts. The first four include, in
pertinent part: "(a) the place ... where the plaintiff acted
in reliance upon the defendant's representations, (b) the
place where the plaintiff received the representations,
(c) the place where the defendant made the
representations, (d) the ... place of incorporation and
place of business of the parties." *Ibid.* The remaining
two contacts enumerated in the Restatement are: "(e)
the place where a tangible thing which is the subject of
the transaction between the parties was situated at the
time, and (f) the place where the plaintiff is to render
performance under a contract which he has been
induced to enter by the false representations of the
defendant." *Ibid.*

Comment j to § 148 of the Restatement provides the
"general approach" that if a plaintiff acts in reliance
upon a defendant's representations in a particular state,
that state's law will usually apply "with respect to most
issues," if certain other conditions are met. For
example, if, in addition to relying on a defendant's
representations, the plaintiff received the defendant's
representations, or is domiciled or has its principal
place of business there, or "this state is the place where
the plaintiff was to render at least the great bulk of his
performance under his contract with the defendant,"
then that state "will usually be the state of applicable
law." *Id.* § 148 comment j.

*11 Merck argues that each of the significant relevant

--- A.2d ----
--- A.2d ----, 2006 WL 827285 (N.J.Super.A.D.)
(Cite as: --- A.2d ----)

Page 11

contacts referenced in the *Restatement's* § 148(2)(a)-(f), pertaining to misrepresentation, except for Merck's place of incorporation and initiation of the alleged fraud, occurred in the state where each prospective plaintiff third-party payor conducts business. Thus, Merck asserts that New Jersey cannot possibly be the State with the strongest interests over this litigation.

[19] The choice of law analysis, however, is not a simple tabulation of contacts and "[n]o definite rules as to the selection of the applicable law can be stated." *Ibid.* As the Restatement points out "any rule of choice of law, like any other common law rule, represents an accommodation of conflicting values." *Restatement, supra, § 6* comment c. Our analysis must be geared toward determining how the contacts relate to and affect the governmental policies underlying each state's statute. *Erny, supra, 171 N.J.* at 103, 792 *A.2d* 1208 (citing *Fu, supra,* 160 *N.J.* at 119, 733 *A.2d* 1133).

As Merck argues, plaintiff's principal place of business is a contact "of substantial significance when the loss is pecuniary in its nature." *Restatement, supra, § 148* comment i. This is so because the state of the victim's residence will bear the social consequences of the victim's loss. *Ibid.; see Fu,* 160 *N.J.* at 131, 733 *A.2d* 1133. However, "the place of loss does not play so important a role in the determination of the law governing actions for fraud and misrepresentation as does the place of injury in the case of injuries to persons or to tangible things." *Restatement, supra, § 148* comment c.

"[W]hen the primary purpose of the tort rule involved is to deter or punish misconduct, the place where the conduct occurred has peculiar significance." *Id.* § 145 comment e. With such a law, seeking to deter or punish misconduct, "the state where the conduct took place may be the state of dominant interest and thus that of most significant relationship." *Id.* § 145 comment c. "The place where the defendant made his false representations ... is as important a contact in the selection of the law governing actions for fraud and misrepresentation as is the place of the defendant's conduct in the case of injuries to persons or tangible things." *Id.* § 148 comment c.

[20] New Jersey's contacts with this dispute are both extensive and weighty. Besides having the plaintiff class representative organized and operating in New Jersey, Merck is a New Jersey corporation with its corporate home located in this state. Vioxx was primarily developed in New Jersey. Scientific research, studies, and presentations relating to the safety of Vioxx and its clinical studies were conducted in this

State. The ultimate decision-making power regarding Vioxx's marketing and development was exercised in New Jersey.

The fraud allegedly was conceived of and executed from New Jersey. Merck's senior-level committee in charge of overseeing the "broad development of [its] products," including Vioxx, and providing "a final sign-off on plans and activities related to the product," met in New Jersey. This group is allegedly connected to deliberate suppression and/or misrepresentation of damaging information concerning Vioxx. In addition, a board of scientific advisors expressed its concerns to Merck in New Jersey. Manipulation of clinical studies allegedly took place in New Jersey as well. It was this manipulation that aimed to spur sales of the drug and, in part, hide its risks. Thus, the claimed misrepresentations and omissions in the marketing and advertising of the drug all emanated largely from New Jersey.

