# TAB 9



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 342392 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

▷

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
PANACHE BROADCASTING OF
PENNSYLVANIA, INC., et al. Plaintiffs,
v.
RICHARDSON ELECTRONICS, LTD., and Varian
Associates, Inc., in their own right and as successors
in interest to Varian Supply Company, a joint
venture, Defendants.
**No. 90 C 6400.**

May 14, 1999.

### *MEMORANDUM OPINION AND ORDER*
NORDBERG, J.

\*1 Plaintiffs, Panache Broadcasting of Pennsylvania,
Inc., V-R Electronics, Inc. and Wood Radio Partnership
(collectively, "Plaintiffs"), filed this action charging
Defendants, Richardson Electronics, Ltd. ("REL") and
Varian Associates, Inc. ("Varian") with a conspiracy to
eliminate competition, allocate markets and customers,
raise or fix prices, and capture the entire electron power
tube market in violation of Sections 1 and 2 of the
Sherman Act, 15 U.S.C. § § 1 and 2, and Section 7 of
the Clayton Act, 15 U.S.C. § 18. Plaintiffs filed a
motion for class certification which was referred to
then-Magistrate Judge Pallmeyer for the entry of a
Report and Recommendation ("R & R"). The R & R,
along with the parties' objections, are now before the
Court.

> FN1. Judge Pallmeyer was appointed to the
> United States District Court for the Northern
> District of Illinois, Eastern Division, in
> November 1998.

I. The Report and Recommendation

Judge Pallmeyer's thorough and well reasoned R & R is
attached and incorporated herein. The parties do not
dispute the statement of facts contained in the R & R
and those facts are adopted in full by this Court. In her
R & R, Judge Pallmeyer recommends that the court
"certify, for purposes of a liability determination only, a
class consisting of all persons and business entities
throughout the United States, its territories and the

District of Columbia who purchased electron tubes that
were (1) sold through VASCO, (2) related to the "dud"
tube collection program instituted by Defendants, or (3)
related to acquisitions by the Defendants arising out of
the VASCO agreements, from one or more of the
defendants at any time between February 1986 and the
present.

Judge Pallmeyer's R & R begins with a review of the
requirements for class certification pursuant to Federal
Rule of Civil Procedure 23(a) and (b)(3). Rule 23(a)
provides for class certification when plaintiffs can
establish that the prerequisites of numerosity,
commonality, typicality and adequacy have been met.
*Retired Chicago Police Ass'n v. City of Chicago,* 7 F.3d
584, 596 (7 [th] Cir.1993). Once those requirements are
met, plaintiffs must also establish that questions of law
or fact common to the class predominate over
individual questions and that a class action is the
superior form of adjudication for the controversy.
Fed.R.Civ. P. 23(b)(3).

#### A. Rule 23(a)

In both the briefs before Judge Pallmeyer, and the
objections before this court, defendants Varian and
REL focus almost exclusively on the requirements of
Rule 23(b)(3). Nonetheless, Judge Pallmeyer
thoroughly analyzed each of the Rule 23(a)
requirements, concluding that each was met. First,
Judge Pallmeyer concluded, without objection from
defendants, that both the proposed class and the class as
subsequently narrowed satisfy the numerosity
requirement. (R & R at 14-15, 51, n. 14.)

Judge Pallmeyer next analyzed the commonality
requirement, noting that only a minimal showing is
required to satisfy commonality when the suit involves
an antitrust price fixing conspiracy. (R & R at 15)
(citations omitted). Relying on *In re Brand Name
Prescription Drugs Antitrust Litig.,* Nos. 94 C 897,
MDL 997, 1994 WL 663590 (N.D.Ill. Nov. 18, 1994),
and *In re Industrial Gas Antitrust Litig.,* 100 F.R.D.
280, 287 (N.D.Ill.1983), Judge Pallmeyer held that
allegations of a conspiracy to fix or raise prices on an
industry-wide basis, despite the allegedly diverse and
heterogeneous nature of the industry, were sufficient to
satisfy Rule 23(a)(2) because questions involving the
existence of the conspiracy were common to all class
members.    While noting that Plaintiffs' specific

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

allegations all relate to the VASCO agreements, Judge Pallmeyer held that the general allegations of conspiracy were sufficient to satisfy "the low threshold placed on Rule 23(a)(2) by courts in this circuit with respect to antitrust suits." (R & R at 19 .)

> FN2. Judge Pallmeyer noted, however, that in the event this Court dismissed plaintiffs' price fixing claims, reconsideration of the sufficiency of the remaining conspiracy claims may be necessary. (R & R, n. 5.) This Court denied defendants' motion to dismiss plaintiffs' price fixing allegations. *Panache Broadcasting of Pennsylvania, Inc. v. Richardson Electronics, Ltd.,* 1995 WL 584345 (N.D.Ill. Oct. 2, 1995). Accordingly, Judge Pallmeyer's finding stands.

**\*2** In holding that the typicality requirement had been met, Judge Pallmeyer found that Plaintiffs' claims of an industry-wide violation of the Sherman Act were based on the same legal theory as the claims of the proposed class members. (R & R at 24.) Judge Pallmeyer considered cases cited by both parties, concluding that *In re Prescription Drugs* and *United National Records, Inc. v. MCA, Inc.,* 99 F.R.D. 178 (N.D.Ill.1983), *motion to vacate denied,* 101 F.R.D. 323 (N.D.Ill.1984) were the more persuasive authority because both involved antitrust claims. In *Prescription Drugs,* the court rejected defendants' argument that the industry was too diverse for the plaintiffs' claims to be typical of the class, stating that "the factual variations in plaintiffs' methods of business operation does not dilute the typicality of their common claim of a conspiracy to fix, and/or stabilize the price of brand-name prescription drugs in violation of antitrust laws." 1994 WL 663590. Judge Pallmeyer concluded that, in this case, "[t]he acts and agreements that, although arising out of VASCO, were of allegedly greater scope than VASCO, form the 'course of conduct' that gives rise to the claims of all class members." (R & R at 24.)

Finally, Judge Pallmeyer held that the fourth requirement of Rule 23(a), adequacy of representation, was met. Judge Pallmeyer noted that Defendants had not offered any meaningful arguments against Plaintiffs' satisfaction of the adequacy prerequisite. Finding that all the prerequisites of Rule 23(a) were met, Judge Pallmeyer turned her attention to the crux of Defendants' arguments against class certification-Rule 23(b)(3)'s requirement that questions of law or fact common to the class predominate over questions affecting individual members.

### B. Rule 23(b)(3)

The final twenty-five pages of Judge Pallmeyer's fifty-page R & R are dedicated solely to Defendants' arguments regarding predominance of common questions. The gist of Defendants' arguments are that Plaintiffs cannot offer proof of antitrust violations on a class-wide basis because of the diverse and heterogenous nature of the electron power tube industry, and because the allegations only evince harm relating to class members who are VASCO-related purchasers. Pursuant to *Simer v. Rios,* 661 F.2d 655, 672 (7 th Cir.1981), *cert. denied,* 456 U.S. 917 (1982), Judge Pallmeyer began the predominance inquiry by focusing on the substantive elements of the cause of action, then examining the evidence necessary to prove those elements in order to determine whether common or individual questions were likely to predominate in the litigation. To establish an antitrust violation, Plaintiffs are required to show: (1) that the defendants violated the antitrust laws; (2) that the alleged violation caused injury or harmful impact to the plaintiffs' business or property; and (3) quantifiable damages. *Industrial Gas,* 100 F.R.D. at 288.

Judge Pallmeyer thus began her analysis with Plaintiffs' antitrust allegations. After reviewing Plaintiffs' complaint, Judge Pallmeyer concluded:
**\*3** the allegations Plaintiffs offer in this case seem to flow almost exclusively from evidence relating to the VASCO agreements. Both the dud tube program and the alleged customer allocation were established by clauses of the [Joint Venture ("JV") ] Agreement. Other alleged agreements on price fixing and customer allocation apparently took place under the guise of the JV Management Committee. And at least some of the acquisitions by Defendants were allegedly made pursuant to or through VASCO. And yet, according to Defendants, many tubes made and sold by REL and Varian have no relationship with the joint venture. The JV Agreement encompasses only power grid tubes, reflex klystrons, some receiver protectors and a few magnetrons-an apparently small subset of the electron power tubes manufactured and sold by Defendants. In addition, certain customers were specifically excluded from the VASCO agreements.

(R & R at 31-32.) Relying on *Alabama v. Blue Bird Body Co., Inc.,* 573 F.2d 309 (5 th Cir.1978), Judge Pallmeyer held that "the meager evidence of how Plaintiffs intend to establish the conspiracy in relation to purchasers of these non-VASCO electron tubes suggests that Plaintiffs will not be able to prove a conspiracy on a class-wide basis.... Although there may

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 342392 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

be a few questions of fact or law common to the whole class-perhaps, for example, whether there were any discussions by Defendants of a plan to monopolize the whole industry-common question of fact or law will not *predominate* in a suit that includes within a single plaintiff class both purchasers of VASCO-related products and purchasers of non-VASCO related products." (R & R at 32.) Unlike the Fifth Circuit in *Blue Bird,* Judge Pallmeyer did not deny class certification but elected to narrow the class to purchasers of products related to the VASCO agreements, holding that common questions concerning the alleged antitrust violation would predominate with respect to those purchasers. (*Id.* at 32-33.)

> FN3. In *Bluebird,* the Fifth Circuit reversed a class certification because the only evidence in the record showing how the plaintiffs would prove a nationwide conspiracy was a single deposition of an Alabama distributor that, at most, implicated defendants in Alabama and several other southern states in antitrust violations. Similarly, the only evidence presented by Plaintiffs implicates a conspiracy with respect to purchasers of electron tubes covered by the VASCO agreements.

Judge Pallmeyer further rejected Defendants' argument that predominance was defeated even in the narrower class because there were three distinct components of the alleged wrongdoing, each component implicating only a segment of the electron tubes covered by the VASCO agreements. For example, the customer allocation allegations pertain to a different segment of electron tubes than the dud tube allegations, and the acquisition allegations pertain to businesses that either manufactured or distributed an altogether different set of electron power tubes. Judge Pallmeyer thoroughly addressed these arguments, holding that "[d]espite the fact that Plaintiffs' overall conspiracy charges spring from several components, Panache, V-R and Wood each have claims that can be attributed to each component. Common questions of antitrust violation would certainly predominate in an action brought only by these three-further indication that a class of VASCO-related purchasers would have common evidence of antitrust violation to prove." (R & R at 34.)

*4 Judge Pallmeyer next found that common questions predominated with respect to the antitrust injury to or impact on VASCO-related purchasers. Judge Pallmeyer exhaustively addressed each of Defendants' arguments pertaining to the diversity and heterogenous nature of

the electron tube industry. The R & R contains a comprehensive discussion of each case cited both by the Plaintiffs and the Defendants. After a thorough analysis of each of these decisions, Judge Pallmeyer concluded that, while Defendants cases supported, to some extent at least, Defendants' predominance argument, greater weight should be given to Plaintiffs' authority because it is comprised of cases arising in this circuit. (R & R at 38-44.) She further concluded that evidence used to show an anticompetitive effect would be common to the class as narrowed. (*Id.* at 45.) Such evidence, Judge Pallmeyer noted, would include an anticompetitive price increase for VASCO-related tubes. The judge further noted that, for purposes of showing anticompetitive injury, it might make sense to divide Plaintiffs' claims of customer allocation, dud tube conspiracy, unlawful acquisition and price fixing into subclasses. (*Id.* at 46.) She declined to create such subclasses at this time, however, because the court was without sufficient information to adequately define the subclasses. (*Id.* at 47.) This Court recognizes its discretion to modify the class certification if and when it becomes necessary or desirable. *See Potash,* 159 F.R.D. at 700.

