# TAB 12

Westlaw.

**H**
Briefs and Other Related Documents

United States District Court,D. New Jersey.
In re: REMERON END-PAYOR ANTITRUST
LITIGATION
STATES AND COMMONWEALTHS OF
TEXAS, et al., Plaintiffs,
v.
ORGANON USA INC. and Akzo Nobel N.V.,
Defendants.
No. Civ. 02-2007 FSH, Civ. 04-5126 FSH.

Sept. 13, 2005.

Lisa J. Rodriguez, Donna Siegel Moffa, Trujillo
Rodriguez & Richards, LLP, Haddonfield, NJ,
Arthur M. Kaplan, Jeffrey S. Istvan, Fine Kaplan
and Black, R.P.C., Philadelphia, PA, Joseph H.
Meltzer, Schiffrin & Barroway, LLP, Radnor, PA,
for Plaintiffs.

Kevin J. McKenna, Gibbons, Del Deo, Dolan,
Griffinger & Vecchione, PC, Newark, NJ, Dean
Ringel, Cahill, Gordon & Reindel, New York, NY,
Joseph M. Rebein, Shook Hardy & Bacon, LLP,
Kansas City, MO, for Defendants.

*OPINION*

HOCHBERG, J.
*1 This matter is before the Court upon a settlement
agreement between the manufacturers of the
anti-depressant drug Remeron, Organon USA Inc.
and Akzo Nobel N.V. (Defendants or Organon),
and the end-payor purchasers of Remeron along
with all Attorney Generals of the United States of
America and territories. The settling parties seek (1)
final approval of their class action settlement
agreement and plan of distribution, (2) final
certification of an end-payor settlement class
pursuant to Fed.R.Civ.P. 23, and (3) award of
attorneys' fees to Plaintiffs' Counsel, reimbursement
of litigation expenses, and incentive awards to
named Plaintiffs. The Court preliminarily approved

the settlement on January 25, 2005 after a
preliminary fairness hearing on December 1, 2004.
The final Fairness Hearing was conducted on June
28, 2005.

## I. BACKGROUND

### A. The Litigation

#### 1. *The Complaint*

In 2002, end-payor purchasers of Remeron filed
class action complaints against Defendants.
Complaints were filed by United Food and
Commercial Workers Local 56 Health & Welfare
Fund, Board of Trustees of United Food and
Commercial Workers Local 56 Health & Welfare
Fund, Vista Healthplan, Inc., Gayle Taylor, Dianne
Mason and Robert Kupella (End-Payor Plaintiffs or
Plaintiffs). These complaints were followed by a
Consolidated Class Action Complaint on September
11, 2002, and thereafter by an Amended
Consolidated Class Action Complaint (Complaint)
in *In re Remeron End-Payor Antitrust Litigation,*
Master Docket No. 02-CV-2007 (D.N.J.), filed
January 5, 2004.

The Complaint alleges violations of the Sherman
Act, 15 U.S.C. § 2, and violations of state antitrust
and/or unfair competition statutes. It alleges that
Defendants (a) obtained United States Patent No.
5,977,099 ('099 patent) through fraud on the United
States Patent and Trademark Office (PTO), (b)
improperly listed the '099 patent in the United
States Food and Drug Administration's (FDA's) "
Approved Therapeutic Equivalence Evaluations"
(Orange Book) to preserve their monopoly, (c)
improperly delayed the listing of that patent in the
Orange Book to prolong their monopoly, and (d)
thereafter improperly commenced lawsuits asserting
sham claims of patent infringement under the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 2230314 (D.N.J.), 2005-2 Trade Cases P 74,966
*(Cite as: Slip Copy)*

Hatch-Waxman Act, 21 U.S.C. § 355, and the United States patent laws against generic drug companies (Generic Manufacturers), which sought permission to market generic versions of Organon's antidepressant drug. Remeron.

The Complaint alleges that Defendants took these several actions in order to forestall the market entry of FDA-approved generic versions of Remeron (i.e. generic mirtazapine). As a result, end-payor purchasers-composed of Third-Party Payors (such as health benefit funds, HMOs, health insurers and hospitals), governmental entities, and individual consumers-were allegedly required to purchase brand-name Remeron at monopoly prices instead of being able to purchase generic mirtazapine at a fraction of the price. Absent Defendants' illegal activities, it is alleged that patients would have been able to purchase lower-priced generic mirtazapine earlier, resulting in a savings of millions of dollars.

## 2. *Extensive Discovery and Litigation Prior to Settlement*

*2 This litigation was complex and hotly contested from the outset, beginning with Defendants' initial unsuccessful efforts to obtain a stay from the Magistrate Judge. On December 18, 2002, this Court granted summary judgment in favor of certain Generic Manufacturers with respect to Organon's patent claims against them. Following that decision, class action complaints and individual complaints were filed by various direct purchasers of Remeron (Direct Purchasers), who are not a part of this litigation or settlement.

The Court then entered a case management Order on June 18, 2003, coordinating discovery in the End-Payor class actions, the Direct Purchaser cases, and the antitrust counterclaims filed by the Generic Manufacturers. Additional coordination and case management Orders were issued on July 16, 2003; August 11, 2003; and December 11, 2003, and several Orders regarding discovery were issued September 26, 2003; December 23, 2003; January 15, 2004; January 16, 2004; February 3, 2004; February 10, 2004; and February 13, 2004.

On December 3, 2003, the Court granted Defendants' motion to dismiss several antitrust counterclaims by Generic Manufacturers including the (a) allegation that the '099 patent had been improperly listed by Defendants in the FDA's Orange Book for anticompetitive reasons, and (b) allegation that the Defendants' patent litigation against the Generic Manufacturers was baseless and brought for anticompetitive purposes to prolong Defendants' monopoly.

Overall, discovery was extensive. Approximately 800,000 pages of documents and data were produced by Defendants and third parties. Documents produced included hundreds of thousands of pages relating to Defendants' various anti-generic strategies for Remeron; Defendants' internal patent planning and life cycle management strategy; Defendants' regulatory and Orange Book listing strategies; Defendants' clinical development files, which contained additional documentation regarding other regulatory exclusivity strategies for Remeron; Defendants' patent files, including file wrapper and patent prosecution history documentation; and numerous scientific and medical articles and other publications which impacted upon the issues of non-infringement and invalidity of the '099 patent. End-Payor Plaintiffs' briefs revealed extensive research into the various legal and regulatory issues in this case, including an analysis of various FDA regulations and the case law interpreting those regulations.

End-Payor Plaintiffs' counsel pressed Defendants on the adequacy of their document production at a hearing on December 19, 2003, through a Notice of Deposition of Corporate Defendants Pursuant to Fed.R.Civ.P. 30(b)(6), and through a letter brief on February 2, 2004. They took depositions of numerous current or former employees of the Defendants. These included many high-level executives and employees, who were deposed on complicated and highly technical issues relating to Defendants' various legal, regulatory, marketing and other anti-generic strategies for Remeron. Plaintiffs also consulted heavily with counsel for the Direct Purchasers, counsel for the Generic Manufacturers, and the State Attorneys General. In all, over 50 depositions were taken.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 2230314 (D.N.J.), 2005-2 Trade Cases P 74,966
(Cite as: **Slip Copy**)

**\*3** The End-Payor Plaintiffs also provided extensive discovery, including Rule 26 Initial Disclosures on October 15, 2002, answers to interrogatories on September 8, 2003, supplemental voluminous document production, and deposition testimony by the two institutional End-Payor Plaintiff Class Representatives (Vista Healthplan, Inc. and United Food & Commercial Workers Local 56 Health & Welfare Fund). End-Payor Plaintiffs also engaged and met extensively with economic and other experts to develop support for theories of liability and to measure the monetary harm suffered by End-Payors of Remeron.

Defendants moved to dismiss or stay the End-Payor Plaintiffs' Consolidated Amended Complaint on November 14, 2002. End-Payor Plaintiffs filed a comprehensive Memorandum in Opposition to Defendants' Motion to Dismiss or Stay on January 17, 2003, and a Notice of Supplemental Authority in opposition on February 6, 2003, as well as a letter brief regarding subsequent authority on April 25, 2003, and a letter brief on further supplemental authority on June 3, 2003. Defendants filed their Reply Memorandum in Support of Motion to Dismiss or Stay on February 21, 2003, and filed a response to End-Payor Plaintiffs' April 25 letter brief on May 8, 2003, and a response to End-Payor Plaintiffs' June 3 letter brief on June 5, 2003.

Defendants opposed End-Payor Plaintiffs' motion for leave to file the End-Payor Plaintiffs' Consolidated Amended Complaint. End-Payor Plaintiffs filed an extensive Memorandum of Law in Support of Plaintiffs' Motion for Leave to Amend on November 18, 2003. After briefing and oral argument, the Court granted End-Payor Plaintiffs' motion for leave to amend on December 31, 2003. Following oral argument, Defendants' initial motion to dismiss was denied as moot in light of End-Payor Plaintiffs' Amended *Consolidated Complaint*, by Order dated January 15, 2004.

Defendants thereafter moved to dismiss End-Payor Plaintiffs' Amended Consolidated Class Action *Complaint* on January 20, 2004. End-Payor Plaintiffs moved to certify a nationwide class of End Payors, including consumers as well as public (non-federal) and private institutional End Payors,

on October 27, 2003. End-Payor Plaintiffs filed a comprehensive Memorandum of Law in Support of Plaintiffs' Motion for Class Certification, together with a detailed and extensive Declaration from Harvard University health economist Professor Richard G. Frank in support of class certification. The Court had not issued a ruling on these two *motions at the time of the proposed settlement.*

As the End-Payor Plaintiffs were developing their case, the working group of State Attorneys General were conducting their own economic and factual *investigation relating to the claims, underlying* events, and conduct alleged by the End-Payor Plaintiffs and others. Beginning in March 2003, the Office of the Attorney General of Texas issued Civil Investigative Demands (CIDs) for documents and answers to written interrogatories to the Defendants and to third parties, including the Generic Manufacturers. A multi-state working group of State Attorneys General that was formed during the summer of 2003 conducted a targeted review of the 200 CD-ROMs of document images produced in response to the CIDs. The working group also reviewed transcripts of depositions and hearings from the patent litigation and the End-Payor and Direct Purchaser litigation. The State Attorneys General also researched and analyzed may legal and regulatory issues involving patents, the FDA and the Hatch-Waxman process. In addition, the State Attorneys General gathered data relating to purchases of Remeron from their state agencies, including their state Medicaid programs, as well as sales and pricing data from the Defendants and the Generic Manufacturers, and *retained economists to analyze the data and create* damages estimates. The State Attorneys General undertook extensive legal research and analysis and consulted with economic and intellectual property law experts regarding the theories of liability at *issue in this case.*

### B. Mediation and Settlement

**\*4** In December 2003, the parties began to explore the possibility of settlement with the working group of State Attorneys General. The settlement negotiations included a multi-day global settlement

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

mediation before Judge Politan in January 2004. This was followed by a series of settlement discussions between Defendants' and End-Payor Plaintiffs' counsel in coordination with the working group of State Attorneys General. These discussions laid the groundwork, but settlement was not achieved until the end of a two-day settlement conference before this Court. The broad outlines of this agreement were discussed with the Court in chambers on February 18, 2004.

For the next half year, the End-Payor Plaintiffs and the States together engaged in further negotiations with Defendants to craft and finalize the detailed written settlement agreement. Other negotiations included crafting and finalizing the escrow agreement, the proposed preliminary approval order, the proposed final judgment, and the class notice of the proposed settlement. The working group of State Attorneys General, in conjunction with the Federal Trade Commission, engaged in many further negotiations with Defendants to draft and finalize the Stipulated Injunction. State Attorneys General who were not involved in the working group were later invited to join the settlement.

C. Preliminary Approval of the Settlement and Execution of the Notice Plan

On October 20, 2004, End-Payor Plaintiffs and the Plaintiff States filed their Memorandum in Support of End-Payor Plaintiffs' and States' Motion for Preliminary Approval of Proposed Settlement. Contemporaneous with the filing of that M emorandum, a Complaint including all of the 50 States, the District of Columbia, and all U.S. territories was filed with the Court, along with the fully executed settlement agreement.

> FN1. *States and Commonwealths of Texas, Florida, Oregon, et al. v. Organon USA Inc. and Akzo Nobel N.V.*, Civil Action No. 04-5126(FSH) (Complaint filed Oct. 20, 2004).

