# TAB D

## D - UNREPORTED CASES CITED IN FOREGOING TABLES

**Case** **Tab**

*Bellinder v. Microsoft Corp.*,
No. 99-CV-17089, slip op. (Kan. Dist. Ct., Johnson Cty. Sept. 7, 2001) ..... 1

*Blake v. Abbott Laboratories, Inc.*,
No. 9509-CV-00307, 1996 WL 134947 (Tenn. App. March 27, 1996) ..... 2

*Carlson v. Abbott Labs.*,
No. 94-CV-002608 (Cir. Ct. Milwaukee County Mar. 23, 1995) ..... 3

*Coordination Proceedings Special Title (Rule 1550(b)) Microsoft I-V Cases,*
No. J.C.C.P. No. 4106, Order re Class Certification, slip op.
(Cal. Super. Ct. Aug. 29, 2000) ..... 4

*Donelan v. Abbott Labs., Inc.*,
No. 94C709 (Kan. Dist. Ct. May 3, 1995). ..... 5

*Friedman v. Microsoft Corp.*,
No. 2000-000722, slip op. (Az. Super. Ct., Maricopa Cty. Nov. 14, 2000) ..... 6

*Goda v. Abbott Labs.*,
1997-1 Trade Cas. (CCH) ¶ 71,730 (Sup. Ct. D.C. Feb. 3, 1997). ..... 7

*Gordon v. Microsoft Corp.*,
2001-1 Trade Cas. (CCH) ¶ 73,254, 2001 WL 366432 (Minn. Dist. Ct. Mar. 30, 2001) ..... 8

*Hagemann v. Abbott Labs., Inc.*,
No. 94-221 (N.D. Dist. Ct. Nov. 21, 1995) ..... 9

*In re Microsoft Antitrust Litig.*,
No. 99-27340, 2002 WL 31423620 (Fla. Cir. Ct. Aug. 26, 2002) ..... 10

*In re: New Mexico Indirect Purchasers Microsoft Corp. Antitrust Litig.*,
No. 0101-CV-2000-1697, *Decision and Order on Motion for Class Certification*
(1st Jud. Dist., County of Santa Fe, NM, Oct. 2, 2002) ..... 11

*Pooler v. R.J. Reynolds Tobacco Co.*,
2001-1 Trade Cas. (CCH) ¶73,232, 2001 WL 403167 (Nev. Dist. Ct. April 4, 2001) ..... 12

*Preciado v. Abbott,*
No. 962294, slip op. (Cal. Super. Ct., San Francisco County, Aug. 16, 1995) ..... 13

*Sherwood v. Microsoft Corp.*
No. M2000-1850, 2003 WL 21780975 (Tenn. App. July 31, 2003) ..... 14

# TAB D-1

Westlaw.

Not Reported in P.3d
2001 WL 1397995 (Kan.Dist.Ct.), 2001-2 Trade Cases P 73,438
**(Cite as: 2001 WL 1397995 (Kan.Dist.Ct.))**

Page 1

District Court of Kansas.

Bryce BELLINDER, Individually and as Representative of all Persons Similarly Situated, Plaintiffs
v.
MICROSOFT CORP., Defendant.
Consolidated with Barbara MACK, Individually and on Behalf of Others Similarly Situated
v.
MICROSOFT CORP. (Sedgwick County District Court, Case No. 00-C-0855),
and
Jay Clifford FOSTER, Individually and on Behalf of All Others Similarly Situated
v.
MICROSOFT CORP. (Wyandotte County District Court, Case No. 00-C-00092).

**No. 00-C-0855, 00-C-00092, 99CV17089.**

Sept. 7, 2001.

Deborah McIlhenny, Hutton & Hutton, Wichita, KS, for Plaintiff.

For defendant: Charles Casper, Redmond, Wash.

JOURNAL ENTRY
(*Memorandum Ruling* )

SHEPPARD, D.J.

*1 In this consolidated action, Plaintiffs, Bryce Bellinder, Barbara Mack and Jay Clifford Foster ("Plaintiffs") move the court pursuant to K.S.A. 60-223 for an order establishing a class of indirect purchasers [FN1] to recover damages from defendant, Microsoft Corporation ("Microsoft") for alleged violations of K.S.A. 50-101, 50-112, 50-132 (K.S.A., Ch. 50, Restraint of Trade), treble damages under K.S.A. 50-801, *et seq.* and violations of the Kansas Consumer Protection Act, K.S.A. 56-626, *et seq.* The motion has been fully briefed and argued and is ripe for ruling. [FN2]

FN1. Under federal antitrust law, indirect purchaser suits for overcharge damages are essentially prohibited. See Hanover Shoe, Inc. v. United Shoe Machinery Corp. [1968 TRADE CASES ¶ 72,490], 392 U.S. 481 (1968); *Illinois Brick Co. v. Illinois* [1977-1 TRADE CASES ¶ 61,460], 431 U.S. 720 (1977). In *Hanover Shoe,* the Supreme Court held that a direct purchaser from a monopolist could claim the entire monopoly overcharge as damages, even though the purchaser passed most of the overcharge on to its customers. A decade later in *Illinois Brick,* the Supreme Court followed *Hanover Shoe* in deciding that, since the direct purchaser has an action for the entire monopoly overcharge, the indirect purchaser should have none. It did not matter that the indirect purchaser could show that part of the overcharge had been passed on and that it had been injured as a result.
Many states in response to *Illinois Brick* enacted repealer statutes that allow indirect purchaser lawsuits to be maintained locally. The Kansas repealer statute can be found at K.S.A. 50-801(b). Such local repeals were validated by the Supreme Court in *California v. ARC America Corp.,* 490 U.S. 93, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989). Kansas' repealer statute therefore grants an individual indirect purchaser standing to sue in state court under the state's antitrust laws for claims accruing prior to July 1, 2000. *See* HB 2855 (Ch. 136; 2000 Session Laws, Vol. 1).

FN2. The substantive allegations of the pleadings are accepted as true for purposes of determining class certification. *Blackie v. Barrack,* 524 F.2d 891, 901, n. 17 (9th Cir.1975); *In re Catfish Antitrust Litigation,* 826 F.Supp. 1019, 1033 (N.D.Miss.1993). Parties may also supplement the pleadings with material so that the court can make an informed decision. *Blackie.*

*Nature of the Case*

Plaintiffs have filed a petition alleging that Microsoft abused its monopoly power and contracted, combined or conspired to fix the price of the Windows Operating System ("WINDOWS") in Kansas above competitive levels, resulting in an overcharge that was passed on by intermediate purchasers to plaintiffs. Microsoft denies that it abused its

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

monopoly power or that it fixed the price of WINDOWS in violation of Kansas law.

Microsoft argues that Plaintiffs cannot meet their burden of proof for certifying a class. K.S.A. 60-223. Microsoft contends there are so many distribution channels for its operating system and so many intermediate sellers that Plaintiffs cannot prove the existence of an antitrust injury common to all class members (*i.e.* that any overcharge was passed on to them). The proposed class consists only of indirect purchasers of WINDOWS (*i.e.* persons that bought from intermediaries or retailers and not directly from Microsoft itself). Microsoft claims that the number of intermediaries in this case is so large that any damages are virtually impossible to calculate for retail customers like Plaintiffs.

*Discussion*

Before certifying a class of indirect purchasers, the court must find that Plaintiffs satisfy the four threshold requirements of 60-223(a) and the additional requirements of predominance and superiority under K.S.A. 60- 223(b)(3). [FN3]

FN3. K.S.A. 60-223 is patterned after Fed.R.Civ.P. 23 and decisions of the federal courts interpreting that rule are traditionally followed in Kansas. *Steele v. Security Benefit Life Ins. Co.*, 226 Kan. 631, 636, 602 P.2d 1305 (1979); *Brueck v. Krings*, 6 Kan.App.2d 622, 624, 631 P.2d 1233 (1981).

*Numerosity*

The first requirement for class certification is that "the class is so numerous that joinder of all members is impracticable." K.S.A. 60-223(a)(1). Plaintiffs are not required to prove the exact size of the proposed class, but only that the number is exceedingly large. *Rex v. Owens*, 585 F.2d 432, 436 (10th Cir.1978)("no set formula" to determine whether numerosity requirement was met; instead, this is a fact-specific inquiry best left to discretion of district court); *Senter v. General Motors Corp.*, 532 F.2d 511, 523, n. 24 (6th Cir.1976)("Impracticability of joinder is not determined according to a strict numerical test but upon the circumstances surrounding the case"); *Schreiber v. NCAA*, 167 F.R.D. 169, 173 (D.Kan.1996)("The party seeking class certification need not show the exact size of the class"). A reasonable estimate of the number of class members who may be involved is sufficient. *Rex*, 585 F.2d at 436. A court can use its common sense to reach its determination. *Zine v. Chrysler Corp.* ., 236 Mich.App. 261, 600 N.W.2d 384, 400 (Mich.App.1999)("The exact number of members need not be known as long as general knowledge and common sense indicate that the class is large").

*2 Plaintiffs estimate the number of indirect purchasers of Microsoft WINDOWS in the State of Kansas is in the hundreds of thousands. Microsoft has not challenged Plaintiff's figures and conceded at oral argument on the motion for class certification that Plaintiffs satisfy the numerosity requirement.

*Commonality*

The next issue is to determine whether "there are questions of law or fact common to the class." K.S.A. 60-223(a)(2). There need only be a single issue common to all members of the class. *Shutts v. Phillips Petroleum Co.*, 235 Kan. 195, 212, 679 P.2d 1159 (1984). Either a common question of law or a common question of fact will be deemed sufficient. *Id.* Factual differences in the claims of the class members should not result in a denial of class certification where common questions of law or fact exist. *Schreiber*, 167 F.R.D. at 174. Every member of the class need not be in a situation identical to that of the named plaintiff. *Rich v.. Martin Marietta Corp.*, 522 F.2d 333, 340 (10th Cir.1975). The commonality requirement permits varying factual situations among individual members of the class so long as the claims of the named plaintiffs and other class members are based on the same legal or remedial theory. *Realmonte v. Reeves*, 169 F.3d 1280, 1285 (10th Cir.1999)(finding commonality where "legal questions uniting the class members is substantially related to the resolution of the litigation"); *Schreiber*, 167 F.R.D. at 174 (finding commonality in antitrust class action where "all members of the proposed class similarly base their claims on the same legal theories and authority").

Plaintiffs seek to prosecute this action on behalf of all indirect purchasers in the State of Kansas who bought WINDOWS at prices that have been maintained above competitive levels by unlawful conduct. The alleged monopolistic and anti-competitive acts of Microsoft are common to the Plaintiffs' claims. Microsoft's counsel acknowledged this fact at oral argument. The court finds there is commonality of Plaintiffs' claims.

*Typicality*

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in P.3d Page 3
2001 WL 1397995 (Kan.Dist.Ct.), 2001-2 Trade Cases P 73,438
**(Cite as: 2001 WL 1397995 (Kan.Dist.Ct.))**

The third requirement is that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." K.S.A. 60- 223(a)(3).

Microsoft concedes that the claim of Barbara Mack is typical to those of the class. However, Microsoft argues that the claims of Bryce Bellinder and Jay Clifford Foster are atypical. In the case of Bryce Bellinder, it appears that he did not "buy" his computer in the traditional sense of the word. Instead, he worked 100 hours for his employer and earned his computer which contained the Windows Operating System on it. Plaintiffs contend the fact and extent of Bellinder's alleged antitrust injury can be calculated by taking the amount of money he would have received for 100 hours of work and consider that amount as the price paid for the computer when calculating any overcharge. The Court agrees. Bellinder may not be the perfect person to act as a named plaintiff in this case, but his claim is still typical of others similarly situated. *See Shutts*, 235 Kan. at 207, 679 P.2d 1159 ("the law does not require that a named plaintiff be the perfect class member or even the best available").

