# TAB D-5

TRIPLETT, WOOLF & GARRETSON
151 North Main, Suite 800
Wichita, KS  67202-1409
(316) 265-5700

FILED
APP DOCKET NO. _____

Mar 3  3 13 PM '95

CLERK OF _____
18TH JU _____
SEDGW _____
BY _____

IN THE EIGHTEENTH JUDICIAL DISTRICT
DISTRICT COURT, SEDGWICK COUNTY, KANSAS
CIVIL DEPARTMENT

CHERYL DONELAN, on her own           )
behalf and on behalf of all          )
others similarly situated            )
within the State of Kansas,          )
                                     )
            Plaintiff,               )
                                     )        Case No. 94 C 709
      vs.                            )
                                     )
ABBOTT LABORATORIES, INC.            )
BRISTOL-MYERS SQUIBB CO.,            )
and MEAD JOHNSON & CO.,              )
                                     )
            Defendants.              )

Pursuant to Chapter 60,
Kansas Statutes Annotated

## ORDER OF CLASS CERTIFICATION

NOW on this 1st day of March, 1995, this matter comes regularly on for hearing on plaintiff's Motion for an Order pursuant to K.S.A. § 60-223(c)(1) determining that this case may be maintained as a class action on behalf of the class defined in paragraph seventeen (17) of her Petition. Plaintiff appears personally, and by and through her respective counsel of record. Defendants appear by and through their respective counsel of record.

THEREUPON, plaintiff makes her opening statement by and through her counsel of record and, thereafter, defendants make their opening statements by and through counsel of record.

THEREUPON, plaintiff introduces her evidence and rests.

THEREUPON, defendants introduce their evidence and rest.

THEREUPON, after hearing the evidence, reading the briefs filed herein, reviewing the Court file, hearing arguments of counsel and being otherwise fully and duly advised in the premises, the Court makes the following findings and orders:

1.    THE COURT FINDS that the proposed class is defined and described as follows:

> All persons who indirectly purchased one or more brands of infant formula manufactured by ABBOTT, ROSS, BRISTOL-MYERS, and/or MEAD JOHNSON, except for infant formula sold under the Gerber brand name in the State of Kansas during the period January 1, 1980, to December 31, 1992.[1]

2.    THE COURT FURTHER FINDS that the proposed class satisfies the four (4) prerequisites of K.S.A. § 60-223(a) and the requirements of K.S.A. § 60-223(b)(3).

3.    THE COURT FURTHER FINDS that, as is appropriate and timely during the course of these proceedings, pursuant to K.S.A. § 60-223(d), it should enter further appropriate orders in the conduct of this action, as a class action, including, without limitation, orders relating to the notice to be provided to the plaintiff class, which by this Order the Court has now certified.

IT IS THEREFORE ORDERED, DECREED AND ADJUDGED that this action is to be maintained as a class action by the named plain-

---

[1]    The parties agree that parents who received infant formula through the Kansas Special Supplemental Food Program for Women, Infants and Children ("WIC") program did not "purchase" the formula; and, therefore, such consumers are not a part of the class plaintiff represents.

tiff, individually, and on behalf of all others similarly situated, which class consists of those persons described above.

PAUL BUCHANAN

THE HONORABLE PAUL BUCHANAN
DISTRICT COURT JUDGE

APPROVED:
Michael D. Hausfeld
Daniel A. Small
COHEN, MILSTEIN, HAUSFELD & TOLL
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, D.C. 20005-3934
and
Samuel D. Heins
Kent Williams
HEINS, MILLS & OLSON
700 Northstar East
608 Second Avenue South
Minneapolis, MN 55402
and
FLEESON, GOOING, COULSON & KITCH, LLC

By
Richard I. Stephenson, #06273
Attorneys for Plaintiff

Todd A. Gale
KIRKLAND & ELLIS
300 South Grand Avenue
Los Angeles, CA 90071

MORRIS, LAING, EVANS, BROCK
& KENNEDY, CHARTERED

By
Joseph W. Kennedy, #05466
Attorneys for Defendant Abbott
Laboratories

Paul R. Vardeman
Cathy J. Dean
POLSINELLI, WHITE, VARDEMAN & SHALTON
700 West 47th Street, Suite 1000
Kansas City, MO 64112
and

Max R. Shulman
Bradley J. Kurkowski
CRAVATH, SWAINE & MOORE
Worldwide Plaza
825 Eighth Avenue
New York, NY  10019
        and
TRIPLETT, WOOLF & GARRETSON, LLP

By _____
    James A. Walker, #09037
    Attorneys for Defendants
    Bristol-Myers Squibb Co. and
    Mead Johnson & Co.

# TAB D-6

COPY

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CLERK OF THE COURT
FORM V000

11/14/2000

A. Beery
Deputy

HON. MICHAEL J. O'MELIA

CV2000-000722

HOV 15 2000

FILED: _____

CHARLES I. FRIEDMAN, P.C., ET AL.

ANDREW S. FRIEDMAN

v.

MICROSOFT CORPORATION

LEONARD B SIMON
MILBERG WEISS BERSHAD
HYNES & LERACH LLP
600 W BROADWAY
STE 1800
SAN DIEGO  CA  92101

DAVID J BERSHAD
ONE PENNSYLVANIA PLAZA
NEW YORK NY  10119-0165

KENNETH J VIANALE
MILBERG WEISS BERSHAD HYNES &
LERACH LLP
THE PLAZA  STE 900
5355 TOWN CENTER RD
BOCA RATON FL  33486

MARK D BOGEN
1761 W HILLSBORO BLVD
STE 328
DEERFIELD BEACH FL  33442

BRIAN MICHAEL GOODWIN

Page 1

Docket Code 019

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

11/14/2000

CLERK OF THE COURT
FORM V000

A. Beery
Deputy

HON. MICHAEL J. O'MELIA

CV2000-000722

JOHN J. BOUMA

CHRISTOPHER A. O'HARA

STEVE W BERMAN
HAGENS BERMAN
1301 FIFTH AVE
STE 2900
SEATTLE WA  98101

MINUTE ENTRY

The Court has considered all of the memoranda and cases
submitted by both parties.    The Court will not give an
appellate-type ruling, as I would only be repeating what is set
forth in the moving papers.    The Court therefore makes the
following rulings:

1.    Microsoft's Motion to Dismiss is denied.    The Court
finds that Arizona residents can bring this action,
and *Illinois Brick* does not apply.

2.    The Plaintiff's Motion to Certify the Class is
granted.

3.    Microsoft's Motion to Stay is denied.

Docket Code 019

Page 2



SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

COPY

11/14/2000

CLERK OF THE COURT
FORM V000

HON. MICHAEL J. O'MELIA

A. Beery
Deputy

CV2000-000722

The Court will rule on Microsoft's Motion to Consolidate and Lucero's Motion to Intervene when the pleadings are complete.

Docket Code 019

Page 3

# TAB D-7

Westlaw.

Not Reported in A.                                                                                  Page 1
1997 WL 156541 (D.C.Super.), 1997-1 Trade Cases  P 71,730
**(Cite as: 1997 WL 156541 (D.C.Super.))**

C

Superior Court of the District of Columbia.

Herbert L. GODA, individually and on behalf of
himself and all others similarly
situated
v.
ABBOTT LABORATORIES, et al.

No. CIV. A. 01445-96.

Feb. 3, 1997.

OPINION (ON CLASS CERTIFICATION)

BRAMAN, Judge:

*1 We are presented with a motion seeking class
certification which raises questions of first
impression in this jurisdiction. The classification
issues arise in a suit charging a horizontal, price-
fixing conspiracy against the leading manufacturers
of pharmaceuticals. [FN1] The difficulties stem from
a lack of privity between the defendants and the
putative class members. Specifically, while the class
members are purchasers and consumers of
defendants' pharmaceuticals, they do not purchase
directly from defendants.

> FN1. Principal jurisdiction is stated under
> the District of Columbia Antitrust Act of
> 1980, D.C.Code § 28-4508(a) (1996 Repl.),
> which permits a private action against any
> business that engages, *inter alia,* in any
> "conspiracy in restraint of trade or
> commerce all or any part of which is in the
> District of Columbia...." *Id.* at § 28-4502.
> Alternative counts are pitched under the
> Consumer Protection Procedures Act,
> D.C.Code § 28-3905(k)(l) (1996 Repl.) and
> under the common law of unjust enrichment.
> The ensuing analysis will demonstrate that
> these alternatives do not substantively alter
> the merits of class action certifiability.

We are in the domain of *Illinois Brick Co. v. Illinois*
[1977-1 TRADE CASES ¶ 61,460], 431 U.S. 720
(1977), beset by the quandaries involved in tracing
the effects of alleged conspiratorial overcharges
down the relevant line of distribution through
successive purchasers who may or may not have

passed on the overcharge in whole or in part.

**Illinois Brick**

The Court had decided prior to *Illinois Brick* that a
price-fixer could not defend against or mitigate a
direct purchaser's claim on the ground that the direct
purchaser had passed on the overcharge to its
customers and was not, therefore, "injured" within
the contemplation of section 4 of the Clayton Act 15
U.S.C. § 15 (1994). *Hanover Shoe, Inc. v. United
Shoe Machinery Corp.* [1968 TRADE CASES ¶
72,490], 392 U.S. 481 (1968). The direct purchaser
is thus permitted a full recovery notwithstanding that
he has not absorbed the overcharge. The issue in
*Illinois Brick* was whether indirect purchasers, such
as we have here, would be permitted to claim that the
illegal overcharge was successively passed on
through the distribution chain and later paid by them.
Confronted with *Hanover Shoe's* rejection of pass-on
as a defense when urged by the wrongdoer, the
*Illinois Brick* Court also rejected offensive use of the
pass-on theory by plaintiffs. Speaking through Mr.
Justice White, the Court ruled that indirect or
subsequent purchasers were not "injured" and hence
were not entitled to recover even though they
ultimately paid the overcharges imposed by the
antitrust violator.

Rejection of the indirect purchaser's plight was
primarily driven by fear that antitrust cases, already
noted for their complexities, would be further
confounded by inquisitions seeking to track the
damaging effects of an overcharge on the murky
interplay of market forces, including supply and
demand, as the levy impacts each relevant purchaser
through each successive link in the distribution chain.
Faced with the choice of allowing a 100 percent
recovery to an undamaged, direct purchaser and
apportioning the total impact of the overcharge
among its victims, the Court declared that, "until
there are clear directions from Congress to the
contrary," the antitrust laws are better enforced "by
holding direct purchasers to be injured to the full
extent of the overcharge paid by them than by
attempting to apportion the overcharge among all that
may have absorbed a part of it." *Illinois Brick,* 431
U.S. at 746. [FN2]

> FN2. The risk of multiple liability also
> prompted the Court to reject the indirect
> purchaser's claim. We will allude later to

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

this problem. *See infra* [page 79,140].

*\*2* The *Illinois Brick* dissent, authored by Mr. Justice Brennan, was undaunted by the difficulties in assessing damages. Admittedly,

the portion of the overcharge passed on may be only approximately determinable. But again, this problem hardly distinguishes this case from other antitrust cases. Reasoned estimation is required in all antitrust cases, but "while the damages [in such cases] may not be determined by mere speculation [sic] this problem hardly distinguishes this case from other antitrust cases. Reasoned estimation is required in all antitrust cases, but "while the damages [in such cases] may not be determined by mere speculation [sic] or guess, it will be enough if the evidence show [sic] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. Lack of precision in apportioning damages between direct and indirect purchasers is thus plainly not a convincing reason for denying purchasers an opportunity to prove their injuries and damages.

*Id.* at 759-760 (first brackets in original, citations omitted) (quoting *Story Parchment Co. v. Paterson Co.,* 282 U.S. 555, 563 (1931)).

The dissent's faith in "reasoned estimation" that "only approximate[s]" damages, an implicit acceptance of a doctrinal approach to be crafted by experts, was rejected by a skeptical majority for its lack of focus on individual injury and the realities of the market. *Id.* at 742-743.

**The Legislative Solution**

Whereas *Illinois Brick* had favored the direct purchaser and damages that were certain, the District of Columbia legislature opted, as the Court said it might, in favor of apportionment among the *de facto* victims of the overcharge regardless of whether they were in privity with the wrongdoer. In 1980, the Council of District of Columbia passed, and Congress sanctioned, the District of Columbia Antitrust Act which, *inter alia,* took square aim at *Illinois Brick:*

Any indirect purchaser in the chain of manufacture, production, or distribution of goods or services, upon proof of payment of all or any part of any overcharge for such goods or services, shall be deemed to be injured within the meaning of this chapter.

D.C.Code § 28-4509(a) (1996 Repl.). [FN3] Safeguards against the risk of multiple liability are set forth in sections 28-4509(b) & (c), thus greatly reducing if not entirely eliminating the apprehensions of *Illinois Brick.*

FN3. The report of the Committee on the

Judiciary states, "*Illinois Brick* has engendered substantial criticism, commencing with the dissenting opinion of Mr. Justice Brennan joined by Justices Marshall and Blackmun. Section 28-4509(a) makes clear that indirect purchasers can indeed seek damages for overcharges resulting from antitrust violations which are proven to have been passed on to them." Report on Bill 3-107, at 16 (Oct. 8, 1980).

But the presence of *Illinois Brick* is not so easily dismissed, for it nevertheless casts a long shadow over class actions in antitrust matters.

**The Instant Case and the Class Motion**

The 23 defendants comprise most of the leading manufactures of brand name prescription drugs, as distinguished from drugs that are sold under their generic names. The plaintiff, a resident of the District, is an ultimate consumer who buys his prescription drugs from retail pharmacies located in the District. Plaintiff charges that the defendants have conspired to fix, raise and maintain prices charged for brand name prescription drugs sold to independent and chain pharmacies while, at the same time, charging substantially lower prices to institutional pharmacies and mail order pharmacies. [FN4] These more favorable prices are steadfastly refused to independent and chain pharmacies, it is claimed. Wholesalers are also in collusion, it is averred, to impose and maintain this dual pricing structure (although they are not sued). Plaintiff seeks certification of the following class:

FN4. Institutional pharmacies include some health maintenance organizations (HMOs), hospitals, nursing homes, health clinics and other managed-care health organizations. Mail order pharmacies include some HMOs and insurance companies.

*\*3* [A]ll persons who purchased branded drugs from retail pharmacies in the District which were manufactured, marketed, distributed and sold by Defendants at supra-competitive prices ... during the period commencing four years before the filing of this complaint to the present.... Excluded from the Class are officers and directors of the Defendants, any entity in which any of the Defendants has a controlling interest, and the family members, legal representatives, heirs, successors or assigns of any of the foregoing Defendants.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.
1997 WL 156541 (D.C.Super.), 1997-1 Trade Cases  P 71,730
**(Cite as: 1997 WL 156541 (D.C.Super.))**

### Rule 23 and the Contentions of the Parties

Plaintiff's compliance with subsection (a) of Rule 23, SUPER.CT.CIV.R., has not been put in question by defendants. [FN5] Instead, defendants' attack on class recognition concentrates upon Rule 23(b)'s insistence that the applicant also meet one of its criteria. Here the standard is the third, which heightens the demands upon common-question certification by also requiring "that the question of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." *Id.* at 23(b)(3).

> FN5. Rule 23(a) provides that:
> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impractical, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Defendants maintain that this case quintessentially displays the complexities and individualized circumstances inherent in indirect purchaser suits as *Illinois Brick* apprehended. Viewed from the bottom of the distribution line upwards, the defendants argue that the proof would have to be on a per-purchaser, per-purchase basis, *i.e.,* each purchaser would be required to show, as to each purchase made at a local retail pharmacy, that the drug was tainted by the conspiracy, that he or she was thereby injured and the amount of damage sustained. Viewed from the top down, a class member would be required to prove that (1) a defendant conspiratorially over-charged one or more wholesalers, (2) the wholesaler passed the overcharge onto the class member's pharmacy, (3) the pharmacy then passed on the overcharge to the consumer plaintiff, and (4) the consumer plaintiff, as distinguished from a health benefit plan or other third-party source, actually paid the overcharge. Far from issues of injury and damages being common, the defendants argue they are highly individualized thereby requiring individualized proof. In short, defendants maintain, the individual issues will far and away predominate over the common ones.

Plaintiff, who has the burden of establishing compliance with Rule 23, *Yarmolinsky v. Perpetual American Federal Savings and Loan Ass'n.,* 451 A.2d 92, 94 (D.C.App.1982), contends that the conspiracy issue is not only a common issue but the dominant one. It is further argued that District law permits classwide proof on the issues of injury and damages, and plaintiff is prepared through the testimony of an expert economist to quantify the overcharge and the pass-ons, thus enabling injury and damages to be shown by common proof. Other issues impacting a particular class member (*e.g.,* third party payment for a purchase and failure to mitigate damages) may be addressed, it is claimed, in the administrative phase of this proceeding following the main trial. Finally, plaintiff argues that rejection of certification of the damage claims for lack of common-issue dominance should not defeat his application for certification of the injunction claim.

### The MDL Litigation

*4 In resolving these issues we do not write upon a clean slate. The case at bar trails two federal antitrust proceedings in the Northern District of Illinois brought by retail pharmacies against the same manufacturers of brand name prescription drugs as well as wholesalers. *In re Brand Name Prescription Drugs Antitrust Litig.,* No. MDL 997, 94 C 897 (the "MDL" or multidistrict litigation). The first proceeding is a class action. The second consists of consolidated actions brought by opt-out, independent pharmacies.

The retail pharmacies are indirect purchasers since they purchased from wholesalers, not the defendants. On defendants' motions for summary judgment based, *inter alia,* on *Illinois Brick,* Judge Kocoras held in both proceedings that the wholesalers were unwilling captives and under the control of the manufactures. *Brand Name Prescription Drugs Antitrust Litig.,* No. MDL 997, 94 C 897, 1996 WL 167350, at *30-32 (N.D.ILL. Apr. 4, 1996). Hence, the case fell within the "control" exception to the indirect-purchaser bar of *Illinois Brick,* 431 U.S. at 736 n. 16, and the pharmacies effectively would be considered direct purchasers of the manufacturers. *Id.,* at *32.

I will treat the MDL summary judgment ruling as tantamount to the law of this case. *See Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 326-333 (1979). For our purposes this means that, instead of their being two tiers of purchasers between plaintiffs and manufacturers (the wholesale tier and the retail

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

tier), there is only one (the retail tier). [FN6]

> FN6. The consequences of this contraction
> will be developed when we treat the "Scope
> of Our Question." *See infra* [page 79,143].

The MDL rulings by Judge Kocoras on two motions
for class certification should also be considered. In
the first, involving the federal action brought by the
pharmacies, class certification was granted. *Brand
Name Prescription Drugs,* No. MDL 997, 94 C 897,
1994 U.S.Dist. LEXIS 16658, at *3-16 (N.D.Ill. Nov.
15, 1994). The second motion arose in a separate
state action brought on behalf of ultimate consumers
from Alabama. Certification was denied because
these plaintiffs, unlike the pharmacies in their suit,
failed to make a showing of injury and damages on a
classwide basis. For that reason it was held that
common issues did not predominate. *Id.* at *17-19.

Faced with the same issue against most of the same
defendants, a lower court in California granted
certification to a class composed of ultimate
consumers. Its force as persuasive authority is
weakened, however, because it rests entirely on
ultimate conclusions of commonality and
predominance without a reasoned basis of support.
*Preciado v. Abbott Laboratories,* No. 962294 (San
Francisco Super.Ct.Calif Aug. 16, 1996) (order
certifying consumer class).

