# TAB D-11

- ⅌

FIRST JUDICIAL DISTRICT COURT
STATE OF NEW MEXICO
COUNTY OF SANTA FE

ENDORSED
First Judicial District Court

OCT 0 2 2002

Santa Fe, Rio Arriba &
Los Alamos Counties
PO Box 2268
Santa Fe, NM 87504-2268

NO. D 0101-CV-2000-1697

IN RE: NEW MEXICO INDIRECT PURCHASERS
MICROSOFT CORPORATION ANTITRUST LITIGATION

## DECISION AND ORDER ON MOTION FOR CLASS CERTIFICATION

THIS MATTER came on for hearing on the 1ˢᵗ and 2ⁿᵈ day of July 2002 on a

MOTION FOR CLASS CERTIFICATION before the HONORABLE DANIEL A. SANCEZ,

Judge of the First Judicial District, State of New Mexico. Division VII.

The Plaintiffs, NEW MEXICO INDIRECT PURCHASERS, appeared by Counsel of

Record, THOMAS M. HNASKO, Attorney at Law, JOSEPH ARSHAWSKY, Attorney at Law.

DANIEL A SMALL, Attorney at Law, and WILLIAM MARKOVITS, Attorney at Law.

The Defendant, MICROSOFT CORPORATION, appeared by Counsel of Record,

LESLIE MCCARTHY APODACA and THOMAS A. OUTLER, Attorneys at Law, CHARLES

B. CASPER and PETER BRESLAUER, Attorneys at Law.

This Motion was brought before this Court for Class Certification pursuant to

NMRCP 1-023 NMSA 2002, and more specifically Sections A and B (3) which provide, inter

alia:

    A.   Prerequisites to a Class Action. One or more members of a class may

sue or be sued as representative parties on behalf of all only if:

        (1)  the class is so numerous that joinder of all members is impracticable;

        (2)  there are questions of law or fact common to the class;



(3)  the claims of defenses of the representative parties are typical of the claims or defenses of the class; and

(4)  the representative parties will fairly and adequately protect the interests of the class.

B.    Class Actions Maintainable.  An action may be maintained as a class action if the prerequisites of Paragraph A of this rule are satisfied, and in addition:

(3)  the Court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  The matters pertinent to the findings include:

(a)  the interest of members of the class in individually controlling the prosecution or defense of separate actions;

(b)  the extent and nature of any litigation concerning the controversy already commenced by or against member of the class;

(c)  the desirability or undesirability of concentrating the litigation of the claims in the particular forum;

(d)  the difficulties likely to be encountered in the management of a class action.

The Court deems that before allowing a case to proceed as a class action, the Court needs to make the necessary factual and legal inquiries under this rule.

The Court agrees with the Plaintiffs' that the appropriate inquiry here is whether or not the Plaintiffs' can show a plausible method to prove impact and damages on a class wide basis and liability is not an issue in this class certification proceeding.

In considering class certification, once damage in fact or impact is shown, New

Mexico law does not require the amount of damages be proven at the class certification stage of

the proceedings.

The fact that the measure of damages is the subject of disputed and

conflicting expert testimony, does not diminish the fact that common impact has occurred and

this is not a basis for denying certification at this stage.

A class action suit is the only affective method of providing relief under the

New Mexico antitrust laws for purchasers with relatively small damages such as here.

The Court has employed the "rigorous analysis" that it must employ

The Court, at this stage of the proceedings, is to determine only if Plaintiffs

methodology is plausible.

It is the Court's opinion that In Re Potash Antitrust Litigation 159 F.R.D. 882,

states the proper standard by which this Court should determine the appropriateness of

certification of the class:

Plaintiffs' do not need to supply a precise damage formula at the certification
stage of antitrust action. Instead, in assessing whether to certify a class, the Court's inquiry is
limited to whether to certify a class, the Court's inquiry is limited to whether or not the proposed
methods are so insubstantial as to amount to no method at all . . . .The fact that the damages
calculation may involve individualized analysis is not by itself sufficient to preclude certification
when liability can be determined on a class-wide basis.

Plaintiffs' have put forward a plausible method for determing damages on a

class-wide basis.

Dr. Leffler, the Plaintiff's expert, acknowledged that it may be time

consuming to apply, on a class-wide basis his method for proving impact and damages in this

case, but as Dr. Leffler testified, the fact that the method is difficult, requiring significant time

and effor . does not mean that the methodology is not workable. Dr. Leffler demonstrated that there are plausible methods for measuring the overcharge.

Plaintiffs' have offered a standard and accepted economic methodology for estimating the amount of pass-on of any Microsoft overcharges. The record before the court shows tha Plaintiffs' have proposed standard accepted economic techniques for estimating pass-on change; and while they agree on the difficulty of performing such a regression analysis, there is no disagreement as to the validity of the proposed methodology. Dr. Leffler testified that in his opinion the Plaintiffs have the data sufficient to calculate an aggregate damages amount at trial.

The Court has options available should Plaintiffs' ultimately not be able to prove impact and damages on a class-wide basis. The Court can alter or amend the class certification order at any time or even decertify the class if Plaintiffs' are ultimately unable to prove impact and damages. The Court also retains the ability to grant a motion for directed verdict following Plaintiffs' case-in-chief if Plaintiffs' fail to prove their case.

Defendant Edward's, has shown his interest in this case to the court's satisfaction. The loss of his option is a sufficient interest to warrant a claim as a class representative

Windows NT purchasers should be excluded from the operating system class definition, and the starting date for the Word and Excel class should be adjusted forward to August, 1995.

The Court concludes that Certification of a Class of New Mexico Indirect Purchases of

Microsoft Products is proper and the request to dismiss Defendant Edward's as a class

representative is denied.

IT IS SO ORDERED.

Dated this 30th day of September 2002.          ~~DANIEL A. SANCHEZ~~

                                                DANIEL A. SANCHEZ, District Judge

# TAB D-12

Westlaw.

Not Reported in P.3d

Not Reported in P.3d, 2001 WL 403167 (Nev.Dist.Ct.), 2001-1 Trade Cases P 73,232

(Cite as: 2001 WL 403167 (Nev.Dist.Ct.))

C

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

District Court of Nevada.
Lucille POOLER, et al, Plaintiff,
v.
R.J. REYNOLDS TOBACCO COMPANY, et al,
Defendant.
**No. CV00-02674.**

April 4, 2001.

Jerry H. Mowbray, Esq., Reno, for Plaintiff.

Ben Furth, Esq., the Furth Firm, San Francisco, CA, for Plaintiff.

Thomas R.C. Wilson, Esq., McDonald, Carano, Wilson, McCune, Bergin, Frankovich & Hicks, Reno, for Defendant Philip Morris Inc.

David Boies, Esq., Jonathan D. Schiller, Esq., Sherab Posel, Esq., Boies Schiller & Flexner, Armouk, NY, for Defendant Philip Morris Inc.

Darryl Snider, Esq., Michael T. Williams, Esq., Kenneth L. Cherrof, Esq., Heller, Ehrman, White & McAuliffe, LLP, Washington, DC, for Defendant Philip Morris Inc.

Dan C. Bowen, Esq., Lionel, Sawyer & Collins, Reno, for Defendants Brown & Williamson Tobacco Corporation and R.J. Reynolds Tobacco Company.

Thomas F. Cullen, Esq., Edward L. Fourntain, Esq., William V. O'Reilly, Esq., Jones, Day, Reavis & Pogue, Washington, DC, for Defendant R.J. Reynolds Tobacco Company.

Irving Scher, Esq., Weil, Gotshal & Manges LLP, New York, N.Y., for Defendant Lorillard Tobacco Company.

Peter D. Isakoff, Esq., Holly E. Loiseau, Esq., Weil, Gotshal & Manges LLP, Washington, D.C., for Defendant Lorillard Tobacco Company.

Colin R. Kaas, Esq., Andrew R. McGaan, Esq., Barack S. Echois, Esq., Stephen R. Patton, Esq., Kirkland & Ellis, Washington, D.C., for Defendant Brown & Williamson Tobacco Corporation.

ORDER DENYING MOTION TO DISMISS
*1 The court has carefully considered the legal memoranda and exhibits submitted in support of and in opposition to defendants' motion to dismiss filed November 3, 2000 and the argument of counsel presented on March 30, 2001.

Three arguments are asserted in support of the motion to dismiss: (1) NRS 598A.210(2) does not permit suit by indirect purchasers for conduct that allegedly took place prior to amendment of the statute, effective October 1, 1999.(2) The Second Amended Complaint fails to allege acts committed in this state which are part of the alleged illegal conspiracy, as required by NRS 598A.060. (3) This action is barred by the applicable statute of limitations, NRS 598A.220, because the plaintiff does not allege with particularity affirmative acts of fraudulent concealment on the part of the defendants.

The Nevada Unfair Trade Practice Act (UTPA), as enacted in 1975, provided that "*any person* injured in his business or property," by reason of an alleged violation of the act may sue for treble damages, attorney fees and costs. The Nevada legislature declared that the provisions of the UTPA shall be "construed in harmony with prevailing interpretations of the federal antitrust statutes." NRS 598A.050. In *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), the United States Supreme Court decided that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in P.3d, 2001 WL 403167 (Nev.Dist.Ct.), 2001-1 Trade Cases P 73,232

(Cite as: 2001 WL 403167 (Nev.Dist.Ct.))

indirect purchasers had standing to bring antitrust claims under federal law but only for injunctive relief, not money damages. Applying the *Illinois Brick* decision under the authority of NRS 598A.050 , Judge Mark Handelsman entered a decision on April 3, 1995 in *DeVincenzi vs. Abbott Laboratories, et al*, Case No. CV94-02528, concluding that indirect purchasers had no standing under NRS 598A.210 to bring an action for recovery under UTPA.

The 1999 amendment of NRS 598A.210(2) provides that an action for damages may be instituted by "any person injured or damaged *directly or indirectly* in his business or property" by reason of a violation of UTPA. Does this amendment "change" prior law, thus precluding indirect purchaser actions for conduct occurring prior to October 1, 1999, or is it a "clarification" of the unaltered legislative intent to permit such actions by any injured party (whether damaged directly or indirectly) before and after the effective date of the amendment?

Although the word "change" appears in the legislative history of the amendment, it is apparent that the legislative action in 1999 was a response to the application of *Illinois Brick* to the Nevada act by Judge Handelsman in the *DeVincenzi* decision. The language of NRS 598A.210(2) prior to amendment is unambiguous: Any injured person may sue. There is no legislative history to suggest that when the UTPA was originally adopted the legislature distinguished between whether the injury was direct or indirect, or intended to preclude indirectly injured persons from bringing suit. The 1999 amendment, expressly including indirectly injured parties, does no more than to respond to the results in *Illinois Brick* and *DeVincenzi* by reaffirming the original legislative intent: any person injured by an alleged violation of the act may sue. Therefore, plaintiff's UTPA claims may be pursued in this action whether the alleged conduct of defendants occurred before or after the 1999 amendment of NRS 598A.210(2).

*2 Defendants next argue that the marketing and retail sale in Nevada of cigarettes at prices allegedly

established by an illegal conspiracy is insufficient to confer jurisdiction under UTPA because such sales alone do not constitute a conspiracy in restraint of trade or any part of activity prohibited under NRS 598A.060. The UTPA should be construed consistently with the legislative policy declared in NRS 598A.030, including preserving and protecting the free, open and competitive nature of our market system and penalizing "to the full extent allowed by law" of all persons engaged in anticompetitive practices. NRS 598A.030(2)(b), (c).

The Second Amended Complaint alleges that for decades the defendants have conspired to set the price of cigarettes significantly above competitive levels and that distributors and wholesalers routinely receive notification of impending price increases within hours and often minutes of defendants' price increase notification. It is alleged that through various incentive programs to distributors and/or retailers, defendants were able to monitor their conspiratorial actions and ensure that the mutually-agreed price levels were honored and thus that the conspiracy was enforced. Allegedly this course of conduct was implemented in both domestic and foreign markets. By obtaining the benefit of Nevada laws enabling the sale of cigarettes to indirect purchasers in this state, it is claimed that defendants "reaped at least tens of millions of dollars of profits." Second Amended Complaint, page 2, lines 24-27. The allegations of the Second Amended Complaint, taken as a whole, describe an illegal scheme whereby the price-fixing agreement, wholesale and retail marketing, incentive programs and retail sales to the ultimate consumer are integral to the nature, implementation, enforcement and success of the conspiracy. Therefore, the marketing and sales of tobacco products in Nevada during the time alleged and in the context of the other allegations of the Second Amended Complaint is sufficient to confer jurisdiction under NRS 598A.060.

Finally, defendants argue that the failure of plaintiff to allege the elements of fraudulent concealment requires dismissal of the UTPA claim under NRS 598A.220, the applicable statute of limitations. However, NRS 598A.220(1) does not require proof

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in P.3d                                                                                    Page 3

Not Reported in P.3d, 2001 WL 403167 (Nev.Dist.Ct.), 2001-1 Trade Cases P 73,232

(Cite as: 2001 WL 403167 (Nev.Dist.Ct.))

of fraudulent concealment, but only that the action
be brought within four years "after the plaintiff
discovered, or by the exercise of reasonable
diligence, should have discovered the facts relied
upon for proof of the conspiracy." The allegations
of the Second Amended Complaint, if true, are
sufficient to demonstrate that the plaintiff could not
have discovered, by the exercise of due diligence,
the alleged facts relied upon for proof of the
conspiracy.

Accordingly, the motion to dismiss is denied.

Not  Reported  in  P.3d,  2001  WL  403167
(Nev.Dist.Ct.), 2001-1 Trade Cases P 73,232

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB D-13

1  William Bernstein (State Bar No. 065200)
   Joseph R. Saveri (State Bar No. 130064)
2  LIEFF, CABRASER & HEIMANN
   275 Battery Street, 30th Floor
3  San Francisco, California 94111-3339
   Telephone:  (415) 956-1000
4
   Plaintiffs' Co-Lead and Co-Liaison Counsel
5



6

7

8                SUPERIOR COURT OF THE STATE OF CALIFORNIA

9            IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO

10

11  Coordination Proceeding          )  J.C.C.P. Nos. 2969, 2971 & 2972
    Special Title (Rule 1550(b))     )
12                                    )  Hon. Alfred G. Chiantelli
                                      )  Coordination Trial Judge
13  PHARMACEUTICAL CASES I, II,       )
    and III                          )
14                                    )
                                      )
15  _____  )
                                      )  San Francisco Sup. Ct. No.
16                                    )  962294
    THIS DOCUMENT RELATES TO:         )
17                                    )  ORDER CERTIFYING
    Preciado v. Abbott               )  CONSUMER CLASS
18  Laboratories                     )
                                      )
19  _____  )

20

21         The motion of plaintiffs Reyna Preciado (Barrero), Alan

22  Cutler, and Cynthia Alexis for class certification of the consume

23  class came on regularly for hearing before this Court on June 23,

24  1995.  The Court has considered the memoranda of the parties,

25  reviewed the evidence submitted, and has considered the oral

26  argument of counsel.  For good cause appearing therefor, the

27  motion for class certification of the consumer class is GRANTED (

28  the terms and conditions set forth in this Order.

                              -1-                        EXHIBIT A

1.   The class sought by the plaintiffs in these coordinated actions satisfies the numerosity requirement in that there are at least many thousands of individuals who purchased brand name prescription drugs ("Brand Name Prescription Drugs") manufactured and/or sold by the defendants.

2.   The class is ascertainable and its members posses. a commonality of interest in determining defendants' liability, any, for the course of conduct alleged in the Complaint.

3.   Common questions of law or fact, including the claimed existence, nature, scope and extent of the alleged conspiracy, as well as the claimed fact of injury, exist and predominate over any individual questions that may arise.

4.   The plaintiffs' claims are typical of the claims absent class members, as all such claims arise out of their indirect purchase of Brand Name Prescription Drugs from the defendants.

5.   Plaintiffs will fairly and adequately represent t class, and plaintiffs' counsel are skilled in prosecuting such class actions.

6.   The following plaintiffs shall serve as class representatives: Reyna Barrero, Alan Cutler, and Cynthia Alexis.

7.   The following law firms are qualified to and shal serve as class counsel:  Lieff, Cabraser, Heimann & Bernstein; L Offices of Francis O. Scarpulla; and the Law Offices of Sherman Kassof.

8.   This action is manageable as a class action.

Therefore, pursuant to Rules 23(a)(1)-(4) and 23(b)(3) of the Federal Rules of Civil Procedure, adopted for use by

-2-

1  California courts and California Code of Civil Procedure section

2  382 the following plaintiff class is certified:

3          All natural persons who, at the time notice is
        published, reside in the State of California
4          and who, beginning four years prior to
        July 12, 1994 through the present, indirectly
5          purchased Brand-Name Prescription Drugs
        through Independent Retail Pharmacies in the
6          State of California from any of the defendants
        for consumption by their families and/or
7          themselves and not for resale.  For purposes
        of this order, "Independent Retail Pharmacies"
8          shall mean retail pharmacies or retail
        pharmacy chains with ten locations or less.
9          Independent Retail Pharmacies shall not
        include pharmacies which are owned, operated,
10         controlled or managed by health maintenance
        organizations or hospitals.

11

        Excluded from the class are all natural
12         persons who purchased Brand-Name Prescription
        Drugs other than through Independent Retail
13         Pharmacies; all natural persons who obtained
        Brand-Name Prescription Drugs through the
14         MediCal Prescription Drug Program; and all
        natural persons who made no payment directly
15         to an Independent Retail Pharmacy for the
        purchase of a Brand Name Prescription Drug.
16

17         Counsel for the parties shall meet and confer on the

18  form of notice to be submitted to the class.

19         Further, the parties have stipulated and the Court

20  orders as follows:

21              (a)   The action captioned Lazio v. Abbott

22  Laboratories S.F. Superior Court No. 969870 is hereby dismissed.

23              (b)   The Complaint in the Preciado action shall b.

24  amended to add Lawrence Lazio as an additional party plaintiff a:

25  proposed class representative.   Defendants shall have until

26  September 15, 1995 to inform plaintiffs' counsel of their intent

27  to depose Mr. Lazio and/or to propound written discovery upon Mr

28  Lazio pertaining to his proposed designation as a class

-3-

1  representative.  This order shall not otherwise limit defendants'

2  ability to take future discovery of Mr. Lazio in accordance with

3  the Code of Civil Procedure.  Unless Defendants file a motion by

4  October 15, 1995 objecting to Mr. Lazio's designation as a class

5  representative, Mr. Lazio shall become on that date an additional

6  class representative without further order of this Court.

