EXHIBIT A

Westlaw.

Not Reported in F.Supp.2d                                                                                                Page 1
Not Reported in F.Supp.2d, 2003 WL 23531750 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

H

Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
AUSCAPE INTERNATIONAL, et al., Plaintiffs,
v.
NATIONAL GEOGRAPHIC SOCIETY, et al.,
Defendants.
**No. 02 Civ. 6441 LAK HBP.**

July 25, 2003.

*REPORT AND RECOMMENDATION*
PITMAN, Magistrate J.

I. *Introduction*

**\*1** Plaintiffs seek damages and other relief arising out of the publication of their graphic and written works in a CD-ROM format entitled *The Complete National Geographic* and on microfilm or microfiche. Plaintiffs' photographs and articles formerly appeared in the printed editions of *National Geographic.* Among other things, plaintiffs claim that the publication of their works in archival form as CD-ROMs and on microfilm and microfiche violate their rights under the Copyright Act. Plaintiffs have moved for class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure. For the reasons set forth below, I respectfully recommend that plaintiffs' motion for class certification be denied.

II. *Facts* [FN1]

FN1. For the purposes of this motion for class certification, I assume the truth of the allegations contained in plaintiffs' Corrected First Amended Complaint, dated May 21, 2002 ("Corr.Am.Compl."). *See In re Rezulin Prods. Liab. Litig.,* 210 F.R.D. 61, 62 n. 4 (S.D.N.Y.2002), *citing German v. Federal Home Loan Mortgage Corp.,* 885 F.Supp. 537, 547 (S.D.N.Y.1995) *and Maywalt v. Parker & Parsley Petroleum Co.,* 147 F.R.D. 51, 54 (S.D.N.Y.1993).

The controversy here has been set forth in several opinions by the Honorable Lewis A. Kaplan, United States District Judge, addressing discovery disputes

in this action and addressing motions in companion actions pending in this Court. *See Faulkner v. National Geographic Soc'y,* 220 F.Supp.2d 237 (S.D.N.Y.2002); *Ward v. National Geographic Soc'y,* 208 F.Supp.2d 429 (S.D.N.Y.2002). Familiarity with these opinions is assumed.

For many years, *National Geographic* has been one of the best-known magazines published in the United States. It has been published in print format since 1888. According to the allegations in the complaint and the information provided in connection with the present motion, the photographs and text appearing in the magazine have, in some instances, originated with employees of the National Geographic Society ("NGS") and, in other instances, originated with individuals working on a freelance basis. There appears to be no dispute that, over the 115 years during which the magazine was published, NGS has used different forms of agreements with its non-employee contributors to secure the right to publish their works. A number of the contracts did not foresee the technological developments of the late 20th century with respect to the storage and reproduction of information.

In 1996, NGS granted National Geographic Ventures, Inc. ("NGV"), a wholly owned, taxable subsidiary of NGS, the nonexclusive right to use the text and photographs appearing in the magazine "in archival form" for the development and distribution of multimedia products. *Ward v. National Geographic Soc'y, supra,* 208 F.Supp.2d at 431.

As a result of additional agreements between NGV and certain of the other defendants on this action, the defendants caused all issues of the magazine to be digitally scanned, recorded on CD-ROMs, DVDs, microfilm and microfiche and marketed in various sets.[FN2]

FN2. Defendants have admitted to the release of at least three such sets: (1) "The Complete National Geographic: 109 Years of National Geographic Magazine on CD-ROM;" (2) "The Complete National Geographic: 109 Years of National Geographic Magazine on DVD;" (3) "The Complete National Geographic: 110 Years of National Geographic Magazine on CD-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 2
Not Reported in F.Supp.2d, 2003 WL 23531750 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

ROM," and (4) "The Complete National Geographic: 110 Years of National Geographic Magazine on DVD." *Ward v. National Geographic Soc'y,supra,* 208 F.Supp.2d at 433.

The plaintiffs in this putative class action seek to represent "all those persons who have at any time since 1888 allowed NGS to publish and distribute any of their copyrightable works in the National Geographic Magazine or in any other NGS publication and who have since then been adversely impacted by the Defendants' acts of infringement, violations of personal right, torts and breaches of contract by NGS's further uses of those texts and images in digital form or in the works at issue in this case" (Corr. Am. Compl. at ¶¶ 40, 503). [FN3]

> **FN3.** In their reply brief, plaintiffs attempt to alter the definition of the proposed class to "[t]hose whose copyrighted and copyrightable works have been published in National Geographic Magazine, and whose names and works have been used by Defendants without their consent or required payment in new and different digital products and on microfiche or microfilm" (Plaintiffs' Reply Brief in Support of Plaintiffs' Motion for Order Certifying Action as a Class Action, dated January 15, 2003 ("Pls.' Br."), at 1). Since plaintiffs' proposed amended definition would inject new issues into the case, I do not consider it. *See Lynch v. New York City Dist. Council of Carpenters Welfare Fund,* 99 Civ. 0671(DLC), 1999 WL 177436 at *9 (S.D.N.Y. Mar. 30, 1999) (finding that argument raised by plaintiffs for the first time in their reply brief was not properly before the court), *citing Thomas v. Roach,* 165 F.3d 137, 145-46 (2d Cir.1999).

**\*2** In the Corrected First Amended Complaint, plaintiffs allege that the publication of the CD-ROM and DVD sets gives rise to fourteen claims: (1) false designation of origin and false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); (2) unfair trade practices in violation of the Uniform Unfair Trade Practices Act and Cal. Bus. & Prof. C. § 17200 *et. seq.;* (3) common law unfair competition; 4) commercial misappropriation in violation of common law right of privacy; 5) violation of rights of publicity under Cal. Civ.Code § § 3344 and 3344-1; 6) breaches of contracts; 7)

unjust enrichment; 8) involuntary trust pursuant to Cal. Civ.Code § 2224; 9) direct copyright infringement in violation of 17 U.S .C. § 501; 10) inducement to infringe copyrights; 11) contributory copyright infringement; 12) breach of fiduciary duties; 13) declaration of ownership of copyright; and 14) conversion (Corr. Am. Compl. at ¶¶ 533-644).

### III. *Analysis*

Rule 23(a) of the Federal Rules of Civil Procedure sets forth the initial requirements that plaintiffs must satisfy before a class action can be maintained: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims ... of the representative parties are typical of the claims ... of the class, and (4) the representative parties will fairly and adequately protect the interest of the class."

Once plaintiffs meet each of these four threshold requirements, class certification is appropriate if the action satisfies one of the three subdivisions of Rule 23(b). In this case, plaintiffs argue that class certification is proper under Rule 23(b)(3), which provides that a class action may be maintained where:

the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution ... of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by ... members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of the class action.

Fed.R.Civ.P. 23(b)(3).

The party seeking class certification bears the burden of establishing each of these elements. *See Cokely v. New York Convention Ctr. Operating Corp.,* 00 Civ. 4637(CBM), 2003 WL 1751738 at *3 (S.D.N.Y. Apr. 2, 2003), *citing Caridad v. Metro-North Commuter R.R.,* 191 F.3d 283, 291 (2d Cir.1999); *In re Rezulin Prods. Liab. Litig., supra,* 210 F.R.D. at 66.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 3
Not Reported in F.Supp.2d, 2003 WL 23531750 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

A. *Requirements of Rule 23(a)*

**\*3** Defendants argue that class certification should be denied because plaintiffs cannot satisfy the requirements of Rule 23(a)(3), the typicality requirement, and Rule 24(a)(4), the adequacy of representation requirement. Defendants do not challenge class certification under Rule 23(a)(1), the numerosity requirement; nor do they challenge the existence of at least some common questions of law or fact under Rule 23(a)(2). Defendants do not, however, concede commonality, but rather, argue that "the commonality requirement is 'subsumed under, or superceded by, the more stringent Rule 23(b)(3) requirement that questions common to the class predominate over other questions' " (Defendants' Opposition to Plaintiffs' Motion for Order Certifying Action Should be Maintained as a Class Action, dated December 13, 2002 ("Defs.' Opp'n") at 4 n. 8).

Accordingly, my analysis of Rule 23(a)'s requirements will address the parties' arguments concerning whether the claims of the class representatives are typical of the entire class and whether the interests of the class members are adequately represented.

### 1. *Rule 23(a)(3)-Typicality*

"Typicality 'requires that the claims of the class representatives be typical of those of the class, and is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." ' *Robinson v. Metro-North Commuter R.R. Co.,* 267 F.3d 147, 155 (2d Cir.2001), quoting *Marisol A. v. Giuliani,* 126 F.3d 372, 376 (2d Cir.1997). Thus, the inquiry concerning typicality focuses on the relationship between the claims of the class representatives and the claims of the absentee class members. Typicality, however, "does not require that the factual background of each named plaintiff's claim be identical to that of all class members; rather, it requires that the disputed issue of law or fact 'occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class." ' *Caridad v. Metro-North Commuter R.R., supra,* 191 F .3d at 293, quoting *Krueger v. New York Tel. Co.,* 163 F.R.D. 433, 440-41 (S.D.N.Y.1995).

Although defendants claim that plaintiffs cannot satisfy the typicality requirement, the section of their brief concerning this requirement does not really address the similarities and differences between the claims of the named representatives and the claims of absentee class members. Defendants, for example, discuss at some length the differences in the forms of contracts NGS has used (Defs.' Opp'n at 5), whether there are conflicts of interest among class members (Defs.' Opp'n at 6) and whether the named plaintiffs have described their claims consistently. Although these issues are, no doubt, relevant to the issue of class certification, they don't really bear on the issue of typicality because defendants have not focused on how the claims of the named plaintiffs compare to the claims of absentee class members.

**\*4** However, since I conclude that class certification should be denied because plaintiffs have failed to establish that the class will be adequately represented and that the requirements of Rule 23(b)(3) are met, I do not reach the issue of typicality.

### 2. *Rule 23(a)(4)-Adequacy of Representation*

"To determine whether the requirement of adequacy has been satisfied, courts must look to whether 'the representative parties will fairly and adequately protect the interests of the class." ' *Ingles v. City of New York,* 01 Civ. 8279(DC), 2003 WL 402565 at \*5 (S.D.N.Y. Feb. 20, 2003), *quoting* Fed.R.Civ.P. 23(a)(4). "Adequate representation is a twofold requirement: class counsel must be qualified and able to conduct the proposed litigation, and the class representatives must not have interests antagonistic to those of the other class members." *Fox v. Cheminova, Inc.,* 213 F.R.D. 113, 127 (E.D.N.Y.2003), *citing In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d 285, 291 (2d Cir.1992). *See also Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 222 F .3d 52, 60 (2d Cir.2000); *Daniels v. City of New York,* 198 F.R.D. 409, 418 (S.D.N.Y.2001).

### a. *Adequacy of Class Counsel*

Under the first prong of adequacy of representation, plaintiffs must demonstrate "that 'class counsel is qualified, experienced, and generally able to conduct the litigation." ' *Marisol A. v. Giuliani, supra,* 126 F.3d at 378, quoting *In re Drexel Burnham Lambert Group Inc., supra,* 960 F.2d at 291. " ' [I]n determining the adequacy of counsel, the court looks beyond reputation built upon past practice and examines counsel's competence displayed by present performance." ' *Bolanos v. Norwegian Cruise Lines Ltd.,* 212 F.R.D. 144, 156 (S.D.N.Y.2002), *quoting In*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 4
Not Reported in F.Supp.2d, 2003 WL 23531750 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

re Towers Fin. Corp. Noteholders Litig._, 177 F.R.D. 167, 171 (S.D.N.Y.1997) (citation omitted).

Defendants argue that plaintiffs' counsel, Surjit Soni, is an inadequate representative of a class action for the following three reasons: (1) counsel has been sanctioned in a prior case (Defs.' Opp'n at 9); (2) counsel has "committed flagrant discovery and solicitation abuses" (Defs.' Opp'n at 9-15), and (3) counsel has "associated himself with counsel already adjudged unsuited to pursue a class action" (Defs.' Opp'n at 16-17).

### (i) Counsel's Prior Conduct

Defendants first challenge Mr. Soni's adequacy to represent the purported class on the basis of his performance as plaintiffs' counsel in _Hi-Tek Bags, Ltd. v. Bobtron Int'l Inc._, 144 F.R.D. 379, 384 (C.D.Cal.1992), another action asserting claims for copyright infringement. In that case, the district court dismissed the plaintiffs' complaint after plaintiffs', apparently through their counsel, disclosed confidential information in violation of a court order. 144 F.R.D. at 384. The Court found that "[w]hen the documents containing the Confidential Information were filed with th[e] Court, they were not filed under seal, thereby permitting the public access to them. In addition, the documents containing the Confidential Information were also served on each of the defendants to th[e] action, thereby disclosing the Confidential Information to each defendant." 144 F.R.D. at 382. The Court made the following findings with respect to Mr. Soni:
**\*5** 16. Plaintiffs' counsel has apologized to the Court for the aforementioned violations. Notwithstanding this statement, the Court finds that plaintiffs' Opposition to the present Motion for Contempt misstates the law, fails to adequately address the issues presented by the plaintiffs' conduct in this action thus far and fails to meet plaintiffs' duty of candor with this Court. The Court finds that the disclosure of the Confidential Information is utterly inconsistent with the orderly administration of justice and the terms of this Court's Expedited Discovery Order.
17. The declaration[s] of plaintiffs' counsel claiming inadvertence are uncredible and are inconsistent with other declarations previously filed in this action. Plaintiffs' counsel was present at defendants' premises when the disclosed documents were originally seized under the guise of this Court's Expedited Discovery Order. Plaintiffs' counsel, who submitted the Expedited Discovery Order were aware

of the terms of the Court's Expedited Discovery Order or under a duty to be aware of its terms. Plaintiffs' counsel Surjit P. Soni also has previously declared that he is an experienced intellectual property lawyer. (_See_ Declaration of Surjit P. Soni in support of Ex Parte Application for Protective Order.) Plaintiffs were sternly warned and also sanctioned for the earlier violations of this Court's Order. Under these circumstances, plaintiffs' counsel and plaintiffs had or should have had a very high awareness of this Court's disfavor with the prior violations of the Expedited Discovery Order and should have taken adequate precautions to avoid all future violations, which they did not.

144 F.R.D. at 382-83.

Plaintiffs' make the following argument in response to defendants' argument:
NGS claims that Mr. Soni is not qualified to serve as Class Counsel because "Mr. Soni's client's complaint was dismissed as a sanction for civil contempt because Mr. Soni willfully disregarded a court's discovery order and misrepresented the law to the Court" in another case ten years ago, citing _Hi-Tek Bags, Ltd. v. Bobtron Int'l, Inc._, 144 F.R.D. 379, 384 (C.D.Cal.1992). The suggestion is ludicrous. It is also a dishonest statement of the facts because it fails to report that the sanctions order was vacated _nunc pro tunc_ and a consent judgment was entered in favor of plaintiff, which included a permanent injunction against the defendants. See _Hi-Tek Bags, Ltd. v. Bobtron Int'l, Inc._, 887 F.Supp. 230 (C.D.Cal.1993). If NGS found the first _Hi-Tek_ case, they surely found the second.

(Pls.' Br. at 7) (footnote omitted). Although plaintiffs are correct that _Hi-Tek Bags_ was ultimately disposed of by way of a consent judgment and permanent injunction, the order that did so made no reference to the October 27, 1992 Order that found that Mr. Soni improperly disclosed confidential information and dismissed the complaint as a sanction. _See_ 887 F.Supp.2d at 230.

**\*6** In an effort to resolve this apparent inconsistency, I issued an Order on June 26, 2003, directing plaintiffs' counsel "to fax to my chambers and to defendants' counsel a copy of the Order vacating the October 27, 1992 Order cited by defendants" (_See_ Docket Item 138). By fax dated and received July 2, 2003, plaintiffs' counsel acknowledged that the Order he cited to "is silent about the disposition of [the] October 27, 1992 Order" (Response from Surjit P. Soni, dated July 2, 2003 ("Response"), at 1).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

However, Mr. Soni contends that "[t]he judgment and permanent injunction entered against [the defendants] on August 30, 1993 *ipso facto* vacated the October 27, 1992 Order" because "[s]ince the October 27, 1992 Order dismissed the Complaint against [the defendants] *with prejudice,* no judgment could have been entered unless the dismissal was vacated *nunc pro tunc*" (Response at 1-2).

Although Mr. Soni appears to be correct that the Court in *Hi-Tek Bags* vacated its dismissal of plaintiffs' action, it also appears that the dismissal was vacated as a result of the defendants' consent to the entry of an injunction. Mr. Soni's contention that the vacatur of the dismissal in *Hi-Tek Bags* somehow renders that matter irrelevant here misapprehends the reason *Hi-Tek Bags* is relevant. *Hi-Tek Bags* is relevant here not for the ultimate disposition of plaintiffs' claims in that action, but, rather, it is relevant to the extent it bears on Mr. Soni's failure to conduct himself properly in that matter. Indeed, the decision would be just as relevant to the adequacy of Mr. Soni's representations of plaintiffs here even if the court in *Hi-Tek Bags* had determined that there was no reason to saddle the plaintiffs there with the consequences of Mr. Soni's misdeeds. The Court's apparent vacatur of the dismissal does not, in any way, constitute a vacatur of its finding of fact that Mr. Soni improperly disclosed confidential information, and *Hi-Tek Bags,* therefore, remains relevant notwithstanding the action's ultimate outcome.

## ii. *Counsel's Present Conduct*

Counsel's "present performance" is clearly a factor in assessing the adequacy of representation. *Bolanos v. Norwegian Cruise Lines Ltd., supra,* 212 F.R.D. at 156. Defendants argue that plaintiffs' counsel "blatantly disregarded court orders" and "willfully impeded the timely completion of discovery" (Defs.' Opp'n at 9, 11).[FN4] Plaintiffs respond that defendants' assertion of flagrant discovery abuse is "unfounded" and that it was defendants' "unreasonableness" that impeded discovery (Pls.' Br. at 8, 9).

> FN4. Defendants further argue that plaintiffs' counsel "improperly solicited potential class members" with a letter that "mischaracterized the United States Supreme Court's denial of certiorari, and its effect, in *Greenberg v. National Geographic Society, et al.*" and "solicited employment

from Plaintiffs by contacting many of the Plaintiffs by telephone" (Defs.' Opp'n at 10, 11). Defendants' argument here-that Mr. Soni mischaracterized the Supreme Court's denial of certiorari as a decision on the merits-is so hypertechnical that it is almost a certainty that it had no effect on potential class members. Because defendants have not shown that any plaintiff has relied on the letter in joining this action, I do not reach the issue of whether the letter was misleading. Moreover, Mr. Soni submitted an uncontradicted affirmation that neither he nor anyone from his firm has made telephone solicitations in this case (Affirmation of Surjit P. Soni, dated January 15, 2000, at ¶ 3).

Reviewing the record in this case, it is apparent that plaintiffs' counsel's conduct has been far from satisfactory. In an Order dated October 8, 2002, Judge Kaplan noted "the delay caused by plaintiffs' intransigence and tendentious positions with respect to discovery." *Auscape Int'l v. National Geographic Soc'y,* 02 Civ. 6441(LAK), 2002 WL 31250727 at *3 (S.D.N.Y. Oct. 8, 2002). Second, and most significant, plaintiff's counsel was sanctioned by Judge Kaplan, who found that counsel was "responsible for the plaintiffs' failure to comply with the [discovery] Order because ... of Mr. Soni's failure to communicate the Order to his clients." *Auscape Int'l v. National Geographic Soc'y,* 02 Civ. 6441(LAK), 2003 WL 134989 at *6 (S.D.N.Y. Jan. 17, 2003).[FN5] On the same date, in addressing "yet another discovery dispute," Judge Kaplan described plaintiffs' counsel's assertions as "misleading" and as not being "candid." *Auscape Int'l v. National Geographic Soc'y,* 02 Civ. 6441(LAK), 2003 WL 139213 at *1-*2 (S.D.N.Y. Jan. 17, 2003). Third, on March 14, 2003, Judge Kaplan once again found that "plaintiffs' behavior in respect of discovery ha[d] been dilatory and obstructive." *Auscape Int'l v. National Geographic Soc'y,* 02 Civ. 6441(LAK), 2003 WL 1565952 at *1 (S.D.N.Y. Mar. 14, 2003). Finally, in declining to extend the deadline for discovery, Judge Kaplan described plaintiffs' arguments as "specious" and noted that "plaintiffs' claim of misunderstanding [was] not credible." *Auscape Int'l v. National Geographic Soc'y,* 02 Civ. 6441(LAK), 2003 WL 21146628 at *1 (S.D.N.Y. May 13, 2003).

> FN5. Despite unambiguous precedent in this Circuit that a sanction against an attorney

for a party is not immediately appealable, *New Pac. Overseas Group v. Excal Int'l Dev. Corp.,* 252 F.3d 667, 669-70 (2d Cir.2001) ("[A]n order imposing Rule 37 sanctions against an attorney ... is not an appealable 'final decision' under 28 U.S.C. § 1291."), Mr. Soni attempted to appeal Judge Kaplan's Order imposing sanctions. Mr. Soni's disregard of this controlling authority is, at best, inexplicable.

**\*7** In response to defendants' argument that plaintiffs' counsel willfully impeded the timely completion of discovery, plaintiffs argue that "it was [defendant's] own unreasonableness in insisting upon in person depositions in New York on short notice which caused the delay. [Defendant] was ordered to take depositions in the county of Plaintiff's residence or by phone" (Pls.' Br. at 9). Judge Kaplan's Order of January 17, 2003 addressed and soundly rejected plaintiffs' argument, finding, in pertinent part, that "it [was] neither honest nor wise to suggest, as counsel did ... that the Court had ruled, as a general matter, that plaintiffs are to be deposed in their counties of residence." *Auscape Int'l v. National Geographic Soc'y, supra,* 2003 WL 139213 at \*1.

### iii. Counsel's Association With Stephen Weingrad

Finally, defendants argue that plaintiffs' counsel's association with Stephen Weingrad, Esq., of the New York law firm Weingrad & Weingrad, L.L.P., gives rise to further questions regarding counsel's ability to represent this class adequately (Defs.' Opp'n at 16-17). Although the magnitude of Mr. Weingrad's participation in this action is unclear, Mr. Soni described Mr. Weingrad's involvement as follows: "He is counsel associated with my firm. He is counsel assisting me...." (Transcript of Deposition of Catherine Ursillo, at 12, annexed as Ex. 42 to Affirmation of Naomi Jane Gray, dated December 13, 2002 ("Gray Aff.")). Plaintiffs now admit that "Mr. Weingrad serves as local counsel for the Soni Law Firm in this case" (Pls.' Br. at 11).

Defendants note that in *Faulkner v. National Geographic Soc'y, supra,* 99 Civ. 12488(LAK) (S.D.N.Y. May 17, 2000), Judge Kaplan denied class certification on the basis of Mr. Weingrad's inability to represent the purported class adequately. Because of the importance of this determination, I quote from the relevant portion of Judge Kaplan's Order, dated May 17, 2000, at length.

The attorney of record for the plaintiffs and the proposed class in this case is Stephen A. Weingrad of the firm of Weingrad & Weingrad, L.L.P. Mr. Weingrad is not a stranger to this Court. He represented the plaintiffs in another copyright case recently, *Bridgeman Art Library, Ltd. v. Corel Corp.,* 36 F.Supp.2d 191 (S .D.N.Y.1999). His professional performance in that action was unsatisfactory. Indeed, in passing on his motion to [*sic* ] for reargument and reconsideration after the Court granted summary judgment dismissing his client's claims, the Court wrote as follows:

"At the outset, it is worth noting that the post-judgment flurry was occasioned chiefly by the fact that the plaintiff [represented by Mr. Weingrad] failed competently to address most of the issues raised by this interesting case prior to the entry of final judgment. In particular, while plaintiff urged the application of U.K. law, it made no serious effort to address the choice of law issue and no effort at all (apart from citing the British copyright act) to bring pertinent U.K. authority to the Court's attention before plaintiff lost the case. Indeed, it did not even cite *Graves' Case,* the supposedly controlling authority that the Court is said to have overlooked." *Id.* at 192.

**\*8** Regrettably, Mr. Weingrad's performance in *Bridgeman* was not an isolated occurrence. In *Ernst Haas Studio, Inc. v. Palm Press, Inc.,* 164 F.3d 110 (2d Cir.1999), the Second Circuit rejected an appeal, taken by Mr. Weingrad from a district court judgment of dismissal, "on the ground that the main Brief filed by appellant [*i.e.,* Mr. Weingrad] articulates no grounds for reversal of the judgment, and we decline to entertain arguments made for the first time in the Reply Brief." *Id.* at 111. Moreover, the Circuit ordered Mr. Weingrad to pay the appellee's attorney's fees as a sanction pursuant to Fed.R.App.P. 38:

"We do hold that appellee should recover under Rule 38 its reasonable attorney's fees in connection with this appeal. By failing in its main Brief to state reasoned arguments based on cited authority setting out grounds for reversal, appellant's counsel forced appellee to anticipate, research, and reargue the issues in the case without knowing what issues appellant intended to raise. [citation omitted] An award of attorney's fees is thus appropriate as a sanction. Because the frivolous nature of the Brief is due to counsel, he should bear sole liability for these fees." *Id.* at 112-13.

Given both this Court's experience with Mr. Weingrad in *Bridgeman* and the Court of Appeals' determinations in *Ernst Haas Studio,* this Court quite confidently holds that no class represented by Mr. Weingrad meets Rule 23(a)'s requirements of adequate representation.

Not Reported in F.Supp.2d                                                                                Page 7
Not Reported in F.Supp.2d, 2003 WL 23531750 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

(Gray Aff., Ex. 12 at 2).

Since Judge Kaplan's decision in May 2000, Mr. Weingrad has been sanctioned by this Court in two additional actions. In *MAI Photo News Agency, Inc. v. American Broad. Co.*, 97 Civ. 8908(WK), 2001 WL 180020 at *7 (S.D.N.Y. Feb. 22, 2001), the Honorable Whitman Knapp, Senior United States District Judge, imposed sanctions against Mr. Weingrad based on the following conduct:

[Mr. Weinegrad] has made accusations that lack evidentiary basis [and are] contrary to what his client ... has admitted to in his deposition. He used his summary judgment opposition papers to change his claims and add new claims, claims that also lack evidentiary support. His briefs, aside from being incoherent and unconvincing, contain purported quotations of portions of defendant's briefs with key words switched around to make the statements support his unfounded position. Furthermore, Mr. Weinegrad, in an effort to misconstrue the law, has done the same thing with cases used by plaintiff in its brief and with statements made by this very court during oral argument pertaining to this case. Intentionally mis-citing the law is inexcusable and should be sanctioned.

More recently, the Honorable Gerard E. Lynch, United States District Judge, sanctioned Mr. Weingrad for his conduct as plaintiffs' attorney in *Silberman v. Innovation Luggage, Inc.*, 01 Civ. 7109(GEL), 2003 WL 1787123 at *15 (S.D.N.Y. Apr. 3, 2003).

[P]laintiffs' counsel's slovenly approach to the Swiss law issues in this case occasions grave concern. After initially stating a straightforward, meritorious copyright claim (albeit one that was unpromising in terms of potential damages) on behalf of Silberman, counsel proceeded to amend that complaint to add a Swiss law claim on behalf of Wizard. The fact that plaintiffs' own expert was induced to present a generalized opinion that superficially might appear to support Wizard's claims, without having been adequately briefed on the facts, and then at his deposition, when confronted with the facts, testified diametrically in opposition to plaintiffs' position, speaks ill-to say the least-of the adequacy of counsel's investigation before filing the Amended Complaint. Moreover, the addition of unfounded claims under foreign law both put defendants to the burden and considerable expense of retaining a Swiss law expert of their own and preparing for and conducting the deposition of Dr. Reutter, and

significantly delayed the processing of Silberman's own meritorious claim.

**\*9** His conduct here is inexcusable, and his failure to present the slightest evidence of the validity of the foreign law claims (the basis for which was essentially disavowed by his own expert), compels the conclusion that the Swiss law claim was presented without adequate investigation and in bad faith.

*See also Baker v. Urban Outfitters, Inc.*, 254 F.Supp.2d 346, 361 (S.D.N.Y.2003) ("[G]iven the complete lack of merit of Baker's Rule 11 motion-which Baker and his counsel [Mr. Weingrad] were warned about prior to making the motion-it is appropriate that defendants, the prevailing parties on plaintiff's Rule 11 motion, be compensated for their reasonable expenses and attorneys' fees incurred in opposing the motion.").

Despite Mr. Weingrad's reputation in this Court and a previous determination finding him inadequate counsel in a proposed class action, plaintiffs' response in its entirety consists of the following two sentences: "All material decisions, briefing and every appearance has been handled by The Soni Law Firm, not Mr. Weingrad. Mr. Weingrad is not expected to play a significant role in representing the class" (Pls.' Br. at 11). Based on Mr. Weingrad's previous conduct, which is far from an isolated incident of poor judgment, he is clearly inadequate counsel for this proposed class action in any role, whether "significant" or not.

iv. *Summary*

Both Mr. Soni and his "associate" Mr. Weingrad have been sanctioned by this Court and have been repeatedly criticized extensively for their behavior in other actions. Based on the fore-going, they are inadequate representatives for this proposed class action. *See Kingsepp v. Wesleyan Univ.*, 142 F.R.D. 597, 602 (S.D.N.Y.1992) (denying class certification where "[counsel's] documented failures to comply with a variety of court orders, statutory requirements, and the Federal Rules of Civil Procedure indicate[d] that he [was] not an attorney who should be entrusted to conduct the proposed litigation"); *Sicinski v. Reliance Funding Corp.*, 82 F.R.D. 730, 734 & n. 2 (S.D.N.Y.1979) (class certification denied where counsel's performance in commencing the action and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                Page 8
Not Reported in F.Supp.2d, 2003 WL 23531750 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

proceeding with discovery had been unsatisfactory). *See also McGowan v. Faulkner Concrete Pipe Co., 659 F.2d 554, 559 (5th Cir.1981)* (class certification denied where counsel displayed "lack of competency" in completing discovery); *Gray v. Frito-Lay, Inc., No. 481-0516, 1982 WL 397 at *5 (S.D.Miss. Aug. 12, 1982)* (denying class certification where counsel displayed "total lack of diligence").

### b. *Adequacy of Class Representatives*

Under the second prong of adequacy of representation, plaintiffs must demonstrate the absence of conflict between the class representatives and the absentee class members and assure that the class representatives will vigorously prosecute the claims. *See Robinson v. Metro-North Commuter R.R. Co., supra, 267 F.3d at 170-71.* "Courts do not require the representative plaintiff to be the best of all possible plaintiffs or to be especially knowledgeable, intelligent, or possessing a detailed understanding of the legal or factual basis on which a class action can be maintained." *In re Playmobil Antitrust Litig., 35 F.Supp.2d 231, 242 (E.D.N.Y.1998), citing Surowitz v. Hilton Hotels Corp., 383 U.S. 363, 366 (1966).* However, "[i]f the representative displays a lack of credibility regarding the allegations [being] made or a lack of knowledge or understanding concerning what the suit is about, then the court may conclude that Rule 23(a)(4) is not satisfied." *Ingles v. City of New York, supra, 2003 WL 402565 at *6, citing Jane B. by Martin v. New York City Dep't of Social Servs., 117 F.R.D. 64, 70-71 (S.D.N.Y.1987).*

**\*10** Defendants argue that the named plaintiffs are "nothing more than their counsel's 'keys to the courthouse door,' utterly lacking in knowledge about their claims or responsibilities as class representatives" (Defs.' Opp'n at 18).

First, defendants point out that many of the plaintiffs did not read the complaint in this action (Gray Aff.: Ex. 6, Nebbia Dep. 11:23-25 ("I might have [received a copy of the complaint] on the Internet, but like I said, I didn't download it and I'm glad I didn't."); Ex. 21, Stone Dep. 36:22-37:16 (plaintiff was not sure if she ever received a copy of the complaint and did not believe that she would have "waded into it ... [a]t least not very deeply"); Ex. 26, Schofield Dep. 51:2-52:14 (did not believe he had ever seen the complaint "in its entirety"); Ex. 36, Maisel Dep. 7:10-14 (did not even read summary of complaint provided by plaintiffs' counsel: "I hate reading legal documents. I

usually glance over them and that's about it. There is a redundancy that bothers me in most legal documents so that it is difficult for me to read them."); Ex. 43, Morris Dep. 30:15-23 (did not read complaint and had never seen it before the deposition); Ex. 45, Oxford 30(b)(6) Dep. 29:18-22 (witness could not answer how many photographers Oxford was representing in this lawsuit), 33:6-9 (witness did not know the images involved in the dispute), 103:19-104:6 (witness did not know if Oxford had suffered any financial damages from the sale of the disputed products or if Oxford was seeking to impound the products); Ex. 47, Greer Dep. 54:16-55:19 (during deposition was the first time plaintiff saw the complaint); Ex. 48, Auscape 30(b)(6) Dep. 7:7-13 (witness did not review documents provided by its counsel carefully)).

Second, defendants point out that a number of the named plaintiffs are unfamiliar with the nature of their role as class representatives (Gray Aff.: Ex. 6, Nebbia Dep. 43:1-2 ("I'm not representing anyone other than myself.") and 48:7-12 (did not know that he was responsible for fees and costs in the action); Ex. 11, Starck Dep. 40:17-24 (had "no understanding" of the time commitments or financial requirements in being a class representative); Ex. 22, Maisel Dep. 16:5-8 (has "no idea" of whose responsibility it is to pay costs incurred in the litigation) and 20:3-14 (stating that Mr. Soni has the authority to make settlement decisions [FN6]); Ex. 26, Schofield Dep. 50:17-51:1 (stating that Mr. Soni has the authority to decide whether to settle the case); Ex. 47, Greer Dep. 54:2-6 (stating that with respect to authority to settle the action: "I leave that up to Mr. Soni. That is his business. He is the lawyer, not me.") and 106:25-107:16 (believed that any costs and fees in the litigation would be incurred by "all members of the class").

> [FN6.] Maisel has subsequently contradicted this testimony by way of errata sheet stating "I would expect that any settlement discussions would involve discussions between Mr. Soni and me, as well as the other named plaintiff" (Gray Aff., Ex. 23).

Lastly, the testimony of at least three of the named plaintiffs will be subject to impeachment based on contradictions between their deposition testimony and the errata sheets that were submitted with "corrections" to their deposition testimony.[FN7]

Not Reported in F.Supp.2d                                                                    Page 9
Not Reported in F.Supp.2d, 2003 WL 23531750 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

FN7. Menzel, Maisel and Schofield made substantial changes to their deposition testimony by way of errata sheets:

| Original Testimony | Correction |
|---|---|
| Gray Aff., Ex. 9, Menzel Dep. 63:2-10<br>Q. Who owns the copyright in the photographs that were taken pursuant to these agreements and which were published in National Geographic Magazine?<br>A. These documents all state that National Geographic owns the copyright ....* | Gray Aff., Ex. 28<br>*ADD: I own the copyright to the images. |
| Ex. 9, Menzel Dep. 67:14-68:8<br>Q. You also stated in one of your previous answers that the contract provides that [NGS] will own the copyright. Do you recall making this statement?<br>A. That National Geographic-<br>Q. Society would own the copyright?<br>A. To the images that were published in the magazine in context.<br>Q. Pursuant to the agreements?<br>A. Yes.<br>Q. Do you recall making that statement?<br>A. Yes.<br>Q. Is it fair to say that you are not claiming that you own the copyright to these images?<br>A. National Geographic owns the copyright to the images that were published in National Geographic, the ones that I shot on assignment for them, as they appear in the magazine. Is that clear?* | Gray Aff., Ex. 28<br>*CHANGE: National Geographic does not own the copyright. |
| Gray Aff., Ex. 22, Maisel Dep. 35:21-36:7<br>Q. What is your understanding of who owns the copyright in the photographs that you created pursuant to [the contract] that were published in National Geographic Magazine?<br>A. What was my understanding of it? | Gray Aff., Ex. 25<br>*Insert: That may be what the document seems to say, but I believe I am the owner of the copyright in my |

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 10
Not Reported in F.Supp.2d, 2003 WL 23531750 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Q. Of who owns the copyright in those photographs.

A. They own the copyright.*

Q. National Geographic Society owns the copyright?

A. Yes. With stipulations further mentioned in this text.

photographs because I do not believe that the document is effective. National Geographic did not perform its obligations under it.

Gray Aff., Ex. 26, Schofield Dep. 65:1-16

Q. When you say part of the contract, you mean the part of the contract that the copyright would belong exclusively to National Geographic Society, is that right?

A. That's what they are asking for in the contract, yes.

Q. And you agreed to the contract when you signed it, correct?

A. I agreed that I definitely wanted to shoot the assignment, yes.

Q. But you signed the contract with this term in it, correct?

A. Yes, that's correct.

Q. Indicating that you agreed and accepted it?

A. That's correct.*

Gray Aff., Ex. 27
*ADD:  I own the copyright to the images.

**\*11** Although Rule 30(e) of the Federal Rules of Civil Procedure permits a deponent to make liberal changes to the form or substance of his or her deposition testimony, a deponent can be impeached at trial with any inconsistencies that result from the errata sheet. As the Second Circuit has noted:

[W]hen a party amends his testimony under Rule 30(e), "[t]he original answer to the deposition questions will remain part of the record and can be read at the trial." *Id.* (citing, *inter alia, Usiak v. New York Tank Barge Co.,* 299 F.2d 808 (2d Cir.1962)). "Nothing in the language of Rule 30(e) requires or implies that the original answers are to be stricken when changes are made." *Id.* at 641-642. This Court has recognized that because "[a]ny out-of-court statement by a party is an admission," a deponent's "original answer should [be] admitted [into evidence]" even when he amends his deposition testimony-with the deponent "[o]f course ... free to introduce the amended answer and explain the reasons for the change." *Usiak,* 299 F.2d at 810.

*Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 103 (2d Cir.1997). *See Toland v. Forest Labs., Inc.,* 00 Civ.

4179(LAK), 2001 WL 30617 at *1 (S.D.N.Y. Jan. 11, 2001) ("The changes [pursuant to Rule 30(e) ] obviously may affect the trier of fact's view of the credibility of the witness."). *See also DeLoach v. Phillip Morris Cos.,* 206 F.R.D. 568, 570 (M.D.N.C.2002); *Holland v. Cedar Creek Mining, Inc.,* 198 F.R.D. 651, 653 (S.D.W.Va.2001); *Metayer v. PFL Life Ins. Co.,* No. CIV. 98-177-P-C, 1999 WL 33117063 at *3 (D.Me.1999); *Innovative Mktg. & Tech. v. Norm Thompson Outfitters, Inc.,* 171 F.R.D. 203, 205 (W.D.Tex.1997).

Thus, a number of the named plaintiffs in this action suffer from deficiencies in their ability to vigorously prosecute this lawsuit that render them inadequate representatives for the absentee members of this putative class action.

### c. *Conclusion*

Based on the foregoing, plaintiffs' have not shown that either class counsel or the named members of the proposed class are adequate representatives for this class action. Therefore, I conclude that plaintiffs have failed to satisfy the requirements of Rule 23(a)(4).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 11
Not Reported in F.Supp.2d, 2003 WL 23531750 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

B. *Requirements of Rule 23(b)(3)*

The Court of Appeals addressed the predominance requirement of Rule 23(b)(3) in *Moore v. PaineWebber, Inc.,* 306 F.3d 1247, 1252 (2d Cir.2002). "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). It is a more demanding criterion than the commonality inquiry under Rule 23(a). *Id.* at 623-24, 117 S.Ct. 2231. Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof. *Visa Check,* [280 F.3d 124, 136 (2d Cir.2001)].

**\*12** As noted by the Honorable William J. Pauley, United States District Judge:
"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem,* 521 U.S. at 623, 117 S.Ct. 2231. "In order to meet the predominance requirement of Rule 23(b)(3), a plaintiff must establish that 'the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, ... predominate over those issues that are subject only to individualized proof.' " *Visa,* 280 F.3d at 136 (quoting *Rutstein v. Avis Rent-A-Car Sys., Inc.,* 211 F.3d 1228, 1233 (11th Cir.2000)). This predominance requirement is more demanding than the commonality requirement under Rule 23(a), and thus the Court must deny certification where individual issues of fact abound. *Moore v. PaineWebber, Inc.,* 306 F.3d 1247, 1252 (2d Cir.2002); *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.,* 209 F.R.D. 323, 349 (S.D.N.Y.2002); *see also Jones v. Goord,* 190 F.R.D. 103, 113 (S.D.N.Y.1999) ("While this section raises similar issues as the typicality and commonality requirements of Rule 23(a), under Rule 23(b)(3) the predominance criterion is far more demanding.").

*Benner v. Becton Dickinson & Co.,* 214 F.R.D. 157, 168 (S.D.N.Y.2003).

As explained in more detail below, resolution of the claims of the class proposed-which literally includes individuals from around the globe who have contributed to the magazine over the course of 115 years-involve so

many diverse questions of fact and law that this action cannot reasonably be maintained as a class action. Although there may be some legal issues that are common to more than one member of the putative class, the need to resolve a multitude of individualized factual and legal disputes would far outweigh any efficiencies that might result from class certification.

1. *Questions of Fact*

One of the the overarching problems to this matter proceeding as a class action is the divergent contracts and other agreements NGS had with the members of the putative class over the 115-year period encompassed by the proposed class.

Publication of a copyrighted photograph or article in electronic format, pursuant to a valid grant of permission to do so is simply not copyright infringement. *See Graham v. James,* 144 F.3d 229, 236 (2d Cir.1998). Thus, the scope of the rights granted to NGS by each of the members of the proposed class is critical to resolving the claim for copyright infringement. The existence of a valid grant of permission, whether by license or assignment, would also defeat many of the claims asserted by plaintiffs, including their claims for false designation of origin (Claim 1), unfair trade practices (Claim 2), unfair competition (Claim 3), commercial misappropriation (Claim 4), violation of publicity rights (Claim 5), breach of contract (Claim 6), unjust enrichment (Claim 7), involuntary trust (Claim 8), breach of fiduciary duties (Claim 12), and conversion (Claim 14).

**\*13** NGS did not use a standard form of contract with the members of the proposed class. To the contrary, "no two [Geographic] contracts are alike.... It was the most unruly situation that you can imagine, because truly no two of the contracts are alike" (Gray Aff ., Ex. 7 McIntyre Dep. 36:12-19); *see also* Gray Aff., Ex. 63 Rogers Dep. 91:7-9 ("[The contracts between photographers and NGS] are all different. It depends how you negotiate the rights to the photograph you sell them.").

The record here amply demonstrates that the scope of the rights that the members of the putative class granted to NGS varied widely.[FN8]

> FN8. In addition to the varied written contracts entered into between some of the plaintiffs and NGS, other plaintiffs had purely oral agreements governing their relationship with NGS (*See* Corr. Am. Compl. at ¶ 142(f) ( "It is believed that there are hundreds of authors who fall into to this

Not Reported in F.Supp.2d                                                                 Page 12
Not Reported in F.Supp.2d, 2003 WL 23531750 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

category.”)).

| | |
|---|---|
| *Item:* | NGS's contract with C. David Hiser provided that NGS "will retain possession of all published photographs and will retain publication rights to the published photographs" (Gray Aff., Ex. 51 at 1). |
| *Item:* | NGS's contract with Douglas Faulkner provided that NGS was "purchasing only first publication rights to ... transparencies, made on [Faulkner's own time and expense]. The originals will be returned to [Faulkner] after publication" (Gray Aff., Ex. 52 at 1). |
| *Item:* | NGS's contract with Fred Ward provided: "All photographs taken by you under this agreement will be considered as specially commissioned for use by NGS and upon creation all rights (i.e., entire copyright) will automatically, by virtue of this agreement, be deemed transferred exclusively and indefinitely to NGS. .. (Gray Aff., Ex. 53 at ¶ 4). |
| *Item:* | NGS's contract with Phil Schofield provided: "All photographs taken by you under this Agreement will be considered as specially commissioned for use by NGS and upon creation all rights, including the copyright, to these photographs will automatically, by virtue of this Agreement, be deemed to belong to NGS. Ninety days after publication, and in return for the license granted to NGS, NGS will return to you the copyright in all published and unpublished photographs from that assignment" (Gray Aff., Ex. 54 at ¶ 8). |
| *Item:* | NGS's contract with Richard Conniff provided: "The Material will be a specially commissioned work for use in *National Geographic Magazine* and you hereby grant all rights of first publication of the Material throughout the world exclusively to us. However, we will reassign copyright to you on your request sixty days after publication (Gray Aff., Ex. 56 at 2) (emphasis omitted). |
| *Item:* | NGS's contract with David Hiser provided: "In return for NGS' conveying copyright in assignment photographs to you, you hereby grant to NGS and NGS retains a perpetual |

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                              Page 13
Not Reported in F.Supp.2d, 2003 WL 23531750 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

worldwide nonexclusive license to reproduce
any photographs from the assignment, whether
published or unpublished, for NGS use or for
NGS products.  NGS shall make payment to you
for any such use under the license at 50% of
the established NGS market rate, except ...
NGS shall make no payment to you if the use
is for educational purposes (Gray Aff., Ex.
57 at ¶ 8(c).

*Item:*  NGS's  contract with Loren McIntyre provided:
"The [assignment] payments will entitle us to
photographic and manuscript rights to material
you produce for the National Geographic.
As in the past, we will return to you pictures
in which we have no further interest.
We will reserve the right to recall them for
use in some other Society related context"
(Gray Aff., Ex. 58 at 1).

*Item:*  NGS's  contract with Susan Johnson provided:
"Your text will be a specially commissioned
work for use in *National Geographic* magazine
and all world rights to such material shall
exclusively belong to the National Geographic
Society....  The Society will also consider
reassignment of copyright upon request"
(Gray Aff., Ex. 59 at 1).

*Item:*  NGS's  contract with John T. Burgoyne, Inc.
provided:  "All rights including copyright in
the above specially commissioned work and all
developmental stages of that work (including
concept and comprehensive color sketches)
belong to the National Geographic Society
(NGS)....  NGS shall make no payment to
you if the reuse is for a product of NGS or
of a corporate subsidiary which carries an
NGS trademark, and over which NGS maintains
final editorial control" (Gray Aff., Ex. 60
at ¶ 2).

*Item:*  NGS's  contract with David Allen "set down the
terms of the agreement" with NGS, but did not
make any reference to the issue of copyright
ownership (Gray Aff., Ex. 61 at 1).

*Item:*  NGS's  contract with Walter A. Starck, III,
provided that NGS would have the " 'first
refusal' of any photographs" taken on
Starck's "Expedition," but did not contain

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00360-SLR     Document 212-2     Filed 08/17/2006     Page 15 of 150

Not Reported in F.Supp.2d                                                                           Page 14
Not Reported in F.Supp.2d, 2003 WL 23531750 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

any terms relating to copyright ownership (Gray Aff., Ex. 62 at ¶ 6).

## 2. *Questions of Law*

Plaintiffs acknowledge that "Class Members are citizens of many different countries, including the United States, and they reside all over the world" (Corr. Am. Compl. at ¶ 44).[FN9] Nevertheless, plaintiffs assert that California law "must" be applied to the claims of all members:

> FN9. Named plaintiffs include citizens of Australia, Denmark, Italy, the United Kingdom and the United States. Within the United States, named plaintiffs include residents of Alabama, California, Florida, Illinois, Massachusetts, New Mexico, New York, North Carolina, and Washington (Corr. Am. Compl. at ¶ 13-38).

**\*15** Plaintiffs' claims are based on the publication and sale of infringing products in California. Since each Plaintiff's rights were similarly violated, each Plaintiff has the right to bring a State and Federal action. Based on the population of California (a tenth of the entire Nation), a substantial portion of the infringing media was sold within its borders. NGS admits that this Court as the transferee court must apply California law.
(Pls.' Br. at 17).

Plaintiffs' argument is contrary to clearly established and controlling precedent.

Plaintiffs are effectively asking the court to create a new choice of law rule notwithstanding the existence of precedent that controls the issue. "A federal court sitting in diversity or adjudicating state law claims that are pendent to a federal claim must apply the choice of law rules of the forum state." *Rogers v. Grimaldi,* 875 F.2d 994, 1002 (2d Cir.1989), *citing* *Klaxon Co. v.. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496 (1941) *and* *Colgate Palmolive Co. v. S/S Dart Canada,* 724 F.2d 313, 316 (2d Cir.1983). *Accord* *Darboe v. Staples, Inc.,* 243 F.Supp.2d 5, 18-19 (S.D.N.Y.2003). Where, as here, the action has been transferred from a federal court in another state, the transferee court must apply the choice of law rules of the transferor court. *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 244 n. 8 (1981); *Van Dusen v. Barrack,* 376 U.S. 612, 639 (1964); *Valley Juice Ltd. v. Evian Waters of France,* Inc., 87 F.3d 604, 607 (2d Cir.1996). Thus, controlling precedent requires that I must apply the state law of the transferor forum-California-to determine what law governs the state law claims of each class member.

**\*14** As is evident from the examples provided above, NGS entered into varied contractual agreements with its freelance photographers and writers. Under these circumstances, the efficiency of a class action suit is negated by the individual factual inquiries that will be necessary for each plaintiff. *See* *Estate of Berlin v. Stash Records, Inc.,* 96 Civ. 6575(PKL), 1996 WL 374176 at \*2 (S.D.N.Y. July 2, 1996) ("whether or not defendants obtained a license from named plaintiff before releasing phonorecords to which named plaintiff has a copyright is not relevant to any other putative class member's claim).

Accordingly, I find that maintenance of this suit as a class action is inappropriate given that the resolution of the claims asserted here require a plaintiff-by-plaintiff determination of the contractual rights conveyed to NGS. *See* *Broussard v. Meineke Disc. Muffler Shops, Inc.,* 155 F.3d 331, 340 (4th Cir.1998) (finding that "the differences between the [agreements] raise the distinct possibility that there was a breach of contract with some class members, but not with other class members. In such a case, the plaintiffs cannot amalgamate multiple contract actions into one."); *Sprague v. General Motors Corp.,* 133 F.3d 388, 398 (6th Cir.1998) (no common questions where each proof of contractual agreement would depend on documents and representations for each plaintiff); *Basco v. Wal-Mart Stores, Inc.,* 216 F.Supp.2d 592, 602-03 (E.D.La.2002) (individual issues predominated where plaintiffs would be required to prove the terms of and breach of oral contracts); *Cohn v. Massachusetts Mut. Life Ins. Co.,* 189 F.R.D. 209, 215 (D.Conn.1999) (no predominance where the resolution of plaintiffs' breach of contract claims was dependent upon the representations made to each plaintiff individually); *Nagel v. ADM Investor Servs.,* 65 F.Supp.2d 740, 747 (N.D.Ill.1999) (common questions did not predominate where plaintiffs were subject to different contracts); *Moore Video Distribs., Inc. v. Quest Entm't, Inc.,* 823 F.Supp. 1332, 1339 (S.D.Miss.1993) (no commonality where the "plaintiffs [had] not made a prima facie showing that the terms of the contract were the same or that they were all breached in the same manner or under the same set of circumstances"); *Brooks v. Southern Bell Tel. & Tel. Co.,* 133 F.R.D. 54, 57 (S.D.Fla.1990) (finding that commonality was not met where "[i]t [was] not only conceivable, but probable, that [the] court [would] be required to hear evidence regarding the existence, terms, modifications and limitations of *each* alleged contract of the over 5,000 prospective class members.").

Not Reported in F.Supp.2d                                                                                                Page 15
Not Reported in F.Supp.2d, 2003 WL 23531750 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

California applies a multi-step "governmental interest analysis" approach to resolving choice of law issues:

Under the leadership of former Chief Justice Roger Traynor, the California law moved away from a mechanical choice of law process to employ the "governmental interest analysis" approach. Before a California court makes a choice of law, it will first consider the actual stake that the potentially concerned states have in the litigation. (*Hurtado v. Superior Court,* 11 Cal.3d 574, 114 Cal.Rptr. 106, 522 P.2d 666 (1974); *Reich v. Purcell,* 67 Cal.2d 551, 63 Cal.Rptr. 31, 432 P.2d 727 (1967).) The court will examine the decisional rule of a sister state and will determine whether the state interests the rule is designed to protect will be significantly furthered by its application to the case at hand. Generally, the preference is to apply California law, rather than choose the foreign law as a rule of decision. (*Hurtado v. Superior Court, supra,* 114 Cal.Rptr. at 110, 522 P.2d at 670.) Therefore, if application of a foreign decisional rule will not significantly advance the interests of the foreign state, a California court will conclude that the conflict is "false" and apply its own law. (*Id.* at 110-11, 522 P.2d at 670-71; *Reich v.. Purcell, supra,* 63 Cal.Rptr. at 35, 432 P.2d at 731.) Only if both California and the foreign state have a strong interest in the application of their own law to the controversy will a true conflict be said to exist, requiring an examination of the "comparative impairment" to each states' interest of the choice of one rule over the other. (*Bernhard v. Harrah's Club,* 16 Cal.3d 313, 128 Cal.Rptr. 215, 218-23, 546 P.2d 719, 722-27 (1976); *Bernkrant v. Fowler,* 55 Cal.2d 588, 12 Cal.Rptr. 266, 360 P.2d 906 (1961); *People v. One 1953 Ford Victoria,* 48 Cal.2d 595, 311 P.2d 480 (1957).) This approach is applied to contracts cases as well as in the more familiar tort context. (*See Bernkrant v. Fowler, supra; Dixon Mobile Homes, Inc. v. Walters,* 48 Cal .App.3d 964, 122 Cal.Rptr. 202 (1975).)

**\*16** *Strassberg v. New England Mut. Life Ins. Co.,* 575 F.2d 1262, 1263-64 (9th Cir.1978). *Accord Isuzu Motors Ltd. v. Consumers Union,* 12 F.Supp.2d 1035, 1043 (C.D.Cal.1998).

Plaintiffs here have asserted ten pendent state law claims.[FN10] Although the states of residency of all of the class members is not currently known, given the size of the class, it is probable that there are class members from most of the states and, no doubt, at least some class members reside in foreign countries. If I make the modest assumption that class members reside in at least 40 different states and foreign countries, class certification would require that at least 400 different choice of law analyses be performed. *See Lewallen v. Medtronic USA, Inc.,* No. C 01-20395(RMW), 2002 WL 31300899 at *5 (N.D.Cal. Aug. 28, 2002)* ("The choice of law analysis must be applied to each claim upon which certification is sought.... Here, the proposed class is nationwide, and therefore, each of the fifty states may have an interest in seeing that its law is applied in an action involving one of its own injured citizens."). *See also In re Rezulin Prods. Liab. Litig., supra,* 210 F.R.D. at 70-71.

> FN10. Plaintiffs' claims for false designation of origin, direct copyright infringement, inducement to commit copyright infringement and their claim for a declaratory judgment concerning copyright ownership appear to be federal claims.

The specter of a multitude of choice of law analyses is not a mere academic possibility. Clearly, conflicts of laws do exist among the fifty states. For example, a survey of the statutes of limitations for breach of contract reveals that there are considerable differences among the states.[FN11] Nevertheless, plaintiffs have ignored this issue and attempt to dismiss defendants' choice of law arguments in one page of their reply brief (*see* Pls.' Br. at 17-18). Plaintiffs' "back-of-the-hand" argument is simply insufficient to sustain plaintiffs' burden of proof. As noted by Judge Kaplan in *In re Rezulin Prods. Liab. Litig., supra,* 210 F.R.D. at 71 n. 59:

> FN11.

| | |
|---|---|
| *Alabama:* | 6 years |
| Ala.Code § 6-2-34(4) 1975 | |
| *California:* | 4 years (written) |
| Cal.Civ.Proc.Code § 337(1) | 2 years (unwritten) |
| *District of Columbia:* | 3 years |
| D.C.Code § 12-301(7) | |
| *Florida:* | 5 years (written) |
| Fla. Stat. Ann. § 95.11 | 4 years (unwritten) |
| *Illinois:* | 15 years |

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 16
Not Reported in F.Supp.2d, 2003 WL 23531750 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

735 Ill. Comp. Stat. Ann. 5/13-206

| | |
|---|---|
| *Massachusetts:* | 6 years |
| Mass. Gen. Laws Ann. ch. 260, § 2 | |
| *New Mexico:* | 6 years |
| N.M. Stat. Ann. § 37-1-3-(A) | |
| *North Carolina:* | 3 years |
| N.C. Gen.Stat. § 1-52(1) | |
| *Ohio:* | 15 years (written) |
| Ohio Rev.Code Ann. § § | 6 years (unwritten) |
| 2305.06, 2305.07 | |
| *Virginia:* | 5 years (written) |
| Va.Code Ann. § 8.01-246(2) | 3 years (unwritten) |

"[P]laintiffs b[ore] the burden of providing an 'extensive analysis' of state law variations to determine whether there are 'insuperable obstacles' to class certification." *In re Ford Motor Co. Ignition Switch Products Liab. Litig.,* 174 F.R.D. at 332; *see also Walsh v. Ford Motor Co.,* 807 F.2d 1000, 1017 (D .C. Cir.1986). Attempts at such "extensive analysis" often include model jury instructions and verdicts forms, as well as an attempt to group state laws by their relevant differences. Plaintiffs made no such showing here, despite being challenged in defendants' answering brief to do so....

Finally, even if I were free to rewrite the applicable choice of law rules, rewriting them in the manner suggested by plaintiffs and blindly applying California law to the claims of all class members appears to violate Due Process. Due Process requires that there be some connection between the substantive law applied to a dispute and the dispute or the parties. *See Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 821-22 (1985). Thus, California substantive law could not properly be applied to the claims of parties who have never resided in California and have no connection with the state apart from the defendants' fortuitous sale of some allegedly infringing works there.

### 3. Summary

**\*17** Plaintiffs have failed to show that either common questions of fact or common questions of law predominate over questions requiring individual inquiry. I conclude, therefore, that the requirements of Rule 23(b)(3) have not been met. Because common questions of law and fact do not predominate in this action, I do not reach the other arguments asserted by defendants concerning the requirements of Rule 23(b)(3).

### IV. *Conclusion*

For all the foregoing reasons, I find that plaintiffs have failed to meet the requirements Rule 23 of the Federal Rules of Civil Procedure and respectfully recommend that plaintiffs' motion for class certification be denied.

### V. *Objections*

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from the date of this Report to file written objections. *See also* Fed.R.Civ.P. 6(a) and 6(e). Such objections (and responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Lewis A. Kaplan, United States District Judge, 500 Pearl Street, Room 1310, New York, New York 10007, and to the chambers of the undersigned, 500 Pearl Street, Room 750, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Kaplan. FAILURE TO OBJECT WITHIN TEN (10) DAYS *WILL* RESULT IN A WAIVER OF OBJECTIONS AND *WILL* PRECLUDE APPELLATE REVIEW. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Male Juvenile,* 121 F.3d 34, 38 (2d Cir.1997); *IUE AFL-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57-59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237-38 (2d Cir.1983).

S.D.N.Y.,2003.
Auscape Intern. v. National Geographic Enterprises Inc.
Not Reported in F.Supp.2d, 2003 WL 23531750 (S.D.N.Y.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT B

835 N.E.2d 801                                                                                     Page 1
216 Ill.2d 100, 835 N.E.2d 801, 296 Ill.Dec. 448
**(Cite as: 216 Ill.2d 100, 835 N.E.2d 801)**

▷

Briefs and Other Related Documents

Supreme Court of Illinois.
Michael AVERY et al., Appellees,
v.
STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, Appellant.
**No. 91494.**

Aug. 18, 2005.
Rehearing Denied Sept. 26, 2005.

**Background:** Insureds brought class action against automobile insurer to recover for breach of contract, and for consumer fraud and deceptive acts in violation of Consumer Fraud and Deceptive Business Practices Act, and sought declaratory and injunctive relief, alleging insurer's failure to pay for original equipment manufacturer (OEM) parts for repairs of insureds' damaged vehicles, and insurer's misrepresentations or failures to disclose regarding quality of non-OEM parts. Contract claim was tried to jury, and remaining claims were tried to the court. The Circuit Court, Williamson County, John Speroni, J., entered judgment on jury's verdict for insureds on contract claim, entered judgment for insureds on consumer fraud claim, granted declaratory but not injunctive relief, and awarded insureds damages of $1,186,180,000. Insurer appealed. The Appellate Court, 321 Ill.App.3d 269, 254 Ill.Dec. 194, 746 N.E.2d 1242, affirmed in part, reversed in part, and remanded. Appeal was allowed.

**Holdings:** The Supreme Court, McMorrow, C.J., held that:

4(1) whether insurance contracts in 48 states could be given uniform interpretation should have been decided at class certification stage rather than at trial;

9(2) contracts could not be given uniform interpretation, and thus, commonality and predominance requirement for class certification did not exist;

12(3) insurer did not breach the insurance contracts;

20(4) mere specification of non-OEM parts did not constitute damages;

22(5) "installation damages" for removing non-OEM parts were speculative;

28(6) insurer did not have to disclose that non-OEM parts were "categorically inferior";

30(7) insurer's representations regarding quality of non-OEM parts were non-actionable puffery;

39(8) a non-resident plaintiff may pursue private cause of action under Consumer Fraud and Deceptive Business Practices Act only if the circumstances that relate to the disputed transaction occur primarily and substantially in Illinois;

41(9) non-resident insureds did not have private cause of action under the Act; and

46(10) plaintiffs must prove the elements of a private cause of action under the Act by a preponderance of the evidence, overruling *General Motors Acceptance Corp. v. Grissom*, 150 Ill.App.3d 62, 103 Ill.Dec. 447, 501 N.E.2d 764, and *Munjal v. Baird & Warner, Inc.*, 138 Ill.App.3d 172, 92 Ill.Dec. 809, 485 N.E.2d 855.

Appellate Court affirmed in part and reversed in part; Circuit Court affirmed in part and reversed in part.

Freeman, J., filed an opinion concurring in part and dissenting in part, in which Kilbride, J., joined.

West Headnotes

**[1] Courts 106 ⚖97(1)**

106 Courts
    106II Establishment, Organization, and Procedure
        106II(G) Rules of Decision
            106k88 Previous Decisions as Controlling or as Precedents
                106k97 Decisions of United States Courts as Authority in State Courts
                    106k97(1) k. In General. Most Cited Cases
The Illinois Code of Civil Procedure provision on

216 Ill.2d 100, 835 N.E.2d 801, 296 Ill.Dec. 448
**(Cite as: 216 Ill.2d 100, 835 N.E.2d 801)**

class certification is patterned after Rule 23 of the Federal Rules of Civil Procedure, and, given the relationship between these two provisions, federal decisions interpreting Rule 23 are persuasive authority with regard to questions of class certification in Illinois. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.; S.H.A. 735 ILCS 5/2-801.

**[2] Appeal and Error 30 ☞949**

30 Appeal and Error
  30XVI Review
    30XVI(H) Discretion of Lower Court
      30k949 k. Allowance of Remedy and Matters of Procedure in General. Most Cited Cases

**Parties 287 ☞35.9**

287 Parties
  287III Representative and Class Actions
    287III(A) In General
      287k35.9 k. Discretion of Court. Most Cited Cases
Decisions regarding class certification are within the sound discretion of the trial court and should be overturned only where the court clearly abused its discretion or applied impermissible legal criteria. S.H.A. 735 ILCS 5/2-801.

**[3] Parties 287 ☞35.9**

287 Parties
  287III Representative and Class Actions
    287III(A) In General
      287k35.9 k. Discretion of Court. Most Cited Cases
A trial court's discretion in deciding whether to certify a class action is not unlimited and is bounded by and must be exercised within the framework of the civil procedure rule governing class actions. S.H.A. 735 ILCS 5/2-801.

**[4] Parties 287 ☞35.73**

287 Parties
  287III Representative and Class Actions
    287III(C) Particular Classes Represented
      287k35.73 k. Insurance Claimants. Most Cited Cases
Whether insurer's automobile insurance contracts in 48 states could be given uniform interpretation should have been decided at class certification stage rather than at trial, in insureds' action for breach of contract, alleging insurer's failure to pay for original

equipment manufacturer (OEM) parts for repairs of insureds' damaged vehicles; whether insurance contracts could be given uniform interpretation was relevant to determining whether questions of fact or law common to the class predominated over any questions affecting only individual members, as element for class certification. S.H.A. 735 ILCS 5/2-801(2).

**[5] Parties 287 ☞35.17**

287 Parties
  287III Representative and Class Actions
    287III(A) In General
      287k35.17 k. Community of Interest; Commonality. Most Cited Cases
In order to satisfy the requirement of a common question of fact or law that predominates over other questions affecting only individual class members, as element for class certification, it must be shown that successful adjudication of the purported class representatives' individual claims will establish a right of recovery in other class members. S.H.A. 735 ILCS 5/2-801(2).

**[6] Contracts 95 ☞152**

95 Contracts
  95II Construction and Operation
    95II(A) General Rules of Construction
      95k151 Language of Instrument
        95k152 k. In General. Most Cited Cases
The starting point of any contract interpretation analysis is the language of the contract itself.

**[7] Contracts 95 ☞176(1)**

95 Contracts
  95II Construction and Operation
    95II(A) General Rules of Construction
      95k176 Questions for Jury
        95k176(1) k. In General. Most Cited Cases
As a general rule, the construction, interpretation, or legal effect of a contract is a matter to be determined by the court as a question of law.

**[8] Appeal and Error 30 ☞893(1)**

30 Appeal and Error
  30XVI Review
    30XVI(F) Trial De Novo
      30k892 Trial De Novo
        30k893 Cases Triable in Appellate Court

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

835 N.E.2d 801                                                                                                  Page 3
216 Ill.2d 100, 835 N.E.2d 801, 296 Ill.Dec. 448
**(Cite as: 216 Ill.2d 100, 835 N.E.2d 801)**

30k893(1) k. In General. Most Cited Cases

Appellate review of a contract interpretation issue is de novo.

**[9] Parties 287 ⚷35.73**

287 Parties
    287III Representative and Class Actions
        287III(C) Particular Classes Represented
            287k35.73 k. Insurance Claimants. Most Cited Cases

Insurer's automobile insurance contracts in 48 states could not be given uniform interpretation, and thus, commonality and predominance requirement for class certification, i.e., that questions of fact or law common to class predominated over any questions affecting only individual members, was not satisfied, in insureds' action for breach of contract, alleging insurer's failure to pay for original equipment manufacturer (OEM) parts for repairs of insureds' damaged vehicles; first group of contracts required insurer to pay for parts of "like kind and quality" to replaced parts, second group required insurer to pay for parts sufficient to restore vehicle to its "pre-loss condition" and further provided that insured agreed such parts could include non-OEM parts, third group, in Massachusetts, required insurer to pay actual cash value of replaced parts at time of collision, and fourth group, representing majority of insurer's assigned risk policies used in residual market of high-risk consumers that insurers were required to cover, required insurer to pay an "[a]mount necessary to repair or replace the property." S.H.A. 735 ILCS 5/2-801(2).

**[10] Parties 287 ⚷35.73**

287 Parties
    287III Representative and Class Actions
        287III(C) Particular Classes Represented
            287k35.73 k. Insurance Claimants. Most Cited Cases

Where a putative class includes members who are insured under insurance policies that are materially different, the commonality and predominance requirement for class certification, i.e., that questions of fact or law common to the class predominate over any questions affecting only individual members, cannot be met. S.H.A. 735 ILCS 5/2-801(2).

**[11] Appeal and Error 30 ⚷1173(1)**

30 Appeal and Error

30XVII Determination and Disposition of Cause
    30XVII(D) Reversal
        30k1173 Reversal as to One or More Coparties
            30k1173(1) k. In General. Most Cited Cases

Jury's verdict finding breach of contract by automobile insurer, relating to insurer's failure to pay for original equipment manufacturer (OEM) parts for repairs of insureds' damaged vehicles, could not be upheld as to any of the four subclasses, in action in which trial court, after improperly certifying as a class claims for which common questions of fact or law did not predominate over any questions affecting only individual members, instructed jury that the four subclasses constituted a single contract; jury's verdict did not reflect individual findings on the subclasses, which had materially different terms, i.e., first subclass required insurer to pay for parts of "like kind and quality" to replaced parts, second subclass required insurer to pay for parts sufficient to restore vehicle to its "pre-loss condition" and further provided that insured agreed such parts could include non-OEM parts, third subclass, in Massachusetts, required insurer to pay actual cash value of replaced parts at time of collision, and fourth subclass, representing majority of insurer's assigned risk policies used in residual market of high-risk consumers that insurers were required to cover, required insurer to pay an "[a]mount necessary to repair or replace the property." S.H.A. 735 ILCS 5/2-801(2).

**[12] Insurance 217 ⚷2719(2)**

217 Insurance
    217XXII Coverage--Automobile Insurance
        217XXII(B) Property Coverage
            217k2717 Amounts Payable; Extent of Damage or Loss
                217k2719 Total or Partial Loss
                    217k2719(2) k. Repair or Replacement. Most Cited Cases

Automobile insurer's failure to pay for original equipment manufacturer (OEM) parts for repairs of insureds' damaged vehicles did not breach the insurance contract, which promised to pay "the actual cash value" of "parts at the time of the collision"; such contract did not expressly impose any standard of part quality.

**[13] Insurance 217 ⚷2719(2)**

217 Insurance

835 N.E.2d 801                                                                Page 4
216 Ill.2d 100, 835 N.E.2d 801, 296 Ill.Dec. 448
**(Cite as: 216 Ill.2d 100, 835 N.E.2d 801)**

217XXII Coverage--Automobile Insurance
   217XXII(B) Property Coverage
     217k2717 Amounts Payable; Extent of
Damage or Loss
      217k2719 Total or Partial Loss
       217k2719(2) k. Repair or
Replacement. Most Cited Cases
Failure of automobile insurer, under assigned risk policies used in residual market of high-risk consumers that insurers were required to cover, to pay for original equipment manufacturer (OEM) parts for repairs of insureds' damaged vehicles did not breach the insurance contract, which promised to pay an "[a]mount necessary to repair or replace the property"; such contract did not expressly impose any standard of part quality.

**[14] Insurance 217 ⚷2719(2)**

217 Insurance
  217XXII Coverage--Automobile Insurance
   217XXII(B) Property Coverage
    217k2717 Amounts Payable; Extent of
Damage or Loss
     217k2719 Total or Partial Loss
      217k2719(2) k. Repair or
Replacement. Most Cited Cases
Automobile insurer's failure to pay for original equipment manufacturer (OEM) parts for repairs of insureds' damaged vehicles did not breach the insurance contract, which required insurer to pay for parts sufficient to restore vehicle to its "pre-loss condition" and further provided that insured agreed such parts could include non-OEM parts; contract expressly permitted the specification of non-OEM parts.

**[15] Parties 287 ⚷35.73**

287 Parties
  287III Representative and Class Actions
   287III(C) Particular Classes Represented
    287k35.73 k. Insurance Claimants. Most Cited Cases
Insureds' claims of automobile insurer's breach of insurance contract to pay for parts sufficient to restore vehicle to its "pre-loss condition," with insureds alleging insurer's failure to pay for original equipment manufacturer (OEM) parts for repairs of insureds' damaged vehicles, did not meet commonality and predominance requirement for class certification, i.e., that questions of fact or law common to class predominated over any questions affecting only individual members; determination of

pre-loss condition of each insured's vehicle would require individual examination of hundreds of thousands if not millions of vehicles, and such examinations would overwhelm any question common to the insureds. S.H.A. 735 ILCS 5/2-801(2).

**[16] Parties 287 ⚷35.13**

287 Parties
  287III Representative and Class Actions
   287III(A) In General
    287k35.13 k. Representation of Class; Typicality. Most Cited Cases
A class cannot be certified unless the named plaintiffs have a cause of action.

**[17] Insurance 217 ⚷2719(2)**

217 Insurance
  217XXII Coverage--Automobile Insurance
   217XXII(B) Property Coverage
    217k2717 Amounts Payable; Extent of
Damage or Loss
     217k2719 Total or Partial Loss
      217k2719(2) k. Repair or
Replacement. Most Cited Cases
Parts of "like kind and quality," within meaning of automobile insurance policy requiring insurer to pay to replace insured's damaged parts with parts of like kind and quality, were parts sufficient to restore the vehicle to its pre-loss condition, which would not necessarily be original equipment manufacturer (OEM) parts.

**[18] Evidence 157 ⚷455**

157 Evidence
  157XI Parol or Extrinsic Evidence Affecting Writings
   157XI(D) Construction or Application of Language of Written Instrument
    157k454 Meaning of Words, Phrases, Signs, or Abbreviations
     157k455 k. In General. Most Cited Cases
Absent a finding that automobile insurance contract was ambiguous regarding the meaning of insurer's promise to pay for replacement parts of "like kind and quality" to replaced parts, extrinsic evidence, including insurer's internal document defining such term, was irrelevant to the meaning of such phrase.

**[19] Parties 287 ⚷35.73**

835 N.E.2d 801
216 Ill.2d 100, 835 N.E.2d 801, 296 Ill.Dec. 448
**(Cite as: 216 Ill.2d 100, 835 N.E.2d 801)**

Page 5

287 Parties
  287III Representative and Class Actions
    287III(C) Particular Classes Represented
      287k35.73 k. Insurance Claimants. Most Cited Cases

Insureds' claims of automobile insurer's breach of insurance contract to pay for replacement parts of "like kind and quality" to replaced parts, with insureds alleging insurer's failure to pay for original equipment manufacturer (OEM) parts for repairs of insureds' damaged vehicles, did not meet commonality and predominance requirement for class certification, i.e., that questions of fact or law common to class predominated over any questions affecting only individual members; parts of "like kind and quality" were parts sufficient to restore the vehicle to its pre-loss condition, determination of pre-loss condition of each insured's vehicle would require individual examination of hundreds of thousands if not millions of vehicles, and such examinations would overwhelm any question common to the insureds. S.H.A. 735 ILCS 5/2-801(2).

**[20] Insurance 217 ⊶2719(2)**

217 Insurance
  217XXII Coverage--Automobile Insurance
    217XXII(B) Property Coverage
      217k2717 Amounts Payable; Extent of Damage or Loss
        217k2719 Total or Partial Loss
          217k2719(2) k. Repair or Replacement. Most Cited Cases

Automobile insurer's mere specification of non-OEM (original equipment manufacturer) parts, in its estimate of costs to repair an insured's vehicle, did not constitute damages, in insureds' action for breach of contract, alleging insurer's failure to pay for OEM parts; an insured suffered actual loss or measurable damages only if a non-OEM part was actually installed in the repaired vehicle and if installation of non-OEM part failed to restore vehicle to its pre-loss condition.

**[21] Damages 115 ⊶117**

115 Damages
  115VI Measure of Damages
    115VI(C) Breach of Contract
      115k117 k. Mode of Estimating Damages in General. Most Cited Cases

The basic theory of damages for breach of contract is that the plaintiff must establish an actual loss or measurable damages resulting from the breach, in order to recover.

**[22] Constitutional Law 92 ⊶299.1**

92 Constitutional Law
  92XII Due Process of Law
    92k299 Creation or Discharge of Liability in General
      92k299.1 k. In General. Most Cited Cases

**Insurance 217 ⊶2185**

217 Insurance
  217XVI Coverage--Property Insurance
    217XVI(A) In General
      217k2184 Repair or Replacement
        217k2185 k. In General. Most Cited Cases

Award of $212,440,000 in so-called "installation damages," in insureds' class action against automobile insurer for breach of contract relating to insurer's failure to pay for original equipment manufacturer (OEM) parts for repairs of insureds' damaged vehicles, based on costs to be incurred by insureds in removing non-OEM parts installed in their vehicles and replacing them with OEM parts was so speculative and uncertain as to violate due process; in order to calculate amount of installation damages for nationwide class it was necessary to estimate the number of insureds that had non-OEM parts installed, insurer did not have records showing whether OEM or non-OEM parts were actually installed if the insurer's repair cost estimate had specified non-OEM parts, insureds' expert on damages estimated that percentage of insureds whose vehicles were in fact repaired with non-OEM parts ranged from 50 percent to 92 percent, and in light of such range, expert conceded that margin of error in his estimate of amount of installation damages was one billion dollars. U.S.C.A. Const.Amend. 14.

**[23] Damages 115 ⊶184**

115 Damages
  115IX Evidence
    115k183 Weight and Sufficiency
      115k184 k. In General. Most Cited Cases

While it has become acceptable to use statistical inference in determining aggregate damages in a class action suit, it also is understood that the possibility of error involved in such an approach may exceed constitutional bounds.

**[24] Evidence 157 ⊶547.5**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

835 N.E.2d 801                                                          Page 6
216 Ill.2d 100, 835 N.E.2d 801, 296 Ill.Dec. 448
(Cite as: 216 Ill.2d 100, 835 N.E.2d 801)

157 Evidence
   157XII Opinion Evidence
      157XII(D) Examination of Experts
         157k547.5 k. Certainty of Testimony;
Probability, or Possibility. Most Cited Cases
While expert testimony in support of damages awards
may be couched in terms of probabilities or
possibilities, there is a need for a reasonable degree
of certainty in such testimony.

**[25] Antitrust and Trade Regulation 29T ⚷357**

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and
Consumer Protection
      29TIII(E) Enforcement and Remedies
         29TIII(E)5 Actions
            29Tk356 Pleading
               29Tk357 k. In General. Most Cited
Cases
         (Formerly 92Hk38 Consumer Protection)
A statutory consumer fraud claim must be pled with
specificity. S.H.A. 815 ILCS 505/1 et seq.

**[26] Antitrust and Trade Regulation 29T ⚷221**

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and
Consumer Protection
      29TIII(C) Particular Subjects and Regulations
         29Tk221 k. Insurance. Most Cited Cases
         (Formerly 92Hk6 Consumer Protection)
Insureds could not bring consumer fraud claim under
Consumer Fraud and Deceptive Business Practices
Act, alleging automobile insurer's failure to pay for
original equipment manufacturer (OEM) parts for
repairs of insureds' damaged vehicles, based on
breach of a promise contained in the insurance
contracts. S.H.A. 815 ILCS 505/2.

**[27] Antitrust and Trade Regulation 29T ⚷147**

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and
Consumer Protection
      29TIII(A) In General
         29Tk139 Persons and Transactions Covered
Under General Statutes
            29Tk147 k. Contractual Relationships
and Breach of Contract in General. Most Cited Cases
         (Formerly 92Hk4 Consumer Protection)
A breach of contractual promise, without more, is not
actionable under the Consumer Fraud and Deceptive

Business Practices Act. S.H.A. 815 ILCS 505/1 et
seq.

**[28] Antitrust and Trade Regulation 29T ⚷221**

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and
Consumer Protection
      29TIII(C) Particular Subjects and Regulations
         29Tk221 k. Insurance. Most Cited Cases
         (Formerly 92Hk6 Consumer Protection)
Even if automobile insurer knew that the non-OEM
(original equipment manufacturer) parts that insurer
specified in its estimates for cost to repair insureds'
damaged vehicles were "categorically inferior" to
OEM parts, such specification of non-OEM parts was
not consumer fraud in violation of Consumer Fraud
and Deceptive Business Practices Act; for any
product, there would always be some brands of that
product that were not as good as, or which were
"categorically inferior" to, other brands of the same
product. S.H.A. 815 ILCS 505/2.

**[29] Antitrust and Trade Regulation 29T ⚷221**

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and
Consumer Protection
      29TIII(C) Particular Subjects and Regulations
         29Tk221 k. Insurance. Most Cited Cases
         (Formerly 92Hk6 Consumer Protection)
Plaintiff insureds could not establish causation, as
element of consumer fraud claim under Consumer
Fraud and Deceptive Business Practices Act relating
to automobile insurer's conduct in specifying non-
OEM (original equipment manufacturer) parts for
repairs of insureds' damaged vehicles, based on
"market theory" that publications that plaintiffs did
not see, i.e., insurer's newsletter distributed generally
to insureds approximately three years before earliest
of five named plaintiffs' accidents, and insurer's
magazine article distributed to insurance agents, each
of which stated that non-OEM parts were as good as
or better than OEM parts, helped create a nationwide
market for non-OEM parts. S.H.A. 815 ILCS 505/2.

**[30] Antitrust and Trade Regulation 29T ⚷221**

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and
Consumer Protection
      29TIII(C) Particular Subjects and Regulations
         29Tk221 k. Insurance. Most Cited Cases
         (Formerly 92Hk6 Consumer Protection)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

835 N.E.2d 801                                                                                                         Page 7
216 Ill.2d 100, 835 N.E.2d 801, 296 Ill.Dec. 448
**(Cite as: 216 Ill.2d 100, 835 N.E.2d 801)**

Automobile insurer's description of non-OEM (original equipment manufacturer) parts as "Quality Replacement Parts" in repair cost estimates and brochures given to insureds during claims process, and its statement in the brochures that only those parts that met insurer's "very high performance criteria" were acceptable, constituted mere "puffing" which was not actionable as consumer fraud under Consumer Fraud and Deceptive Business Practices Act. S.H.A. 815 ILCS 505/2.

**[31] Antitrust and Trade Regulation 29T ⚬⚬ 161**

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and Consumer Protection
      29TIII(B) Particular Practices
         29Tk161 k. Representations, Assertions, and Descriptions in General. Most Cited Cases
            (Formerly 92Hk4 Consumer Protection)
"Puffing," which is not actionable as consumer fraud under Consumer Fraud and Deceptive Business Practices Act, denotes the exaggerations reasonably to be expected of a seller as to the degree of quality of his or her product, the truth or falsity of which cannot be precisely determined, and such statements include subjective descriptions relating to quality. S.H.A. 815 ILCS 505/2.

**[32] Antitrust and Trade Regulation 29T ⚬⚬ 221**

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and Consumer Protection
      29TIII(C) Particular Subjects and Regulations
         29Tk221 k. Insurance. Most Cited Cases
            (Formerly 92Hk6 Consumer Protection)
Mere fact that insureds would be required to take action to invoke the guarantee did not make the guarantee, by automobile insurer, that if an insured was unsatisfied with fit and corrosion resistance qualities of a replacement part used in repair of insured's damaged vehicle then insurer would repair or replace the part at no cost, fraudulent, as basis for violation of Consumer Fraud and Deceptive Business Practices Act, relating to insurer's specification of non-OEM (original equipment manufacturer) parts in estimates for costs of original repairs of insureds' damaged vehicles. S.H.A. 815 ILCS 505/2.

**[33] Antitrust and Trade Regulation 29T ⚬⚬ 221**

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and

Consumer Protection
      29TIII(C) Particular Subjects and Regulations
         29Tk221 k. Insurance. Most Cited Cases
            (Formerly 92Hk6 Consumer Protection)
Mere speculation by insureds that an insured's insurance rates would increase if the insured successfully invoked the guarantee, by automobile insurer, that if an insured was unsatisfied with fit and corrosion resistance qualities of a replacement part used in repair of insured's damaged vehicle the insurer would repair or replace the part at no cost, did not make the guarantee fraudulent, as basis for violation of Consumer Fraud and Deceptive Business Practices Act, relating to insurer's specification of non-OEM (original equipment manufacturer) parts in estimates for costs of original repairs of insureds' damaged vehicles. S.H.A. 815 ILCS 505/2.

**[34] Antitrust and Trade Regulation 29T ⚬⚬ 128**

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and Consumer Protection
      29TIII(A) In General
         29Tk126 Constitutional and Statutory Provisions
            29Tk128 k. Purpose and Construction in General. Most Cited Cases
               (Formerly 92Hk36.1 Consumer Protection)

**Appeal and Error 30 ⚬⚬ 893(1)**

30 Appeal and Error
   30XVI Review
      30XVI(F) Trial De Novo
         30k892 Trial De Novo
            30k893 Cases Triable in Appellate Court
               30k893(1) k. In General. Most Cited Cases
The scope of the Consumer Fraud and Deceptive Business Practices Act is a question of statutory interpretation, and thus, appellate review is de novo. S.H.A. 815 ILCS 505/1 et seq.

**[35] Antitrust and Trade Regulation 29T ⚬⚬ 134**

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and Consumer Protection
      29TIII(A) In General
         29Tk133 Nature and Elements
            29Tk134 k. In General. Most Cited Cases

               (Formerly 92Hk34, 92Hk4 Consumer

835 N.E.2d 801                                                                          Page 8
216 Ill.2d 100, 835 N.E.2d 801, 296 Ill.Dec. 448
**(Cite as: 216 Ill.2d 100, 835 N.E.2d 801)**

Protection)
To prove a private cause of action under the
Consumer Fraud and Deceptive Business Practices
Act, a plaintiff must establish: (1) a deceptive act or
practice by the defendant; (2) the defendant's intent
that the plaintiff rely on the deception; (3) the
occurrence of the deception in the course of conduct
involving trade or commerce; (4) actual damage to
the plaintiff; and (5) the damage was proximately
caused by the deception.  S.H.A. 815 ILCS 505/2,
10a(a).

**[36]** Antitrust and Trade Regulation 29T ⊙➞131

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and
Consumer Protection
        29TIII(A) In General
            29Tk131 k. What Law Governs;  Territorial
Limitations. Most Cited Cases
            (Formerly 92Hk5  Consumer Protection)
Phrase "wherever situated," in provision of
Consumer Fraud and Deceptive Business Practices
Act defining "trade" and "commerce" for purposes of
Act's requirement for private cause of action that
disputed conduct must involve trade or commerce,
which definition refers to "the advertising, offering
for sale, sale, or distribution of any services and any
property, tangible or intangible, real, personal or
mixed, and any other article, commodity, or thing of
value wherever situated," does not expand Act's
scope to apply to consumer transactions taking place
out-of-state; "wherever situated" does not refer to
fraudulent transactions, but to the nouns "any
property, tangible or intangible, real, personal or
mixed, and any other article, commodity, or thing of
value." S.H.A. 815 ILCS 505/1(f), 2, 10a(a).

**[37] Courts 106 ⊙➞8**

106 Courts
    106I Nature, Extent, and Exercise of Jurisdiction
in General
        106k3 Jurisdiction of Cause of Action
            106k8 k. Actions Under Laws of Other
State. Most Cited Cases
A statute is without extraterritorial effect unless a
clear intent to have extraterritorial effect appears
from the express provisions of the statute.

**[38] Antitrust and Trade Regulation 29T ⊙➞131**

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and

Consumer Protection
        29TIII(A) In General
            29Tk131 k. What Law Governs;  Territorial
Limitations. Most Cited Cases
            (Formerly 92Hk5  Consumer Protection)
The Illinois General Assembly did not intend the
right to private cause of action under the Consumer
Fraud and Deceptive Business Practices Act to apply
to fraudulent transactions which take place outside
Illinois. S.H.A. 815 ILCS 505/1(f), 2, 10a(a).

**[39]** Antitrust and Trade Regulation 29T ⊙➞131

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and
Consumer Protection
        29TIII(A) In General
            29Tk131 k. What Law Governs;  Territorial
Limitations. Most Cited Cases
            (Formerly 92Hk5  Consumer Protection)
A non-resident plaintiff may pursue a private cause
of action under the Consumer Fraud and Deceptive
Business Practices Act if the circumstances that relate
to the disputed transaction occur primarily and
substantially in Illinois.  S.H.A. 815 ILCS 505/1(f),
2, 10a(a).

**[40]** Antitrust and Trade Regulation 29T ⊙➞131

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and
Consumer Protection
        29TIII(A) In General
            29Tk131 k. What Law Governs;  Territorial
Limitations. Most Cited Cases
            (Formerly 92Hk5  Consumer Protection)
The place where the defendant's company policy was
created or where a form document was drafted may
be a relevant factor to consider in determining the
location of a consumer transaction, for purposes of
determining whether non-resident plaintiff's disputed
transaction with defendant occurred primarily and
substantially in Illinois, as would be required for non-
resident plaintiff to have private cause of action
under Consumer Fraud and Deceptive Business
Practices Act. S.H.A. 815 ILCS 505/1(f), 2, 10a(a).

**[41] Antitrust and Trade Regulation 29T ⊙➞131**

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and
Consumer Protection
        29TIII(A) In General
            29Tk131 k. What Law Governs;  Territorial

Limitations. Most Cited Cases

      (Formerly 92Hk6  Consumer Protection)

Circumstances relating to non-resident insureds' disputed transactions with resident automobile insurer, involving insurer's allegedly deceptive conduct in failing to inform insureds, during claims process, of allegedly categorical inferiority of non-OEM (original equipment manufacturer) parts specified by insurer in estimates for costs to repair insureds' damaged vehicles, did not occur primarily and substantially in Illinois, and thus, non-resident insureds did not have private cause of action under Illinois Consumer Fraud and Deceptive Business Practices Act; estimates were written out-of-state, insurer's brochures were received by insureds out-of-state, any damage to insureds occurred out-of-state, and non-residents contacted insurer through out-of-state insurance agents, claims representatives, and claims adjustors.  S.H.A.  815 ILCS 505/1(f), 2, 10a(a).

**[42] Appeal and Error 30 ⟜1012.1(7.1)**

30 Appeal and Error
   30XVI Review
     30XVI(I) Questions of Fact, Verdicts, and Findings
       30XVI(I)3 Findings of Court
        30k1012 Against Weight of Evidence
         30k1012.1 In General
          30k1012.1(7) Particular Cases and Issues
           30k1012.1(7.1) k. In General. Most Cited Cases

In general, a trial court's decision as to whether the elements of a private cause of action under the Consumer Fraud and Deceptive Business Practices Act have been proven in any case is reviewed under the manifest weight of the evidence standard.  S.H.A. 815 ILCS 505/2, 10a(a).

**[43] Evidence 157 ⟜596(1)**

157 Evidence
   157XIV Weight and Sufficiency
     157k596 Degree of Proof in General
      157k596(1) k. In General. Most Cited Cases

In the ordinary civil case, because there are no sound reasons for favoring one party over another, the party with the burden of persuasion must prove his or her case by a preponderance of the evidence.

**[44] Evidence 157 ⟜598(1)**

157 Evidence
   157XIV Weight and Sufficiency
     157k598 Preponderance of Evidence
      157k598(1) k. In General. Most Cited Cases

A proposition proved by a "preponderance of the evidence" is one that has been found to be more probably true than not true.

**[45] Fraud 184 ⟜50**

184 Fraud
   184II Actions
     184II(D) Evidence
      184k50 k. Presumptions and Burden of Proof. Most Cited Cases

**Fraud 184 ⟜58(1)**

184 Fraud
   184II Actions
     184II(D) Evidence
      184k58 Weight and Sufficiency
       184k58(1) k. In General. Most Cited Cases

In the context of common law fraud, the law presumes that transactions are fair and honest, and fraud is not presumed; accordingly, fraud must be proved by clear and convincing evidence.

**[46] Antitrust and Trade Regulation 29T ⟜369**

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and Consumer Protection
     29TIII(E) Enforcement and Remedies
      29TIII(E)6 Evidence
       29Tk369 k. Weight and Sufficiency. Most Cited Cases

      (Formerly 92Hk39  Consumer Protection)

Plaintiffs must prove the elements of a private cause of action under the Consumer Fraud and Deceptive Business Practices Act by a preponderance of the evidence, rather than by clear and convincing evidence; overruling *General Motors Acceptance Corp. v. Grissom*, 150 Ill.App.3d 62, 103 Ill.Dec. 447, 501 N.E.2d 764, and *Munjal v. Baird & Warner, Inc.*, 138 Ill.App.3d 172, 92 Ill.Dec. 809, 485 N.E.2d 855.  S.H.A. 815 ILCS 505/2, 10a(a).

**[47] Antitrust and Trade Regulation 29T ⟜221**

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and Consumer Protection

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

835 N.E.2d 801                                                                    Page 10
216 Ill.2d 100, 835 N.E.2d 801, 296 Ill.Dec. 448
**(Cite as: 216 Ill.2d 100, 835 N.E.2d 801)**

29TIII(C) Particular Subjects and Regulations
    29Tk221 k. Insurance. Most Cited Cases
      (Formerly 92Hk6  Consumer Protection)
Automobile insurer's allegedly fraudulent misrepresentations to insured, during claims process, regarding quality of non-OEM (original equipment manufacturer) parts specified by insurer in its estimate for cost to repair insured's damaged vehicle, and insurer's allegedly deceptive act in failing to disclose during claims process allegedly categorical inferiority of non-OEM parts, did not cause actual damage to insured, as element of private cause of action under Consumer Fraud and Deceptive Business Practices Act; when insured resold the vehicle, the resale price was not discounted because of the presence of non-OEM parts in the vehicle. S.H.A. 815 ILCS 505/2, 10a(a).

**[48]** Antitrust and Trade Regulation 29T ⚷221

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and Consumer Protection
      29TIII(C) Particular Subjects and Regulations
        29Tk221 k. Insurance. Most Cited Cases
          (Formerly 92Hk6  Consumer Protection)
Automobile insurer's mere specification of non-OEM (original equipment manufacturer) parts, in its estimate of cost to repair insured's vehicle, did not constitute actual damage, as element of private cause of action for consumer fraud or deceptive act under Consumer Fraud and Deceptive Business Practices Act, relating insurer's alleged misrepresentation during claims process of quality of non-OEM parts and insurer's failure to disclose during claims process alleged categorical inferiority of non-OEM parts; insured suffered actual loss or measurable damages only if non-OEM part was actually installed in vehicle and if installation of non-OEM part failed to restore vehicle to its pre-loss condition, and alleged misrepresentations and omissions occurred after insurer made its repair cost estimate specifying non-OEM parts.

**[49]** Antitrust and Trade Regulation 29T ⚷161

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and Consumer Protection
      29TIII(B) Particular Practices
        29Tk161 k. Representations, Assertions, and Descriptions in General. Most Cited Cases
        (Formerly 92Hk40  Consumer Protection)

Antitrust and Trade Regulation 29T ⚷162

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and Consumer Protection
      29TIII(B) Particular Practices
        29Tk162 k. Omissions and Other Failures to Act in General;  Disclosure. Most Cited Cases
        (Formerly 92Hk40  Consumer Protection)
Actual damage, as element of private cause of action under Consumer Fraud and Deceptive Business Practices Act, cannot be the result of omissions and misrepresentations which are made after the damage has already occurred. S.H.A. 815 ILCS 505/2, 10a(a).

**[50]** Antitrust and Trade Regulation 29T ⚷162

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and Consumer Protection
      29TIII(B) Particular Practices
        29Tk162 k. Omissions and Other Failures to Act in General;  Disclosure. Most Cited Cases
        (Formerly 92Hk34  Consumer Protection)
In a private cause of action for fraudulent misrepresentation brought under the Consumer Fraud and Deceptive Business Practices Act, a plaintiff must prove that he or she was actually deceived by the misrepresentation in order to establish the element of proximate causation. S.H.A. 815 ILCS 505/2, 10a(a).

**[51]** Antitrust and Trade Regulation 29T ⚷221

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and Consumer Protection
      29TIII(C) Particular Subjects and Regulations
        29Tk221 k. Insurance. Most Cited Cases
        (Formerly 92Hk6  Consumer Protection)
Insured was not actually deceived by, and therefore did not establish proximate cause element of, private causes of action against automobile insurer for consumer fraud and deceptive act under Consumer Fraud and Deceptive Business Practices Act, relating to insurer's alleged misrepresentations in repair cost estimate regarding quality of non-OEM (original equipment manufacturer) parts and its failure to disclose in brochure provided to insured at time of repair cost estimate the allegedly categorical inferiority of non-OEM parts; before insured received the estimate and the brochure, he already believed non-OEM parts were inferior to OEM parts. S.H.A.

835 N.E.2d 801                                                                                          Page 11
216 Ill.2d 100, 835 N.E.2d 801, 296 Ill.Dec. 448
**(Cite as: 216 Ill.2d 100, 835 N.E.2d 801)**

815 ILCS 505/2, 10a(a).

**\*809** Michele Odorizzi, Bradley J. Andreozzi, Allan Erbsen, of Mayer, Brown, Rowe & Maw, William R. Quinlan, of Quinlan & Carroll, Ltd., Marci A. Eisenstein, Aphrodite Kokolis, of Schiff, Hardin & Waite, Gino L. DiVito, of Tabet, DiVito & Rothstein, L.L.C., Chicago, Skadden, Arps, Slate, Meagher & Flom (Wayne W. Whalen, Edward M. Crane, Gregory S. Bailey, Chicago, Sheila L. Birnbaum, Douglas W. Dunham, New York, New York, of counsel), Robert H. Shultz, Jr., of Heyl, Royster, Voelker & Allen, Edwardsville, for appellant.

Michael B. Hyman, William H. London, Melinda J. Morales, of Much, Shelist, Freed, Denenberg, Ament & Rubenstein, P.C., Robert A. Clifford, Robert P. Sheridan, of Clifford Law Offices, Patricia Murphy, of Marion, Edward J. Kionka, Carbondale, Elizabeth A. Cabraser, Morris A. Ratner, Scott P. Nealey, of Lieff, Cabraser, Heimann & Bernstein, L.L.P., San Francisco, California, for appellees.

Richard F. Record, Jr., Stephen L. Corn, of Craig & Craig, Mattoon, for amici curiae Department of Insurance of the State of North Carolina et al.

Robert H. King, Jr., Steven C. Coberly, of Greenberg Traurig, P.C., Chicago, for amicus curiae Alliance of American Insurers.

Jeffrey P. Lennard, Richard L. Fenton, Brett J. Hart, of Sonnenschein, Nath & Rosenthal, Chicago, for amicus curiae Allstate Insurance Company.

Brian L. Crowe, Patricia S. Spratt, of Shefsky & Froelich, Ltd., Chicago, Robin S. Conrad, Washington D.C., for amicus curiae Chamber of Commerce of the United States of America.

Iwan, Cray, Huber, Horstman & VanAusdal, L.L.C., Chicago (Elaine S. Vorberg, Michael D. Huber and James K. Horstman, of counsel), for amicus curiae Citizens for a Sound Economy Foundation.

Mitchell A. Orpett, Chicago (Tribler, Orpett & Crone, P.C., of counsel), for amicus curiae J. Lee Covington II, Superintendent of the Ohio Department of Insurance.

John H. Beisner, Marc E. Isserles, of O'Melveny & Myers, L.L.P., Washington, D.C., for amici curiae General Motors Corporation and Ford Motor Company.

J. William Lucco, Joseph R. Brown, Jr., of Lucco, Brown & Mudge, Edwardsville, David P. Gersch, of Arnold & Porter, Washington, D.C., Sheila Carmody, of Snell & Wilmer, Phoenix, Arizona, for amici curiae Government Employees Insurance Company et al.

James R. Thompson, Steven F. Molo, Norman K. Beck, Jon J. Kramer, of Winston & Strawn, Chicago,

for amicus curiae Illinois Chamber of Commerce.
Robert N. Enoex, Springfield, for amicus curiae Illinois Department of Insurance.

David E. Bennett, James A. Spizzo, Thomas A. Baker, of Vedder, Price, Kaufman **\*810** & Kammholz, Chicago, for amicus curiae Illinois Manufacturers' Association.

Richard Hodyl, Jr., of Williams, Montgomery & John, Ltd., Chicago, for amici curiae National Association of Independent Insurers et al.

John W. Bauer, Kansas City, Missouri, for amicus curiae National Association of Insurance Commissioners.

Richard J. Rappaport, of Ross & Hardies, Chicago, for amici curiae Public Citizen, Inc. and The Center for Auto Safety.

John Lingner, of Kakacek & Lingner, Chicago, Daniel J. Popeo, Richard A. Samp, Washington, D.C., for amicus curiae Washington Legal Foundation.

J. Timothy Eaton, Kevin P. Shea, of Ungaretti & Harris, Chicago, for amici curiae National Conference of Insurance Legislators and The American Legislative Exchange Council.

Dmitry Feofanov, Dixon, F. Paul Bland, Jr., Washington, D.C., for amici curiae Trial Lawyers for Public Justice et al.

Jerome F. Crotty, of Rieck & Crotty, P.C., Chicago, for amici curiae Alliance of Automotive Service Providers National Association et al.

William J. Harte, Ltd., Joseph E. Tighe, P.C., and Sotiras & Mannix, Ltd., Chicago, for amicus curiae Illinois Trial Lawyers Association.

Lawrence S. Fischer, Chicago, Eugene Anderson, New York, New York, of Anderson, Kill & Olick, P.C., Amy Bach, Mill Valley, California, for amicus curiae United Policyholders.

Chief Justice McMORROW delivered the opinion of the court:

Michael Avery and other named plaintiffs brought a class action in the circuit court of Williamson County against defendant, State Farm Mutual Automobile Insurance Company (State Farm).  Representing a nearly nationwide class of State Farm policyholders, plaintiffs alleged claims sounding in breach of contract and statutory consumer fraud, in addition to a claim seeking declaratory and injunctive relief.

The circuit court certified the class.  The breach of contract claim was tried before a jury, and the remaining claims received a simultaneous bench trial.  The jury returned a verdict in favor of plaintiffs on the breach of contract claim, and the circuit court entered judgment in favor of plaintiffs on the consumer fraud claim.  With regard to the third

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

835 N.E.2d 801                                                                                    Page 12
216 Ill.2d 100, 835 N.E.2d 801, 296 Ill.Dec. 448
**(Cite as: 216 Ill.2d 100, 835 N.E.2d 801)**

count, the circuit court granted declaratory relief but declined to grant injunctive relief. The damages awarded to plaintiffs totaled $1,186,180,000.

The appellate court affirmed the judgment, with one exception. The appellate court reversed a portion of the damages, lowering the total award to $1,056,180,000. 321 Ill.App.3d 269, 254 Ill.Dec. 194, 746 N.E.2d 1242. We allowed State Farm's petition for leave to appeal. 177 Ill.2d R. 315(a).

Plaintiffs' suit centers on certain automobile repair part categories which have been identified in the record and to which we refer throughout our discussion. "Crash parts" refers to automobile components that are used to replace parts damaged in a crash, rather than parts that have failed mechanically. They are primarily sheet metal and plastic parts that are attached to the outer shell of the car. Crash parts consist of two categories. The first category is comprised of new parts made by or on behalf of the automobile's original manufacturer. These parts are commonly referred to as "Original Equipment Manufacturer" parts, or "OEM" crash parts. The second class includes**\*811** aftermarket parts made by companies not affiliated with original equipment manufacturers. These parts are referred to as "non-OEM crash parts.[FN1]

> FN1. The non-OEM crash parts involved in this case are: (1) fenders; (2) hoods; (3) doors; (4) deck lids; (5) luggage lid panels; (6) quarter panels; (7) rear outer panels; (8) front-end panels; (9) header panels; (10) filler panels; (11) door shells; (12) pickup truck beds, box sides, and tailgates; (13) radiator/grill support panels; (14) grilles; (15) headlamp mounting panels/brackets/housings/lenses/doors; (16) taillight mounting panels/brackets/housings/lenses; (17) outer body moldings; (18) door body side moldings; (19) front wheel opening moldings; (20) side moldings; (21) front and rear fascias; (22) outer panel mounting brackets, supports, and surrounds; (23) bumpers (excluding chrome bumpers); (24) bumper covers/face bars; and (25) bumper brackets/supports.

A succinct general overview of plaintiffs' theory of the case may be found in "Plaintiff's Memorandum in Support of Application of Illinois Law to the Claims of Class Members Under Illinois Choice of Law

Doctrine":

"In this case, plaintiffs have placed at issue the propriety of State Farm's uniform practice of specifying the use of non-OEM crash parts to repair its policyholders' car[s] in every instance in which such cheaper parts are available. * * * Plaintiffs contend that this policy breaches State Farm's standard contract because it is not designed to restore policyholders' cars to their pre-loss condition by using parts of like kind and quality. Plaintiffs further contend that this practice violates Illinois' consumer law because the practice itself and its economic ramifications constitute a violation of Illinois consumer statutes, which prohibit[ ] misrepresentations as to the 'standard, quality, or grade' of the goods and services provided under State Farm's policies. [Citation.] At trial, the Court and jury must resolve the classwide question of whether State Farm, by requiring the uniform use of non-OEM crash parts, and through the course of conduct it designed to conceal the true import of this practice from its policyholders, breached its contractual obligations and committed consumer fraud."

This opinion is divided into two principal sections: "Breach of Contract" and "Consumer Fraud." In a third section, we deal with plaintiffs' claims for declaratory and injunctive relief. These sections are further subdivided, as required by the various arguments and issues, as follows:
I. Breach of Contract
A. *Propriety of the Nationwide Contract Class*
B. *Whether the Verdict May Be Affirmed with Respect to Subclasses*
1. The Massachusetts and "Assigned Risk" Policies
2. The "You Agree" Policies
3. The "Like Kind and Quality" Policies
4. Damages
a. *Specification Damages*
b. *Installation Damages*
II. Consumer Fraud Act
A. *Plaintiffs' Consumer Fraud Claim*
1. Plaintiffs' Consumer Fraud Claim May Not Be Based on a Breach of a Promise Contained in Their Insurance Policies
2. This Case Is Not About the Specification of Defective Parts
3. The Representations Which Form the Basis of Plaintiffs' Cause of Action for Consumer Fraud Do Not Include the Statement That Non-**\*812** OEM Parts Are as Good as OEM Parts
4. Describing a Non-OEM Part as a "Quality Replacement Part" Is Puffing and, Hence, Not Actionable

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

835 N.E.2d 801                                                        Page 13
216 Ill.2d 100, 835 N.E.2d 801, 296 Ill.Dec. 448
**(Cite as: 216 Ill.2d 100, 835 N.E.2d 801)**

5. The Guarantee Provided by State Farm Cannot Form a Basis for Plaintiffs' Consumer Fraud Claim

6. The Crux of Plaintiffs' Consumer Fraud Claim Is a Failure by State Farm to Disclose the Categorical Inferiority of Non-OEM Parts During the Claims Process

B. *Propriety of the Nationwide Consumer Fraud Class*

1. Scope of the Consumer Fraud Act

2. Whether the Consumer Fraud Act Applies to the Transactions at Issue in This Case

C. *Propriety of Judgment: Named Plaintiff*

1. Burden of Proof

2. The Deceptive Act or Practice

3. Actual Damage

4. Proximate Cause-Actual Deception

D. *Other Issues*

III. Equitable and Declaratory Relief


We begin with plaintiffs' breach of contract count.


## I. Breach of Contract

Plaintiffs' original class action complaint, which was filed in July 1997, was amended several times. The trial, which took place in 1999, was predicated upon plaintiffs' third amended class action complaint. Count I (breach of contract) of the third amended complaint alleged that State Farm breached its "uniform insurance contract" with its policyholders. Plaintiffs alleged that, under the terms of this contract, State Farm promised "to restore plaintiffs' vehicles to their pre-loss condition using parts of like kind and quality." According to plaintiffs, the term "like kind and quality," as stated in this promise, meant "like kind and quality to OEM parts." However, plaintiffs also alleged that the non-OEM parts at issue in this case were categorically inferior to their OEM counterparts. Under plaintiffs' view, non-OEM parts could *never* satisfy State Farm's "like kind and quality" obligation. Plaintiffs alleged: "As a practical matter, [State Farm's] obligation could be met *only* by requiring the *exclusive use* in repairs *of factory-authorized or OEM parts.*" (Emphases added.)

In urging the certification of their claim as a class action, plaintiffs alleged that State Farm's contractual agreement with its policyholders was a uniform "Policy," in the singular, with "the same or common general terms." State Farm argued, to the contrary, that there was no uniform State Farm automobile insurance policy nationwide, and individual issues therefore would dominate the contract claims,

rendering classwide determinations impossible. See 735 ILCS 5/2-801(2) (West 1998). According to State Farm, some of its policies included a promise to pay to repair the vehicle with parts of "like kind and quality," but other policies did not contain this provision. State Farm added that, in many states, its policies explicitly provided for the specification of non-OEM parts sufficient to restore the vehicle to its "pre-loss condition." Still other State Farm automobile insurance policies contained neither the "like kind and quality" nor the "pre-loss condition" language. State Farm pointed, for example, to its Massachusetts policies, which promised simply to pay "the actual cash value" of "parts at the time of the collision." Another group of policies that contained neither the "like kind and quality" nor the "pre-loss condition" language were the majority of State Farm's **\*813** "assigned risk" contracts, which were written for the "residual market" of high-risk consumers whom states *required* insurers to cover. According to State Farm, most of these assigned risk policies promised simply to pay the "[a]mount necessary to repair or replace the property."

State Farm also argued that there were substantive conflicts of law between Illinois and other states, and therefore it would be improper to apply Illinois law to the contract claims of class members nationwide. State Farm contended, in addition, that Illinois lacked significant contacts with the claims of class members in other states and the imposition of Illinois law with regard to their claims would violate constitutional rights. See *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985).

Following a hearing, the circuit court certified plaintiffs' claims as a 48-state class action. The circuit court rejected State Farm's arguments, finding that Illinois law could be applied to the claims of the entire class and that this imposition of Illinois law presented no constitutional difficulties. The court also rejected State Farm's argument that there was no standard form insurance policy. The court took the position that the specific form of the individual policies was immaterial so long as the operative contractual language in each policy was susceptible of uniform interpretation. The court declined to address this issue at the certification stage, maintaining instead that the question of whether the language in State Farm's various policies could be given a uniform interpretation should be resolved at trial.

In reaching its decision to certify the class, the court concluded that there were questions of fact or law

835 N.E.2d 801                                                                                                    Page 14
216 Ill.2d 100, 835 N.E.2d 801, 296 Ill.Dec. 448
**(Cite as: 216 Ill.2d 100, 835 N.E.2d 801)**

that were common to the class, and these questions predominated over any questions affecting only individual members.     735 ILCS 5/2-801(2) (West 1998).     The court pointed to what it termed State Farm's uniform practice "throughout the United States" of specifying non-OEM parts on policyholders' repair estimates.     According to the court, the members of the plaintiff class had a "common interest" in determining whether this practice constituted a breach of State Farm's contractual obligation.     In the court's view, this common interest predominated over questions affecting individual class members.

In an "Order Regarding Law to be Applied to Class Members' Claims," the circuit court explained its reasoning for applying Illinois law to class members' claims nationwide.     The court stated:
"With respect to the breach of contract claims, the court finds that there are no true conflicts of law raised by the specific claims or facts at issue in this case which require application of the law of any state other than Illinois.     Illinois possesses sufficient contacts such that the application of Illinois law to the breach of contract claims in this case is neither arbitrary nor unfair and comports with due process. Application of Illinois law to the breach of contract claims does not implicate the interests of any other jurisdiction and application of its law to these claims. Finally, the application of Illinois breach of contract standards, which are identical to those in other jurisdictions, does not interfere with any state's legislative or legal choices."

Based on its finding that class members had a "common interest" in determining whether State Farm's "uniform" practice of specifying non-OEM parts breached State Farm's contractual obligation, and that Illinois law could be applied to class members' claims nationwide, the circuit court certified the following class:
**\*814** "All persons in the United States, except those residing in Arkansas and Tennessee, who, between July 28, 1987, and February 24, 1998, (1) were insured by a vehicle casualty insurance policy issued by Defendant State Farm and (2) made a claim for vehicle repairs pursuant to their policy and had non-factory authorized and/or non-OEM (Original Equipment Manufacturer) 'crash parts' installed on their vehicles or else received monetary compensation determined in relation to the cost of such parts.     Excluded from the class are employees of Defendant State Farm, its officers, its directors, its subsidiaries, or its affiliates.

In addition, the following persons are excluded from the class:   (1) persons who resided or garaged their vehicles in Illinois and whose Illinois insurance policies were issued/executed prior to April 16, 1994, and (2) persons who resided in California and whose policies were issued/executed prior to September 26, 1996."

Following entry of the circuit court's order certifying the class, State Farm sought from this court a writ of *mandamus* directing the circuit court to reverse the order.     State Farm suggested in the alternative that this court reverse the circuit court's certification order pursuant to our supervisory authority.     State Farm also moved for transfer, consolidation, and a stay of proceedings.     This court entered an order in which we took "no action" on State Farm's various requests because there were insufficient votes either to allow or to deny.

In the circuit court, State Farm subsequently moved for summary judgment on the class claims and for decertification of the class.     The circuit court denied these motions.     State Farm also moved for summary judgment against each of the named plaintiffs.     This motion was denied as well.

Prior to trial, the parties tendered a number of motions *in limine*.     One of plaintiffs' motions sought to bar State Farm from presenting evidence to the jury that the regulation of insurance varied from state to state, and another of plaintiffs' motions sought to prohibit any disclosure of the states where the class members' policies were filed.     Still another of plaintiffs' motions sought to preclude the introduction of evidence regarding differences in State Farm's contractual obligations to class members.     In opposing these motions, State Farm argued, as it had in opposing class certification, that there were significant variances in its contractual obligations to the members of the class, and these variances resulted, at least in part, from differing insurance regulations in the various states.     State Farm asserted:
"[N]othing is more basic in the trial of a contract claim than * * * that [ ] the rights and duties of the parties to a contract are defined by that specific contract.     But plaintiffs ask to exclude that very starting point [,][t]he contract of the individual class members, a contract which varies * * * depending on troublesome differences in State Farm's obligations toward members of the class.     The contractual rights of the members of the class, Your Honor, do vary, and those variances are not only relevant but

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

835 N.E.2d 801                                                                                    Page 15
216 Ill.2d 100, 835 N.E.2d 801, 296 Ill.Dec. 448
**(Cite as: 216 Ill.2d 100, 835 N.E.2d 801)**

fundamental."

The circuit court granted several of plaintiffs' motions *in limine,* including those barring State Farm from (1) disclosing the states where the class members' policies were filed, (2) introducing evidence regarding variances in the states' insurance regulations, and (3) introducing evidence regarding differences in State Farm's contractual**815 obligations to members of the class.

The trial began on August 16, 1999. As previously indicated, the breach of contract claim was tried before the jury, and the remaining claims were tried before the court after the jury had left for the day. At the start of the trial, and over the objection of State Farm, the circuit court gave preliminary jury instructions. In these instructions, the court told the jury that State Farm's contractual obligation was "exactly the same, whether State Farm promised to pay for crash parts of like kind and quality or promised to pay for crash parts which restore a vehicle to its pre-loss condition." The court added that, under State Farm's policies, the company was allowed to specify either OEM parts or non-OEM parts, "so long as the crash parts are of like kind and quality which restore the damaged vehicle to its pre-loss condition." According to the circuit court, crash parts were of like kind and quality "only if they restore[d] a vehicle to its pre-loss condition," which the court defined as "the condition of the vehicle immediately prior to the time it is damaged."

It is unnecessary to recount in detail the evidence presented at trial. We note that the trial lasted several days, and involved hundreds of exhibits and testimony by dozens of witnesses. Much of the testimony dealt with whether non-OEM parts were categorically inferior to OEM parts. Each side presented the testimony of experts and body-shop witnesses in support of their respective positions. At this point, we summarize only the testimony of the named plaintiffs, the testimony of plaintiffs' damages expert, and that of a State Farm claims consultant. Other facts relevant to our analysis will be introduced as they become pertinent.

Five named plaintiffs testified at trial. Michael Avery, of Louisiana, testified by video deposition. The remaining four gave their testimony in person: Mark Covington, a resident of Mississippi; Sam DeFrank, who lived in Illinois; Carly Vickers, a resident of Pennsylvania; and Todd Shadle, who was living in Massachusetts when his accident occurred.

Two of the witnesses, Avery and Shadle, did not have non-OEM parts installed on their vehicles. Both testified that before their respective accidents, their cars were in very good condition, and they would not consider non-OEM parts. Accordingly, both had OEM parts installed on their vehicles, rather than the non-OEM parts specified in the estimate, and both paid the difference in cost. For Shadle, the difference was about $45, and for Avery it was about $155.

Covington, DeFrank and Vickers did have non-OEM parts installed on their vehicles. All three expressed dissatisfaction with the parts. Vickers testified that, following the collision that gave rise to her suit, her car was involved in a subsequent, more serious accident and was declared a total loss. Vickers admitted that State Farm paid her "book value" for the car. She added that, so far as she knew, State Farm did not value her car any less because of the non-OEM parts that had been used in its repair. DeFrank testified that, several months after his truck was repaired, he sold the vehicle to his brother-in-law for an amount that was slightly below "Blue Book" value. However, DeFrank asserted that, even though the truck had been repaired with non-OEM parts, he did not discount the sale price based on this fact. DeFrank characterized the sale of the truck to his brother-in-law as an "arm's length transaction."

Plaintiffs' damages expert, Dr. Iqbal Mathur, testified that there were two **816 types of damages being sought for breach of contract. The first was what Mathur termed "direct," or "specification," damages. According to Mathur, these damages were incurred when State Farm specified a non-OEM part on the repair estimate. Under this theory, everyone in the class was eligible to receive specification damages.

On cross-examination, Mathur acknowledged that a plaintiff would be entitled to receive specification damages even if his car were restored to its preloss condition. Mathur also conceded that specification damages would apply even if the car were repaired with an OEM part or with a non-OEM part that was of the same quality as an OEM part.

The second type of contract damages, which Mathur described as "consequential," or "installation," damages, was determined by calculating the cost of *replacing* non-OEM parts with OEM parts on a class member's vehicle. Only those class members who actually had non-OEM parts installed on their vehicles were eligible to receive installation damages.

835 N.E.2d 801                                                                                                    Page 16
216 Ill.2d 100, 835 N.E.2d 801, 296 Ill.Dec. 448
**(Cite as: 216 Ill.2d 100, 835 N.E.2d 801)**

On cross-examination, Mathur acknowledged that, with regard to installation damages, it was necessary to determine whether a non-OEM part was installed on a class member's vehicle. However, Mathur conceded that he had no way of making this determination. Mathur also acknowledged that he had "no opinion" as to how many class members had non-OEM parts installed on their vehicles but later received fair market value for them. Mathur admitted that his calculations as to installation damages might be incorrect by as much as $1 billion.

Among the witnesses appearing for defendant was Don Porter, a State Farm property consultant in auto general claims. Porter's testimony was directed primarily to State Farm's "basic philosophy" of handling auto damage claims, rather than any specific contractual obligation. In describing this philosophy, Porter testified repeatedly that State Farm's goal was to pay to restore a policyholder's car to its preloss condition. According to Porter, State Farm has "always had a commitment to restoring the vehicle to its pre-loss condition." Porter also testified that the parts specified "must be as good as the part that was on the car prior to the loss." Porter never mentioned the Massachusetts or assigned risk policies, and never stated that all the State Farm policy forms at issue in this case were uniform.

Following the close of evidence, the circuit court, in conferring with the parties, reiterated the view that State Farm's contractual obligation was the same for each member of the class. In describing this uniform obligation, the circuit court pointed to Porter's testimony. According to the court, Porter testified that State Farm's promise "always was that when the car was repaired, the parts would be of like kind and quality which restores [the vehicle] to its pre-loss condition." The court ruled that this uniform interpretation of the contractual obligation would apply to all of State Farm's policies, including the "assigned risk" policies and the Massachusetts policies (neither of which contained the "like kind and quality" or the "pre-loss condition" language).

During the conference on jury instructions, State Farm objected to the use of the term "contract" in the instructions.[FN2] *817 State Farm argued: "Reference to a singular contract is factually inaccurate. There were numerous contracts." Counsel for State Farm informed the circuit court that, with regard to the court's interpretation of the contractual obligation as uniform, State Farm wanted to preserve its "objections as to variations in contract terms based on either differing policy language or differing state

regulations." Counsel stated:

> [FN2.] State Farm made essentially the same objection, in writing, in its "Memorandum Regarding Jury Instructions." Referring to plaintiffs' "substantive proposed contract instructions," State Farm noted that "[t]hese instructions speak of a single State Farm 'contract' with the 'class.'" State Farm argued, however, that "there is no one 'contract' with the class."

"We understand that's not going to be a part of this trial. So we merely want to preserve that for appellate purposes."

The circuit court noted the objection, and subsequently instructed the jury. The instructions regarding State Farm's contractual obligation essentially repeated what the court had given in its preliminary instructions. The essence of these contractual obligation instructions was that State Farm's contractual obligation was the same for every class member.

The verdict form given by the circuit court was general and classwide. It stated, in pertinent part: "Do you find that defendant State Farm failed to perform its obligations under the contract and breached its contract with the plaintiff class?" The circuit court denied State Farm's request to give, in addition, individual verdict forms for each named plaintiff.

The jury found that "defendant State Farm failed to perform its obligations under the contract and breached its contract with the plaintiff class." Contract damages awarded to the plaintiff class totaled $456,180,000, which consisted of $243,740,000 in specification damages and $212,440,000 in installation damages. The circuit court entered judgment on the jury's verdict in favor of plaintiffs on the contract claim. The court also entered judgment in plaintiffs' favor on the consumer fraud claim, finding that State Farm had, by its practices, violated the Consumer Fraud Act. The court awarded plaintiffs an additional $130 million in "disgorgement" damages and $600 million in punitive damages, resulting in a total award of $1,186,180,000 on all claims.

On appeal, State Farm argued that, with regard to plaintiffs' breach of contract claim, individual questions predominated over any purported common

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

questions, and the claim for breach of contract therefore should not have been certified as a class action. [735 ILCS 5/2-801(2)](West 1998). In its brief to the appellate court, State Farm contended that, contrary to the conclusion of the circuit court, the operative contractual language in State Farm's policies was *not* susceptible of uniform interpretation. While acknowledging that most of its auto insurance contracts contained the "like kind and quality" or the "pre-loss condition" language, State Farm insisted that "a significant number of policies did not." State Farm pointed, for example, to its policies in Massachusetts, as well as its assigned risk policies in Alaska, Illinois, Indiana, and Minnesota, which State Farm averred "did not use either the 'like kind and quality' or 'pre-loss condition' language." In its brief to the appellate court, State Farm asserted:
"Neither of these formulations [the Massachusetts policy provision or the 'assigned risk' policy provision] expressly imposes *any* standard of part quality. In fact, the assigned risk policies deliberately *delete* the 'like kind and quality' and 'pre-loss condition' language that appears in other State Farm policies." (Emphases in original.)

Focusing on the circuit court's interpretation of its contractual obligation as uniform, State Farm told the appellate court:
**\*818** "Rather than trying to deal with the variations in policy language and the governing [state] laws, the circuit court chose to ignore them completely. The court instructed the jury that there was only one policy form, even though there are a number of different forms. Then the court made up its own interpretation of that policy form, without citing any law to support it. Finally, in order to enforce the artificial uniformity it had created, the court barred State Farm from telling the jury about any different contract language or differing state laws governing the specification of non-OEM parts.
The circuit court's decision to force this case into the mold of a class action by fabricating a single contract and a single interpretation is an error of law of constitutional dimension that requires reversal by this Court."

The appellate court affirmed the certification of plaintiffs' breach of contract claim as a class action. The appellate court concluded, as had the circuit court, that State Farm's contractual promise was the same for each member of the class. The appellate court stated:
"The record demonstrates that plaintiffs presented

evidence to show that State Farm made the same promise (*i.e.,* to pay for parts 'of like kind and quality' to restore 'pre-loss condition') to its policyholders throughout the country. State Farm's own witness, Don Porter, a claims consultant, acknowledged that State Farm had a uniform nationwide obligation to policyholders. This promise was to specify parts of like kind and quality *to OEM parts* so as to restore preloss condition." (Emphasis added.) [321 Ill.App.3d at 280, 254 Ill.Dec. 194, 746 N.E.2d 1242](#).

The appellate court also affirmed the circuit court's finding that Illinois law could be applied to the contract claims of all the class members nationwide and that this imposition of Illinois law presented no constitutional difficulties.

With regard to the merits, the appellate court upheld the circuit court's judgment that State Farm breached its contractual obligation to the plaintiff class. The appellate court stated:
"Plaintiffs claimed that the non-OEM parts specified by State Farm were categorically inferior and failed to restore the vehicles to their 'pre-loss condition.' The claim was supported with expert testimony, from which it could be reasonably inferred, if accepted as true, that the lot of non-OEM parts specified by State Farm was inferior in terms of appearance, fit, quality, function, durability, and performance." [321 Ill.App.3d at 280, 254 Ill.Dec. 194, 746 N.E.2d 1242](#).

The appellate court also upheld most of the damages awarded for breach of contract. In affirming the award of specification damages, the appellate court explicitly concluded that these damages applied even where (1) an inferior non-OEM part was specified on the estimate, but the body shop provided an OEM part at no additional cost to the class member, and (2) non-OEM parts were used in the vehicle's repair, but the class member subsequently sold the vehicle for fair market value with no diminution in value because of the use of non-OEM parts. [321 Ill.App.3d at 287-88, 254 Ill.Dec. 194, 746 N.E.2d 1242](#). The appellate court also upheld the award of installation damages, rejecting State Farm's criticism that these damages were speculative. [321 Ill.App.3d at 288-90, 254 Ill.Dec. 194, 746 N.E.2d 1242](#).

However, the appellate court concluded that the $130 million in disgorgement damages constituted an impermissible double recovery, and the appellate court therefore reversed this award. As a result,

plaintiffs'"**819** total award was reduced to $1,056,180,000.

State Farm appeals from those portions of the judgment of the appellate court affirming the judgment of the circuit court.[FN3] We granted State Farm's petition for leave to appeal. 177 Ill.2d R. 315(a).

> FN3. We granted leave to the following agencies and organizations to file *amicus curiae* briefs in support of State Farm: Alliance of American Insurers, Allstate Insurance Company, the Chamber of Commerce of the United States, Citizens for a Sound Economy Foundation, North Carolina Department of Insurance *et al.,* General Motors Corporation *et al.,* Government Employees Insurance Company *et al.,* Illinois Chamber of Commerce, Illinois Department of Insurance, Illinois Manufacturers' Association, National Association of Independent Insurers *et al.,* National Association of Insurance Commissioners, National Conference of Insurance Legislators *et al.,* the Superintendent of the Ohio Department of Insurance, Public Citizen, Inc., *et al.,* and Washington Legal Foundation. We also granted leave to the following agencies and organizations to file *amicus curiae* briefs in support of plaintiffs: Alliance of Automotive Service Providers National Association *et al.,* Illinois Trial Lawyers Association, Trial Lawyers for Public Justice *et al.,* and United Policyholders. See 155 Ill.2d R. 345.

### A. *Propriety of the Nationwide Contract Class*

Before this court, State Farm argues, as it did before the circuit and appellate courts, that the class should not have been certified. State Farm contends that individual questions predominate over any questions common to the class and that Illinois law should not have been applied to the contract claims of class members nationwide. With regard to the merits, State Farm argues that plaintiffs failed to establish a breach of State Farm's contractual obligation and plaintiffs failed to establish that they were entitled to damages. We turn first to State Farm's contention that the class should not have been certified.

[1] Class certification is governed by section 2-801 of

the Code of Civil Procedure (735 ILCS 5/2-801 (West 1998)), which is patterned after Rule 23 of the Federal Rules of Civil Procedure. See Getto v. City of Chicago, 86 Ill.2d 39, 47, 55 Ill.Dec. 519, 426 N.E.2d 844 (1981); K. Forde, *Illinois's New Class Action Statute,* 59 Chi. B. Rec. 120, 122-24 (1977). Given the relationship between these two provisions, federal decisions interpreting Rule 23 are persuasive authority with regard to questions of class certification in Illinois. See, *e.g., Schlessinger v. Olsen,* 86 Ill.2d 314, 320, 56 Ill.Dec. 42, 427 N.E.2d 122 (1981) (citing Fed.R.Civ.P. 23 case in analyzing class certification issue); see K. Forde, *Illinois's New Class Action Statute,* 59 Chi. B. Rec. 120, 122-24 (1977); *Southwestern Refining Co. v. Bernal,* 22 S.W.3d 425, 433 (Tex.2000). Under section 2-801, a class may be certified only if the proponent establishes the four prerequisites set forth in the statute: (1) numerosity ("[t]he class is so numerous that joinder of all members is impracticable"); (2) commonality ("[t]here are questions of fact or law common to the class, which common questions predominate over any questions affecting only individual members"); (3) adequacy of representation ("[t]he representative parties will fairly and adequately protect the interest of the class"); and (4) appropriateness ("[t]he class action is an appropriate method for the fair and efficient adjudication of the controversy"). 735 ILCS 5/2-801 (West 1998).

[2][3] Decisions regarding class certification are within the sound discretion of the trial court and should be overturned only where the court clearly abused its discretion or applied impermissible legal criteria. *McCabe v. Burgess,* 75 Ill.2d 457, 464, 27 Ill.Dec. 501, 389 N.E.2d 565 (1979); **820***Eshaghi v. Hanley Dawson Cadillac Co.,* 214 Ill.App.3d 995, 1001, 158 Ill.Dec. 647, 574 N.E.2d 760 (1991). However, "[a] trial court's discretion in deciding whether to certify a class action is not unlimited and is bounded by and must be exercised within the framework of the civil procedure rule governing class actions." 4 A. Conte & H. Newberg, Newberg on Class Actions § 13:62, at 475 (4th ed.2002); see also *Broussard v. Meineke Discount Muffler Shops, Inc.,* 155 F.3d 331, 344 (4th Cir.1998) (noting that, while a trial court has broad discretion in deciding whether to certify a class, this discretion must be exercised within the framework of Fed.R.Civ.P. 23).

In the case at bar, State Farm argues that it was an abuse of discretion to certify the class. State Farm's argument focuses on the commonality and predominance requirement of section 2-801.

According to State Farm, it was error for the lower courts to conclude that common questions predominated over questions affecting only individual class members.

With regard to the class that was certified for plaintiffs' contract claim, the common question identified by the circuit court in its certification order was whether State Farm's practice of specifying non-OEM parts on repair estimates constituted a breach of State Farm's contractual obligations. According to the circuit court, this question of "contractual interpretation" predominated over other issues. In reaching this conclusion, the circuit court acknowledged State Farm's argument that its insurance contracts took varying forms and there was thus no standard form contract to be interpreted. However, in the court's view, the specific form of the individual insurance policies was immaterial so long as "the operative contractual language contained in each policy [was] susceptible [of] uniform interpretation." The court concluded that this question of whether the various policies' language could be given uniform interpretation should be decided at trial, rather than at the class certification stage.

Notwithstanding this assertion by the court, the issue of uniform contractual interpretation was never decided on the merits. As previously noted, prior to trial the circuit court granted plaintiffs' motions *in limine* barring the introduction of evidence regarding differences in State Farm's contractual obligations and prohibiting any mention of the states where the class members' policies were filed. As a result of these rulings, the jury was prevented from hearing evidence regarding any variations in State Farm's contractual obligations to the class members. Moreover, by the time the trial began, the circuit court itself had decided the issue of whether the contractual language in State Farm's various policies was susceptible of uniform interpretation. In its preliminary instructions to the jury, the court stated: "The contractual obligation of State Farm under its policies or insurance contracts is *exactly the same*, whether State Farm promised to pay for crash parts of like kind and quality or promised to pay for crash parts which restore a vehicle to its pre-loss condition." (Emphasis added.) Following the close of evidence in the jury trial, the circuit court expressed this uniform contractual interpretation in even broader terms, ruling that it applied to all of State Farm's policies, including the assigned risk policies and the Massachusetts policies (neither of which contained the "like kind and quality" or the

"pre-loss condition" language).

[4][5] In our view, the circuit court was incorrect in concluding, in the first instance, that the question of uniform contractual interpretation should be decided at trial rather than at the class certification stage. Apparently the circuit court **\*821** came to this realization as well (although belatedly), as is evinced by the court's deciding the uniform interpretation issue prior to trial. The reason why this question should have been resolved during the certification stage is that, had the court answered the question in the negative rather than the affirmative, the class could not have been certified. In order to satisfy the second requirement of section 2-801 (a common question of fact or law predominates over other questions affecting only individual class members), it must be shown that "successful adjudication of the purported class representatives' individual claims will establish a right of recovery in other class members." *Goetz v. Village of Hoffman Estates, 62 Ill.App.3d 233, 236, 19 Ill.Dec. 401, 378 N.E.2d 1276 (1978);* accord *Society of St. Francis v. Dulman, 98 Ill.App.3d 16, 18, 53 Ill.Dec. 646, 424 N.E.2d 59 (1981); Hagerty v. General Motors Corp., 59 Ill.2d 52, 59, 319 N.E.2d 5 (1974);* see also *Mace v. Van Ru Credit Corp., 109 F.3d 338, 341 (7th Cir.1997)* (noting that the typicality and commonality requirements of *Fed.R.Civ.P. 23* "ensure that only those plaintiffs or defendants who can advance the same factual and legal arguments may be grouped together as a class"). In the case at bar, if the circuit court had concluded that the operative contractual language in State Farm's various policies was *not* susceptible of uniform interpretation, this would have raised the possibility that there was a breach of contract with some class members but not with others. See *Broussard, 155 F.3d at 340.* In such a situation, the successful adjudication of the claims of some class members would not necessarily establish a right to recovery in others. If there were significant differences in the operative contractual language of the various policies, the commonality and predominance requirement of section 2-801 could not be met, and the class could not be certified. Accordingly, the circuit court erred in declining to decide the question of uniform contractual interpretation at the class certification stage. As noted, the circuit court apparently realized this error and decided the uniform interpretation issue prior to trial.

[6][7][8] The question before us is whether the circuit court decided this issue correctly. In other words, was it error for the circuit court to conclude that the

216 Ill.2d 100, 835 N.E.2d 801, 296 Ill.Dec. 448
**(Cite as: 216 Ill.2d 100, 835 N.E.2d 801)**

operative language in State Farm's various policies could be given a uniform interpretation such that the successful adjudication of the contract claims of some class members would establish a right to recovery in other class members? The determination of this issue requires an examination of the relevant contracts. The starting point of any contract analysis is the language of the contract itself. *Church v. General Motors Corp.,* 74 F.3d 795, 799 (7th Cir.1996); *Dugan v. Smerwick Sewerage Co.,* 142 F.3d 398, 403 (7th Cir.1998). As a general rule, the construction, interpretation, or legal effect of a contract is a matter to be determined by the court as a question of law. 12A Ill. L. & Prac. *Contracts §* 264, at 107 (1983); see *Chicago Daily News, Inc. v. Kohler,* 360 Ill. 351, 363, 196 N.E. 445 (1935); *Sindelar v. Liberty Mutual Insurance Co.,* 161 F.2d 712, 713 (7th Cir.1947). Our review of this issue is therefore *de novo.* See *Hessler v. Crystal Lake Chrysler-Plymouth, Inc.,* 338 Ill.App.3d 1010, 1017, 273 Ill.Dec. 96, 788 N.E.2d 405 (2003).

[9] We begin with the two main policy forms at issue in this case. The first includes the "like kind and quality" language and provides, in pertinent part:
"We have the right to settle a *loss* with *you* or the owner of the property in one of the following ways:
* * *
**\*822** 2. pay to repair or replace the property or part with like kind and quality. If the repair or replacement results in better than like kind and quality, *you* must pay for the amount of the betterment * * *." (Emphases in original.)

The second policy form contains the "pre-loss condition" provision, as well as language expressly providing that State Farm's contractual obligation could be met by specifying non-OEM parts. This policy form states, in pertinent part:
"The cost of repair or replacement is based upon one of the following:

* * *

3. an estimate written based upon the prevailing competitive price. * * * We will include in the estimate parts sufficient to restore the vehicle to its pre-loss condition. *You* agree with us that such parts may include either parts furnished by the vehicle's manufacturer or parts from other sources including non-original equipment manufacturers." (Emphasis in original.)

In our view, these two policy forms are *not* the same. As noted, the second one contains, in addition to the "pre-loss condition" promise, an explicit agreement between State Farm and the policyholder regarding the use of non-OEM parts: "*You* agree with us that such parts may include either parts furnished by the vehicle's manufacturer or parts from other sources including non-original equipment manufacturers." (Emphasis in original.) In its brief to this court, State Farm points in particular to this language, explaining that it "expressly provided that State Farm could meet [the preloss condition] obligation by specifying non-OEM parts." In contrast, the first policy form set forth above, which contains the "like kind and quality" promise, makes no mention of OEM or non-OEM parts, nor does it expressly allow for the specification of non-OEM parts. If, as plaintiffs claim, the specification of non-OEM parts constitutes a breach of State Farm's contractual obligation, plaintiffs who were insured under policies containing the "like kind and quality" promise would be in a different position regarding this non-OEM-parts claim than would plaintiffs with policies containing the "you agree" language. Class members with a "like kind and quality" policy would have a stronger case for breach of contract than would those whose policies expressly *allowed* the practice that is alleged to constitute the breach. It follows that the successful adjudication of the claims of class members with the "like kind and quality" language would not necessarily establish a right of recovery in those with the "you agree" language. See *Hagerty,* 59 Ill.2d at 59, 319 N.E.2d 5; *Goetz,* 62 Ill.App.3d at 236, 19 Ill.Dec. 401, 378 N.E.2d 1276; *Dulman,* 98 Ill.App.3d at 18, 53 Ill.Dec. 646, 424 N.E.2d 59; *Mace,* 109 F.3d at 341. There is thus a material difference between the policies containing the "you agree" provision and those that do not contain this language.[FN4]

FN4. Plaintiffs make no mention of the "you agree" language in their brief to this court.

This difference between the "like kind and quality" policies, on the one hand, and the "pre-loss condition" policies containing the "you agree" provision, on the other, is not the only instance in this case of material differences in policy language. The putative class also includes State Farm insureds with policies that contain *neither* the "like kind and quality" *nor* the "pre-loss condition" promise. State Farm's Massachusetts policies, for example, simply promise to pay "the actual cash value" of "parts at the

835 N.E.2d 801                                                                              Page 21
216 Ill.2d 100, 835 N.E.2d 801, 296 Ill.Dec. 448
**(Cite as: 216 Ill.2d 100, 835 N.E.2d 801)**

time of the collision." The same is true of most of State Farm's "assigned**\*823** risk" policies, which are used in the "residual market" of high-risk consumers that insurers are required to cover. Just as with the Massachusetts policies, the majority of the "assigned risk" policies contain neither the "like kind and quality" nor the "pre-loss condition" language. Instead, the "assigned risk" policies promise to pay an "[a]mount necessary to repair or replace the property."

As State Farm points out, neither of these formulations-the Massachusetts policy provision or the "assigned risk" policy provision-expressly imposes *any* standard of part quality. It follows that plaintiff class members who were insured under either of these policies would be in a different position than their "like kind and quality" and "pre-loss condition" counterparts regarding the claim that the specification of non-OEM parts constituted a breach of their insurance contract. The successful adjudication of the claim of a "like kind and quality" policyholder, for example, would not necessarily establish a right to recovery in a class member with either a Massachusetts or an "assigned risk" policy. See *Goetz,* 62 Ill.App.3d at 236, 19 Ill.Dec. 401, 378 N.E.2d 1276; *Dulman,* 98 Ill.App.3d at 18, 53 Ill.Dec. 646, 424 N.E.2d 59.

Notwithstanding the foregoing, the circuit court, following the close of evidence in the jury trial, reiterated its pretrial conclusion that State Farm's contractual obligation was the same for each member of the class. The circuit court determined that all of State Farm's policies, including the Massachusetts policies and the "assigned risk" policies, conveyed the same contractual promise. The court stated: "After having heard all the testimony, and I wrote down in particular when it was done, Mr. Porter's testimony that State Farm's agreement, promise, however you choose to characterize it, always was that when the car was repaired, the parts would be of like kind and quality which restores [it] to its pre-loss condition."

The appellate court also referred specifically to Porter's testimony in concluding that State Farm's contractual obligation was uniform: "State Farm's own witness, Don Porter, a claims consultant, acknowledged that State Farm had a uniform nationwide obligation to policyholders." 321 Ill.App.3d at 280, 254 Ill.Dec. 194, 746 N.E.2d 1242. Plaintiffs take this same position, pointing to Porter's testimony and contending that State Farm's contractual obligations to its policyholders were

uniform. We disagree.

First, Porter's testimony about State Farm's "commitment to restoring the vehicle to its pre-loss condition" referred to a "basic philosophy" goal of the company, rather than a contractual obligation. Porter never testified that all of the policy forms at issue in this case were uniform. Second, to the extent that his testimony could be read as referring to State Farm's insurance contracts, the most that can be said about this testimony is that Porter was referring to individual policy *terms* rather than all of the relevant policy *forms*. Viewed in the light most favorable to plaintiffs, Porter's testimony may be read as supporting the position that the "like kind and quality" and the "pre-loss condition" phrases mean the same thing: State Farm promised to pay to restore the policyholder's vehicle to its preloss condition using parts as good as the parts that were on the vehicle at the time of the loss. However, there is nothing to indicate that Porter's testimony encompasses any other policy language.

An example of a policy provision that falls *outside* the scope of Porter's testimony is the "you agree" language, which expressly allows for the specification of non-OEM parts. While Porter made brief mention of the "you agree" language in his **\*824** testimony, he discussed this language only as an example of the notice that State Farm provided to policyholders regarding its non-OEM-parts practices. Porter did *not* state in his testimony that a policy containing language that expressly allows for the specification of non-OEM parts is the contractual equivalent of a policy that *omits* this language. His testimony simply contains *no comment* with regard to this matter. Accordingly, with respect to State Farm's allegedly uniform contractual obligation, Porter's testimony supports *only* the view that the " like kind and quality" phrase and the "pre-loss condition" phrase mean the same thing: that State Farm's obligation was to pay to restore the policyholder's vehicle to its preloss condition. Porter's testimony does *not* support the position of the lower courts, and of plaintiffs, that the presence of the "you agree" language makes no difference and that policies containing this language convey the same contractual promise as do policies that omit it.

Equally important, Porter's testimony does not encompass State Farm's Massachusetts policies or its "assigned risk" policies, neither of which contain the "like kind and quality" or the "pre-loss condition" language. We have carefully examined the more than 200 transcript pages of Porter's testimony. We

835 N.E.2d 801                                                                                              Page 22
216 Ill.2d 100, 835 N.E.2d 801, 296 Ill.Dec. 448
**(Cite as: 216 Ill.2d 100, 835 N.E.2d 801)**

find no mention of either the Massachusetts policies or the "assigned risk" policies. The assertion that Porter's "uniform obligation" testimony encompasses these policies is simply not supported by the evidence. Accordingly, Porter's testimony does *not* support the position of the lower courts, and of plaintiffs, that State Farm policies which *omit* the "like kind and quality" and the "pre-loss condition" language state the same contractual promise as policies that include this language.

Moreover, there is no other record evidence that can sustain the conclusion that material policy differences-*i.e.,* the "you agree" language and the "assigned risk" language-make *no* difference, and that all of State Farm's various policy formulations are the same. Plaintiffs do point to evidence in addition to Porter's testimony, but this other evidence consists essentially of statements that are equivalent to Porter's assertions or reflect them. There is nothing to support the conclusion that the "you agree" language, for example, or the Massachusetts or "assigned risk" policies are irrelevant and that all of State Farm's policy variations therefore are susceptible of the same contractual interpretation. Indeed, State Farm has argued from the beginning of this case that such variances *are* relevant and that they preclude class certification.

[10] In sum, there is simply no evidentiary support for the lower courts' conclusion that *all* of State Farm's various policies are uniform. Where a putative class includes members who are insured under policies that are materially different, the commonality and predominance requirement of section 2-801 cannot be met. 735 ILCS 5/2-801(2) (West 1998). See *Hagerty,* 59 Ill.2d at 59, 319 N.E.2d 5; *Goetz,* 62 Ill.App.3d at 236, 19 Ill.Dec. 401, 378 N.E.2d 1276; *Dulman,* 98 Ill.App.3d at 18, 53 Ill.Dec. 646, 424 N.E.2d 59; *Mace,* 109 F.3d at 341. Accordingly, it was an abuse of discretion for the circuit court to certify plaintiffs' breach of contract claim as a class action. See *Broussard,* 155 F.3d at 340 (" [P]laintiffs simply cannot advance a single collective breach of contract action on the basis of multiple different contracts"). We therefore reverse the certification of the nationwide contract class.

### B. *Whether the Verdict May Be Affirmed With Respect to Subclasses*

[11] Having determined that the certification of the nationwide contract class **\*825** should be reversed,

we note that there remains a question whether the jury's breach of contract verdict may be affirmed with regard to any subclass comprised of policyholders who were insured under any of the relevant individual policy forms. For the reasons set forth below, we answer this question in the negative.

We note initially that there are serious questions as to whether the breach of contract verdict can be upheld for *any* group of class members. Under the verdict form given by the circuit court, the jury found that "defendant State Farm failed to perform its obligations under *the contract* and breached *its contract* with the plaintiff class." (Emphases added.) This verdict form followed naturally from the jury instructions, which stated that there was a single contract at issue with a uniform contractual obligation.

However, we have concluded, as a matter of law, that this was error. There was no single contract. Rather, there were multiple policy forms which differed materially. On its face, therefore, the verdict is improper. It included no finding, for example, that State Farm breached the policy form containing the "you agree" language, which *allowed* the practice that plaintiffs claim constituted the breach. Indeed, there could not have been such a finding. The jury was never instructed as to the "you agree" provision. Nor was there any finding in the verdict that State Farm breached its contractual obligation in the Massachusetts policies or the "assigned risk" policies. Once again, the jury was not instructed as to these policies. The verdict simply stated, incorrectly, that State Farm breached a *single contract* with the plaintiff class.

Accordingly, the breach of contract verdict cannot be upheld with respect to any subclass of policyholders insured under any of the individual policy forms at issue. However, we do not decide this case on this ground alone. Instead, we also look at the individual relevant policy forms and consider whether plaintiffs established a breach of any of them. We also consider whether plaintiffs established damages. For the reasons set forth below, we answer these questions in the negative.

### 1. The Massachusetts and "Assigned Risk" Policies

[12][13] With regard to the Massachusetts policies and the "assigned risk" policies, we conclude that there was no breach. Neither of these policy forms contained the "like kind and quality" or the "pre-loss

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

835 N.E.2d 801                                                                                         Page 23
216 Ill.2d 100, 835 N.E.2d 801, 296 Ill.Dec. 448
**(Cite as: 216 Ill.2d 100, 835 N.E.2d 801)**

condition" language.    The Massachusetts policies promised to pay "the actual cash value" of "parts at the time of the collision," and the "assigned risk" policies promised to pay an "[a]mount necessary to repair or replace the property."    As State Farm has noted, neither of these formulations-the Massachusetts policy provision or the "assigned risk" policy provision-expressly imposed any standard of part quality.    The specification of non-OEM parts would not constitute a breach of these contracts.    So long as, with regard to the Massachusetts policies, State Farm paid "the actual cash value" of "parts at the time of the collision," and so long as, with regard to the "assigned risk" policies, State Farm paid an "[a]mount necessary to repair or replace the property," the contractual obligation would be met.    It would not matter whether the parts specified were non-OEM, OEM, or some other type.    Thus, the jury's breach of contract verdict may not be affirmed with respect to a subclass consisting of policyholders insured under these provisions.


### 2. The "You Agree" Policies

[14] We turn next to the policies containing the "pre-loss condition" and the **\*826** "you agree" language. As noted, these provisions state:
"The cost of repair or replacement is based upon one of the following:

\* \* \*

3. an estimate written based upon the prevailing competitive price.    \* \* \* We will include in the estimate parts sufficient to restore the vehicle to its pre-loss condition.    *You* agree with us that such parts may include either parts furnished by the vehicle's manufacturer or parts from other sources including non-original equipment manufacturers."    (Emphasis in original.)

We cannot affirm the jury's verdict with respect to a subclass of policyholders who were insured under these provisions.    First, pursuant to the "you agree" language, the insured expressly agrees that "such parts," *i.e.,* parts sufficient to restore a vehicle to its preloss condition, "may include \* \* \* parts from \* \* \* non-original equipment manufacturers."    In other words, the insured agrees that the "pre-loss condition" promise may be met by specifying non-OEM parts.    In their brief to this court, plaintiffs do not explain, in any way, how a contract containing

the "you agree" language, which *expressly permits* the specification of non-OEM parts, may be breached by *the specification of non-OEM parts.*    Plaintiffs have established, in support of their claim, that non-OEM parts were specified by State Farm in class members' estimates.    However, in view of the "you agree" language, this specification of non-OEM parts, by itself, cannot constitute a breach of the " pre-loss condition" promise.

[15] Second, in order to establish a breach of the "pre-loss condition" promise, plaintiffs would have to show that the parts specified or used by State Farm, whether OEM or non-OEM parts, did not restore the vehicle to its preloss condition.    A necessary first step in making this showing would be to examine each class member's vehicle to determine its preloss condition.    At trial, Timothy Ryles and Paul Griglio, two of plaintiffs' expert witnesses, conceded the necessity for such a determination.    The following colloquy took place between State Farm's counsel and Ryles:
"Q. Good point, Dr. Ryles.    To determine whether a particular car has been restored to its pre-loss condition, you'd have to know what the pre-loss condition of that car was;  isn't that right?
A. You need to, yes."

Griglio made a similar concession in this exchange with State Farm's counsel:"Q. Similarly, sir, to know whether or not a car was restored to the pre-loss condition, you would need to know what the pre-loss condition of that car was, wouldn't you?
A. Yes, you would."

In the case at bar, the determination of the preloss condition of each subclass member's vehicle would require the individual examination of hundreds of thousands, if not millions, of vehicles.    Undoubtedly, these examinations would overwhelm any question common to the subclass, rendering it impossible for such questions to predominate.    As noted, class certification is improper unless "common questions predominate over any questions affecting only individual members."    735 ILCS 5/2-801(2) (West 1998).    For this reason, a claim for breach of the preloss condition promise cannot be maintained as a class action.    See *Augustus v. Progressive Corp.,* 2003-Ohio-296, 2003 WL 155267, ¶ 25; **\*827***Schwendeman v. USAA Casualty Insurance Co.,* 116 Wash.App. 9, 22-23, 65 P.3d 1, 8 (2003); *Snell v. Geico Corp.,* No. Civ. 202160, slip op. at 6, 2001 WL 1085237 (Md.Cir.Ct. August 14, 2001). Accordingly, the jury's breach of contract verdict

may not be affirmed for a subclass comprised of policyholders insured under the preloss condition provision.

### 3. The "Like Kind and Quality" Policies

The remaining policy form is the one containing the "like kind and quality" promise. Before analyzing this provision, we note that the record appears to include the policies of only two of the named plaintiffs, DeFrank and Covington. Both DeFrank's and Covington's policies contain the "pre-loss condition" and "you agree" language. In addition, although we were unable to find a copy of Avery's policy in the record, testimonial evidence indicates that Avery's policy also contained the "pre-loss condition" and "you agree" language.

[16] With regard to the remaining two named plaintiffs-Shadle and Vickers-the record does not appear to include their policies. On this record, therefore, it is unclear that the contracts of *any* of the named plaintiffs contained the "like kind and quality" language. If none of the named plaintiffs' policies contained the "like kind and quality" language, State Farm could not have breached this provision in any of the named plaintiffs' policies. Accordingly, plaintiffs' claim for breach of the "like kind and quality" promise fails for lack of proof. We cannot uphold a subclass based on this policy form. "It is well settled that a class cannot be certified unless the named plaintiffs have a cause of action." *Spring Mill Townhomes Ass'n v. OSLA Financial Services, Inc.,* 124 Ill.App.3d 774, 779, 80 Ill.Dec. 378, 465 N.E.2d 490 (1983), citing *Landesman v. General Motors Corp.,* 72 Ill.2d 44, 18 Ill.Dec. 328, 377 N.E.2d 813 (1978); accord, *e.g., Perlman v. Time, Inc.,* 133 Ill.App.3d 348, 354, 88 Ill.Dec. 524, 478 N.E.2d 1132 (1985). Assuming, *arguendo,* that there *were* named plaintiffs with this policy form, we conclude that there was no breach of the "like kind and quality" promise.

The "like kind and quality" promise states: "We have the right to settle a *loss* with *you* or the owner of the property in one of the following ways: * * * 2. pay to repair or replace the property or part with like kind and quality. If the repair or replacement results in better than like kind and quality, *you* must pay for the amount of the betterment * * *." (Emphases in original.)

According to the appellate court (and plaintiffs), "like kind and quality," as stated in this promise, meant "like kind and quality to OEM parts." 321 Ill.App.3d at 280, 254 Ill.Dec. 194, 746 N.E.2d 1242. Plaintiffs' contention throughout this case has been that the non-OEM parts that were at issue were categorically inferior to their OEM counterparts. It follows that, under this theory, State Farm's specification of non-OEM parts could *never* satisfy the obligation to pay for parts of "like kind and quality." In their third amended complaint, plaintiffs alleged: "As a practical matter, [State Farm's] obligation could be met *only* by requiring the *exclusive use* in repairs *of factory-authorized or OEM parts.*" (Emphases added.)

[17] In our view, there are several difficulties with this theory that the "like kind and quality" promise is necessarily breached by the specification of non-OEM parts. First, the language of the promise itself contradicts the view that State Farm may meet its contractual obligation *only* by specifying *OEM* parts. If the purpose of State Farm's promise "to repair or replace **\*828** the property or part with *like kind and quality* " (emphasis added) were to require the specification of OEM parts, then there is no reason why the indirect phrasing "like kind and quality" would have been used. The provision could simply have promised that OEM parts would be specified. Implicit in the phrase "like kind and quality" is the likeness or similarity of *one thing* to *another.* Common sense indicates that an item that is of "like kind and quality" to another is not that very item, but rather is something of "like kind and quality" to it.

Also contradicting the position that "like kind and quality" means OEM parts is the contract language *accompanying* the "like kind and quality" promise. In the "like kind and quality" provision as set forth above, the sentence immediately following the "like kind and quality" promise states: "If the repair or replacement results in *better than like kind and quality* [emphasis added], *you* must pay for the amount of the betterment [emphasis in original] * * *." This policy language, which requires an insured to pay for "repair or replacement [which] results in *better than like kind and quality* " (emphasis added), presumes a standard of quality that is "better than like kind and quality." However, under plaintiffs' reasoning, there is nothing better than "like kind and quality."

Recall the position taken by plaintiffs. According to plaintiffs, *all* the non-OEM parts at issue in this case are categorically inferior to OEM parts. This means,

835 N.E.2d 801                                                                          Page 25
216 Ill.2d 100, 835 N.E.2d 801, 296 Ill.Dec. 448
**(Cite as: 216 Ill.2d 100, 835 N.E.2d 801)**

of necessity, that OEM parts represent the highest possible standard of quality. In addition, according to plaintiffs, because non-OEM parts are categorically inferior to OEM parts, the "like kind and quality" promise can only be met by specifying OEM parts. Thus, because OEM parts are the best possible parts, and because the "like kind and quality" promise means OEM parts, plaintiffs also necessarily take the position that the term "like kind and quality" refers to the highest possible standard of quality.

But this reasoning cannot be correct. State Farm's policy cannot be referring to OEM parts when it uses the term "like kind and quality" because the policy itself says that there is a standard of quality which is *better* than "like kind and quality" parts. Plaintiffs are clearly incorrect in equating "like kind and quality" with OEM parts.

[18] As previously indicated, State Farm defines "like kind and quality" differently from plaintiffs (and the appellate court). In State Farm's view, "like kind and quality" means "sufficient to restore a vehicle to its pre-loss condition." [FN5] There is substantial legal support for State Farm's view.

> **FN5.** Plaintiffs point to a 1986 version of an internal State Farm document, General Claims Memo # 430 (GCM # 430), which, according to plaintiffs, contradicts State Farm's position that "like kind and quality" means "sufficient to restore a vehicle to its pre-loss condition." However, as State Farm claims consultant Don Porter stated at trial, GCM # 430 is not contained within the four corners of any State Farm insurance contract. GCM # 430 is therefore extrinsic evidence as to the meaning of the "like kind and quality" contractual promise. Absent a finding that the "like kind and quality" promise is ambiguous, such extrinsic evidence is irrelevant to the meaning of this contractual provision. See *Grzeszczak v. Illinois Farmers Insurance Co.,* 168 Ill.2d 216, 223-24, 213 Ill.Dec. 606, 659 N.E.2d 952 (1995); *Dempsey v. National Life & Accident Insurance Co.,* 404 Ill. 423, 426, 88 N.E.2d 874 (1949). We make no such finding of ambiguity.

Courts in other jurisdictions have adopted a similar interpretation of the term "like kind and quality." In *Siegle v. Progressive Consumers Insurance Co.,* 819

So.2d 732 (Fla.2002), the issue was whether,**\*829** under "like kind and quality" policy language similar to that in the case at bar, an insurer was obligated not only to complete "a first-rate repair which returns the vehicle to its pre-accident level of performance, appearance, and function," but also to compensate the insured in money for any diminution in market value that resulted from the repaired vehicle's status as a wrecked car. *Siegle,* 819 So.2d at 733. The court ruled that there was no such dual obligation on the part of the insurer. The court explained that, under the policy language at issue, the insurer had a choice of either reimbursing the insured through a money payment or paying to repair or replace the automobile with other property of like kind and quality. If, as in the case that was before the court, the repair option was chosen, "the insurer's liability was limited to the monetary amount necessary to repair the car's function and appearance, *commensurate with the condition of the auto prior to the loss.*" (Emphasis added.) *Siegle,* 819 So.2d at 739. Thus, in the court's view, a promise to repair damaged property with *like kind and quality* meant that the insurer was obligated to restore the vehicle to its *preloss condition.* See also *Ray v. Farmers Insurance Exchange,* 200 Cal.App.3d 1411, 1418, 246 Cal.Rptr. 593, 596 (1988) ("To the extent [that plaintiff's] automobile was repaired to its *pre-accident* safe, mechanical, and cosmetic condition, [defendant's] obligation under the policy of insurance to repair to 'like kind and quality' was discharged" (emphasis added)); *Berry v. State Farm Mutual Automobile Insurance Co.,* 9 S.W.3d 884, 894-95 (Tex.Ct.App.2000) (under court's interpretation of the Texas Insurance Code, whether a part is of "like kind and quality" depends on "the age or condition of the covered vehicle prior to the accident"); *Schwendeman v. USAA Casualty Insurance Co.,* 116 Wash.App. 9, 22-23, 65 P.3d 1, 8 (2003) (under the insurance policy at issue, "whether a replacement part is of 'like kind and quality' to the part it replaces necessarily requires ascertaining the condition of the vehicle before the accident in terms of its age, mileage, and physical condition, and the quality of the replacement part"); *Snell v. Geico Corp.,* No. Civ. 202160, slip op. at 6, 2001 WL 1085237 (Md.Cir.Ct. August 14, 2001) (preloss condition of each individual vehicle must be established in order to determine whether insurer's "like kind and quality" promise was breached).

State Farm maintains that "pre-loss condition" is what defines "like kind and quality," rather than the other way around. For State Farm it is irrelevant whether non-OEM parts are of like kind and quality

835 N.E.2d 801

216 Ill.2d 100, 835 N.E.2d 801, 296 Ill.Dec. 448

**(Cite as: 216 Ill.2d 100, 835 N.E.2d 801)**

Page 26

to OEM parts. The determinative issue is whether the parts specified are sufficient to restore the vehicle to its preloss condition, *i.e.,* the condition of the vehicle shortly before the accident. Under this definition of "like kind and quality," the specification of non-OEM parts would not necessarily breach the "like kind and quality" promise.

We agree with State Farm. The term "like kind and quality," as used in the relevant policies, meant "sufficient to restore a vehicle to its pre-loss condition." We therefore conclude that the specification of non-OEM parts would not necessarily constitute a breach of the "like kind and quality" promise. Thus, we cannot affirm the jury's breach of contract verdict with respect to a subclass consisting of policyholders insured under this provision.

[19] In sum, the jury's breach of contract verdict may not be upheld for any subclass comprised of policyholders insured under any of the individual relevant policy forms. State Farm's specification of non-OEM parts did not constitute a breach of the "Massachusetts policies or the "assigned**830** risk" policies, neither of which expressly imposed any standard of part quality. Nor did the specification of non-OEM parts constitute a breach of the policies containing the "pre-loss condition" and the "you agree" provisions. Under the "you agree" language, the insured *agrees* that the "pre-loss condition" promise may be met by specifying non-OEM parts. Further, the individualized proof needed to establish a breach of the "pre-loss condition" promise would destroy the commonality required of a class action. Finally, plaintiffs' claim for breach of the "like kind and quality" promise fails for a number of reasons. First, the claim fails for lack of proof. In addition, State Farm's specification of non-OEM parts did not constitute a breach of the policies containing the "like kind and quality" provision. The term "like kind and quality," as used in the relevant policies, meant "sufficient to restore a vehicle to its pre-loss condition." This obligation, which is satisfied so long as the parts are sufficient to restore the vehicle to its preaccident condition, is not necessarily breached by the specification of non-OEM parts. Moreover, as noted above, the individualized proof required to establish a breach of the " pre-loss condition" promise would overwhelm any questions common to the subclass, thus prohibiting certification of the claim as a class action.

4. Damages

There is an additional reason why the breach of contract verdict may not be upheld with regard to any subclass. Plaintiffs have failed to establish damages.

a. *Specification Damages*

Two types of damages were awarded to the plaintiff class for breach of contract: (1) direct, or "specification," damages, and (2) consequential, or "installation," damages. The first type of damages, which is based on plaintiffs' theory that the contract was breached by the *specification* of non-OEM parts, was calculated as the cost difference between the OEM parts that plaintiffs claimed *should* have been specified and the non-OEM parts that State Farm listed on the repair estimate. According to plaintiffs, this figure constituted the amount that State Farm "saved by specifying cheaper [non-OEM] parts." Plaintiffs' damages expert, Dr. Iqbal Mathur, calculated that specification damages for the class as a whole would total $243,700,000. Under plaintiffs' theory, everyone in the class was eligible to receive specification damages.

In our view, plaintiffs' theory of "specification damages" has no basis in the law. Under this theory, loss occurs when a non-OEM part is *specified* on the estimate rather than when the part is *installed* on the vehicle. Plaintiffs' damages expert, Dr. Mathur, conceded at trial that specification damages apply to any class member whose repair estimate *specified* a non-OEM part, regardless of whether a non-OEM part was used in the repair of the vehicle. Thus, a policyholder who had been quoted a non-OEM part on his estimate could receive specification damages even if (1) his vehicle was repaired with an OEM part, or (2) his car was restored to its preloss condition. By this same reasoning, specification damages would apply where a non-OEM part was specified on the estimate and was used in the repair, but the policyholder subsequently sold his vehicle for fair market value. If it is the simple *specification* of the non-OEM part in a repair estimate that inflicts the damage, it is irrelevant, under plaintiffs' theory, what happens afterwards, even if the policyholder ultimately suffers no actual damage.

It should be noted that, given this focus on the *specification,* rather than the *installation,***831** of non-OEM parts, plaintiffs' specification-damages theory stands in contrast to their third amended complaint, as well as to the definition of the plaintiff class as certified by the circuit court. In their third

835 N.E.2d 801                                                                                           Page 27
216 Ill.2d 100, 835 N.E.2d 801, 296 Ill.Dec. 448
**(Cite as: 216 Ill.2d 100, 835 N.E.2d 801)**

amended complaint, plaintiffs describe State Farm's alleged breach of contract in terms of State Farm's *use* of non-OEM parts in *repairs* that result, *inter alia,* in plaintiffs' *receipt* of such parts:
"Defendant State Farm's common practice of *using* inferior, imitation parts in *repairs* constitutes a breach of its obligation to all insureds who either *received* such parts or were obligated to pay the difference in price between imitation parts and the OEM parts actually *installed.*" (Emphases added.)

Similarly, the circuit court, in defining the plaintiff class, refers to plaintiffs who had non-OEM parts *installed* on their vehicles. In the judgment in favor of plaintiffs on their breach of contract claim, the plaintiff class was defined, in pertinent part, as:"All persons in the United States, except those residing in Arkansas and Tennessee, who, between July 28, 1987, and February 24, 1998, (1) were insured by a vehicle casualty insurance policy issued by Defendant State Farm and (2) made a claim for vehicle repairs pursuant to their policy and had non-factory authorized and/or non-OEM (Original Equipment Manufacturer) 'crash parts' *installed* on their vehicles or else received monetary compensation determined in relation to the cost of such parts." (Emphasis added.)

Given the contrast between the focus of the specification-damages theory on the estimate's *listing* of non-OEM parts, on the one hand, and the references in the complaint and the class definition to the *use* or *installation* of non-OEM parts, on the other, a question arises as to why plaintiffs devised their specification-damages theory in the first instance. The answer lies in plaintiffs' belated realization that they would be unable to establish damages and still maintain the commonality required of a class action. If, in keeping with the complaint and the class definition, loss did not occur until non-OEM parts were *installed,* plaintiffs would need to show which class members' vehicles had actually been repaired with non-OEM parts, as well as which class members still owned vehicles that had been repaired with non-OEM parts. However, State Farm's records did not contain this information.[FN6] Accordingly, any determinations as to which plaintiffs were eligible for damages would require the examination of each individual class member's vehicle and repair. Such an undertaking, however, would mean that questions affecting individual class members would predominate over common questions, destroying the commonality required for a class action. See [735 ILCS 5/2-801(2)](#) (West 1998);

[*Magro v. Continental Toyota, Inc.,* 67 Ill.2d 157, 161, 8 Ill.Dec. 90, 365 N.E.2d 328 (1977).](#)

> [FN6.](#) In affirming the certification of the nationwide class, the appellate court stated: "[T]hrough its own records State Farm is capable of identifying class members who have had non-OEM parts installed on their vehicles." [321 Ill.App.3d at 283, 254 Ill.Dec. 194, 746 N.E.2d 1242.](#) However, in its brief to the appellate court, State Farm flatly contradicted this assertion: "State Farm's records do not show which class members' vehicles had actually been repaired with non-OEM parts, let alone which class members still owned such vehicles." The appellate court never explained the discrepancy between its statement and State Farm's.

Faced with this dilemma, plaintiffs created their specification-damages theory, under which the alleged breach of contract and the resulting damages occurred when **\*832** non-OEM parts were *specified* in repair estimates, rather than when the non-OEM parts were *installed.* If damage occurred when non-OEM parts were *specified,* there would be no need for individual inquiry as to whether such parts were actually used in the repair of a particular vehicle, or whether the claimant still owned the vehicle in question. Under plaintiffs' specification-damages theory, the damage occurred when the non-OEM part was *listed* on the estimate, and it did not matter whether the part was actually used in the repair or whether the policyholder still owned the vehicle.

[20] While plaintiffs' specification damages theory appeared to preserve the commonality necessary for a class action, it achieved this goal at the expense of denoting real damages. Common sense dictates that any injury resulting from non-OEM parts would be inflicted, not by the mere *specification* of such parts in an estimate, but by the *use* of the parts in the repair of a vehicle. No possible damage could come to a policyholder simply because a non-OEM part was listed on his repair estimate. Only if the part were actually installed, and only if it were shown that this part failed to restore the vehicle to its preloss condition, could it possibly be said that the policyholder suffered damage.

Indeed, plaintiffs' own damages expert, Dr. Mathur, acknowledged at trial that plaintiffs' theory of specification damages made no economic sense.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

835 N.E.2d 801                                                                      Page 28
216 Ill.2d 100, 835 N.E.2d 801, 296 Ill.Dec. 448
(Cite as: 216 Ill.2d 100, 835 N.E.2d 801)

During cross-examination, the following colloquy took place between State Farm's counsel and Dr. Mathur:

"Q. So, from an economic perspective, which is all that you are qualified to testify about, you would have to tell us that your theory of direct damages doesn't make economic sense; isn't that true, sir?

A. That is correct.

Q. Thank you.   So, according to you, as an economist, and not as a lawyer, using theories that plaintiffs' lawyers have tried to give you, is a policyholder *entitled* to damages merely because State Farm quoted a non-OEM part on their estimate, as long as State Farm did restore the car to its preloss condition?

A. No."  (Emphasis added.)

[21] We agree with plaintiffs' damages expert that plaintiffs' theory of specification damages makes no sense.   In our view, plaintiffs' notion of specification damages contravenes the basic theory of damages for breach of contract, under which the claimant must establish an actual loss or measurable damages resulting from the breach in order to recover.   See, *e.g.,* Economy Fire & Casualty Co. v. GAB Business Services, Inc., 155 Ill.App.3d 197, 201, 107 Ill.Dec. 743, 507 N.E.2d 896 (1987).   We reject, as a matter of law, plaintiffs' theory of specification damages.

### b. *Installation Damages*

[22] The second type of contract damages awarded was installation damages.   Unlike "specification" damages, "installation" damages were derived from a theory based on an actual loss.   However, as explained below, the evidence offered in support of plaintiffs' installation damages was so speculative and uncertain that awarding damages based on this evidence constituted an arbitrary deprivation of property in violation of State Farm's due process rights.   See State Farm Mutual Automobile Insurance Co. v. Campbell, 538 U.S. 408, 416, 123 S.Ct. 1513, 1519-20, 155 L.Ed.2d 585, 600 (2003) (due process clause of the fourteenth amendment prohibits imposition of arbitrary punishments).

*833 Installation damages consisted of the additional costs to be incurred by plaintiffs in removing non-OEM parts from their vehicles and replacing them with OEM parts.   Included in these damages was an amount to cover two days of car rental while the non-OEM parts were being replaced.   Only those class members who actually had non-OEM parts installed

on their vehicles were eligible to receive installation damages.   Plaintiffs' expert, Dr. Mathur, explained that, for a variety of reasons, many plaintiffs who had non-OEM parts specified on their repair estimates did not, in fact, have non-OEM parts installed on their vehicles.   These plaintiffs were not eligible for installation damages.   Thus, in order to calculate the amount of installation damages for the nationwide class, it was necessary to estimate the number of plaintiffs who were eligible for such damages. Mathur estimated that, of the total number of plaintiffs who were quoted non-OEM parts, the percentage whose vehicles were, in fact, repaired with non-OEM parts ranged from 50% to 92%.   In other words, although each class member's estimate, by definition, specified *non*-OEM parts, *OEM* parts were actually installed on the class members' cars as often as 50% of the time.   Mathur testified that, in his view, the actual figure for repairs using non-OEM parts probably was closer to 92% than 50%.   He calculated that, if 50% of class members received non-OEM parts, installation damages for the class as a whole would total $658,450,000.   If, on the other hand, the correct figure were 92%, installation damages would total $1.2 billion.

On cross-examination, Mathur acknowledged that, with regard to installation damages, it was necessary to determine whether a non-OEM part had been installed on a class member's vehicle.   However, Mathur conceded that he had no way of making this determination.   Mathur also acknowledged that he had "no opinion" as to how many class members had non-OEM parts installed on their vehicles but later received fair market value for them.   Mathur admitted that his calculations as to installation damages might be incorrect by as much as $1 billion.

The following exchange took place between counsel for State Farm and Mathur.

"Q. From an economic perspective, there is simply no way for you to identify which members of the class are entitled to damages; isn't that right?

A. Well, I don't have the data, and so I really cannot identify who the class members are.

Q. Therefore, there is no way for you to identify who is and who is not entitled to damages; isn't that right, sir?

A. That is correct." [FN7]

FN7. John Werner, an assistant director in State Farm's research division, testified that, while the company's computer system could

tell what kind of part was specified on an estimate, it could *not* tell what kind of part, whether OEM or non-OEM, was actually installed on a policyholder's vehicle.

The jury awarded plaintiffs $212,440,000 in installation damages. This was about $1 billion less than Mathur's high-end estimate.

[23] While it has become acceptable to use statistical inference in determining aggregate damages in a class action suit (*e.g.,* 3 A. Conte & H. Newberg, Newberg on Class Actions § 10:2, at 478 (4th ed.2002)), it also is understood that the possibility of error involved in such an approach may exceed constitutional bounds. See, *e.g., Bell v. Farmers Insurance Exchange,* 115 Cal.App.4th 715, 746-57, 9 Cal.Rptr.3d 544, 571-80 (2004). In *Bell,* for example, the court rejected a determination of aggregate**834** damages, noting that "the possible inaccuracy of the estimate of unpaid double-time compensation presents an issue of constitutional dimension." *Bell,* 115 Cal.App. 4th at 756, 9 Cal.Rptr.3d at 579. See also *In re Chevron U.S.A., Inc.,* 109 F.3d 1016, 1020-21 (5th Cir.1997) ("a procedure is inherently unfair when the substantive rights of * * * the defendant are resolved in a manner that lacks the requisite level of confidence in the reliability of its result").

In the case at bar, the range between Mathur's high-end and low-end estimates for installation damages was half a billion dollars. Moreover, as previously indicated, Mathur conceded that his estimates could be incorrect by as much as $1 billion. A due process violation is clearly established where the method for determining damages has the potential to increase a defendant's aggregate liability by as much as $1 billion over what is warranted. See *Bell,* 115 Cal.App. 4th at 751-53, 9 Cal.Rptr.3d at 575-76; *Hilao v. Estate of Marcos,* 103 F.3d 767, 786 (9th Cir.1996).

Notwithstanding the foregoing, the appellate court below concluded that there was "little danger that ineligible class members will receive a share of this award [installation damages]." 321 Ill.App.3d at 290, 254 Ill.Dec. 194, 746 N.E.2d 1242. In support of this view, the appellate court pointed, *inter alia,* to the size of the jury's installation damages award, which was "approximately $1 billion less than the expert's estimate." 321 Ill.App.3d at 289, 254 Ill.Dec. 194, 746 N.E.2d 1242. Unlike the appellate court, we find little comfort in the size of the jury's installation damages award. In our view, it is

troubling, rather than reassuring, that Mathur's half-billion-dollar range for installation damages was found by the jury to be too narrow, by another half-billion dollars. In other words, the jury had so little confidence in even the lowest estimate for installation damages that the jury found it necessary to reduce that figure by $500 million. This suggests that the jury's award of aggregate installation damages was based, not on Mathur's expert testimony, but on pure speculation and conjecture.

[24] The potential for inaccuracy in Mathur's installation-damages estimates is simply too great to support an award of damages. See *Bell,* 115 Cal.App.4th at 751-56, 9 Cal.Rptr.3d at 575-79. While expert testimony in support of damages awards may be couched in terms of probabilities or possibilities, there is a need for a reasonable degree of certainty in such testimony. See *Brown v. Chicago & North Western Transportation Co.,* 162 Ill.App.3d 926, 937-38, 114 Ill.Dec. 165, 516 N.E.2d 320 (1987). Here, given the fact that Mathur conceded that the margin of error in his estimate of the amount of installation damages was a billion dollars, the requisite degree of reasonable certainty is lacking. In our view, there is no valid basis for upholding the award of installation damages for the nationwide class and, thus, no valid basis for awarding such damages with regard to a subclass.

In sum, the jury verdict on the breach of contract claim cannot be affirmed. The jury was incorrectly instructed that the operative language in State Farm's various policy forms could be given a uniform interpretation. Further, the verdict cannot be affirmed for any subclass comprised of policyholders who were insured under any of the relevant individual policy forms. The reason is that plaintiffs' claim for breach of contract fails on the merits. State Farm's specification of non-OEM parts did not constitute a breach of any of the relevant individual policy forms, whether the policies at issue were those containing the "like kind and quality" **835** promise, or those containing the "pre-loss condition" and the "you agree" language, or whether the policies at issue were the Massachusetts or "assigned risk" policies. Moreover, plaintiffs have failed to establish contract damages. With regard to specification damages, there is no basis in the law for this theory. In addition, while the installation damages were derived from a model based on an actual loss, the evidence offered in support of them was too speculative and uncertain to support an award of damages. Accordingly, we reverse the jury's verdict that State Farm breached its contractual obligations. In view

835 N.E.2d 801
216 Ill.2d 100, 835 N.E.2d 801, 296 Ill.Dec. 448
**(Cite as: 216 Ill.2d 100, 835 N.E.2d 801)**

Page 30

of our disposition of plaintiffs' contract claim, we need not reach State Farm's other arguments with regard to breach of contract.

One point raised by the dissent merits response. The dissent states that this court has "ben[t] over backwards" to rule in State Farm's favor (216 Ill.2d at 223, 296 Ill.Dec. at 521, 835 N.E.2d at 874 (Freeman, J., concurring in part and dissenting in part, joined by Kilbride, J.)), that we have "vilifi[ed]" and "humiliated" plaintiffs' counsel (216 Ill.2d at 229, 238, 296 Ill.Dec. at 524, 529, 835 N.E.2d at 877, 882 (Freeman, J., concurring in part and dissenting in part, joined by Kilbride, J.)) and "demeaned" the courts below (216 Ill.2d at 238, 296 Ill.Dec. at 529, 835 N.E.2d at 882 (Freeman, J., concurring in part and dissenting in part, joined by Kilbride, J.)), and that the result in this case has not been arrived at by an evenhanded application of the law, but because this court has developed "a new hostility" to class actions and wishes to "send[ ] a message" that "different standards" will be applied to cases arising out of the Fifth District of our appellate court (216 Ill.2d at 237-38, 296 Ill.Dec. at 529, 835 N.E.2d at 882 (Freeman, J., concurring in part and dissenting in part, joined by Kilbride, J.)).[FN8] In other words, according to the dissent, this court's decision to reverse the verdict on plaintiffs' breach of contract count is the result of bias and extralegal considerations. This is emphatically not true. This appeal has been decided pursuant to the same standards that are applied to every case that is brought before this court. Moreover, we have not fashioned any changes to the legal rules governing class actions, let alone ones that are "hostile" to this procedural device. In deciding plaintiffs' breach of contract claim we have not acted with bias or favoritism but, instead, have applied the law objectively to the facts of record with no purpose other than to reach a just result. The dissent's assertions to the contrary are unfounded and inappropriate.

FN8. The dissent agrees that the verdict in favor of plaintiffs on the consumer fraud count must be reversed in its entirety. 216 Ill.2d at 234-35, 296 Ill.Dec. at 527-28, 835 N.E.2d at 880-81 (Freeman, J., concurring in part and dissenting in part, joined by Kilbride, J.). Thus, the dissent's statement that this court is now employing "different standards" to class action cases arising out of the Fifth District (216 Ill.2d at 238, 296 Ill.Dec. at 529, 835 N.E.2d at 882 (Freeman,

J., concurring in part and dissenting in part, joined by Kilbride, J.)), must apply only to those cases alleging breach of contract.

## II. Consumer Fraud Act

State Farm raises several arguments regarding the circuit court's judgment that State Farm violated the Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act or Act) (815 ILCS 505/2 (West 1998)). Before addressing these arguments, we examine the factual background of plaintiffs' consumer fraud count in detail.

This case did not begin as a consumer fraud action. As originally pled, plaintiffs' class action complaint contained only a single count for breach of contract. Plaintiffs added count II, in which they alleged that **836** State Farm violated the Consumer Fraud Act, in their "Second Amended Class Action Complaint (A)."

Although their class action complaint was subsequently amended, the relevant portion of plaintiffs' consumer fraud count remained unchanged. In their consumer fraud count, plaintiffs alleged the following:

"Among the unlawful practices that defendant engaged in was the practice of installing non-OEM crash parts in its insureds' vehicles that were inferior, substandard parts, when State Farm had promised and was obligated to undertake repairs on damaged vehicles using only parts of like kind and quality, so as to restore the vehicles to their pre-loss condition.
* * * By way of false or deceptive pretenses, acts, or practices, defendant did not disclose to plaintiffs that they were: a) using inferior, imitation parts that diminished the value of their vehicles; and/or b) paying the cost of cheaper imitation parts when available and refusing to pay for OEM parts, thereby causing class members and/or their repair shops to absorb the cost difference."

After plaintiffs added their consumer fraud count, State Farm argued that it was simply a duplicate of the breach of contract count and, therefore, should be dismissed. State Farm pointed in particular to the language in plaintiffs' complaint which asserts that State Farm violated the Consumer Fraud Act by installing inferior parts despite having "promised" to use parts of "like kind and quality." [FN9] This language, according to State Farm, was nothing more than a restatement by plaintiffs that State Farm had breached a contractual promise. And, State Farm

argued, under decisions such as *DeLeon v. Beneficial Construction Co.*, 55 F.Supp.2d 819, 826 (N.D.Ill.1999), and *Petri v. Gatlin*, 997 F.Supp. 956, 967-68 (N.D.Ill.1997), a breach of a contractual promise cannot serve as the basis for a statutory consumer fraud action.

> FN9. Plaintiffs made similar statements in various other filings in the circuit court. For example, in "Class Plaintiffs' Reply to State Farm's Informational Memorandum of Law on Plaintiffs' Causes of Action," plaintiffs wrote the following: "State Farm contends that 'Plaintiffs have only vaguely alluded to any specific misrepresentation or omission.' *See* Def. Mem. at 13. This contention is ludicrous. Plaintiffs repeatedly have stated that State Farm's practice of promising in Plaintiffs' policies to restore Plaintiffs' vehicles to pre-loss condition by using parts of like kind and quality, but nonetheless using inferior non-OEM crash parts which were not of like kind and quality and which did not restore Plaintiffs' vehicles to their pre-loss condition violated the CFA [Consumer Fraud Act]." Similarly, in their written opposition to State Farm's motions for summary judgment on class claims and against the named plaintiffs, plaintiffs identified the fraudulent misrepresentation as "State Farm's promis[e] in the policy to restore Plaintiffs' vehicles to pre-loss condition by using parts of like kind and quality."

Confronted with the argument that its consumer fraud count was simply a redressed version of its breach of contract count, plaintiffs retreated somewhat from the language in their complaint. During the hearing on State Farm's motion to decertify the class and motions for summary judgment, plaintiffs clarified to the circuit court that the consumer fraud count was not premised on "the drafting, or the sale or even the interpretation" of a contract. Instead, according to plaintiffs, the consumer fraud count was based on actions, representations and omissions which occurred during the claims process, *i.e.,* after the policyholder brought his or her car to an adjuster or body shop to receive an estimate and repair. This shift in emphasis was significant. By focusing on **\*837** statements and actions which occurred during the claims process, rather than promises contained in the contract, plaintiffs were able to persuade the circuit court that the consumer fraud count was truly

independent from the breach of contract count. Thus, as the circuit court noted, the jury could "say there's a breach of contract, but that doesn't necessarily mean there's been Consumer Fraud."

In support of their argument that State Farm made fraudulent representations and omissions during the claims process, plaintiffs relied on four documents. The first document was the estimate given to each of the named plaintiffs after his or her car had been examined by a State Farm claims adjuster. Each of these estimates consisted of a computer-generated printout that listed the parts that were to be put on the plaintiff's car, along with the prices of the parts. The estimates also give the source or type of each part. Non-OEM parts are listed as "Quality Replacement Parts," while OEM parts are listed along with the manufacturer's name. Although the named plaintiffs' estimates varied because of the individual nature of the repairs, each estimate used the term "quality replacement part." Thus, for example, on plaintiff Sam DeFrank's estimate, the "Part Type" for the various parts on the estimate is listed as "Quality Replacement Part," "GM Part" or "Order From Dealer." Plaintiffs alleged that each member of the class, like DeFrank, received an estimate that included the term "quality replacement part." A copy of DeFrank's estimate is attached to this opinion as Appendix A.

Stamped on DeFrank's estimate in the upper left-hand corner of the first page are the words, "Read the Attached Information Regarding Quality Replacement Parts Not Made By The Original Equipment Manufacturer." This statement refers to a document, known as a "half sheet," which was attached to repair estimates that included non-OEM parts. On the half sheet is a disclosure which states, in part, "THIS ESTIMATE HAS BEEN PREPARED BASED [*sic*] ON THE USE OF AFTERMARKET CRASH PARTS SUPPLIED BY A SOURCE OTHER THAN THE MANUFACTURER OF YOUR MOTOR VEHICLE." A copy of the half sheet is attached to this opinion as Appendix B.

The second item relied upon by plaintiffs was a brochure produced by State Farm titled "Quality Replacement Parts." This brochure was allegedly given to each member of the consumer fraud class, usually at the time the insured received his or her estimate. In this brochure, State Farm refers to non-OEM parts as "quality replacement parts" and states that "[o]nly those parts which meet our very high performance criteria are acceptable." Also included in the brochure is a guarantee which states that if the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

835 N.E.2d 801                                                                                                  Page 32
216 Ill.2d 100, 835 N.E.2d 801, 296 Ill.Dec. 448
**(Cite as: 216 Ill.2d 100, 835 N.E.2d 801)**

policyholder is unsatisfied with the "fit and corrosion resistance qualities" of the replacement parts, then State Farm will repair or replace the parts at no cost to the policyholder. A copy of the brochure is attached to this opinion as Appendix C.

Unlike the estimates and the brochure, the third and fourth items identified by plaintiffs-articles in a newsletter and a magazine-were not given to the policyholders during the claims process. Instead, these items were promotional or informational materials produced by State Farm. Plaintiffs used these materials to illustrate State Farm's marketing and use of the term "quality replacement parts."

The newsletter which the plaintiffs relied upon is titled "Good Neighbor News" and is dated "Fall 1993." The newsletter which is of record is in the form of a mailing and has a return address of a State Farm agent based in Michigan. The **838** mailing address on the newsletter states generically, "Policyholder Name; Policyholder Address." A brief article discussing the high price of OEM parts appears on the third page of the newsletter. In the middle of the article there is this quote: "High prices for parts is a major reason why it costs so much to repair a car that's been damaged. And that's why State Farm is a big fan of what we call 'quality replacement parts.' These parts are identical to-or better than-the original equipment manufacturers' parts, but cost a lot less."

The fourth and final item identified by plaintiffs is an article from the April 1990 issue of a magazine called "Reflector," a State Farm publication circulated to State Farm agents. The article at issue, titled "Quality Replacement Parts," gives a general overview of State Farm's use of non-OEM parts. Underneath the title to the article appears this caption: "One of the bumpers on the cover of this *Reflector* was produced by the original equipment manufacturer. The other is a quality replacement part produced by another company. The same is true of the other pairs [of parts shown]. The parts are identical except for one thing-the price."

As noted, the plaintiffs' focus on the actions taken by State Farm during the claims process made it possible for plaintiffs to pursue a separate count for consumer fraud. It also made possible a second important objective of plaintiffs-class certification. Because the consumer fraud claim was based on the uniform representations contained in State Farm's written claims documents and not, for example, on the myriad different oral representations that occurred

during the sales of the class members' policies, plaintiffs were able to convince the circuit court that there was a common question of fact which predominated over the class. In its order certifying the nationwide consumer fraud class (in language taken verbatim from plaintiffs' filing in support of certification), the circuit court stressed the uniformity of the representations made during the claims process:

"As to the consumer fraud allegations, the facts presented at the certification hearing on State Farm's methods of disclosing to policyholders its use of non-OEM parts also demonstrates a course of conduct common to all class members. When such parts are used on an estimate, the policyholder is given a State Farm brochure discussing the use of non-OEM parts. Defendant's Exhibit 24; Certification Hearing at 0124-25. The estimate is then stamped indicating the use of non-OEM parts. Defendant's Exhibit 27. State Farm has also promoted the use of the term 'quality replacement parts' nationwide in an effort to promote its substitution of non-OEM for OEM parts. Plaintiffs' Exhibits 115 and 116.[FN10]

FN10. Plaintiffs' exhibits 115 and 116 are two internal State Farm memoranda which discuss the term "quality replacement parts." There is no allegation that these memoranda were ever seen by any member of the class.

The Court finds that the evidence introduced at the certification hearing demonstrate 'a series of essentially identical transactions,' *Miner [v. Gillette Company*], 87 Ill.2d [7] at 19 [,56 Ill.Dec. 886], 428 N.E.2d [478] at 484 [ (1981) ], between State Farm and its insureds, which transactions routinely result in the use of non-OEM parts."

In its certification order, the circuit court also determined that the Consumer Fraud Act could, as a matter of statutory interpretation, be applied to members of the plaintiff class who did not reside in **839** Illinois. The court further concluded that applying the Consumer Fraud Act to the entire class presented no choice-of-law or constitutional problems. In its subsequent "Order Regarding Law to be Applied to Class Members' Claims," the circuit court explained its reasoning:

"With respect to the claims under the Illinois Consumer Fraud Act, the court finds there are no true conflicts of law raised by the specific claims or facts at issue in this case which require application of the law of any state other than Illinois. *Martin v.*

835 N.E.2d 801

216 Ill.2d 100, 835 N.E.2d 801, 296 Ill.Dec. 448

**(Cite as: 216 Ill.2d 100, 835 N.E.2d 801)**

Page 33

*Heinhold* [*Heinold*] *commoDities, inc.,* 117 ill.2d 67 [, 109 ILL.DEc. 772], 510 n.e.2D 840 (1987) and *Gordon v. Boden,* 224 Ill.App.3d 195 [, 166 Ill.Dec. 503], 586 N.E.2d 461 (1st Dist.1991) have approved the application of the Illinois Consumer Fraud Act to the claims of out-of-state plaintiffs. State Farm was chartered and is headquartered in Illinois. State Farm affirmatively uses and consents to the jurisdiction of Illinois courts. It is alleged that the conduct at issue emanated from activities in Illinois. Given the aggregation of contacts of State Farm with this jurisdiction, and the allegations that the conduct at issue emanated from activities in Illinois, Illinois possesses sufficient contacts so that the application of the Illinois Consumer Fraud Act to all class claims is neither unreasonable nor unfair and comports with due process. Further, application of the Illinois Consumer Fraud Act to all claims will not interfere with any other jurisdictions' legislative, regulatory or administrative policies * * *."

Based on its finding that a common fact predominated, and that the Consumer Fraud Act could be applied to out-of-state residents, the circuit court certified a nationwide class consisting of
"[a]ll persons in the United States, except those residing in Arkansas and Tennessee, who, between July 28, 1994, and February 24, 1998, (1) were insured by a vehicle casualty insurance policy issued by Defendant State Farm and (2) made a claim for vehicle repairs pursuant to their policy and had non-factory authorized and/or non-OEM * * * 'crash parts' installed on their vehicles or else received monetary compensation determined in relation to the cost of such parts."

At trial, the five named plaintiffs testified to the representations made and actions taken by State Farm during each of their claims proceedings. Each plaintiff stated that he or she had received a car-repair estimate, and all but one stated that they had received the "Quality Replacement Parts" brochure. The point in the repair process at which the plaintiffs received the brochure, and whether they read it, varied from plaintiff to plaintiff. Shadle, for example, testified that he received his estimate and "Quality Replacement Parts" brochure when the claims adjuster first looked at his car, but that he did not read the brochure. Avery stated that he received his estimate and brochure in the mail after taking his car to an adjuster, that he read the brochure, and that he was "extremely concerned" about what it said. Vickers first saw her written estimate when she went

to pick up her car after it was repaired, although her body shop told her early in the repair process that non-OEM parts were going to be used. She did not say whether she received or read the brochure. Like Vickers, Covington did not see his estimate prior to the repairs being started, although his body shop informed him that non-OEM parts were being used. Covington received and read his brochure after the repairs were finished. DeFrank testified that he received his estimate and brochure **\*840** from the claims adjuster prior to the repair of his pickup truck. He read the brochure and became "very upset." Notably, none of the five plaintiffs testified that they saw, read or were aware of the articles in the "Good Neighbor News" newsletter or the " Reflector" magazine.

At the conclusion of trial, the circuit court found that State Farm had violated the Consumer Fraud Act with respect to the five named plaintiffs and the class as a whole. In its judgment order, the circuit court noted that a violation of the Consumer Fraud Act could not be proven simply by showing a breach of a contractual promise:
"The court, after considering all the evidence, finds, as did the jury, that State Farm did breach its contract with the plaintiffs, that the non-OEM 'crash parts' specified and used by State Farm were not of 'like kind and quality' and did not restore plaintiffs' vehicles to their pre-loss condition as required by the insurance contract between State Farm and the plaintiffs. These findings do not on their own establish a violation of the Act. The court must now consider whether the evidence also establishes the elements, set forth above, which are required to prove a violation of the Consumer Fraud Act."

After stating the above, the circuit court set forth what it concluded were the deceptive acts perpetrated by State Farm. The circuit court stated:"The plaintiffs allege, under Count II and Count III of the Third Amended Class Action Complaint, that State Farm violated the Consumer Fraud Act. The Plaintiffs['] allegations include, without limitation, that State Farm installed inferior non-OEM 'crash parts' on the plaintiffs' vehicles when it was obligated under its insurance policies with the plaintiffs to use 'crash parts' of 'like kind and quality' which would restore plaintiffs' vehicles to their 'pre-loss condition' and that State Farm failed to disclose to plaintiffs that it was using and paying for cheaper, inferior non-OEM 'crash parts' to repair plaintiffs' vehicles.
After considering all the testimony and evidence admitted at trial, the court finds that the plaintiffs have proven that State Farm violated the Consumer

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

835 N.E.2d 801                                                                                          Page 34
216 Ill.2d 100, 835 N.E.2d 801, 296 Ill.Dec. 448
**(Cite as: 216 Ill.2d 100, 835 N.E.2d 801)**

Fraud Act and that none of the defenses asserted by State Farm bar plaintiffs' right to recover under the Act or reduce the amount of plaintiffs' recovery.

State Farm, prior to and during the class period for the Consumer Fraud Act plaintiffs, knew that the non-OEM 'crash parts' it was specifying on its policyholders' repair estimates were not of 'like kind and quality' and would not restore their policyholders' vehicles to 'pre-loss condition.' State Farm's knowledge of the inferiority of the non-OEM 'crash parts' is clearly shown [*sic*] the testimony of witnesses, State Farm's own internal documents, CAPA documents (State Farm was instrumental in the creation of CAPA. CAPA's stated purpose was to certify quality non-OEM 'crash parts' and State Farm officers and management served on CAPA's board prior to and during the class period for Consumer Fraud Act plaintiffs) of which State Farm had knowledge, and other documents, all of which were admitted into evidence and appear in the trial court record. Rather than telling its policyholders of the known problems with the non-OEM 'crash parts,' including possible safety concerns, State Farm chose to adopt and use on its estimates the misleading term 'Quality Replacement Parts,' and to tell its policyholders, in various written documents which were admitted into evidence, that the **\*841** parts were as good, or better than, OEM parts. Further, the written disclosures stamped on or attached to the repair estimates or which were delivered with the repair estimates, did nothing to advise the State Farm policyholder of the inferiority of the parts. Finally, State Farm's 'Guarantee' improperly and unfairly placed the burden of securing a quality repair on the policyholder, not State Farm.

State Farm is a mutual insurance company which operates for the benefit of its policyholders. State Farm occupies a position of trust with its policyholders, who pay the required premiums and are entitled to receive all the benefits State Farm promises to provide in its insurance contract with them. State Farm violated this trust. The court finds that State Farm, in light of its knowledge of the inferiority of non-OEM 'crash parts,' misrepresented, concealed, suppressed or omitted material facts concerning the non-OEM 'crash parts,' with the intent that its policyholders rely upon on [*sic*] these deceptions, in violation of the Consumer Fraud Act."

In succinct fashion, the circuit court also held that State Farm's deceptive acts had proximately caused the named plaintiffs and the class as a whole actual damages and that the actual damages were defined in the same terms as they were under the breach of

contract count:

"The court further finds that as a direct and proximate result of State Farm's violation of the Consumer Fraud Act, the plaintiffs were injured and incurred actual damages; namely the specification/direct damages and installation damages which occurred during the class period for Consumer Fraud Act plaintiffs."

Because the consumer fraud damages were identical to the breach of contract damages, the circuit court reasoned that an award of actual damages for consumer fraud would constitute a double recovery. The circuit court therefore declined to award plaintiffs "actual economic damages" (815 ILCS 505/10a(a) (West 2002)) under the Consumer Fraud Act. The circuit court did, however, award plaintiffs $130 million in "disgorgement" damages and $600 million in punitive damages.

On appeal, the appellate court affirmed the circuit court's certification of a nationwide class for consumer fraud. As in the circuit court, the appellate court held that a common question of fact predominated for the class based upon State Farm's uniform practice of specifying non-OEM parts and providing its insureds with a written estimate and a "Quality Replacement Parts" brochure:

"In regard to the consumer-fraud claim, the record contained evidence that State Farm engaged in an ongoing course of conduct nationwide, in which it specified inferior non-OEM parts whenever those parts were cheaper and available, that State Farm knew those parts were inferior, that State Farm did not inform its policyholders of the problems with those parts, and that State Farm affirmatively misrepresented the condition of those parts by assuring policyholders-on the damage estimates and in brochures-that it specified only 'quality replacement parts' and that it guaranteed the parts at no additional cost." 321 Ill.App.3d at 280-81, 254 Ill.Dec. 194, 746 N.E.2d 1242.

Like the circuit court, the appellate court also held that the Consumer Fraud Act could be applied to consumers residing out-of-state. Citing *Martin v. Heinold Commodities, Inc.,* 117 Ill.2d 67, 109 Ill.Dec. 772, 510 N.E.2d 840 (1987), the appellate court determined that non-Illinois consumers are "permitted to pursue an action **\*842** under the Act against a resident defendant where the deceptive acts and practices [are] perpetrated in Illinois." 321 Ill.App.3d at 281, 254 Ill.Dec. 194, 746 N.E.2d 1242.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

835 N.E.2d 801                                                                                                      Page 35
216 Ill.2d 100, 835 N.E.2d 801, 296 Ill.Dec. 448
**(Cite as: 216 Ill.2d 100, 835 N.E.2d 801)**

The appellate court then concluded: "The evidence demonstrates that the deceptive claims practices occurred in Illinois. It was in Illinois that the claims practices were devised and procedures for implementation were prepared for dissemination in other states." 321 Ill.App.3d at 282, 254 Ill.Dec. 194, 746 N.E.2d 1242. Finally, the appellate court affirmed the circuit court's finding that there were "no true conflicts" between the Consumer Fraud Act and other states' consumer fraud laws and that "Illinois has significant contacts to the claims asserted by each class member." 321 Ill.App.3d at 282, 254 Ill.Dec. 194, 746 N.E.2d 1242. From this, the appellate court concluded that there was no constitutional barrier to applying the Consumer Fraud Act to the claims of plaintiffs who resided out-of-state. 321 Ill.App.3d at 282-83, 254 Ill.Dec. 194, 746 N.E.2d 1242.

With respect to the merits of the claim, State Farm repeated its argument to the appellate court that plaintiffs' consumer fraud claim was nothing more than a restatement of the breach of contract claim. Citing to several decisions from the appellate court in support of this argument, including *Zankle v. Queen Anne Landscaping*, 311 Ill.App.3d 308, 312, 244 Ill.Dec. 100, 724 N.E.2d 988 (2000), State Farm argued that the trial court's finding of liability under the Consumer Fraud Act should be reversed. The appellate court rejected this contention, finding that "[t]he evidence of State Farm's deceptive claims practices moves this case beyond a mere contract breach." 321 Ill.App.3d 269, 254 Ill.Dec. 194, 746 N.E.2d 1242 (quote contained in a portion of the opinion unpublished under Supreme Court Rule 23).

State Farm also argued to the appellate court that it was not liable under the Consumer Fraud Act for the affirmative representations it made to plaintiffs because those representations were merely puffing and, therefore, not actionable. The appellate court rejected this argument, stating:
"In our view, [State Farm's] representations assigned 'virtues' to non-OEM parts that they did not possess. See *Totz v. Continental Du Page Acura*, 236 Ill.App.3d 891, 905 [, 177 Ill.Dec. 202, 602 N.E.2d 1374] (1992); *Rumford v. Countrywide Funding Corp.*, 287 Ill.App.3d 330, 336 [, 222 Ill.Dec. 757, 678 N.E.2d 369] (1997). They are representations that a reasonable policyholder would have interpreted as fact." 321 Ill.App.3d 269, 254 Ill.Dec. 194, 746 N.E.2d 1242 (quote contained in a portion of the opinion unpublished under Supreme Court Rule 23).

Finally, State Farm argued to the appellate court that the evidence was insufficient to establish that the actions, representations or omissions which occurred during the claims process proximately caused injury to any of the class members. The appellate court rejected this argument too:
"Plaintiffs presented evidence that the non-OEM parts which State Farm specified were categorically inferior, that State Farm specified non-OEM parts that it knew to be inferior, that State Farm did not inform its policyholders that the non-OEM parts it specified were inferior, and that State Farm knowingly represented on its estimates, in its 'Quality Replacement Part[s]' brochures, and through its estimators that these non-OEM parts were of equal quality or better than OEM parts. There is evidence that State Farm's material misrepresentations led numerous class members to blindly accept the non-**\*843** OEM parts specified (*i.e.*, without knowledge of the inferior condition of those parts). See *Perona [v. Volkswagen of America, Inc.]*, 292 Ill.App.3d [59] at 68-69 [, 225 Ill.Dec. 868, 684 N.E.2d 859(1997) ]; *Johnston v. Anchor Organization for Health Maintenance*, 250 Ill.App.3d 393, 397, 190 Ill.Dec. 268, 621 N.E.2d 137 (1993). There is overwhelming evidence of State Farm's calculated deception of its policyholders in a deliberate disregard of its express written promises contained in the policies issued. The deceit was deliberate and universally employed for the purpose of obtaining unearned, illegitimate monetary gain. This was an ill-gotten gain, acquired at the expense of persons that trusted and relied upon State Farm for honest, fair treatment. There is an abundance of evidence to support the trial court's finding that the class members' injuries were proximately caused by State Farm's deceptive conduct." 321 Ill.App.3d 269, 254 Ill.Dec. 194, 746 N.E.2d 1242 (quote contained in a portion of the opinion unpublished under Supreme Court Rule 23).

Based on this reasoning, the appellate court affirmed the judgment of the circuit court holding that State Farm had violated the Consumer Fraud Act. The appellate court also affirmed the circuit court's $600 million punitive damage award. However, the appellate court reversed the $130 million in disgorgement damages, holding that it constituted an impermissible double recovery. State Farm then appealed.

On appeal, State Farm contests the circuit court's certification of a nationwide consumer fraud class, as well as the circuit court's judgment in favor of plaintiffs on the merits. We first examine, however,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the nature of plaintiffs' consumer fraud claim.

### A. *Plaintiffs' Consumer Fraud Claim*

[25] Surprisingly, although plaintiffs' allegation of consumer fraud has been in litigation for several years, and a statutory consumer fraud claim must be pled with specificity (*Connick v. Suzuki Motor Co., 174 Ill.2d 482, 501, 221 Ill.Dec. 389, 675 N.E.2d 584 (1996)*), there is still some confusion-as evinced by plaintiffs' arguments before this court-as to exactly what conduct of State Farm is at issue under the consumer fraud claim. To clarify what is at issue, it will be helpful to identify that conduct which we can readily conclude does *not* support plaintiffs' consumer fraud claim.

### 1. Plaintiffs' Consumer Fraud Claim May Not Be Based on a Breach of a Promise Contained in Their Insurance Policies

[26] Before the circuit court, plaintiffs maintained that their consumer fraud count was not based on "the drafting, or the sale or even the interpretation" of any class member's insurance policy. Yet in their brief before this court, plaintiffs repeatedly point to State Farm's contractual promises to define the consumer fraud. Plaintiffs state, for example, that State Farm disregarded "the express written promises in its policies," that there was "no evidence that Plaintiffs or the class knew, expected or understood that State Farm would specify parts that failed to fulfill its contractual obligations," and that "[t]he law implies and recognizes the expectation, understanding and belief that State Farm would fulfill its contractual obligation." Similarly, although both the circuit court and the appellate court stated that plaintiffs' consumer fraud count was not based on a breach of a contractual promise, each court referenced State Farm's failure to fulfill its policy obligations in its analysis of plaintiffs' consumer**\*844** fraud claim. The appellate court in particular, in upholding the circuit court's consumer fraud judgment, pointedly relied on State Farm's "deliberate disregard of its express written promises contained in the policies issued." 321 Ill.App.3d 269, 254 Ill.Dec. 194, 746 N.E.2d 1242 (quote contained in a portion of the opinion unpublished under Supreme Court Rule 23). These repeated references to simple breaches of contractual promises in support of the consumer fraud count are in error.

[27] A breach of contractual promise, without more,

is not actionable under the Consumer Fraud Act. *American Airlines, Inc. v. Wolens, 513 U.S. 219, 233, 115 S.Ct. 817, 826, 130 L.Ed.2d 715, 728 (1995),* quoting *Golembiewski v. Hallberg Insurance Agency, Inc., 262 Ill.App.3d 1082, 1093, 200 Ill.Dec. 113, 635 N.E.2d 452 (1994).* As our appellate court has explained:

"What plaintiff calls 'consumer fraud' or 'deception' is simply defendants' failure to fulfill their contractual obligations. Were our courts to accept plaintiff's assertion that promises that go unfulfilled are actionable under the Consumer Fraud Act, consumer plaintiffs could convert any suit for breach of contract into a consumer fraud action. However, it is settled that the Consumer Fraud Act was not intended to apply to every contract dispute or to supplement every breach of contract claim with a redundant remedy. See *Law Offices of William J. Stogsdill v. Cragin Federal Bank for Savings, 268 Ill.App.3d 433, 437-38 [, 206 Ill.Dec. 559, 645 N.E.2d 564] (1995); Golembiewski v. Hallberg Insurance Agency, Inc., 262 Ill.App.3d 1082, 1093 [, 200 Ill.Dec. 113, 635 N.E.2d 452] (1994).* We believe that a 'deceptive act or practice' involves more than the mere fact that a defendant promised something and then failed to do it. That type of 'misrepresentation' occurs every time a defendant breaches a contract." *Zankle v. Queen Anne Landscaping, 311 Ill.App.3d 308, 312, 244 Ill.Dec. 100, 724 N.E.2d 988 (2000).*

Accord, *e.g., Kleczek v. Jorgensen, 328 Ill.App.3d 1012, 1022, 263 Ill.Dec. 187, 767 N.E.2d 913 (2002); Lake County Grading Co. of Libertyville, Inc. v. Advance Mechanical Contractors, Inc., 275 Ill.App.3d 452, 460, 211 Ill.Dec. 299, 654 N.E.2d 1109 (1995); Exchange National Bank v. Farm Bureau Life Insurance Co. of Michigan, 108 Ill.App.3d 212, 216, 63 Ill.Dec. 884, 438 N.E.2d 1247 (1982); DeLeon v. Beneficial Construction Co., 55 F.Supp.2d 819, 826 (N.D.Ill.1999); Petri v. Gatlin, 997 F.Supp. 956, 967-68 (N.D.Ill.1997).*

Both the circuit court and appellate court recognized this principle but both courts failed to apply it consistently. As a matter of law, plaintiffs' consumer fraud claim may not be based on the assertion that State Farm breached its promise to restore plaintiffs' vehicles to their "pre-loss condition" or that State Farm breached its promise to repair plaintiffs' vehicles using parts of "like kind and quality."

### 2. This Case Is Not About the Specification of Defective Parts

835 N.E.2d 801                                                                                                                    Page 37
216 Ill.2d 100, 835 N.E.2d 801, 296 Ill.Dec. 448
**(Cite as: 216 Ill.2d 100, 835 N.E.2d 801)**

Before this court, plaintiffs do not claim to have proven that any of the non-OEM parts specified by State Farm in its repair estimates were defective. This is in keeping with plaintiffs' position at trial. Plaintiffs deliberately avoided any theory relating to defective parts at trial because such a theory would have significantly increased their burden of proof. Such a theory would also have rendered class certification far less likely, since the common question of fact or law necessary for certification would have been more difficult to establish if plaintiffs had been forced to prove that each individual non-OEM part, **\*845** or grouping of parts, was defective.     Thus, before the circuit court, plaintiffs' counsel made it very clear that they were *not* trying to prove that any of the non-OEM parts at issue were defective, at one point saying: "[A]s we've stated this is not a defect case.   We are not proving and we are not required to prove that the parts are defective."

What plaintiffs do claim to have established at trial is a proposition far more general than whether any of the specified non-OEM parts were defective. Plaintiffs claim to have proven that non-OEM parts, as a whole, are not as good as OEM parts.   Or, to use plaintiffs' terminology, that non-OEM parts are "categorically inferior" to OEM parts.   But "categorically inferior" is not the same thing as "categorically defective."   This point is important.

[28] In their written opinions, both the circuit court and the appellate court refer to State Farm's specification of "categorically inferior" parts as if the act of specifying nondefective parts, by itself, is fraudulent.   The appellate court, for example, in describing State Farm's allegedly deceptive acts, notes that "[p]laintiffs presented evidence that the non-OEM parts which State Farm specified were categorically inferior, [and] that State Farm specified non-OEM parts that it knew to be inferior."   321 Ill.App.3d 269, 254 Ill.Dec. 194, 746 N.E.2d 1242 (quote contained in a portion of the opinion unpublished under Supreme Court Rule 23).   However, it is no more fraudulent-in and of itself-to specify non-OEM parts while knowing that they are not as good as OEM parts than it is to sell Chevrolet automobiles while knowing that they are not as good as Cadillacs.   Whether the consumer product is automobiles, toasters or something else, there will always be some brands of that product that are not as good as, or which are "categorically inferior" to, other brands of the same product.   The state's economy would come to a grinding halt if the sale of

anything less than the single, best brand of every consumer good were considered fraudulent.

What makes the specification of the *nondefective,* non-OEM part potentially fraudulent are the statements which are made, or not made, about the product.   It is the omissions and representations State Farm made about non-OEM parts-not simply the act of specifying non-OEM parts-that must form the basis of plaintiffs' consumer fraud action.

3. The Representations Which Form the Basis of Plaintiffs' Cause of Action for Consumer Fraud Do Not Include the Statement That Non-OEM Parts Are as Good as OEM Parts

The appellate court based its holding that State Farm violated the Consumer Fraud Act, in part, on its findings that "State Farm knowingly represented on its estimates [and] in its 'Quality Replacement Parts' brochures" that non-OEM parts "were of equal quality or better than OEM parts."   321 Ill.App.3d 269, 254 Ill.Dec. 194, 746 N.E.2d 1242 (quote contained in a portion of the opinion unpublished under Supreme Court Rule 23).   These findings, however, are incorrect.   Neither the written estimates nor the "Quality Replacement Parts" brochures which the named plaintiffs received from State Farm contain the statement that non-OEM parts are "of equal quality to or better than OEM parts."     See Appendix A and Appendix C.

[29] As previously noted, two of the State Farm documents relied upon by plaintiffs in this case, the "Good Neighbor News" newsletter and the "Reflector" magazine, do contain the statement that non-OEM parts are as good as, or better than, OEM parts.   However, there is no **\*846** evidence that any of the named plaintiffs ever read, saw or were in any way aware of these documents.     This is not surprising.   The "Good Neighbor News" newsletter which is of record is dated "Fall 1993," one year before the starting date of the consumer fraud class period and approximately three years before the earliest of the five named plaintiffs' accidents occurred.     The "Reflector" magazine article was circulated to State Farm agents, not policyholders, and was published in 1990, some six years before the earliest of the named plaintiffs' accidents and four years before the starting date of the class period.

In its order certifying the nationwide consumer fraud class, the circuit court wrote that "State Farm has also promoted the use of the term 'quality replacement

parts' nationwide in an effort to promote its substitution of non-OEM for OEM parts." This sentence seems to suggest that the circuit court found the newsletter and magazine articles relevant to all policyholders, regardless of whether they saw them or not, because the articles helped create a nationwide market for non-OEM parts. However, we explicitly rejected this "market theory" of causation in *Oliveira v. Amoco Oil Co.*, 201 Ill.2d 134, 267 Ill.Dec. 14, 776 N.E.2d 151 (2002), and again, more recently, in *Shannon v. Boise Cascade Corp.*, 208 Ill.2d 517, 281 Ill.Dec. 845, 805 N.E.2d 213 (2004). Accordingly, neither the "Good Neighbor News" newsletter nor the "Reflector" magazine has any relevance to this case, and the statement that non-OEM parts are "of equal quality to or better than OEM parts" simply does not support plaintiffs' consumer fraud claim.

4. Describing a Non-OEM Part as a "Quality Replacement Part" Is Puffing and, Hence, Not Actionable

[30] Plaintiffs object to two phrases describing non-OEM parts which appear in the named plaintiffs' estimates and in the "Quality Replacement Parts" brochure. The first phrase plaintiffs point to is "quality replacement parts." This phrase appears in both the named plaintiffs' estimates, as a line entry under "Part Type" (see, *e.g.,* Appendix A), and in the brochure received along with the estimate (see Appendix C). The second phrase is "very high performance criteria," which appears in the brochure in this sentence: "Only those parts which meet our very high performance criteria are acceptable." See Appendix C. Plaintiffs maintain that both these phrases are deceptive under the Consumer Fraud Act.

[31] State Farm, however, contends that these phrases are merely "puffing" and, hence, cannot form a basis for plaintiffs' consumer fraud claim. We agree. "Puffing" denotes the exaggerations reasonably to be expected of a seller as to the degree of quality of his or her product, the truth or falsity of which cannot be precisely determined. See, *e.g., Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862, 866 (7th Cir.1999) ("Puffing in the usual sense signifies meaningless superlatives that no reasonable person would take seriously, and so it is not actionable as fraud"). Such statements include subjective descriptions relating to quality. See, *e.g., Evanston Hospital v. Crane*, 254 Ill.App.3d 435, 439, 444, 193 Ill.Dec. 870, 627 N.E.2d 29 (1993) ("high-quality"); *Breckenridge v. Cambridge Homes, Inc.*, 246 Ill.App.3d 810, 823, 186 Ill.Dec. 425, 616 N.E.2d

615 (1993) ("expert workmanship," "custom quality," "perfect"); *Zimmerman v. Northfield Real Estate, Inc.*, 156 Ill.App.3d 154, 163, 109 Ill.Dec. 541, 510 N.E.2d 409 (1986) ("magnificent," "comfortable"); *Spiegel v. Sharp Electronics Corp.*, 125 Ill.App.3d 897, 902, 81 Ill.Dec. 238, 466 N.E.2d 1040 (1984) ("picture perfect"); see also **847***State v. American TV & Appliance of Madison, Inc.*, 146 Wis.2d 292, 302, 430 N.W.2d 709, 712 (1988) ("A general statement that one's products are best is not actionable as a misrepresentation of fact"). Describing a product as "quality" or as having "high performance criteria" are the types of subjective characterizations that Illinois courts have repeatedly held to be mere puffing. Thus, as a matter of law, neither phrase can be considered deceptive under the Consumer Fraud Act.

Plaintiffs nevertheless point out that the circuit court found that the phrase "quality replacement parts" was "misleading." However, the circuit court did not cite to, or distinguish, any of the decisions cited above which hold that subjective statements of quality are merely puffing. Moreover, the circuit court did not cite any evidence to support its finding that the phrase was "misleading" and never made any determination that the phrase "quality replacement parts" stated a deceptive fact.

The appellate court, unlike the circuit court, did conclude that State Farm made representations "that a reasonable policyholder would have interpreted as fact." 321 Ill.App.3d 269, 254 Ill.Dec. 194, 746 N.E.2d 1242 (quote contained in a portion of the opinion unpublished under Supreme Court Rule 23). The appellate court determined that State Farm's "representations assigned 'virtues' to non-OEM parts that they did not possess" and, therefore, the representations violated the Act. 321 Ill.App.3d 269, 254 Ill.Dec. 194, 746 N.E.2d 1242 (quote contained in a portion of the opinion unpublished under Supreme Court Rule 23). However, the appellate court's conclusion that State Farm's "representations assigned 'virtues' to non-OEM parts that they did not possess" is based on a misstatement of the facts. The appellate court found that State Farm "represented on its estimates" and "in its Quality Replacement Part[s] brochures" that "non-OEM parts were of equal quality or better than OEM parts." 321 Ill.App.3d 269, 254 Ill.Dec. 194, 746 N.E.2d 1242 (quote contained in a portion of the opinion unpublished under Supreme Court Rule 23). As noted, this is incorrect. The statement that non-OEM parts are as good as OEM parts does not appear in either the named plaintiffs' estimates or the "Quality

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Replacement Parts" brochure.

There is no basis for concluding, as plaintiffs contend, that the phrases "quality replacement parts" and "high performance criteria" are anything other than puffing. Thus, these phrases cannot support plaintiffs' consumer fraud claim.

### 5. The Guarantee Provided by State Farm Cannot Form a Basis for Plaintiffs' Consumer Fraud Claim

[32] The circuit court held that State Farm violated the Consumer Fraud Act by providing a guarantee which states that if the policyholder is unsatisfied with the "fit and corrosion resistance qualities" of a replacement part, then State Farm will repair or replace the part at no cost. The circuit court concluded that this guarantee violated the Act because it "improperly and unfairly placed the burden of securing a quality repair on the policyholder, not State Farm." Plaintiffs point to this conclusion in support of their contention that State Farm violated the Act.

It is not clear what the circuit court meant when it held that State Farm's guarantee improperly put a "burden" on policyholders. Every guarantee places a burden on the consumer-the manufacturer or retailer must be notified when there is a problem with the product that is produced or sold and the guarantee must be invoked. For this reason, the circuit court cannot be correct if it meant that the guarantee is fraudulent because it required the policyholders to take action. If **848** this were true, every guarantee, no matter how comprehensive or generous, would be inherently fraudulent.

Plaintiffs argue, however, that the guarantee put an improper burden on policyholders because it was simply too difficult to use. According to plaintiffs, State Farm adjustors would "brush off attempts to use the guarantee," getting an OEM replacement part once the guarantee was invoked could take "up to three to five days," and "[e]ven when a body shop showed State Farm that a non-OEM crash part did not fit, State Farm would still sometimes not authorize OEM parts." However, several witnesses, including some who testified on behalf of plaintiffs, stated that the guarantee was honored in a routine fashion. For example, plaintiffs' witness Dave Beyers, the manager of a body shop in Williamson County, testified that if he had a problem with a non-OEM fender he would simply "fax up a form" to State Farm and "[p]ut the OEM fender on."

More important, none of the named plaintiffs in this case testified that they had problems using the guarantee. Indeed, none of the named plaintiffs made any attempt to invoke it. Avery and Shadle refused to have non-OEM parts put on their vehicles, so for them, the guarantee was not at issue. The other named plaintiffs, Covington, DeFrank and Vickers, did not attempt to use the guarantee. DeFrank was specifically asked whether he took "advantage of State Farm's guarantee that had been provided to [him] at the time the estimate was prepared." He answered that he had not. Accordingly, there is no basis in the record for concluding that the guarantee was unduly burdensome for the named plaintiffs, let alone for the class members as a whole.

[33] Finally, plaintiffs point out that when a policyholder successfully used the guarantee, the amount paid to replace the non-OEM part was recorded as an indemnity payment and became part of the insured's claim file. Plaintiffs speculate that the inclusion of this information in the claim file could "possibly rais[e] the insured's rates." However, plaintiffs point to no testimony or other evidence of record to support this assertion. Thus, we conclude that the guarantee offered by State Farm cannot form a basis for plaintiffs' consumer fraud claim.

### 6. The Crux of Plaintiffs' Consumer Fraud Claim Is a Failure by State Farm to Disclose the Categorical Inferiority of Non-OEM Parts During the Claims Process

Having eliminated that conduct which clearly cannot support a claim for consumer fraud, what remains is the core allegation stated in plaintiffs' complaint: "By way of false or deceptive pretenses, acts, or practices, defendant did not disclose to plaintiffs that they were: a) using inferior, imitation parts * * *."

Plaintiffs' complaint does not allege that State Farm failed to disclose an inferior characteristic of any specific non-OEM part. This is to be expected, since the characteristics of one part were not always present in every other part and did not always apply to every member of the class. For example, while plaintiffs contended at trial that some non-OEM parts were not as safe as OEM parts (a proposition which State Farm vigorously disputed), this contention applied only to some of the non-OEM parts at issue, such as bumpers, which not every member of the

835 N.E.2d 801                                                                                    Page 40
216 Ill.2d 100, 835 N.E.2d 801, 296 Ill.Dec. 448
**(Cite as: 216 Ill.2d 100, 835 N.E.2d 801)**

class received.    Similarly, plaintiffs' assertion that some non-OEM parts were inferior because they were not properly galvanized applied only to metal parts, not plastic.    Thus, the allegedly deceptive act which was common to the entire class and every **\*849** repair was not the failure to disclose a specific inferior characteristic but, rather, the failure to disclose the supposed categorical inferiority of non-OEM parts.    This failure to disclose, according to plaintiffs, constitutes "the concealment, suppression or omission of any material fact" (815 ILCS 505/2 (West 1998)) in violation of the Act.

Further, the failure to disclose occurred during the claims process.    Recall that State Farm's practice of giving its policyholders a written estimate and a brochure-in which the alleged categorical inferiority of non-OEM parts was not disclosed-was precisely the basis on which the circuit court found, in its order certifying the consumer fraud class, that State Farm's conduct was common to all class members.    As the circuit court stated:
"As to the consumer fraud allegations, the facts presented at the certification hearing on State Farm's methods of disclosing to policyholders its use of non-OEM parts also demonstrates a course of conduct common to all class members.    When such parts are used on an estimate, the policyholder is given a State Farm brochure discussing the use of non-OEM parts. Defendant's Exhibit 24;   Certification Hearing at 0124-25.    The estimate is then stamped indicating the use of non-OEM parts.   Defendant's Exhibit 27."

The appellate court below correctly stated the core allegation of plaintiffs' consumer fraud claim: "Plaintiffs claimed that by adopting and employing this claims practice, State Farm deceived its policyholders in that it failed to inform them of the inferior quality of specified replacement parts." 321 Ill.App.3d at 273, 254 Ill.Dec. 194, 746 N.E.2d 1242. It is this allegation we must keep in mind when considering the remaining challenges raised by State Farm in this appeal.

### B. *Propriety of the Nationwide Consumer Fraud Class*

[34] State Farm contends that the circuit court's certification of a nationwide consumer fraud class was improper.   According to State Farm, the circuit court's application of the Consumer Fraud Act to policyholders across the country was impermissible because the Act, by its own terms, does not apply to

consumer transactions involving nonresidents that occur outside Illinois.    Moreover, in State Farm's view, the certification of the nationwide class violated Illinois' choice-of-law rules, as well as the full faith and credit clause, the due process clause, and the commerce clause of the federal constitution. A determination by this court that the Consumer Fraud Act does not apply, by its own terms, to the out-of-state transactions at issue in this case would render it unnecessary to address State Farm's choice-of-law and constitutional arguments.    Accordingly, we consider the scope of the Consumer Fraud Act first.   See, *e.g., Beahringer v. Page,* 204 Ill.2d 363, 370, 273 Ill.Dec. 784, 789 N.E.2d 1216 (2003) (holding that constitutional questions will not be decided if case can be decided on other grounds). Because the scope of the Act is a question of statutory interpretation, our review is *de novo.   Lucas v. Lakin,* 175 Ill.2d 166, 171, 221 Ill.Dec. 834, 676 N.E.2d 637 (1997).

### 1. Scope of the Consumer Fraud Act

[35] Section 2 of the Consumer Fraud Act provides that "deceptive acts or practices * * * or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact * * * in the conduct of any trade or commerce are hereby declared unlawful * * *." 815 ILCS 505/2 (West 1998).   Section 10a(a) of the Act authorizes **\*850** private causes of action for practices proscribed by section 2.   Section 10a(a) states, in pertinent part:    "Any person who suffers actual damage as a result of a violation of [the] Act committed by any other person may bring an action against such person."   815 ILCS 505/10a(a) (West 1998).    To prove a private cause of action under section 10a(a) of the Act, a plaintiff must establish: (1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage to the plaintiff (5) proximately caused by the deception.   *Oliveira,* 201 Ill.2d at 149, 267 Ill.Dec. 14, 776 N.E.2d 151.

As noted, State Farm maintains that a nonresident consumer may not pursue a private cause of action under the Act when the disputed consumer transaction occurs out-of-state.    Plaintiffs dispute this contention.    To support their positions, both plaintiffs and State Farm note that a plaintiff cannot recover under the Act unless the defendant's disputed

conduct involves "trade or commerce." 815 ILCS 505/2 (West 1998); *Oliveira,* 201 Ill.2d at 149, 267 Ill.Dec. 14, 776 N.E.2d 151. Both parties then point to section 1(f) of the Act, the provision of the Act which defines the terms "trade" and "commerce":

"(f) The terms 'trade' and 'commerce' mean the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situated, and shall include any trade or commerce directly or indirectly affecting the people of this State." 815 ILCS 505/1(f) (West 1998).

[36] Plaintiffs initially state that section 1(f) "expressly notes that it applies to transactions 'wherever situated.'" This is incorrect. The words "wherever situated" do not refer to fraudulent transactions, but to the nouns "any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value." 815 ILCS 505/1(f) (West 1998). The words "wherever situated" do not expand the scope of the Act to apply to consumer transactions that take place out-of-state.

State Farm, in its argument, points to the language of section 1(f), which states that the trade or commerce must affect "the people of this State." 815 ILCS 505/1(f) (West 1998). Emphasizing the words "this State," State Farm contends that the Act is limited to transactions which take place in Illinois. Further, according to State Farm, the Consumer Fraud Act does not provide a cause of action to nonresidents whose claims processes took place outside of Illinois because those transactions had no effect on the people of Illinois. Plaintiffs, in reply, argue that the language of section 1(f) is broadly worded, and emphasize that the trade or commerce need only "indirectly affect" (815 ILCS 505/1(f) (West 1998)) the people of Illinois. From this, plaintiffs maintain that there is no geographic limit to the "trade or commerce" covered by the Act.

The language of section 1(f) has been interpreted by courts in a variety of ways. This divergence of interpretation is most notable in the federal district courts. In one of the earliest opinions to address the statute, *Seaboard Seed Co. v. Bemis Co.,* 632 F.Supp. 1133, 1140 (N.D.Ill.1986), the district court concluded that section 1(f) "defines 'trade' and 'commerce' in a geographically limited manner." See also *Bettarini v. Citicorp Services, Inc.,* No. 91 C 8390, 1992 WL 3718 (N.D.Ill.1992) (noting the "geographical scope of the Act" and rejecting a claim

under the Act where **\*851** the defendant's "complained of conduct impacted on [plaintiff] only at his home base in London"); *Swartz v. Schaub,* 818 F.Supp. 1214 (N.D.Ill.1993). Other district courts, however, have expressly disagreed with the notion that the Act is limited geographically. See *Nichols Motorcycle Supply Inc. v. Dunlop Tire Corp.,* 913 F.Supp. 1088, 1140 (N.D.Ill.1995) ("This Court believes that the Illinois Consumer Fraud Act, although intended to protect Illinois consumers, does not contain a geographic limitation"); see also *Continental X-Ray Corp. v. XRE,* No. 93 C 3522 n. 1, 1995 WL 599064 (N.D.Ill.1995) (same).

Still other district courts interpreting section 1(f) have concluded that the section limits the scope of the Act based on the residency of the plaintiff. Some of the courts adopting this focus have concluded that the Act is intended only to "protect and benefit Illinois residents." *Lincoln National Life Insurance Co. v. Silver,* No. 86 C 7175 (N.D.Ill.1991), cited in *Nichols,* 913 F.Supp. at 1139. Other courts, however, have concluded that nonresidents may pursue a cause of action, although these courts typically hold that the transaction at issue must occur in Illinois or that there be an adequate "connection" to Illinois. See, *e.g., Tylka v. Gerber Products Co.,* 182 F.R.D. 573, 576-78 (N.D.Ill.1998) (noting that "[c]ourts in this district are split as to whether the [Consumer Fraud Act] may apply to consumers who are not citizens of Illinois" and holding that the Act could apply where "the transactions giving rise to the action took place in Illinois"); *MAN Roland, Inc. v. Quantum Color Corp.,* 57 F.Supp.2d 568, 575 (N.D.Ill.1999) (rejecting interpretation of the Act which extends " standing only to consumers who are Illinois residents" and holding that the Act could apply where the nonresident consumer purchased a product "in Illinois from an Illinois corporation"); *Rohlfing v. Manor Care, Inc.,* 172 F.R.D. 330, 339 (N.D.Ill.1997) (even under those cases allowing nonresidents to pursue a cause of action under the Act, the non-Illinois residents in this case could not do so because their claims had "little or no connection to Illinois"); *Peters v. Northern Trust Co.,* No. 92 C 1647, 1999 WL 515481 (N.D.Ill.1999) (noting split in the district courts based on residency and holding that plaintiffs' consumer fraud claim failed because the conduct underlying the claims had "no connection to Illinois").

Additional interpretations of section 1(f) also exist in the district courts. One court has stated that what is important in determining whether a plaintiff may pursue a cause of action under section 1(f) is not the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

plaintiff's "residency, but the State of Illinois' interest in protecting its consumers" (*Ivanhoe Financial, Inc. v. Mortgage Essentials, Inc.,* No. 03 C 6887, 2004 WL 856591 (N.D.Ill.2004)), while another court has referred to section 1(f) as imposing " 'Illinois contact' requirements" (*Uniroyal Goodrich Tire Co. v. Mutual Trading Corp.,* 749 F.Supp. 869, 878 (N.D.Ill.1990)).    Still other permutations can be found in the district courts;  this list is not exhaustive.

Like the federal district courts, our appellate court has also divided over the question of how best to interpret section 1(f).  In *Oliveira v. Amoco Oil Co.,* 311 Ill.App.3d 886, 244 Ill.Dec. 455, 726 N.E.2d 51 (2000), *vacated in part & rev'd on other grounds,* 201 Ill.2d 134, 267 Ill.Dec. 14, 776 N.E.2d 151 (2002), the Fourth District of our appellate court declined to hold that the Act applied to out-of-state consumers.  *Oliveira,* 311 Ill.App.3d at 898, 244 Ill.Dec. 455, 726 N.E.2d 51, citing *Scott v. Association for Childbirth at Home, International,* 88 Ill.2d 279, 288, 58 Ill.Dec. 761, 430 N.E.2d 1012 (1981).    The appellate court's decision in *Oliveira* was subsequently cited by a First District decision in **\*852**_Prime Leasing,  Inc. v. Kendig,_ 332 Ill.App.3d 300, 265 Ill.Dec. 722, 773 N.E.2d 84 (2002), where the court stated in *dicta* that "the Act normally does not apply to out-of-state consumers."    *Prime Leasing,* 332 Ill.App.3d at 313, 265 Ill.Dec. 722, 773 N.E.2d 84.

In the case at bar, the Fifth District concluded, without discussing the statutory language of section 1(f) or any of the federal district court decisions discussing this issue, that non-Illinois consumers are "permitted to pursue an action under the Act against a resident defendant where the deceptive acts and practices [are] perpetrated in Illinois."    321 Ill.App.3d at 281, 254 Ill.Dec. 194, 746 N.E.2d 1242.  More recently, in *Bunting v. Progressive Corp.,* 348 Ill.App.3d 575, 284 Ill.Dec. 103, 809 N.E.2d 225 (2004), the First District elected to follow the appellate court decision in this case and rejected the defendant's argument that "the Act is inapplicable because plaintiff is a nonresident."    *Bunting,* 348 Ill.App.3d at 586, 284 Ill.Dec. 103, 809 N.E.2d 225.

It is not clear from the plain language of section 1(f) which, if any, of the many interpretations noted above accurately captures the meaning of that provision.    Indeed, the wealth of competing interpretations of section 1(f) is a compelling indication of the statute's ambiguity.    See, *e.g.,* *Krohe v. City of Bloomington,* 204 Ill.2d 392, 395-96, 273 Ill.Dec. 779, 789 N.E.2d 1211 (2003) ("A statute

is ambiguous if it is capable of being understood by reasonably well-informed persons in two or more different ways").    Because the language of section 1(f) is ambiguous, it is appropriate for us to consider other sources, including legislative history, in order to discern the statute's meaning.    See, *e.g.,* *People v. Jameson,* 162 Ill.2d 282, 288, 205 Ill.Dec. 90, 642 N.E.2d 1207 (1994).

Although there is not a great deal of legislative history with respect to section 1(f), we do find relevant a statement from Senator Sours, the Senate sponsor of the bill which created a private cause of action under the Act and which added section 1(f). See Pub. Act 78-904, eff. September 21, 1973.  Just before the vote in the Senate was taken, Senator Sours made the following remarks:
"Just to conclude briefly Mr. President and Senators, I'd like to just read a couple of excerpts from this bill and ... the excerpts are very brief to indicate the broad terms of the bill.  I'm reading line 7 on page 2:  'The terms trade and commerce' and that really is what we're talking about.  *We're talking about trade and commerce that is not included within the interstate concept.*  Means the advertising and how much of that we see offering for sale, sale or distribution of any services and any property tangible or and intangible, real, personal or mixed and every other article, commodity or thing of value wherever it's situated and shall include any trade or commerce, directly or indirectly affecting the people of this State." (Emphasis added.)  78th Ill. Gen. Assem., Senate Proceedings, June 30, 1973, at 268 (statements of Senator Sours).

[37][38] In addition to Senator Sours' statement, we note the long-standing rule of construction in Illinois which holds that a "statute is without extraterritorial effect unless a clear intent in this respect appears from the express provisions of the statute." *Dur-Ite Co. v. Industrial Comm'n,* 394 Ill. 338, 350, 68 N.E.2d 717 (1946);  *Graham v. General U.S. Grant Post No. 2665, V.F.W.,* 43 Ill.2d 1, 6, 248 N.E.2d 657 (1969);  see also *Sale v. Haitian Centers Council, Inc.,* 509 U.S. 155, 188, 113 S.Ct. 2549, 2567, 125 L.Ed.2d 128, 155 (1993) ("Acts of Congress normally do **\*853** not have extraterritorial application unless such an intent is clearly manifested");    73 Am.Jur.2d *Statutes* § 250 (2001).    Given the statement of Senator Sours and the rule against giving statutes extraterritorial effect unless an intent to do so is clearly expressed, we conclude that the General Assembly did not intend the Consumer Fraud Act to apply to fraudulent transactions which

835 N.E.2d 801
216 Ill.2d 100, 835 N.E.2d 801, 296 Ill.Dec. 448
**(Cite as: 216 Ill.2d 100, 835 N.E.2d 801)**

take place outside Illinois.

Having concluded that the Act does not have extraterritorial effect, the next step in our analysis is to determine whether the transactions at issue in this case took place outside Illinois. We first observe, however, that it can be difficult to identify the situs of a consumer transaction when, as plaintiffs in this case allege, the transaction is made up of components that occur in more than one state. To solve this problem, courts have often directed their focus to the site of injury or deception-the reason being that, until a deceptive statement has been communicated to a plaintiff and there has been an injury, there is no fraudulent transaction and no cause of action. The Court of Appeals of New York followed this approach in *Goshen v. Mutual Life Insurance Co.*, 98 N.Y.2d 314, 746 N.Y.S.2d 858, 774 N.E.2d 1190 (2002). In that decision, the New York court considered whether "hatching a scheme" or originating a marketing campaign in New York constituted an actionable deceptive act under a consumer fraud statute which limited the definition of trade or commerce to that which occurred in-state. *Goshen*, 98 N.Y.2d at 324, 746 N.Y.S.2d 858, 774 N.E.2d at 1195. The court concluded that it did not. The court explained that "[t]he origin of any advertising or promotional conduct is irrelevant if the deception itself-that is, the advertisement or promotional package-did not result in a transaction in which the consumer was harmed." *Goshen*, 98 N.Y.2d at 326, 746 N.Y.S.2d 858, 774 N.E.2d at 1196. Because there was no fraudulent transaction until the deception occurred, the location of the deception was the controlling factor. Thus, the court held that "to qualify as a prohibited act under the statute, the deception of a consumer must occur in New York." *Goshen*, 98 N.Y.2d at 325, 746 N.Y.S.2d 858, 774 N.E.2d at 1195. See also *Graham v. General U.S. Grant Post No. 2665, V.F.W.*, 43 Ill.2d 1, 6, 248 N.E.2d 657 (1969) (no cause of action under Illinois Dram Shop Act where the injury to plaintiff occurred out-of-state).

The position taken by the *Goshen* court is not unreasonable. In a misrepresentation case, there is no fraudulent transaction until the misrepresentation has been communicated. But the *Goshen* court's view of the situs of a consumer transaction is a narrow one. The place of injury or deception is only one of the circumstances that make up a fraudulent transaction and focusing solely on that fact can create questionable results. If, for example, the bulk of the circumstances that make up a fraudulent transaction occur within Illinois, and the only thing that occurs

out-of-state is the injury or deception, it seems to make little sense to say that the fraudulent transaction has occurred outside Illinois. Stated otherwise, we believe that there is a broader alternative to the position taken by the *Goshen* court, namely, that a fraudulent transaction may be said to take place within a state if the circumstances relating to the transaction occur primarily and substantially within that state.

[39] The General Assembly has stated that the Consumer Fraud Act "shall be liberally construed to effect" its purposes. 815 ILCS 505/11a (West 1998). Given this fact, we believe that the General Assembly intended the broader understanding of an in-state transaction noted above. Accordingly, we hold that a plaintiff may pursue a **\*854** private cause of action under the Consumer Fraud Act if the circumstances that relate to the disputed transaction occur primarily and substantially in Illinois. In adopting this holding, we recognize that there is no single formula or bright-line test for determining whether a transaction occurs within this state. Rather, each case must be decided on its own facts. Accordingly, the critical question in this case becomes whether the circumstances relating to plaintiffs' disputed transactions with State Farm occurred primarily and substantially in Illinois.

## 2. Whether the Consumer Fraud Act Applies to the Transactions at Issue in This Case

The appellate court below concluded that the Consumer Fraud Act could be applied to the out-of-state plaintiffs in this case. The appellate court explained: "The evidence demonstrates that the deceptive claims practices occurred in Illinois. It was in Illinois that the claims practices were devised and procedures for implementation were prepared for dissemination in other states." 321 Ill.App.3d at 282, 254 Ill.Dec. 194, 746 N.E.2d 1242.

[40] We agree with the appellate court that the place where a company policy is created or where a form document is drafted may be a relevant factor to consider in determining the location of a consumer transaction. However, in this case, it does not follow that because a single factor relating to State Farm's claims practices with its policyholders took place in Illinois, the claims practice itself "occurred in Illinois." In fact, just the opposite is true. The overwhelming majority of circumstances relating to the disputed transactions in this case-State Farm's claims practices-occurred outside of Illinois for the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

835 N.E.2d 801                                                                                                              Page 44
216 Ill.2d 100, 835 N.E.2d 801, 296 Ill.Dec. 448
**(Cite as: 216 Ill.2d 100, 835 N.E.2d 801)**

out-of-state plaintiffs.

[41] Plaintiff Michael Avery's transaction with State Farm during the claims process is representative of the situation of the out-of-state plaintiffs. Avery resides in Louisiana, not Illinois. His car was garaged in Louisiana and his accident occurred there as well. Avery's estimate was written in Louisiana and he received his "Quality Replacement Parts" brochure in Louisiana. The alleged deception in this case-the failure to disclose the inferiority of non-OEM parts-also occurred in Louisiana. The repair of Avery's car took place in Louisiana. Damage to Avery, if any, occurred in Louisiana. Moreover, there is no evidence that Avery ever met or talked to a State Farm employee who works in Illinois. Avery's contact with State Farm was through a Louisiana agent, a Louisiana claims representative, and a Louisiana adjustor. In sum, the overwhelming majority of the circumstances which relate to Avery's and the other out-of-state plaintiffs' claims proceedings-the disputed transactions in this case-occurred outside Illinois. We conclude, therefore, that the out-of-state plaintiffs in this case have no cognizable cause of action under the Consumer Fraud Act.

In support of the appellate court, plaintiffs rely on *Martin v. Heinold Commodities, Inc.,* 117 Ill.2d 67, 109 Ill.Dec. 772, 510 N.E.2d 840 (1987) (*Martin I* ), to which the appellate court cited. In *Martin I,* a plaintiff class consisting of both Illinois and non-Illinois residents brought suit against an Illinois company that had served as broker for the plaintiffs in commodities transactions. The broker relationship had been established by a contract that allegedly contained deceptive statements. This court allowed certification of the plaintiffs' claims under the Illinois Consumer Fraud Act, even with respect to the non-Illinois plaintiffs. **\*855***Martin I,* 117 Ill.2d at 80-83, 109 Ill.Dec. 772, 510 N.E.2d 840.

*Martin I* is of little help to plaintiffs. In addressing the propriety of the class before it, *Martin I* considered only whether the class comported with the due process principles laid out in *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985). *Martin I,* 117 Ill.2d at 82, 109 Ill.Dec. 772, 510 N.E.2d 840. *Martin I* did not address the scope of the Consumer Fraud Act as a matter of statutory interpretation; that issue simply was not presented. See *Nix v. Smith,* 32 Ill.2d 465, 470, 207 N.E.2d 460 (1965) ("A judicial opinion is a response to the issues before the court, and these opinions, like others, must be read in light of the

issues that were before the court for determination"). Nevertheless, to the extent that *Martin I* is relevant here, it is distinguishable.

In *Martin I,* this court specifically based its decision on the following facts: (1) the contracts containing the deceptive statements were all executed in Illinois; (2) the defendant's principal place of business was in Illinois; (3) the contract contained express choice-of-law and forum-selection clauses specifying that any litigation would be conducted in Illinois under Illinois law; (4) complaints regarding the defendant's performance were to be directed to its Chicago office; and (5) payments for the defendant's services were to be sent to its Chicago office. Given these circumstances, this court concluded that the Act could apply to the whole class. *Martin I,* 117 Ill.2d at 82-83, 109 Ill.Dec. 772, 510 N.E.2d 840.

In contrast to *Martin I,* there are virtually no circumstances relating to the disputed claims practices at issue in this case which occurred or existed in Illinois for those plaintiffs who are not Illinois residents. The appellate court's conclusion that a scheme to defraud was "disseminated" from State Farm's headquarters is insufficient. See, *e.g., Rohlfing v. Manor Care, Inc.,* 172 F.R.D. 330, 340 & n. 10 (N.D.Ill.1997) (where the only connection with Illinois is the headquarters of the defendant or the fact that a scheme "emanated" from Illinois, the Consumer Fraud Act "does not apply to the claims of the non-Illinois plaintiffs even under the broad application of the [Act] endorsed by *Martin* and other similar cases").

Based on the foregoing, we conclude that the circuit court erred in certifying a nationwide class that included class members whose claims proceedings took place outside Illinois. Because we have decided the propriety of the certification order on statutory interpretation grounds, we need not consider whether certification of the nationwide class was unconstitutional or violated choice-of-law rules.

The only putative class that can exist in this case under the Consumer Fraud Act is a class consisting of policyholders whose vehicles were assessed and repaired in Illinois. Four of the five named plaintiffs in this case, Avery, Covington, Shadle and Vickers, are not residents of Illinois, the damage to their vehicles did not occur in Illinois, they did not receive their repair estimates in Illinois, and they did not have their cars repaired in Illinois. These individuals have no cause of action under the Act. The only named plaintiff in this case whose vehicle was

assessed and repaired in Illinois and, therefore, the only named plaintiff who can serve as a representative plaintiff for the putative Illinois class, is Sam DeFrank.    Because a failure of DeFrank's claim would render discussion of class certification issues moot (see, *e.g.*, *Oliveira v. Amoco Oil Co.,* 201 Ill.2d 134, 156-57, 267 Ill.Dec. 14, 776 N.E.2d 151 (2002)), we now turn to the propriety of the judgment in favor of DeFrank.

**\*856** C. *Propriety of Judgment:  Named Plaintiff*

[42] To succeed in a private cause of action under the Consumer Fraud Act, a plaintiff must prove "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage to the plaintiff (5) proximately caused by the deception." *Oliveira,* 201 Ill.2d at 149, 267 Ill.Dec. 14, 776 N.E.2d 151.    In general, a trial court's decision as to whether these elements have been proven in any case is reviewed under the manifest weight of the evidence standard. *Kirkruff v. Wisegarver,* 297 Ill.App.3d 826, 839, 231 Ill.Dec. 852, 697 N.E.2d 406 (1998).

State Farm contends that the named plaintiffs, including DeFrank, failed to prove several of the elements required to establish a private cause of action.    State Farm also contends that the circuit court held plaintiffs to the wrong burden of proof. We address this issue first.

1. Burden of Proof

The circuit court below held, as a matter of law, that plaintiffs must prove the elements of a private cause of action under section 10a(a) of the Act by a preponderance of the evidence.    The appellate court agreed. 321 Ill.App.3d at 291, 254 Ill.Dec. 194, 746 N.E.2d 1242.    State Farm contends that these holdings are incorrect and that the proper burden of proof in this case is clear and convincing evidence.

[43][44] In the ordinary civil case, because there are no sound reasons for favoring one party over another, the party with the burden of persuasion must prove his or her case by a preponderance of the evidence. A proposition proved by a preponderance of the evidence is one that has been found to be more probably true than not true.    Occasionally, however, policy considerations require a court to impose a

higher standard of proof.    In such a case, the party with the burden of persuasion must prove his or her case by clear and convincing evidence. *Bazydlo v. Volant,* 164 Ill.2d 207, 212-13, 207 Ill.Dec. 311, 647 N.E.2d 273 (1995);  see *Arrington v. Walter E. Heller International Corp.,* 30 Ill.App.3d 631, 639-40, 333 N.E.2d 50 (1975).

[45] In the context of common law fraud, the law presumes that transactions are fair and honest;  fraud is not presumed.    Accordingly, fraud must be proved by clear and convincing evidence. *Racine Fuel Co. v. Rawlins,* 377 Ill. 375, 379-80, 36 N.E.2d 710 (1941);  see *Gordon v. Dolin,* 105 Ill.App.3d 319, 324, 61 Ill.Dec. 188, 434 N.E.2d 341 (1982) (observing that in a common law fraud action, the plaintiff carries "a heavy responsibility").

The Consumer Fraud Act does not expressly provide the standard of proof required to succeed in a private cause of action.    However, as noted, the Act is to be liberally construed to effect its purpose, which is to provide broader protection to consumers than an action for common law fraud.    Accordingly, based on the liberal intent of the legislature behind the Act, and based on the fact that the Act does not expressly require a greater standard of proof, the appellate court has held that the appropriate standard of proof for a statutory fraud claim is preponderance of the evidence.    See *Cuculich v. Thomson Consumer Electronics, Inc.,* 317 Ill.App.3d 709, 717-18, 251 Ill.Dec. 1, 739 N.E.2d 934 (2000);  *Malooley v. Alice,* 251 Ill.App.3d 51, 56, 190 Ill.Dec. 396, 621 N.E.2d 265 (1993).

[46] In this case, the appellate court agreed with this reasoning and conclusion. 321 Ill.App.3d at 291, 254 Ill.Dec. 194, 746 N.E.2d 1242.    We do likewise and so hold.    **\*857** Cases requiring a clear and convincing standard of proof (see, *e.g.*, *General Motors Acceptance Corp. v. Grissom,* 150 Ill.App.3d 62, 65, 103 Ill.Dec. 447, 501 N.E.2d 764 (1986);  *Munjal v. Baird & Warner, Inc.,* 138 Ill.App.3d 172, 183, 92 Ill.Dec. 809, 485 N.E.2d 855 (1985)) are overruled on this point.

2. The Deceptive Act or Practice

When State Farm specified a non-OEM part in one of its repairs, it disclosed the use of that part in the policyholder's estimate and "half-sheet."    See Appendix A and Appendix B.    As noted previously, the gravamen of plaintiffs' complaint against State Farm is that this disclosure was inadequate.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

835 N.E.2d 801
216 Ill.2d 100, 835 N.E.2d 801, 296 Ill.Dec. 448
**(Cite as: 216 Ill.2d 100, 835 N.E.2d 801)**

Page 46

According to plaintiffs, State Farm should also have disclosed the categorical inferiority of non-OEM parts.  Its failure to do so, plaintiffs contend, constituted a deceptive act or practice under the Act.

There are several difficulties with plaintiffs' argument.  Recall that plaintiffs do not contend that all non-OEM parts are defective, only that they are not as good as OEM parts.  State Farm knew this fact, plaintiffs allege, and should have disclosed it to all policyholders.  But many businesses undoubtedly sell products with the knowledge that those products are not as good as other brands on the market.  Under plaintiffs' reasoning, it would appear that to avoid liability under the Act, every knowing sale of a brand of product which is not the top brand would have to carry a disclaimer:  "Notice, our brand is not, on the whole, as good as our competitor's."  Thus, adopting plaintiffs' argument would appear to work a significant expansion of liability under the Act.

Further, and of equal importance, we note that the disclosure provided by State Farm was required by, and complied with, state law.

Section 155.29 of the Insurance Code provides:
" § 155.29. (a) Purpose.  The purpose of this section is to regulate the use of aftermarket crash parts by requiring disclosure when any use of an aftermarket non-original equipment manufacturer's crash part is proposed and by requiring that the manufacturers of such aftermarket crash parts be identified.
(b) Definitions. * * *


* * *


(c) Identification.  Any aftermarket crash part supplied by a non-original equipment manufacturer for use in this State after the effective date of this Act shall have affixed thereto or inscribed thereon the logo or name of its manufacturer.  The manufacturer's logo or name shall be visible after installation whenever practicable.
(d) Disclosure.  No insurer shall specify the use of non-OEM aftermarket crash parts in the repair of an insured's motor vehicle, nor shall any repair facility or installer use non-OEM aftermarket crash parts to repair a vehicle unless the customer is advised of that fact in writing.  In all instances where an insurer intends that non-OEM aftermarket crash parts be used in the repair of a motor vehicle, the insurer shall provide the customer with the following information:
(1) a written estimate that clearly identifies each non-

OEM aftermarket crash part;  and
(2) a disclosure settlement incorporated into or attached to the estimate that reads as follows:  'This estimate has been prepared based on the use of crash parts supplied by a source other than the manufacturer of your motor vehicle.  Warranties applicable to **858** these replacements parts are provided by the manufacturer or distributor of these parts rather than the manufacturer of your vehicle.' "
215 ILCS 5/155.29 (West 1998).


State Farm's compliance with section 155.29 of the Insurance Code raises an important issue.  Like most state consumer fraud statutes, the Illinois Consumer Fraud Act exempts from its coverage practices or transactions which are permitted by other laws.  Section 10b(1) of the Consumer Fraud Act provides:
"Nothing in this Act shall apply to any of the following:
(1) Actions or transactions specifically authorized by laws administered by any regulatory body or officer acting under statutory authority of this State or the United States."  815 ILCS 505/10b(1) (West 1998).


Interpreting Illinois decisions which have addressed this provision, the Seventh Circuit has stated:
"Taken together, the [Illinois] cases stand for the proposition that the state [Consumer Fraud Act] will not impose higher disclosure requirements on parties than those that are sufficient to satisfy federal regulations.  If the parties are doing something specifically authorized by federal law, section 10b(1) will protect them from liability under the [Act].  On the other hand, the [Consumer Fraud Act] exemption is not available for statements that manage to be in technical compliance with federal regulations, but which are so misleading or deceptive in context that federal law itself might not regard them as adequate."  (Emphasis omitted.)  *Bober v. Glaxo Wellcome PLC, 246 F.3d 934, 941 (7th Cir.2001).*


The Insurance Code does not require insurance companies to disclose that non-OEM parts are "categorically inferior" to OEM parts.  Indeed, contrary to the findings of the circuit court below, it would appear that by allowing and regulating the use of non-OEM parts in Illinois, the General Assembly has made the policy determination that at least some number of non-OEM parts are *not* inferior to OEM parts.  Otherwise, the General Assembly's decision to permit their use makes little sense.  See *Snell v. Geico Corp.,* No. Civ. 202160, slip op. at 9 n. 2, 2001

835 N.E.2d 801                                                                                     Page 47
216 Ill.2d 100, 835 N.E.2d 801, 296 Ill.Dec. 448
**(Cite as: 216 Ill.2d 100, 835 N.E.2d 801)**

WL 1085237 (Md.Cir.Ct. August 14, 2001) (reasoning that, if state insurance commissioners would not sanction the use of *inferior* non-OEM parts, and if, nevertheless, they sanctioned the use of non-OEM parts in some instances, "these insurance commissioners must have determined that non-OEM parts are not *categorically* and *universally* inferior" (emphases in original)).

In light of section 155.29 of the Insurance Code, and section 10b(1) of the Act, we believe that there is a serious question as to whether State Farm's failure to disclose to its policyholders that non-OEM parts are not as good as OEM parts can be considered a deceptive act or practice. However, State Farm does not press this issue and we need not explore it further. We express no opinion as to the proper scope of section 10b(1) of the Act or the correctness of the *Bober* decision, or whether State Farm committed a deceptive act or practice within the meaning of the Consumer Fraud Act. Instead, we conclude that DeFrank's claim fails because he suffered no actual damage, as required under the Act, and because he failed to establish proximate causation.

3. Actual Damage

[47] The most striking deficiency in DeFrank's claim that State Farm violated the Consumer Fraud Act is his lack of actual damage. In order to sustain a private cause of action under the Act, a plaintiff**859** must prove that he or she suffered "actual damage as a result of a violation of [the] Act." 815 ILCS 505/10a(a) (West 1996); *Oliveira*, 201 Ill.2d at 148-49, 267 Ill.Dec. 14, 776 N.E.2d 151.[FN11] In this case, DeFrank did not suffer any damage as a result of State Farm's specification or use of non-OEM parts.

> FN11. The word "actual" was added to section 10a(a) by Public Act 89-144, effective January 1, 1996. Without expressing any opinion on the significance of this change, we note that DeFrank's accident occurred in 1997 and, thus, is covered by this language. See *Greisz v. Household Bank (Illinois)*, 8 F.Supp.2d 1031, 1043 (N.D.Ill.1998) (discussing the change in language).

The incident that gave rise to DeFrank's claim occurred on November 1, 1997, when his 1992 Chevrolet pickup truck was damaged in an accident. DeFrank testified that State Farm's estimate for repair of his truck included non-OEM parts and that these non-OEM parts were used in the truck's repair. DeFrank stated that several months later he sold his truck to his brother-in-law for $11,000, slightly below the "blue book" value of $11,400, in what DeFrank himself agreed was an "arm's length" transaction. DeFrank was asked by plaintiffs' counsel at trial whether the non-OEM parts on the truck were a factor in the sale. His answer was "No." On cross-examination, this point was made clear:
"Q. [Counsel for State Farm] And there were no discounts in the price that you sold the truck for to your brother-in-law on account of the fact that there were non-OEM parts on the car; is that right?
A. [DeFrank] Right.
Q. Is that correct?
A. Yes."

The language of the Consumer Fraud Act is plain. A plaintiff must prove "actual damage" before he or she can recover under the Act. That did not occur here. DeFrank's own testimony establishes that, when he sold his truck to his brother-in-law, he received the same value for the truck that he would have received if only OEM parts had been used in the repair. It simply made no difference that non-OEM parts were present on the truck. Clearly, DeFrank suffered no "actual damage" as a result of State Farm's specification or use of non-OEM parts and, therefore, he cannot recover under the Act.[FN12]

> FN12. DeFrank was not the only named plaintiff for whom the use of non-OEM parts made no difference. State Farm paid plaintiff Carly Vickers "book value" for her car after it was totaled in an accident. In her trial testimony, Vickers stated that, as far as she knew, State Farm did not value the car any less because of the non-OEM parts which were on it.

The appellate court offered no explanation as to how DeFrank, or any other members of the class, suffered "actual damage" within the meaning of the Consumer Fraud Act, while the circuit court offered only a brief statement on the issue. In a single sentence in its judgment order, the circuit court held that plaintiffs' damages under the consumer fraud count were defined in the same manner as they were under the breach of contract count. Thus, according to the circuit court, actual damages were defined as "specification" and "installation" damages. As with the breach of contract count, "specification" damages

occurred at the moment State Farm specified a non-OEM part in a policyholder's repair estimate. "Installation" damages consisted of the cost of replacing non-OEM parts with OEM parts on those vehicles which had actually had non-OEM parts installed. Neither of these theories establishes that DeFrank suffered any damage under the Consumer Fraud Act.

**\*860** First, DeFrank no longer owns his truck, which was sold for fair market value. Accordingly, as plaintiffs' own damages expert, Dr. Mathur, acknowledged at trial, DeFrank is not entitled to installation damages.

[48][49] Second, reliance on specification damages is entirely inappropriate for DeFrank's consumer fraud claim. As explained in our discussion of plaintiffs' breach of contract count, specification damages are not, in fact, real or measurable damages and, hence, in no way constitute "actual damage" within the meaning of the Act. In addition, with respect to DeFrank's consumer fraud claim, specification damages make no chronological sense. Under plaintiffs' theory of specification damages, the damage done to DeFrank occurred at the moment State Farm specified non-OEM parts in its repair estimate. However, the alleged misrepresentations made to DeFrank, and the alleged failure to disclose the categorical inferiority of non-OEM parts, occurred *after* specification, when DeFrank was handed his estimate and the brochure. Actual damage cannot be the result of omissions and misrepresentations which are made after the damage has already occurred. *Connick v. Suzuki Motor Co.,* 174 Ill.2d 482, 502, 221 Ill.Dec. 389, 675 N.E.2d 584 (1996).

Perhaps aware of the temporal problems that arise when actual damage is defined as the mere specification of non-OEM parts, the appellate court offered an additional explanation of damage which, at least implicitly, resolves this problem. The appellate court stated:
"There is evidence that State Farm's material misrepresentations led numerous class members to blindly accept the non-OEM parts specified (*i.e.,* without knowledge of the inferior condition of those parts)." 321 Ill.App.3d 269, 254 Ill.Dec. 194, 746 N.E.2d 1242 (quote contained in a portion of the opinion unpublished under Supreme Court Rule 23).[FN13]

FN13. The appellate court did not identify what percentage of the class it was referring to when it used the term "numerous." Nor did the court explain why, if only "numerous class members" were damaged, State Farm was held liable for damages to the entire class.

Notice what the appellate court has done here. With this sentence, it is no longer the case that damage occurred when non-OEM parts were *specified.* Instead, the damage occurred when non-OEM parts were *accepted.* This is not the theory of damages which was adopted by the circuit court, nor is it the theory advanced by plaintiffs.

The new theory of damages offered by the appellate court has the virtue of making chronological sense because it places the deception before the damage. Applying this reasoning to DeFrank's case, DeFrank would first have received an estimate and a brochure, and the omissions in those documents would then have deceived him into "blindly accept[ing] the non-OEM parts specified without knowledge of their categorical inferiority." However, this theory still does not explain how DeFrank was actually damaged within the meaning of the Consumer Fraud Act. As noted above, even though DeFrank accepted the non-OEM parts that were placed on his truck, he suffered no damage whatsoever as a result of that acceptance. Accordingly, because State Farm's specification or use of non-OEM parts did not cause DeFrank any actual damage, his consumer fraud claim is without merit.

### 4. Proximate Cause-Actual Deception

The appellate court's conclusion that State Farm's representations "led numerous**\*861** class members to blindly accept the non-OEM parts specified * * * without knowledge of their categorical inferiority" cannot apply in DeFrank's case for an additional reason-lack of proximate causation.

[50] In a series of three cases, this court has held that in a cause of action for fraudulent misrepresentation brought under the Consumer Fraud Act, a plaintiff must prove that he or she was actually deceived by the misrepresentation in order to establish the element of proximate causation. The three cases are *Zekman v. Direct American Marketers, Inc.,* 182 Ill.2d 359, 231 Ill.Dec. 80, 695 N.E.2d 853 (1998), *Oliveira v. Amoco Oil Co.,* 201 Ill.2d 134, 267 Ill.Dec. 14, 776 N.E.2d 151 (2002), and *Shannon v.*

835 N.E.2d 801                                                                                                          Page 49
216 Ill.2d 100, 835 N.E.2d 801, 296 Ill.Dec. 448
**(Cite as: 216 Ill.2d 100, 835 N.E.2d 801)**

*Boise Cascade Corp.,* 208 Ill.2d 517, 281 Ill.Dec. 845, 805 N.E.2d 213 (2004).

In the case at bar, State Farm argues that under *Zekman* and *Oliveira* (*Shannon* was not yet filed at the time of briefing and argument), DeFrank's consumer fraud claim must fail because he has not established that he was actually deceived by any omissions or representations made by State Farm. Plaintiffs, in response, argue that *Zekman* and *Oliveira* are distinguishable from the present case because those cases involved deceptive advertising and alleged fraud on the market, *i.e.,* misrepresentations made to the public at large, rather than misrepresentations "directed specifically at plaintiffs as policyholders." According to plaintiffs, a covenant of good faith is implied in every contract and the presence of such a covenant here gave rise "to a relationship quite different than the attenuated nexus between a merchant and prospective consumer in an impersonal deceptive advertising campaign."

Though not entirely clear, it appears that plaintiffs are arguing in favor of a different definition of causation for those individuals who have contracts with a consumer fraud defendant versus those who do not. To the extent that this is plaintiffs' argument, we reject it. Further, and more importantly, we reject plaintiffs' attempt to distinguish *Zekman* and *Oliveira.* The critical point of these cases is not that they involved advertising. Rather, the important legal principle established in *Zekman, Oliveira* and *Shannon* is that in a case alleging deception under the Act, it is not possible for a plaintiff to establish proximate causation unless the plaintiff can show that he or she was, "in some manner, deceived" by the misrepresentation. *Oliveira,* 201 Ill.2d at 155, 267 Ill.Dec. 14, 776 N.E.2d 151. Proximate causation is an element of all private causes of action under the Act. Thus, DeFrank must establish that he was deceived by State Farm's representations or omissions in order to prove his claim.

The circuit court did not discuss deception in its judgment order and the court's entire analysis of proximate causation is contained in its finding that "as a direct and proximate result of State Farm's violation of the Consumer Fraud Act, the plaintiffs were injured and incurred actual damages." The appellate court did address deception, although in a summary fashion. The court stated, without further explanation, that "[t]here is overwhelming evidence of State Farm's calculated deception of its policyholders." 321 Ill.App.3d 269, 254 Ill.Dec. 194, 746 N.E.2d 1242 (quote contained in a portion of the

opinion unpublished under Supreme Court Rule 23).

[51] The notion that DeFrank was deceived by the omissions or representations in his estimate and brochure into accepting non-OEM parts is categorically refuted by the record. At trial, DeFrank gave the following testimony:

**\*862** "Q. [Plaintiffs' counsel] I may have asked you this. Did you report the collision to State Farm?
A. [DeFrank] Yes.
Q. Did you report it promptly?
A. Yes.
Q. Okay. Tell the jury what happened, Sam, after you called State Farm.
A. They made an appointment with me to take my truck to the claims center which is out by the airport.
Q. Okay.
A. And which I did on that particular day.
Q. Okay. Was it on November the 5th that you did that?
A. Yes, sir.
Q. Okay. Tell the jury what happened on November the 5th when you went out there.
A. Well, I took my truck to the claims center. I pulled it inside. And the fellow there that-he started looking it over. And I said, Oh, yeah. By the way, I said, I want all GM parts on that truck.
Q. Why did you happen to bring that up?
A. Seeing commercials on TV where they say, you know, keep your GM car all GM.
Q. Okay. That was all you knew about it?
A. That was all I knew about it at the time.
Q. What did he tell you?
A. He said, We will talk about that later.
Q. Did that indicate anything-what did you think?
A. I figured something was up.
Q. Okay. Did you talk to a man named-a claim representative or somebody named Richard Hill?
A. Yes, sir.
Q. Okay. When did you do that?
A. When?
Q. Yeah. When did you do that? Was that while the truck-
A. While this other fellow was looking at my truck and, I guess, writing the estimate on that, we went into his office.
Q. Richard Hill?
A. Richard Hill's office.
Q. Okay. And did what [*sic*] Mr. Hill give you?
A. We talked for a little bit, and then he handed me a little brochure from State Farm.
Q. Okay.
A. That stated their policy.
Q. Okay. Did it tell you that-state their policy about what?

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

835 N.E.2d 801
216 Ill.2d 100, 835 N.E.2d 801, 296 Ill.Dec. 448
(Cite as: 216 Ill.2d 100, 835 N.E.2d 801)

Page 50

A. If they used non-OEM parts on your vehicle.
Q. That they would use non-OEM?
A. That they stand behind it.  Yeah.
Q. What was your reaction to finding out that they were going to use non-OEM parts on your vehicle?
A. I was very upset.
Q. Did you complain?
A. Did I to Mr. Hill at that time?  Yes.
Q. And what was Mr. Hill's response to you?
A. He just promised me that-or basically said that there was really-that's how they do it, and that they stand behind their non-OEM parts.    If I had any trouble they would take care of me."

DeFrank's testimony makes it abundantly clear that he was not deceived by anything State Farm said, or did not say, **\*863** regarding the quality of non-OEM parts.    Even before he spoke to the State Farm adjuster, DeFrank believed, in his own mind, that non-OEM parts were not as good as OEM parts. Otherwise, he would not have insisted that GM parts be installed on his truck.  Further, DeFrank would not have become, in his words, " very upset" upon learning that non-OEM parts were to be used on his truck unless he believed that non-OEM parts were not as good as OEM parts.

Neither the appellate court nor the circuit court addressed DeFrank's testimony or explained how, in light of that testimony, it can be said that he "blindly" accepted the non-OEM parts "without knowledge of their categorical inferiority." 321 Ill.App.3d 269, 254 Ill.Dec. 194, 746 N.E.2d 1242 (quote contained in a portion of the opinion unpublished under Supreme Court Rule 23).    DeFrank plainly was not deceived by State Farm's estimate or "Quality Replacement Parts" brochure.    Because he was not deceived by State Farm, DeFrank failed to establish the proximate causation necessary to recover under the Consumer Fraud Act.

In light of the above, it is clear that DeFrank suffered no actual damage, and that he failed to establish proximate causation.    For these reasons, DeFrank failed to prove a private cause of action under the Consumer Fraud Act.    Because DeFrank, as the representative plaintiff, has not proven his claim for consumer fraud, there can be no Illinois class for plaintiffs' consumer fraud count.  See, *e.g., Oliveira, 201 Ill.2d at 156-57, 267 Ill.Dec. 14, 776 N.E.2d 151; Charles Hester Enterprises, Inc. v. Illinois Founders Insurance Co.,* 114 Ill.2d 278, 294-95, 102 Ill.Dec. 306, 499 N.E.2d 1319 (1986).    Therefore, we reverse the judgments of the circuit and appellate courts in favor of plaintiffs on the consumer fraud count.

### D. *Other Issues*

In light of our disposition of plaintiffs' consumer fraud claim, we need not reach other issues raised by State Farm in relation to that claim, including the propriety of the circuit court's punitive damages award.

### III. Equitable and Declaratory Relief

In count III of their third amended complaint, plaintiffs sought a declaration of rights and a permanent injunction that would, *inter alia,* prohibit State Farm from representing "that non-OEM crash parts are of 'like kind and quality' to OEM crash parts" or that non-OEM crash parts can "restore a vehicle to its pre-loss condition."  The circuit court granted plaintiffs declaratory relief.    The court entered a declaration which stated, in essence, that State Farm's contractual obligation was the same with respect to each member of the class, regardless of variations in policy language and state regulations. However, the court declined to award plaintiffs injunctive relief, finding that money damages constituted an adequate remedy at law.

In light of our disposition of plaintiffs' claims for breach of contract and statutory consumer fraud, we affirm the circuit court's denial of equitable relief. We reverse the circuit court's granting of declaratory relief.

### CONCLUSION

For the foregoing reasons, that portion of the circuit court's judgment which denied plaintiffs' request for equitable relief is affirmed.    All other portions of the circuit court's judgment are reversed.    Those portions of the appellate court judgment which affirmed the denial of equitable relief and which reversed the circuit court's award of disgorgement damages are affirmed.**\*864**    All other portions of the appellate court's judgment are reversed.

*Appellate court judgment affirmed in part and reversed in part;  circuit court judgment affirmed in part and reversed in part.*

Justice THOMAS took no part in the consideration or decision of this case.Justice FREEMAN, concurring

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

in part and dissenting in part:
I agree with my colleagues with respect to some, but not all, of the issues raised in this appeal. Apart from my disagreement on these legal matters, I am troubled by the tone and tenor of today's opinion. I, therefore, write separately to explain my views.

## I. BREACH OF CONTRACT

The court reverses the jury verdict in favor of the plaintiff class outright, based on several different rationales. I agree with two major points. First, I concur in the judgment that the nationwide class certification cannot stand. While I disagree with the court's analysis, I believe its conclusion is correct. Further, although the court rightly concludes that the "specification" damages have no basis in law, thus necessitating reversal, I cannot completely join in this portion of the court's opinion because of some unnecessary *dicta.*

Notwithstanding the above, I respectfully disagree with the remainder of the court's conclusions on the breach of contract claim, and dissent therefrom. As I will explain, the court errs in its conclusion that plaintiffs cannot prove a breach of any of the various insurance policies in effect during the class period. Moreover, I do not believe that the jury engaged in improper speculation in awarding installation damages, such as would necessitate this court stepping in and overruling the jury verdict.

### A. Nationwide Certification

The court concludes that nationwide certification was erroneous because the various contracts State Farm uses in different states cannot all be interpreted as promising the same thing. Although I agree with the ultimate result reached by my colleagues-I, too, would find that the circuit court erred in certifying the nationwide class-I disagree with the court's reasoning.

As an initial matter, the court's analysis with respect to this issue is plagued by inconsistencies. For example, the court criticizes the circuit court's conclusion that there is a unitary contractual promise, noting that the various contracts contain different language and that there is no evidence to support the conclusion that the language is irrelevant to determining State Farm's obligations to its insureds. See 216 Ill.2d at 134-35, 296 Ill.Dec. at 471- 72, 835 N.E.2d at 824-25. The court specifically holds that

the "like kind and quality" policy form and the "pre-loss condition" form "are *not* the same." (Emphasis in original.) 216 Ill.2d at 130, 296 Ill.Dec. at 469, 835 N.E.2d at 822. But later, the court inexplicably accepts *State Farm's argument* that "[t]he term 'like kind and quality,' as used in the relevant policies, meant 'sufficient to restore a vehicle to its pre-loss condition.' " 216 Ill.2d at 144, 296 Ill.Dec. at 477, 835 N.E.2d at 830. In other words, despite what the court said earlier, it ultimately concludes that the promises in the two contracts *are* the same. If the promises are the same, then any differences between the forms are irrelevant.

In another example of inconsistency, the court states that the circuit court should have ruled before trial on the issue of whether State Farm's various contract **\*865** forms had a unitary promise. 216 Ill.2d at 127, 296 Ill.Dec. at 469, 835 N.E.2d at 822. However, when it comes to reviewing the lower courts' rulings, the court holds that "there is simply no *evidentiary support* for the lower courts' conclusion that" there is a unitary promise. (Emphasis added.) 216 Ill.2d at 134, 296 Ill.Dec. at 471, 835 N.E.2d at 824. The evidentiary support the court considers but finds wanting consists, of course, of information adduced at trial. See 216 Ill.2d at 132-35, 296 Ill.Dec. at 470-72, 835 N.E.2d at 823-25. This is clearly inconsistent with the earlier statement that the circuit court ought to have decided the issue before trial began, in light of the fact that the court is-quite properly, in my mind-willing to entertain the possibility that evidence adduced at trial could demonstrate that State Farm had a common obligation to all of its policyholders, regardless of variations in the contracts State Farm drafted.

Moreover, the court's rejection of the evidence adduced at trial-specifically, the testimony of Don Porter-cannot withstand scrutiny. First, I note that the court characterizes Porter as "a State Farm property consultant in auto general claims." 216 Ill.2d at 119, 296 Ill.Dec. at 463, 835 N.E.2d at 816. This description connotes that Porter is the equivalent of a lower level employee. In reality, Porter, a State Farm witness, worked at the State Farm home office in Bloomington as one of only 19 State Farm "property consultants" in the entire nation. At the time of trial, he had been a State Farm employee for 21 years. Porter specifically testified that he was "here to testify to what we do as an organization and what I know that my comrades do when we talk about the use of these parts."

Porter testified, as the court admits, that State Farm

had a uniform nationwide practice: " 'restoring the vehicle to its pre-loss condition.' " 216 Ill.2d at 120, 296 Ill.Dec. at 463, 835 N.E.2d at 816. The court, however, determines that it may ignore this testimony because Porter did not specifically refer to each and every form of contract which State Farm used. I do not believe that the court is respecting the standard of review. Had Porter testified that he arranged his bookshelves in alphabetical order by title, we would not refuse to accord this testimony weight because he did not *specifically* testify that he placed *Moby Dick* before *Wuthering Heights.* Porter was no neophyte, and he was testifying to the practices of State Farm "as an organization." His testimony cannot be brushed away on the basis that he might not have been talking about State Farm as a whole.

The court also interprets Porter's testimony in the light least favorable to the result reached by the circuit court, stating that his general testimony regarding State Farm's practices related only to State Farm's "philosophy," and not its contractual obligations. In other words, the court overrules the circuit court because although State Farm might have had a nationwide "philosophy," its various policies might have promised less-*i.e.,* State Farm might as a matter of "philosophy" give its policyholders *more* than the benefits for which they have paid. Although it might make a nice sound bite for State Farm's advertisements, this is simply conjecture, not a valid basis for overruling the circuit court. We must defer to the circuit court's interpretation of testimony unless it is clearly erroneous. That standard clearly has not been reached here. At best, the court is suggesting another *possible* interpretation of the testimony at issue and substituting its judgment for the circuit court's. This is not a reviewing court's role. Porter, during his testimony, made a general, categorical statement that **\*866** State Farm had an overarching consistent obligation. As the court admits, Porter knew that State Farm had several differently worded policies; it is not as if he were unaware that State Farm chose to use different language in its policies in different states. Nevertheless, he testified that its obligation was everywhere the same.

The court also makes much of Porter's numerous self-serving statements that State Farm's only intent was to restore its insureds' vehicles to their "pre-loss condition." (Indeed, Porter repeated this phrase no less than 26 times during the course of his testimony.) But sometimes, another answer slipped through. For instance, when asked whether State Farm treated all insureds "equally with respect to specifying non-OEM crash parts," Porter testified,

"In my experience, we do. *It doesn't make any difference the age of the vehicle,* the type of the vehicle." (Emphasis added.) This cuts against the court's argument that State Farm's obligation depends on the preloss condition of every individual vehicle, as a vehicle's age is a component of its preloss condition. At another point, counsel for State Farm asked Porter to supply his definition of "the term 'non-OEM part.' " He responded:

"Well, a non-OEM part to me is a part that's made by other than the original manufacturer. And, you know, but it simply to me, is you buy a part from Ford and if the Ford fender was made by Ford, but you can buy that fender that's-that's originally produced by Ford by another manufacturing firm that has produced the same type of fender or fenders *as good as the fender that was the OEM fender.*" (Emphasis added.)

Here Porter clearly testified that non-OEM parts had to be as good as OEM parts.

On cross-examination, Porter was asked about a confidential internal State Farm memorandum, titled General Claims Memorandum (GCM) # 430 (I will return to this document later). Porter admitted that this document required that non-OEM parts "must be of OEM quality." Plaintiffs' counsel subsequently posed the following question to Porter, and received the following response:

"Q. Yes, sir. Now, is there a guarantee to-anywhere else other than this general claims memo that guarantees that these parts will be made out of the same construction and have the same structural integrity as the OEM parts?

A. You know, sir, I would have to say that, *yes, it does* after all *because* it says quality replacement part, and *when we say quality replacement part, we mean those parts that are as good as the parts that were on the vehicle at the time of the loss.*" (Emphases added.)

Porter here made clear that the term "quality replacement part," which meant "parts that are as good as the parts that were on the vehicle at the time of the loss," was a guarantee of *OEM quality.* Thus, here, Porter equated the guarantee to restore the vehicle to preloss condition with a guarantee of OEM-quality replacement parts. This telling admission wholly undermines the court's theory that preloss condition destroys commonality, because if preloss condition means OEM quality, then a vehicle cannot be restored to preloss condition with a part which falls short of OEM quality, and thus individual examinations of plaintiffs' vehicles is not necessary

835 N.E.2d 801                                                                                              Page 53
216 Ill.2d 100, 835 N.E.2d 801, 296 Ill.Dec. 448
**(Cite as: 216 Ill.2d 100, 835 N.E.2d 801)**

if, as the jury concluded, all non-OEM parts are of lesser quality than OEM parts.[FN14]

> FN14. On this topic I note that the court has accepted State Farm's argument that its contractual guarantees to restore vehicles to their "pre-loss condition" and to perform repairs with parts of "like kind and quality" may be defined in terms of each other. See 216 Ill.2d at 143-44, 296 Ill.Dec. at 476-77, 835 N.E.2d at 829-30. If the promises are fungible, as the court admits, then clearly plaintiffs could show that State Farm breached its promise to restore their vehicles to preloss condition by showing that State Farm was not using parts of "like kind and quality."

**\*867** The jury was entitled to believe Porter's admissions in plaintiffs' favor over his constant repetition of a term favoring State Farm, his long-term employer. The court's proffered reasons for disregarding Porter's testimony are simply untenable.

The court's treatment of Porter's testimony, moreover, is not an isolated event. I am troubled by the court's consideration-or more appropriately its lack of consideration-of the evidence adduced at trial. This case comes before this court on appeal from a trial which lasted more than seven weeks-50 days elapsed between opening statements on August 16, 1999, and the jury's October 4 verdict. Over the course of the trial, 81 witnesses testified, with the circuit court admitting into evidence well over 200 exhibits. Before the case even went to trial, there were over two years of pretrial proceedings between the filing of plaintiffs' original class action complaint in July 1997 and the August 1999 beginning of trial. The common law record alone runs to more than 30,000 pages of filings. And yet, in an 81-page opinion, the court devotes *less than two full pages* to its initial recitation of the facts. It concerns me, as it ought to concern anyone, to see that the actual evidence adduced in this case is given such short shrift.

As I stated at the outset of this separate opinion, however, I do ultimately agree with my colleagues that the nationwide class cannot stand. Initially, I believe that the circuit court abused its discretion in applying Illinois law to the contracts between State Farm and non-Illinois residents. Illinois follows the Restatement (Second) of Conflict of Laws in making choice-of-law decisions. *Morris B. Chapman & Associates, Ltd. v. Kitzman*, 193 Ill.2d 560, 568, 251

Ill.Dec. 141, 739 N.E.2d 1263 (2000). The Restatement provides that when the parties have not made an effective choice of law, the factors of possible relevance to choice of law in breach of contract cases are

"(a) the place of contracting,
(b) the place of negotiation of the contract,
(c) the place of performance,
(d) the location of the subject matter of the contract, and
(e) the domicil, residence, nationality, place of incorporation and place of business of the parties,"

which are to be "evaluated according to their relative importance with respect to the particular issue." Restatement (Second) of Conflict of Laws § 188, at 575 (1971). In the context of insurance contracts,"[T]he rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship * * * to the transaction and the parties, in which event the local law of the other state will be applied." Restatement (Second) of Conflict of Laws § 193, at 610 (1971).

**\*868** Accord *Westchester Fire Insurance Co. v. G. Heileman Brewing Co.*, 321 Ill.App.3d 622, 630-31, 254 Ill.Dec. 543, 747 N.E.2d 955 (2001). With respect to automobile insurance contracts, the "principal location of the insured risk" is that location in which the vehicle is to be garaged during most of the insurance policy's term. Restatement (Second) of Conflict of Laws § 193, Comment *b*, at 611 (1971).

Of the above factors, the only one which would appear to militate in favor of applying Illinois law to the out-of-state contracts is the fact that State Farm is an Illinois resident. The most important factor, the location of the insured risks-the insureds' vehicles-would cut against application of Illinois law. The contracts would not have been delivered in Illinois. The insureds would not be domiciled in Illinois. And the last act to give rise to a valid contract-either the insureds' signatures or the deposit of checks in the mail-most likely would not have occurred in Illinois. Consideration of the relevant factors would appear to militate strongly against applying Illinois law to the entire multistate class in this case.

Moreover, even if the fact of State Farm's Illinois domicile sufficed to uphold application of Illinois law according to Illinois choice of law principles, doing so would not pass constitutional muster. In *Phillips*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

835 N.E.2d 801                                                                                          Page 54
216 Ill.2d 100, 835 N.E.2d 801, 296 Ill.Dec. 448
**(Cite as: 216 Ill.2d 100, 835 N.E.2d 801)**

*Petroleum Co. v. Shutts,* 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985), the Supreme Court reviewed a class action brought in Kansas against Phillips Petroleum for recovery of interest on royalties in oil and gas contracts. The contracts at issue were entered into in 10 different states. Even though most of the contracts were entered into outside Kansas, the Kansas Supreme Court upheld its trial court's decision to apply Kansas law to the entire action.

The Supreme Court reversed. The Court stated that even in a case where multiple choices of law might be *possible,* the forum court's choice of law had to comply with constitutional guarantees of due process. *Shutts,* 472 U.S. at 822-23, 105 S.Ct. at 2980, 86 L.Ed.2d at 649 ("in many situations a state court may be free to apply one of several choices of law. But the constitutional limitations * * * must be respected even in a nationwide class action"). The Court rejected the rule formulated by the Kansas Supreme Court that " 'Where a state court determines it has jurisdiction over a nationwide class action and procedural due process guarantees of notice and adequate representation are present, we believe the law of the forum should be applied unless compelling reasons exist for applying a different law.' " *Shutts,* 472 U.S. at 821, 105 S.Ct. at 2979, 86 L.Ed.2d at 648, quoting *Shutts v. Phillips Petroleum Co.,* 235 Kan. 195, 221-22, 679 P.2d 1159, 1181 (1984). The Court also noted that a plaintiff's choice of the forum state's law-as evinced by having filed the suit there-is of "little relevance." *Shutts,* 472 U.S. at 820, 105 S.Ct. at 2979, 86 L.Ed.2d at 648. Rather, the Court held that to apply its own law, the forum state "must have a 'significant contact or significant aggregation of contacts' to the claims asserted by each member of the plaintiff class, contacts 'creating state interests,' in order to ensure that the choice of [the forum state's] law is not arbitrary or unfair." *Shutts,* 472 U.S. at 821-22, 105 S.Ct. at 2979, 86 L.Ed.2d at 648. The Court concluded that in the case before it, " [g]iven [the forum state's] lack of 'interest' in claims unrelated to that State, and the substantive conflict with jurisdictions such as Texas, we conclude that application of [the forum state's] law to every claim in this case is sufficiently arbitrary and unfair as to exceed constitutional**869** limits." *Shutts,* 472 U.S. at 822, 105 S.Ct. at 2979, 86 L.Ed.2d at 648.

The same shortcomings that caused the Supreme Court to find a constitutional violation in *Shutts* are present in the instant case. As in *Shutts,* there are significant outcome-determinative differences between the law of Illinois and the laws of other

states regarding the breach of contract action. For instance, our circuit and appellate courts determined that State Farm's promise to have repairs performed with parts "of like kind and quality" meant "of like kind and quality to OEM parts," a conclusion with which I agree. However, as State Farm observes, courts in other jurisdictions have not so construed the language. See, *e.g., Ray v. Farmers Insurance Exchange,* 200 Cal.App.3d 1411, 1417, 246 Cal.Rptr. 593, 596 (1988) (" 'like kind and quality' * * * means 'substantially the same condition [as] before the accident' "), quoting *Owens v. Pyeatt,* 248 Cal.App.2d 840, 849, 57 Cal.Rptr. 100, 107 (1967); *Schwendeman v. USAA Casualty Insurance Co.,* 116 Wash.App. 9, 22-23, 65 P.3d 1, 8 (2003); see also *Berry v. State Farm Mutual Automobile Insurance Co.,* 9 S.W.3d 884, 894-95 (Tex.App.2000). Other states have expressly provided by statute or regulation that non-OEM parts may be used in repairs so long as they are the equivalent of the part on the vehicle immediately prior to the accident. See Or.Rev.Stat. § 746.287(2) (1999); Mass. Regs.Code tit. 211, § 133.04(1) (2004); 806 Ky. Admin. Regs. 12:095 (2003). Application of these jurisdictions' laws would change the outcome of the instant case.

It is possible for a forum state to have a sufficient interest in the resolution of the claims of out-of-state litigants as to render the application of the forum state's law neither arbitrary nor fundamentally unfair despite outcome-determinative differences. *Shutts,* 472 U.S. at 818, 105 S.Ct. at 2977-78, 86 L.Ed.2d at 646. However, I do not believe that Illinois has such an interest in the instant action. It is true that State Farm is an Illinois corporate citizen, and Illinois does have an interest in regulating its conduct. However, Illinois does not have any particularly compelling interest in protecting the rights of the citizens of other states, especially given that there is no indication that the other states are unable or unwilling to vindicate the rights of their citizens within their own court systems, according to their own laws. Moreover, neither State Farm nor any non-Illinois policyholder would appear to have had any reasonable expectation that Illinois law would govern their contractual dispute. See *Shutts,* 472 U.S. at 822, 105 S.Ct. at 2979-80, 86 L.Ed.2d at 648-49 (fairness calculus must take into account the reasonable expectations of parties as to which state's law would control). Thus, I believe that applying Illinois law to the entire nationwide class which the circuit court certified in this case would run afoul of the due process concerns spelled out in *Shutts,* and I would reverse the multistate certification for this reason. See *State ex rel. American Family Mutual Insurance Co. v. Clark,*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 S.W.3d 483, 486-87 (Mo.2003).

B. Contract Interpretation

Having determined that the nationwide class cannot stand, the court next examines whether the verdict may be upheld with respect to any subclass. 216 Ill.2d at 135, 296 Ill.Dec. at 471, 835 N.E.2d at 824. The court concludes that the question must be answered in the negative. The court actually answers this question in two paragraphs, with no analysis nor citation to authority, based on the verdict form. See 216 Ill.2d at 135-36, 296 Ill.Dec. at 471-72, 835 N.E.2d at 824- 25. This ought, perhaps, to be the end of the opinion. But, the court quickly turns the reader's**870 eye away from the paucity of its analysis of what is apparently the determinative issue in the case by turning to a lengthy exegesis of the individual policy forms.

Before reviewing the court's conclusion that, as a matter of law, the plaintiffs failed to prove a breach of any promise State Farm made in any of the various policies State Farm drafted, it is helpful to recall the overarching theme of the plaintiffs' complaint. At its heart, plaintiffs' complaint was that State Farm promised policyholders that their vehicles would be repaired with OEM-quality parts, but the non-OEM parts State Farm specified for repairs were simply not as good as OEM parts and that State Farm knew it. State Farm knowingly specified the inferior non-OEM parts, plaintiffs contended, because they were cheaper. These contentions cannot be ignored, when one considers the evidence adduced at trial. Plaintiffs presented to the jury numerous internal State Farm memoranda that detailed problems with non-OEM parts, some of which criticized non-OEM parts as a class. One such memorandum went so far as to state specifically, in contrasting galvanized OEM parts with nongalvanized non-OEM parts, that "we may well say it is like kind and quality, but the bottom line is that it is not the same." Plaintiffs also presented expert testimony to the effect that non-OEM parts were categorically inferior to OEM parts and thus were *never* of like kind and quality. State Farm does not challenge these experts' *bona fides* on review, and thus their conclusions must be accepted. I believe it is important to note that a reviewing court neither can substitute its judgment for that of the trier of fact nor can it set aside a verdict simply because the trier of fact could have drawn different conclusions from conflicting testimony. *Doser v. Savage Manufacturing & Sales, Inc.,* 142 Ill.2d 176, 154 Ill.Dec. 593, 568 N.E.2d 814 (1990). Although

State Farm presented its own expert witnesses, a "battle of the experts" is a situation in which reviewing courts are especially loathe to second-guess the findings made by the trier of fact. See *In re Glenville,* 139 Ill.2d 242, 152 Ill.Dec. 90, 565 N.E.2d 623 (1990).

The court avoids discussing the evidence presented by plaintiffs by holding that State Farm never promised any policyholders that repairs would utilize parts of equal quality to OEM parts. Thus, according to my colleagues, it *does not matter* whether State Farm was knowingly repairing its policyholders' vehicles with inferior parts, because State Farm never promised to use noninferior parts. I suggest that the court has perhaps insufficiently considered the policy implications of overturning a billion dollar verdict on the basis of an insurer's knowing usage of inferior parts is "good enough." I am not stating that non-OEM parts are by definition inferior; my point is that plaintiffs alleged, and by its verdict the jury found, that as of now non-OEM parts are not up to the standards of OEM parts-a factual conclusion the court avoids addressing. The quality of non-OEM parts could change in the future, but the court does not dispute that the crash parts State Farm was actually specifying for repairs were inferior to their OEM counterparts.

In addition to being bad policy, the court's conclusion is also based on a flawed analysis of the relevant contractual provisions. In this regard I note a piece of evidence which the court has remarkably determined to be irrelevant. In 1986, State Farm's vice president of claims penned a confidential internal memorandum, known as "General Claims Memorandum # 430" (hereinafter GCM # 430). Therein, he discussed the quality of the parts to be used in repairs. He-that is, State Farm's vice president of claims-**871 specifically distinguished between what was required of " aftermarket" parts and what was required of "salvage" parts. As an aid to understanding the memorandum, I note that it is uncontroverted that " aftermarket" is a synonym for "non-OEM," and it is also uncontroverted that " salvage" parts are, as the name implies, a lower grade than non-OEM parts. In comparing the two grades of parts, State Farm's vice president of claims had this to say:
"*Aftermarket parts must be of OEM quality;* that quality must be guaranteed by the supplier;
*Salvage parts must be* of equal, or better, quality *compared to the parts being replaced.*" (Emphases in original.)

Thus State Farm specifically required that non-OEM parts be of equal quality to OEM parts, only holding "salvage" parts to the lesser standard of equivalence to the parts being replaced.

One might think that this would be the end of the matter. A reasonable reader might expect that a reviewing court would affirm the lower court's conclusion that non-OEM parts had to be of equal quality to OEM parts, given a memorandum by State Farm's vice president of claims that precisely so stated. The court, however, does not consider whether GCM # 430 ought to be treated as a binding admission by State Farm, because the court, in a footnote, concludes that GCM # 430 is irrelevant. See 216 Ill.2d at 142, 296 Ill.Dec. at 475, 835 N.E.2d at 828 n. 5. Instead, the court performs its own investigation into the policies at issue, ignoring the fact that State Farm has already said that its non-OEM (aftermarket) parts "must be of OEM quality," as opposed to salvage parts, a lower grade, which are merely required to be of equal quality "to the parts being replaced."

Even if the court were correct to so blatantly ignore the evidence, its analysis of the contracts is logically faulty. For instance, in what the court calls "The 'You Agree' Policies" (see 216 Ill.2d at 137, 296 Ill.Dec. at 473, 835 N.E.2d at 826 (heading 2)), State Farm promises to restore the insured's vehicle to its "pre-loss condition." This particular form of the contract also contains what the court calls the "you agree" language: "*You* agree with us that such parts may include either parts furnished by the vehicle's manufacturer or parts from other sources including non-original equipment manufacturers." (Emphasis in original.) See 216 Ill.2d at 137, 296 Ill.Dec. at 473, 835 N.E.2d at 826.

The court's defense of this policy form is twofold, and begins by focusing on the "you agree" language. The court reasons that by agreeing to this language a policyholder has implicitly admitted that there must exist at least some non-OEM parts capable of satisfying State Farm's promise. The court construes this admission strictly against the policyholder (in startling contrast to the court's treatment of State Farm's admission in GCM # 430 that non-OEM parts must be of equal quality to OEM parts). See 216 Ill.2d at 137, 296 Ill.Dec. at 473-74, 835 N.E.2d at 826.

First, one must recall that this is an insurance policy- a classic contract of adhesion. See *Cramer v. Insurance Exchange Agency,* 174 Ill.2d 513, 533, 221 Ill.Dec. 473, 675 N.E.2d 897 (1996) (Freeman, J., specially concurring) ("It is well established that an insurance contract is one of adhesion"); see also *Williams v. Illinois State Scholarship Comm'n,* 139 Ill.2d 24, 72, 150 Ill.Dec. 578, 563 N.E.2d 465 (1990) (adhesion contracts are those in which the parties are in a disparate bargaining position, and one party has no hand in drafting the agreement but, rather, must "take it or leave it" as the other **\*872** party has drafted). Contractual clauses which are "part of a 'boilerplate' agreement" in a contract of adhesion have their "significance greatly reduced because of the inequality in the parties' bargaining power." *Williams,* 139 Ill.2d at 72, 150 Ill.Dec. 578, 563 N.E.2d 465. The average person has no ability to bargain over the individual clauses of his or her auto insurance policy. The court ignores this fact, and seriously damages the credibility of its analysis by doing so. The notion that a policyholder has entered into a binding, factual admission simply by purchasing an auto insurance policy would merely be laughable if the court was not seriously suggesting it as a basis for overturning a billion dollar verdict produced by a two-month-long trial in which the evidence supports the conclusion that an insurer knowingly specified inferior crash parts for repairs of its policyholders' vehicles.

More overridingly, however, even ignoring the injustice of strictly construing a contract of adhesion in favor of the drafter, the court's analysis is logically flawed. The "you agree" language is *not* an admission that there exist non-OEM parts which will restore vehicles to their preloss condition. It is merely an agreement that *if* State Farm proposes to perform a repair with a non-OEM part which *is* sufficient to restore a vehicle to its preloss condition, the insured cannot object to the part *simply* because it is non-OEM. But if non-OEM parts are *not* sufficient to restore vehicles to their preloss condition, as plaintiffs have consistently maintained and as the jury by its verdict found, the policyholder cannot be not forced to accept it simply because of the "you agree" language.

The fallacy of the court's position is better viewed when one examines how it would play out in the context of other policies State Farm could have issued. Suppose, for example, that State Farm knew that all of the major auto manufacturers were considering building plants in a foreign country that I shall designate as Country A. In anticipation of the plants being built and in order to forestall any complaints by policyholders about receiving parts produced in Country A, State Farm amended its

835 N.E.2d 801                                                                                                                      Page 57
216 Ill.2d 100, 835 N.E.2d 801, 296 Ill.Dec. 448
**(Cite as: 216 Ill.2d 100, 835 N.E.2d 801)**

policy so as to provide that

"*You* agree with us that such parts may include parts furnished by the vehicle's manufacturer, including parts manufactured in Country A."

The reasoning employed by the court in the instant case would hold that everyone insured under this policy has entered into a binding admission that there are General Motors parts manufactured in Country A which are of sufficient quality to restore their vehicles to preloss condition.    This is logically fallacious.    Recall that the policy language in my hypothetical was drafted in *advance* of the plant in Country A being built, and thus at the time it went into use, there did not exist *any* General Motors parts made in Country A.   A plain reading of this language is, rather, a concession by the insured that *if* a part manufactured in Country A suffices to restore his vehicle to its preloss condition, he may not reject the part simply *because* of its origin in Country A.

My colleagues might protest that this hypothetical is far-fetched-and it may be-but no more so than the court's tortured reading of language in a contract of adhesion against innocent policyholders in order to avoid having to acknowledge the proofs adduced at trial.    The underlying point remains that the language upon which the court relies is *not* an admission by an insured that there exist non-OEM parts which suffice to restore a vehicle to its preloss condition.    It is merely an agreement that *if* there are such parts, the **\*873** insured may not refuse to accept them *simply* because they are non-OEM parts.

The second stage of the court's defense of this policy form focuses on the fact that State Farm's promise is to restore the insured's vehicle to its " pre-loss condition."    The court believes that this policy form is unsuited to be the basis of a class action because to determine whether a vehicle has been restored to its preloss condition requires determination of the condition of each individual policyholder's vehicle before the loss and after repair, and this multitude of individual questions would "overwhelm any question common to the subclass."   216 Ill.2d at 138, 296 Ill.Dec. at 473, 835 N.E.2d at 826.

However, as I have already noted, State Farm witness Porter testified that the term "quality replacement part," which meant "parts that are as good as the parts that were on the vehicle at the time of the loss," was a guarantee of *OEM quality*.    This testimony equates the guarantee to restore the vehicle to preloss condition with a guarantee of OEM-quality replacement parts, which undermines the court's

theory that preloss condition destroys commonality. If preloss condition means OEM quality, as Porter's testimony reveals, then a vehicle cannot be restored to preloss condition with a part which falls *short* of OEM quality.    Thus if, as the jury concluded, all non-OEM parts are of lesser quality than OEM parts, individual examinations of plaintiffs' vehicles are *not* necessary.    State Farm does not argue in its briefs to this court that the circuit court erred in determining that the "pre-loss condition" and "like kind and quality" promises are the same.    Indeed, to the contrary, State Farm affirmatively argues that the promises *are* the same, an argument the majority accepts.    See 216 Ill.2d at 143-44, 296 Ill.Dec. at 476-77, 835 N.E.2d at 829-30.

Accordingly, the court has failed to demonstrate any reason that plaintiffs would be barred from recovering under "The 'You Agree' Policies."

The court's analysis of the "like kind and quality" policies also falls short.   Here, the court examines those policies in which State Farm has written that it promises to "pay to repair or replace the property or part with like kind and quality."   The court construes this language in the most favorable way possible for State Farm, concluding ultimately that this is an unambiguous promise to restore the vehicle to its preloss condition-a term which appears nowhere in this form of the contract.

The court acknowledges (see 216 Ill.2d at 140, 296 Ill.Dec. at 474, 835 N.E.2d at 827) plaintiffs' argument that "like kind and quality" means of "like kind and quality to OEM parts."   This interpretation is well supported by State Farm's own analysis of the standards required of non-OEM parts, in GCM # 430: "*Aftermarket parts must be of OEM quality; that quality must be guaranteed by the supplier;
Salvage parts must be* of equal, or better, quality *compared to the parts being replaced.*"   (Emphases in original.)

I respectfully suggest that this ought to be the end of the matter.    Plaintiffs argue that "like kind and quality" means "like kind and quality to OEM parts"; State Farm has admitted in its internal memoranda that this is *precisely* the quality standard it requires of non-OEM parts;  case closed.

Instead,   the   court   once   again   ignores   the memorandum by State Farm's vice president of claims and construes the language State Farm drafted in State Farm's favor, even going so far as to draw inferences advantageous to State Farm.    See 216

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

835 N.E.2d 801                                                    Page 58
216 Ill.2d 100, 835 N.E.2d 801, 296 Ill.Dec. 448
**(Cite as: 216 Ill.2d 100, 835 N.E.2d 801)**

**\*874** Ill.2d at 140-45, 296 Ill.Dec. at 475-77, 835 N.E.2d at 828-30.   In so doing, the court abandons our well-established rule that ambiguities in insurance contracts are to be strictly construed *against* the drafter.   See *Travelers Insurance Co. v. Eljer Manufacturing, Inc.,* 197 Ill.2d 278, 293, 258 Ill.Dec. 792, 757 N.E.2d 481 (2001); *American States Insurance Co. v. Koloms,* 177 Ill.2d 473, 479, 227 Ill.Dec. 149, 687 N.E.2d 72 (1997); *Outboard Marine Corp. v. Liberty Mutual Insurance Co.,* 154 Ill.2d 90, 108-09, 180 Ill.Dec. 691, 607 N.E.2d 1204 (1992).

The phrase "like kind and quality" is clearly ambiguous.   The language itself gives no clue as to whether it means of like kind and quality *to OEM parts* or *to the part which existed on the vehicle immediately prior to the crash.*   But instead of construing this phrase against State Farm, as mandated by our precedent, the court bends over backwards to find an interpretation that favors State Farm.   For instance, the court reasons that if non-OEM parts *never* satisfied this promise (as plaintiffs have alleged), there would be no need for this "indirect phrasing."   216 Ill.2d at 140, 296 Ill.Dec. at 475, 835 N.E.2d at 828.   In other words, the court finds that the very vagueness of State Farm's contract of adhesion is a point in State Farm's *favor.*

Moreover, the court misses the fundamentally obvious point that State Farm and the plaintiffs *disagreed* as to whether non-OEM parts were of like kind and quality to OEM parts.   State Farm, of course, has maintained all along that non-OEM parts are or can be of like kind and quality to OEM parts. Given this professed belief, there was no reason for State Farm to restrict itself only to using OEM parts. The proofs at trial, however, convinced the jury that this was not the case.   Essentially, the court is saying that State Farm must not have promised that any non-OEM parts it used would be of OEM quality *because the plaintiffs argued and proved that State Farm never fulfilled this promise.*   This defies reason.   We do not automatically adopt a defendant's interpretation of a contract it drafted whenever a plaintiff proves a breach of its interpretation of the contract.   To so suggest is absurd.

The court also draws inferences in favor of State Farm from the sentence which follows the "like kind and quality" promise:   "If the repair or replacement results in better than like kind and quality, you must pay for the amount of the betterment."   Clearly this statement by State Farm in its contract of adhesion is meant to cover State Farm in the unlikely event that a

repair left the policyholder better off.   But the court argues on State Farm's behalf that the very existence of this statement shows that " like kind and quality" cannot mean "like kind and quality to OEM parts," because if it did, nothing could ever run afoul of the "better than 'like kind and quality' " language. (Emphasis omitted.) 216 Ill.2d at 141, 296 Ill.Dec. at 475, 835 N.E.2d at 828.   First, this reasoning is faulty in much the same way as the court's reasoning regarding the "you agree" language:  State Farm could just as easily have provided that "If the repair or replacement results in your vehicle being able to fly to the moon, you must pay for the value of this ability."   That State Farm included self-serving language in a contract of adhesion does not constitute an admission by its policyholders regarding the hypothetical possibility against which State Farm has sought to protect itself.

Moreover, the proofs plaintiffs presented at trial concerned the quality of non-OEM parts during the relevant period.   Plaintiffs claimed, and the jury concluded, based on documentary evidence and the **\*875** testimony of experts whose *bona fides* State Farm does not challenge on appeal, that non-OEM parts were not the equal of OEM parts.   This does not foreclose the possibility that a master craftsman in Zurich might in the future take it upon himself to smith a set of General Motors crash parts out of titanium alloy, to such precise tolerances that the parts were indeed an improvement on OEM parts. More realistically, it is possible that in the future a company could mass produce non-OEM parts which are better than OEM parts.   It could happen.   But according to the proofs plaintiffs presented at trial, and the verdict the jury returned in plaintiffs' favor, it has not happened yet.   State Farm has protected itself against this eventuality by the sentence upon which the court relies. But there is no basis for the court's broad inference from this sentence to support its interpretation of the baseline promise State Farm has made in this version of the policy.

Again, the flaw in the court's reasoning is that it is taking into account plaintiffs' *theory* of the case in evaluating State Farm's contractual *promises.*   The court's reasoning runs as follows:  if, as plaintiffs contend, no non-OEM parts were of like kind and quality to OEM parts, then there would have been no reason for State Farm to draft the policy in the manner in which plaintiffs suggest they did.   The problem with this reasoning is that it was very much in dispute whether non-OEM parts were of like kind and quality to OEM parts.   State Farm has consistently maintained and still maintains that they

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

are or can be equivalent, and *State Farm drafted the policy.*

Moreover, as I have already observed, the court ultimately concludes that "like kind and quality" means something which is nowhere found in the language of this policy: it means, just as State Farm argues, " 'sufficient to restore a vehicle to its pre-loss condition.' " 216 Ill.2d at 144, 296 Ill.Dec. at 476-77, 835 N.E.2d at 829-30. There are a number of difficulties with this conclusion. First, it contravenes the rule that ambiguous language in an insurance contract is to be strictly construed against the insurer. Clearly the court finds the "like kind and quality" language ambiguous, given that the court ultimately finds that it has a meaning contained nowhere in the contract. Given that it is ambiguous, there is no question that it ought to be construed against State Farm. *Eljer Manufacturing,* 197 Ill.2d at 293, 258 Ill.Dec. 792, 757 N.E.2d 481; *Koloms,* 177 Ill.2d at 479, 227 Ill.Dec. 149, 687 N.E.2d 72; *Outboard Marine,* 154 Ill.2d at 108-09, 180 Ill.Dec. 691, 607 N.E.2d 1204.

A second problem with the court's conclusion is that in order to reach it, the court ignores State Farm's own admissions that non-OEM parts "must be of OEM quality." The court's willful blindness to GCM # 430 is truly troubling. It is, of course, possible for reasonable minds to differ as to the weight to accord a particular piece of evidence. But to act as though a document on the precise issue at hand, penned by State Farm's vice president of claims, does not even *exist* does a disservice not only to the parties but also to the credibility of this court. The court suggests that GCM # 430 is irrelevant because it is not contained within the four corners of the policy and the court has not *explicitly* found that the "like kind and quality" language is ambiguous. See 216 Ill.2d at 142, 296 Ill.Dec. at 475, 835 N.E.2d at 828 n. 5. This misses the mark. As I have already observed, the meaning the court ultimately ascribes to the phrase-"sufficient to restore a vehicle to its pre-loss condition"-is *itself* not found within the four corners of the document. It can only further erode the public's trust in the judiciary to reverse a verdict of this ***876** size, ignoring relevant evidence precisely on point, because the court claims it is *unambiguous*-clear, beyond any doubt-that State Farm's promise to "repair or replace the property or part with like kind and quality" means "with a part equally bad to whatever part was on the vehicle just before the accident" and *cannot possibly* mean "like kind and quality to OEM parts." There is no defensible basis for this conclusion and there is a host

of evidence to the contrary, including not only Porter's testimony and the text of GCM # 430, but also extensive testimony by State Farm witnesses that repairs with non-OEM parts would never compromise the safety of the vehicle. If State Farm may utilize replacement parts no better than the parts which happened to be on the vehicle preaccident, however old or faulty, as the court concludes, a vehicle could very well have safety issues after repair. If the court is looking outside the document to understand the meaning of the phrase, and there is no question that it is, then the court is *treating* the phrase as ambiguous, regardless of whether my colleagues are forthright enough to so admit.

Moreover, GCM # 430 itself shows that the court's analysis of the contract is wrong-not only is the phrase ambiguous, but the court has actually interpreted it incorrectly. GCM # 430 *directly* contradicts the court's pro-State Farm interpretation of the ambiguous phrase in State Farm's insurance policy. Not only did the vice president of claims specify that aftermarket parts had to be "of OEM quality," he also specified that the lesser standard of equality to "the parts being replaced"-*i.e.,* preloss condition-was a standard applicable only to "salvage parts." How the court can square its interpretation of "like kind and quality" with this evidence is beyond me. Apparently, given the court's deafening silence on the matter, it is beyond the court as well.

The court errs in construing the ambiguous language "like kind and quality" in favor of State Farm, in terms which appear only in other versions of the policy. Doing so violates the rule that ambiguous terms in insurance policies are strictly construed against the drafter. Indeed, three out of the four members of today's majority have authored opinions which have explicitly endorsed this long-standing rule of construction of insurance contracts, and the fourth member has recently concurred in an opinion in which the rule was applied. See *Eljer Manufacturing,* 197 Ill.2d at 293, 258 Ill.Dec. 792, 757 N.E.2d 481 (Justice McMorrow, writing for the court, acknowledging that "if the language of the policy is susceptible to more than one meaning, it is considered ambiguous and will be construed strictly against the insurer who drafted the policy and in favor of the insured"); *Central Illinois Light Co. v. Home Insurance Co.,* 213 Ill.2d 141, 153, 290 Ill.Dec. 155, 821 N.E.2d 206 (2004) (Justice Garman, writing for the court, acknowledging that "if the words used in the policy are reasonably susceptible to more than one meaning, they are ambiguous and will be strictly construed against the drafter"); *Gillen v.*

*State Farm Mutual Automobile Insurance Co., 215
Ill.2d 381, 393, 294 Ill.Dec. 163, 830 N.E.2d 575
(2005)* (Justice Fitzgerald, writing for a unanimous
court, acknowledging that "[i]f the policy language is
susceptible to more than one reasonable meaning, it
is considered ambiguous and will be construed
against the insurer").     This construction also
contradicts the court's own statements that "There is
nothing to support the conclusion that [linguistic
differences] are irrelevant and that all of State Farm's
policy variations therefore are susceptible of the same
contractual interpretation" (216 Ill.2d at 134, 296
Ill.Dec. at 471, 835 N.E.2d at 824) and that the "like
kind and quality" **877 policy form and the " pre-loss
condition" form "are *not* the same." (Emphasis
in original.) 216 Ill.2d at 130, 296 Ill.Dec. at 469, 835
N.E.2d at 822.   The court also ignores State Farm's
own interpretation of its obligations in GCM # 430, a
document by a State Farm vice president which
directly contradicts State Farm's position and the
court's conclusion regarding what is required of non-
OEM (aftermarket) parts.   The court's conclusion
that in order to be "like kind and quality," non-OEM
parts need merely to be sufficient to put the car in
preloss condition erases the distinction *drawn by
State Farm* in GCM # 430 between non-OEM parts
and salvage parts.

Because the reasoning regarding the "like kind and
quality" form of contract is erroneous, there is no
reason that plaintiffs could not recover under this
form of the contract as well as the "pre-loss
condition" form of contract, as I previously
demonstrated.

Unlike my colleagues, I would construe the
ambiguous terms in State Farm's policies against the
drafter, in accordance with our unwavering
precedent.   See, *e.g., Eljer Manufacturing,* 197 Ill.2d
at 293, 258 Ill.Dec. 792, 757 N.E.2d 481; *Koloms,*
177 Ill.2d at 479, 227 Ill.Dec. 149, 687 N.E.2d 72;
*Outboard Marine,* 154 Ill.2d at 108-09, 180 Ill.Dec.
691, 607 N.E.2d 1204.     Noting that State Farm
witness Porter testified that State Farm's obligation
was everywhere the same, and that State Farm's vice
president of claims specified that non-OEM parts
must be "of OEM quality," as opposed to the lesser
standard of equivalence "to the parts being replaced,"
which applied only to salvage parts, I would affirm
the conclusion of the circuit court and appellate court
that State Farm could only satisfy its obligations to its
insureds with non-OEM parts of equivalent quality to
OEM parts.

C. Damages

The court goes on to discuss the damages awarded on
the breach of contract claim, even though doing so is
not necessary to its decision.     Having already
determined that the verdict form was faulty and there
was in any event no breach of any of the underlying
policies, the court's decision to address damages is
clearly *dictum,* even though the court labels its
damages discussion an "additional reason" to reverse.
As I stated at the outset, I agree with the court that
there is no basis for the so-called "specification"
damages.   No State Farm policyholder was harmed
by the isolated act of State Farm *specifying* that their
vehicle was to be repaired with a non-OEM part.
Rather, only those policyholders whose vehicles were
*actually* repaired with non-OEM parts or who paid
the difference to have OEM parts installed can be
said to have been harmed.

However, I do not agree with the court's unwarranted
attack on plaintiffs' counsel for requesting
specification damages.   First, it is *wholly* irrelevant
to the legal issues involved in this case "why
plaintiffs devised their specification-damages theory
in the first instance."  216 Ill.2d at 147, 296 Ill.Dec.
at 478, 835 N.E.2d at 831.   The court's answer to this
question is nothing more than an attack on plaintiffs'
counsel as unintelligent and dishonest, in that order.
The court reasons that counsel was, at first, ignorant
that plaintiffs would have to establish damages
without destroying commonality and, then,
mendacious enough to deliberately invent a bogus
category of damages in order to hoodwink the circuit
court into maintaining this action as a class action
when it should not have been.  216 Ill.2d at 147-48,
296 Ill.Dec. at 478-79, 835 N.E.2d at 831- 32.   This
vilification of plaintiffs' counsel is wholly speculative
and injudicious.

**878 The court's attack has the additional fault of
being inaccurate.   The court guesses that plaintiffs
invented specification damages because without
them, plaintiffs would have been "unable to establish
damages and still maintain the commonality required
of a class action."  216 Ill.2d at 147, 296 Ill.Dec. at
478, 835 N.E.2d at 831.   And yet, the court does not
hold that the other category of damages plaintiffs
claimed,     installation     damages,    destroyed
commonality.   In fact, the court admits that there is
nothing wrong with "us[ing] statistical inference in
determining aggregate damages in a class action suit"
(216 Ill.2d at 151, 296 Ill.Dec. at 480, 835 N.E.2d at
833), as plaintiffs did with respect to installation
damages.     The court here implicitly admits that

plaintiffs *could* have established installation damages without destroying commonality (the court simply holds that plaintiffs presented insufficient *evidence* to support their installation damage claim in this case, a conclusion with which I disagree, as I shall discuss). So the "realization" the court attributes to plaintiffs is entirely false.    And thus the attack on plaintiffs' counsel, along with the impugning of their integrity, unwarranted even if it were accurate, is ill-founded as well.

With respect to installation damages, I would hold that plaintiffs did present sufficient evidence to uphold their installation damages claim.    This court has stressed that the determination of the amount of damages is a function reserved to the trier of fact and that a reviewing court should not substitute its opinion for the judgment rendered in the trial court.    *Richardson v. Chapman,* 175 Ill.2d 98, 113, 221 Ill.Dec. 818, 676 N.E.2d 621 (1997).    Moreover, "a court reviewing a jury's assessment of damages should not interfere unless a proven element of damages was ignored, the verdict resulted from passion or prejudice, or the award bears no reasonable relationship to the loss suffered."    *Snelson v. Kamm,* 204 Ill.2d 1, 37, 272 Ill.Dec. 610, 787 N.E.2d 796 (2003).    Therefore, when "the calculations and proportions of the award demonstrate a strong relation to the evidence presented, the jury's determination *cannot* be against the manifest weight of the evidence.    See *Jones v. Chicago Osteopathic Hospital,* 316 Ill.App.3d 1121, 1138, 250 Ill.Dec. 326, 738 N.E.2d 542 (2000) (if a jury's award falls within the flexible range of conclusions reasonably supported by the evidence, it must stand)."    (Emphasis added.)    *Snelson,* 204 Ill.2d at 38-39, 272 Ill.Dec. 610, 787 N.E.2d 796.    These long-standing principles are nowhere acknowledged in today's opinion.

The court's damages discussion presents an anomaly in American jurisprudence, in that it would reverse a damage award for being *too low*.    I know of no rule of law which would lead a court of review to conclude, as the court does today, that if the jury had given plaintiffs more than it believed the plaintiffs had proven they deserved, it would affirm, but because the jury was conservative and awarded a low amount, plaintiffs are entitled to no compensation at all.

In my view, the court appears to be punishing the conservatism of the jury's damage award.    Dr. Mathur testified that damages could be as high as $1.2 billion.    He also testified that his estimate could

be off by as much as $1 billion.    The jury obviously took Dr. Mathur at his word.    The jury accepted the top estimate Dr. Mathur suggested, but reduced his highest estimate by the largest correction he endorsed.    These calculations clearly "demonstrate a strong relation to the evidence presented" (*Snelson,* 204 Ill.2d at 38, 272 Ill.Dec. 610, 787 N.E.2d 796), and thus are not against the manifest weight of the evidence.    I decline to join the court's suggestion that jury awards which bear a **879 strong relation to the evidence presented might still be reversed for being too low, and I question the impact the court's discussion will have on future damage awards in this state.    And, again, it is worth recalling that the entire discussion here is *dictum,* as the court has already determined that the plaintiff class is entitled to no relief on other, independent grounds.    The court's decision to include this analysis cannot be understood as anything but a decision to attack this particular jury verdict on every conceivable front.

D. Disposition

In light of the foregoing, I believe that the appropriate disposition with regard to the breach of contract claim is to remand the cause to the circuit court to determine whether there exists any subclass of the nationwide class with respect to which the verdict may be upheld.    In contrast to my colleagues, I believe that the proper reason for reversing the nationwide class is the *Shutts* problem:    there are outcome-determinative differences between the laws of Illinois and the laws of other states, and Illinois has no compelling interest in applying its law to states whose laws differ.    See *supra,* 216 Ill.2d at 214, 296 Ill.Dec. at 482, 835 N.E.2d at 869 (Freeman, J., concurring in part and dissenting in part, joined by Kilbride, J.).    But the fact that there are outcome determinative differences between Illinois and *some* other states does not mean that there are outcome-determinative differences between Illinois and *all* other states.    Thus, on remand, I would direct the circuit court to hold a hearing to determine which (if any) of the states that have been the subject of evidence in these proceedings is sufficiently closely aligned with Illinois law that the use of Illinois law to determine the contractual rights of State Farm's policyholders in that state would not offend State Farm's due process rights.    Such a result would be well within the circuit court's inherent power to manage class actions.    See 735 ILCS 5/2-802(a), (b) (West 1998).    See also *Purcell & Wardrope, Chartered v. Hertz Corp.,* 279 Ill.App.3d 16, 20, 215 Ill.Dec. 769, 664 N.E.2d 166 (1996) (" 'A

class action may, nevertheless, still be maintained, despite these conflicting or differing State laws, and the court may simply choose to divide the class into subclasses. Moreover, if at some later time in the litigation, the subclassification becomes unmanageable, the court, of course, always has the option to set aside the class certification or a portion of it' "), quoting *Purcell & Wardrope, Chartered v. Hertz Corp.,* 175 Ill.App.3d 1069, 1075, 125 Ill.Dec. 585, 530 N.E.2d 994 (1988). Assuming that all the requirements of a class action are satisfied with respect to such a subclass, the verdict could be affirmed with respect to that subclass, with damages equal to the *pro rata* portion of the nationwide installation damages attributable to the policyholders in those states.

Notwithstanding the decertification of the entire nationwide class, a considerable volume of evidence has been received in connection with this matter and considerable judicial resources which have been expended thereon. As previously noted, this trial lasted nearly two months and the pretrial proceedings spanned more than two years. It would be contrary to any proper sense of judicial economy to require a retrial as to the contract issues for the rights of any subclass of policyholders to which Illinois law could be applied without impacting the due process rights of State Farm.

Nor is judicial economy the only interest to be served by making all reasonable efforts to uphold the verdict to the extent possible. Class actions are a valued, indeed an integral, part of our judicial system and our society. As Chief Justice **\*880** Burger, in writing for the United States Supreme Court, recognized, "The aggregation of individual claims in the context of a classwide suit is an evolutionary response to the existence of injuries unremedied by the regulatory action of government. Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class-action device." *Deposit Guaranty National Bank of Jackson v. Roper,* 445 U.S. 326, 339, 100 S.Ct. 1166, 1174, 63 L.Ed.2d 427, 440 (1980).

In other words, the class action makes it possible for wrongs, which might otherwise go unredressed, to be pursued, and righted. The possibility that wrongdoers might be held accountable provides a powerful incentive not to engage in even small-scale wrongdoing, and such an incentive can only benefit society as a whole. If there was a wrong committed

here-as the jury found, the trial court agreed, the appellate court confirmed, and I would affirm-State Farm ought to be held accountable therefor to the extent that due process will allow.

## II. CONSUMER FRAUD

I concur in the court's analysis of the consumer fraud issue. However, the court's analysis includes an instance of objectionable *dicta.* Also, as with the breach of contract issue, I find the tone and tenor of the court's analysis to be injudicious. I, therefore, disavow and dissent from those instances of hostile rhetoric and objectionable *dicta.*

I agree with the court's analysis of the consumer fraud issue. Due to inconsistencies in the arguments of counsel and analyses in the lower courts, the court correctly discusses what allegations are *not* at issue. 216 Ill.2d at 170-77, 296 Ill.Dec. at 491- 95, 835 N.E.2d at 844-48. This discussion leads to the core allegation of plaintiff's consumer fraud claim: that, during the claims process, State Farm failed to disclose the categorical inferiority of non-OEM parts. 216 Ill.2d at 177-78, 296 Ill.Dec. at 495-96, 835 N.E.2d at 848-49.

Turning to the propriety of the nationwide consumer fraud class, the court opinion correctly holds that the Illinois Consumer Fraud Act has no out-of-state effect and I expressly agree with the court's analysis of this issue. 216 Ill.2d at 179-90, 296 Ill.Dec. at 496-503, 835 N.E.2d at 849-56. Further, the court correctly concludes that, in this case, the Consumer Fraud Act applies only to those policyholders whose vehicles were assessed and repaired in Illinois. Accordingly, the court focuses its application of the Act solely on DeFrank, who is the only named plaintiff who can represent an Illinois class. 216 Ill.2d at 191-99, 296 Ill.Dec. at 503-08, 835 N.E.2d at 856-61.

The court eventually concludes as follows. DeFrank suffered no actual damage as a result of State Farm's specification of non-OEM parts. 216 Ill.2d at 195-99, 296 Ill.Dec. at 506-08, 835 N.E.2d at 859-61. Also, based on this court's *Zekman* and *Oliveira* decisions, and DeFrank's testimony, DeFrank was not actually deceived by anything State Farm said or did not say regarding the quality of non-OEM parts. 216 Ill.2d at 199-202, 296 Ill.Dec. at 506-10, 835 N.E.2d at 861-63.

Although I concur in the court's analysis of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

consumer fraud issue, I dissent from an instance of objectionable *dicta*. It is found in section II(C)(2) of the court opinion, captioned "The Deceptive Act or Practice." 216 Ill.2d at 192-95, 296 Ill.Dec. at **881 504-06, 835 N.E.2d at 857-59. Prior to reaching the determinative issues with respect to DeFrank, the court opinion purports to identify the deceptive act or practice that pertains to DeFrank. However, the opinion already identified this claim. 216 Ill.2d at 175-77, 296 Ill.Dec. at 494-95, 835 N.E.2d at 847-48. The clear purpose of this section is to discuss the state regulation of aftermarket crash parts as a possible basis for reversal. At the close of this discussion, the court expressly declines to resolve the issue. If the court is unwilling to resolve this issue, then the court should not raise it.

I also take issue with the tenor of the court's analysis of the consumer fraud claim. Like the section dealing with breach of contract, the court indulges in sarcasm, chiding, and innuendo in furtherance of needless and intemperate attacks on the plaintiffs bar and our own appellate court. Some examples follow:
"Plaintiffs deliberately avoided any theory relating to defective parts at trial because such a theory would have significantly increased their burden of proof. Such a theory would also have rendered class certification far less likely, since the common question of fact or law necessary for certification would have been more difficult to establish if plaintiffs had been forced to prove that each individual non-OEM part, or grouping of parts, was defective." 216 Ill.2d at 170, 296 Ill.Dec. at 492, 835 N.E.2d at 845.

This is sheer speculation. Also, the majority suggests that the appellate court intentionally rephrased or recharacterized DeFrank's actual damages to avoid certain "temporal problems." 216 Ill.2d at 198, 296 Ill.Dec. at 507, 835 N.E.2d at 860. Assigning such motives to the appellate court constitutes unfair innuendo. These statements impugn the integrity of the bench and bar. I expressly disavow them.

CONCLUSION

Although I am in agreement with my colleagues on a number of legal points, I disagree with many conclusions reached by them today. I find the tone taken by the court with respect to plaintiffs' trial counsel and the lower courts to be particularly unwarranted given that their actions were not

especially egregious. They did not flout any of the rules of this court nor did they break with precedent in such a way as to deserve condemnation. Thus, the question becomes, from whence does this hostility come? What is not said anywhere in today's opinion is the fact that this case has been the focus of a great deal of national attention with respect to class actions in general and our Fifth District in particular. In my view, today's opinion appears to be my colleagues' point of entry into the ongoing national debate concerning class action litigation. It is my considered opinion, however, that while this debate is being conducted in the legislative arena amongst our elected officials in Congress and the Illinois General Assembly, we in the judiciary ought to tread carefully.

I am as troubled as every citizen ought to be about the possibility of abuse of the class action vehicle. And it would further no end to feign ignorance of the fact that some allegations of abuse have been leveled at the courts of this state, and the Fifth District in our state in particular. However, as the saying goes, the baby should not be thrown out with the bathwater. In 1977, this court acknowledged the utility of the class action as a method of litigating complex common questions brought by numerous claimants:
"A class action is a potent procedural vehicle. Under its terms claims by multiple persons can be decided without the necessity of the appearance of each. A **882 vindication of the rights of numerous persons is possible in a single action when for many reasons individual actions would be impracticable. [Citations.] The origins of this invention of equity, according to Professor Chafee [citation], go back almost 300 years. Its purpose has been described as 'to enable it [equity] to proceed to a decree in suits where the number of those interested in the subject of the litigation is so great that their joinder as parties in conformity to the usual rules of procedure is impracticable.' [Citation.]" *Steinberg v. Chicago Medical School, 69 Ill.2d 320, 334-35, 13 Ill.Dec. 699, 371 N.E.2d 634 (1977).*

Several years later, the United States Supreme Court echoed our sentiments, noting:"The class-action device was designed as 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.' [Citation.] Class relief is 'peculiarly appropriate' when the 'issues involved are common to the class as a whole' and when they 'turn on questions of law applicable in the same manner to each member of the class.' [Citation.] For such cases, 'the class-action device saves the resources of both the courts and the parties

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

835 N.E.2d 801
216 Ill.2d 100, 835 N.E.2d 801, 296 Ill.Dec. 448
**(Cite as: 216 Ill.2d 100, 835 N.E.2d 801)**

by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion under [Federal Rule of Civil Practice] 23.' [Citation.]" *General Telephone Co. of the Southwest v. Falcon,* 457 U.S. 147, 155, 102 S.Ct. 2364, 2369, 72 L.Ed.2d 740, 749 (1982).

These observations illustrate why class actions have long held a legitimate and important place in the judiciary. Both this court and the United States Supreme Court have approved of this litigation tool for over 100 years. See K. Forde, *Illinois's New Class Action Statute,* 59 Chi. B. Rec. 120 (1977) (explaining historical background of class actions). In their haste, perhaps, to take a stand on the class action question, my colleagues seemingly retreat from these time-honored principles and show a new hostility to a long-recognized form of litigation. I feel it is my duty to remind my colleagues that the same standards of review that are at play in the other four districts of the state apply to the Fifth District. I am concerned that today's opinion sends a message that we, as a court, will employ different standards for cases coming out of the Fifth District on which national attention has been focused in order to reach a desired result. My feelings in this regard stem from the fact that in overturning the verdict in its entirety, my colleagues in this case have ignored the standard of review, humiliated plaintiffs' counsel, and demeaned both the trial court and the appellate court. It is my sincere hope that the rhetoric employed in today's opinion will not serve to further coarsen a debate already littered with incivility and hostility.

Justice KILBRIDE joins in this partial concurrence and partial dissent.

**\*883** Appendix A

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

835 N.E.2d 801                                                                                   Page 65

216 Ill.2d 100, 835 N.E.2d 801, 296 Ill.Dec. 448
**(Cite as: 216 Ill.2d 100, 835 N.E.2d 801)**

## Appendix A

### Sam DeFrank's Estimate



835 N.E.2d 801

216 Ill.2d 100, 835 N.E.2d 801, 296 Ill.Dec. 448

**(Cite as: 216 Ill.2d 100, 835 N.E.2d 801)**

```
                                                           Profile ID: E.N. BAKER, INC.

#:8   AUTO     ADD'L COST    PAINT MATERIALS                              140.40*
      * Judgement Item
      # Labor Note Applies
      ** QUAL REPL PART = Quality Replacement Parts not subjected to CAPA certification        **
      C Included in Clear Coat / Two Tone Calc


:TED BUMPER SALES.INC      FENDERS AND MORE          BODY PANELS OF MEMPHIS
.8 LACLEDE AVENUE          1248 AMDES BLVD            2282 WHITTEN ROAD
. LOUIS                    ST LOUIS                   MEMPHIS
: 63108                    MO  63132                  TN  56133
:4) 533-8612  (800) 533-8612   (314) 997-4355  (800) 205-7559   (901) 372-6964  (800) 530-7744
3: 5533ST      145.50      4: ORDER BY APPLIC.   35.90   16: C5187           114.18
                           5: ORDER BY APPLIC.   17.00
                           6: CHEV211-431        19.00
                           8: CHEV211-452        15.00
                           9: CHEV211-455        15.00
                           10: ORDER BY APPLIC.  28.00
                           18: TYC 211-111        6.00
                           19: TYC 211-113        6.00


                     Add'l
                    Labor  Sublet
Labor Subtotals    Units  Rate  Amount  Amount  Totals   II. Part Replacement Summary          Amount
   Body             4.5   35.00                 157.50     Taxable Parts                        865.82
   Refinish         7.8   35.00                 273.00         Sales Tax @  6.50%               56.28
   Frame            4.0   35.00                 140.00         Total Replacement Parts Amount:  922.10
                                       Labor Subtotal 570.50
  .abor Summary Totals  16.3                            570.50

:ii. Additional Costs                    Amount   IV. Adjustments                             Amount
     Taxable Costs:                       140.40     Insurance Deductible                     100.00-
                           Sales Tax @  6.50%  9.13         Customer Responsibility:           100.00-
                 Total Additional Costs:  149.53
                                                     I. Total Labor:                          570.50
                                                     II. Total Replacement Parts:             922.10
                                                     III. Total Additional Costs:             149.53

                                                            Gross Total:                     1,642.13
                                                     IV. Total Adjustments:                   100.00-

                                                            Net Total:                       1,542.13

Point of Impact: 12 FRONT CENTER          Inspection Site:  P\I
        Body Shop:  E.N. BAKER INC
        Address:  PO BOX 279  MARION  IL 62959

        ************************************************************
        THIS IS NOT AN AUTHORIZATION TO REPAIR.  ALL SUPPLEMENTS REQUIRE PRIOR
        APPROVAL BY A STATE FARM CLAIM REPRESENTATIVE.
        ************************************************************


ESTIMATE RECALL NUMBER: 11/05/97 09:45:12 13-6670-46501
Mitchell Data Version:  NOV_97_A       Copyright (C) 1990-1996, Mitchell International   Page  2 of  3
                                              All Rights Reserved
                                                             *885
```

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

216 Ill.2d 100, 835 N.E.2d 801, 296 Ill.Dec. 448
**(Cite as: 216 Ill.2d 100, 835 N.E.2d 801)**

Estimate ID: 13-6670-48301
Committed
Profile ID: E.H. BAKER, INC.

NOTICE:  REPAIRS TO THIS VEHICLE MAY REQUIRE SPECIFIC WELDING
EQUIPMENT AS RECOMMENDED BY THE MANUFACTURER.

ILLINOIS LAW REQUIRES THAT VEHICLE REPAIRERS MUST BE LICENSED
IN ACCORDANCE WITH SECTION 5-301 OF THE ILLINOIS VEHICLE CODE.

ESTiMATE RECALL NUMBER: 11/05/97 09:45:12 13-6670-48301
Mitchell Data Version: NOV_97_A          Copyright (C) 1970-1996, Mitchell International          Page  3 of 3
All Rights Reserved

**\*886** Appendix B

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

835 N.E.2d 801                                                                                            Page 68
216 Ill.2d 100, 835 N.E.2d 801, 296 Ill.Dec. 448
**(Cite as: 216 Ill.2d 100, 835 N.E.2d 801)**

Appendix B

State Farm's "Half Sheet"

## NON-ORIGINAL EQUIPMENT REPLACEMENT PARTS INFORMATION

*Whenever ** appears next to the description of a part which is to be replaced, this means:*

THIS ESTIMATE HAS BEEN PREPARED BASED ON THE USE OF AFTERMARKET CRASH PARTS SUPPLIED BY A SOURCE OTHER THAN THE MANUFACTURER OF YOUR MOTOR VEHICLE. THE AFTERMARKET CRASH PARTS USED IN THE PREPARATION OF THIS ESTIMATE ARE WARRANTED BY THE MANUFACTURER OR DISTRIBUTOR OF SUCH PARTS RATHER THAN THE MANUFACTURER OF YOUR VEHICLE.

160-5536 AL  Printed in U.S.A.

FILED

MAR 2 4 2000

LOUIS E. COSTA
CLERK, APPELLATE COURT, 5th DIST.

RECEIVED
CLERK, APPELLATE COURT
5TH DISTRICT  MT. VERNON, IL

MAR 2 4 2000

MAILED _____
OTHER _____

SCANNED _____

DEFENDANT'S
EXHIBIT
# 418

TET 77919
8/24/98

5-99-0830

***887** Appendix C

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

### Appendix C

### State Farm's "Quality Replacement Parts" Brochure



*888

835 N.E.2d 801

Page 70

216 Ill.2d 100, 835 N.E.2d 801, 296 Ill.Dec. 448

**(Cite as: 216 Ill.2d 100, 835 N.E.2d 801)**

# Quality Replacement Parts

## State Farm's Promise To You

State Farm will guarantee the performance of new Quality Replacement Parts we include in our estimates on claims in which we pay for repairs.

As the world's largest auto insurer, our thousands of agents and claim employees are prepared to deliver the "Good Neighbor" service we promise.

### Satisfaction Guaranteed

- If you authorize repairs by a repairer that we agree upon ...
- Using new Quality Replacement Parts that we include in our estimate ...
- And we pay for those repairs ...

- State Farm promises that you will be satisfied with the fit and corrosion resistance qualities of the outer plastic and sheet metal parts for as long as you own your vehicle. We also promise that you will be satisfied with the performance of all other Quality Replacement Parts for at least as long as the original equipment manufacturer would have warranted its new replacement part ...
- OR WE'LL SEE THAT THE PARTS ARE REPAIRED OR REPLACED TO YOUR SATISFACTION — AT NO COST TO YOU.

Standards, Insurance companies, manufacturers of alternative parts, and repair facilities established the Certified Automotive Parts Association (CAPA) in 1989 to set quality standards.

State Farm is very selective when the prices of new alternative parts are used in determining repair costs. Only those parts which meet our very high performance criteria are acceptable. We refer to these as Quality Replacement Parts.

When State Farm prepares a damage estimate, we may include:
readily available, Quality Replacement Parts or parts provided by the original manufacturer. If we include Quality Replacement Parts, they will be clearly identified as such on your estimate.

The Choice is Yours. The final choice as to which parts will actually be used in repairs rests with you, the vehicle owner. If you prefer parts other than those included in our estimate, you should notify your repairer. Should use of those parts increase the repair cost, you will be expected to pay the difference.

Keeping the Promise. State Farm keeps the promise of "Good Neighbor" service thousands of times each day as we pay individual claims. Our promise now includes a commitment to your satisfaction regarding new Quality Replacement Parts used in the repair of your automobile.

*889

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

835 N.E.2d 801                                                                                          Page 71
216 Ill.2d 100, 835 N.E.2d 801, 296 Ill.Dec. 448
**(Cite as: 216 Ill.2d 100, 835 N.E.2d 801)**



*890

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Ill.,2005.
Avery v. State Farm Mut. Auto. Ins. Co.
216 Ill.2d 100, 835 N.E.2d 801, 296 Ill.Dec. 448

Briefs and Other Related Documents (Back to top)

• 2003 WL 24298241 (Appellate Brief) Reply Brief of Defendant-Appellant State Farm Mutual Automobile Insurance Company (Mar. 11, 2003)

Original Image of this Document (PDF)
• 2003 WL 24298242 (Appellate Brief) Amicus Curiae Brief of United Policyholders in Support of the Position of Class Plaintiffs-Appellees-Respondents (Mar. 06, 2003) Original Image of this Document (PDF)
• 2003 WL 24298243 (Appellate Brief) Brief of Amicus Curiae Illinois Trial Lawyers Association in Support of Plaintiffs-Appellees Michael E. Avery, et al. (Feb. 26, 2003) Original Image of this Document (PDF)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

• 2003 WL 24298244 (Appellate Brief) Brief of the Alliance of Automotive Service Providers National Association, the Alliance of Automotive Service Providers of Illinois, the Coalition for Collision Repair Excellence, the Louisiana Collision Association, the Washington Metropolitan Auto Body Association, the Alliance of Auto Service Providers of Minnesota, the Association of Automotive Service Providers of Texas, the Alliance of Automotive Service Providers of Missouri, the Automotive Service Counsel of Kentucky and Southern Indian (Feb. 26, 2003) Original Image of this Document (PDF)

• 2003 WL 24298245 (Appellate Brief) Brief of Class Plaintiff-Appellees (Feb. 14, 2003) Original Image of this Document (PDF)

• 2003 WL 24298246 (Appellate Brief) Amici Brief of Trial Lawyers for Public Justice, Aarp and the National Association of Consumer Advocates in Support of the Position of Class Plaintiffs-Appellees-Respondents (Jan. 13, 2003) Original Image of this Document (PDF)

• 2002 WL 33000648 (Appellate Brief) Brief of the National Conference of Insurance Legislators and the American Legislative Exchange Council as Amici Curiae in Support of Defendant-Appellant State Farm Mutual Automobile Insurance Company (Dec. 05, 2002) Original Image of this Document (PDF)

• 2002 WL 33000649 (Appellate Brief) Brief Amici Curiae National Association of Independent Insurers, American Insurance Association and Health Insurance Association of America in Support of Petitioner State Farm Mutual Insurance Company (Nov. 20, 2002) Original Image of this Document (PDF)

• 2002 WL 33000650 (Appellate Brief) Brief of Amici Curiae Government Employees Insurance Company, Geico General Insurance Company, Geico Casualty Company and Geico Indemnity Company (Nov. 20, 2002) Original Image of this Document (PDF)

• 2002 WL 33000651 (Appellate Brief) Brief of Amici Curiae General Motors Corporation and Ford Motor Company in Support of Defendant-Appellant State Farm Mutual Automobile Insurance Company (Nov. 20, 2002) Original Image of this Document (PDF)

• 2002 WL 33000652 (Appellate Brief) Brief of Amicus Curiae J. Lee Covington II, Superintendent of the Ohio Department of Insurance, in Support of Appellant State Farm Mutual Automobile Insurance Co. (Nov. 20, 2002) Original Image of this Document with Appendix (PDF)

• 2002 WL 33000653 (Appellate Brief) Brief of Amicus Curiae the Illinois Department of Insurance

in Support of Appellant (Nov. 20, 2002) Original Image of this Document (PDF)

• 2002 WL 33000654 (Appellate Brief) Amicus Brief of Citizens for a Sound Economy Foundation in Support of Appellant's Brief and Argument (Nov. 20, 2002) Original Image of this Document (PDF)

• 2002 WL 33000655 (Appellate Brief) Brief of Amicus Curiae the Alliance of American Insurers in Support of Appellant State Farm's Brief (Nov. 20, 2002) Original Image of this Document (PDF)

• 2002 WL 33000656 (Appellate Brief) Brief of Washington Legal Foundation as Amicus Curiae in Support of Petitioner (Nov. 20, 2002) Original Image of this Document (PDF)

• 2002 WL 33000657 (Appellate Brief) Brief of the National Association of Insurance Commissioners as Amicus Curiae in Support of Defendant-Appellant (Nov. 20, 2002) Original Image of this Document (PDF)

• 2002 WL 33000658 (Appellate Brief) Brief of Amicus Curiae Allstate Insurance Company in Support of Defendant State Farm Mutual Automobile Insurance Company (Nov. 20, 2002) Original Image of this Document (PDF)

• 2002 WL 33000659 (Appellate Brief) Brief of Amici Curiae Public Citizen, Inc. and the Center for Auto Safety in Support of Appellant State Farm Mutual Automobile Insurance Company (Nov. 20, 2002) Original Image of this Document (PDF)

• 2002 WL 33000660 (Appellate Brief) Brief of Amicus Curiae Illinois Manufacturers' Association in Support of Defendant-Appellant State Farm Mutual Automobile Insurance Company (Nov. 20, 2002) Original Image of this Document (PDF)

• 2002 WL 33005230 (Appellate Brief) Brief of the Chamber of Commerce of the United States of America as Amicus Curiae in Support of Petitioner State Farm Mutual Automobile Insurance Company (Nov. 20, 2002) Original Image of this Document (PDF)

• 2002 WL 32157189 (Appellate Brief) Brief of Washington Legal Foundation as Amicus Curiae in Support of Petitioner (Nov. 14, 2002)

• 2002 WL 33000661 (Appellate Brief) Brief of Amici Curiae the Department of Insurance of the State of North Carolina and the Department of Business and Industry, Division of Insurance of the State of Nevada and the Department of Regulatory Agencies, Division of Insurance of the State o f Colorado and the Department of Insurance and Securities Regulation of the District of Columbia in Support of Appeal of State Farm Mutual Automobile Insurance Company (Nov. 13, 2002) Original Image of this Document (PDF)

• 2002 WL 33000662 (Appellate Brief) Brief of

835 N.E.2d 801

Page 74

216 Ill.2d 100, 835 N.E.2d 801, 296 Ill.Dec. 448
**(Cite as: 216 Ill.2d 100, 835 N.E.2d 801)**

Defendant-Appellant State Farm Mutual Automobile
Insurance Company (Nov. 06, 2002) Original Image
of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT C



Not Reported in F.Supp., 1993 WL 527928 (E.D.Mich.), 1993-2 Trade Cases P 70,408
**(Cite as: Not Reported in F.Supp.)**

▷
Briefs and Other Related Documents

United States District Court, E.D. Michigan.
DRY CLEANING & LAUNDRY INSTITUTE OF
DETROIT, INC., Walker Management Co. Inc.,
F.C.II, Inc., dba Arnold Cleaners, Kyu Chung Cho,
a sole proprietor dba Magic 49 Minute Cleaners,
Bel-Aire Dry Cleaners, Inc., Harrison Cleaners &
Laundry, Inc., Fabricare Center Corp., Leo
Lemieux, a sole proprietor dba Leo's Colonial
Village, Yeong P. Hong, a sole proprietor dba
Deluxe Dry Cleaners, and Kyu Hwa Cho, a sole
proprietor dba Quality 40 Minute Cleaners, on
behalf of themselves and as representatives of a
class of Plaintiffs who are similarly situated
v.
FLOM'S CORP., George Tarnoff, J. Levin Sons
Co., Bernard M. Levin, and Arnold A. Levin.
**No. 91-CV-76072-DT.**

Oct. 19, 1993.

OPINION
DUGGAN, District Judge:
**\*1** The case at bar is a civil action brought under
the Sherman Antitrust Act, 15 U.S.C. § 1 *et seq.,* by
plaintiffs, various Michigan dry cleaners and a trade
association, against defendants, dry cleaning and
laundry supply companies and their principals. In
November, 1991, defendants, in a separate criminal
action ("Criminal Action"), pleaded guilty to
antitrust violations in relation to their agreement to
fix prices on dry cleaning and laundry supplies in
the Michigan market. Plaintiffs in the instant
action seek to recover civil damages for the injury
they allegedly suffered as a result of defendants'
price-fixing.

Presently before the Court is plaintiffs' motion for
certification of a modified class which seeks an
order from this Court deeming the instant action a
class action.[FN1] Plaintiffs modification of the

proposed class is "narrowed" to include purchasers
of the three product groups: perchloroethylene ("
perc"), polyethylene bags ("poly"), and hangers.
Although the proposed modified class includes
fewer products than those involved in the initially
proposed class, the problems the Court addressed
with the composition of the first class still exist.
Nothing provided by plaintiffs in this renewed
motion changes the defendants sketch of their
market's complexity. This Court reaches this
conclusion after an exhaustive review of the
affidavits of the expert economists, their charts and
graphs, as well as the arguments and supporting
documents submitted in the numerous briefs.
Plaintiffs are still unable to satisfy Rule 23(b)(3)
because questions of law or fact common to the
members of the class do not predominate over
questions affecting only individual members of the
class.[FN2] Accordingly, for the reasons cited
below, plaintiffs' motion for certification of a
modified class is denied.

*Discussion*

A. *Rule 23-Certification of a Class Action*

Even after a court makes an initial class decision
under Fed.R.Civ. 23, it may define, redefine,
modify, or even decertify a class in light of
subsequent evidentiary developments in that
particular case. See, e.g., *General Telephone Co.
v. Falcon,* 457 U.S. 147, 160, 102 S.Ct. 2364,
2372, 72 L.Ed.2d 740 (1982); *Mallory v. Eyrich,*
922 F.2d 1273, 1282 (1991); *Salazar-Calderon v.
Presidio Valley Farmers Ass'n,* 765 F.2d 1334,
1350 (5th Cir.1985) (citation omitted). Rule 23
provides a procedural device which allows this
Court to achieve efficiencies in the adjudication of
similar claims. The requirements of the rule are
benchmarks to be used in evaluating the efficiency
and fairness of trying certain types of claims either
jointly or separately. The parties seeking class

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1993 WL 527928 (E.D.Mich.), 1993-2 Trade Cases P 70,408
**(Cite as: Not Reported in F.Supp.)**

certification have the burden of establishing these prerequisites. *Reid v. White Motor Corp.,* 886 F.2d 1462, 1471 (6th Cir.1989), cert. denied, 494 U.S. 1080 (1990). This Court has previously determined that the prerequisites of Rule 23(a) were established. Opinion dated September 18, 1992 at 14-22. Thus, the issue presently before this Court on plaintiffs' renewed motion for class certification is whether they have established the requirements of Rule 23(b)(3).[FN3]

**\*2** It is well-settled that district courts have broad discretion in determining whether or not to certify a class under Fed.R.Civ.P. 23(a) and (b). *General Telephone Co. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982); *Califano v. Yamasaki,* 442 U.S. 682, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979). As explained by the Sixth Circuit, "[t]he district court retains broad discretion in determining whether an action should be certified as a class action, and its decision, based on the particular facts of the case, should not be overturned absent a showing of abuse of discretion." *Weaver v. University of Cincinnati,* 970 F.2d 1523, 1531 (6th Cir.1992) quoting *Sterling v. Vesicol Chemical Corp.,* 855 F.2d 1188, 1197 (6th Cir.1988)). The court, however, does not delve into the merits of plaintiffs' substantive claims or defendants defense of the suit. See e.g., *Eisen v. Carlisle & Jacquelin* [1974-1 Trade Cases ¶ 75,082], 417 U.S. 156, 177, 94 S.Ct. 2140, 2152 40 L.Ed.2d 732 (1974). The court's focus is strictly upon the requirements as articulated in Rule 23.

### B. *Recovery in a Civil Antitrust Action*

The defendants argue that the dry cleaning and laundry supply industry is a highly diverse, fragmented industry which is incapable of price fixing, or producing any predominating result or consequence. In the effort to defeat Rule 23(b)(3) certification, the defendants include the opinion of an expert economist who has offered his opinion and statistical analysis on every conceivable consideration in this industry. Likewise, plaintiffs are equipped with their own expert economists who can refute every opinion, every chart, and every statistic served by defendants. This Court has

carefully reviewed all of the affidavits, deposition testimony and exhibits submitted by the parties. Some of it was helpful to the Court in consideration of the class certification motion, but most of it was not.[FN4] This Court has heard and fully considered all parties' arguments relating to class certification when it denied class certification in its Opinion and order dated September 18, 1992. [FN5] Additionally, this Court has fully considered the briefs submitted by the parties, as well as the amicus curiae briefs in support and opposition to plaintiffs' present motion to certify a modified class. [FN6]

In the context of a civil antitrust action, the mere charge of conspiracy does not mean that common questions predominate, or that product or market diversity, or dissimilar treatment could render a class unmanageable.[FN7] The suitability for Rule 23 certification is, by design and necessity, decided on a case-by-case basis. In order to recover under the antitrust laws, every plaintiff must prove: (1) violation of an antitrust law; (2) direct antitrust injury or "impact" from such violation; and (3) the amount of damages sustained as a result of the violation. See *Shreve Equip. Inc. v. Clay Equip. Co.,* 650 F.2d 101 (6th Cir.), cert. denied, 454 U.S. 897 (1981); *Alabama v. Blue Bird Body Co., Inc.* [1978-1 Trade Cases ¶ 62,041], 573 F.2d 309 (5th Cir.1978). Thus, recovery under § 4 of the Clayton Act is based not on the conspiracy itself but upon the actual injury "to business or property" suffered by the individual plaintiff and caused by the underlying antitrust violation. 15 U.S.C. § 15; *Atlantic Richfield Co. v. USA Petroleum Co.* [1990-1 Trade Cases ¶ 69,019], 495 U.S. 328, 110 S.Ct. 1884, 1897, 109 L.Ed.2d 333 (1990).[FN8] Accordingly, each plaintiff seeking to recover damages due to an alleged price-fixing conspiracy must show with certainty that he made purchases of a price-fixed product at a price raised by reason of the illegal agreement above the competitive level that otherwise would have prevailed. See e.g. *In re Hotel Telephone Charges* [1974-2 Trade Cases ¶ 75,145], 500 F.2d 86 (9th Cir.1974).

#### (1) *Antitrust Impact and Damages*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1993 WL 527928 (E.D.Mich.), 1993-2 Trade Cases P 70,408
**(Cite as: Not Reported in F.Supp.)**

**\*3** Antitrust impact is established by showing that defendants' activities had the effect of stabilizing prices above competitive levels. Defendants contend that product diversity for each of the three product "groups" mentioned above and complex pricing preclude generalized proof of impact. The nature of a civil antitrust action under § 4 demonstrates this Court's concern with certifying a modified class under Rule 23(b)(3); only individual members of the proposed class, not the class, can be injured "in business or property" by a price-fixing conspiracy. The impact of a price-fixing conspiracy on the various plaintiffs would not present common questions of fact given the numerous products and prices involved in this case. The determination of such injury and the calculation of the damages resulting therefrom is simply not susceptible to any generalized class-wide method of proof. Thus, individual questions predominate even at the liability stage of the case.[FN9]

On the facts of this case, this Court finds that the modification proposed by plaintiffs does not eliminate the difficulties encountered in a complex market. Defendants aver that they marketed approximately two different kinds of perc, 85 different types of poly, and 53 different types of hangers during the time of the price-fixing conspiracy, 1979-89, and that such products involved differing levels of profit margins based on quantities and kinds of product offered. (See Declaration of Arnold Levin at ¶ s 2 & 4, attached as Exhibit 2 to Defendants' Response).[FN10] Additionally, Levin indicates that it special orders a large number of items within these product-groups that it does not stock. *Id.* To further complicate matters, defendants state that such product groups were marketed in various areas throughout the state and that the competition for sales of products varied according to the product, the area, and the number of competing suppliers of dry cleaning and laundry products.[FN11] (See Levin Declaration at ¶ s 5, 8, & Exhibit A attached to declaration). Also, defendant note that the cost of the products sold in these diverse areas varied according to the shipping costs for each area. (See Levin Declaration) Defendants further note that the competitors they faced over the time period of the price-fixing

conspiracy varied. (Levin Declaration at ¶ 8-10). Moreover, defendants note that several class members preferred their service, or particular brands marketed by them. (See Levin Declaration at ¶ 6). Accordingly, defendant-Levin's costs, margins, and number of competitors vary on a brand-by-brand basis for each type of product that exists for the three product-groups.

Defendants finally note that prices charged to customers varied by method of payment, quantity and other factors. (See Levin Declaration at ¶ s 11-15). The foregoing evidence illustrates that common issues still do not predominate, even with plaintiffs' proposed modification of the class to include these three product-groups.

**\*4** This Court previously stated that it found the guidance of *American Custom Homes v. Detroit's Lumberman's Association* [1981-2 Trade Cases ¶ 64,361], 91 F.R.D. 548, 550-51 (E.D.Mich.1981) persuasive with respect to the denial of class certification when:
... The claims of the parties would involve thousands upon thousands of sales during four separate annual marketing seasons. Moreover, the claims could not be proved by any set method of mathematical or formula calculation but would require individual proof and trial, necessitating the examination of countless invoices, warehouse records, etc.... In view of the overwhelming nature of the individual claims and their complexity, he found, as we have said, that the issue of violation did not predominate nor was a class action a superi or remedy in the case.

*Id.* at 551 (quoting *Windham v. American Brands, Inc.* [1977-2 Trade Cases ¶ 61,670], 565 F.2d 59, 66-67 (4th Cir.1977)). Accord, *Mekani v. Miller Brewing Co.* [1982-1 Trade Cases ¶ 64,563], 93 F.R.D. 506, 511 (1982); *Alabama v. Blue Bird Body,* 573 F.2d at 317. In *American Custom Homes,* the plaintiffs, home builders, sued the defendants, lumber suppliers and a lumber trade association, for price-fixing in violation of the antitrust laws. The court denied certification under Rule 23(b)(3), in part, because the transactions involved were numerous, involved individualized purchases and numerous pricing/discount structures

Not Reported in F.Supp.                                                                                                    Page 4

Not Reported in F.Supp., 1993 WL 527928 (E.D.Mich.), 1993-2 Trade Cases P 70,408
**(Cite as: Not Reported in F.Supp.)**

between the various plaintiffs and defendants. *Id.* at 550-551.

In the instant action, thousands of transactions were involved over many years; each transaction was different; various plaintiffs may have purchased the dry cleaning supplies, which varies by brand and type, at different prices and varying quantities, in different ways under different credit terms. No formula proposed would be even-handed among class members or fair to defendants.

Furthermore, resolving the individual damages claims would also present imposing manageability problems. This Court's at the class certification stage in assessing the proposed methods of proving damages is quite limited. The preliminary inquiry is not whether each of the methods is valid,[FN12] but only to assess whether the methods are able to prove damages on a class basis. Where "the amount of injury could not be proven on a class-wide basis [s]uch individualized inquiries could pose a great burden on the court and render the case unmanageable as case action." *Mekani,* 93 F.R.D. at 511. Each member of the class would not be entitled to a refund of three times what he paid, but rather three times the amount by which such payment exceeded the prices that would have prevailed on a free market. This determination would be complicated by the number of different products involved, varying local market conditions, fluctuations over time, and the difficulty of proving purchases in the absence of complete purchasing records.

**\*5** Defendants proffer numerous affidavits of their expert economist, John Pisarkiewicz, Jr., an economist experienced in price-fixing matters, for an interpretation of this highly complex scenario of defendants' marketing practice. Pisarkiewicz concludes that injury and damages on a class-wide basis cannot be determined in the instant case due to the complexity of the marketing, pricing, and product lines involved-in sum, because there is no ascertainable common impact suffered by the class members. He consistently asserts that the determination of any impact to class members would have to be made on an individualized basis due to the myriad of factors, products, and market

conditions involved in this case.

In response to defendants' argument, plaintiffs offer several affidavits of their expert, Jeffrey N. Lutz.[FN13] Throughout all of his affidavits in this matter, Lutz states that injury and damages can be calculated on a class-wide basis. Lutz does not, however, offer any empirical data or analysis establishing that there is a structure to the prices in the dry cleaning and laundry supply industry. Without providing a rule-of-thumb for pricing in this industry, it is difficult to establish that a certain price is above market level for purposes of determining antitrust impact. The Court is not persuaded that, for the purposes of a motion for class certification, plaintiffs have made a threshold showing that a price fixing conspiracy as to these three general product groups, if proven, would have a common impact for members of the proposed class.

Lutz explains that the measurement of damages involves a two step process. First, the amount of a percentage of overcharge must be determined by which prices were artificially inflated because of defendants' actions. The second step is simply calculated by multiplying the class member's purchases by the percentage of overcharge. The first step identifies a "benchmark" price, which estimates what the prices of the products would have been absent the pricefixing scheme. Lutz offers two primary methods which might be used to calculate the percentage of overcharge and proposes to use an additional theory as a confirming model.

This Court finds Lutz' proposed methods unpersuasive as to the central issue here-whether common issues of law and fact predominate over individual issues of law and fact. Lutz' methods of calculation, going to comparisons between defendants and other suppliers on a brand/product line basis could result in proof of injury for particular brands/product lines sold in particular areas involving particular competitive conditions. The very particularity of such proof, however, indicates that it would go to individualized calculation of injury, i.e., that a certain class member purchasing a particular brand or line of products would be injured. Further, such

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1993 WL 527928 (E.D.Mich.), 1993-2 Trade Cases P 70,408
**(Cite as: Not Reported in F.Supp.)**

methodologies do not take into account the varying markets for dry cleaning and laundry supplies which defendants aver exist in Michigan. Under all of the proposed methods, the determination of amount of damages would still have to be maintained on an individualized basis. Lutz does not factor in the large volumes of sales at deviated prices. Because pricing varied between customers, and in some instances, in each customer's purchases over a given time, the price deviation precludes both a common determination of impact and damages. Both the prompt payment discounts and other special discounts were applied presumably due to industry competition, and were calculated on a customer-by-customer basis. There are numerous customer differences between the different geographical areas as well as within each market area.

**\*6** The cases plaintiffs rely upon in support of their argument that common issues of injury and damages predominate over individual matters are distinguishable from the instant matter. Plaintiffs continue to place their reliance on *In re Domestic Air Transportation Antitrust Litigation* [1991-2 Trade Cases ¶ 69,518], 137 F.R.D. 677 (N.D.Ga.1991). The court certified the class even though the litigation involved numerous and complex claims of airline fare price-fixing in numerous markets, in varying market conditions and involving a myriad of pricing. However, as to injury, the plaintiffs offered extensive testimony from their expert economist involving thorough analysis of the market and fare structures involved and offering a defined method of calculating injury on a class-wide basis. *Id.* at 689-92. Further, with regard to damages calculations, the plaintiffs' expert provided three proposed mathematical formulae, and had gone beyond merely identifying prospective methodologies. *Id.* at 692-93 & n. 18. In the present case, Lutz has not conducted a thorough empirical analysis of the market and fare structures involved in the dry cleaning and laundry supply industry. Furthermore, with respect to damages calculations, plaintiffs have only offered Lutz' proposed methodologies without indicating how these calculations would be adapted to this case.[FN14]

### (2) *Fraudulent Concealment*

Finally, defendants argue that the fraudulent concealment issue would require individual proof from various class members, particularly with respect to the element of due diligence. Defendants' acknowledged that "each of the Plaintiffs were aware that the Defendants had the same list prices, which changed at the same time. (Defendants' Brief at 23).

There is no agreement between the courts with respect to whether common issues predominate for the fraudulent concealment tolling doctrine to apply. Some courts find that questions common to the class would predominate the analysis of whether the statute of limitations should be tolled. See e.g., *In re Catfish Antitrust Litigation* [1993-2 Trade Cases ¶ 70,395], 826 F.Supp. 1019, 1044 (N.D.Miss.1993). Others hold that "proof of failure to discover and due diligence [cannot] be established on a generalized basis." *Wagner v. Central Louisiana Elec. Co. Inc.* [1983-2 Trade Cases ¶ 65,705], 99 F.R.D. 279, 289 (E.D.La.1983). Although due diligence by the plaintiffs may remain an individual issue, it is not clear that it is a sufficient ground to justify denying a class.[FN15] This issue is of no consequence in the present action in light of this Court's prior determination that plaintiffs were unable to establish the prerequisite showing of fraudulent acts of concealment to assert the equitable tolling doctrine. (See Opinion & Order dated October 18, 1993 [1993-2 Trade Cases ¶ 70,407] ).

This Court further notes that the class action method is not superior to other available methods for the fair and efficient adjudication of the controversy. Because of the highly individualized inquiries involved, questions of fact simply do not predominate over questions affecting the individual members. In this case, prices and costs vary with each local market and defendants market a myriad of different brands and types within each brand, which vary in price. Each plaintiff's proof as to antitrust injury and thus to liability will be highly individualistic. These individualized inquiries pose a great burden on the court and render the case unmanageable as a class action.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 6

Not Reported in F.Supp., 1993 WL 527928 (E.D.Mich.), 1993-2 Trade Cases P 70,408
**(Cite as: Not Reported in F.Supp.)**

*Conclusion*

**\*7** In sum, this Court finds defendants' arguments persuasive and concludes that individual issues as to injury and damages of the class members predominate over the common issues in this matter. Accordingly, the requirements of Rule 23(b)(3) have not been met and class certification shall be denied.

An Order consistent with this Opinion shall issue forthwith.

FN1. This Court previously denied plaintiffs' original motion for class certification in an Opinion and Order dated September 18, 1992.

FN2. Rule 23(b) provides, in relevant part:
"An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
"(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."
Fed.R.Civ.P. 23(b).

FN3. This Court previously found that " defendants' arguments [were] persuasive and concludes that individual issues as to injury and damages of the class members predominate over the common issues in this matter. Accordingly, the requirements of Rule 23(b)(3) have not been met and class certification shall be denied." Opinion dated September 18, 1992 at 28.

FN4. The affidavits contained some rather bold assertions regarding the merits of this civil antitrust action. An examination of the merits of plaintiffs' claim is premature and inappropriate on a motion for class certification. At this point, the Court is concerned only with the legal criteria for the motion for class certification. The Court finds no purposeful use for the expert economists' conclusions concerning the merits of this case.

FN5. This Court held oral arguments in plaintiffs' original class certification motion on June 11, 1992.

FN6. In their last brief submitted to this Court, plaintiffs request this Court to appoint its own expert to examine the class certification issue pursuant to Fed.R.Evid. 706. (See Plaintiffs' Brief dated September 17 at 4-5). The Court is satisfied that the experts supplied by the parties have covered the pertinent issues laudably and declines to appoint an expert in this case.

FN7. Proof of a criminal violation of the Sherman Antitrust Act standing alone does not establish civil liability. *Shreve Equip.,* 650 F.2d at 105; *Blue Bird Body Co.,* 573 F.2d at 317.

FN8. In order to establish a prima facie case of injury and damage in a civil action, the plaintiff must show that the price paid by the customer is illegally high and show the amount of overcharge. *County of Oakland v. Detroit* (1989-1 Trade Cases ¶ 68,413], 866 F.2d 839, 847 (6th Cir.1989) (citing *Hanover Shoe, Inc. v. United Shoe Machinery Corp.* [1968 Trade Cases ¶ 72,490], 392 U.S. 481, 489, 88 S.Ct. 2224, 2229, 20 L.Ed.2d 1231). Moreover, the plaintiff has the burden of proving a causal connection between the antitrust violation and the damages suffered. *Shreve,* 650 F.2d at 105. The causal link must be proved as a matter of fact and with a fair degree of certainty; the violation must be the proximate or material cause of the plaintiff's injury. *Id.*

FN9. As this court indicated earlier in its Opinion issued October 18, 1993, denying

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 7

**Not Reported in F.Supp., 1993 WL 527928 (E.D.Mich.), 1993-2 Trade Cases P 70,408**
**(Cite as: Not Reported in F.Supp.)**

summary judgment, there is a genuine dispute with respect to whether plaintiffs can show that defendants set prices above market level. Even if plaintiffs were to prove this, plaintiffs would still not necessarily be entitled to damages under § 4. Plaintiffs must demonstrate that each member suffered antitrust injury to their business or property, or the fact of damage, and show some evidence indicating the extent of damages before plaintiff could recover.

FN10. Arnold Levin is, and has been the Secretary of defendant J. Levin Sons Co. for over 32 years, and has managerial responsibility for most of Levin's operations. (Declaration at ¶ 1).

FN11. For example, some competitors only operated in the metro-Detroit area, others only competed in Western Michigan, and Defendant-Flom's sells only in southeastern Michigan. Defendant-Levin contends that no competitors competed on a state-wide basis.
Additionally, during the 1979-89 period, defendant-Levin had 12 competitors in the hangers market, 13 competitors in poly sales, and 10 competitors in perc sales.
Moreover, the time period that each individual competitor competed during the applicable period varied.
Furthermore, none of defendant-Levin's competitors carried all types of perc, poly, and hangers that Levin did.

FN12. The question of credibility of witnesses used to show both the existence of antitrust injury and the amount of damages is for the trier of fact to consider and decide. *South-East Coal Co. v. Consolidation Coal Co.* [1970 Trade Cases ¶ 73,391], 434 F.2d 767, 793-94 (6th Cir.1970), cert. denied, 402 U.S. 983 (1971); *In re Paoli R.R. Yard PCB Litigation,* 916 F.2d 829 (3rd Cir.1990).

FN13. Plaintiffs also supply the Affidavit of Peter Max. Such affidavit did not assist this Court's determination of the present motion.

FN14. Furthermore, plaintiffs continued reliance on *Transamerican Refining Corp. v. Dravo Corp.* [1990-1 Trade Cases ¶ 68,919], 130 F.R.D. 70 (S.D.Tex.1990) is misplaced. The court granted class certification, finding that the plaintiffs had satisfied Rule 23(b)(3). In response to the defendants' arguments as to class-wide proofs of injury and damages, the court noted that the plaintiffs were claiming that the defendants had sold the piping on a cost plus basis, overcharging by a fixed percentage. *Id.* at 76. This fact, the court noted, made irrelevant such factors as market and product complexity. *Id.* In the instant case, the price-fixing claims do not revolve around "cost plus fixed-percentage" issues. Market and product complexities are implicated in this case and make class-wide determination of injury and damages impracticable.

FN15. There is some suggestion in the present action that certain plaintiffs would fall subject to statute of limitations not faced by other plaintiffs on the issues of failure to discover and due diligence.

E.D.Mich.,1993.
Dry Cleaning & Laundry Institute of Detroit, Inc. v. Flom's Corp.
Not Reported in F.Supp., 1993 WL 527928 (E.D.Mich.), 1993-2 Trade Cases P 70,408

Briefs and Other Related Documents (Back to top)

• 2:91cv76072 (Docket) (Nov. 15, 1991)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT D



Not Reported in F.Supp., 1990 WL 259683 (D.Minn.), 1990-2 Trade Cases P 69,283
**(Cite as: Not Reported in F.Supp.)**

United States District Court, D. Minnesota, Third Division.
CITY OF ST. PAUL
v.
FMC Corp., Occidental Chemical Corp., Stauffer Chemical Co., The Dow Chemical Co., PPG Industries, Inc., Diamond Shamrock Corp., Pennwalt Corp., The B.F. Goodrich Co., Vulcan Materials Co., Georgia-Pacific Corp., and Kaiser Aluminum and Chemical Corp.
**Civ. No. 3-89-0466.**

Nov. 14, 1990.

Memorandum and Order

MAGNUSON, District Judge:
**\*1** This matter is before the court upon plaintiff's motion for class certification pursuant to Fed.R.Civ.P. 23. For the reasons sent forth below, plaintiff's motion is Denied.

*Facts*

This is an antitrust action in which plaintiff alleges that defendants have engaged in a conspiracy to fix the prices of chlorine and caustic soda products.

Plaintiff, the City of St. Paul, Minnesota, seeks to represent "all municipal corporations, school boards, cities and towns, public bodies, boards, and commissions located within the State or Minnesota (other than the State of Minnesota and excluding direct purchasers)" that purchased chlorine and caustic soda indirectly from defendants. The court has previously limited the class to governmental entities within the State of Minnesota.

The product in question, chlorine, is used by governmental entities as a disinfectant. It is sold in various sizes including 55-ton tank car shipments, 1-ton cylinders, 155-pound cylinders and 100-pound cylinders. Within Minnesota four government entities purchase the chlorine in 55-ton tank car shipments. The City of St. Paul is one of those entities. The rest of the proposed class purchase in the one-ton, 155-pound, or 100-pound sizes. For shipments smaller than the 55-ton tank car, distributors must purchase chlorine in the 55-ton tank cars and repackage the chlorine into the smaller cylinders. Because chlorine is so toxic, inspection and testing costs are substantial. Other costs include the cylinders, maintenance, and delivery.

Most of the governmental entities in question also purchase maintenance services for their chlorine equipment. Chlorine's toxicity requires a reliable service capability, and the service accompanying chlorine sales forms a substantial portion of the price for the total chlorine and service package. Governmental entities which purchase 55-ton tank cars do not need to purchase such services because their own personnel provide the services.

*Discussion*

Class Actions are governed by Fed.R.Civ.P. 23, which provides in pertinent part:

(a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

(b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1990 WL 259683 (D.Minn.), 1990-2 Trade Cases P 69,283
**(Cite as: Not Reported in F.Supp.)**

subdivision (a) are satisfied, and in addition:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

**\*2** (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of the members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

The party seeking class certification has the burden of establishing that the Rule 23 requirements have been met. *Bishop v. Committee on Professional Ethics and Conduct of the Iowa State Bar Assoc.,* 686 F.2d 1278, 1288 (8th Cir.1982).

Plaintiff asserts a class under Rule 23(b)(3). Defendants challenge many of the prerequisites to

class certification, but because the court concludes that common questions do not predominate over individual questions these other arguments need not be addressed.

To prevail on its claim, plaintiff must prove an antitrust violation (the alleged conspiracy), the fact of damage or injury, a causal relationship between the violation and the injury, and the amount of damages. *Roseborough Monument Co. v. Memorial Park Cemetery* [1981-2 TRADE CASES ¶ 64,392], 666 F.2d 1130, 1146 (8th Cir.1981) cert. denied 457 U.S. 1111 (1982). As has been noted previously in this litigation, the Minnesota Antitrust statute is interpreted consistently with federal law. See, e.g., *United States v. Stauffer Chemical Co.,* 1983-2 TRADE CASES (CCH) ¶ 65,749 at 69,816-17 (D.Minn.1983). In addition, the court has previously noted the Supreme Court's rejection of indirect purchaser actions under the federal antitrust statutes in *Illinois Brick Co. v. Illinois* [1977-1 TRADE CASES ¶ 61,460], 431 U.S. 720 (1977). The *Illinois Brick* rationale is based on evidentiary complexity. Proving that an overcharge has been passed on in the chain of distribution, given the multitude of factors involved in pricing, would be next to impossible. 431 U.S. at 737. Despite these difficulties, the Supreme Court held in *California v. ARC America Corp.* [1989-1 TRADE CASES ¶ 68,537], 109 S.Ct. 1661 (1989) , that indirect-purchaser actions under state antitrust statutes were not preempted by federal law.

The instant case, despite the viability of indirect-purchaser claims under state law, is not appropriate for class certification. The key to the court's determination is the "fact of damage" element. This element must be proven for each class member and cannot be proven on a classwide basis. Because substantial value is added to the chlorine at various points in the chain of distribution, the court would have to examine the circumstances of each class member individually to determine whether that member has suffered an overcharge. For this reason individual factual issues predominate over common issues. Other courts have reached the same result when faced with this issue. In a ruling this court finds persuasive, the Minnesota Court of Appeals upheld

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                      Page 3

Not Reported in F.Supp., 1990 WL 259683 (D.Minn.), 1990-2 Trade Cases P 69,283
**(Cite as: Not Reported in F.Supp.)**

the denial of class certification in a similar indirect-purchaser case brought under the Minnesota statutes. See *Keating v. Phillip Morris, Inc.* [1987-2 TRADE CASES ¶ 67,801], 417 N.W.2d 132, 136-38 (Minn.Ct.App.1987) (alleged conspiracy to fix the prices of cigarettes). Here, as in *Keating,* individual questions regarding fact of damages based on the difficulties inherent in an indirect-purchaser action render a class action unworkable. *Id.* See also *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation* [1982-83 TRADE CASES ¶ 65,028], 691 F.2d 1335 (9th Cir.1982), cert. denied, 464 U.S. 1068 (1984); *Albertson's, Inc. v. Amalgamated Sugar Co.* [1974-1 TRADE CASES ¶ 74,875], 62 F.R.D. 43 (D.Utah 1973), aff'd in part, vacated and remanded in part on other grounds [1974-2 TRADE CASES ¶ 75,261], 503 F.2d 459 (10th Cir.1974); *Borden, Inc. v. Universal Industries Corp.* [1981-1 TRADE CASES ¶ 63,896], 88 F.R.D. 708 (N.D.Miss.1981).

**\*3** Plaintiff's reliance on *B.W.I. Custom Kitchen v. Owens Illinois, Inc.* [1988-1 TRADE CASES ¶ 68,053], 235 Cal.Rptr. 228, 191 Cal.App. 3d 1341 (Cal.App.1987) is misplaced because, unlike this case, the *B.W.I.* case involved an alleged conspiracy to fix the prices of glass bottles which did not change significantly in form or value by the time they reached the ultimate consumer. Fact of damages on a classwide basis cannot be inferred here from the mere proof of a conspiracy.

This case, in short, involves common questions only on the existence of the conspiracy plaintiff has alleged. The existence of individual question on the fact of damages and, assuming liability can be established, the amount of individual damages precludes certification.

Accordingly, It Is Ordered that plaintiff's motion is Denied.

D.Minn.,1990.
City of St. Paul v. FMC Corp.
Not Reported in F.Supp., 1990 WL 259683 (D.Minn.), 1990-2 Trade Cases P 69,283

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT E

Westlaw.

Not Reported in S.E.2d                                                                 Page 1
Not Reported in S.E.2d, 2004 WL 2414027 (N.C.Super.), 2004-2 Trade Cases P 74,601, 2004 NCBC 7
(Cite as: Not Reported in S.E.2d)

C
Briefs and Other Related Documents

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Superior Court of North Carolina,
New Hanover County and Harnett County,
Business Court.
Auley M. CROUCH, III, on behalf of himself and all others similarly situated, Plaintiff,
v.

CROMPTON CORPORATION, Crompton Manufacturing Company, Inc., formerly named in North Carolina as Uniroyal Chemical Company, Inc., Uniroyal Chemical Company Limited, Flexsys NV, Flexsys America Limited Partnership of North Carolina, Bayer Ag, Bayer Corporation, and Rhein Chemie Rheinau GMBH, Defendants.
Timothy J. Morris, on behalf of himself and all others similarly situated, Plaintiff,
v.

Visa U.S.A. Inc. and Mastercard International, Inc., Defendants.
Nos. 02 CVS 4375, 03 CVS 2514.

Oct. 28, 2004.

{1} The above captioned cases are before the Court on motions to dismiss pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure. They are treated together because they both present the same legal issues. The first issue is whether indirect purchasers have standing under N.C.G.S. § 75-16 to sue for violations of the state antitrust laws. The Court holds, as it has before, that the decision of the Court of Appeals in Hyde v. Abbott Laboratories, Inc., 123 N.C.App. 572, 473 S.E.2d 680 (1996), disc. rev. denied, 344 N.C. 734, 478 S.E.2d 5 (1996), is controlling, and indirect purchasers do have standing to sue under North Carolina's antitrust laws. If indirect purchasers have standing, the question becomes whether there are applicable limitations on that standing. The Court holds that indirect purchaser standing is not limitless; that there are standing requirements that apply to indirect purchasers. Application of those standards to the pleadings in each of these cases results in dismissal.

Lea, Rhine & Associates, PLLC by Christopher A. Chleborowicz and Joel R. Rhine; Lerach Coughlin

Stoia Geller Rudman & Robbins LLP by Robert J. Gralewski, Jr. and Bonny E. Sweeney; The David Danis Law Firm by Alexander E. Barnett, Michael J. Flannery and James J. Rosemergy for Plaintiff Crouch.
Moore & Van Allen, PLLC by Joseph W. Eason; O'Melveny & Myers, LLP by Benjamin G. Bradshaw, Richard G. Parker and Ian Simmons for Defendants Crompton Corporation, Inc. and Uniroyal Chemical Company Limited.
Womble Carlyle Sandridge & Rice by Pressley M. Millen; Gibson, Dunn & Crutcher, LLP by D. Jarrett Arp, James Slear and Daniel G. Swanson; Covington & Burling by Michael J. Fanelli, William D. Iverson and Vijay Shanker for Defendants Flexsys America, LP, Flexsys America Limited Partnership of North Carolina, and Flexsys NV.
Helms, Mulliss & Wicker, PLLC by Henry L. Kitchin, Jr. and Bradley R. Kutrow; Jones Day by Thomas Demitrack, William V. O'Reilly and J. Andrew Read for Defendants Bayer Corporation and Rhein Chemie Corporation.
Hardison & Leone, L.L.P. by Kenneth L. Hardison, Elizabeth A. Leone and Joseph W. Osman; Susman Godfrey, L.L.P. by Mark A. Evetts, Drew D. Hansen and Neal S. Manne; Markun Zusman Compton & David, L.L .P. by Kevin Eng, David S. Markun, Edward S. Zusman; Friedman & Shube by Noah Shube for Plaintiff Morris.
Ellis & Winters, LLP by Richard W. Ellis, Stephen C. Keadey, and Matthew W. Sawchak; Robinson, Bradshaw & Hinson, PA by Everett J. Bowman, Mark W. Merritt and John R. Wester; Heller Ehrman White & McAuliffe LLP by Stephen V. Bomse, David M. Goldstein and Rachel M. Jones; Arnold & Porter LLP by Robert C. Mason for Defendant Visa U.S.A., Inc.
Womble Carlyle Sandridge & Rice by Pressley M. Millen; Paul Weiss Rifkind Wharton & Garrison, L.L.P. by Gary R. Carney, Patricia C. Crowley and Kenneth A. Gallo for Defendant MasterCard International, Inc.

*CORRECTED OPINION, ORDER AND JUDGMENT*

I.

FACTUAL BACKGROUND IN *CROUCH*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*1** {2} Plaintiff Crouch is an individual residing in New Hanover County, North Carolina. Plaintiff purchased four B.F. Goodrich tires (Advantage GT model # P195-70R14 90SM+S) for his automobile on October 19, 2002 from Sam's Club of Wilmington. Plaintiff brings this claim individually and on behalf of all other persons who purchased tires, other than for resale, that were manufactured using the rubber-processing chemicals sold by Defendants since 1994.[FN1]

> FN1. Am. Compl. ¶ 20. At oral argument the Court understood plaintiff's counsel to say that the class would be limited to retail consumers, excluding, for example, customers who purchased used cars with new tires.

{3} Defendant Crompton Corporation ("Crompton") is a Connecticut corporation with its principal place of business in Greenwich, Connecticut. Crompton is a global marketer and manufacturer of specialty chemicals, polymer products and processing equipment, which includes chemicals used for the processing of rubber and tires. Crompton's actions have affected commerce within the State of North Carolina.

{4} Defendant Uniroyal Chemical Company Limited ("Uniroyal") is a Delaware corporation with its principal place of business in Akron, Ohio. It is a wholly-owned subsidiary of Crompton and is responsible either independently or jointly with Crompton Manufacturing Company, Inc. for the manufacture, sale and/or distribution of rubber-processing products as part of its ordinary and customary business. Uniroyal manufactures several rubber-processing products including specialty products for tires and industrial rubber goods. Uniroyal's actions have affected commerce within the State of North Carolina.

{5} Defendant Crompton Manufacturing Company, Inc., formerly legally named in North Carolina as Uniroyal Chemical Company, Inc. ("Crompton Manufacturing"), is a New Jersey corporation with its principal place of business in Greenwich, Connecticut. It is a wholly-owned subsidiary of Crompton and is responsible either independently or jointly with Uniroyal for the manufacture, sale and/or distribution of rubber-processing products as part of its ordinary and customary business. Crompton

Manufacturing's rubber-processing products include specialty products for tires and industrial rubber goods. Crompton Manufacturing's actions have affected commerce within the State of North Carolina.

{6} Defendant Flexsys NV is a joint venture between Solutia, a United States company, and Akzo Nobel, a Netherlands company. Flexsys NV has its headquarters in Woluwe, Belgium.

{7} Defendant Flexsys America LP ("Flexsys") is the United States subsidiary of Flexsys NV. Flexsys is a Delaware corporation with its headquarters located in Akron, Ohio. Flexsys NV is the world's leading supplier of chemicals to the rubber industry. Flexsys' actions have affected commerce within the State of North Carolina.

{8} Defendant Flexsys America Limited Partnership of North Carolina ("Flexsys NC"), the legal name in North Carolina of Flexsys America LP, is the United States subsidiary of Flexsys NV. Flexsys NC is a Delaware corporation with its headquarters located in Akron, Ohio.

**\*2** {9} Defendant Bayer AG is a corporation organized and existing under the law of the Federal Republic of Germany and maintains its principal place of business in Leverkusen, Federal Republic of Germany. Bayer AG is the parent company of Bayer Corporation, the wholly-owned subsidiary that sells and markets rubber-processing chemicals in the United States.

{10} Defendant Bayer Corporation ("Bayer") is a wholly-owned subsidiary of Bayer AG. Bayer has its principal place of business in Pittsburg, Pennsylvania, and is incorporated under the laws of Pennsylvania. Bayer develops, manufactures, sells and distributes a variety of pharmaceutical and chemical products, including rubber-processing products.

{11} Bayer develops, manufactures, sells and distributes its rubber-processing products through its Fibers, Additives and Rubbers Division. The Division is headquartered in Akron, Ohio. The Division manufactures rubber-processing chemical products which have a variety of differing roles in rubber-processing.

{12} Defendant Rhein Chemie Rheinau GmbH ("Rhein GmbH") is a business organized under the laws of the Federal Republic of Germany with its

Case 1:05-cv-00360-SLR     Document 212-2     Filed 08/17/2006     Page 108 of 150

Not Reported in S.E.2d                                                                                      Page 3
Not Reported in S.E.2d, 2004 WL 2414027 (N.C.Super.), 2004-2 Trade Cases P 74,601, 2004 NCBC 7
**(Cite as: Not Reported in S.E.2d)**

principal place of business located in Mannheim, Federal Republic of Germany. Rhein GmbH, a subsidiary or affiliate of Bayer AG, manufactures, sells and distributes the relevant rubber-processing chemicals throughout the global market, including the United States.

{13} Defendant Rhein Chemie Corporation ("Rhein"), a New Jersey corporation and a wholly-owned subsidiary and/or affiliate of Rhein GmbH, is responsible for the manufacture, sale and/or distribution of the relevant rubber-processing products throughout the United States, including North Carolina.

{14} On September 26, 2002, inspectors from the European Commission's Competition Division, assisted by officials from the Commission's member states, carried out unannounced inspections at defendants' European offices. According to a memorandum issued by the Commission on October 10, 2002, the stated purpose of the inspections was to "ascertain whether there is evidence of a cartel agreement and related illegal practices concerning price fixing for rubber chemicals." (Am.Compl.¶ 43.) On October 14, 2002, the Associated Press reported that Crompton, Bayer and Flexsys made press releases verifying that their respective companies were under investigation for alleged price collusion in rubber chemicals both by U.S. and European Union authorities.[FN2] On May 27, 2004, Crompton pled guilty to participating in a conspiracy to suppress and eliminate competition by maintaining and increasing the price of certain rubber chemicals sold in the United States and elsewhere during the period between July 1995 to 2001. The U.S. federal court imposed a fine of $50 million. On May 28, 2004, Crompton pled guilty to one count of conspiring to lessen competition unduly in the sale and marketing of certain rubber chemicals in Canada. The Canadian federal court imposed a sentence requiring Crompton to pay a fine of $7 million. On July 14, 2004, Bayer pled guilty to charges filed by the U.S. Department of Justice in Federal District Court in the Northern District of California and agreed to a $66 million fine for participating in an international conspiracy to fix prices in the rubber chemicals market.

FN2. Miles Moore, *U.S., EU Probing Rubber Chemical Suppliers,* Rubber & Plastics News, Oct. 14, 2002, at 1.

**\*3** {15} Plaintiff filed this action on November 5,

2002, only thirty days after the European investigation was announced, alleging violations of North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA"), including N.C.G.S. § § 75-1.1, 75-2, 75-5, 75-16, 75-16.1. Plaintiff alleges that defendants "entered into an agreement, arrangement, contract, combination, conspiracy and/or understanding that was intended to and which did have the effect of fixing, raising, stabilizing and maintaining the price for the relevant rubber-processing chemicals." (Am.Compl.¶ 40.) Plaintiff alleges that defendants' "supracompetitive pricing" was reflected in the prices of automobile tires manufactured using these rubber-processing chemicals. (Am.Compl.¶ 41.) Therefore, plaintiff alleges that consumers who purchased these automobile tires, not directly from defendants but rather from tire retailers, paid more than they would have in the absence of the alleged anticompetitive agreement. (Am.Compl.¶ 55.) Similar suits have been filed in other jurisdictions that recognize indirect purchaser standing. Plaintiff seeks to represent only persons who purchased tires at retail.

{16} Direct purchasers have filed a nationwide class action lawsuit seeking to recover the alleged overcharge that is the subject of the state litigation. *In re Rubber Chemicals Antitrust Litig.,* Master Docket No. C-03-1496 (N.D. Cal. (Judge Martin J. Jenkins)).

{17} Defendants have responded by moving to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted based upon plaintiff's lack of standing to sue under North Carolina's antitrust laws.

{18} The case was assigned to this Court by Order dated April 19, 2004.

## II.

## FACTUAL BACKGROUND IN *MORRIS*

{19} Plaintiff, Timothy Morris, is a resident of North Carolina. Plaintiff brings this contemplated class action on behalf of all North Carolina consumers who purchased goods from merchants who accepted Visa and/or MasterCard credit cards and debit cards during the four years preceding the filing of the Complaint.

{20} Defendant Visa U.S.A. Inc. ("Visa") is a Delaware corporation. Visa's principal place of business is San Francisco, California. Visa transacts

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.E.2d                                                                    Page 4
Not Reported in S.E.2d, 2004 WL 2414027 (N.C.Super.), 2004-2 Trade Cases P 74,601, 2004 NCBC 7
**(Cite as: Not Reported in S.E.2d)**

business within the State of North Carolina. At all relevant times, Visa was a national bankcard association whose members included more than 6,000 banks.

{21} Defendant MasterCard International, Inc. ("MasterCard") is a Delaware corporation. MasterCard's principal place of business is Purchase, New York. MasterCard transacts business within the State of North Carolina. At all relevant times, MasterCard was a national bankcard association whose members included more than 6,000 banks.

{22} In October 1996, Wal-Mart Stores, The Limited, Sears Roebuck, Safeway, Circuit City, the International Mass Retail Association, the National Retail Federation, the Food Marketing Institute, Bernie's Army-Navy Store, Auto-Lab of Farmington Hills, Burlington Coat Factory Warehouse, Sportstop, Payless Shoesource Shoes, Etc., the Coffee Stop, UCC Kwik Doc, Computer Supplies Unlimited, Denture Specialist, Inc./Geneva White D.M.D., Shark 3 Audio, 53, Inc., and Scrub Shop collectively filed a claim challenging the "Honor All Cards" rules of Visa and MasterCard that require all merchants accepting Visa and MasterCard credit cards to also accept their debit cards. The plaintiffs alleged that this requirement was a tying arrangement violating section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. Plaintiffs further asserted that Visa and MasterCard attempted and conspired to monopolize the debit card market in violation of section 2 of the Sherman Act, 15 U .S.C. § 2. Plaintiffs alleged that the defendants' actions resulted in excessive fees to merchants for the debit card processing services. *See In re Visa Check/MasterMoney Antitrust Litig., 192 F.R.D. 68 (E.D.N.Y.2000) aff'd, 280 F.3d 124 (2d Cir.2001), cert. denied, 536 U.S. 917, 122 S.Ct. 2382, 153 L.Ed.2d 201 (2002).*

**\*4** {23} In February 2000, a plaintiff class of approximately four million merchants who have accepted Visa and/or MasterCard credit cards and therefore were required to accept VisaCheck and/or MasterMoney debit cards under the "Honor All Cards" rule was certified. *Id.* Oral arguments on motions for summary judgment were heard on January 10, 2003. On April 1, 2003, the federal court granted the merchants' motion for summary judgment in part and denied it in part. The defendants' motions for summary judgment were denied in their entirety. In addition, MasterCard's motion for a severance was denied. *See In re Visa Check/MasterMoney Antitrust Litig.,* 2003 U.S. Dist. LEXIS 4965, at *27 (E.D.N.Y. Apr. 1, 2003).

{24} On the day that opening statements were to occur, April 28, 2003, MasterCard agreed to settle with the plaintiff class. *In re Visa Check/ MasterMoney Antitrust Litig., 297 F.Supp.2d 503, 508 (E.D.N.Y.2003).* Visa agreed to settlement two days later, April 30, 2003. On December 19, 2003, the federal court issued an order providing final approval of the settlements. Pursuant to the settlement, merchants who accept Visa and MasterCard credit cards were free to reject Visa and MasterCard debit cards. In addition, Visa and MasterCard will pay more than $3 billion into a settlement fund to be distributed to the merchant class. *Id.* at 506-08.

{25} Plaintiff filed this action on December 31, 2003, alleging violations of North Carolina's Unfair and Deceptive Trade Practices Act, N.C.G.S. § 75. Plaintiff asserts consumer antitrust claims that attack the manner in which the "Honor All Cards" rules of the MasterCard and Visa national payment systems are applied to merchants across the country. Plaintiff's claim in this action is founded upon the same alleged "tying" conduct by Visa and MasterCard that was at issue in the federal merchant class antitrust action. (*Compare* Compl. ¶ ¶ 2-6, 27(m), 28-57, *with In re Visa Check/MasterMoney Antitrust Litig., 192 F.R.D. at 71-73.*) Plaintiff alleges that consumers paid higher prices for goods sold by the merchants bringing the claim in the federal action. Plaintiff alleges that because merchants were "compelled to pay supracompetitive prices," merchants, in turn, passed along their extra costs to consumers by raising the price of goods. (Compl.¶ ¶ 57-58.)

{26} Defendants have responded by moving to dismiss under Rule 12(b)(6) based on two grounds: first, that plaintiff lacks standing to sue under North Carolina's antitrust laws; and second, that plaintiff seeks relief that would violate the Commerce Clause of the United States Constitution, which forbids states from regulating interstate commerce that requires uniform national regulation.

{27} The case was assigned to this Court by Order dated May 11, 2004.

### III.

### LEGAL STANDARD

Not Reported in S.E.2d                                                                                                              Page 5
Not Reported in S.E.2d, 2004 WL 2414027 (N.C.Super.), 2004-2 Trade Cases P 74,601, 2004 NCBC 7
**(Cite as: Not Reported in S.E.2d)**

{28} When ruling on a motion to dismiss under Rule 12(b)(6), the court must determine "whether, as a matter of law, the allegations of the complaint ... are sufficient to state a claim upon which relief may be granted." *Harris v. NCNB,* 85 N.C.App. 669, 670, 355 S.E.2d 838, 840 (1987). In ruling on a motion to dismiss, the court must treat the allegations in the complaint as true. *See Hyde v. Abbott Labs., Inc.,* 123 N.C.App. 572, 575, 473 S.E.2d 680, 682 (1996). The court must construe the complaint liberally and must not dismiss the complaint unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim. *See id.*

## IV.

**\*5** {29} An understanding of the issues in these two cases necessarily begins with examination of the standing requirements under federal antitrust law. That examination begins with the study of two cases, *Hanover Shoe Co. v. United Shoe Machinery Corp.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), and *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). The interrelationship of those two cases is best described by William Landes and Richard Posner in their seminal article: *Should Indirect Purchasers Have Standing to Sue Under the Antitrust Laws? An Economic Analysis of the Rule of* Illinois Brick.

In *Illinois Brick Co. v. Illinois,* the Supreme Court held that indirect purchasers do not have standing to sue for violations of the antitrust laws under section 4 of the Clayton Act, which authorized private treble-damage suits by individuals or firms injured in their business or property by a violation of those laws. To understand this decision, one must go back to *Hanover Shoe Co. v. United Shoe Machinery Corp.,* a suit by a shoe manufacturer against a manufacturer of shoe machinery who had earlier been found to have monopolized the shoe machinery industry in violation of section 2 of the Sherman Act. The defendant argued that it should be allowed to show that its customer had not in fact been injured by the antitrust violation because the customer had passed on the costs of the violation to its customers, the purchasers of shoes. The Supreme Court rejected this argument, holding that there is no "passing on" defense to a suit by a direct purchaser; the direct purchaser is entitled to get the overcharge back, trebled, whether or not he was really injured to that extent.

*Illinois Brick* is the mirror image of *Hanover Shoe.* The plaintiffs in *Illinois Brick,* represented by the

state of Illinois suing on behalf of itself and some 700 local government entities in the Chicago area, claimed overcharges in connection with various construction projects. The defendants, manufacturers and distributors of concrete block alleged to be in collusion, sold the block to masonry contractors who submitted bids to general contractors who in turn submitted bids to customers such as the plaintiffs. The *Illinois Brick* plaintiffs were therefore indirect purchasers of concrete block, standing in the same relation to the defendants as the buyers of shoes at retail stood to United Shoe Machinery Corporation. The predicate of the *Illinois Brick* suit was the passing on of all or part of the overcharge by the direct purchaser; without passing on, there could be no injury to indirect purchasers.

Unless they are willing to countenance multiple liability, the courts cannot allow suits by indirect purchasers without also permitting the defendant to assert a "passing-on defense" against direct purchaser plaintiffs. As the Court recognized in *Illinois Brick,* there are only two ways of avoiding unacceptable multiple liability: (1) allow indirect purchasers to sue but overrule *Hanover Shoe* or (2) retain Hanover Shoe and preclude indirect purchasers from suing.

**\*6** 46 U. Chi. L.Rev.. 602, 602-03 (1979) (footnotes omitted).

{30} The rule governing indirect purchaser standing in federal antitrust cases has not changed since *Illinois Brick.* The fact that there has been no congressional or judicial repeal of the rule indicates that the policy behind it has proven effective. That policy holds that the direct purchaser suit is on balance a more effective instrument for enforcement of the antitrust rule prohibiting price fixing than the indirect purchaser suit.[FN3] Under the federal scheme, where avoidance of a double recovery is favored, the federal government has chosen the direct purchaser suit as the most effective means of enforcing the antitrust laws, particularly in price fixing cases.

> FN3. William Landes and Richard Posner, *Should Indirect Purchasers Have Standing to Sue Under the Antitrust Laws? An Economic Analysis of the Rule of* Illinois Brick. 46 U. Chi. L.Rev.. 602, 634-35 (1979). The authors stated:
> Our analysis has suggested that the rule of *Illinois Brick,* which bars indirect purchasers from bringing private antitrust damage actions, is probably the soundest rule from the standpoint of maximizing the

Case 1:05-cv-00360-SLR     Document 212-2     Filed 08/17/2006     Page 111 of 150

Not Reported in S.E.2d                                                                                    Page 6
Not Reported in S.E.2d, 2004 WL 2414027 (N.C.Super.), 2004-2 Trade Cases P 74,601, 2004 NCBC 7
**(Cite as: Not Reported in S.E.2d)**

effectiveness of antitrust enforcement. We anticipate the argument that, however abstractly desirable it may seem to confine enforcement to direct purchasers, to do so is to alter the fundamental character of the private antitrust action in a way that cannot be squared with the intent of Congress in creating private damage remedies for antitrust violations. One way of characterizing our position is that it allows someone who may not be injured (or not injured much)-the direct purchaser-to recover (treble) damages while denying the right to recover any damages to other people-indirect purchasers-who may in fact be injured. There is an element of paradox in this result, but it is dispelled by careful analysis. As we have shown, even if indirect purchasers were given the nominal right to sue, they would often fail to receive significant compensation. And anyone troubled by the windfall element in the judgment received by the direct purchaser must in logic reexamine the entire structure of private antitrust enforcement. Two-thirds of *every* private antitrust damage judgment (the punitive component of the judgment) is a windfall to the purchaser. In a class action, much of even the compensatory portion of the judgment may end up in the pockets of lawyers or in state treasuries, rather than in the pockets of the people who were actually harmed by the antitrust violation. The windfall element cannot be purged by the private antitrust suit without a complete reworking of antitrust enforcement. Until that is done, society will be well-advised to allow some direct purchasers to enjoy windfalls if, as we have argued, the direct purchaser suit is on balance a more effective instrument for enforcing the antitrust rule prohibiting price fixing than the indirect-purchaser suit.

*Id.* (footnote omitted).

{31} The choice made in the federal system had the effect of preventing indirect purchasers who were actually injured by a price fixing scheme from recovering their damages. It was a policy decision that was not well received in some states. There were rational arguments that the decision was wrong from a policy standpoint. Those arguments were made effectively by Justice Brennan in a well-reasoned dissent in *Illinois Brick.* A minority of states chose to alleviate the problems created for indirect purchasers

by *Illinois Brick* by either passing statutes (*Illinois Brick* repealer statutes) or interpreting their existing statutes as permitting indirect purchaser standing under the state antitrust law based upon some differentiation in language between the state and federal statutes. For example, the District of Columbia passed a statute [FN4] which was modeled directly on Justice Brennan's dissent in *Illinois Brick.* It specifically provides for indirect purchaser standing and it adopts the "target area" test for standing mentioned by Justice Brennan in his dissent .[FN5] It is a model for states desiring to create a clear statutory framework for indirect purchaser cases.

FN4. *See* D.C.Code Ann. § 28-4509(a) (1981).

FN5. Justice Brennan suggested a target area test as one possible approach to standing, but did not actually endorse it as a test to be adopted. It is worthy of note that Justice Brennan was among the majority in its holding in *Associated General Contractors of California, Inc. v. California State Counsel of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) ("*AGC* "), which was decided subsequent to *Illinois Brick* and prior to the 1996 amendments to the North Carolina statute.

{32} The recognition of indirect purchaser standing by this minority of states created an unusual situation. In federal price fixing cases, direct purchasers were permitted to recover the artificially inflated price and treble damages even though they may have passed on the artificially inflated price to someone else in the distribution chain. They receive a windfall in some instances; but that windfall is predicated upon the policies that the federal scheme was (a) the most effective deterrent, (b) eliminated double recovery, (c) eliminated extraordinarily difficult damage proof [FN6] and (d) was economically rational.[FN7] When the minority states reacted by repealing *Illinois Brick,* they created a situation which (a) restored the ability of indirect purchasers to recover for injuries actually sustained as a result of anticompetitive behavior, (b) added a redundant and less effective deterrent, (c) condoned double recovery (trebled) against violators and (d) created the potential for extremely difficult damage proof issues.

FN6. *See* Landes and Posner, *supra* note 3, at 609, 615, 619-20.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.E.2d                                                                                          Page 7
Not Reported in S.E.2d, 2004 WL 2414027 (N.C.Super.), 2004-2 Trade Cases P 74,601, 2004 NCBC 7
(Cite as: Not Reported in S.E.2d)

FN7. *See* Landes and Posner, *supra* note 3, at 611-12, 617-18, 620, 625.

**\*7** {33} Not surprisingly, the state efforts to restore indirect purchasers' ability to recover for injuries sustained as a result of antitrust violations were challenged, primarily on the ground that state statutes were preempted by the federal scheme. That challenge was directly rejected by the United States Supreme Court in *California v. ARC America Corp.,* 490 U.S. 93, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989). The Supreme Court held that states may allow an indirect purchaser to sue under state antitrust laws.

When viewed properly, *Illinois Brick* was a decision construing the federal antitrust laws, not a decision defining the interrelationship between the federal and state antitrust laws. The congressional purposes on which *Illinois Brick* was based provide no support for a finding that state indirect purchaser statutes are preempted by federal law.

*California v. ARC Am. Corp.,* 490 U.S. 93, 105-06, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989).

This Court has previously noted the problems created by this dual enforcement in *Adams v. Aventis, S.A.,* 2003 NCBC 7, at ¶ 23 (No. 01CVS2119, Craven County Super. Ct. August 26, 2003)(Tennille, J.). The Court stated:

In 1995, the Section of Antitrust Law of the American Bar Association published a Report of the Indirect Purchaser Task Force outlining proposed legislative changes to address the "indirect purchaser problem." *Report of the Indirect Purchaser Task Force: Section of Antitrust Law American Bar Association,* 63 Antitrust L.J. 993 (Spring 1995). The report stated that the results of state *Illinois Brick* repealer laws are that:

(1) The full amount of the overcharge, trebled, can be recovered by (i) direct purchasers who sue under federal law; (ii) the customers of those direct purchasers who sue under state law; and (iii) under most state *Illinois Brick* repealers, by indirect purchasers at every other stage of distribution down the line.

(2) The overcharge that an indirect purchaser can have trebled may be a multiple of the overcharge to the direct purchaser because indirect purchasers can claim that their seller's markups on the original overcharge are also inflated because of that overcharge.

(3) The direct purchaser cases can be prosecuted in federal court and the indirect purchaser cases can be prosecuted in state court(s). Indeed, the Supreme

Court seemed to encourage that kind of multiple litigation in *ARC America* by broadly hinting to federal courts that they utilize pendent jurisdiction principles for state law indirect purchaser claims.

(4) The results in the direct and indirect purchaser cases need not be consistent. The overcharge which is treated as the direct purchaser's in the federal court can be treated as the indirect purchaser's in the state court. In fact, if indirect purchaser cases are brought in several state courts, there may be inconsistencies in those decisions.

Thus, defendants in horizontal price-fixing cases face not only the burden and expense of multiple treble-damage lawsuits, but also enormous potential liability-not just three, but multiples of three times the overcharge, if a lay jury finds liability. Few companies can afford to "roll the dice" on a jury verdict when the exposure is that high, no matter how innocent they believe they are.

**\*8** Additionally, the current law turns judicial economy-the principal reason for the decisions in *Hanover Shoe* and *Illinois Brick*-on its head. Federal *and* state judicial resources are finite and precious. It makes little sense to permit, much less encourage, multiple litigation in federal and state courts. It makes even less sense to permit inconsistent judgments as to who bore the overcharge.

2003 NCBC 7, at ¶ 23.

{34} Thus, states may provide indirect purchaser recovery based upon state antitrust laws even though (1) the result may and almost assuredly will be a double recovery and (2) a preferable deterrent exists under federal law. It is clear then that the primary rational for enforcement of the state antitrust laws is to provide a recovery for indirect purchasers *actually* injured by antitrust violations. That goal should be kept in mind when interpreting and applying the statute.

{35} The inquiry into standing in federal antitrust cases does not end with *Hanover Shoe* and *Illinois Brick.* Those cases dealt only with apportionment of damages in price fixing situations.

{36} The Supreme Court specifically noted that its decision was not directed to standing. It said:

Because we find Hanover Shoe dispositive here, we do not address the standing issue, except to note, as did the Court of Appeals below, that the question of which persons have been injured by an illegal overcharge for purposes of § 4 is analytically distinct from the question of which persons have sustained injuries too remote to give them standing to sue for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.E.2d                                                                           Page 8
Not Reported in S.E.2d, 2004 WL 2414027 (N.C.Super.), 2004-2 Trade Cases P 74,601, 2004 NCBC 7
(Cite as: Not Reported in S.E.2d)

damages under § 4.

*Illinois Brick,* 431 U.S. at 728 n. 7 (citation omitted).

{37} Since *Illinois Brick,* the federal courts have addressed standing in other situations involving indirect purchasers or persons indirectly injured by alleged antitrust activity. The leading federal case on standing in situations not involving price fixing is *Associated General Contractors of California, Inc. v. California State Counsel of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) ("*AGC*").[FN8] In that case, the Unions sought damages under section 4 of the Clayton Act.[FN9] They alleged that the employer group defendant had coerced some of its members to enter into business relationships with nonunion contractors and subcontractors, thus adversely affecting the trade of the unionized firms and consequently the unions themselves.

FN8. The application of the *AGC* standing requirements was not originally argued in *Crouch,* but was argued in *Morris.* Subsequent to the oral argument in *Morris,* counsel in *Crouch* were afforded the opportunity to address the application of the *AGC* requirements as well as the application of a target area test to the fact situation in *Crouch.* Each side filed supplemental briefs on those questions.

FN9. 15 U.S.C. § 15 (2004). That provision is the model after which the North Carolina statute is patterned. *See infra* ¶ 46.

{38} In holding that the Union was not a person injured by reason of a violation of the antitrust laws within the meaning of section 4 of the Clayton Act, the Supreme Court adopted a five factor standing test which it derived in part by looking at the standard applied in common law damage actions when the Clayton Act's predecessor was originally passed in 1890.

{39} Significantly, the Supreme Court rejected the argument made by both plaintiffs in these cases that because the language in the statutes (section 4 of the Clayton Act and Chapter 75) is broad and unrestricted, it covers any and every arguable injury flowing from an antitrust violation.[FN10] In rejecting a limitless interpretation of the language the Supreme Court said:

FN10. *See* Pl.'s Opp'n Defs.' Mot. Dismiss at 8-9 in *Morris;* Pl.'s Mem. Opp'n Defs.' Mot. Dismiss at 4-9 in *Crouch.*

*9 A literal reading of the statute is broad enough to encompass every harm that can be attributed directly or indirectly to the consequences of an antitrust violation. Some of our prior cases have paraphrased the statute in an equally expansive way. But before we hold that the statute is as broad as its words suggest, we must consider whether Congress intended such an open-ended meaning.

*AGC,* 459 U.S. at 530 (footnote omitted).

{40} The Court then went on to hold:
As this Court has observed, the lower federal courts have been "virtually unanimous in concluding that Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Hawaii v.. Standard Oil Co.,* 405 U.S. 251, 263, n. 14, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972). Just last Term we stated:
An antitrust violation may be expected to cause ripples of harm to flow through the Nation's economy; but "despite the broad wording of § 4 there is a point beyond which the wrongdoer should not be held liable." [*Illinois Brick Co. v. Illinois,* 431 U.S.], at 760 (BRENNAN, J. dissenting). It is reasonable to assume that Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property. *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 476-477, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982).

*Id.* at 534-35.

{41} The Supreme Court found that there was no single bright line test that could be applied in determining standing. Rather, it required federal judges to evaluate the plaintiff's harm, the alleged wrongdoing by the defendant and the relationship between the two according to five factors. The five factors to be used by federal courts in determining standing as set forth in *AGC* are: (1) whether the plaintiff is a consumer or competitor in the allegedly restrained market, (2) whether the injury alleged is direct and a first hand product of the restraint alleged, (3) whether there exists more directly injured parties with motivation to sue, (4) whether the damage claims are speculative and (5) whether the claims (a) risk duplicative recovery and (b) would require a complex apportionment of damages.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.E.2d                                                    Page 9
Not Reported in S.E.2d, 2004 WL 2414027 (N.C.Super.), 2004-2 Trade Cases P 74,601, 2004 NCBC 7
(Cite as: Not Reported in S.E.2d)

{42} The holding in *AGC* has been followed consistently in the federal courts. *See, Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.,* 828 F.2d 211, 219 (4th Cir.1987) (affirming dismissal because "though there obviously is a causal relation between the conduct and harm as alleged, it is remote rather than direct"); *Eagle v. Star-Kist Foods, Inc.,* 812 F.2d 538, 539-43 (9th Cir.1987) (affirming dismissal because plaintiffs "were neither consumers nor competitors in the relevant market," who alleged injuries derivative of others who also had sued defendants); *Henke Enters., Inc. v. Hy-Vee Food Stores, Inc.,* 749 F.2d 488, 489-90 (8th Cir.1984) (affirming dismissal because plaintiff "was neither a competitor, participant, nor consumer within the [allegedly restrained] market" and its alleged injury was "an incidental by-product of the conspirators' claimed anticompetitive action"). Viewed in the broader context of standing enunciated in *AGC, Illinois Brick* appears as a per se disqualification of indirect purchasers in price fixing cases under application of factors 2, 3 and 5. *Illinois Brick* and *AGC* are logically consistent.

**\*10** {43} If *Hyde* is correct that the North Carolina statute created indirect purchaser standing and if the courts of this state are required to interpret our antitrust statutes consistently with federal law[FN11], reconciling *Illinois Brick* and *AGC* in this state requires that factor 3 be modified and that the application of factors 2 and 5 be limited by the statutory recognition of indirect purchaser claims. The courts of this state may not deny standing based upon *Illinois Brick* but must still determine standing based upon relevant factors.

FN11. *See infra* ¶ 49; N.C.G.S. § 75-1 (1999); Act of June 3, 1996, ch. 550, 1995 N.C. Sess. Laws 550 (titled "An Act to Revise the Statutes Regarding Antitrust Law to Ensure That These Provisions are Internally Consistent and Consistent with Federal Antitrust Laws").

{44} "Standing is a necessary prerequisite to a court's proper exercise of subject matter jurisdiction." *Neuse River Found., Inc. v. Smithfield Foods, Inc.,* 115 N.C.App. 110, 113, 574 S.E.2d 48, 51 (2002) (quoting *Aubin v. Susi,* 149 N.C.App. 320, 324, 560 S.E.2d 875, 878 (2002)). "The term ['standing'] refers to whether a party has a sufficient stake in an otherwise justiciable controversy so as to properly seek adjudication of the matter." *Neuse River*

*Found.,* 115 N.C.App. at 114, 574 S.E.2d at 51-52 (quoting *Sierra Club v. Morton,* 405 U.S. 727, 731-32, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)). Standing consists of three elements:
(1) "injury in fact"-an invasion of a legally protected interest that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is *fairly traceable* to the challenged action of the defendant; and (3) it is *likely, as opposed to merely speculative,* that the injury will be redressed by a favorable decision.

*Neuse River Found.,* 155 N.C.App. at 114, 574 S.E.2d at 52 (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)) (emphasis added).

"The gist of standing is whether there is a justiciable controversy being litigated among adverse parties with substantial interest affected so as to bring forth a clear articulation of the issues before the court." *Street v. Smart Corp.,* 157 N.C.App. 303, 305-06, 578 S.E.2d 695, 698 (2003) (quoting *Texfi Industries v. City of Fayetteville,* 44 N.C.App. 268, 269-70, 261 S.E.2d 21, 23 (1979), *aff'd,* 301 N.C. 1, 269 S.E.2d 142 (1980)). "Standing most often turns on whether the party has alleged 'injury in fact' in light of the applicable statutes or caselaw." *Neuse River Found.,* 115 N.C.App. at 114, 574 S.E.2d at 52.

## V.

{45} The federal law and the issue of preemption of state antitrust laws by federal law being clear, the Court turns to a review of the North Carolina experience in indirect purchaser cases.

## A.

{46} That review begins with the statute and its history. The only appellate decision interpreting the statute is *Hyde v. Abbott Laboratories, Inc.,* 123 N.C.App. 572, 473 S.E.2d 680 (1996), *disc. rev. denied,* 344 N.C. 734, 478 S.E.2d 5 (1996). As this Court has previously noted:
The *Hyde* decision is the only North Carolina appellate decision dealing with indirect purchaser standing. That case was settled after the Court of Appeal's decision and before review by the North Carolina Supreme Court. In *Hyde,* plaintiffs filed a class action against manufacturers of infant formula, alleging violations of North Carolina's antitrust laws. 123 N.C.App. at 573, 473 S.E.2d at 681. The

purported class consisted of ultimate consumers who purchased infant formula from parties other than the manufacturer. *Id.* at 574, 473 S.E.2d at 681-82. The defendants filed a motion to dismiss alleging that plaintiffs were indirect purchasers and therefore lacked standing to sue under N.C.G.S. § 75-16. *Id.* The Superior Court granted the motion to dismiss, and plaintiffs appealed. *Id.*

**\*11** The Court of Appeals reversed the Superior Court and found that under North Carolina's antitrust statute, an indirect purchaser may sue a manufacturer for antitrust violations. The Court of Appeals based this finding upon a review of the plain language of N.C.G.S. § 75-16. North Carolina's antitrust statute provides:

If any person shall be injured or the business of any person, firm or corporation shall be broken up, destroyed, or injured by reason of any act or thing done by any other person, firm or corporation in violation of the provisions of this Chapter, such person, firm or corporation so injured shall have a right of action on account of such injury done, and if damages are assessed in such case judgment shall be rendered in favor of the plaintiff and against the defendant for treble the amount fixed by the verdict. N .C.G.S. § 75-16 (1999).

The current version of N.C.G.S. § 75-16 was amended in 1969. Prior to the amendment, the first sentence of the provision began: "If the business of any person, firm, or corporation shall be broken up...." 1913 N.C. Sess. L. 66, 70. The *Hyde* court found it significant that, in amending the statute, the legislature decided to add the phrase "if *any person* shall be injured" to the beginning of the provision. 123 N.C.App. at 578, 473 S.E.2d at 684. The court found that this evidenced an intent to expand the class of persons with standing to sue under Chapter 75, and thus provide a recovery "for all consumers," including indirect purchasers. *Id.* at 577-78, 473 S.E.2d at 684. A review of the legislative history also leads to the conclusion that the General Assembly intended to create indirect purchaser standing to sue under the state antitrust laws when it amended the statute. There is simply no logical reason for the amendment other than the creation of indirect purchaser standing.

In holding that indirect purchasers have standing to sue under North Carolina antitrust law, the Court of Appeals specifically declined to interpret the statute consistent with federal antitrust law. As originally enacted in 1913, the North Carolina antitrust statute was modeled after federal antitrust law, codified as Section 7 of the Sherman Act. *See* An Act to Declare Illegal Trusts and Combinations in Restraint of Trade, Ch. 41, § 14, 1913 Sess. Laws 66. Section 7

of the Sherman Act was recodified as Section 4 of the Clayton Act. Both federal and state law have been amended throughout the years; however, the language of the North Carolina statute has remained similar to the language of the Clayton Act.

*Bruggers v. Eastman Kodak Co.*, 2000 NCBC 3, at ¶ ¶ 5-8 (No. 97CVS11278, Wake County Super. Ct. March 17, 2000) (Tennille, J.).

{47} This Court has previously held that unless and until *Hyde* is overruled by the Supreme Court or new legislation is passed, this Court is bound by the decision in *Hyde* to the extent that it holds that indirect purchasers have standing under the North Carolina antitrust laws. *See, Bruggers,* 2000 NCBC 3, at ¶ 17; *Adams,* 2003 NCBC 7, at ¶ 8; *MJM Investigations, Inc. v. Microsoft Corp.* (No. 00CVS4073, Wake County Super. Ct.; No. 00CVS1246, Lincoln County Super. Ct., N.C. Aug. 2, 2004) (Tennille, J.) (Order Approving Settlement). In *Hyde,* the Court of Appeals was only asked to consider the question of whether the statute provided indirect purchaser standing. It was not called upon to delineate the scope and breadth of standing under the statute.

**\*12** {48} Since *Hyde* was briefed and argued there have been several developments which might have impacted the scope, if not the actual outcome, of that decision. Those developments demonstrate that the landscape upon which these types of claims are viewed has changed significantly since *Hyde* was decided.

{49} First, in June 1996 the General Assembly ratified a bill entitled "An Act to Revise the Statutes Regarding Antitrust Law to Ensure That These Provisions Are Internally Consistent and Consistent With Federal Antitrust Laws." Act of June 3, 1996, ch. 550, 1995 N.C. Sess. Laws 550 ("1996 amendments"). That legislative history is important for two reasons. First, if the General Assembly had desired to change the statute to provide for an *Illinois Brick/Hanover Shoe* limitation, it could have done so then. It did not, and it has done nothing to change the law since the *Hyde* decision. Second, and equally important, the General Assembly signaled a clear intent for the state courts to follow federal decisional guidance in interpreting and enforcing state antitrust laws. Clearly, counsel for the parties did not bring the 1996 amendments to the attention of the *Hyde* court.[FN12] The statutory direction to follow federal guidance has a bearing on this Court's decisions in these two cases, requiring the Court to reconcile the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.E.2d                                                                                                    Page 11
Not Reported in S.E.2d, 2004 WL 2414027 (N.C.Super.), 2004-2 Trade Cases  P 74,601, 2004 NCBC 7
(Cite as: Not Reported in S.E.2d)

indirect purchaser standing statute with the federal standing requirements enunciated in *AGC*.

> FN12. The *Hyde* court held: "Unlike Texas, our General Assembly has not mandated that our antitrust laws be construed in harmony with federal antitrust laws." 123 N.C.App. at 581, 473 S.E.2d at 686.

{50} Second, a track record is available which provides information not available to the *Hyde* court.[FN13] The track record to date establishes that state indirect purchaser cases are generally parasitic. They are not self-generating or supporting but almost always are dependent on some triggering federal action for their genesis. The track record also establishes that these cases pose significantly complex proof issues both as to damages and liability.[FN14] The track record establishes that they can in fact result in double recovery.[FN15] That same track record discloses that these types of cases are difficult to administer from a settlement standpoint and that the complexities and administrative costs and difficulties result in settlements that are something less than sterling from the consumer's point of view.[FN16] None of that information was available to the court in *Hyde*. This Court has previously pointed out the problems with settlement of these kinds of cases. In approving the *Microsoft* indirect purchaser class action settlement, the Court noted:

> FN13. *See* discussion *infra* Part V.B (describing the indirect purchaser litigation since *Hyde* was decided).

> FN14. The *Hyde* court specifically found that there were no complex damage or proof issues before it and further held that there was nothing in the record in that case to establish that other cases would pose difficult damage and administrative issues. The *Hyde* court said:
> It is clear that a suit by indirect purchasers under our antitrust laws will be complex. However, when asked at oral argument whether "chaos reigned" in states which have allowed indirect purchaser suits, defendants were unable to cite a single example. This failure to cite a single indirect purchaser case in which a court has been faced with an impossible complex situation counsels us that a fear of complexity is not a

sufficient reason to disallow a suit by an indirect purchaser....
> 123 N.C.App. at 584, 473 S.E.2d at 687-88.
> The facts in *Hyde* presented a fairly simple case. The product was a commodity which was not altered or incorporated in another product in the distribution chain, and the price fixing took place at the wholesale level, only one level removed from the consumer. Direct impact on the consumer and pass through were not difficult issues to prove. The question of whether the fixed price was absorbed by the consumer was not difficult. The complexity presented by *Morris* and *Crouch* differs dramatically from *Hyde.*

> FN15. The *Hyde* court found: "However, there are few, if any, reported instances of a defendant paying treble damages to two different classes of purchasers based on a single antitrust violation." 123 N.C.App. at 583, 473 S.E.2d at 687. In *Crouch,* plaintiffs seek to recover the same damages for which direct purchasers such as tire companies may seek treble damages. In *Morris,* defendants have already agreed to a multibillion dollar settlement with the direct purchaser class. In *Bruggers,* the class recovered for the same offenses which were the subject of federal direct purchaser actions. Likewise, in *Microsoft,* the plaintiffs recovered on the same claims which were asserted by direct purchasers. The problems recognized with possible double recovery are obvious.

> FN16. The settlements in *Long v. Abbott Laboratories,* 1999 NCBC 10 (No. 97CVS8289, Mecklenburg County Super. Ct. July 30, 1999) (Tennille, J.), *Bruggers* and *Microsoft* demonstrate the difficulties inherent in consumer class action cases. *Long* was a *cy pres* settlement that provided no benefit to the class. *Bruggers* resulted in a settlement that went to class members under a cumbersome administrative process which did not likely reach anything more than a small minority of the class. *Microsoft* is a classic example of the complex administrative problems that can be created. It will likely result in primarily a *cy pres* settlement. All of these cases fit the forecast of difficulties made by Landes and Posner in their article. *See supra* note 3.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.E.2d                                                                    Page 12
Not Reported in S.E.2d, 2004 WL 2414027 (N.C.Super.), 2004-2 Trade Cases P 74,601, 2004 NCBC 7
**(Cite as: Not Reported in S.E.2d)**

There is no definitive decision from the North Carolina Supreme Court ruling upon the issue of indirect purchaser standing in North Carolina, nor is there a clear legislative history. Accordingly, every plaintiff argues that there is indirect purchaser standing, and every defendant argues that there is no standing under North Carolina law. The stakes are almost always too high for either side to risk trial and an appeal. Further, numerous issues flowing from indirect purchaser standing remain unanswered. For example, who has the burden of proof on pass-through issues, and what must be shown? How indirect can the purchaser be? Who has the burden of showing that an indirect purchaser did not pass through the price increase to another consumer? Are there reliable means to determine pass through and the amount thereof? The answers to these questions dramatically affect liability and the potential for recovery. It is no surprise that neither plaintiffs lawyers nor defendants have wished to incur the expense of trial and appeal which would be necessarily incurred in getting the answers to these questions. It is likely that more than one trial would be required to get all the required answers.

**\*13** Additionally, there were significant questions concerning the application of the law of damages and how damages were to be determined in this case. The federal case which spawned this and other indirect purchaser cases was not a price fixing case. It involved anticompetitive behavior and not price fixing. The cost of Microsoft products at issue had decreased relatively speaking over the time in question. While there had been a determination in the federal action that Microsoft had a monopoly, there was no finding that it had used that monopoly to artificially increase prices. Proving damages by pass through of artificially inflated prices would have raised numerous novel questions of law. Proving damages to indirect purchasers by anticompetitive actions (which may have included artificially deflated prices) would raise a whole host of other issues for which there is no statutory or case law guidance.

In short, the process of trying this case and going through an appeal and possible retrial meant that the case would not be finally resolved for at least four or five years. Final judgment would have been entered some ten years after the alleged damages were incurred. For reasons explained more fully below, that time lag was a significant issue.

While there is a possible philosophical argument that this uncertainty has a salutary effect in promoting settlement of cases, this court does not believe it is the function of the law to create ambiguity and uncertainty. If consumers have a cause of action they should be entitled to full recovery, not a compromise amount. On the other hand, if no cause of action exists or damages are limited to direct pass through of artificially inflated prices, businesses ought not to have to pay for unfounded claims even if they are compromised. Under the present system, only the lawyers really benefit from the uncertainty. One of their clients is paying an unnecessary price.

....

Two factors are critical to the Court's decision to approve the terms of this settlement affecting purchasers of Microsoft products-timing and purchaser identification. Most indirect purchaser cases involve common problems-how to identify the class members and distribute small amounts of money to them. This case is no different. Plaintiff's counsel and Microsoft have represented to the Court that a means of identifying all consumers who purchased the software at issue does not exist and cannot be created. Thus, there will be a claim process of some sort no matter the outcome of settlement or trial. As counsel for one of the interveners has suggested, even in cash refund cases, the claims process is abysmally ineffective, with only single-digit percentages of potential beneficiaries making claims. It thus appears to the Court that there will have to be a claims process no matter the outcome. If the case were tried and some amount awarded for damages to purchasers of specific products, a mechanism would have to be put in place for identification of products purchased, claims and payment. If that process were to be put in place three to five years from now and it covered products purchased in the late 1990s, it is unlikely that the claims process would result in any significant payout. Most of these technology products will have been replaced well before any claims process begins. If the funds were not paid out, Microsoft would get to keep the money. Purchasers would be required to prove purchases which occurred many years before the claim process begins. That will be difficult enough now, and perhaps impossible years from now. Settlement now, while there is some prospect that purchasers will have records of their purchases, is far more beneficial to the class. Here, most of the purchasers are businesses that arguably have better records of their purchases. For consumers, the settlement has the benefit of not requiring proof of purchase for smaller claims. The combination of the more current claim process and the *cy pres* component of the settlement make acceptance of the coupon aspect of the settlement acceptable, even if it is not the most desirable process. Given the rapid advancements in technology, it is also likely that computer owners will make purchases of new

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

hardware and software, making the coupons more valuable than they would be for products not likely to be replaced.

**\*14** *MJM Investigations, Inc. v. Microsoft Corp.* (No. 00CVS4073, Wake County Super. Ct.; No. 00CVS1246, Lincoln County Super. Ct., N.C. Aug. 2, 2004) (Tennille, J.) (Order Approving Settlement).

{51} Third, there are cases from other indirect purchaser states which provide some guidance with respect to limitations on standing. The case law has evolved from interpretations of state statutes to determine if they provide for indirect purchaser standing (as happened in *Hyde* ) to a more detailed examination of standing requirements. Not unexpectedly, the far reaches of the claims against Visa and MasterCard in the various indirect purchaser states have prompted some of that evolution.

{52} At least eight other courts have rejected standing for plaintiffs with claims identical to those presented in the *Morris* case. Each of those states recognizes indirect purchaser claims. In South Dakota the court simply dismissed the case without detailed explanation.[FN17] In North Dakota the plaintiff's case was dismissed with the holding: "As 'non-purchasers' of defendants' debit card services to merchants, the Court believes that plaintiffs lack standing to sue for the alleged restraint of trade in such services. Their alleged injury is simply too remote." [FN18]

> FN17. *Cornelison v. Visa U.S.A., Inc.,* Civ. No. 03-1350 (Pennington County Cir. Ct., S.D. Sept. 29, 2004).

> FN18. *Beckler v. Visa U.S.A., Inc.,* Civ. No. 09-04-C-00030, at 5 (Cass County Dist. Ct., N.D. Aug. 23, 2004).

{53} In Michigan [FN19] the trial court applied the five *AGC* factors directly in dismissing similar claims, finding that each failed to support standing. Significantly, the Michigan court rejected an argument similar to that made by plaintiffs in these two cases that the broad language of the state statute trumped application of the *AGC* factors. In addition, the court found that plaintiff was not an indirect purchaser under the statute.

> FN19. *Stark v. Visa U.S.A., Inc.,* No. 03-

055030-CZ (Oakland County Cir. Ct., Mich. July 23, 2004).

{54} In Minnesota the courts have also applied *AGC* factors in determining standing for indirect purchasers even though *Illinois Brick* was not applied to preclude indirect purchaser claims. In a well-reasoned opinion in the *Gutzmiller*[FN20] case, the court applied factors 1, 4 and 5 under *AGC* in denying standing to plaintiffs under the Minnesota statute, which is similar to North Carolina's antitrust law.

> FN20. *Gutzwiller v. Visa U.S.A., Inc.,* No. 14-C4-04-000058 (Clay County Dist. Ct., Minn. Sept. 15, 2004).

{55} In New York, the Commercial Court in *Ho*[FN21] rejected standing for plaintiffs under circumstances identical to the *Morris* case. The court applied several of the *AGC* factors in determining that the plaintiffs lacked standing under New York antitrust laws.

> FN21. *Ho v. Visa U.S.A., Inc.,* No. 112316/00, 2004 N.Y. Misc. LEXIS 577 (New York County Super. Ct., N.Y. Apr. 21, 2004).

{56} In California the trial judge hearing the consolidated cases against Visa and MasterCard dismissed all the claims arising under the Cartwright Act, Cal. Bus. & . Prof.Code § 16720, *et seq.,* applying the *AGC* factors to find no standing. The court also held that plaintiffs were neither direct nor indirect purchasers of card services.[FN22]

> FN22. Credit/Debit Card Tying Cases, No. CJC-03-004335 (City and County of San Francisco Super. Ct., Cal. Oct. 14, 2004).

{57} In Nebraska, the trial court applied the five *AGC* factors in dismissing the identical claims by plaintiff. Specifically, the court held that the plaintiff failed to satisfy factors 2 and 3 under *AGC*. The court also held that the plaintiff was not an indirect purchaser within the scope of the state statute, which expressly grants standing to indirect purchasers. [FN23]

> FN23. *Tackitt v. Visa U.S.A., Inc.,* No. C103-740 (Lincoln County Dist. Ct., Neb. Oct. 19, 2004).

Not Reported in S.E.2d                                                                                          Page 14
Not Reported in S.E.2d, 2004 WL 2414027 (N.C.Super.), 2004-2 Trade Cases P 74,601, 2004 NCBC 7
**(Cite as: Not Reported in S.E.2d)**

**\*15** {58} In Maine the trial court rejected standing for the plaintiffs under an application of the *AGC* factors. The court held that factors 3, 4 and 5 particularly weighed against standing.[FN24]

> [FN24.] *Knowles v. Visa U.S.A. Inc.,* No. CV-03-707 (Cumberland County Super. Ct., Me. Oct. 20, 2004).

{59} In Superior Court in Buncombe County, North Carolina, Judge Dennis Winner dismissed the plaintiff's indirect purchaser claim, which was virtually identical to the claim in *Crouch,* stating:

It is the opinion of the undersigned that notwithstanding the enactment of the amendment in 1996, the *Hyde* decision is still the law of this State with respect to the issue of suit by an indirect purchaser. Nevertheless, this Court believes that the General Assembly never intended that the antitrust laws of this State be used in the manner in which the Plaintiff has attempted in this case, and that this case is therefore distinguishable from the *Hyde* case. To rule otherwise would put this Court in an impossible position of attempting to determine whether the alleged price-fixing by an oligopoly of an ingredient used to make tires had anything to do with the price paid by the Plaintiff when he bought the tires. This Court believes that without some allegation and proof that the tire manufacturers themselves were an oligopoly and were fixing prices, that it would be impossible to show the price the Plaintiff paid was not set by the normal laws of supply and demand in our open economic system, and that even if it were possible to show that, there would be no way for the Court to, in any fair or just way, determine an amount the Plaintiff was damaged.

Therefore, it is the opinion of this Court that the General Assembly could not have intended that our Antitrust Statue be used by an indirect purchaser of tires against the manufacturers of an ingredient placed in those tires.

*Weaver v. Cabot Corp.,* No. 03CVS04760 (Buncombe County Super. Ct., N.C. Mar. 29, 2004) (Winner, J).

**B.**

{60} A review of indirect purchaser cases in North Carolina is informative. The Court does not believe the North Carolina experience differs substantially from the national experience. State indirect purchaser cases have common characteristics. They are seldom

*sui generis.* More commonly they originate after a federal triggering event. Those triggering events include a guilty plea to federal price fixing, a class action suit by direct purchasers, or notice of a settlement of antitrust claims with private plaintiffs or the Department of Justice. *Morris* is an excellent example. Sometimes only the announcement in an SEC filing that there is an investigation underway will trigger suit. The *Crouch* case is an excellent example. Almost all of the cases are brought as class actions.[FN25] Discovery tracks the federal action permitting class counsel to piggyback on the work of the government or counsel for the direct purchasers. Both plaintiffs and defendants have a vested interest in seeing the federal action proceed first. Cases are filed in most if not all states having indirect purchaser standing, frequently by the same lawyers. The cases are seldom, if ever, tried. They get settled far short of trial.[FN26] Often and not unexpectedly, the settlements in the various indirect purchaser standing states track each other closely. The *Microsoft* case is an excellent example. Sometimes the state and federal actions are settled together.[FN27] The Court is unaware of any case in which the settlement reflected treble damages. Rather, most settlements are less than a whole recovery of the alleged overcharge and are not particularly satisfying from the perspective of the consumer class member. *Cy pres* settlements are not uncommon since the difficulties inherent in distributing tiny amounts among large numbers of consumers are daunting and expensive. The settlement in *Long v. Abbott Laboratories, 1999 NCBC 10* (No. 97CVS8289, Mecklenburg County Super. Ct. July 30, 1999)(Tennille, J.) is an excellent example. The North Carolina cases mirror the national characteristics.

> [FN25.] The *Adams* case is an exception. In that case the plaintiffs were individual hog farmers who opted out of a class action settlement that they believed was disadvantageous.

> [FN26.] The reasons for settlement are aptly described in the ABA Report of Indirect Purchaser Cases at *supra* ¶ 33.

> [FN27.] See the settlements in *Adams,* and *Thai Holding v. Archer Daniels Midland Co.* (No. 03CVS15096, Mecklenburg County Super. Ct ., N.C. Aug. 24, 2004) (Tennille, J.) (Order Staying Action).

**\*16** {61} This Court has presided over a number of

Not Reported in S.E.2d, 2004 WL 2414027 (N.C.Super.), 2004-2 Trade Cases P 74,601, 2004 NCBC 7
**(Cite as: Not Reported in S.E.2d)**

class action settlements involving indirect purchaser claims, beginning with *Long v. Abbott Laboratories.* That case is instructive for a number of reasons. It was parasitic in the sense that it was filed after a federal direct purchaser antitrust case was filed and discovery consisted of following discovery in the federal case. Similar cases were filed in ten other states by the same counsel appearing in North Carolina. Fortunately for the plaintiffs, a class action settlement of the various state claims was reached prior to trial of the federal action. The federal case was decided adverse to the plaintiffs, and no antitrust violations were found. Since a settlement agreement had been reached, it was enforced. The agreement provided for a settlement fund of approximately $9 million for North Carolina residents of which class counsel sought approximately twenty-five percent.[FN28] Since the settlement could not be distributed to the class, which consisted of all North Carolinians who purchased a prescription drug at a retail drugstore, a *cy pres* fund for people who could not afford their medications was created. Class members received nothing, and the defendants[FN29] paid a cost of litigation settlement although no underlying claim was ever proved.

> **FN28.** The court reduced the request to approximately ten percent based on the poor results for the class.

> **FN29.** Twenty three of the largest drug companies in the world.

{62} In *Bruggers,* the state claim was filed after federal triggering events, including a federal action. 2000 NCBC 3, at ¶ 15. Claims were filed in other indirect purchaser states.[FN30] The defendants were alleged to have fixed the price of x-ray film. The class consisted of all consumers of x-ray film in North Carolina. The problems created by the great variety of purchasers and the number of distribution chains made settlement difficult. In the end, a settlement fund of approximately $200,000 was created and divided among claimants on a two fund basis. One fund went to purchasers based upon the pro rata amount if they purchased and the other fund provided one lump sum payment to anyone who filed a claim, determined per capita based on the number of claims. In total, 116 claimants sought recovery through the settlement fund. However, only 100 claims were found valid. Potential claimants numbered in the thousands. In this instance, money actually went to class members although the payment was small and the cost of administration high. Class

counsel sought and obtained a reasonable fee based upon the amount recovered for the class. Counsel for both sides urged the Court to approve the settlement based upon the uncertain state of the law in North Carolina and the difficulty of proof involving so many different purchasers and distribution methods. The pass through issues were extremely difficult, including questions of whether hospitals absorbed the cost or passed it on to patients and insurance companies and whether the dentist or patient ended up paying the cost for dental x-ray film. The Court is convinced that the vast majority of class members declined to take advantage of the settlement because the dollar amount was not worth the effort required by the claims process.

> **FN30.** The original complaint sought a nationwide class consisting of residents of all states which had indirect purchaser standing. The complaint was amended to limit the claims to North Carolina.

**\*17** {63} The Court's most recent experience has been in the settlement of indirect purchaser claims against Microsoft.[FN31] Again, the action was filed after a federal triggering event, the determination in the government's federal case of abuse of monopoly power by Microsoft. Lawsuits were filed in numerous states and discovery coordinated with federal actions by direct purchasers. The direct purchasers recovered little in the federal action, and their counsel intervened in the state actions to try to obtain some of the attorney fees in the state actions even though they had no agreements with local counsel and had made no appearances in the cases. The settlement was complicated and had a significant *cy pres* component.[FN32] Counsel for the plaintiffs and Microsoft urged approval of the settlement over significant objections based in part on the complicated proof of damages and the uncertain state of the North Carolina law. Like *Morris,* that case did not involve allegations of price fixing among competitors.

> **FN31.** *MJM Investigations, Inc. v. Microsoft Corp.* (No. 00CVS4073, Wake County Super. Ct.; No. 00CVS1246, Lincoln County Super. Ct., N.C. Aug. 2, 2004) (Tennille, J.) (Order Approving Settlement).

> **FN32.** See the description at *supra* ¶ 50.

{64} The Court is aware of other cases in this state.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.E.2d                                                                                                   Page 16
Not Reported in S.E.2d, 2004 WL 2414027 (N.C.Super.), 2004-2 Trade Cases P 74,601, 2004 NCBC 7
**(Cite as: Not Reported in S.E.2d)**

A class action settlement was approved in an alleged price fixing scheme involving vitamins. Those cases followed guilty pleas to federal criminal charges. That case was not before this Court, but a number of large hog farmers opted out of what they believed was an inadequate class settlement and filed their own indirect purchaser actions. This Court ruled that they had standing.[FN33] The defendants declined the Court's suggestion to seek appellate review of that decision, and those cases have settled without necessity of court approval since they were individual and not class actions. Another case involving price fixing of monosodium glutamate products has been stayed in this Court pending a global settlement covering the federal claims and all state indirect purchaser claims.[FN34] Such settlements are preferable, but rare. They produce a more rational allocation of the liability fund.

FN33. *Adams,* 2003 NCBC 7, at ¶ 31.

FN34. *Thai Holding v. Archer Daniels Midland Co.* (No. 03CVS15096, Mecklenburg County Super. Ct., N.C. Aug. 24, 2004) (Tennille, J.) (Order Staying Action).

{65} The Court is not aware of any North Carolina class action that did not have a federal triggering event. The Court is not aware of any indirect purchaser case in North Carolina that has proceeded to trial, presumably because there is a federal triggering event establishing liability. In each case before this Court, the argument is made that the case must be compromised because the proof of damages is difficult and uncertain. Such arguments lead to a question of whether standing is appropriate. Settlements are to be encouraged, but they should have some basis in reality, and class counsel should be prepared to show the court more than the simple fact that the issues are difficult. That preparation undoubtedly requires some time and expense on the part of class counsel. Some investigation before rushing to the courthouse after a federal triggering event might generate better results or prevent dismissal on a challenge to standing.

## VI.

{66} The following policy considerations are relevant in deciding the standing requirements in indirect purchaser cases in North Carolina.

**\*18** {67} If *Hyde* is correct, the General Assembly intended for persons *actually* injured to be able to recover for injuries resulting from violations of the state antitrust laws.

{68} The General Assembly has directed the state courts to follow federal guidelines in determining standing.

{69} There is already an adequate deterrent to violation of the antitrust laws in the federal system. Accordingly, the focus of state law should be recovery for those *actually* injured: i.e., victim compensation.

{70} State indirect purchaser standing creates the prospect of double recovery, both as between direct and indirect purchasers and between indirect purchasers at different levels in the distribution chain. Double recovery is not favored, and where, as here, it is permitted between direct and indirect purchasers, it should be narrowly construed to ameliorate the adverse consequences.

{71} Indirect purchaser cases are expensive, inefficient and low-yield for consumers. The cost of obtaining information relevant to pass through of added costs from antitrust violations and investigating the pricing decisions made in the distribution chain is high. Apportionment among various tiers in the distribution chain involves extremely difficult problems of economic analysis and measurement. The practical difficulties of estimating both supply and demand elasticity at any one level and then over and among multiple tiers in the distribution chain results in speculative damage estimates. From an economics perspective, indirect purchasers face negligible price increases in comparison to direct purchasers.[FN35] Apportionment results in added cost of litigation and uncertainty. The actual recovery for class members in consumer class actions is relatively small and is frequently outweighed by the cost of administration and attorney fees. The yield is low given the potential expense of litigation. That is one explanation for the settlements which do not reflect actual injury as much as the costs of litigation.

FN35. *See* Landes and Posner, *supra* note 3, at 617.

{72} There is no single bright line test that works in every case. Each standing case must be decided based on its own factual situation.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.E.2d                                                                 Page 17
Not Reported in S.E.2d, 2004 WL 2414027 (N.C.Super.), 2004-2 Trade Cases P 74,601, 2004 NCBC 7
**(Cite as: Not Reported in S.E.2d)**

{73} Given those policy considerations, the decision of the Court of Appeals in *Hyde,* the developments since *Hyde,* the history of the amendment of the statute and the subsequent directions from the General Assembly to follow federal guidelines, and the clear federal approach to standing, the Court believes that the North Carolina courts would apply a multifactor test to determine standing in indirect purchaser cases. The requirements would recognize indirect purchaser standing, but engraft upon the statute the requirements of standing enunciated in *AGC,* modified to recognize the right to recover for injury created by statute for indirect purchasers. The factors would include:

1. *Whether the plaintiff is a consumer or competitor in the allegedly restrained market.* This inquiry focuses on the market the alleged restraint was designed to impact and the intent of the actor in engaging in the restraint. One key question is whether the plaintiff claims injury in a market collateral to the market in which the alleged restraint took place. This factor recognizes that the antitrust laws are designed to see that customers in the relevant market get the benefit of price competition. This factor would have supported standing in *Hyde.*

**\*19** 2. *The directness of the impact on the plaintiff.* This factor is modified to eliminate the restriction of *Illinois Brick* against indirect purchaser standing. Being an indirect purchaser does not preclude standing. However, the causal connection between the act and the claimed injury cannot be too remote. Purchasers in the direct chain of distribution are more likely to be able to show sufficiently direct injury than those outside the chain of distribution. Purchasers who buy the product which is the subject of the restraint are more likely to be able to show sufficiently direct injury than those who purchase a product with a component which is the subject of the restraint. Purchasers of products whose manufacture was impacted by the restraint face significant hurdles showing sufficiently direct impact. Within the chain of distribution, the relative positions of the purchaser and the actor can be significant, depending on the length and complexity of the distribution chain. Even though a purchaser is removed from the direct restraint, he or she may still show direct injury. *See Blue Shield of Va. v. McCready,* 457 U.S. 465, 478-81, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982). This factor would have supported standing in *Hyde.*

3. *Whether there exist other indirect purchasers in the distribution chain who are more directly impacted by the alleged violation.* The nature of the market is significant here. Courts must look at the nature of the product and the market for the product

as well as the chain of distribution to determine the likelihood of direct pass through of the cost of the restraint or inflated price. The nature of the restraint must also be considered. Double recovery among indirect purchasers should be avoided. This factor would have supported standing in *Hyde* where the distribution chain was short.

4. *The speculative nature of the damage claims.* As damage claims move from direct to indirect and the distribution chain becomes more complex, the possibility of factors intervening to affect causation and price multiplies, and claims become more speculative. It is appropriate for purposes of determining indirect purchaser standing "to consider whether a claim rests at bottom on some abstract conception or speculative measure of harm." *McCready,* 457 U.S. at 475 n. 11. In *McCready* the Court noted that the courts were required to be cautious when dealing with speculative, abstract and impractical damage theories. *Id.* This factor would not have prevented standing in *Hyde.* This factor focuses on sound economic analysis. Important factors would include reliable demand and supply curve studies and sufficient regression analysis to eliminate other factors in pricing.

5. *The risk of duplicative recovery and danger of complex apportionment of damages.* While these factors are limited by the General Assembly's creation of indirect purchaser standing, they should not be totally eliminated when considering the state claims. The courts still have the same interest in keeping the scope of a complex antitrust trial within judicially manageable limits. *AGC,* 459 U.S. at 543. The factors are simply taken down a level and the *Hanover Shoe/Illinois Brick* restrictions eliminated. State cases may present apportionment issues which are simply too complex and for which there exists no measure of recovery which is not speculative. It is clear that the General Assembly did not intend that every purchaser in the distribution chain have a right of recovery or that there be duplicative recovery among indirect purchasers. Such an interpretation would be contrary to the clear guidance to follow federal precedent and harmonize state antitrust law with federal law. Rather, it should be clear that the General Assembly intended that those who can show with some degree of certainty that they were directly impacted by the alleged acts in restraint of trade should be able to recover even though they are indirect purchasers. The courts must be cognizant that the problems between direct and indirect purchaser cases replicate themselves in state indirect purchaser cases where there are multiple levels in the distribution chain and multiple distribution chains. There should only be one fund constituting the

amount of the alleged overcharge to North Carolina residents, and the courts must guard against multiple liability for the fund and prejudice to absent victims or non-class members. The complexity of the distribution chain and the variety of consumers in *Bruggers* highlight the issues this factor would implicate. As the Supreme Court noted in *AGC* and *Illinois Brick,* massive and complex damages litigation undermines the effectiveness of treble damage suits. The poor results obtained in settlement in the North Carolina cases confirms this view.

**\*20** {74} There is no bright line test: each situation must be considered on its facts and the factors applied. Different factors might be important in different cases. Accordingly, the Court turns to the application of those factors to these two cases.

## VII.

### A. The *Crouch* Case

{75} The Court's analysis is premised on the underlying proposition that defendants have engaged in illegal price fixing in the market for rubber chemicals.

{76} Both Crompton and Bayer have pled guilty to conspiring to fix prices and suppress competition in the sale of certain rubber compounds and chemicals. On October 13, 2004, the Associated Press reported that Bayer pled guilty to a criminal charge involving a rubber compound used in hoses, belts, seals, adhesives and sealants. Crompton pled guilty in Canada to fixing prices on chemicals used in the manufacture of tire-quality rubber and non-tire applications such as automobile parts, conveyor belts, weather stripping and rubber latex gloves from July 1995 to 2001. Certain of the findings in the Agreed Statements of Facts in the *Crompton* plea agreement are instructive. It states:

On a commercial basis, rubber chemicals are produced synthetically through highly sophisticated processes. It is apparent that rubber chemicals are now a commodity product and over capacity in the industry has been a constant restraint upon profitable operation and re-investment. Rubber chemicals are significant in the production of useable modern rubber products, principally tires. There are no practical or reasonable economic substitutes to certain rubber chemicals which are the subject of this proceeding, although innovation in both application and production does from time to time cause some

products to be superseded. The accused and its co-conspirators are best situated from the perspective of size, experience and incentive to participate in such developments. Based upon facts obtained by the Commissioner, which Crompton is not aware of but does not contest for the purposes of this proceeding, rubber chemicals are said to constitute about 1% of the value of finished tires, they are a practical sine qua non to the manufacture of over $2 billion worth of tires produced in Canada annually. An additional approximately 30% of rubber chemical sales are devoted to non-tire uses in various automobile parts, surgical gloves and other commercial, industrial and health applications.

The rubber chemical producers identified above manufactured and/or sold the substantial majority of the rubber chemicals that were sold or distributed in Canada during the period of the offence for use in the tire, automobile parts, industrial applications and health industries. Indeed a significant amount (approaching 50% in some instances) of the rubber chemicals manufactured in Canada are exported. Each of the above referred to entities participate, to varying degrees, in the globally organized tire manufacturing industry. The principal Tire Producers buy centrally (not in Canada) for delivery to their regional production facilities. The rubber chemical producers in turn organize their delivery logistics to best meet customer demands and their own production facilities. There is a significant buyer power within the tire-destined rubber chemical business.

**\*21** ....

It is a matter of some debate between Crompton and the Commissioner as to the quantum of commerce affected by the illegal activity herein referred to. This requires specifically a consideration of the "lasting effect" of various price increases on certain specific rubber chemicals. This analysis however, given the prevailing conditions in the market, does not give credit to the fact that price increases may not have been appropriate at all and one or more producers may have had to exit the market, in the absence of such restraints upon the normal market processes. If Crompton's analysis is correct the gap between the opposing views of affected commerce may be measured in hundreds of millions of dollars. In any event it is agreed that the assessment of competitive injury is largely one of judgment in all of the relevant circumstances.

*The Queen v. Crompton Corp.,* [May 2004] F.C. ---- (Can.) (Agreed Statement of Facts).

{77} The Canadian plea agreement highlights two

Case 1:05-cv-00360-SLR    Document 212-2    Filed 08/17/2006    Page 124 of 150

Not Reported in S.E.2d                                                                    Page 19
Not Reported in S.E.2d, 2004 WL 2414027 (N.C.Super.), 2004-2 Trade Cases P 74,601, 2004 NCBC 7
**(Cite as: Not Reported in S.E.2d)**

problems significant to the standing determination. First, the calculation of the impact on prices of the conspiracy will be difficult to determine. As noted, "In any event, it is agreed that the assessment of competitive injury is largely one of judgment in all of the relevant circumstances." That factor is complicated by the significant buyer power within the tire-destined rubber chemical business. Second, the impact on the retail consumer will be minimal. The example in paragraph 79 below highlights the degree of impact on the retail purchaser.

{78} The problems inherent in the *Crouch* claims are the same alluded to by Judge Posner in his noted article on pass through economic analysis.[FN36] First, the price-fixed item is a product consumed or altered in the manufacturing process. Accordingly, its use will vary with the type of rubber product being made. It may also vary with the nature of the product (chemical) being made and how it is used in the manufacturing process. Different direct purchasers (here, tire manufacturers) might use the various chemicals in various ways in differing products.

> FN36. *See* Landes and Posner, *supra* note 3, at 615-21.

{79} The price today for a set of four BF Goodrich® Touring T/A SR4-P195/70R14 90S tires, which are similar in size and quality to those purchased by Crouch, is $222.64 at Sam's Club's posted price on the Internet. If the value of the chemicals represents 1% of the value of the tires,[FN37] the chemicals in the tires have a total value of $2.23 or $0.56 per tire. If we assume that in an industry with overcapacity and strong buyer power the conspirators were able to artificially inflate prices by as much as 20 % [FN38] and assume that all of that can be proven to be passed through to retail consumers, Crouch's injury can be calculated to be $0.44 for the set of tires or $0.11 per tire. Bigger tires will cost more, smaller tires less. Thus, it is likely that the recovery per tire sold in North Carolina will be in the range of $0.01 to $0.11. That number represents a remote impact on its face. Certainly it would not represent a meaningful recovery for consumers. In any event, the costs associated with litigation and administration of any settlement would far outweigh the benefits to consumers. Few consumers are likely to fill out a claim form for $0.44 or even $1.32 (trebled damages). While the above calculations would affect class certification, they also are relevant to a determination of the remoteness of injury.

> FN37. One percent was the actual number used by Canadian authorities in their case against Crompton. *See supra* ¶ 76.

> FN38. The calculation of this number will be difficult, but it is difficult to conceive of prices being artificially inflated at a higher level in a market with strong buyer power and overcapacity. It is also unlikely that 100% of the inflated cost was passed through to consumers or that it affected consumer prices.

*22 {80} In this instance, Crouch would be required to establish tire prices in North Carolina by manufacturer both before and after the alleged conspiracy period. Because this case involves a product used in the manufacturing process, regression analysis would be required to disaggregate any effect of other changes in the manufacturing process for each manufacturer for each product category. Further regression analyses would be required to disaggregate the impact on price, if any (by product category and by manufacturers), of other influences on the manufacturer's price. As the product moved down the distribution chain into various avenues of distribution, each step would require additional regression studies to disaggregate other impacts on prices until the final price paid by a consumer for different products purchased in different markets is determined. To perform such studies the economists will require enormous amounts of information, parts of which will constitute trade secrets or confidential information of nonparties, principally tire manufacturers. Many manufacturers are foreign companies. Determining a price differential per tire for tires sold in North Carolina which were manufactured using price-fixed chemicals during the relevant time period would be a Herculean task and one which the Court believes would not be free from speculation given the enormous number of disaggregating factors to be considered in the process.

{81} Clearly, the tires made for SUVs will differ from those made for compact cars. The market for these tires will vary. There is a range in quality and price of the products made using the price-fixed chemicals. If, as is usually the case, there is cheating among the price fixers, additional variations are created.[FN39] In this situation there are a small number of large producers, some or all of which could exert great pressure on price. Thus, at the outset the multiple of variations in pass through analysis is

daunting. The discovery involved in ascertaining the production methods, costs and pricing strategies of tire manufacturers would intrude into their most fundamental confidential business information and trade secrets, insuring a long and difficult battle over access. If that information is available, the demand and supply curves must then be calculated for this myriad of products and suppliers and the prices determined by the intersections of those curves tested against rigorous regression analysis to insure that no external factors affected the pricing and pass through at the manufacturer level.

> FN39. Price fixing schemes frequently fall apart because the temptation to cheat to get market share is great.

{82} Then the process of determining the subsequent pass through begins. Demand and supply curves and regression analysis must be created for the various lines of distribution and for the various companies and for the various products. Here, it is significant that consumers are at least three steps removed from the original offense. That makes apportionment of damages/pass through extremely difficult and raises a greater risk of double recovery.

*23 {83} Again, the distribution processes may vary with producers and products. Are there tires on the market which were made with non-price-fixed chemicals? If so, how do they affect price? What is the effect of foreign competition? Do company owned stores or franchises sell at different prices than Sam's Club or Wal-Mart? Does the corner gas station price yet another way? Must the pass through expense be determined with reference to the customer base? These are but a sampling of the difficulties inherent in determining pass through in this case.[FN40]

> FN40. See, Michele Molyneaux, Comment, Quality Control of Economic Expert Testimony: The Fundamental Methods of Proving Antitrust Damages, 35 Ariz. St. L.J. 1049, 1074-75 (2003).

{84} Each case must be analyzed individually. There will be cases where the economic analysis is not difficult. Hyde may have been one of those cases. There could be other examples where a component, such as a computer chip, is price fixed, and its costs passed through directly to purchasers of the product in which it is incorporated.[FN41] Individual cases will vary, and the factors must be considered in each case.

The relevant reliability of economic analysis is a key factor in applying those factors. The economic analysis cannot be oversimplified. See In re Aluminum Phosphide Antitrust Litig., 893 F.Supp. 1497, 1503 (D.Kan.1995). There, the court rejected an expert report which failed to apply standard economic methodology to test the conclusions reached. In ruling on a motion in limine the court said:

> FN41. The Court notes that certain manufacturers of DRAM chips used in a variety of computer products have been accused of price fixing. See, Stephen Labaton, Infineon To Pay a Fine In the Fixing Of Chip Prices, N.Y. Times, Sept. 16, 2004, at C6. The Court expresses no opinion on standing in that situation. Each case must be judged on its own merits, and that case is not before the Court. The Court simply notes that the nature of the component can make a difference.

The goal of a prudent economist in performing the "before and after" analysis is to determine the hypothetical or "counter-factual" prices that would have prevailed during the conspiracy period, but for the conspiracy. In applying the "before and after" model of damages, it is fundamentally necessary to explain the pattern of forces outside the violation period using factors that might have changed (i.e., supply, demand, and the differences in competition) to predict the prices during the conspiratorial period. In this context, as in most economic problems, failure to keep "other things equal" is one of the known "pitfalls ... in the path of the serious economist." Samuelson, P. and Nordhaus, W.D., Economics (13th ed.) at p. 7. This case presents two potential normative periods, a "before" period and an "after" period that have distinctly different price levels. One therefore must identify the reasons for the disparate price levels. According to Dr. Siegfried, the field of economics supplies a statistical methodology for making this determination on a scientific basis, and the generally accepted means of predicting the prices that would have prevailed absent the conspiracy is regression analysis. At a minimum, regression analysis addresses supply and demand factors by looking at price trends over time. A prudent economist must account for these differences and would perform a minimum regression analysis if utilizing the "before and after" model.
Id. at 1503-04 (footnotes omitted).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

{85} The five key factors are analyzed with respect to *Crouch* below.

**\*24** 1. *The relevant market.* The chemical manufacturers accused of price fixing sold to rubber manufacturers. Because the number of sellers and the number of buyers was relatively small, the price fixing scheme had to have at its core an effort to affect price pressure from the oligopolists in the tire manufacturing business. The antitrust laws are designed to see that customers in the relevant market get the benefit of price competition. This is a mixed case, as there are two relevant markets: the first is the market for chemicals, and the second is the market for rubber products indirectly affected by the artificial influence in the chemical market. As a purchaser at retail of a rubber product, Crouch is in a market secondarily affected by the restraint in the original chemical market. That is a complicating factor for standing. This factor weighs slightly against standing, as the alleged price fixing was directed at the market for chemicals, not the market for tires. Prices were allegedly fixed for chemicals used to manufacture other rubber products. However, the plaintiff purchased a product the price of which *may* have been influenced by the illegal restraint.

2. *Directness of impact on plaintiff.* The fact that the artificially restrained price impacts the manufacturing process removes it at least one level of directness. Unlike a component that remains unchanged when incorporated in the final product, manufacturing costs are less directly passed through and may be affected by differing manufacturing processes used by producers. While it is clear that in most instances some portion of a price-fixed cost gets passed along, the directness can be impacted by the nature of the item subject to price fixing, be it a component, labor cost, or something used in the manufacturing process. The nature of the item can influence the directness of the impact on the price of the end product at retail. Because these chemicals are products used in a manufacturing process, the direct impact at retail is less clear and subject to variation among manufacturers using the chemicals. The smaller the component, the less likely there will be impact on the final price. Here the chemicals only comprise 1% of the value of a tire, reducing the likelihood that total final price was significantly affected.

There is also an additional question of the length of the distribution chain. While plaintiff purchased from Sam's Club, which may have purchased directly from a manufacturer, other class members may have purchased through other lengthier distribution chains. This factor weighs against standing.

3. *Other indirect purchasers.* This is the factor which gets most confusing when *Illinois Brick* is eliminated.

State courts should focus this inquiry on whether or not the existence of other indirect purchasers in the chain of distribution gives rise to other claims against the fund representing the amount by which the price of the retail item has been artificially inflated. It becomes more of an examination of whether there will be double recovery on the state claim (eliminating the concern about double recovery created by standing holdings in *Hanover Shoe/Illinois Brick* ). Here the other indirect purchaser claimants may be distributors and retailers who claim to have absorbed some of the price increase. No claims have been filed on their behalf. This factor would adversely impact standing in *Crouch* based on this record.

**\*25** 4. & 5. *Speculative nature of damage claims and complexity.* These items sometimes overlap. That is the case with *Crouch.* In this case there are multiple factors which render valid economic analysis either impossible or unmanageably complex. While the number of manufacturers is not great, each will have different manufacturing processes. Those processes and the use of alleged price-fixed chemicals will vary from product to product. Products will vary in size, quality and costs. There will be different markets for the products-retailers like Wal-Mart, Sam's Club, K-Mart and Sears, local tire stores, gas stations, company franchise stores and Internet sales. In a typical price fixing scenario, some, if not a substantial portion, of the price increase is absorbed at the earliest stages in the distribution chains. Some retailers will buy direct; some will buy from distributors. Foreign competition, not insignificant in the tire industry, can affect price. Tracing the price of the processing chemicals through foreign manufacturers provides other problems. The price of tires may be affected by external factors such as high gas prices, which could lower demand. Each variation in manufacturer's process, price, size, quality, market, distribution method and changes in applicable externalities requires individual supply and demand analysis and may require multiple regression analyses in order to eliminate the speculative nature of any damage calculation. Given the many variables, the issues surrounding allocation of the alleged price fixing fund in this case would be exceptionally complex and the results of economic analysis speculative.

Unlike direct purchasers who may recover for costs which they do not incur, state indirect purchasers may recover only for injury actually incurred. Thus, they must prove pass through of the artificially inflated cost. To prevent double recovery for the same alleged injury there must be a reliable means of allocating the effects of the price fixing among the

Not Reported in S.E.2d, 2004 WL 2414027 (N.C.Super.), 2004-2 Trade Cases P 74,601, 2004 NCBC 7
**(Cite as: Not Reported in S.E.2d)**

various participants in the distribution chain. It must take into account other externalities. For example, how would purchasers of tires that were recalled and replaced be treated? Factor 5 takes this complexity into account when drawing the line on remoteness of claims. The size of the impact on tire prices is relevant here. As demonstrated in paragraph 78 above, any increase in tire prices will be relatively insignificant. In *Crouch,* factors 4 and 5 dictate heavily against standing.

There may well be occasions on which the Court should defer a standing determination until there has been far ranging discovery and expert evidence produced on pass through and allocation. The problem inherent in delay is the enormous cost involved in getting the information and expert analysis. If it proves insufficient, substantial resources will be wasted. Where, as here, it is apparent from the pleadings that any analysis will either be speculative or allocations enormously complex, the Court should rule on standing early in the process. Where, as here, counsel have not made any attempt to ascertain facts relating to standing prior to filing suit, the court's job is made more difficult. The rush to file in indirect purchaser states works against adequate investigation prior to filing.

**\*26** {86} Considering all five factors, Crouch lacks standing to pursue indirect purchaser claims.

## B. The *Morris* Case

{87} The *Morri* s case presents a far easier analysis. It is not a price fixing case.

{88} In *Morris,* the underlying antitrust claim is for illegal tying of credit and debit cards under the "Honor All Cards" policy. For purposes of analysis here, the Court assumes the tying arrangement was illegal. Tying cases present unique damages issues.

In tying cases, the measure of damages to an injured purchaser is described as "the difference between the price actually paid for the tied product and the price at which the product could have been obtained on the open market." However, several courts have held that damages can be recovered only if the combined fair market value of both the tying and tied products is exceeded by the amount actually paid for both.

*Private Antitrust Suits,* A.B.A. Sec. Antitrust Law, Antitrust Law Developments 875 (5th ed.2002) (footnotes omitted).

{89} Here, not only would Plaintiff be required to

show the underlying complicated damage to merchants,[FN42] but also how those damages got passed on in each and every consumer transaction by the merchant. In the case of a hot product which sells on its label (Calvin Klein jeans, for example) so that the price is unrelated to costs of sale, manufacture or distribution of the product, how could plaintiff possibly show what part of the price included a pass through cost resulting from the tying arrangement which would not have been included in the absence of the tying arrangement?[FN43] How could the Court administer a trial where every consumer transaction might be subject to that proof for every merchant? It cannot be done. More compelling is the fact that a determination would have to be made for every product since price elasticity varies between products.[FN44]

FN42. For cases discussing the difficulty of proof in tying cases see, *Will v. Comprehensive Acctg. Corp.,* 776 F.2d 665 (7th Cir.1985); *Kypta v. McDonald's,* 671 F.2d 1282 (11th Cir.1982); *Siegel v. Chicken Delight,* 448 F.2d 43 (9th Cir.1971).

FN43. *Gutzwiller v. Visa U.S.A., Inc.,* No. 14-C4-04-000058 (Clay County Dist. Ct., Minn. Sept. 15, 2004). Judge Vaa presented an illustrative example:

Assume that Plaintiff purchased an item at a K-Mart store which accepted Visa and MasterCards, on March 1, 2003. To recover damages, Plaintiff would first need to prove that as a result of Defendants' alleged restraint of trade in providing debit card services to that K-Mart store, K-Mart paid excessive debit fees. Plaintiff would then need to prove that K-Mart did not absorb any such excess debit fees by making less profit, or in some other non-monetary way, such as by hiring fewer employees and/or not making major repairs to its building, but instead passed on the excess debit fees in the price of the items sold to consumers. Plaintiff would then need to prove that some identifiable portion of the item was not attributable to any factors which might affect the price of that item on that specific date. Plaintiff would then need to make the same offer of proof for any item sold by the K-Mart store not only on March 1, 2003, but for every other day in issue, and would have to make the same offer of proof relative to every other merchant involved in his claim.

Not Reported in S.E.2d                                                                                                      Page 23
Not Reported in S.E.2d, 2004 WL 2414027 (N.C.Super.), 2004-2 Trade Cases P 74,601, 2004 NCBC 7
**(Cite as: Not Reported in S.E.2d)**

*Id.* at 16.

FN44. This fact alone would render class certification impossible since each customer would have different damages depending on each individual purchase they made.

{90} The five key factors with respect to *Morris* are analyzed below.

1. *The relevant market.* Defendants refer to plaintiff as a "non-purchaser." That is shorthand for not being a purchaser in a relevant market. The relevant market in *Morris* is the sale of credit and debit card services. Morris did not make a purchase in that market. Morris simply made purchases of consumer goods. Antitrust laws are designed to see that customers in the relevant market get the benefit of price competition. In this case the customers in the relevant market would be the retailers who purchase debit and credit card services, not all consumers of retail products. This factor alone would strongly support a finding of no standing in *Morris.*

2. *Directness of impact.* The underlying restraint alleged in *Morris* was a tying arrangement, not price fixing. It is founded on the proposition that retailers paid more for debit card services than necessary without the tying arrangement. Morris does not even allege he is a debit card holder. He seeks to represent a class consisting of consumers who paid by a credit card, paid cash, paid by check, bought on credit or used a debit card. The impact of the alleged tying arrangement (which applied only to retailers using debit card services) on consumers is as remote as this Court can conceive.

*27 3. *Other indirect purchasers.* Since consumers are not a part of the relevant market for credit/debit card services, there are no other indirect purchasers. This is a situation where the impact, if any, of the tying arrangement falls directly on the direct purchaser.

4. *Speculative nature of damage claims.* This is not a price fixing case. It is at bottom a tying case which carries additional proof problems affecting the speculative nature of damages to indirect purchasers. Indirect purchasers would first have to prove what the damages were to retailers. Retailers would be required to show that the tied price of debit and credit cards was higher than the price of each sold separately in competitive markets. Indirect purchasers would then be required to show how those damages got passed through or had a direct impact on each consumer purchase they made in North Carolina, whether by cash, check, credit card or debit card. Two examples come to mind. When a teenager pays $100 cash for a pair of designer label jeans that

cost $10 to make because they are the hot fashion item, are they paying more than they would have paid had there been no tying arrangement involving debit or credit cards? How could that be proven? What about the item that is put on sale below cost because it is outdated and needs to be cleared from inventory? Assuming that injury at the retailer level could be quantified somehow, that injury would be attributable only to the increased use of debit cards, a minor part of the market. According to plaintiff, that cost is then spread over every consumer product sold by every retailer. If plaintiff is correct, the recovery per product will be infinitesimal. In addition, the manageability of the litigation and the administration of any settlement present insurmountable barriers. If the Court of Appeals asked today if there is an example of "an impossible complex situation," the *Morris* case would provide such an example. The Court cannot conceive of an economically feasible way to administer a trial which would require inquiry into how every retailer set the price for every consumer good sold in this state. Nor is it conceivable that any judgment would be in any amount which could be economically *allocated* and *paid* to *every* consumer in North Carolina.

5. *Complexity.* It is difficult to imagine a more complex damage case. Plaintiff's case would require an analysis of pricing of virtually every product sold at retail in North Carolina. The litigation could last an interminable period, and it is difficult to conceive of how a claims process would work. It is likely the price increases attributable to the excess cost to the retailer of using debit cards would be such a small measure that there would be no cost effective way to administer a claims process that would compensate consumers directly.

{91} Each *AGC* factor in *Morris* supports dismissal of the claims. Morris asserts remote claims outside the relevant market which involve speculative and complex damages. Eight other jurisdictions have agreed and thus placed limits on indirect purchaser standing. Plaintiff's counsel urged the Court to permit amendment to the pleadings to assert only claims for debit card holders. Such an amendment would make no difference in the outcome on this motion.

*28 {92} Having found that the complaint is subject to dismissal, the Court does not need to address defendants' argument that plaintiff seeks relief that would violate the Commerce Clause of the United States Constitution.

**CONCLUSION**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00360-SLR    Document 212-2    Filed 08/17/2006    Page 129 of 150

Not Reported in S.E.2d                                                                    Page 24
Not Reported in S.E.2d, 2004 WL 2414027 (N.C.Super.), 2004-2 Trade Cases  P 74,601, 2004 NCBC 7
**(Cite as: Not Reported in S.E.2d)**

{93} If state antitrust laws are to have any impact, they must work. Compromise *cy pres* settlements that provide no payments to consumers have little deterrent effect and no benefit for those actually injured. Where actual injury can be shown with reasonable certainty, defendants should pay those damages to the injured parties and be subject to statutory penalties. That is a real deterrent, and it benefits those injured.

{94} Part of the problem in dealing with indirect purchaser cases is the race to the courthouse which follows a triggering event at the federal level. Despite the fact that the case was two years old, when asked at oral argument, plaintiff's counsel in *Crouch* had no idea what the pass through per tire would be, either in cents or in dollars. His suggestion was for the Court to wait until class certification and address the issues in that context. Where, as here, it is apparent from the pleadings that either (1) sound economic analysis can only produce speculative damages or (2) the complexity of the required sound economic analysis is staggering and virtually impossible to accomplish given the inability to get at all the required information, deferral to class certification is unnecessary. The Court is not required to nor should it defer standing determinations to class certification. While there may be some overlap in the factors considered in each determination, the tests are different.

{95} As Justice Brennan noted in his dissent in *Illinois Brick,* the complexity of damage proof should not foreclose a claim .[FN45] That policy must be balanced with the need to control the manageability of litigation. Judge Posner has correctly noted that indirect consumer class actions frequently do little to provide redress for injury in indirect purchaser cases,[FN46] and the North Carolina cases support his conclusion. [FN47] The proper focus should be on insuring that those cases in which there is non-speculative proof of direct impact on consumers at something other than a negligible level get tried and those cases which fall outside the limits of rational accepted economic analysis are dismissed. The modified *AGC* factors provide guidelines for making those determinations at the trial level. Applying those factors to these two cases results in their dismissal. Other cases may come out differently or may require some discovery before ruling. Class actions which provide no redress to those actually injured do not fulfill the purpose of the state statute which is to redress injury to those directly impacted by the price fixing.

FN45. 431 U.S. at 758-60.

FN46. *See* Landes and Posner, *supra* note 3, at 607.

FN47. *See* discussion *supra* ¶ ¶ 60-65.

{96} State statutes do not provide as effective a deterrent as the federal scheme. There is an adequate and more effective deterrent to antitrust violations at the federal level. State indirect purchaser cases should be designed to provide relief to those directly injured by antitrust violations. Since they permit double recovery they should be narrowly construed. Similar to the judgments the legal system makes on "foreseeability" in negligence cases, judgments on "standing" are designed to place limits on what would otherwise be limitless claims. The two concepts are similar in that they set a boundary beyond which claims are determined to be too remote. Where a class action will provide no actual benefit or an insignificant benefit to class members, there exists a strong inference that the class claims are too remote or speculative to withstand scrutiny under the modified *AGC* factors. Sometimes, as here, the standing determination can be made early in the process and save significant resources. Other times the determination should await further discovery before decision. In either case, the five factors set out above should be applied and each case determined on its own facts. Applying the factors to the claims in *Crouch* and *Morris* results in dismissal.

**\*29** It is hereby ORDERED, ADJUDGED and DECREED:
1. Defendants' Motion to Dismiss in *Crouch* is granted, and plaintiff's claims are hereby dismissed.
2. Defendants' Motion to Dismiss in *Morris* is granted, and plaintiff's claims are hereby dismissed.
3. Each party shall bear its own costs.

This the 26th day of October 2004.

N.C.Super.,2004.
Crouch v. Crompton Corp.
Not Reported in S.E.2d, 2004 WL 2414027 (N.C.Super.), 2004-2 Trade Cases  P 74,601, 2004 NCBC 7

Briefs and Other Related Documents (Back to top)

• 2004 WL 3313262 (Trial Motion, Memorandum and Affidavit) DEfendants' Brief in Response to the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.E.2d, 2004 WL 2414027 (N.C.Super.), 2004-2 Trade Cases P 74,601, 2004 NCBC 7
**(Cite as: Not Reported in S.E.2d)**

Court's Order of August 27, 2004 ÝOther¨ (Sep. 15, 2004) Original Image of this Document (PDF)

• 2004 WL 3313263 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum in Response to Judge Tenille's August 27,2004 Order (Sep. 15, 2004) Original Image of this Document (PDF)

• 2003 WL 24045466 (Trial Motion, Memorandum and Affidavit) Defendants' Joint Reply Memorandum Of Law In Support Of Defendants' Motion To Dismiss Ýothr¨ (Mar. 28, 2003) Original Image of this Document with Appendix (PDF)

• 2003 WL 24045467 (Trial Motion, Memorandum and Affidavit) Defendants' Joint Memorandum Of Law In Support Of Defendants' Motion To Dismiss (Mar. 28, 2003) Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT F



Not Reported in F.Supp.2d, 2004 WL 1926086 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 1683
**(Cite as: Not Reported in F.Supp.2d)**

⚑
Briefs and Other Related Documents

United States District Court,S.D. New York.
Eulie DAVIS, Individually and on behalf of others
similarly situated, Plaintiff,
v.
LENOX HILL HOSPITAL, Access Private Duty
Services, Inc., and Louise Weadock, Defendants.
**No. 03 Civ.3746 DLC.**

Aug. 31, 2004.

Michael Shen, Michael Shen & Associates, P.C.,
New York, New York, for the Plaintiff.
Kristin M. Burke, Daniel Moreland, Clifton Budd &
DeMaria, LLP, New York, New York, for the
Defendant Lenox Hill Hospital.
Dean L. Silverberg, Daniel B. Abrahams, Susan
Gross Sholinsky, Epstein Becker & Green, P.C.,
New York, New York, for the Defendants Access
Private Duty Services, Inc. and Louise Weadock.

*OPINION AND ORDER*
COTE, J.
**\*1** This Opinion addresses motions brought by
plaintiff Eulie Davis ("Davis") to amend her
complaint and for class certification. Davis brings
this action on behalf of herself and others against
defendants Access Private Duty Services, Inc. and
Louise Weadock (collectively, "Access") and
Lenox Hill Hospital ("Lenox Hill") for a refusal to
pay overtime wages, improper wage deductions,
and the denial of benefits in violation of the Federal
Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("
FLSA"), the Employee Retirement Income Security
Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.,*
and the New York Labor Law ("NYLL"), as well as
for unjust enrichment and breach of contract. Davis
also asserts an individual claim against the
defendants for retaliation under Section 215 of the
NYLL.

In a separate Opinion issued today ("*Davis I*"),
Davis' ERISA claim and her claim for violations of
the overtime pay provisions of the NYLL were
dismissed. Remaining in this action are Davis'
purported class claims for unjust enrichment and
breach of contract, her collective action claim for
violations of the FLSA, and her individual claim for
retaliation under the NYLL.

Davis now moves to amend her complaint to (1)
add fourteen named plaintiffs; [FN1] (2) certify a
class under Rule 23(b)(3), Fed.R.Civ.P.; and (3)
expand her unjust enrichment class action claim to
include Access. Davis defines the class as "all
persons employed by the defendants as private duty
nurses who were denied full compensation in pay
and benefits, including overtime premium
compensation for all hours worked in excess of
forty per week ... at any time after May 23, 1997,"
and also seeks to circulate a notice of pendency of
an FLSA collective action for these same
individuals. For the reasons described below, each
of the motions are denied with the exception of the
request to circulate a notice of pendency of an
FLSA collective action to a sub-group of those
whom Davis seeks to represent.

> FN1. It is assumed that the fourteen
> plaintiffs are intended to be additional
> class representatives. In her motion, Davis
> does not address this issue; the caption on
> her proposed Amended Complaint,
> however, identifies the fourteen proposed
> plaintiffs as bringing their claims "
> individually and on behalf of others
> similarly situated."

*Background*

This Opinion incorporates and assumes familiarity
with the facts described in *Davis I.* Only the facts
necessary to understand the parties' arguments in
connection with the plaintiff's motions to amend and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 1926086 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 1683
**(Cite as: Not Reported in F.Supp.2d)**

for class certification will be restated here.

Access is a nursing service that provides private registered nurses ("RNs"), licensed practical nurses ("LPNs") and nurse's aids ("NAs") to healthcare facilities. RNs, LPNs, and NAs possess significantly different levels of training and specialization. An Access employee manual dated March 23, 1995 provides job descriptions and qualifications for each category of private duty nurse.[FN2] According to the manual, to qualify as an RN, the nurse must have graduated from an accredited school of nursing, possess a "minimum of two years professional experience; one year of which must be in an acute care setting," and have at least one year experience in an area of "special care." The manual explains that, as a general matter, an RN is "a highly qualified healthcare provider, who through educational preparation, possesses a distinct body of knowledge and skills." In contrast, LPNs "work under the supervision of the registered nurse ... [and] may be assigned to give nursing care which does not require the skill and/or judgment of a registered nurse." An LPN must have "at least one year's current and appropriate experience." The NA need only be a high school graduate, and is qualified to "provide companionship ... assist with personal hygiene, minor housekeeping and other related supportive tasks to the patient."

> FN2. "Private duty nurse" is the term used in the industry for RNs, LPNs, and NAs who, because of a doctor's order or a patient's choice, provide care for patients beyond that provided by the regular hospital staff.

**\*2** In 1994, Lenox Hill contracted with Access to assume certain employer functions, including payment of wages, with respect to all private duty nurses at Lenox Hill. In November 1994, Access announced the implementation of the "Elite Corps" program for interested RNs. The Elite Corps program was not open to LPNs and NAs. According to Access, Elite Corps RNs would be guaranteed a minimum number of shifts per week at a set salary, in exchange for which they would be exempt from the overtime compensation requirements of the

FLSA.[FN3] Elite Corps RNs would also be eligible for extra vacation and other bonuses. *See Davis I.*

> FN3. In contrast, non-Elite Corps employees received compensation at the rate of time and one-half for hours worked beyond forty per week.

Despite statements by Access that Elite Corps RNs would be paid a weekly salary, issues of fact remain as to whether the Elite Corps RNs were in fact paid on an hourly basis. *See Davis I.* It also appears that Elite Corps RNs were subject to the same paycheck deductions as the other private duty nurses. *Id.* The Elite Corps program was disbanded in December 2003.

Davis, an RN, worked for Access as a private duty nurse from 1994 until the termination of her employment on December 27, 2001.[FN4] On March 30, 1995, Davis joined the Elite Corps.

> FN4. In her complaint, Davis alleges she was employed as an RN by Access from November 1983 through December 27, 2001. In her declaration in opposition to this motion she clarifies that she worked as a private duty nurse at Lenox Hill from 1983 until 1994, at which time she joined Access.

*Procedural History*

Davis commenced this action on May 23, 2003. In her complaint, Davis sought class certification of her state law claims pursuant to Rule 23(b)(2), Fed.R.Civ.P., for all similarly situated persons, including LPNs, RNs, and NAs, who worked at Access at any time after May 23, 1997. Davis also sought to represent herself and all similarly situated Access employees who filed consents to join her FLSA claim.

An initial conference in this action was scheduled for August 22, 2003. The parties requested adjournment of the conference on several occasions so that they might consult with each other on class

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 1926086 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 1683
**(Cite as: Not Reported in F.Supp.2d)**

certification issues. For example, in a letter dated October 9, 2003, Davis asked for another adjournment so that the parties could "discuss whether or not the numerosity prong of a class action would be met in this case."

The initial pretrial conference was held on October 23. The conference principally centered on an evaluation of Davis' class action claim. As a member of the Elite Corps, Davis' employment at Access was subject to policies that were not applicable to non-Elite Corps employees. Concern was expressed over Davis' ability to represent fairly the LPNs, NAs and non-Elite Corps RNs in a class action lawsuit. It appeared, however, based on the facts presented by the parties in their pleadings and at the conference, that a class action brought solely on behalf of the Elite Corps RNs would fail to meet the numerosity requirement of Rule 23(a), Fed.R.Civ.P. Davis' counsel was asked to consider whether a joinder action with other Elite Corps RNs might not be a preferable approach to litigating this case.

At the conclusion of the conference, the Court adopted a joint scheduling order proposed by the parties setting March 26, 2004 as the last day for class discovery. The Court asked the parties to consider the concerns raised at the conference and instructed them to return on December 19 to explore further the class certification issues following initial discovery. The class certification motion was scheduled to be filed on April 23.

**\*3** At the December 19 conference, Davis' counsel reaffirmed his desire to pursue a class action on behalf of all private duty nurses employed by Access, but agreed to take targeted class discovery to determine whether all private duty nurses were similarly situated. The defendants were ordered to produce payroll records and the parties were ordered to make certain witnesses available for depositions. The parties were reminded that March 26, 2004 was a firm date for the close of class discovery.

In one of several interrogatories served on Davis during the class discovery period, the defendants asked her to identify "all other similarly situated

plaintiffs who have signed an 'opt in' election ... or who may be joined to this action, including companions [i.e., Nurse's Aids]." Davis did not identify any NAs. On the last day of class discovery, the defendants deposed Davis on the class certification issues.[FN5] At her deposition, Davis indicated that all putative class members who had signed notices to join the litigation had been or were currently members of Access' Elite Corps.

> FN5. On February 5, 2004, Access sought leave to file and filed an Amended Answer. Davis did not oppose the motion. Access' Amended Answer adds a counterclaim for defamation arising from documents produced by Lenox Hill during discovery.

On March 31, after the close of class discovery, Davis filed the instant motion to amend her complaint. Davis asserts that her primary incentive in filing this motion is to give all members of the class bringing unjust enrichment and breach of contract claims the opportunity to have their claims relate back to the date on which Davis filed this action. According to Davis, "the main difference for prospective plaintiffs between amending the complaint and filing a separate complaint and then consolidating, would be the additional time that the prospective plaintiffs would have on their claims, other than under the FLSA, because their claims would relate back to the filing date of Ms. Davis' original complaint."

On April 27, Davis filed a motion for class certification pursuant to Rule 23(b)(3), Fed.R.Civ.P . Davis states that she contacted Access and Lenox Hill on April 27 and 28, respectively, to ask whether they wished to conduct class discovery on the proposed new plaintiffs. The defendants declined. On May 4, the defendants moved for judgment on the pleadings and/or summary judgment on all of Davis' claims. That motion is addressed in *Davis I.*

*Discussion*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 1926086 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 1683
**(Cite as: Not Reported in F.Supp.2d)**

### A. *Motion to Amend*

Davis seeks to (1) add fourteen named plaintiffs; (2) add a Rule 23(b)(3) basis for class certification; and (3) expand her unjust enrichment class action claim to include Access.[FN6] Of the fourteen proposed new plaintiffs, seven are RNs who worked in the Elite Corps at least part of their time at Access; one is an RN who never worked in the Elite Corps; five are NAs and one is an LPN.

> FN6. Davis claims that she contacted the defendants on February 17 and again on March 15 to "discuss[ ] with them the major changes, including [ ] additional plaintiffs and different basis for class certification." Davis asked the defendants to stipulate to the amended complaint, but the defendants refused.

Once a responsive pleading has been served, a party may amend its pleadings "only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." Rule 15(a), Fed.R.Civ.P. Courts may refuse to grant leave to amend on grounds such as undue delay or prejudice, bad faith, or futility of amendment. *Foman v. Davis,* 371 U.S. 178, 182 (1962); *see also Milanese v. Rust-Oleum Corp.,* 244 F.3d 104, 110 (2d Cir.2001). An amendment causes undue prejudice where it would "(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction." *Block v. First Blood Assocs.,* 988 F.2d 344, 350-51 (2d Cir.1993); *see also Monahan v. New York City Dept. of Corrections,* 214 F.3d 275, 283 (2d Cir.2000).

**\*4** Davis has not shown that her motion to amend is timely, or that amendment of her claims would not unfairly prejudice the defendants. Class discovery has closed. Davis waited until five days *after* the close of class discovery to file her motion to amend the complaint and to add seven named plaintiffs who are not Elite Corps RNs. There is no

justification for this delay. Davis has been aware since the filing of this lawsuit of the obstacles facing her class claims. Both the defendants and the Court alerted Davis to the hurdles she faced in meeting the numerosity requirement for a class action on behalf of the Elite Corps RNs, and in meeting the typicality and commonality requirements for a broader class if she were the sole named plaintiff. The defendants raised these issues several times before the first court conference; these same concerns were reiterated at the October 24 and December 19 conferences.

The defendants have not had an opportunity to take class discovery of the fourteen new named plaintiffs, [FN7] and in particular the seven who could represent RNs who were not in the Elite Corps, LPNs and NAs. According to the defendants, class discovery confirmed that Davis could only properly assert claims, if at all, on behalf of present and former Elite Corps RNs. Although asked on numerous occasions about her plans to join other Access employees to her action, Davis consistently represented, including in her deposition and in her answer to an interrogatory, that all putative class members who had submitted notices to join her lawsuit were RNs who were or had been members of Access' Elite Corps. The defendants therefore limited the scope of their class discovery to that potential class, which consisted of less than twenty Elite Corps RNs over the last six years. Had Davis timely filed her motion to amend, the scope of class discovery could have been significantly broader.

> FN7. Davis' purported class action was originally filed pursuant to Rule 23(b)(2), which raises significantly different issues with respect to the propriety of class certification. A class may be certified under Rule 23(b)(2) if the defendants have acted or refused to act on grounds generally applicable to the class, "thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Rule 23(b)(2), Fed.R.Civ.P. In contrast, class certification under Rule 23(b)(3) requires a finding that "the questions of law or fact

Not Reported in F.Supp.2d, 2004 WL 1926086 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 1683
**(Cite as: Not Reported in F.Supp.2d)**

common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Rule 23(b)(3), Fed.R.Civ.P.

Accordingly, Davis has not shown that her motion to amend the complaint is timely, or that granting it would not cause unfair prejudice to the defendants. Davis' proposed amendments would change the nature of the claims in this case and would require the defendants to "expend significant additional resources to conduct discovery and prepare for trial. " *Block,* 988 F.2d at 350-51.

### B. *Rule 23 Class Certification*

Davis does not identify the claims for which she seeks class certification under Rule 23(b)(3). As described below, collective actions pursuant to the FLSA are governed by a different legal standard than class actions brought under Rule 23. It will be assumed that Davis' motion is directed at her non-FLSA claims, specifically her unjust enrichment and breach of contract claims.

As explained in the discussion of the requirements for class certification that follows, Davis cannot represent a class that includes employees other than Elite Corps RNs, and there are too few Elite Corps RNs to justify certification of a class. Even assuming that Davis had wished to preserve the basis under which she originally sought class certification of her non-FLSA claims, that is, Rule 23(b)(2),[FN8] certification on that basis would be denied for her failure, *inter alia,* to meet the threshold requirements of Rule 23(a), Fed.R.Civ.P. [FN9]

FN8. In her motion for class certification, Davis argues only that the purported class meets the requirements of Rule 23(b)(3). She makes no arguments relating to class certification under Rule 23(b)(2).

FN9. Certification of a Rule 23(b)(2) class would also be denied for her failure to meet the specific requirements of Rule 23(b)(2). To certify a class under Rule 23(b)(2), a court must find that the equitable relief sought by the plaintiff predominates over any claims for monetary relief. *Robinson v. Metro-North Commuter R.R.,* 267 F.3d 147, 164 (2d Cir.2001). In making this assessment, a court should satisfy itself that "(1) even in the absence of a possible monetary recovery, reasonable plaintiffs would bring the suit to obtain the injunctive or declaratory relief sought; and (2) the injunctive or declaratory relief sought would be both reasonably necessary and appropriate were the plaintiffs to succeed on the merits." *Id.* Davis' predominant claim in this action is for the recovery of unpaid benefits. She has not claimed that she would seek declaratory relief in the absence of any monetary recovery. Therefore, this action may not be maintained under Rule 23(b)(2) . *See Spann v. AOL Time Warner, Inc.,* 219 F.R.D. 307, 322 (S.D .N.Y.2003).

### 1. *Rule 23(a)*

**\*5** A plaintiff seeking certification of a class must demonstrate that the proposed class action fulfills the four requirements of Rule 23(a). *See In re Visa Check/MasterMoney,* 280 F.3d 124, 132 (2d Cir.2001). Rule 23(a) states that class members may act as class representatives only if
(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses or the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

*See* Rule 23(a), Fed.R.Civ.P. In reviewing a motion for class certification, the question is not whether the plaintiff has "stated a cause of action or will prevail on the merits, but whether the requirements of Rule 23 are met." *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178 (1974) (citation omitted).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 1926086 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 1683
**(Cite as: Not Reported in F.Supp.2d)**

### 1. *Numerosity*

To satisfy the numerosity requirement under Rule 23(a), a plaintiff must show that joinder is " impracticable," not that it is "impossible." *Robidoux v. Celani,* 987 F.2d 931, 935 (2d Cir.1993). Numerosity is presumed when a class consists of forty or more members. *See Consolidated Rail Corp. v. Town of Hyde Park,* 47 F.3d 473, 483 (2d Cir.1995).

Davis' putative class consists of all former and present private duty nurses who worked at Access after May 23, 1997. As will be discussed, Davis cannot adequately represent such a class. If the class is limited to those Access employees who are similarly situated to Davis-that is, RNs who were members of Access' Elite Corps program-approximately twenty Access employees would be eligible to join this class action.[FN10] Davis has not shown that joinder is impractical.

> FN10. Davis contends that the number may be as high as thirty-one.

### 2. *Commonality*

The commonality requirement of Rule 23(a) requires a plaintiff to show that the action raises an issue of law or fact that is common to the proposed class. *Robinson,* 267 F.3d at 155; *Marisol A. v.. Giuliani,* 126 F.3d 372, 376 (2d Cir.1997) (per curiam). The breach of contract and unjust enrichment claims advanced by Davis do not present common issues of law or fact with respect to members of the purported class. As proposed, the class would encompass Elite Corps RNs, non-Elite Corps RNs, LPNs, and NAs, categories of employees whose jobs were governed by different pay and benefits policies. The gravamen of Davis' claims is that Access willfully and falsely informed her and other members of the Elite Corps RNs that they were exempt from the overtime provisions of the FLSA, and that they made certain guarantees with respect to bonuses and minimum work hours that they never intended to fulfill. At most, Davis' claims implicate common issues of law or fact only with respect to the RNs who participated in Access'

Elite Corps program.

### 3. *Typicality*

The typicality requirement of Rule 23(a) "requires that the claims of the class representatives be typical of those of the class, and is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Robinson,* 267 F.3d at 155; *Marisol,* 126 F.3d at 376 . Class certification may not be granted "where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation ." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 222 F.3d 52, 59 (2d Cir.2000) (citation omitted).

**\*6** Again, Davis' claims are not typical of those of the proposed class. According to Access, Elite Corps RNs-but not other RNs or LPNs and NAs-were exempt from the overtime provisions of the FLSA. Elite Corps RNs were also guaranteed minimum work hours and accrued certain vacation benefits at a faster rate than other Access employees. Former members of the Elite Corps program thus possess materially different claims and are subject to unique defenses such that Davis' claims and the interests of a broader class than one composed solely of Elite Corps RNs are not "so inter-related that the interests of the class members will be fairly protected in their absence." *Caridad v. Metro-North Commuter R.R.,* 191 F.3d 283, 291 (citation omitted).

### 4. *Adequacy*

To satisfy the adequacy requirement of Rule 23(a), a class representative must "possess the same interest and suffer the same injury as the class members." *Amchem Prods.,* 521 U.S. at 625-26. The adequacy criteria tend to merge with the commonality and typicality requirements, although courts chiefly inquire whether the named plaintiff's interests are antagonistic to those of the class, and whether class counsel is competent. *See Amchem Prods.,* 521 U.S. at 626 n. 20; *General Telephone*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 7

Not Reported in F.Supp.2d, 2004 WL 1926086 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 1683
**(Cite as: Not Reported in F.Supp.2d)**

*Co. of Southwest v. Falcon,* 457 U.S. 147, 157 n. 13 (1982); *Baffa,* 222 F.3d at 60.

Davis does not possess the same interests and has not suffered the same injuries as other members of the purported class. She has not shown that she would be an appropriate representative of her broadly defined class either at trial or in settlement discussions. Given this deficiency, it is unnecessary to address the defendants' assertion that Davis also faces a counterclaim for defamation that will present her with unique litigation issues and undermine her ability to serve as a class representative. The fact that the defendants have not disputed the competency of class counsel is not, standing alone, sufficient to satisfy the requirements of Rule 23(a) .[FN11]

> FN11. Had the other requirements of Rule 23(a) been met in this action, it would be necessary to address the competency of putative class counsel.

In sum, Davis' motion to certify a Rule 23(b)(3) class for her non-FLSA claims is denied. As a consequence, her subsidiary motion to expand the class claim for unjust enrichment to include Access is also denied.

### C. *Collective Action Pursuant to the FLSA*

#### 1. *Class Members*

Davis also seeks to bring this action on behalf of herself and others who were denied overtime compensation in violation of the FLSA. The consent procedures of the FLSA permit one or more employees to pursue an action in a representative capacity for "other employees similarly situated." 29 U.S.C. § 216(b) ("Section 216(b)"). Section 216(b) states, in relevant part, that an action to recover damages under the FLSA:

may be maintained against any employer ... by any one or more employees for and on behalf of himself or themselves *and other employees similarly situated.* No employee shall be a party plaintiff to

any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

*7 29 U.S.C. § 216(b) (emphasis added). In contrast to class actions brought pursuant to Rule 23(b)(3), a "collective action" to recover benefits under the FLSA requires similarly situated class members to opt-in to the case. *See id.* The requirements of Rule 23 do not apply to FLSA actions and no showing of numerosity, commonality, typicality and adequacy of representation need be made.[FN12] *See Ansoumana v. Gristede's Operating Corp.,* 201 F.R.D. 81, 84 (S.D.N.Y.2001); *Foster v. The Food Emporium,* No. 99 Civ. 3860(CM), 2000 WL 1737858, at *1 (S.D.N.Y. Apr. 26, 2000). In order to maintain a collective action under the FLSA, a named plaintiff bears the burden of showing that she is sufficiently " similarly situated" to the opt-in plaintiffs such that the case may proceed as a collective action. *Foster,* 2000 WL 1737858, at *1. The test is whether there is a "factual nexus" between the claims of the named plaintiff and those who have chosen to opt-in to the action. *Id.*

> FN12. "Although cases frequently make loose reference to certifying [FLSA] collective actions, neither the Federal Rules nor the FLSA requires that a motion for certification be made. Nevertheless, a district judge should be concerned about fair notice and other protections for parties who are not directly before the court." *Ansoumana,* 201 F.R.D. at 84 n. 1 (citation omitted).

Apart from Davis, twelve Access employees have filed opt-in notices with the Clerk of Court.[FN13] Of the twelve, only seven are RNs who worked in the Elite Corps during at least part of their employment at Access. As already discussed, the claims asserted by Davis in this lawsuit are representative only of other Elite Corps RNs. Davis has not met her burden of showing that she is similarly situated to Access employees who did not participate in the Elite Corps. Davis can only present a "factual nexus " between her claims and those of other Elite Corps

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 1926086 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 1683
**(Cite as: Not Reported in F.Supp.2d)**

RNs. Accordingly, an FLSA collective action will only be authorized for Elite Corps RNs and only the seven Elite Corps RNs who have filed opt-in notices will be permitted to pursue their FLSA claims in this lawsuit.[FN14] Davis will be permitted to send a notice of pendency of the collective action to Elite Corps RNs.

> FN13. Although Davis seeks to add fourteen plaintiffs to this action, only twelve current and former Access employees have filed consent forms to join this lawsuit. They are:
> - Isidora A. Gallego, *Elite Corps RN,* Access employee from 1987 to the present, opt-in filed on February 13, 2004.
> - Tracey M. Glazebrook, *Elite Corps RN,* Access employee from June 1987 to the present, opt-in filed on February 13, 2004.
> - Claudette Marshall, *Elite Corps RN,* Access employee in 1994, and from 1996 to 2001, opt-in filed on March 2, 2004.
> - Anne V. McKnight, *Elite Corps RN,* Access employee from June 1987 to the present, opt-in filed on February 13, 2004.
> -Merle Moore, *Elite Corps RN,* Access employee from 1986 to the present, opt-in filed on February 19, 2004.
> - Misty Scalfarotto, *Elite Corps RN,* Access employee from May 1974 to August 2002, opt-in filed on March 2, 2004.
> - Hyacinth Wiggan-James, *Elite Corps RN,* Access employee from 1980 to the present, opt-in filed on February 13, 2004.
> - Mary Shortt, *Non-Elite Corps RN,* Access employee from 1991 to the present, opt-in filed on March 12, 2004.
> - Ruth Rapada, *LPN,* Access employee from 1980 to the present, opt-in filed on April 1, 2004.
> - Greta Blackman, *NA,* Access employee from September 2001 to October 2002, opt-in filed on April 1, 2004.
> - Johnnie L. Brown, *NA* Access employee from October 1994 to July 2001, opt-in filed on April 1, 2004.
> - Telethia McKenzie, *NA,* Access

employee from may 1004 to March 2003, opt-in filed on April 1, 2004.

> FN14. Should other Elite Corps RNs file timely consents to join this lawsuit, they will also be permitted to pursue FLSA claims.

The defendants contend that the number of Elite Corps RNs are too few and the program too old to justify the expense and burden of notification. They point out that there were only twenty Elite Corps RNs and that the program ceased in 2003. Whether large or small, the group of eligible plaintiffs have a right to notice of these claims and an opportunity to join this action.

### 2. *Date of Commencement of Action*

Defendants argue that this action is governed by the FLSA's two-year statute of limitations and therefore is barred.[FN15] According to the defendants, Davis' failure properly to file her consent to join the instant action until December 4, 2003 bars all but 23 days of her FLSA claim.[FN16] Defendants further maintain that even those 23 days are barred by her failure to serve the defendants until May 23, 2004. [FN17]

> FN15. Although the defendants briefly argue in their opposition to the motion for class certification that the majority of Davis' FLSA claim is barred by the statute of limitations, the defendants' principal arguments in this regard are contained in their motion for judgment on the pleadings and summary judgment, which is addressed in *Davis I.* A determination of the date on which this action is deemed to have commenced, however, is critical to Davis' motions to amend and for certification of a FLSA collective action. As such, the statute of limitations issue is addressed in this Opinion.

> FN16. Davis' employment with Access was terminated on December 27, 2001.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 1926086 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 1683
**(Cite as: Not Reported in F.Supp.2d)**

FN17. In their reply to this motion, the defendants state that, by facsimile dated May 23, 2004, Davis finally provided to defendants "what purports to be the Plaintiff's consent." The defendants argue, however, that the purported consent " contains no case caption and it is not clear what action Plaintiff is consenting to join." To date, Davis has not filed with the Clerk of Court an affidavit of service with respect to her consent form.

As an initial matter, whether this action is governed by a two or three year statute of limitations is an issue of fact. Although the statute of limitations for violation of the FLSA is ordinarily two years, it is extended to three years for willful violations. 29 U.S.C. § 255(a); *Brock v. Superior Care, Inc.,* 840 F.2d 1054, 1061 (2d Cir.1988). A willful violation exists when an employer knew or recklessly disregarded the fact that its conduct violated the FLSA. *McLoughlin v. Richland Shoe Co.,* 486 U.S. 128, 133 (1988); *Brock,* 840 F.2d at 1062. " Willfulness cannot be found on the basis of mere negligence or 'on a completely good faith but incorrect assumption that a pay plan complied with the FLSA in all respects." ' *Boekemeier v. Fourth Universalist Society in City of New York,* 86 F.Supp.2d 280, 288 (S.D.N.Y.2000) (citing *McLaughlin,* 486 U.S. at 135). Whether the defendants knew or recklessly disregarded the fact that a failure to pay Elite Corps RNs overtime violated the FLSA-thereby extending the statute of limitations to three years-is a disputed issue of fact and must be decided by a jury.

**\*8** Regardless of whether a two or three year statute of limitations applies to this case, the date upon which Davis' action was commenced must be resolved. An action for loss of overtime pay in violation of the FLSA

shall be considered to be commenced on the date when the complaint is filed; *except* that in the case of a *collective or class action ....* it shall be considered to be commenced in the case of any individual claimant-
(a) on the date when the complaint is filed, if he is *specifically named as a party plaintiff* in the complaint *and his written consent to become a*

*party plaintiff is filed on such date* in the court in which the action is brought; *or*
(b) *if such written consent was not so filed* or if his name did not so appear-*on the subsequent date on which such written consent is filed in the court in which the action was commenced."*

29 U.S.C. § 256 (emphasis supplied). Somewhat surprisingly, Davis did not file her consent to join this lawsuit on the date on which she filed her complaint. Accordingly, to the extent that Davis wishes to pursue this action as a collective action, the date on which the statute of limitations is tolled will depend on the date on which Davis' consent to join was properly filed with the Clerk of Court.

Davis filed this action on May 23, 2003. Davis originally submitted her consent form to the Clerk of Court on July 23, but the form was returned to her attorney on the same day [FN18] for failure to comply with the Local Rules for the Southern District of New York. On August 20, Davis again sent her consent form to the Clerk of Court, which was forwarded to this Court for lack of compliance. The Court returned the consent form to Davis' attorney at a conference held on October 24. On November 18, Davis resent her consent form to the Clerk of Court, but it was again returned for failure to comply with the Local Rules of this district. On December 2, Davis mailed another consent form to the Clerk of Court with a cover letter requesting that it be filed with the "original date it was submitted for (August 20, 2003)." The Clerk of Court accepted Davis' consent for filing on December 4.

FN18. Plaintiff's counsel represents that his office received the deficient consent form on July 28.

Davis claims that her consent form should be deemed filed on August 20, 2003. Davis' consent form was repeatedly rejected for its failure to comply with the Local Rules of this district. Davis does not claim that the Clerk of Court erroneously refused to accept her July 23, August 20, or November 18 filings, and has provided no excuse for her failure to comply with the rules of this district. Since this Court retained her deficient

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 10

Not Reported in F.Supp.2d, 2004 WL 1926086 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 1683
**(Cite as: Not Reported in F.Supp.2d)**

August 20 filing until it could return it to her counsel at the October 24 conference, she will be given a credit of 55 days, that is, the number of days her consent form was in the possession of the Court. [FN19] Accordingly, Davis' consent to join this lawsuit will be deemed filed on October 10, 2003.

> FN19. Defendants' argument that Davis' consent form should be deemed filed on May 23, 2004-the date on which the defendants claim they were finally served with Davis' consent form-is rejected. The defendants were on notice from the inception of this lawsuit that Davis intended to commence a collective action pursuant to the FLSA, and that she had engaged in multiple attempts to file her consent form. Court conferences were held in this case on October 24 and December 19, 2003; telephone conferences were held on February 26 and April 22, 2004. At each conference, Davis' counsel discussed the nature of her claims and her intent to pursue this lawsuit on behalf of herself and others. At the October 24 conference, Davis' counsel explicitly discussed his deficient filing of Davis' consent to join. Davis' counsel acknowledged that the filing of the consent to join was necessary to toll the statute of limitations, and represented that he would be refiling Davis' consent with the Clerk of Court immediately.

### Conclusion

The plaintiff's motions to amend and for class certification of her state law claims are denied. The claims brought on behalf of Mary Shortt, Ruth Rapada, Greta Blackman, Johnnie L. Brown, and Telethia McKenzie are dismissed from this lawsuit. The application to maintain a collective action pursuant to the FLSA is granted with respect to plaintiffs Isidora A. Gallego, Tracey M. Glazebrook, Claudette Marshall, Anne V. McKnight, Merle Moore, Misty Scalfarotto, Hyacinth Wiggan-James. Davis' FLSA claim is deemed to have been filed as of October 10, 2003.

Davis' request to send a notice of pendency of the FLSA collective action is granted to the extent that it concerns Elite Corps RNs.

**\*9** SO ORDERED:

S.D.N.Y.,2004.
Davis v. Lenox Hill Hosp.
Not Reported in F.Supp.2d, 2004 WL 1926086 (S.D.N.Y.), 9 Wage & Hour Cas.2d (BNA) 1683

Briefs and Other Related Documents (Back to top)

• 1:03cv03746 (Docket) (May. 23, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT G

Westlaw.

Not Reported in N.W.2d                                                    Page 1
Not Reported in N.W.2d, 1998 WL 1031504 (Wis.Cir.), 1998-2 Trade Cases P 72,300
**(Cite as: Not Reported in N.W.2d)**

breadth.

See ¶ 9410.

Circuit Court of Wisconsin.
Alan DERZON
v.
APPLETON PAPERS, INC., et al.
**No. 96-CV-3678.**

July 7, 1998.

DECISION AND ORDER DENYING PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION

*Introduction*

Wisconsin Antitrust Act
FRANKE, Cir. J.
**\*1** In an amended complaint filed February 17, 1997,
plaintiff alleges that between 1990 and 1992 he
purchased thermal facsimile paper at prices which
were inflated by a price fixing conspiracy engaged in
by the defendants, and he seeks certification of a
class of plaintiffs who have been similarly
victimized. Plaintiff has also filed an amended
motion for class certification on February 24, 1997.
Because I find that the plaintiff cannot fairly
represent the class, and because I find that the class
identified by the plaintiff would be unmanageable,
plaintiff's motion for class certification is denied.

Class Actions-Class Certification-State Laws-Paper.-
A proposed class including all indirect purchasers of
fax paper-whether the purchase was for personal use
or resale-was denied certification to proceed with
price fixing claims under Wisconsin antitrust laws
against fax paper manufacturers and distributors. The
multi-state character of the class, the indirect
purchaser theory, the vast number of potential
members, and the many different types of
wholesalers and retailers included with actual
consumers all combined to create significant
complexities. The proposed class did satisfy two of
the three threshold requirements for certification.
There was a sufficient common interest, and
individual suits were clearly impractical. However,
the inherent conflict over the apportionment of
damages created a clear conflict between the
differing types of indirect purchasers and many
conflicts even at the same level in the distribution
chain. While the named plaintiff, a lawyer who
purchased fax paper for his own use, might have been
able to fairly represent the entire class in proving up
the conspiracy, he could not fairly represent the entire
class on the issue of damages. The proposed class
was simply unmanageable in view of its depth and

The plaintiff is a Milwaukee lawyer who purchased
fax paper for his own use. The eleven defendants
include seven manufacturers of fax paper, three
distributors of fax paper, and one individual. With the
exception of Appleton Papers, Inc., located in
Appleton, Wisconsin, the manufacturers and
distributors of fax paper are all Japanese firms. The
individual defendant is Jerry Wallace, an employee
of Appleton Papers alleged to have been responsible
for fax paper pricing decisions during the relevant
time period.

The amended complaint advances a claim for treble
damages under Wisconsin's antitrust statute, See.
133.1, *et. seq.*[FN1] As described in the amended
complaint, the proposed class includes all persons
and entities, excluding the defendants, for whom the
following conditions apply:

> FN1. The amended complaint also contained
> a second claim for treble damages under
> Wisconsin's Deceptive Trade Practices Act,
> Sections 100.18, *et seq.* The deceptive trade
> practices claim has been withdrawn and is
> no longer at Issue.

(1) the person or entity made art indirect purchase of
fax paper;
(2) the paper was produced by one of the defendants;
(3) the purchase occurred in Wisconsin, the District
of Columbia, or one of sixteen other named states;[FN2]
and

> FN2. The other states are Arizona, Kansas,
> Louisiana. Maine. Maryland, Massachusetts,
> Michigan, Minnesota. Mississippi, New
> Mexico, North Carolina, North Dakota,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                    Page 2
Not Reported in N.W.2d, 1998 WL 1031504 (Wis.Cir.), 1998-2 Trade Cases P 72,300
**(Cite as: Not Reported in N.W.2d)**

Rhode Island, South Dakota, Tennessee, and West Virginia.

**\*2** (4) the purchase occurred between February 1, 1990, and March 31, 1992.
*Amended Complaint,* par. 45. "Indirect purchase" apparently means that the purchase was from someone other than one of the named defendants. The proposed class includes all indirect purchasers, whether the purchase was for personal use or resale. This is in conspicuous contrast to the class proposed in the initial complaint and motion, which was specifically limited to persons purchasing the paper only for personal use.

### A. Factual Background

This motion has preceded to a decision without an evidentiary hearing and with little evidence offered by affidavit as to the nature of the market for fax paper. Regarding this market, certain undisputed facts can be gleaned from the representations of counsel at the hearing on January 12, 1998; Exhibits 1 and 2 received at that hearing: the attachments to the affidavit of Katherine Keppel filed March 17, 1997; and from the Amended Complaint.

Fax machines need a special paper which is chemically coated in order to produce an image transferred by heat from a printing head. Fax paper manufacturers, such as the manufacturing defendants in this case, produce the paper in huge rolls weighing up to 2,000 pounds. Those rolls are sold, either directly or through a distributor, to firms known as "converters." These firms convert the huge rules into smaller rolls suitable for use in fax machines and certain other printing equipment.

*During the time in question,* the Japanese manufacturers typically sold the jumbo rolls to Japanese trading houses. It is a part of the plaintiff's conspiracy theory that the Japanese manufacturers sold the jumbo rolls to the trading houses on the condition that they be resold to specific customers in North America at specified prices. It is not clear whether the conversion of the Japanese paper rolls took place overseas or in the United States but the converters were apparently not a part of the alleged conspiracy. Once converted, the smaller tolls would then follow one of a number of paths down the distribution chain through various office supply distributors and a variety of different retail outlets, where they would ultimately be purchased by the consumer.

### B. General Legal Background

#### 1. Class Certification in Wisconsin

A trial court's consideration of a class certification request is governed by a broadly worded statute and considerably more specific caselaw. The statute provides as follows:
803.08. Class Actions. When the question before the court is one of a common or general interest of many persons or when the parties are very numerous and it may be impractical to bring them all before the court, one or more may sue or defend for the benefit of the whole.

This statute has been interpreted to establish three prerequisites for class certification: (1) a common interest shared by all members of the class; (2) a plaintiff or plaintiffs who will fairly represent the class; and (3) a class of plaintiffs who cannot practically be brought before the court. *Mercury Records v. Economic Consultants,* 91 Wis.2d 482, 490, 283 N.W.2d 613 (Ct.App.1979); *Sisters of St. Mary v. AAER Insulation,* 151 Wis.2d 708, 713-14, 445 N.W.2d 723 (Ct.App.1989).

**\*3** Although these and other cases announce that if the three prerequisites are satisfied, class certification is in the public interest, it is clear that the analysis does not end at this point. The Supreme Court has consistently quoted Professor Chaffee's instruction that the trial court must also weigh "the advantages of disposing of the entire controversy in one proceeding" against "the difficulties of combining divergent issues and persons." *Schlosser v. Allis-Chalmers Corp.,* 65 Wis.2d 153, 172, 222 N.W.2d 156 (1974), quoting Chaffec. *Some Problems in Equity,* at 193. See also *Goebel v. First Fed. Savings & Loan.* 83 Wis.2d 668, 681-82, 266 N.W.2d 352 (1978); and *Sisters of St. Mary, supra,* at 714, 445 N.W.2d 723. As a part of this balancing process, the trial court must consider the important question of whether the proposed class is manageable. *Id.*

There are no Wisconsin cases which address the certification of a class of indirect victims of an anti-trust violation. The parties, however, have cited a multitude of published and unpublished opinions considering proposed classes of indirect purchasers from state trial and appellate courts as well as from federal trial courts prior to *Illinois Brick, infra.* While the standards applied in these cases are not dissimilar,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the language of the federal rule governing class certification is quite different than the Wisconsin statute, and it appears that many of cases cited by the parties are from state jurisdictions with class certification statutes modeled after the federal rule. See Rule 23, Federal Rules of Civil Procedure.

The federal rule analysis often focuses on whether common or individual questions predominate. This test is not specifically a part of the Wisconsin criterion or analysis, but certainly reflects a similar purpose, and finds an echo in this language from *Goebel, supra:*

In essence, the determination whether a case should proceed as a class action turns on the question whether the benefits to be derived from such a procedure outweigh the inherent difficulties. In other words, a court must determine whether the issues common to the named plaintiffs and the class members are outweighed by the issues particular to the individual class members.

83 Wis.2d, at 684, 266 N.W.2d 352. There is also a common concern with the basic question of manageability. For example:It is obvious that the district court's concern-a justifiable and serious one-is with manageability. This is a practical problem, and primarily a factual one with which a district court generally has a greater familiarity and expertise than does a court of appeals.

*Link v. Mercedes Benz of North America* [1977-1 TRADE CASES ¶  61,319], 550 F.2d 860, 864 (3d Cir.). *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). This language was cited favorably by the Wisconsin Court of Appeals in *Sisters of St. Mary, supra,* at 714, 445 N.W.2d 723.

### 2. A Multi-State Class of Indirect Price-Fixing Victims

The multi-state character of the proposed class and the indirect purchaser antitrust theory make plaintiff's request unique in Wisconsin, and a person unfamiliar with federal antitrust law will wonder, as I did, why this case was not brought in federal court. The answer is found in *Illinois Brick v. Illinois* [1977-1 TRADE CASES ¶  61,460], 431 U.S. 720 (1977), which held that indirect purchasers of price-fixed goods have no remedy under the federal antitrust laws. The court recognized that this holding would allow the direct purchasers to recover and retain damages which were actually passed along to subsequent customers, but nevertheless concluded that ascertaining the extent to which price increases were passed on was an extraordinarily complex undertaking, even in the context of one plaintiff's case, which would frustrate the goals of federal antitrust legislation. After *Illinois Brick,* several states. Including Wisconsin, passed laws specifically authorizing a cause of action for such victims. It is these jurisdictions which define the geographical scope of plaintiff's proposed class.

**\*4** Defendants suggest that a multi-state class may not be permitted in Wisconsin, but our Supreme Court has, at least implicitly, accepted the legitimacy of the concept. In *Schlosser v. Allis-Chalmers Corp.,* 65 Wis.2d 153, 222 N.W.2d 156 (1975), and in the same case revisited at 86 Wis.2d 233 (1978), the court approved certification of a class of employees allegedly harmed when Allis-Chalmers discontinued free life insurance benefits for its retirees. The multi-state character of the class is not even mentioned in the first decision. It is acknowledged in the second decision, but not treated as an issue. Beyond accepting the certification of a class of multi-victims, the *Schlosser* cases have no bearing on the issues raised here. Not only did Wisconsin residents dominate the class in *Schlosser,* but all claims were based on a single contract obligation arising from employment with Allis-Chalmers, and the Wisconsin focus of the class was obvious and overwhelming. In contrast, the injuries to the proposed class here occurred in countless distinct transactions in countless different locations. In contrast, the class here has no particular Wisconsin character; it is only the presence of Appleton Papers within our borders which makes Wisconsin any more logical a venue than Louisiana or Tennessee or any other "Illinois Brick repealer" jurisdiction.

The multi-state character of the class, the indirect purchaser theory, the vast number of potential members, and the many different types of wholesalers and retailers included with actual consumers all combine to create significant complexities, but such a case is still not a legal impossibility. The fact that Wisconsin has not yet done it does not suggest that it cannot be done. On the other hand, simply because Wisconsin sought to provide a remedy to indirect purchasers of price-fixed goods does not signify that such a remedy is necessarily appropriate for a class action, be it a Wisconsin class or multi-state class.

### C. Application of the Class Action Criteria

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                 Page 4
Not Reported in N.W.2d, 1998 WL 1031504 (Wis.Cir.), 1998-2 Trade Cases P 72,300
**(Cite as: Not Reported in N.W.2d)**

Defendants challenge plaintiff's claim of a common interest and plaintiff's ability to fairly represent the class on a number of grounds, but many of these arguments have more to do with the procedural and legal manageability of the class. While issues of manageability might overlap in certain respects with the three class action prerequisites, it is best to treat them separately. This is the procedure implicitly endorsed in *Sisters of St. Mary, supra,* where the trial court found that the three prerequisites had been satisfied, but denied class certification on the issue of manageability. In affirming the trial court's decision, the Supreme Court implicitly endorsed this methodology.

The proposed class has extraordinary depth and breadth. By depth I refer to the attempt to include the entire chain of fax paper distribution, from "converters" who might purchase the bulk rolls from a non-defendant all the way down to the actual consumer of the paper. Although some of the problems related to the depth of class could be solved by certifying only a class of actual consumers. I have not considered this option because the breadth of even this modified class and the many levels of distribution separating these consumers from the defendants makes it completely unmanageable in the absence of a clear methodology for proof of damages by common evidence. Whether or not the distributors and retailers are a part of the class, in assessing the damages to the actual consumers, the jury will still have to consider the extent to which any price increase was passed on at each stage of distribution.

**\*5** Defendants also challenge the constitutionality of applying Wisconsin law to this class, citing *Phillips Petroleum Co. V. Shutts,* 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985), and question the legal manageability of the class if the court attempts to apply the antitrust laws of 18 different jurisdictions. Since the class is unmanageable even in the plaintiff prevails as to the application of Wisconsin law, I will not attempt to resolve the issue of whether the law of the forum state may be constitutionally applied.

*1. Common Interest*

The members of the proposed class clearly have both shared and unshared interests. While it is presumptive to speak to the desires of hundreds of thousands of people, it seems safe to conclude that unless he or she owns stock in one of the defendants, each member of the class would like to see the plaintiff establish that a price-fixing conspiracy induced substantially higher prices and that each member ought to receive a check in the mail. Thus, there is clearly a substantial common interest in a finding of liability.

When it comes to the size of the check, however, the class includes groups whose interests will very much diverge. The large scale distributors or other purchasers closest to the direct victims will want to establish that the price increases were passed on to them, but no further. Other types of purchasers will hope to prove that it was they who absorbed all or most of the increase. The end users, consumers like the plaintiff Derzon, will benefit most if it can be shown that all of the price increase was passed on to them.

Even though *Illinois Brick* was not concerned with class action issues, the court identified this obvious conflict in expressing concern about what would happen if federal antitrust cases got caught up in apportioning damages between the many potential claimants:

As we have indicated, potential plaintiffs at leach level in the distribution chain are in a position to assert conflicting claims to a common fund-the amount of the alleged overcharge-by contending that the entire overcharge was absorbed at that particular level in the chain.

431 U.S., at 737. In the case of fax paper, the problems arise not just because the class consists of very different types of purchasers, but also because these different groups cannot be clearly defined and because there is no standard pattern by which fax paper proceeds from the defendants to the consumer. Thus, there is not a common interest as to the assessment of damages.

Is a material common interest which goes to liability but not damages sufficient to meet the first class action criteria? The caselaw does not provide a clear answer. The cases often note that members of a class need not share *all* interests, it is sufficient if they have a common interest. See, e.g., *Hogan v. Musolf,* 157 Wis.2d 362, 379, 459 N.W.2d 865 (Ct.App.1990). [FN3] The common interest, however, must relate to the outcome of the case:

FN3. *Rev'd on other grounds,* 163 Wis.2d 1, 471 N.W.2d 216, *cert. denied,* 502 U.S. 1030, 112 S.Ct. 867, 116 L.Ed.2d 773 (1991).

Not Reported in N.W.2d                                                                                    Page 5
Not Reported in N.W.2d, 1998 WL 1031504 (Wis.Cir.), 1998-2 Trade Cases P 72,300
(Cite as: Not Reported in N.W.2d)

The test for common interest is whether all members of the purported class desire the same outcome of the suit that the alleged representatives of the class desire.

**\*6** *Mercury Records, supra,* at 490, 283 N.W.2d 613. *Goebel, supra,* offered a somewhat more complex test which arguably suggests that the common interest must extend to all material questions involved in the controversy:

It is not necessary that the position of each member of a class be identical; it is necessary only that there be " '... a community of interest among them in the questions of law and fact involved in the general controversy, or in the kind and form of relief demanded and obtained by or against each individual member of the numerous body ...' " *Schlosser, supra,* at 171, 222 N.W.2d 156, *quoting* 1 Pomeroy, *Equity Jurisprudence* (5th ed.) pp. 598-600, sec. 269.

*Goebel,* 83 Wis.2d, at 684, 266 N.W.2d 352.[FN4]

> **FN4.** The cite to *Schlosser* is to the first *Schlosser* case. 65 Wis.2d 153, 222 N.W.2d 156, which favorably set forth a much longer passage from Pomeroy's treatise.

Where, as here, the members have a common interest in establishing the defendants' liability but contrary interests as to damages, the inquiry as whether there is a common interest tends to become indistinguishable from the general balancing of common and individual issues. See *Plaintiff's Brief,* at 17-24; *Defendants' Brief,* at 9-10. Nevertheless, Wisconsin's first criteria does not, as Plaintiff's argument on this point suggests, depend on whether common questions or individual questions predominate. Defendants' argument that there is no "commonality" where questions of liability or injury require individual determination is similarly misplaced. This argument is drawn from language in *Goebel* which is a part of the court's effort to weigh advantages against difficulties; it is not properly a part of the common interest prerequisite.

Obviously, if the "outcome" test contemplates a common interest in all questions pertinent to the final result, the common interest criteria is not satisfied in this case, and might never be satisfied in complex class actions. While the answer is immaterial in light of other findings below, my best understanding of the caselaw is that a common interest in a material aspect of the lawsuit is sufficient. A common interest in all questions pertinent to the outcome is not required.

Defendants also contest the "common interest" criteria on the ground that the Wisconsin anti-trust statute provides a remedy only for intrastate violations, citing *Grams v. Boss,* 97 Wis.2d 332, 346, 294 N.W.2d 473 (1980); and *State v. Waste Management* [1978-1 TRADE CASES ¶ 61,813], 81 Wis.2d 555, 574, cert. denied, 439 U.S. 865, 99 S.Ct. 189, 58 L.Ed.2d 175 (1978). Plaintiff has not responded to this intriguing challenge, but the challenge seems more appropriate to a motion to dismiss. The question here is whether, assuming the claim applies to them, class members have a common Interest.

### 2. Plaintiff's Ability to Represent the Class Fairly

For reasons discussed in the proceeding section, plaintiff Derzon will fairly represent the entire class only in proving up the conspiracy, which, in light of the many apparent criminal convictions, might be the easy part. As to damages, he can fairly represent only those members who share his position as an individual consumer of tax paper, and then perhaps only if they turn out to have bought paper in markets with the same pass-on characteristics as his. There is no reason to believe that a price increase for this sort of common product is distributed proportionally over the many potential indirect victims, or that any disproportion will be consistent over different distribution patterns or regions of the country. What happens when plaintiff Derzon finds an expert who concludes that the lion's share of the increase was absorbed by the final purchaser?

**\*7** The proposed class represents all areas of the country except the deep South and the Pacific Northwest, and regional differences might also threaten class unity. What if an available expert agrees that consumers took the primary hit in Wisconsin, but concludes that Office Max and other office supply chain stores absorbed all of the increase in New Mexico? Common sense suggests that differences will exist, and plaintiff Derzon has offered nothing to suggest that there will be expert evidence reasonably attractive to all levels of the distribution chain and to all the geographic groups represented in this extraordinarily diverse class.

### 3. Impracticality of Separate Cases

The defendants have not contended that individual cases are a practical alternative, although the existing record does not allow me to determine whether there

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                              Page 6
Not Reported in N.W.2d, 1998 WL 1031504 (Wis.Cir.), 1998-2 Trade Cases P 72,300
**(Cite as: Not Reported in N.W.2d)**

are large victims at the top or middle of the distribution chain which might practically and better proceed as individual cases. At least as to the vast number of fax paper consumers, the proposed class clearly satisfies this criteria. Given the extent of the damages, it cannot be expected that any end user will initiate litigation, nor would it make sense to litigate the existence of the price-fixing conspiracy in thousands of individual cases.

*4. Manageability: Factual and Procedural Difficulties*

Plaintiff correctly claims that the unifying thread for the proposed class is the defendant's wrongful conduct and the possible injury to all class members which resulted therefrom. *Plaintiff's brief, at 26.* The existence of injury to each class member, however, is precisely where the thread begins to unravel. Plaintiff has failed to show the he has the means to prove injury by common evidence and that class members damage claims ran reasonably be united in a single case.

The cases cited by the plaintiff concur that it is the plaintiff's burden to make a showing at this stage that an antitrust impact can be proven with common evidence on a class wide basis. See, for example, *In re Polypropylene Carpet Antitrust Litigation [1997-2 TRADE CASES ¶ 72,027]*, MDL Docket No. 1075, at 34 (N.D.Ga., September 5, 1997); *In re Disposable Contact Lens Antitrust Litigation [1997-1 TRADE CASES ¶ 71,811], 170 F.R.D. 524 (M.D.Fla.1996)*. Plaintiff suggests that at this stage the court must not consider the *merits* of plaintiff's methodology, but the *viability* of the proposed methodology. [FN5] Whether or not this rather exquisite distinction is helpful, plaintiff is correct that he need not prove his case at this point. He does, however, bear the burden of establishing that he possesses the means to prove it.

FN5. Letter to the court from attorney Gustafson, dated February 16, 1998.

The cases offered by plaintiff in which classes of indirect purchasers have been certified typically involve an extensive record, including testimony from plaintiff's experts, as to the theoretical basis by which the plaintiff will prove the case by common evidence. See, for example, *In re Polypropylene Carpet Antitrust Litigation, supra; Goda v. Abbott Laboratories [1997-1 TRADE CASES ¶ 71,730]*, No. 1445-96, at 13-17 (Superior Court of the District

of Columbia, February 3, 1997); *In re Disposable Contact Lens Antitrust Litigation, supra;* and *Hagemann v. Abbott Laboratories,* Civ. No. 94-221. (So. Dakota Cir. Ct., Hughes Co., 1995).[FN6] In this case. plaintiff's counsel has simply represented that by means of "incidence analysis" and "regression analysis" an unnamed expert will overcome the enormous barriers there seem to be to the proof of damages by common evidence. When such methodologies have been presented in support of similar requests to certify classes of indirect price-fixing victims, they have not been well received. See *Execu-Tech Business Systems v. Appleton Papers,* No. 96-9639 CACE 05 (Fla. Cir. Ct., Broward Co., Dec. 15 1997) [FN7]; and *Wood v. Abbott Laboratories,* Case No. 96-512561-CZ (Mich, Cir. Ct., Oakland Co., Sept. 11, 1997), reported in 1997-2 TRADE CASES [CCH] P72.014.[FN8]

FN6. These four cases are attached to attorney Gustafson's letter to the court dated February 16, 1998. For readable copy of *Goda v. Abbott Laboratories,* see Exhibit B to Plaintiff's Brief.

FN7. Attached to attorney Pollack's letter to the court dated January 5, 1998. *Execu-Tech* involved a claim based on the same price-fixing conspiracy alleged here, but seeking certification of a class of persons who made indirect purchases of fax paper only in Florida.

FN8. Attached to attorney Pollack's letter to the court dated February 10, 1998.

**\*8** Constructing economic models in order to reach generalized conclusion about economic behavior is one thing; using such theories to prove that *every* class member has suffered a loss *and the amount of that loss* is quite another. Just how is a jury in Milwaukee going to decide whether this price-fixing conspiracy injured the purchaser of fax paper at a K-Mart in Baton Rouge or a Sam's Club in Santa Fe? Just how will it then proceed to determine the extent of that injury? It is hard to imagine that any common product is sold and resold in a manner which is so clean and clear as to allow for common evidence which establishes that a price increase was passed on to every indirect purchaser and establishes the amount to the overcharge.[FN9] Certainly in the case of fax-paper, common sense and the available evidence suggest the existence of an extraordinary variety of significant and unpredictable pricing factors. To step

into this uncharted territory-certifying a class of geographically widespread indirect victims of price-fixing-the court needs something more than blind faith in the notion of regression analysis.

> FN9. Even in such a market. I cannot imagine how you exclude the possibility that one class member may have purchased at a price-a close-out or promotional sale-unaffected by the price-fixing conspiracy. Whether or not such a possibility should defeat an otherwise valid class action is not an issue here in light the plaintiff's complete failure to offer a viable methodology.

Plaintiff's citation to various federal cases which have approved such suits only tends to highlight the complexities and difficulties. In *In re Sugar Industry Antitrust Litigation* [1976-2 TRADE CASES ¶ 61,215], 73 F.R.D. 322 (E.D.Pa.1976), the court describes how prior litigation had divided the controversy into an eastern phase and a western phase due to regional market differences. The court approved *four separate classes* of industrial users, institutional users, wholesalers and retail grocers. There was no class of individual consumers. In the same year, a district court in the Eastern District of Louisiana granted class certification for direct and indirect purchasers of plywood, but *only as to issues of antitrust liability* and only based on the division of the plaintiffs into five classes: dealers, subcontractors, contractors, builderowners, and manufacturers. *In re Plywood Antitrust Litigation* [1976-1 TRADE CASES ¶ 60,805], 76 P.R.D. 570 (E.D.La.1976). Again, individual consumers were not included.

In several of the cases cited by plaintiff, the court accepted the fact that if liability were established, damages would have to be established by individual or "subclass" proceedings. See, for example, *B.W.I. Custom Kitchen v. Owens-Illinois* [1988-1 TRADE CASES ¶ 68,053], 235 Cal.Rptr. 228, 236-37 (1987), and the cases cited and discussed at 236-237: *In re Plywood Antitrust Litigation, supra.* Such cases come from jurisdictions which, unlike Wisconsin, permit the bifurcation of issues. Rule 42(b) of the Federal Rules of Civil Procedure, for example, permits separate trials on separate issues relating to the same claim. Wis. Stat. 805 .05(2) allows for the separation of claims but not of issues. See Judicial Council Committee Note. Moreover. Wisconsin's five-sixths rule appears to preclude a discretionary bifurcation of issues into separate trials:

**\*9** (2) VERDICT. A verdict agreed to by five-sixths of the jurors shall be the verdict of the jury. If more than one question must be answered to arrive at a verdict on the same claim, the same five-sixths of the jurors must agree on all questions.

You cannot possibly have the same ten jurors if you do not have the same jury. [FN10]

> FN10. I say that a discretionary bifurcation "appears" to be precluded because of *Zawlstowski v. Kissinger,* 160 Wis.2d 292, 466 N.W.2d 664 (Ct.App.1991), in which the court held that the discretion to bifurcate can be found in sec. 906.11. Unfortunately, it is difficult to Interpret this case because the decision does not indicate whether the "bifurcated" trials were before the same jury or different juries. At least to me, the term "bifurcation" tends to suggest two juries, but if that was the case, it is difficult to see how the court could have reached its conclusion without the problem of the 5/6ths rule.

Despite plaintiff's rather casual suggestion that "damages calculations may be performed following the resolution of common liability issues." such a procedure is not lawful in Wisconsin unless the same jury is to be kept around for the entire process. *Plaintiff's Reply Brief,* at 14. I recognize that the language cited by the plaintiff from *Schlosser, supra,* 86 Wis.2d, at 243, 271 N.W.2d 879 ("... damages are to be determined in a subsequent proceeding."); and *Mercury Records, supra,* 91 Wis.2d, at 490, 283 N.W.2d 613 ("... a class action is proper even if each member of the class has a separate cause of action for money damages.") has sown some confusion, but these comments do not explain how the trial court can ignore sees. 805.05(2) and 805.09. They also contrast with the subsequent comments of the Court of Appeals in *Markweise v. Peck Foods Co.,* 205 Wis.2d 208, 225, 556 N.W.2d 326 (Ct.App.1996), which directly spoke to this issue:

The federal jury-trial right applies to class actions. *[citation omitted]* This means that the parties to a classaction lawsuit have the right to have all "juriable issues" decided by the same jury. *[citations omitted]* There is no authority that we know that would permit a different result under the Wisconsin Constitution.

The court found, nevertheless, that "substantial issues regarding the defendants' right to a jury trial" had not been briefed or considered by the trial court, and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                    Page 8
Not Reported in N.W.2d, 1998 WL 1031504 (Wis.Cir.), 1998-2 Trade Cases  P 72,300
**(Cite as: Not Reported in N.W.2d)**

remanded the case for additional efforts at the trial court level. *Id., at 227, 556 N.W.2d 326.*

A careful reading of the cases relied on by plaintiff indicates that there is often an extensive showing on the proposed methodology or other differences in manageability factors. For example, in determining that "[t]he problems of ascertaining individual damages ... should not be overwhelming," the California Court in *B.W.I. Custom Kitchen, supra,* noted that "[t]he parties to this action are business entities which presumably kept records." at 237. The issues related to the manageability of plaintiff's proposed class are far more like the problems which caused the court to find unmanageability in *Keating v. Philip Morris* [1987-2 TRADE CASES ¶ 67,801], 4174 N.W.2d 132 (Minn.App.1987), which rejected a proposed class of wholesale purchases of cigarettes who were allegedly harmed by a price-fixing conspiracy. Even though the proposed class did not have the complexities added by inclusion of individual consumers, the court found that the prospect of "thousands of mini-trials to determine damages" made the class unmanageable. See also *Windham v. American Brands* [1977-2 TRADE CASES ¶ 61,670], 565 F.2d 59 (4th Cir.1977).

*Conclusion*

**\*10** The proposed class satisfies two of the three threshold requirements for certification. It has a sufficient common interest and individual suits are clearly Impractical. The inherent conflict over the apportionment of damages, however, creates a clear conflict between the differing types of indirect purchasers and many potential conflicts even at the same level in the distribution chain, and the plaintiff cannot fairly represent the entire class on the issue of damages. More importantly and more clearly, the class, even as it might potentially be redefined, is simply unmanageable. The inclusion of consumers of fax paper, and the variety of routes by which fax paper might travel from converter to end user, make it imperative that the plaintiff describe and demonstrate a means by which this case can be fairly and efficiently organized for proof by common evidence. This the plaintiff has not done. Even without the problems created by the apparent requirement of a single jury, the case is unmanageable.

Finally, plaintiff suggests that failure to certify this class will allow those guilty of serious antitrust violations to keep their ill-gotten gains. The test for a class action, however, is not simply whether there is some wrong to be righted. Nor is a class action the only weapon against such illegal practices. Plaintiff's complaint recites the defendants' criminal convictions and details fines totalling more than $11 million. Where there is generalized harm such as this, the application of criminal laws by government is the primary means by which we punish and deter. Even where prosecutions and fines are inadequate, it does not necessarily follow that class actions must be permitted to attempt to take up the slack. On balance, the unmanageability of the class and the related difficulties of pursuing and securing a reasonable and just result outweigh the unsubstantiated possibility that some good might come of this class action.

It is therefore ordered that plaintiff's request for class certification is denied.

Wis.Cir.,1998.
Derzon v. Appleton Papers, Inc.
Not Reported in N.W.2d, 1998 WL 1031504 (Wis.Cir.), 1998-2 Trade Cases  P 72,300

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.