\*12 By contrast, the contacts each prospective member of the plaintiffs' class has had with this litigation relate to receipt of the alleged fraudulent communications and the resulting economic loss. Merck undoubtedly sent representatives and various communications from New Jersey, and perhaps elsewhere, to the states of various third-party payors. However, once Vioxx was added to the various formularies, the third-party payors had no choice but to pay for any Vioxx prescription in accordance with their formularies. The prescription process was controlled by health care providers who are not part of this litigation. Plaintiff, on behalf of the class, is claiming only economic loss resulting from Merck's alleged fraud. There are no out-of-state-resident-plaintiffs who had Vioxx prescribed and suffered some adverse physical or mental consequence. There are no disabled plaintiffs who may become dependent on any state's welfare system or other safety net program.

New Jersey's interests in this litigation, in our opinion, far outweigh the interests of all other states. All consumer fraud laws in the nation are designed to protect consumers to some degree. "Their differences do not represent competing or conflicting resolutions of a particular policy issue. Rather [the laws] reflect a legislative determination to attack the same evil." *Boyes, supra,* 27 *F.Supp.*2d at 548.

This litigation seeks to place no obligations on any other state's businesses. Instead, third-party payors from other states may be compensated for losses suffered allegedly because of Merck's fraud. No state has an interest in denying its own citizens recovery

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- A.2d ----
--- A.2d ----, 2006 WL 827285 (N.J.Super.A.D.)
(Cite as: --- A.2d ----)

while protecting a foreign New Jersey corporation when the conduct at issue took place, to a significant degree, in New Jersey. "Application of New Jersey law will not undermine [other states'] interest[s] in compensating [their] injured residents because that interest is not actually implicated or compromised by allowing a [consumer fraud] action brought by [non-residents of New Jersey] to proceed against" a New Jersey corporation. _Gantes, supra,_ 145 _N.J._ at 497-98, 679 _A._2d 106. In short, Merck has not established how denying a putative plaintiff relief against a New Jersey corporation would further the concerns of any given state's consumer protection law.

Merck cites _Heindel v. Pfizer Inc.,_ 381 _F.Supp._2d 364 (D.N.J.2004), as apposite and reaching the exact opposite conclusion we come to herein. In _Heindel,_ plaintiffs brought a consumer class action, along with several other claims, "on behalf of the purchasers and users of Celebrex and Vioxx, claiming that they [were] entitled to recover economic damages they sustained due to Defendants' 'unconscionable marketing conduct.' " _Id._ at 367. Many of plaintiffs' fraud and class action claims, which sought application of New Jersey law to the entire class, were similar to those advanced herein. The federal judge in _Heindel,_ however, rejected plaintiffs' argument and found that Pennsylvania law applied.

*13 _Heindel_ is distinguishable from the instant dispute. In _Heindel,_ plaintiffs' physicians had prescribed Vioxx to plaintiffs who purchased, paid for, and ingested the drug in Pennsylvania. Physician involvement was particularly significant because Pennsylvania had adopted the learned intermediary doctrine, which limits the liability of prescription drug manufacturers and "reflects the determination by the Pennsylvania courts to preserve the primacy of the physician's role in making treatment decisions for Pennsylvania patients." _Id._ at 378. In the instant case, Merck has not demonstrated that another state applies an equally weighty doctrine as Pennsylvania's learned intermediary doctrine to the purchases made by third-party payors, who obviously have not ingested the drug.

In further support of its position, Merck cites products liability and personal injury cases that found New Jersey's deterrent interests to have been outweighed by the compensation interest of the putative class members' home states. _E.g., Deemer v. Silk City Textile Mach. Co.,_ 193 _N.J.Super._ 643, 649, 475 _A._2d 648 (App.Div.1984).