> FN4. Plaintiffs placed great reliance on *In re Prescription Drugs,* 1994 WL 663590, *In re Folding Carton Antitrust Lit.,* 75 F.R.D. 727 (N.D.Ill.1977) and *In re Fine Paper Antitrust Lit.,* 82 F.R.D. 143 (E.D.Pa.1979), *aff'd,* 685 F.2d 810 (3d Cir.1982), *cert. denied, Alaska v. Boise Cascade,* 459 U.S. 1156 (1983), for the proposition that diversity in the industry does not necessarily preclude the possibility of a common conspiracy among defendants to limit price competition among them. Defendants cited *Nichols v. Mobile Bd. of Realtors, Inc.,* 675 F.2d 671 (5 th Cir.1982); *In re Hotel Tel. Charges,* 500 F.2d 86 (9 th Cir.1974); *Dry Cleaning & Laundry Inst., Inc. v. Flom's Corp.,* No. 91 C 76072 DT, 1993 WL 527928 (E.D.Mich.1993); *Burkhalter Travel Agency v. MacFarms, Int'l, Inc.,* 141 F.R.D. 144 (N.D.Cal.1991); *Butt v. Allegheny Pepsi-Cola Bottling Co.,* 116 F.R.D. 486 (E.D.Va.1987); *Glicktronix Corp. v. AT & T Co.,* 603 F.Supp. 552 (D.N.J.1984); *Kenett Corp. v. Massachusetts Furniture nd Piano Movers Ass'n,* 101 F.R.D. 313 (D.Mass.1984); *Jackshaw Pontiac v. Cleveland Press Publishing Co.,* 102 F.R.D. 183 (N.D.Oh.1984); *Legal Clinic of Green and Logan v. Gannett Co .,* 1984-1 Trade Cas. (CCH) ¶ 65,783 (D.Or.1983); and *School*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 342392 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

*Dist. V. Harper & Row Publishers, Inc.*, 267 F.Supp. 1001 (E.D.Pa.1967), for the proposition that diversified and individualized industries preclude a finding that common questions predominate. "Notably, none of these cases arose in this circuit." (R & R at 41.)

Finally, Judge Pallmeyer addressed the third prong of Plaintiffs' antitrust claim-quantifiable damages. She held that "Plaintiffs clearly cannot prove damages in this case on a class-wide basis, regardless of whether the class is that proposed by Plaintiffs or the restricted class of VASCO-related purchasers." (R & R at 48.) This finding was based on the diversity of the electron tube industry, and the fact that Defendants charge different prices depending on whether a purchaser buys in bulk or is an Original Equipment Manufacturer requiring technical assistance. Accordingly, "the extent of each purchaser's loss would require an individual showing." (R & R at 48.) Nonetheless, the Judge held that the inability to prove damages on a classwide basis was not fatal to class certification, noting that "it is well established that individual questions with respect to damages need not defeat an antitrust class action." (*Id.*) (citing *Hardy v. City Optical Inc.*, 39 F.3d 765, 771 (7th Cir.1994)). She found that "this case is not so intertwined with the injury questions that common questions will not predominate." (*Id.*) Finally, Judge Pallmeyer rejected Defendants' argument that class certification was inappropriate because Plaintiffs have not advanced a formula for calculating damages, noting that presentation of a formula is not required under Rule 23(b)(3).

> FN5. This Court notes that neither Judge Pallmeyer nor the parties discussed the superiority prong of Rule 23(b)(3), except to address the manageability of the case as a class action. In that regard, Judge Pallmeyer stated that, "this court sees no reason that the evidence presented by Defendants need be any more detailed than that required of Plaintiffs." (R & R at 49.) This Court finds, *sua sponte*, that the superiority requirement is met. First, the Court finds that members of the class do not have a strong interest in individually controlling the prosecution of their own actions as, to this Court's knowledge, no individual class member has instituted a separate action. *See Gaspar v. Linvatec Corp.*, 167 F.R.D. 51, 60 (N.D.Ill.1996). Further, judicial economy is served by litigating this matter as a class

action in that a finding with regard to the anticompetitive effect of the Defendants' conduct under VASCO agreements will enable each class member to have its day in court without filing a separate claim. *Id.* Finally, contrary to Defendants' assertions of the complexity of the industry, the Court does not find insuperable difficulties in managing this class action. *See Little Caesar Enterprises, Inc. v. Smith*, 172 F.R.D. 236, 246 (E.D.Mich.1997) ( "[i]f it is ultimately proven that defendants violated the Sherman Act, it seems unfair and ironic that the party who caused the complexity on liability and damages should benefit from such acts by disarming the plaintiffs and the Court of the most efficient and effective tool for resolving these issues.").

Accordingly, Judge Pallmeyer recommended certification of a class restricted to purchasers of VASCO-related products. For the reasons stated below, this Court agrees with and adopts Judge Pallmeyer's Report and Recommendation.


II. Defendants' Objections to the R & R

*5 The court will begin with Defendants' objections to Judge Pallmeyer's Rule 23(b)(3) predominance analysis, as this is where Defendants have focused the bulk of their energies in both the briefing on class certification, as well as their objections to the R & R. As Judge Pallmeyer correctly held, Plaintiffs must establish that the common questions of law or fact predominate with respect to the elements of their antitrust violation claims. *Simer, 661 F.2d at 672*. Those elements include (1) a violation of the antitrust laws; (2) injury or harmful impact to plaintiffs' business or property; and (3) damages. *Industrial Gas, 100 F.R.D. at 288*. The Court recognizes that "as a general rule in antitrust price-fixing cases, questions common to the members of the class will predominate over questions affecting only individual members." *Potash, 159 F.R.D. at 693*.

Defendant Varian challenges Judge Pallmeyer's finding that common questions predominate with respect to proof of antitrust violation. Varian asserts that Judge Pallmeyer's finding that common questions did not predominate with respect to the entire proposed class is equally applicable to the narrowed class because there are still approximately 500 different types of tubes covered by the VASCO agreements, each facing different competitive conditions. Varian misses the

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 342392 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

basis for Judge Pallmeyer's recommendation that the restricted class of VASCO-related purchasers meets the predominance requirement of Rule 23(b)(3) with respect to the first element of an antitrust claim. Judge Pallmeyer's recommendation was not based on the diversity or heterogenous nature of the electron tube industry, but was based on a determination of common proof regarding Defendants' anti-competitive conduct. See Potash, 159 F.R.D. at 694 (the first element, antitrust violation, "relates solely to Defendants' conduct, and as such proof for these issues will not vary among class members"); Rohlfing v. Manor Care, Inc., 172 F .R.D. 330, 336 (N.D.Ill.1997) ("[t]he weight of authority in antitrust cases indicates that the existence of a conspiracy in restraint of trade is one that is common to all potential plaintiffs, and the importance of this question usually warrants treating them as a class") (collecting cases). Judge Pallmeyer correctly recognized that the bulk of Plaintiffs' allegations pertained to conduct under the VASCO agreements, be it the dud tube collection program, the anticompetitive acquisitions or the customer allocation provisions. That conduct arose out of the VASCO agreements. Consequently, purchasers of electron tubes not contained in those agreements could not have been harmed by that conduct, and would need individual proof of a separate anticompetitive conspiracy. This Court agrees with Judge Pallmeyer's conclusion that questions regarding Defendants' conduct are common only to those purchasers of VASCO-related products.

Judge Pallmeyer's reliance on *Blue Bird* is well placed. In that case, the proof of antitrust violations related only to defendants in Alabama and in some southern states. 573 F.2d 309. That proof was not common to a nation-wide class. While the Fifth Circuit or the district court might have narrowed the class to purchasers of buses from Alabama or other southern state dealers, the court used its discretion to reverse the class certification. Judge Pallmeyer was entirely within her discretion, however, in deciding to narrow the class in this case to VASCO related purchasers rather than deny certification outright. See Potash Antitrust Lit., 159 F.R.D. at 700 ("Courts retain great discretion in managing class action proceedings").

*6 Varian also challenges the sufficiency of the VASCO agreements as the sole evidence of an antitrust violation. Plaintiffs have already survived a motion to dismiss the antitrust claims. See Panache Broadcasting of Pennsylvania, Inc. v. Richardson Electronics, Ltd., 1995 WL 584345 (N.D.Ill. Oct. 2, 1995). Thus, the sufficiency of the antitrust allegations that almost exclusively relate to the VASCO agreements is *res judicata*. Moreover, the court may not examine the

merits of a case when deciding the certification issue, it may only examine the substantive elements of the underlying cause of action to determine if they are amenable to class-wide proof. Simer, 661 F.2d at 672-73. If in fact Plaintiffs' VASCO evidence is ultimately insufficient to sustain their antitrust claims, Defendants can file a motion for summary judgment.

Both defendants focus their objections on the second two prongs of Plaintiffs' antitrust claims-fact of injury and damages. Defendants make many of the same arguments regarding the diversity of the electron power tube industry, including the wide variations in price depending on the tube or the customer. Defendants maintain that proof of anticompetitive impact or injury must be offered on a tube-by-tube basis. Judge Pallmeyer thoroughly analyzed Defendants' arguments and authority. REL's objections are merely a rehash of the same authority reviewed, analyzed and distinguished by Judge Pallmeyer. This Court sees no need to discuss Judge Pallmeyer's well-reasoned and thorough analysis of the authority cited by the parties and agrees with her conclusion that the fact of injury (as opposed to damages) can be established by common proof with respect to the class of VASCO-related purchases.

Indeed, this Court's own research provides additional support for Judge Pallmeyer's conclusion. Several courts have considered and rejected arguments similar to those made by Defendants here-that in assessing injury to members of the class an individual determination must be made, transaction by transaction and member by member. It is well settled that common proof of impact is possible without common damage amounts. In re Potash Lit., 159 F.R.D. at 694; Rohlfing, 172 F.R.D. at 337 ("[i]f it is feasible to prove that the plaintiff class as a whole has been injured by the defendants' conspiracy, then the class may be certified even though individual damage questions remain to be resolved at a later stage of the proceedings"); Little Caesar Enterprises, Inc. v. Smith, 172 F.R.D. 236, 245 (E.D.Mich.1997) ("[t]he class plaintiffs need only show that all suffered some loss in their business, and that there was a causal relation between the tying arrangement and that loss"); In re Workers Compensation, 130 F.R.D. 99, 109 (D.Minn.1990) (stating that a showing of injury "may be made on a class basis if the evidence demonstrates that the conspiracy succeeded in raising prices above the competitive level"). In other words, the issue in the common impact analysis is the fact, not the amount of injury. Potash Antitrust Lit., 159 F.R.D. at 694. In this case, common questions predominate if the evidence demonstrates that Defendants' conduct under the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 342392 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

VASCO agreements resulted in higher prices for the electron tubes covered by those agreements. *See id.* at 695 ("because the gravamen of a price-fixing claim is that the price in a given market is artificially high, there is a presumption that an illegal price-fixing scheme impacts upon all purchasers of a price-fixed product in a conspiratorially affected market").

*7 Defendants point out that Plaintiffs provide no method by which to determine if the alleged conspiracy succeeded in raising VASCO-related electron tube prices above the competitive level. This Court agrees that Plaintiffs' lack of evidence on this issue is troublesome, and acknowledges that Plaintiffs' case might be stronger with expert testimony on the proper method to measure the impact of Defendants' conduct on the market. In *In re Potash Antitrust Lit.,* the court placed great weight on the fact that plaintiffs presented an evaluation of the potash market conducted by their expert, who examined the prices paid before and during the alleged conspiracy, the defendants' price lists and actual transaction data. 159 F.R.D. at 695-96. Nonetheless, the Court's research reveals no authority holding that Rule 23(b)(3) mandates a specific methodology for proving harmful impact prior to class certification.