On November 17, 2004, the Court issued an Order

requesting End-Payor Plaintiffs and Plaintiff States submit a brief addressing in further detail their proposed Notice Plan. On November 24, 2004, End-Payor Plaintiffs and Plaintiff States submitted a Supplemental Memorandum in Further Support of Plaintiffs' Motion for Preliminary Approval that addressed the issues raised. On December 1, 2004, the Court held a hearing on the proposed preliminary approval of the settlement. At that hearing, the Court requested that the parties develop a proposed Plan of Distribution and include details regarding that plan in the notices, which the parties did. On January 14, 2005, the End-Payor Plaintiffs and Plaintiff States submitted a Second Supplemental Memorandum in Further Support of Plaintiffs' Motion for Preliminary Approval, setting forth the proposed Plan of Distribution and revised notices. On January 24, 2005, the Court followed up with an e-mail to the parties seeking additional information regarding certain language in the proposed order and the notice. End-Payor Plaintiffs and Plaintiff States responded to the Court's questions by return e-mail and revised the long-form and summary notices in response to the Court's inquiries.

*5 On January 25, 2005, the Court entered an Order Conditionally Certifying Settlement Class, Preliminarily Approving Proposed Settlement, and Preliminarily Approving Representation of Attorneys General. In compliance with the settl ement agreement and the Court's January 25, 2005 Order, Defendants paid $35 million into escrow on February 1, 2005.

Then the Notice Plan was carried out. The claims administrator, Complete Claim Solutions (CCS), mailed 13,431 notice packages to Third-Party Payor (TPP) class members. As of May 25, 2005, with the cooperation of the pharmacies, CCS had caused to be mailed 854,046 notice packets to potential consumer class members. The media consultant retained by CCS published the summary notice in national publications, such as *Reader's Digest, Parade, USA Today* and *USA Weekend.* To provide adequate coverage for class members residing in one of the United States Territories, the media consultant published summary notice in El Nuevo Dia, the Pacific Daily News and the Virgin Islands

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Daily News. The media consultant also published the summary notice in an industry periodical, National Underwriter, to reach TPP class members. Additionally, CCS contacted 22,643 physicians, and numerous mental health, senior and women's organizations soliciting their assistance in notifying their members of the settlement. CCS distributed Public Service Announcements (PSAs) to 1,000 radio stations. As of May 25, 2005, 60 radio stations reported airing the PSAs a total of 11,179 times. CCS designed and developed a website for potential class members to obtain information and for consumer class members to file a claim online; and CCS set up and operates a toll-free 800 telephone number to answer class members' questions. As of May 25, 2005, over 40,000 visits have been made to the website and nearly 30,000 calls have been made to the toll-free telephone number.

### D. The Settlement Terms

A copy of the settlement agreement and its exhibits were filed with the Court on October 20, 2004 with the motion by End-Payor Plaintiffs and States for preliminary settlement approval.

#### 1. *Monetary Payments And Distributions*

The settlement provides for settlement payments by Defendants in a total amount of up to Thirty-Six Million Dollars ($36,000,000.00) (Settlement Consideration) consisting of: (1) Thirty-Three Million Dollars ($33,000,000.00) that Defendants paid into an escrow account on February 1, 2005, plus any interest, dividends and other distributions and payments earned on that sum while in escrow (Settlement Fund); (2) Two Million Dollars ($2,000,000.00) that Defendants paid on February 1, 2005 into a separate escrow account to pay for costs and expenses of settlement class notice and future costs of settlement administration, plus any interest, dividends and other distributions and payments earned on that sum while in escrow (Notice Fund); and (3) up to One Million Dollars ($1,000,000.00) that the Defendants will pay to the States following the effective date of the settlement

agreement for their reasonable attorneys' fees and expenses incurred in their investigations of Defendants relating to this matter and in connection with the approval and administration of this settlement.

#### a. The Settlement Fund

*6 On February 1, 2005, Defendants deposited into escrow the sum of Thirty-Three Million Dollars ($33,000,000.00). This Settlement Fund may be used for purposes of distribution to the members of the settlement class and the Plaintiff States, payment of further notice or administrative costs in excess of the amount of the Notice Fund up to $500,000.00, and payment of End-Payor Plaintiffs' attorneys' fees and costs, and incentive awards for the class representatives.

Under the Plan of Distribution, the net settlement amount (the settlement fund less notice and claims administration costs, attorneys' fees, expenses, and incentive awards) will be allocated as follows: 32.8% to consumers, 16.5% to state governmental purchasers, and 50.7% to TPPs. End-Payor Plaintiffs' Co Lead Counsel have applied to the Court for an attorneys' fees award from the Settlement Fund equal to $7.8 million (23.6% of the Settlement Fund) plus 23.6% of interest that has accrued on the Settlement Fund, as well as reimbursement of almost $500,000.00 in expenses (including expert fees and costs). Attorneys' fees and expenses will be distributed by End-Payor Plaintiffs' Co-Lead Counsel among the ten law firms that initiated and litigated these End Payor cases. In addition, End-Payor Plaintiffs seek an award of incentive awards to the Class Representatives in the amount of Seventy-Five Thousand Dollars ($75,000.00).

#### b. The Notice Fund

Defendants deposited into escrow a separate amount of Two Million Dollars ($2,000,000.00) used exclusively for the payment of notice and administrative fees and costs reasonably incurred for the purpose of providing notice of settlement to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

members of the settlement class, processing claims and administering the settlement, paying any taxes and tax expenses with respect to the escrow accounts, and paying reasonable fees and costs to the escrow agent.

#### c. Payment to State Attorneys General

After the effective date of the settlement agreement, Defendants will reimburse the Plaintiff States for their reasonable attorneys' fees and expenses incurred in connection with their investigations of Defendants relating to this matter, as well as their future reasonable attorneys' fees and expenses to be incurred in connection with settlement approval and administration. The aggregate amount of all such fees and expenses of all Plaintiff States that shall be reimbursable shall not exceed One Million Dollars ($1,000,000.00).

#### d. Any Unclaimed Money

Any amount in the Settlement Fund that remains after payment of all claims, Court-approved fees, costs, expenses, and incentive awards, and any supplemental distribution to settlement class members and Court-approved supplemental fees and costs, will be distributed to charitable organizations or state agencies that provide health or legal services to settlement class members, as recommended by End-Payor Plaintiffs' Co-Lead Counsel and/or State Liaison Counsel and approved by the Court.

#### 2. *Injunctive Relief*

*7 Defendants have agreed to an injunction prohibiting certain future conduct (Injunction), which will become effective when the settlement agreement becomes effective. The Injunction, which was negotiated by the Plaintiff States in conjunction with the Federal Trade Commission states, *inter alia*, that Defendants (a) "shall not seek, maintain, certify to, or take any other action in furtherance of, the listing or continued listing of any Patent in the Orange Book where the listing of such Patent in the

Orange Book violates Applicable Law" and (b) " shall not" provide to the FDA "Listing Information that [is] false or misleading."

#### 3. *Release of Claims*

Members of the settlement class (who have not made valid and timely elections to exclude themselves from the settlement class) release and discharge forever the Defendants from all claims which could have been asserted from the facts and circumstances giving rise to this case, from the beginning of time through January 25, 2005 (the date this Court preliminarily approved the Settlement Agreement).

### II. ANALYSIS

#### A. Class Certification for Purposes of Settlement

In its Order preliminarily approving the settlement agreement, the Court conditionally certified the Settlement Class, defined in the settlement agreement as:

All End Payors (including any assignees of such End Payors) who purchased and/or paid all or part of the purchase price of Mirtazapine Products in the United States during the period beginning June 15, 2001 through January 25, 2005 (the date of the Preliminary Approval Order). Excluded from the Settlement Class are (i) Defendants and any of their subsidiaries and affiliates, (ii) all federal governmental entities, agencies and instrumentalities, and (iii) all wholesalers and retailers and all persons or entities that purchased Mirtazapine Products primarily for purposes of resale.

The Court also preliminarily approved the following as Class Representatives:United Food and Commercial Workers Local 56 Health & Welfare Fund, and Board of Trustees of United Food and Commercial Workers Local 56 Health & Welfare Fund, a health benefit fund operated for the benefit of present and retired members of the union local and their families;

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 2230314 (D.N.J.), 2005-2 Trade Cases P 74,966
(Cite as: Slip Copy)

Vista Healthplan, Inc., a health maintenance organization that provides comprehensive healthcare benefits to its members; and
Gayle Taylor, Dianne Mason, and Robert Kapella, all of whom are consumers who purchased Remeron during the Class Period.

Under Rule 23 of the Federal Rules of Civil Procedure, the Court must engage in a two-step analysis in order to determine whether it should certify a class action for settlement purposes. First, the Court must determine whether the End-Payor Plaintiffs and Plaintiff States have satisfied the prerequisites for maintaining a class action as set forth in Fed.R.Civ.P. 23(a). If the End-Payor Plaintiffs and Plaintiff States can satisfy these prerequisites, the Court must then determine whether the alternative requirements of Rule 23(b)(2) or 23(b)(3) are met. *See* Fed.R.Civ.P. 23(a) advisory committee's note. "Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, *see* Fed. Rule Civ. Proc. 23(b)(3)(D), for the proposal is that there be no trial." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 619, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

### 1. *The Requirements of Rule 23(a)*

**\*8** Rule 23(a) provides that class members may maintain a class action as representatives of a class if they show the court that:
(a) the class members are so numerous that joinder of all members is impracticable;
(b) the action addresses questions of law or fact common to the class;
(c) the claims or defenses of the class representatives are typical of the claims or defenses of the class; and
(d) the class representative parties will fairly and adequately protect the interests of the class.

### a. Numerosity

Courts will ordinarily discharge the prerequisite of numerosity if the class is so large that "joinder of all members is impracticable." *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1019 (9th Cir.1998). "The plaintiff need not precisely enumerate the potential size of the proposed class, nor is the plaintiff required to demonstrate that joinder would be impossible." *Cannon v. Cherry Hill Toyota, Inc.,* 184 F.R.D. 540, 543 (D.N.J.1999); *accord Wachtel v. Guardian Life Ins. Co.,* 223 F.R.D. 196, 211 (D.N.J.2004). Moreover, "[i]t is proper for the court to accept common sense assumptions in order to support a finding of numerosity." *Cumberland Farms, Inc. v. Browning-Ferris Indus.,* 120 F.R.D. 642, 646 (E.D.Pa.1988) (citation omitted); *accord In re Nasdaq Market-Makers Antitrust Litig.,* 169 F.R.D. 493, 509 (S.D.N.Y.1996).

Here, the plaintiff class consists of End Payors, including consumers, who paid all or part of the price of Remeron in the United States during the class period. "There can be no serious question that joinder of all these parties, geographically dispersed throughout the United States, would be impracticable." *In re Corrugated Container Antitrust Litig.,* 80 F.R.D. 244, 247 (S.D.Tex.1978). Hundreds of thousands of class members have received notice and tens of thousands have filed proofs of claim across. The class thus easily fulfills the numerosity requirement. "[N]umbers in excess of forty, particularly those exceeding one hundred or one thousand have sustained the [numerosity] requirement." *Weiss v. York Hosp.,* 745 F.2d 786, 808 n. 35 (3d Cir.1984).

### b. Commonality

The threshold commonality inquiry is whether there are any questions of fact or law that are common to the class. Fed.R.Civ.P. 23(a)(2). "[C]ommonality does not require an identity of claims or facts among class members." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 183 (3d Cir.2001). Rather, "[t]he commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." "Even where individual facts and circumstances do become

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

important to the resolution, class treatment is not precluded." *Baby Neal v. Casey*, 43 F.3d 48, 57 (3d Cir.1994) *Id.* at 57. "The threshold of commonality is not high." *In re School Asbestos Litig.*, 789 F.2d 996, 1010 (3d Cir.1986).

\*9 In this case, many common questions exist. They include, *inter alia*, (1) what is the relevant product market?; (2) did Defendants have market power in that market?; and (3) did Defendants unlawfully monopolize that market? Antitrust actions often present common questions of law and fact, and are, therefore, frequently certified as class actions. *See, e.g., Transamerican Ref. Corp. v. Dravo Corp.*, 130 F.R.D. 70, 73 (S.D.Tex.1990) (antitrust price-fixing claims and common law fraud); *Cusick v. NV Nederlandsche Combinatie Voor Chemische Industrie*, 317 F.Supp. 1022, 1024 (E.D.Pa.1970) (consumer class action charging monopolization). The commonality requirement is satisfied here.

### c. Typicality

The Third Circuit has "set a low threshold for satisfying" the typicality requirement holding that "[i]f the claims of the named plaintiffs and class members involve the same conduct by the defendant, typicality is established." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183-84 (3d Cir.2001); *accord Baby Neal v. Casey*, 43 F.3d 48, 58 (3d Cir.1994) (stating "cases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement").