*3 As for Jay Clifford Foster, Microsoft claims he is atypical because he allegedly copied an upgraded version of WINDOWS to two different computers in violation of his license agreement with Microsoft. As such, Microsoft would have a potential, "unique defense" argument against Mr. Foster that Microsoft may not have against other members of the class. The existence of a potential counterclaim or defense has been found not to defeat typicality so long as the named plaintiff's claim arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and his or her claims are based on the same legal theory. *Heartland Communications, Inc. v. Sprint*, 161 F.R.D. 111, 116 (D.Kan.1995); *Shutts*, 235 Kan. at 208, 679 P.2d 1159. The typicality requirement focuses on the class representative's claims or defenses, not on the defendant's defenses against the class representative. *Seidman v. American Mobile Systems*, Inc., 157 F.R.D. 354, 361 (E.D.Pa.1994).

The court recognizes that neither of the claims of Bellinder or Foster are perfectly typical to those of the purported class members. However, the standard for meeting the typicality requirement, as stated above, is not "identical" or "perfectly typical". As with the commonality requirement, classes have been certified where some atypicalities and non-commonalities exist.

The typicality criterion focuses on whether there exists a relationship between the Plaintiffs' claims and the claims alleged on behalf of the class. As with the commonality requirement, the claims or defenses need not be identical. *In re Aluminum Phosphide Antitrust Litigation*, 160 F.R.D. 609, 613 (D.Kan.1995). Differences in the methods of purchase, kinds of products purchased among class members, and difference in price, as Microsoft asserts here, have been held not to bar a finding of typicality, *Id.; In re Catfish Antitrust Litigation*, 826 F.Supp. 1019, 1036-1037 (N.D.Miss.1993). A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and his or her claims are based on the same legal theory. *Milonas v. Williams*, 691 F.2d 931, 938 (10th Cir.1982); *Penn v. San Juan Hospital, Inc.*, 528 F.2d 1181, 1189 (10th Cir.1975); *Serna v. Portales Munic. Schools*, 499 F.2d 1147, 1152 (10th Cir.1974); *Edgington v. R.G. Dickinson and Co.*, 139 F.R.D. 183, 189 (D.Kan.1991). The purpose of the typicality requirement is to ensure that the named Plaintiffs' interests are aligned with those of the proposed class, and in pursuing their own claims, the named plaintiffs will also advance the interests of the class. *Emig v. American Tobacco Co., Inc.*, 184 F.R.D. 379, 385 (D.Kan.1998). What is important as far as typicality is concerned is that the named Plaintiffs and the rest of the class members "share common objectives and legal or factual positions." *Shutts*, 235 Kan. at 208, 679 P.2d 1159.

*4 The overriding considerations typifying many antitrust claims are the need to prove that there is a conspiracy to fix prices in violation of the antitrust laws, that the prices are fixed pursuant thereto, and that the Plaintiffs purchased products at prices which, as a result of the conspiracy, were higher than they should have been. *In re Aluminum Phosphide*, 160 F.R.D. at 613.

Bellinder and Foster do not have claims antagonistic to other proposed class members. All indirect purchasers rely on the same theories of liability against Microsoft. The evidence and testimony offered by Plaintiffs to attempt to prove Microsoft engaged in anticompetitive and illegal conduct will be the same for every claim. Both Bellinder and Foster along with Mack will have to prove the same elements as those of the class, namely the existence of a monopoly, the abuse thereof, antitrust injury, and damages. The claims of all three named Plaintiffs arise from the same alleged pattern and practice of monopolistic conduct by Microsoft and are based on

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

the same legal and remedial theories. Their claims are the same as other indirect purchasers who purchased or obtained Microsoft's WINDOWS at inflated or excessive prices. They are typical.

*Adequacy of Representation*

The fourth requirement is that "the representative parties will fairly and adequately protect the interests of the class." K.S.A. 60-223(a)(4).

Whether this requirement has been met depends on the answer to the following two questions: (1) Does the class representative have any kind of a material conflict of interest with the class with respect to the common questions involved? (2) Will counsel vigorously prosecute the action on behalf of the class? *Olenhouse v. Commodity Credit Corp.*, 136 F.R.D. 672, 680 (D.Kan.1991); *Zapata v. IBP, Inc.*, 167 F.R.D. 147, 160 (D.Kan.1996); *Emig*, 184 F.R.D. at 387; *Schreiber*, 167 F.R.D. at 175.

Courts have held that the number of class representatives is not significant for purposes of meeting this requirement, and that a single plaintiff can be an adequate representative of a class of several thousand members. *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 563 (2d Cir.1968). However, a plaintiff cannot be an adequate representative if he or she has a conflict of interest with class members. *General Tel. Co. v. EEOC*, 446 U.S. 318, 331, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980). In order for a conflict to prevent a plaintiff from meeting this requirement, it must be fundamental. *See In re Foundation for New Era Philanthropy Litig.*, 175 F.R.D. 202, 206 (E.D.Pa.1997). It must go to the heart of the litigation, relating to the subject matter of the suit. *In re South Cent. States Bakery Products Antitrust Litigation*, 86 F.R.D. 407, 418 (M.D.La.1980). Conflicts which have resulted in a finding of inadequacy include competition between class members and the existence of business negotiations between class members and the defendant. There has been no evidence at this point to suggest that any kind of material conflict exists with regard to the named Plaintiffs or that any of them have entered into business negotiations with Microsoft. There are no interests antagonistic to those of the class. There is complete unity of legal and remedial theory between Plaintiffs' claims and those of the class. The only possible difference is with the amount of damages. The court concludes that Bellinder, Foster and Mack are adequate representatives of the class.

*5 The adequate representation requirement also consists of a vigorous prosecution component. When a plaintiff is represented by competent counsel, the court may presume that the prosecution of the action will be vigorous. *Zapata*, 167 F.R.D. at 161. Moreover, the Court's analysis of this requirement is ongoing. The court has a continuing supervisory duty over class counsel to ensure plaintiffs are adequately represented. *See Foe v. Cuomo*, 892 F.2d 196, 198 (2d Cir.1989)(district court judge has obligation to insure plaintiff class is adequately represented throughout litigation). Thus, the district court must constantly scrutinize class counsel to determine if counsel is adequately protecting the interests of the class. *North Am. Acceptance Corp. Sec. Cases v. Arnall, Golden & Gregory*, 593 F.2d 642, 645 (5th Cir.1979).

Counsel for Plaintiffs are experienced in complex, class action litigation. They are aggressively prosecuting this action and appear competent to adequately represent Plaintiffs.

*Predominance / Superiority*

In addition to satisfying the requirements of numerosity, commonality, typicality and adequacy of representation under K.S.A. 60-223(a), Plaintiffs must also demonstrate that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other methods for fair and efficient adjudication of their claims. K.S.A. 60-223(b)(3).

The suggested rationale for this requirement is that it is only where common questions predominate that economies can be achieved by means of the class action device. *Rules Advisory Committee Notes*, 39 F.R.D. 69, 103 (1966). One of the fundamental objectives of class action litigation is to allow numerous small claimants to join together and sue as one when prosecution of their individual claims would otherwise be impractical. The antitrust laws rely heavily for their enforcement on citizen suits. Without the class action device, such laws could be violated with impunity, as long as individual damages were comparatively small, even though the aggregate damage was great.

Where there is a central or overriding issue or a common nucleus of operative facts, the predominance test is satisfied. *Esplin v. Hirschi*, 402 F.2d 94, 99 (10th Cir.1968); *Heartland Communications*, 161 F.R.D. at 117. Again, the issues of conspiracy, monopolization and conspiracy

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

to monopolize have been viewed as central issues which satisfy the predominance requirement. *See* *Gold Strike Stamp Co. v. Christensen,* 436 F.2d 791 (10th Cir.1970). Individual damage questions do not ordinarily preclude a (b)(3) class action when the issue of liability is common to the class. *Id* at 796; *Blackie,* 524 F.2d at 905; *Commander Properties Corp. v. Beech Aircraft Corp.,* 164 F.R.D. 529, 538 (D.Kan.1995). Courts have repeatedly focused on the liability issues, in contrast to damage questions, and, if they found issues were common to the class, have held that the requirements of (b)(3) are satisfied.

*6 Plaintiffs' expert, Dr. Keith B. Leffler, Ph.D., opines the fact and amount of antitrust injury can be proved as to each individual class member utilizing common proof, and that any overcharge paid by class members can be accurately estimated using basic economic principles. Leffler Affidavit at ¶ 5. For instance, Dr. Leffler cites to economic literature for the proposition that in a market with no close substitutes (as Plaintiffs contend here with the operating system market), some increase in price or overcharge is almost always passed on to the end-user. Leffler Affidavit at ¶ 8. Therefore, Plaintiffs claim that at least the *fact* of injury can be shown with some certainty.

Dr. Leffler concludes that the *amount* of antitrust injury can be calculated using standard, yardstick methodologies. He proposes doing this by measuring the difference between the price a Kansas end-user paid for Microsoft's WINDOWS software and the price they would have paid absent Microsoft's alleged unlawful conduct. Leffler Affidavit at ¶ 12. This "but-for" price can be ascertained by using any one of three yardsticks: the comparable market yardstick, the competitive margin yardstick, and the violation-free-period yardstick. Leffler Affidavit at ¶ 12.

Under the comparable market yardstick, one would compare the prices charged for WINDOWS to the price of products from a comparable market not affected by anticompetitive activity. Leffler Affidavit at ¶ 12. The three examples proposed by Leffler are the anti-virus software, fax software, and internet portal markets. Leffler Affidavit at ¶ ¶ 15 & 17. These three markets, according to Leffler, are competitive and contain close substitutes. Leffler Affidavit at ¶ 15. Therefore, by tracking the prices in these markets, Leffler can estimate the but-for WINDOWS price. Leffler Affidavit at ¶ 17. By subtracting the price the Kansas consumer paid for WINDOWS from the but-for price, Leffler is able to calculate the amount of any overcharge; and consequently, the amount of antitrust injury.

Next, Leffler proposes using the competitive margin yardstick. Using this method, one compares the margins earned by sellers in a comparable market free from antitrust violations to the margins earned by sellers in the alleged anticompetitive market. Leffler Affidavit at ¶ 12. By comparing the mark-ups by software products facing competition to those of Microsoft, the amount of any overcharge can be ascertained. Leffler Affidavit at ¶ 13.

Finally, Leffler proposes using the violation-free-period yardstick. Under this theory, one compares the price of WINDOWS being charged during the alleged anti-competitive time period with the price of WINDOWS being charged during a period free of anti-competitive conduct. Leffler Affidavit at ¶ 12. For instance, by comparing the price of WINDOWS now to the price of Microsoft's operating system back in the late 1980's or early 1990's when Microsoft faced stiffer competition from DR DOS, Leffler claims he can calculate the fact and extent of antitrust injury. Leffler Affidavit at ¶ 20.

*7 Dr. Leffler's conclusions are vigorously challenged by Microsoft's expert, Dr. Jerry Hausman, Ph.D., who complains that Leffler's conclusions are based on assumptions, conjecture and mere speculation and that Leffler does not account for the economic realities of this case. For example, Dr. Hausman argues that often price increases are not passed down the distribution chain to the end-user because of price lag and focal-point pricing.

Now is not the time to resolve this "battle of the experts." *See* *In re Potash Antitrust Litigation,* 159 F.R.D. 682, 697 (D.Minn.1995). Whether Dr. Leffler is correct in his opinions or not is an issue for the trier of fact. *See* *In re Catfish Antitrust Litigation,* 826 F.Supp. at 1042. Plaintiffs, at the class certification stage, are not required to prove their case. *Eisen,* 391 F.2d at 566; *In re Catfish Antitrust Litigation,* 826 F.Supp. at 1042. Plaintiffs need only make a "threshold showing" that antitrust violations, if proven at trial, have had a common impact on the class. *In re Catfish Antitrust Litigation,* 826 F.Supp. at 1042. The Court is persuaded that for purposes of establishing a class, Plaintiffs have made the required threshold showing.