### Predominance of Common v. Individual Issues

Plaintiff advances an array of cases to support the
proposition that in a horizontal, price-fixing case the
conspiracy is treated as the common and predominant
issue for class-certification purposes. But those
cases with facts sufficient to permit analysis, show
them to be direct-purchaser cases. [FN7]

> FN7. *In re Aluminum Phosphide Antitrust
> Litigation.* [1995-2 TRADE CASES ¶
> 71,209], 160 F.R.D. 609 (D.Kan.1995); *In
> re Potash Antitrust Litig.* [1995-1 TRADE
> CASES ¶ 70,885], 159 F.R.D. 682
> (D.Minn.1995); *In re Catfish Antitrust Litig.*
> [1993-2 TRADE CASES ¶ 70,395], 826
> F.Supp. 1019 (N.D.Miss.1993); *Coleman v.
> Cannon Oil Co.,* 141 F.R.D. 516
> (M.D.Ala.1992); *In re Infant Formula
> Antitrust Litig.,* No. MDL 878, 1992 WL
> 503465 (N.D.Fla. Jan. 13, 1992); *In re
> Domestic Air Transportation Antitrust Litig.*
> [1991-2 TRADE CASES ¶ 69,518], 137
> F.R.D. 677 (N.D.Ga.1991); *New York v.*

> *Salem Sanitary Carting Corp.,* No. CV-85-
> 0208, 1989 WL 86997 (E.D.N.Y. July 24,
> 1989). In support of *In re Amino Acid
> Lysine Antitrust Litig.,* No. 95-C-7679
> (N.D.Ill. Feb. 15, 1996) (granting
> certification), plaintiff submits the transcript
> of the oral hearing on class certification.
> Although the court delivered its views, the
> underlying facts are obscure and do not
> reveal whether the purchaser was in privity.

**\*5** Defendants advance a line of authorities in
indirect-purchaser cases which reject certification.
But these cases mostly turn on circumstances where
the proof was not common to the putative class.
[FN8]

> FN8. *E.g., In re Coordinated Pretrial
> Proceedings in Petroleum Products
> Antitrust Litig.,* [1982-83 TRADE CASES ¶
> 65,028], 691 F.2d 1335 (9th Cir.1982), *cert.
> den.,* 464 U.S. 1068 (1984); *Borden, Inc. v.
> Universal Indus. Corp.* [1981-1 TRADE
> CASES ¶ 63,896], 88 F.R.D. 708
> (N.D.Miss.1981); *Keating v. Phillip Morris,
> Inc.* [1987-2 TRADE CASES ¶ 67,801],
> 417 N.W.2d 132 (Minn.Ct.App.1987).

It is evident that when the class-action remedy
intersects price-fixing litigation, the conflict between
the philosophies of the majority and dissenting
opinions in *Illinois Brick is* sharpened. If we disdain
the expert's theories, as does the majority, and
demand the singular facts involving the particular
individuals in the specific context of their market, the
class action is virtually doomed in indirect-purchaser
cases. But if we assume the commission of a wrong
that has resulted in some injury, albeit one difficult to
measure, the allowance of "reasoned estimation" and
"approximation," as postulated by the expert is not
without appeal. The approach is especially
persuasive where the wrongdoer's action has itself
created the difficulty in proving damages with
certainty. *Bigelow v. RKO Radio Pictures, Inc.*
[1946-1947 TRADE CASES ¶ 57,445], 327 U.S.
251, 264- 265 (1946). *The Illinois Brick* dissent
opens the way for admission of the expert's formulae
to measure the overcharge and successive pass-ons,
thus establishing injury and damages on a classwide
basis. Common questions of fact are thereby
increased and individual questions correspondingly
reduced.

Classwide formulae have been allowed after all to
prove injury and damages in class actions involving

direct purchasers. *E.g., In re Fine Paper Antitrust Litig.* [1979-1 TRADE CASES ¶ 62.551], 82 F.R.D. 143, 154 (E.D.Pa.1979), *aff'd* [1982-2 TRADE CASES ¶ 64,843], 685 F.2d 810 (3d Cir.1982), *cert. den.* 459 U.S. 1156 (1983); *In re Domestic Air Transportation Antitrust Litig.* 137 F.R.D. at 691; *Transamerican Refining Corp. v. Dravo Corp.* [1990-1 TRADE CASES ¶ 68,919], 130 F.R.D. 70. 76 (S.D.Tex.1990). And in the MDL litigation involving our defendants, Judge Korcoas certified a direct-purchaser class after recognizing the "number of different methodologies that can be used in proving damages and injury on a classwide basis." *Brand Name Prescription Drugs,* 1994 U.S.Dist. LEXIS 16658, at *13.

Again we are spared the difficulty of choosing, for the legislature in opting for the indirect-purchaser remedy also focused upon class actions and classwide proof.

### The Legislative Gloss on Class Actions

Section 28-4508 of the D.C.Code provides remedies for private parties injured by violations of the District of Columbia Antitrust Act. As respects class actions, the legislature explicitly sanctioned, in section 28-4508(c), the use of common or classwide proof of injury to the class as a whole as well as to its members individually:

> In any class action brought under this section by purchasers or sellers, the fact of injury and the amount of damages sustained by members of the class may be proven on a class-wide basis, without requiring proof of such matters by each individual member of the class. The percentage of total damages attributable to a member of such class shall be the same as the ratio of such member's purchases or sales to the purchases or sales of the class as a whole.

*6 In this manner has the expert and his formulae gained sway as Mr. Justice Brennan contemplated. [FN9]

> FN9. Our legislature, in so acting, was following respected authority. See *Newberg on Class Actions,* § § 10.06, 10.07 (3d ed. 1992) and cases collected therein.

Defendants seek to negate this legislative allowance of classwide proof by arguing that it is in conflict with the requirement of section 28-4509(a), that the indirect purchaser individually prove "payment of all or any part of any overcharge" in order to be deemed "injured." The two provisions mesh perfectly,

however. To sue, the plaintiff must be "injured" and section 28-4509(a) provides that upon proof of "payment of all or any part of any overcharge," the indirect purchaser is "deemed to be injured within the meaning of this chapter." Having told us who is injured, the legislature then deals in section 28-4508(c) with the proof and measure of damages when the injured person is a member of a class. Class damages may be reckoned on a classwide basis and the individual member, who has qualified as "injured" under section 28-4509(a), is allowed individual damages under section 28- 4508(c) pursuant to the "ratio" payout specified in that section.

While not dispelling *Illinois Brick's* skepticism of experts, section 28- 4508(c) does mitigate the majority's apprehension of a plethora of mini-trials on injury and damages by sanctioning classwide proof. But statutory sanctioning of classwide proof does not by itself make the problem go away. The requirements of Rule 23(a) and (b) must still be satisfied.

### The Scope of Our Question

Two limiting circumstances should be noted before we deal with the common *vis a vis* individual questions presented here:
(1) Because summary judgment in the MDL litigation effectively eliminated wholesalers from the distribution chain as being captives of the defendants-manufactures, we have only one intermediate tier (*i.e.,* the retail pharmacy) between the manufacturer and the ultimate consumer, the putative class member. Accordingly, only one pass-on must be scrutinized as distinguished from two in *Illinois Brick.* The effect of this contraction of issues is to lessen the individual issues within the contemplation of Rule 23 that would otherwise be spawned by this dispute.
(2) The ultimate consumer, at least in one respect, presents an easier question as a plaintiff than a middleman, indirect purchaser. The ultimate consumer has no one to pass on to and there are no damages other than the overcharge he suffers. But the middleman, even though passing on the overcharge in whole or in part, may yet demand additional damages on the theory that his sales were reduced by the increased prices. See *Illinois Brick,* 431 U.S. 733 n. 13.

Indirect-purchaser cases that do not present these limiting factors may present more difficult and intractable circumstances for class-action treatment

than our case at bar. But more significantly, the nature of the classwide proof presented impacts significantly on certifiability.

We should also clear at the threshold defendants' argument that no injury can accrue to the class on account of any conspiracy because retail pharmacies, unlike managed care organizations, do not possess sufficient market-share power to command price discounts. Therefore, the theory goes, the prices to the pharmacies would remain unchanged regardless of any alleged conspiracy. Same argument was advanced and rejected in the MDL litigation on the summary judgment motion. I find the reasons supporting denial of the motion in the MDL case, *Brand Name Prescription Drugs, 1996 WL 167350, at *13, 15,* entirely persuasive here.

**The Proffered Classwide Proof**

*7 Plaintiff's expert economist, Dr. Michael J. Sattinger, has advanced by affidavit various econometric methodologies for measuring the overcharge and the extent to which retailers passed it on. This would permit, if accepted, common proof to establish injury and damage to the putative class. His opinions and methodologies have been subjected to extensive cross-examination by deposition and they are heavily attacked. [FN10]

> FN10. Defendants' attack overreaches the deposition transcript in a number of instances. For example, the claim that Dr. Sattinger was unable to rate the accuracy of any of his proposed methodologies in reflecting individual damages (Defendants' Memorandum of Law at 36) turns out to be an inability at the time of deposition to *comparatively rank* the various formulae according to their respective accuracy in reflecting individual damages (Sattinger Dep., 1135-1136), not a failure of any formula to fairly approximate damages. He is also said to have admitted that one of his constructs used in the MDL case "doesn't necessarily tell you 'what the price would be absent the conspiracy.' " (Defendants' Memorandum of Law at 34). The cited deposition page (165) does not support the proposition. Even had the witness so testified, admissibility would not be impaired. A construct or formula is not required to "necessarily" prove a conclusion. Probability is sufficient.

I am not, however, permitted to assess the persuasive force of plaintiff's expert compared to defendant's expert, Dr. Edward A. Snyder. Nor may I determine whether, in a bench trial, I would credit Dr. Sattinger's opinions and methodologies. The question, instead, is whether they are sufficiently colorable to merit jury consideration. *In re Disposable Contact Lens Antitrust Litig.,* No. MDL 1080, slip op. at 12 (M.D.Fla. Sept. 5, 1996) (A "colorable method of proving impact" or injury is sufficient for certification purposes.); *In re Potash Antitrust Litig.* [1995-1 TRADE CASES ¶ 70,885], 159 F.R.D. 682, 697 (D.Minn.1995) ("Without trenching on the merits, in considering a class certification motion, a court must consider only whether plaintiffs have made a threshold showing 'that what proof they will offer will be sufficiently generalized in nature that ... the class action will provide a tremendous savings of time and effort.' "); *See* 7B Charles Wright, *Et Al.,* FEDERAL PRACTICE & PROCEDURE § 1718 at 7-8 (1986). While class-action certification often involves analytical entanglement with the merits, *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 469 n. 12 (1978), it does not permit nitpicking testimony to determine who "will prevail on the merits." *Eisen v. Carlisle & Jacqueline* [1974-1 TRADE CASES ¶ 75,082], 417 U.S. 156, 178 (1974).

The threshold showing here is more than sufficient. Dr. Sattinger's theorems on quantification of an overcharge were accepted in the MDL litigation. *Brand Name Prescription Drugs,* 1994 U.S.Dist. Lexis 16658, at *13. The remainder of his testimony dealing with the pass-on is corroborated *a fortiori* by four experts engaged by five of the defendants in the MDL litigation. They self-servingly opined, as respects the Robinson-Patman Act price discrimination claims also presented there, that 100 percent of any overcharge was in fact passed on by the retailers. Dr. Sattinger's affidavit postulates only a 50 percent pass-on. The literature is also supportive. "[I]ndirect purchasers virtually always can legitimately claim to have suffered overcharge harm as a result of a successful price fixing conspiracy." SECTION OF ANTITRUST LAW, A.B.A., PROVING ANTITRUST DAMAGES; LEGAL AND ECONOMIC ISSUES 184 (1996). [FN11]

> FN11. *See also,* Harris and Sullivan, *Passing on the Monopoly Overcharge: A Comprehensive Policy Analysis,* 128 U.Pa.L.Rev. 269, 289-290 (1979); Elmer J. Schaefer, *Passing-On Theory in Antitrust*

1997 WL 156541 (D.C.Super.), 1997-1 Trade Cases P 71,730
**(Cite as: 1997 WL 156541 (D.C.Super.))**

> *Treble Damages Actions: An Economic and
> Legal Analysis,* 16 Wm. & Mary L.Rev.
> 883, 897 (1975); Cynthia U. Kassis, *The
> Indirect Purchaser's Right to Sue Under
> Section 4 of the Clayton Act: Another
> Congressional Response to Illinois Brick,* 32
> Am.U.L.Rev. 1087 n. 2 (1983).

  The proffered testimony here on classwide injury
and damages distinguishes our case from the
Alabama indirect-purchaser case where, in denying
certification, Judge Kocoras noted that plaintiffs
"have failed to show that they can establish the fact
of injury and damages through common proof on a
class-wide basis." *Brand Name Prescription Drugs,*
1994 U.S.Dist. LEXIS 16658, at *17- 18.

  *8 Defendants argue that Dr. Sattinger's formulaic
approach to injury and damages is a crude effort to
get at individual loss.  But the concept is sanctioned
by section 28-4508(c) and defendants, while hinting
at constitutional difficulties, conspicuously stop short
of attacking it.    It is hard to view the statutory
concept (which adopted Mr. Justice Brennan's
dissent) as being more crude and unfair in a case like
this than the doctrine of the *Illinois Brick* majority,
which permits a full recovery to an unharmed, direct
purchaser while denying the real victim, the indirect
purchaser, any relief at all.    Moreover, in terms of
fair enforcement of the antitrust laws, it sounds
hollow for the alleged wrongdoer, while striking only
a glancing blow against classwide damages, to
champion the rights of the individual consumer by
arguing vigorously that his damages have not been
accurately reckoned.

  Nor am I impressed at this stage with the alarms of
insuperable complexities that will follow class
certification.    We are told there are 800 different
drugs, thousands of retail outlets and tens of
thousands of ultimate consumers with a myriad of
health plans involved here.    If analyzed on a drug-
by-drug, retailer-by-retailer and consumer-by-
consumer basis, it is claimed that the class action
would be overwhelmed with individual questions.
The argument is a variation, albeit a significant one,
on a theme often raised and rejected in direct-
purchaser cases where there is a colorable, expert
approach to a classwide assessment of injury and
damages. [FN12] The variation presented here is our
putative class of indirect purchasers.  This opens the
door to the pass-on puzzle.        But our statutes
authorizing indirect purchaser suits (§  28-4509(a))
and classwide proof of injury and damages (§  28-
4508(c)) mandate that we be solicitous to the class-

action remedy if it is otherwise in conformity with
Rule 23 and is manageable.    And although we are
trading up to the question of pass-on, we are rid of
the middleman's consequential damage claims
stemming from the assertion that, although the
overcharge was passed on in whole or in part, sales
and profits were lost because of higher costs.

> FN12. *E.g., Brand Name Prescription
> Drugs,* 1994 U.S.Dist. LEXIS 16658, at
> *11-12; *In re Potash,* 159 F.R.D. at 694-
> 695, 697; *In re Carbon Dioxide Antitrust
> Litigation* [1993-1 TRADE CASES ¶
> 70,230], 149 F.R.D. 229, 233-234
> (M.D.Fla.1993); *In re Domestic Air
> Transportation Litig.,* 137 F.R.D. at 689,
> 693-694; *In re Wirebound Boxes Antitrust
> Litig.* [1989-2 TRADE CASES ¶ 68,818],
> 128 F.R.D. 268, 271-272 (D.Minn.1989); *In
> re South Central States Bakery Products
> Antitrust Litig.,* 86 F.R.D. 407, 419, 420-423
> (M.D.La.1980); *In re Fine Paper,* 82 F.R.D.
> at 147, 151-152; *In re Corrugated
> Container Antitrust Litig.* [1978-2 TRADE
> CASES ¶ 62,220], 80 F.R.D. 244, 246, 249,
> 250 (S.D.Tex.1978).

  There is yet, however, another substantial obstacle
to the class-action remedy or, at least, to the
composition of the class as proffered.

**The Collateral Source Issue**

  Defendants point to the fact that third parties or
collateral sources often pay directly, or reimburse the
consumer, for drugs purchased at retail pharmacies.
Among such collateral sources are insurance
companies, managed care plans and medicaid.
Depending upon the contract or arrangement, there
may be no "injury" within the contemplation of the
antitrust laws, it is argued.  Indeed, some members
of the applicant class may belong to health care
organizations who are favored by the discount denied
to retail pharmacies.      In such cases, defendants
contend, the consumer has no valid complaint.

  The gravamen of plaintiff's claim is the passing on of
the conspiratorial overcharge.    Without the passing
on the consumer is not injured.      Clearly, HMO
members who are permitted to buy from designated
pharmacies are not injured within the contemplation
of section 28-4509(a) if the pharmacy effectively
absorbs the overcharge (either by moderating the
prices charged to members or by rebating to the
HMO).      Medicaid recipients are also uninjured

consumers. Federal law requires that manufacturers of brand name prescription drugs give the D.C. Medicaid program the "best price" provided to any private buyer or a 15 percent discount, whichever is greater. 42 U.S.C. § 1396r-8 (1994). Accordingly, to be excluded from any class are consumers in those two categories: (1) Medicaid recipients; and (2) Members of health plans which, by dint of their economic clout, oblige independent pharmacies to absorb any overcharge.

*9 Other collateral-source arrangements require further examination, however. No case has been cited dealing with collateral contributions in the context of antitrust injury. But we must regard *Hudson v. Lazarus*, 95 U.S.App.D.C. 16, 217 F.2d 344 (1954), even though it is based in the law of personal injury. *Hudson* decided that

> an injured person may usually recover in full from a wrongdoer regardless of anything he may get from a "collateral source" unconnected with the wrongdoer.... [T]he interests of society are likely to be better served if the injured person is benefited than if the wrongdoer is benefited.

*Id.* at 18-19, 217 F.2d at 346. Applied strictly to this case, an injured consumer would be entitled to a full recovery notwithstanding his health care contract.

It is true, as defendants argue, that a consumer with a managed care plan or insurance policy calling upon him to make a fixed co-payment feels no pinch when drug companies hike prices and the retailers pass-on to the plan or the carrier. But there is nevertheless an injury as a result of a wrong. True it is that the injury is absorbed by the managed care plan or an insurance company, but they were paid to do so by the consumer-beneficiary who paid the premiums directly or indirectly through his employer. There is no reason why a wrongdoer should gain because his target has paid for coverage either through his dollars or through his labors for his employer. [FN13] In that sense he may be regarded as injured and as stated in *Hudson*, it is better here to benefit the injured than the wrongdoer. The rationale is more appealing where the wrong is not mere negligence that usually harms only one person but a deliberate conspiracy that harms many. Effective enforcement of the antitrust laws is thus promoted.

> FN13. To the argument that the consumer with fixed copayments has gotten what he bargained for, fixed costs without the risk of enhanced prices, it may be said that this artful rationale is one of the analgesics that permits escalating costs in health care. In any event, the predictable result is that, although copayments and/or premiums may be stabilized for one year, they will surely rise in the next to the detriment of the consumer/beneficiary.

We must not confuse the rights of the consumer as against a wrongdoer with the consumer's rights against his collateral source. While the manufacturer may be liable to the consumer, the insurance company or managed care plan may be entitled to indemnification from him, as would certainly be the case in subrogation. The latter circumstance can be addressed if and when we reach it in the administrative phase of these proceedings.