7          (c)  The law offices of Saveri & Saveri and Eric B

8  Freed are skilled in prosecuting class actions and shall also

9  serve as class counsel in this action.

10         IT IS SO ORDERED.

                                        ALFRED G. CHIANTELLI

11

                   AUG 1 6 1995

12                                      Honorable Alfred G. Chiantelli
                                        Judge of the Superior Court

13

Approved as to form:

14

15  _____

Leonard R. Stein

16  STEEFEL, LEVITT & WEISS
One Embarcadero Center, 30th Floor

17  San Francisco, California 94111

18

_____

19  Terrence A. Callan

PILLSBURY, MADISON & SUTRO

20  225 Bush Street
San Francisco, California 94104

21

22

[7652.PLEA]F30807

23

24

25

26

27

28

                        -4-

# TAB D-14

Westlaw.

Not Reported in S.W.3d                                                        Page 1

Not Reported in S.W.3d, 2003 WL 21780975 (Tenn.Ct.App.), 2003-2 Trade Cases P 74,109
(Cite as: Not Reported in S.W.3d)

▷

SEE COURT OF APPEALS RULES 11 AND 12
Court of Appeals of Tennessee.
Daniel SHERWOOD, et al.,
v.
MICROSOFT CORPORATION, et al.
No. M2000-01850-COA-R9-CV.

Jan. 31, 2001 Session.
July 31, 2003.
Application for Permission to Appeal Denied by
Supreme Court Aug. 2, 2004.

Appeal from the Circuit Court for Davidson
County, No. 99C-3562: Walter C. Kurtz, Judge.

Leo Bearman, Jr., Memphis, Tennessee, James A.
DeLanis, Richard H. Stout, Nashville, Tennessee,
for the appellants, Microsoft Corporation and Does
1 through 100, inclusive.
C. Dewey Branstetter, Jr., James G. Stranch, III,
George E. Barrett, Edmund L. Carey, Nashville,
Tennessee, for the appellees, Daniel Sherwood, Roy
Coggins and wife Sheila Coggins d/b/a Microfilm
Services and William Overton, individually and on
behalf of all others similarly situated.

PATRICIA J. COTTRELL, J., delivered the
opinion of the court, in which BEN H. CANTRELL
, P.J., M.S., and WILLIAM C. KOCH, JR., J.,
joined.

OPINION
PATRICIA J. COTTRELL, J.
*1 In this appeal, Plaintiffs, purchasers of Microsoft
software, sued Microsoft alleging that the company
violated the Tennessee Trade Practices Act and the
Tennessee Consumer Protection Act and claiming
that they paid inflated prices for software due to
Microsoft's alleged violations of Tennessee antitrust
law. Microsoft filed a motion to dismiss arguing
that Tennessee antitrust law applies to activities that

are predominantly intrastate in character and that
Microsoft's business is predominantly interstate.
Microsoft also argued that indirect purchasers have
no cause of action under the Tennessee Trade
Practices Act. The trial court found that federal law
does not provide a remedy for indirect purchasers in
antitrust cases and, consequently, those purchasers
must have a Tennessee state law remedy. The trial
court denied the motion to dismiss the claims of the
indirect purchasers, but because direct purchasers
have a federal law remedy, dismissed the claims of
the direct purchasers. We affirm in part, reverse in
part, and hold: (1) indirect purchasers may bring an
action for damages under the Tennessee Trade
Practices Act; (2) the Tennessee Trade Practices
Act applies to activity that has substantial effects on
commerce within the state, and Plaintiffs have made
sufficient allegations of such effects; and (3) the
Tennessee Consumer Protection Act does not apply
to antitrust causes of action or anticompetitive
conduct.

In this interlocutory appeal Microsoft Corporation ("
Microsoft") appeals the judgment of the trial court
that indirect purchasers of Microsoft software,
purchasers who bought a computer with the
software installed or purchased the software from a
dealer, have a cause of action against Microsoft
pursuant to the Tennessee Trade Practice Act ("
TTPA") and the Tennessee Consumer Protection
Act ("TCPA"). Plaintiffs appeal the decision of the
trial court dismissing the claims of the direct
purchasers, those who bought the software directly
from Microsoft.

This appeal raises difficult and complex issues of
state law, and its interrelationship to federal law,
that have been unaddressed in depth by the courts of
this state in almost a century. With the aid of
informative and well drafted briefs by the parties,
we have given thorough consideration to those
issues.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.W.3d, 2003 WL 21780975 (Tenn.Ct.App.), 2003-2 Trade Cases P 74,109
**(Cite as: Not Reported in S.W.3d)**

## I. Background

Plaintiffs filed suit seeking damages, injunctive relief, and equitable remedies under the TTPA, Tenn.Code Ann. §§ 47-25-101 to -2704, and the TCPA, Tenn.Code Ann. §§ 47-18-101 to -1808. The Plaintiffs are a class comprised of users of personal computers who bought Microsoft software, either separately or loaded in a computer. Plaintiffs alleged that Microsoft, the leading supplier of operating systems software for personal computers, engaged in conduct that eliminated or retarded the development of new software products that could support or become alternative platforms to Microsoft's operating systems. The Plaintiffs also contended that the price that they paid for their software was higher than it would have been in a competitive market. They emphasized the "massive" involvement of Microsoft in the Tennessee economy, and contended that Microsoft's conduct was within the scope of the TTPA and the TCPA.

> FN1. The class had not been certified. After appeal was granted herein, but prior to oral argument the trial court stayed this case for reasons unrelated to this appeal by order of October 23, 2000. The stay was lifted by order entered September 11, 2002.

*2 The trial court dismissed the claims of the direct purchasers and allowed the claims of the indirect purchasers. In its order, the court considered the history of the TTPA and Tennessee appellate courts' interpretation of the Act and found state law to " start where federal law stops." Further, the trial court held "that the TTPA is to cover 'all commerce not covered by the federal statute' and that the intention of the legislature was to ensure that there was no void where neither federal nor state law governs." Noting that indirect purchasers lacked standing to enforce federal antitrust law and that state antitrust laws could be applied to indirect purchasers, the trial court held that the indirect purchasers herein had a cause of action pursuant to state law. The court dismissed the claims of the direct purchasers.

The issue before us is not whether Microsoft has

engaged in conduct violative of either state or federal antitrust law; rather it is whether Plaintiffs have stated a cause of action against Microsoft under Tennessee law. The issues presented involve the scope of Tennessee statutes: (1) their applicability to parties who did not purchase directly from Microsoft; (2) their applicability to business activities that involve interstate commerce; and (3) their applicability to the conduct complained of.

The decision appealed is a partial grant and partial denial of a Tenn. R. Civ. P. 12.02(6) motion. Such a motion is designed to test the sufficiency of the complaint, and dismissal is warranted only when no set of facts would entitle the plaintiffs to relief. *Trau-Med of Am., Inc. v. Allstate Ins. Co.,* 71 S.W.3d 691, 696 (Tenn.2002). When reviewing the decision on such a motion, this court must take all the well-plead material factual allegations as true, construe the complaint liberally in favor of the plaintiffs, and give the plaintiffs the benefit of all reasonable inferences. *Id.; Stein v. Davidson Hotel Co.,* 945 S.W.2d 714, 716 (Tenn.1997); *Forman, Inc. v. Nat'l Council on Comp. Ins., Inc.,* 13 S.W.3d 365, 366 (Tenn.Ct.App.1999).

In their complaint, Plaintiffs alleged specific instances of anticompetitive conduct. More succinctly stated, their allegations are:
Microsoft possesses a dominant, persistent, and increasing share of the world-wide and Tennessee market for Intel-compatible PC operating systems. Because Microsoft's market share is so dominant, it prevents Intel-compatible PC operating systems other than Windows from attracting significant consumer demand. Plaintiffs allege that Microsoft engaged in conduct which eliminated or retarded the development of new software products that could support, or themselves become, alternative platforms to Microsoft's operating systems. Consequently, Plaintiffs and Class members have paid higher prices for Intel-compatible PC operating systems than they would have paid in a competitive market.

Plaintiffs brought this action pursuant to state antitrust law, embodied in the TTPA, which provides, in pertinent part:*3 All arrangements,

Not Reported in S.W.3d                                                                    Page 3

Not Reported in S.W.3d, 2003 WL 21780975 (Tenn.Ct.App.). 2003-2 Trade Cases P 74,109
(Cite as: Not Reported in S.W.3d)

contracts, agreements, trusts, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in the importation or sale of articles imported into this state, or in the manufacture or sale of articles of domestic growth or domestic raw material, and all arrangements, contracts, agreements, trusts, or combinations between persons or corporations designed, or which tend, to advance, reduce, or control the price or the cost to the producer or the consumer of any such product or article, are declared to be against public policy, unlawful, and void.

Tenn.Code Ann. § 47-25-101.Any arrangements, contracts, and agreements that may be made by any corporation or person, or by and between its agents and subagents, to sell and market its products and articles, manufactured in this state, or imported into this state, to any producer or consumer at prices reduced below the cost of production or importation into this state, including the cost of marketing, and a reasonable and just marginal profit, to cover wages or management, and necessary incidentals, as is observed in the usual course of general business, and the continuance of such practice under such contracts and arrangements for an unreasonable length of time, to the injury of full and free competition, or any other arrangements, contracts, or agreements, by and between its agents and subagents, which tend to lessen full and free competition in the sale of all such articles manufactured and imported into the state, and which amount to a subterfuge for the purpose of obtaining the same advantage and purposes are declared to be against public policy, unlawful, and void.

Tenn.Code Ann. § 47-25-102.

The TTPA provides a number of sanctions for violators, including criminal sanctions and revocation of the right to do business in the state. Tenn.Code Ann. §§ 47-25-103 & -104. While providing for enforcement by the Attorney General, it also provides a remedy to those injured by a violation:

Any person who is injured or damaged by such arrangement, contract, agreement, trust, or

combination described in this part may sue for and recover, in any court of competent jurisdiction, from any person operating such trust or combination, the full consideration or sum paid by the person for any goods, wares, merchandise, or articles, the sale of which is controlled by such combination or trust.

Tenn.Code Ann. § 47-25-106.

Issues of statutory construction are questions of law reviewed by the appellate courts *de novo* with no presumption of correctness accorded to the findings of the trial court. *Bryant v. Genco Stamping Mfg. Co.,* 33 S.W.3d 761, 765 (Tenn.2000); *Perry v. Sentry Ins. Co.,* 938 S.W.2d 404, 406 (Tenn.1996). In our review, we must apply well-settled principles. The role of the courts in construing statutes is to ascertain and give effect to the legislative purpose and intent without unduly restricting or expanding a statute's coverage beyond its intended scope. *Limbaugh v. Coffee Med. Ctr.,* 59 S.W.3d 73, 83 (Tenn.2001); *Mooney v. Sneed,* 30 S.W.3d 304, 306 (Tenn.2000). We attempt to ascertain that purpose or intent from the natural and ordinary meaning of the language used in the statute, without a forced or subtle interpretation that would limit or extend the statute's application. *Id.* We must presume the legislature meant what it said, and if the words plainly mean one thing, they cannot be given another meaning by use of judicial interpretation. *Gleaves v. Checker Cab. Transit Corp.,* 15 S.W.3d 799, 803 (Tenn.2000); *BellSouth Telecomm., Inc. v. Greer,* 972 S.W.2d 663, 673 (Tenn.Ct.App.1997).

*4 In the absence of ambiguity in the statute itself, the purpose and intent of the legislature are found in the language used. *Davis v. Reagan,* 951 S.W.2d 766, 768 (Tenn.1997). When the legislative purpose has been expressed in plain, clear and unambiguous language, courts look to that language and give effect to the statute according to the plaint meaning of its terms. *Limbaugh,* 59 S.W.3d at 83; *Planned Parenthood of Middle Tenn. v. Sundquist,* 38 S.W.3d 1, 24 (Tenn.2000); *Lavin v. Jordan,* 16 S.W.3d 362, 365 (Tenn.2000).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.W.3d, 2003 WL 21780975 (Tenn.Ct.App.), 2003-2 Trade Cases P 74,109
(Cite as: Not Reported in S.W.3d)

### II. No Direct Purchasers

The same lawsuit has been brought in a number of other states under each state's laws. The reason that state laws have been used rather than federal antitrust laws is because indirect purchasers cannot bring a cause of action for overcharge against an antitrust violator under the federal antitrust statutes. *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). Based upon the language of the Clayton Act, the Court held, "the overcharged direct purchaser, and not others in the chain of manufacture or distribution, is the party ' injured in his business or property' within the meaning of [§ 4 of the Clayton Act]." 431 U.S. at 729, 97 S.Ct. at 2067. Thus, for plaintiffs who are indirect purchasers, state law offers the only recourse, although many states follow the federal rule and do not allow actions by indirect purchasers.

In the case before us, the trial court made a distinction between direct and indirect purchasers based upon its interpretation of the relationship between state and federal antitrust law. The trial court agreed with Plaintiffs' argument that, "If an indirect purchaser is adversely affected by a transaction which impacts interstate commerce but is not covered by federal antitrust law, then the transaction is governed by the TTPA." Accordingly, the court held that "the cause of action alleging a violation of the TTPA is limited to indirect purchasers." The court granted the motion to dismiss "only as to the application of the TTPA to direct purchasers."

Our review of the pleadings indicates there are no direct purchasers involved in this litigation. Plaintiffs brought this action "on behalf of themselves and other persons or entities in the State of Tennessee who purchased Intel-compatible PC operating systems licensed by Microsoft for purposes other than resale or distribution." The individually named plaintiffs alleged they purchased either software, Windows 95 and Windows 98, or computers with Windows operating system software already installed. Every allegation by a named plaintiff is that the purchase was made from a retailer, not from Microsoft. The allegations all refer to operating system software "licensed by

Microsoft;" nowhere is there any allegation that any Plaintiffs actually bought anything directly from Microsoft.

> FN2. The complaint describes the process by which Microsoft authorizes or licenses original equipment manufacturers ("OEM" s) to copy its software for installation in the OEMs' computers which are then sold as a combined product under a single price.

These allegations indicate there are no direct purchasers among Plaintiffs. In fact, in some of their filings in the trial court, Plaintiffs argue that, as indirect purchasers, they are without a remedy under federal law. In other filings Plaintiffs argue that since Microsoft has stated that virtually all its sales are through middlemen, there is some possibility that there may have been some direct sales to some unknown Tennesseans. However, Plaintiffs have made no such claim themselves. The named plaintiffs cannot rely on unidentified persons who may have suffered an injury to state a claim for relief. *In re Terazosin Hydrochloride Antitrust Litig.,* 160 F.Supp.2d 1365, 1371 (S.D.Fla.2001). Each claim must be analyzed separately, and a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim. *Griffin v. Dugger,* 823 F.2d 1476, 1483 (11th Cir.1987), *cert denied,* 486 U.S. 1005, 108 S.Ct. 1729, 100 L.Ed.2d 193 (1988) . Plaintiffs' allegations that there might be some direct purchasers in this state do not give the actual plaintiffs a claim as a direct purchaser. *See Shotz v. Cates,* 256 F.3d 1077, 1081 (11th Cir.2001) (explaining that in evaluating standing, the court must look at "the facts alleged in the complaint" and "may not 'speculate concerning the existence of standing or 'piece together support for the plaintiff' ") (quoting *Cone Corp. v. Fla. Dep't of Transp.,* 921 F.2d 1190, 1210 (11th Cir.1991)); *USA v. AVX Corp.,* 962 F.2d 108, 115 (1st Cir.1992) (holding that in order to have standing, plaintiffs must demonstrate more than "purely conclusory allegations" and the pleadings "must be something more than an ingenious academic exercise in the conceivable").

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.W.3d, 2003 WL 21780975 (Tenn.Ct.App.), 2003-2 Trade Cases P 74,109
(Cite as: Not Reported in S.W.3d)

*5 The complaint also makes allegations regarding Microsoft's end user licence agreements, by which end users are granted a right to use the software for specified purposes. The end user license agreement is consummated when the end user installs or begins to use the software. Other than references to the end user licensing agreement, none of the plaintiffs alleges he or she entered into any transactions with Microsoft. While the Plaintiffs principally rely on the end user license agreements in support of other arguments, their filings can be read to rely on those agreements as establishing a relationship between the end user and Microsoft that makes them direct purchasers.

> FN3. Plaintiffs state that "depending on what discovery may develop further about the nature of the end user license agreements" a buyer-seller relationship " may be" fleshed out.

Indirect purchasers in similar suits under other state statutes have attempted to use the end user license agreement to establish an exception to the indirect purchaser preclusion from claims for damages or to demonstrate that the indirect purchasers are really direct purchasers. This argument has been uniformly rejected. See, e.g., Pomerantz v. Microsoft Corp., 50 P.3d 929, 934-35 (Colo.Ct.App.2002) (holding that the end user license agreement has "no bearing on whether the consumer is a direct purchaser...."); Davidson v. Microsoft Corp., 143 Md.App. 43, 792 A.2d 336, 342 (Md.Ct.Spec.App.2002) (affirming the trial court's dismissal of the consumers' claim where consumers were not direct purchasers despite arguing that end user license agreements made them direct purchasers); Minuteman, LLC & Assoc. v. Microsoft Corp., 147 N.H. 634, 795 A.2d 833, 840-41 (N.H.2002); Major v. Microsoft Corp., 60 P.3d 511, 515 (Okla.Ct.App.2002); Siena v. Microsoft Corp., 796 A.2d 461, 465 (R.I.2002) (stating "the enormous number of potential litigants created by adopting such a warranty or end user license exception to Illinois Brick Co. is, in itself, instructive ... [and] these incidental agreements do not exempt plaintiffs' claims from the purview of Illinois Brick Co."). We agree with the reasoning of

these courts that the end user licensing agreement, a method used to protect copyrights, does not transform indirect purchasers into direct purchasers.

Although the named Plaintiffs never actually plead status as direct purchasers, they nonetheless appeal the trial court's dismissal of claims by direct purchasers. If we could conclude that any direct purchasers were involved in this lawsuit, we would be inclined to agree with Plaintiffs that the TTPA provides a cause of action for direct purchasers by its own terms. Such a cause of action is viable for either direct or indirect purchasers, however, only if subject matter jurisdiction exists or, stated differently, if the TTPA applies.