Our Supreme Court, however, has found to the contrary. In _Gantes, supra,_ 145 _N.J._ at 478, 679 _A._2d

106, the decedent, a Georgia resident, "was killed at work when she was struck in the head by a moving part of a shaker machine" manufactured by a New Jersey corporation with its principal place of business in New Jersey. _Id._ at 482, 679 _A._2d 106. Her survivors brought a wrongful death action that would have been timely under New Jersey's statute of limitations. However, it was barred under Georgia's statute of repose and dismissed on this ground by the trial court. We affirmed, but, after applying the governmental-interest test, the Supreme Court reversed holding that New Jersey's statute of limitations applied.

The court noted that Georgia's statue of repose was enacted to counter the problems associated with open-ended liability by "serv[ing] the dual purposes of stabilizing insurance underwriting and eliminating stale claims." _Id._ at 486, 679 _A._2d 106. However, these policy concerns were not implicated because Georgia was found to have "no contacts with the defendant manufacturer or with this lawsuit." _Id._ at 494, 679 _A._2d 106. As such, there was no "governmental interest that must be protected by applying its statute of repose to foreclose this suit in New Jersey." _Ibid._ Moreover, the plaintiff's status as a Georgia domiciliary "[did] not implicate the policies of its [law], which is intended only to unburden Georgia courts and to shield Georgia manufacturers." _Id._ at 496, 679 _A._2d 106.

Instead, "New Jersey's policy in deterring tortious conduct of manufacturers" constituted a "substantial interest to be weighed against Georgia's interest in compensation of its resident plaintiffs." _Ibid._ Failure to apply Georgia's statute of repose, would "not undermine Georgia's interest in compensating its injured residents because that interest is not actually implicated or compromised by allowing a products-liability action brought by Georgia residents to proceed against a non-Georgia manufacturer." _Id._ at 497-98, 679 _A._2d 106.

*14 It has been questioned whether _Deemer,_ which found our deterrent interests outweighed by other states' compensation interests, has any continuing precedential value after _Gantes. See_ Eugene Scoles et al., _Conflict of Laws_ 920 (4th ed.2004). In any event, we have recently followed _Gantes_ in another products liability action.

In _Rowe v. Hoffman-La Roche Inc.,_ --- _N.J.Super._ ---- (App.Div.2006) (slip op. at 1-30), a Michigan resident sued a New Jersey drug company for failing to warn of the "dangers and adverse health risks associated with Accutane," a drug designed to treat acne. The drug company claimed a Michigan statute, finding the warning adequate as a matter of law, required dismissal

--- A.2d ----
--- A.2d ----, 2006 WL 827285 (N.J.Super.A.D.)
(Cite as: — A.2d —)

Page 13

of the plaintiff's suit. We held applicable New Jersey's
law, which provides only a rebuttable presumption that
the warning was adequate. In that case, in the face of an
argument similar to Merck's in this case, we noted that
"the Michigan Legislature may have intended to create
a more hospitable commercial atmosphere, to
encourage drug manufacturers to locate in that state,
thereby creating jobs and related economic benefits."
(Slip op. at 23 n. 5). We found that Michigan's interests
were "not impeded by a ruling that rejects application
of Michigan's statute to [a New Jersey based
company]." *Ibid.* Instead, this state's "strong
governmental interest in deterring the manufacture of
unsafe products within its borders, substantially
outweighs the countervailing Michigan contacts and
governmental interests." *Id*. at 30.

Just as our product liability cases have a "strong
interest in deterrence," *Gantes, supra,* 145 *N.J.* at 490,
679 *A.2d* 106, it can be argued that our Consumer
Fraud Act has at least as strong or perhaps an even
stronger deterrence goal. *See Furst, supra,* 182 *N.J.* at
11-12, 860 *A.2d* 435; *Lettenmaier, supra,* 162 *N.J.* at
139, 741 *A.2d* 591; *Cox, supra,* 138 *N.J.* at 21, 647
*A.2d* 454.