Further, Judge Pallmeyer's point regarding subclasses is well taken. It may well be more feasible to evaluate the impact of Defendants' conduct pursuant to the different components of the conspiracy, namely the customer allocation provisions, the dud tube conspiracy and the anticompetitive acquisitions. At this point, however, the Court agrees with Judge Pallmeyer's conclusion that Rule 23(b)(3) does not require a specific methodology for showing harmful impact and that there is insufficient information to adequately define subclasses for purposes of determining harmful impact. "Courts retain great discretion in managing class action proceedings." *In re Potash Antitrust Lit.,* 159 F.R.D. at 700. "If, as this case develops, class treatment proves to be inappropriate or otherwise not in the best interests of the parties," whether because Plaintiffs fail to provide a feasible methodology for proving anticompetitive injury, or because subclasses are better suited for such calculations, "the Court will in its discretion make whatever reasonable modifications are necessary up to and including decertification." *Id.*

The Court also agrees with Judge Pallmeyer's conclusion that the inability to prove damages on a class-wide basis is not fatal to class certification. Despite Defendants' lengthy arguments regarding the diversity of electron tube market and the numerous types of tubes covered by the VASCO agreements, this

principle is well settled. *See Ruiz v. Stewart Associates, Inc.,* 171 F.R.D. 238, 243 (N.D.Ill.1997)("[t]hough the amount of damages may differ among proposed class members, that potential variation does not overcome the predominance of common questions established here"); *Arenson v. Whitehall Convalescent and Nursing Home, Inc.,* 164 F.R.D. 659, 666 (N.D.Ill.1996) ("[i]t is well established, however, the presence of individualized damages does not render the class unsuitable for certification. (Citation omitted) In the event that it becomes necessary to adjudicate the individual issues of either damages or reliance, the Court has several options available to it"); *Little Caesar Enterprises,* 172 F.R.D. at 245-46 ("[n]or is the fact that there will be uncertainty later in the individual measure of damages fatal to common proof of the fact of damages so long as it can be clearly shown that the illegal behavior of defendants did cause some damage in fact to each class member"); *In re Potash Antitrust Lit.,* 159 F.R.D. at 697 ("the fact that the damages calculation may involve individualized analysis is not by itself sufficient to preclude certification when liability can be determined on a class-wide basis," noting various judicial methods available to resolve individual damage issues without precluding class certification). "The gestalt of much of defendants' argument is an attempt to make this case appear overwhelmingly complicated and thereby remove the class action tool from plaintiffs' hands." *Little Caesar Enterprises, Inc.,* 172 F.R.D. at 246. Like the court in *Little Caesar,* this Court "believe[s] defendants' complexity arguments are exaggerated, should not intimidate or overwhelm this Court, and should not prevail." *Id.*

*8 Nor is this Court persuaded by REL's argument that individual issues predominate over common issues with respect to Plaintiffs' monopoly claims. Just as with Plaintiffs' antitrust claims, common issues with respect to Defendants' conspiratorial conduct predominate. *See Rohlfing,* 172 F.R.D. at 337 ("[t]he question of whether Manor Care engaged in a 'willful acquisition' of monopoly power is, like the question of whether it engaged in a conspiracy in restraint of trade, common to all members of the class because of its susceptibility to common proof or disproof").

Finally, REL contends that Judge Pallmeyer erred in finding that the commonality and typicality requirements of Rule 23(a) had been met. Judge Pallmeyer's conclusion with respect to commonality is supported by recent opinions. To satisfy the commonality requirement, it is well established that the allegations need only allege a single course of conduct that affects the market by fixing, raising, maintaining

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and/or stabilizing prices in the relevant industry. *See Ruiz v. Stewart Associates, Inc.,* 171 F.R.D. 238, 242 (N.D.Ill.1997) (allegations of standardized conduct toward members of proposed class sufficient to satisfy commonality requirement); *Rozema v. The Marshfield Clinic,* 176 F.R.D. 295, 301 (W.D.Wisc.1997) ("it is sufficient that plaintiffs have alleged a single product market of physician services, including HMO health care services, in which they allegedly can prove that defendants' alleged wrongdoing fixed, raised, maintained and stabilized the prices of all physician services"); *In re Potash Antitrust Litigation,* 159 F.R.D. 682, 689 (D.Minn.1995) ("[i]nsofar as Plaintiffs allege that Defendants engaged in a conspiracy to fix the wholesale price of potash, they have satisfied the commonality requirement of Rule 23(a)"). "Rule 23(a)(2) requires only that the course of conduct giving rise to a cause of action affects all class members, and that at least one of the elements of that cause of action is shared by all class members." *Lockwood Motors, Inc. v. General Motors Corp.,* 162 F.R.D. 569, 575 (D.Minn.1995).

This Court agrees with the R & R's finding of commonality with respect to the class as subsequently narrowed by Judge Pallmeyer (purchasers of VASCO-related electron tubes). The court disagrees, however, that Plaintiffs' general conspiracy allegations involve a common nucleus of operative fact or that the course of conduct giving rise to the cause of action affects all proposed class members. As Judge Pallmeyer correctly notes, Defendants' allegedly anticompetitive conduct arises from the VASCO agreements, and the VASCO agreements involved only a subset of the many types of tubes sold and manufactured by REL and Varian. The court fails to understand how the Defendants' conduct with respect to the VASCO agreements affects all members of the proposed class, including those members who purchased tubes not covered by the agreements. Accordingly, while this court agrees with Judge Pallmeyer's ultimate conclusion, it would narrow the class at an earlier stage in the analysis, namely the commonality stage.

*9 Similarly, this Court agrees with Judge Pallmeyer's finding of typicality with respect to the narrowed class of VASCO-related purchasers. In five pages of analysis, Judge Pallmeyer considered each of Defendants' arguments against typicality and reviewed each of the cases cited by the parties. After thorough review, she concluded that Plaintiffs' claims are based on the same legal theory as the claims of the class members: "[t]he acts and agreements that, although arising out of VASCO, were of allegedly greater scope than VASCO, form the 'course of conduct' that gives

rise to the claims of all class members." (R & R at 24.) Again, this Court agrees with her conclusion to the extent that Plaintiffs' claims are typical of the class of VASCO-related purchasers. Given that each of the plaintiffs purchased tubes encompassed by the VASCO agreements, their claims arise from "the same event or practice or course of conduct that gives rise to the claims of other class members" and "are based on the same legal theory." *See Retired Chicago Police,* 7 F.3d at 597.

Finally, the Court finds Varian's argument that the R & R "misallocates the burden of proof on the issue of class certification" is without merit. Judge Pallmeyer's thorough R & R plainly establishes that Plaintiffs met their burden on the class certification issue with respect to the restricted class of VASCO-related purchasers.

### III. Plaintiffs' Objections to the R & R

Plaintiffs object to the class definition contained in the R & R's conclusion paragraph as ambiguous. In her Conclusion, Judge Pallmeyer "recommends that the court certify, for purposes of a liability determination only, a class consisting of all persons and business entities throughout the United States, its territories and the District of Columbia who purchased electron tubes that were (1) sold through VASCO, (2) related to the dud tube collection program instituted by Defendants, or (3) related to acquisitions by the Defendants arising out of the VACSO agreements, from one or more of the defendants at any time between February 26, 1986 and the present ." Plaintiffs object to the language "sold through VASCO," claiming that the class includes all purchasers of electron tubes of the specific types encompassed in the VASCO agreements, not merely persons who purchased electron tubes which had actually been supplied by VASCO. The Court agrees with Plaintiffs' interpretation of the R & R. Judge Pallmeyer's holding pertains to purchasers of all electron tubes encompassed in the VASCO agreements, as that is the relevant market affected by Defendants' allegedly anticompetitive conduct. Accordingly, the Court will modify Judge Pallmeyer's recommendation and change "sold through VASCO" to "encompassed in the VASCO agreements."

Plaintiffs next object to Judge Pallmeyer's finding that damages cannot be proven on a class-wide basis. Given the paucity of Plaintiffs' evidence regarding a methodology for measuring anticompetitive impact and damages, this argument is without merit. It is a close question whether Plaintiffs have adequately established common proof with respect to harmful impact, much

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 342392 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

less actual damages. This Court agrees with Judge Pallmeyer's conclusion that damages must be shown on an individual basis given the varied prices and customers of electron tubes.

*10 Finally, Plaintiffs contend that the narrowed class should include not only purchasers of electron tubes related to acquisitions by Defendants arising out of the VASCO agreements, but should also include purchasers of tubes related to pre-VASCO acquisitions. The Court disagrees. The common questions of law and fact relate to the conspiracy between Varian and REL to control the electron tube market. The pre-VASCO acquisitions are not related to that conspiracy but, in Plaintiffs' own words, to "REL's unilateral monopolization scheme." (Pltf's Objections at 4.) This scheme is entirely separate from its VASCO conspiracy with Varian. Accordingly, purchasers of pre-VASCO tubes will not be included in the certified class.

*Conclusion*

For the foregoing reasons, Judge Pallmeyer's Report and Recommendation is approved and adopted by this Court with minor modifications as indicated. The Court hereby certifies, for purposes of a liability determination only, a class consisting of all persons and business entities throughout the United States, its territories and the District of Columbia who purchased electron tubes that were (1) encompassed in the VASCO agreements; (2) related to the dud tube collection program instituted by Defendants, or (3) related to acquisitions by Defendants arising out of the VASCO agreements, from one or more of the defendants at any time between February 26, 1986 and May 13, 1999.

N.D.Ill.,1999.
Panache Broadcasting of Pennsylvania, Inc. v. Richardson Electronics, Ltd.
Not Reported in F.Supp.2d, 1999 WL 342392 (N.D.Ill.)

Briefs and Other Related Documents (Back to top)

• 1:90cv06400 (Docket) (Nov. 02, 1990)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 10

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 852135 (Pa.Com.Pl.)
(Cite as: Not Reported in A.2d)

Page 1

**H**
Only the Westlaw citation is currently available.
Court of Common Pleas of Pennsylvania,
Philadelphia County..
In re: PENNSYLVANIA BAYCOL THIRD-PARTY
PAYOR LITIGATION
**No. 1874 SEPT.TERM 2001.**

April 4, 2005.

MEMORANDUM OPINION
BERNSTEIN, J.
*1 Presently before this court is plaintiffs' motion for
class certification arising from the defendants' decision
on August 8, 2001 to cease distribution of Baycol, also
known as Cervistatin, and advise all known users to
immediately cease using Baycol. This action is brought
on behalf of all third-party payors ("TTP's") nationwide
who purchased or paid for Baycol on behalf of users.
Plaintiffs assert claims for breach of warranty and
unjust enrichment only. Plaintiffs' claim for damages is
all sums paid for Baycol by class members which
pursuant to manufacturer instruction should not have
been used, together with medical costs associated with
transfering patients to a different cholesterol reducing
drug.

FINDINGS OF FACT

1. Plaintiffs are third party payors who paid defendants
on behalf of their subscribers for Baycol prescribed and
purchased before August 2001.

2. Defendant individually or as part of joint marketing
efforts engaged in the business of testing,
manufacturing, labeling, licensing, marketing,
distributing, promoting and selling Baycol also known
as Cervistatin.

3. Cerivastatin was originally approved by the FDA for
sale on June 26, 1997.

4. Baycol is a statin drug. Statin drugs are cholesterol
lowering drugs that operate by blocking a liver enzyme
involved in the synthesis of cholesterol.

5. Defendants marketed Baycol to physicians and
directly to class member TPP's requesting that the
medication be listed upon insurance company

formulary in order to encourage physicians to prescribe
Baycol.

5. Approximately 700,000 consumers have used
Baycol.

7. The use of Baycol and particularly the change in
medication to a different statin medication requires
careful medical monitoring and repeat physician visits
and lipid, liver function and CPK tests.

8. A pharmaceutical company which markets a
medication approved by the FDA warrants that the
medication should be used.

9. On August 8, 2001 defendants voluntarily and
without any FDA requirement withdrew Baycol from
the market and informed physicians:

"Effective Immediately Bayer has discontinued the
marketing and distribution of all dosage strengths of
Baycol. Patients who are currently taking Baycol
should have their Baycol discontinued and be switched
to an alternative therapy."

10. The purpose and intent of this notification and other
activity subsequent to August 8, 2001 was to stop all
further patient use of the medication, including the use
of already purchased Baycol.