The typicality requirement "does not mandate that all putative class members share identical claims." *Newton*, 259 F.3d at 84; *see also Hassine v. Jeffes*, 846 F.2d 169, 176-77 (3d Cir.1988). Plainly, "there is nothing in Rule 23(a)(3) which requires named plaintiffs to be clones of each other or clones of other class members." *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12, 27 (D.D.C.2001); *accord In re Catfish Antitrust Litig.*, 826 F.Supp. 1019, 1036 (N.D.Miss.1993).

In this case, the Class Representatives' and the class members' claims are identically predicated upon

Defendants' alleged actions of improper listing and late listing of the '099 Patent in the Orange Book, fraud on the PTO, and filing of allegedly baseless patent infringement lawsuits against Generic Manufacturers. Thus, "[t]here are no differences as to the type of relief sought or the theories of liability upon which plaintiffs will proceed." *In re Corrugated Container Antitrust Litig.*, 80 F.R.D. 244 (S.D.Tex.1978). The Class Representatives' claims and those of the class members arise from the same course of conduct. "[S]ince the various claims alleged appear to stem from a single course of conduct ... we cannot conclude that the district court abused its discretion in holding that the typicality requirement was met." *Grasty v. Amalgamated Clothing and Textile Workers Union*, 828 F.2d 123, 130 (3d Cir.1987). Accordingly, the Class Representatives' claims are typical of those of the class members.

### d. Adequacy of Representation

The final requirement of Rule 23(a) is that "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). The Third Circuit has held that "adequate representation depends on two factors: (i) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (ii) the plaintiff must not have interests antagonistic to those of the class." *Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912, 923 (3d Cir.1992); *accord In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 532 (3d Cir.2004); *Wetzel v. Liberty Mutual Ins. Co.*, 508 F.2d 239, 247 (3d Cir.1975).

\*10 As to the first factor, End-Payor Plaintiffs' counsel have successfully prosecuted numerous antitrust class actions. Plaintiffs' Co-Lead Counsel, Arthur M. Kaplan, is a graduate of the Harvard Law School (J.D., *cum laude*, 1970) and has been active in antitrust and other complex litigation. Mr. Kaplan was Co-Lead Counsel for plaintiffs in the *In re Nasdaq Market-Makers Antitrust Litig.*, 187 F.R.D. 465 (S.D.N.Y.1998), in which plaintiffs achieved settlements totaling $1.027 billion. End-Payor Plaintiffs' Co-Lead Counsel Joseph H. Meltzer

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 2230314 (D.N.J.), 2005-2 Trade Cases P 74,966
(Cite as: Slip Copy)

likewise is experienced. Mr. Meltzer is a graduate of the Temple University School of Law (J.D., *cum laude* ) and has focused his practice exclusively on antitrust and complex class action litigation. In addition to prominent roles in prosecuting several major antitrust class actions to successful conclusions, including *In re Sorbates Direct Purchaser Antitrust Litig.,* C98-4886 (N.D.Cal.2001) (settlements exceeding $92 million), Mr. Meltzer was appointed Co-Lead Counsel in *Ryan-House v. GlaxoSmithKline plc,* C.A. 2:02cv442 (E.D.Va.), a pharmaceutical antitrust class action brought on behalf of end payors of the prescription medication Augmentin which recently settled for $29 million. End-Payor Plaintiffs' Acting Co-Lead Counsel Jeffrey S. Istvan is a 1992 graduate of the University of Virginia School of Law, where he was a Hardy Cross Dillard Scholar. Following a federal judicial clerkship, he has been active in antitrust and consumer class actions. Mr. Istvan was sole lead counsel in *Parsky v. Wachovia Bank, N.A.,* 2001 WL 535786 (C.C.P. Phila. May 8, 2001), a consumer class action that recently settled for approximately than $23 million and worked on several large antitrust class actions, including *In re Copper Antitrust Litig.,* M.D.L. No. 1303 (7th Cir.2004) (appeal pending); *In re Polypropylene Carpet Antitrust Litig.,* 93 F.Supp.2d 1348 (N.D.Ga.2000) (settlements totaling $50 million); and *In re Commercial Explosives Antitrust Litig.,* 945 F.Supp. 1489 (D.Utah 1996) (settlements totaling $77 million).

> FN2. In *In re Nasdaq Market-Makers Antitrust Litig.,* 187 F.R.D. at 474, the court in approving that settlement stated, " it is difficult to conceive of better representation than the parties to this action achieved." Likewise, in *In re Lorazepam & Clorazepate Antitrust Litig.,* 2003 WL 22037741, at *6 (D.D.C. June 16, 2003), in which Mr. Kaplan was co-counsel for the class of direct purchasers, the Court in approving settlement characterized counsel as " among the best and most experienced antitrust litigators in the country."

The State Attorneys General, as counsel for the Plaintiff States, have considerable expertise in complex antitrust *parens patriae* and class action litigation. State Liaison Counsel Patricia A. Conners, Director of the Antitrust Division of the Florida Attorney General's Office and past Chair of the National Association of Attorneys General (" NAAG") Multistate Antitrust Task Force. She was an Assistant Attorney General in the Antitrust Division, working on such notable cases as *Florida v. Borden, Inc.,* the 1989 school milk bid-rigging cases that resulted in a $36 million recovery for Florida school boards and *Florida v. Abbott Laboratories, Inc.,* the first of the so-called Infant Formula cases, and the *Disposable Contact Lens Litigation,* which settled in 2002 for $80 million. She has practiced antitrust law exclusively since 1987. State Liaison Counsel Kim Van Winkle is an Assistant Attorney General in the Office of the Attorney General of Texas, where she has practiced antitrust law exclusively since 1998. Ms. Van Winkle graduated in 1997 with honors from the University of Texas School of Law, with a joint Master of Public Affairs degree from the Lyndon B. Johnson School of Public Affairs. She has participated in the investigation and litigation of numerous complex, multistate antitrust cases, including *In re Buspirone Antitrust Litigation,* No. 01-CV-11401, MDL 1413 (S.D.N.Y. Mar. 7, 2003) (final approval granted for $100 million settlement of end-payor action alleging monopolization of drug markets through patent abuse). These attorneys are qualified, experienced, and have skillfully worked on this litigation.

*11 The Class Representatives' interests are not antagonistic to those of the absent class members. The central issues in this case are critical to the claims of both groups. In proving these common issues, the Class Representatives further the absent class members' claims no less than their own. *Cf. In re Cardizem CD Antitrust Litig.,* 218 F.R.D. 508, 518 (E.D.Mich.2003) ("Each Class member ... has a common interest in establishing that he, she, or it was financially injured by Defendants' conduct and in an aggregate damages computation"); *In re Warfarin Sodium Antitrust Litig.,* 212 F.R.D. 231, 251 (D.Del.2002), *aff'd,* 391 F.3d 516 (3d Cir.2004) ("The named plaintiffs share a strong interest in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 2230314 (D.N.J.), 2005-2 Trade Cases P 74,966
**(Cite as: Slip Copy)**

establishing liability of defendant, seeking the same
type of damages (compensation for overpayment)
for the same type of injury (overpayment for
warfarin sodium)"). Further, "it is difficult to
imagine a better representative of the retail
consumers within a state than the state's attorney
general." *In re Antibiotic Antitrust Actions,* 333
F.Supp. 278, 280 (S.D.N.Y.1971); *accord In re
Lorazepam & Clorazepate Antitrust Litig.,* 205
F.R.D. 369, 387 (D.D.C.2002) (stating the plaintiff
states "have evidenced a genuine interest in this
litigation, and are qualified and experienced.").
States, acting through their attorneys general, have
frequently been held to be the "best representatives
of the consumers residing within their jurisdictions."
*In re Ampicillin Antitrust Litig.,* 55 F.R.D. 269,
274 (D.D.C.1972); *see also West Virginia v. Chas.
Pfizer & Co., Inc.,* 440 F.2d 1079, 1089-91 (2d
Cir.1971). Thus, the adequacy requirement has been
met.

### 2. *The Requirements of Rule 23(b)(3)*

Once the requirements of Rule 23(a) are met, Rule
23(b)(3) permits the maintenance of a class action if
"the court finds [a] that the questions of law or fact
common to the members of the class predominate
over any questions affecting only individual
members, and [b] that a class action is superior to
other available methods for the fair and efficient
adjudication of the controversy."

"The Rule 23(b)(3) predominance inquiry tests
whether proposed classes are sufficiently cohesive
to warrant adjudication by representation." *Amchem
Prod., Inc. V. Windsor,* 521 U.S. 591, 623, 117
S.Ct. 2231, 138 L.Ed.2d 689 (1997). As the
Supreme Court has observed, "[p]redominance is a
test readily met in certain cases alleging ...
violations of the antitrust laws." *Amchem,* 521 U.S.
at 625. In particular, "[a]ntitrust actions involving
common questions of liability for monopolization ...
have frequently been held to predominate for the
preliminary stage of class certification." *Lorazepam
& Clorazepate,* 202 F.R.D. at 29. "The presence of
individual questions ... does not mean that the
common questions of law and fact do not
predominate." *Eisenberg v. Gagnon,* 766 F.2d 770,

786 (3d Cir.1985).

#### a. Questions of Law and Fact Common to the Class Predominate

*12 "As is true in many antitrust cases, the alleged
violations of the antitrust laws at issue here
respecting ... monopolization relate solely to
Defendants' conduct, and as such proof for these
issues will not vary among class members."
*Lorazepam & Clorazepate,* 202 F.R.D. at 29
(internal quotation marks and citation omitted). As
the Third Circuit held in *In re Linerboard Antitrust
Litig.,* 305 F.3d 145 (3d Cir.2002), *cert. denied,*
538 U.S. 977, 123 S.Ct. 1786, 155 L.Ed.2d 666
(2003) that "common issues ... predominate here
because the inquiry necessarily focuses on
defendants' conduct, that is, what defendants did
rather than what plaintiffs did." *Id.* at 163 (citation
omitted); *see also Warfarin Sodium,* 391 F.3d at 528
. "The common questions of law, the elements of
the monopolization claim fully enumerated, ...
dwarf, rather than merely predominate over, any
individual questions." *Sollenbarger v. Mountain
States Tel. and Tel. Co.,* 121 F.R.D. 417, 427
(D.N.M.1988); *see also Davis v. Southern Bell Tel.
Co.,* 1993 WL 593999, *7 (S.D.Fla. Dec.23, 1993) (
"[T]he issues of antitrust violation, injury, and
damages all turn on class-wide proof").

In this case, the claims of all class members arise
from the same facts giving rise to the same legal
claims, as discussed in the above sections on
commonality and typicality. Accordingly, the
predominance requirement is satisfied.

#### b. A Class Action is Superior to Other Available Methods

"In the case of consumers, the class members here
have little interest in 'individually controlling the
prosecution or defense of separate actions,'
Fed.R.Civ.P. 23(b)(3)(A), because each consumer
has a very small claim in relation to the cost of
prosecuting a lawsuit." *Warfarin Sodium,* 212
F.R.D. at 251. Indeed, "[w]here it is not
economically feasible to obtain relief ... aggrieved

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 2230314 (D.N.J.), 2005-2 Trade Cases P 74,966
**(Cite as: Slip Copy)**

persons may be without any effective redress unless they employ the class action device." *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 339, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980).

In contrast to the inefficiency of duplicative individual lawsuits, "[t]he efficacy of resolving all plaintiffs' claims in a single proceeding is beyond discussion." *Sollenbarger v. Mountain States Tel. and Tel. Co.*, 121 F.R.D. 417, 436 (D.N.M.1988). " [T]he class action mechanism offers substantial economies of time, effort and expense for the litigants as well as the Court." *In re Terazosin Hydrochloride*, 220 F.R.D. 672, 700 (S.D.Fl.2004).

In this very expensive litigation involving hundreds of thousands documents, it would not have been economically feasible for many plaintiffs to seek individual redress. Judicial economy as well as fairness to Defendants makes the litigation of such claims in one action far more desirable than numerous separate actions litigating the same issues.

Because the End-Payor Plaintiffs and Plaintiff States have satisfied all of the requirements under Fed.R.Civ.P. 23(a) and the requirements of Fed.R.Civ.P. 23(b)(3), this Court certifies the proposed class for purposes of this settlement.

**B. The Notice of Settlement**

\*13 The settlement class members are entitled to notice of the proposed settlement and an opportunity to be heard. *See* Fed.R.Civ.P. 23(e); *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985). The notice period in this case began on March 14, 2005, and continued for forty-five (45) calendar days until April 27, 2005. Under the settlement agreement and Preliminary Approval Order, settlement class members had that Notice Period of 45 days to submit any requests to opt-out of the class and until May 28, 2005 to submit objections.