Plaintiffs are also required to advance a method for proving generalized damages on a classwide basis "not so insubstantial that it amounts to no method at all." *Id.* In making the class certification

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

determination, the court should avoid focusing on the merits underlying the class claim. *In re Commercial Tissue Products,* 183 F.R.D. 589, 592 (N.D.Fla.1998); *In re Catfish Antitrust Litigation,* 826 F.Supp. at 1033. Although the court may ultimately need to reach this question, it is not germane to the question of class certification. *Eisen,* 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) ("Nothing in either the language or history of Rule 23 ... gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action"); *Anderson v. City of Albuquerque,* 690 F.2d 796, 799 (10th Cir.1982)(inquiry into likelihood of prevailing on claim inappropriate to analysis of class certification); *In re Aluminum Phosphide Antitrust Litigation,* 160 F.R.D. at 612. The question for the Court is whether plaintiffs claims can be evaluated without being overwhelmed by so many individualized issues that class status would be completely impracticable. The Court is persuaded that this can be done.

This is a complicated case. If in the administration of this case the Court determines, as Microsoft asserts, that the damage issues are too complex and/or conflicting for a single class, the Court may create subclasses to handle divergent damage issues or implement any of the other alternatives available under K.S.A. 60-223(c)(4). *See also In re School Asbestos Litigation,* 789 F.2d 996, 1011 (3d Cir.1986). Plaintiffs have made the requisite showing that issues common to all plaintiffs predominate over individual issues.

***8** Lastly, the superiority requirement invites the Court to consider other alternatives to certifying the class such as bringing an individual action as a test case, joinder of all Plaintiffs, liberal intervention by absent class members, consolidation of several actions, or simply allowing each class member to bring an individual action. Because the number of potential class members is so numerous, none of these alternatives are feasible. Moreover, an individual claimant's damages may be so small and the cost of litigating a claim so large that as a practical matter no rational person would bring the action except as a member of a class. The superiority of class action litigation under these circumstances is obvious. No other alternatives are feasible. Failure to certify the class would likely result in no remedy for Plaintiffs and the persons whom they represent.

The Kansas Supreme Court issued its order on June 13, 2000 consolidating all Kansas Microsoft Antitrust Litigation in this court. By certifying a class of indirect purchasers, the rights of Kansas consumers will be efficiently resolved in one proceeding. This efficiency will benefit both parties. Hypothetically, if the Court denied class certification to Plaintiffs and every possible plaintiff filed suit on their individual claims, Microsoft would be forced to defend hundreds of thousands of lawsuits at great expense. Such result would also put an immeasurable strain on the court system.

Courts are to construe the class action requirements liberally and resolve all doubts in favor of class certification. *Arch v. American Tobacco Co.,* 175 F.R.D. 469, 476 (E.D.Pa.1997) ("Since the court may amend an order granting class certification, in a close case, the court should rule in favor of class certification"); *Kahan v. Rosenstiel,* 424 F.2d 161, 169 (3d Cir.1970)("any error, if there is to be one, should be committed in favor of allowing the class action").

*Conclusion*

The court concludes, as a matter of law, that Plaintiffs satisfy the requirements of numerosity, commonality, typicality, adequate representation, predominance and superiority under K.S.A. 60-223 and that their motion for class certification should be and is sustained.

*Ruling*

IT IS, THEREFORE, CONSIDERED, ORDERED AND DECREED that Plaintiffs' Motion for Class Certification pursuant to K.S.A. 60-223 is SUSTAINED for the reasons above stated. The class is defined as follows:

> All persons or entities who purchased, leased or licensed either (1) an upgrade from Windows 95 to Windows 98; (2) a computer system which had Windows 95 or Windows 98 installed as the operating system; or (3) a stand alone Windows 95 or Windows 98 operating system, in Kansas, for their own use and not for resale and not directly from Microsoft.

IT IS FURTHER ORDERED that Plaintiffs give notice of this class certification to interested persons in the manner and as provided by law.

IT IS FURTHER ORDERED that pursuant to K.S.A. 60-216(b), counsel of record convene a case management conference and prepare a case management order for the court's approval. The court

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in P.3d Page 7
2001 WL 1397995 (Kan.Dist.Ct.), 2001-2 Trade Cases P 73,438
**(Cite as: 2001 WL 1397995 (Kan.Dist.Ct.))**

will reserve setting a date for trial until a discovery schedule has been established.

*9 IT IS SO ORDERED.

2001 WL 1397995 (Kan.Dist.Ct.), 2001-2 Trade Cases P 73,438

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# TAB D-2

SEE COURT OF APPEALS RULES 11 AND 12
Court of Appeals of Tennessee.
Eileen M. BLAKE, on her own behalf and on behalf of all others similarly situated within the State of Tennessee, Plaintiff-Appellant
v.
ABBOTT LABORATORIES, INC., Bristol-Myers Squibb Co., and Mead Johnson & Co., *Defendants-Appellees*
**C.A. NO. 03A01-9509-CV-00307**

March 27, 1996.
Rehearing Denied April 24, 1996.

GORDON BALL, Knoxville, for the Appellant.
ROBERT J. WALKER and R. DALE GRIMES, Bass Berry and Simms, Nashville, for Bristol-Myers Squibb Co., and Mead Johnson Company.
CHARLES W. BURSON, Attorney General and Reporter, MICHAEL E. MOORE, Solicitor General, PERRY ALLAN CRAFT, Deputy Attorney General, and VERNON A. MELTON, JR., Amicus Curiae.

OPINION

MCMURRAY.

*1 This case originated in the Circuit Court for Blount County. The complaint ostensibly attempted to state a class action against the defendants, alleging a violation of The Tennessee Unfair Trade Practices Act, (T.C.A. §§ 47-25-101 et seq.), hereinafter referred to as The Trade Practices Act, and The Tennessee Consumer Protection Act, (T.C.A. §§ 47-18-101 et seq.) No order has been entered pursuant to Rule 23.03, Tennessee Rules of Civil Procedure, allowing the case to proceed as a class action.

FN1. Abbott Laboratories, Inc., have reached a settlement with the plaintiff and are, therefore, not parties to this appeal.

FN2. The parties will be referred to as they appeared in the trial court, i.e., plaintiff and defendants.

The defendants filed a joint motion to dismiss under the provisions of Rule 12, Tennessee Rules of Civil Procedure, asserting that the plaintiff's complaint failed to state a claim upon which relief can be granted. The motion was sustained and the case dismissed. This appeal resulted. We reverse the judgment of the trial court.

In their motion to dismiss, the defendants proceeded on the theories that The Tennessee Trade Practices Act applies only to transactions that predominately affect intrastate commerce as opposed to interstate commerce. Secondly, they assert that The Tennessee Consumer Protection Act of 1977 does not apply to the type of conspiracy alleged by the plaintiff.

Our review of the trial court's action in granting a motion to dismiss pursuant to Rule 12, T.R.C.P., is rather limited. When considering a Rule 12 motion to dismiss, we are required to accept the allegations of the complaint as true. *Greenhill v. Carpenter,* 718 S.W.2d 268 (Tenn.1986). Our scope of review is *de novo* with no presumption of correctness. *Montgomery v. Mayor of the City of Covington,* 778 S.W.2d 444 (Tenn.App.1988).

THE FACTS

FN3. The numbered paragraphs are set our verbatim as they appear in the plaintiff's complaint.

The plaintiff alleged that the defendants by independent action and conspiracy among themselves and others, not named as defendants,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.W.2d Page 2

Not Reported in S.W.2d, 1996 WL 134947 (Tenn.Ct.App.), 1996-1 Trade Cases P 71,369
**(Cite as: Not Reported in S.W.2d)**

grossly overcharged Tennessee consumers who purchased baby food formula in the State of Tennessee. To substantiate this conclusion, the plaintiff alleges that:

15. Defendants have been able to grossly overcharge for infant formula by various acts or practices, including, without limitation, banning, and conspiring to ban, direct advertising of infant formula to consumers and pursuing an aggressive effort to sell their products through physicians, nurses, and hospitals. Defendants refer to the medical market as the "ethical" market and to their sales strategy as "medical detailing."

28. Beginning in 1980 and continuing through 1992, the defendants engaged in a continuing trust, combination, contract, arrangement and agreement, express or implied in violation of Section 47-25-101 , et seq., of the Tennessee Unfair Trade Act which provides that "such combinations are hereby declared to be against public policy, unlawful and void."
29. In violation of section 47-25-101, et seq., of the Tennessee Unfair Trade Practices Act, the ... trust, combination, contract, arrangement, and agreement consisted of an agreement, arrangement and concert of action among the defendants, the substantial terms of which were to raise, fix, maintain and stabilize at artificially high levels the wholesale prices of infant formula sold in the United States, including the State of Tennessee. Such trust, combination, contract, arrangement and agreement had the effect, among others, of causing retail prices of infant formula purchased by plaintiff and other members of the class to be raised, fixed, maintained and stabilized at artificially high and non-competitive levels.

*2 32. For over twelve years, defendants have unilaterally committed, and have conspired amongst themselves to commit, an unfair or deceptive act or practice in violation of Section 47-18-109, et seq., of the Tennessee Consumer Protection Act in the sale and marketing of infant formula to thousands of Tennessee consumers at excessively high prices.

34. In violation of the Tennessee Consumer Protection Act, defendants have supplied infant formula and engaged in unconscionable acts or practices in connection with its sales of infant formula to customers in Tennessee. Defendants unfair or deceptive acts or practices include the conspiracy to sell infant formula at an excessively high price.

DISCUSSION

Most of the plaintiff's allegations are conclusory rather than allegations of fact. A motion to dismiss for failure to state a claim upon which relief can be granted admits well-pled facts, not conclusions of the pleader. *See Swallows v. Western Electric Co., Inc.*, 543 S.W.2d 581, 583 (Tenn.1976).
The sole purpose of a Tenn. R. Civ. P. 12.02(6) motion to dismiss is to test the legal sufficiency of the complaint. *Sanders v. Vinson*, 558 S.W.2d 838, 840 (Tenn.1977); *Holloway v. Putnam County*, 534 S.W.2d 292, 296 (Tenn.1976). These motions are not favored, *see Moore v. Bell*, 187 Tenn. 366, 369, 215 S.W.2d 787, 789 (1948), and are now rarely granted in light of the liberal pleading standards in the Tennessee Rules of Civil Procedure. *See Barish v. Metropolitan Gov't*, 627 S.W.2d 953, 954 (Tenn.Ct.App.1981); 5A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure §§ 1356 & 1357 (2d ed. 1990) (" Wright & Miller").
Tenn. R. Civ. P. 12.02(6) motions are not designed to correct inartfully worded pleadings. Wright & Miller § 1356, at 296. And so a complaint should not be dismissed, no matter how poorly drafted, if it states a cause of action. *Paschall's, Inc. v. Dozier*, 219 Tenn. 45, 50-51, 407 S.W.2d 150, 152 (1966); *Collier v. Slayden Bros. Ltd. Partnership*, 712 S.W.2d 106, 108 (Tenn.Ct.App.1985). Dismissal under Tenn. R. Civ. P. 12.02(6) is warranted only when no set of facts will entitle the plaintiff to relief, *Pemberton v. American Distilled Spirits Co.*,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.W.2d Page 3

Not Reported in S.W.2d, 1996 WL 134947 (Tenn.Ct.App.), 1996-1 Trade Cases P 71,369
**(Cite as: Not Reported in S.W.2d)**

664 S.W.2d 690, 691 (Tenn.1984), or when the complaint is totally lacking in clarity and specificity. *Smith v. Lincoln Brass Works, Inc.*, 712 S.W.2d 470, 471 (Tenn.1986).
While it is not our role to create claims where none exist, *Donaldson v. Donaldson*, 557 S.W.2d 60, 62 (Tenn.1977), we must always look to the substance of a pleading rather than to its form. *Usrey v. Lewis*, 553 S.W.2d 612, 614 (Tenn.Ct.App.1977). Thus, when a complaint is tested by a Tenn. R. Civ. P. 12.02(6) motion to dismiss, we must take all the well-pleaded, material factual allegations as true, and we must construe the complaint liberally in the plaintiff's favor. *Lewis v. Allen*, 698 S.W.2d 58, 59 (Tenn.1985); *Holloway v. Putnam County*, 534 S.W.2d at 296; *Lilly v. Smith*, 790 S.W.2d 539, 540 (Tenn.Ct.App.1990).