Nevertheless, problems involving collateral source are such that they deserve special and separate treatment. While insurance policies that simply provide for reimbursement of the insured's directly incurred expenses do no appear to present the complications of managed care plans, the better course at this time is to reserve them for separate scrutiny.

**Subclass Certification**

Aided as I am (1) by this jurisdiction's legislation and (2) finding as I do that plaintiff's methodologies on overcharge and pass-on permit common proof of injury and damages sufficient to merit injury consideration, I conclude that the common questions of law and fact do predominate over individual questions. The residual requirement of Rule 23(b)(3), that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy," is not genuinely contested. There is in practical terms no alternative remedy since the individual stakes in independent actions are no doubt insufficient to justify the costs. Accordingly, the class action remedy is the only remedy available.

*10 I am mindful of defendants' argument that class-action certification and a single trial would "permit only proof common to the class ... [and] prevent the defendants from explaining, on a consumer-by-consumer, drug-by-drug, and retailer-by-retailer basis, why many individual consumers have no claim, why many individual consumers would be compensated who (even under plaintiff's own theory) were never injured at all and why many others would be overcompensated for any claimed damage." (Defendants' Memorandum of Law at 6). The point has merit but is exaggerated.

Not Reported in A.
1997 WL 156541 (D.C.Super.), 1997-1 Trade Cases  P 71,730
(Cite as: 1997 WL 156541 (D.C.Super.))

To the extent that these three subject matters of alleged preclusion implicate collateral contributions, the questions are issues of law upon which the court will rule. Those rulings will control individual entitlements. The first matter, that "many individuals have no claim," is unclear. If defendants mean that they will not be able to challenge pass-on in whole or in part, they are mistaken. Nor will they be confined strictly to common proof. If the theorems propounded by the class skew individual damages so far that aggregate damages are in doubt or otherwise suspect, the jury would be entitled to weigh this in determining whether to adopt the methodology advanced by the class. [FN14] Rule 23(b) does not foreclose the trial of individual issues in a class action suit. It merely requires that the common issues predominate.

> FN14. The latitude allowed for such evidence is obviously a matter of trial court discretion.

As stated, there will be excluded from certification (1) medicare beneficiaries and (2) persons with managed care programs whose brand-name-prescription-drug benefits are such that they negate any pass-on. [FN15]

> FN15. The class certified in *Preciado* excluded persons who did not purchase from an independent retail pharmacy.

Accordingly, this case will go forward as a class action but structured in subclasses pursuant to Rule 23(c)(4). The first subclass will consist of consumers who are without collateral source benefits. The second subclass will consist of those who have unexcluded, collateral source benefits. Questions of individual entitlement will, should plaintiffs prevail, be left to the administrative stage subject to determination according to standards of law established by the court. The ratio formula of section 28-4508(c) will assist in the resolution of these matters. Collateral source problems will also be sorted out at this stage as well as problems involving individual mitigation of damages. Recourse to special masters pursuant to Rule 53 may also be helpful.

Whether the complexities of this case are ultimately susceptible to class action treatment is yet unclear. Certification, according to Rule 23(c)(1), "may be conditional and may be altered or amended before the decision on the merits." This power will be exercised as the exigencies require.

**Conclusion**

As our economy becomes more complex, technologically sophisticated and global, it continues to test the adequacy of the judicial process. The genius of our jurisprudence has always been its creative powers to adapt to the imperatives of our times. [FN16] Our legislature has taken the lead in this antitrust area with bold legislation endowing old remedies with new concepts and dimensions. The courts should not be found wanting where the subject matter at bar is *prima facie* manageable, as it is here.

> FN16. The metamorphic nature of the law has not abated. Its continuing vitality is attested to in cases like *Sindell v. Abbott Laboratories,* 26 Cal.3d 588, 607 P.2d 924 (1980), *cert. den.* 449 U.S. 912 (1980) (espousing the theory of "market share liability" in limited circumstances) and *Anderson v. Somberg,* 67 N.J. 291, 338 A.2d 1 (1975), *cert. den.,* 423 U.S. 929 (1975) (endorsing the theory of "alternative liability" in appropriate circumstances).

*11 Plaintiff is to submit within fourteen days an order which includes a restructuring of the class in conformity with this Opinion. Plaintiff should also submit within the same time pertid an order providing notice pursuant to Rule 23(c)(2) and setting forth, *inter alia,* the proposed notice, the means of notice and provision for the payment of costs.

SO ORDERED.

1997 WL 156541 (D.C.Super.), 1997-1 Trade Cases P 71,730

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# TAB D-8

Not Reported in N.W.2d                                                    Page 1
2001 WL 366432 (Minn.Dist.Ct.), 2001-1 Trade Cases P 73,254
(Cite as: 2001 WL 366432 (Minn.Dist.Ct.))

▷
Related Andrews Newsletter Articles

District Court of Minnesota.

Daniel GORDON, Brandon Welter, David Ellingson,
Kari A. Wallace, on behalf of
themselves and all others similarly situated,
Plaintiffs,
v.
MICROSOFT CORPORATION, Defendant.

**No. 00-5994.**

March 30, 2001.

ORDER GRANTING CLASS CERTIFICATION
AND MEMORANDUM

PETERSON, J.

*1 The above entitled matter came on for hearing
before the Honorable Bruce A. Peterson on February
5, 2001, on Plaintiffs' Motion for Class Certification.

Richard M. Hagstrom and Thomas M. Sobol
appeared on behalf of Plaintiffs.

David B. Tulchin appeared on behalf of Defendant.

Based on all the files, records, pleadings,
submissions and arguments of counsel, it is hereby
ORDERED:

1. Plaintiffs' Motion for Class Certification is
GRANTED.

2. The class period is May 18, 1994 to the present.
The class will consist of:
All persons or entities who acquired for their own
use, and not for further selling, leasing or licensing,
a license in Minnesota from Microsoft, an agent of
Microsoft, or an entity under Microsoft's control,
for an Intel-compatible PC version of MS-DOS,
Windows 95, upgrades to higher MS-DOS
versions, upgrades to or of Windows 95, Windows
98, upgrades to or of Windows 98, or other
software products in which MS-DOS or Windows
has been incorporated in full or part ("Microsoft
Operating System Software") at any time during

the Class Period ("Windows Operating Software
Class").

3. The attached memorandum is hereby incorporated
into this Order.

MEMORANDUM

Defendant contends the pricing and distribution
system for Microsoft Operating System software is
too complex to determine antitrust damages for a
class of Minnesota consumers. Because the
Minnesota Legislature intended such consumers to
have a remedy for antitrust violations, because there
is no realistic alternative to a class action, and
because Plaintiffs have proposed a methodology that,
while hotly disputed, at least appears at this
preliminary stage adequate for use at trial, the court
certifies the class.

Facts and Procedural History

Plaintiffs [FN1] seek certification of a class
composed of Minnesota indirect purchasers of
Microsoft Windows or MS-DOS operating software
("Microsoft OS"). Defendant in this matter
manufactures Microsoft OS, which is the software
that runs personal computers ("PCs").

> FN1. The Complaint dated April 28, 2000
> named Daniel Gordon as Plaintiff and others
> similarly situated as the "Windows
> Operating Software Class." An Amended
> Complaint was filed on January 23, 2001,
> naming Daniel Gordon, Brandon Welter,
> David Ellingson and Kari Wallace as
> Plaintiffs. The Amended Complaint contains
> additional facts, as well as an additional
> class, the "Windows Application Software
> Class." The motion now before the court
> concerns only certification of the first class,
> the "Windows Operating Software Class."
> The court will consider the facts described
> in the Amended Complaint as applied to the
> Plaintiffs listed therein.

Defendant's products may reach the consumer in a
variety of ways. In some instances, the consumer
buys the "full packaged product," a shrink wrapped
package containing Microsoft OS. The product may
have been sold by Defendant directly to a vendor (a
store such as Best Buy or CompUSA), or the product

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d
2001 WL 366432 (Minn.Dist.Ct.), 2001-1 Trade Cases P 73,254
**(Cite as: 2001 WL 366432 (Minn.Dist.Ct.))**

may have moved through an intermediate distributor before reaching the store shelf. A different chain of distribution provides educational institutions, students and faculty members with academic editions of the product. Defendant also licenses copies of Microsoft OS programs to manufactures of PCs ("original equipment manufacturers" or "OEMs") who install the software and then sell the PCs to consumers for a single price. Plaintiffs assert that a monopoly overcharge to each of the direct purchasers has been passed on to consumers, including members of the proposed class.

Plaintiffs allege that Defendant established a monopoly in the market for operating software through various anticompetitive acts and has maintained that monopoly since the late 1980s. According to Plaintiffs, Defendant has used its monopoly power to stifle innovation in the market and overcharge consumers. Plaintiffs claim the Defendant's actions have eliminated competition in the market for similar operating system software, deprived purchasers of the benefits of a free market, and injured consumers by forcing them to purchase Microsoft OS at artificially high and non-competitive prices in violation of the Minnesota Antitrust Law.

**\*2** Although indirect purchasers such as Plaintiffs are barred from making claims under federal antitrust laws, see *Illinois Brick Co. v. Illinois,* 431 U.S. 720 (1977), Minnesota antitrust law expressly provides damages for indirect purchasers injured by antitrust violations. Minn. State. § 325D.57. No special provision regulates such suits brought as class actions, however, suits filed under the antitrust law as class actions must meet all requirements for class certification specified by the Minnesota Rules of Civil Procedure and relevant case law. To date, apparently no Minnesota court has certified a class of indirect purchasers.

### Analysis

In order to proceed as a class action, Plaintiffs must meet all four prerequisites of Rule 23.01 and one of the three requirements of Rule 23.02 of the Minnesota Rules of Civil Procedure.

#### I. Rule 23.01 Requirements

Minnesota Rule of Civil Procedure 23.01 requires a finding that:
  (a) the class is so numerous that joinder of all members is impracticable;
  (b) there are questions of law or fact common to

the class;
  (c) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
  (d) the representative parties will fairly and adequately protect the interest of the class.
 Plaintiffs contend that the four factors enumerated above (numerosity, commonality, typicality and adequacy) are easily met in this case because:
  1) the class of persons or entities that purchased Microsoft OS from various sources is a class too numerous to make joinder practicable;
  2) the questions of whether Defendant is a monopolist in the market for operating system software, whether Defendant engaged in anticompetitive conduct in order to unlawfully maintain its monopoly, whether the alleged conduct violated the Minnesota Antitrust Law, the impact of Defendant's activity in the relevant market, and whether Defendant's conduct caused harm to the class are common to every member of class;
  3) Plaintiffs' claims are typical of the claims of the class, even if the amount of damages is variable; and
  4) the representative parties' interests are not in conflict with the class and Plaintiffs' lawyers are adequate to defend the interests of the class.
 Defendant offers no argument on these issues and this court finds that Plaintiffs have met their burden under Rule 23.01.

#### II. Rule 23.02(c) Requirements

Minnesota Rule of Civil Procedure 23.02 requires that Plaintiffs also meet one of three additional requirements. Plaintiffs argue that they have met the requirement of Rule 23.02(c) that "questions of law or fact common to the members of the class predominate over questions affecting only individual members of the class, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." The rule instructs the court to consider:
  1) the interest of members of the class in individually controlling the prosecution or defense of separate actions;
  **\*3** 2) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;
  3) the desirability or undesirability of appropriateness of concentrating the litigation of the claims in the particular forum; and
  4) the difficulties likely to be encountered in the management of a class action.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

2001 WL 366432 (Minn.Dist.Ct.), 2001-1 Trade Cases P 73,254
(Cite as: 2001 WL 366432 (Minn.Dist.Ct.))

Id. See also *Streich v. American Family Mut. Auto. Ins. Co.,* 399 N.W.2d 210, 218 (Minn.App.1987) ("in determining whether a class action is appropriate, factors to consider include manageability, fairness, efficiency and available alternatives").

A. Predominance

Private antitrust liability requires a showing of (1) a violation of the antitrust laws, (2) the fact of damage, and (3) some indication of the amount of damage. See *Keating v. Phillip Morris, Inc.,* 417 N.W.2d. 132, 137 (Minn.App.1987). Plaintiffs assert that the following questions of fact or law common to all member of the proposed class predominate:

1) whether Defendant is a monopolist in the market for operating system software,

2) whether Defendant engaged in anticompetitive conduct in order to unlawfully maintain its monopoly,

3) whether the alleged conduct violated the Minnesota Antitrust Law,

4) the impact of Defendant's activity in the relevant market, and

5) whether Defendant's conduct caused harm.

Defendant argues that common questions do not predominate because Plaintiffs will not be able to prove class-wide injury and because damages will have to be determined on a case by case basis, necessitating many mini-trials.

An issue will meet the predominance standard "when there exists generalized evidence that proves or disproves [an] element on a simultaneous, class-wide basis. Such proof obviates the need to examine each class member's individual position." *In Re Industrial Gas,* 100 F.R.D. 280, 288 (N.D.Ill.1983). The mere existence of individual damage questions does not automatically preclude satisfaction of the predominance requirement; the total amount of time spent on a common issue compared to time spent on individual issues is immaterial, so long as some common proof is used to demonstrate adequately some damages to each plaintiff. See *In Re Alcoholic Beverages,* 95 F.R.D. 321, 327 (E.D.N.Y.1982); *In Re South Central Bakery Products,* 86 F.R.D. 407, 419 (M.D.La.1980). In this case it is readily apparent that Plaintiffs will present common proof on the class-wide issues of whether Defendant created a monopoly, whether it did so through illegal means, whether its conduct violated state law, and the impact of its conduct on the market.

The court recognizes the inherent complexities in determining fact of class-wide injury and amount of

individual damages in an indirect purchaser class action, but agrees with the federal court that "complexity does not mean the issue of conspiracy does not predominate." *In Re Workers Compensation,* 130 F.R.D. 99, 108 (D.Minn.1990). In enforcing various trade regulation statutes, Minnesota courts have construed remedial statutes broadly and rejected arguments based on complexity alone. See *Group Health Plan, Inc. v. Phillip Morris, Inc.,* WL 25889 (Minn.2001); *Gilchrist v. Perl,* 387 N.W.2d 412 (Minn.1986); *Streich v. American Family Mut. Ins. Co.,* 399 N.W.2d 210 (Minn.Ct.App.1987). In *Group Health,* for example, the Minnesota Supreme Court rejected holdings in *Thompson v. American Tobacco Co.,* 189 F.R.D. 544 (D.Minn.1999) and *Parkhill v. Minnesota Mut. Life Ins. Co.,* 188 F.R.D. 332 (D.Minn.1999), both of which initially denied class certification on the basis that individualized proof of reliance predominated over common questions of law or fact. WL 25889 at *2. While this court must address problems of proving class-wide injury and amount of individual damages in considering the superiority requirement, this court concludes that questions of law or fact common to all class members here predominate over questions affecting individuals.

B. Superiority

*4 In order to certify a class, the second prong of Rule 23.02(c) requires that the court find that class action "is superior to other available methods for the fair and efficient adjudication of the controversy."

1. Prior Cases

Defendant asserts that a class action is not a superior method of adjudication, relying heavily on the fact that since the Minnesota legislature amended Minn.Stat. § 325D.57 in 1984 to permit indirect purchasers to sue for antitrust damages, Minnesota courts have denied class certification motions because of manageability in five indirect purchaser cases.

Despite the consistency of prior decisions, certainly no established rule exists in Minnesota against certification of indirect purchaser classes. Along with California, Wisconsin, New Mexico, Michigan, Kansas, South Dakota, the District of Columbia, North Dakota and Maine, Minnesota has enacted legislation allowing indirect purchasers to recover damages in antitrust suits. According to the court in *State of Minnesota v. Phillip Morris Inc.,* 551 N.W.2d 490, 493 (1996), the state legislature intended

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

to broadly confer standing for indirect purchasers
when it enacted the statute. The court opined that the
broad statutory grant of standing was a direct
response to the United States Supreme Court's ruling
in *Illinois Brick Co. v. Illinois* that indirect purchaser
plaintiffs could not use the pass-through theory to
establish injury. See 431 U.S. 720; see also *Keating
v. Phillip Morris, Inc., supra* 417 N.W.2d at 163
(stating that the Minnesota Antitrust Act was
amended "to allow a cause of action to indirect
purchasers ... The legislative history of this
amendment indicates that it was a direct response to
the *Illinois Brick* decision.").

Inferring a rule in Minnesota against indirect
purchaser classes in the face of the 1984 amendment
would be contrary to legislative intent. As a practical
matter, denying class certification usually constitutes
the functional dismissal of a consumer antitrust
lawsuit. Denying class certification based merely on
economic complexity would effectively abrogate the
indirect purchaser provision altogether, since
economic complexity is inherent in indirect purchaser
actions. In order to effectuate the Minnesota
Legislature's intent, standards for class certification
should be interpreted if at all possible in a fashion
that indirect purchasers can meet.

Closer analysis reveals that each of the five prior
cases differed materially from the case now before
the court, and that each denial was on narrow
grounds rather than pursuant to any general rule. In
*Keating v. Philip Morris, Inc.,* the owner of several
gas stations sued six of the largest cigarette
manufacturers in the country. *See* 417 N.W.2d. at
134. The cigarette companies sell to a vast number of
distributors, who in turn sell to retailers, such as the
gas stations, or to "subjobbers." The "subjobbers"
also sell to the retailers. The gas station owner moved
to certify a class of "[a]ll persons, corporations or
other entities in Minnesota ... who purchased
cigarettes manufactured by the Defendants ... for
resale to consumers" at monopolistic prices. Id. at
134.

*5 Cigarette retailers must frequently restock their
inventory. The plaintiff claimed damages from many
separate purchases at different prices of different
amounts of product from several defendants. See id.
Thus, the court found that in order to establish both
fact of injury and amount of individual damages,
"[t]he class action would quickly degenerate into
thousands and thousands of individual trials ." Id. at
137. The plaintiff failed to meet the burden of
predominance and manageability because "the

differences involved in each transaction preclude a
uniform method for calculating damages," and the
plaintiff failed to produce any "mathematical
calculations or formulae" to be used in determining
damages. Id. The instant case, by contrast, involves
only one Defendant, and presumably most Plaintiffs
purchased a small number of products on one or a
small number of occasions.

*City of St. Paul v. FMC Corp.,* WL 259683
(D.Minn.1990), involved an alleged conspiracy to fix
the prices of chlorine products used as disinfectants.
The City of St. Paul moved for certification of a class
of "all municipal corporations, school boards, cities
and towns, school boards, and commissions located
within the State ... that purchased chlorine and caustic
soda indirectly," from eleven chemical companies. Id.
at *1. The product was sold in cylinders of various
sizes. See id. For cylinders of the smaller sizes,
distributors had to repackage chlorine purchased
from the defendants. See id. Because of the toxic
nature of the product, substantial costs were added to
the product throughout the chain of distribution at
various stages, including inspection, testing, delivery
and maintenance. See id. Maintenance services often
formed a substantial portion of a package price, but
some of the purchasers of the largest cylinders
provided their own services and did not purchase
total packages. See id. The court found that common
questions did not predominate over individual
questions because "substantial value is added to the
chlorine at various points in the chain of
distribution," and the court "would have to examine
the circumstances of each class member individually
to determine whether that member [had] suffered an
overcharge." Id at *2.