> FN4. Because the plaintiffs have not alleged that they are direct purchasers of Microsoft products, we affirm the trial court's dismissal on behalf of direct purchasers.

### III. The Scope of the TTPA

Section 1 of the Sherman Act makes contracts, combinations, and conspiracies "in restraint of trade or commerce among the several states" illegal. 15 U.S.C. § 1. Similarly, Section 2 of the Act prohibits monopolies and conspiracies to monopolize "any part of the trade or commerce among the several States." 15 U.S.C. § 2. Consequently, there is an interstate commerce jurisdictional requirement under the Act. Summit Health, Ltd. v. Pinhas, 500 U.S. 322, 11 S.Ct. 1842 (1991).

*6 The scope of Congress's authority to legislate under the Commerce Clause, and the " correspondingly broad reach of the Sherman Act," have evolved through judicial holdings. See United States v. Lopez, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (tracing the development of the Court's interpretation). In Lopez, the Court enumerated three broad categories of activity that Congress may regulate under its commerce power, the one relevant herein being "those activities having a substantial relation to interstate commerce, i.e., those activities that substantially affect interstate commerce." United States v. Morrison,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.W.3d, 2003 WL 21780975 (Tenn.Ct.App.), 2003-2 Trade Cases P 74,109
(Cite as: Not Reported in S.W.3d)

529 U.S. 598, 608-09, 120 S.Ct. 1740, 1749, 146 L.Ed.2d 658 (2000) (quoting *Lopez*, 514 U.S. at 558-59, 115 S.Ct. at 1624) (citing *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37, 57 S.Ct. 615, 624, 81 L.Ed. 893 (1937)).

Federal courts have often been called upon to determine whether activity is sufficiently interstate in nature to bring it within Congress's power to regulate interstate commerce. That authority, exercised in this situation through antitrust statutes, extends beyond activities actually "in" or "part of" interstate commerce. Activities that are wholly local in nature, but that substantially affect interstate commerce, are also included in the reach of federal antitrust statutes. *McLain v. Real Estate Bd. of New Orleans*, 444 U.S. 232, 241, 100 S.Ct. 502, 508, 62 L.Ed.2d 441 (1980).

Just as actions under federal antitrust statutes can proceed only if there is a jurisdictional basis in interstate commerce, a plaintiff seeking relief under state antitrust statutes must show that those statutes apply, whether such a showing is required to establish subject matter jurisdiction or simply to state a claim. Microsoft argues that Plaintiffs herein have failed to make the required allegations because the commerce affected by the conduct complained of is predominantly interstate, not intrastate.

It is undisputed that Microsoft is involved in interstate commerce. Microsoft is the leading supplier of operating systems for personal computers and transacts business throughout the United States and in most countries of the world. Plaintiffs accuse Microsoft of unlawful monopolization of the worldwide licensing market for all Intel-compatible operating systems software and allege this conduct affected prices of software throughout the country and the world. Despite the clear effect Microsoft's business activities have on interstate commerce and the interstate nature of the allegations, Plaintiffs herein have brought this action under state law because they have no federal cause of action. Plaintiffs maintain that Microsoft's anticompetitive conduct, although occurring primarily out of state and affecting interstate commerce, is nonetheless covered by the Tennessee statute because of the substantial adverse effect that

conduct had on commerce within the state.

The question presented is not one of federal preemption or federal limitation on the scope of state legislation. As a general rule, federal antitrust law does not preempt state antitrust law. "Congress intended the federal antitrust laws to supplement, not displace, state antitrust remedies. And on several prior occasions, the Court has recognized that the federal antitrust laws do not pre-empt state law." *Cal. v. ARC Am. Corp.*, 490 U.S. 93, 101-102, 109 S.Ct. 1661, 1666, 104 L.Ed.2d 86 (1989). State antitrust laws "are consistent with the broad purposes of the federal antitrust laws: deterring anticompetitive conduct and ensuring the compensation of victims of that conduct." *Id.* " Antitrust law ... is a field in which Congress has not sought to replace state with federal law." *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 611 (7th Cir.1997). As one court has explained:

*7 Although the U.S. Supreme Court has not explicitly held that state antitrust statutes may apply to matters involving both intrastate and interstate commerce, it has upheld application of state antitrust laws in cases in which those laws clearly affected interstate commerce. *See California v. ARC America Corp.*, 490 U.S. 93, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989); *U.S. v. Underwriters Assn.*, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944); *Watson v. Buck*, 313 U.S. 387, 61 S.Ct. 962, 85 L.Ed. 1416 (1941).

Moreover, several lower federal courts have expressly determined that the Commerce Clause of the U.S. Constitution does not necessarily preclude the application of state antitrust laws to interstate commerce. *Shell Oil Co. v. Younger*, 587 F.2d 34 (9th Cir.1978), *cert. denied*, 440 U.S. 947, 99 S.Ct. 1425, 59 L.Ed.2d 635 (1979); *Woods Exploration & Pro. Co. v. Aluminum Co. of Amer.*, 438 F.2d 1286 (5th Cir.1971), *cert. denied*, 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972); *Mathews Conveyer Co. v. Palmer-Bee Co.*, 135 F.2d 73 (6th Cir.1943).

Indeed, several state courts have reasoned that neither federal antitrust legislation nor the Commerce Clause precludes application of state antitrust laws to all interstate commerce. *Younger v. Jensen*, 26 Cal.3d 397, 605 P.2d 813, 161 Cal.Rptr.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

905 (1980); *State v. Sterling Theatres Co.,* 64 Wash.2d 761, 394 P.2d 226 (1964); *State v. Southeast Tex. Chap. Of Nat. Elec. Con. Ass'n,* 358 S.W.2d 711 (Tex.Civ.App.1962), *cert. denied,* 372 U.S. 969, 83 S.Ct. 1094, 10 L.Ed.2d 131 (1963); *Peoples Savings Bank v. Stoddard,* 359 Mich. 297, 102 N.W.2d 777 (1960); *State v. Allied Chemical & Dye Corp.,* 9 Wis.2d 290, 101 N.W.2d 133 (1960); *Commonwealth v. McHugh,* 326 Mass. 249, 93 N.E.2d 751 (1950); *C. Bennett Bldg. Supplies v. Jenn Air,* 759 S.W.2d 883 (Mo.App.1988); *State v. Coca Cola Bottling Co. of Southwest,* 697 S.W.2d 677 (Tex.App.1985), *appeal dismissed,* 478 U.S. 1029, 107 S.Ct. 9, 92 L.Ed.2d 764 (1986).

*Heath Consultants, Inc. v. Precision Instruments, Inc.,* 247 Neb. 267, 527 N.W.2d 596, 606-07 (Neb.1995). *See also Waste Control Specialists, LLC v. Envirocare of Tex. Inc.,* 199 F.3d 781, 783 (5th Cir.2000); *Blake v. Abbott Labs., Inc.,* 894 F.Supp. 327, 328-29 (E.D.Tenn.1995); *Two Queens, Inc. v. Scoza,* 296 A.D.2d 302, 304, 745 N.Y.S.2d 517 (N.Y.App.Div.2002) (stating that "It is by now well settled that states can enact and enforce, through their courts, legislation which affects interstate commerce 'when such commerce has significant local consequences' ").States now have the power to condemn antitrust violations that occur anywhere in the nation, provided that there are sufficient harmful effects within the state itself. The commerce clause of the United States Constitution is not a substantial barrier to the application of a state's antitrust law to activities occurring outside the state. The Supreme Court has insisted on upholding state antitrust laws under the dormant commerce clause by holding as a general matter that such laws do not interfere with the interstate flow of goods and do not discriminate against interstate commerce. At the same time, the courts refuse to find state antitrust laws preempted by federal antitrust law, unless the conflict is so sharp that compliance with the state law would require violation of the federal law. Even in that instance, the 'state action' exemption from the federal antitrust laws might permit enforcement of the state law.

*8 Herbert Hovenkamp, *State Antitrust in the Federal Scheme,* 58 Ind. L.J. 375, 431 (1983).

Thus, the fact that Microsoft engages in interstate commerce does not, under federal law, preclude actions brought under state statutes. Specific conduct can subject a defendant to liability under both federal law and similar state statutes. The District Court in *United States v. Microsoft Corp.,* 87 F.Supp.2d 30, 54 (D.C.2000), found that the facts "proving that Microsoft unlawfully maintained its monopoly power in violation of § 2 of the Sherman Act are sufficient to meet analogous elements of causes of action arising under the laws of each plaintiff state." The reviewing court affirmed in part and reversed in part the trial court's findings on violations of the Sherman Act. *United States v. Microsoft Corp.,* 253 F.3d 34, 46 (D.C.Cir.2001). The Court of Appeals for the D.C. Circuit agreed that Microsoft possessed monopoly power over the relevant market and that it had engaged in anticompetitive conduct to preserve that monopoly in the operating systems software market. The court, however, reversed the district court's finding that Microsoft had unlawfully attempted to extend its monopoly into the internet browser market. The court held that its "judgment extends to the District Court's findings with respect to the state law counterparts of the plaintiffs' Sherman Act claims." *Id.* 253 F.3d at 42. Thus, the appellate court affirmed the district court's finding that Microsoft had violated state antitrust laws as well as the Sherman Act with respect to the operating system software.

> FN5. The District Court cited state statutes from California, Connecticut, District of Columbia, Florida, Illinois, Iowa, Kansas, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, New Mexico, New York, North Carolina, Ohio, Utah, West Virginia, and Wisconsin.

> FN6. The court remanded the issue of whether Microsoft had illegally tied its browser and operating system. On remand, the United States decided not to pursue the tying claim. *See United States v. Microsoft Corp.,* 215 F.Supp.2d 1, 3 n. 2 (D.D.C. July 2, 2002).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.W.3d                                                                              Page 8

Not Reported in S.W.3d, 2003 WL 21780975 (Tenn.Ct.App.), 2003-2 Trade Cases P 74,109
(Cite as: Not Reported in S.W.3d)

FN7. That case was an enforcement action brought by the Department of Justice and a number of state attorneys general. In other cases brought by private parties, defendants have also been subject to liability under both federal and state antitrust laws. *See, e.g., Griffiths v. Blue Cross and Blue Shield of Ala.,* 147 F.Supp.2d 1203, 1214-15 & 1221 (N.D.Ala.2001) (holding that the complaint alleged restraint of trade under Section 1 of the Sherman Act; made sufficient allegations that the primarily intrastate commercial restraint substantially affected interstate commerce to sustain federal jurisdiction; and, based upon the same underlying factual allegations, also made claims under Alabama's antitrust statutes because it claimed an intrastate restraint of trade with effects on both intrastate and interstate commerce); *In re Terazosin Hydrochloride Antitrust Litig.,* 160 F.Supp.2d 1365 (S.D.Fla.2001) (granting partial summary judgment to direct purchaser plaintiffs on Sherman Act claim and considering indirect purchasers' claims under various state antitrust laws); *In re Cardizem CD Antitrust Litig.,* 105 F.Supp.2d 618 (E.D.Mich.2000) (involving direct purchasers bringing claims under the Sherman Act and indirect purchasers bringing claims under antitrust statutes of eight states).

The interstate versus intrastate commerce issue is only raised as a defense where it is arguable that a particular state statute has limited the scope of its antitrust statute by imposing a greater connection with or impact upon commerce within the state than is the general constitutionally required standard. Apparently, only a few states fall in that category; Tennessee is one. *See, e.g., Cardizem CD Antitrust Litig.,* 105 F.Supp. 618 (E.D.Mich.2000) (involving claims of violation of the antitrust laws of eight states, but raising the interstate versus intrastate commerce issue only as to Wisconsin and Tennessee); *FTC v. Mylan Labs., Inc.,* 62 F.Supp.2d 25, 42 (D.C.1999), *petitions for*

*reconsideration granted in part,* 99 F.Supp. 1 (1999) (involving claims under antitrust laws of thirty-two states with defendants asserting the claims must be dismissed if the state law applies only to intrastate violations, the court finding that only the Louisiana, South Carolina, Tennessee, and Utah statutes required examination under this argument ); *In re Terazosin Hydrochloride Antitrust Litig.,* 160 F.Supp.2d 1365 (S.D.Fla.2001) (involving claims under the antitrust and consumer protection statutes of eighteen states, with challenges as to an intrastate conduct requirement made only to the Tennessee and Wisconsin statutes).

FN8. The court held that state courts in Louisiana were undecided on whether their statute's "restraint of trade or commerce in *this state*" required that the violation occur in the state, that South Carolina's antitrust act applies only to intrastate commerce but its unfair trade practices act was not so limited, that the Utah statute only applied where the violation occurs in the state, and that the Tennessee statute applied only to violations occurring within the state).

*9 Thus, it is not federal law that determines whether Tennessee has jurisdiction under the TTPA. Rather, it is state law that determines what degree of connection with or impact upon commerce within the state must exist.

FN9. Lawsuits essentially identical to the one before us have been brought by indirect purchasers in a number of states, and none has been dismissed on the basis that federal law requires that the suit be brought under the Sherman Act because of its interstate commerce aspects. That argument has not been made by Microsoft in those cases, and it does not make that argument herein. Both parties herein agreed that to the extent the trial court's decision was based upon the exclusivity of federal and state antitrust statutes, that decision was in error.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

### A. What Tennessee Courts Have Said About the Tennessee Standard

Although federal courts and courts in other states have attempted to determine the reach of Tennessee's antitrust statute, our state courts have spoken rarely on the topic. We begin with the seminal case, *Standard Oil Co. v. State,* 117 Tenn. 618, 100 S.W. 705 (1907), the Tennessee Supreme Court's last statement on the issue.

> FN10. The Court has considered antitrust issues, such as the requirement of an actual antitrust injury, in cases construing other statutes. *See GHEM, Inc.,* 850 S.W.2d 447 (Tenn.1993) (construing the Petroleum Trade Practices Act); *Walker v. Bruno's, Inc.,* 650 S.W.2d 357 (Tenn.1983) (holding that the Tennessee Unfair Milk Sales Act did not conflict with the Sherman Act). *See also State ex rel. Attorney Gen. v. Burley Tobacco Growers' Co-Operative Ass'n,* 2 Tenn.App. 674 (Tenn.Ct.App.1927) (holding, in a suit to prohibit association from transacting business in this state for violation of antitrust statutes, that a statute allowing co-operative marketing legalized practices that might have previously been illegal).

*Standard Oil* involved a constitutional challenge to the TTPA. In that case, the Standard Oil Company and its employee, Mr. Holt, were indicted for violating state antitrust laws by making an unlawful agreement for the purpose of lessening competition in the sale of coal oil. The company and its agents induced customers in Gallatin to cancel orders they had placed with a competitor by offering the customers quantities of free oil. Once it again became the sole supplier of coal oil in the area, the company raised its prices. After being found guilty by a jury, Standard Oil and Mr. Holt appealed and therein assailed the constitutionality of the statue, arguing that it was invalid because it was an attempt at regulation of interstate commerce. The Tennessee Supreme Court disagreed.

> FN11. The language of the act defining the prohibited conduct has not changed since the Court interpreted it in *Standard Oil.*

It is important to recognize the basis for the constitutional challenge so that the Court's holdings can be placed in proper context. Standard Oil argued that to the extent the statute applied to transactions relating to the importation of articles of commerce from other states, it impinged upon Congress's exclusive power to regulate interstate commerce. Based upon its determination of the legislative intent behind the statute, the Court held that the statute did not apply to interstate commerce "when properly construed," and stated, "the sole object and purpose of the enactment of it was to correct and prohibit abuses of trade within the state." 117 Tenn. at 635, 100 S.W. at 709.

> FN12. In pertinent part, the statute made unlawful arrangements lessening competition "in the importation or sale of articles imported into this state." Tenn.Code Ann. § 47-25-101.

Applying fundamental rules of statutory construction, including an examination of the history of the time when the statute was passed, the Court concluded:

The Legislature was cognizant, we must presume, that it had no power to enact laws regulating interstate commerce, and did not intend to enact unconstitutional law, in whole or in part. There was already then in force an act of Congress, the Sherman Antitrust Act, enacted in 1890, fully covering that subject, the provisions of which were much broader and more effective than those of this act, and could be enforced to their fullest extent by the stronger and more vigorous government. There was neither the power nor the necessity for enacting any legislation relative to interstate commerce. **The wrongs to trade which were intended to be corrected and punished were those being perpetrated against commerce within the state,** which Congress could not reach, and for which there was then no efficient remedy.

**\*10** *Id.* 117 Tenn. at 639-40, 100 S.W. at 710

Not Reported in S.W.3d                                                                                    Page 10

Not Reported in S.W.3d, 2003 WL 21780975 (Tenn.Ct.App.), 2003-2 Trade Cases P 74,109
(Cite as: Not Reported in S.W.3d)

(emphasis added).

The Court found that the convictions were based
upon charges and proof of agreements to lessen
competition in the sale of coal oil that had already
been imported into the state prior to the agreement .
117 Tenn. at 646-47, 100 S.W. at 712. This finding
was consistent with the Court's interpretation of the
word "importation" as used in the statute, to include
articles "which had been imported from other states
and countries, commingled with the common mass
of property in this state, and no longer articles of
interstate commerce." *Id.* at 117 Tenn. at 642-43,
100 S.W. at 711.

> FN13. The appellants had argued that the
> statute impinged on interstate commerce
> because it was applied, in their case, to an
> arrangement relating to property to be
> thereafter imported into the state. The
> Court made clear, however, that there was
> no averment that the agreement was made
> to lessen competition in the sale of coal oil
> intended to be imported by Standard Oil's
> competitor. 117 Tenn. at 642-43, 100 S.W.
> at 711.

Relying on precedent holding that commerce in "
such" imported articles may be regulated by state
legislation, the Court determined that the
legislature's intent was to protect commerce in
articles already imported into the state because that
commerce would not otherwise be protected if not
expressly mentioned in the statute; it needed the
same protection as commerce in domestic products
due to the investment of Tennessee citizens in
imported property; and because:

> FN14. This conclusion was based upon the
> narrow interpretation of Congress's
> Commerce Clause power that prevailed at
> the time.

[t]he Legislature clearly intended to prohibit trusts,
combinations, and agreements affecting all
commerce not covered by the federal statute, and
upon which it had a right to legislate. It did not

intend to stop short of its power or to exceed it.
*Standard Oil,* 117 Tenn. at 643, 100 S.W. at 711
(emphasis added).