[21] "The legislature enacted the CFA in 1960 to
address rampant consumer complaints about fraudulent
practices in the marketplace and to deter such conduct
by merchants." *Thiedemann, supra,* 183 *N.J.* at 245,
872 *A.2d* 783 (citing *Furst, supra,* 182 *N.J.* at 11, 860
*A.2d* 435) (citing *Cox, supra,* 139 *N.J.* at 21, 651 *A.2d*
949)). The Act, "in allowing for private suits in
addition to actions instituted by the Attorney General,
contemplates that consumers will act as 'private
attorneys general.' " *Lemelledo, supra,* 150 *N.J.* at 268,
696 *A.2d* 546 (noting the "strong and sweeping
legislative remedial purpose apparent in the CFA.").

The Act punishes wrongdoers with mandatory "treble
damages." *Lettenmaier, supra,* 162 *N.J.* at 139, 741
*A.2d* 591 (citing *Roberts v. Cowgill,* 316 *N.J.Super.* 33,
45, 719 *A.2d* 668 (App.Div.1998)). Unlike punitive
damages in tort actions, which can only be awarded
upon proofs establishing that a defendant's conduct was
malicious or wanton and willful, *see N.J.S.A.* 2A:15-
5.12 and *Nappe v. Anschelewitz, Barr, Ansell &
Bonello,* 97 *N.J.* 37, 49, 477 *A.2d* 1224 (1984), any
ascertainable loss under the Act is trebled. Obviously,
the trebling of damages is not designed to fairly
compensate an injured party. Instead, the Act reflects a
very strong policy to deter wrongdoing, *Cox, supra,*
138 *N.J.* at 21, 647 *A.2d* 454, and encourage "truth and
fair dealing in the market place." *Feinberg v. Red Bank
Volvo, Inc.,* 331 *N.J.Super.* 506, 512, 752 *A.2d* 720

(App.Div.2000). The Act also awards attorney's fees,
filing fees, and costs. *See generally Skeer, supra,* 187
*N.J.Super.* at 469-73, 455 *A.2d* 508. These awards are
additional evidence of the strong deterrent goal present
in the Act. *Cox, supra,* 138 *N.J.* at 21, 647 *A.2d* 454;
*Grubbs v. Knoll,* 376 *N.J.Super.* 420, 449, 870 *A.2d*
713 (App.Div.2005).

*15 Despite New Jersey's strong interest in preventing
deception by its corporations, Merck relies upon several
out-of-state cases to assert that Judge Higbee's ruling
"contradict[s] an extraordinary wide body of law
rejecting efforts to certify nationwide classes by finding
the law of a single state applicable to all class members'
claims." We either do not find these cases analogous or
disagree that their conclusions should be applied to this
litigation. *E.g., In the Matter of: Bridgestone/Firestone
Inc., Tires Prods. Liab. Litig.,* 288 *F.3d* 1012, 1016 (7th
Cir.2002) (rejecting nationwide products liability class
action brought on behalf of owners of tires or cars
manufactured by defendants because Indiana was "a *lex
loci delicti* state [that] in all but exceptional cases
applies the law of the place where the harm occurred"
in contrast to states like New Jersey that apply the
governmental interest test); *In re Rezulin Prods. Liab.
Litig.,* 210 *F.R.D.* 61, 64, 70-72 (S.D.N.Y.2002)
(rejecting New Jersey law for a nationwide class of
products liability plaintiffs who allegedly would not
have taken Rezulin had the defendants adequately
disclosed its risks because each state has important
interests in ensuring that its citizens are compensated
for injuries, that product sale standards are complied
with, and that physician and pharmacist conduct are
regulated); *In re Consol. Parlodel Litig.,* 22 *F.Supp.*2d
320, 324 (D.N.J.1998) (rejecting New Jersey law for
sixteen plaintiffs from a variety of states who brought
multiple products liability actions alleging that they
were injured as a result of taking a drug manufactured
by the defendant because the critical issues "rest[ed]
upon testimony and other evidence from each Plaintiff's
treating physicians" located in the home states of each
plaintiff); *In re Ford Motor Co. Ignition Switch Prods.
Liab. Litig.,* 174 *F.R.D.* 332, 348 (D.N.J.1997)
(rejecting Michigan's law for a products liability class
action involving approximately 23 million vehicles that
were manufactured and distributed by defendant Ford
Motor Co. because of the interest each state has in
"protecting its consumers from in-state injuries caused
by foreign corporations" and in determining the scope
of recovery for its citizens); *Avery v. State Farm Mut.
Auto. Ins. Co.,* 216 *Ill.*2d 100, 187, 296 *Ill.Dec.* 448,
835 *N.E.*2d 801, 854 (2005) (rejecting plaintiff
policyholders' nationwide class action, which alleged
that defendant insurance company's claims practices
violated Illinois consumer fraud law, because "the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- A.2d ----
--- A.2d ----, 2006 WL 827285 (N.J.Super.A.D.)
(Cite as: --- A.2d ----)