11. Patients who had unused Baycol were refunded out
of pocket costs to the full extent of any co-pay
requirements.

12. Defendant has refused and continues to refuse to
refund TPPs the purchase price paid for Baycol
rendered unusable by defendant's voluntary actions and
advice.

13. Defendant has refused and continues to refuse to
refund TPPs for increased costs rendered medically
necessary in order to safely switch patients to a
different medication.

14. Plaintiffs filed this class action on behalf of the
following proposed classes: "All Third-Party Payors,
throughout Pennsylvania and the United States
(excluding all governmental entities, Defendant and
Defendant's respective subsidiaries and affiliates) who
have purchased Baycol, or reimbursed their
beneficiaries/insureds for their purchases of Baycol,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 852135 (Pa.Com.Pl.)
(Cite as: Not Reported in A.2d)

that is unusable and/or have incurred additional expenses associated with Baycol's withdrawal."

*2 15. The Class brings claims for breach of warranty and unjust enrichment.

16. The class meets all the requirements for certification as more fully set forth below.

## DISCUSSION

The sole issue before this court is whether the prerequisites for certification as stated in Pa. R.C.P. 1702 are satisfied. The purpose behind class action suits is "to provide a means by which the claims of many individuals could be resolved at one time, thereby eliminating the possibility of repetitious litigation and providing small claimants with a method to seek compensation for claims that would otherwise be too small to litigate". _DiLucido v. Terminix Intern., Inc.,_ 450 Pa.Super. 393, 397, 676 A.2d 1237, 1239 (Pa.Super.1996). For a suit to proceed as a class action, Rule 1702 of the Pennsylvania Rules of Civil Procedure requires that five criteria be met:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class;

(4) the representative parties will fairly and adequately assert and protect the interests of the class under the criteria set forth in Rule 1709;

(5) a class action provides a fair and efficient method for adjudication of the controversy under the criteria set forth in Rule 1708.

Rule 1708 of the Pennsylvania Rules of Civil Procedure requires:

In determining whether a class action is a fair and efficient method of adjudicating the controversy, the court shall consider among other matters the criteria set forth [below]

a) Where monetary recovery alone is sought, the court shall consider

(1) whether common questions of law or fact

predominate over any question affecting only individual members;

(2) the size of the class and the difficulties likely to be encountered in the management of the action as a class action;

(3) whether the prosecution of separate actions by or against individual members of the class would create a risk of

(i) inconsistent or varying adjudications with respect to individual members of the class which would confront the party opposing the class with incompatible standards of conduct;

(ii) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests;

(4) the extent and nature of any litigation already commenced by or against members of the class involving any of the same issues;

(5) whether the particular forum is appropriate for the litigation of the claims of the entire class;

(6) whether in view of the complexities of the issues or the expenses of litigation the separate claims of individual class members are insufficient in amount to support separate actions;

(7) whether it is likely that the amount which may be recovered by individual class members will be so small in relation to the expense and effort of administering the action as not to justify a class action.

*3 (b) Where equitable or declaratory relief alone is sought, the court shall consider

(1) the criteria set forth in subsections (1) through (5) of subdivision (a), and

(2) whether the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making final equitable or declaratory relief appropriate with respect to the class.

(c) Where both monetary and other relief is sought, the court shall consider all the criteria in both subdivisions (a) and (b).

The burden of showing each of the elements in Rule

1702 is initially on the moving party. This burden "is
not heavy and is thus consistent with the policy that
decisions in favor of maintaining a class action should
be liberally made." *Cambanis v. Nationwide Ins. Co.,*
348 Pa.Super. 41, 45, 501 A.2d 635, 637
(Pa.Super.1986). The moving party need only present
evidence sufficient to make out a *prima facie* case
"from which the court can conclude that the five class
certification requirements are met." *Debbs v. Chrysler
Corp.,* 2002 Pa.Super. 326, 810 A.2d 137, 153-154
(2002)(quoting *Janicik v. Prudential Ins. Co.,* 305
Pa.Super. 120, 451 A.2d 451, 455 (Pa.Super.1982).

In other contexts, the *prima facie* burden has been
construed to mean "some evidence," "a colorable
claim," "substantial evidence," or evidence that creates
a rebuttable presumption that requires the opponent to
rebut demonstrated elements. In the criminal law
context, "the *prima facie* standard requires evidence of
the existence of each and every element."
*Commonwealth v. Martin,* 727 A.2d 1136, 1142
(Pa.Super.1999), *alloc. denied,* 560 Pa. 722, 745 A.2d
1220 (1999). However, "The weight and credibility of
the evidence are not factors at this stage ."
*Commonwealth v. Marti,* 779 A.2d 1177, 1180
(Pa.Super.2001).

In the family law context, the term " '*prima facie* right
to custody' means only that the party has a colorable
claim to custody of the child." *McDonel v. Sohn,* 762
A.2d 1101, 1107 (Pa.Super.2000). Similarly, in the
context of employment law, the Commonwealth Court
has opined that a *prima facie* case can be established by
"substantial evidence" requiring the opposing party to
affirmatively rebut that evidence. *See, e.g.,
Williamsburg Community School District v. Com.,
Pennsylvania Human Rights Comm.,* 99 Pa.Cmwlth.
206, 512 A.2d 1339 (Pa.Commw.1986).

Courts have consistently interpreted the phrase
"substantial evidence" to mean "more than a mere
scintilla," but evidence "which a reasonable mind might
accept as adequate to support a conclusion." *SSEN,
Inc., v. Borough Council of Eddystone,* 810 A.2d 200,
207 (Pa.Commw.2002). In *Grakelow v. Nash,* 98
Pa.Super. 316 (Pa.Super.1929), a tax case, the Superior
Court said: "To ordain that a certain act or acts shall be
*prima facie* evidence of a fact means merely that from
proof of the act or acts, a rebuttable presumption of the
fact shall be made; ... it attributes a specified value to
certain evidence but does not make it conclusive proof
of the fact in question."

*4 Class certification is a mixed question of fact and
law. *Debbs v. Chrysler Corp.,* 2002 Pa.Super. 326, 810

A.2d, 137 (Pa.Super.2002). The court must consider all
the relevant testimony, depositions and other evidence
pursuant to Rule 1707(c). In determining whether the
prerequisites of Rule 1702 have been met, the court is
only to decide who shall be the parties to the action and
nothing more. The merits of the action and the
plaintiffs' right to recover are excluded from
consideration. 1977 Explanatory Comment to Pa. R.
Civ. P. 1707. Where evidence conflicts, doubt should
be resolved in favor of class certification. In making a
certification decision, "courts in class certification
proceedings regularly and properly employ reasonable
inferences, presumptions, and judicial notice." *Janicik,*
451 A.2d at 454, 455. Accordingly, this court must
refrain from ruling on plaintiff's ultimate right to
achieve any recovery, the credibility of the witnesses
and the substantive merits of defenses raised.

"The burden of proof to establish the five prerequisites
to class certification lies with the class proponent;
however, since the hearing on class certification is akin
to a preliminary hearing, it is not a heavy burden."
*Professional Flooring Co. v. Bushar Corp.,* 61 Pa. D &
C 4th 147, 153, 2003 WL 21802073
(Pa.Com.Pl.Montgo.Cty. Apr. 14, 2003), (citing *Debbs
v. Chrysler Corp.,* 810 A.2d 137, 153-54
(Pa.Super.2002); *Janicik v. Prudential Inc. Co. of
America,* 305 Pa.Super. 120, 451 A.2d 451, 455
(Pa.Super.1982)); *See also Baldassarl v. Suburban
Cable TV Co.,* 808 A.2d 184, 189 (Pa.Super.2002);
*Cambenis v. Nationwide Insurance Co.,* 348 Pa.Super.
41, 501 A.2d 635 (Pa.Super.1985). The *prima facie*
burden of proof standard at the class certification stage
is met by a qualitative "substantial evidence" test.

Our Superior Court has instructed that it is a strong and
off-repeated policy of this Commonwealth that
decisions applying the rules for class certification
should be made liberally and in favor of maintaining a
class action. *Weismer by Weismer v. Beech-Nut
Nutrition Corp.,* 419 Pa.Super. 403, 615 A.2d 428, 431
(Pa.Super.1992). *See also Janicik,* 451 A.2d at 454,
*citing and quoting Esplin v. Hirschi,* 402 F.2d 94, 101
(10th Cir.1968) ("in a doubtful case ... any error should
be committed in favor of allowing the class action").

Likewise, the Commonwealth Court has held that "in
doubtful cases any error should be committed in favor
of allowing class certification." *Foust v. Septa,* 756
A.2d 112, 118 (Pa.Commw.2000). This philosophy is
further supported by the consideration that "[t]he court
may alter, modify, or revoke the certification if later
developments in the litigation reveal that some
prerequisite to certification is not satisfied." *Janicik,*
451 A.2d at 454

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 852135 (Pa.Com.Pl.)
(Cite as: Not Reported in A.2d)

Within this context, the court will examine the requisite factors for class certification.

### I. Numerosity

To be eligible for certification, plaintiffs must demonstrate that the class is "so numerous that joinder of all members is impracticable." *Pa.R.C.P. 1702(1)*. A class is sufficiently numerous when "the number of potential individual plaintiffs would pose a grave imposition on the resources of the court and an unnecessary drain on the energies and resources of the litigants should plaintiffs sue individually." *Temple University v. Pa. Dept. of Public Welfare,* 30 Pa.Cmwlth. 595, 30 Pa.Cmwlth. 595, 374 A.2d 991, 996 (1977) (123 members sufficient); *ABC Sewer Cleaning Co. v. Bell of Pa.,* 293 Pa.Super. 219, 438 A.2d 616 (1981) (250 members sufficient); *Ablin, Inc. v. Bell Tel. Co. of Pa.,* 291 Pa.Super. 40, 435 A.2d 208 (1981) (204 plaintiffs sufficiently numerous). Plaintiffs need not plead or prove the actual number of class members, so long as they are able to "define the class with some precision" and provide "sufficient indicia to the court that more members exist than it would be practicable to join." *Janicik, 451 A.2d at 456.*

*5 Approximately 700,000 consumers have ingested Baycol, 10.6 million new and refilled prescriptions were dispensed in the year 2000. Many if not most of these prescriptions were paid by TPP's. Defendant does not contest numerosity.

The plaintiffs have satisfied the numerosity requirement for class certification of all proposed classes.

### II. Commonality

The second prerequisite for class certification is that "there are questions of law or fact common to the class." Pa. R. Civ. P. 1702(2). Common questions exist "if the class members' legal grievances arise out of the 'same practice or course of conduct on the part of the class opponent.' " *Janicik,* supra. 133, 451 A.2d at 457. Thus, it is necessary to establish that "the facts surrounding each plaintiff's claim must be substantially the same so that proof as to one claimant would be proof as to all." *Weismer by Weismer v. Beechnut Nutrition Corp.,* 419 Pa.Super. 403, 615 A.2d 428 (Pa.Super.1992)). However, where the challenged conduct affects the potential class members in divergent ways, commonality may not exist. *Janicik,* supra. 457 fn. 5

"While the existence of individual questions is not necessarily fatal, it is essential that there be a predominance of common issues shared by all class members which can be justly resolved in a single proceeding." *D'Amello v. Blue Cross of Lehigh Valley,* 414 Pa.Super. 310, 606 A.2d 1215 (Pa.Super.1992). In examining the commonality of the class' claims, a court should focus on the cause of injury and not the amount of alleged damages. "Once a common source of liability has been clearly identified, varying amounts of damages among the plaintiffs will not preclude class certification." See *Weismer by Weismer v. Beech-Nut Nutrition Corp.,* 419 Pa.Super. 403, 409, 615 A.2d 428, 431 (Pa.Super.). Where there exists intervening and possibly superseding causes of damage however, liability cannot be determined on a class-wide basis. *Cook v. Highland Water and Sewer Authority,* 108 Pa. Cmwlth. 222, 231, 108 Pa.Cmwlth. 222, 530 A.2d 499, 504 (Pa.Cmwlth.1987).