*1. Notice Plan*

The Notice Plan consisted of multiple components

designed to reach consumers through paid print and broadcast media through Public Service Announcements, earned media, and direct mailed notice (to the extent that information could be obtained) to purchasers of Remeron. The media plan provided an estimated reach of more than 90 percent, and frequency realized may have been as much as 2.5 times.

> FN3. Measurement of the notice program is provided in terms of *reach* and *frequency*. *Reach* is the estimated percentage of a target audience reached through a specific media vehicle or combination of media vehicles. *Frequency* is the estimated average number of times an audience is exposed to advertising vehicles carrying the message.

a. Published Notice

Syndicated data, audited data and proprietary research from the National Mental Health Association and the National Foundation for Depressive Illness were reviewed to identify the media vehicles that would most effectively deliver the message to potential class members in the U.S. and its territories (specifically, Guam, U.S. Virgin Islands, and Puerto Rico). The resulting plan was that the summary notice (about 1 page) be placed in a combination of national Sunday Supplements, *USA Today*, and *Reader's Digest* to reach consumers, plus an insertion in *National Underwriter* to reach Third-Party Payors. The Notice Plan's consumer published media schedule was based upon techniques specifically designed for legal notification.

The long-form notice (several pages) provides detailed information about the proposed settlement, including a summary of the monetary and injunctive terms, the allocation percentages, the requested attorneys' fees, litigation costs and incentive awards, and detailed information on the terms of the releases. In addition, the long-form notice provides information about the fairness hearing date, and Settlement Class members' rights to object or opt out (and deadlines and procedures). Finally, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 2230314 (D.N.J.), 2005-2 Trade Cases P 74,966
**(Cite as: Slip Copy)**

long-form notice included a Claim Form to be completed and returned by Class members. The Claim Form also is available on a dedicated website, *www.RemeronSettlement.com*, or by calling a toll-free 800 telephone number provided in the long-form notice and the summary notice.

### b. Mailed Notice

Direct mail notices consisted of mailing the settlement notice packet (including the long-form notice and a Claim Form) to inform potential class members of their rights and how they could participate in the class action. This direct mail settlement notice packet was sent to all potential TPP class members included in CCS' proprietary TPP mailing database, which includes 13,431 TPPs (e.g., insurance companies, healthcare and welfare funds, self-insureds, etc.) and record keepers (e.g., third-party administrators and pharmacy benefit managers).

*14 In addition, potential consumer class members were contacted by direct mail with the assistance of pharmacies and psychiatrists. Many potential class members were mailed a settlement notice packet by their pharmacy and/or psychiatrist. Twenty-six large national pharmacies participated in mailing settlement notice packets to their customers who purchased Remeron and mirtazapine during the claim period, including 14 of the top 25 drug chains, 6 of the top 7 mass merchant pharmacies, and 3 of the top 6 supermarket pharmacies. In all, more than 850,000 settlement notice packets were mailed to potential class members through this program. This direct mail program provided an opportunity to reach those class members who may have missed the summary notice in their newspapers.

### c. News Media

CCS implemented a campaign to expand notice through free or "earned" media which included contacting consumer groups such as AARP, mental health groups such as the National Alliance for the Mentally Ill, National Federation for Depressive

Illnesses, National Mental Health Association, National Community Pharmacists Association, and issuing a press release over Businesswire. The State Attorneys General have undertaken further efforts to expand notice through the news media. A number of Attorneys General issued press releases about the settlement, notice and claims process, including the toll-free telephone numbers and website address. These press releases were run in newspapers and broadcast on the radio.

### d. Toll-Free Telephone Number

Complete Claims Solutions has obtained a toll-free telephone number that allows callers to request the notice of settlement and obtain a Claim Form. It also allows them to find out other information about the settlement. This number was included in the summary notice, the notice of settlement, and on the website, *www.RemeronSettlement.com*.

### e. Internet Website

In addition to the media outlets described above, Complete Claims Solutions developed and maintains a website at *www.RemeronSettlement.com*, which can be accessed by the settlement class members. This website includes the summary notice and long-form notice and a Claim Form.

### f. Results of Notice Effort

CCS received nearly 65,000 individual consumer claims and 1,156 TPP claims. In addition, over 40,000 visits have been made to the settlement website, and approximately 30,000 telephone calls have been made to the toll-free number.

### 2. *The Notice Plan Meets the Requirements of Due Process*

"In order to satisfy due process, notice to class members must be reasonably calculated under all the circumstances, to apprise interested parties of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 2230314 (D.N.J.), 2005-2 Trade Cases P 74,966
(Cite as: Slip Copy)

the pendency of the action and afford them an opportunity to present their objections." *In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109, 119 (D.N.J.2002) (internal quotations and citation omitted). In Rule 23(b)(3) actions, "class members must receive the best notice practicable under the circumstances." *Id.* at 119-20 (quoting Fed.R.Civ.P. 23(c)(2)(B)); *see also Varacalla v. Massachusetts Mut. Life Ins. Co.*, 226 F.R.D. 207, 225 (D.N.J.2005).

*15 The notice forms are similar to those successfully used in numerous other class settlements. *See, e.g., In re Toys 'R' Us Antitrust Litig.*, 191 F.R.D. 347 (E.D.N.Y.2000); *In re Linerboard Antitrust Litig.*, 321 F.Supp.2d 619, 627 (E.D.Pa.2004). This Court reviewed the summary notice and the long-form notice in detail and suggested several changes, which were made, prior to the preliminary approval of the settlement. The final product is clear and comprehensive, and is written in simple terminology. The notices "fairly, accurately, and neutrally describe the claims and parties in the litigation, the terms of the proposed settlement and the identity of persons entitled to participate in it," and apprise affected class members of their options with regard to the proposed settlement. *Foe v. Cuomo*, 700 F.Supp. 107, 113 (E.D.N.Y.1988).

For those whose names and addresses cannot be determined by reasonable efforts, notice by publication suffices under both Rule 23(c)(2) and under the Due Process Clause. *Carlough v. Amchem Products, Inc.*, 158 F.R.D. 314, 325 (E.D.Pa.1993) (citing *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 317-18, 70 S.Ct. 652, 94 L.Ed. 865 (1950)). Under the circumstances of this case, where End-Payor Plaintiffs, Plaintiff States and Defendants have limited and/or incomplete access to the names or addresses of End-Payors who purchased Remeron during the Class Period, the law requires reasonably feasible notice by publication coupled with such mailed notice. The plan is allocated $2 million for this task and for processing returned Claims Forms, spending over $750,000 on publication notice alone. The Notice Plan meets the requirements of due process.

FN4. The privacy of consumers who purchase prescription medication is protected under the provisions of the Health Insurance Portability and Accountability Act of 1996 (HIPAA), Public Law 104-91. 42 U.S.C. § 1320d-2. HIPAA protects "protected health information" from disclosure. "Protected health information" means individually identifiable health information that is maintained and/or transmitted in any form or medium. 45 C.F.R. § 160.103 (2004). Pharmacists are health care providers covered by the act. Patient authorization is required for disclosure of "protected health information." Improper disclosure may subject the provider to civil and/or criminal penalties. 42 U.S.C. § 1320d-5 and 6. Thus, End-Payor Plaintiffs and Plaintiff States were unable to obtain a list of potential class members for a direct mail campaign and instead had to rely on pharmacies and psychiatrists to forward notices to their customers and patients.

### C. Final Approval of Class Action Settlement

#### 1. *State Attorneys' General Authority to Settle All Consumer Claims*

Plaintiff States, by their Attorneys General, have the authority to settle and release indirect purchaser claims in a *parens patriae* or other representative capacity, "A State has a quasi-sovereign interest in the health and well being-both physical and economic-of its residents in general." *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982). That federal authority is supplemented by state statutory provisions and case law. All Attorneys' General have authority to represent consumers, depending on the state, in at least one of the following four ways: (1) *parens patriae* authority expressly conferred by the state legislature, (2) authority expressly conferred by the state legislature that is the functional equivalent of parens patriae authority, (3) judicially recognized authority to represent consumers, or (4) authority to proceed as a class

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 2230314 (D.N.J.), 2005-2 Trade Cases P 74,966
(Cite as: Slip Copy)

representative of consumers pursuant to
Fed.R.Civ.P. 23. *See, e.g., In re Lorazepam &
Clorazepate Antitrust Litig.* ("Lorazepam"), 205
F.R.D. at 386-87.

### 2. Settlements That Meet Certain Conditions Are Presumed Fair

The Third Circuit affords an initial presumption of
fairness for a settlement "if the court finds that: (1)
the negotiations occurred at arm's length; (2) there
was sufficient discovery; (3) the proponents of the
settlement are experienced in similar litigation; and
(4) only a small fraction of the class objected." *In re
Cendant Corp. Litig.*, 264 F.3d 201, 233 n. 18 (3d
Cir.2001). As discussed in Part 1 above, this case
has seen heated litigation between the parties and
the review of hundreds of thousands of documents
and dozens of depositions. The Plaintiffs' lawyers
involved have a great deal of experience in antitrust
litigations such as these, as discussed in Part
II(A)(1)(d), and favor settlement. Defendants'
Counsel, including Dean Ringel of Cahill, Gordon,
& Reindel and Joseph Rebein of Shook, Hardy &
Bacon, are prominent litigators from successful law
firms and also favor settlement.

*\*16 The Court is also satisfied with the
qualifications of State Attorneys General who also
favor settlement. Furthermore, "[t]he participation
of the State Attorneys General furnishes extra
assurance that consumers' interests are protected."
*In re Toys 'R' Us Antitrust Litig.*, 191 F.R.D. 347,
351 (E.D.N.Y.2000); *accord New York v. Reebok
Int'l. Ltd.*, 96 F.3d 44, 48 (2d Cir.1996) (noting that
Attorneys General in *parens* actions are motivated
by concern for the public interest); *Wellman v.
Dickinson*, 497 F.Supp. 824, 830 (S.D.N.Y.1980).

Finally, there have been few objectors to the
settlement, as discussed in Part II(C)(4)(b). This
Court determines that an initial presumption of
fairness attaches, although such finding is not
dispositive.

### 3. Standard for Court Approval of Settlement

A class action may be settled under Rule 23(e) upon
a judicial finding that the settlement is "fair,
reasonable, and adequate." Fed.R.Civ.P.
23(e)(1)(C). Under Rule 23(e), this Court must
determine whether the settlement is within a range
that experienced and experienced attorneys could
accept considering all relevant risks and factors of
litigation. *See Walsh v. Great Atlantic and Pacific
Tea Co.*, 96 F.R.D. 632, 642 (D.N.J.1983). The
range "recognizes the uncertainties of law and fact
in any particular case and the concomitant risks and
costs necessarily inherent in taking any litigation to
completion." *Newman v. Stein*, 464 F.2d 689, 693
(2d Cir.1972).

Because a settlement represents an exercise of
judgment by the negotiating parties, cases have
consistently held that the function of a court
reviewing a settlement is neither to rewrite the
settlement agreement reached by the parties nor to
try the case by resolving issues left unresolved by
the settlement. *Bryan v. Pittsburgh Plate Glass Co.*,
494 F.2d 799, 801 (3d Cir.1974); *Bullock v.
Administrator of Kircher's Estate*, 84 F.R.D. 1, 4
(D.N.J.1979). "The temptation to convert a
settlement hearing into a full trial on the merits must
be resisted." *Bell Atlantic Corp. v. Bolger*, 2 F.3d
1304, 1315 (3d Cir.1993).

To determine whether the settlement is fair,
reasonable and adequate under Rule 23(e), courts in
the Third Circuit apply the nine-factor test
enunciated in *Girsh v. Jepson*, 521 F.2d 153, 157
(3d Cir.1975), and recently reaffirmed in *Warfarin
Sodium*, 391 F.3d at 534-35. These factors are:
(a) The complexity, expense, and likely duration of
the litigation;
(b) the reaction of the class to the settlement;
(c) the stage of the proceedings and the amount of
discovery completed;
(d) the risks of establishing liability;
(e) the risks of establishing damages;
(f) the risks of maintaining the class action through
the trial;
(g) the ability of the defendants to withstand a
greater judgment;
(h) the range of reasonableness of the settlement
fund in light of the best possible recovery; and
(i) the range of reasonableness of the settlement

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

fund to a possible recovery in light of all the attendant risks of litigation.

*17 *Id.* (quoting *Girsh,* 521 F.2d at 156-57).

> FN5. When evaluating settlements in *parens patriae* actions brought by state Attorneys General under either the Clayton Act or comparable state laws, courts have generally utilized the standards used to analyze private class action settlements under Rule 23. *See, e.g., In re Toys 'R' Us Antitrust Litig.,* 191 F.R.D. at 352; *New York v. Reebok Int'l. Ltd.,* 903 F.Supp. 532, 535 (S.D.N.Y.1995); *In re Minolta Camera Prod. Antitrust Litig.,* 668 F.Supp. 456 (D.Md.1987).