*3 *Dobbs v. Guenther*, 846 S.W.2d 270 (Tenn.App.1992).

Testing the plaintiff's pleadings under the above rules, it appears that the only facts properly and well pled are that the defendants, along with others, conspired to fix prices and did fix prices of baby formula. In reaching this conclusion, we are construing the pleadings most liberally and in favor of the plaintiff. We, therefore, find that the complaint states sufficient facts to allege price fixing.

> FN4. This statement is not intended to be a criticism of counsel. We agree with the observations of Judge McRae in *Tacker v. Wilson*, hereinafter cited, that a complaint ought not be dismissed for plaintiff's failure to state facts that ... only a discovery process might reveal.... [T]he proof [in antitrust litigation] is largely in the hands of the alleged conspirators.

THE TENNESSEE TRADE PRACTICES ACT

Our next inquiry is whether there is an individual remedy available to indirect purchasers under The Tennessee Trade Practices Act, (T.C.A. §§ 47-25-101 et seq.). To this inquiry, we respond in the affirmative. T.C.A. § 47-25-106 provides as follows:
47-25-106. Recovery of consideration as remedy for damages.-Any person who is injured or damaged by any such arrangement, contract, agreement, trust, or combination described in this part may sue for and recover, in any court of competent jurisdiction, from any person operating such trust or combination, the full consideration or sum paid by the person for any goods, wares, merchandise, or articles, the sale of which is controlled by such combination or trust.

It seems abundantly clear from the unambiguous provisions of T.C.A § 47-25-106, that there is an individual right, under the laws of this state, to maintain an action against any person or entity guilty of violating the provisions of Title 47, Chapter 25, whether the individual is a direct purchaser or indirect purchaser.

Apparently, this precise issue has not been addressed by the appellate courts of this state. The primary thrust of the defendants' argument that an indirect purchaser has no standing to maintain an action such as this is based on the decision in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).
In *Illinois Brick* the U.S. Supreme Court determined that indirect purchasers lack standing to recover under federal antitrust law. To support their position that a similar restriction is applicable to actions under the Tennessee Trade Practices Act, they assert that The General Assembly of Tennessee on three occasions has sought to pass legislation to expressly confer standing on indirect purchasers.
We simply note that proposed legislation, not enacted, has no consequence whatever upon the interpretation of an existing statute. While such proposed legislation may indicate to some extent some of the individual legislators' interpretation of an existing statute, it is in no way controlling or, for that matter, relevant, to the court's duty to properly construe statutes.

The cardinal rule of Tennessee statutory interpretation is to ascertain and give effect to the intent and purpose of the Legislature in relation to the subject matter of the legislation, all rules of construction being but aids to that end. *Rippeth v.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Connelly*, 60 Tenn.App. 430, 447 S.W.2d 380, 381 (1969). A statute must be construed so as to ascertain and give effect to the intent and purpose of the legislation, considering the statute as a whole and giving words their common and ordinary meaning. *Marion County Board of Commissioners v. Marion County Election Commission,* 594 S.W.2d 681 (Tenn.1980). The court should assume that the Legislature used each word in the statute purposely and that the use of these words conveyed some intent and had a meaning and purpose. *Anderson Fish & Oyster Company v. Olds,* 197 Tenn. 604, 277 S.W.2d 344 (1955). *See also Crowe v. Ferguson,* 814 S.W.2d 721 (Tenn.1991). Where the language contained within the four corners of a statute is plain, clear, and unambiguous and the enactment is within legislative competency, "the duty of the courts is simple and obvious, namely, to say *sic lex scripta* [the law is so written], and obey it." *Miller v. Childress,* 21 Tenn. (2 Hum.) 319, 321-22 (1841).

*4 We find that the plaintiff in this case has standing to pursue an action for a violation of T.C.A. §§ 47-25-101 et seq., without reference to classification as a direct or indirect purchaser. There is no such limitation written into the statute. We do not find *Tacker v. Wilson,* 830 F.Supp. 422 (W.D.Tenn.1993), cited by the defendants, to be persuasive authority to the contrary. In *Tacker,* the court disposed of the issue with the following statement:

Plaintiff has alleged no facts that would indicate that plaintiff transacted business with any of the defendants. As a private party, plaintiff's remedy for a violation of [T.C.A.] § 47-25-101 would be found in [T.C.A.] § 47-25-106, but plaintiff has stated no claim for which relief can be granted.

*Id.* page 430

The bare assertion that plaintiff has stated no claim for which relief can be granted can hardly be taken as a determination that a private person has no standing to pursue a remedy under T.C.A. § 47-25-106.

The next inquiry is whether The Tennessee Trade Practices Act applies to the circumstances of this case. The defendants insist that the Tennessee Trade Practices Act applies only to transactions that predominately affect intrastate commerce, and that since the complaint alleges a price-fixing conspiracy occurring outside of Tennessee, the plaintiff has failed to state a claim under Tennessee Law. We agree with the proposition of law as advanced by the defendants but not their conclusion. The Congress of the United States is vested with authority to regulate interstate commerce by virtue of The Constitution of the United States, Article I, Section 8. Our court in examining the issue in *Lynch Display v. National Souvenir Center,* 640 S.W.2d 837 (Tenn.App.1982) states that:

The Tennessee antitrust law applies to transactions which are predominately intrastate in character. The transaction does not have to be exclusively intrastate to be affected. The old constitutional doctrine of mutual exclusivity between state and federal laws affecting commerce has long been rejected. (Citations omitted).

*Id.* 840.

The question before us, however, is not whether the plaintiff's claim is, in fact, predominately intrastate commerce or predominately interstate commerce, but whether the plaintiff's complaint states a claim cognizable under the laws of the State of Tennessee. We hold that it does.

We have carefully examined the complaint. Contrary to the defendants' assertions, we fail to find an allegation that the alleged conspiracy took place outside the State or that the transactions complained of occurred outside the state. It is alleged that the principal offices of the defendants are located outside the State of Tennessee and that the defendants intended their actions to artificially maintain high wholesale levels of infant formula in the entire United States. From that information, alone, however, we cannot infer that the conspiracy, if any, occurred outside the State or that the transactions occurred outside the state. Since we are required take all the well-pled, material factual allegations as true, and construe the complaint liberally in the plaintiff's favor, we cannot dismiss a complaint on inferences which may reasonably be

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

drawn from the pleadings unless the inferences are so incontestably conclusive as to exclude all other reasonable inferences. Such is not the case here.

*5 It is settled in the undisturbed opinion of *Standard Oil Co. v. State,* 117 Tenn 618, 100 S.W. 705 (1906), quoted with approval in *State ex rel Cates v. Standard Oil Co. Of Kentucky,* 120 Tenn 86, 110 S.W. 565 (1908), that the "Legislature clearly intended to prohibit trusts, combinations, and agreements affecting all commerce not covered by the federal statute, and upon which it had a right to legislate. It did not intend to stop short of its power or to exceed it." *Id.* 580.

In *State ex rel Cates,* the court discussed the issue of "importation" as used in the statute. The court opined that once a product was imported into the state from other states or countries and became commingled with the common mass of property in this state, it is no longer an article of interstate commerce. "It is well settled that commerce in such imported articles may be regulated by state legislation." (Citations omitted).

We find nothing in the complaint or the entire record before us which justifies a finding by the trial court, on a Rule 12 motion, that the transactions complained of predominantly affect interstate commerce as opposed to intrastate commerce. If it is later determined by some manner cognizable under Tennessee law that the actions complained of by the plaintiff predominately affect interstate commerce, then the defendants must prevail on this issue. On the other hand, if it is determined by any method cognizable under Tennessee law, that the transactions complained of predominately affect intrastate commerce, the plaintiff may proceed in this action.

In sum and substance, it is not determinable from the record before us that the acts complained of by the plaintiff predominately affect interstate commerce. We note that all parties argued facts, in the trial court, in their briefs and before this court that are not contained in the record before us. In reviewing a Rule 12 motion, we are not at liberty to assume facts not in the record. We, therefore, reverse the judgment of the trial court on this issue and hold that the complaint does state a cause of action under the Tennessee Trade Practices Act.

THE TENNESSEE CONSUMER PROTECTION ACT OF 1977

We must next look to the propriety of the trial court's judgment that the plaintiff cannot maintain this action under The Tennessee Consumer Protection Act of 1977, T.C.A. §§ 47-18-101 et seq.

T.C.A. § 47-18-109 provides in pertinent part as follows:
47-18-109. Private right of action-Damages-Notice to division.-(a)(1) Any person who suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use or employment by another person of an *unfair or deceptive* act or practice declared to be unlawful by this part, may bring an action individually to recover actual damages. (Emphasis added).

Our inquiry is whether price fixing is an unfair or deceptive act or practice. While price fixing is not among the unfair or deceptive acts or practices specifically enumerated in T.C.A. § 47-18-104, it is clear that the enumeration of unfair or deceptive acts or practices is not exclusive nor limited only to those acts enumerated. Paragraph (b)(27) specifically states that "engaging in any other act or practice which is deceptive to the consumer or to any other person" falls within the scope of the statute.

*6 In any event, reasonable minds cannot differ, in good conscience, that price fixing is not an unfair practice. We have hereinbefore set out the guidelines for statutory interpretation. We note that the terms unfair or deceptive as used in the Consumer Protection Act are in the disjunctive. We are required to give each word its common and ordinary meaning.

The term "unfair" is defined as follows:
Contrary to laws or conventions, especially in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

commerce; unethical; unfair trading.

American Heritage Dictionary of the English Language, Third Edition, Houghton-Mifflin Company, (1992).1. Not just or impartial; biased, inequitable,
2. Dishonest, dishonorable, or unethical in business dealings involving relations with employees, customers, or competitors.

Webster's New Twentieth Century Dictionary, unabridged, Second Edition, Prentiss Hall Press, (1983).

Defendants argue that since The Tennessee Trade Practices Act predates the Consumer Protection Act, and since it specifically addresses the conduct for which plaintiff seeks relief the construction sought by the plaintiff would result in a repeal by implication of part of The Tennessee Trade Practices Act. In support of this position, the defendants again assert that the General Assembly intended The Tennessee Trade Practices Act to apply only to conduct that predominantly affects intrastate commerce. Further, the defendants assert specifically, that to allow the plaintiff to prosecute a claim as an indirect purchaser under The Tennessee Consumer Protection Act of 1977 would conflict with The Tennessee Trade Practices Act. We expressly reject this argument based on our finding hereinabove stated that under our Tennessee Trade Practices Act, a plaintiff has standing as an indirect purchaser to maintain an action.

Further and finally, we note that T.C.A. §§ 47-18-102 and 47-18-112, provide respectively:
47-18-102. Purposes.-The provisions of this part shall be liberally construed to promote the following policies:
(1) To simplify, clarify, and modernize state law governing the protection of the consuming public and to conform these laws with existing consumer protection policies;
(2) To protect consumers and legitimate business enterprises from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce in part or wholly within this state;
(3) To encourage and promote the development of fair consumer practices;
(4) To declare and to provide for civil legal means for maintaining ethical standards of dealing between persons engaged in business and the consuming public to the end that good faith dealings between buyers and sellers at all levels of commerce be had in this state; and
(5) To promote statewide consumer education.
47-18-112. Supplementary law.-The powers and remedies provided in this part shall be cumulative and supplementary to all other powers and remedies otherwise provided by law. The invocation of one power or remedy herein shall not be construed as excluding or prohibiting the use of any other available remedy.