The *City of St. Paul* court found that individual
factual issues predominated over common issues
because the plaintiff presented no method for proving
fact of injury on a class-wide basis. *See* Id. at *2.
Here, Plaintiffs have offered a method of proving fact
of class-wide injury that does not require examining
each class member's individual circumstances.
Because the plaintiff did not meet its burden of
proving predominance in *City of St. Paul,* the court
did not even address the superiority determination at
issue here.

The court in *Fischenich v. Abbott Laboratories, Inc.,
et al,* No. MC 94-6868 (Minn.Dist.Ct. May 26,
1995), denied a motion for class certification on the
grounds that upwards of 1,000,000 mini-trials would
be required to determine individual damages due to
lack of data. See id. at 5. The defendants

Not Reported in N.W.2d
2001 WL 366432 (Minn.Dist.Ct.), 2001-1 Trade Cases P 73,254
(Cite as: 2001 WL 366432 (Minn.Dist.Ct.))

manufactured infant formula sold in a variety of retail markets, including grocery stores, drug stores, mass merchandisers and convenience stores. See id. at 6. The parties agreed that the members of the proposed class lacked basic information about amount paid for the product, quantity of the product purchased, and dates of purchase. See id. at 5. Furthermore, the plaintiff's proposed method of calculation was based on unsubstantiated assumptions regarding pass-through and lowest retail prices, records of which did not exist during eight years of the proposed class period. See id. at 8.

*6 Consumers are much more likely to remember, and perhaps even to have a record of, when they purchased a computer than when they purchased baby food. For example, in his deposition Plaintiff Gordon stated when and where he bought his computer and for exactly how much. Although class members may recall fewer details about purchasing a shrink-wrapped product than a PC, there will still be far fewer purchases to reconstruct than the weekly or even daily purchases of infant formula.

In *Peridot, Inc. v. Kimberly-Clark Corporation, et al,* No. MC 94-6868 (Minn.Dist.Ct. May 26, 1995), ten manufacturers of commercial tissue products were sued by two commercial entities as indirect purchasers. The plaintiffs moved to certify the class of "business entities that purchased commercial tissue products from forty Minnesota distributors that purchased directly from defendant manufacturers." Id. at 4. The court held that "where evidence shows that defendants' alleged price-fixing action was not always 'passed on' to all putative class members ... proof of impact and damages as to each plaintiff becomes too individualized a task to make a class action feasible-- the class is unmanageable." Id. at 7, quoting *In re Alcoholic Beverages Litigation,* 1982-1 Trade Cas (CCH) ¶ 63, 783 (E.D.N.Y. Mar 11, 1982). The plaintiff's own expert admitted that he had "never before devised" the method for calculation he proposed and was "unaware of anyone else devising a model for calculating the amount of a price increase passed through to others in a distribution chain using his proposed economic methods.". Id. at 9. Unlike in *Peridot,* Plaintiffs' economic expert in this case has proposed a viable method for determining the amount of pass through that occurred to indirect purchasers during the proposed class period, as have a host of others.

Lastly, in *Kerr v. Abbott Laboratories,* WL 314419 (D.Minn.1997), the plaintiffs proposed to certify a class of "all person who purchased brand-name

prescription drugs from retail pharmacies in the State of Minnesota" sold by twenty-five manufacturers. Id. at *1. Although the plaintiffs offered several methods for class-wide computation of damages in the aggregate, no valid mathematical formula or calculation could be developed to determine individual damages. The court determined that a class action would be unmanageable because it involved "various brand-name drugs, from various retailers, at various times, under varying terms" necessitating "thousands of trials [to] examine thousands of transactions between thousands of retailers, wholesalers, distributors and manufacturers." Id.

In each of the prior cases, the court denied class certification because the plaintiff failed to propose a viable method for proving class-wide fact of injury (*City of St. Paul* ), amount of individual damages (*Fischenich, Kerr* ), or both (*Keating, Peridot* ). This case is different. One software manufacturer has been sued, rather than three infant formula manufacturers, six cigarette manufacturers, ten commercial tissue manufacturers, eleven chemical manufactures, or twenty-five prescription drug manufacturers. The lawsuit concerns only two basic products, Microsoft Windows and MS-DOS, rather than multiple brands of cigarettes, various forms of chlorine products, or all brand-name prescription drugs. In addition, Microsoft OS was usually purchased on only one or a small number of occasions, as opposed to the frequent and recurrent purchases of cigarettes, infant formula, drugs or chlorine products. Determination of amount of individual damages is more readily subject to calculation here than in these earlier cases, and, unlike in any of the other cases, Plaintiffs have actually produced a time-consuming but apparently workable method for calculating damages.

*7 Although Minnesota courts may have previously declined to certify a class of indirect purchasers, a number of other states that have implemented *Illinois Brick* repealer statutes like ours have certified classes of indirect purchasers in antitrust cases. See *Carlson v. Abbot Labs.,* No. 94- CV-002608 (Cir.Ct. Milwaukee Co., Wis. Mar. 23, 1995); see e.g. *K-S Pharmacies, Inc. v. Abbott Labs.,* No. 94 CV 2384 (slip op.)(Cir.Ct. Dane Co., Wis., May 17, 1996); *Lethbridge v. Johnson & Johnson,* Super Ct.No. BC 113271 (slip op.)(Cal.2d App.Dist. Nov.10, 1997); *Feitelberg v. Abbott Labs.,* No. 953865 (Cal.Super. Ct. San Francisco Co., June 23, 1995); *Preciado v. Abbott Labs.,* No. 962294 (Cal.Super. Ct. San Francisco Co., Aug. 16, 1995); *Robinson v. EMI Music Dist.,* WL 495551 (Cir.Ct.Tenn.1996); *Donelan v. Abbott Labs.,* No. 94 C 709 (Kan. Dist.

Not Reported in N.W.2d
2001 WL 366432 (Minn.Dist.Ct.), 2001-1 Trade Cases P 73,254
(Cite as: 2001 WL 366432 (Minn.Dist.Ct.))

Ct. Sedgwick Co., May 3, 1995); and *Hagemann v. Abbott Labs.,* Civ. No. 94-221 (S. Dakota Cir. Ct. Hughes Co., Nov. 21, 1995).

2. *Manageability*

An indirect purchaser class is legally plausible, but do the facts here establish superiority? Minnesota Rule of Civil Procedure 23.02(c) lists four factors "pertinent to [a] finding" of superiority. First the court must consider whether class members would pursue separate, individual actions. It is unlikely that proposed class members here would personally bring suit, considering the high cost and time commitment required and that individual recovery would be minimal. For the same reason, the second consideration for the court is moot: no individual litigation has been commenced at this point. The third factor is the suitability of the particular forum. The proposed class consists only of Minnesota residents, making this forum appropriate.

Defendant's argument against certification is based on the final factor, manageability, because proving fact of class-wide injury and the amount of damage to each indirect purchaser would require individual determinations. To maintain an antitrust suit as a class action, Plaintiffs must be able to establish a violation of antitrust law, the fact that injury occurred on a class-wide level as a result of the violation, and "some indication of the amount of damage." Keating v. Philip Morris, Inc., supra 417 N.W.2d at 137. However, common proof of the fact of injury "is possible without common damage amounts." *In Re Potash Antitrust Litigation,* 159 F.R.D. 682, 694 (D.Minn.1995). Fact of injury to each class member is an element of liability and must be shown with some certainty. See *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 563 (1931) and *Eastman Kodak Co. v. Southern Photo Materials Co.,* 273 U.S. 359, 379 (1927). The amount of individual damages, however, may be established by "just and reasonable inference," *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 264-66 (1946). Neither of these standards, of course, requires Plaintiffs to *prove* class-wide fact of injury or individual damages at the class certification stage. On the other hand, at this stage, Plaintiffs "cannot demonstrate common impact by simply *alleging* a price-fixing conspiracy." *Potash,* 159 F.R.D. at 695 (quoting *In Re Catfish Antitrust Litig.,* 826 F.Supp. 1019, 1039 (N.D.Miss.1993)). Instead, the court must determine whether Plaintiffs offer a viable method for determining class-wide impact and whether "a mechanical calculation is available," *In Re Antibiotic*

*Antitrust Actions,* 333 F.Supp. 278, 281 (S.D.N.Y.1971), for determining individual damage amounts.

**\*8** Defendant, citing *Washington Mutual Bank v. Superior Court of Orange County,* 24 Cal. 4 th 906, 103 Ca. Rptr.2d 320, 15 P.3d 1071 (2001), contends that Plaintiffs must show that common issues predominate "at the time of certification," Id. at 923, and certification cannot be granted based on "counsel's assurances of manageability." Id. at 924. In *Washington Mutual Bank,* a home mortgagor sued on behalf of a nationwide class, claiming that the bank had "charged excessive amounts for replacement hazard insurance when a mortgagor defaulted on the loan." Id. at 906. Because the deed securing the mortgage contained a choice of law clause mandating that both federal law and law of the state where the property was located governed, the California Supreme Court held that class certification should not have been granted before determining the effect of choice of law agreements. *See* Id. Not only are choice of law questions not a problem here, but the following discussion demonstrates that Plaintiffs have presented more than assurances of manageability.

a. *Fact of Class-wide Injury*

To prove harm to each class member, Plaintiffs must show that the price each member paid for Microsoft OS was higher than it would have been absent Defendant's illegal conduct. Plaintiffs must do this by establishing that Defendant's conduct increased prices paid by direct purchasers, and that some amount of this overcharge was passed on to the consumers.

Plaintiffs have offered testimony of Dr. Keith Leffler, an authority in the field of antitrust economics, that it is possible to establish fact of injury on a class-wide basis. Dr. Leffler describes "three yardstick methodologies that could be used to estimate Microsoft's overcharge to its buyers." [FN2] Leff. Supp. Aff. ¶ 23. One yardstick is a "comparison price from a comparable market that was not affected by the anticompetitive activity." Leff. Aff ¶ 10. The prices for Microsoft OS would be compared to those of "software sellers [that] encountered significant competition such as, for example, anti-virus software, money management software or fax software." Id. at ¶ 13. Prices in such competitive markets indicate what Microsoft OS prices would be with competition. See id. The second yardstick is "based on margins earned by sellers in a comparable market free from antitrust violations." Id

Case 1:05-cv-00360-SLR   Document 126-3   Filed 05/08/2006   Page 27 of 53

Not Reported in N.W.2d
2001 WL 366432 (Minn.Dist.Ct.), 2001-1 Trade Cases P 73,254
(Cite as: 2001 WL 366432 (Minn.Dist.Ct.))

Page 7

at ¶ 10. An estimation of the price Microsoft likely could have charged but for its monopoly can "be derived from assuming Microsoft would earn a competitive return, properly adjusted for risk, for its investments in product improvements undertaken to provide various versions and upgrades of the Microsoft operating systems." Id. at ¶ 17. Risk can be estimated from profit margins from an "average" software company facing competition. Leff. Supp. Aff. ¶ 28. The third yardstick requires measuring the "price in the market at issue during a period free from anticompetitive conduct." Leff. Aff. ¶ 10. Dr. Leffler proposes to evaluate prices for Microsoft OS in the late 1980s and early 1990s when DR DOS, a compatible alternative to MS-DOS, "had caused a 30-40% reduction in the price of MS-DOS." Id. at ¶ 18. After a "benchmark" price has been determined using one of these yardsticks, Dr. Leffler proposes to deduct the "benchmark" price from the actual price paid to determine the amount of overcharge to the direct purchasers. The strength and accuracy of Dr. Leffler's model cannot be determined here, but will be established upon application of the facts at trial. See *Zenith Radio Corp. v. Hazeltine Research Inc., 395 U.S. 100, 123-124 (1969).*

> FN2. Defendant criticizes the yardsticks, citing their "principal deficiency" to be "that none of them even attempts to deal with the enormous difficulties of showing how much (if any) of an initial claimed overcharge was passed on to the ultimate end users." Defendant's Memorandum at 35. There is some ambiguity as to whether Dr. Leffler proposes to use the yardsticks to measure overcharge to the direct purchasers or to establish the amount of overcharge passed through the chain of distribution to the consumer. When describing the Comparable Market Yardstick in his original Affidavit, Dr. Leffler mentions both "the price to end users," Leff. Aff. ¶ 14, and "Microsoft's operating system prices," id. at ¶ 15. Then he refers to "the overcharge by Microsoft," id. at ¶ 17, and "Microsoft overcharge," id. at ¶ 19, when discussing the other two yardsticks. However, Lefler's Supplemental Affidavit contains the language quoted in the text, indicating that the yardsticks are intended to measure overcharge to direct purchasers. Relying on Dr. Leffler's language describing the yardsticks as a measure of the overcharge to direct purchasers, the court addresses pass through as a separate issue discussed below.

**\*9** Consistent with Dr. Leffler's position, in *United States v. Microsoft,* 84 F.Supp.2d 9 (D.D.C.1999), Judge Jackson not only described an overcharge to direct purchasers but specified an amount. He called Microsoft's actions "indicative of monopoly power ... A Microsoft study from November of 1997 reveals that the company could have charged \$49 for an upgrade to Windows 98-there is no reason to believe that the \$49 price would have been unprofitable-but the study identifies \$89 as the revenue-maximizing price. Microsoft thus opted for the higher price." Id. at 27.

If Plaintiffs indeed establish an overcharge to the direct purchasers at trial, in order to prove fact of injury Plaintiffs must be able to show that some of the overcharge was passed through to all class members. Defendant contends there would be no universal pass through because of time delays between Defendant's price increases and any retail price increase, and because of a number of variables that determine consumer prices. Defendant claims that because of "focal point pricing" (fixing retail prices at amounts that end in 49 or 99, *See* Nichols Aff. ¶ 34), and "menu costs" (the cost of changing retail prices), an increase in the cost of one component is not "immediately" passed on to consumers. See Hausman Aff. ¶ 41. Defendant then points out that PCs with preinstalled Microsoft OS sell for a wide range of prices, with the differential far exceeding the amount of any possible overcharge and even the cost of the entire Microsoft OS component. See Nichols Aff. ¶ ¶ 18, 26. Defendant also asserts that rebates, either as discounts at the cash register or as mail-in vouchers, affected how much consumers paid at any given time during the class period. See id. at ¶ 31. Any pass through of software overcharge is also questionable because some PCs are apparently sold below cost and some PCs are sold for the same price even if the operating software differs in cost. Finally, Defendant claims that inclusion of valuable Web browsing capabilities in the Microsoft OS off-set any harm caused by an overcharge. See Hausman Aff. ¶ 98.

Dr. Leffler relies heavily on economic literature to establish that a cost increase to distributors will cause a price increase to consumers in all cases in which, as here, the product has no close substitutes. See Leff. Aff. ¶ 8. All or nearly all of the overcharge to the direct purchasers will be passed through to end users, "when distribution markets are highly competitive." Id. at fn. 6. The distribution markets for Microsoft OS are highly competitive, so it is likely that

Not Reported in N.W.2d
2001 WL 366432 (Minn.Dist.Ct.), 2001-1 Trade Cases P 73,254
(Cite as: 2001 WL 366432 (Minn.Dist.Ct.))

"competitors at the retail and distribution stages will be motivated and forced by competition to reduce their prices when they face lower costs because of the elimination of an overcharge." Id. at ¶ 9. This economic theory-that as a general matter a non-negligible cost increase to all distributors at the beginning of a distribution system would, in a highly competitive market, eventually work its way through to a price increase to the consumers at the end of the system-appears well developed enough to entitle Plaintiffs to an opportunity to prove it at trial.

*10 Dr. Leffler addresses the issue of "price lag," the time required for a cost change to work its way to the consumers in a complex chain of distribution. He contends that the overcharges at issue "would have been embedded in the prices at all levels of distribution at the beginning of the class period" because Defendant's monopolistic conduct began a substantial time before the class period. Leff. Aff. ¶ 5b. Since the overcharge would have had time to work its way to consumers before the class period began, whatever the price paid for a PC after 1994, it would have been lower but-for the overcharge. Thus, if prices were further increased during the class period at certain intervals, it does not follow that class members who made purchases just before a price increase were not injured. Likewise, if a consumer received a rebate or paid less than cost, it does not follow that that individual was not damaged by an overcharge that kept the price from being even lower.

Dr. Leffler also explains that focal point pricing and menu costs would not have eliminated pass through to class members. He asserts that "the extremely competitive nature of computer retailing and the lower cost of an operating system in the but-for world" negates the proposition of Defendant's expert that "a small change in the cost of the operating system may not cause a seller to move from its chosen focal point." Leff. Supp. Aff. ¶ 13. Because the Microsoft OS is "unchanged as it passes through distribution ... every dollar reduction in the overcharge by Microsoft causes exactly a dollar cost reduction at the distribution level for each and every participant distributor." Id. at ¶ 14. If price decreases in Microsoft OS occurred across the board at the distribution and retail stages, competition would demand price reductions to the consumers. See Id. If the overcharge was eliminated, resellers could avoid varying competitive focal prices by upgrading other PC components such as the hardware, applications software, and technical support and services. See Id. at ¶ 15.

Lefler contends inclusion of a Web browser in the Microsoft OS has no bearing on whether or not Defendant's alleged overcharge injured purchasers. If Defendant's monopolistic pricing of Microsoft OS harmed consumers, other conduct by the Defendant plays no role in an analysis of fact of injury. While "[t]he predatory browser action may benefit consumers in the browser market ... this has no implications as to the injury and the amount of injury suffered by consumers in the separate operating system market." Leff. Supp. Aff. ¶ 22. Whether Defendant committed an antitrust violation causing higher consumer prices independent of providing its Web browser would appear to be an issue that must be resolved at trial.

Plaintiffs offer affirmations by independent economic and antitrust experts that their own calculations have determined that Defendant's increased prices have been passed through to consumers. See Robert E. Hall, "Toward a Quantification of the Effects of Microsoft's Conduct," *American Economic* Review 90 at 188-196 (2000) (quantifying harm Microsoft caused consumers at about 56 billion in five years); Franklin M. Fisher and Daniel L. Rubinfeld, *Did Microsoft Harm Consumers?: An Economic Analysis,* Chapters 1 and 3 (2000) (concluding Microsoft has inflicted harm on all consumers); Consumer Federation of America, Media Access Project, U.S. Public Interest Research Group, *The Consumer Cost of the Microsoft Monopoly: $10 Billion in Overcharges and Counting* (Jan.1999) (confirming that Microsoft's monopoly caused consumer harm on a nationwide basis); Herbert Hovenkamp, *Federal Antitrust Policy, the Law of Competition and Its Practice,* Chapter 16, "Private Enforcement," at 564 (1994) (explaining that an "overcharge at the top of a distribution chain generally results at higher prices at every level."); Robert G. Harris and Lawrence A. Sullivan, "Passing on the Monopoly Overcharge: A Comprehensive Policy Analysis," 2 U. Penn. L.Rev., 128 at 276 (1979) (asserting that "in a multiple-level chain of distribution, passing on monopoly overcharges is not the exception: it is the rule.") Moreover, one of Defendant's experts, Dr. Richard Schmalensee, testified that "OEMs pass the price of the operating system through to consumers as part of the overall price of the computer." *United States v. Microsoft,* ¶ 2. Goodnow Aff.

*11 Judge Jackson's Findings of Fact in *United States v. Microsoft,* 84 F.Supp.2d 9 (D.D.C.1999), support Plaintiffs' position that consumers have been

Not Reported in N.W.2d
2001 WL 366432 (Minn.Dist.Ct.), 2001-1 Trade Cases P 73,254
**(Cite as: 2001 WL 366432 (Minn.Dist.Ct.))**

directly harmed by Defendant: "Many of Microsoft's actions have harmed consumers in ways that are immediate and easily discernible. They have also caused less direct, but nevertheless serious and far-reaching, consumer harm by distorting competition." Id. at 102-103.