The Court's holdings were shaped in the context of
two expressed principles. One, that it is the courts'
duty to construe a statute so as to avoid conflict
with the United States Constitution, if such
construction can be accomplished without disregard
of the evident intent of the legislature. 117 Tenn. at
642, 100 S.W. at 710. Second, that even though the
legislature may include overly broad terms in a
statute, it is the duty of the courts to limit
application of the statute to those situations that
were within the intent of the legislature. *Id.* 117
Tenn. at 643, 100 S.W. at 711.

We interpret *Standard Oil* as holding, whether
because of Constitutional limitations or because of
imputed legislative intent consistent with those
limitations, that the state antitrust statute did not
infringe on Congress's exclusive power to regulate
interstate commerce. All of the Court's findings in
that case were made in the context of the
constitutionally allowed scope of authority of state
legislatures in the areas of antitrust law and
interstate commerce and the court's duty to interpret
the statute so as to avoid constitutional invalidity.

Shortly after the *Standard Oil* criminal case, the
Attorney General sought to enjoin the out-of-state
corporation from doing business in the state based
upon the same conduct that resulted in the criminal
convictions. On appeal, Standard Oil raised the
same interstate commerce infringement challenge to
the statute, and the Tennessee Supreme Court
merely recited and readopted its holdings in
*Standard Oil. State ex rel. Cates v. Standard Oil
Co. of Ky.,* 120 Tenn. 86, 110 S.W. 565 (1908),
*aff'd by Standard Oil of Ky. v. State of Tenn., ex rel.
Cates,* 217 U.S. 413, 30 S.Ct. 543, 54 L.Ed. 817
(1910). The case eventually went to the United
States Supreme Court, which upheld the ouster of
the foreign corporation and stated:

*11 The present statute ... does not regulate
business at all. It is not even directed against
interference with that business specifically, but
against acts of a certain kind that the state
disapproves in whatever connection. The mere fact

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.W.3d                                                                     Page 11

Not Reported in S.W.3d, 2003 WL 21780975 (Tenn.Ct.App.), 2003-2 Trade Cases P 74,109
(Cite as: Not Reported in S.W.3d)

that it may happen to remove an interference with commerce among the states as well as with the rest does not invalidate it.

217 U.S. at 422, 30 S.Ct. at 544.

This statement provides another explanation for the Tennessee Supreme Court's determination that the Act did not unconstitutionally attempt to regulate interstate commerce that is consistent with that court's earlier statement in *State ex rel. Astor,* 104 Tenn. 715, 740-41, 59 S.W. 1033, 1039 (1900), that the act's inclusion of imported goods was not an interference with interstate commerce or a regulation of such commerce. It also demonstrates that even at that time there was no clear demarcation between interstate and intrastate commerce and no complete exclusivity. The Tennessee Supreme Court had said the same thing in *Standard Oil,* when it recognized that the TTPA could reach conduct "where interstate commerce is incidentally affected." 117 Tenn. at 647, 100 S.W. 712.

The Tennessee Court of Appeals has discussed the interpretation of the TTPA in only a few cases. The first is *Lynch Display Corp. v. Nat'l Souvenir Ctr.,* 640 S.W.2d 837 (Tenn.Ct.App.1982). In that case, Lynch, a Maryland corporation manufacturing and leasing wax figures for museums, agreed to manufacture and lease to Historical Reviews, Inc. (" HRI"), a Tennessee Corporation that operated a wax museum in Gatlinburg, 90 wax figures to be displayed in its museum. The lease agreement included a provision that required HRI to enter into a franchising agreement with National Historical Museum, Inc. ("NHM"), a District of Columbia corporation.

> FN15. HRI was a wholly owned subsidiary of National Souvenir Center, Inc., a District of Columbia corporation that was also a party to this suit.

When HRI stopped making payments under the franchise agreement, Lynch brought suit. HRI counterclaimed and defended on the basis that the original lease and franchising agreement were

forced on HRI because of the monopoly position of Lynch and, consequently, the agreements were void under the Tennessee antitrust statute. This court determined that the Tennessee antitrust statute could not be used as the basis for either the counterclaim or the defense because that statute was simply not applicable. It agreed with the trial court's conclusion that the activities of the parties "were acts exclusively in interstate commerce and therefore not within the purview of the Tennessee Antitrust Act." 640 S.W.2d at 838. The court held:
The Tennessee antitrust law applies to transactions which are *predominantly* intrastate in character. The transaction does not have to be *exclusively* intrastate to be affected. The old constitutional doctrine of mutual exclusivity between state and federal laws affecting commerce has long been rejected. The Tennessee Supreme Court has recognized this fact in the important opinion *Standard Oil Co. v. State.* ...

> FN16. In support of this statement, the court cited *S.C. Hwy. Dep't v. Barnwell Bros.,* 303 U.S. 177, 58 S.Ct. 510, 82 L.Ed. 734 (1938) and *Union Brokerage Co. v. Jensen,* 322 U.S. 202, 64 S.Ct. 967, 88 L.Ed. 1227 (1944).

*12 640 S.W.2d at 840. Applying the standard of " predominantly intrastate," the court reached the conclusion that the subject of the dispute, the lease and franchise agreement between instate and out-of-state corporations, was "predominantly interstate in character [and] only incidentally affects intrastate commerce." *Id.*
[T]he predominant character of these agreements is interstate commerce. The goods, services, and payment for them is flowing between parties in different states. Appellants argue in their briefs that the wax museum has been established in Gatlinburg for 17 years and regularly sells tickets to customers in exchange for admission and that this fact establishes significant intrastate commerce. Although this is unquestionably intrastate commerce, it is of a nature incidental to the predominant agreements in this dispute. Hence, the Tennessee antitrust statute does not apply.

Not Reported in S.W.3d, 2003 WL 21780975 (Tenn.Ct.App.), 2003-2 Trade Cases P 74,109
(Cite as: Not Reported in S.W.3d)

*Lynch Display Corp.*, 640 S.W.2d at 840-41.

This court again addressed the application of the TTPA in *Blake v. Abbott Labs., Inc.*, No. 03A01-9509-CV-00307, 1996 WL 134947 (Tenn.Ct.App. Mar.27, 1996) (no Tenn. R.App. P. 11 application filed). The plaintiffs in *Blake* alleged that the defendants, Abbott Laboratories, an out-of-state company distributing nationwide, grossly overcharged Tennessee consumers who purchased infant formula in the state. This court found that the only sufficiently plead facts were that the defendants, along with others, conspired to fix prices and did fix prices of formula.

In the portion of the opinion relevant to this issue, the court in *Blake* reiterated the "predominantly intrastate" standard established in *Lynch*, but proceeded to apply the test to the effect of the allegedly illegal conduct on commerce. The court determined that there were not sufficient facts alleged to make a finding "that the transactions complained of predominantly affect interstate commerce as opposed to intrastate commerce" and, consequently, dismissal under Tenn. R. Civ. P. 12 was inappropriate. 1996 WL 134947, at *5. However, "if it is later determined by some manner cognizable under Tennessee law that the actions complained of by the plaintiff predominantly affect interstate commerce, then the defendants must prevail on this issue." *Id.*

Finally, this court was called upon to interpret Tennessee's antitrust statutes in *Forman v. Nat'l Council on Comp. Ins., Inc.*, 13 S.W.3d 365 (Tenn.Ct.App.1999), but only on the question of whether workers' compensation insurance, an intangible contract right or service, was an article or product subject to those statutes. This court found that the antitrust statutes did not apply to insurance and declined to adopt the argument that *Standard Oil* indicated that the state statute should be interpreted expansively to encompass claims not precluded by the federal antitrust statutes, at least with regard to the definition of articles or goods.

### B. What Other Courts Have Said About the Tennessee Standard

*13 A number of courts not part of the Tennessee court system have examined the scope of Tennessee's antitrust statute using the scant state authority discussed above. While those decisions are not binding on the courts of this state, they are informative and demonstrate the differing and even inconsistent conclusions that have been reached.

> FN17. Some of those courts have relied upon an additional opinion this court is precluded from addressing because the Tennessee Supreme Court concurred in results only when it denied permission to appeal. Pursuant to Tenn. R. Sup.Ct. 4(F), an intermediate court opinion so designated may not be cited by any judge or by any litigant. Because courts outside our state court system have cited the opinion, however, it is prudent for us to provide the name and citation: *Dzik & Dzik, P.C. v. Vision Serv. Plan*, No. 836, 1989 WL 3082 (Tenn.Ct.App. Jan.20, 1989) (permission to appeal denied, concurring in results only, Aug. 7, 1989).

> FN18. This court has described the effect of the interpretation of state law by federal courts as follows:
> *Federal courts look to the law of the state as declared by its highest court when they decide questions of state law. In the absence of an authoritative pronouncement by the state's highest court, the federal courts may either certify the state law question to the state's highest court for an interpretation,* Tenn. S.Ct. 23; *Arizonans for Official English v. Arizona*, 520 U.S. 43, 76-78, 117 S.Ct. 1055, 1073-74, 137 L.Ed.2d 170 (1977), *or ascertain and apply the state law as they understand it from available sources. United States v. Anderson County*, 761 F.2d 1169, 1173 (6th Cir.1953). *When a federal court undertakes to decide a state law question in the absence of authoritative state precedent, the state courts are not bound to follow the federal court's decision.*
> *Townes v. Sunbeam Oster Co., Inc.*, 50

Not Reported in S.W.3d                                                                    Page 13

Not Reported in S.W.3d, 2003 WL 21780975 (Tenn.Ct.App.), 2003-2 Trade Cases P 74,109
(Cite as: Not Reported in S.W.3d)

S.W.3d 446, 452 (Tenn.Ct.App.2001).

In a reported decision by a federal court in
Tennessee, *Valley Prods. Co., Inc. v. Landmark,*
877 F.Supp. 1087 (W.D.Tenn.1994), the court,
relying on *Lynch,* held that the Tennessee antitrust
statute applies to transactions that are
predominantly intrastate in character. "Although the
dispute need not be exclusively intrastate to fall
within the statute, it must more than incidentally
affect intrastate commerce." *Id.* 877 F.Supp. at 1095
. The court held that the standard was not met
because "[t]he matter before the court clearly
involves significant interstate commerce and
activity and only minimally affects intrastate
commerce. HFS franchisees are located in every
state in the country and the sale of guest amenities
necessarily implicates many geographic regions." *Id.*

FN19. In *Duke v. Browning-Ferris Indus.
of Tenn., Inc.,* No. 96-2859-TUA, 1996
WL 33415134 (W.D.Tenn. Oct.22, 1996),
the court considered an antitrust claim
under the Tennessee statute that was
essentially the same as one brought by the
plaintiff in another case under federal law.
The court viewed its task as determining
whether a cause of action had been alleged
under the *Sherman Act* or under state law,
stating, "The main distinction between
claims under the Tennessee and the federal
statutes is that the Sherman Act prohibits
monopolization in interstate commerce,
while the Tennessee statute only applies if
the action is predominantly intrastate."
1996 U.S. Dist. LEXIS at *7-*8. In a third
case, *Blake v. Abbott Labs., Inc.,* 894
F.Supp. 327 (E.D.Tenn.1995), the court
did not address the merits of plaintiffs'
claim under state law, but commented that
the Tennessee Supreme Court had
narrowly construed Tennessee antitrust law
in *Standard Oil.* 894 F.Supp. at 330.

Federal courts outside this state have also been
called upon to apply the TTPA. In *FTC v. Mylan
Labs., Inc.,* 62 F.Supp.2d 25 (D.C.1999) the United

States District Court for the District of Columbia
considered claims brought by thirty-two states
under the Sherman Act as well as under each
individual state's antitrust laws. The initial lawsuit
brought by the FTC alleged the defendants were
engaging in unfair methods of competition in or
affecting commerce. The states joined in adopting
these allegations, added another defendant, and
alleged an illegal price-fixing agreement.

The defendants moved to dismiss the state law
claims on various grounds, one being that the state
law challenges to the interstate conduct alleged
must be dismissed if the state law applies only to
intrastate violations of the law. With regard to
Tennessee, the court dismissed all claims brought
under the TTPA and the TCPA "because both
statutes apply only to violations occurring in
intrastate commerce," relying on *Standard Oil.
Mylan Labs., Inc.,* 62 F.Supp.2d at 51. *See also
FTC v. Mylan Labs., Inc.,* 99 F.Supp.2d 1, 4
(D.C.Cir.1999) (reaffirming on motion to
reconsider its decision to dismiss the Tennessee
claims because the conduct complained of was
predominantly interstate).

The same court in a later case saw fit to "expound
upon its rationale" for ruling in *Mylan Labs* that the
national conspiracy affecting thirty-two states was
outside the ambit of Tennessee's antitrust laws. *In re
Vitamins Antitrust Litig.,* 2001 WL 849928 (D.D.C.
Apr.11, 2001). The court emphasized that the
Tennessee Supreme Court had narrowed the
importation language of the statute and found
significant the *Standard Oil* court's specific holding
that the oil that was the subject of the
anticompetitive arrangement was not an article of
interstate commerce when the agreement was made;
it had already come to rest in Tennessee. Stating, "
[a]nd therein lies the critical distinction upon which
*Mylan* and the instant action lie," the court
reiterated its holding in *Mylan* that when the
challenged conduct occurs before the products
arrive in Tennessee, the conduct is considered
interstate and not subject to the TTPA or the TCPA.
*In re Vitamins Antitrust Litig.,* 2001 WL 849928, at
*4. The court also relied upon *Lynch* and *Blake* for
the predominantly intrastate test, and its application
to the facts therein. Distinguishing the case before it

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

from *Blake*, the court had no trouble finding that " although the alleged conduct may have a demonstrable effect in Tennessee, this effect is clearly incidental in comparison to the interstate character of the alleged conspiracy." *Id.* at \*5.

\*14 A similar conclusion was reached in *In re Terazosin Hydrochloride Antitrust Litig.*, 160 F.Supp.2d 1365 (S.D.Fla.2001), wherein classes of indirect and direct purchasers of certain drugs filed complaints alleging violations of federal and various state antitrust and consumer protection laws. The indirect purchasers' claims under federal law were dismissed. The court also dismissed those state law claims where no named plaintiff had purchased a particular drug in that state. The court then proceeded to examine the remaining claims on a state by state basis and held that the TTPA did not reach "so far as to prohibit the nationwide conspiracy alleged in the end payors' complaint." 160 F.Supp.2d at 1376-77. The court reached this conclusion based in part on its reading of *Standard Oil*, which it interpreted as holding that the statute applied to commerce within Tennessee, not contracts "in relation to the importation of articles." 160 F.Supp.2d at 1377 (quoting *Standard Oil*, 117 Tenn. at 643, 100 S.W. at 711).

The court also held that *Standard Oil* had been refined by the courts to hold that the Act applies to transactions which are predominantly intrastate in character and found that the complaint did not meet that standard. Noting that, "conspicuously absent from the complaint are any allegations that the defendants forged alliances in Tennessee, stored terazosin hydrochloride drugs therein, or sold them within the state at the time," 160 F.Supp.2d at 1377, the court concluded, "No reasonable observer confronted with these allegations would infer that the defendants' conspiracy was 'predominantly intrastate' in character." 160 F.Supp.2d at 1378.

A different result, emanating from a different interpretation, was reached in *In re Cardizem CD Antitrust Litig.*, 105 F.Supp.2d 618 (E.D.Mich.2000). That multidistrict litigation involved class actions under federal law and under various state laws and alleged that the defendants committed anticompetitive practices with regard to

the sale of heart medication.

Relying on previously discussed holdings, the defendants argued that the claims for violation of the TTPA and the TCPA must be dismissed because these statutes apply only to transactions that are wholly or predominantly intrastate in character and plaintiffs alleged anticompetitive activity and restraints of trade occurring in several jurisdictions. The court, however, found that this argument interpreted the statutes too narrowly and agreed with the plaintiffs' position that the statutes allow Tennessee to regulate anticompetitive conduct occurring outside the state but having more than incidental effect on Tennessee's intrastate commerce; i.e., situations like that alleged here where anticompetitive conduct may have occurred outside the state but results in a prescription drug product intentionally coming to rest within Tennessee and causing injury to Tennessee citizens who have purchased the product in Tennessee at artificially inflated prices as a result of Defendants' anticompetitive conduct.

\*15 *In re Cardizem CD Antitrust Litig.*, 105 F.Supp.2d at 667.

The court based its conclusion on its interpretation of *Standard Oil* and the more recent opinion in *Forman, supra*, which the court described as " observing that 'it is clear that Tennessee Code Annotated section 47-25-101, in express terms, applies to articles of foreign and domestic origin.' " 105 F.Supp.2d at 667.

The *Cardizem* court then found that courts have subsequently held that to state a claim under Tennessee's antitrust statute, "the dispute need not be exclusively intrastate" but "it must more than incidentally affect intrastate commerce," citing *Valley Products*, 105 F.Supp.2d at 667. The court held that the antitrust statutes were not limited to anticompetitive conspiracies that are "hatched and implemented solely or predominantly" in Tennessee and to the extent the decisions in *Lynch, Blake, Dzik,* and *Mylan* held otherwise, those decisions were " wrongly decided ." 105 F.Supp. at 667. The court went on to predict that the Tennessee Supreme Court, if presented with the issue would establish a

Not Reported in S.W.3d, 2003 WL 21780975 (Tenn.Ct.App.), 2003-2 Trade Cases P 74,109
(Cite as: Not Reported in S.W.3d)

test of whether the alleged facts show that an illegal combination or agreement more than incidentally affects Tennessee's intrastate commerce. *Id.* at 667-68.

### IV. The Tennessee Intrastate Commerce Requirement

As the above discussion demonstrates, various courts have interpreted the scarce Tennessee authority to espouse different tests for whether Tennessee's antitrust statute applies. Some have focused on the defendant's conduct, some have focused on the transactions involved, and some have looked to the nature of the dispute. Many have focused on, or at least included in the analysis, the effects on commerce.

### A. Test Based on Transaction or Illegal Conduct

Our review of *Lynch* confirms Plaintiffs' assertions that no background, source, authority, or explanation is given for the court's statement that, " Tennessee antitrust law applies to transactions which are predominantly intrastate in character." As the quoted statement makes clear, the standard announced in *Lynch* focused on the transaction giving rise to the dispute, or the "character" of the agreements between the parties. However, the court also stated that the intrastate commerce activities of plaintiff were only incidental to the parties' transactions and that the agreements only incidentally affected intrastate commerce.