Page 14

overwhelming majority of circumstances relating to the disputed transactions ... occurred outside of Illinois for the out-of-state plaintiffs.").

It is true, as alleged by Merck, that certification of a nationwide class action with application of one state's law to all claims is rare. *See* 52 *Am. J. Comp. L.* 919, 988-990, *Choice of Law in the American Courts in 2004: Eighteenth Annual Survey.* Merck's claim that Judge Higbee's action is totally unprecedented, however, is overstated.

\*16 In *Wershba v. Apple Computer, Inc.,* 91 *Cal.App.* 4th 224, 110 *Cal.Rptr.*2d 145 (Ct.App.), *pet. denied,* 2001 *Cal.* LEXIS 8019 (Cal. Nov. 14, 2001), for example, a class action similar to the one advanced here was certified. Like New Jersey, the California court found its "consumer protection laws [ ] among the strongest in the country." *Id.* at 242. Because the claimed fraud emanated from California, that state's " 'more favorable laws may properly apply to benefit nonresident plaintiffs when their home states have no identifiable interest in denying such persons full recovery.' " *Id.* at 243 (quoting *Clothesrigger, Inc. v. GTE Corp. et. al., 191 Cal.App.*3d 605, 612-16, 236 *Cal.Rptr.* 605, 607-11 (Ct.App.1987) (noting that the trial court "erred in stating that California has no interest in providing nonresident plaintiffs greater protection than their home states provide.")).

In *Clark v. TAP Pharmaceutical Prods., Inc.,* 343 *Ill.App.*3d 538, 278 *Ill.Dec.* 276, 798 *N.E.*2d 123 (Ct.App.2003), as another example, plaintiff claimed that "as a result of the defendants' fraudulent marketing and sales scheme, he, along with thousands of individuals and entities who paid copayment or deductible amounts for beneficiaries under Medicare, overpaid for the prescription drug Lupron, which is used to treat prostate cancer." *Id.* at 542, 278 Ill.Dec. 276, 798 N.E.2d 123. The Illinois appellate court affirmed certification of a nationwide class of " '[a]ll individuals or non-ERISA third-party payor entities in the United States who paid any portion of the 20% co-payment or deductible amount for beneficiaries under the Medicare Part B for Lupron during the period 1993 through the present[.]' " *Id.* at 543, 278 Ill.Dec. 276, 798 N.E.2d 123.

The court noted that "[t]he practical effect of applying Illinois law to the present case is to control conduct within the boundaries of Illinois, namely, the reporting by the defendants, headquartered in Illinois, of a deceptively inflated price for Lupron to uniformly defraud Medicare and its beneficiaries." *Id.* at 546-7, 278 Ill.Dec. 276, 798 N.E.2d 123; *see also, e.g., Perry*

*v. Household Retail Servs. ., Inc.,* 953 *F.Supp.* 1378, 1382-83 (M.D.Ala.1996)(holding that Illinois Consumer Fraud Act applied to all non-Illinois members of the class "because Illinois had a substantial interest in seeing that companies operating in the state operate lawfully"); *In re Badger Mountain Irrigation Dist. Sec. Litig.,* 143 *F.R.D.* 693, 699-700 (W.D.Wash.1992) (applying Washington law to claims of nonresident plaintiffs was appropriate due to strong state policy, defendant's contacts with state, and ability of unnamed class members to opt out).

V.

Accordingly, we agree with Judge Higbee that, based upon the evidence she had before her, New Jersey law may properly be applied to the entire plaintiff class, as this state has the most significant relationship to the alleged fraud and the parties. Furthermore, the judge did not abuse her discretion in certifying the nationwide class of third-party payors who paid for Vioxx, in accordance with the drug's placement on their formularies, between May 1999 and 2004. In addition, the judge correctly rejected the contention that fifty statewide classes or a multitude of individual actions on the same issue involving thousands of third-party payors would be a superior method of adjudicating this claim.