Plaintiffs argue that questions of law and fact common to the class exist. Defendants claim that individual issues of law and fact exist and predominate. After reviewing the class action record created at the certification hearing in this matter, the court finds that the claims presented by the Class do satisfy the commonality requirement of Rule 1702(a)(2). The common issue is the liability to a third party payor for the costs of medication sold to consumers who were subsequently advised it was unsafe to use and attendant costs for a patient to safely switch medications.

Defendants argue a conflict of law exists as to plaintiffs' claims for unjust enrichment precluding commonality. Defendants do not claim any conflict with respect to the claim of a breach of the implied warranty of usability. Plaintiffs' warranty claim arises under section 2-314(3) of the Uniform Commercial Code which has been adopted in forty-nine states and the District of Columbia. The one remaining state, Louisiana, has a similar provision. Defendants raise the issue of privity of contract, however no state has expressly extended this requirement to a breach of an implied warranty under the U.C.C. "[I]f there is no pertinent decision or statute, or if there is a very substantial doubt about the law of a sister state, the law of a common law sister state in such a situation and at the time in question is presumed to be the same as that of this Commonwealth." *In Re: Trust of Pennington,* 421 Pa. 334, 219 A.2d 353 (1966). Herein, defendants specifically told purchasers to stop using the purchased product and took affirmative and reasonable steps including refund of all individual out of pocket costs, to

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 852135 (Pa.Com.Pl.)
**(Cite as: Not Reported in A.2d)**

insure that their product was not used. The law of every state, in one form or another, clearly requires any seller of a product to warrant that the product should be used.

*6 Additionally, even if minor variations of law do exist it is neither inequitable nor improper under the facts of this case to apply Pennsylvania law to all claims. Defendants maintain their principle places of business in Pennsylvania. They directed and controlled their national sales strategies with regard to TPP's from within Pennsylvania. Their refund policy was designed or coordinated within Pennsylvania. The Commonwealth of Pennsylvania has a strong interest in the conduct of the execution of contract rights and the business expectations in the uniformity of interpretation in commercial and insurance reimbursement contracts controlled from within the state.

As to the alternative claim of unjust enrichment, Plaintiffs' claim no significant conflict of law exists or if a conflict does exist, the Pennsylvania choice of law analysis requires this court to apply Pennsylvania law. As discussed below no significant conflict of law is relevant to the fair adjudication of this case as a class action. If indeed the defense persists in it's contention that relevant differences do exist, the Court is confident that the "ingenuity of counsel" can craft specific subclasses which allow for the easy management of trial while preserving all claims for appellate review.

Pennsylvania choice of law analysis entails a determination of whether the laws of the competing states actually differ. If the laws of the competing states do not differ, no further analysis is necessary. If a conflict is present, Pennsylvania courts utilize the approach set forth in the Restatement (Second) of Conflicts Section 145. _Troxel v. A.I. duPont Institute.,_ 431 Pa.Super. 464, 468, 636 A.2d 1179, 1181 (1994). The relevant inquiry under this standard is not the number of contacts each litigant has with a state but the extent to which one state rather than another has demonstrated by reason of its policies and their connection and relevance to the matter in dispute a priority of interest in the application of its rule of law. The following factors may be considered in the analysis: 1) the place where the injury occurred; 2) the place where the conduct causing the injury occurred; 3) domicile, residence, nationality, place of incorporation, and place of business of the parties; 4) and the place where the relationship between the parties is centered. _Laconis v. Burlington County Bridge,_ 400 Pa.Super. 483, 492, 583 A.2d 1218, 1222-23 (1990). The conflicting interests of each state must be analyzed within the context of the specific facts at issue in a particular case. Additionally, the weight of a particular

state's contact must be measured on a qualitative rather than a quantitative scale. _Cipolia v. Shaposka,_ 439 Pa. 563, 566, 267 A.2d 854 (1970).

The law of unjust enrichment does vary from state to state. See _Clay v. American Tobacco Co.,_ 188 F.R.D. 483, 500 (S.D.Ill.1999). A conflict of law exists for plaintiffs' national claim for unjust enrichment but the conflict is not relevant to this lawsuit. All state laws commonly find unjust enrichment when a defendant wrongfully retains the money received from a sale when the defendant thereafter advises the consumer not to use the product because it may be unsafe. Essentially, the law everywhere requires proof that the defendant has kept what a plaintiff paid for a product under circumstances in which retention is inequitable.

*7 As Judge Charles B. Kommann of the District Court for the District of South Dakota, Northern Division said in _Schumacher v. Tyson Fresh Meats, Inc.,_ 2004 DSD 5, 221 F.R.D. 605, 2004 U.S. Dist. Lexis 11666:

"Certification of the unjust enrichment claims is more complicated. Defendants contend that class certification of the pendent state law claims for unjust enrichment should be denied because these claims involve varying state common law standards of liability."

In looking at claims for unjust enrichment, we must keep in mind that the very nature of such claims requires a focus on the gains of the defendants, not the losses of the plaintiffs. That is a universal thread throughout all common law causes of action for unjust enrichment. What is the practical difference between a practice that is "unfair" and a practice that results in "unjust enrichment"? What is the difference between "unfair" and "unjust"? The answers are probably very little."

"Failure to certify the claims for unjust enrichment would or could result in class members having to file virtually thousands of individual suits wherein the discovery and factual issues would be nearly identical."

"There are some differences between or among the states. There are also many states where the common law is the same. Sub-classes can be identified, if necessary, to group residents of various states with identical common law requirements into subclasses. In other words, the problems are manageable.... The claims for unjust enrichment should also be certified." _Id._

Unjust Enrichment is essentially an equitable doctrine.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The elements of unjust enrichment are "benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant and acceptance and retention of such circumstances that it would be inequitable for defendant to retain the benefit without payment of value." *AmeriPro Search, Inc. v. Fleming Steel Co.,* 2001 Pa.Super. 325, 787 A.2d 988 (2001) (citing *Schenck v. K.E. David, Ltd.,* 446 Pa.Super. 94, 666 A.2d 327, 328 (Pa.Super.1995). The application of this doctrine in this matter does not depend on the particular factual circumstances of the case at issue. An unjust enrichment class requires answers to the following common questions of fact: (1) did plaintiffs confer a benefit upon defendants, (2) did the defendants appreciate the benefit. These questions must be answered in the affirmative since the plaintiffs' present a claim only to the extent that they paid defendants for Baycol which the company thereafter strongly urged consumers not to use. An unjust enrichment claim further requires proof of (3) whether the defendant accepted and retained the benefits under the circumstances that would make it inequitable for the defendant to retain the benefit without payment for value. The response to this remaining factual question will be uniform as to every class member. Determination of the equitable claim of unjust enrichment will not require any individualized determination, all class members stand in precisely the same relation to defendant. Either it would be inequitable for defendants to retain the payments made to them by TPPs while refunding the deductible or co-pay for the same purchase or it is acceptable. No individualized issues are significantly involved in the unjust enrichment claim.

**\*8** Plaintiffs have sustained their burden of demonstrating that common issues of fact and law exist to satisfy the requirement of commonality.

### III. Typicality

The third step in the certification test requires the plaintiff to show that the class action claims and defenses are typical of the entire class. The purpose behind this requirement is to determine whether the class representatives' overall position on the common issues is sufficiently aligned with that of the absent class members, to ensure that pursuit of their interests will advance those of the proposed class members. *DiLucido v. Terminix Intern., Inc.,* 450 Pa.Super. 393, 404, 676 A.2d 1237, 1242 (Pa.Super.1996).

The named plaintiffs are typical of those class claimants for both the warranty and unjust enrichment

claims since they made payments on behalf of individuals who purchased Baycol but were advised by the defendant on August 8, 2001 to cease taking the medication and have incurred additional, otherwise unnecessary costs, when their insureds were told not to use the medication. Clearly class members suffered monetary loss for unused Baycol purchased prior to August 8, 2001. The fact that different class members may have different damage claims does not defeat the typicality of the class representative. The requirement of typicality has been met.

### IV. Adequacy of Representation

For the class to be certified, this court must also conclude that the plaintiffs "will fairly and adequately assert and protect the interests of the class." Pa. R. Civ. P. 1702(4). In determining whether the representative parties will fairly and adequately represent the interests of the class, the court shall consider the following:
"(1) whether the attorney for the representative parties will adequately represent the interests of the class,
(2) Whether the representative parties have a conflict of interest in the maintenance of the class action, and
(3) Whether the representative parties have or can acquire financial resources to assure that the interests of the class will not be harmed."
Rule 1709.

"Until the contrary is demonstrated, courts will assume that members of the bar are skilled in their profession." *Janicik,* 305 Pa.Super. at 136, 451 A.2d at 458. Here, defendants do not challenge plaintiffs' counsels' skill and therefore, the court presumes that counsel is skilled in their profession.

"Courts have generally presumed that no conflict of interest exists unless otherwise demonstrated, and have relied upon the adversary system and the court's supervisory powers to expose and mitigate any conflict." *Janicik,* 305 Pa.Super. at 136, 451 A.2d at 458. Defendants argue that the interests of the named plaintiffs conflict with the interests of other class members. This Court concludes that the named class representatives' interests do not conflict with those of the proposed putative class even though some class members may have additional monetary claims. All claims derive from the same liability and are attendant together. Accordingly, the court finds that no conflict of interest exists and the adequacy of representation has been demonstrated.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 852135 (Pa.Com.Pl.)
(Cite as: Not Reported in A.2d)

V. Fair and Efficient Method of Adjudication

*9 The final criteria under Pa. R. Civ. P. 1702 is a determination of whether a class action provides a fair and efficient method for adjudication of the controversy under the criteria set forth in Rule 1708. Since the court has determined that the claims satisfy the requirements of Pa. R. Civ. P. 1702 and no form of equitable relief is requested, it is not necessary to consider both subdivisions (a) and (b) of Rule 1708.

1. Predominance of Common Questions of Law and Fact

The most important requirement in determining whether a class should be certified under 1702(a)(5) and 1708(a)(1) is whether common questions of law and fact predominate over any question affecting only individual members. In addition to the existence of common questions of law and fact, plaintiffs must also establish that the common issues predominate. The analysis of predominance under Rule 1708(a)(1) is closely related to that of commonality under Rule 1702(2). Janick, supra, 451 A.2d at 461. The court adopts and incorporates its analysis of commonality and concludes that the requirement of predominance has been satisfied.

2. The Existence of Serious Management Difficulties

Under Pa. R. Civ. P. 1708(2), a court must also consider the size of the class and the difficulties likely to be encountered in the management of the action as a class action. While a court must consider the potential difficulties in managing the class action, any such difficulties generally are not accorded much weight. Problems of administration alone ordinarily should not justify the denial of an otherwise appropriate class action for to do so would contradict the policies underlying this device. Yaffe v. Powers, 454 F.2d 1362 (1st Cir.1972). Rather, the court should rely on the ingenuity and aid of counsel and upon its plenary authority to control the action to solve whatever management problems the litigation may bring. Id (citing Buchanan v. Brentwood Federal Sav. and Loan Ass'n, 457 Pa. 135, 320 A.2d 117, 131 (Pa.1974)). The Court sees no serious management difficulties in the trial of this case.

Whatever management problems remain, this court will rely upon the ingenuity and aid of counsel and upon the court's plenary authority to control the action. Janicik, 305 Pa.Super. at 142, 451 A.2d 462.

3. Potential for Inconsistent Adjudications

Pennsylvania Rule 1708(a)(3) also requires a court to evaluate whether the prosecution of separate actions by or against individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class. In considering the separate effect of actions, the precedential effect of a decision is to be considered as well as the parties' circumstances and respective ability to pursue separate actions.

While there is no significant risk of inconsistent adjudications herein because of the straightforward nature of the issues and facts involved, as a single certified class one case will determine liability and one verdict will establish all obligations. Any possibility for inconsistent verdicts is eliminated by certification.