### 4. *Evaluation of the Settlement Under Applicable Standards*

#### a. The Complexity, Expense and Likely Duration of the Litigation

By reaching a favorable settlement prior to dispositive motions or trial, the End-Payor Plaintiffs and Plaintiff States avoided significant expense and delay, and ensured recovery. An "antitrust action is arguably the most complex action to prosecute." *In re Linerboard Antitrust Litig.,* 2004 WL 1221350, at *10 (E.D.Pa. June 2, 2004) (citations omitted); *see also Nichols v. SmithKline Beecham Corp.,* 2005 WL 950616, at *12 (E.D.Pa. Apr.22, 2005) (same). This litigation involves complicated patent, regulatory, and antitrust laws, including interpretation of provisions of the Hatch Waxman Act and their application to antitrust law.

Although the End-Payor Plaintiffs have conducted a substantial amount of discovery, significant additional work would be necessary if this case proceeded beyond the current 12b6 and class certification stages. First, expert witness reports and depositions would need to be undertaken. Then, summary judgment motions would need to be resolved. In the Direct Purchaser case, which recently came to a preliminary settlement,

thousands of pages of materials were filed with this Court on summary judgment issues such as market definition, market power, and improper / late listing in the FDA Orange Book. These issues would most likely come up again in the End-Payor Plaintiffs' litigation.

Furthermore, a trial on the merits of the action would entail considerable expense. Market definition alone would require dozens of hours of testimony at this stage. Finally, trial would likely not end the litigation, given the right to appeal. This factor weighs in favor of the settlement. *See In re Linerboard Antitrust Litig.,* 292 F.Supp.2d 631, 642 (E.D.Pa.2003) (noting that the "protracted nature of class action antitrust litigation means that any recovery would be delayed for several years," and thus settlement's "substantial and immediate benefits " to class members favors settlement approval); *Slomovics v. All for a Dollar, Inc.,* 906 F.Supp. 146, 149 (E.D.N.Y.1995) (where litigation is potentially lengthy and will result in great expense, settlement is in the best interest of the class members).

#### b. The Reaction Of The Settlement Group

As described above in Part II(B)(1)(b), CCS sent out 13,431 notices to third-party payors, and caused the mailing of more than 850,000 notices to potential consumer class members across the country. In addition, CCS developed and maintained a website and a toll-free telephone " hotline" to provide information about the settlement and arranged for publication of the summary notice over a period of approximately six weeks in selected publications throughout the country.

In response, no TPP excluded itself from the settlement, and about 70 individual consumers timely submitted Requests for Exclusion. Given that the TPP portion of the class is made up largely of sophisticated managed care companies, the fact that not one of them wishes to exclude itself is strong evidence of a positive reaction to the settlement. Equally strong evidence is the very low number of consumer opt-outs relative to the hundreds of the thousands notified and the tens of thousands who

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                                          Page 16

Slip Copy, 2005 WL 2230314 (D.N.J.), 2005-2 Trade Cases P 74,966
(Cite as: Slip Copy)

submitted claims forms.

> FN6. Five TPPs did initially opt out, but
> they soon entered into an agreement with
> the parties to request that the Court permit
> them to rescind their notices of exclusion.
> That agreement is reflected in a
> Memorandum of Understanding filed with
> the Court that guaranteed $450,000 more
> to the Settlement Fund, instead of going to
> Plaintiffs' Attorneys' Fees. The Court
> granted the request.

*18 Also relevant is the number of objections. Eight
individuals and two TPPs filed objections. This
Court has considered all of the objectors' written
submissions and the three oral arguments that were
made at the Fairness Hearing. The non-monetary
objections that have been filed are the following:
(1) the name of the charity that would receive left
over funds has not been disclosed, (2) Rider A, a
confidential attachment to the settlement agreement
containing provisions regarding the number of
opt-outs that would lead to termination of the
settlement, was not disclosed, (3) consumer
information should have been subpoenaed from the
ten largest retail pharmacies and those consumers
should have received direct payments without
having to file Claims Forms, and (4) the settlement
should not contain a boilerplate provision that
allows for modification of the settlement without
notice to the class, despite agreement by the settling
parties and Court approval, and (5) 30 days after the
45-day notice period was an insufficient amount of
time to object to the settlement and the 45-day
notice period was an insufficient amount of time to
opt-out of the settlement.

> FN7. Two objections were filed on behalf
> of TPPs, Health Care Service Corporation
> and certain Blue Cross entities; and eight
> were filed by consumers, Eugene Clasby,
> Roberta Geha, Rhonda Marcus, Nadine
> Street, William L. Bedford, Susan Ruth
> Hall, Dot K. Kensinger, and Robert L.
> Kensinger. The objections by the latter
> five individuals were filed by the same

attorney, Stephen Tsai, who spoke at the
Fairness Hearing.

> FN8. As some objection points are entirely
> unsupported, too vague to comprehend, or
> clearly without merit, the Court only writes
> on those objections that require some
> explanation.

These objections are considered in turn. First, when
providing notice, the law does not require that the
charity that may receive left over funds be disclosed
in notice to the class. See Mangone v. First USA
Bank, 206 F.R.D. 222, 230 (S.D.Ill.2001) ("Courts
have broad discretion in distributing unclaimed
class funds, and where the parties agree on the
distribution of unclaimed class funds, the court
should defer to that method of distribution.") (citing
Wilson v. Southwest Airlines, Inc., 880 F.2d 807,
815-16 (5th Cir.1989) (where parties agree to
distribution of unclaimed class fund, and agreed
distribution is equitable, court will defer to such
agreement)). More importantly, this objection is
moot as the claims administrator has advised that
there are no surplus funds because of the high
response to the notice.

Second, Courts have held that information
regarding conditions that may terminate a
settlement need not be detailed in the notice to the
class. See In re Warfarin Sodium Antitrust Litig.,
212 F.R.D. 231, 253 (D.Del.2002) (stating that
notice did not need to include details on "the
confidential 'opt-out' threshold beyond which
defendant reserved the right to withdraw from the
settlement"). The Court, the Attorneys General, and
Class Counsel know the contents of Rider A and
agreed to its sealing in the interest of consummating
the settlement. The Rider has no legitimate bearing
on a class member's decision to opt-out of the
settlement, object, or file a claims form.

Third, the suggested subpoenas of the top 10 retail
pharmacies is unnecessary given that 14 of the top
25 pharmacy chains, 3 of the top 6 supermarket, and
6 of the top 7 mass merchant retailers voluntarily
participated in searching their databases for
Remeron purchasers and sending notices with
Claims Forms to them. This process led to 800,000

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

notices being sent and nearly 65,000 consumer claims being filed. As to the objector's additional suggestion to automatically distribute money to those who purchased Remeron through a top 10 pharmacy, this Court will not favor one group of class members over another. *See, e.g., In re Diet Drugs Prods. Liab. Litig.,* 93 Fed. Appx. 338, 343 (3d Cir.2004) ("a class action settlement cannot arbitrarily prefer one group of plaintiffs over another-because such a rule would be inimical to the very principles of class advocacy"). In addition, there are practical problems with the suggestion, including those associated with blindly sending checks to addresses that may be outdated.

*19 Fourth, the boilerplate provision that allows for modification of the settlement without notice to class is satisfactory and necessary. The class is protected from adverse modifications by Rule 23 and the requirements of due process, regardless of what the provision says, and the Court is charged with enforcing these protections. Minor modifications may be necessary to a settlement agreement (indeed may be favorable to the class), and additional class notice is not always required because, e.g., of the cost of notice that would take recovered money from the class. *See In re Prudential Ins. Co. of America Sales Practice Litig.,* 962 F.Supp. 450, 473 n.10 ("Class members need not be informed of the [amendment to the settlement agreement] because the [settlement] is only more valuable with these changes"). In this case, the adjustment that was made to the settlement that favored the class, after notice went out, was followed by additional notice and by opportunity for any opt-outs to return to the class in order to partake in the additional recovery.

FN9. *See supra* note 6.

Fifth, 30 days after a 45-day notice period is a sufficient amount of time to object to the settlement. This Court suggested this deadline to Plaintiffs' Counsel shortly after the preliminary fairness hearing. Many district courts have set a similar deadline in antitrust class action settlements. In *In re Augmentin Antitrust Litig.* (Case No. 02-CV-442, E.D. Va.), Judge Morgan approved a forty-five day

notice period and set the opt-out and objection deadline two weeks from the close of the notice period. In *In re Buspirone Antitrust Litig.* (Case No. 01-CV-7951-JGK, S.D.N.Y), Judge Koeltl set the opt-out and objection deadline forty-five days after the notice date. And in *In re Lorazepam & Clorazepate Antitrust Litig.* (Case No. 99-276-TFH/JMF, D.D.C.), Judge Hogan also set the objection deadline forty-five days after the notice date. Indeed, the objector Health Care Service Corporation, submitted its objection on May 16, 2005, two weeks before the May 28, 2005 objection deadline, thus revealing the adequacy of the objection period.

As to the opt-out deadline, this Court passes no judgment because the issue is moot. Of over 800,000 notices only two objections were made stating insufficient time to opt-out during the 45-day notice period. On the other hand, at least 65,000 class members chose not to opt-out, as evidenced by their filing of claims forms. At the Fairness Hearing, both objectors on this issue took the opportunity to be heard. Counsel to Health Care Service Corporation informed the Court at the Fairness Hearing that, despite objecting, the company did not wish to opt-out. Counsel to Nadine Street, the other objector in this regard, also spoke at the Fairness Hearing. Rather than expressing a desire to opt-out of the settlement, the lawyer requested additional time to forge an objection to Plaintiffs' motion for attorneys' fees, which the Court granted, as discussed in Part II(E)(1)(b). Thus, the issue is moot.

*20 Six additional objection points were made pertaining to the class's compensation. They are the following: (1) one group in the class (TPPs or individual consumers) is getting more than its fair share than the other group, (2) the Plan of Distribution's reliance on "expenditures" rather than "damages" is inappropriate and unfairly benefits TPPs, (3) claim rates of the TPPs or individual consumers should not be considered in distributing monies between the two groups, (4) money should "spill over" from the individual consumers' allocation to the TPPs' allocation before any money is made available for a *cy pres* distribution, (5) the individual consumers are not receiving sufficient

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00360-SLR    Document 125    Filed 05/09/2006    Page 19 of 29

Slip Copy

Slip Copy, 2005 WL 2230314 (D.N.J.), 2005-2 Trade Cases P 74,966
(Cite as: Slip Copy)

Page 18

compensation, and (6) class members from states whose antitrust laws do not provide for the recovery of damages to indirect purchasers should not receive compensation.

These objections are also considered in turn. First, both the TPP group and the individual consumer group make the same argument that the other group is getting more than it should. Two (of two) TPP objectors contend that they are entitled to more than the Plan of Distribution's dedicated 50.7%, while at the same time five (of seven) individual consumers contend that the individuals are entitled to more than the Plan of Distribution's dedicated 32.8%. As discussed in Part II(D), the Court finds the Plan of Distribution to be fair. These conflicting objections are without merit.

> FN10. Several objectors also objected that they did not have access to the economic reports that were the basis of the Plan of Distribution, and objector Eugene Clasby made a motion to this effect. As a result, the Court ordered that End-Payor Plaintiffs make this underlying information available prior to the Fairness Hearing, which they did. The objection was not pursued at the Fairness Hearing and one TPP objector, the Blue Cross entities, withdrew its relevant objections.

Second, the reasons put forth as to why reliance on " expenditures" would be inappropriate is inapplicable here. The objector, Eugene Clasby, is concerned that damages based on the end-payors " expenditures" would be skewed in favor of TPPs because such a measurement would not discount for co-payments paid by individual consumers or for certain rebates received by TPPs. However, the " expenditures" data used in this case in fact does factor in these offsets. Furthermore, the Third Circuit has approved settlement allocations based on expenditures rather than damages, see In re Warfarin Sodium Antitrust Litig., 391 F.3d at 539, and this precise objection by Eugene Clasby was overruled in Nichols v. SmithKline Beecham Corp., 2005 WL 950616, *18 (E.D.Pa. Apr.22, 2005).

Third, claim rates were not a factor in determining the Plan of Distribution's distribution percentages. The allocation is based on each group's expenditures. That TPPs might be more likely to claim their damages did not give them a higher percentage of the Settlement Fund.

Fourth, the issue of "spill over" from individual consumers to TPPs prior to any cy pres distribution is moot. The claims administrator has reported that consumer claims already exceed the amount available to them by a very wide margin, thus no funds remain for a cy pres distribution or a transfer to the TPPs.