*7 We interpret the foregoing sections of The Tennessee Consumer Protection Act of 1977, to mean what they say, i.e., the provisions of The Tennessee Consumer Protection Act of 1977, are cumulative remedies in all respects and their application under the circumstances of this case, at least for the purposes of a Rule 12 motion, are not inconsistent with the application of The Tennessee Trade Practices Act.

Parenthetically, we note that the same limitations must apply to the Tennessee Consumer Protection Act of 1977, as those applied to the Tennessee Trade Practices Act. If it is determined that the acts complained of predominately affect interstate commerce, the defendants must prevail. It is a well-settled principle of law that one cannot do indirectly what cannot be done directly. *See* i.e., *Scott v. McReynolds*, 225 S.W.2d 401 (Tenn.App.1952); *Roberts v. Roberts*, 767 S.W.2d 646 (Tenn.App.1988) and *Haynes v. City of Pigeon Forge*, 883 S.W.2d 619 (Tenn.App.1994).

We are of the opinion that the judgment of the trial court sustaining the Rule 12 motion and dismissing the plaintiff's complaint was error. We accordingly reverse the judgment of the trial court.

Costs of this cause are taxed to the defendants and this case is remanded to the trial court for the collection thereof and for such other and further action as may be necessary and not inconsistant

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.W.2d Page 7

Not Reported in S.W.2d, 1996 WL 134947 (Tenn.Ct.App.), 1996-1 Trade Cases P 71,369
**(Cite as: Not Reported in S.W.2d)**

with this opinion.

FRANKS, J., concurs.
SANDERS, Sp. J., not participating.

*ORDER*

This appeal came on to be heard upon the record from the Circuit Court of Blount County, briefs and argument of counsel. Upon consideration thereof, this Court is of the opinion that there was reversible error in the trial court. We, therefore, reverse the judgment of the trial court.

Costs of this cause are taxed to the defendants and this case is remanded to the trial court for the collection thereof and for such other and further action as may be necessary and not inconsistent with this opinion.

Tenn.App.,1996.
Blake v. Abbott Laboratories, Inc.
Not Reported in S.W.2d, 1996 WL 134947 (Tenn.Ct.App.), 1996-1 Trade Cases P 71,369

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB D-3

STATE OF WISCONSIN CIRCUIT COURT MILWAUKEE COUNTY

RICHARD R. CARLSON AND DIANE FRENCH, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

ABBOTT LABORATORIES, INC.,; BRISTOL-MYERS SQUIBB CO.,; and MEAD JOHNSON & CO.,

Defendants.

CLASS ACTION
CASE NO. 94-CV-002608
CODE: 30301 Money Judgment

FILED
22 MAR 2 3 1995 22
GARY J. BARCZAK
CLERK OF CIRCUIT COURT

ORDER

A hearing having been held in this consolidated action on February 27, 1995 before the Honorable William J. Haese in his courtroom at the Milwaukee County Courthouse on the plaintiffs' motion for class certification, the Attorney General's motion to intervene, the defendants' motion for permission to file surreply brief in opposition to the Attorney General's motion to intervene, and the defendants' motion for summary judgment; plaintiff Richard Carlson having appeared by Beth J. Kushner of Gibbs, Roper, Loots & Williams, S.C., and by Kent Williams of Heins, Mills & Olson; plaintiff Diane French having appeared by Michael J. Cohen of Meissner & Tierney, S.C., and by Atty. Todd R. Seelman, Atty. Thomas H. Brill, and Atty. Isaac L. Diel; defendants Bristol-Myers Squibb and Mead Johnson having appeared by James Clark of Foley & Lardner; defendant Abbott Laboratories

having appeared by Dan Conley of Quarles & Brady; and the State of Wisconsin having appeared by Kevin O'Connor, Roy Korte and David J. Gilles, and the Court being well advised in the premises;

IT IS ORDERED:

1. The Court finds that the requirements of Wis. Stat. § 803.08 have been satisfied and grants the plaintiffs' motion to certify this consolidated action as a class action on behalf of the following class of persons:

> All persons who currently reside in the State of Wisconsin and who, at any time between January 1, 1980 and December 31, 1992 indirectly purchased (other than for resale) one or more brands of infant formula for consumption by newborn infants in the State of Wisconsin from Abbott Laboratories, Inc., Ross Laboratories, Bristol-Myers Squibb Company, and/or Mead Johnson & Company, except for infant formula sold under the Gerber brand name.

2. The Court appoints Richard Carlson and Diane French as class representatives, and Beth Kushner of Gibbs, Roper, Loots & Williams, S.C. as lead counsel for the class.

3. The Court denies the Attorney General's motion to intervene in this action.

4. The Court denies the defendants' motion to file a surreply brief in opposition to the Attorney General's motion to intervene on the grounds that such motion is moot.

5. The Court denies the defendants' motion for summary judgment dismissing this action.

Dated this 23rd day of March, 1995.

BY THE COURT:

William J. Haese
Circuit Court Judge

# TAB D-4

FILED
San Francisco County Superior Court
AUG 2 9 2000
GORDON PARK-LI, Clerk
BY: Deputy Clerk

CALIFORNIA SUPERIOR COURT

CITY AND COUNTY OF SAN FRANCISCO

DEPARTMENT 304

COORDINATION PROCEEDINGS SPECIAL TITLE (Rule 1550(b))

MICROSOFT I – V CASES

NO. J.C.C.P. No. 4106

ORDER RE CLASS CERTIFICATION

This is a coordinated proceeding brought by plaintiffs as representatives of two purported classes of California indirect purchasers of software products produced by defendant Microsoft Corporation.

The operative complaint for all of the coordinated actions[1] alleges causes of action under the Cartwright Act (Bus. & Prof. Code, § 16720 et seq.) and the Unfair Competition Act (Bus. & Prof. Code, § 17200 et seq.). Plaintiffs allege that defendant engaged in numerous violations of these Acts in establishing and maintaining an illegal monopoly of the Intel-compatible personal

[1] The Amended Complaint for Violations of California Business and Professions Code §§ 16720 and 17200 Seeking Damages, Restitution and Injunctive Relief; Class Action, filed March 19, 1999 in *Lingo v. Microsoft Corporation*, San Francisco Superior Court No. 301357 (hereafter "Complaint").

computer markets for operating systems software and for word processing and spreadsheet applications software. Plaintiffs allege that Microsoft harmed California consumers by overcharging for its software as a result of the abuse of its monopoly power and by depriving consumers of other benefits that would have been derived from competition in those markets.

Plaintiffs seek to bring this action on behalf of California individuals and entities that purchased software programs indirectly from Microsoft. Specifically, plaintiffs request that two classes be certified:

(1) The "Windows and MS-DOS Operating System Software Class:" All persons or entities within the State of California who, on or after May 18, 1994, indirectly purchased "Microsoft Windows operating system software or MS-DOS operating system software" and who did not purchase it for the purpose of resale.

(2) The "Word and Excel Software Class:" All persons or entities within the State of California who, on or after May 18, 1994, indirectly purchased Microsoft "Word" word processing software and/or "Excel" spreadsheet software compatible with "Microsoft Windows operating system software or MS-DOS operating system software" and who did not purchase it for the purpose of resale.

Excluded from the class[es] are government entities, Microsoft officers and directors, subsidiaries in which Microsoft has greater than a 50 percent ownership interest and any judges or justices assigned to hear any aspect of this litigation. Also excluded are persons or entities who make their purchases after the date of notice to the class.[2]

Microsoft contends that the complexities of this case preclude common proof of the key issue of whether any illegal practices adversely impacted California consumers, and that certification is therefore inappropriate. "[S]hort of making an individual inquiry as to each proposed class member, [there is] no way of proving the key 'fact of injury' or 'impact' element in an antitrust class action: that the alleged monopolistic 'overcharge' actually worked a discernible, tangible impact on the vast majority of end-users in the proposed class. Nor could the amount of the alleged overcharge, if any, passed on to an end-user be estimated without individual investigation." (Microsoft Corporation's Memorandum of Points and Authorities in Support of Its Opposition to Plaintiffs' Renewed Motion for Class Certification ("Opp.") at p. 3.)

[2] Microsoft notes that because it does not actually "sell" its software to anyone (rather, it "licenses" its products), it is technically incorrect to refer to putative class members as indirect "purchasers." However, for the sake of simplicity, the court will also adopt plaintiffs' use of the widely recognized terminology. However, the term "licensed" should be inserted in the definition of the classes to be certified.

While plaintiffs urge that "[t]here is nothing extraordinary about [this] motion" (Memorandum of Points and Authorities in Support of Plaintiffs' Renewed Motion for Class Certification ("Motion") at p. 1), the application for certification of a class in this case is hardly run of the mill. Unlike virtually all reported decisions in antitrust cases in which classes of indirect purchasers have been certified, plaintiffs do not base their claim for recovery on allegations that defendant committed a *per se* violation—a critical factor that would permit a classwide presumption of injury. Moreover, there undoubtedly is a basis for Microsoft's emphasis on the number of software programs it has marketed over the purported class period, the pricing differences that have existed over this period of more than six years, the rapid pace of change in the computer industry over this period, the varied channels through which its software has been distributed, and the critical fact that its software was frequently incorporated into personal computers and represented only a small fraction of the consumers' purchase price. These factors require the court to consider with utmost care the particular issues raised by the allegations and the way in which plaintiffs intend to meet their burden of proof. The question at this point, however, is not whether plaintiffs will be able to prove their case, but only whether their contentions can be evaluated in a manner that does not require consideration of so many individualized circumstances as to be completely impracticable.

A. **Standard for Class Certification.**

Class suits are authorized in California when "the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court." (Code Civ. Proc., § 382.) A class should be certified when the party seeking certification has demonstrated the existence of an ascertainable class and a well-defined community of interest among the class members. (*Richmond v. Dart Indus., Inc.* (1981) 29 Cal.3d 462, 470; see also *Daar v. Yellow Cab Co.* (1967) 67 Cal.2d 695, 704.) The community of interest requirement embodies three factors: "(1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives

who can adequately represent the class." (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435 (citing *Richmond v. Dart Indus., Inc., supra,* 29 Cal.3d at p. 470.) In addition, the party seeking certification must establish that the class action is a superior method of adjudicating the matter. (*Reyes v. Board of Supervisors* (1987) 196 Cal.App.3d 1263, 1279-1280.) In the absence of controlling state authority, California courts look to Rule 23 of the Federal Rules of Civil Procedure and to the federal case law interpreting this rule. (*Richmond v. Dart Indus., Inc., supra,* 29 Cal.3d at pp. 469-470.)[3]

The party seeking certification of the class carries the burden of establishing that the requirements for certification are met. (*Richmond v. Dart Indus., Inc., supra,* 29 Cal.3d at p. 470.) Courts encourage the use of the class action to "prevent a failure of justice in our judicial system." (*Linder v. Thrifty Oil Co., supra,* 23 Cal.4th at p. 434.) Consumers' individual damages frequently are insufficient to justify the costs of litigation, so that in the absence of class treatment, violations of law inflicting substantial damages in the aggregate would go unremedied. But to ensure that no party suffers a failure of justice, it is necessary to "carefully weigh respective benefits and burdens and to allow maintenance of the class action only where substantial benefits accrue both to litigants and the courts." (*Linder v. Thrifty Oil Co., supra,* 23 Cal.4th at p. 435.)