It is apparent that Defendant hotly disputes Plaintiffs' pass through theory, and both positions have merit. Now is not the time to resolve that dispute. The court concludes that Plaintiffs have proposed a viable methodology and theory for proving the fact of class-wide injury to a jury. Defendant's many counter-arguments can be better considered in that forum. See *In Re Potash Antitrust Litigation,* 159 F.R.D. 682, 697 (D.Minn.1995) ("Whether or not plaintiffs' expert is correct in his assessment of common impact/injuries is for the trier of fact to decide at the appropriate time." (quoting *In Re Catfish Litig.,* 826 F.Supp. 1019,1042 (N.D.Miss.1993)).

### 2b. Individual Damages

To warrant class certification, Plaintiffs must also show that a viable method exists for calculating individual damages. In antitrust cases, damage issues "are rarely susceptible of the kind of detailed proof of injury which is available in other contexts ... [I]n the absence of more precise proof, the factfinder may conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure ... that defendants' wrongful acts had caused damage to the plaintiffs." *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 123-24 (1969). Allowing a defendant to escape liability simply because it has implemented its monopoly in such a complex manner as to render calculations difficult "would mean that the more grievous the wrong done, the less likelihood there would be of a recovery." *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 264-65 (1946).

While Plaintiffs do not need to present a precise damage formula at the class certification stage, they must propose the existence of such a method. "In assessing whether to certify a class, a Court's inquiry is limited to whether or not the proposed methods are so insubstantial as to amount to no method at all, ..[T]he fact that the damages calculation may involve individualized analysis is not by itself sufficient to preclude certification when liability can be determined on a classwide basis." *In Re Potash Antitrust Litigation,* 159 F.R.D. 682, 697 (D.Minn.1995); see also *In Re Worker's Compensation Antitrust Litigation,* 130 F.R.D. 99,

108 (D.Minn 1990) ("Mere existence of individual damage questions will not preclude certification as long as there is some 'common proof' to adequately demonstrate some damage to each plaintiff.")

Dr. Leffler asserts that a method exists for establishing the amount of overcharge to direct purchasers passed through to consumers. [FN3] A key concept in Dr. Leffler's analysis is the logical proposition that an increase in the cost of Microsoft OS affects each purchaser in the same manner as an increase in any other cost: "the impact of a change in Microsoft's charge to the distribution channel would have the same impact as a comparable change in other costs faced by the distribution channel." Leff. Aff. ¶ 21. This concept permits the effect on consumer prices of a Microsoft OS overcharge to distributors to be determined by actual analysis of the effects of other cost increases. As Dr. Leffler explains, considering cost increases for various computer components and evaluating "how the actual prices charged end users were impacted by actual cost changes to Microsoft's customers will show how the overcharge damaged end users." Leff. Supp. Aff. ¶ 33-34. An overcharge for Microsoft OS would have affected class members in the same manner as a cost increase in any other computer component, such as a disk drive, a hard drive, or a system upgrade. Using data from public sources and third party discovery, Plaintiffs will review actual cost changes for actual products, examine actual market behavior at each distribution stage, and determine the actual impact on consumers in a variety of distribution channels.

> FN3. Dr. Leffler is not totally clear whether his proposed methodology will determine amount of individual damages or aggregate damages to the class. Dr. Leffler considers the issue of individual damages "premature" at this stage, but indicates nonetheless that his methodology will yield a "specific individual's damages," Leff. Supp. Aff. ¶ 32 fn. 60. The damage calculations here, like those in *Gilchrist v. Pearl,* 387 N.W.2d 412 (Minn.1986), involve determining the percentage of Defendant's alleged overcharge that has been passed through to consumers. All purchasers in specific distribution channels presumably experienced a similar percentage pass through, and the court proceeds with the understanding that the percentage of pass through, as determined by Dr. Leffler's proposed methodology, will be applicable to

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d
2001 WL 366432 (Minn.Dist.Ct.), 2001-1 Trade Cases P 73,254
(Cite as: 2001 WL 366432 (Minn.Dist.Ct.))

class members on an individual basis.

*12 Dr. Leffler asserts that the amount of pass through in each of the chains of distribution will be near 100%. If he is right and the pass though amounts all converge at a similar percentage, even if it is less than 100%, the damage to individual consumers can be readily calculated. If Plaintiffs establish an overcharge and a 75% pass through, damages to a class member would be 75% of the overcharge to the applicable direct purchaser. Of course, the percentage of pass through could vary for each chain of distribution. This would require a more complicated damage calculation.

Defendant has presented a complicated distribution system: several variations of OS products; distributed by Defendant at different prices; to at least six categories of direct purchasers (royalty and other OEM distributors, full packaged product and volume licensing distributors, direct retail and large account software resellers); many of whom resell to a third level distributor (PC aggregators, full line and other PC resellers, system builders and value added PC resellers, authorized educational software resellers, direct marketing and value added software resellers, and volume licensing resellers); and most of whom incorporate the OS products as about 4% of the value of a PC sold for a single price; before the products reach the consumers. This class probably contains tens or even hundreds of thousands of people. Multiple distribution channels like these have "no significant conceptual difficulties," but they do require separate analyses. See Leff. Aff. ¶ 23, Plaintiffs' counsel, in taking on the responsibility of representing this class and declaring to the court that they intend to conduct the empirical research on these multiple distribution channels needed to make meaningful estimates of the pass through percentages applicable to each class member, may well be undertaking as extensive and sophisticated an antitrust analysis as has ever been conducted in Minnesota. Nonetheless, they said they would do it and, if done properly, such a methodology apparently would constitute a mechanical method for calculating damages. While not guaranteed to produce a simple result, Plaintiffs' method is far more substantial than "no method at all." *Potash,* 159 F.R.D. at 697. Moreover, should it be necessary, individual damage issues could also be resolved though use of methods such as "bifurcating liability and damage trials, appointing special masters or magistrates to preside over individual damage proceedings, decertifying the class after the liability trial, if liability and damages are separated ... and creating subclasses." Id. at 698.

In sum, then, based on Plaintiffs' proposed methods of determining an overcharge to direct purchasers and a percentage pass through to individual consumers, the court does not find manageability problems sufficient to deny certification of the class. "Dismissal for management reasons is never favored" since "the vehicle of a class action is meant to permit plaintiffs with small claims and little money to pursue a claim otherwise unavailable." *In Re Workers Compensation,* 130 F.R.D. 99, 110 (D.Minn.1990). Superiority is to be determined based on a consideration of all four factors, and class certification must be found to be superior to other *available* methods of adjudication. Such a disparity exists between the parties' abilities to litigate that most proposed class members, absent certification, have no other legal recourse at all. Even if a few businesses included in the proposed class may be in a position to litigate a separate claim, the fact that thousands of individuals would have no method by which to receive fair adjudication of their claims makes class certification far superior to the alternative.

### Conclusion

*13 Plaintiffs have met their burden of presenting viable methods of establishing fact of class-wide injury and calculating individual damages, rendering adjudication as a class action superior to the alternative, no action at all. Therefore, Plaintiffs' motion to certify this matter as a class action is GRANTED.

8 NO. 11 Andrews Antitrust Litig. Rep. 4

8 NO. 11 Andrews Antitrust Litig. Rep. 4

8 NO. 11 Andrews Antitrust Litig. Rep. 4

8 NO. 11 Andrews Antitrust Litig. Rep. 4

8 NO. 11 Andrews Antitrust Litig. Rep. 4

18 NO. 17 Andrews Comp. & Online Litig. R. 5

Related Andrews Newsletter Articles(Back to Top)

8 NO. 11 Andrews Antitrust Litig. Rep. 4

18 NO. 17 Andrews Comp. & Online Litig. R. 5

2001 WL 366432 (Minn.Dist.Ct.), 2001-1 Trade Cases P 73,254

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d
2001 WL 366432 (Minn.Dist.Ct.), 2001-1 Trade Cases P 73,254
**(Cite as: 2001 WL 366432 (Minn.Dist.Ct.))**

END OF DOCUMENT

# TAB D-9

MAR-25-1996  11:06     HEINS MILLS OLSON     612 338 4692   P.02/16

STATE OF SOUTH DAKOTA FILED    IN CIRCUIT COURT

COUNTY OF HUGHES                SIXTH JUDICIAL DISTRICT

CIV. NO. 94-221

VICKI HAGEMANN,                )
                               )
        Plaintiff,             )
                               )        ORDER GRANTING
v.                             )        CLASS CERTIFICATION
                               )
ABBOTT LABORATORIES, INC.,     )
BRISTOL-MYERS SQUIBB CO., and  )
MEADE JOHNSON & CO.            )
                               )
        Defendants.            )

THIS MATTER having come before the Court on October 20, 1995 upon plaintiff's Motion for Class Certification, the parties having submitted memoranda regarding same, and the Court having considered the arguments of counsel, the legal memoranda and other pertinent documents and being fully advised herein, now, finds, for reasons more fully stated in the Findings of Fact and Conclusions of Law attached hereto, that the requirements of SDCL 15-6-23(a) and (b) have been satisfied and that the class shall be certified.  Therefore,

IT IS HEREBY ORDERED that the class shall be certified as follows:

All persons who, at any time from January 1, 1980 through December 31, 1992 purchased infant formula in the state of South Dakota indirectly from Abbott Laboratories, Bristol-Myers Squibb Co., and/or Mead Johnson & Co., except for infant formula sold under the Gerber brand name, for consumption by an infant and not for resale.

Further, IT IS ALSO ORDERED that Plaintiff Vicki Hagemann is a suitable representative for the above-named class and shall be the Class Representative in this action.

Dated: NOV. 21, 1995
                                        JAMES W. ANDERSON
                                        Circuit Court Judge

STATE OF SOUTH DAKOTA
CIRCUIT COURT, HUGHES CO.
FILED
NOV 21 1995

Mary L. _____ CLERK
By _____ Deputy

classcer.ord/kmg

# TAB D-10

Westlaw.

Not Reported in So.2d                                                    Page 1

Not Reported in So.2d, 2002 WL 31423620 (Fla.Cir.Ct.)
*(Cite as: Not Reported in So.2d)*

C

Only the Westlaw citation is currently available.
Florida Circuit Court.
In re FLORIDA MICROSOFT ANTITRUST
LITIGATION.
No. 99-27340.

Aug. 26, 2002.

*Indirect purchasers brought antitrust action against
maker of personal computer operating system
software, and moved for class certification. The
Circuit Court, Eleventh Judicial Circuit,
Miami-DadeCounty, Shapiro, J., held that: (1)
indirect purchasers of a monopolist's or price fixer's
product could bring suit under the Florida
Deceptive and Unfair Trade Practices Act (DTPA);
(2) named plaintiffs were adequate class
representatives, even though some were employed
by law firms seeking to represent class; (3) common
issues regarding damages predominated over
damage issues that were individual; and (4) class
action was superior to other methods of
adjudication.*

Motion for class certification granted.

West Headnotes

[1] Trade Regulation 382 ⊕⇒864

382 Trade Regulation
   382II Statutory Unfair Trade Practices
     382II(B) Other Statutes, Liabilities and
Remedies Under
       382II(B)1 Unfair Trade Practices in
General
        382k864 k. Actions and Injunctions in
General. Most Cited Cases
Indirect purchasers of a monopolist's or price fixer's
product may bring suit under the Florida Deceptive
and Unfair Trade Practices Act (DTPA). West's
F.S.A. § 501.211.

[2] Parties 287 ⊕⇒35.67

287 Parties
   287III Representative and Class Actions
     287III(C) Particular Classes Represented
      287k35.67 k. Antitrust or Trade
Regulation Cases. Most Cited Cases
Named plaintiffs in indirect purchaser antitrust
action under the Florida Deceptive and Unfair
Trade Practices Act (DTPA) against maker of
personal computer operating system software were
adequate class representatives for putative class
action, where all named plaintiffs alleged that they
were harmed by the same anticompetitive actions
that maker allegedly took to maintain monopolies in
the personal computer operating systems and
applications software markets, sought the same
relief for themselves and the class members,
intended to vigorously prosecute the case, and had
retained attorneys whose competency in litigating
antitrust class actions and other complex litigation
was well-established and had not been challenged
by software maker. West's F.S.A. RCP Rule 1.220.

[3] Parties 287 ⊕⇒35.67

287 Parties
   287III Representative and Class Actions
     287III(C) Particular Classes Represented
      287k35.67 k. Antitrust or Trade
Regulation Cases. Most Cited Cases
Named plaintiffs in indirect purchaser antitrust
action under the Florida Deceptive and Unfair
Trade Practices Act (DTPA) against maker of
personal computer operating system software were
not inadequate class representatives for putative
class action because they were employees of one of
the law firms seeking to represent the class, where
record reflected no testimony by any of such named
plaintiffs indicating a lack of independence from
counsel due to their employment. West's F.S.A.
RCP Rule 1.220.

[4] Parties 287 ⊕⇒35.67

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in So.2d                                                              Page 2

Not Reported in So.2d, 2002 WL 31423620 (Fla.Cir.Ct.)
**(Cite as: Not Reported in So.2d)**

287 Parties
   287III Representative and Class Actions
      287III(C) Particular Classes Represented
         287k35.67    k.    Antitrust    or    Trade
Regulation Cases. Most Cited Cases
Named plaintiffs in indirect purchaser antitrust
action under the Florida Deceptive and Unfair
Trade Practices Act (DTPA) against maker of
personal computer operating system software were
not inadequate class representatives for putative
class action because they lacked receipts to prove
how much they paid for computers installed with
makers' software, absent showing that possession of
such receipts was necessary for *plaintiffs to prove
that they or any class member were impacted by*
software maker's behavior, or to prove damages.
West's F.S.A. RCP Rule 1.220.

|5| Parties 287 ☞35.67

287 Parties
   287III Representative and Class Actions
      287III(C) Particular Classes Represented
         287k35.67    k.    Antitrust    or    Trade
Regulation Cases. Most Cited Cases
Individual issues did not predominate with respect
to determination of whether alleged monopolization
impacted or caused some harm *to class members*
and quantification of that impact to arrive at class
member damages, for purposes of deciding whether
common legal or factual issues predominated over
issues that were individual to each class member
and thus whether putative class action brought by
indirect purchasers against maker of personal
computer operating system software *could be*
certified, as plaintiffs' expert profered reasonable
economic theories and methodologies to prove fact
of injury and damages on a class-wide basis,
support for plaintiffs' expert's methods could be
found in the work of other leading economists, and
resolution of dispute on such issues between
*plaintiffs' expert and software maker's expert was*
beyond the scope of the class certification inquiry.
West's F.S.A. RCP Rule 1.220(b)(3).

|6| Parties 287 ☞35.67

287 Parties
   287III Representative and Class Actions

287III(C) Particular Classes Represented
         287k35.67    k.    Antitrust    or    Trade
Regulation Cases. Most Cited Cases
Courts may infer antitrust impact despite pricing
diversity, and non-uniformity of the prices at which
plaintiffs purchased their goods is not fatal to class
certification. West's F.S.A. RCP Rule 1.220(b)(3).

|7| Parties 287 ☞35.67

287 Parties
   287III Representative and Class Actions
      287III(C) Particular Classes Represented
         287k35.67    k.    Antitrust    or    Trade
Regulation Cases. Most Cited Cases
Although damage amounts may vary among
plaintiffs, this fact alone, particularly in antitrust
actions, will not defeat certification. West's F.S.A.
RCP Rule 1.220(b)(3).

|8| *Parties 287 ☞35.37*

287 Parties
   287III Representative and Class Actions
      287III(B) Proceedings
         287k35.37    k.    Consideration of *Merits.*
Most Cited Cases
At the class certification stage, plaintiffs are not
required to prove their case regardless of how much
data has been collected through discovery. West's
F.S.A. RCP Rule 1.220.

|9| *Parties 287 ☞35.67*

287 *Parties*
   287III Representative and Class Actions
      287III(C) Particular Classes Represented
         287k35.67    k.    Antitrust    or    Trade
Regulation Cases. Most Cited Cases
Class action was superior *to other methods of*
adjudication, for purposes of class certification of
indirect purchasers' antitrust action against maker of
personal computer operating system software, as
there was a very large number of claimants with
relatively small amounts at stake, individual actions
by claimants would impose a strangling harness on
the judiciary as well as the parties, and separate
actions would produce duplication of effort,
increase the cost of litigation, create the risk of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in So.2d                                                      Page 3

Not Reported in So.2d, 2002 WL 31423620 (Fla.Cir.Ct.)
(Cite as: Not Reported in So.2d)

inconsistent results for parties who were similarly situated, and consume judicial resources to wasteful levels. West's F.S.A. RCP Rule 1.220b)(3).

Daniel Hume, Alan M. Grunspan, Robert L. Parks, and James J. Thompson of Kirby, McInerney & Squire, New York, N.Y., for plaintiffs.
Sara Ford of Lightfoot, Franklin & White, Birmingham, Ala., Charles B. Casper of Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., Daryl A. Libow of Sullivan & Cromwell, Washington, D.C., and Hilarie Bass of Greenberg Traurig, Miami, Fla., for defendant.

ORDER GRANTING CLASS CERTIFICATION
SHAPIRO, J.
*1 This matter having come for hearing before the Court in the 12th Floor Courtroom of the Dade County Courthouse, Miami, Florida on April 18-19 and May 22, 2002, pursuant to Plaintiffs' Motion for Class Certification, dated July 20, 2001, Plaintiffs, Shelby Hartman, Julia Frow, Barbara Diaz, Eric Lazarus, and B. Lazarus, Inc. ("Plaintiffs" ), appearing through counsel, and Defendant Microsoft Corporation ("Microsoft"), appearing through counsel, and having thoroughly reviewed and considered the memoranda and materials submitted by the parties together with the statements, oral arguments of counsel, the live testimony given by the respective experts for Plaintiffs and Defendant through direct and cross-examination, and all of the records on file, the Court hereby grants Plaintiffs' motion in its entirety.

I. PROCEDURAL BACKGROUND.

1. Plaintiffs are residents of the State of Florida who seek certification of two classes pursuant to Florida Rule of Procedure 1 .220 encompassing a class period of November 16, 1995 to the present. The two classes are:
A. All persons and entities who indirectly, i.e., not from Microsoft, acquired for their own use, and not for further selling, leasing or licensing, a license in Florida for an Intel-compatible PC version of MS-DOS, Windows 95, upgrades to higher MS-DOS versions, upgrades to or of Windows 95,

Windows 98, on or after November 16, 1995; and
B. All persons and entities who indirectly, i.e., not from Microsoft, acquired for their own use, and not for further selling, leasing or licensing, a license in Florida for an Intel and Windows 95 and later compatible PC version of Microsoft Word or any upgrade of Microsoft Word, Microsoft Excel or any upgrade of Microsoft Excel, whether by themselves or as part of a software package or "suite" such as Microsoft Office or any upgrade of Microsoft Office, on or after November 16, 1995.

Both classes exclude Microsoft and its co-conspirators; their parents, subsidiaries, affiliates, officers, directors, and employees. Also excluded are any federal, state or local governmental entity, and any judge or judicial officer presiding over this matter, judicial staff, and the members of their immediate families.