The *Lynch* court's focus on the character of the transaction is understandable in light of the issue in that case: the enforceability of contracts between the parties to the lawsuit. Thus, the nature or character of the transaction could be analyzed. *See also Valley Products,* 877 F.Supp. at 1094-95 (involving a specific relationship between the parties). Attempting to apply a transaction-based standard to the case before us illustrates the difficulty of such a standard. Herein, there were no direct transactions between Plaintiffs, indirect purchasers, and the defendant. The complaint alleges intrastate and interstate purchases by

Plaintiffs from third parties and also alleges interstate transactions between Microsoft, an out-of-state corporation, and third parties, at least some of which are also out-of-state corporations. *Lynch* provides no guidance as to which of these transactions is subject to the "predominantly intrastate" test.

> FN20. Some courts have found a legislature's grant of remedy to indirect purchasers significant in determining the scope of a state's antitrust statute. *See, e.g., Emergency One v. Waterous Co., Inc.,* 23 F.Supp.2d 959, 964 (E.D.Wis.1998) (holding that the best indication of an intent to hold interstate actors accountable may be the inclusion of a remedy for indirect purchasers, and stating "the prototypical indirect purchasers action would vindicate far-flung consumers for the indirect costs of price-fixing conducted on a national scale").

\*16 We find no language in the TTPA itself to evidence an intent that it cover only intrastate transactions. Similarly, we find no expression of intent that only illegal conduct occurring in this state subjects the defendant to civil causes of action. While the Tennessee legislature could have placed such limitations on the scope of the TTPA, *see, e.g., Archer Daniels Midland Co. v. Seven Up Bottling Co. of Jasper, Inc.,* 746 So.2d 966, 989-90 (Ala.1999) (holding that Alabama's antitrust statute regulates only "monopolistic activities that occur ' within this state'-within the geographical boundaries of this state"); and *Mylan Labs.,* 62 F.Supp.2d at 47, 51, and 52 (discussing the requirement in several states that the illegal conduct occur in the state), we simply find no indication of such intent in the statute itself.

> FN21. The federal court's statement in *In re Terazosin Hydrochloride Antitrust Litig.* that the phrase "transactions," as used in the plaintiffs' pleadings and, presumably, as used in *Lynch,* must refer to the actions

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.W.3d, 2003 WL 21780975 (Tenn.Ct.App.), 2003-2 Trade Cases P 74,109
(Cite as: Not Reported in S.W.3d)

of the defendants because Tenn.Code Ann. § 47-25-102 prohibited "arrangements to restrain competition," 160 F.Supp. at 1377 n. 9, implies that the test is related to the alleged illegal conduct. We disagree with that conclusion, however, because the *Lynch* court's analysis of the transactions between the parties, i.e. their contractual relationship, demonstrates that the *Lynch* standard was based upon the transactions between the parties giving rise to the dispute, not to the location of the allegedly anticompetitive acts.

The TTPA applies, by its terms, to arrangements lessening competition "in the sale of articles imported into this state" or affecting the "price or the cost to the producer or the consumer of any such product or article." Consequently, the legislature clearly intended that the Act apply to anticompetitive conduct that decreases competition in or increases the price of goods paid by consumers in Tennessee even though those goods may have arrived in Tennessee through interstate commerce. Other than the reference to articles imported "into this state," the statute includes no " in this state" language. Thus, the statute itself does not place a geographic limitation on where the illegal conduct must occur or on the nature of the transactions involved. Because the purchase by consumers in this state of articles imported from out of state will generally involve at least one transaction between instate and out-of-state parties, we must presume the legislature intended that such transactions be included in the statute's reach, contrary to the *Lynch* court's analysis.

We also find no judicial interpretation prior to *Lynch* establishing such limitation To the contrary, in *Bailey v. Ass'n of Master Plumbers*, 103 Tenn. 99, 52 S.W. 853 (1899), the Supreme Court of Tennessee found, under common law and under the statute at issue herein, void and unenforceable certain provisions of the bylaws of the Association of Master Plumbers of the City of Memphis. In particular, the court examined a provision that required members to purchase materials and supplies from only specified dealers who had agreed to sell only to members of the association.

The court noted that the dealers, by agreeing to and observing this provision, had become parties to the scheme. Several out-of-state dealers had ratified the by-laws as to themselves and refused to sell to non-members. "This action of important dealers was the consummation of a vital part of the complex scheme," resulting in a restraint of trade in a Tennessee community. *Id.* 103 Tenn. at 121, 52 S.W. at 858.

*State ex rel. Astor v. Schlitz Brewing Co.*, 104 Tenn. 715, 59 S.W. 1033 (1900), involved an action by this state's Attorney General to enjoin a foreign corporation from doing business in Tennessee because of alleged violations of this state's antitrust statutes. The complaint alleged that Schlitz Brewing Company, the foreign corporation, and its agent in Tennessee had entered into an arrangement with a Tennessee corporation and other brewers with the intent and effect of lessening competition in the importation and sale of beer. The defendants attacked the statute as unconstitutional under various provisions of the Tennessee Constitution and the United States Constitution, but the Tennessee Supreme Court found the act constitutional in all particulars. 104 Tenn. at 750-51, 59 S.W. at 1041. The court upheld the provision penalizing a foreign corporation by prohibiting it from doing business in the state. In addition, the court found:

*17 The subject of this act, as already stated, is the prohibition and punishment of those transactions which are calculated to lessen competition in trade, or to influence the price of either imported or domestic goods.

*State ex rel. Astor*, 104 Tenn. at 741-42, 59 S.W. at 1039. *Standard Oil* itself involved an out-of-state corporation that sold coal oil in this state and was convicted for its role in an arrangement to reduce competition in this state. *See also State ex rel Cates v. Standard Oil Co. of Ky.*, 120 Tenn. 86, 110 S.W. 565 (1908), *aff'd by Standard Oil of Ky. v. State of Tenn., ex rel. Cates*, 217 U.S. 413, 30 S.Ct. 543, 54 L.Ed. 817 (1910) (prohibiting the same foreign corporation from doing business in this state because it violated the Act).

Courts in other states have relied upon statutory

Not Reported in S.W.3d                                                                                      Page 17

Not Reported in S.W.3d, 2003 WL 21780975 (Tenn.Ct.App.), 2003-2 Trade Cases P 74,109
(Cite as: Not Reported in S.W.3d)

language in considering the reach of their states'
antitrust statutes. For example, in *Heath
Consultants, Inc.*, 527 N.W.2d at 606, the Nebraska
Supreme Court held that the Nebraska antitrust
statute, which prohibited combinations "in restraint
of trade or commerce, within this state" applied to
extraterritorial conduct when that conduct affected
consumers within the state, stating:

While there is no showing that any of the conduct
about which Precision complains occurred within
the territorial limits of this state, the record
nonetheless inferentially establishes that the tying
arrangement affected end users of Heath equipment
in Nebraska by denying them the advantage of parts
sold in a freely competitive market.

527 N.W.2d at 606. The court concluded this
evidenced anticompetitive conduct restraining trade
within the state and the statute applied. *Id. See also
In re: Microsoft Antitrust Litig.*, No. CV-99-752 &
-709, 2001 WL 1711517 (Me.Super.Ct. Mar. 26,
2001) (holding that the Maine antitrust statute
applied to illegal conduct occurring outside the state
that restrains trade or monopolizes any part of the
trade or commerce within the state, because the
statute used the phrases "in this State" and "of this
State" to modify trade or commerce, not the illegal
conduct).

The Wisconsin Supreme Court determined in *State
v. Allied Chemical & Dye Corp.*, 9 Wis.2d 290, 101
N.W.2d 133 (Wis.1960), that because the people of
that state were entitled to the advantages that flow
from free competition, any illegal arrangement
restraining trade or affecting prices to those citizens
was within the state's police power to prohibit or
punish, regardless of the fact that the defendants did
not operate a manufacturing, sales, or other facility
within the state.

We conclude that Tennessee's antitrust statute is not
limited to anticompetitive conduct occurring within
the boundaries of the state. We also conclude that it
is not limited to transactions between the parties
that are predominantly intrastate in character. We
also conclude that neither a transaction-based nor a
locality-of-illegal-conduct based test is appropriate
for determining the scope of the TTPA. Instead, the
proper test must relate to the potential effect or

impact on commerce within this state of the illegal
acts condemned by the statute because such a
standard is directly related to the purpose of the Act.

*18 As set out earlier, the court in *Astor* indicated it
was the effect on trade or commerce in Tennessee
that was the determinative factor in whether the
statute applied. That conclusion is reinforced by the
court's additional statements that, "The thing
condemned and punished by the Act is injury to
trade. The thing protected is trade...." *State ex rel.
Astor*, 104 Tenn. at 741-42, 59 S.W. at 1039. These
comments are consistent with the Supreme Court's
statement in *Standard Oil* that the "wrongs to trade
which were intended to be corrected and punished
were those being perpetrated against commerce
within the state....." 117 Tenn. at 642, 100 S.W. at
710. In addition, we note that the criminal sanctions
portion of the statute declares that a violation of
either section 101 or 102 is "a conspiracy against
trade." Tenn.Code Ann. § 47-25-101 & -102.

### B. Test Based on Effect on Commerce Within the State

Those courts examining Tennessee's statute under
an effects on commerce test have espoused the two
standards argued by the parties herein: the "
predominant effects" standard and the "significant
effects" standard.

Federal courts use an effects on commerce test in
determining whether federal law is applicable to an
antitrust action. For purposes of establishing
jurisdiction under the Sherman Act, plaintiffs must
only demonstrate a substantial, or not insubstantial,
effect on interstate commerce generated by the
defendant's normal business activity that is infected
by the illegal conduct. *McLain*, 444 U.S. at 242-43,
100 S.Ct. at 509. In *Blake*, this court indicated the
correct analysis would involve examining whether
the alleged illegal actions by defendants
predominantly affected interstate or intrastate
commerce. 1996 WL 134947, at *5.

> FN22. The Court specifically held that the
> plaintiffs are not required to make the "

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.W.3d, 2003 WL 21780975 (Tenn.Ct.App.), 2003-2 Trade Cases P 74,109
**(Cite as: Not Reported in S.W.3d)**

more particularized showing" that the
anticompetitive conduct caused an effect
on interstate commerce. 444 U.S. at
242-43, 100 S.Ct. at 509. The test
enunciated is:
To establish federal jurisdiction in this
case, there remains only the requirement
that respondents' activities which allegedly
have been infected by a price-fixing
conspiracy be shown "as a matter of
practical economics" to have a not
insubstantial effect on the interstate
commerce involved.
444 U.S. at 246, 100 S.Ct. at 511. The
pleading requirement has been refined, at
least in some circuits, to require
identification of the relevant aspect of
interstate commerce. *Valley Disposal v.
Cent. Vt. Solid Waste Mgmt. Dist.*, 31 F.3d
89, 94 (2d Cir.1994).

Applying a similar analysis, the inquiry becomes
whether that portion of Microsoft's business
infected by the alleged illegal conduct, or whether
that illegal conduct itself: (1) predominantly affects
intrastate commerce as opposed to interstate
commerce, under the "predominant effects" test, or
(2) has a substantial effect on commerce within
Tennessee, under the "substantial effects" test.

The predominant effects standard requires the court
to make a determination of whether the commerce
involved or potentially affected by the wrongful
conduct is predominantly intrastate or interstate.
Courts are not unfamiliar with legal standards
requiring them to determine predominance. *See,
e.g., Trau-Med of Am., Inc.*, 71 S.W.3d at 702 n. 5
(holding that to sustain an action for intentional
inference with business relationships, improper
motive must be shown by plaintiff demonstrating
that the defendant's predominant purpose was to
injure the plaintiff); *City of Chattanooga v. Davis*,
54 S.W.3d 248, 270 n. 22 (Tenn.2001) (requiring a
determination of whether the predominant "remedial
" purpose of a monetary sanction is ensuring
deterrence against wrongdoing); *Williams v. Estate
of Williams*, 865 S.W.2d 3, 5 (Tenn.1993) (holding
that the expressed predominant purpose of a testator
prevails, and subsidiary clauses must be construed

so as to bring them into subordination to the
predominant purpose); *Hudson v. Town and
Country True Value Hardware, Inc.*, 666 S.W.2d
51 (Tenn.1984) (adopting and applying the test for
the application of the Uniform Commercial Code as
depending on whether the predominant assets to be
transferred are goods or services).

**\*19** "Predominant" is a relative term; whether
something is predominant can only be determined in
relation to other things; it is greater or superior in
influence compared to other factors. *Dillard v. City
of Greensboro*, 946 F.Supp. 946, 955-56
(M.D.Ala.1996); *Matthews v. Bliss*, 39 Mass. 48,
53 (1839). Consequently, we agree that "[a]n action
cannot be both predominantly interstate in nature
and predominantly intrastate in nature; it must be
one or the other." *Emergency One*, 23 F.Supp.2d at
967.

FN23. Although Plaintiffs argued that the
predominant effects test was extinct,
inapplicable, and introduced into
Tennessee law without explanation or
authority, they also maintained that their
claims met the predominant effects test.
We disagree. Based upon allegations in the
complaint, it is clear that Microsoft's
allegedly anticompetitive conduct would
have had effects on interstate commerce,
as well as on that of other states.
Confronted with these allegations, we
cannot infer that the effects are
predominantly intrastate. Plaintiffs have
offered no factual allegations that they are.
Plaintiffs' conclusory allegations that
Microsoft's conduct had significant,
substantial, and "predominant" effects on
trade and commerce inside the state of
Tennessee cannot suffice for the absence
of even one factual allegation that the
effects in Tennessee are predominant over
the effects nationwide.

The *Lynch* decision has been interpreted by some
courts as introducing the predominant effects test
into Tennessee law. However, the court in *Lynch*
actually mentioned the effect on intrastate

Not Reported in S.W.3d                                                                              Page 19

Not Reported in S.W.3d, 2003 WL 21780975 (Tenn.Ct.App.), 2003-2 Trade Cases P 74,109
(Cite as: Not Reported in S.W.3d)

commerce as only incidental to the interstate nature
of the transaction. It is a significant leap to translate
"not incidental" to "predominant." Thus, to the
extent *Lynch* set a standard based on the effect on
commerce within the state, that standard can only be
interpreted as requiring something more than an
incidental effect. It was in the unreported decision
in *Blake* that this court indicated that plaintiffs
could only proceed under the TTPA if they could
show that the alleged anticompetitive conduct
affected predominantly intrastate, as opposed to
interstate, commerce.

According to Plaintiffs, *Lynch* and subsequent cases
have mechanically applied the "predominant vs.
incidental effects" test, with no discussion of the
impact of current Commerce Clause analysis on the
efficacy of this test for state court jurisdiction.
Indeed, at the time *Standard Oil* was decided and
into the middle of the twentieth century, a
dichotomy or dual sovereignty theory prevailed
presuming mutually exclusive jurisdiction for state
and federal regulation. However, state antitrust
laws are now considered supplementary and
complementary to federal laws and enforcement of
state laws consistent with the purposes of federal
legislation. *ARC America,* 490 U.S. at 101-02, 109
S.Ct. at 1661. Plaintiffs' position is supported by
judicial analysis of the issue:

> FN24. For a discussion of the "dual
> sovereignty" theory that predominated in
> early state antitrust cases, which set forth
> distinct    and    mutually    exclusive
> jurisdictional areas for state and federal
> regulation, *see Abbott Labs. v. Durrett,*
> 746 So.2d 316 (Ala.1999) and *Archer
> Daniels Midland Co.,* 746 So.2d at 987-88.

Framing the issue as one of predominance thus
becomes a way of reintroducing federal preemption
of state antitrust law-a result consistently rejected
by the Supreme Court. Congress intended the
federal antitrust laws to supplement and not
displace state regulation.... Further, a standard
which results in the mutually exclusive application
of state and federal antitrust law is contrary to
Congressional intent and Supreme Court precedent.

*Emergency One,* 23 F.Supp.2d at 967-68 (citations
omitted).

The cases on which the defendants rely ... date from
a period in which, interstate commerce being
narrowly defined, and federal power to regulate
such commerce being deemed exclusive, ... a state
statute limited to intrastate commerce would have
some, albeit a strictly limited, scope and could not
have a greater scope no matter how much the state
wanted it to. The cases thus were not interpreting
the statute; they were interpreting the Constitution
as placing upper and lower bounds on the reach of
the statute, and the Constitution has since been
reinterpreted.

*20 *In re Brand Name Prescription Drugs Antitrust
Litig.,* 123 F.3d at 612-13 (citations omitted).
Authors of learned articles have also accepted the
premise argued by Plaintiffs:

> FN25. The Alabama Supreme Court
> rejected the conclusion of the Seventh
> Circuit in *In re Brand Name Prescription
> Drugs* regarding the scope of the Alabama
> antitrust statute and held that the scope was
> exactly the same today as it was when the
> statute was passed. *Archer Daniels
> Midland Co.,* 746 So.2d at 987-88.

At various times, many state courts concluded that
their jurisdiction was limited to activities that either
were not involved in interstate commerce or which
had no effect on interstate commerce. Many of
those decisions-at least those based on perceived
limits imposed upon the states by federal law-are of
dubious vitality today.

For a half century after the Sherman Act's passage,
courts and many commentators adopted a rather
facile distinction between the proper jurisdictional
limits of federal and state antitrust law. Federal law
applied to restraints that were 'in or affecting'
interstate commerce. State law, on the other hand,
applied to purely 'local' restraints.

In other words, the classification of restraints [of
trade] as purely intrastate and thus within the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

exclusive jurisdiction of state antitrust, or interstate
and thus within the exclusive domain of federal law
has long since passed....

Hovenkamp, *supra*, 58 Ind. L.J. at 376.

> FN26. *See also* David W. Lamb, Note,
> *Avoiding Impotence: Rethinking the
> Standards for Applying State Antitrust
> Laws to Interstate Commerce*, 54 Vand.
> L.Rev.. 1705 (2001).

These statements accurately describe and explain
the Tennessee Supreme Court's holding in *Standard
Oil*. The Court strove therein to interpret the statute
in a way that would make it constitutional under
then prevailing law. It considered the bounds of the
statute to be limited only by restraints originating in
the United States Constitution. It attributed intent to
the legislature based upon the presumption that that
body did not intend to enact a statute that was
violative of those restraints. The Court was
interpreting the Constitution. Most significantly, it
held that the legislature "did not intend to stop short
of its power or to exceed it." 117 Tenn. at 643, 100
S.W. at 711.