\*17 Given the confluence of New Jersey contacts and interest, choosing New Jersey as the site for this nationwide class action is not unconstitutionally "arbitrary or unfair." *Phillips Petroleum Co. v. Shutts,* 472 *U.S.* 797, 821-822, 105 *S.Ct.* 2965, 2979, 86 *L. Ed.*2d 628, 648 (1985). This State's strong interest is present across the entire class, and the common proofs offered on behalf of all members of the class will predominate at trial with respect to the consumer fraud issues. *See In re NASDAQ, supra,* 169 *F.R.D.* at 517.

Though undoubtedly presenting complex management problems, a class action in this matter, would be a relatively inexpensive solution to "accomplish the greatest possible good for the greatest possible number of" third-party payors who have common problems and complaints with Merck. *Kugler v. Romain,* 58 *N.J.* 522, 538, 279 *A.*2d 640 (1971). Such litigation would promote "efficient judicial administration, ... save time and money for the parties and the public [,] and [ ] promote consistent decisions for [third party payors] with similar claims." *In re Cadillac, supra,* 93 *N.J.* at 430, 461 *A.*2d 736 (citing *Fed.R.Civ.P.* 23 The Advisory Committee Note, 39 *F.R.D.* 98, 102-03 (1966)).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- A.2d ----                                                                    Page 15
--- A.2d ----, 2006 WL 827285 (N.J.Super.A.D.)
(Cite as: --- A.2d ----)


Affirmed.

>        FN1. A corporation is a "person" entitled to
>        sue under the Act. *N.J.S.A.* 56:8-1(d); *Dreier*
>        *Co. v. Unitronix Corp.,* 218 *N.J.Super.* 260,
>        271-72, 527 *A.*2d 875 (App.Div.1986);
>        *Hundred East Credit Corp. v. Eric Schuster*
>        *Corp.,* 212 *N.J.Super.* 350, 355-59, 515 *A.*2d
>        246 (App.Div.), *certif. denied,* 107 *N.J.* 60,
>        526 *A.*2d 146 (1986) (corporations may sue as
>        "consumers" under the Act). We are uncertain
>        whether plaintiff Trust Fund is organized as a
>        corporation. In any event, because the issue is
>        outside the scope of our grant of Merck's
>        motion seeking leave to appeal, we do not
>        review Judge Higbee's prior decision
>        concluding that third-party payors are
>        consumers under the Act.
>
>        FN2. The Class Action Fairness Act, which
>        became effective on February 18, 2005,
>        applies only to civil actions commenced on or
>        after that date. *Pub.L. No.* 109-2, § 9, 119
>        *Stat.* 4 (2005). Thus, the federal law does not
>        apply to this complaint, which was filed on
>        October 30, 2003. (The medical definitions
>        bracketed in the quotation are from *Stedman's*
>        *Medical Dictionary* 385, 895 (22nd Edition
>        1972)).
>
>        FN3. Interestingly, in *Heindel,* unlike this
>        matter, Merck established that its "employees
>        stationed in Pennsylvania had responsibility
>        for much of the interaction with the FDA
>        regarding Vioxx"; the Merck department of
>        research "responsible for collecting adverse
>        events and reporting them to the FDA is also"
>        in Pennsylvania; the national headquarters of
>        the Merck division which marketed Vioxx
>        was in that state and it was in "charge of
>        training its U.S.-based professional
>        representatives" responsible for advertising
>        Vioxx; and a Merck committee "responsible
>        for the drafting and editing" of a Vioxx
>        circular was "comprised of employees located
>        in both Pennsylvania and New Jersey."
>        *Heindel, supra,* 381 *F.Supp.*2d at 376-77.

N.J.Super.A.D.,2006.
International Union of Operating Engineers Local #?68
Welfare Fund v. Merck & Co., Inc.
--- A.2d ----, 2006 WL 827285 (N.J.Super.A.D.)


END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.