4. Extent and Nature of any Preexisting Litigation and the Appropriateness of this Forum

*10 Under Pa. R. Civ. P. 1708(a)(4) and (a)(5), a court should consider the extent and nature of any litigation already commenced by or against members of the class involving any of the same issues. The Court is advised that numerous claims of the type presented herein by former class members have already been amicably resolved. The Court is aware of no litigation which would conflict with this case. This court finds that this forum is appropriate to litigate the class claims. This Court has a demonstrated record of excellence in managing Complex Litigation and Class Action Litigation.

5. The Separate Claims of the Individual Plaintiffs are Insufficient in Amount to Support Separate Claims or their Likely Recovery.

Rule 1708 also requires the court to consider the amount of damages sought by the individual plaintiffs in determining the fairness and efficiency of a class action. Thus, a court must analyze whether in view of the complexities of the issues or the expenses of litigation the separate claims of individual class members are insufficient in amount to support separate actions. Pa. R. Civ. P. 1706(a)(6). Alternatively, the rules ask the court to analyze whether it is likely that the amounts which may be recovered by individual class members will be so small in relation to the expense and effort of administering the action as not to

justify a class a action. Pa. R. Civ. P. 1708(a)(7). This criteria is rarely used to disqualify an otherwise valid class action claim. See *Kelly v. County of Allegheny*, 519 Pa. 213, 215, 546 A.2d 608, 609 (Pa.1988)(Trial court erred in refusing to certify a class on the grounds that the class members' average claim was too small in comparison to the expenses incurred.). However, in *Klusman v. Bucks County Court of Common Pleas*, 128 Pa. Cmwith. 616, 128 Pa.Cmwlth. 616, 564 A.2d 526 (1989) the Court said: "Where the issue of damages does not lend itself to a mechanical calculation, but requires separate mini-trials of a large number of individual claims, courts have found that the staggering problem of logistics make the damage aspect of the case predominate and renders the class unmanageable as a class action." *State of Alabama v. Blue Bird Body Co., Inc.*, 573 F.2d 309 (5 th Cir.1978).

While the amounts of recovery may vary widely by individual class members, none are likely to be so small as to dissuade class treatment. Plaintiffs have prima facie demonstrated that damages can be calculated and tried on a class basis. The plaintiffs' herein have satisfied the criteria for class under Pa. R. Civ. P. 1702(a) (6) and (7).

### CONCLUSIONS OF LAW

1. The class is sufficiently numerous that joinder of all its members would be impracticable.
2. There are questions of law and fact common to the Class.
3. Plaintiffs will fairly and adequately assert and protect the interests of the Class under the criteria set forth in Pa. R. Civ. P. 1709.
4. A class action provides a fair and efficient method for adjudication of the criteria set forth in Pa. R. Civ. P. 1708.

### CONCLUSION

*11 For these reasons, this court grants Plaintiffs' Motion for Class Certification as follows:

1. A Class is hereby certified and defined as follows: "All Third-Party Payors, throughout Pennsylvania and the United States (excluding all governmental entities, Defendants and Defendants' respective subsidiaries and affiliates) who have purchased Baycol, or reimbursed their beneficiaries/insureds for their purchases of Baycol, that is unusable and/or have incurred additional expenses associated with Baycol's withdrawal."

2. Philadelphia Firefighters Local 22 Health Fund, AFL-CIO District Council 47, and the National Conference of Fireman and Oilers Local 1201 Fund are designated as class representatives.

3. Plaintiffs counsel are appointed as counsel for the Class.

4. The parties shall submit proposals for a notification procedure and proposed forms of notice for class members within thirty days from the date of this Order.

A contemporaneous order consistent with this Opinion is filed.

### ORDER AND MEMORANDUM

AND NOW, this 4th of April, 2005, upon consideration of Plaintiffs' Motion for Class Certification, all responses in opposition, the respective memoranda, all matters of record, and in accordance with the contemporaneous Memorandum Opinion, it hereby is ORDERED and DECREED as follows:

1. Plaintiffs Motion for Class Certification is GRANTED,

2. A Class is hereby certified and defined as follows: "All Third-Party Payors, throughout Pennsylvania and the United States (excluding all governmental entities, Defendants and Defendants' respective subsidiaries and affilietes) who have purchased Baycol, or reimbursed their beneficiaries/insureds for their purchases of Baycol, that is unusable and/or have incurred additional expenses associated with Baycol's withdrawal."

3. Philadelphia Firefighters Local 22 Health Fund, AFL-CIO District Council 47, and the National Conference of Fireman and Oilers Local 1201 Fund are the class representatives.

4. Plaintiffs counsel is appointed as counsel for the Class.

5. The parties shall submit proposals for a notification procedure and proposed forms of notice for class members within thirty days from the date of this Order. Discovery for trial, if needed, shall commence. All discovery shall be completed not later than August 1, 2005.

Pa.Com.Pl.,2005.
In re Pennsylvania Baycol Third-Party Payor Litigation

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 9
Not Reported in A.2d, 2005 WL 852135 (Pa.Com.Pl.)
**(Cite as: Not Reported in A.2d)**

Not Reported in A.2d, 2005 WL 852135 (Pa.Com.Pl.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 11



Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 135703 (E.D.Pa.), 1998-1 Trade Cases P 72,107
**(Cite as: Not Reported in F.Supp.)**

Page 1

**H**
Briefs and Other Related Documents

United States District Court, E.D. Pennsylvania.
In Re: PLASTIC CUTLERY ANTITRUST
LITIGATION.
**No. CIV. A. 96-CV-728.**

March 20, 1998.

McGLYNN, J.
\*1 Before the court is plaintiffs' motion for class certification. Defendant Amcel Corp. has submitted an opposition brief, in which codefendant Dispoz-O Plastics Corp. has joined. For the following reasons, plaintiffs' motion for class certification will be granted.

I. Background

Plaintiffs allege defendants violated section 1 of the Sherman Act, 15 U.S.C. § 1, by conspiring to fix, raise, maintain and stabilize prices of medium weight polypropylene cutlery ("plastic cutlery") from January 1, 1990 through December 31, 1992. Plaintiffs are: (1) Eisenberg Brothers, Inc.; (2) Servall Products, Inc.; (3) Clark Foodservices, Inc.; and (4) the St. Cloud Restaurant Supply Company. This action commenced in February 1996 with the filing of four separate complaints against the same group of defendants. The court consolidated those actions (96-CV-728; 96-CV-1116; 96-CV-1618; and 96-CV-1619) under Civil Action No. 96-728 by its Pretrial Order No. 1 of April 30, 1996.

> FN1. Section 1 of the Sherman Act provides: Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion

of the court.
15 U.S.C.A. § 1 (West 1997).

Plaintiffs' motion for class certification follows close on the heels of a criminal antitrust action against two of the current defendants, Amcel Corp. and Dispoz-O Plastics, Inc., and their respective presidents, Lloyd Gordon and Peter Iacovelli. That trial ended on July 22, 1997, with a jury verdict of guilty against all four defendants.

Plaintiffs and the members of the class they seek to represent are direct purchasers of plastic cutlery. The proposed class consists of:
[a]ll purchasers in the United States of plastic cutlery directly from the defendants or their respective wholly-owned subsidiaries or affiliates, at any time from as early as January 1, 1990 to and including at least December 31, 1992 (excluded from the Class are the Defendants, subsidiaries and affiliates of defendants and co-conspirators of the defendants.) [sic]

Defendants are several major producers of plastic cutlery in the United States. They are: (1) Amcel Corp.; (2) Clear Shield National, Inc.; (3) Dispoz-O Plastics Corp., and (4) Benchmark Holdings, Inc.

> FN2. One of the defendants, Amcel Corp., has already "agreed in principle to settle" with plaintiffs, Pls. 1/29/98 Letter to Ct., although a settlement agreement has not yet been submitted.

Plaintiffs claim that they and the members of the proposed class have been injured in their respective businesses because they had to pay more for plastic cutlery during the relevant time period than they would have paid under conditions of free and open competition. Plaintiffs seek treble damages, costs of suit, including reasonable attorneys' fees, and injunctive relief against defendants to prevent and restrain them from further violations of section 1 of the Sherman Act.

Defendant Amcel opposes the motion for class certification on three grounds: (1) plaintiffs cannot prove that antitrust "impact"-the fact of injury to each putative class member from the alleged price-fixing conspiracy-is a common issue; (2) even if it was a common issue, plaintiffs cannot establish that "impact"

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 135703 (E.D.Pa.), 1998-1 Trade Cases  P 72,107
(Cite as: Not Reported in F.Supp.)

is provable on a class-wide basis by generalized proof; and (3) market factors such as geography, customer demands, and individualized transactions create individual issues which would overwhelm common class issues.

## II. Discussion

**\*2** Class actions are widely-recognized as being particularly appropriate for the litigation of antitrust cases alleging a price-fixing conspiracy because price-fixing schemes presumably impact all purchasers in the affected market, so that common questions on the issue of liability predominate. *See Cumberland Farms, Inc. v. Browning-Ferris Indus., Inc.,* 120 F.R.D. 642, 645 (E.D.Pa.1988) (Bechtle, J.) (citations omitted); 5 James W. Moore's Federal Practice §   23.47[3][a] (3d ed.1997) (citations omitted). "With that in mind, in an alleged horizontal price-fixing conspiracy case when a court is in doubt as to whether or not to certify a class action, the court should err in favor of allowing the class." *Cumberland Farms,* 120 F.R.D. at 645 (citing *Eisenberg v. Gagnon,* 766 F.2d 770, 785 (3d Cir.), *cert. denied,* 474 U.S. 946 (1985)).

In evaluating a motion for class certification, the district court should not decide the merits of a case. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177-78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). The court should rather perform a "rigorous analysis" to ensure that all the requirements of Federal Rule of Civil Procedure 23 are met. *See In re Chlorine & Caustic Soda Antitrust Litig.,* 116 F.R.D. 622, 625 (E.D.Pa.1987) (citing *General Tel. Co. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); *Glick v. E.F. Hutton & Co., Inc.,* 106 F.R.D. 446, 447 (E.D.Pa.1985)). A plaintiff seeking class certification bears the burden of proving that the action satisfies the four threshold requirements of Federal Rule of Civil Procedure 23(a) and also falls within one of the three categories of Rule 23(b). *Baby Neal v. Casey,* 43 F.3d 48, 55 (3d Cir.1994).

Rule 23(a) provides:
(a) Prerequisites to a Class Action.    One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a).

A plaintiff relying on Rule 23(b)(3) must also meet two additional criteria: (1) questions of law or fact common to class members must predominate over any questions affecting individual members; and (2) the class action device must be superior to any other method of adjudication. Fed.R.Civ.P. 23(b)(3).

### B. Numerosity (Rule 23(a)(1))

Rule 23(a)(1) requires the class to be "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). There is no magic number which satisfies the numerosity requirement, and plaintiffs do not have to allege the precise number or identity of the class members. *See Cumberland Farms,* 120 F.R.D. at 645. A court may instead "accept commonsense presumptions in order to support a finding of numerosity." *Id.* at 646.

**\*3** In this case, plaintiffs believe "that the number of purchasers of plastic cutlery numbers in the thousands." Pls. Br. at 9. They further contend that "joinder would be impracticable in each action because many of the smaller purchasers of defendants' plastic cutlery would be unable to assume the financial burdens associated with litigation of individual antitrust lawsuits." *Id.* Defendants do not contest plaintiffs' assertion that they have satisfied the numerosity requirement.

The typical considerations in evaluating the impracticability of joinder are: (1) the size of the putative class; (2) the geographic location of the members of the class; and (3) the relative ease or difficulty in identifying members of the class for joinder purposes. *See Ardrey v. Federal Kemper Ins. Co.,* 142 F.R.D. 105, 110 (E.D.Pa.1992).