Fifth, the individual consumers are receiving adequate compensation. They are receiving an estimated $8.1 million in the aggregate which, based on the estimated number of claims filed, will result in each claiming consumer receiving approximately 34 cents for every dollar spent on Remeron. Discounting for litigation risk, cost, and delay, as discussed in Part 1 and Part II(C)(4), this Court cannot find that such a recovery is inadequate.

*21 Sixth, class members from states whose antitrust laws do not provide for the recovery of charges to indirect purchasers should still receive compensation if the parties agreed to it. An important part of a settlement like this one is that Defendants achieve "total peace," thus all potential plaintiffs must be compensated in order to preclude future litigation attempts and allow such a settlement to consummate. See In re Chicken Antitrust Litig., 669 F.2d 228, 238 (5th Cir.1982). Furthermore, Plaintiffs are being compensated not just for state antitrust law violations but also for the common law claim of unjust enrichment. These two objectors, both represented by Stephen Tsai, provide no legal authority for their position nor do they at all consider that the Settlement Fund would likely have been much smaller if end-payors from certain states were barred from compensation (assuming the settlement would still have been consummated at all). The objection is without merit.

c. The Stage of the Proceedings and the Amount of Discovery Completed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 19

Slip Copy, 2005 WL 2230314 (D.N.J.), 2005-2 Trade Cases P 74,966
(Cite as: Slip Copy)

In examining the stage of the litigation at which a
settlement was reached, the proper question is "
whether counsel had an adequate appreciation of the
merits of the case before negotiating." *Warfarin
Sodium*, 391 F.3d at 537. Under this standard,
End-Payor Plaintiffs and the Plaintiff States were
clearly in a position to make the necessary risk
assessments in the context of settlement
negotiations. As discussed in Part 1, End-Payor
Plaintiffs conducted an extensive economic and
factual investigation, including review hundreds of
thousands of pages of documents and data produced
by Defendants and third parties, taking depositions
of many current or former employees of the
Defendants, and consultation with counsel for the
Direct Purchasers, counsel for the Generic
Manufacturers, the State Attorneys General, and
others.

The Office of the Attorney General of Texas also
began an investigation into Defendants' alleged
Remeron monopoly maintenance practices in March
2003, and a multi-state working group was formed
in July 2003 with several other State Attorneys
General to pursue that investigation. The
investigation included issuance of Civil
Investigative Demands to Defendants and third
parties, and review of documents produced. In
cooperation with the Federal Trade Commission,
the Plaintiff States conducted interviews of experts,
potential experts, and potential witnesses. The
Plaintiff States reviewed and analyzed thousands of
documents from the Defendants' voluminous
production, and read numerous deposition and
hearing transcripts.

"The pursuit of early settlement is a tactic that
merits encouragement; it is entirely appropriate to
reward expeditious and efficient resolution of
disputes." *In re Vitamins Antitrust Litig.*, 1999 WL
1335318, at *4 (D.D.C. Nov.23, 1999). "Early
settlements benefit everyone involved in the process
and everything that can be done to encourage such
settlements, especially in complex class action
cases, should be done." *In re M.D.C. Holdings Sec.
Litig.*, 1990 WL 454747, at *7 (S.D.Cal. Aug.30,
1990). Given the extensive amount of time devoted
to this case, End-Payor Plaintiffs and Plaintiff
States have obtained sufficient information to

adequately evaluate the merits of their claims.

### d & e. The Risks of Establishing Liability and Damages

*22 These two factors "survey the potential risks
and rewards of proceeding to litigation in order to
weigh the likelihood of success against the benefits
of an immediate settlement." *Warfarin Sodium*, 391
F.3d at 537. End-Payor Plaintiffs and the Plaintiff
States initially proceeded against Defendants on
four theories of antitrust liability: (1) Fraud on the
PTO in connection with the prosecution and
obtaining of the '099 patent; (2) wrongful listing of
the '099 patent in the Orange Book; (3) sham patent
litigation against generic competitors based on the
'099 patent; and (4) late listing of the '099 patent.

This Court issued a series of rulings that limited the
possibility of Plaintiffs achieving ultimate success
on the merits. First, regarding the Generic
Manufacturers' claims against Organon, the Court
on December 3, 2003 dismissed those antitrust
claims that were based on the theory that the '099
Patent was improperly listed in the Orange Book.
The Court held that "the then existing statute and
regulation, 21 U.S.C. §§ 355(b)(1) and (c)(2) and
21 C.F.R. § 314.53(b), gave Organon a reasonable
basis for listing in the Orange Book." *Organon, Inc.
v. Mylan Pharm., Inc.*, 293 F.Supp.2d 453, 459
(D.N.J.2003). The Court also dismissed the
allegations that Organon initiated sham patent
infringement lawsuits against the Generic
Manufacturers, ruling that Organon's infringement
theory was reasonable, in large part because of the
existence at the time of three district court decisions
allowing such claims against Generic Manufacturers.

Although these rulings were made in the litigation
involving the Generic Manufacturers, this Court
applied those rulings to the Direct Purchaser
litigation (and, by inference, to this litigation) under
the doctrine of collateral estoppel or the doctrine of
law of the case. *In re Remeron Antitrust Litig.*, 335
F.Supp.2d 522, 526, n. 4 (D.N.J.2004). This Court
also dismissed the Direct Purchasers' antitrust
claims based on fraud on the PTO in that Opinion.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 2230314 (D.N.J.), 2005-2 Trade Cases P 74,966
(Cite as: Slip Copy)

As a result of these rulings, the late listing claim is, for practical purposes, the only remaining claim in End-Payor Plaintiffs' and the Plaintiff States' case. Without this settlement, this final claim would need to survive summary judgment, where the definition of the relevant antitrust market would be the dominant threshold issue. In the Direct Purchaser case, this Court denied the Direct Purchaser class's motion for summary judgment regarding their proposed antitrust market definition and whether the Defendants had monopoly power in that market. *In re Remeron Direct Purchaser Antitrust Litig.,* 367 F.Supp.2d 675 (D.N.J.2005). This Court held that the "direct evidence" the plaintiffs put forth was, on its own, insufficient to establish monopoly power. Thus, unless End-Payor Plaintiffs could perhaps put forth more convincing direct evidence than that of the Direct Purchaser plaintiffs, End-Payor Plaintiffs would need to use the traditional market definition approach in order to demonstrate monopoly power, thus increasing the risk of losing of merits and significantly increasing the amount of discovery and expert analysis needed.

> FN11. To the extent End-Payor Plaintiffs and the Plaintiff States would advance an " overall scheme" claim, finding such a scheme would likely be predicated upon proving the late listing claim.

*23 Finally, trial itself would be risky to Plaintiffs on their one surviving claim. *See e.g., In re Brand Name Prescription Drugs Antitrust Litig.,* 186 F.3d 781, 785 (7th Cir.1999) (plaintiff class suffered directed verdict after eight weeks of trial); *United States Football League v. Nat'l Football League,* 644 F.Supp. 1040 (S.D.N.Y.1986), *aff'd,* 842 F.2d 1335 (2d Cir.1988) (antitrust jury awarded $1.00 in nominal damages to successful plaintiffs). These risks of proving liability and damages weigh in favor of approving this settlement.

### f. Risks of Maintaining Class Action Status Through Trial

"Because the prospects for obtaining certification have a great impact on the range of recovery one

can expect to reap from the [class] action, this factor measures the likelihood of obtaining and keeping a class certification if the action were to proceed to trial." *Warfarin Sodium,* 391 F.3d at 537 (internal quotes and citation omitted). The End-Payor Plaintiffs moved for class certification on October 27, 2003. As a result of the settlement discussions that began shortly thereafter, the Defendants' response to the class certification motion was extended to April 12, 2004. The Defendants never filed their response, as the settlement had been tentatively reached by the time their response was due. Consequently, the record does not reflect vigorous opposition, but class certification throughout trial is not guaranteed. This factor neither favors nor disfavors settlement.

### g. Defendants' Ability to Withstand a Greater Judgment

The parties do not contend that Defendants could not withstand a larger judgment. However, many settlements have been approved where a settling defendant has had the ability to pay greater amounts. *See, e.g., Warfarin Sodium,* 391 F.3d at 538 ("[T]he fact that DuPont could afford to pay more does not mean that it is obligated to pay any more than what the ... class members are entitled to under the theories of liability that existed at the time the settlement was reached."); *Young Soon Oh v. AT & T Corp.,* 225 F.R.D. 142, 150-51 (D.N.J.2004) ; *In re Linerboard Antitrust Litig.,* 321 F.Supp.2d 619, 632 (E.D.Pa.2004); *Erie County Retirees Assoc. v. County of Erie, Pennsylvania,* 192 F.Supp.2d 369, 376 (W.D.Pa.2002); *Lazy Oil Co. v. Witco Corp.,* 95 F.Supp.2d 290, 318 (W.D.Pa.1997) . This factor does not favor nor disfavor settlement.

### h & i. The range of reasonableness of the settlement fund in light of the best possible recovery and all the attendant risks of litigation.

A court evaluating a proposed class action settlement should also consider "whether the settlement represents a good value for a weak case or a poor value for a strong case." *Warfarin Sodium,* 391 F.3d at 538; *Girsh,* 521 F.2d at 157 (court

Slip Copy, 2005 WL 2230314 (D.N.J.), 2005-2 Trade Cases P 74,966
(Cite as: Slip Copy)

must examine the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation); *see also Hammon v. Barry,* 752 F.Supp. 1087, 1095 (D.D.C.1990) (court must "evaluate the strengths and weaknesses of class members' claims within the framework of their likelihood of establishing liability and damages at trial"). In the process, however, a court must "avoid deciding or trying to decide the likely outcome of a trial on the merits." *In re Nat'l Student Mktg. Litig.,* 68 F.R.D. 151, 155 (D.D.C.1974).

*24 Continued litigation of this lawsuit would require further decisions by the Court on (a) End-Payor Plaintiffs' pending class certification motion, (b) Defendants' pending motion to dismiss the End-Payor Plaintiffs' Amended Consolidated Complaint, (c) future summary judgment motions, and (d) at trial.

#### (i) Estimated Damages

On the basis of estimates by End-Payor Plaintiffs' expert economists, the maximum antitrust single damages totaled $109,704,738.00. Economists retained by the Plaintiff States reached a similar estimate of antitrust single damages for settlement purposes. These estimates likely overstate the amount of damages that would be available to Plaintiffs absent this settlement, because they were compiled before the Court issued its decisions that effectively limited End-Payor Plaintiffs' and Plaintiff States' claims to only a late listing claim. This claim has a shorter period of antitrust injury than some of the others.

#### (ii) Comparison of the Settlement Amount to Estimated Damages and Weighed Against the Risks of Non-Recovery

In order to evaluate the propriety of an antitrust class action settlement's monetary component, a court should compare the settlement recovery to the estimated single damages. *In re Ampicillin Antitrust Litig.,* 82 F.R.D. 652, 654 (D.D.C.1979) (citing *Detroit v. Grinnell Corp.,* 495 F.2d 448 (2d Cir.1974)). Although in certain circumstances a

plaintiff class may recover treble damages if it prevails at trial, that result is far from certain. Moreover, in the present case, End-Payor Plaintiffs and Plaintiff States represent consumers pursuant to state laws that provide for varying levels of recovery-some provide only for recovery of equitable relief, and many do not provide for recovery of treble damages.

As the Second Circuit emphasized in *Detroit v. Grinnell Corp.,* 495 F.2d at 455, an antitrust class action settlement may be approved even if the settlement amounts to a small percentage of the single damages sought, if the settlement is reasonable relative to other factors, such as the risk of no recovery. "In fact there is no reason, at least in theory, why satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *Id.*

Relative to maximum estimated damages of $109,704,738, the Settlement Consideration represents about one-third of single damages, quite a substantial recovery, especially given that three of the initial four theories of antitrust liability can no longer be advanced. This recovery must, of course, be weighed against the substantial risks of continued litigation, including future risks at summary judgment and trial. The Court is satisfied that the settlement agreement accounts for the risks inherent in this complex litigation and provides appropriate relief in light of these risks.

#### j. Conclusion

Given this Court's analysis, the Court concludes that the nine-factor test utilized by the Third Circuit is satisfied. The settlement is fair, adequate, and reasonable under Federal Rule of Civil Procedure 23(e).