In considering a class certification motion, the court accepts the facts alleged in the complaint as true. (See *Linder v. Thrifty Oil Co., supra,* 23 Cal.4th at p. 443; *Blackie v. Barrack* (9th Cir. 1975) 524 F.2d 891, 901, fn. 17.) The Supreme Court has recently emphasized that certification of a class is a procedural question that should not be conditioned upon a showing that the class claims are likely to succeed on the merits. (*Linder v. Thrifty Oil Co., supra,* 23 Cal.4th at pp. 439-440, 443.) The Supreme Court also has repeated that courts should resolve any doubt as

---

[3] Rule 23 of the Federal Rules of Civil Procedure requires that plaintiff show common questions of fact or law, numerosity of the class, typicality of the named plaintiff's claim and adequacy of representation. In addition, plaintiff must show that the common questions of law or fact predominate over questions affecting only individual class members and that the class action is superior to other methods for fairly and efficiently resolving the dispute. (Fed. Rules Civ. Proc., Rule 23(a), (b)(3), 28 U.S.C.; *B.W.I. Custom Kitchen v. Owens-Illinois, Inc.,* (1987) 191 Cal.App.3d 1341, 1347, fn. 5.)

to whether to certify a class in favor of certification. (See, e.g., *Richmond v. Dart Indus., Inc.*, *supra*, 29 Cal.3d at pp. 473-475; *La Sala v. American Savings & Loan Ass'n* (1971) 5 Cal.3d 864, 883; *Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 807.)

While issues affecting the merits may be enmeshed with class action requirements, the issue at this stage of the proceedings is only whether the matter is suitable for resolution on a classwide basis. (*Linder v. Thrifty Oil Co., supra*, 23 Cal.4th at p. 443.) Plaintiffs are not now required to prove their case. (See *id.*, at p. 438-39, 443; *Eisen v. Carlisle & Jacquelin* (1974) 417 U.S. 156, 177; *In re Catfish Antitrust Litigation* (N.D. Miss. 1993) 826 F.Supp. 1019, 1038-1039.) Rather, they are required to make a "threshold showing" that the antitrust violations, if proven, have had a common impact on the class. (*In re Catfish Antitrust Litigation, supra*, at pp. 1041-1042.) Plaintiffs are also required to advance a method for proving generalized damages on a classwide basis "not so insubstantial that it amount[s] to no method at all." (*Id.*, at p. 1042.) In response to plaintiffs' showing that all of the requirements for class certification have been met, Microsoft disputes only whether common questions of law or fact predominate.[4]

---

[4] Microsoft does not seem to contest that the proposed classes are ascertainable. Whether a class is ascertainable depends on the clarity of the class definition, the numerosity of the putative class and the means available to identify potential class members. (*Reyes v. Board of Supervisors, supra*, 196 Cal.App.3d at p. 1974.) The class definitions make clear that any California consumer of the software at issue who purchased the product(s) for his, her or its own use and not for resale within the class period is a member of the class. The definitions also make clear who is excluded from the classes. Moreover, according to declarations submitted with the moving papers, the named plaintiffs who seek to represent one or both classes are themselves members of one or both of the classes.

The numerosity requirement also is not disputed and is satisfied because the class members are so numerous that it is "impracticable to bring them all before the court." (Code Civ. Proc., § 382.) There is no predetermined number of class members necessary as a matter of law for the maintenance of a class action. (*Hebbard v. Colgrove* (1972) 28 Cal.App.3d 1017 (not inappropriate to certify class involving a minimum of 28 members); *Clothesrigger, Inc. v. GTE Corp.* (1987) 191 Cal.App.3d 605 (mere size of proposed class numbering over one million members did not make proposed class action unmanageable).) Here plaintiffs allege there are "clearly millions of class members." (Motion at p. 19.)

The typicality requirement is satisfied if the representative plaintiff's claim "has the essential characteristics common to the claims of the class." (*In re Flat Glass Antitrust Litigation* (1999) 191 F.R.D. 472, 479.) The named plaintiffs' claims here, that they paid illegal overcharges due to defendant's antitrust violations, are identical to those of the class, and are, therefore, typical of those of the class.

Again, the parties do not take issue with the adequacy of representation requirement, which is met by (1) retaining class counsel competent to handle the litigation; and (2) ensuring that the class representatives' interests are not antagonistic to those of the class. In approving plaintiffs' proposed organization of counsel, this court found plaintiffs' counsel to be well qualified to conduct this litigation. (See Pretrial Order No.1, filed Mar. 9, 2000, and supporting documentation filed by plaintiffs in support thereof.) The named plaintiffs' claims arise through the same

B. **Indirect Purchaser Suits for Damages in California.**

California is one of a minority of states that permits indirect purchasers to maintain antitrust suits for damages. Rejecting *Illinois Brick Co. v. Illinois* (1977) 431 U.S. 720, in which the United States Supreme Court held that such suits could not be maintained under the federal Sherman Act, the California Legislature amended the Cartwright Act specifically to permit indirect purchaser actions under California law. (Bus. & Prof. Code, § 16750(a).) The California Supreme Court noted that this legislative action constituted an endorsement of Justice Brennan's dissenting opinion in *Illinois Brick* and "a mandate to avoid unnecessary procedural barriers to indirect purchasers' prosecution of California antitrust suits." (*Union Carbide v. Superior Court* (1984) 36 Cal.3d 15, 21-22.)

C. **Common Questions of Law or Fact Predominate over Individual Questions.**

Plaintiffs' burden is to establish that common questions of law or fact predominate over individual issues. This inquiry "turns on an interpretation of substantive issues of antitrust law." (*Rosack v. Volvo of America Corp.* (1982) 131 Cal.App.3d 741, 751 (*Rosack*).) Federal case law interpreting the Sherman and Clayton Acts is applicable to interpretation of California's antitrust law. (*Ibid.*) To establish liability, plaintiffs must prove an antitrust violation and demonstrate that the class suffered injury or impact as a result of the violation. (*B.W.I. Custom Kitchen v. Owens-Illinois, Inc.* (1987) 191 Cal.App.3d 1341, 1350 (*B.W.I. Custom Kitchen*).) For class certification purposes, plaintiffs may satisfy this requirement by making a "threshold showing that the antitrust violation, if proven, had a common impact on the class members." (*In re Catfish Antitrust Litigation, supra*, 826 F.Supp. at pp. 1038-1039.) "If plaintiffs have stated claims of illegality and impact which can be proved predominantly with facts applicable to the class as a whole, rather than by a series of facts relevant to only individual or small groups of plaintiffs, then prosecution of this case as a class action is appropriate and desirable." (*Rosack, supra*, 131

set of facts as do those of the class and their claimed injuries are the same. Through declarations, the named plaintiffs attest to their ability and willingness to prosecute the litigation and protect the interests of the class.

Cal.App.3d at p. 752.) Plaintiffs' proposed method for generalized proof of damages must not be "so insubstantial that it amount[s] to no method at all." (*In re Catfish Antitrust Litigation, supra,* 826 F.Supp. at p. 1042.)

Plaintiffs frame the common questions presented by this action as follows:

> (1) whether Microsoft possesses monopoly power in the relevant computer software markets; (2) whether Microsoft has acquired, maintained and increased its market power through violations of the Cartwright Act and the Unfair Competition Act (Bus. & Prof. Code §§ 16720, 16727 and 17200); (3) whether Microsoft exploited its illegal monopoly to cause substantial harm to competition in the relevant markets; (4) whether Microsoft exploited its illegal monopoly to cause substantial harm to consumers by overcharging them for inferior products, suppressing innovation and denying consumers their freedom of choice in a competitive market; (5) whether Microsoft should be required to make full restitution for the harm it unlawfully inflicted upon consumers and the profit it unlawfully reaped from consumers; and (6) whether Microsoft should be enjoined from continuing its violations of law.

(Plaintiffs' Reply in Support of Renewed Motion for Class Certification ("Reply") at pp. 10-11.) The issues presented fall into three categories: (1) whether Microsoft violated California's antitrust law; (2) whether any such violation caused harm to the classes; and (3) what relief is appropriate.

1. **Violation.**

Plaintiffs allege numerous antitrust violations by Microsoft that had the purpose and effect of establishing and maintaining an illegal monopoly of the personal computer operating systems, word processing and spreadsheet software markets. (Compl. at ¶¶ 37, 38, 104-107.) Plaintiffs allege that Microsoft exploited its monopoly power[5] to cause substantial harm to competition and to the ultimate consumers of Microsoft's products in California, including overcharges for the software programs at issue. (Compl. at ¶¶ 104, 105, 107.) Such conduct, if proven, violates the Cartwright Act, which prohibits combinations or conspiracies in restraint of trade. (Bus. & Prof. Code, § 16720 et seq.)

---

[5] Plaintiffs allege that Microsoft controls approximately 90% of the operating systems, word processing and spreadsheet software markets. (Compl. ¶¶ 31, 34, 36.)

As evidence of the substantiality of their claims and the susceptibility of these claims to classwide analysis, plaintiffs point to the Findings of Fact in the antitrust action brought by the United States against Microsoft. (*United States v. Microsoft Corp.* (D.D.C. 1999) 65 F.Supp.2d 1 [hereafter "Findings of Fact"]; see also *United States v. Microsoft Corp.* (D.D.C. 2000) 87 F.Supp.2d 30 [hereafter "Conclusions of Law"].) There, the District Court made detailed findings of various forms of anticompetitive conduct by Microsoft. Judge Jackson found that Microsoft engaged in anticompetitive conduct to protect Windows, its core asset, from competition (*e.g.* Findings of Fact ¶¶ 132, 194, 409-412; *see also* Conclusions of Law § I.2), including restrictions on personal computer manufacturers, internet access providers and internet content providers. (*E.g.* Findings of Fact ¶¶ 155, 203, 215, 221, 234, 235, 237, 242-336.) Judge Jackson found that Microsoft charged higher prices than it would have in a competitive environment, consistent with monopoly power (Findings of Fact ¶¶ 62, 63),[6] and concluded that Microsoft's conduct had "harmed consumers in ways that are immediate and discernible." (Findings of Fact ¶ 409.)

Such Sherman Act violations also constitute violations of the Cartwright Act and violations of the Unfair Competition Act (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 42-43), and will entail proof of the same conduct by Microsoft as to each class member. (*Rosack, supra,* 131 Cal.App.3d at p. 752; *In re Catfish Antitrust Litigation, supra,* 826 F.Supp. at p. 1039.) Microsoft's actions in this regard are not differentiated with respect to individual consumers; the focus is squarely on Microsoft's conduct, not the conduct of individual class members. Thus, the proof required to demonstrate the "existence, implementation and effect" of the alleged unlawful conduct will require "a common thread of evidence" which will "correspond to evidence which otherwise would be introduced by absentee class members."

[6] In further support of their motion, plaintiffs submitted the opinion of Professor David J. Farber describing the nature of the competition that would have existed absent Microsoft's alleged anticompetitive conduct (the "but for" world) and opining that pricing for operating systems and applications software would have been lower had Microsoft not engaged in such conduct. (Declaration of David J. Farber in Support of Plaintiffs' Renewed Motion for Class Certification ("Farber Decl.") ¶¶ 34, 57.)

(*B.W.I. Custom Kitchen, supra*, 191 Cal.App.3d at p. 1349 [quoting *In re Sugar Indus. Antitrust Litigation* (E.D. Pa. 1976) 73 F.R.D. 322, 345]; *In re Flat Glass Antitrust Litigation* (W.D. Pa. 1999) 191 F.R.D. 472, 484.) Plaintiffs have made a sufficient "threshold showing" that the issues of fact and law regarding Microsoft's alleged violations of the Cartwright Act and the Unfair Competition Act are subject to common proof.

**2. Fact of Injury.**

Plaintiffs must also demonstrate that whether consumers suffered harm as a result of Microsoft's anticompetitive conduct is also capable of proof on a classwide basis. (*B.W.I. Custom Kitchen, supra*, 191 Cal.App.3d at p. 1350.)[7] "[A]n antitrust plaintiff's 'burden of proving the fact of damage . . . is satisfied by its proof of some damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damage.'" (*Ibid.* [citing *Zenith Corp. v. Hazeltine* (1969) 395 U.S. 100, 114, fn. 9].) Plaintiffs contend that Microsoft harmed the class by charging supracompetitive prices for its software. Plaintiffs must, therefore, make a "threshold showing" that proof of the overcharge is common to the class.