2. Plaintiffs allege that Microsoft established a monopoly in the market for operating system software through various anticompetitive acts and has maintained this monopoly since the late 1980's. According to Plaintiffs, Microsoft has used its monopoly power to stifle innovation in the operating system market, create a monopoly in the applications market, and overcharge consumers in both markets in violation of Florida's deceptive and unfair trade practices laws.

3. In support of their motion for class certification, Plaintiffs submitted the following:
a. Memorandum of Law in Support of Plaintiffs' Motion for Class Certification;
b. Affidavit of Dr. Keith B. Leffler, dated 6/17/01 (" Leffler Aff.");
c. Reply Memorandum of Law in Support of Plaintiffs' Motion for Class Certification;
*2 d. Reply Affidavit of Dr. Keith B. Leffler, dated 2/04/01 ("Reply Aff.");
e. Other Exhibits, including relevant case law.

Plaintiffs also sat for depositions taken on October 23-25, 2002.

4. Defendant submitted the following in opposition to Plaintiffs' Motion for Class Certification.
a. Defendant Microsoft Corporation's Memorandum

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in So.2d

Not Reported in So.2d, 2002 WL 31423620 (Fla.Cir.Ct.)
(Cite as: Not Reported in So.2d)

Page 4

of Law in Opposition to Plaintiffs' Motion for Class
Certification;

b. Affidavit of Dr. Jerry Hausman, dated 11/28/01;

c. Transcripts of Plaintiffs' Depositions;

d. Other exhibits, including additional affidavits
from Microsoft witnesses, case law and other
documents.

5. Each expert was deposed in other Microsoft
antitrust litigation by counsel who also appeared on
behalf of the parties here at an evidentiary hearing
held on April 18-19 and May 22, 2002. During the
hearing, the Court heard oral argument from
counsel for both parties on Plaintiffs' Motion and
live expert testimony from Dr. Leffler and Dr.
Hausman.

## II. INDIRECT PURCHASER ANTITRUST SUITS IN FLORIDA.

6. Under the Florida Deceptive and Unfair Trade
Practices Act ("the Florida DTPA"), Chapter 501,
Part II, Florida Statutes (1993), Florida consumers
who are injured by a violation of the Florida
DTPA's provisions may seek to recover monetary
damages from the violator. The relevant language of
the Florida DTPA states:

In any individual action brought by a consumer who
has suffered a loss as a result of a violation of this
part, such consumer may recover actual damages,
plus attorney's fees and court costs as provided in s.
501.2105.

FLA. STAT. ANN. § 501.211(2) (West 1985). The
statute defines a "violation of this part" as any
violation of this act and may be based upon the
violation of: (1) any rules promulgated pursuant to
the Federal Trade Commission Act; (2) any rules
promulgated pursuant to the Federal Trade
Commission and interpreted by the Federal Trade
Commission or the federal courts; and (3) any law,
statute, rule, regulation, or ordinance which
proscribes unfair methods of competition, or unfair
deceptive or unconscionable acts or practices. See
FLA. STAT. ANN. § 501.203(3).

[1] 7. Indirect purchasers of a monopolist's or price

fixer's products, such as Plaintiffs here, may bring
suit under the Florida DTPA. See Mack v. Bristol
Myers Squibb Co., 673 So.2d 100 (Fla. 1st DCA
1996). The plaintiff in Mack filed a putative class
action alleging that the defendants had violated the
Florida Antitrust Act and the Florida DTPA by
engaging in price-fixing for infant formula. The trial
court dismissed the plaintiffs' claim under Florida's
antitrust statute on the ground that Florida antitrust
law paralleled federal antitrust law and incorporated
the federal bar against indirect purchaser suits as
articulated in Illinois Brick Co. v. Illinois 431 U.S.
720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). While
the Supreme Court later ruled in California v. ARC
America Corp., 490 U.S. 93, 109 S.Ct. 1661, 104
L.Ed.2d 86 (1989) that states could exempt their
antitrust laws from Illinois Brick, Florida has not so
amended its Antitrust Act. The trial court also
dismissed the DTPA claim on the theory that the
DTPA should not be used to avoid the effect of
Illinois Brick. The appellate court disagreed, and
reversed the dismissal of the Florida DTPA claim.
In so doing, the Mack court effectively declared
Florida an Illinois Brick "repealer" state.

*3 8. The First District Court of Appeal is the
highest state court in Florida to have addressed the
question of an indirect purchaser's standing for
antitrust claims under the Florida DTPA. Since no
appellate court in this District has addressed the
question, Mack is binding precedent for this Court.
See Pardo v. State, 596 So.2d 665, 666 (Fla.1992).
Accordingly, Plaintiffs have standing to pursue their
claims under the Florida DTPA.

## III. OTHER MICROSOFT ANTITRUST CLASS CERTIFICATION DECISIONS.

9. Plaintiffs in several other Illinois Brick "repealer"
jurisdictions have sued Microsoft for antitrust
violations substantially identical to those alleged
here. With one exception, every other court in a
repealer jurisdiction has granted class certification
to indirect purchasers seeking redress against
Microsoft for antitrust violations. See Howe v.
Microsoft Corp., 2002 WL 199130 (N.D.Dist.Ct.
Jan. 16, 2002), appeal pending, Supreme Court No.
20020075 (N.D.); In re South Dakota Microsoft

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in So.2d

Not Reported in So.2d, 2002 WL 31423620 (Fla.Cir.Ct.)
(Cite as: Not Reported in So.2d)

*Antitrust Litig.*, Civ. No. 00-235 (6th Jud. Cir. Ct., Hughes Co., S.D., May 31, 2001), petition for permission to take a discretionary appeal granted, Appeal No. 22306 (S.D. March 22, 2002); *Bellinder v. Microsoft Corp.* 2001 WL 1397995 (Kan.Dist.Ct. Sept.7, 2001), application for permission to take an interlocutory appeal denied, Case No. 02-88795-A (Kan.Ct.App. May 7, 2002), denial of application affirmed, Case No. 02-88795-A (Kan. July 11, 2002); *A & M Supply v. Microsoft Corp.*, No. 00-301123-NZ (Mich. Cir. Ct., Wayne Co., Aug. 21, 2001), application for leave to appeal granted, Court of Appeals Case No. 236598 (Mich.Ct.App. Nov. 2, 2001); *Capp v. Microsoft Corp.*, No. 00-CV-0637 (Wis. Cir. Ct., Dane Co., June 28, 2001); *Friedman v. Microsoft Corp.*, CV 2000-000722 (Consol.) (Ariz.Super. Ct., Maricopa Co., Nov. 15, 2000 & July 13, 2001); *Gordon v. Microsoft Corp.*, 2001 WL 366432 (Minn.Dist.Ct. Mar.30. 2001), petition for discretionary review denied, No. C8-01-701 (Minn.Ct.App. May 8, 2001), denial of petition affirmed 645 N.W.2d 393, 2002 WL 1291887 (Minn. Jun.13, 2002); *Coordination Proceedings Special Title*, (Rule 1550(b)) *Microsoft-V Cases*, NO. J.C.C.P. No. 4106 (Cal.Super. Ct., San Francisco Co., Aug. 29, 2000). Most, if not all, of the same arguments Microsoft made before this Court also were made and rejected in these other courts.

> FN1. *Melnick v. Microsoft Corp.*, 2001 WL 1012261 (Me.Super.Ct. Aug. 24, 2001), held that plaintiffs, who also had submitted Dr. Leffler's testimony, did not meet Maine's requirements for class certification.

> FN2. This Court takes notice of the opinion of the Minnesota Supreme Court issued after the conclusion of the class motion hearing here. The Court notes that the Minnesota Supreme Court's opinion only addressed the question of whether the Minnesota Court of Appeals, when denying Microsoft's petition for interlocutory review, applied the correct criteria in doing so. Neither the Minnesota

Court of Appeals nor the Supreme Court addressed the merits of Microsoft's challenge to the propriety of class certification in that state.

### IV. STANDARDS FOR DETERMINING CLASS CERTIFICATION.

10. To obtain certification of a case as a class action, Plaintiffs must satisfy the prerequisites set forth in Florida Rule of Civil Procedure 1.220(a) and at least one of the provisions of Rule 1.220(b). *See Execu-Tech Business Systems, Inc. v. Appleton Papers, Inc.* 743 So.2d 19, 22 (Fla. 4th DCA 1999).

11. Class certification determination is wholly procedural, and does not depend on whether Plaintiffs will ultimately prevail on the substantive merits of their claims. *See OCE Printing Systems, USA, Inc. v. Mailers Data Services, Inc.* 760 So.2d 1037, 1045 (Fla. 2d DCA 2000) ("matters of proof that go to the merits of the claim are inappropriate when considering class certification"); *Execu-Tech*, 743 So.2d at 21 (noting with approval that the lower court did not make inquiry into or require proof of the merits of the case in determining whether class certification was appropriate); *see also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).

> FN3. Because Florida Rule of Civil Procedure 1.220 is based on and closely parallels Federal Rule of Civil Procedure 23, Florida courts may look to and rely on federal case authority construing Rule 23 as persuasive authority when passing on class certification motions. *See Broin v. Philip Morris Companies, Inc.*, 641 So.2d 888, 889 n. 1 (Fla. 3d DCA 1994); *Concerned Class Member v. Sailfish Point, Inc.*, 704 So.2d 200, 201 (Fla. 4th DCA 1998).

### V. RULE 1.220(a) CRITERIA.

*4 12. Microsoft has never challenged Plaintiffs' showing that they have satisfied the Rule 1.220(a)(1)-(3) requirements of numerosity,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in So.2d                                                                                    Page 6

Not Reported in So.2d, 2002 WL 31423620 (Fla.Cir.Ct.)
(Cite as: Not Reported in So.2d)

commonality, and typicality. Microsoft does contest the adequacy of the named Plaintiffs under 1.220(a)(4) in this putative class action.

13. Based on the record before the Court and the lack of opposition from Microsoft, the Court finds that Rule 1.220(a)(1)-(3) requirements of numerosity, commonality, and typicality have been met. Numerosity is satisfied here because the broad definition of Plaintiffs' classes and Microsoft's dominance in the operating systems and applications software markets will result in classes consisting of thousands of Florida consumers. Commonality exists because there are at least some issues to be resolved that are common to each class member. Microsoft does not contest that these include the overall question of its liability for illegally creating and/or maintaining monopolies in the markets at issue. Typicality is satisfied because the Plaintiffs and class members assert the same claims against Microsoft and will rely upon the same facts and evidence to prove liability for each of those claims. None of the proposed class representatives are subject to unique defenses.

14. In addition to the foregoing requirements, a class representative must be able to fairly and adequately protect and represent the interests of each member of the class. See Fla. R. Civ. P. 1.220(a)(4). This adequacy requirement is satisfied if "the named representatives have interests in common with the proposed class members and the representatives and their qualified attorneys will properly prosecute the class action." Broin, 641 So.2d at 892.

[2] 15. The evidence before the Court indicates that the named Plaintiffs are adequate class representatives for this putative class action. All of the Plaintiffs allege that they were harmed by the same anticompetitive actions that Microsoft allegedly took to maintain monopolies in the personal computer operating systems and applications software markets. The named Plaintiffs seek the same relief for themselves and the class members. These plaintiffs intend to vigorously prosecute this case. Pursuant to that end, they have retained attorneys whose competency in litigating antitrust class actions and other complex litigation

is well-established and has not been challenged by Microsoft. These facts demonstrate that the Plaintiffs have met Rule 1.220(a)'s adequacy requirement.

[3] 16. Microsoft contends that three of the five Plaintiffs are not adequate class representatives because they are employees of one of five law firms seeking to represent the class. Microsoft argues that this relationship between three of the Plaintiffs and one of the law firms prosecuting this case alone warrants a finding of inadequacy.

17. This Court rejects Microsoft's attack upon the adequacy of Plaintiffs Hartman, Frow, and Diaz. Microsoft took their depositions. The record reflects no testimony by any of the three indicating a lack of independence from counsel due to their employment, and the Court declines Microsoft's invitation to disqualify them per se. See Robertson v. National Basketball Association 389 F.Supp. 867 (S.D.N.Y.1975) ("Class action determination will not be denied ... in the absence of a showing that the alleged potential conflicts are real probabilities and not mere imaginative speculation"). Even if such a concern existed, Eric Lazarus and B. Lazarus, Inc. are not employees of any of the law firms representing Plaintiffs. Their presence in this lawsuit eliminates Microsoft's basis for doubting the independence of the class representatives. See Shroder v. Suburban Coastal Corporation, 729 F.2d 1371, 1376 (11th Cir.1984); Susman v. Lincoln American Corp., 561 F.2d 86, 90, n. 7 (7th Cir.1977); Wellman v. Dickinson, 79 F.R.D. 341, 347 (S.D.N.Y.1978); Sommers v. Abraham Lincoln Federal Savings and Loan Association 66 F.R.D. 581, 589 (E.D.Pa.1975).

*5 18. Microsoft does challenge the adequacy of Plaintiffs Eric Lazarus and B. Lazarus, Inc. on other grounds. Microsoft asserts that Eric Lazarus purchased a computer for B. Lazarus, Inc. pursuant to a discount program run by another entity, and implies some wrongdoing thereby. However, the record indicates no such wrongdoing. Thus, the Court rejects Microsoft's allegations of impropriety. Even if the Court did accept Microsoft's allegations, the misconduct it alleges would not require a finding of inadequacy. See Newberg on Class

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in So.2d, 2002 WL 31423620 (Fla.Cir.Ct.)
**(Cite as: Not Reported in So.2d)**

*Actions*, § 3.36 ("Plaintiffs have been challenged as inadequate representatives because their backgrounds were alleged to include unrelated, unsavory, unethical, or even illegal conduct. Most cases have rejected such challenges as irrelevant to the issue of adequacy ..."). The Court finds that Mr. Lazarus and B. Lazarus, Inc. are adequate class representatives for the putative class.

[4] 19. Microsoft contends that Plaintiffs Frow and Diaz are not adequate class representatives because they lack receipts to prove how much they paid for computers installed with Microsoft software. The Court rejects this argument. Microsoft has made no showing that possession of such receipts is necessary for Plaintiffs to prove that they or any class member were impacted by Microsoft's behavior, or to prove damages.

20. There is no need for this Court to address Microsoft's attack on Plaintiffs' adequacy based on the lack of a written fee agreement between Plaintiffs and their counsel. Plaintiffs have submitted to the Court a fee agreement that satisfies the requirements of Florida Rule of Professional Conduct 4-1.5(f)(2).

## VI. RULE 1.220(b)(3) PREDOMINANCE.

21. Besides satisfying the requirements of Florida Rule of Civil Procedure 1.220(a), Plaintiffs also must satisfy Rule 1.220(b)(1), (2), or (3). Here, Plaintiffs have moved under (b)(3), which requires that the common legal or factual issues predominate over any issues that are individual to each class member. Such common issues need not be dispositive of the entire litigation. *See* 7A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* 1778, n. 11 (2d ed.1986); *Lockwood Motors, Inc. v. General Motors Corp.*, 162 F.R.D. 569, 580 (D.Minn.1995) ("common questions need only predominate, they need not be dispositive of the litigation").

22. Predominance exists when there is "generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class member's

individual position." *In re Potash* 159 F.R.D. 682, 693 (D.Minn.1995); *see also Cheatwood v. Barry University, Inc.*, 2001 WL 1769914 (Fla.Cir.Ct. Dec.26, 2001) (*quoting Lockwood*, 162 F.R.D. at 580). The fundamental question "is whether the group aspiring to class status is seeking to remedy a common legal grievance." *Lockwood*, 162 F.R.D., at 580. Moreover, only questions relating to the defendant's violations must predominate, *Sterling v. Velsico Chemical Corp.*, 855 F.2d 1188, 1197 (6th Cir.1988); *see also Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir.1975) ("[t]he amount of damages is invariably and individually in question and does not defeat class action treatment"), and the predominance inquiry under Rule 23(b)(3) is directed toward the issue of liability. *Dura-Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 93 (S.D.N.Y.1981).

*6 23. "Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." *AmChem Products, Inc. v. Windsor*, 521 U.S. 591, 625, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). The predominance inquiry under Rule 1.220(b)(3) should be directed toward the issue of liability. *Dura-Bilt Corp.*, 89 F.R.D. at 93.

24. "Where an antitrust conspiracy has been at issue, the courts have tended to find that common questions predominated despite the existence of individual questions." *Jennings Oil Co., Inc. v. Mobil Oil Corp.* 80 F.R.D. 124, 130(S.D.N.Y.1978) . *See also Newberg on Class Actions*, § 18.25 at p. 81 ("common liability issues such as conspiracy or monopolization have, almost invariably, been held to predominate over individual issues").

Plaintiffs assert that questions of law or fact common to all members of the proposed class predominate, including:
a. Whether Microsoft is a monopolist in the markets for operating system applications software, and the definition of those markets;
b. Whether Microsoft engaged in anticompetitive conduct in order to unlawfully maintain or acquire its monopoly power in these markets;
c. Whether Microsoft's conduct violated the Florida Deceptive and Unfair Trade Practices Act;

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in So.2d                                                                                              Page 8

Not Reported in So.2d, 2002 WL 31423620 (Fla.Cir.Ct.)
*(Cite as: Not Reported in So.2d)*

d. Whether Microsoft's conduct caused harm to the
proposed class; and
e. Whether Plaintiffs and the putative class are
entitled to damages and the appropriate measure of
such damages.

25. Microsoft does not dispute that the issues of
market definition, its monopoly position with
respect to those markets, and whether its alleged
acts violated the Florida DTPA, can be determined
through common proof. This Court agrees. Such
determinations are functions of the operating system
and applications market places in general, and of
Microsoft's business. These affect all class members
equally, and therefore are ideally suited for
class-wide determination.

[5] 26. Microsoft has asserted that individual issues
will predominate with respect to any determination
of whether its alleged monopolization impacted or
caused some harm to class members, and
quantification of that impact to arrive at class
member damages. Plaintiffs have retained an expert
economist, Dr. Keith Leffler, to opine on whether,
contrary to Microsoft's argument, a " 'reasonable
methodology [exists] for generated proof of
class-wide impact and damages." *Execu-Tech*, 743
So.2d at 21. Dr. Leffler has presented such methods
to this Court through his affidavits and live
testimony. Microsoft retained its own expert, Dr.
Jerry Hausman, to discredit Dr. Leffler's opinions.
In large measure, the Court's determination that
Plaintiffs have satisfied their burden to proffer a
reasonable methodology for generalized proof of
class-wide impact and damages turns on the
testimony of these two experts.

### A. PLAINTIFFS EXPERT.

27. Dr. Leffler is an Associate Professor of
Economics at the University of Washington in
Seattle, Washington where his teaching and
research experience is in the area of industrial
organization. His specialty is antitrust economics
including the study of monopolies and the impact of
monopolies on consumers. Dr. Leffler has taught
classes and conducted research in industrial

organization and antitrust economics for over
twenty-five years. He has performed complex
economic analysis in antitrust cases for more than
two and one-half decades and has been qualified as
an economic expert in proceedings before federal
and state courts, and federal and state regulatory
agencies. Dr. Leffler has analyzed economic issues
relating to class certification in a number of
industries including infant formula, propane,
residential doors and prescription drugs. He also
has experience in analyzing markets involving
computer operating systems and software. Of
particular relevance here, Dr. Leffler assisted the
Federal Trade Commission and the Justice
Department in their investigation of Microsoft's
activities in the 1980's and 1990's.