The Court in *Standard Oil* did not base any
limitations in the statute's application on the
language of the Act itself. There is good reason for
that, as the language contains no such limitations.
The language of the statute is broad and does not
evidence an intent to limit its application. Nowhere
in the statute do the words "predominant" or "
intrastate" appear. The legislature clearly intended
to prohibit arrangements tending to lessen free
competition in "the importation or sale of articles
imported into this state" and tending to affect the
price to "producer or consumer" of "such product
or articles." From the language of the statute itself,
including the original preamble , we simply cannot
conclude that the legislature intended to limit the
application of the statute geographically other than
the effect on competition and prices in Tennessee.
Limitation in its scope would not further the
expressed purpose of the Act.

> FN27. The preamble to the 1903 Act,
> which was identical to that of the 1897
> Act, provided:
> An act to declare unlawful and void all
> arrangements and contracts, agreements,
> trusts or combinations made with a view to
> lessen, or which tend to lessen free
> competition in the importation or sale of
> articles imported into this state; or in the
> manufacture or sale of articles of domestic
> growth or of raw material; to declare
> unlawful and void all arrangements,
> contracts, agreements, trusts or
> combinations between persons or
> corporations designed, or which tend to
> advance, reduce or control the price of
> such product or articles to producer or
> consumer of any such product or articles;
> to provide for forfeiture of the charter and
> franchise of any corporation, organized
> under the laws of this state, violating any
> of the provisions of this act; to prohibit
> every foreign corporation, violating any of
> the provisions of this act, from doing
> business in this state; to require the
> Attorney General of this state to institute
> legal proceedings against any such
> corporations violating the provisions of
> this Act, and to enforce the penalties
> prescribed; to prescribe penalties for any
> violation of the act; to authorize any
> person or corporation damaged by any
> such trust, agreement or combination, to
> sue for the recovery of such damages, and
> for other purposes.
> 1903 Tenn. Pub. Acts, ch. 140 § 1; *see
> also State ex rel. Astor*, 104 Tenn. at 722,
> 59 S.W. at 1034 (quoting the preamble to
> the 1897 Act).

Thus, the only limitation placed on the scope of the
statute has been a judicial one, impelled initially by
federal interpretations of U.S. Constitutional
provisions, the Supreme Clause and the
Commerce Clause. It is well settled that courts have
a duty to construe a statute to avoid a constitutional
conflict. *State v. Burkhart*, 58 S.W.3d 694, 697-98
(Tenn.2001). Courts should adopt the plausible
construction that avoids undermining the statute's

Not Reported in S.W.3d                                                                Page 21

Not Reported in S.W.3d, 2003 WL 21780975 (Tenn.Ct.App.), 2003-2 Trade Cases P 74,109
(Cite as: Not Reported in S.W.3d)

constitutionality. *Davis-Kidd Booksellers, Inc. v. McWherter,* 866 S.W.2d 520, 529-30 (Tenn.1993). We must presume that an act of the legislature is constitutional. *State v. Robinson,* 29 S.W.3d 476, 479 (Tenn.2000).

\*21 It was these already established principles that framed the Tennessee Supreme Court's decision and language in *Standard Oil,* and the only restriction placed on the statute's broad language was Congress's exclusive power to regulate interstate commerce. We agree with Plaintiffs and with the trial court that the *Standard Oil* court's primary concern was ensuring that Tennessee law was construed to reach as far as possible within the confines of the Constitution.

Recodifications and amendments subsequent to *Standard Oil* have not altered the sections of the TTPA defining the offenses and, consequently, the scope of the statute. Rather, it is judicial interpretation of the authority of states to enact and enforce antitrust statutes even where interstate commerce is involved that has changed or evolved since our Supreme Court last considered the scope of the TTPA. Under now well-established principles set out earlier, neither federal law nor federal interpretation of the United States Constitution precludes state antitrust laws from reaching anticompetitive conduct that affects interstate commerce but also has substantial effects on intrastate commerce. Limitations on such authority are much less restrictive; state antitrust laws reach activities in or affecting interstate commerce, and there is an overlap between federal and state antitrust authority. Hovenkamp, *supra,* 58 Ind. L.J. at 376. Consequently, "[s]tate courts frequently use state antitrust laws to condemn activities occurring outside the state if the violation has a sufficient effect within the state so that the state may justifiably assert its own law." Hovenkamp, *supra,* 58 Ind. L.J. at 382.

> FN28. A state's power to regulate interstate commerce is still limited in some situations; for example, by the limitations on the extraterritorial powers of state government. *See K-S Pharmacies, Inc. v.*

*Am. Home Prods. Corp.,* 962 F.2d 728, 730 (7th Cir.1992) (holding that a state cannot regulate sales that take place wholly outside it). *See also Heath Consultants,* 527 N.W.2d at 606 (giving examples of preemption or inapplicability of state antitrust laws, generally describing them as situations involving national organizations already subject to federal legislation or national governing bodies). Some courts have applied the test promulgated by the U.S. Supreme Court in *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), that is, "Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits...." *Id.*

We can find no basis for a requirement that the illegal conduct predominantly affect intrastate commerce. As the court in *In re Brand Names Prescription Drugs Antitrust Litig.* found, limiting a statute today to outdated concepts of Commerce Clause jurisprudence would make state antitrust laws ineffective because there are "virtually no sales ... in the United States, that are intrastate in *that* sense." 123 F.3d at 613. Such an interpretation would be inconsistent with the purpose of the statute.

Because the legislature put no words in the statute limiting its application to conduct predominantly affecting intrastate commerce, because our highest court has determined that the legislature intended the scope of the statute to extend as far as allowed by the United States Constitution, and because the allowable scope has greatly expanded, we conclude that Tennessee's Trade Practices Act applies to illegal conduct that substantially affects commerce within this state. That is the generally accepted test for application of state antitrust laws. *Emergency One,* 23 F.Supp. at 969 (holding that a standard extending the scope of the Wisconsin antitrust statute to unlawful activity which has significantly and adversely affected trade and competition in the

Not Reported in S.W.3d, 2003 WL 21780975 (Tenn.Ct.App.), 2003-2 Trade Cases P 74,109
(Cite as: Not Reported in S.W.3d)

state is consistent with judicial interpretations of the scope of federal antitrust law as well as the purpose of the state statute); *Hovenkamp, supra,* 58 Ind. L.J. at 387 ("... one must look at the state's interest sought to be protected. That interest is measured in part by examining the effect that the transaction had within the state or upon the people whom the state protects").

> FN29. This is the same test used by federal courts to determine if the Sherman Act can be applied to a primarily local restraint of trade. *McLain,* 444 U.S. at 510, 100 S.Ct. at 244. It is also the approach taken with regard to the Sherman Act's application to anticompetitive conduct occurring outside this country. "[I]t is well established by now that the Sherman Act applies to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States." *Hartford Fire Ins. Co. v. Cal.,* 509 U.S. 764, 795, 113 S.Ct. 2891, 2909, 125 L.Ed.2d 612 (1993).

\*22 Plaintiffs have alleged that Microsoft monopolized the Intel-compatible PC operating system software market and that, as a result, Plaintiffs and other purchasers of Windows have paid higher prices than they would have in a competitive market free of Microsoft's alleged illegal conduct. They also alleged that Microsoft sells or licenses its operating systems software throughout the State of Tennessee, that Microsoft has profited substantially by the sale and licensure of its operating systems to Tennesseans, and that Microsoft's conduct has had the following substantial adverse effects on commerce inside the State of Tennessee: (1) Competition between actual and potential competitors in the Tennessee market for Intel-compatible PC operating systems has been restrained, eliminated and foreclosed; (2) Actual and potential competitors in the Tennessee market have been injured in their business and their property; (3) Purchasers, including indirect purchasers, in the Tennessee market have been deprived of the benefits of a free, competitive, innovative, and unrestrained market; (4) Purchasers, including indirect purchasers, in the Tennessee

market have had to pay artificially high and non-competitive prices; and (5) In place of a free, open and competitive market, a monopoly in the Tennessee market has been maintained.

Similar allegations have been found sufficient to sustain actions under other state's antitrust laws. *In re Terazosin Hydrochloride Antitrust Litig.,* 160 F.Supp. 1365 (holding that defendants' anticompetitive acts had a significant and adverse impact on consumers in the state, forcing them to pay artificially high prices in a nationwide conspiracy to forestall competition); *In re Cardizem CD Antitrust Litig.,* 105 F.Supp.2d 618 (holding that an alleged anticompetitive agreement had significant effect on price competition in the state); *United States v. Microsoft Corp.,* 87 F.Supp.2d at 55 ("assuming that each of those [19] states has, indeed, expressly limited the application of its antitrust laws to activity that has a significant adverse effect on competition within the state or is other contrary to state interests, that element is manifestly proven by the facts presented here...."); *Allied Chemical & Dye Corp.,* 101 N.W.2d at 135 (holding that the public interest and welfare of the people of that state are substantially affected if prices of a product are fixed or supplies thereof are restricted as a result of an illegal arrangement). *See also In re S.D. Microsoft Antitrust Litig.,* 657 N.W.2d 668 (S.D.2003) (upholding certification of class of indirect purchasers who alleged Microsoft's monopolistic conduct eliminated competition in the operating system software market, deprived purchasers of the benefit of a free market, and forced them to pay artificially high prices, and finding the consumers met their threshold of showing harm).

We conclude that Plaintiffs have sufficiently alleged substantial effects on commerce within this state to state a claim under the TTPA.

V. Indirect Purchaser Standing Under the TTPA

\*23 The trial court herein determined that indirect purchasers could sue under the TTPA because they could not sue under federal law. While we agree that indirect purchasers are persons within the Act's

Not Reported in S.W.3d, 2003 WL 21780975 (Tenn.Ct.App.), 2003-2 Trade Cases P 74,109
(Cite as: Not Reported in S.W.3d)

provision on private remedies, we do so on the basis of our reading of that statute, not on the basis of *Standard Oil.* We have already determined that *Standard Oil* limited the scope of the TTPA only to the extent of federal Constitutional restraints, but we conclude that holding is related to the scope of the statute defining the offense, not to the provision establishing the right to remedy. In other words, we affirm the trial court's holding, but for different reasons.

In 1977, the United States Supreme Court held, in *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), that indirect purchasers have no cause of action pursuant to federal law because they suffer no legally cognizable injury. Section 4 of the Clayton Act allows suit by a party "injured in his business or property," and the Court reaffirmed its holding in *Hanover Shoe, Inc. v. United Shoe Mach. Corp.,* 392 U.S. 481, 88 S.Ct. 224 (1968) that "the overcharged direct purchaser, and not others in the chain of manufacture or distribution," is the party suffering that injury. *Illinois Brick,* 431 U.S. at 728, 97 S.Ct. at 2066. Thus, the Court determined that direct purchasers suffer the entire injury that is a consequence of violation of federal antitrust laws and could collect the entire overcharge.

In *Hanover Shoe,* the Court had rejected a defense to an antitrust claim based on the theory that the direct purchaser had suffered no real injury because any illegal overcharge had been passed on to the ultimate customers or consumers. The Court held that direct purchasers could pursue antitrust claims regardless of whether they had absorbed or passed on the overcharge resulting from anti-competitive conduct. The Court in *Hanover Shoe* reasoned that to hold otherwise would complicate treble-damages actions with attempts to trace the effects of the overcharge on the purchaser's prices, sales, costs, and profits. The court also was concerned that unless direct purchasers were allowed to sue for the portion of the overcharge arguably passed on to indirect purchasers, antitrust violators "would retain the fruits of their illegality" because direct purchasers "would have only a tiny stake in the lawsuit" and hence little incentive to sue.

In *Illinois Brick,* the Court reaffirmed *Hanover Shoe* and determined that the pass-on theory could not be used offensively by indirect purchasers claiming the illegal overcharge was actually passed on to them. *Illinois Brick,* 431 U.S. at 728-29, 97 S.Ct. at 2066. The Court stated:

We decline to abandon the construction given § 4 [of the Clayton Act] in *Hanover Shoe* that the overcharged direct purchaser, and not others in the chain of manufacture or distribution, is the party " injured in his business or property" within the meaning of the section in the absence of a convincing demonstration that the Court was wrong in *Hanover Shoe* to think that the effectiveness of the antitrust treble-damages action would be substantially reduced by adopting a rule that neither party in the chain may sue to recover the fraction of the overcharge allegedly absorbed by it.

*24 *Id.* 431 U.S. at 728, 97 S.Ct. at 2066.

The Court expressed concern that allowing offensive use of the pass-on theory would create: (1) the risk of multiple liability for the defendant, i.e., recovery by both the direct and indirect purchasers of the entire overcharge; (2) difficulty in apportioning the responsibility for the overcharge among those in the chain of distribution; and (3) lack of incentive for the direct purchasers to sue. In addition, the Court was concerned that allowing suit by indirect purchasers would lead to highly complex litigation because of the necessity of determining the proportion of the overcharge that was passed on to indirect purchasers. *Id.* 431 U.S. at 732, 97 S.Ct. at 2067-68.

[T]he principal basis for the decision in *Hanover Shoe* was the Court's perception of the uncertainties and difficulties in analyzing price and output decisions "in the real economic world rather than an economist's hypothetical model," and of the costs to the judicial system and the efficient enforcement of the antitrust laws of attempting to reconstruct those decisions in a courtroom.

*Id.* 431 U.S. at 731-32, 97 S.Ct. at 2067 (citations omitted). The Court reaffirmed the direct purchaser rule in *Kan. v. Utilicorp United, Inc.,* 497 U.S. 199, 110 S.Ct. 2807, 111 L.Ed.2d 169 (1990).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.W.3d

Not Reported in S.W.3d, 2003 WL 21780975 (Tenn.Ct.App.), 2003-2 Trade Cases P 74,109
(Cite as: Not Reported in S.W.3d)

Clearly *Illinois Brick* addressed only federal law. In *Cal. v. ARC Am. Corp.,* 490 U.S. 93, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989), a case involving claims of a nationwide conspiracy to fix cement prices in violation of the Sherman Act and a number of state antitrust laws, the plaintiff direct purchasers objected to payment to indirect purchasers any portion of the settlement fund, arguing that claims by indirect purchasers under state antitrust law were preempted by federal law and that allowing indirect purchasers a cause of action under state antitrust laws would frustrate federal law. The Supreme Court held otherwise and made clear that states are free to determine the issue themselves.

It is one thing to consider the congressional policies identified in *Illinois Brick* and *Hanover Shoe* in defining what sort of recovery federal antitrust law authorizes; it is something altogether different, and in our view inappropriate, to consider them as defining what federal law allows States to do under their own antitrust law. As construed in *Illinois Brick,* § 4 of the Clayton Act authorizes only direct purchasers to recover monopoly overcharges under federal law. We construed § 4 as not authorizing indirect purchasers to recover under federal law because that would be contrary to the purposes of Congress. But nothing in *Illinois Brick* suggests that it would be contrary to congressional purposes for States to allow indirect purchasers to recover under their own antitrust laws.

490 U.S. at 103, 109 S.Ct. at 1666. The Court re-emphasized this holding, stating, "When viewed properly, *Illinois Brick* was a decision construing the federal antitrust laws, not a decision defining the interrelationship between the federal and state antitrust laws." *Id.* 490 U.S. at 105, 109 S.Ct. at 1666. The Supreme Court declined to impose on states the policy, designed to further federal antitrust legislative purposes, of deterring violations by simplifying litigation. Thus, states can, but are not required to, provide a remedy to indirect purchasers under state law. Whether to do so is a policy decision left to the legislature. *See Mack v. Bristol-Myers Squibb Co.,* 673 So.2d 100, 108 (Fla.Dist.Ct.App.1996) (stating "issues such as whether deterrence, compensation, or efficient judicial administration should be promoted by antitrust laws and whether and to what extent these

goals can or should be harmonized are fundamental policy decisions for the legislature of each state").

\*25 After *Illinois Brick,* a number of states amended their antitrust laws to specifically cover indirect purchasers. In those states adopting " *Illinois Brick* repealer statutes," the legislature has clearly expressed its intent, and courts have interpreted those statutes as allowing indirect purchasers to sue under state law. *See, e.g., Union Carbide Corp. v. Superior Court,* 36 Cal.3d 15, 201 Cal.Rptr. 580, 679 P.2d 14, 17 (Cal.1984) (observing that "California's 1978 amendment ... in effect incorporates into the Cartwright Act the view of the dissenting opinion in *Illinois Brick* that indirect purchasers are persons 'injured' by illegal overcharges passed on to them in the chain of distribution"); *A & M Supply Co. v. Microsoft Corp.,* 252 Mich.App. 580, 654 N.W.2d 572, 595 (Mich.Ct.App.2002) (holding that Michigan's adoption of an *Illinois Brick* repealer law incorporating "directly or indirectly" language to describe the injury allowed suit by direct or indirect purchasers); *In re Microsoft Antitrust Litig.,* 2001 WL 1711517, at \*2 (Me.Super.Ct. Mar. 26, 2001) (holding that the passage in Maine of an *Illinois Brick* repealer in 1989 reflected an intent to fill the gap that prohibited indirect purchaser suits and referring to legislative history mentioning *ARC America* ).

> FN30. In *Comes v. Microsoft Corp.,* 646 N.W.2d 440, 448 (Iowa 2002), the Supreme Court of Iowa stated that nineteen states, the District of Columbia, and Puerto Rico have adopted statutes expressly authorizing suits by indirect purchasers, citing statutes from California, Hawaii, Illinois, Kansas, Maryland, Michigan, Minnesota, New Mexico, New York, South Dakota, Wisconsin, and the District of Columbia.

Some state legislatures have allowed an action on behalf of indirect purchasers but limited that right. *See, e.g., Gaebler v. N.M. Potash Corp.,* 285 Ill.App.3d 542, 221 Ill.Dec. 707, 676 N.E.2d 228, 230 (Ill.Ct.App.1996) (holding that the Illinois

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Antitrust Act's provision that "no person other than
the Attorney General of this State shall be
authorized to maintain a class action in any court of
this State for indirect purchasers asserting claims"
precluded private plaintiffs' class action on behalf
of indirect purchasers); *Davidson v. Microsoft
Corp.*, 143 Md.App. 43, 792 A.2d 336, 341
(Md.Ct.App.2002) (noting that the legislature had
rejected a bill that would have repealed the *Illinois
Brick* principle as to all plaintiffs but had, instead,
later passed a limited amendment allowing
governments to sue regardless of whether they dealt
"directly or indirectly" with the violator); *Siena v.
Microsoft*, 796 A.2d 641 (R.I.2002) (noting Rhode
Island antitrust statute limited right to bring
damages action on behalf of indirect purchasers to
Attorney General as *parens patriae* ).