Plaintiffs' proposed class is estimated to number in the thousands, to be located across the United States, and to be identifiable only through examination of defendants' sales records.    Under these circumstances, joinder would clearly be impracticable and the numerosity requirement is therefore met. *See In re Fine Paper Antitrust Litig.,* 82 F.R.D. 143, 149-50 (E.D.Pa.1979).

### B. Common Questions of Law or Fact (Rule 23(a)(2))

Rule 23(a)(2) requires there to be questions of law or fact common to the class. Fed.R.Civ.P. 23(a)(2).

Not Reported in F.Supp.                                                                    Page 3
Not Reported in F.Supp., 1998 WL 135703 (E.D.Pa.), 1998-1 Trade Cases P 72,107
(Cite as: Not Reported in F.Supp.)

Courts have generally taken a liberal view of the commonality requirement in cases of conspiracy. *See Cumberland Farms Inc. v. Browning-Ferris Indus., Inc., 120 F.R.D. 642, 645 (E.D.Pa.1988).* Furthermore, courts have noted that "[a]ntitrust price-fixing conspiracy cases, by their nature, deal with common legal and factual questions about the existence, scope and effect of the alleged conspiracy." *In re Sugar Indus. Antitrust Litig., 73 F.R.D. 322, 335 (E.D.Pa.1976); see also Cumberland Farms, 120 F.R.D. at 645; In re South Central States Bakery Prod. Antitrust Litig., 86 F.R.D. 407, 415 (M.D.La.1980); In re Fine Paper Antitrust Litig., 82 F.R.D. 143, 150 (E.D.Pa.1979).*

Here, plaintiffs allege the existence of a horizontal price-fixing conspiracy by defendants. Defendants do not oppose plaintiffs' claim that common questions of law or fact exist. Two common questions which are immediately apparent are: (1) whether defendants, their respective wholly-owned subsidiaries, and their affiliates conspired to raise, fix, maintain and stabilize the prices of their plastic cutlery products during the relevant time period; and (2) whether the prices paid by plaintiffs and the proposed class members were higher than they would have been absent the alleged conspiracy. Plaintiffs admit that the amount of damages to each particular class member may be an individual issue, but that is not fatal to a claim of commonality. *See Siedman v. American Mobile Sys., Inc., 157 F.R.D. 354, 360 (E.D.Pa.1994)* (holding that potential need for individual damages calculations in securities fraud action did not defeat certification because common questions of liability predominated). Rule 23(a)(2)'s commonality requirement is therefore satisfied.

### C. Typicality (Rule 23(a)(3))

*\*4* Under Rule 23(a)(3), the claims of the representative plaintiffs must be typical of the claims of the class. Fed.R.Civ.P. 23(a)(3). "The typicality requirement is met if the plaintiff's claim arises from the same event or course of conduct that gives rise to the claims of other class members and is based on the same legal theory." *Cumberland Farms Inc. v. Browning-Ferris Indus., Inc., 120 F.R.D. 642, 646 (E.D.Pa.1988); see also Eisenberg v. Gagon, 766 F.2d 770, 786 (3d Cir.), cert. denied, 474 U.S. 946 (1985).* "Typical" does not mean "identical"-so long as the representative plaintiffs' individual circumstances and legal theories upon which they base their claims are not markedly different from those of the other class members, the typicality requirement is satisfied. *Eisenberg, 766 F.2d at 786.*

This litigation arises from an alleged price-fixing conspiracy by the defendants in violation of the section 1 of the Sherman Act. In order to prevail on the merits, plaintiffs will have to prove: (1) concerted action by the defendants; (2) that produced an anticompetitive effect within the relevant product and geographic markets; (3) that the objects of the conduct pursuant to the concerted action were illegal; and (4) that plaintiffs were injured as a proximate result of the concerted action. *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc., 998 F.2d 1224, 1229 (3d Cir.1993).* These are the same elements the other class members would have to prove if they brought individual actions. Defendants do not argue that the proposed class fails to meet the typicality requirement. The requirements of Rule 23(a)(3) are therefore satisfied.

### D. Adequacy of Representation (Rule 23(a)(4))

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). Adequacy of representation rests upon two considerations: (1) the plaintiffs' attorneys must be qualified, experienced, and generally able to conduct the litigation; and (2) the representative plaintiffs must not have interests antagonistic to those of the class. *Hosworth v. Blinder Robinson & Co., Inc., 980 F.2d 912, 924 (3d Cir.1992).*

Plaintiffs' counsel asserts that they are experienced in class and antitrust litigation. They also claim that there are no actual or potential conflicts of interest between the members of the class and representative plaintiffs because of their common interest in seeing the defendants' antitrust liability established. Defendants do not question the adequacy of plaintiffs and their attorneys as representatives of the proposed class. The court therefore finds plaintiffs and their attorneys to be adequate class representatives under Rule 23(a)(4).

### E. Predominance (Rule 23(b)(3))

*\*5* In order to certify a class under Rule 23(b)(3), the court must find that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members." Fed.R.Civ.P. 23(b)(3). An essential element in any class action is "impact" or "fact of damage"-i.e., that each putative class member was damaged by the defendants' wrongful conduct. In a price-fixing antitrust class action, plaintiffs must "establish that both

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 4
Not Reported in F.Supp., 1998 WL 135703 (E.D.Pa.), 1998-1 Trade Cases P 72,107
(Cite as: Not Reported in F.Supp.)

the defendants' violations of law and the impact of those violations on the class members involve predominantly common issues." 5 James W. Moore's Federal Practice § 23.47[3][a] (3d ed.1997) (citations omitted). Plaintiffs must therefore "make a threshold showing that the element of impact will predominantly involve generalized issues of proof, rather than questions which are particular to each member of the plaintiff class." _Lumco Indus. v. Jeld-Wen, Inc.,_ 171 F.R.D. 168, 174 (E.D.Pa.1997).

As the district court noted in _Jeld-Wen,_ "[s]everal courts have held that when a defendant is alleged to have participated in a nationwide price-fixing conspiracy, impact will [be] presumed as a matter of law, and the predominance requirement of Fed.R.Civ.P. 23(b)(3) will be satisfied." _Jeld-Wen,_ 171 F.R.D. at 173.

> FN3. Citing _In re Citric Acid Antitrust Litig.,_ 1996-2 CCH Trade Cases ¶ 71,595, 1996 WL 655791 (N.D.Cal. Oct.2, 1996); _In re Amino Acid Lysine Antitrust Litig.,_ MDL No. 1083, 1996 WL 69699 (N.D.Ill. Feb.15, 1996); _In re Sugar Indus. Antitrust Litig.,_ MDL Dkt. No. 201, 1976 WL 1374, at *24 (N.D.Cal. May 21, 1976); Newberg on Class Actions, § 18.28 at 18-98, 18-99 (3d ed.1992) (stating, "[a]s a rule, the allegation of a price-fixing conspiracy is sufficient to establish predominance of common questions" for purposes of Fed.R.Civ.P. 23(b)(3)).

In spite of this trend, Amcel argues that plaintiffs cannot prove that all members of the proposed class were impacted by defendants' alleged price-fixing conspiracy because: (1) the alleged conspiracy did not have the market power to impact all class members; (2) Amcel applied individual pricing strategies to the various categories of its customers; and (3) even if there was class-wide impact, plaintiffs cannot prove that impact by generalized proof.

### 1. Market Power

Amcel first argues that because the alleged conspiracy did not include significant competitors of the conspirators, including Dart, a leading price cutter in the industry, defendants did not have the nationwide pricing power to impact the proposed class. The court does not agree. Simply because Dart and other competitors were not a part of the alleged conspiracy does not invalidate plaintiffs' allegation of class-wide

impact. Defendants rely on _In re Agricultural Chemicals Antitrust Litigation_ for the proposition that a price-fixing conspiracy which does not include substantial competitors in the industry eliminates the conspirators' pricing power and their impact on the proposed class. No. 94-40216-MMP, 1995 WL 787538 (N.D.Fla. Oct.23, 1995). That case is inapposite. The _Agricultural Chemicals_ case involved a vertical price-fixing scheme in which Zeneca, Inc., a manufacturer of pesticides, allegedly entered into a conspiracy with its distributors to market Zeneca products at or above a set minimum price imposed by Zeneca. _Id._ at *1. The district court rejected the plaintiffs' proposed class in part because Zeneca and its distributors had insufficient market power to charge supracompetitive prices and therefore could not have impacted the purchasers of Zeneca products. _Id._ at *8-9. This was largely because Zeneca had a market share of only 8-9%. _Id._ at *5 n. 7. That is not true here, where the four defendants possessed a 65% national market share of the polypropylene cutlery industry from 1990 through 1992. Amcel Br. at 6. That market power is sufficient to meet plaintiffs' threshold showing that defendants had the market power to impact the putative class members, especially in light of plaintiffs' evidence that Dart was tacitly raising its prices in line with defendants' price increases. Pls. Reply Br. 13-14.

> FN4. Plaintiffs cite _Rebel Oil Co., Inc. v. Atlantic Richfield Co.,_ 51 F.3d 1421, 1437 (9th Cir.1995), in support of their statement that "[m]arket share in excess of 50% has been found sufficient to presume market power." Pls. Reply Br. at 12. In that case, the Court of Appeals for the Ninth Circuit noted, "[w]ith a dominant share of the market's productive assets, a firm may have the market power to restrict marketwide output and, hence, increase prices, as its rivals may not have the capacity to increase their sales quickly to make up for the reduction by the dominant firm." _Id._ While _Rebel Oil_ dealt with an "attempt-to-monopolize" claim against a wholesale and retail oil marketer and its affiliated gas stations, its reasoning with regard to market power is equally cogent in a horizontal price-fixing case such as this one.

> FN5. Plaintiffs point to a fax dated June 10, 1993 from Michael N. Phillips, Dispoz-O's Vice President of Sales and Marketing, in which he noted the announcement of price increases by other competitors and wrote,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                  Page 5
Not Reported in F.Supp., 1998 WL 135703 (E.D.Pa.), 1998-1 Trade Cases  P 72,107
**(Cite as: Not Reported in F.Supp.)**

"[t]his leaves only us, Dart and Jet to announce." Pls. Reply Br. at 14. Further, in a June 17, 1993, letter to its customers, Amcel states its assumption that Jet Plastica, Dispoz-O and Dart will "also increase their prices." *Id.*

**\*6** Amcel further argues that the plastic cutlery market is too regionally fragmented-with various manufacturers pricing differently and achieving dominance in different regional markets-to permit a finding that impact is a predominant common issue. The Court of Appeals for the Third Circuit addressed this problem in *Bogosian v. Gulf Oil Corp.,* stating, [i]f the price structure in the industry is such that nationwide the conspiratorially affected prices at the wholesale level fluctuated within a range which, though different in different regions, was higher in all regions than the range which would have existed in all regions under competitive conditions, it would be clear that all members of the class suffered some damage, notwithstanding that there would be variations among all dealers as to the extent of their damage.

*Bogosian v. Gulf Oil Corp.,* 561 F.2d 434,455 (3d Cir.1977), *cert. denied,* 434 U.S. 1086 (1978).

In this case, plaintiffs contend that "Amcel and its co-conspirators implemented list price increases that had a uniform impact on the transaction prices paid by their customers." Pls. Reply Br. at 2. This nationwide price-fixing scheme, plaintiffs allege, caused the price of plastic cutlery to be higher than it would have been in a competitive market. Compl. at 8, ¶ 21. Plaintiffs plan to prove each member of the proposed class was damaged by introducing generalized evidence which controls for regional price differences. Pls. Reply Br. at 18.