### D. Approval Of The Plan of Distribution

*25 "As with settlement agreements, courts consider whether distribution plans are fair, reasonable, and adequate." *In re Lorazepam & Clorazepate Antitrust Litig.,* 205 F.R.D. 369, 381

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(D.D.C.2002); *see also In re Vitamins Antitrust Litig.*, 2000 WL 1737867, at *6 (D.D.C. Mar.31, 2000). "[I]n evaluating the formula for apportioning the settlement fund, the Court keeps in mind that district courts enjoy broad supervisory powers over the administration of class action settlements to allocate the proceeds among the claiming class members equitably." *Hammon v. Barry*, 752 F.Supp. 1087, 1095 (D.D.C.1990) (internal quotation marks and citations omitted); *accord In re "Agent Orange" Prod. Liability Litig.*, 818 F.2d 179, 181 (2d Cir.1987).

At the Court's request, End-Payor Plaintiffs' Co-Lead Counsel and State Liaison Counsel jointly proposed a Plan of Distribution to the Court. As described in the long form notice, the Plan of Distribution is as follows:
32.8% of the Net Settlement Fund will be allocated to consumers ("Consumer Fund"), 16.5% of the Net Settlement Fund will be allocated to state governmental purchasers ("State Fund"), and 50.7% of the Net Settlement Fund will be allocated to Third-Party Payors ("TPP Fund"). Consumers who submit valid claims will receive a *pro rata* share of the Consumer Fund based on the amount he or she paid for Mirtazapine Products during the Class Period, and on how many other consumers file valid claims, and the amount they paid for Mirtazapine Products during the Class Period. Third-Party Payors who submit valid claims will receive a *pro rata* share of the TPP Fund based on the amount paid by that entity for Mirtazapine Products during the Class Period and on how many other Third-Party Payors file valid claims, and the amount they paid for Mirtazapine Products during the Class Period. The maximum payment to any Class Member may be limited to 100% of the amount that Class Member paid for Mirtazapine Products during the Class Period.

This distribution plan was based on Plaintiffs' expert economists' findings, using data produced by defendants and the Plaintiff States, as well as CMS statistics and data from other reliable sources. These calculations were performed in anticipation of the mediation of this case, and they were used in the mediation and submitted to the Court confidentially

during the mediation.

Kim Van Winkle, Liaison Counsel for the Plaintiff States, informed the Court by affidavit and orally at the Fairness Hearing that she reviewed the proposed allocation on behalf of consumers and the Plaintiff States and concluded it is fair, reasonable and adequate for consumers and Plaintiff States. Similarly, Kevin Love, counsel for Vista Healthplan Inc., informed the Court that he reviewed the proposed allocation, and also concluded that it is fair, reasonable and adequate for TPPs. Mr. Love retained and consulted with a separate expert economist for TPPs only in reaching his conclusion.

*26 As the Plan of Distribution appears fair based on the experts' calculations, and all three groups of Plaintiffs including the Attorneys General support it, and the few related objections that have been made were overruled in Part II(C)(4)(b), this Court gives the plan final approval.

E. Plaintiffs' Motion for Award of Attorneys' Fees, Interest, Reimbursement of Expenses, and Incentive Awards.

Class Counsel request that the Court award attorney fees in the amount of $7.8 million plus interest accrued on that amount since it has been held in escrow. The $7.8 million requested fee represents 23.6% of the $33 million Settlement Fund. Class Counsel also request recovery of reasonable litigation expenses and incentive awards to named Plaintiffs.

> FN12. Class Counsel initially indicated they would request up to 25% of the Settlement Fund, as indicated in the notice that was sent to the class. They later reduced that number by providing $450,000 more to the class in order to prevent the terms of Rider A from terminating, as described in footnote 6.

1. *Attorneys' Fees and Interest*

This Court first finds that the percentage of fund

Slip Copy, 2005 WL 2230314 (D.N.J.), 2005-2 Trade Cases P 74,966
(Cite as: Slip Copy)

method is the proper method for compensating Plaintiffs' Counsel in this common fund case. *See, e.g., In re Prudential Ins. Co. Of America Sales Practices Litig.*, 148 F.3d 283, 333 (3d Cir.1998) (stating "the percentage of recovery method is generally favored in cases involving a common fund, and is designed to award fees from the fund in a manner that rewards counsel for success and penalizes it for failure"); *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 734 (3d Cir.2001) (stating "the percentage-of-recovery method has long been used in this Circuit in common-fund cases ").

The Third Circuit set forth with specificity the factors that a court should consider in evaluating such requested attorneys' fees in *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 (3d Cir.2000) (overturning a decision that reduced a requested fee of 25% of the recovered fund to 18%). The *Gunter* factors "need not be applied in a formulaic way, and their weight may vary on a case-by-case basis." *Oh v. AT & T Corp.*, 225 F.R.D. 142, 146 (D.N.J.2004) (citing *Gunter*, 223 F.3d at 195). The *Gunter* factors include (a) the size of the fund created and number of persons benefitting from the settlement, (b) the presence/absence of substantial objections to the fee, (c) the skill of Plaintiffs' counsel, (d) complexity and duration of the litigation, (e) the risk of nonpayment, (f) amount of time devoted to the litigation, (g) awards in similar cases. *See Gunter*, 223 F.3d at 195; *In re Aremissoft Corp. Sec. Litig.*, 210 F.R.D. 109, 129 (D.N.J.2002).

### a. The size of the fund created and the number of persons benefitted by the settlement

Pursuant to the parties' settlement agreement, the class will obtain an immediate and certain benefit of $33 million plus accrued interest, less attorneys fees, expenses and incentive award payments as awarded by the Court. Over 65,000 individuals and entities will receive significant financial benefit, without having to go through the time, expense, and risk of continued litigation.

### b. The presence or absence of substantial objections to the request for fees

\*27 In response to the Notice Plan, only one TPP and seven individual consumers objected to the payment of the requested attorneys' fees. Of the seven individuals, four are represented by the same counsel and filed near verbatim statements. The presence of a handful of objections does not mean that the requested fee should be denied. *Cf. In re Lloyd's American Trust Fund Litig.*, 2002 WL 31663577, \*3, \*38 (S.D.N.Y. Nov.26, 2002) (approving fee request of 28% of settlement fund, even though 18% of class members filed objections to the settlement on one or more grounds); *Automotive Refinishing Paint Antitrust Litig.*, (E.D.Pa. Oct. 13, 2004) (stating that, where nearly 60,000 notices sent out and only three objections were received, the vast majority of the class members had no objection, which counseled in favor of a 32% fee award).

> FN13. These are the objections of Dot K. Kensinger, William L. Bedford III, Susan Ruth Hall, and Robert L. Kensinger, represented by Stephen Tsai.

The single TPP objection was filed by Health Care Service Corporation. In its papers, it objected that 30 days after the close of the 45-day Notice Period was an insufficient amount of time to file its objections and that Class Counsel do not deserve their fee request. These objections were made without any legal support and were made in a total of three sentences. The TPP's objections are overruled. 30 days after the close of the 45-day Notice Period is a sufficient amount of time to forge an objection, as discussed in Part II(C)(4)(b). Further, Plaintiffs' Counsel did provide support in the record for their time spent litigating case and their contribution to the litigation process has been explained throughout this Opinion.

Objector Nadine Street initially objected that the (a) distribution to Plaintiffs' Counsel should be reduced to 15%, and that (b) Ms. Street did not have sufficient information to further support its objection because the deadline for filing objections

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 24

Slip Copy, 2005 WL 2230314 (D.N.J.), 2005-2 Trade Cases P 74,966
(Cite as: Slip Copy)

coincided with Plaintiffs' deadline for filing its
motion for attorneys' fees. As a result, at the
Fairness Hearing, the Court granted an extension of
time to file objections regarding attorneys' fees so
that End-Payor Plaintiffs' brief in support of
attorneys' fees could be more fully considered by
objectors.

Only Ms. Street took this opportunity, filing a
second objection which further explained her claim
that only a 15% distribution to Plaintiffs' Counsel
was warranted. The bases were essentially that
several law firms were not necessary to litigate
Plaintiffs' claims and that Plaintiffs' papers in favor
of their fee request were deficient. Based on the
complexity of this case as explained in Part I and
Part II(C)(4), and based on the supporting
documentation in favor of granting Plaintiffs'
attorney fees request, this Court finds Ms. Streets's
objections to be without merit.

> FN14. Ms. Street also objected to the
> agreement between the litigating parties
> and five TPPs that initially opted out of the
> settlement which stated that, *inter alia,*
> Defendants would advance up to $500,000
> of if they rescinded their notices of
> exclusion. By Order dated June 24, 2005,
> this Court rejected that part of the
> agreement, and the five TPPs were
> afforded absolutely no special treatment in
> exchange for returning to the class. Thus,
> Ms. Street's objection as to this point had
> been resolved before the objection was
> filed. *See also supra* notes 6 and 9 and
> accompanying text.

The nearly identical objections of Dot K.
Kensigner, William L. Bedford III, Susan Ruth
Hall, and Robert L. Kensinger claimed that Class
Counsel should not be allowed a percentage of the
$33 million Settlement Fund that was created but
rather such fund should first be discounted by the
16.5% portion going to the State Attorneys General.
The objections state that the State Attorneys
General "are already being paid $1 million in fees
for their recovery of the 16.5% that is being paid to
the states."

*28 The Court understands the thrust of the
objection; however, Plaintiffs' Counsel were largely
responsible for creating a $35 million benefit for the
class ($33 million Settlement Fund and $2 million
Notice Fund). Class Counsel took the lead in
creating that fund for the states. The States
Attorneys General have not objected to Class
Counsel's fees and have endorsed the settlement.
The objection is without merit.

The remaining objectors are Rhonda Marcus and
Robert Geha. Both of them take issue with the
percentage of recovery counsel requests but provide
little substantiation of why the percentage is
excessive. In light of the consideration of the below
factors that consider Plaintiffs' Counsel fee award,
these two objections are also without merit. The
courts do not hesitate to grant attorneys' fees despite
the presence of objections when the rationale for
awarding fees outweighs the objections. *See e.g.,
Nichols v. SmithKline Beecham Corp.,* 2005 WL
950616, at *21 (E.D.Pa. Apr.22, 2005) (awarding
30% fee despite six substantive objections to
settlement, three of which mentioned attorneys'
fees); *Oh,* 225 F.R.D. at 152 (awarding fee despite
three objections); *In re Rite Aid Corp. Sec. Litig.,*
396 F.3d 294, 305 (3d Cir.2005) (affirming district
court's finding that only two objections weighed in
favor of awarding fee); *Varacallo,* 226 F.R.D. at 251
(awarding fee despite almost 50 objections in large
class case).

The absence of meaningful class member objection
to the proposed fee ordinarily supports the
reasonableness of the request. *See In re Rite Aid
Corp. Sec. Litig.,* 146 F.Supp.2d 706, 735
(E.D.Pa.2001); *Fanning v. Acromed Corp.,* 2000
WL 1622741, at *6 (E.D.Pa.2000). Further, a
working group of State Attorneys General, who
worked alongside Class Counsel, have concluded
that the proposed settlement terms, including Class
Counsel's request for attorneys' fees, is fair and
appropriate.

c. The skill of Plaintiffs' counsel

This settlement was achieved by Class Counsel who
include some of the preeminent antitrust firms in the

country with decades of experience in prosecuting and trying complex actions, as described in Part II(A)(1)(d). Class Counsel have considerable experience in FDA regulatory matters through other generic drug litigations. The settlement result achieved is a reflection of counsel's skill and expertise. *See In re Warfarin Sodium Antitrust Litig.,* 212 F.R.D. 231, 261 (D.Del.2002)(class counsel "showed their effectiveness through the favorable cash settlement they were able to obtain" ); *see also In re Ikon Office Solutions, Inc. Sec. Litig.,* 194 F.R.D. 166, 194 (E.D.Pa.2000) (awarding 30% fee and stating "the most significant factor in this case is the quality of representation, as measured by the 'quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of the counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel" ').

### d. The complexity and duration of the litigation

\*29 "As to the complexity of the case, '[a]n antitrust class action is arguably the most complex action to prosecute." ' *In re Linerboard Antitrust Litig.,* 2004 WL 1221350, at \*10 (E.D.Pa. June 2, 2004) (quoting *In re Motorsports Merchandise Antitrust Litig.,* 112 F.Supp.2d 1329, 1337 (N.D.Ga.2000)). This matter is extremely complicated, involving the patent, regulatory and antitrust laws, including interpretation of complex provisions of the Hatch Waxman Act, as discussed throughout this Opinion.

The discovery process in this case was difficult. Class Counsel (i) reviewed over 800,000 million documents, (ii) for a time, held regular lengthy conference calls with Defendants that resulted in contentious debate and multiple motions to compel, which were briefed and argued before the Court, and (iii) participated in over fifty depositions, most of which were technical and complicated covering subjects such as Orange Book listing protocol and the science relating to the chemical composition of mirtazapine products.