There is considerable authority for the proposition that in a case alleging price fixing the fact of injury may be determined on a classwide basis. (See, e.g., *B.W.I. Custom Kitchen, supra*, 191 Cal.App.3d 1341; *Rosack, supra*, 131 Cal.App.3d 741; *In re Catfish Antitrust Litigation, supra*, 826 F.Supp. 1019; *In re Sugar Antitrust Litigation, supra*, 73 F.R.D. 322.) Because price fixing is a *per se* violation of antitrust law, a presumption of harm arises from proof of such a violation. (*B.W.I. Custom Kitchen, supra*, at pp. 1350-1353; *Rosack, supra*, at pp. 753-754.) "It has been held that impact will be presumed once a plaintiff demonstrates the existence of an unlawful conspiracy that had the effect of stabilizing, maintaining or establishing product prices beyond competitive levels." (*In re Sugar Indus. Antitrust Litigation, supra*, at p. 347.) A *per se*

[7] The parties acknowledge the distinction between the fact of harm or impact, on the one hand, and actual damages, on the other. "Fact of damage pertains to the existence of injury, as a predicate to liability; actual damages involve the quantum of injury, and relate to the appropriate measure of individual relief." (*B.W.I. Custom Kitchen, supra*, 191 Cal.App.3d at p. 1350, fn. 7 [citation omitted].)

violation raises a presumption of harm because conduct such as a conspiracy to fix prices has the sole purpose of artificially raising the price of the item. It follows that consumers of the product pay more than they would in a competitive market even if the prices charged to direct purchasers vary. (*B.W.I. Custom Kitchen, supra*, at pp. 1350-1351.) Thus, a plaintiff need not provide evidence of harm to direct purchasers above and beyond establishing "the existence of an unlawful conspiracy that had the effect of stabilizing, maintaining, or establishing product prices beyond competitive levels." (*In re Sugar Indus. Antitrust Litigation, supra*, at p. 347.)

Holding monopoly power, however, is not itself a violation of any antitrust provision. Whether particular practices engaged in to acquire, maintain or extend such power constitute violations must be evaluated under the rule of reason. (*Bert G. Gianelli Distrib. Co. v. Beck & Co.* (1985) 172 Cal.App.3d 1020, 1047-1048; *Standard Oil Co. v. United States* (1910) 221 U.S. 1, 61-62.) Some practices that flow from the existence of monopoly power may benefit rather than harm consumers, so that injury may not be presumed simply from proof that the defendant engaged in the conduct in question. (*Standard Oil Co. v. United States, supra*, 221 U.S. at pp. 61-62.) Here, Microsoft makes exactly that contention: that the various practices that are challenged—such as preventing other products from being used with its operating systems and bundling its internet browser with its operating system—have been of great benefit to the public by enhancing product standardization and increasing the ease of computer use and internet access.

But while the presence of these additional issues in a monopolization case such as this may preclude any presumption of harm, as in a price-fixing case, the existence of these issues does not necessarily mean that common issues do not predominate. Without regard to the possibility that some of the relevant issues in this case may be conclusively determined by the final outcome in the Government's action against Microsoft, remaining issues concerning the legality of defendant's practices are issues common to all members of the classes plaintiffs seek to certify. As discussed in section C.1 above, the fundamental and predicate issues as to whether defendant violated the Cartwright Act are not differentiated among individual consumers. In this

respect, the situation is no different from a case involving an alleged conspiracy that would constitute a *per se* violation of the statute.

If it should be determined that defendant's practices unlawfully elevated prices to direct purchasers of Microsoft's software, the complexities of the marketplace to which defendant refers will affect the ability to analyze whether, and the extent to which, these higher prices were passed on to consumers. However, once the existence of unlawfully inflated prices at the direct purchaser level has been established, the difficulties of determining whether the price increase was absorbed by those direct purchasers or passed on to successive purchasers in the chain of distribution are no greater in a monopolization case than in a *per se* price-fixing case. There is no ascertainable difference between the analysis of the impact of the abuse of a monopoly and of price fixing once the overcharge to direct purchasers has been established, and in response to the court's inquiry at oral argument Microsoft offered none. The starting point in both situations is artificially high prices set in an anticompetitive market. The same economic models and analyses that have been accepted for purposes of tracing a supracompetitive price that results from a price fixing conspiracy are relevant and applicable to trace the pass-through resulting from monopoly abuse.

Unlike the conclusion reached by the Supreme Court in *Illinois Brick* and by the courts of some other states, the California courts have made clear that the difficulties in tracing the pass-through of artificially inflated prices do not necessarily create insuperable obstacles to classwide analysis and to class certification. "In certifying a plaintiff class, the courts have found it appropriate to look past surface distinctions among the products purchased by class members or the marketing mechanisms involved when allegations of anticompetitive behavior embracing all of the various products and distribution patterns have been credibly pleaded. [Citation omitted.] Identical products, uniform prices, and unitary distribution patterns are not indispensable for class certification in this context." (*B.W.I. Custom Kitchen, supra*, 191 Cal.App.3d at p. 1350 [quoting *Shelter Realty Corp. v. Allied Maintenance Corp.* (S.D.N.Y. 1977) 75 F.R.D. 34, 37]; *Rosack,*

*supra*, 131 Cal.App.3d at p. 757 [same].) "[C]ontentions of infinite diversity of product, marketing practices, and pricing have been made in numerous cases and rejected." (*Rosack*, *supra*, 131 Cal.App.3d at p. 755 [quoting *In re Folding Carton Antitrust Litigation* (N.D. Ill. 1977) 75 F.R.D. 727, 734].) "It should also be emphasized that courts have applied these principles to markets, such as this one, characterized by individually negotiated prices, varying profit margins, and intense competition." (*B.W.I. Custom Kitchen*, *supra*, at p. 1351.)

Nonetheless, defendant argues that the complexity and changing nature of the software markets over the past six years have been so great as to render classwide analysis "impossible" in this case. (Opp. at p. 1.) Focusing almost exclusively on the market for operating systems software, defendant emphasizes that over the class period it marketed a progression of product "families"—from MS DOS to the most current Windows NT Workstation system. The variety of illegal practices in which defendant allegedly engaged necessarily affected the price defendant was able to and did charge at different times and for different products. If defendant engaged in predatory pricing, the price to some purchasers presumably would have been less than a competitively determined price, so that some class members may have benefited from the practice, rather than having been damaged by it. Because of the high level of competition among computer manufacturers ("original equipment manufacturers" or "OEMs"), each OEM that purchased software directly from Microsoft made its own pricing decisions and therefore each may have absorbed rather than passed on a different portion of any excess in the price paid to Microsoft. Because the software represents only a small percentage of the cost of the computer, and because there are many other factors which may inhibit passing on price changes (such as "focal point" pricing and "menu costs"), whether, and the extent to which, any given OEM passed on the excess will differ from case to case. The amount passed through by distributors or retailers purchasing from the OEMs, or purchasing directly from Microsoft, may also vary, so that the fact, much less the amount, of any overcharge reaching a consumer will be a function of so many variables, defendant argues, that the impact of any violation cannot possibly be considered

collectively. In the words of Microsoft's economist, Professor Jerry A. Hausman, "any analysis of whether an overcharge may have been passed on to an eventual final purchaser would require an evaluation of a large number of individual-specific facts that essentially will amount to an individualized inquiry for each final purchaser." (Declaration of Jerry A. Hausman ("Hausman Decl.") ¶ 32.)

Such a broad statement proves too much. If true, it would invalidate the entire study of microeconomics. In his Findings of Fact, Judge Jackson concluded that Microsoft's conduct had "harmed consumers in ways that are immediate and discernible." (Findings of Fact ¶ 409.) To demonstrate that impact on consumers can be proven on a non-individualized and classwide basis, plaintiffs rely heavily on the expert opinion of Professor Jeffrey K. MacKie-Mason, an economist. Accepting the allegations in the Complaint and the Findings of Fact, and based upon his knowledge of the industry, Professor MacKie-Mason opined that plaintiffs could demonstrate common impact on the classes "by showing that, as a result of Microsoft's monopoly power (derived from or maintained by the anticompetitive conduct alleged) consumers (1) were charged supra-competitive prices for [the relevant software] and (2) experienced less choice and innovation in [the relevant software markets] than they would have enjoyed in a competitive market." (Declaration of Jeffrey K. MacKie-Mason in Support of Plaintiffs' Renewed Motion for Class Certification ("MacKie-Mason Decl.") ¶ 6(a), (c).) "When a monopolist sets prices above competitive levels to its distributors, it generally results that all customers suffer harm." (Declaration of Jeffrey K. MacKie-Mason in Support of Plaintiffs' Reply re Renewed Motion for Class Certification ("MacKie-Mason Reply Decl.") ¶ 5.) Summarizing his conclusions, Professor MacKie-Mason stated:

> As is well known in economic theory and practice, at least some of the overcharge will be passed on by distributors to end consumers. When the distribution markets are highly competitive, as they are here, all or nearly all of the overcharge will be passed through to ultimate consumers. . . . Both of Microsoft's experts also agree upon the economic phenomenon of cost pass through, and how it works in competitive markets. This general phenomenon of cost pass through is well established in antitrust law and economics as well."

(MacKie-Mason Reply Decl. ¶ 6.)

Professor MacKie-Mason described several recognized methods to estimate what Microsoft's prices to its direct purchasers would have been in a hypothetical "but for" world in which Microsoft had not engaged in the allegedly anticompetitive conduct. These include the use of "yardstick" prices based on the prices of products when the markets were more competitive or the prices of similar goods sold in more competitive markets; the comparative margin method (calculating the price at which Microsoft's margin on a product would equal the average margin of other software manufacturers); and constructing models of equilibrium in the relevant markets. (MacKie-Mason Decl. ¶¶ 28-36.) He further described two methods to measure the extent to which particular increased costs were passed on to final purchasers, both based on equilibrium models of distribution channels. (Mackie-Mason Decl. ¶¶ 38-40.)

Professor MacKie-Mason did not commit himself to the use of any one or more of these approaches, nor did he make the necessary calculations or attempt to prove that any of these methods ultimately will be able to support plaintiffs' burden of proof at trial. Nonetheless, his declarations contain a good bit more than a plea to "trust me," as the defendant would characterize his testimony. (Opp. at p. 3.)

In addition to proposing several methodologies shown to be widely accepted within the profession, plaintiffs submitted several published works by prominent economists and consumer groups that have conducted empirical analyses to demonstrate general harm to consumers as a result of Microsoft's conduct. (Hall, *Toward A Quantification of the Effects of Microsoft's Conduct* (2000) American Economic Review 90; Fisher & Rubinfeld, *United States v. Microsoft: An Economic Analysis* in Did Microsoft Harm Consumers? Two Opposing Views (AEI-Brookings Joint Center for Regulatory Studies 2000); Fisher & Rubinfeld, *Misconceptions, Misdirection, and Mistakes* in Did Microsoft Harm Consumers? Two Opposing Views (AEI-Brookings Joint Center for Regulatory Studies 2000); Consumer Federation of America, Media Access Project, U.S. Public Interest Research Group, The Consumer Cost of the Microsoft

Monopoly: $10 Billion of Overcharges and Counting (Jan. 1999).) Moreover, the opposing experts agree that equilibrium economic models can be used to calculate damages in antitrust cases. According to the defense expert, Professor Hausman:

> Economists have developed various theoretical models of competition in markets with limited numbers of sellers. These models are based on a series of strong simplifying assumptions. They can provide useful bases for suggestive theoretical analyses, but they do not provide reliable bases for calculating damages *unless carefully designed and calibrated to fit the actual conditions of the market in question.*

(Hausman Decl. ¶ 125 (emphasis added).)