*7 28. Dr. Leffler has also provided similar
testimony for class certification in a number of
other antitrust cases filed against Microsoft in
repealer states, including Kansas, Maine,
Minnesota, North Dakota, Michigan, South Dakota,
Tennessee, New Mexico, and Wisconsin.

29. The Court finds Dr. Leffler to be qualified for
the task given to him with respect to this class
certification motion, *i.e.*, to proffer a "reasonable
methodology for generalized proof of class-wide
impact and damages." *Execu-Tech*, 743 So.2d at 21.

### B. FACT OF INJURY (HARM/IMPACT).

30. Plaintiffs assert that Microsoft harmed the class
by charging supra-competitive (*i.e.*, artificially high
or inflated) prices for its software. There are two
steps to proving this assertion. First, Plaintiffs will
have to show that Microsoft charged
supra-competitive prices for the products at issue,
resulting in overcharges to the entities purchasing
those products directly from Microsoft. Second,
Plaintiffs will have to show that at least some
portion of these overcharges were passed on to the
indirect purchaser end users that make up the
classes here. A separate issue, discussed below, is
quantifying the overcharges and the amount of
overcharge passed on to class members.

31. With respect merely to establishing that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Microsoft imposed overcharges to at least some degree on the products at issue, Dr. Leffler testified that "the underlying principle of antitrust is that competition benefits consumers, and in a situation in which that competition had been artificially suppressed through allegedly illegal means, the direct implication of that basic economic principle would be that the prices that the consumers paid would be higher than if that competition had been allowed to thrive and impact the marketplace." *See* Transcript of Class Certification Hearing, April 19, 2002, at p, 89. The significance of Dr. Leffler's observation is that "the presence of more effective competition would have impacted the entire pricing structure and led to lower prices to all class members." Reply Aff. ¶ 9. In other words, economic principles, rather than evidence particular to any individual class member, dictate that the lack of competitive factors necessarily results in a monopolist charging supra-competitive prices for its products. Thus Dr. Leffler proposes that "a class wide analysis of Microsoft's monopolization activities provides the proper economic basis to determine the fact of impact on these end-users ..." *Id.*

32. With respect to the pass on issue, Dr. Leffler explained that he is assuming Plaintiffs will prove that "the monopolization activity and overcharges at issue here regarding operating systems substantially predate the class period, [so that] a Microsoft operating system overcharge would impact prices at all levels of distribution ... prior to the beginning of the class period." Reply Aff. ¶ 4c; 4/19/2002 Tr. at 87, 92. If this assumption is proved, according to Dr. Leffler, the embedded nature of Microsoft's operating system overcharge acts as a tax imposed on each unit sold by the overcharged original computer equipment manufacturers ("OEMs") and other distributors. According to Dr. Leffler, " regardless of whether a price increase by Microsoft in, for example, 1996 caused an immediate increase in the overcharge to end-users, all class members were likely already paying higher prices because of the prior monopolization and overcharges." Leffler Aff. ¶ 10. Thus Dr. Leffler proposes that (as with the fact of overcharges), economic principles, rather than individual class member evidence, can be used to prove the fact that some portion of those

overcharges were passed on to every class member.

*8 33. The Court finds that Dr. Leffler has proposed reasonable methods, based on standard economic principles, for establishing with common evidence that each class member was impacted to some extent by Microsoft's alleged behavior. Microsoft has not convinced the Court that the principles upon which Dr. Leffler relies are false or unsound. As set forth below, other established economists support Dr. Leffler's assertion that Microsoft's monopolization resulted in overcharges that were passed on, at least in part, to end users. Whether a fact-finder actually should or will accept Plaintiffs' common evidence on this issue is beyond the scope of the class certification inquiry.

## C. CALCULATION OF DAMAGES.

34. Plaintiffs need not calculate the exact extent of each class member's damages individually. *See Execu-Tech,* 743 So.2d at 21 n. 4. *See also South Dakota Microsoft* at 30 ("Plaintiffs ... need not present a method to calculate each class member's damage individually"), *citing Zenith Radio Corp. v. Hazeltine Research, Inc.* 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). In *Zenith,* the Supreme Court held that "damage issues in [antitrust] cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts. The Court has repeatedly held that in the absence of more precise proof, the factfinder may 'conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs ... " ' *Id.* at 123-124

35. "The willingness on the part of courts to accept some uncertainty with respect to damages stems from a simple equitable notion that a wrongdoer should not be allowed to profit by insistence upon an unobtainable standard of proof." *South Dakota Microsoft* at 17, *citing California Microsoft* at 17; *Gordon* at *11); see also J. Truett Payne Co. v.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in So.2d                                                                                           Page 10

Not Reported in So.2d, 2002 WL 31423620 (Fla.Cir.Ct.)
(Cite as: Not Reported in So.2d)

*Chrysler Motors Corp.* 451 U.S. 557, 566, 101
S.Ct. 1923, 68 L.Ed.2d 442 (1981) ("The vagaries
of the marketplace usually deny us sure knowledge
of what plaintiff's situation would have been in the
absence of the defendant's antitrust violation").
Aggregation is accepted because courts have
recognized that common issues can be found to
predominate in an antitrust case despite "the fact
that each class member's damages will be different
and, thus, will require individualized treatment ..."
*In re Alcoholic Beverages Litigation* 95 F.R.D. 321,
327 (E.D.N.Y.1982). "Any other role would enable
the wrongdoer to profit by his wrongdoing at the
expense of his victim ... Failure to apply it would
mean that the more grievous the wrong done, the
less likelihood there would be of a recovery" (
*Bigelow v. RKO Radio Pictures, Inc.* 327 U.S. 251,
264-265, 66 S.Ct. 574, 90 L.Ed. 652 (1946)). and "
to accept such an argument uncritically would leave
'little if any place for the class action device in the
adjudication of antitrust claims." ' *Town of New
Castle v. Yonkers Contracting Co., Inc.* 131 F.R.D.,
38, 42 (S.D.N.Y.1990), *citing In re Alcoholic
Beverages*, 95 F.R.D. at 327-28. *See Story
Parchment Co. v. Paterson Parchment Paper Co.*,
282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544
(1931) ("The wrongdoer is not entitled to complain
that [the damages] cannot be measured with the
exactness and precision that would be possible if
the case, which he alone is responsible for making,
were otherwise ... [T]he risk of the uncertainty
should be thrown upon the wrongdoer, instead of
upon the injured party").

*9 36. Microsoft argues that the distribution of its
own products is so complex that any class wide
damages calculations will be impossible. Based on
Dr. Leffler's testimony, the Court disagrees.
Through Dr. Leffler, Plaintiffs have presented
reasonable methods for estimating damages for each
class member that a fact-finder could accept.

37. These methods begin with the construction of a "
'but for" world in which Microsoft faced
competition in the operating system market. This "
but for" world does not contain the "tax" or
overcharge built into every layer of the operating
system and applications distribution chain. *See*
Leffler Aff. at ¶¶ 13-14.

38. Once the "but for" world without Microsoft
domination is established, Dr. Leffler proposes
three separate ways to measure the lower operating
system and applications prices that would prevail in
such a world:

A but-for price from which the overcharge can be
calculated is frequently estimated using a yardstick
or benchmark. One well-accepted yardstick is a
comparison price from a comparable market that
was not affected by anticompetitive activity. A
second alternative yardstick can be based on
margins earned by sellers in a comparable market
free from antitrust violations. A third well-accepted
yardstick is a price in the market at issue during a
period free of the anticompetitive conduct.

In this case each of these three alternative yardstick
approaches likely can be used to estimate the
overcharges that resulted from Microsoft's
monopolization actions. Under the first approach,
Microsoft's prices and price changes are compared
with the prices of software that faced competition
and had types of revenue opportunities comparable
to those of the relevant products. The second
yardstick approach involves comparing the rates of
return earned by Microsoft operating systems and
applications software with those earned by software
products facing competition. The third yardstick
approach extrapolates competitive prices for
Microsoft's software from the period in which
Microsoft faced limited competition to subsequent
periods in which its monopoly was established.

Leffler Aff. ¶¶ 15-16; *see also* ¶¶ 13-24 and
Reply Aff. ¶¶ 31-40. According to Dr. Leffler,
most of his work so far has involved the third
benchmark. With respect to the other two, he noted
that "I have no doubt that economically they're
reasonable approaches. The issues concern data
availability, what will be coming forth, the ability to
implement them, and currently I don't know the
answer to whether the data will be available to
implement. It's being pursued. It's being studied and
evaluated." 4/19/02 Tr. at 112.

39. The next step after "but for" or "benchmark"
prices have been determined is to deduct the "
benchmark" price from the actual price charged to
arrive at the overcharge. *See Image Technical
Services, Inc. v. Eastman Kodak Co.*, 1994 U.S.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in So.2d, 2002 WL 31423620 (Fla.Cir.Ct.)
(Cite as: Not Reported in So.2d)

Dist. LEXIS 12652, *9 (N.D.Cal.1994) ("*Kodak II*"), *on remand from Eastman Kodak Co. v. Image Technical Services, Inc.* 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). This is "a likely method for determining class damages." *In re Domestic Air Transp.* 137 F.R.D. 677, 692-93 (N.D.Ga.1991); *Kodak II* at *9; *Green-haw v. Lubbock County Beverage Association* 721 F.2d 1019,1026-29 (5th Cir.1983) (affirming jury award in antitrust class action based on presentation of benchmark evidence) *overruled on other grounds by International Woodworkers of America v. Champion International Corp.* 790 F.2d 1174 (5th Cir.1986); *Catfish,* 826 F.Supp. at 1043 (certifying class based on proposed benchmark methodology); *Potash,* 159 F.R.D. at 697-98 (same).

*10 40. The Court finds Dr. Leffler's benchmark method to be a reasonable way of establishing the difference between prices that Microsoft would have been able to charge for the products at issue in a competitive environment, and the prices that Microsoft actually charged during the class period. Calculating the numbers themselves and evaluating those calculations are for trial and beyond the scope of the class certification inquiry.

41. Plaintiffs will have to establish the extent that overcharges to Microsoft's direct customers were passed on to the indirect purchaser end user class members. In his affidavits, Dr. Leffler explains that the "pass on" to end users of Microsoft's overcharge can be estimated using a class-wide statistical determination of the relationship between the costs faced by Microsoft's customers and the prices paid by end-users. Leffler Aff. ¶ 5d; *see also* Reply Aff. ¶ 4h. "[A]nalyses of how the prices charged end users were in fact impacted by comparable cost changes to Microsoft's customers will show how the overcharge damaged end users ... [This] requires a relatively simple statistical estimation." Leffler Aff. ¶ 26; *see also* Reply Aff. ¶ 43. Dr. Leffler says that the data he needs to perform this statistical estimation can be gleaned from examining price information for computer components. He points out that "OEMs and system builders have continually faced reduced costs for many components such as disk drives and hard drives," and that "[the] ... cost reductions can be statistically

related through regression analysis to actual end users' prices. The end-user price impact of different overcharges to Microsoft customers can then be inferred from such regression analysis". Leffler Aff. ¶ 28; *see also In re Polypropylene Carpet* 996 F.Supp., 18, 22-30 (N.D.Ga.1997) (regression analysis used by the plaintiffs' expert satisfied the predominance requirement of Rule 23(b)(3)). Plaintiffs can also look to the costs and charges for computer system upgrades when calculating the amount of overcharge consumers pay for Microsoft's OS products. As Dr. Leffler points out:

OEMs and system builders also offer additions and upgrades to their products. The impact on the final price to end-users from the inclusion or exclusion of upgrades of a cost comparable to the Microsoft overcharge should also provide a reliable guide as to how the final price would have changed absent the overcharge.

Leffler Aff. ¶ 29.

42. The Court finds that Dr. Leffler has presented methods which a reasonable fact finder can accept for estimating the amount of any overcharges that were passed on to the class members. *See Microsoft I-V Cases,* slip op. at 17-18; *Gordon,* 2001 WL 366432 at ----11-12; *see also, In re Cardizem* 200 F.R.D. 326, 347-51 (E.D.Mich.2001); *Lumco Industries, Inc. v. Jeld-Wen, Inc.* 171 F.R.D. 168, 174-75 (E.D.Pa., 1997). Although Microsoft's expert challenged the use of regression analysis for this task, this Court is convinced that the regression methods proposed by Dr. Leffler are reasonable. Whether a fact-finder actually would accept the results of the regression analysis that Dr. Leffler proposes is not an issue for class certification.

### D. THERE IS AMPLE SUPPORT FOR DR. LEFFLER'S METHODOLOGY IN THE ECONOMICS COMMUNITY.

*11 43. Support for Dr. Leffler's methods can be found in the work of other leading economists who have identified methodologies that show how consumers were impacted by Microsoft's monopolistic behavior. Since being retained by Microsoft, Dr. Robert E. Hall testified that "we can

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in So.2d, 2002 WL 31423620 (Fla.Cir.Ct.)
(Cite as: Not Reported in So.2d)

determine pass-through by building a pass-through model. Again, that's doable." Professor Daniel L. Rabinfeld of the University of California at Berkeley and Professor Franklin M. Fisher of the Massachusetts Institute of Technology (both Department of Justice economists in *U.S. v. Microsoft* ) have similarly concluded that Microsoft has inflicted harm on *all* consumers. In January, 1999, the Consumer Federation of America published a comprehensive report that confirms consumer harm on a nationwide basis was caused by Microsoft's monopoly. Professor Herbert Hovenkamp, a distinguished antitrust law authority, has explained the economics simply: "A monopoly overcharge at the top of a distribution chain generally results in higher prices at every level below." Dr. Robert G. Harris and Professor Lawrence A. Sullivan (economics professor and antitrust law professor, respectively) explain: " Through simple analytic models we show that in a multiple-level chain of distribution, passing on monopoly overcharges is not the exception: it is the rule.

> FN4. *See* page 130 from the transcript of the December 10, 2001 hearing in the MDL Proceeding. *See also* Reply Aff. at ¶ 46.

> FN5. Franklin M. Fisher and Daniel L. Rubinfeld, *Did Microsoft Harm Consumers?: An Economic Analysis*, Chapters 1 and 4 (2000).

> FN6. *See* Consumer Federation of America, Media Access Project, U .S. Public Interest Research Group, *The Consumer Cost of the Microsoft Monopoly: $10 Billion of Overcharges and Counting* (January 1999).

> FN7. Herbert Hovenkamp, *Federal Antitrust Policy, the Law of Competition and Its Practice,* Chapter 16, "Private Enforcement," at 564 (1994).

> FN8. Robert G. Harris and Lawrence A. Sullivan, "Passing On The Monopoly

Overcharge: A Comprehensive Policy Analysis," 2 U. Penn. L.Rev., 128 at 276 (1979).

44. Another of Microsoft's own experts, Dr. Richard Schmalensee, admitted during the *U.S. v. Microsoft* trial that all operating system consumers would be harmed if Microsoft engaged in monopoly overcharging. Dr. Schmalensee admitted that a monopoly overcharge by Microsoft necessarily would cause harm to every ultimate consumer because "OEMs pass the price of the operating system through to consumers as part of the overall price of the computer." The other courts which have certified classes against Microsoft found such testimony compelling. *See, e.g., Gordon,* 2001 WL 366432, at *10.

> FN9. Direct Testimony of R. Schmalensee, *United States v. Microsoft Corp.* ¶ 2.

45. Based in part on Dr. Schmalensee's admissions, the trial court in the United States Government's antitrust case against Microsoft found at trial that " [m]any of [Microsoft's] actions have harmed consumers in ways that are immediate and easily discernible. They have also caused less direct, but nevertheless serious and far-reaching, consumer harm by distorting competition ... The ultimate result is that some innovations that would truly benefit consumers never occur for the sole reason that they do not coincide with Microsoft's self-interest," *United States v. Microsoft Corp.* 84 F.Supp.2d 9,112 (D.D.C.1999).

46. Finally, Microsoft's expert here, Dr. Hausman, has admitted that economic models exist for calculating damages in antitrust cases. *See Coordination Proceedings* at 15 (emphasis added):
... the opposing experts agree that equilibrium economic models can be used to calculate damages in antitrust case. *According to the defense expert, Professor Hausman: "Economists have developed various theoretical models of competition in markets with limited numbers of sellers.* These models are based on a series of strong simplifying assumptions. They can provide useful bases for suggestive theoretical analyses, but they do not

Not Reported in So.2d

Not Reported in So.2d, 2002 WL 31423620 (Fla.Cir.Ct.)
(Cite as: Not Reported in So.2d)

provide reliable bases for calculating damages
unless carefully designed and calibrated to fit the
actual conditions of the market in question."

\*12  47. Dr. Hausman also testified that statistical
methods are available to show class wide injury in
indirect purchaser cases, instead of having to trace
any alleged overcharge through every company in
the distribution chain for every single class member:
Q. Okay. Now, I take it that your testimony then at
bottom, Professor Hausman, is that we would need
to do here in Florida is look to particular individual
consumers who have purchased a particular
particular point in time and recreate the
circumstances that led through the distribution chain
for that individual's purchase. Is that correct?
A. Not for each individual in the but-for-world, but
groups of individuals. You always take a sample in
statistics and from that extrapolate to the population.
... I said you don't have to look at every company.
You know, for like the white box, Taiwanese, you
could look at a sample of them, and we discussed
that at my deposition.
So, it's not the case that you have to look at every
one, but you have to cover all the main paths of
distribution and the main types of customers.

Transcript of Class Certification Hearing, May 22,
2002 at pp. 101, 102.

### E. DR. HAUSMAN'S ATTACKS ON DR. LEFFLER

48. Microsoft argues that it will be impossible to
prove with common evidence that any Microsoft
overcharge actually made its way to the class
members. Its expert, Dr. Hausman, gave three
reasons why Microsoft believes this to be so. Dr.
Hausman's arguments in this regard have been
rejected by other courts as reasons for denying class
certification against Microsoft, and this Court
rejects them as well. *See, e.g., Michigan Microsoft*
at 8 ("The discrepancies among the experts and the
accurateness of their opinions are not dispositive at
this juncture. It is sufficient that plaintiff has
demonstrated through Professor Leffler that impact
might be shown by common proof."); *see also*

*South Dakota Microsoft* at 25-29.

49. First. Dr. Hausman claims that any rise or fall in
prices would not be immediately passed on to
consumers. Dr. Leffler explains that such an
observation, even if true, is irrelevant here because
it does not take into account the long-run nature of
Microsoft's monopolistic conduct. By the start of
the class period, Microsoft had already been
reaping monopoly profits for its operating systems
for years. *See* Leffler Aff.. ¶ ¶ 6-7, Reply Aff. ¶
¶ 8-9. As Dr. Leffler explains, "absent [these]
activities predating the class period, the prices of
Microsoft's operating systems would likely have
been substantially below the prices in fact charged
by Microsoft." Leffler Aff. ¶ 7. Accordingly, Dr.
Leffler points out that Microsoft's overcharges have
been embedded into OEMs' and other distributors
retail prices since well before the start of this class
period. Leffler Aff. ¶ 10. By the beginning of the
class period, regardless of whether or not
subsequent increases occurred, all consumers were
impacted by Microsoft's illegal anti-competitive
activity pre-class period. Dr. Leffler explains that it
is irrelevant whether OEMs charge more or less for
different Windows versions during the class period
because any overcharges at issue would have been
embedded in the costs at each level of distribution
long before the beginning of the class period. *See*
Leffler Aff. ¶ ¶ 7-10. The embedded overcharge
cost would have worked through the distribution
sector long prior to the start of the class period.
Reply Aff. ¶ ¶ 11-14. As Dr. Leffler explains at
Reply Aff. ¶ 4c:
\*13  Since the monopolization activity and
overcharges at issue here ... substantially predate
the class period, a Microsoft ... overcharge would
impact prices at all levels of distribution and for all
end-users prior to the beginning of the class period...
. Therefore, contrary to [Dr.] Hausman's claims, any
lag between price increases by Microsoft during the
class period and the resulting price increases to the
end-users does *not* show that "(f)inal purchasers
who made their purchase during those intervals
suffered no injury."