Tennessee has not adopted an *Illinois Brick* repealer
amendment. Some courts have considered their
state legislature's failure to enact specific legislation
addressing indirect purchasers after *Illinois Brick* in
determining legislative intent: *See, e.g., Vacco v.
Microsoft Corp.*, 260 Conn. 59, 793 A.2d 1048,
1059-60 (Conn.2002) (stating the court was mindful
of *Illinois Brick* repealer bills that had been
introduced in the state legislature but never enacted,
setting out statements from legislative history of
those attempts, and acknowledging "the inferential
value of failed attempts to amend existing laws with
respect to the intent of the legislature to acquiesce
in prevailing judicial interpretations of such laws");
*Davidson*, 792 A.2d at 341 (stating that a 2001
unsuccessful attempt to amend the statute to permit
suits by private party indirect purchasers was
consistent with the court's conclusion that only
governmental indirect purchasers could sue, but
pointing out that mere introduction of a bill does
not establish legislative intent).

*26 This court addressed the same situation in
*Blake v. Abbott Labs ., Inc.*, and held:
To support their position that a similar restriction
[the *Illinois Brick* preclusion of indirect purchaser
claims] is applicable to actions under the Tennessee
Trade Practices Act, [defendants] assert that The
General Assembly of Tennessee on three occasions
has sought to pass legislation to expressly confer
standing on indirect purchasers. We simply note

that proposed legislation, not enacted, has no
consequence whatever upon the interpretation of an
existing statute. While such proposed legislation
may indicate to some extent some of the individual
legislators' interpretation of an existing statue, it is
in no way controlling or, for that matter, relevant, to
the court's duty to properly construe statutes.

*Blake*, 1996 WL 134947, at *3.

This conclusion regarding the effect of failed efforts
to amend legislation appears contradictory to that
expressed by this court in *Forman*, which involved
the question of whether worker's compensation
insurance was a product or article under the TTPA.
This court relied on the Tennessee Supreme Court's
decision in *McAdoo Contractors, Inc. v. Harris*,
222 Tenn. 623, 439 S.W.2d 594 (1969), that claims
of restraint of trade in the bidding and award of
construction contracts could not be brought under
the TTPA because that statute applied to articles,
not services, to find that insurance was not an article.

We also noted that after the *McAdoo* decision,
many attempts had been made in the General
Assembly to expand the scope of the TTPA,
including one in 1978 to add "services" to §
47-25-101. None was successful. This court relied
on the principle that failure of the legislature to
express disapproval of a judicial construction of a
statute is persuasive evidence of legislative
adoption of the judicial construction, as expressed
in *Hamby v. McDaniel*, 559 S.W.2d 774, 776
(Tenn.1977). Although this court acknowledged
that unsuccessful attempts at legislation are not the
best guides to legislative intent, it also noted that
courts have held that nonaction by a legislative
body may become significant where proposals for
legislative change have been repeatedly rejected.
*Forman*, 13 S.W.3d at 373. The court noted that if
the statute were intended to be as broadly applicable
as argued, there would simply have been no need
for the attempts to amend it.

Any apparent conflict between *Blake* and *Forman*
on the significance of legislative failure to amend is
explained in the context of the case before us.
While the *Hamby* principle remains good law, *see
Storey v. Nichols*, 27 S.W.3d 886 (Tenn.2000), it is

Not Reported in S.W.3d                                                                                    Page 26

Not Reported in S.W.3d, 2003 WL 21780975 (Tenn.Ct.App.), 2003-2 Trade Cases P 74,109
(Cite as: Not Reported in S.W.3d)

applicable where there has been a judicial interpretation of the statute at issue. In *Forman*, the highest court in this state had interpreted specific language of the TTPA; when another request to interpret that same language presented itself, the court was entitled to presume that the legislature's inaction indicated agreement with the prior interpretation.

\*27 In *Blake*, however, the court considered the Tennessee legislature's inaction in amending a state statute in reaction to a federal court interpretation of a federal statute. The effect of the *Illinois Brick* ruling on state statutes was not clarified, in general, until *ARC America*, and, in specific, until rulings on each state's statutes. Thus, we cannot presume that the Tennessee legislature considered *Illinois Brick* to affect the state's antitrust act or that any amendment was necessary. We assign no specific legislative intent to the failure to enact an *Illinois Brick* repealer.

In states where the legislature has not adopted a statute in response to *Illinois Brick*, state courts have searched the language of the state antitrust statutes for other indications of the legislature's intent regarding indirect purchasers. Many have found that intent in language directing how the state statute is to be interpreted, particularly language directing harmony with federal court interpretations of federal law.

In *Major v. Microsoft Corp.*, 60 P.3d 511 (Okla.Ct.App.2002), the court found dispositive language in the Oklahoma Antitrust Reform Act (1) describing those persons entitled to relief under the state statute in almost identical terms as federal law, the Clayton Act, "any person who is injured in his or her business or property by a violation of the act," and (2) the controlling section of the Oklahoma Act stating that the provisions of that act "shall be interpreted in a manner consistent with Federal Antitrust Law 15 U.S .C. § 1 et seq. and the case law applicable thereto." 60 P.3d at 513. The court interpreted these two sections as requiring it to apply *Illinois Brick*. *Id.*

In *Vacco v. Microsoft Corp.*, 260 Conn. 59, 793 A.2d 1048 (Conn.2002), the court found

determinative a 1992 amendment to that state's antitrust act directing that the courts be "guided by interpretations given by the federal courts to federal antitrust statutes." *Id.* 793 A.2d at 1056. After careful analysis of *Illinois Brick* and other federal cases relevant to the issues raised in the case before it, the court determined that allowing only those consumers who purchase directly from the antitrust defendant to bring suit ensured harmony between the state act and federal statutes. The court distinguished cases from other states, including Tennessee, on the basis that those state statutes did not require that their state courts interpret those statutes consistently with federal interpretation. *Id.* 793 A.2d at 1059; *see also Siena*, 796 A.2d at 461 (explaining that Rhode Island statute required construction in harmony with judicial interpretations of comparable federal antitrust statutes).

In some states, the courts have had more than one indication of legislative intent or used more than one factor in their analysis. For example, in *Stifflear v. Bristol-Myers Squibb*, 931 P.2d 471 (Col.Ct.App.1996), the court construed its antitrust statute to preclude direct actions by indirect purchasers because: (1) the Colorado statute was modeled on the federal statute; (2) the Colorado Supreme Court had previously held that the state act should be interpreted consistently with federal antitrust law; (3) a 1992 re-enactment directed Colorado courts to use as a guide federal court interpretations of federal law; and (4) the same re-enactment only partially repealed the indirect purchaser preclusion by giving standing to governmental entities injured "either directly or indirectly." The court also shared the same concerns expressed by the Supreme Court in *Illinois Brick* regarding disincentive to private enforcement and difficulties in apportioning alleged overcharges. *Id.* at 476; *see also Davidson v. Microsoft Corp.*, 143 Md.App. 43, 792 A.2d 336, 341 (Md.Ct.App.2002) (holding that *Illinois Brick* applied in that state because of language in the Maryland statute that directed the courts to "be guided by federal court interpretations of federal antitrust statutes," because of prior cases using federal authority in interpreting the Maryland antitrust statute, and based on the legislative history of the act, including adoption of a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.W.3d, 2003 WL 21780975 (Tenn.Ct.App.), 2003-2 Trade Cases P 74,109
**(Cite as: Not Reported in S.W.3d)**

right for only governmental indirect purchasers to sue); *Elkins v. Microsoft,* 817 A.2d 9, 18 (Ver.2002) (discussing the holdings of various states under their antitrust statutes and their consumer protection statutes).

*28 The Tennessee act includes no section directing the courts' interpretation. More specifically, the Tennessee legislature has not included any reference to federal antitrust law and federal interpretations of that law. Consequently, the cases listed above are useful primarily to distinguish their analysis from the one appropriate in this case. More relevant to our inquiry, although still only persuasive authority, are those decisions by other courts that do not depend upon either an *Illinois Brick* repealer or mandatory direction on interpretation.

Among those is the consideration of the issue in *Bunker's Glass Co. v. Pilkington PLC,* 202 Ariz. 481, 47 P.3d 1119 (Ariz.Ct.App.2002). Arizona's antitrust statute was enacted in 1974 by adoption of the Uniform State Antitrust Act. The legislature adopted the portion of the uniform statute requiring construction effectuating the general purpose of making the law uniform among the states enacting the uniform law. However, the legislature added a provision that the courts "may" use as a guide interpretations given by the federal courts to comparable federal antitrust statutes. The court found that the legislature's use of the word "may" did not require it to follow federal interpretations and, consequently, it was not bound to follow *Illinois Brick.* 47 P.3d at 1126-27.

> FN31. It appears the Arizona Supreme Court has granted review of this case.

Acknowledging that the provision encouraged Arizona courts to reach interpretations consistent with those of federal courts, the court found it significant that the state statute was adopted before the *Illinois Brick* decision and, at that time, indirect purchasers could bring actions under the Sherman Act according to law prevailing in that circuit. Consequently, the court found that the legislature's failure to specifically authorize indirect purchaser

claims could not be interpreted as indicating its agreement with *Illinois Brick.*

The court concluded that the statute's grant of a cause of action to "any person ... injured in his business or property" applied to individual consumers and could not be interpreted to exclude those individual consumers who were indirect purchasers. Given the public policy of the state against anticompetitive conduct, the court determined the statute must be liberally construed to carry out its purposes. Thus, the court found that "a person" includes indirect purchasers.

Similarly, in *Comes v. Microsoft,* 646 N.W.2d 440 (Iowa 2002), the court determined that Iowa's harmonization provision did not require Iowa courts to interpret its state antitrust statute the same way as federal courts interpreted federal antitrust statutes, particularly since that provision stated such harmonization "shall not be made in such a way as to constitute a delegation of state authority to the federal government." The court found the purpose of the provision was to apply a uniform standard of conduct, not to require the state to define who may sue in state courts the same way federal courts decided who could bring an action in federal courts. The court found that the language of its antitrust statute providing a remedy to a person who is injured by conduct prohibited by the act did not restrict the class of persons eligible to sue to direct purchasers. "Given the clear, broad language of the state antitrust law, we conclude [it] creates a cause of action for all consumers, regardless of one's technical status as a direct or indirect purchaser." 646 N.W.2d at 445.

*29 In *Hyde v. Abbott Labs., Inc.,* 123 N.C.App. 572, 473 S.E.2d 680 (N.C.Ct.App.1996), the court held that a 1969 (pre-*Illinois Brick* ) amendment to the North Carolina statutes adding "if any person shall be injured" to the previous language granting a cause of action "if the business of any person be ... injured" indicated an intent to establish a private cause of action for any person injured by a violation of the act, including primarily consumers, and that there was no basis to conclude that the legislature intended to exclude consumers who were indirect purchasers. *Id.* at 683-84. The court found the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.W.3d, 2003 WL 21780975 (Tenn.Ct.App.), 2003-2 Trade Cases P 74,109
**(Cite as: Not Reported in S.W.3d)**

legislature had intended to expand the class of person with standing to sue to include any person suffering an injury, regardless of whether that person purchased directly from the wrongdoer.

Although interpreting a consumer protection statute rather than an antitrust state, the court in *Elkins*, 817 A.2d at 12-13, found that the statute contained no privity requirement and that it expressly stated that any consumer, defined as 'any person' who suffers an injury, may bring an action. The court concluded that any consumer or any person included indirect purchasers.

While decisions from other states provide insight into the issues involved, our decision must be based on Tennessee's statute. That statute makes unlawful all arrangements tending to lessen competition in the importation or sale of imported and domestic articles or tending to affect the price "to the producer or **consumer**" of such goods. Tenn.Code Ann. § 47-25-101 (emphasis added). Similarly, price fixing agreements to sell and market products manufactured in this state or imported into it to any producer or **consumer** at below cost, to the injury of free competition, are also against public policy, unlawful, and void. Tenn.Code Ann. § 47-25-102 (emphasis added).

In addition to criminal sanctions, the law provides a civil remedy to "Any person who is injured or damaged by such arrangement ." Tenn.Code Ann. § 47-25-106. Unlike the federal statute and many state statutes modeled thereon, Tennessee's statute has never included the "any person injured in his business or property" language. Combined with the use of the word "consumer" in Tenn.Code Ann. §§ 47-25-101 and -102, the statute clearly reflects an intent to protect and provide a remedy to individuals who are the ultimate consumers.

That conclusion is strengthened by other language in Tenn.Code Ann. § 47-25-106 that allows recovery of "the full consideration or sum paid by the person for any goods, ... the sale of which is controlled by such combination or trust" (emphasis added). In addition, that recovery is to be had "from any person operating such trust or combination." There is no requirement that the consideration be

paid directly from the injured consumer to the person operating the trust.

While the purpose of the federal antitrust statutes is to protect competition and commerce, the state act's purposes are to protect both commerce and the consuming public. It is clear that the legislature intended that consumers, or ultimate purchasers, of goods be provided a remedy for any injury, including higher prices, sustained due to the prohibited anticompetitive conduct. There is no basis to presume that the legislature intended to protect only those consumers who purchased directly from the violator. There is clear intent to the contrary. We hold that indirect purchasers are " persons" who may bring an action for an injury caused by violation of the TTPA.

*30 Our holding is consistent with that reached in *Blake v. Abbott Labs. Inc.*, wherein this court also held that the TTPA provided indirect purchasers a remedy, stating:

It seems abundantly clear from the unambiguous provision of T.C.A. § 47-25-106, that there is an individual right, under the laws of this state, to maintain an action against any person or entity guilty of violating the provision of Title 47, Chapter 25, whether the individual is a direct purchaser or indirect purchaser.

We find that the plaintiff in this case has standing to pursue an action for a violation of T.C.A. §§ 47-25-101 et seq., without reference to classification as a direct or indirect purchaser. There is no such limitation written into the statute.

*Blake*, 1996 WL 134947, at *3-*4. It is also consistent with the statement in *State ex rel. Cates v. Standard Oil Co. of Ky.*, 120 Tenn. at 138, 110 S.W. at 578 that the section provided a civil remedy "in favor of any one who may be injured or damaged by the things legislated against in the first section." Of course, plaintiffs will be required to prove they were actually damaged by the alleged monopolistic conduct, *i.e.*, that they paid more for the software than they would have been required to pay absent the anticompetitive conduct.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.W.3d                                                          Page 29

Not Reported in S.W.3d, 2003 WL 21780975 (Tenn.Ct.App.), 2003-2 Trade Cases P 74,109
(Cite as: Not Reported in S.W.3d)

FN32. The two decisions by federal courts in Tennessee interpreting the remedies section of the statute provide little guidance on the issue before us. *See Volpp Tractor Parts, Inc. v. Caterpillar, Inc.,* 917 F.Supp. 1208, 1236 (W.D.Tenn.1995) (holding that Tenn.Code Ann. § 47-25-106 provides a remedy only to customers or consumers, not to competitors and stating that, "As a competitor, Volpp never paid any consideration or sum for any product sold in violation of the statute"); *Tacker v. Wilson,* 830 F.Supp. 422, 430 (W.D.Tenn.1993) (finding that plaintiff had not stated a claim for relief under Tenn.Code Ann. § 47-25-106 because he had not alleged any facts to indicate he transacted business with any of the defendants).

The *Hyde, Bunker's Glass,* and *Comes* courts weighed the policy concerns raised by the Court in *Illinois Brick.* They found that allowing indirect purchasers to sue would not pose a risk of deterring lawsuits because of apportionment of recovery, observing "a defendant guilty of an antitrust violation would face paying damages to indirect purchasers under state antitrust laws as well as paying any damages awarded to direct purchasers under federal antitrust laws" and, consequently, both would have incentive to sue, *Bunker's Glass,* 47 P.3d at 1129 (quoting *Hyde,* 473 S.E.2d at 687), and also that often indirect purchasers are the only ones who will sue, *Comes,* 646 N.W.2d at 450. These courts found the concerns over complexity and apportionment less worrisome or inapplicable in the cases before them and were sympathetic to the arguments that indirect purchasers usually suffer the real loss.

The obvious difficulty with denying damages for consumers buying from an intermediary is that they are injured, often more than the intermediary, who may also be injured but for whom the entire overcharge is a windfall. The indirect purchaser rule awards greatly overcompensate intermediaries and greatly undercompensate consumers in the name of efficiency in the administration of the antitrust laws.

*Bunker's Glass Co.,* 47 P.3d at 1129 (quoting

Phillip E. Areeda, et al., Antitrust law 378 (2000)). None found complexity of the litigation a reason to prohibit indirect purchaser suits, one noting that "complexity is not a foreign concept in the world of antitrust." *Comes,* 646 N.W.2d at 451.

FN33. Some commentators have expressed the view that state courts dealing with the question of indirect purchasers and the concerns raised in *Hanover Shoe* and *Illinois Brick* generally approach the policy questions in one of two ways. The first emphasizes the purpose of antitrust remedies as deterring violations; the other views compensation as more important and emphasizes compensation of the consumer who usually bears the cost of all or a portion of the overcharge caused by anticompetitive conduct. *See A & M Supply Co. .,* 654 N.W.2d at 580-81 (discussing and quoting extensively from William H. Page, *The Limits of State Indirect Purchaser Suits: Class Certification in the Shadow of Illinois Brick,* 67 Antitrust L.J. 1, 2 (1999)).

Any policy questions about allowing recovery to indirect purchasers have been answered in Tennessee by our legislature. The legislature has determined that the purposes of the TTPA are furthered by granting a private remedy to any person injured by anticompetitive conduct and by setting those damages at the consideration paid by those purchasers for the product. Our role is to give effect to clear legislative purpose and language. We conclude that indirect purchasers such as Plaintiffs herein may sue for injury caused them by violation of the TTPA.