In support of their objection, Amcel offers the statements of Miguel Milich, its Vice President of Marketing and Sales since 1990, to show that Amcel's market power in certain regions was weaker than Dart's. Amcel Br. at 23-24. These self-serving statements, however, fail to show that the alleged price-fixing agreement did not have at least some impact on the putative class members' purchase of plaintiffs' plastic cutlery, even in regions where Dart may have been more dominant than Amcel. As a result, the court does not view defendants' claim of geographic market fragmentation as a barrier to class certification. *See Lumco Indus., Inc. v. Jeld-Wen, Inc.,* 171 F.R.D. 168, 173 (E.D.Pa.1997); *Cumberland Farms v. Browning-Ferris Indus., Inc.,* 120 F.R.D. 642, 647 (E.D.Pa.1988); *In re Fine Paper Antitrust Litig.,* 82 F.R.D. 143, 153 (E.D.Pa.1979).

> FN6. Moreover, "[e]ven if the variation in price dynamics among regions or marketing areas were such that in certain areas the free market price would be no lower than the conspiratorially affected price it might be possible to designate subclasses to conform with these variations." *Bogosian,* 562 F.2d at 454-55.

### 2. Individual Pricing Strategies & Generalized Proof of Impact

Amcel's arguments regarding individual pricing strategies and the difficulty of showing impact by generalized proof basically boil down to the contention that too many variables enter into setting prices in the plastic cutlery industry to permit common proof of impact in this case. Specifically, Amcel contends that the different pricing strategies it applied to bid customers, master distributors and repackers require their exclusion from the class because they could not have been impacted. Amcel also argues that a determination of impact would involve proving the price each class member actually paid for plastic cutlery and then comparing it to the hypothetical price the class member would have paid in the absence of the alleged conspiracy. This is impossible by common proof, says Amcel, because: (1) rebates and discounting programs caused actual transaction prices to vary according to competitive conditions and the needs of individual customers; and (2) determining the hypothetical competitive market price would require individualized calculations involving a multiplicity of market factors during different time periods and tailored to the nature of the class members' respective businesses.

> FN7. Amcel explains that the prices charged to bid customers were determined on a customer-by-customer basis and were always below Amcel's list price due to competitive conditions. Amcel also contends that distributors and repackers could not have been impacted by the alleged conspiracy because they purchase large volumes at low prices under contracts that are negotiated on an individual basis. In support of these arguments, Amcel again offers the declarations of Miguel Milich, as well as the testimony of one of the government's witnesses in the criminal trial, who testified

that the price-fixing agreement did not refer to these three categories of purchasers.

*7 These objections are unavailing. Plaintiffs have submitted letters sent by defendants to their customers announcing uniform price list increases on plastic cutlery. Pls. Reply Br., Exs. F, G & H. None of these letters indicate that different categories of purchasers-such as bid customers, master distributors and repackers-were exempted from the price list increases, or that special rebates and discounts would counteract the effect of the price increases. Inasmuch as these letters alerted putative class members that the bar had been raised with regard to the cost of defendants' plastic cutlery, these letters are strong proof of class-wide impact by the defendants' alleged price-fixing conspiracy.

This reasoning is supported by a notable line of cases in the Eastern District of Pennsylvania rejecting similar arguments by defendants in price-fixing class actions. As the district court explained in *In re Industrial Diamonds Antitrust Litigation,*

> FN8. See *Lumco Indus., Inc. v. Jeld-Wen, Inc.,* 171 F.R.D. 168, 173-75 (E.D.Pa.1997); *Cumberland Farms v. Browning-Ferris Indus.,* 120 F.R.D. 642, 647 (E.D.Pa.1988); *Hedges Enters., Inc. v. Continental Group,* 81 F.R.D. 461, 475 (E.D.Pa.1979); *In re Fine Paper Antitrust Litig.,* 82 F.R.D. 143, 151-52 (E.D.Pa.1979).

[i]n a number of price-fixing cases concerning industries where discounts and individually negotiated prices are common, courts have certified classes where the plaintiffs have alleged that the defendants conspired to set an artificially inflated base price from which negotiations for discounts began. The theory that underlies these decisions is, of course, that the negotiated transaction prices would have been lower if the starting point for negotiations had been list prices set in a competitive market. Hence, if a plaintiff proves that the alleged conspiracy resulted in artificially inflated list prices, a jury could reasonably conclude that each purchaser who negotiated an individual price suffered some injury.

> FN9. Citing *In re Potash Antitrust Litig.,* 159 F.R.D. 682, 696 n. 19 (D.Minn.1995); *In re Domestic Air Transp. Litig.,* 137 F.R.D. 677, 689 (N.D.Ga.1991); *Fisher Bros. v. Mueller Brass Co.,* 102 F.R.D. 570, 578

(E.D.Pa.1984); *In re Glassine & Greaseproof Paper Antitrust Litig.,* 88 F.R.D. 302, 306-07 (E.D.Pa.1980); *Hedges Enters., Inc. v. Continental Group, Inc.,* 81 F.R.D. 461, 475 (E.D.Pa.1979); *In re Catfish Antitrust Litig.,* 826 F.Supp. 1019, 1040-41 (N.D.Miss.1993); *In re Screws Antitrust Litigation,* 91 F.R.D. 52, 55 (D.Mass.1981).

*In re Industrial Diamonds Antitrust Litig.,* 167 F.R.D. 374, 383 (S.D.N.Y.1996).

Thus, even if bid customers, master distributors and repackers, as well as other types of purchasers who received rebates and discounts, paid less than the floor price agreed to by the conspirators, information that the uniform price lists were a factor in negotiating these purchases would provide adequate proof of impact. *See Hedges Enters., Inc. v. Continental Group,* 81 F.R.D. 461, 475 (E.D.Pa.1979) (proof of inflated base price from which all negotiations began found sufficient to establish fact of damage); *Industrial Diamonds,* 167 F.R.D. at 384 (evidence that supracompetitive list prices "formed the basis for subsequent individualized negotiations" sufficient to satisfy common impact requirement).

In addition, plaintiffs proffer two methods of proving antitrust impact by generalized proof. The first method, multiple regression analysis, compares prices and pricing patterns before and during the relevant time period, "using regression analysis to determine actual customer prices after controlling for various characteristics of the market, including regional price differences and various types of rebates." Pls. Reply Br. at 18. The court of appeals has noted that multiple regression analysis is reliable when based upon complete and accurate data. *Petruzzi's IGA Supermarkets, Inc. v. Darling Delaware Co., Inc.,* 998 F.2d 1224, 1238 (3d Cir.1993); *see also Jeld-Wen,* 171 F.R.D. at 174. The second method, called the "yardstick model," involves a comparison of the characteristics of the plastic cutlery industry with the characteristics of a comparable, or "yardstick," industry that is not affected by the price-fixing conspiracy. Pls. Reply Br. at 19. The district court in *Jeld-Wen* found this to be a "logical and feasible" method of determining damages. 171 F.R.D. at 174. Defendants have not challenged plaintiffs' ability to prove class-wide impact through multiple regression analysis and the "yardstick model." The proffer of these analytical methods is therefore sufficient to meet plaintiffs' threshold showing that they can prove impact on the proposed class by generalized proof.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*8** Amcel cites several horizontal price-fixing cases where class certification was denied, despite the existence of base prices of some sort, because individual questions regarding proof of impact predominated over common questions. *See Burkhalter Travel Agency v. MacFarms Int'l, Inc.,* 141 F.R.D. 144, 154 (N.D.Cal.1991) (differences in pricing and submarkets for macadamia nuts precluded class action); *American Custom Homes v. Detroit Lumberman's Ass'n,* 91 F.R.D. 548, 549 (E.D.Mich.1981) (class action unmanageable where plaintiffs purchased lumber "in a myriad of different ways involving literally tens of thousands of transactions"); *In re Beef Indus. Antitrust Litig.,* 1986-2 Trade Cases (CCH) ¶ 67,277, at 61,414 (S.D.Tex.1986) (prices published in industry "yellow sheet"); *Dry Cleaning & Laundry Institute of Detroit, Inc. v. Flom's Corp.,* 91-CV-76072-DT (E.D.Mich. Sept. 28, 1992). Despite these rulings, the court finds the line of opinions allowing class certification in cases such as this to be more persuasive.

Accordingly, Rule 23(b)(3)'s predominance requirement is satisfied.

### F. Superiority (Rule 23(b)(3))

Rule 23(b)(3) also requires that the class action device be "superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). Plaintiffs argue that class action treatment is superior here because:  (1) the members of the proposed class number in the thousands, Compl. ¶ 13(b); (2) "many of the smaller purchasers of defendants' plastic cutlery would be unable to assume the financial burdens associated with litigation of individual antitrust lawsuits," Pls. Reply Br. at 9; and (3) other methods of adjudication would be less expeditious and economical. *Id.* at 25. Defendants do not specifically contest the superiority of the class action device here.

The court's 23(b)(3) superiority finding requires at a minimum
(1) an informed consideration of alternative available methods of adjudication of each issue, (2) a comparison of the fairness to all whose interests may be involved between such alternative methods and a class action, and (3) a comparison of the efficiency of adjudication of each method.

*Katz v. Carte Blanche Corp.,* 496 F.2d 747, 757 (3d Cir.) (en banc), *cert. denied,* 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1974).

In making its superiority determination, the court should take into account the interests of the judicial system, the putative class, the instant plaintiffs and defendants and their attorneys, as well as the general public. *See id.* at 760. The four fairness and efficiency criteria of Rule 23(b)(3) should also be considered. *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 448 (3d Cir.1977), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978).

> FN10. Those criteria are:
> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions;  (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum;  [and] (D) the difficulties likely to be encountered in the management of a class action.
> Fed.R.Civ.P. 23(b)(3).

**\*9** In view of the above factors, the court finds class action treatment to be the best means of adjudicating this controversy. First, the injury to each putative class member arises from a single alleged price-fixing scheme by the defendants. Individual actions would be needlessly duplicative, expensive, and time-consuming, especially in light of the predominance of common questions. *See Hedges Enters., Inc. v. Continental Group,* 81 F.R.D. 461, 477 (E.D.Pa.1979). Second, identification and notification of the putative class members do not appear to present manageability problems, as class members names and addresses are allegedly contained in defendants' own business records. *Id.* Third, if successful, defendants would only have to defend against these allegations of liability for price-fixing a single time. *Id.*; *see also In re Fine Paper Antitrust Litig.,* 82 F.R.D. 143, 155 (E.D.Pa.1979). Lastly, refusing to certify the proposed class might preclude recovery for many putative class members who lack the resources to pursue individual claims, or whose financial injuries are insufficiently grave to make pursuit of individual claims worthwhile. *See Lake v. First Nationwide Bank,* 156 F.R.D. 615, 626 (E.D.Pa.1994).

As a consequence, Rule 23(b)(3)'s superiority requirement is satisfied.

### III. Conclusion

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                Page 8
Not Reported in F.Supp., 1998 WL 135703 (E.D.Pa.), 1998-1 Trade Cases P 72,107
**(Cite as: Not Reported in F.Supp.)**

For the foregoing reasons, the court finds that plaintiffs' proposed class meets all the requirements of <u>Federal Rules of Civil Procedure 23(a)</u> and <u>23(b)(3)</u>. Plaintiffs' motion for class certification is therefore granted, and this action will be maintained as a class action pursuant to <u>Rule 23(a)</u>.

An appropriate order follows.

## *ORDER*

AND NOW, this day of March, 1998, after consideration of plaintiffs' motion for class certification pursuant to <u>Federal Rules of Civil Procedure 23(a)</u> and <u>23(b)(3)</u>, and defendant Amcel Corp's. response thereto, it is hereby

ORDERED that plaintiffs' motion for class certification is GRANTED. The class shall be defined as follows: all purchasers in the United States of plastic cutlery directly from defendants or their respective wholly-owned subsidiaries or affiliates, at any time from January 1, 1990 up to and including December 31, 1992 (excluded from the class are defendants, subsidiaries and affiliates of defendants, and co-conspirators of defendants).

E.D.Pa.,1998.
In re Plastic Cutlery Antitrust Litigation
Not Reported in F.Supp., 1998 WL 135703 (E.D.Pa.),
1998-1 Trade Cases P 72,107

Briefs and Other Related Documents <u>(Back to top)</u>

• <u>2:96cv00728</u> (Docket) (Feb. 01, 1996)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.