Further, the circumstances surrounding a difficult

settlement increase the complexity of a case. *Cf. In re Lucent Technologies, Inc., Sec. Litig.,* 327 F.Supp.2d 426, 434 (D.N.J.2004). Here, they were lengthy and difficult. Class Counsel coordinated the settlement on behalf of End-Payor Plaintiffs and among 56 states and territories. Class Counsel also dealt with the negotiation of opt-out members. Class Counsel's ability to successfully navigate these hurdles enabled the settlement to come to fruition.

### e. The risk of nonpayment

The instant case was presented with significant obstacles since its filing. If the settlement is not consummated, class members may very well receive nothing. End-Payor Plaintiffs and the Plaintiff States proceeded against Defendants under four theories of liability: (1) Fraud on the U.S. Patent and Trademark Office ("PTO") in connection with the prosecution and obtaining of the '099 patent; (2) wrongful listing of the '099 patent in the Orange Book; (3) sham patent litigation against generic competitors based on the '099 patent; and (4) late listing of the '099 patent. As described in Part II(C)(4), three of these claims face dismissal by this Court due to dismissals of such claims in the Generic Manufacturer and Direct Purchaser cases. The Plaintiffs would most likely have been left with their late listing claim and would still have to defeat summary judgment and win at trial. Accordingly, risk of non-payment in this case weigh heavily in favor of approving the requested fee.

### f. The amount of time devoted to the litigation

Plaintiffs' counsel have spent over 12,000 combined hours in prosecuting this case on behalf of the class. The complexity of this action required a significant amount of work by a number of attorneys. Class Counsel performed investigations, filed complaints, fought motions to dismiss, filed briefing in support of class certification, participated in extensive and contentious discovery including the review of hundreds of thousands of documents and the conduct of dozens of depositions. Class Counsel's " efforts in posturing this case for trial ... played a role in spurring the settlement, [and] produced a

Slip Copy, 2005 WL 2230314 (D.N.J.), 2005-2 Trade Cases P 74,966
(Cite as: Slip Copy)

substantial payout to the class." *In re Newbridge Networks Sec. Litig.,* 1998 U.S. Dist. LEXIS 23238, *11 (D.D.C. Oct. 22, 1998).

*30 Moreover, counsel worked for the class to finalize the settlement, to oversee claims administration, and will have to work on any future appellate issues. Work was allocated in this case between several law firms.

### g. Awards in similar cases

In comparing the award in this action with amounts awarded in similar actions, a court's analysis is two-pronged. First, the court compares the actual award requested to other awards in comparable settlements. Second, the court ensures that the award is in line with what an attorney would have received if the fee was negotiated on the open market.

### (i) The fee requested here is similar or lower to fees awarded in comparable settlements

"A district court may not rely on a formulaic application of the appropriate range in awarding fees but must consider the relevant circumstances of the particular case." *In re Cendant PRIDES Litig.,* 243 F.3d 722, 736 (3d Cir.2001). A comparison of awards in similar cases is only a factor in determining the appropriateness of a fee award. *See Gunter,* 223 F.3d at 195. In considering this factor, the Court notes the survey of fee awards that have occurred in similar cases. *See, e.g., In re Rite Aid Corp. Sec. Litig.,* 396 F.3d 294, 306-07 (3d Cir.2005) (review of 289 settlements demonstrates "average attorney's fees percentage [of] 31.71%" with a median value that "turns out to be one-third"); *Cullen v. Whitman Medical Corp.,* 197 F.R.D. 136, 150 (E.D.Pa.2000) ("the award of one-third of the fund for attorneys' fees is consistent with fee awards in a number of recent decisions within this district"); *Varacallo v. Mass. Mut. Life. Ins. Co.,* 226 F.R.D. 207, 249 (D.N.J.2005) (" 'Many courts, including several in the Third Circuit, have considered 25% to be the standard "benchmark" figure for attorney fee awards in class action

lawsuits, with adjustments up or down for significant case-specific factors' "); *In re Linerboard Antitrust Litig.,* 2004 WL 1221350, at *14 ("The above figures are in accord with a recent Federal Judicial Center study that found that in federal class actions generally median attorney fee awards were in the range of 27 to 30 percent.").

Courts within the Third Circuit often award fees of 25% to 33% of the recovery. *See, e.g., In re Linerboard Antitrust Litig.,* 2004 WL 1221350 (E.D.Pa.2004) (approving 30% fee of a $202 million settlement in an antitrust class action); *Nichols v. SmithKline Beecham Corp.,* 2005 WL 950616 (E.D.Pa.2005) (approving 30% fee of the $65 million settlement in similar pharmaceutical antitrust action); *In re ATI Technologies Inc. Sec. Litig.,* 2003 U.S. Dist. LEXIS 7062 (E.D.Pa. Apr. 28, 2003) (awarding 30% of fund); *In re Cell Pathways Sec. Litig. II,* 2002 U.S. Dist. LEXIS 18359 (E.D.Pa. Sept. 24, 2002) ("A thirty percent fee is very comparable to awards in similar cases, providing further support for approval of the fee petition"); *Blackman v. O'Brien Envtl. Energy, Inc.,* 1999 U.S. Dist. LEXIS 7160 (E.D.Pa. May 11, 1999) (35% fee awarded). The percentage fee requested in this case (23.6% of the fund) is consistent with other cases.

*31 Moreover, Class Counsel's fee request compares favorably to fees awarded in similar pharmaceutical antitrust actions. See *Augmentin Antitrust Litig.,* No. 2:02cv442, Final Order and Judgment Approving Settlement and Awarding Attorneys' Fees, Reimbursement of Expenses and Incentive Awards to the Named Plaintiffs (E.D.Va. Jan. 10, 2005) (awarding a fee of 25% of the $29 million indirect purchaser settlement fund); *In re Relafen Antitrust Litig.,* Master File No. 01-12239-WGY, Order and Final Judgment (D. Mass. April 9, 2004) (awarding fees of 33 1/3% of $175 million of settlement fund).

### (ii) The fee requested here is consistent with a privately negotiated contingent fee in the marketplace

"[W]hen deciding on appropriate fee levels in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

common-fund cases, courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *In re Synthroid Marketing Litig.*, 264 F.3d 712, 718 (7th Cir.2001). "The object ... is to give the lawyer what he would have gotten in the way of a fee in an arm's length negotiation." *In re Continental Illinois Sec. Litig.*, 962 F.2d 566, 572 (7th Cir.1992).

Consequently, courts should look to the private market when assessing the reasonableness of the percentage fee. *See In re RJR Nabisco Inc. Sec. Litig.*, MDL No. 818, 1992 WL 210138, *7 (S.D.N.Y. Aug. 24, 1992) ("What should govern [fee] awards is ... what the market pays in similar cases"). A one-third contingency fee is generally standard in individual cases. *See, e.g., In re Copley Pharmaceutical*, 1 F.Supp.2d 1407, 1412 (D.Wyo.1998); *see also In re Aetna Sec. Litig.*, 2001 U.S. Dist. LEXIS 68 (E.D.Pa. Jan. 4, 2001) (" thirty percent is in line with what is routinely privately negotiated in contingency fee tort litigation "). The requested fee award of 23.6% is below that general standard.

### h. Lodestar Cross-check

A lodestar cross-check is not a *Gunter* factor but is a "suggested practice." *In re Cendant Corp., PRIDES Litig.*, 243 F.3d at 735 (3d Cir.2001). When performing the lodestar cross-check, the Third Circuit has recognized that " 'multiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied." ' *In re Prudential Sales Practices Litig.*, 148 F.3d at 341 (quoting 3 Herbert Newberg & Albert Conte, Newberg on Class Actions, § 14.03 at 14-5 (3d ed.1992)). "The district courts may rely on summaries submitted by the attorneys and need not review actual billing records." *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d at 306-07 (footnote omitted).

The record demonstrates that Class Counsel's lodestar in this case is $4,506,294.25, resulting in a multiplier of 1.73. An examination of recently approved multipliers reveals that the multiplier requested here is on the low end of the spectrum.

*See, e.g., Nichols v. SmithKline Beecham Corp.*, 2005 WL 950616, *24 (E.D.Pa. Apr.22, 2005) (approving multiplier of 3.15); *In re Linerboard Antitrust Litig.*, 2004 WL 1221350, *4 (E.D.Pa. June 2, 2004) (approving a 2.66 multiplier); *Weiss v. Mercedes-Benz of N. Am., Inc.*, 899 F.Supp. 1297, 1304 (D.N.J.), *aff'd*, 66 F.3d 314 (3d Cir.1995) (approving a 9.3 multiplier); *In re Rite Aid Corp. Secs. Litig.*, 146 F.Supp.2d 706, 736 (E.D.Pa.2001) (multiple of over 6). This lodestar cross check corroborates the result of the percentage of fund method.

### i. Conclusion

*32 Taking into consideration the above factors, this Court awards Plaintiffs' Counsel $7.8 million of the Settlement Fund, plus 23.6% of the accrued interest on the Settlement Fund.

### 2. *Reimbursement of Reasonable Expenses*

In addition to their request for Attorneys' fees, Plaintiffs' Counsel seek reimbursement of $494,683.73 in expenses. "Counsel in common fund cases is entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the case." *In re Cendant Corp.*, 232 F.Supp.2d 327, 343 (D.N.J.2002) (quoting *In re Safety Components Int'l, Inc.*, 166 F.Supp.2d 72, 104 (D.N.J.2001)); *Abrams v. Lightolier, Inc.*, 50 F.3d 1204, 1225 (3d Cir.1995).

Upon review of the affidavits submitted in support of this request, the Court finds the requested amount to be fair and reasonable. Plaintiffs' Counsels' expenses reflect costs expended for purposes of prosecuting this litigation, including substantial fees for experts; substantial costs associated with creating and maintaining an electronic document database; travel and lodging expenses; copying costs; and the costs of deposition transcripts. Reimbursement of similar expenses is routinely permitted. *See e.g., Oh v. AT & T Corp.*, 225 F.R.D. 142, 154 (D.N.J.2004) (finding the following expenses to be reasonable: "(1) travel and lodging,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 2230314 (D.N.J.), 2005-2 Trade Cases P 74,966
**(Cite as: Slip Copy)**

(2) local meetings and transportation, (3) depositions, (4) photocopies, (5) messengers and express services, (6) telephone and fax, (7) Lexis/Westlaw legal research, (8) filing, (10) postage, (11) the cost of hiring a mediator, and (12) NJ Client Protection Fund relating to *pro hac vice*").

### 3. *Incentive Awards to Named Plaintiffs*

Finally, Plaintiffs' Counsel request the approval of $75,000 in incentive awards to the five Class Representatives. They seek $30,000 for each of the two TPPs and $5,000 for each of three individual consumers. "Like the attorneys in this case, the class representatives have conferred benefits on all other class members and they deserve to be compensated accordingly." *In re Linerboard Antitrust Litig.*, 2004 WL 1221350, at *18 (citation omitted). In the instant action, the Class Representatives, spent a significant amount of their own time and expense litigating these cases for the benefit of the absent members of the settlement class, and as is recognized by a multitude of courts, their efforts should not go unrecognized. *See e.g., In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 400 (D.D.C.2002) ("Incentive awards are not uncommon in class action litigation and particularly where ... a common fund has been created for the benefit of the entire class.... In fact, [c]ourts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation") (internal quotations and citation omitted).

**\*33** In the detailed notice sent to Class members, Class Counsel indicated they would seek incentive awards in an amount not to exceed $100,000.00. No class members objected. The amounts requested are similar to amounts awarded in similar settlements. *See e.g., Nichols*, 2005 WL 950616, at *24 (approving $5,000 to each third-party payor named plaintiff, $2,500 to each consumer named plaintiff); *In re Linerboard Antitrust Litig.*, 2004 WL 1221350, *18 (E.D.Pa.2004) (approving $25,000 to each representative of the classes). The named Plaintiffs complied with all reasonable demands and

provided significant assistance to counsel in the prosecution of this case. The requested incentive awards are both appropriate and reasonable.

### III. CONCLUSION

For the foregoing reasons, (a) End-Payor Plaintiffs' and Plaintiff States' motion for final approval of settlement, and (b) Class Counsel for End-Payor Plaintiffs' motion for attorneys' fees of $7.8 million (plus accrued interest), litigation expenses, and incentive award to Class Representatives are granted.

D.N.J.,2005.
In re Remeron End-Payor Antitrust Litigation
Slip Copy, 2005 WL 2230314 (D.N.J.), 2005-2 Trade Cases P 74,966

Briefs and Other Related Documents (Back to top)

• 2004 WL 2734453 (Trial Pleading) Complaint (Oct. 20, 2004)
• 2:04cv05126 (Docket) (Oct. 20, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.