Professor Hausman asserts that none of the methods proposed by Professor MacKie-Mason will work because none of them "accounts for the real world complexities of the products and the distribution chains at issue." (Hausman Decl. ¶ 113.) However, the experts agree on the importance of product differentiation in reaching dependable conclusions (Hausman Decl. ¶ 126; MacKie-Mason Decl. ¶108.), but, not surprisingly, disagree over the extent to which Professor MacKie-Mason's anticipated models will reflect reality. (See, e.g., Hausman Decl. at pp. 43-52; MacKie-Mason Decl. at pp. 38-52.) The question at this stage is not whether plaintiffs will be able to carry their burden of proving that their experts' analyses are reliable, but whether it appears that the differences between the experts can be intelligently presented and evaluated within the framework of a class action. On a motion for class certification, it is inappropriate to resolve a "battle of the experts." (*In re Catfish Antitrust Litigation, supra*, 826 F.Supp. at p. 1042.) "Whether or not [plaintiff's expert] is correct in his assessment of common impact/injury is for the trier of fact to decide at the proper time. [Citations omitted.] For now, the court is persuaded that for the purposes of a class certification motion, plaintiffs have made [the required] threshold showing . . . ." (*Ibid.*) The court is similarly persuaded here.

It may be, as defendant has argued, that closer examination of the facts will disclose that not all class members were harmed by Microsoft's practices.[8] However, plaintiffs need not prove

---

[8] Some skepticism is warranted as to the extent to which defendant will be able to prove its assertion in this regard. Microsoft contends, for example, that its conduct benefited rather than harmed consumers because consumers

that each and every class member paid a supracompetitive price for the relevant software products. As explained in *Rosack*, "[t]he courts have rejected the notion that each member of the purported class must prove that he or she absorbed at least some portion of the overcharges in order to establish liability. [Citations omitted] '[C]lass certification does not require that common questions be completely dispositive . . . as to all potential members of the class. [Citations omitted.] The fact that certain members of the class may not have been injured at all does not defeat class certification. [Citations omitted.]" (*Rosack*, *supra*, 131 Cal.App.3d at pp. 753-754.) Similarly, the *B.W.I. Custom Kitchen* court pointed out that "[e]ven if it were shown that certain class members escaped having to pay any of the overcharge . . . , the fact remains that in the vast majority of cases at least a portion of the illegal overcharge was passed on by the independent distributors to class members in the form of higher prices." (*B.W.I. Custom Kitchen*, *supra*, 191 Cal.App.3d at p. 1353.) Whether that is true in this case will depend upon an evaluation of the evidence at trial.

Defendant is correct that the multiple products embraced within each of the two proposed classes, the multiple distribution channels, and the extraordinary rate at which changes have occurred in the relevant markets over the six-year class period will complicate the analysis of the impact of any illegal practices in which Microsoft is found to have engaged. The trier of fact undoubtedly will be required to do more than make a single determination of whether any damages were incurred by the respective classes over the six-year period. However, plaintiffs advise that their evidence and expert studies will be presented in a manner that will permit, at a minimum, annual comparisons of prices paid by consumers for particular software products with the prices that would have prevailed in the hypothetical "but for" world in the absence of the

received Microsoft's Web browser, Internet Explorer, at "no charge." Judge Jackson found that Microsoft's practice of bundling its Web browser with Windows was designed to harm the ability of Netscape's Navigator Web browser to compete and caused harm to consumers. (Findings of Fact ¶¶ 143, 155-160, 166-168, 171-177; Conclusions of Law at pp. 38-40, 42-43.) Moreover, as Professor Mackie-Mason explained, the effect of an overcharge is not cured by the marketing strategy: "buy three tires; get the fourth tire free." (MacKie-Mason Reply Decl. ¶ 23.)

unlawful practices. Moreover, since the relevant comparison is not between actual prices and prices in a perfectly competitive market, or even between actual prices and prices lawfully obtained in a monopoly market, plaintiffs' evidence will need to establish "the price increment caused by the anticompetitive conduct that originated or augmented the monopolist's control over the market." (*Berkey Photo, Inc. v. Eastman Kodak Co.* (2d Cir. 1979) 603 F.2d 263, 297.) The task is formidable, but not impossible. As the case proceeds towards trial, careful consideration will have to be given to the possibility of creating subclasses, bifurcating issues, making special findings, or using other techniques that may facilitate the presentation and consideration of the relevant evidence. At this point, the court is not persuaded that a comprehensible analysis of these issues cannot be made within the context of properly managed trial proceedings.

**3. Calculation of Damages.**

Plaintiffs must also meet their burden of demonstrating that the amount of damages is susceptible to classwide proof. With respect to calculating damages once liability has been established, individual issues will not bar certification of a class. (*B.W.I. Custom Kitchen, supra,* 191 Cal.App.3d at p. 1354; *Rosack, supra,* 131 Cal.App.3d at p. 761.) "[I]t has been recognized consistently that differences among potential class members concerning damages do not preclude class treatment so long as common questions regarding conspiracy and impact allegations predominate." (*Rosack, supra,* at p. 761.) Courts recognize a somewhat relaxed standard of proof once the antitrust violation and resulting injury have been proven. (*In re Catfish Antitrust Litigation, supra,* 826 F.Supp. at p. 1042.) This is the logical result of an inability to ascertain exactly what "plaintiff's position would have been in the absence of defendant's antitrust violation." (*Ibid.*) "Hence, the willingness to accept some uncertainty stems from a simple, equitable notion that the wrongdoer should not be allowed to profit by an insistence upon an unattainable standard of proof." (*Id.*, at pp. 1042-1043; see also *Bigelow v. RKO Radio Pictures, Inc.* (1946) 327 U.S. 251, 264.)

The basic measure of damages for overcharges resulting from Microsoft's alleged

anticompetitive conduct is the difference between the price paid by a class member for a particular product and the price that would have been paid absent the alleged anticompetitive conduct. (See *In re Catfish Antitrust Litigation, supra*, 826 F.Supp. at p. 1043; MacKie-Mason Decl. ¶¶ 25, 40.) To determine this amount, as discussed in section C.2 above, it is of course necessary to determine both the amount of the overcharge by Microsoft and the amount of such overcharge passed through to the consumer. Total classwide damages are the sum of the overcharges on all software programs sold to class members during the class period. (MacKie-Mason Decl. ¶ 40.)

Plaintiffs need not present a method to calculate each class member's damage individually. California courts permit calculation of damages in the aggregate for a class and do not require summing all individual claims. (*Daar v. Yellow Cab Co., supra*, 67 Cal.2d at pp. 706, 714, 716; *Bruno v. Superior Court* (1981) 127 Cal.App.3d 120, 128-129 & fn. 4.) A reasonable basis for computing damages is permissible, even if it involves approximation or estimation. (*Suburban Mobile Homes, Inc. v. AMFAC Communities, Inc.* (1980) 101 Cal.App.3d 532, 545; *Bigelow, supra*, 327 U.S. at pp. 264-265.) Other courts in antitrust proceedings have found similar approaches to be sufficiently viable for purposes of class certification. (See, e.g., *In re Catfish Antitrust Litigation, supra*, 826 F.Supp. at p. 1043; *In re Domestic Air Transportation Antitrust Litigation* (N.D. Ga. 1991) 137 F.R.D. 677, 692; *In re Corrugated Container Antitrust Litigation* (S.D. Tex. 1978) 80 F.R.D. 244, 251.) Moreover, it is not necessary that plaintiffs demonstrate to a certainty that their proposed methods will succeed, and it would be improper for the court to make a determination as to the likely success of plaintiffs' proposed methods. (*In re Domestic Air Transportation Antitrust Litigation, supra*, at p. 693; *In re Flat Glass Antitrust Litigation, supra*, 191 F.R.D. at p. 487.)

The method of calculating the amount of any recovery that will be received by each class member and the method of distributing damages to class members are different questions altogether that need not be addressed at this point, and which the parties have not argued. S[illegible]

it to say that there is no reason to presume that conventional techniques for notifying class members of their right to submit claims and for submitting and processing claims will not be feasible in this litigation. Nor is there any reason to assume that the amounts to which individual class members may be entitled will be insufficient to justify the effort and expense of a claim procedure. Moreover, as noted by plaintiffs, fluid class recovery is also a possibility. (*Bruno, supra*, 127 Cal.App.3d at p. 135; *Kraus v. Trinity Management Services, Inc.* (2000) 23 Cal.4th 116, 119-120.) Should problems in calculating damages appear to outweigh the benefits of class treatment, the court may reconsider its certification order and vacate or amend the certification. (*B.W.I. Custom Kitchen, supra*, 191 Cal.App.3d at p. 1348 [citations omitted].)

**D. A Class Action Is a Superior Method of Adjudicating the Matter.**

Finally, plaintiffs must demonstrate that a class action would be of substantial benefit to the litigants and the court. (See *Blue Chip Stamps v. Superior Court* (1976) 18 Cal.3d 381, 385.) This requirement incorporates the superiority standard of Rule 23 of the Federal Rules of Civil Procedure. (*Schneider v. Vennard* (1986) 183 Cal.App.3d 1340, 1347.) The matters pertinent to this determination include:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

(Fed. Rules Civ. Proc., Rule 23(b)(3), 28 U.S.C.) The various indirect purchaser claims filed in California against Microsoft already have been consolidated in this court, which is specifically called upon to utilize innovative methods to manage complex cases as part of the Judicial Council's Complex Civil Litigation pilot program. (See also *B.W.I. Custom Kitchen, supra*, 191 Cal.App.3d at p. 1355 [calling upon courts to adopt innovative methods for handling indirect purchaser class actions].)

This case involves a very large number of claimants with relatively small amounts at stake. Most consumers have little incentive to litigate independently since the costs of litigation

undoubtedly would overwhelm their potential recovery. "The problems which arise in the management of a class action involving numerous small claims do not justify a judicial policy that would permit the defendant to retain the benefits of its wrongful conduct and to continue that conduct with impunity." (*Linder v. Thrifty Oil Co., supra*, 23 Cal.4th at p. 446.) Moreover, the potential recovery here is not so insignificant to warrant the assumption that individual consumers will not be motivated to claim any recovery to which they may be entitled, or that a favorable outcome would benefit only the attorneys involved. And, to the extent that purchasers of large quantities of Microsoft software should elect to pursue their individual claims, denying class treatment could result in repetitious litigation and inconsistent adjudication of similar issues and claims. (*Richmond v. Dart Indus., Inc., supra*, 29 Cal.3d at p. 469.) Under the circumstances, the superiority of a class action is apparent.

CONCLUSION

In keeping with the Supreme Court's mandate, this court must "avoid interpreting procedural requirements in such a way as 'would thwart the legislative intent . . . to retain the availability of indirect-purchaser suits as a viable and effective means of enforcing California's antitrust laws.'" (*B.W.I. Custom Kitchen, supra*, 191 Cal.App.3d at p. 1355 [quoting *Union Carbide Corp. v. Superior Court, supra*, 36 Cal.3d at p. 21].) The court finds that the proposed classes are ascertainable, that the classes are sufficiently numerous, that the named representatives' claims are typical of those of the classes and that the interests of the classes will be fairly and adequately represented. In addition, common questions of fact or law predominate and a class action is the superior method for adjudicating the matter. Accordingly, the two proposed classes will be certified, and the litigation will proceed as a class action.

Counsel should confer concerning the method of giving notice to the classes and the content of the notice, and be prepared to discuss these issues at the status conference scheduled for October 4, 2000.

Dated: August 29, 2000

STUART R. POLLAK
Judge of the Superior Court

21

COORDINATION PROCEEDINGS SPECIAL TITLE (Rule 1550(b) MICROSOFT I-V CASES - ORDER RE CLASS CERTIFICATION – J.C.C.P. 4106