*See also id.* at ¶ ¶ 10-11:Throughout his
Affidavit, Professor Hausman refers to the
possibility that there may be a lag between a price

Not Reported in So.2d, 2002 WL 31423620 (Fla.Cir.Ct.)
(Cite as: Not Reported in So.2d)

increase by Microsoft and a resultant price increase by distributors, OEMs or retailers. He argues that this is sufficient to conclude that not all class members would be impacted by a Microsoft overcharge since the overcharge "may be passed through only after a long period of time." It is not necessary to consider the general economic validity of this argument because Professor Hausman's argument simply has no applicability to the plaintiffs' allegations in this case.

... [A]s explained above, I have economically analyzed a situation in which I assume plaintiffs will demonstrate that Microsoft had effectively eliminated competition in the market for Intel compatible operating systems before the beginning of the class period. Thus, at the beginning of the class period, the price of Microsoft's operating system at all distribution levels would have included an overcharge. Plaintiffs allege that during the class period Microsoft engaged in other activity that enhanced and maintained Microsoft's monopoly position. That subsequent activity, or the continuing effects of the prior monopolization activity, may have caused increases in the Microsoft overcharge ... during the class period. [But][r]egardless of whether there were any lags in the passing on of subsequent price or overcharge increases, all end-users would have paid a precedent, embedded overcharge.

50. The Court finds Dr. Leffler's analysis of this issue to be reasonable, and that Microsoft's "pass on lag" argument does nothing other than raise a possible issue for jury determination.

51. Second, Dr. Hausman argues that Microsoft's methods for distributing operating systems and applications products to the class members are complex, usually involving one or more distribution layer. This, he argues, makes difficult the task of figuring out the amount of overcharge, if any, paid by consumers. However, supposed "complexity" in the subject product's market does not prevent courts from certifying classes of antitrust victims. As Dr. Leffler pointed out in his reply affidavit, "there is nothing unique about estimating Microsoft's 'but for ' price and overcharge compared to other overcharge situations ... Domestic airline travel,

residential doors, flat glass, NASDAQ stock transactions, brand name drugs, and many other industries in which classes were certified are equally or more complex than the sale of Microsoft operating systems and applications. Microsoft produces relatively few relevant products, sells them to relatively few buyers, and changes prices relatively infrequently." Reply Aff. ¶ 32.

*14 [6][7] 52. Indeed, courts may infer antitrust impact despite pricing diversity. *See In re Workers Compensation* 130 F.R.D. 99, 108-110 (D.Minn., 1990):

Non-uniformity of the prices at which plaintiffs purchased their goods is not fatal to certification. As long as the existence of a conspiracy is the overriding question, then the class has met its predominance requirement.... To prove injury, plaintiffs need only demonstrate they have suffered *some* damage from the unlawful conspiracy ... Such a showing may be made on a class basis if the evidence demonstrates that the conspiracy succeeded in increasing prices above the competitive level.

'Common proof of impact is possible even though prices are individually negotiated.... 'Proof of impact typically follows proof of a price-fixing conspiracy where the defendants are shown to have sufficient market power'.... *Although damage amounts may vary among plaintiffs, this fact alone, particularly in antitrust actions, will not defeat certification* .... Individual questions of damages are often a problem encountered in an antitrust action and are rarely a barrier to certification. [emphasis added].

53. Even assuming complex distribution and/or diverse pricing in the market for DOS and Windows, Dr. Leffler explains why the common denominator will be lower prices in the but-for world paid by all re-sellers of these products. "The 'but-for' world ... being evaluated in this case is one in which *every* distributor, OEM and retailer purchasing from Microsoft faces a lower price for each relevant product throughout the class period. Whatever the array of Microsoft prices, the entire array of such prices is lower absent the monopolization. Every distributor, OEM and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

retailer would be making resale pricing decisions in an environment in which it and every one of its competitors faces a lower cost. Common sense and basic economic principles imply lower prices to end-users will result." Reply Aff. ¶ 15.

54. The California, Kansas, Michigan, Minnesota, North Dakota, and South Dakota courts rejected Microsoft's "complexity" claims and granted class certification. *See, e.g., Coordination Proceedings* at 17 (while "the task [of proving antitrust impact] is formidable," it is "not impossible ... At this point, the court is not persuaded that a comprehensible analysis of these issues cannot be made within the context of properly managed trial proceedings").

55. These rejections of Microsoft's complexity arguments are consistent with accepted antitrust case law. For example, in *In re NASDAQ Market-Makers Antitrust Litigation* 169 F.R.D. 493, 499 (S.D.N.Y.1996), the court certified a class even though plaintiffs had accused 33 defendants of conspiring through A492 Nasdaq market-makers, making markets in 5,393 stocks with "11 market-makers for each Nasdaq stock." The *NASDAQ* court certified the class despite this obvious complexity, holding: "Neither a variety of prices nor negotiated prices is an impediment to class certification if it appear that plaintiffs may be able to prove at trial that ... the price range was affected generally." *Id.* at 523.

*15 56. The court in *Little Caesar Enterprises, Inc. v. Smith* 172 F.R.D. 236, 246 (E.D.Mich.1997) explained why defendants' claims of complexity should not bar certification:
Defendants argue that the damages or fact of damage issue is too complicated for class treatment.. .. The gestalt of much of defendants' argument is an attempt to make this case appear overwhelmingly complicated and thereby remove the class action tool from plaintiffs' hands.... If it is ultimately proven that defendants violated the Sherman Act, it seems unfair and ironic that the party who caused the complexity on liability and damages should benefit from such acts by disarming the plaintiffs and the Court of the most efficient and effective tool for resolving the issues.

57. The Court finds Dr. Leffler's analysis of this issue to be reasonable, and that Microsoft's " complexity" argument also does nothing other than raise a possible issue for jury determination.

58. Third, Dr. Hausman asserts that most retail prices end in 99 or 49. From this, Dr. Hausman surmises that a distributor who experienced an increase in Microsoft's operating system may not pass on that increase to consumers, because such a pass-on might result in the new retail price not ending in the preferred 99 or 49.

59. Dr. Leffler asserted that in the highly competitive computer industry, distributors must increase their retail prices in response to cost increases. Thus, contrary to Dr. Hausman's logic, Professor Leffler believes that a small increase in the cost of the operating system necessarily would cause a seller to move from its chosen focal price point. Reply Aff. ¶ ¶ 19-20. In the world that would have existed "but-for" Microsoft's allegedly illegal conduct, a cost decrease "would be of substantial consequence in such a highly competitive industry." *Id.* at ¶ 20. "Under any reasonable competitive conditions, when competitors at the retail and the distribution stages all incur lower costs because of the elimination of the overcharge ... competition among distributors and retailers will result in price reductions to end-users." *Id.*

60. The Court finds Dr. Leffler's analysis of this issue to be reasonable, and that Microsoft's "focal point pricing" argument, like the other two arguments discussed above, does nothing other than raise a possible issue for jury determination.

61. Accordingly, this Court rejects Microsoft's arguments that proving impact and estimating damages with common evidence will be impossible tasks. Dr. Leffler's testimony is credible and the methods proposed by him for accomplishing these tasks through common evidence at trial are reasonable.

## F. A BATTLE OF THE EXPERTS IS NOT APPROPRIATE AT THIS STAGE.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

62. Plaintiffs' expert has proffered reasonable economic theories and methodologies to prove fact of injury and damages on a class-wide basis. Microsoft's expert claims that these methods will not work at trial. When the experts for the parties both are well credentialed and even if both offer compelling arguments, resolution of such a "duel" is beyond the scope of the class certification inquiry. *See Kansas Microsoft* at 12 ("Now is not the time to resolve [a] 'battle of the experts.' ... Whether Dr. Leffler is correct in his opinions or not is an issue for the trier of fact"), *quoting Potash* 159 F.R.D. at 697. In *Gordon,* the Minnesota court explained:

\*16 It is apparent that [Microsoft] hotly disputes Plaintiffs' pass through theory, and both positions have merit. Now is not the time to resolve that dispute. The court concludes that Plaintiffs have proposed a viable methodology and theory for proving the fact of class-wide injury to a jury. [Microsoft's] many counter-arguments can be better considered in that forum.

2001 WL 366432 at \*11, *aff'd,* 645 N.W.2d 393, 2002 WL 1291887.

63. The South Dakota, Michigan, and North Dakota courts all agreed. *See, e.g., South Dakota Microsoft* at 22: "The bulk of [Microsoft's] arguments challenge the merits of [Dr. Leffler's] conclusions. The courts routinely reject such arguments, observing that they are improper at this stage of the litigation. The fact that the defendants' expert disagrees with the methodology and the conclusions propounded by [Dr. Leffler] is no reason to deny class certification." *Quoting In re Cardizem CD Antitrust Litigation,* 200 F.R.D. 326, 350 (E.D.Mich.2001). *See also Michigan Microsoft* at 8: At the class certification stage, it is "unnecessary to resolve the dispute between the experts, or to delve into the merit based issue of whether Professor Leffler is correct in his assessment of impact."

64. These decisions rest on a sound foundation of Federal antitrust case law. *See Caridad v. Metro-North Commuter R.R.,* 191 F.3d 283, 292 (2nd Cir.1999). In reversing a denial of class certification, the *Caridad* court held that the district

court's critique of plaintiffs' expert "may prove fatal at the merits stage, [but] the Class Plaintiffs need not demonstrate at this stage that they will prevail on the merits ... More detailed statistics might be required to sustain the Plaintiffs' burden of persuasion, but this report, in conjunction with the anecdotal evidence, satisfies the Class Plaintiffs' burden of demonstrating commonality for purposes of class certification." *Id.* at 292-3 (internal citation omitted). The court concluded that "[i]n deciding a certification motion, district courts must not consider or resolve the merits of the claims of the purported class. Here, the District Court credited Metro-North's expert evidence over that of the Class Plaintiffs. Such a weighing of the evidence is not appropriate at this stage in the litigation." *Id.* at 293. *See also In re Visa Check/Mastermoney Antitrust Litig.* 192 F.R.D. 68, 79 (E.D.N.Y.2000) (" a district court is not permitted to indulge 'dueling' between opposing experts at the class certification stage"), *aff'd* 280 F.3d 124 (2nd Cir.2001), *cert. denied,* 536 U.S. 917, 122 S.Ct. 2382, 153 L.Ed.2d 201 (2002); *In re Sumitomo Copper Litig.,* 182 F.R.D. 85, 91 (S.D.N.Y.1998) (deficiency in expert's affidavit "is a matter to be ascertained by trial and not for a determination as to the appropriateness of class certification"); *In re Industrial Diamonds Litig.* 167 F.R.D. 374, 384 (S.D.N.Y.1996) ("it is for the jury to evaluate ... conflicting evidence and to determine what weight to give the expert's conclusions"); *Krueger v. New York Tel. Co.,* 163 F.R.D. 433, 442 (S.D.N.Y.1995) ("The plaintiffs have laid a sufficient evidentiary foundation which, if believed, supports their allegations of common questions of law and fact."); *Domestic Air Transp.,* 137 F.R.D. at 692 ("It is not the function of the Court at this time to determine whether [plaintiffs' expert] is correct. The weight to be given his testimony and its effect is for the fact-finder massessing the merits of plaintiffs' claims at a later date").

\*17 65. Avoiding a "battle of the experts" at the class certification stage clearly is in keeping with the basic principle of *Eisen* that on a motion for class certification, the court must not endeavor to decide the merits of the case. *See Coordination Proceedings* at p. 15:
The question at this stage is not whether plaintiffs

Not Reported in So.2d                                                    Page 17

Not Reported in So.2d, 2002 WL 31423620 (Fla.Cir.Ct.)
(Cite as: Not Reported in So.2d)

will be able to carry their burden of proving that
their experts' analyses are reliable, but whether it
appears that the differences between the experts can
be intelligently presented and evaluated within the
frame-work of a class action. On a motion for class
certification, it is inappropriate to resolve a "battle
of the experts." "Whether or not [plaintiffs' expert]
is correct in his assessment of common
impact/injury is for the trier of fact to decide at the
proper time").

66. The Court thus finds that the arguments made
by Microsoft and its expert with respect to Dr.
Leffler's proposed methods for proving impact and
damages at most raise issues for a fact-finder later
in the case.

### G. CONSUMER BENEFITS.

67. Microsoft claims that some class members were
not harmed and may have even benefited from its
conduct. For example, Microsoft argues that some
class members benefited by getting a free web
browser if Internet Explorer ("IE") was included in
their version of Windows. Dr. Leffler rebutted this
assertion to the Court's satisfaction in his reply
affidavit: "[T]o the extent that the web browser is a
separate product from the operating system, as
found by Judge Jackson, there is no economic basis
to offset operating system overcharges because of
predatory actions with respect to browsers. The
predatory browser action may benefit consumers in
the browser market in the short run until Microsoft
establishes its monopoly in the browser market but
this has no implications as to the injury and the
amount of injury suffered by consumers in the
separate operating system market. Moreover, the
competitive browser price may have been zero,
given that Netscape and Microsoft have given away
their browsers for several years. If so, there is no
consumer benefit to including IE with Windows.
Finally, as emphasized in Judge Jackson's findings,
the competitive harm from the browser tie-in by
Microsoft included computer performance
degradation and costs to consumers that were
independent of the price charged for the browser."
Reply Aff. ¶ 28. At most, Microsoft's arguments

regarding supposed benefits of its monopolistic
conduct are matters for the fact finder to consider.

### H. EMPIRICAL DATA.

68. Microsoft claims that Plaintiffs and their expert
have had the necessary data available to employ Dr.
Leffler's proposed methods, and thus could have
already performed the analyses they propose. It
argues that nothing prevented Plaintiffs from using
this data or obtaining more information through
studies and focused class certification discovery, if
needed.

[8] 69. First of all, this is beside the point because at
the class certification stage, Plaintiffs are not
required to prove their case regardless of how much
data has been collected through discovery. In any
event, Dr. Leffler testified that at the time of the
hearing, Plaintiffs did not yet have all of the data
necessary for actually employing his methods. Dr.
Leffler testified that Plaintiffs, together with
plaintiffs in other antitrust litigation against
Microsoft, are engaged in a large scale coordinated
discovery process. Dr. Leffler further testified that
he expects the necessary data will be gathered in
time for the preparation of final expert reports and
trial. Microsoft has not shown that collection of
such data is impossible. The extent to which any
necessary data actually is present or lacking will be
for the fact-finder to decide.

### VII. RULE 1.220(b)(3) SUPERIORITY

*18 70. Lastly, Plaintiffs must demonstrate that the
class action is "superior to other available methods
for the fair and efficient adjudication of the
controversy." Rule 1.220(b)(3) sets forth several
factors that this Court should consider in its
determination and the Court has done so here.

[9] 71. The prosecution of separate actions by
members of the class would create a risk of
inconsistent adjudications and would substantially
impair and impede the administration of justice.
There are questions well suited for class resolution
that would assuredly require needless duplication of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in So.2d, 2002 WL 31423620 (Fla.Cir.Ct.)
(Cite as: Not Reported in So.2d)

proof if each Plaintiff was required to prosecute his/her/its claim apart from the rest. *See In re Infant Formula Antitrust Litigation,* 1992 WL 503465 at *5 (N.D.Fla. Jan.13, 1992) ("A class action is often the only realistic method for litigating a large number of claims"). *See also Catfish,* 826 F.Supp. at 1044-45: "In light of the large number of potential class members and the strong predominance of issues, the court concludes, without reservation, that a class action is superior to other methods of adjudication. The court is convinced that individual actions by claimants would impose a strangling harness on the judiciary, as well as the parties. Separate actions would produce similar duplication of effort, increase the cost of litigation, create the risk of inconsistent results for parties who are similarly situated and consume judicial resources to wasteful levels." Any notion that Plaintiffs' monopolization claims could be litigated individually is unrealistic and contrary to the tenets of Rule 1.220.

72. The Court does not believe that prosecution of this case as a class action would be unmanageable. Courts confronted with far larger and even more complex antitrust class actions than this one have found such cases to be manageable. *See e.g., In re General Motors Corp. Pickup Truck Fuel Tank Products Liability Litigation,* 55 F.3d 768, 800 (3d Cir.(1995);) (nationwide class of 6 million truck owners); *Domestic Air Transportation,* 137 F.R.D. at 694 (nationwide class of "close to 12.5 million [airline ticket] purchasers"); *Allender v. Schweiker,* 550 F.Supp., 1348, 1359 (S.D.N.Y.1982) (nationwide class of 2.8 million middle-age survivor benefit recipients). Regardless, any problems which arise in the management of a class action such as this one involving numerous small claims do not justify the Court permitting Microsoft to retain the benefits of its alleged wrongful conduct and to continue that conduct with impunity. *See Coordination Proceedings,* slip op. at 20.

73. This case involves a very large number of claimants with relatively small amounts at stake. Most consumers have little incentive to file suit independently since the high cost of litigation would far exceed their potential recovery. Yet at the same time, any monetary relief received is not so

insignificant to support the proposition that individual consumers would not be motivated to pursue their claims in any resolution of this class action or that a favorable outcome would only benefit the attorneys involved.

*19 74. There can be little question that the class action device here would be of substantial benefit to the litigants and to this Court. *See Cardizem,* 200 F.R.D. at 350-51. Under the circumstances, the Court finds and concludes that allowing the case at hand to proceed as a class action is far superior to any other available method of adjudication.

## VIII. CONCLUSION.

75. Based on the foregoing, this Court finds and concludes that Plaintiffs have satisfied the requirements for class certification set forth in Florida Rule of Civil Procedure 1.220(a) and 1.220(b)(3), to wit:
a. The class is so numerous that joinder of all members is impracticable;
b. There are questions of law or fact common to the class;
c. The claims or defenses of the representative parries are typical of the claims or defenses of the class;
d. Representative parties will fairly and adequately protect the interests of the class;
e. The questions of law or fact common to members of the class predominate over any questions affecting only individual members; and
f. A class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Based on the foregoing, IT IS SO ORDERED, that the classes proposed by Plaintiffs as set forth herein, *supra,* are certified, that the named Plaintiffs, Shelby Hartman, Julia Frow, Barbara Diaz, Eric Lazarus and B. Lazarus, Inc., are certified as class representatives, that counsel for the named Plaintiffs as designated in Pretrial Order Number One are appointed counsel for the class, and that an appropriate notice be sent to class members as soon as practicable in accordance with Florida Rule of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in So.2d

Not Reported in So.2d, 2002 WL 31423620 (Fla.Cir.Ct.)
**(Cite as: Not Reported in So.2d)**

Civil Procedure 1.220(d)(2).

Fla.Cir.Ct.,2002.
In re Florida Microsoft Antitrust Litigation
Not Reported in So.2d, 2002 WL 31423620
(Fla.Cir.Ct.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.