## VI. Plaintiffs' Claims Under the TCPA

*31 The trial court denied Microsoft's motion to dismiss the indirect purchasers' claims pursuant to the TCPA, Tenn.Code Ann. §§ 47-18-101 to -1808. Plaintiffs alleged that the unlawful arrangement in restraint of trade that was the basis for their antitrust claims was also a violation of the TCPA. Thus, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.W.3d, 2003 WL 21780975 (Tenn.Ct.App.), 2003-2 Trade Cases P 74,109
**(Cite as: Not Reported in S.W.3d)**

first question presented is whether anticompetitive conduct actionable under the TTPA also creates a cause of action under the TCPA.

The TCPA prohibits "unfair or deceptive acts or practices affecting the conduct of any trade or commerce." Tenn.Code Ann. § 47-18-104(a). The Act is to be liberally construed consistently with expressed specific purposes, all of which relate to fair consumer practices, and include protection of " consumers and legitimate business enterprises from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce in part or wholly within this state." Tenn.Code Ann. § 47-18-102(2). In addition, the legislature has provided guidance for interpreting the TCPA:

This part, being deemed remedial legislation necessary for the protection of the consumers of the state of Tennessee and elsewhere, shall be construed to effectuate the purposes and intent. It is the intent of the general assembly that this part shall be interpreted and construed consistently with the interpretations given by the federal trade commission and the federal courts pursuant to § 5(A)(1) of the Federal Trade Commission Act (15 U.S.C. § 45(a)(1)).

Tenn.Code Ann. § 47-18-115.

> FN34. 15 U.S.C.A. § 45(a)(1) provides:
> Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful.

The federal provision referred to, unlike the TCPA, declares two types of offenses unlawful: (1) unfair methods of competition in or affecting commerce; and (2) unfair or deceptive acts or practices in or affecting commerce. While the Tennessee General Assembly has chosen to include in the TCPA's prohibitions "unfair or deceptive acts or practices affecting the conduct of any trade or commerce," Tenn.Code Ann. § 47-18-104(a), it did not include unfair competition or anticompetitive acts. That choice is significant.

> FN35. The FTC and federal courts reviewing FTC actions have interpreted the "unfair methods of competition" language as applying to violations of the Sherman Act and other antitrust statutes and to actions raising antitrust issues or concerns. *FTC v. Brown Shoe Co.,* 384 U.S. 316, 321-22, 86 S.Ct. 1501, 1504-05, 16 L.Ed.2d 587 (1966); *FTC v. Motion Picture Adver. Serv. Co.,* 344 U.S. 392, 394-95, 73 S.Ct. 361, 363, 97 L.Ed. 426 (1953); *FTC v. Cement Inst.,* 333 U.S. 683, 692-95, 68 S.Ct. 793, 799-801, 92 L.Ed. 1010 (1948). *See also* John F. Graybeal, *Unfair Trade Practices, Antitrust and Consumer Welfare in North Carolina,* 80 N.C. L.Rev. 1927, 1939-51 (2002).

When originally adopted, the federal statute creating the FTC proscribed only "unfair methods of competition." Fed. Trade Comm'n Act, Pub.L. No. 63-203, § 5, 38 Stat. 717, 719 (1914). Apparently in reaction to judicial interpretation requiring a showing of injury to competition, not just to consumers, and creation of the "rule of reason," the Act was amended in 1938 to add to the FTC's enforcement jurisdiction "unfair or deceptive acts or practices." Fed. Trade Comm'n Act, Pub.L. No. 75-447, § 3, 52 Stat. 111 (1938).

> FN36. For an explanation of the history of the FTC Act *see* John F. Graybeal, *supra;* Marshall A. Leaffer & Michael H. Lipson, *Consumer Actions Against Unfair or Deceptive Acts or Practices: The Private Uses of Federal Trade Commission Jurisprudence,* 48 Geo. Wash. L.Rev., 521 (1980); William A. Lovett, *State Deceptive Trade Practice Legislation,* 46 Tul. L.Rev. 724 (1972).

In the 1960's the FTC participated with others, including the Council of State Governments, in the development of a uniform act, the Uniform Trade Practices Act and Consumer Protection Law. The uniform act included three alternative forms. All three included deceptive acts or practices in their

Not Reported in S.W.3d, 2003 WL 21780975 (Tenn.Ct.App.), 2003-2 Trade Cases P 74,109
(Cite as: Not Reported in S.W.3d)

definition of unlawful conduct. However, only the first alternative form also included unfair methods of competition. It was described as follows:

> FN37. Other uniform acts have also been proposed, including the Uniform Deceptive Trade Practices Act. 7A U.L.A. 35 (1978), and the Uniform Consumer Sales Practices Act, 7A U.L.A. 1 (1978). *See* Marshall A. Leaffer and Michael H. Lipson, *supra,* at 522 n. 3. However, the genesis of the majority of state consumer protection acts can be traced to the Uniform Trade Practices and Consumer Protection Law. Dee Pridgen, Consumer Protection and the Law, § 3.5 (2002). Obviously, Tennessee's enactment preceded these other uniform acts.

\*32 This formulation has the broadest impact because it, like the present section 5 of the FTC Act, achieves antitrust as well as deceptive practice objectives. As the explanatory comments to the model legislation indicate, this language "enables the enforcement official to reach not only deceptive practices that prey upon consumers, but also unfair methods that injure competition."

William A. Lovett, *State Deceptive Trade Practice Litigation,* 46 Tulane L.Rev. 724, 732 (1972) (quoting Council of State Governments, 1970 Suggested State Legislation 142)); *see also* National Association of Attorneys General Committee on the Office of the Attorney General, Report on the Office of Attorney General, 395, 399 (1971).

From the mid 1960s, states began adopting consumer protection laws, most based more or less on one of the formats proposed in the Uniform Act. A large number adopted the version that mirrored the FTC Act, prohibiting both unfair methods of competition and unfair or deceptive acts of practices. Dee Pridgen, Consumer Protection and the Law § 3:5 (2002); Marshall A. Leafler & Michael H. Lipson, *Consumer Actions Against Unfair or Deceptive Acts or Practices: the Private uses of Federal Trade Commission Jurisprudence,* 48 Geo. Wash. L.Rev., 521, 531 and Appendix (1980).

> FN38. The Pridgen book lists twenty states as adopting the "Little FTC Act" version: Alaska, California, Connecticut, Florida, Hawaii, Illinois, Louisiana, Maine, Massachusetts, Montana, Nebraska, New Hampshire, North Carolina, Pennsylvania, Rhode Island, South Carolina, Vermont, Washington, West Virginia and Wisconsin. Pridgen, *supra,* § 3:5 n. 13.

Other states chose to adopt another version of the proposed model act, thereby electing to prohibit only unfair and deceptive acts and practices without including the unfair methods of competition language. Marshall A. Leafler & Michael H. Lipson, *supra,* at 531 and Appendix. When Tennessee adopted the TCPA in 1977, it chose this approach.

> FN39. Along with a number of other states, Tennessee also adopted the approach of listing certain prohibited practices and including a general "any other practice that is unfair or deceptive" provision. The TCPA lists some thirty-three specific acts that constitute unfair or deceptive acts or practices, Tenn.Code Ann. § 47-18-104(b), all of which involve some form of misrepresentation about goods or services. In addition, there is a general catchall, " engaging in any other act or practice which is deceptive to the consumer or to any other person." Tenn.Code Ann. § 47-18-104(b)(27).

This history makes clear that by the time Tennessee adopted its Consumer Protection Act, its drafters and the legislators considering it had the benefit of the federal act and experience under it, the proposed Uniform Trade Practices Act and Consumer Protection Law, the statutory language adopted in many other states, and the evaluations of a number of authors of learned articles and treatises. We cannot presume other than that the Tennessee General Assembly knowingly chose not to include antitrust or anticompetitive conduct as actionable under the TCPA. *Heirs of Ellis v. Estate of Ellis,* 71

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.W.3d, 2003 WL 21780975 (Tenn.Ct.App.), 2003-2 Trade Cases P 74,109
(Cite as: Not Reported in S.W.3d)

S.W.3d 705, 713-14 (Tenn.2002) (explaining the interpretation accorded the legislature's adoption of uniform laws or parts thereof).

That conclusion is further buttressed by the legislature's choice of language in the private remedy provision of the Act, which allows an action by any person injured "as a result of the use or employment by another person of an unfair or deceptive act or practice declared to be unlawful by this part." Tenn.Code Ann. § 47-18-109(a)(1). A deceptive act or practice involves a material representation or practice likely to mislead a reasonable consumer or the concealment or omission of a material fact. *Ganzevort v. Russell,* 949 S.W.2d 293, 299 (Tenn.1997). The TCPA generally applies to transactions between buyers and sellers, and its purpose is to protect buyers in such transactions, *Id.* 949 S.W.2d at 297-98, from unfair and deceptive practices in the conduct of commerce, *Pursell v. White,* 937 S.W.2d 838, 841-42 (Tenn.1996).

*33 Accordingly, we must presume that the legislature intended that antitrust actions, those involving harm to competition, continue to be brought under the existing antitrust statute, the TTPA. Consequently, we conclude that claims based upon anticompetitive conduct are not cognizable under the TCPA. Plaintiffs' TCPA claims based on allegations of anticompetitive conduct must be dismissed.

> FN40. In *Blake,* the unreported opinion discussed earlier, the court held that "a viable cause of action under TTPA also states a cause of action under TCPA," 1996 WL 134947, at *5-*6. For the clear legislative history reasons stated herein, we disagree and decline to follow that holding in *Blake.*

Other courts have reached the same conclusion. For example, in *Laughlin v. Evanston Hosp.,* 133 Ill.2d 374, 140 Ill.Dec. 861, 550 N.E.2d 986 (1990), the Supreme Court of Illinois concluded that that state's consumer fraud act was not intended to be an additional antitrust mechanism. "The language of

the Act shows that its reach was to be limited to conduct that defrauds or deceives consumers or others." 140 Ill.Dec. 861, 550 N.E.2d at 986.

This is not a question of whether the TCPA can apply to conduct that is also covered by another statute. Our Supreme Court has stated that, "Even when a different code section applies and is invoked to obtain relief, the TCPA may also apply, **assuming the act or practice in question falls within the scope of its application.**" *Myint v. Allstate Ins. Co.,* 970 S.W.2d 920, 926 (Tenn.1998) (emphasis added). The TCPA's provision making powers and remedies under the act cumulative and supplementary to all other powers and remedies provided by law, Tenn.Code Ann. § 47-18-112, likewise has no application to a claim based on conduct that is simply not a violation of the TCPA.

Our conclusion is based solely on the purpose of the Tennessee legislature in enacting the TCPA, as reflected in the language of the statute and the circumstances existing at the time. Irrelevant to our holding are cases relied upon by Microsoft and distinguished by Plaintiffs wherein courts in other states have ruled that because indirect purchasers have no cause of action under that state's antitrust laws, they similarly are precluded from bringing a case under that state's consumer protection statutes where both claims rest on the same conduct. *See, e.g., Abbott Labs., Inc. v. Segura,* 907 S.W.2d 503, 507 (Tex.1995) (dismissing plaintiffs' claims under the deceptive practices statute because they were " in essence antitrust claims," and those claims had been dismissed under Texas antitrust law because the court would not permit "an end run around the policies allowing only direct purchasers to recover under the Antitrust Act").

> FN41. In *Blake* this court stated that because "one cannot do indirectly what cannot be done directly," if plaintiffs had no cause of action under the antitrust statute, they similarly had no claim under the TCPA. *Blake,* 1996 WL 134947, at *19 . The court concluded, however, that plaintiffs had a cause of action under both statutes. We disagree, because the two

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.W.3d, 2003 WL 21780975 (Tenn.Ct.App.), 2003-2 Trade Cases P 74,109
**(Cite as: Not Reported in S.W.3d)**

statutes cover different types of illegal conduct. *See* footnote 40.

Obviously, our holding may differ from that reached by courts in states that have adopted the " unfair methods of competition" language. *See Mack v. Bristol-Myers Squibb Co.*, 673 So.2d 100 (Fla.Dist.Ct.App.1996) (holding that although plaintiff indirect purchaser could not bring an action under Florida's antitrust statute, she had standing under that state's Deceptive and Unfair Trade Practices Act because she alleged she was damaged by an unfair method of competition, relying on federal interpretations of "unfair methods of competition" in the FTC Act as including antitrust violations); *Elkins v. Microsoft,* 817 A.2d 9 (Ver.2002) (holding that the Vermont Consumer Fraud Act prohibiting unfair methods of competition was an additional state antitrust statute).

*34 Having determined that Plaintiffs' allegations of anticompetitive conduct do not state a claim for a violation of the TCPA, we must consider whether other conduct is alleged. In their brief, Plaintiffs assert that they alleged conduct that violates the TCPA separate and apart from, or in addition to, the alleged anticompetitive conduct that is the basis for their claim under the antitrust statute. We have reviewed those portions of the amended complaint referred to by Plaintiffs as examples of "varying ways in which consumers were victims of misleading, unfair and/or deceptive conduct by Microsoft." Many of those paragraphs simply allege facts regarding Microsoft's sale to OEMs in Tennessee and elsewhere and the distribution of computers with Microsoft software already loaded. There are two allegations that software was flawed and Microsoft would not repair it at its cost. Several describe the licensing procedure for end user licenses and for OEMs, including an allegation that purchasers of a pre-loaded computer may contact the computer manufacturer for a refund if they choose not to accept the terms of the licensing agreement. None of the specific factual allegations constitutes a separate allegation of unfair or deceptive acts or practices.

The allegations in the complaint regarding the TCPA cause of action, other than the

anticompetitive conduct allegation set out earlier, are, first, "advertising upgrades with the intent not to sell them as advertised, *i.e.,* the price was set by competitive market forces when in fact that was not the case," in violation of Tenn.Code Ann. § 47-18-104(b)(9). This allegation is directly related to, and an alleged consequence of, the antitrust violation allegations. The second is by " representing that a transaction involves rights which are prohibited by law," in violation of Tenn.Code Ann. § 47-18-104(b)(12). We can find no further explanation for this conclusory allegation, and no facts supporting it. The third is "engaging in other acts or practices that are deceptive to the consumer," in violation of Tenn.Code Ann. § 47-18-104(b)(27) . Of course, this is the general catchall provision of the TCPA. No specific conduct was tied to this general allegation in the complaint.

We are unable to find any sufficient factual allegations to support the conclusory allegations that Microsoft engaged in deceptive acts or practices in violation of the TCPA other than through anticompetitive conduct and its consequences. Essentially, Plaintiffs' claims are " classic antitrust allegations dressed in" TCPA clothing, *Gaebler,* 221 Ill.Dec. 902, 676 N.E.2d at 709, or "the same claim with a different label," *Blewett v. Abbott Labs.,* 86 Wash.App. 782, 938 P.2d 842, 846 (Wash.Ct.App.1997). Consequently, Plaintiffs' cause of action based upon the TCPA must be dismissed.

## VII. Conclusion

Plaintiffs as indirect purchasers have standing to bring an action for damages under Tenn.Code Ann. § 47-25-106 for injuries caused by violation of Tenn.Code Ann. §§ 47-25-101 or -102. Plaintiffs have no cause of action under the TCPA for antitrust violations prohibited by the TTPA. Plaintiffs have sufficiently alleged substantial adverse effects on commerce within Tennessee of the alleged misconduct to bring this action for violation of the TTPA.

*35 We reverse the trial court's denial of Microsoft's motion to dismiss the TCPA claims. We

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.W.3d                                                                  Page 34

Not Reported in S.W.3d, 2003 WL 21780975 (Tenn.Ct.App.), 2003-2 Trade Cases P 74,109
**(Cite as: Not Reported in S.W.3d)**

affirm the denial of the motion to dismiss the TTPA.

Costs of this appeal are taxed equally between the appellants Microsoft, et al., and the appellees, Daniel Sherwood, et al.
WILLIAM C. KOCH, JR., J., concurring.
I concur completely with the court's disposition of the issues in this case and subscribe to the court's thorough legal analysis except for its attempted reconciliation of the conflicting decisions regarding the interpretative significance of legislative inaction.

In *Forman v. National Council on Comp. Ins., Inc.,* 13 S.W.3d 365, 373 (Tenn.Ct.App.1999), the Middle Section of this court attached significance to the Tennessee General Assembly's failure to enact amendments expanding the scope of the Tennessee Trade Practices Act, even though it conceded that " unsuccessful attempts at legislation are not the best guides to legislative intent." Three years earlier, the Eastern Section of this court concluded that " proposed legislation, not enacted, has no consequence whatever upon the interpretation of an existing statute." *Blake v. Abbott Labs., Inc.,* No. 03A01-9509-CV-00307, 1996 WL 134947, at *3 (Tenn.Ct.App. Mar.27, 1996) (No Tenn. R.App. P. 11 application filed). Regrettably, the *Forman* court did not address the *Blake v. Abbott Labs., Inc.* decision.

In the context of statutory construction, I side with the Eastern Section. The Tennessee General Assembly should act with precision when it drafts statutes. Attaching significance to legislative inaction when it comes to interpreting statutory language dilutes the General Assembly's responsibility and can provide an avenue for the courts to import their own policy views into the process. Few scholars today attach interpretative significance to legislative inaction. William N. Eskridge, Jr., *The New Textualism,* 37 UCLA L.Rev. 621, 640 (1990), *reprinted in* 2A Norman J. Singer, Statutes and Statutory Construction 581 (5th ed 1992). Justice Scalia provided the reasons for this view when he observed that it is "impossible to assert with any degree of assurance that ... [legislative] failure to act represents (1) approval of the status quo, as opposed to (2) inability to agree upon how to alter the status quo, (3) unawareness of

the status quo, (4) indifference to the status quo, or even (5) political cowardice." *Johnson v. Transportation Agency,* 480 U.S. 616, 672, 107 S.Ct. 1442, 1472, 94 L.Ed.2d 615 (1987) (Scalia, J., dissenting).

The plain language of Tenn.Code Ann. §§ 47-25-101, -102 (2001) covers anti-competitive acts that harm "consumers," and Tenn.Code Ann. § 47-25-106 (2001) explicitly provides a civil remedy to "[a]ny person who is injured or damaged by any such arrangement...." Thus, there is no need to reconcile *Blake v. Abbott Labs., Inc.* and *Forman v. National Council on Comp. Ins., Inc.* It should be sufficient for us to conclude in this case that the Tennessee General Assembly meant what it said when it enacted the Tennessee Trade Practices Act and leave it at that.

Tenn.Ct.App.,2003.
Sherwood v. Microsoft Corp.
Not Reported in S.W.3d, 2003 WL 21780975 (Tenn.Ct.App.), 2003-2 Trade Cases P 74,109

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.