# EXHIBIT H

Westlaw.

Not Reported in N.W.2d                                                                                   Page 1
Not Reported in N.W.2d, 2003 WL 23105552 (Minn.Dist.Ct.), 2004-1 Trade Cases P 74,272
**(Cite as: Not Reported in N.W.2d)**

Briefs and Other Related Documents

District Court of Minnesota.
Daniel GORDON, Brandon Welter, David Ellingson,
Kari A. Wallace, on behalf of themselves and all
others similarly situated, Plaintiffs,
v.
MICROSOFT CORPORATION, Defendant.
**No. MC 00-5994.**

March 14, 2003.

Richard M. Hagstrom, for Plaintiffs.
Charles B. Casper, and Robert L. DeMay, for
Defendant.

ORDER GRANTING CERTIFICATION OF
APPLICATIONS CLASS, CLARIFYING
OPERATING SYSTEMS CLASS DEFINITION,
AND DETERMINING CLASS PERIOD
PETERSON, J.

**\*1** The above entitled matter came on for hearing
before the Honorable Bruce A. Peterson on
December 16, 2002.

Based on the the arguments of counsel, and all the
files, records, and proceedings, the court makes the
following:

ORDER

1. Plaintiffs' Motion for Certification of an
Application Systems Class is granted. The class will
consist of:
All persons or entities who indirectly acquired or
purchased in Minnesota for their own use, and not for
further selling, leasing, or licensing, Microsoft Word,
Microsoft Excel, or any other software product in
which Word or Excel has been incorporated in whole
or in part ("Microsoft Applications Software") at any
time during the class period.
2. Plaintiffs' Motion for Amendment of the Operating
Systems Class definition is granted. The class will
consist of:
All persons or entities who indirectly acquired or
purchased in Minnesota for their own use, and not for
further selling, leasing, or licensing, any version of
the following Intel-compatible PC software:

Microsoft MS-DOS, Microsoft Windows, or any
other software product in which MS-DOS or
Windows has been incorporated in whole or in part
("Microsoft Operating System Software") at any time
during the class period.
3. Excluded from each class definition are Microsoft
and its alleged co-conspirators, their parents,
subsidiaries, affiliates, officers and directors. Also
excluded are any federal, state, or local governmental
entity, and any judge or judicial officer presiding
over this matter, their judicial staff, and members of
their immediate families.
4. The class period is from May 18, 1994, to
December 15, 2001.
5. The attached Memorandum is hereby incorporated
into this Order.

MEMORANDUM

Plaintiffs have moved the court to amend the
previously certified operating systems class to
include purchasers of Microsoft Word, Microsoft
Excel, and any product that incorporates Word or
Excel. Although the methodology for determining
classwide injury and damages proposed by Plaintiffs'
expert witness, Professor Jeffery K. MacKie-Mason,
differs somewhat from the methodology of Dr. Keith
Leffler, which was the basis for the original class
certification, it is adequate at this stage of the
proceedings. Since applications software constitutes a
different market from operating systems, the court
grants certification of a second class of applications
software purchasers. The court also amends the class
definition, clarifying that all versions of MS-DOS
and Windows are included. Because Defendant's
compliance with the Revised Judgment on December
15, 2001, raises significant new questions about
whether the anticompetitive conduct alleged
previously by Plaintiffs continued and about how
consumers were impacted thereby, Plaintiffs' motion
to extend the class period past that date is denied.

*Facts and Procedural History*

Microsoft Corporation is the largest manufacturer of
computer software. Microsoft produces both
Windows operating system software and various
applications software, such as Excel, Word, and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                                                    Page 2
Not Reported in N.W.2d, 2003 WL 23105552 (Minn.Dist.Ct.), 2004-1 Trade Cases P 74,272
**(Cite as: Not Reported in N.W.2d)**

Office. The operating system ("OS") of a computer is a software program that controls the allocation and use of computer resources. Most of Microsoft's operating system software is distributed to PC manufacturers known as original equipment manufacturers ("OEMs"). OEMs preload the software onto PCs, which are then sold to the consumer. Microsoft refers to this as the OEM channel. In addition to purchasing the software pre-loaded on a new PC, consumers can also purchase it in a shrink-wrap package. Microsoft refers to this as the finished goods channel.

**\*2** Applications are software programs that perform specific user-oriented tasks. Applications programs are typically written to run on a particular operating system and cannot run on other operating systems unless the developer creates additional code to "port" the program to another operating system. Like the operating system software, Microsoft's applications software can be purchased through either the OEM channel or the finished goods channel. Plaintiffs contend that Microsoft currently controls over 85% of the market for word processing and spreadsheet software and that it obtained that monopoly control through anticompetitive conduct.

On March 30, 2001, this court certified a class of indirect purchasers of Microsoft operating system software. The class consisted of
Persons or entities who acquired for their own use, and not for further selling, leasing or licensing, a license in Minnesota from Microsoft or an entity under Microsoft's control, for an Intel compatible PC version of MS-DOS, Windows 95, upgrades to higher MS-DOS versions, upgrades to or of Windows 95, Windows 98, upgrades to or of Windows 98, or other software products in which MS-DOS or Windows has been incorporated in full or in part at any time during the Class Period.

The court's Memorandum set forth the legal standards for certification of such a class, which continue to apply to this motion.

On October 25, 2002, Plaintiffs moved that the certification order be amended to (1) add indirect purchasers of Microsoft Word, Microsoft Excel, and any other software product that incorporates Word or Excel, such as Microsoft Office or Microsoft Works Suite, (2) clarify that all versions of MS-DOS and Microsoft Windows are included in the class definition, and (3) extend the class period to the date of trial. Plaintiffs contend that the amended class definition is reasonable due to the similarity between

the OS market and the applications software market and the "interrelation between Microsoft's anti-competitive conduct in the complementary applications and operating systems markets." (Pltf. Memo at 5)

Under Minn.R.Civ.P. 23.01 Plaintiffs must establish numerosity, commonality, typicality, and adequacy. As in the prior motion, there are few disputes about these requirements as applied to applications class members. Plaintiffs point out that the class is numerous since nearly all members of the operating systems class will also be purchasers of applications software. The class includes thousands of geographically diverse members, making joinder impossible. Common questions of law and fact include whether Microsoft is a monopolist in the markets for PC operating systems and applications software, whether Microsoft and its co-conspirators engaged in anticompetitive activity and unlawful restraint of trade, whether Microsoft violated the Minnesota Antitrust Law, and whether Microsoft's conduct has caused harm to each class member.

Plaintiffs claim that Microsoft principally damaged applications class members by causing the price of applications software to increase. Although the amount of damage varies, the claims of the class representatives are typical. Defendant argues that the requirements of typicality and adequacy will be destroyed by the addition to the class of applications purchasers because "class members who licensed operating systems would have no incentive to have their lawyers expend the time and resources necessary to prove that Microsoft unlawfully overcharged purchasers of application software." (Def. Memo at 28) This, however, is not such a problem if indirect purchasers of applications software are certified as a separate class, as the court has done here.

**\*3** Under Minn.R.Civ.P. 23.02(c) Plaintiffs must show that questions of law and fact pertaining to the class as a whole predominate over questions that pertain only to individual class members and that a class action is superior to other methods available for resolving the dispute. Defendant makes its principal challenge to the superiority requirement, arguing the unmanageability of determining class-wide damages.

*Analysis*

I. The Application Software Class

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                                    Page 3
Not Reported in N.W.2d, 2003 WL 23105552 (Minn.Dist.Ct.), 2004-1 Trade Cases  P 74,272
**(Cite as: Not Reported in N.W.2d)**

To maintain an antitrust suit as a class action, Plaintiffs must be able to establish a violation of antitrust law, the fact that injury occurred on a class-wide level as a result of the violation, and "some indication of the amount of damage." *Keating v. Philip Morris, Inc.*, 417 N.W.2d 132, 137 (Minn.App.1987). As in the original motion, in order to prove class-wide damages to applications consumers, Plaintiffs must first show an overcharge to direct purchasers. Once an overcharge is established, Plaintiffs must then prove to what extent this overcharge was passed on through the distribution channels.

Plaintiffs contend that a damages analysis similar to the one used for the OS market can be applied to the application software market. As with MS-DOS and Windows, applications software reaches end users through two principal channels. In some instances consumers buy the product pre-installed on a new computer system. In other cases consumers purchase a shrink-wrapped package containing the application.

In addition to the similarity between the distribution channels, Plaintiffs claim that Microsoft's conduct in the application market is interwoven with its conduct in the OS market. Applications are written to run on only one operating system. This means that people who buy Microsoft Word need some form of Windows to run the application. Plaintiffs claim that this creates a "chicken-and-egg" problem. Consumers wish to buy an operating system that can run a large number of applications, and developers prefer to write for operating systems that have a large consumer base. This ensures that applications will continue to be written for the already dominant Windows, which in turn will ensure that consumers will continue to prefer it to other operating systems. This "applications barrier to entry" prevents upstart operating system developers from obtaining the applications that are needed for their platforms to become viable alternatives to Windows. According to Plaintiffs, Microsoft has further solidified its monopoly in the two markets by controlling crucial applications markets, such as word processing and spreadsheet applications. Microsoft has allegedly given its applications developers preferential access to Windows code and failed to "port" its applications software to other operating systems. Plaintiffs contend that in this way Microsoft's monopoly in the OS market reinforces its monopoly in the applications market and visa versa.

Plaintiffs point out that indirect purchaser classes for Microsoft's operating systems as well as applications software have been certified in California, Florida, and New Mexico, and that Microsoft has not claimed there that certification of a class of applications software purchasers presents inherent obstacles not encountered for a class of operating system purchasers.

A. Monopoly Overcharge to Direct Purchasers.

**\*4** The original class certification was based upon the expert opinion of Dr. Keith. Leffler, who proposed using three "yardstick" methods to measure a monopoly overcharge to direct purchasers. The three yardsticks were a price comparison between Microsoft's market and markets unaffected by the alleged anticompetitive activity, a comparison between Microsoft's profit margins and the profit margins of other companies in the comparable markets, and a comparison of prices in the current market with prices in the same market before the alleged anticompetitive activity. The yardstick methodologies would be used to determine a "benchmark" price. Once the benchmark price had been determined, Leffler proposed to deduct the benchmark price from the actual price paid to determine the amount of overcharge.

The Plaintiffs now rely on the testimony of Professor Jeffery K. MacKie-Mason. To calculate the overcharge MacKie-Mason also uses three comparisons. Two of MacKie-Mason's comparables are similar to Leffler's-a comparison between Microsoft's profits and price premiums and the profits and price premiums of other companies in related markets. MacKie-Mason also compares Microsoft's rate of return with the rate of return of other companies in related markets. As with Leffler, MacKie-Mason determines a benchmark price which represents what Microsoft would have to charge to receive a similar profit, rate of return, and price premium as the other companies. MacKie-Mason has already employed this methodology for a similar class certification motion in California.

Although MacKie-Mason's methodology is not beyond question, it does present a workable method, one that has already been used to determine a monopoly overcharge to direct purchasers. As noted in the original certification order, the strength and accuracy of the model cannot be determined here, but will be established upon application of the facts at trial. *See Zenith Radio Corp. v. Hazeltine Research Inc.*, 395 U.S. 100, 123-124 (1969).

Not Reported in N.W.2d                                                                                Page 4
Not Reported in N.W.2d, 2003 WL 23105552 (Minn.Dist.Ct.), 2004-1 Trade Cases  P 74,272
**(Cite as: Not Reported in N.W.2d)**

B. Measuring Pass Through

Once the overcharge is established, the pass through to consumers must be calculated. Plaintiffs have the burden not only of showing that pass through occurred, but of proposing a method that will determine individual damages for every indirect purchaser in the class.

Leffler proposed to look at cost changes at the top of a distribution channel and determine how they affect prices at the bottom of the channel. MacKie-Mason agrees with the methods proposed by Leffler. MacKie-Mason states that although all economists generally agree that some pass through occurs, the actual rate must be measured empirically. He uses a regression analysis to calculate what percentage of the overcharge is passed on to consumers.

MacKie-Mason proposes looking at how different preloaded software packages affect the overall price of the computer. (MacKie-Mason Aff. ¶ 46) For example, he observes how the price of a computer changes as the user chooses between Microsoft Office and Microsoft Office Pro. He then calculates the cost to the OEM of providing Office rather than Office Pro. Id. This provides a measurement of how much of the cost to the OEM is passed through to the consumer. For sales via the finished goods channel MacKie-Mason regresses price at the bottom of the channel to price at the top of the channel. (Id at ¶ 47)

*5 Defendant claims that in California MacKie-Mason "delivered sweeping conclusions about market conditions in a few channels, based on a tiny sliver of data that is demonstrably unrepresentative of the many different intermediate companies and sales practices by which Microsoft software is distributed; and his 'multiple regression' analyses ... are riddled with fundamental flaws." (Def. Memo at 8) Defendant goes on to raise a series of specific objections to MacKie-Mason's California analyses: he lacked any empirical basis whatsoever for major distribution channels such as system builders, his data were simply insufficient for estimates in other major channels, (e.g., he studied too few OEMs for too narrow a period, his sample for finished goods sold by volume licensers is too small and unrepresentative, and his data for finished goods sold in retail stores were unreliable) and he had no basis to extrapolate his results to distribution channels and time periods for which he had little or no data. Defendant also contends that MacKie-Mason's

California studies are riddled with technical errors.

Defendant asserts: "The time has come for Plaintiffs to set forth their proofs." (Def. Memo at 8) The court disagrees. As the court attempted to articulate in the initial class certification order, the time for proof is at trial. At the class certification stage Plaintiffs do not have to present a damage analysis, but merely show that it can be done. MacKie-Mason asserts: "There is little dispute that there are standard economic and statistical methods that can be applied to calculate pass-through." (MacKie-Mason Aff. ¶ 40) The court does not read Defendant's materials to challenge the existence of such methods, only to contend that MacKie-Mason has not properly applied them. Indeed, Microsoft's own expert, Professor Jerry Hausman, apparently concluded that a pass through analysis can be done. (Decl. of MacKie-Mason in support of Renewed Motion for Class Certif. (Calif.) ¶ 29, citing Hausman Calif. Decl. ¶ 56,57) To be sure, Hausman claims that the pass through rate is in fact much less than that set forth by MacKie-Mason and varies with particular demand conditions. (Hausman Aff. at 50-53) But whether pass through rates differ for different distribution chains, and what the rates are, are disputes to be resolved at trial.

Defendant's many complaints about the adequacy of MacKie-Mason's database and the technical quality of his regression analysis will be important matters for the jury to address at trial. For now, the "Court's inquiry is limited to whether or not the proposed methods are so insubstantial as to amount to no method at all." *In Re Potash Antitrust Litigation,* 159 F.R.D. 682, 697 (D.Minn.1995). Although the damage calculations for Minnesota have yet to be done, Plaintiffs' methods represent a viable means for proving the fact of injury to each member of an applications class, and such a class should be certified.

C. Number of Classes

*6 Defendant initially claimed MacKie-Mason's work is so deficient that not only should the class not be expanded, but it should be decertified. Having seen in MacKie-Mason's Reply Affidavit and Plaintiff's Reply Memorandum that a separate analysis will be submitted for Minnesota, however, at the hearing defense counsel recognized that the question of decertification would have to await the submission of Plaintiff's expert report in Minnesota, presently due May 5, 2003.[FN1]

Not Reported in N.W.2d                                                                          Page 5
Not Reported in N.W.2d, 2003 WL 23105552 (Minn.Dist.Ct.), 2004-1 Trade Cases  P 74,272
**(Cite as: Not Reported in N.W.2d)**

FN1. Following the submission of expert reports for both parties, the court asked defense counsel to submit a letter to the court setting forth their proposed procedure and legal standards for addressing decertification. Upon receipt a conference call will be conducted with court and counsel to establish appropriate procedures and standards.

At the hearing neither party could identify any compelling practical distinction between one class that would include both operating systems and applications, which could then be divided into subclasses, and separate classes for operating systems and applications. Plaintiffs prefer one class to avoid duplicative notices to class members and resulting confusion, but defense counsel represented at the hearing that Defendant was interested in the most convenient and clear method of notification.

Operating systems and applications clearly are in different markets. While there may be overlapping proof, the questions of Microsoft's conduct and damages will have to be proved separately for operating systems and applications. Accordingly, this court will certify two separate classes with the understanding that one notification will be made to class members who are in both classes. This is apparently the approach taken by the other courts which have addressed this question. Different applications such as Word and Excel also occupy separate markets, and subclasses may need to be identified for trial.

**II. Extending the Class Period**

The court's prior class certification order established the class period as "May 18, 1994 to the present" (i.e., March 30, 2001). Plaintiffs initially moved the court to extend the class period to the date of trial. Recognizing the inherent problems in notification of class members prior to trial, Plaintiffs have revised this request to an extension of the class period up to 120 or 90 days prior to trial, currently scheduled for February 2, 2004. Defendant objects to this extension, based upon a settlement agreement it reached with the Department of Justice and nine state Attorneys General and with which it began complying on December 15, 2001. ("Revised Judgment") Defendant's Memorandum sets forth some of the major actions Defendant took as a result of this agreement:

After the agreement, Microsoft stopped negotiating prices individually with OEMs and started using a published pricing schedule.

Microsoft issued its first major update to Windows 2000 Professional on August 1, 2002, and its first major update to Windows XP on September 9, 2002. Pursuant to its agreements with the government, with these updates it is possible for OEMs and hardware vendors using Windows to offer programs from Microsoft's competitors on their PCs instead of Microsoft's integrated programs, including key programs such as Microsoft's Internet Explorer. This eliminates an important restriction on competition that was central to the Plaintiffs' Complaint.

**\*7** On August 6, 2002, Microsoft disclosed application program interfaces which will enable software developers to write programs that run on Windows. Subsequently Microsoft disclosed additional application program interfaces to enable competitors to create software that operates on Windows.

Defendant contends that this agreement and Microsoft's resulting changes in conduct fundamentally changed the competitive structure of the software industry. Defendant points out that the California court, when presented with a similar request, limited the extension to a period ending December 15, 2001.

These changes in Microsoft's competitive conduct address some of the central allegations made by Plaintiffs in their Complaint. As a result, it appears that to establish antitrust violations in the period following December 15, 2001, Plaintiffs would have to introduce substantial additional expert and factual evidence, which Defendant indicates it would vigorously contest. This sounds almost like a separate trial on liability after December 15, 2001, will be necessary and raises the question as to whether, under Rule 23.01, the question of Microsoft's liability is common to the entire extended class.

Plaintiffs raise several objections to Microsoft's argument. Plaintiffs rely on MacKie-Mason's declaration in support of the Plaintiffs' motion in California to extend the class period through December 31, 2002. In that declaration MacKie-Mason makes conclusory statements that Microsoft's market share for operating systems and applications remains very high and that "the impacts of the conduct from 1988 through 2001 are ongoing." (¶ ¶ 9, 13) He asserts that the impacts flow from the same market-wide conduct Microsoft engaged in previously.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                                      Page 6
Not Reported in N.W.2d, 2003 WL 23105552 (Minn.Dist.Ct.), 2004-1 Trade Cases  P 74,272
**(Cite as: Not Reported in N.W.2d)**

MacKie-Mason may be correct, and it could well be that at a trial Plaintiffs could establish continuing antitrust violations by Microsoft through the extended class period. Nonetheless, Plaintiffs would have to prove the ineffectiveness of the series of measures Microsoft took pursuant to the Revised Judgment. Given the complexity already inherent in this case, which is now expanded to two classes and several applications subclasses, it appears advisable to limit Plaintiffs' proof in this trial to the conduct of Microsoft before it began complying with specific restrictions negotiated with the government. A trial of the effectiveness of those restrictions is better left for another day.

The series of specific objections made by Plaintiffs to Microsoft's argument do not seriously undermine this logic. First, Plaintiffs logically point out that the Revised Judgment may have changed Microsoft's conduct, but it did not immediately end damages to class members from alleged anticompetitive conduct prior to December 15, 2001. Even if Microsoft began perfect compliance with the antitrust laws on December 15, 2001, it would take some time for the effects of its new behavior to work its way through the distribution chain. The problem with this argument is that the court has no idea what the lag time would be and has no way to establish a later class termination date before which all class members would still be experiencing the effects of Microsoft's conduct prior to December 15, 2001. If, for the reasons described above, the court restricts Plaintiffs from presenting additional evidence on post-Revised Judgment conduct, and the time lag is not known, the only logical termination date available to the court is December 15, 2001.

**\*8** Second, Plaintiffs state that compliance with the terms of a consent decree is an entirely separate issue from compliance with the antitrust laws. This is obviously correct, and the court has acknowledged that Plaintiffs might be able to establish that Microsoft is in violation of the antitrust laws even if it is in compliance with the Revised Judgment. Nonetheless, establishing such violations would require different and additional proof not common to that applicable to earlier purchasers in the class.

Third, Plaintiffs argue that Microsoft should not be absolved from lingering consequences of its anticompetitive conduct. Most courts would agree that lawbreakers should not be absolved of misconduct. Perhaps a separate class action should be initiated regarding Microsoft's conduct after

December 15, 2001. Such a follow on case, of course, would not address the question of compensation for consumers who purchased Microsoft products after December 15, 2001, but who paid prices dictated by Microsoft's conduct before December 15, 2001. If Plaintiffs had submitted persuasive evidence about how long it would take for the effect of changes in Microsoft's conduct in December 2001 to work its way through the distribution system, the court could have some rational basis for extending the class period for that amount of time. This is a complicated question, however, Plaintiffs have not attempted it, and the court is unwilling to speculate.

Fourth, Plaintiffs contend that by arguing for a December 15, 2001, cutoff, "Microsoft by implication admits that its liability in the government case is co-extensive with its liability in this case." (Pltf. Reply Memo at 20) Plaintiffs then call for the application of offensive collateral estoppel on the issue of liability. This argument is not well developed, there have been extensive proceedings in other courts regarding Microsoft, and the court will be pleased to entertain any motions by Plaintiffs, or Defendants for that matter, regarding collateral estoppel.

Fifth, Plaintiffs point out that many of the actions cited by Microsoft took place months after December 2001. The court recognizes, of course, that Microsoft would be unwise to contend that the entire market changed suddenly on December 15, 2001. But some date must be chosen, and at this point December 15, 2001, appears to be the start of a series of actions by Microsoft that would require different proof from Plaintiffs. Accordingly, it is a logical date to terminate the class.

Sixth, Plaintiffs point out that Microsoft's own evidence confirms that Microsoft has not suffered from changing its agreements with OEMs, which did occur on December 16, 2001. The complexities of proof remain the same, however. If Microsoft eliminated anticompetitive contract arrangements and was still able to maintain its profits, that may call into question the illegal nature of its prior arrangements. Addressing this question interjects another issue into this case and requires non-common proof in an already complicated litigation.

**\*9** Finally, Plaintiffs contend that the settlement addressed Microsoft operating systems only and has no effect on applications. This is Plaintiffs' most telling argument. Certainly the focus of the Department of Justice litigation was operating

Not Reported in N.W.2d                                                                                          Page 7
Not Reported in N.W.2d, 2003 WL 23105552 (Minn.Dist.Ct.), 2004-1 Trade Cases  P 74,272
**(Cite as: Not Reported in N.W.2d)**

systems, and the focus of the Revised Judgment is enhancing competition in operating systems. The effect of the Revised Judgment is not completely limited to operating systems, however. As the court understands it, disclosing application program interfaces so that other software developers can write applications to run on Windows, eliminates one of the controls on the applications market of which Plaintiffs complain. (*See* Second Amended Complaint at ¶ ¶  132, 140-141.) It is also apparent that Microsoft's conduct in the operating systems market and in the applications market is interwoven and that it would be difficult to assess Microsoft's conduct after December 15, 2001, in the applications market without taking into consideration the evidence of what happened in the operating systems market as a result of the Revised Judgment. Thus, on balance it appears advisable to keep both class periods the same.

Whether to extend this class period is a question about which reasonable minds can readily differ. It would make little sense to create needless follow-on litigation by carving up a class along arbitrary lines that have little meaning in the real world. However, a settlement agreement with the United States and nine states designed to address the very conduct at issue in this case would appear to be an event significant enough to bear out Defendant's claim that it changed Microsoft's competitive position. The government lawyers who negotiated the deal undoubtedly thought that it would. The Defendant has persuaded the court that enough additional evidence would be required to address the significance of the Revised Judgment that the question of Microsoft's liability throughout a lengthened class period is not common, and Plaintiff's motion should be denied.


### III. Product Definition.

The class previously certified consisted of consumers who had purchased MS-DOS and Windows. Microsoft has apparently taken the position that, apart from certain versions of MS-DOS, only Windows 2 .x, Windows 3.x and Windows 95/98 are included in the existing class. Plaintiffs have moved the court to clarify that this class includes the latest models of Windows, including Windows XP, which went on the market in 2001.[FN2] Defendant contends that Plaintiffs have to establish at least a prima facie case that Microsoft has engaged in illegal conduct with respect to these later models.

FN2. At the hearing, Defendant indicated that including Windows XP in the class would have little significance if, as the court decided in the Order, the class period is restricted to December 15, 2001, which is only shortly after the XP system was released.

The court is not convinced. Plaintiffs allege that Microsoft has monopolized the market for operating systems. If Plaintiffs establish that Microsoft engaged in illegal conduct to obtain and maintain that monopoly and that the effect of this conduct was damage to class members, they should prevail in this lawsuit. Plaintiffs do not have to establish illegal conduct with respect to every model sold by Microsoft to perform the function of an operating system. The question is Microsoft's monopoly power in the operating system market, and any operating systems offered by Microsoft that are reasonable substitutes for each other and therefore in this same market should be included in this same class definition. As a practical matter, of course, Plaintiffs at trial will have to establish that all class members were damaged, so proof of a monopolistic overcharge and a pass through to consumers for every operating system will have to be forthcoming.


### *Conclusion*

**\*10** Plaintiffs have met their burden of showing a workable methodology for calculating damages for indirect purchasers of applications software. A second class should be certified. Plaintiffs have also shown that a clarification of the class definition to include all versions of MS-DOS and MS Windows is appropriate. Defendant has established that different proof would be required regarding Microsoft's conduct after December 15, 2001, and the class should not be extended after that date.

Minn.Dist.Ct.,2003.
Gordon v. Microsoft Corp.
Not Reported in N.W.2d, 2003 WL 23105552 (Minn.Dist.Ct.), 2004-1 Trade Cases  P 74,272

Briefs and Other Related Documents (Back to top)

• 2004 WL 3515299 () Affidavit of Janet S. Netz in Support of the Proposed Settlement (Oct. 15, 2004) Original Image of this Document (PDF)
• 2004 WL 3515322 () Affidavit of Professor Geoffery P. Miller in Support of Plaintiffs' Motion for Attorneys' Fees and Expenses (Aug. 10, 2004)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                                     Page 8
Not Reported in N.W.2d, 2003 WL 23105552 (Minn.Dist.Ct.), 2004-1 Trade Cases  P 74,272
**(Cite as: Not Reported in N.W.2d)**

Original Image of this Document (PDF)
• 2002 WL 32881083 () Affidavit of Jeffrey K. Mackie-Mason in Support of Plaintiffs' Motion to Amend the Class Definition (Nov. 13, 2002) Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT I



Not Reported in A.2d                                                                     Page 1

Not Reported in A.2d, 2003 WL 1963161 (Conn.Super.), 34 Conn. L. Rptr. 485
**(Cite as: Not Reported in A.2d)**

Briefs and Other Related Documents

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
    Superior Court of Connecticut,Judicial District of
Tolland.
        Michael GRANITO,
            v.
INTERNATIONAL BUSINESS MACHINES.
        **No. X07CV020080440S.**

        April 16, 2003.

Scott & Scott LLC, Colchester, for Michael Granito.
Cummings & Lockwood, Hartford, for International
Business Machines Inc.

SFERRAZZA, J.
**\*1** The defendant, International Business Machines,
Inc., moves to strike the first and third counts of the
complaint filed in this proposed class action suit.
The motion to strike is based on the preemption
provision of the Connecticut Product Liability Act
(CPLA), General Statutes § 52-572m et seq., and
the failure to state a valid cause of action for unjust
enrichment.

A motion to strike "admits all the facts well
pleaded; it does not admit conclusions or the truth
or accuracy of opinions stated in the pleadings."
*Mingachos v. CBS, Inc.,* 196 Conn. 91, 108 (1985).

            I

The first count of the complaint alleges a violation
of the Connecticut Unfair Trade Practice Act,
General Statutes Ch 735a, (CUTPA), and the third
count attempts to make a claim for unjust
enrichment. Both counts arise from the distribution
and sale by the defendant of purportedly defective
75 gigabyte hard disk drives to a variety of
computer manufacturers and vendors. The plaintiff
is a member of a proposed class of end users who
purchased the hard disk drives or computers which
incorporated that device. The complaint further
avers that these drives malfunctioned at an
unacceptably high rate causing electronically stored
data to be lost; that the drives were unable to
perform satisfactorily contrary to the
representations made by the defendant; and that the
defendant failed to warn consumers about the
deficiencies and intentionally or recklessly misled
them concerning the quality and utility of this
product.

The defendant argues that because the plaintiff also
alleged the same defects, misrepresentation, and
harm to consumers in the second count, which is a
product liability claim, the CUTPA and unjust
enrichment counts are barred by the preemption
provision set forth in General Statutes § 52-572n(a)
and the definition of "product liability claim"
contained in General Statutes § 52-572m(b).

Our Supreme Court has very recently ruled that a
CUTPA claim is preempted by the CPLA but only
if the harm for which compensation is sought is for
personal injury, death, or property damage, which
injuries are governed by the CPLA. Where the loss
claimed is other than personal injury, death, or
property damage, a CUTPA claim remains viable
even though the underlying misconduct alleged is
the same. *Gerrity v. R.J. Reynolds Tobacco Co.,*
263 Conn. 129-30 (2003). In that case, the plaintiff
alleged that a cigarette maker knowingly concealed
and misled consumers regarding the deleterious and
addictive nature of its product. Answering a
certified question from the United States District
Court, the Court held that, because the product
liability claim concerned losses from personal
injury and death and the CUTPA claim concerned
the losses from the inflated price of cigarettes, the
CUTPA claim fell outside the preemption of the
CPLA. *Id.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                        Page 2

Not Reported in A.2d, 2003 WL 1963161 (Conn.Super.), 34 Conn. L. Rptr. 485
**(Cite as: Not Reported in A.2d)**

In the present case, whether the loss of electronically stored data constitutes property damage for the purposes of the CPLA is in doubt. General Statutes § 52-572m(b) and (d). When the nature of the loss, as in this case, is nebulous, a plaintiff ought to be able to plead alternative causes of action. Judge Berdon adopted this reasoning with respect to the CPLA and CUTPA in *Skerrit v. Sandoz Nutrition Corp.,* Superior Court, New Haven J.D., d.n. 305253 (March 26, 1991) (3 Conn. L. Rptr. 433). This court employs the same approach and denies the motion to strike the first and third counts on the basis of preemption by the CPLA.

II

**\*2** The defendant also contends that the unjust enrichment count is deficient because it fails to recite facts supporting a conclusion that the plaintiff conferred a benefit directly upon the defendant rather than merely through the chain of commerce. The court agrees.

In order to recover for unjust enrichment, a plaintiff must prove (1) that a benefit was conferred upon the defendant; (2) that the defendant unjustly failed to pay the plaintiff for the benefit; and (3) the lack of payment was detrimental to the plaintiff. *Herring v. Daniels,* 70 Conn.App. 649, 663 (2002). Paragraph 77 of the complaint states that the benefit conferred was unmerited profits from the sale of substandard hard disk drives which eventually reached the members of the class as end-users. There is no allegation that the plaintiff or members of the proposed class paid the defendant directly for the drives as opposed to paying third party retailers, middlemen, or computer manufacturers. The fact that, ultimately, the defendant may have received payment from someone for the hard drives is insufficient to establish a right to recover profits by this plaintiff. Absent the conferring of a benefit by the plaintiff directly, no action for unjust enrichment by him is valid. *United Coastal Industries v. Clearheart Con.,* 71 Conn.App. 506, 511 (2002).

The benefits conferred by third party retailers, etc.

may have been paid much earlier in time and far from the point of sale to the consumer. Statute of limitations and personal jurisdictional problems would loom if the consumers could sue for unjust enrichment for the sums paid by third parties earlier in the stream of commerce. Consequently, this court holds that, absent an allegation of purchases directly from the defendant, no cause of action for unjust enrichment may lie.

The motion to strike is denied as to the first count but granted as to the third count.

Conn.Super.,2003.
Granito v. International Business Machines
Not Reported in A.2d, 2003 WL 1963161 (Conn.Super.), 34 Conn. L. Rptr. 485

Briefs and Other Related Documents (Back to top)

• TTD-CV-02-0080440-S (Docket) (Jun. 25, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT J

Westlaw.

--- P.3d ----

--- P.3d ----, 2006 WL 1073067 (Okla.), 2006 OK 24
**(Cite as: --- P.3d ----)**

**H**

NOTICE: THIS OPINION HAS NOT BEEN
RELEASED FOR PUBLICATION IN THE
PERMANENT LAW REPORTS. UNTIL
RELEASED, IT IS SUBJECT TO REVISION OR
WITHDRAWAL.

Supreme Court of Oklahoma.
Lori HARVELL, Individually and on behalf of
herself and all others similarly situated,
Plaintiff/Appellee,
v.
The GOODYEAR TIRE & RUBBER COMPANY,
Defendant/Appellant.
**No. 102,128.**

April 25, 2006.
As Corrected May 9, 2006.

**Background:** Consumer brought class action
against national car repair company alleging
consumers were charged for shop supplies
regardless of whether shop supplies were used. The
District Court, Sequoyah County, John C. Garrett,
J., certified the class, and company appealed.

**Holdings:** The Supreme Court, Kauger, J., held that:

10(1) common questions of law and fact did not
predominate on breach of contract claim;

13(2) common questions of law and fact did not
predominate on unjust enrichment claim;

14(3) Ohio Consumer Sales Practices Act did not
apply to class action; and

17(4) action required examination of individual
transactions rather than broad injunctive or
declaratory relief.

Reversed and remanded.

**[1] Appeal and Error 30 ⬅️949**

30 Appeal and Error
  30XVI Review
    30XVI(H) Discretion of Lower Court
      30k949 k. Allowance of Remedy and
Matters of Procedure in General. Most Cited Cases
A trial court's class certification order is reviewed
for abuse of discretion.

**[2] Appeal and Error 30 ⬅️946**

30 Appeal and Error
  30XVI Review
    30XVI(H) Discretion of Lower Court
      30k944 Power to Review
        30k946 k. Abuse of Discretion. Most
Cited Cases
For appellate purposes, an abuse of discretion
occurs when a court bases its decision on an
erroneous conclusion of law or where there is no
rational basis in evidence for the ruling.

**[3] Appeal and Error 30 ⬅️949**

30 Appeal and Error
  30XVI Review
    30XVI(H) Discretion of Lower Court
      30k949 k. Allowance of Remedy and
Matters of Procedure in General. Most Cited Cases
If the record does not demonstrate that the
requisites for class action have been met, the trial
court abuses its discretion in certifying the class. 12
Okl.St.Ann. § 2023.

**[4] Parties 287 ⬅️35.33**

287 Parties
  287III Representative and Class Actions
    287III(B) Proceedings
      287k35.33 k. Evidence; Pleadings and
Supplementary Material. Most Cited Cases

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- P.3d ----, 2006 WL 1073067 (Okla.), 2006 OK 24
**(Cite as: --- P.3d ----)**

The party who seeks certification has the burden of proving each of the requisite elements for class action.

**[5] Appeal and Error 30 ⬅️913**

30 Appeal and Error
  30XVI Review
    30XVI(G) Presumptions
      30k913 k. Parties. Most Cited Cases
In reviewing the propriety of certification of a class, the appellate court takes as true all uncontroverted allegations in the instruments in the record and the undenied statements of counsel in the briefs.

**[6] Parties 287 ⬅️35.31**

287 Parties
  287III Representative and Class Actions
    287III(B) Proceedings
      287k35.31 k. In General; Certification in General. Most Cited Cases

**Parties 287 ⬅️35.35**

287 Parties
  287III Representative and Class Actions
    287III(B) Proceedings
      287k35.35 k. Hearing and Determination. Most Cited Cases
A trial court is allowed flexibility and discretion to modify, or even set aside, its order of certification if later developments demonstrate a need to do so.

**[7] Appeal and Error 30 ⬅️1024.1**

30 Appeal and Error
  30XVI Review
    30XVI(I) Questions of Fact, Verdicts, and Findings
      30XVI(I)6 Questions of Fact on Motions or Other Interlocutory or Special Proceedings
        30k1024.1 k. In General. Most Cited Cases
To resolve whether the prerequisites for class certification are met, an appellate court need not reach the merits of the claim; however, determining whether the trial court applied the correct legal standards when it assessed the statutory requirements for class certification necessitates identification and review of the core liability issues asserted by the class. 12 Okl.St.Ann. § 2023.

**[8] Parties 287 ⬅️35.37**

287 Parties
  287III Representative and Class Actions
    287III(B) Proceedings
      287k35.37 k. Consideration of Merits. Most Cited Cases
Inquiry into the merits of the action is inappropriate when the court is deciding whether a class should be certified.

**[9] Contracts 95 ⬅️144**

95 Contracts
  95II Construction and Operation
    95II(A) General Rules of Construction
      95k144 k. What Law Governs. Most Cited Cases
The choice of law rule applicable in contract actions in Oklahoma is lex loci contractus, which is that unless the contract terms provide otherwise, the nature, validity, and interpretation of a contract are governed by the law where the contract was made.

**[10] Parties 287 ⬅️35.71**

287 Parties
  287III Representative and Class Actions
    287III(C) Particular Classes Represented
      287k35.71 k. Consumers, Purchasers, Borrowers, or Debtors. Most Cited Cases
Common questions of law and fact on consumer's breach of contract claim against national car repair company did not exist, as required for class certification, even though shop supply fee was charged in each location regardless of whether shop supplies were actually used pursuant to corporate policy, given contract law in each of the 37 states in which class members were located had to be considered, and claim required that each individual transaction be analyzed to determine if the material terms of each contract differed. 12 Okl.St.Ann. § 2023(B)(3).

**[11] Implied and Constructive Contracts 205H**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- P.3d ----                                                                Page 3

--- P.3d ----, 2006 WL 1073067 (Okla.), 2006 OK 24
**(Cite as: --- P.3d ----)**

☞3

205H Implied and Constructive Contracts
   205HI Nature and Grounds of Obligation
      205HI(A) In General
         205Hk2 Constructive or Quasi Contracts
            205Hk3 k. Unjust Enrichment. Most Cited Cases
"Unjust enrichment" is a condition which results from the failure of a party to make restitution in circumstances where it is inequitable; that is, the party has money in its hands that, in equity and good conscience, it should not be allowed to retain.

**[12] Implied and Constructive Contracts 205H ☞3**

205H Implied and Constructive Contracts
   205HI Nature and Grounds of Obligation
      205HI(A) In General
         205Hk2 Constructive or Quasi Contracts
            205Hk3 k. Unjust Enrichment. Most Cited Cases
Where the plaintiff has an adequate remedy at law, the court will not ordinarily exercise its equitable jurisdiction to grant relief for unjust enrichment.

**[13] Parties 287 ☞35.71**

287 Parties
   287III Representative and Class Actions
      287III(C) Particular Classes Represented
         287k35.71 k. Consumers, Purchasers, Borrowers, or Debtors. Most Cited Cases
Common issues of law and fact did not predominate in class action on claim that national car repair company service centers were unjustly enriched by charging a shop supply fee regardless of whether any shop supplies were actually used, given that law of each state where services were rendered and consumers were required to pay the fee applied, there were state differences regarding misconduct, availability of an adequate remedy at law, and effect of express contract governing the transaction, and each transaction required analysis of the services provided, amount of shop supply fee, supplies actually used, and whether consumer agreed to pay the fee. 12 Okl.St.Ann. § 2023(B)(3).

**[14] Parties 287 ☞35.71**

287 Parties
   287III Representative and Class Actions
      287III(C) Particular Classes Represented
         287k35.71 k. Consumers, Purchasers, Borrowers, or Debtors. Most Cited Cases
Consumers' claim that national car repair company, with headquarters in Ohio, violated the Ohio Consumer Sales Practices Act by having its service centers charge a shop supply fee regardless of whether shop supplies were actually used, was inappropriate for national class action, given that the Act only imposed liability for deceptive, unfair, or unconscionable sales that actually took place in the state, even though the policy to charge the fee originated at corporate headquarters, where the alleged deceptive sales took place at each individual service center. R.C. § 1345.01 et seq.

**[15] Parties 287 ☞35.17**

287 Parties
   287III Representative and Class Actions
      287III(A) In General
         287k35.17 k. Community of Interest; Commonality. Most Cited Cases
Certification of a class is improper if the merits of the claim turn on the defendant's individual dealings with each plaintiff. 12 Okl.St.Ann. § 2023(B).

**[16] Declaratory Judgment 118A ☞305**

118A Declaratory Judgment
   118AIII Proceedings
      118AIII(C) Parties
         118Ak305 k. Representative or Class Actions. Most Cited Cases

**Parties 287 ☞35.17**

287 Parties
   287III Representative and Class Actions
      287III(A) In General
         287k35.17 k. Community of Interest; Commonality. Most Cited Cases
Certification of a class is generally reserved for cases in which broad, class-wide injunctive or declaratory relief is necessary to address a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- P.3d ----                                                                 Page 4

--- P.3d ----, 2006 WL 1073067 (Okla.), 2006 OK 24
**(Cite as: --- P.3d ----)**

group-wide injury such as in discrimination or civil rights suits, even though some damages may also be awarded. 12 Okl.St.Ann. § 2023(B).

Certification of a class is generally reserved for cases in which broad, class-wide injunctive or declaratory relief is necessary to address a group-wide injury such as in discrimination or civil rights suits, even though some damages may also be awarded. 12 Okl.St.Ann. § 2023(B).

**[17] Declaratory Judgment 118A ☜305**

118A Declaratory Judgment
   118AIII Proceedings
      118AIII(C) Parties
         118Ak305 k. Representative or Class Actions. Most Cited Cases

**Parties 287 ☜35.71**

287 Parties
   287III Representative and Class Actions
      287III(C) Particular Classes Represented
         287k35.71 k. Consumers, Purchasers, Borrowers, or Debtors. Most Cited Cases

The crux of consumer's class action against national car repair company was for monetary damages for charging a shop supply fee regardless of whether shop supplies were actually used, rather than for broad injunctive or declaratory relief, as required for class certification, where trial court would be required to examine each individual claim to compare fee to supplies actually used in order to determine appropriate monetary damages. 12 Okl.St.Ann. § 2023(B)(2).

The crux of consumer's class action against national car repair company was for monetary damages for charging a shop supply fee regardless of whether shop supplies were actually used, rather than for broad injunctive or declaratory relief, as required for class certification, where trial court would be required to examine each individual claim to compare fee to supplies actually used in order to determine appropriate monetary damages. 12 Okl.St.Ann. § 2023(B)(2).

¶ 0 In July of 2004, Lori Harvell brought her car in for service at a Goodyear Auto Service Center in Tulsa, Oklahoma. After performing a diagnostic check, the service center presented Harvell with an invoice which included a charge for shop supplies. Although Harvell disputed the necessity of the charge, she paid the fee in order to retrieve her car. On August 26, 2004, Harvell filed a class action lawsuit against the Goodyear Tire & Rubber Company, seeking certification of a national class action of consumers who had paid Goodyear a shop supply fee regardless of whether shop supplies were used. The trial court, Honorable John C. Garrett, certified the class and Goodyear appealed. We retained the cause and hold that the trial court abused its discretion in certifying the class.

**TRIAL COURT REVERSED; CAUSE REMANDED.**

Harry Scoufos, Thomas W. Condit, Sallisaw, OK, for Appellee.
P. Jefferson Ballew, Adrienne E. Dominguez, Dallas, TX, William K. Orendorff, Sallisaw, OK, for Appellant.
KAUGER, J.

*1 ¶ 1 The only issue presented [FN1] is whether the trial court abused its discretion in certifying a class pursuant to 12 O.S.2001 § 2023. [FN2] We hold that it did.

**FACTS**

¶ 2 On July 28, 2004, the plaintiff/appellee, Lori Harvell (Harvell/customer) noticed that the check engine light in her car was on. After spotting a Goodyear Auto Service Center (service center) a few blocks away, she pulled into the service center to get her car checked. After performing a diagnostic check on the vehicle, the service center recommended that she replace the spark plugs and told her that her brakes were worn. Rather than have the spark plugs or the brakes replaced at that time, she drove home.

¶ 3 The service center presented the customer with two copies of an invoice. One was an estimate invoice, the other was an actual invoice for the services performed. Although an estimate invoice is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- P.3d ----, 2006 WL 1073067 (Okla.), 2006 OK 24
**(Cite as: --- P.3d ----)**

typically given to customers before any work is done, it was not given to Harvell before the service center checked her car. The actual invoice itemized the charges as $36.50 for labor, $0.00 for parts, $2.56 for shop supplies for a total of $39.28 which included $.22 for taxes on the $2.56 shop supply charge. The shop supply charge also appeared on the estimate invoice.[FN3] Both invoices contained an explanation of the shop supply fee at the bottom of the page which provided: "SHOP SUPPLY FEES COVER MISC MATERIALS USED IN SERVICING YOUR VEHICLE THAT DO NOT APPEAR ELSEWHERE ON THIS INVOICE AND FOR PROFIT."

¶ 4 When the customer questioned the cashier about the shop supply fee, she was told not to worry about it, that it was just part of the bill. She asked whether she would get her car back if she failed to pay the $2.56 charge, and was told that she had to pay it. Harvell paid the invoice.

¶ 5 On August 26, 2004, the customer filed a class action lawsuit against the defendant/appellant, the Goodyear Rubber & Tire Company (Goodyear), seeking certification of a national class action of consumers who, in approximately 37 states, had paid Goodyear a shop supply fee since 1998.[FN4] She alleged that Goodyear was illegally charging a shop supply fee based on 7% of the labor charge, regardless of whether shop supplies were used. She asserted claims for breach of contract, unjust enrichment, and a violation of the Ohio Consumer Sales Practices Act (the Ohio Act).[FN5]

¶ 6 A hearing for class certification was held on March 29, 2005. On stipulation of the parties, the trial court admitted deposition testimony, affidavits, and exhibits into evidence. The evidentiary materials show, among other things, that the shop supply fee was initiated [FN6] and tracked from Goodyear's corporate offices in Ohio, but because stores purchased their own supplies, the brand, supplier, and cost of the supplies varied from store to store.

¶ 7 On April 14, 2005, the trial court issued an order granting the customer's motion for class certification. The trial court found that the four

requirements of 12 O.S.2001 § 2023(A): numerosity, commonality, typicality, and representation, were satisfied. It also determined that two of the requirements of § 2023(B) were applicable because there was a predominance of common questions of law or fact, a superiority of class action adjudication, and injunctive relief was appropriate. It also found that Ohio substantive law applied to all three claims.[FN7] Goodyear appealed, and we retained the cause on June 3, 2005. The briefing cycle was completed on October 18, 2005.

### THE TRIAL COURT ABUSED ITS DISCRETION IN CERTIFYING THE CLASS.

**\*2** ¶ 8 Title 12 O.S.2001 § 2023 requires that four prerequisites for class certification under § 2023(A) and one of the three additional requirements contained in § 2023(B) must be met in order to certify a class. [FN8] Subsections 1 through 4 of § 2023(A), respectively, require: 1) numerosity of class members; 2) commonality of questions of law or fact; 3) typicality of claims or defenses of the class representatives with the class; and 4) adequacy of representative parties to protect class interests. Subsection 1 through 3 of § 2023(B) requires either: 1) a risk of inconsistent adjudications by separate actions or substantial impairment of non-parties to protect their interests; 2) appropriateness of final injunctive or declaratory relief; or 3) predominance of common questions of law or fact to class members and superiority of class action adjudication.

[1][2][3] ¶ 9 A trial court's class certification order is reviewed for abuse of discretion.[FN9] An abuse of discretion occurs when a court bases its decision on an erroneous conclusion of law or where there is no rational basis in evidence for the ruling.[FN10] If the record does not demonstrate that the requisites for class action have been met, the trial court has abused it discretion.[FN11]

[4][5][6] ¶ 10 The party who seeks certification has the burden of proving each of the requisite elements for class action.[FN12] We take as true all uncontroverted allegations in the instruments in the record and the undenied statements of counsel in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- P.3d ----                                                                          Page 6

--- P.3d ----, 2006 WL 1073067 (Okla.), 2006 OK 24
**(Cite as: --- P.3d ----)**

the briefs.[FN13] A trial court is allowed flexibility and discretion to modify, or even set aside, its order of certification if later developments demonstrate a need to do so.[FN14] Consequently, in the face of a close question as to certification, the Court has held that the pragmatic action is to sustain certification. [FN15]

[7][8] ¶ 11 To resolve whether the prerequisites for class-certification are met, we need not reach the merits of the claim.[FN16] Nevertheless, determining whether the trial court applied the correct legal standards when it assessed § 2023's requirements for class certification necessitates identification and review of the core liability issues asserted by the class. [FN17]

¶ 12 The customer argues that because she proved that the four elements required pursuant to 12 O.S. § 2023(A) [numerosity, commonality, typicality, and representation] and that two of the three standards of § 2023(B) [the appropriateness of injunctive or declaratory relief or predominance of common questions of law or fact and the superiority of class action adjudication] were met, the trial court's certification order must be affirmed. The primary focus of Goodyear's challenge to the trial court's certification is that certification must fail because Harvell did not satisfy the requirements of either appropriateness of injunctive or declaratory relief or predominance of common questions of law or fact over questions affecting only individual members. Goodyear also argues that Ohio law is inapplicable to the claims. We agree with Goodyear's challenges.

*3 ¶ 13 A factor weighing heavily in this case is the geographic dispersion of the class members and the consequent, potential applicability of the law of multiple jurisdictions. This factor is important because we have previously held that where the substantive law of multiple jurisdictions may apply, common issues of law or fact generally do not predominate as required by 12 O.S.2001 § 2023(B)(3) [FN18] and class certification should be defeated. [FN19]

### i. Breach of Contract Claim

[9] ¶ 14 The trial court analyzed the applicability of the law of multiple jurisdictions in terms of the most significant relationship test of the Restatement (Second) Conflicts of Law §§ 6 and 188 (1971). [FN20] However, in Oklahoma,[FN21] the established choice of law rule in contract actions known as *lex loci contractus* is that, unless the contract terms provide otherwise, the nature, validity, and interpretation of a contract are governed by the law where the contract was made.[FN22] Although variations from this rule have been applied in the unique context of motor vehicle insurance policies with contract terms contrary to law or the public policy of the state where enforcement is sought, [FN23] and contracts involving the sale of goods under the Uniform Commercial Code [FN24]-neither of the exceptions are involved here.[FN25]

[10] ¶ 15 The place of performance of any alleged contract for each person charged a supply fee for the service of vehicles is the state in which the vehicle was serviced.[FN26] Consequently, the law of each of the 37 states involved governs the breach of contract claims. While the elements for breach of contract may be substantially similar in each state, the trial court would be required to apply each state's contracts regime, including applicable defenses and divergent statutes of limitation.[FN27]

¶ 16 Goodyear's standard procedure requires that each customer receive and sign an estimate, notifying each customer that some or all of the shop supply fee is for profit. The customer ordinarily signs the estimate before any work is done. Apparently, Harvell is not the typical customer because she alleges that she was not given an estimate until after the work was completed. The existence of a contract and a determination of what the material terms of the contract were differ with each class member's interaction with each service center. These individualized determinations, coupled with the application of the law of 37 states, precludes a finding of predominance and defeats the purpose of certifying a class. The trial court would be overwhelmed with the burden of an unmanageable class.[FN28] Consequently, trial court abused its discretion in certifying the breach of contract claim.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- P.3d ----                                                                                    Page 7

--- P.3d ----, 2006 WL 1073067 (Okla.), 2006 OK 24
**(Cite as: --- P.3d ----)**

### ii. Unjust Enrichment Claim

¶ 17 To determine which state's law governs, Harvell argues that the most significant relationship test of Restatement (Second) of Conflicts § 148 (1971),[FN29] which we have previously applied to fraud/false representations and misrepresentation claims,[FN30] also applies to the unjust enrichment claims. She insists that because Ohio has the most significant relationship to the transactions of all of the class members, Ohio law clearly controls.[FN31] Goodyear contends that this cause is governed by the law of each state in which a service was performed.[FN32]

**\*4** [11][12] ¶ 18 Unjust enrichment is a condition which results from the failure of a party to make restitution in circumstances where it is inequitable; i.e. the party has money in its hands that, in equity and good conscience, it should not be allowed to retain.[FN33] Where the plaintiff has an adequate remedy at law, the court will not ordinarily exercise its equitable jurisdiction to grant relief for unjust enrichment.[FN34]

[13] ¶ 19 In the present case, regardless of whether we apply a significant relationship analysis or whether the principle of *lex loci contractus,* the result is the same. Any representations upon which a customer relied and any enrichment received occurred in the state where the services were rendered. The unjust enrichment sought by Harvell is an equitable remedy aimed at recovering unspecified amounts of money which Goodyear received, unrelated to the actual shop supplies used.

¶ 20 Any enrichment related to the services rendered by Goodyear occurred in the state in which the alleged contract for service was signed and performed. Therefore, the law of each state where the services were rendered governs any claim for unjust enrichment. The elements of unjust enrichment claims differ markedly from state to state.[FN35] In addition to the differences in these basic criteria, state considerations of such claims differ over issues of misconduct,[FN36] availability of adequate remedies at law,[FN37] and the effect of the existence of an express contract governing the transaction.[FN38]

¶ 21 Additionally, for each class member, a decision as to whether unjust enrichment is applicable will depend heavily on the services rendered, the amount of supply fee charged, the supplies used (if any), the cost of the shop supplies, and whether a customer agreed to pay the cost, even if it might have been purely for profit. The success of a claim for unjust enrichment depends on the particular facts and circumstances of each case and hinges on whether a customer actually received few or no miscellaneous supplies. These factual particularities make class certification imprudent because the claims and defenses of each class member involve a specific finding of cost, profit, and equitable unfairness which necessarily requires individualized findings of fact for each member of the class. For all of these reasons, there is a lack of predominance of common legal and factual issues and the trial court abused its discretion in certifying the claim for unjust enrichment which fails to meet the statutory requirement of predominance under 12 O.S.2001 § 2023(B)(3).[FN39]

### iii. Ohio Consumer Sales Practices Act Claims

[14] ¶ 22 The consumer alleges that Goodyear violated the Ohio Consumer Sales Practices Act (the Act).[FN40] Goodyear argues that the trial court erred in certifying a class action based on the alleged violation of the Act because the Act is inapplicable to the class.

¶ 23 The Act generally prohibits unfair, unconscionable, and deceptive sales.[FN41] Section 1345.04 of the Act imposes liability only when an offending act or practice takes place within the state of Ohio.[FN42] Courts have generally determined that the focus of the inquiry concerning application of such an Act to out-of-state consumers is whether the offending consumer transaction occurred with the state.[FN43]

**\*5** ¶ 24 While Goodyear may have developed the shop supply fees from its corporate offices in Ohio, in our view any unfair, deceptive or unconscionable conduct toward a consumer occurred where the transaction occurred-when a customer brought an automobile in for service to a service center and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- P.3d ----                                                                                                    Page 8

--- P.3d ----, 2006 WL 1073067 (Okla.), 2006 OK 24
**(Cite as: --- P.3d ----)**

was charged a shop supply fee. Accordingly, the Ohio Act is inapplicable to transactions occurring in states other than Ohio.

### iv. Appropriateness of Final Injunctive or Declaratory Relief.

¶ 25 In addition to finding predominance, the trial court determined that the class should be certified under 12 O.S. § 2023(B)(2). Section (B)(2) allows certification when the class representative can show that the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the class as a whole.[FN44] Under this section, the customer argues that injunctive or declaratory relief is an appropriate basis for certifying the class. Goodyear insists that because all of the asserted claims seek predominately monetary damages, subsection (B)(2) is inapplicable.

¶ 26 We have not previously addressed a class certification under § 2023(B)(2). However, Oklahoma's class action scheme closely parallels Rule 23, of the Federal Rules of Civil Procedure and we find it illustrative. [FN45] Under Rule 23(b)(2) of the Federal Rules of Civil Procedure [FN46] the injunctive or declaratory relief must be the primary remedy requested for class members, [FN47] and the defendant's behavior must be generally applicable to the class as a whole.[FN48] The award of some monetary damages is not precluded by the requirement, provided that monetary relief is secondary or incidental to the primary injunctive or declaratory relief sought.[FN49]

[15][16] ¶ 27 To determine certification under subsection (2), the court considers not merely the relief sought by the plaintiffs, but whether the crux of the action is for monetary damages.[FN50] Certification is improper if the merits of the claim turn on the defendant's individual dealings with each plaintiff.[FN51] Certification is generally reserved for cases in which broad, class-wide injunctive or declaratory relief is necessary to address a group-wide injury such as in discrimination or civil rights suits, even though

some damages may also be awarded.[FN52]

[17] ¶ 28 The present action is not similar to those types of actions. Even though Harvell also seeks an injunction against the continued practice of charging the fees, the crux of her class action is compensation sought for the allegedly fraudulently charged shop supply fees.[FN53] This case focuses squarely on a claim for compensatory money damages. A determination of the damages would require individualized determinations for each class member of the fees charged compared with the services rendered, to determine whether the fees did in fact correlate to the supplies used. Accordingly, certification pursuant to § 2023(B)(2) is also an abuse of discretion.

### CONCLUSION

**\*6** ¶ 29 A trial court's class certification order is reviewed for abuse of discretion.[FN54] An abuse of discretion occurs when a court bases its decision on an erroneous conclusion of law or where there is no rational basis in evidence for the ruling.[FN55] If the record does not demonstrate that the requisites for class action have been met, the trial court has abused its discretion.[FN56]

¶ 30 The trial court certified a class action on a common law breach of contract claim, a common law claim of unjust enrichment and a violation of the Ohio Consumer Sales Practices Act, finding that the requirements of numerosity, commonality, typicality, and representation as well as two alternative requirements of appropriateness of injunctive or declaratory relief or predominance of common questions of law or fact and superiority of class action adjudication had been met. We have determined that neither of the predominance requirements or the alternative requirements of appropriateness of injunctive or declaratory relief were satisfied and that the Ohio Act is inapplicable. Accordingly, the trial court abused its discretion in certifying the class action.

**TRIAL COURT REVERSED; CAUSE REMANDED.**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- P.3d ----, 2006 WL 1073067 (Okla.), 2006 OK 24
**(Cite as: --- P.3d ----)**

ALL JUSTICES CONCUR.

FN1. On October 7, 2005, the Court entered an order directing the appellant, the Goodyear Tire and Rubber Company, to show why the appendix to its brief in chief filed on October 6, 2005, should not be stricken in violation of Oklahoma Supreme Court Rule 1.11, 12 O.S.2001 Ch. 15, App. 1. which provides in pertinent part:

"... An Appendix to a brief may be filed as an attachment to the brief or as a separate document. An Appendix to a brief on appeal may only include: (1) a copy of the decision from which the appeal is taken; (2) copies of authorities not contained in the National Reporter System; (3) copies of statutes or rules not promulgated in Oklahoma; ..."

On October 18, 2005, the Court deferred consideration of the issue to the decisional stage. Because the appendix contains copies of authorities not contained in the National Reporter System and copies of statutes or rules not promulgated in Oklahoma, it is in compliance with the rule and will not be stricken.

FN2. Title 12 O.S.2001 § 2023 provides in pertinent part:

"A. PREREQUISITES TO A CLASS ACTION.

One or more members of a class may sue or be sued as representative parties on behalf of all only if:

1. The class is so numerous that joinder of all members is impracticable;

2. There are questions of law or fact common to the class;

3. The claims or defenses of the representative parties are typical of the claims or defenses of the class; and

4. The representative parties will fairly and adequately protect the interests of the class.

B. CLASS ACTIONS MAINTAINABLE.

An action may be maintained as a class action if the prerequisites of subsection A are satisfied and in addition:

1. The prosecution of separate actions by or against individual members of the class would create a risk of:

a. inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

b. adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

2. The party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

3. The court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include:

a. the interest of members of the class in individually controlling the prosecution or defense of separate actions,

b. the extent and nature of any litigation concerning the controversy already commenced by or against members of the class,

c. the desirability or undesirability of concentrating the litigation of the claims in the particular forum, and

d. the difficulties likely to be encountered in the management of a class action...."

FN3. According to Goodyear, the shop supplies include such things as floor covers, seat and steering wheel covers, rags, small amounts of brake cleaner or fluid, and lubricating grease and other solutions which are immeasurable as a per-vehicle cost.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN4. Excluded from the class were transactions occurring in New York, California and Washington, D.C.

FN5. Ohio Rev.Code Ann. § 1345.01 et seq.

FN6. Goodyear initially instituted the shop fee as 2% of the costs for parts and labor with a maximum charge of $2.00 and over time has increased the fee to 7% with a maximum charge of $20.00.

FN7. Title 12 O.S.2001 § 2023, see note 2, supra.

FN8. *Id. Fent v. Oklahoma Natural Gas Co.,* 2001 OK 35, ¶ 12, 27 P.3d 477; *Black Hawk Oil Co. v. Exxon Corp.,* 1998 OK 70, ¶ 12, 969 P.2d 337.

FN9. *Ysbrand v. DaimlerChrysler Corp.,* 2003 OK 17, ¶ 5, 81 P.3d 618 *cert. denied DaimlerChrysler Corp. v. Ysbrand,* 542 U.S. 937, 124 S.Ct. 2907, 159 L.E.2d 812 (2004); *Scoufos v. State Farm Fire & Cas. Co.,* 2001 OK 113, ¶ 1, 41 P.3d 366; *Black Hawk Oil Co., v. Exxon Corp.,* see note 8, supra at ¶ 10; *Shores v. First City Bank Corp.,* 1984 OK 67, ¶ 4, 689 P.2d 299.

FN10. *Fent v. Oklahoma Natural Gas Co.,* see note 8, supra; *KMC Leasing, Inc. v. Rockwell-Standard Corp.,* 2000 OK 51, ¶ 9, 9 P.3d 683.

FN11. *Ysbrand v. Daimlerchrysler Corp.,* see note 9, supra.

FN12. *KMC Leasing, Inc. v. Rockwell-Standard Corp,* see note 10, supra.

FN13. *Fent v. Oklahoma Natural Gas Co.,* see note 8, supra at ¶ 13; *Shores v. First City Bank Corp.,* see note 9, supra at ¶ 6; *Mattoon v. City of Norman,* 1981 OK 92, ¶ 11, 633 P.2d 735.

FN14. Title 12 O.S.2001 § 2023(C)(1) provides:
"As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained. An order under this subsection may be conditional, and may be altered or amended before the decision on the merits."

FN15. *Black Hawk Oil Co. v. Exxon Corp.,* see note 8, supra; *Perry v. Meek,* 1980 OK 151, ¶ 19, 618 P.2d 934.

FN16. Inquiry into the merits of the action is inappropriate when the court is deciding whether a class should be certified. *Black Hawk Oil Co.,* see note 8, supra at ¶ 18.

FN17. See, *Scoufos v. State Farm Fire & Cas. Co.,* note 9, supra; *KMC Leasing, Inc. v. Rockwell-Standard Corp.,* note 10, supra.

FN18. Title 12 O.S.2001 § 2023(B), see note 2, supra.

FN19. *KMC Leasing, Inc. v. Rockwell-Standard Corp.,* see note 10, supra at ¶ 20. See also, *Ysbrand v. DaimlerChrysler Corp,* note 9, supra [Analyzing choice of law issues to determine common issue of law.].

FN20. The Restatement (Second) Conflict of Laws § 6 (1971) provides:
"(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include
(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum,
(c) the relevant policies of the other interested states and the relative interests of those states in the determination of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- P.3d ----, 2006 WL 1073067 (Okla.), 2006 OK 24
**(Cite as: --- P.3d ----)**

particular issue,
(d) the protection of justified expectations,
(e) the basic policies underlying the particular field of law,
(f) certainty, predictability and uniformity of result, and
(g) ease in the determination and application of the established choice of law rule for the more modern 'significant relationship' test."
The Restatement (Second) Conflict of Laws § 188 (1971) provides in pertinent part:
"(1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles state in § 6.
(2) In the absence of an effective choice of law by the parties, the contracts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
(a) the place of contracting,
(b) the place of negotiation of the contract,
(c) the place of performance,
(d) the location of the subject matter of the contract, and
(e) the domicile, residence, nationality, place of incorporation and place of business of the parties. These contracts are to be evaluated according to their relative importance with respect to the particular issue.
(3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided in §§ 189-99 and 203."

FN21. This suit was brought in Oklahoma; therefore, Oklahoma choice of law principles must be applied. *Ysbrand v. DaimlerChrysler Corp.,* see note 9, supra at ¶ 11. *See also, In re Bridgestone/Firestone, Inc.,* 288 F.3d 1012, 1015 (7th Cir.2002) *cert. denied*

*Gustafson v. Bridgestone/Firestone, Inc.,* 537 U.S. 1105, 123 S.Ct. 870, 154 L.Ed.2d 774 (2003)[Because plaintiffs' claims rest on state law, the choice-of-law rules come from the state in which the federal court sits.].

FN22. *Bohannan v. Allstate Ins. Co.,* 1991 OK 64, ¶ 30, 820 P.2d 787; *Telex Corp. v. Hamilton,* 1978 OK 32, ¶ 8, 576 P.2d 767; *Paclawski v. Bristol Laboratories, Inc.,* 1967 OK 21, ¶ 5, 425 P.2d 452; *Aetna Cas. & Sur. Co. of Hartford, Conn. v. Gentry,* 1942 OK 366, ¶ 32, 132 P.2d 326; *Clark v. First National Bank of Marseilles,* 1916 OK 404, ¶ ----, 157 P. 96. Title 15 O.S.2001 § 162 provides:
"A contract is to be interpreted according to the law and usage of the place where it is to be performed, or, if it does not indicate a place of performance, according to the law and usage of the place where it is made."

FN23. *Bohannan v. Allstate Ins. Co.,* see note 22, supra [The choice of law rule for motor vehicle insurance cases which involve conflicting state law is that the law of the state in which the contract was made applies unless those provisions are contrary to the public policy of Oklahoma, or unless the facts demonstrate that another jurisdiction has the most significant relationship with the subject matter of the parties.].

FN24. *Ysbrand v. DaimlerChrysler Corp.,* see note 9, supra at ¶¶ 12-13.

FN25. When a transaction relates primarily to services, an incidental sale of merchandise does not make it a contract for the sale of goods governed by the Uniform Commercial Code. 12A. O.S.2001 § 2-102 [Recognizing application to transactions in goods.]. Other states apply a predominance or dominance test to determine whether the transaction is primarily for services or the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

sale of goods to determine the applicability of the Uniform Commercial Code. See, for example, *Tarrant County Hosp. Dist. v. GE Automotive Services, Inc.,* 156 S.W.3d 885, 892 (Tex.App.2005); *Lohman v. Wagner,* 160 Md.App. 122, 862 A.2d 1042, 1046 (2004); *Hensley v. Ray's Motor Co.,* 158 N.C.App. 261, 580 S.E.2d 721, 724 (2003); *Heart of Texas Dodge, Inc. v. Star Coach,* 255 Ga.App. 801, 567 S.E.2d 61 (2002). Here, the predominate purpose of the customer's alleged contract with the service center was for repair of her vehicle a provision of services, rather than sale of goods. See also, *McCool v. Hoover Equipment Co.,* 1966 OK 95, ¶ 9, 415 P.2d 954 [Where service predominates, contract is for work or labor and materials and not sales.].

FN26. Even if we were to apply a significant relationship test and weigh through the factors of the Restatement (Second) of Conflicts §§ 6 and 188, see note 20, supra, we are not convinced that Ohio has more significant relationship between the contracting parties than the state where the services were performed and the contract was allegedly formed and breached.

FN27. *See* Miss.Code Ann. § 15-1-49(1) [Default three year statute of limitations for all unprescribed offenses, including breach of contract.]; Tex. Civ. Prac. & Rem.Code Ann. § 16.051 [Four year statute of limitations for breach of contract.]; 12 O.S.2001 § 95(a) [Five year limitation for written contracts; three year limitation for express or implied oral contracts.]; Ga.Code Ann. § 9-3-24 [Six year statute of limitations for written contracts.]; Mont.Code Ann. § 27-2-202 [Eight year statute of limitations for written contracts; three year statute of limitations for oral contracts.] Iowa Code Ann. § 614.1(5)[Ten year statute of limitations for written contracts.].

FN28. Title 12 O.S.2001 § 2023(B)(3), see note 2, supra; *Ysbrand v. DaimlerChrysler Corp.,* see note 9, supra. See generally, *KMC Leasing, Inc. v. Rockwell-Standard Corp.,* note 10, supra.

FN29. The Restatement (Second) Conflict of Law § 148 (1971) provides:
"(1) When the plaintiff has suffered pecuniary harm on account of his reliance on the defendant's false representations and when the plaintiff's action in reliance took place in the state where the false representations were made and received, the local law of this state determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.
(2) When the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made, the forum will consider such of the following contacts, among others, as may be present in the particular case in determining the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties:
(a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,
(b) the place where the plaintiff received the representations,
(c) the place where the defendant made the representations,
(d) the domicile, residence, nationality, place of incorporation and place of business of the parties,
(e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and
(f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- P.3d ----, 2006 WL 1073067 (Okla.), 2006 OK 24
**(Cite as: --- P.3d ----)**

See also § 221 of the Restatement (Second) Conflicts of Law (1971), which according to the comments, applies to unjust enrichment claims which are based neither on contract nor on tort. Neither party argues it applies to the present cause.

FN30. *Ysbrand v. DaimlerChrysler Corp.,* see note 9, supra.

FN31. Harvell contends that Ohio law should govern the unjust enrichment claims for the same reason that she argues the breach of contracts claims should be governed by Ohio law-because Ohio has the most significant relationship. Even if we were to apply a significant relationship test and weigh through the factors of the Restatement (Second) of Conflicts §§ 148 or 221, see note 29, supra, the only connection Ohio has is that: 1) Goodyear is headquartered in Ohio; 2) the decision to charge the fee in question originated in Ohio; 3) the computer system for each store stems in Ohio; and 4) part or all of the fee was ultimately transmitted to Ohio. We are not convinced that these factors are enough to point away from the law of the state where the service was provided.

FN32. Neither party relies on the Restatement (First) of Conflicts of Law § 453 (1934) which provides: "When a person is alleged to have been unjustly enriched, the law of the place of enrichment determines whether he is under a duty to repay the amount by which he has been enriched."

FN33. *French Energy, Inc. v. Alexander,* 1991 OK 106, ¶ 11, 818 P.2d 1234. One is not unjustly enriched, however, by retaining benefits involuntarily acquired which law and equity give him absolutely without any obligation on his part to make restitution. *McBride v. Bridges,* 1950 OK 25, ¶ 8, 215 P.2d 830.

FN34. *Robertson v. Maney,* 1946 OK 59,

¶ 7, 166 P.2d 106.

FN35. *Ray Reilly's Tire Mart, Inc. v. F.P. Elnicki, Inc.,* 149 Vt. 37, 537 A.2d 994, 995 (1987) and *Bouchard v. Price,* 694 A.2d 670, 673 (R.I.1997) [Requiring inequitable retention of a benefit]; *Lectrodryer v. Seoulbank,* 91 Cal.Rptr.2d 881, 77 Cal.App.4th 723, 726 (2000) [Requiring the unjust retention of a benefit at the expense of another.]; *Amoco Production Co., v. EM Nominee Partnership Co.,* 2 P.3d 534, 541-42 (Wyo.2000) [Requiring constructive notice of intent to be paid.].

FN36. *DCB Construction Co., Inc. v. Central City Development Co.,* 965 P.2d 115, 119 (Colo.1998) [Holding that unjust enrichment requires a showing of improper, deceitful, or misleading conduct]; *Schock v. Nash,* 732 A.2d 217, 232 (Del.1999) [Allowing for restitution, even when defendant is not a wrongdoer.]; *Anderson v. DeLisle,* 352 N.W.2d 794, 796 (Minn.App.1984)[Unjust enrichment claim allowable in situations where enrichment was morally wrong.].

FN37. *Community Guardian Bank v. Hamlin,* 182 Ariz. 627, 898 P.2d 1005,1008 (Ariz.App.1995)[Holding that unjust enrichment requires absence of a remedy provided by law.]; *Independent Voters of Illinois v. Illinois Commerce Com'n,* 117 Ill.2d 90, 109 Ill.Dec. 782, 510 N.E.2d 850, 854 (1987)[Holding that restitution predicated on unjust enrichment "usually" requires that no adequate legal remedy exist.]; *Williams v. Bear Stearns & Co.,* 725 So.2d 397, 400 (Fla.App.1998) [An available legal remedy is not sufficient to bar restitution claims.].

FN38. *Adelman v. Christy,* 90 F.Supp.2d 1034, 1045 (D.Ariz.2000) [The existence of contract governing the dispute is not sufficient to invalidate an unjust enrichment theory of recovery.]; *Williams*

*v. Bear Stearns & Co.,* see note 37, supra [Unjust enrichment claim fails if an express contract already exists.]; *Mitford v. de Lasala,* 666 P.2d 1000, 1006, n. 1 (Alaska 1983) [Unjust enrichment is precluded by the existence of an actual contract.]; *Cole v. Benavides,* 481 F.2d 559, 561 (5th Cir.1973) [Proof of an express contract covering the services precludes relief in unjust enrichment.]; *Lemoge v. County of San Mateo,* 46 Cal.2d 659, 664, 297 P.2d 638 (1956)[Formal contract, the meaning of which is understood by both parties, precludes equitable relief.]; *Keneally v. Orgain,* 186 Mont. 1, 606 P.2d 127, 129 (1980) [Plaintiffs may not allege an implied contract while proving an express contract.]; *Polverari v. Peatt,* 29 Conn.App. 191, 614 A.2d 484, 489 (1992) [Awards for unjust enrichment are allowable when not inconsistent with express contracts.].

FN39. Title 12 O.S.2001 § 2023(B)(3), see note 2, supra. At least one court has recognized that because unjust enrichment claims are fact specific to each case, they are unsuitable for class action treatment altogether. *Avis Rent A Car System, Inc., v. Heilman,* 876 So.2d 1111, 1123 (Ala.2003).

FN40. Ohio Rev.Code § 1345.01 *et seq.*

FN41. See generally, Ohio Rev.Code § 1345.01 et seq.

FN42. Ohio Rev.Code § 1345.04 provides: "The court of common pleas, and municipal or county courts within their respective monetary jurisdiction have jurisdiction over any supplier with respect to any act or practice in this state covered by sections 1345.01 to 1345.13 of the Revised Code, or with respect to any claim arising from a consumer transaction subject to such sections."

FN43. *Clark v. TAP Pharmaceutical Products,* 343 Ill.App.3d 538, 278 Ill.Dec. 276, 798 N.E.2d 123, 129 (2003) [Out-of-state consumer may pursue an action for consumer fraud if deceptive acts and practices took place within the state.]; *Oce Printing Systems USA, Inc. v. Mailers Data Services, Inc.,* 760 So.2d 1037, 1042 (Fla.Dist.Ct.App.2000) [Certification of Nationwide class improper because Deceptive and Unfair Trade Act applies to in-state consumers.]; *Delahunt v. Cytodyne Technologies,* 241 F.Supp.2d 827, 839 (S.D.Ohio 2003); *Shorter v. Champion Home Builders Co.,* 776 F.Supp. 333, 338-39 (N.D.Ohio 1991). See also, *Pacamor Bearings, Inc. v. Minebea Co., LTD.,* 918 F.Supp. 491, 504 (D.N.H.1996); *Brown v. Market Dev. Inc.,* 41 Ohio Misc. 57, 322 N.E.2d 367, 369 (1974) noting that irrespective of the locus of the manufacturer or supplier, it is the activity that is determinative. But see, *Steed Realty v. Oveisi,* 823 S.W.2d 195, 198 (Tenn.App.1991) [Consumer Protection Act applies to any consumer as long as defendant transacts business within the state.].

FN44. Title 12 O.S.2001 § 2023(B)(2), see note 2, supra.

FN45. Federal Rules of Civil Procedure, Rule 23(b) provides in pertinent part: "... An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition: ... (2) the party opposing the class has acted or refused to act on the grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or ..." We have previously considered the federal rule when interpreting our similar statute. *Dewey v. State ex rel. Oklahoma Firefighters Pension & Retirement System,* 2001 OK 40, ¶ 18, 28 P.3d 539; *Mattoon*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*v. City of Norman,* see note 13, supra at ¶ 8; *KMC Leasing, Inc. v. Rockwell-Standard Corp.,* see note 10, supra; *Black Hawk Oil Co. v. Exxon Corp.,* see note 8, supra at ¶ 11; *Shores v. First City Bank Corp.,* see note 9, supra at ¶ 5.

FN46. Federal Rules of Civil Procedure, Rule 23(b)(2), see note 45, supra.

FN47. Federal Rules of Civil Procedure, Rule 23(b)(2), see note 45, supra; *In re St. Jude Medical, Inc.,* 425 F.3d 1116, 1121 (8th Cir.2005); *Molski v. Gleich,* 318 F.3d 937, 947 (9th Cir.2003); *Coleman v. General Motors Acceptance,* 296 F.3d 443, 446 (6th Cir.2002); *Stewart v. Abraham,* 275 F.3d 220, 228 (3rd Cir.2001) *cert. denied* 536 U.S. 958, 122 S.Ct. 2661, 153 L.Ed.2d 836 (2002); *In re Mercedes-Benz Antitrust Litigation,* 213 F.R.D. 180, 186 (D.N.J.2003); *United States v. Trucking Employers, Inc.,* 75 F.R.D. 682, 692 (D.D.C.1977). *In re School Asbestos Litigation,* 789 F.2d 996, 1008 (3rd Cir.1986) *cert. denied Celotex v. School Dist. of Lancaster,* 479 U.S. 852, 107 S.Ct. 182, 93 L.Ed.2d 117 (1986) [An action for money damages may not be maintained as a Rule 23(b)(2) class action.].

FN48. Federal Rules of Civil Procedure, Rule 23(b)(2), see note 45, supra; *Bolin v. Sears, Roebuck & Co.,* 231 F.3d 970, 975 (5th Cir.2000); *In re Methyl Tertiary Butyl Ether Products Liability Litigation,* 209 F.R.D. 323, 341 (S.D.N.Y.2002).

FN49. *Cooper v. Southern Co.,* 390 F.3d 695, 720 (11th Cir.2004) *cert. denied* --- U.S. ----, 126 S.Ct. 478, 163 L.Ed.2d 363 (2005); *Molski v. Gleich,* see note 47, supra; *Coleman v. General Motors Acceptance,* see note 47, supra; *In re Mercedes-Benz Antitrust Litigation,* see note 47, supra; *Colorado Cross-Disability Coalition v. Taco Bell Corp.,* 184 F.R.D. 354, 361 (D.Colo.1999); *Heartland*

*Communications, Inc. v. Sprint Corp.,* 161 F.R.D. 111, 117 (D.Kan.1995).

FN50. *Heartland Communications, Inc. v. Sprint Corp.,* see note 49, supra. See, *Molski v. Gleich,* note 47, supra [Focus is on the intent of plaintiffs in bringing the suit.]; *In re Mercedes-Benz Antitrust Litigation,* note 47, supra [Assessing the " realities of the litigation", the focus of the cause was on money damages.]; *In re School Asbestos Litigation* note 47, supra [Despite plaintiff's ingenuity, claims are essentially for damages.].

FN51. *Bolin v. Sears, Roebuck & Co.,* see note 48, supra.

FN52. *Molski v. Gleich,* see note 47, supra; *Robinson v. Metro-North Commuter Railroad Co.,* 267 F.3d 147, 162 (2nd Cir.2001) *cent. denied* 535 U.S. 951, 122 S.Ct. 1349, 152 L.Ed.2d 251 (2002); *Stewart v. Abraham,* see note 47, supra; *In re Methyl Tertiary Butyl Ether Products Liability Litigation,* see note 48, supra; *Kleiner v. First National Bank of Atlanta,* 97 F.R.D. 683, 691 (N.D.Ga.1983); *McCray v. Standard Oil Co.,* 76 F.R.D. 490, 500 (N.D.Ill.1977). See, *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 614, 117 S.Ct. 2231, 2245, 138 L.Ed.2d 689 (1997) [Noting civil rights cases against parties charged with unlawful, class-based discrimination are prime examples of Rule 23(b)(2) certifications.]; *In re St. Jude Medical, Inc.,* see note 48, supra [Recognizing injuries remedied through (b)(2) actions are really group as opposed to individual injuries and class members are generally bound together by a significant common trait such as race or gender.]; *Lemon v. International Union of Operating Engineers,* 216 F.3d 577, 580 (7th Cir.2000) [23(b)(2) operates under the presumption that the interests of the class members are cohesive and homogenous, not individual differences among members.]; *Marcus v. Kansas Dept. of*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- P.3d ----, 2006 WL 1073067 (Okla.), 2006 OK 24
**(Cite as: --- P.3d ----)**

*Revenue,* 206 F.R.D. 509, 514 (D.Kan.2002) [Certification met for class comprised of purchasers of disabled parking cards who alleged Department of Motor Vehicles violated the Americans with Disabilities Act by charging fees.].

FN53. For example, of Harvell's three asserted claims, the only one which even mentions an injunction is the violation of the Ohio Consumer Sales Practices Act, but she also seeks compensatory and statutory damages under it. The customer seeks compensatory damages under the breach of contract theory in an amount equal to the shop supplies fees paid, and refund of the illegal profits and wrongful fees to the class under her unjust enrichment theory. Here, a determination of damages would require individualized determinations of whether the shop fees did in fact correlate to the supplies used. In any class action in which both injunctive and monetary relief are sought, where the determination of damages are inherently and individualized nature, class action status is inappropriate. *Robinson v. Metro-North Commuter Railroad Co.,* see note 52, supra. See, *Bolin v. Sears, Roebuck & Co.,* note 48, supra [Certification is improper if the merits of the claims turn on the defendant's individual dealings with each plaintiff.]; *Hoffman v. Honda of America Mfg., Inc.,* 191 F.R.D. 530, 533 (S.D.Ohio 1999) [Liability for incidental damages should not require additional hearings to resolve the disparate merits of each individual's case, nor should it entail individualized determinations.].

FN54. *Ysbrand v. DaimlerChrysler Corp.,* see note 9, supra; *Scoufos v. State Farm Fire & Cas. Co.,* see note 9, supra; *Black Hawk Oil Co. v. Exxon Corp.,* see note 8, supra; *Shores v. First City Bank Corp.,* see note 9, supra.

FN55. *Fent v. Oklahoma Natural Gas Co.,*

see note 8, supra; *KMC Leasing, Inc., v. Rockwell-Standard Corp.,* see note 10, supra.

FN56. *Ysbrand v. DaimlerChrysler Corp.,* see note 9, supra.

Okla.,2006.
Harvell v. Goodyear Tire & Rubber Co.
--- P.3d ----, 2006 WL 1073067 (Okla.), 2006 OK 24

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT K



Not Reported in F.Supp.2d, 2005 WL 1683605 (W.D.Va.)
**(Cite as: Not Reported in F.Supp.2d)**

---

**H** Only the Westlaw citation is currently available.
United States District Court,W.D. Virginia.
Michael KARNUTH,
v.
RODALE, INC.
**No. Civ.A. 03-742.**

July 18, 2005.

*MEMORANDUM*

DIAMOND, J.

**\*1** David Wisniewski seeks to represent a class of people he claims Defendant Rodale enrolled in an annual book program in violation of federal and state law. Because Wisniewski's predecessor, Michael Karnuth, was an inadequate representative, I denied class certification. Wisniewski now moves for class certification. I grant Wisniewski's motion in part.

BACKGROUND AND PROCEDURAL HISTORY

On February 25, 2003 Karnuth filed his original Complaint, alleging that in 2001 he received two unsolicited books from Defendant. (Compl. at ¶¶ 1, 7-10). In his first motion to certify a class, Karnuth sought to represent "all persons who, without prior consent, received books and other products from Defendant and an invoice for payment for such books and products," as well as a subclass of "all members of the class who paid, in part or whole, the invoices for such books and products for personal, family, or household purposes." (*Id.* at ¶ 15). Discovery revealed that contrary to the allegations in his Complaint, Karnuth apparently had ordered and paid for an " unordered" Rodale publication. The Honorable Franklin Van Antwerpen deferred ruling on certification until the parties could resolve this discrepancy. *See Karnuth v. Rodale, Inc.,* 2003 U.S. Dist. LEXIS 12095, \*8-10 (E.D.Pa.2003); *see also,*

*Karnuth v. Rodale, Inc.,* 2005 U.S. Dist. LEXIS 5241, \*3-4 (E.D.Pa.2005).

Because his Original Complaint included allegations that were, at best, misleading, Karnuth filed an Amended Complaint in which he made materially different allegations, this time acknowledging that he actually ordered and paid for a Rodale publication. (Amended Compl. at ¶¶ 7-8). In light of the significant differences between Karnuth's two versions of events, I concluded that Karnuth's credibility problems "could certainly divert the jury's 'attention from the substance of the basic claim,' and thus harm 'the remaining class members." ' *Karnuth,* 2005 U.S. Dist. LEXIS 5241, \*8 (E. D.Pa.2005) (quoting *Kline v. Wolf,* 88 F.R.D. 696, 700 (E.D.N.Y.1983)). Accordingly, I denied the Class Certification Motion without prejudice. Given counsel's statement that he could easily find another representative without Karnuth's credibility problems, I allowed counsel to substitute a new class representative and to renew the certification motion. (N.T. March 7, 2005 at 45:22-25).

On April 13, 2005, counsel substituted David Wisniewski as the putative class representative. In his initial and amended notices of substitution, Wisniewski alleged that he received an order card that "was materially similar" to that received by Karnuth in 2000. (Notice of Substitution at ¶¶ 2, 4, 5) (Amended Notice of Substitution at ¶¶ 4-7). Wisniewski alleged that he ordered a Rodale publication, subsequently received other publications that he did not order, and was forced to pay for the unordered books to preserve his credit rating. Although Wisniewski's recollection of the sequence of events is imprecise, his allegations are materially similar to those that Karnuth made in his Amended Complaint. Wisniewski charges that Rodale violated the Postal Reorganization Act, Pennsylvania's Unsolicited Merchandise Act, Pennsylvania's Unfair Trade Practices and Consumer Protection Law, and similar provisions in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 1683605 (W.D.Va.)
**(Cite as: Not Reported in F.Supp.2d)**

other states. *See* 39 U.S.C. § 3009; 73 P.S. § 2001; 73 P.S. §§ 201-2 *et seq.* Wisniewski asks me to certify a class of "all persons who are or have been enrolled in Rodale's Annual Programs and received books from Rodale and invoices for payment of such books, within 6 years preceding the filing of Plaintiff's Class Action Complaint." (Amended Compl. at ¶ 36). Wisniewski also asks me to certify a subclass, defined as "all members of the class who paid, in part or whole, the invoices for such books for personal, family or household purposes." (*Id.*)

## LEGAL STANDARDS

**\*2** To certify this matter as a class action, I must conclude that Wisniewski satisfies all the prerequisites of Fed.R.Civ.P. 23(a), and fulfills at least one of the requirements of Rule 23(b). *See Georgine v. Amchem Products, Inc.,* 83 F.3d 610, 624 (3d Cir.1996), *aff'd,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *Nelson v. Astra Merck, Inc.,* No. 1283, 1998 U.S. Dist. LEXIS 16599 (E.D.Pa.1998). The threshold requirements of Rule 23(a) are numerosity, commonality, typicality, and adequacy of representation. Fed. R. Civ. P. 23(a). Wisniewski seeks certification pursuant the Rule 23(b)(3), which requires that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). As the party seeking certification, it is Wisniewski's burden to show that the class should be certified. *See Freedman v. Arista Records,* 137 F.R.D. 225, 227 (E.D.Pa.1991) (citing *Davis v. Romney,* 490 F.2d 1360, 1366 (3d Cir.1974).

In determining whether to certify, I must accept as true all substantive allegations in the Amended Complaint. *See Blacki v.. Barrack,* 524 F.2d 891, 901 n. 17 (9th Cir.1975), *cert. denied,* 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976); *see also Lyon v. Caterpillar, Inc.,* 194 F.R.D. 206, 209 (E.D.Pa.2000); *Steward v. Associates Consumer Discount Co.,* 183 F.R.D. 189, 193 (E.D.Pa.1998). I may look beyond the four corners of the Amended

Complaint for purposes of class certification, but I may not consider "whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits." *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) (internal quotations omitted).

## DISCUSSION

Rodale does not dispute that Wisniewski has met Rule 23(a)'s numerosity requirement. Accordingly, I will determine whether Wisniewski has met his burden respecting the other Rule 23 factors.

### I. Wisniewski's Claims Are Common To All Class Members

A party moving for class certification must show that there are "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The test for commonality is not stringent: a single common issue of law or fact suffices. *Johnston v. HBO Film Management, Inc.,* 265 F.3d 178, 184 (3d Cir.2001) . Here, the factual question of whether a class of Rodale subscribers received unordered books from Rodale is common to all class members, and affects all class members equally. Accordingly, I find that Wisniewski has shown commonality.

### II. Wisniewski's Imprecise Pleadings and Deposition Testimony Do Not Preclude Him From Adequately Representing Absent Class Members

Defendant argues that Wisniewski's credibility issues preclude him from meeting Rule 23's typicality requirement. *See Johnston v. HBO Film Mgmt., Inc.,* 265 F.3d 178, 184 (3d Cir.2001) ("the claims of the class representatives must be typical of the class as a whole."). The typicality requirement applies not just to a representative's claims but also to the defenses that may be raised against those claims. Fed. R. Civ. P. 23(a)(3). Accordingly, as I noted when I denied Karnuth's certification motion, "[c]ourts may deny class certification when the class representative is subject to a unique defense." *Karnuth v. Rodale, Inc.,* No.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 1683605 (W.D.Va.)
**(Cite as: Not Reported in F.Supp.2d)**

03-742, 2005 U.S. Dist. LEXIS 5241, *7-8 (E.D.Pa.2005) (quoting *J.H. Cohn & Co. v. American Appraisal Associates, Inc.,* 628 F.2d 994, 998-99 (7th Cir.1980)).

**\*3** The Amended Complaint is based in part on the allegation that the book order cards Rodale sent to its subscribers did not comply with federal disclosure requirements and so were misleading. (Amended Compl. at ¶¶ 29-32, 45-49). Rodale contends that because Wisniewski has admitted that he did not read the order card Rodale sent to him, he cannot credibly allege that the card was misleading. Wisniewski responds that whether or not subscribers were actually misled is irrelevant: Rodale sent unordered merchandise to its subscribers, thus violating the Federal Trade Commission's Prenotification Negative Option Rule, which Wisniewski contends is enforceable through the Postal Reorganization Act. In Wisniewski's view, that Rule sets forth an objective disclosure standard that Rodale's order cards did not meet. Thus, the focus of Wisniewski's claim is on the cards themselves, not on whether the cards actually misled subscribers. (N.T. June 27, 2005 at 4:4-5:12). Accordingly, Wisniewski contends that his failure to read Rodale's order card does not subject him to any unique credibility defense.

Rodale disputes that the FTC Rule may serve as an enforcement mechanism for the Postal Reorganization Act. (N.T. June 27, 2005 at 9). Rodale notes that there is absolutely no authority holding that "the FTC Negative Option Rule ... impacts" the Postal Reorganization Act. *Id.* Rodale appears to be correct. I can find no authority linking the FTC Rule and the Postal Reorganization Act. Unfortunately for Rodale, however, this argument goes to the merits of Wisniewski's Amended Complaint-something I may not consider at certification. *See Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 166-67 (3d Cir.2001) (A court's consideration of whether class certification is appropriate under Rule 23 is not intended to be an inquiry into the merits of Plaintiff's claims). Should the issue be raised at summary judgment, I will consider it at that time.

For class certification purposes, I must assume that

Wisniewski's contentions are valid. Thus, I conclude that Wisniewski's failure to read the order card does not defeat typicality. *Crosley,* No. SA-00-CA-385-EP, 2001 U.S. Dist. LEXIS 25222, *12; *see also In re Nasdaq Market-Makers Antitrust Litig.,* 169 F.R.D. 493, 510 (S.D.N.Y.1996) (typicality exists where representatives have incentive to prove all elements of the cause of action that would be presented by the class members if those members had initiated their own suits).

### III. Wisniewski Does Not Satisfy The Requirements Of Rule 23(b)(3) For Counts II and III

I must deny class certification as to Counts II and III because Wisniewski does not meet Rule 23's predominance and superiority requirements. Fed. R. Civ. P. 23(b)(3).

In considering predominance, I must determine " whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods. v. Windsor,* 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). The predominance requirement is satisfied if the plaintiff establishes that "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, ... predominate over those issues that are subject only to individualized proof." *Wal-Mart Stores, Inc. v. Visa USA Inc. (In re Visa Check/MasterMoney Antitrust Litig.),* 280 F.3d 124, 136 (2d Cir.2001). In considering superiority, I must determine whether a class action is "superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

**\*4** In cases where "numerous state law variations [are] implicated by certification of a nationwide class," courts have found that the predominance and superiority requirements are not satisfied. *See Lyon v. Caterpillar, Inc.,* 194 F.R.D. 206, 214-221 (E.D.Pa.2000); *Carpenter v. BMW of N. Am., Inc.,* 1999 WL 415390, *2 (E.D.Pa.1999) (noting that " where the applicable law derives from the law of the 50 states, as opposed to a unitary federal cause of action, differences in state law will 'compound the [

Not Reported in F.Supp.2d                                                                    Page 4

Not Reported in F.Supp.2d, 2005 WL 1683605 (W.D.Va.)
**(Cite as: Not Reported in F.Supp.2d)**

] disparities' among the class members from the different states").

Counts II and III of the Amended Complaint implicate the unsolicited merchandise and consumer fraud laws of all fifty states. (Amend. Compl. at ¶ ¶ 51, 56). Plaintiff argues that Pennsylvania law applies to all class members because Defendant is headquartered in Pennsylvania. Nonetheless, putative class members, "have a due process right to have their claims governed by state law applicable to their dispute." *Lyon,* 194 F.R.D. at 213. This Court has repeatedly held that under Pennsylvania choice of law principles, each class member would be subject to the consumer fraud statutes of the member's home state because "that state would have the paramount interest in applying its laws to protect its consumers." *Id.* at 218, n. 16; *see also Carpenter,* 1999 WL 415390 at *1-2; *Truckway Inc. v. General Elec.,* 1992 WL 70575, at *7 (E.D.Pa.1992); *Matjastic v. Quantum Pharmics, Ltd.,* 1991 WL 238304 at *6 (E.D.Pa.1991). Thus, were I to certify Counts II and III, I would be obligated to apply the consumer protection laws of all fifty states.

In these circumstances, Plaintiff must provide an " extensive analysis" of state law variations to determine whether there are "insuperable obstacles" to class certification. *See Walsh v. Ford Motor Co.,* 807 F.2d 1000, 1017 (D.C.Cir.1986) (citing *In re School Asbestos Litig.,* 789 F.2d 996, 1010 (3d Cir.1986)); *see also Chin v. Chrysler Corp.,* 182 F.R.D. 448, 453 (D.N.J.1998) ("certification of a nationwide class in which the law of the 50 states, rather than federal law, must be identified and applied, places the burden upon plaintiffs to credibly demonstrate, through an extensive analysis of state law variances, that class certification does not present insuperable obstacles.") (internal quotations omitted).

The consumer fraud statutes of the various states are not uniform. *See BMW of North America, Inc., v. Gore,* 517 U.S. 559, 568-69, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) ("No one doubts that a state may protect its citizens by prohibiting deceptive trade practices ... But the states need not, and in fact do not, provide such protection in a uniform manner.

"); *Lyon,* 194 F.R.D. at 218 (noting that the consumer fraud acts of Alabama, Georgia, Mississippi, and South Carolina do not allow the use of class actions by private litigants); *see also* John S. Kiernan, Michael Potenza, Peter Johnson, *Developments in Consumer Fraud Class Action Law,* 537 PLI/PAT 237, 277 (1998) (noting that actionable conduct under the various consumer fraud acts varies considerably). This Court has noted that the:

**\*5** almost universal reluctance to certify such class actions [based on the various states' consumer fraud acts] stems not only from the exponential multiplication of individual issues ... but also from a practical recognition that distilling the laws of the fifty states ... on the causes of action brought by consumer fraud plaintiffs would be an impossibly difficult task.

*Lyon,* 194 F.R.D. at 219 (internal quotations omitted) (brackets in original).

Here, Plaintiff has not analyzed any of the fifty states' consumer protection laws, and has failed to address the variations among applicable consumer fraud statutes. Because these variations create an insuperable obstacle, I am obligated to deny class certification as to Counts II and III with prejudice. *In re School Asbestos Litig.,* 789 F.2d 996, 1010 (3d Cir.1986) (noting that "there will be a point at which the sheer magnitude of the task of construing the various laws will compel a court not to certify the multistate class") (internal quotations omitted).

In light of my decision, I need not address Rodale's remaining arguments against certification as to Counts II and III.

An appropriate Order follows.

W.D.Va.,2005.
Karnuth v. Rodale, Inc.
Not Reported in F.Supp.2d, 2005 WL 1683605 (W.D.Va.)

END OF DOCUMENT

EXHIBIT L



Not Reported in N.W.2d, 1997 WL 314419 (Minn.Dist.Ct.), 1997-1 Trade Cases P 71,776
**(Cite as: Not Reported in N.W.2d)**

District Court of Minnesota.
Richard M. KERR, Plaintiff,
v.
ABBOTT LABORATORIES, Defendant.
**No. 96-002837.**

Feb. 19, 1997.

MEMORANDUM
DANIELSON, District Judge.
**\*1** This matter is before the Court on Plaintiff's Motion for Class Certification.

*Facts:*

Plaintiff alleges the existence of a conspiracy among a group of 25 manufacturers of brand-name prescription drugs and a pharmacy benefit management company. It is alleged that the conspiracy took the form of denying to independent and chain retailers the discounts, rebates, terms and conditions of sale offered to mail order pharmacies and Health Maintenance Organizations with in-house pharmacies (favored purchasers). These rebates and discounts allegedly resulted in a dual-tiered pricing structure with reduced acquisition costs on brand-name prescription drugs for favored purchasers and increased acquisition costs to disfavored purchasers. Allegedly, the disfavored purchasers then pass on some portion of their higher acquisition costs to consumers. Thousands of consumers have allegedly been damaged by the conspiracy through the purchase of brand-name prescription drugs from retail pharmacies in Minnesota at supra-competitive prices.

*Discussion:*

Plaintiff asserts this action, individually and on behalf of the proposed Class, under the Minnesota Antitrust Law of 1971, Minn.Stat. § 325D.49, *et seq.,* and Minnesota Constitution Article 13 § 6.

Plaintiff seeks certification of a class defined as:
all persons who purchased brand-name prescription drugs from retail pharmacies in the State of Minnesota, which were manufactured, marketed and distributed, and directly or indirectly sold by Defendants during the period commencing four years prior to the date of the Complaint and continuing through the present.

In order to maintain a claim for antitrust violations against defendants, plaintiff must show: (1) a violation of the antitrust laws; (2) the fact of damage, or impact; and (3) some indication of the amount of damage. *Keating v. Phillip Morris* [1987-2 Trade Cases ¶ 67,801], 417 N.W.2d 132, 137 (Minn.App.1987).

Whether a suit is properly brought as a class action is determined under Minn.R.Civ.P. 23.01 and 23.02 . Pursuant to Minn.R.Civ.P. 23.01, a class action is appropriate if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; (4) the representative parties will fairly and adequately protect the interests of the class.

Minn.R.Civ.P. 23.02(c) authorizes certification of a class if the four prerequisites of Rule 23.01 are met, and:
(c) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d, 1997 WL 314419 (Minn.Dist.Ct.), 1997-1 Trade Cases P 71,776
**(Cite as: Not Reported in N.W.2d)**

In cases where the fact of injury and damage breaks down in what may be characterized as "virtually a mechanical task," "capable of mathematical or formula calculation," the existence of individualized claims for damages seems to offer no barrier to class certification on the grounds of manageability. *Keating,* 417 N.W.2d at 137. However, where the issues of impact and damages do not lend themselves to such a mechanical calculation, but require separate mini-trials of an overwhelmingly large number of individual claims, courts have found that the "staggering problems of logistics" thus created "make the damage aspect of the case predominate," and render the case unmanageable as a class action. *Id.*

**\*2** In the present action, Defendants do not dispute that Plaintiff's substantive allegations meet the four criteria specified in Minn.R.Civ.P. 23.01. Defendants focus their opposition to class certification on the factors outlined in Minn.R.Civ.P. 23.02(c). Defendants argue that common questions of law or fact do not predominate over individual questions, and that the suit would be unmanageable as a class action based upon the individualized nature of any damages involved. Plaintiff responds that common issues of law and fact predominate based upon the fact that the proposed class would seek a remedy for the common legal grievance of conspiracy, and that Dr. Michael Sattinger has submitted several appropriate methods for classwide computation of damages which could be applied to individuals through the claims administration process.

Upon reviewing the arguments of the parties and controlling Minnesota precedent, the Court finds certification of the proposed class inappropriate. Similar to *Keating,* the only common question in the present action is whether there has been a violation of the antitrust laws. If this element were established, it would still be necessary for each putative class member to establish the fact and amount of damage. In a companion indirect purchaser case involving Alabama consumers, Judge Kocoras noted the predominance of individualized questions in his denial of class certification: "tracing the alleged overcharges from manufacturers, to wholesalers, to retailers, to

consumers presents individualized issues which would dominate this litigation and preclude certification." *In re Brand Name Prescription Drugs Antitrust Litigation,* 1994 U.S.Dist. Lexis 16658, at \*17-19 (N.D.Ill.1994).

*Predominance:*

In the present action, determining whether a consumer had been impacted by the alleged conspiracy would require the examination of myriad transactions at several levels of distribution to determine applicable dates of purchase, prices, generic substitutes available, and the terms of any rebates or discounts applicable at the time of the transaction. Such a procedure would need to be followed for each brand name prescription drug purchased by each class member. Tracing individualized transactions through the complex distribution network of the brand-name prescription drug industry would clearly cause individual questions of fact to predominate over questions common to the proposed class. Like *Keating,* but even more so, "[a]ny determination of fact or amount of individual damage will require thousands of factual examinations ... done on a transaction by transaction basis. The class action would quickly degenerate into thousands and thousands of individual trials." *Id.*

Manageability:

The overwhelmingly individualized nature of any damages in this action further convinces the Court that it would be unmanageable to maintain this suit as a class action. The dissimilarities inherent in purchases of various brand-name drugs, from various retailers, at various times, under varying terms, precludes a uniform method for calculating damages. Similar to *Keating,* "to determine individual damages the Court would have to conduct thousands of trials and examine hundreds of thousands of transactions between thousands of retailers, wholesalers, distributors and manufacturers. This would certainly be an unmanageable, if not impossible, task." *Id.* In the present case, the addition of consumer level

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d, 1997 WL 314419 (Minn.Dist.Ct.), 1997-1 Trade Cases P 71,776
**(Cite as: Not Reported in N.W.2d)**

transactions would make determination of damages even more unmanageable.

**\*3** Plaintiff's suggestion that following classwide proof of aggregate damages, individual damages could be handled by a special master through a claims administration process is unavailing. Shifting and/or deferring the issue of allocation of damages to a separate proceeding would serve only to highlight the inappropriateness of certifying the present case as a class action. The efficiencies traditionally associated with class action treatment would be forfeited. Damages in this case cannot be determined as a "virtually mechanical task," " capable of mathematical or formula calculation," as required under *Keating. Id.* "Where proof of damages must be established on an individual basis for thousands of class members, the suit is unmanageable and class action treatment is inappropriate." *Id.*

Finally, Plaintiff indicates that *Herbert L. Goda v. Abbott Laboratories et al.* [1997-1 Trade Cases ¶ 71,730], Civil Action No. 01445-96 (February 3, 1997) (J. Braman), should be instructive to this Court in considering Plaintiff's motion for class certification. Upon reviewing *Goda,* this Court finds it distinguishable.

As pointed out by counsel for Defendants in a letter dated December 17, 1996, the applicable District of Columbia Antitrust Law expressly provides for proof of impact and damages on a classwide basis; " the fact of injury and the amount of damages sustained by the members of the class may be proven on a class-wide basis, without requiring proof of such matters by each individual member of the class." D.C.Code 1981, § 28-4508.

The preceding language significantly distinguishes District of Columbia Antitrust Law from Minnesota Antitrust Law. Plaintiff's counsel acknowledged that the language of § 28-4508 was "unique" in the breadth of its class action provision as compared to other *Illinois Brick* repealer statutes throughout the country. There is no provision in Minn.Stat. § 325D.49 which provides for proof of impact or damages on a classwide basis. In the absence of such language, this Court declines to construe the

applicable Minnesota Statute with such great breadth.

Therefore, based upon the record before the Court and controlling Minnesota precedent, this Court finds that individual questions of fact predominate over questions common to the class, and that the suit would be unmanageable as a class action. Accordingly, as a class action would not be a superior method for the fair and efficient adjudication of this matter. Plaintiff's motion for class certification under Minn.R.Civ.P. 23.02(c) is denied.

Alternatively, Plaintiff seeks certification of the Class for purposes of injunctive relief pursuant to Minn.R.Civ.P. 23.02(b). Plaintiff argues that a class action suit to enjoin Defendants allegedly collusive conduct would significantly and tangibly benefit retail purchasers of brand-name prescription drugs in Minnesota. Defendants argue that it is improper to certify a class for injunctive relief where plaintiff's claims are focused primarily toward damages.

**\*4** Absent instructive Minnesota precedent, the Court looks to Fed.R.Civ.P. 23(b)(2) for guidance. "Subsection (b)(2) was never intended to cover cases like the instant one where the primary claim is for damages, but is only applicable where the relief sought is exclusively or predominantly injunctive or declaratory." *Eisen v. Carlisle & Jacquelin* [1968 Trade Cases ¶ 72,381], 391 F.2d 555, 564 (2nd.Cir.1968); *Lukenas v. Bryce's Mountain Resort Inc.,* 538 F.2d 594, 595 (4th Cir.1976).

The arguments set forth by plaintiff make it apparent that Plaintiff's primary claim is for damages. Therefore, under the prevailing interpretation of F.R.C.P. 23(b)(2), certification of the proposed Class for injunctive relief would be inappropriate. The Court has been presented with no authority that Minn.R.Civ.P. 23(b)(2) should be given an interpretation different from its federal counterpart. Accordingly, Plaintiff's motion for certification under Minn.R.Civ.P. 23(b)(2) is also denied.

Minn.Dist.Ct.,1997.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                          Page 4

Not Reported in N.W.2d, 1997 WL 314419 (Minn.Dist.Ct.), 1997-1 Trade Cases P 71,776
**(Cite as: Not Reported in N.W.2d)**


Kerr v. Abbott Laboratories
Not Reported in N.W.2d, 1997 WL 314419
(Minn.Dist.Ct.), 1997-1 Trade Cases P 71,776

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT M



Not Reported in So.2d, 1993 WL 13011463 (Ala.Cir.Ct.)
**(Cite as: Not Reported in So.2d)**

Only the Westlaw citation is currently available.
Circuit Court of Alabama.
Aretha MCCARTER, who sues individually and on
behalf of a class of persons similarly situated,
Plaintiffs,
v.
ABBOTT LABORATORIES, INC.; Bristol-Myers
Squibb Co.; and American Home Products, Corp.,
et al., Defendants.
**No. Civ.A. 91-050.**

April 9, 1993.

*ORDER*

**\*1** This action arises from allegations by plaintiffs Aretha McCarter and Joseph Walden that defendants, Abbott Laboratories, Bristol-Myers Squibb Co., and American Home Products Corp., conspired to fix the price of infant formula in violation of Alabama Code Section 6-5-60 (1975).

The case is before the Court on plaintiffs' motion, pursuant to Rule 23 of the Alabama Rules of Civil Procedure, to certify a state-wide class of indirect purchasers (*i.e.,* consumers) of defendants' infant formula products. Specifically, plaintiffs have moved to certify a class consisting of:
"all residents of the state of Alabama who:
(a) purchased infant formula manufactured by one or more of the defendants;
(b) purchased the formula from a vendor other than the defendants;
(c) purchased the formula at any time during the period from January 1, 1980 to the present; and
(d) purchased the formula from stores located within the state of Alabama." <sup>FN1</sup>

> FN1. Plaintiffs' original complaint requested damages allegedly sustained by

the class during the two-year period from February 1989 through February 1991. Just prior to the hearing on class certification, plaintiffs filed an amendment to the complaint to add an allegation that defendants fraudulently concealed the alleged conspiracy, which would have the effect of expanding the alleged damages period from two years to twelve years. Defendants filed a motion to strike and a motion to dismiss this amendment. Because the Court denies class certification, it need not address defendants' motions at this time.

Defendants oppose the class certification motion on the ground that plaintiffs have failed to satisfy the requirements of Rule 23. Defendants allege that plaintiffs have failed to show how the issues of fact of injury to potential class members (or "impact") and the amount of actual damages allegedly suffered by class members can be established on a class-wide basis. Consequently, they argue, issues common to the proposed class do not predominate over individualized issues, thereby rendering this action unmanageable and unsuitable for class action treatment.

The Court held a two-day evidentiary hearing on August 18 and 19, 1992, at which six witnesses testified and seventeen exhibits were introduced. Also before the Court are various affidavits and other documentary evidence, as well as pre-hearing and post-hearing briefs from the parties.

For the reasons set forth below, the Court finds that plaintiffs have failed to show that questions of law or fact common to the members of the proposed class predominate over individual questions, or that a class action is superior to other available methods for adjudicating this controversy, as required by Ala. R. Civ. P. 23(b)(3). Plaintiffs' motion to certify this case as a class action is, therefore, denied.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in So.2d, 1993 WL 13011463 (Ala.Cir.Ct.)
**(Cite as: Not Reported in So.2d)**

#### The Legal Standard

Rule 23 of the Alabama Rules of Civil Procedure provides that a class action is appropriate "only if" certain statutory criteria are met. Plaintiffs must comply with the following four requirements of Rule 23(a):

"(1) the class is so numerous that joinder of all members is impracticable ['numerosity'], (2) there are questions of law or fact common to the class ['commonality'], (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class ['typicality'], and (4) the representative parties will fairly and adequately protect the interests of the class ['adequate representation']."

In addition, the movants must establish that their claim meets the requirements of Rule 23(b)(3) that:
**\*2** "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

Plaintiffs have the burden of proving facts necessary to satisfy each of these criteria. *Ex parte Blue Cross & Blue Shield,* 582 So.2d 469, 475, 483 (Ala.1991).

Furthermore, even "[a]ssuming that all of these criteria have been met, it remains within the discretion of the trial court whether to certify a class, after considering practicality and manageability of the litigation". *Marshall Durbin & Co. v. Jasper Utils. Bd.,* 437 So.2d 1014, 1025 (Ala.1983); *Butler v. Audio/Video Affiliates, Inc.,* No. 1911382, 1992 WL 355540, at \*1 (Ala. Dec. 4, 1992).

On the present motion, the Court finds that plaintiffs have failed to show that questions of law or fact common to the members of the proposed class predominate over individual questions, as required by Rule 23(b)(3). Specifically, plaintiffs have failed to show how the issues of the fact of injury to potential class members (or "impact") and the amount of actual damages allegedly suffered by class members can be established on a class-wide basis. The record reveals that these are highly individualized issues, which would cause class action litigation to be impractical and unmanageable. The Court would face thousands of individual cases, with each potential class member being required to present evidence of the time, place and price of his or her individual purchases, and with there being no trustworthy /way to verify and authenticate, on the one hand, or to question and challenge, on the other hand, the accuracy of those individual claims. This makes certification of a class pursuant to Rule 23 inappropriate. *Butler,* 1992 WL 355540 at \*2.

#### Findings of Fact and Conclusions of Law

#### I

The three defendants in this action manufacture and sell infant formula products.[FN2] Each defendant sells its various products to wholesalers, retail headquarters, distributors and retailers. Retailers in turn sell the product to consumers. These retailers control their own retail prices, and different retailers price their formula products differently and with different profit objectives.

> FN2. Defendants currently sell approximately 69 different formula products (*e.g.,* regular milk-based formula, milk-based formula with iron, and soy-based formula) in a variety of sizes and forms (e .g., powder, concentrate or ready to feed). Abbott Laboratories, Inc. manufactures and sells the Similac and Isomil brands through its Ross Laboratories division. Wyeth-Ayerst, a division of American Home Products Corp., manufactures and sells the SMA and Nursoy brands. Bristol-Myers Squibb Company manufactures and sells the Enfamil and Prosobee brands through its wholly-owned subsidiary Mead Johnson &

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in So.2d                                                                Page 3

Not Reported in So.2d, 1993 WL 13011463 (Ala.Cir.Ct.)
**(Cite as: Not Reported in So.2d)**

Company.

Members of the proposed class have not purchased any product directly from any defendant. Rather, they bought from a variety of intervening third parties-retailers such as Bruno's, Toys "R" Us, Winn-Dixie, 7-Eleven and a whole range of others-at an array of differing retail prices.

The record reveals that at the retail level, where plaintiffs and the prospective class members purchased formula, prices vary considerably with respect to most of defendants' formula products. Retail prices paid by consumers vary considerably even with respect to the same brand, form and size of product depending on when, where, from whom and in what quantity the product is purchased. Sometimes retail prices reflect discounts that each defendant offers its direct customers based on volume purchased, and sometimes they do not. Sometimes retail prices reflect increases in a defendant's wholesale prices, and sometimes they do not. Sometimes mass merchandisers price infant formula below wholesale cost in an effort to draw customers into the store in the hope that they will then purchase other products as well.

**\*3** Consequently, there were variations in prices charged and retail mark-ups and mark-downs during the period covered by plaintiffs' complaint. Retail mark-ups-if any-over wholesale price varied from store to store at any given time, even within the same chain. Retail prices below wholesale cost were not uncommon, and such below-cost pricing also varied from store to store within the same chain.

Moreover, the evidence shows that retail shelf prices were not necessarily the prices actually paid by consumers. During the relevant time period, some defendants offered discount coupons for consumer use. Retailers, too, used coupons to discount the retail price of infant formula.

As a result of these factors, the indirect purchaser consumers that the plaintiffs seek to represent did not pay a uniform or consistent price for their infant formula purchases and were not charged a uniform or consistent mark-up or mark-down from the wholesale price.

II

The Court finds that individual issues with respect to proof or fact of injury (or "impact") predominate over any common questions.

In order to recover damages in this case, plaintiffs must prove they were injured by defendants' alleged price-fixing conspiracy. Proof of fact of injury (or " impact") is critical to plaintiffs' case, because without it there can be no liability under Alabama Code Section 6-5-60 and no award or either damages or the penalty for which the Code section provides. *Alabama Optometric Ass'n v. Alabama State Bd. of Health,* 379 F.Supp. 1332, 1341 (M.D.Ala.1974); *State of Alabama v. Blue Bird Body Co.,* 573 F.2d 309, 317 (5th Cir.1978).

Typical antitrust class actions involve direct purchasers, all of whom bought from the defendants at an alleged commonly inflated price. Such direct purchasers are, therefore, able to offer common proof of impact and damages. Here, however, whether a particular consumer has in fact been injured will depend entirely upon whether the alleged conspiracy resulted in overcharges that were "passed on" to that consumer by retailers and others in the chain of distribution. The testimony of Dr. McLeod, defendants' expert, shows that this is an inquiry that will necessarily vary from purchaser to purchaser, from product to product, from time to time, from place to place and from store to store, and will depend upon the price and quantity of the brand, type, form and size of formula actually bought.

As mentioned above, retailers have employed many different retail pricing strategies, and many different approaches in marking their formula products up above or down below their wholesale cost, sometimes selling brands or types of formula at cost or even below cost, sometimes passing wholesale price increases through to consumers, sometimes not, sometimes doing so in different amounts or at different speeds, at different points in time or at different locations-depending upon a number of market factors, including what their competitors are doing.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in So.2d                                                                     Page 4

Not Reported in So.2d, 1993 WL 13011463 (Ala.Cir.Ct.)
**(Cite as: Not Reported in So.2d)**

**\*4** Consequently, the price paid by each of the tens of thousands of class members for each of their purchases-including the mark-up or mark-down from the wholesale price, and any pass through of any wholesale price increase-will have varied based upon the product purchased (*i.e.,* brand, type, size and form), from whom it was bought, where it was bought and when. According to the testimony of Dr. McLeod, each of these questions will have to be answered separately to determine whether any particular class member did, in fact, pay an inflated price caused by the alleged antitrust violation, and (if so) how much the price he or she paid was actually inflated. The Court finds that these individual questions will predominate over any common ones.

As the Alabama Supreme Court recently said, in affirming denial of class certification in *Butler, supra:*

"Individual questions of fact predominate over questions of fact common to the members of the alleged class, because, among other reasons, to establish a violation, each and every purchaser ... would have to be questioned ... as to whether he or she ... (ii) was injured, and, if so, (iii) the event to which damages have been incurred." *Butler,* 1992 WL 355540 at *2.

That is an accurate description of the present situation as well, and it is why class certification is also inappropriate here.

For example, the evidence submitted by defendants shows that retailers do not pass through price increases-either immediately or 100%. On the contrary, this evidence shows that there is very little correlation between wholesale price movements, on the one hand, and retail shelf price movements, on the other.

Thus, during the same period of time in April 1989 in Birmingham, although all retailers were paying the same wholesale price for the Similac brand, retail shelf prices varied by up to 70 cents, depending on whether Similac was bought at Winn-Dixie for $1.89 or Food Giant for $2.59. Similarly, in July 1989 in Montgomery, retail prices for Similac ranged from $1.09 at K-Mart to $1.39 at

Winn Dixie, even though the wholesale price for Similac to all retailers was the same.

Most important, the evidence submitted by defendants shows that when wholesale prices go up, retail prices at some locations follow and at other locations do not. Insofar as individual consumers are concerned, retailers typically absorb significant portions of wholesale price increases. Moreover, different retailers often absorb different amounts of such increases, and even the same retailers absorb different amounts at different times or places. Thus, defendants' expert testified that:

(a) From January 1989 to May 1990, SMA had three wholesale price increases of greater than 5%, without any change in Winn-Dixie's retail price in the Montgomery area until the very end of the period.

(b) In December 1989, Winn-Dixie reduced its retail price for Enfamil in Montgomery even though there was a wholesale price increase at the same time, with the result that Winn-Dixie's retail price was below its wholesale cost.

**\*5** (c) From July 1989 through April 1991, Wal-Mart in Montgomery did not change its retail price for Similac with iron, even though there were three wholesale price increases by Abbott during that period.

(d) When the wholesale price of Similac increased by 6% in July of 1988, the retail price at Winn-Dixie did not change until May of 1990 - and then it went down by 9%.

Other witnesses testified to further instances in which retailers "[i]n the face of two or three [wholesale price] increases, ... will not raise the price at the retail level". For example, Mark Hudson of Ross Laboratories pointed to the fact that from October 1989 to January 1991, Wal-Mart and K-Mart in Montgomery did not change their retail price for 13-ounce Similac concentrate with iron, even though the wholesale price was increasing during that time. As Mr. Hudson explained, "the only way to get to the bottom of whether or not there was pass-on or not pass-on is to analyze store by store, price increase by price increase, year by year, exactly what was happening at the retail level".

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in So.2d                                                                                    Page 5

Not Reported in So.2d, 1993 WL 13011463 (Ala.Cir.Ct.)
**(Cite as: Not Reported in So.2d)**

The Court finds that, because of these individualized questions, certification of a class in this case would not result in "prompt, efficient judicial administration". *First Baptist Church v. Citronelle-Mobile Gathering Inc.,* 409 So.2d 727, 729 (Ala.1981), *reh'g denied,* 418 So.2d 77 (Ala.1982). Rather, it would result in thousands of mini-trials, rendering this case unmanageable and unsuitable for class action treatment. Accordingly, the Court concludes that the individualized questions relating to the fact of damage (or "impact" ) require denial of plaintiffs' class certification motion. *Blue Bird Body Co.,* 573 F.2d at 321-28; *City of St. Paul v. FMC Corp.* 1990-2 Trade Cas. (CCH) ¶ 69,283 (D.Minn. Nov. 14, 1990).

### III

The Court finds that individual issues with respect to proof of the amount of actual damage predominate over any common questions.

As defendants' expert testified:
"[S]ince we have a multitude of retail outlets that are offering this product, and we have a multitude of pricing strategies and zones, in order to adequately compensate those class members, we would have to know when they bought the product, where they bought the product, how much [of] the product they bought at each of the time intervals that would reflect truly a excess charge that could be applicable for that time period."

The job, defendant's expert testified, would certainly be "very, very unmanageable even if the data were available".[FN3] As a result, denial of class certification is appropriate. *Moore v. Southeast Toyota Distribs., Inc.,* 1982-2 Trade Cas. (CCH) ¶ 64,743 (N.D.Ala. Feb. 4, 1982); *In re Transit Co. Tire Antitrust Litig.,* 67 F.R.D. 59, 75-76, 79 (W.D.Mo.1975); *Boshes v. General Motors Corp.,* 59 F.R.D. 589, 600 (N.D.Ill.1973).

> FN3. Defendants' expert described this as a "monstrous task" even for plaintiffs' original two-year damages period and an

impossible one for the twelve-year period in the amended complaint.

The named plaintiffs' testimony illustrates the problems that would confront the Court on the damages issues here. Neither plaintiff could identify the precise times or places of their formula purchases. Nor could they specify the precise prices that they paid. Moreover, neither plaintiff has any receipts or records that could be used to establish their purchases or prices with any precision-a deficiency that is surely typical of the class as a whole. This lack of records magnifies the problem of measuring damages, thereby further militating against class certification. *City of Philadelphia v. American Oil Co.,* 53 F.R.D. 45, 72-74 (D .N.J.1971).

**\*6** It would be impossible to reasonably assess damages to which the individual plaintiff class members would be entitled to receive, on the front end, without figuring individually, and then totaling, all of the claims of the plaintiffs. Insofar as individual plaintiffs are concerned, Alabama retailers absorb a very substantial amount of wholesaler price increases, at different times, at different places, in different amounts: there was not a 100% "pass through." A formula for total front end damages will not work, and hence the questions which are common to the members of the class do not predominate over questions affecting only individual members of the class.

Plaintiffs have urged that, at the very least, the Court should bifurcate the case into liability and damages and allow the liability phase to proceed as a class action. That, however, would not solve the manageability problems. Proof of an alleged conspiracy alone is not enough to establish antitrust liability; plaintiffs must also prove "fact of injury"- *i.e.,* that the conspiracy actually caused them harm. *Shumate & Co. v. National Ass'n of Securities Dealers, Inc.,* 509 F.2d 147, 155 (5th Cir.), *cert. denied,* 423 U.S. 868 (1975).

Here, as discussed above, the "fact of injury" element of liability is not capable of proof on a class-wide basis. As a result, bifurcation would not " remove or even alleviate the overwhelming burden

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in So.2d                                                                                    Page 6

Not Reported in So.2d, 1993 WL 13011463 (Ala.Cir.Ct.)
**(Cite as: Not Reported in So.2d)**

of mini-trials". *Windham v. American Brands, Inc.,* 565 F.2d 59, 71-72 (4th Cir.1977), *cert. denied,* 435 U.S. 968 (1978); *Keating v. Philip Morris, Inc.,* 417 N.W.2d 132, 138 (Minn.Ct.App.1987). Consequently, the Court finds that bifurcation is inappropriate. *In re Transit Co. Tire,* 67 F.R.D. at 74-75.


                              IV

The Court finds that because each member of the proposed class would be required separately to prove that he or she had (a) purchased infant formula, (b) during the applicable time, (c) in some certain amount, (d) at a certain price and (e) from a certain retailer, class treatment would not be a superior means for adjudicating the present controversy.


                              V

For all the foregoing reasons, the Court hereby denies plaintiffs' motion to certify this case as a class action.

Ala.Cir.Ct.,1993.
McCarter v. Abbott Laboratories, Inc.
Not Reported in So.2d, 1993 WL 13011463 (Ala.Cir.Ct.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT N



Not Reported in A.2d, 2001 WL 1012261 (Me.Super.), 2001-2 Trade Cases P 73,408
**(Cite as: Not Reported in A.2d)**

▷
Briefs and Other Related Documents

Superior Court of Maine.
Harvey MELNICK, Barbara Melnick, John Zerner, M.D., and Jon Blomquist, individually and as representatives of all persons similarly situated, Plaintiffs
v.
MICROSOFT CORPORATION, Defendant
**No. CV-99-709, CV-99-752.**

Aug. 24, 2001.

ORDER ON PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

MILLS, Justice.

**\*1** The plaintiffs are indirect purchasers of Microsoft products and bring their complaint pursuant to Maine's antitrust statute. 10 M.R.S.A. §§ 1101-1109 (1997); Pls.' Amended Complaint, ¶¶ 1 & 61(B) & (C). The plaintiffs allege that the defendant engaged in conduct that eliminated competition and created a monopoly position in the market for the operating system software for IBM-compatible personal computers. Pls.' Amended Complaint, ¶¶ 1-5; Pls.' Mem. at 1. The defendant's alleged conduct occurred outside of Maine; the plaintiffs allege that personal computer users in Maine, such as the plaintiffs, have suffered harm due to Microsoft's monopolistic acts. Pls.' Mem. at 1; Pls.' Amended Complaint, ¶¶ 6-9; 10 M.R.S.A. §§ 1101-1109; *see* Pls.' Mem. in Opp. to Def.'s Mot. For Judgment on Pleadings at 8-10.

Pursuant to M.R. Civ. P. 23(a), (b)(2) and (b)(3), the plaintiffs seek to certify the following class:
All individuals and entities in Maine that, during the period determined by the applicable statute of limitations, purchased products which consisted of or included any Microsoft Intel-compatible PC operating system licensed or manufactured by Microsoft, including but not limited to Microsoft

Windows or MS-DOS operating software. Excluded from the class are defendant, their employees, parents, subsidiaries, and affiliates.

Pls.' Amended Complaint ¶ 50; Pls.' Motion for Class Certification dated 8/15/00. The defendant challenges the plaintiffs' ability to make the required showing under M.R. Civ. P. 23(a)(4), (b)(2), and (b)(3).

For the following reasons, the plaintiffs' motion for class certification is denied.

*M.R. CIV. P. 23(a)(4)*

The defendant challenges whether the representative parties will fairly and adequately protect the interests of the class. *See* M.R. Civ. P. 23(a)(4). [FN1] Specifically, the defendant argues that the named plaintiffs are not adequate representatives of a class because (1) some or all of the plaintiffs were recruited for this case by their attorneys; (2) the named plaintiffs had no knowledge about the allegation of anticompetitive conduct; (3) plaintiff Blomquist did not believe he was overcharged; and (4) plaintiff Blomquist testified at his deposition that he did not know whether he would be willing to appear for trial.

> FN1. The defendant argued in its memorandum that the named plaintiffs' claims are not typical of those of the class because they allege they purchased computers with pre-installed Windows 95 or 98 and not that they acquired any full packaged product Microsoft operating systems or any of the other Microsoft operating systems covered by the class definition. *See* M.R. Civ. P. 23(a)(3); Def.'s Mem. in Opp. at 36-37. During argument, the defendant stated that it challenged only whether the named

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2001 WL 1012261 (Me.Super.), 2001-2 Trade Cases P 73,408
**(Cite as: Not Reported in A.2d)**

plaintiffs would be adequate representatives. Transcript of 5/15/01 Hearing at 6. The named plaintiffs' allegations with regard to purchases are sufficient at this stage of the litigation to satisfy the requirements of Rule 23(a)(3). *See* Pls.' Amended Complaint, ¶¶ 7-9; M.R. Civ. P. 23(a)(3); *Karofsky v. Abbott Labs., Inc.,* CV-95-1009 at 14, 19 & n. 23 (Me.Super.Ct., Cum.Cty. Oct. 15, 1997)(Saufley, J.).

The plaintiffs must show that "(1) the representatives ... are able and willing to prosecute the action competently and vigorously and (2) each representative's interests are sufficiently similar to those of the class that it is unlikely that their goals and viewpoints will diverge." *In re Potash Antitrust Litig.,* 159 F.R.D. 682, 692 (D.Minn.1995). The facts that the named plaintiffs were recruited by counsel and that they are not sophisticated in their knowledge of this lawsuit should not be a bar to their representation of the class. *See Karofsky v. Abbott Labs., Inc.,* CV-95-1009 at 16-17 (Me.Super.Ct., Cum.Cty., Oct. 15, 1997) (Saufley, J.) [hereinafter *Karofsky* ]; B. Melnick Dep. at 40, 44, 116-19; Zerner Dep. at 58, 61-62, 101-03; H. Melnick Dep. at 116-19; Blomquist Dep. at 137-39.

**\*2** Plaintiff Blomquist's testimony during his deposition that he did not believe he was overcharged and that he did not know whether he would appear for trial does not show that he is prepared to prosecute vigorously the claims on behalf of the class. *See* Blomquist Dep. at 81, 108 [FN2]; *Karofsky* at 15-16; *see also Weikel v. Tower Semiconductor Ltd.,* 183 F.R.D. 377, 396 (D.N.J.1998) (named representative's potential unavailability for trial interferes with obligation to vigorously prosecute action and renders him inadequate representative for class). Based on his uncertainty regarding his attendance at trial and his belief that he was not overcharged in his purchase of Microsoft products, if the court had certified the class, plaintiff Blomquist would have been disqualified as a representative for the proposed class.[FN3]

FN2. The plaintiffs argue that "Microsoft distorts the testimony by asserting that Mr. Blomquist disclaimed any damages in this action. In fact, Mr. Blomquist said that he was not sure what remedy the court would order if this suit were successful." Pls.' Reply Mem. at 25 (citation and footnote omitted). Plaintiff Blomquist testified that it would be "for the court to determine" what the result would be if the lawsuit were successful and that "I do not believe I was overcharged." Blomquist Dep. at 81.

FN3. His disqualification would not otherwise defeat certification.

### *M.R. CIV. P. 23(b)(2)*

In their amended complaint, the plaintiffs request that the court enter judgment
A. Declaring that this action may proceed as a class action pursuant to Maine R. Civ. P. 23(b)(2) and (b)(3) by declaring that the plaintiffs be certified as Class representatives and their attorneys as class counsel;
B. Finding that the monopoly alleged herein unreasonably restrained trade or commerce in and/or constituted a deceptive trade practice in violation of 10 M.R.S.A. § 1101 *et seq.*
C. Awarding plaintiff and the Class actual and treble damages as provided for by 10 M.R.S.A. § 1104 and punitive damages due to Microsoft's intentional, outrageous, and egregious conduct.
D. Enjoining Microsoft from continuing the operation of its monopolistic practices as they related to the sale of operating systems.
E. Awarding costs, attorneys' fees, and such other relief as the Court may deem fit, just and proper.

Pls.' Amended Complaint, ¶ 61(A)-(E).

The defendant argues that the class should not be certified pursuant to M.R. Civ. P. 23(b)(2) because the relief sought is predominantly monetary instead of injunctive and the putative class is not sufficiently cohesive. *See Lemon v. Int'l Union of Operating Eng'r Local No. 139, AFL-CIO,* 216 F.3d 577, 581 (7th Cir.2000); *Barnes v. Am. Tobacco Co.,* 161 F.3d 127, 142-43 (3d Cir.1998);

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2001 WL 1012261 (Me.Super.), 2001-2 Trade Cases P 73,408
**(Cite as: Not Reported in A.2d)**

*Allison v. CITGO Petroleum Corp.,* 151 F.3d 402, 415 (5th Cir.1998); *Hall v. Burger King Corp.,* No. 89-0260-CTV-KEHOE, 1992 WL 372354, at *11 (S.D.Fla. Oct. 26, 1992). The plaintiffs argue that federal courts have certified an injunctive class under Rule 23(b)(2) and a damage class under Rule 23(b)(3) in the same action. *See In re NASDAQ Market-Makers Antitrust Litig.,* 169 F.R .D. 493, 515 (S.D.N.Y.1996).

The Advisory Committee Notes provide that Rule 23(b)(2) "does not extend to cases in which the appropriate final relief relates exclusively or predominately to money damages." FED. R. CIV. P. 23 advisory committee's note (1966); *see Weiss v. York Hosp.,* 745 F .2d 786, 811 (3rd Cir.1984) (23(b)(2) certification appropriate when primary relief sought is injunction). Rule 23(b)(2) certification is improper when plaintiffs seek treble damages even if injunctive relief is also sought. *Hall,* 1992 WL 372354, at *11; *contra NASDAQ,* 169 F.R.D. at 517.

**\*3** Members of a class certified under 23(b)(2) cannot opt out of the class. *See Barnes,* 161 F.3d at 142-43. A judgment is binding and has *res judicata* effect on the entire class. *Cook v. Rockwell Int'l Corp.,* 151 F.R.D. 378, 388 (D.Colo.1993). In this case, some consumers may have benefitted from Microsoft's conduct. *See United States v. Microsoft Corp.,* 84 F.Supp.2d 9, 110-11 (D.D.C.1999).

The 23(b)(2) requirements for class certification are more relaxed than those for 23(b)(3). *See Hall,* 1992 WL 372354, at *11 (nature of plaintiff's prayer for relief is primarily one seeking monetary damages despite attempt to couch relief in terms of injunction). Class certification may be unnecessary to achieve classwide injunctive relief. In response to a defendant's practices, one individual can obtain injunctive relief that would benefit others. *See id.* at * *11-12.

The cases relied on by the plaintiffs for certification under Rule 23(b)(2) are federal cases and do not involve indirect purchaser actions. *See* 15 U.S.C.A. §§ 1-7, 12-27 (1997); *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 730-31 (1977); *see also Weiss,* 745 F.2d at 811; *Martens v. Smith Barney, Inc.,* 181

F.R.D. 243, 260 (S.D.N.Y.1998) (Title VII employment discrimination action; damages do not defeat otherwise proper (b)(2) class because damages treated as equitable restitution or because of predominance of judicial finding of discrimination in absence of damages); *Little Caesar Enter., Inc. v. Smith,* 172 F.R.D. 236, 243 (E.D.Mich.1997) (restaurant franchisee against franchisor and distributors); *NASDAQ,* 169 F.R.D. at 517 (plaintiffs will have to show direct antitrust injury to their business or property); *In re Catfish Antitrust Litig.,* 826 F.Supp. 1019, 1045-46 (N.D.Miss.1993) (food distributors' suit against food processors under Sherman Act); *Gelb v. Am. Tel. & Telegraph Co.,* 150 F.R.D. 76, 78 (S.D.N.Y.1993) (class included persons who used defendant's long distance card; recovery of damages uncertain and not predominant claim); *In re Domestic Air Transp. Antitrust Litig.,* 137 F.R.D. 677, 683 & n. 6 (N.D.Ga.1991) (class consisting of all persons who purchased airline tickets from one of defendant airlines certified under (b)(2) and (3) even though court found that true nature of action was for treble damages under Clayton Act); *Northwestern Fruit Co. v. A. Levy & J. Zentner Co.,* 116 F.R.D. 384, 388-90 (E.D.Cal.1986) (class of cantaloupe purchasers certified under 23(b)(2) and (3) without discussion of distinction).

Finally, although neither party relies on the statutory language,[FN4] Maine's statute does not provide for a private right of action for injunctive relief. Section 1104 provides, in part:

> FN4. The plaintiffs' request for certification under Rule 23(b)(2) was not the primary focus of the plaintiffs' argument at hearing. *See* Transcript of 5/15/01 Hearing at 16-21.

1. Right of action and damages. Any person, including the State or any political subdivision of the State, injured directly or indirectly in its business or property by any other person or corporation by reason of anything forbidden or declared to be unlawful by section 1101, 1102 or 1102-A, may sue for the injury in a civil action. If the court finds for the plaintiff, the plaintiff shall

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2001 WL 1012261 (Me.Super.), 2001-2 Trade Cases P 73,408
**(Cite as: Not Reported in A.2d)**

recover 3 times the amount of the damages sustained and cost of suit, including necessary and reasonable investigative costs, reasonable experts' fees and reasonable attorney's fees.

**\*4** 2. Injunction. The Attorney General may institute proceedings in equity to prevent and restrain violations of sections 1101, 1102 and 1102-A.

A. These proceedings may be by way of petitions setting forth the case and praying that the violation shall be enjoined or otherwise prohibited.

B. When the parties complained of have been duly notified of that petition, the court shall proceed as soon as possible to the hearing and determination of the case.

C. Pending the petition and before final decree, the court may at any time make such temporary restraining order or prohibition as considered just under the circumstances.

D. Any person who violates the terms of an injunction issued under this section must forfeit and pay to the State, to be applied in carrying out this chapter, a civil penalty of not more $50,000 for each violation.

10 M.R.S.A. § 1104(1) & (2). Section 1104 does not state that a private right of action exists for injunctive relief. The legislative history does not reveal an intent to provide such a private right of action. *See* L.D. 809 (115th Legis.1991) (no debate); L.D. 1030 (111th Legis.1983) (no debate); *Charlton v. Town of Oxford,* 2001 ME 104, ¶ 15, 774 A.2d 366, 372; *In re Wage Payment Litig.,* 2000 ME 162, ¶ 7, 759 A.2d 217, 222. Implying the existence of such a private right of action would be inconsistent with the legislative scheme. *See Charlton,* 2001 ME 104, ¶¶ 17-18, 774 A.2d at 373; *see also* RESTATEMENT (SECOND) OF CONFLICT OF LAWS] § 53 cmt. b (1969). This action cannot be certified pursuant to Rule 23(b)(2).

### *M.R. CIV.P. 23(b)(3)*

In order to certify the class pursuant to 23(b)(3), the court must find

that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and

that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include:

(A) the interest of the members of the class in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum;

(D) the difficulties likely to be encountered in the management of a class action.

M.R. Civ. P. 23(b)(3). To prevail at trial, the plaintiffs must prove the following: (1) an anti-trust violation; (2) proof of a resultant injury to the plaintiffs; and (3) damages sustained by the plaintiffs. *See Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 114 n. 9 (1969) (price-fixing), *rev'd on other grounds,* 401 U.S. 321 (1971); *NASDAQ,* 169 F.R.D. at 517 (price-fixing); *Karofsky* at 7 (price-fixing). On this motion for class certification, the plaintiffs must show that common proof will predominate [FN5] at trial with respect to these three elements: an antitrust violation; injury to plaintiffs; and damages. *See NASDAQ,* 169 F.R.D. at 517.

> FN5. The predominance requirement is a stumbling block in indirect purchaser actions. *See Sugai Prods., Inc. v. Kona Kai Farms, Inc.,* No. 97-00043 SPK, 1997 WL 824022, at \*13 (D.Haw. Nov. 19, 1997). In *Peridot, Inc. v. Kimberly-Clark Corp.,* indirect purchasers sought class certification. The court determined that impact could be established by use of a mechanical calculation using common proof in indirect purchaser cases. *Peridot, Inc. v. Kimberly-Clark Corp.,* No. MC 98-012686, 2000 WL 673933, at \*3 (Minn.Dist.Ct. Feb. 7, 2000) The court concluded, however, that the plaintiffs' expert did not provide a viable means of calculating the quantity of damages for the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2001 WL 1012261 (Me.Super.), 2001-2 Trade Cases P 73,408
**(Cite as: Not Reported in A.2d)**

class as a whole because the expert had not devised a method of regression analysis or markup analysis to compute the price increases passed through to the putative class. The expert admitted that he was not aware of anyone else devising such a model and that he was not sure how or whether he could control for nonconspiratorial factors to produce an accurate model. The class was not certified. *Id.* at *4.

In *Execu-Tech Bus. Sys., Inc. v. Appleton Papers, Inc.,* the class of indirect purchasers of thermal fax paper was not certified because the plaintiffs could not show proof of impact. *Execu-Tech Bus. Sys., Inc. v. Appleton Papers, Inc.,* 743 So.2d 19, 20 (Fla.Dist.Ct.App.1999) (per curiam), *aff'g* No. 96-9639 CACE 05 (Fla.Cir.Ct. Dec. 16, 1997). The plaintiffs' expert relied on "incidence analysis" and said that that method was generally accepted in the field of economics. He agreed that the method had not been used before, that assumptions had to be made in order for the analysis to work, and that the existence of variability in the amount of pass through throughout the distribution chain during the class period precluded proving impact and damages in common. *Id.* at 21.

In *Derzon v. Appleton Papers, Inc.,* a proposed class of indirect purchasers of fax paper was not certified in a case brought under Wisconsin's antitrust and deceptive trade practices acts. *Derzon v. Appleton Papers, Inc.,* No. 96-CV-3678, 1998 WL 1031504, at *1 (Wis.Cir.Ct. July 7, 1998). Plaintiff had represented that by means of incidence analysis and regression analysis, an expert would prove damages by common evidence. *Id.* at *7.

In *Ashley v. Archer-Daniels-Midland Co.,* plaintiffs were indirect purchasers of an agricultural feed supplement and sued the producers and distributors for price fixing under Alabama law. *Ashley v. Archer-Daniels-Midland Co.,* No. CV-95-336-R, at 2 (Ala.Cir.Ct. Mar. 13,

1998). The class was not certified based on the court's concerns regarding the plaintiff's expert's methodology for proving impact and damages. The court concluded that plaintiff sought certification on the " strength of its statistical model. The Plaintiff clearly rejects any present need, or future intention, of proving the claims in this case by any means other than generalized evidence." *Id.* at 34.

In *Wilcox v. Archer-Daniels-Midland Co.,* plaintiff sought to certify a class of all people in Michigan who used food products containing high fructose corn syrup. *Wilcox v. Archer-Daniels-Midland Co.,* No 96-82473-CP, at 1-2 (Mich.Cir.Ct. Sept. 29, 1997). Certification was denied. In discussing the difficulty in proving damages, the court stated that the purpose of the litigation was to compensate people damaged by the alleged illegal activities and not "just to fix some punishment for antitrust violations." *Id.* at 7.

In *Wood v. Abbott Labs., Inc.,* plaintiff's request to certify a class of indirect purchasers of brand-name prescription drugs was denied. The court noted that the plaintiff's expert, who was the plaintiffs' expert in *Karofsky,* proposed theories that did not provide a method for calculating each class member's individual damages, as required by Michigan law. *Wood v. Abbott Labs., Inc.,* No. 96-512561-CZ, 1997 WL 824019, at *2 (Mich.Cir.Ct. Sept. 11, 1997).

In *Kerr v. Abbott Labs., Inc.,* another indirect purchaser action in Minnesota, the court determined that individual issues would predominate because a showing of consumer impact would require an examination of myriad transactions at many levels of distribution to determine dates of purchase, prices, terms of any rebates, or discounts. The only common question was whether an antitrust violation occurred. *Kerr v. Abbott Labs., Inc.,* No. 96-002837, 1997 WL 314419, at *2 (Minn.Dist.Ct. Feb. 19, 1997).

In *Durden v. Abbott Labs., Inc.,* plaintiffs

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2001 WL 1012261 (Me.Super.), 2001-2 Trade Cases P 73,408
**(Cite as: Not Reported in A.2d)**

requested certification of a class of indirect purchasers of infant formula. The court found the testimony of the defendants' expert more credible than that of the plaintiffs' expert regarding a pass on of overcharges. *Durden v. Abbott Labs., Inc.,* No. CV-93-663, at 5-6 (Ala.Cir.Ct. Jan. 16, 1996). The defendants' expert reviewed extensive empirical evidence on the issue. The plaintiffs' expert "theorized that 100% of all manufacturer overcharges are passed on by all retailers (thereby injuring all consumers), and that both the fact of injury and damages can accordingly be determined on a classwide basis." *Id.* at 6.

In *Harbin v. Johnson & Johnson Vision Prods., Inc.,* certification of a state-wide class of indirect purchasers of defendants' contact lenses was denied. *Harbin v. Johnson & Johnson Vision Prods., Inc.,* No. CV-94-002872, at 3 (Ala.Cir.Ct. Sept. 12, 1995). The court, after a one-day evidentiary hearing, determined that individual questions of fact predominated over common questions because to establish fact of injury, "each and every purchaser of defendants' contact lenses have to be questioned to ascertain that he or she had (a) purchased contact lenses from an Alabamian ECP or retail optical chain, (b) during the applicable time, (c) in some certain amount, and (d) at a certain price." *Id .* at 3.

In *Holmes v. Abbott Labs., Inc.,* the court denied, without written comment, certification of the proposed class because questions of law or fact common to the class members did not predominate over questions affecting individual members. *Holmes v. Abbott Labs., Inc.,* No. 94-744, at 1 (Mich.Cir.Ct. July 10, 1995).

*McCarter v. Abbot Labs., Inc.* involved an unsuccessful effort to certify indirect purchasers of infant formula products under Alabama law. *McCarter v. Abbott Labs., Inc.,* No CV 91-050, at 2 (Ala. Cir. Ct. April 9, 1993). The court concluded that the plaintiffs could not show proof of impact and noted that the evidence

revealed very little correlation between wholesale and retail pricing. *Id.* at 7.

In *City of St. Paul v. FMC Corp.,* a proposed class of municipal indirect purchasers of chlorine and caustic soda products was not certified. *City of St. Paul v. FMC Corp.,* No. 3-89-0466, 1990 WL 259683, at *1 (D.Minn. Nov. 14, 1990). The court concluded that value added to the product at various points in the chain of distribution precluded proof of the fact of damage element. *Id.* at * *2-3.

In *Keating v. Philip Morris, Inc.,* a proposed class of cigarette purchasers sued cigarette manufacturers for price fixing under state antitrust law. *Keating v. Philip Morris, Inc.,* 417 N .W.2d 132, 134 (Minn.Ct.App.1987). The class was not certified based on, among other things, the lack of any formula to calculate damages. *Id.*

In *Borden, Inc. v. Universal Indus. Corp.,* indirect purchasers of refined sugar were proposed as a class under Mississippi's antitrust laws. *Borden. Inc. v. Universal Indus. Corp.,* 88 F.R.D. 708, 709 (N.D.Miss.1981). The court concluded that "[d]etermination of damages would likely require years of proof regarding the effect of a conspiracy between Borden and other sugar companies on the various levels of distribution." *Id.* at 710; *see also Fischerich v. Abbott Lab., Inc.,* No. MC 94-6868 (Minn.Dist.Ct. May 26, 1995) (class certification denied without comment).

**\*5** The defendant challenges the plaintiffs' ability to show the fact of injury and damages by common proof. The defendant does not appear to challenge that the plaintiffs will be prepared to present common proof on the issue of whether the defendant created a monopoly. Def.'s Mem. at 27; *see Karofsky* at 21 & n. 24. The defendant argues further that because individual issues will predominate, a class action is not the superior method to adjudicate this controversy. Def.'s Mem. at 13-33.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 7

Not Reported in A.2d, 2001 WL 1012261 (Me.Super.), 2001-2 Trade Cases P 73,408
**(Cite as: Not Reported in A.2d)**

The plaintiffs argue that on a motion for class certification, the court must accept the substantive allegations of the complaint as true. Pls.' Mem. at 8 & 22; *see Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177-78 (1974); *Thompson v. Am. Tobacco Co. Inc.,* 189 F.R.D. 544, 549 (D.Minn.1999); *Karofsky* at 5; *contra Szabo v. Bridgeport Mach., Inc.,* 249 F.3d 672, 675-76 (7th Cir.2001) (judge should make whatever factual and legal inquiries are necessary under Rule 23; "proposition that a district judge must accept all of the complaint's allegations when deciding whether to certify a class cannot be found in Rule 23 and has nothing to recommend it" ). The plaintiffs also argue that they are not required to *prove* impact or damages at this stage. Pls.' Reply Mem. at 3; *see Eisen,* 417 U.S. at 177-78; *Potash,* 159 F.R.D. at 694 (common proof of fact of injury is possible without common damage amounts).

Although the benefit of the doubt regarding certification must favor certification, the plaintiffs do have the burden at this stage to demonstrate under a "strict burden of proof" that the requirements of Rule 23 have been satisfied. *See Rex v. Owens ex rel. Oklahoma,* 585 F.2d 432, 435 (10th Cir.1978); *In re Infant Formula Antitrust Litig.,* No. MDL 878, 1992 WL 503465, at *3 (N.D.Fla. Jan. 13, 1992); *Karofsky* at 5. A "rigorous analysis"of Rule 23 prerequisites must be undertaken prior to certification. *See Gen. Tel. Co. of S.W. v. Falcon,* 457 U.S. 147, 161 (1982); *Karofsky* at 6. The court "must look beyond the bald allegations of the complaint and review the facts procured through discovery in undertaking the review of plaintiffs' proffered facts." *Liberty Lincoln Mercury, Inc. v. Ford Mktg. Corp.,* 149 F.R.D. 65, 73 (D.N.J.1993) (citation omitted); *Millett v. Atlantic Richfield Co .,* No. Civ. A. CV-98-555, 2000 WL 359979, at *5 (Me.Super.Ct., Cum.Cty., Mar. 2, 2000) (Cole, J.); *Karofsky* at 6; *see also Schreiber v. Nat'l Collegiate Athletic Ass'n,* 167 F.R.D. 169, 177 (D.Kan.1996) ("Naked assurances that a manageable method for dealing with individual issues will be found and presented at trial are not sufficient to meet [plaintiffs'] burden. "). The court "must analyze the-proposed method of proof to assure that common issues will predominate." *Karofsky* at 21.

The court may be required to accept the allegation in the plaintiffs' complaint that plaintiffs and the class have suffered injury through the supra-competitive prices allegedly charged for Microsoft's operating systems. *See* Pls.' Amended Complaint ¶¶ 5-6. That allegation, without more, is insufficient to obtain class certification. Similarly insufficient is the argument that plaintiffs "will be prepared to prove at trial that they and the Class have been injured in the most basic way-as a result of Microsoft's monopolistic overcharge for its operating systems without which their PCs would not work." Pls.' Mem. at 23.

*Fact of Injury*

**\*6** The plaintiffs must show a viable method to prove the "fact of injury" or "proof of impact" to each class member through proof that is common to all. *Alabama v. Blue Bird Body Co., Inc.,* 573 F.2d 309, 326-27 (5th Cir.1978). The plaintiffs are required to come forward with proof that adequately demonstrates some damage to each individual. *Little Caesar,* 172 F.R.D. at 246.[FN6] The plaintiffs must show "that all suffered some loss ... and that there was a causal relation between the [antitrust violation] and that loss." *Id.* Further, "the fact that a case is proceeding as a class action does not in any way alter the substantive proof required to prove up a claim for relief.... each plaintiff must still prove that [the antitrust violation occurred] and that it did in fact cause him injury." *Blue Bird Body,* 573 F.2d at 327; *see also In re Polypropylene Carpet Antitrust Litig.,* 178 F.R.D. 603, 620 (N.D.Ga.1997) .

> FN6. The plaintiffs are correct that they are not required to prove an amount of class member damages on a motion for certification. Pls .' Mem. at 23; *Little Caesar,* 172 F.R.D. at 245; *Coordination Proceedings Special Title (Rule 1550(b)) Microsoft I-V Cases,* No. J.C.C.P. No. 4106 at 9 n. 7 (Cal.Super. Ct., San Francisco Cty., Aug. 29, 2000) (Pollak, J.); *Karofsky* at 22 & n. 25

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2001 WL 1012261 (Me.Super.), 2001-2 Trade Cases P 73,408
**(Cite as: Not Reported in A.2d)**

Proof of impact is the "key element in determining whether common issues will predominate." *Karofsky* at 22 (quoting *In re Domestic Air Transp.,* No. 90-CV-2485-MHS, 137 F.R.D. 677, 689 (N.D.Ga.1991)); *see also* M.R. Civ. P. 23(b)(3). Because indirect purchasers must demonstrate that overcharges have been passed on to them, such claims present an entirely separate level of evidence and proof than that found in a direct purchaser claim. *See Karofsky* at 22-23.[FN7]

> FN7. The enactment of section 1104 does not change the plaintiffs' burden of proof on a motion for class certification. *See* Pls.' Reply Mem. at 21; 10 M.R.S.A. § 1104; *Karofsky* at 25 & n. 30 (no legislative circumvention of required proof of impact in Maine); *see also Peridot,* 2000 WL 673933, at *2 (no special allowance for indirect purchaser suits to be brought as class actions; suits still must meet all requirements for class certification specified in Minnesota Rules of Civil Procedure); *contra Gordon v. Microsoft Corp.,* No. 00-5994, 2001 WL 366432, at *4 (Minn.Dist.Ct. Mar. 30, 2001).

### Damages

The plaintiffs must show that common proof is available to demonstrate adequately damage to each plaintiff. *See Gordon v. Microsoft Corp.,* No. 00-5994, 2001 WL 366432, at *11 (Minn.Dist.Ct. Mar. 30, 2001). When the issue of damages does not lend itself to "what may be characterized as ' virtually a mechanical task,' 'capable of mathematical or formula calculation," ' the case is not manageable as a class action. *Windham v. Am. Brands, Inc.,* 565 F .2d 59, 68 (4th Cir.1977).

The plaintiffs argue that aggregate judgments are widely used in antitrust, securities and other class actions. The plaintiffs rely on cases involving direct purchasers or cases not on point. *See* Pls.' Mem. at 25 n. 11; *see also Zenith,* 395 U.S. at 114 n. 9 (Zenith's burden of proving fact of damage is satisfied by its proof of *some* damage flowing from unlawful conspiracy); *Bigelow v. RKO Radio*

*Pictures, Inc.,* 327 U.S. 251, 264-265 (1946) (not class action); *Van Gemert v. Boeing Co.,* 590 F.2d 433, 435-36 (2d Cir.1978) (deciding that attorneys' fees and costs could be assessed against unclaimed portion of class action judgment), *aff'd,* 444 U.S. 472, 479-80 & n. 6. (1980); *NASDAQ,* 169 F.R.D. at 521 (buyers and sellers of securities sued NASDAQ under Sherman Act); *Town of New Castle v. Yonkers Contracting Co., Inc.,* 131 F.R.D 38, 42 (S.D.N.Y.1990) (no discussion of aggregate judgment); *In re Sugar Indus. Antitrust Litig.,* 73 F.R.D. 322, 339 (E.D.Pa.1976) (purchasers of refined sugar that "was not a component part of anything else" sued sugar refiners for price fixing under federal antitrust laws); *In re Brand Name Prescription Drugs Antitrust Litig.,* Nos. 94 C 897, MDL 997, 1994 WL 663590, at * *5-6 (N.D.Ill. Nov. 18, 1994) (motions to certify two classes of purchasers of prescription drugs; indirect purchaser class not certified; certified plaintiffs came forward with "a number of different methodologies that can be used in proving damages/injury on a classwide basis;" defendants argued that plaintiffs' methodologies were "too complex").

**\*7** The plaintiffs also argue that *Karofsky* tacitly approves the aggregated damage approach based on the references to *Zenith* and *Potash.* Pls.' Reply Mem. at 17; *see Karofsky* at 22 n. 26 (in direct purchasers actions, some courts have engaged in a presumption that direct purchasers are injured by price-fixing). The court in *Karofsky* was careful to distinguish between proof of impact and proof of amount of damages. *Id.* at 22. Contrary to the plaintiffs' argument, the court in *Karofsky* made clear that the presumption engaged in by some courts regarding injury to direct purchasers is not available in an indirect purchaser case:

Because indirect purchasers must demonstrate that any overcharges resulting from the illegal action of the defendants have been passed on to them, an entirely separate level of evidence and proof is injected into litigation of indirect purchaser claims. Proof of antitrust conspiracy may logically lead to a conclusion that the subject of the conspiracy, the retailers, have each been harmed. No such conclusion logically follows without specific proof tracing that overcharge on to consumers. It is this additional level of proof, added to the already

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2001 WL 1012261 (Me.Super.), 2001-2 Trade Cases P 73,408
**(Cite as: Not Reported in A.2d)**

extraordinary level of complexity of market issues, that has been the focus of all courts asked to certify classes similar to the one pending before the court.

*Karofsky* at 23; *see also NASDAQ,* 169 F.R.D. at 521 ("Once a measure of damages is established, it can be applied to the aggregate trading volumes in Class Securities to determine aggregate damages for the Class as a whole, or to individual transactions to determine damages for individual Class members." ); *Kerr v. Abbott Labs., Inc.,* No. 96-002837, 1997 WL 314419, at *3 (Minn.Dist.Ct. Feb. 19, 1997) (plaintiffs' suggestion that following classwide proof of aggregate damages, individual damages could be handled by a special master is unavailing, damages in this case cannot be determined as a " virtually mechanical task").

### Discussion

The amended class action complaint in this case was filed on June 15, 2000. Pursuant to scheduling orders filed on 6/7/00, 7/19/00, 10/13/00, 11/9/00, and 12/5/00, the parties took discovery on class certification issues from 6/15/00 through 9/30/00. [FN8] Experts were deposed through January, 2001. *See* Third Amended Pretrial Order filed 12/5/00. Memoranda were filed and argument on class certification was held on 5/15/01.

> FN8. Any suggestion by the plaintiffs that discovery was inadequate comes too late. *See* Pls.' Attorneys' Letters dated 5/23/01 & 6/7/01. No request was filed to extend discovery on the certification issue.

In support of their motion for class certification, the plaintiffs relied initially on a series of articles, excerpts of testimony given in *United States v. Microsoft,* deposition testimony of Dr. Jerry A. Hausman, and case law. The plaintiffs devoted less than one page in their initial memorandum to the issue of fact of injury and two pages to damages. Pls.' Mem. at 22-25. In response to the defendant's objection to the plaintiffs' motion for class certification and, in particular, its argument regarding the plaintiffs' inability to show common

proof of impact or damages, the plaintiffs filed *with their reply memorandum* [FN9] an affidavit of Dr. Keith Leffler.[FN10] In their reply memorandum, the plaintiffs stated that they rely on the following to show proof of impact and damages: Judge Jackson's findings in *United States v. Microsoft,* admissions by Microsoft expert Richard Schmalensee during testimony in *United States v. Microsoft,* and the affidavit of Dr. Keith Leffler. Pls.' Reply Mem. at 1; *see* Transcript of 5/15/01 Hearing at 23-24. Each of the materials relied on by the plaintiffs is discussed below.

> FN9. The plaintiffs' motion for class certification, memorandum, and supporting documents were filed on 8/16/00. Dr. Leffler was first asked to prepare an affidavit for the Maine action in late October or November, 2000. *See* Leffler Dep. at 124.

> FN10. In its surreply, the defendant argues that the Leffler affidavit is inadmissible pursuant to M.R. Evid. 401 and 702. Def.'s Surreply at 3-6. His statements in his affidavit are relevant to the issue of whether the plaintiffs can show methodologies to prove fact of injury and damages. Whether his statements are helpful is discussed in this decision. *See infra* pp. 26-33.

### 1. *Articles*

**\*8** The proposed method of proof of impact and damages must be analyzed to assure common issues predominate. *See Karofsky* at 21. The articles submitted by the plaintiffs do not address a method to show common proof of impact or damages on Maine indirect purchasers of Microsoft products.

Mr. Hall discusses the effect of virtual competition on the price of Windows and concludes that *if* "the removal of artificial barriers to entry lowered the self-supply cost to $7 billion, the resulting fall in the price of computers of $11 each would save computer purchasers about $6 billion over the next 5 years." Robert E. Hall, *Toward a Quantification*

Not Reported in A.2d, 2001 WL 1012261 (Me.Super.), 2001-2 Trade Cases P 73,408
**(Cite as: Not Reported in A.2d)**

*of the Effects of Microsoft's Conduct,* Mittel Aff. Ex. B at 8. Contrary to the plaintiffs' suggestion, Mr. Hall did not quantify harm already sustained by Microsoft consumers at $6 billion over a period of five years. Pls.' Reply Mem. at 8.

In their article, Messrs. Fisher and Rubenfeld focus on the monopoly power of Microsoft. Franklin M. Fisher & Daniel L. Rubenfeld, *United States v. Microsoft: An Economic Analysis,* Mittel Aff. Ex. C at 2-6. They discuss at length Microsoft's activity with regard to browsers. *Id.* at 18-33.[FN11] The authors concluded that Microsoft "engaged in a number of anti-competitive actions" and conclude that "Judge Jackson's findings of fact support the view that Microsoft's anti-competitive acts caused immediate harm." *Id.* at 41.

> FN11. The plaintiffs' expert concluded that Microsoft's activity with regard to browsers is not relevant. *See* Leffler Aff. ¶ 5(c); *infra* note 16.

In a second article, these authors critique Microsoft's defense in *United States v. Microsoft.* They concluded that "Microsoft's campaigns to limit competition ... harmed consumers by denying them the fruits of innovation and the choice of alternative forms of computing in the Internet era." Franklin M. Fisher & Daniel L. Rubenfeld, *Misconceptions, Misdirection, and Mistakes,* Mittel Aff. Ex. C at 87-88.

The authors of the report of the Consumer Federation of America conclude that from 1996-1998 monopoly overcharges in the operating system market alone from Microsoft are in the range of $9.1-$11.7 billion. CONSUMER FEDERATION OF AMERICA, MEDIA ACCESS PROJECT, U.S. PUBLIC INTEREST RESEARCH GROUP, THE CONSUMER COST OF THE MICROSOFT MONOPOLY: $10 BILLION OF OVERCHARGES AND COUNTING (Jan.1999), Mittel Aff. Ex. D at 5.

Herbert Hovenkamp states that a "monopoly overcharge at the top of a distribution chain generally results in higher prices at every level

below." HERBERT HOVENKAMP, FEDERAL ANTITRUST POLICY, THE LAW OF COMPETITION AND ITS PRACTICE (1994), Mittel Aff. Ex. E at 564. He states further, however, that

[t]heoretically, one can calculate the percentage of any overcharge that a firm at one distributional level will pass on to those at the next level. However, *the computation requires knowledge of the prevailing elasticities of supply and demand,* and obtaining that information is beyond the technical competence of courts.

*Id.* (emphasis added).[FN12]

> FN12. Dr. Leffler concludes that details of supply and demand are not necessary. *See infra* p. 29.

In their article, Messrs. Harris and Sullivan attempt a comprehensive analysis of passing on the monopoly overcharge. Relying on theoretical and institutional analyses, the authors admit that "a method of investigation in particular cases is still important, if only to show how parties could challenge presumptions based on theory. Something more explicit than an abstract model is thus desirable in order to determine the behavior of particular firms in specific market situations." Robert G. Harris & Lawrence A. Sullivan, *Passing on the Monopoly Overcharge: A Comprehensive Policy Analysis,* 128 U. PENN. L. REV. 269, 300 (1979), Mittel Aff. Ex. F. at 300. These authors agree with Mr. Hovenkamp that "the extent of passing on in a particular market depends mainly upon the elasticities of demand and supply." *Id.* at 273.

### 2. *Microsoft's Expert*

**\*9** Plaintiffs rely on Dr. Richard Schmalensee's alleged admission during *United States v. Microsoft* that all operating system consumers would be harmed if Microsoft engaged in monopoly over charging. *See* Pls.' Reply Mem. at 9. The testimony of Richard Schmalensee makes clear that he made assumptions to support the premise that Microsoft's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2001 WL 1012261 (Me.Super.), 2001-2 Trade Cases P 73,408
**(Cite as: Not Reported in A.2d)**

pricing of Windows shows that Microsoft perceives significant competition. He assumed that the supply of personal computers is highly competitive and that with competitive supply, OEM's pass the price of the operating systems to the consumers as part of the "overall price of the computer." Mittel Aff. Ex. G at B-2. Mr. Schmalensee also assumed that Microsoft has monopoly power. *Id.* at B-3. His analysis further ignored factors that could lower the price. *Id.* at B-4.

### 3. Hausman Deposition

The plaintiffs argue that the defendant's expert, Dr. Jerry A. Hausman, "has used economic methodologies to *estimate* the likely impact to consumers in other contexts." Pls.' Reply Mem. at 10. It appears from the deposition testimony that Dr. Hausman had significant data on which to rely for his work in the Staples case and the Exxon case. *See* 12/22/00 Dep. of Jerry A. Hausman, Mittel Aff., Ex. H at 77-78, 351.

### 4. Case Law

#### Barnard v. Microsoft

A class of indirect Microsoft purchasers was certified in this case prior to discovery. *Barnard v. Microsoft,* No. 99-17602 NZ at 3 (Mich. Cir. Ct., Livingston Cty., May 4, 2000) (Burress, J.). The certification was vacated. *Barnard v. Microsoft Corp.,* No. 00-031123-NZ, Transcript of Nov. 10, 2000 Hearing at 12 (Mich. Cir. Ct., Wayne City) (Colombo, J.) (vacating May 4, 2000 order certifying the class action and staying the motion to certify until discovery was completed).

#### Gordon v. Microsoft

A class of indirect purchasers was certified in this Minnesota case. *See Gordon,* 2001 WL 366432, at *1. The court concluded that "[i]n order to effectuate the Minnesota Legislature's intent, standards for class certification should be

interpreted if at all possible in a fashion that indirect purchasers can meet." *Id.* at *4.[FN13]

FN13. *See supra* note 7.

The parties in the Minnesota case presented affidavits from two of the experts involved in this case, Drs. Hausman and Leffler. In fact, some of the language found in the Minnesota and Maine affidavits appears identical. *Compare id.* at * *8-12, with* Leffler Aff. The plaintiffs in Minnesota relied on the same articles submitted in this case, on the same testimony of Dr. Schmalensee, and on Judge Jackson's findings. *See Gordon,* 2001 WL 366432, at * *8-9.

The *Gordon* court concluded that the "economic theory-that as a general matter a non-negligible cost increase to all distributors at the beginning of a distribution system would, in a highly competitive market, eventually work its way through to a price increase to the consumers at the end of the system-appears well developed enough to entitle Plaintiffs to an opportunity to prove it at trial." *Id.* at *9. With regard to damages, the *Gordon* court concluded that "[a] key concept in Dr. Leffler's analysis is the logical proposition that an increase in the cost of Microsoft OS affects each purchaser in the same manner as an increase in any other cost: ' the impact of a change in Microsoft's charge to the distribution channel would have the same impact as a comparable change in other costs faced by the distribution channel.' ' *Id.* at *11 (quoting Leffler Aff. ¶ 21).

**\*10** On May 8, 2001, the Minnesota Court of Appeals denied Microsoft's petition for discretionary review of the certification order. *See Gordon v. Microsoft Corp.,* Order C8-01-701 (Minn.Ct.App. May 8, 2001). On 7/24/01, the Supreme Court of Minnesota granted discretionary review of the certification order. That review is pending. *See Gordon v. Microsoft Corp.,* Order C8-01-701 (Minn Sup.Ct. July 24, 2001).

#### A & M Supply Co. v. Microsoft

Not Reported in A.2d, 2001 WL 1012261 (Me.Super.), 2001-2 Trade Cases P 73,408
**(Cite as: Not Reported in A.2d)**

This class of indirect purchasers was recently certified. *A & M Supply Co. v. Microsoft Corp.*, No. 00-031123-NZ, at 14 (Mich. Cir. Ct., Wayne Cty. Aug. 21, 2001) (Colombo, J.). The Michigan Court relied on affidavits of Dr. Leffler, which appear similar to the affidavit submitted by him in this case and in the *Gordon* case. *Id.* at 6-8, 11.[FN14] In its discussion of proof of impact and damages, the court cited federal case law exclusively. *Id.* at 6, 8-12.[FN15] In particular, the court relied on *NASDAQ* and *Potash. Id.* at 5, 9, 10, 12.

FN14. *See infra* p. 31.

FN15. *See supra* pp. 6-7.

The *A & M Supply* court cited *NASDAQ* in response to Microsoft's argument that variation in its prices to direct purchasers would affect the plaintiffs' ability to show by common proof that all class members paid an overcharge. *Id.* at 9. The *NASDAQ* case involved plaintiffs who purchased or sold shares of class securities from the defendant market-makers. *NASDAQ*, 169 F . R.D. at 499. The court in *NASDAQ* determined that investors who purchased securities through brokers not owned by the defendants were technically indirect purchasers. Because the brokers did not constitute a "distinct link" in the chain of distribution based on the agency relationship, the direct and indirect purchasers were not "distinct economic entities in the purchase chain." *Id.* at 505-06. The plaintiffs had standing to bring their antitrust claims under *Illinois Brick. Id.* at 505.

The *NASDAQ* court discussed the plaintiffs' proposed methodologies for proving the existence and measure of damages. *Id* . at 521. The court noted that the methodologies are "widely accepted" in antitrust cases. *Id.*

The *A & M Supply* court cited *Potash,* which involved allegations of price-fixing by direct purchasers, as authority for the requirement that the plaintiffs had a "limited burden to show that a reliable method exists for calculating individual damages." *A & M Supply,* No. 00-031123-NZ at 10; *see Potash,* 159 F.R.D. at 687. The *Potash* court

observed that in a price-fixing case, "there is presumption that an illegal price-fixing scheme impacts upon all purchasers of a price-fixed product in a conspiratorially affected market." *Id.* at 695. In addition to the presumption, the *Potash* plaintiffs also provided an expert opinion regarding common proof of impact and damages. Their expert evaluated the relevant market and examined "prices paid before and during the alleged conspiracy, the Defendants' price lists, and actual transaction data." *Id.* at 695-96 & n. 18.

**\*11** The *A & M Supply* court also relied on *Bogosian v. Gulf Oil Corp.,* which involved service station dealers who sued major oil companies and alleged a tie-in violation of the Sherman Act, and stated that plaintiffs are not required to show impact for each class member. *A & M Supply,* No. 00-031123-NZ, at 6; *see Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 439 (3rd Cir.1977). In fact, the *Bogosian* court stated that

Since, as we have indicated, the second aspect of fact of damage is a simple concept of causation, any evidence which is logically probative of a loss attributable to the violation will advance plaintiff's case. There is absolutely no requirement that the loss be personal or unique to plaintiff, so long as the plaintiff has suffered loss in his business or property, for as we have noted, this second aspect of fact of damage is not concerned with any policy of limiting liability. Thus, when an antitrust violation impacts upon a class of persons who do have standing, there is no reason in doctrine why proof of the impact cannot be made on a common basis *so long as the common proof adequately demonstrates some damage to each individual.* Whether or not the fact of damage can be proven on a common basis therefore depends upon the circumstances of each case.

*Id.* at 454 (emphasis added); *see also Windham,* 565 F.2d at 71 n. 36.

### Microsoft Corp. v. Manning

This case involved an allegation of faulty compression software and claims of breach of express and implied warranty, unjust enrichment,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2001 WL 1012261 (Me.Super.), 2001-2 Trade Cases P 73,408
**(Cite as: Not Reported in A.2d)**

and violations of the Magnuson-Moss Act and the state consumer protection act. *See Microsoft Corp. v. Manning,* 914 S.W .2d 602, 605 (Tex.App.1995). The fact of injury and damage questions in this case do not appear to have been contested. The court found the following undisputed common fact: "each putative class member seeks the same amount of damages, about $10.00, representing the MS-DOS 6.2 upgrade price...." *Id.* at 611-12.

*Coordination Proceedings Special Title (Rule 1550(b)) Microsoft I-V Cases*

In this California case, the court certified two classes of indirect purchasers of software products produced by Microsoft. The plaintiffs' expert accepted Judge Jackson's findings and the allegations in the complaint and determined that based on "economic theory and practice, at least some of the overcharge will be passed on by distributors to end consumers." *Coordination Proceedings Special Title (Rule 1550(b)) Microsoft I-V Cases,* No. J.C.C.P. No. 4106 at 13 (Cal.Super. Ct., San Francisco Cty., Aug. 29, 2000) (Pollak, J.).

5. *United States v. Microsoft*

Judge Jackson's findings [FN16] do not constitute a method by which the plaintiffs can show proof of impact or a method for proving damages with regard to the indirect purchasers involved this case. Judge Jackson considered whether Microsoft had violated federal and state antitrust laws.[FN17] *See United States v. Microsoft Corp.,* 87 F.Supp.2d 30, 35 (D.D.C.2000); *rev'd in part,* 253 F.3d 34 (D.C.Cir.2001); *Microsoft,* 84 F.Supp.2d at 12. A finding that Microsoft's actions had "harmed consumers in ways that are immediate and discernible" and had "also caused less direct, but nevertheless serious and far-reaching, consumer harm by distorting competition" does not show how these Maine plaintiffs will show proof of impact to indirect purchasers in Maine. *Microsoft,* 84 F.Supp.2d at 111. Similarly, the finding that Microsoft could have charged $49 for an upgrade to Windows 98 but charged $89 does not show proof of impact to Maine purchasers. *See id.* at 27; *see*

*also Elder-Beerman Stores Corp. v. Federated Dep't Stores, Inc.,* 459 F.2d 138, 148 (6th Cir.1972) (private litigant stands in different position than government in antitrust action; damage need not be shown in government action). Judge Jackson also found that

FN16. Judge Jackson's decision includes 412 paragraphs of findings. *See United States v. Microsoft Corp.,* 84 F.Supp.2d 9 (D.D.C.1999); *see also United States v. Microsoft Corp.,* 87 F.Supp.2d 30 (D.D.C.2000). The plaintiffs cite the cases three times, generally for the proposition that Microsoft enjoyed monopoly power. *See* Pls.' Mem. at 7, 21-22; Pls.' Reply Mem. at 10. Plaintiffs state, with no supporting authority, that "Judge Jackson's findings are not limited to particular consumers or distribution channels. They apply to all consumers, regardless of how and from whom they purchased." Pls.' Reply Mem. at 10.

FN17. The fact that a defendant has engaged in illegal conduct is only one of several elements of class action certification. For example, in *Dry Cleaning & Laundry Institute of Detroit, Inc. v. Flom's Corp.,* the plaintiffs were direct purchasers of dry cleaning products and brought their antitrust allegations pursuant to the Sherman Act. Notwithstanding that the defendants had pleaded guilty in a separate criminal action with regard to price fixing, the court declined to certify the class pursuant to 23(b)(3). *Dry Cleaning & Laundry Inst. of Detroit, Inc. v. Flom's Corp.,* No. 91-CV-76072-DT, 1993 WL 527928, at *1 (E.D.Mich. Oct. 19, 1993). The court concluded that the plaintiffs' expert's methodologies were inadequate because they did not establish a structure to the prices in the industry and failed to take into account varying markets, sales at deviated prices as a result of discounts, and customer differences between different

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2001 WL 1012261 (Me.Super.), 2001-2 Trade Cases P 73,408
**(Cite as: Not Reported in A.2d)**

geographical areas. *Id.* at *4. The court distinguished *In re Domestic Air Transportation Antitrust Litigation* because in that case, the plaintiffs' expert had gone beyond merely identifying prospective methodologies regarding damages. *Id.* at *6.

**\*12** [t]he debut of Internet Explorer and its rapid improvement gave Netscape an incentive to improve Navigator's quality at a competitive rate. The inclusion of Internet Explorer with Windows at no separate charge increased general familiarity with the Internet and reduced the cost to the public of gaining access to it, at least in part because it compelled Netscape to stop charging for Navigator. These actions thus contributed to improving the quality of Web browsing software, lowering its cost, and increasing its availability, thereby benefitting consumers.

*Microsoft,* 84 F.Supp.2d at 110-11.[FN18]

> FN18. Dr. Leffler concluded that " Microsoft's monopolization activities concerning its Internet Explorer Web Browser are not of relevance in assessing injury to class members from Microsoft's monopolization of operating systems during the class period." Leffler Aff. ¶ 5(e).

### 6. *Leffler Affidavit*

As noted, the affidavit of Dr. Keith Leffler was filed with the plaintiffs' reply memorandum, after extensive materials, including the affidavits of Dr. Hausman, Professor Meehan, and others, were filed with the defendant's memorandum in opposition to the plaintiffs' initial memorandum. Dr. Leffler considered his task to be "to respond to the issues raised by Microsoft's experts" and in particular, "to respond to Professor Hausman's opinions that impact on plaintiffs cannot be proved on a classwide basis and that calculation of damages cannot be done in a formulaic way." Leffler Aff. ¶ 3.[FN19] He offers his opinions "in response to the Hausman and Meehan Affidavits ...." *Id.* ¶ 5.

> FN19. As discussed, the Leffler affidavit was filed with the plaintiffs' reply brief. The class certification stage is not an occasion for a battle of the experts. *See Caridad v. Metro North Commuter R.R.,* 191 F.3d 283, 292 (2d Cir.1999). Instead, at this stage, the plaintiffs are required to make a threshold showing that the antitrust activity had a common impact on members of the class. *See In re Cardizem CD Antitrust Litig.,* 200 F.R.D. 297, 321 (E.D.Mich.2001). The defendant has no burden. *Contra* Pls.' Reply Mem. at 11 (" Microsoft's Experts Do Not Succeed in *Proving* at this Early Stage That No Possible Method Is Available to Show Classwide Antitrust Injury"); Pls.' Reply Mem. at 15 n. 13 ("Microsoft has made no such showing here."); Leffler Aff. ¶ 5(c) ( "Professor Hausman's analysis offers no evidence to the contrary.").

After months of discovery on the certification issue, Dr. Leffler states:

I understand there has been very little discovery in this case. I therefore have not had access to any data that would allow me to actually calculate damages. *Id.* ¶ 4.

I have not at this time actually performed the detailed careful economic and statistical work that will be required to accurately determine class damages. *Id.* ¶ 5 n. 4.

I also understand that at the certification stage, plaintiffs need not prove the fact of impact or quantify damages. *Id.* ¶ 4.

Absent discovery and the required data, I have not implemented the actual damage calculation, but such analysis should simply require application to each relevant Microsoft overcharge of the statistical methodologies that would be used to estimate a single overcharge had Microsoft not price discriminated. *Id.* ¶ 31.

Dr. Leffler describes the "type of economic analysis, evidence and data [he] would likely use to determine the scope of the impact of Microsoft's alleged monopolization of Intel-PC compatible operating systems on Maine end-users and to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                     Page 15

Not Reported in A.2d, 2001 WL 1012261 (Me.Super.), 2001-2 Trade Cases P 73,408
**(Cite as: Not Reported in A.2d)**

describe the methods by which any damages to Maine end-users can be calculated on a classwide basis." *Id.* ¶ 3. He relies on "basic economic principals to show that the proposed class members paid higher prices during the class period for Microsoft operating system software whether purchased as a software packager or preinstalled on a PC because of Microsoft's monopolization.... [b]asic economic principles, therefore, show that the proposed class members have been injured." *Id.* ¶ 5(a). He states that "any Microsoft overcharge would have been imbedded in the prices at all levels of distribution" and "[a]ny anticompetitive Microsoft price changes during the class period would only have changed the level of the pre-existing overcharge." *Id.* ¶ 5(b). He states further that "[d]etermination of Microsoft's overcharge is amenable to standard economic yardstick approaches." *Id.* ¶ 5(d). Finally, he states that "Microsoft's monopolization activities concerning its Internet Explorer Web Browser are not of relevance in assessing injury to class members ...." *Id.* ¶ 5(e).

**\*13** Dr. Leffler proposes to determine Microsoft's overcharges resulting from anticompetitive conduct through three alternative yardstick methodologies. *Id.* ¶¶ 5(d), 21-31. Regression analysis would be used to determine the price impact of the Microsoft overcharges on end-users. *Id.* ¶¶ 32; 35-38. Dr. Leffler states:

The first step to measure the damages suffered by the class of Maine end-users will be to estimate Microsoft's overcharge to its buyers. This overcharge is the difference between the price actually paid for Microsoft's operating system software and the price that would have been paid absent or "but-for" Microsoft's alleged unlawful conduct. There is nothing unique about estimating Microsoft's "but-for" price and overcharge compared to other overcharge situations ... The estimation of Microsoft's overcharge should be straight forward using standard economic methods of overcharge estimation ... In this case, each of these three alternative yardstick approaches likely can be used to estimate the overcharges that resulted from Microsoft's monopolization actions ... Absent discovery and the required data, I have not implemented the actual damage calculation, but

such analysis should simply require application to each relevant Microsoft overcharge of the statistical methodologies that would be used to estimate a single overcharge had Microsoft not price discriminated.

....

Once the overcharge by Microsoft to distributors has been estimated, calculation of damages to the class requires a final step. In acquiring the right to use the Microsoft operating system, members of the class did not deal with Microsoft but rather with one of the distributors of its products. Therefore, it is necessary to determine how the overcharge by Microsoft will impact the prices charged by the final users by these distributors. In my opinion, the data should be readily available to apply sound, accepted economic and statistical methodologies to estimate the impact of Microsoft's overcharges on the prices to end users ... Separate end-user overcharges and damages could be estimated for each appropriate Microsoft customer channel through using a single regression model.

*Id.* ¶¶ 21, 23, 31, 32 & 38. He notes that it is an " accepted economic principal that monopoly overcharges flow through to end-users." *Id.* ¶ 8 n. 8. Further, "[b]asic economic principals show that the end-user price will increase if the distributors' cost increases in all cases except where a product faces extremely close substitutes." *Id.* ¶ 9 (footnote omitted). He continues: "[t]he economics literature therefore demonstrates that any overcharge by Microsoft is expected to result in all end-users (i.e., class members) paying higher prices regardless of the specific point in the distribution chain from which they purchased. This implies that class members will in fact be injured as a result of any overcharge by Microsoft." *Id.* (footnotes omitted).

**\*14** With regard to the estimate of Microsoft's overcharge, Dr. Leffler states that the price charged by Microsoft should be available from Microsoft. *Id.* ¶ 21. Data for the analysis of how the overcharge damaged end-users "should be readily available." *Id.* ¶ 34.

Dr. Leffler does not state that he or anyone has used the proposed yardstick methods to estimate

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                      Page 16

Not Reported in A.2d, 2001 WL 1012261 (Me.Super.), 2001-2 Trade Cases P 73,408
**(Cite as: Not Reported in A.2d)**

overcharges in an indirect purchaser case. *See id.* ¶ ¶ 21-22. There is no assertion that these yardstick methods provide reliable methods for determining damages in an indirect purchaser case. For example, he states that "a comparison of Microsoft's operating system prices and revenues to the prices and revenue available to the providers of Internet portals is likely a useful application of the standard economic yardstick approach ...." *Id.* ¶ 27; *see Karofsky* at 27 (plaintiff's expert had not undertaken any analysis but instead suggested that regression analysis could provide method for classwide proof of impact).

Dr. Leffler agrees with Microsoft that buyers paid many different prices to Microsoft but states that these overcharges can "still be measured in a formulaic way" by simply applying to each relevant overcharge "the statistical methodologies that would be used to estimate a single overcharge had Microsoft not price discriminated." Leffler Aff. ¶ 31. He notes that "to estimate such [end-user] damages, a proper analysis must identify how an overcharge or cost increase at the initial level of distribution impacts end users prices." *Id.* ¶ 40.

In a stark reversal of roles, Dr. Leffler critiques the data and conclusions offered by Microsoft's experts and other affiants. *See, e.g., id.* ¶ ¶ 15 n. 21, 18 (" There is no way of knowing whether any actual sales were made to any Maine purchasers at these high prices."). It is Microsoft's experts who have analyzed data specific to Maine to determine whether economic theory works in the real world; Dr. Leffler has done no such analysis. *See Wood v. Abbott Labs., Inc.,* No. 96-512561-CZ, 1997 WL 824019, at *2 (Mich.Cir.Ct. Sept. 11, 1997) (plaintiff's expert's theories not consistent with facts provided by defendants' experts). In particular, James Meehan, a professor of economics, presented an extensive analysis of the retail prices in Maine for Intel/Windows-compatible computers that use a Microsoft Windows operating system. Meehan Aff. ¶ 4.

Microsoft's experts specifically address factors in the PC market that affect an analysis of competitive conditions, and, therefore, an analysis of the amount of pass-through of a Microsoft overcharge. *See, e.g.,*

Meehan Aff. ¶ ¶ 6, 22-23, 27-30, 65 (highly differentiated computer market in Maine); First Hausman Aff. ¶ ¶ 26, 29, 66, 71-72. Dr. Hausman concludes that the situation-specific facts about the elasticities of supply and demand must be known. *Id.* ¶ ¶ 54, 66 ("the number of demand curves that would have to be estimated is enormous"). Contrary to the opinions of Dr. Hausman and authors of the articles on which the plaintiffs rely,[FN20] Dr. Leffler states that "the details of supply and demand at each stage of the distribution chain are not necessary for a proper damage calculation." Leffler Aff. ¶ ¶ 5(d), 33, 40. [FN21]

FN20. *See supra* p. 19.

FN21. Clearly, an examination of the demand curve of each firm between Microsoft and the end-user would preclude certification. *See* Second Hausman Aff. ¶ 9.

**\*15** Microsoft provides extensive data regarding the following, among other topics:

(1) the sale of its operating system software as a component of a PC and the number of different operating system products are included in the class definition. *See* Kolb Aff. ¶ 6; Dibb Aff., Att. A; *but see* Leffler Aff. ¶ 21 ("Microsoft produces relatively few products, sells them to relatively few buyers, and changes prices relatively infrequently.");

(2) the levels of distribution that precede the end-users' receipt of the software. *See, e.g.,* Kolb Aff. ¶ ¶ 7, 11, 15, 24; Burg Aff. ¶ ¶ 6, 11-13;

(3) the choice of manufacturers and sellers offered to Maine's consumers. *See, e.g.,* Meehan Aff. ¶ ¶ 6, 22-23;

(4) the prices paid to Microsoft. *See, e.g.,* Kolb Aff. ¶ ¶ 18, 21;

(5) the fact that intermediate sellers price their products independently of Microsoft. *See* Kolb Aff. ¶ ¶ 11, 23;

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                          Page 17

Not Reported in A.2d, 2001 WL 1012261 (Me.Super.), 2001-2 Trade Cases P 73,408
**(Cite as: Not Reported in A.2d)**

(6) the significantly different prices, including rebates, for which identical PCs are available in Maine. *See, e.g.,* Meehan Aff. ¶¶ 8, 10-11, 33-36, 51, 57, 67. In response, Dr. Leffler assumes essentially perfect competition and concludes that " the economic expectation in competitive markets is that cost increases will be fully reflected in the price to the end users." Leffler Aff. ¶ 39; *contra* Second Hausman Aff. ¶ 3(E).

Microsoft provides data regarding distributors' pricing of PCs. *See* Shore Aff. ¶¶ 10-13; Hausman Aff. ¶ 31. Dr. Leffler responds: "[t]his result, that higher cost products sold for lower prices in a competitive market, is counter to the most basic of economic propositions. The results are therefore questionable." Leffler Aff. ¶ 18 & n. 32.

Dr. Leffler states that he has filed affidavits concerning class certification in Tennessee, Minnesota, Wisconsin, and Kansas and that "[t]his affidavit follows the analysis offered there." *Id.* ¶ 3 n. 2; Leffler Dep. at 121-25. As discussed above, the information provided by Dr. Leffler in the Minnesota and Michigan cases appears similar to that in this case. His analysis is generic. As stated in *Karofsky,* the court must "review the facts procured through discovery in undertaking the review of the [plaintiffs'] proffered facts." *Karofsky* at 6. Dr. Leffler provides no facts; [FN22] he relies on " standard, well-accepted, economic and statistical tools based on data that should be available." Leffler Aff. ¶ 5(d).

> FN22. For example, Dr. Leffler assumes that Maine "consumers do not have access to close substitutes to Microsoft's operating systems." Leffler Aff. ¶ 9. Dr. Leffler does, however, criticize Microsoft's experts, Dr. Hausman and Professor Meeham for not providing enough information regarding Maine consumers. *Id.* ¶ 15 n. 21.

In *Karofsky,* the court faulted the plaintiffs' expert because, among other things, he had not undertaken a regression analysis with regard to Maine data.

*Karofsky* at 26. The court stated that "[plaintiffs' expert] suggests that regression analysis *could* provide a method for class wide proof of impact. However, he has not undertaken even a preliminary regression analysis on any Maine pharmacy.... In addition, he has not run any of the regression analyses on Maine data to determine whether the time or geography of the sale affects pass on." *Id.* at 27-28. Dr. Leffler has not done any pass through analysis based on Maine data. Further, he testified at his deposition that he has never focused his research on the pass through issue. Leffler Dep. at 114-15; Def.'s Surreply, Ex. B.[FN23]

> FN23. To the extent that Dr. Leffler has relied on any data, the defendant argues that those facts are not relevant to this case. *See* Def.'s Surreply at 3-4; Pls.' Amended Complaint, ¶¶ 26-31; Leffler Dep. at 147-48.

*Conclusion*

**\*16** The certification of a consumer products class action dramatically affects the litigation. *See Millett,* 2000 WL 359979, at \* \*18-19 (certification mass tort class actions dramatically affects stakes for defendants, strengthens number of unmeritorious claims, results in significantly higher damage awards, and creates "insurmountable pressure on defendants to settle"). The plaintiffs must, therefore, show under a strict burden of proof that the have satisfied the requirements of Rule 23.

In response to arguments similar to those in this case, a Wisconsin judge observed that " [c]onstructing economic models in order to reach generalized conclusion about economic behavior is one thing; using such theories to prove that every class member has suffered a loss and the amount of that loss is quite another." *Derzon v. Appleton Papers, Inc.,* No. 96-CV-3678, 1998 WL 1031504, at \*8 (Wis.Cir. July 7, 1998). That court concluded that class certification required "more than blind faith in the notion of regression analysis." *Id.*

Although this is not the time for a battle of experts, the plaintiffs must show that they are armed with

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2001 WL 1012261 (Me.Super.), 2001-2 Trade Cases P 73,408
**(Cite as: Not Reported in A.2d)**

more than general, untried economic theory.[FN24] They are required to show that their proposed methods are workable with real world facts.[FN25] After months of discovery on the certification issue, the plaintiffs have not shown that they have the means to prove impact or damages on a classwide basis.[FN26]

> FN24. *See supra* note 19.
>
> FN25. Except for the response to the materials filed by Microsoft, the materials on which the plaintiffs rely, including the proposed methodologies in the Leffler affidavit, could have been filed with the plaintiffs' complaint in December, 1999. Nothing in the materials appears to have been obtained during discovery on the certification issue. Nothing is specific to this case or to Maine indirect purchasers.
>
> FN26. *See Derzon,* 1998 WL 1031504, *7 ( "Plaintiff suggests that at this stage the court must not consider the *merits* of plaintiff's methodology, but the *viability* of the proposed methodology. Whether or not this rather exquisite distinction is helpful, plaintiff is correct that he need not prove his case at this point. He does, however, bear the burden of establishing that he possesses the means to prove it.").

The plaintiffs have not shown that questions of law or fact common to the members of the class will predominate over any questions affecting only individual members. *See* M.R. Civ. P. 23(b)(3). For this same reason, the proposed class action is not the superior method for adjudicating this controversy because of the difficulties likely to be encountered in managing the plaintiffs' claims as a class action. M.R. Civ. P. 23(b)(3)(D);[FN27] *Millett,* 2000 WL 359979, at *17.

> FN27. The defendant does not address the factors listed in 23(b)(3)(A)-(C). M.R. Civ. P. 23(b)(3)(A)-(C); Def.'s Mem. at 31-33; *see Sugai,* 1997 WL 824122, at *16.

The entry is
The Plaintiffs' Motion for Class Certification is DENIED.

Me.Super.,2001.
Melnick v. Microsoft Corp.
Not Reported in A.2d, 2001 WL 1012261 (Me.Super.), 2001-2 Trade Cases P 73,408

Briefs and Other Related Documents (Back to top)

• 2001 WL 35709523 () Affidavit of Dr. Keith Leffler in Support of Plaintiffs' Motion for Class Certification (Jan. 16, 2001) Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT O



Not Reported in F.Supp.2d                                                                                    Page 1

Not Reported in F.Supp.2d, 2003 WL 22048232 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

H
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
In re METHIONINE ANTITRUST LITIGATION.
**No. 00-1311.**

Aug. 26, 2003.

Purchaser filed putative class action pursuant to Wisconsin's antitrust laws, alleging that seller engaged in 15-year conspiracy to fix the price of methionine. Following the District Court's certification of indirect purchaser class action, seller moved to decertify the class. The District Court, Breyer, J., held that purchaser did not have colorable method for proving antitrust injury based on the insufficient methodology employed by expert, requiring that the extent of antitrust impact would have to be determined individually.

Motion granted.

See also 204 F.R.D. 161;2001 WL 1018708.

West Headnotes

**Antitrust and Trade Regulation 29T ☞963(3)**

29T Antitrust and Trade Regulation
    29TXVII Antitrust Actions, Proceedings, and Enforcement
        29TXVII(B) Actions
            29Tk959 Right of Action; Persons Entitled to Sue; Standing; Parties
                29Tk963 Injury to Business or Property
                    29Tk963(3) k. Particular Cases. Most Cited Cases
    (Formerly 265k28(1.4))
Purchaser who filed putative class action on behalf of other indirect purchasers, alleging that seller engaged in 15-year conspiracy to fix price of methionine, did not have colorable method for proving antitrust injury, as required to support extent of injury on class-wide basis, and thus,

decertification of class was warranted; although proposed methodology of purchaser's expert to determine amount of overcharge on class-wide basis was adequate, the methodology that expert subsequently employed did not take into account the complexity of synthetic methionine industry and required that extent of antitrust impact be determined individually.

MEMORANDUM AND ORDER
BREYER, J.
**\*1** This Document Relates To: West Bend Elevator, Inc. v. Rhone-Poulenc S.A. 00-3961

Plaintiff West Bend Elevator, Inc. ("West Bend"), a Wisconsin corporation, brings this price-fixing lawsuit under Wisconsin's antitrust statute. The Court previously certified the lawsuit as a class action. Now before the Court is defendants' motion to decertify the class. After carefully considering the papers filed by the parties and all the pleadings in this action, and having had the benefit of oral argument, defendants' motion to decertify the class is GRANTED.

BACKGROUND

This lawsuit arises out of an alleged 15-year conspiracy by defendants to fix the price of methionine. Defendants sell synthetic methionine in variety of forms to direct purchasers, that is, those who purchase the methionine directly from defendants. West Bend is a Wisconsin grain elevator and feed mill and also operates a hog farm. During portions of the alleged conspiracy, it purchased methionine to resell and for its own use in its hog farm operation. West Bend filed this putative class action under Wisconsin's antitrust laws in Wisconsin state court on behalf of all indirect methionine purchasers; that is, those who purchased methionine from someone other than defendants.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 22048232 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

Defendants successfully removed the action to Wisconsin federal court and the Multi-District Litigation Panel transferred the action to this Court. *See* 28 U.S.C. § 1407. The Multi-District Litigation ("MDL") matters that were pending before this Court included a consolidated nation-wide class action on behalf of direct purchasers of methionine, several actions by individual opt-out direct purchasers, and this matter. The Court certified the direct purchaser class action and in August 2002 approved a $107 million settlement. All of the direct purchaser opt-out actions settled earlier this year. West Bend is the only methionine price-fixing case that is still pending.

### A. West Bend's First Motion to Certify the Class

The Court denied West Bend's initial motion for class certification on the ground that plaintiff had not come forward with a "colorable method" of proving antitrust impact, otherwise known as injury in fact, on a class-wide basis. *In re Methionine Antitrust Litigation,* 204 F.R.D. 161, 165 (N.D.Cal.2001). In particular, the Court held that plaintiff's expert, John M. Connor, did not consider that the proposed class included both resellers and ultimate users and that the overpriced product-methionine-is incorporated into other products. *Id.* at 164-65.

### B. West Bend's Second Motion to Certify the Class

West Bend subsequently amended its complaint to bring its claims on behalf of a much narrower class, namely, those who indirectly purchased methionine from defendants in Wisconsin for end use as an animal feed additive; in other words, only those Wisconsin indirect purchasers who did not resell the methionine. West Bend defined the proposed class as follows:
**\*2** All persons and entities ... who purchased methionine in the State of Wisconsin for end use as an animal feed additive (excluding pet feeds for dogs, cats, birds, and fish) indirectly from any of the defendants at any time during the period January 1, 1985 to the end of 1998.

After the parties engaged in further class certification discovery, West Bend moved for certification of this narrower class.

The motion's primary issue was again whether West Bend would be able to prove on a class-wide basis that the class members were injured by the alleged price-fixing conspiracy. To prove that each class member was actually injured, West Bend must demonstrate that the "overcharge" was passed on to each class member, that is, that the methionine reseller who purchased methionine (either directly or indirectly) from defendants paid an inflated price for the methionine and then "passed on" that overcharge to the class member. The Court assumed, for the purpose of the motion, that West Bend could prove the direct purchasers were overcharged for methionine, as well the approximate amount of the overcharge over time. The issue presented was whether West Bend could prove on a class-wide basis that the overcharge was passed on through the various distribution channels to the indirect purchaser end users.

In support of its renewed motion to certify, West Bend relied on a new expert, Dr. Keith Leffler. Dr. Leffler's theory of antitrust impact was, in brief, that given the longevity of the conspiracy, it is common sense that the methionine end users were injured. He therefore proposed comparing the price of methionine products before the conspiracy (pre-1985) to shortly after the conspiracy began to measure the impact of the conspiracy. Any end user during the 15-year class period would be impacted by the conspiracy regardless of whether at any given time a reseller might raise the price of the methionine-containing product for some reason rather than an overcharge; the price paid by the end user would still be higher than it would have been absent the conspiracy because the whole price structure would have been raised because of the conspiracy.

Dr. Leffler proposed to calculate the overcharge pass-on rate for the class using multiple regression analysis. He testified that he would start with the prices paid by end users for methionine-containing products, "regress out" most of the independent factors that might have influenced the price to end

Not Reported in F.Supp.2d                                                    Page 3

Not Reported in F.Supp.2d, 2003 WL 22048232 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

users (labor costs, price of other ingredients, etc.), and be left with how much of an overcharge was passed on to end users.

Defendants raised several challenges to West Bend's proposed methodology. With respect to whether the amount of the overcharge could be determined on a class-wide basis, they argued that the data Dr. Leffler proposed using would necessarily be inaccurate and therefore the amount of the overcharge would necessarily be inaccurate. The Court rejected this argument, noting that many courts have accepted the use of multiple regression analysis and that there is no requirement that a particular method result in a wholly accurate number, and, in any event, the accuracy of plaintiff's figure would be related to the sample size input into Dr. Leffler's formula; the larger the sample the more accurate, as an average, would be the resulting number. Sep. 20, 2002 Memorandum and Order at 7.

**\*3** Defendants also argued that the data necessary for performing Dr. Leffler's proposed multiple regression analysis was not available. The Court held that it was premature to deny West Bend's motion on that ground. Dr. Leffler had stated in his declaration that sufficient data could be collected and the Court could not find, on the record before it at the time, that it could not. *Id.*

Defendants argued further that the price of methionine in the animal feed sold to end users is so minuscule compared to the other feed ingredients and the product as a whole that Dr. Leffler could not compute a reasonably accurate overcharge rate on a class-wide basis. Dr. Leffler rebutted this argument by noting that there was no reason to believe that the pass-on rate was any different for methionine than for the other ingredients and therefore the rate could be determined by calculating the rate for other ingredients which consist of a larger percentage of the price of the final product. *Id.* at 7-8.

Since West Bend's expert had proposed a "colorable " method of proving the amount of the illegal overcharge on a class-wide basis, the Court concluded that questions common to the class

predominated and that class action status was otherwise appropriate. *Id.* At 11-12.

### D. Defendants' Motion to Decertify the Class

As the MDL pretrial proceedings have come to a close, including expert discovery, defendants now move to decertify the class. They argue that Dr. Leffler has not performed any of the data gathering or analysis that was necessary to make his theory of proving the amount of the overcharge on a class-wide basis "colorable."

### DISCUSSION

Once a district court certifies a class, it continues to possess the authority and discretion to determine whether the certification should be amended or vacated in its entirety. *See* Fed.R.Civ.P. 23(c)(4)(B) ; *Armstrong v. Davis,* 275 F.3d 849, 872 n. 28 (9th Cir.2001). As courts have noted,
"[o]nce a class is certified, the parties can be expected to rely on it and conduct discovery, prepare for trial, and engage in settlement discussions on the assumption that in the normal course of events it will not be altered except for good cause. Sometimes, however, developments in the litigation, such as the discovery of new facts or changes in the parties or in the substantive or procedural law, will necessitate reconsideration of the earlier order and the granting or denial of certification or redefinition of the class."

*O'Connor v. Boeing North American, Inc.,* 197 F.R.D. 404, 409-10 (C.D.Cal.2000), quoting *Cook v. Rockwell Int'l Corp.,* 181 F.R.D. 473, 477 (D.Colo.1998) (internal quotation and citation omitted). While plaintiff carried the initial burden of proving that class certification was appropriate, defendants shoulder the burden of proving that certification is no longer warranted. It is worth noting that plaintiff has not sent notice to the class, even though the Court certified this class action one year ago.

**\*4** Defendants argue that changes in the litigation, namely, West Bend's abandonment of its proposed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 22048232 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

methodology for determining the amount of the overcharge on a class-wide basis, warrant vacating the order certifying the class. *See Monaco v. Stone,* 187 F.R.D. 50, 59 (E.D.N.Y.1999) ("A class may be decertified if later events demonstrate that the reasons for granting class certification no longer exist or never existed."); *Cook,* 181 F.R.D. at 478 (" Decertification is warranted where materially changed or clarified circumstances have been shown that would make the continuation of the class action improper.").

The Court agrees that West Bend no longer proposes to prove the amount of the overcharge by the methodology Dr. Leffler originally proposed. Dr. Leffler did not perform a multiple regression analysis as he promised he would do. He did not gather any of the data which he promised he would do. And he did not examine any of the multiple variables that could affect the price of methionine in the products sold to end users. He did not even analyze the price of other ingredients in the animals feeds as a way of determining the pass-on rate for methionine. In short, he did none of the proposed analysis upon which the Court relied in granting West Bend's motion for class certification.

The question, then, is whether what Dr. Leffler did do is sufficient to support a finding that the class was damaged by the price-fixing conspiracy and is sufficient to support a finding on a class wide basis of the amount or amounts of the overcharge. If it is not, common questions of law or fact may not predominate, making maintenance of the class inappropriate. *See Seligson v. Plum Tree, Inc.* 61 F.R.D. 343, 344 (E.D.Pa.1973) (stating that decertification is warranted where individual issues of proof predominate).

Dr. Leffler performed seven simply (rather than multiple) regressions. He concludes from those regressions that the pass-on rate for the entire class for the entire 15-year damage period is the unweighted average of five of the regressions, or, at a minimum, the lowest rate of the same five regressions. He multiplies those pass-on rates by the amount of the overcharge and by the estimated volume of methionine purchased by end users to calculate damage to the class as approximately $4

million to $6.5 million, depending on which pass-on rate is used.

Dr. Leffler's new-and much simplified-method of computing the extent of the antitrust injury is unreasonable for several reasons. First, the simple regression analysis does not take into account any of the myriad variables that could account for the price of the final product to the end user. For example, in one regression, he determined a pass-on rate by taking the average price of methionine and comparing it to the price of "FM Poultry Mix" sold to a single end user. The FM Poultry Mix is composed of only eight percent methionine. Although the relationship between the price of methionine to direct purchasers and the price of FM Poultry Mix to the end user will depend on many variables, including labor, transportation costs, and most importantly, changes in the price of the other 92 percent of the Mix's ingredients, Dr. Leffler's regression does not take into account any of these factors. He fails to do so even though the whole premise behind his original proposed methodology was that such factors had to be considered. *See* Declaration of Keith Leffler (dated February 14, 2002) at ¶ 18 (stating that to determine the pass-on rate he would use multiple regression analysis " since a *proper* estimate of the pass-on rate must control for the influence of other ingredient price changes or other cost changes) (emphasis added); *id.* at ¶ 20 (stating that the variables he intends to study in his regression analysis include "indices of labor costs over time, a variable for whether delivery is included, a variable measuring whether the payment terms vary among customers or over time, and a variable to account for changes in the economic conditions impacting livestock industries" ).

**\*5** Second, the seven regressions are not representative samples of the Wisconsin methionine end user market. None of the samples involves finished feed product. Three of the regressions involve sales to a *single* end user. Only three of the regressions actually link manufacturers' prices to prices paid by end users, and these regressions analyze products with a high percentage of methionine; they are not representative of the large volume of products sold to end users. All of the

Not Reported in F.Supp.2d, 2003 WL 22048232 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

data involve only two intermediaries, and only one intermediary is involved in the three regressions that actually link manufacturers' prices with prices to end users.

Third, Dr. Leffler's regressions analyze data from an extremely limited time period. The damages period is 1984 through 1999, yet none of the regressions includes data from before 1995, and four of them do not include any data from before late 1996. Some of Dr. Leffler's regressions even include data from outside the damages period. Based on this data, Dr. Leffler opines as to the pass-on rate for the entire 15-year conspiracy. He has not offered any rational explanation as to how such analysis is valid.

Fourth, Dr. Leffler's methodology fails to weigh the various regressions. He does not account for the disparity in volume of methionine sold from month-to-month in any given regression, and he fails to take into account the different data involved in each regression. He simply gives each regression (other than the two he ignores) equal weight in computing an average pass-on rate. Nor does he take into account the different products involved in each regression

In sum, if West Bend had moved for class certification on the basis of the methodology Dr. Leffler ultimately employed, the Court would have denied plaintiff's motion. Dr. Leffler's method is "so insubstantial as to amount to no method at all." *In re Potash Antitrust Litig.,* 159 F.R.D. 682, 697 (D.Minn.1995). As the record in these consolidated cases amply demonstrates, the synthetic methionine industry in the United States is complex. It involves multiple sellers, a myriad of distribution channels, and hundreds of different products. The complexity is increased when one considers the impact to end users, many of whom purchased products containing very little methionine. Dr. Leffler's original proposed methodology recognized and addressed this complexity. The methodology he ultimately employed, however, does not take any of it into account. Accordingly, West Bend does not have "colorable" method for proving antitrust injury, and the extent of that injury, on a class-wide basis.

Since the extent of the antitrust impact will have to be determined individually, the Court concludes that individual issues predominate and this indirect purchaser price-fixing case is not appropriate for resolution as a class action.

CONCLUSION

For the foregoing reasons, the Court GRANTS defendants' motion to decertify the class. Since West Bend never sent notice to prospective class members, the Court need not send notice of the dissolution to the prospective class.

**\*6** IT IS SO ORDERED.

N.D.Cal.,2003.
In re Methionine Antitrust Litigation
Not Reported in F.Supp.2d, 2003 WL 22048232 (N.D.Cal.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT P



Slip Copy                                                                                                      Page 1

Slip Copy, 2006 WL 572345 (S.D.N.Y.)
**(Cite as: Slip Copy)**

**H** Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
James NEWMAN, Plaintiff,
v.
RCN TELECOM SERVICES, INC. and RCN
Corp., Defendants.
**No. 05 Civ. 4816(VM)AJP.**

March 7, 2006.

*REPORT AND RECOMMENDATION*
PECK, Chief Magistrate J.
**\*1** Plaintiff James Newman, seeking to represent a class of individuals who subscribed to certain internet services of defendants RCN Corp. and RCN Telecom Services, Inc. (collectively, "RCN"), alleges that RCN violated New York General Business Law §§ 349 and 350 and consequently was unjustly enriched. (Dkt. No. 1: Notice of Removal Ex. A: Compl. ¶¶ 1-14.) Presently before the Court is Newman's motion for class certification of the § 349 claim pursuant to Rule 23 of the Federal Rules of Civil Procedure. (Dkt. No. 17: Newman Class Cert. Motion & Br.; Dkt. No. 35: Newman Class Cert. Reply Papers.) RCN opposes the motion on the grounds that Newman cannot satisfy Rule 23's numerosity, commonality, typicality and predominance requirements. (Dkt. No. 38: 1/16/06 RCN Opp. Br.)

For the reasons set forth below, plaintiff Newman's motion for class certification should be DENIED, and Newman's individual claims accordingly should be remanded to state court.

*FACTS*

In April 2005, plaintiff James Newman filed a Class Action Complaint in Supreme Court, New York County. (Dkt. No. 1: Notice of Removal Ex. A:

Compl.) On May 18, 2005, RCN filed a "Notice of Removal of Class Action Pursuant to 28 U.S.C. § 1453" in this District. (Dkt. No. 1.) On June 15, 2005, RCN answered the complaint. (Dkt. No. 4: Ans.)

*The Allegations in Plaintiff's Class Action Complaint* [FN1]

> FN1. The Court summarizes the allegations in the Class Action Complaint (hereafter, the "complaint" or "Compl.") (Dkt. No. 1: Notice of Removal Ex. A), without use of the introductory phrase, " Plaintiff alleges."

Defendant RCN Corp. is a Delaware corporation, and defendant RCN Telecom Services, Inc. is a Pennsylvania corporation that is a wholly owned subsidiary of RCN Corp. (Compl.¶¶ 2-3.) RCN offers, *inter alia,* internet services to customers in New York. (*Id.*)

Since November 2003, Newman, a New York resident, has been an RCN subscriber. (Coml.¶ 1.) Newman received many advertisements for RCN's internet services via the internet and United States mail. (*Id.*) "Pursuant to defendants' advertising and promotional campaign, plaintiff subscribed to defendants' basic internet service for $39.95 per month." (*Id.* ¶ 4.) Thereafter, RCN developed an improved premium internet service titled Mega Modem Mach 7 ("Mach 7"), which RCN advertised throughout New York as being considerably faster than its basic internet service. (*Id.* ¶¶ 5-6.) " [W]ithout authorization or consent, defendants charged plaintiff for Mach 7 premium service," although he had initially subscribed to RCN's basic internet service. (*Id.* ¶ 5.) Newman had to pay an additional $25 per month for the Mach 7 service. (*Id* . ¶ 7.) RCN knew "that the use of Mach 7 was unavailable during normal hours of the day and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 572345 (S.D.N.Y.)
**(Cite as: Slip Copy)**

could only be obtained at unusual times in early morning, when the internet was not being used by other subscribers of RCN." (*Id.* ¶ 8.) Therefore, Newman and other members of the class were paying extra for a service that was no faster than RCN's basic internet service. (*Id.*)

RCN thereafter developed an even faster internet service entitled Mega Modem Mach 10 ("Mach 10"). (Compl.¶ 9.) In March 2005, RCN automatically upgraded Newman and "other members of the Class" to the Mach 10 service, which increased the bill by an additional $25 per month. (*Id.*) "Plaintiff and the other members of the Class who were subscribers to the Mach 7 did not agree, or consent to the 'bump up' and the additional charges. They were content with the normal download service and did not wish or agree to the Mach 10 premium service." (*Id.*) Newman and the other class members have wrongfully paid RCN "thousands and thousands" of dollars. (*Id.* ¶ 10.)

**\*2** Plaintiff claims that RCN's "conduct violated §§ 349 and 350 of the General Business Law in that it offered a service, contrary to the advertising and promotional campaign, [that] was generally unavailable and, in addition, caused subscribers to pay for additional service without obtaining their consent thereto." (Compl.¶ 12.) Additionally, Newman claims that "defendants have been unjustly enriched through the receipt of such monies and subscription fees for services which were not obtainable at normal times, nor consented to." (*Id.* ¶ 14.)

The complaint defines the class as Newman "and all other New York residents who subscribed to defendants' Mach 7 service, paying therefor and not receiving said service and were bumped up to Mach 10 service and being charged therefor without their expressed consent thereto." (Compl.¶ 15.) "The Class seeks damages for violations of §§ 349 and 350 of the General Business Law, and for violations of the duty of good faith and fair dealing and for unjust enrichment." (*Id.* ¶ 16.) Newman subsequently, however, dropped his class claim under General Business Law § 350, retaining only the § 349 claim on a class basis. (Dkt. No. 35: Newman Class Cert. Reply Br. at 2.)

*RCN's Affidavits*

*RCN's General Pricing and Billing Policies*

"RCN provides telephone, cable television and high speed internet connectivity (through a cable modem network) to customers in the New York City market. ..." (Dkt. No. 39: Tyson Aff. ¶ 2.) RCN offers promotional pricing packages called "bundles," which enable RCN customers who order multiple services (internet, cable television, telephone) to save money by purchasing these services together instead of paying for each service separately. (*Id.* ¶ ¶ 6-7.) RCN's policy "is that if a customer who subscribes to a bundle later cancels one of the bundled services, the customer is still responsible to pay RCN for the remaining services at the regular, non-discounted rates." (*Id.* ¶ 9.) RCN's promotional mailers advertising the "Resilink Gold" bundle (described below), for example, specified that "[i]f a portion of the package is canceled (by customer voluntarily or due to non-payment) remaining service charges will revert to a la carte rates." (*Id.* ¶ 9 & Ex. D at RCN5073, RCN5075, RCN5077.)

RCN bills its customers for all services in advance, which "means that a customer's billing statement is sent and received prior to RCN providing the particular services identified therein, and prior to the time for which the customer is obligated to make payment." (Tyson Aff. ¶ 11.) This procedure gives customers an opportunity to review their bills in advance and to dispute any questionable charges or change any service prior to making payment. (*Id.* ¶ 14.)

*RCN's Internet Service Network*

RCN's internet service network is designed to act as a large "pipeline" for the information sent and received by RCN's customers. (Dkt. No. 41: Laird Aff. ¶ 34.) "That pipeline is designed to transfer up to 40 megabits per second (mbps) of aggregated data being sent to or from RCN subscribers in a geographical location." (*Id.* ¶ 35.) "However, in order to maintain availability of the pipeline to its

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 572345 (S.D.N.Y.)
**(Cite as: Slip Copy)**

subscribers, RCN electronically limits the amount of information that any individual subscriber's cable modem can place on the RCN network at any precise point in time." (*Id.* ¶ 36.) "At the present time RCN's limit is 7 megabits per second (mbps) downstream (from the internet user to the RCN user) for subscribers to RCN's Megamodem Mach 7 service. Subscribers to RCN's Megamodem Mach 10 service are limited to 10 mbps downstream." (*Id.* ¶ 37.)

**\*3** In addition to the limitations that RCN places on its customers, there are myriad other factors that can affect internet speed. (Laird Aff. ¶ 12, 59-81.) Those factors include: "(a) hardware and software configuration for each particular subscriber; (b) the CPU speed of the subscriber's computer; (c) the overall condition of the internet on any given day and at any given time; (d) the capacity of the website that a subscriber seeks to visit; and (e) how many other people are attempting to access a particular website at the same time as an RCN subscriber." (*Id.* ¶ 81.) In order to determine why an RCN subscriber experienced slower internet service, each of these factors would have to be examined. (*Id.* ¶ 83.) According to RCN's Mr. Laird: "RCN's monitoring of its pipeline demonstrates that there was always sufficient capacity for its subscribers to send and receive data through it and across the internet. The RCN network has more than adequate capacity it needs to provide users of Megamodem Mach 7 and Mach 10 service with the maximum available speed to which they subscribe." (*Id.* ¶¶ 91-92.)

*James Newman's RCN Subscription History*

Plaintiff James Newman initially subscribed to RCN's services by subscribing to the "Resilink Gold" bundle on October 31, 2003. (Dkt. No. 39: Tyson Aff. ¶ 18 & Ex. A at RCN0001-0002.) The Resilink Gold bundle included cable television, telephone, and high speed cable modem internet service. (Tyson Aff. ¶ 19.) The Resilink Gold bundle automatically provided subscribers with RCN's best possible internet speed, "so that whatever was RCN's fastest cable modem service available to subscribers at any particular time, a

Resilink Gold subscriber received that premium service over RCN's basic internet service, and received that premium service for no additional charge over the cost of the basic service." (*Id.* ¶ 20.)

Upon subscribing to RCN's Resilink Gold bundle on October 31, 2003, Newman signed and received a copy of a work order, the back of which contained a list of "Terms and Conditions" regarding RCN's services. (Tyson Aff. ¶¶ 18, 21-28 & Ex. A at RCN0002.) The Terms and Conditions on the work order included a paragraph regarding customer payment:
3. Payment of Charges: Customer will be billed monthly in advance for services to be received, plus pro-rata charges, if any, for periods not previously billed.... Customer must pay all undisputed monthly charges as itemized on the RCN monthly invoice and/or notify RCN of disputed items within thirty (30) days of receipt or such other amount of time as is prescribed by law.... Subject to applicable law, RCN shall issue a credit or refund for any billing error that is brought to its attention by Customer within sixty (60) days of bill.

(Tyson Aff. ¶ 26 & Ex. A at RCN0002 ¶ 3.) The Terms and Conditions also specified that "[r]ates for ... programming or other services are subject to change in accordance with applicable law." (Tyson Aff. ¶ 27 & Ex. A at RCN 0002 ¶ 18.) The Terms and Conditions also incorporated certain other RCN agreements that were located on RCN's website: the RCN Internet Access Agreement, the Internet Customer Guide, the RCN Acceptable Use Policy, and the RCN High Speed Cable Modem Service Addendum, all of which contained additional terms and conditions relating to RCN's services, including RCN's right to change its fees upon notice to the customer. (Tyson Aff. ¶¶ 28-32 & Exs. A, B, C.)

**\*4** As of October 31, 2003, when Newman initially subscribed to Resilink Gold, RCN's "premium" internet service was Mach 3, which "afforded users up to 3 megabits per second of data transfer over RCN's internet network." (Tyson Aff. ¶ 36.) Newman received Mach 3 services as part of the Resilink Gold bundle for no additional charge over RCN's lower speed internet service. (*Id.* ¶ 37.) "

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                     Page 4

**Slip Copy, 2006 WL 572345 (S.D.N.Y.)**
**(Cite as: Slip Copy)**

The price initially paid by Plaintiff for Mach 3 service, ($25.48) was the price charged by RCN for its lower speed internet service to customers not within an eligible bundle." (*Id.* ¶ 37 & Ex. E at RCN2091.)

On January 1, 2004, RCN upgraded its premium service to "Mach 5," with an upgraded speed of 5 megabits per second. (Tyson Aff. ¶ 38.) RCN designated Mach 3 service as its basic service at a charge of $25.48 per month. (*Id.* ¶ 39.) Resilink Gold subscribers, including Newman, automatically received Mach 5 service at no extra charge over the previous charge of $25.48 per month. (*Id.* ¶ 40 & Ex. F at RCN2083.) Newman continued to pay his monthly RCN bill without inquiry for the next four months. (Tyson Aff. ¶ 41.)

On May 1, 2004, RCN increased its rate for Mach 3 service to $35.29 per month. (Tyson Aff. ¶ 42.) As a result, RCN billed Newman $35.29 per month for Mach 3 service, and because he was a Resilink Gold bundle subscriber, he received Mach 5 service at no extra charge. (*Id.* ¶ 43 & Ex. G at RCN2067.) Newman continued to pay his monthly RCN bill without complaint to RCN. (Tyson Aff. ¶ 44.)

On September 1, 2004, RCN upgraded its premium service to "Mach 7," with an upgraded speed of 7 megabits per second. (Tyson Aff. ¶ 45.) RCN designated Mach 5 service as its basic service at a charge of $35.29 per month. (*Id.* ¶ 46.) Resilink Gold subscribers, including Newman, automatically received Mach 7 service at no extra charge over the previous charge of $35.29 per month. (*Id.* ¶¶ 47-48 & Ex. H at RCN2050.) Newman paid his September, October and November 2004 RCN bills without dispute. (Tyson Aff. ¶¶ 49-57.) The October and November 2004 bills contained prominent notations on the first page that read: " With your ResiLink Gold bundle, *you saved $32.00* this month compared to buying these services separately!" (Tyson Aff. Ex. I at RCN2001; Tyson Aff. Ex. J at RCN2006; Tyson Aff. ¶ 50, 55.)

On November 4, 2004, "Plaintiff voluntarily discontinued his Resilink Gold bundle, by canceling RCN's telephone service and switching to another

telephone provider." (Tyson Aff. ¶ 58.) After this, RCN billed Newman for his remaining cable television and high speed internet services based on a la carte pricing. (*Id.* ¶¶ 59-60.)

In November 2004, RCN sent Newman his December 2004 statement for high speed internet and cable television services. (Tyson Aff. ¶ 61 & Ex. M.) This statement charged Newman based on a la carte pricing, including $39.95 for Mach 5 high speed internet service as well as $25.00 for an upgrade to Mach 7 internet service. (Tyson Aff. ¶¶ 64-66 & Ex. M at RCN2014.) This statement also omitted the notation regarding Resilink Gold bundle savings that had appeared on Newman's previous bills. (Tyson Aff. ¶ 62 & Ex. M at RCN2012.) Newman did not dispute the charges in the December 2004 statement and paid it in full. (Tyson Aff. ¶¶ 71, 73.) However, Newman contacted RCN on December 8, 2004 to ask what the difference was between Mach 5 and Mach 7 internet service. (*Id.* ¶ 72 & Ex. L at RCN0023.)

**\*5** In December 2004, RCN sent Newman his January 2005 statement for high speed internet and cable television services. (Tyson Aff. ¶ 74 & Ex. N.) This statement again charged Newman based on a la carte pricing, including $39.95 for Mach 5 internet service as well as $25 .00 for an upgrade to Mach 7 internet service. (Tyson Aff. ¶¶ 76-77 & Ex. N at RCN2018.) This statement also did not contain the notation regarding Resilink Gold bundle savings that had appeared on Newman's earlier bills. (Tyson Aff. ¶ 75 & Ex. N at RCN2016.) Newman did not dispute the charges in his January 2005 bill and paid the bill in full. (Tyson Aff. ¶¶ 80-82.)

In January 2005, RCN sent Newman his February 2005 statement for high speed internet and cable television services. (Tyson Aff. ¶ 83 & Ex. O.) This statement mirrored the January 2005 statement with regard to pricing, services and the lack of notation regarding Resilink Gold bundle savings. (Tyson Aff. ¶¶ 84-86 & Ex. O at RCN2020, RCN2022.) Newman did not dispute the charges in the February 2005 bill and paid the bill in full. (Tyson Aff. ¶¶ 88-89.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 572345 (S.D.N.Y.)
**(Cite as: Slip Copy)**

In February 2005, RCN sent Newman his March 2005 statement for high speed internet and cable television services. (*Id.* ¶ 90 & Ex. P.) The rates that RCN charged were the same rates as in the previous bills, $39.95 for basic internet service and $25.00 for premium internet service. (Tyson Aff. ¶ 93 & Ex. P at RCN2025.) However, on March 1, 2005, RCN upgraded its basic internet service to Mach 7 and its premium service to Mach 10, which provided customers with a speed of up to 10 megabits per second of data transfer. (Tyson Aff. ¶ 94-95.) Therefore, Newman's March 2005 bill charged him $39.95 for Mach 7 service and $25.00 more for Mach 10 service. (*Id.* ¶ 97 & Ex. P at RCN2025.) Several weeks after Newman received his March 2005 statement, on March 16, 2005 he called RCN and subscribed to an RCN bundle called "Power/CI," which included cable television and premium Mach 10 internet service. (Tyson Aff. ¶¶ 102-03 & Ex. R at RCN2029.) By subscribing to this bundle, Newman saved $30.70 per month compared to what he was paying for these services a la carte. (Tyson Aff. ¶ 103 & Ex. R at RCN2027.) RCN gave Newman a credit for half the month of March 2005 for the Mach 7 and Mach 10 internet charges. (Tyson Aff. ¶ 104 & Ex. R at RCN2029.) From March 16, 2005 on, Newman has subscribed to RCN's "Power/CI" bundle. (*Id.* ¶ 105.)

*Other RCN Customers Who Were Billed On A La Carte Basis*

According to RCN's customer records, from November 2004 through March 2005, the number of RCN "[c]ustomers who switched to a la carte pricing of premium high speed internet access by dropping telephone service" was between thirteen and thirty customers per month. (Dkt. No. 40: Cherniavsky Aff. ¶ 4 & Ex. A: Subscriber Chart.) For that entire period, only a total of 15 customers (at the rate of 2-4 per month) downgraded their internet service to avoid a la carte charges. (*Id.*)

*Plaintiff James Newman's Deposition*

**\*6** On November 17, 2005, RCN took the deposition of plaintiff James Newman. (Dkt. No.

26: Arturi Aff. Ex. B: Newman Dep.) Newman testified that he owns his own company, Ramben Group, which "tracks class action litigation in the stock market, securities litigation, and helps investors make sure they get everything they are entitled to." [FN2] (Newman Dep. at 26.) Newman said that he originally sought a lawyer to bring a class action lawsuit against RCN because he believed that RCN was charging him for services that he was not receiving and for services that he did not order. (*Id.* at 13-14.)

> FN2. Prior to Ramben Group, Newman published a newsletter entitled "Securities Class Action Alert," which compiled information for institutions and investors regarding securities class action settlements. (Newman Dep. at 28-29.) Approximately fifteen years ago, Newman himself was a plaintiff in a class action lawsuit in California against MBNA, alleging overcharging of fees. (*Id.* at 9-10.) Newman eventually voluntarily dismissed that case after an adverse ruling in a similar case by the U.S. Supreme Court. (*Id.* at 11-12.)

Newman originally contacted RCN to become a subscriber in response to an advertisement, although he could not remember exactly what the advertisement said, and he did not have a copy of that particular advertisement. (Newman Dep. at 42, 129.) Newman was interested in RCN service because it was cheaper than Time Warner. (*Id.* at 42-43.) Newman remembered receiving "dozens" of RCN advertisements in the mail prior to subscribing, and that when he actually decided to subscribe to RCN service, he called to inquire about RCN's available packages. (*Id.* at 129-30.) No one particular advertisement influenced Newman to sign up for RCN service, and he did not remember the contents of any particular RCN advertisements that he received in 2003. (*Id.* at 130-32.) Newman never noticed any restrictions on any of the advertisements that he received. (*Id.* at 132-35.) Newman subscribed by contacting a telephone representative at RCN. (*Id.* at 42-44, 131.) He had no discussion as to speed. (*Id.* at 41-42.) Newman

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

did not remember to which RCN package he initially subscribed when he first became an RCN customer, although he believed that it was a bundled package that included cable television and internet and also probably telephone service. (*Id.* at 44-45, 48, 98, 102-03.)

Newman believed that when he first signed up for service, he would receive an initial discounted rate, which would eventually be "bumped up" to a regular rate. (*Id.* at 45-46.) Newman understood that if he did not buy all three services together as a bundle, the price of each service would be slightly higher if he were paying for each of them a la carte. (*Id.* at 142.) Newman understood that RCN could change its rates as long as it notified customers in advance. (*Id.* at 142-43.) Newman knew that he had the right to discontinue his service at any time. (*Id.* at 143.)

On October 31, 2003, RCN initially installed Newman's service. (Newman Dep. at 49.) Newman signed a work order, but did not read the "Terms and Conditions" on the reverse side. (*Id.* at 50-52.) Newman did not recall how fast his initial RCN internet service was. (*Id.* at 111.)

Throughout the deposition, Newman had very little recollection of any details about his RCN bills. (*See generally* Newman Dep. at 120-271.) Newman did not usually review his RCN bills every month, but would "glance at them to see if the numbers were similar to previous month's." (*Id.* at 15-16, 96-97.) Newman paid all of his monthly RCN bills in full since he became a subscriber in October 2003. (*Id.* at 97.) Newman did not believe that he ever called RCN to dispute any portion of his bills. (*Id.* at 114-15.) [FN3] At some point, Newman asked RCN about a $5 monthly charge for the cable modem, and an RCN representative told him that he could eliminate that charge if he purchased his own cable modem. (*Id.* at 115.) Approximately a month after the call, Newman purchased his own cable modem to use with RCN's service. (*Id.* at 115-16.) According to an RCN work order signed by Newman dated September 21, 2004, Newman turned in the RCN-supplied cable modem and began using RCN internet services with a cable modem that he purchased himself. (*Id.* at 118-19,

121-22.) Newman did not read the "Terms and Conditions" on the back of the RCN work order. (*Id.* at 120.)

> FN3. Sometime during 2004, Newman called RCN to ask RCN why he was being charged twice for a digital converter, and an RCN representative explained that it was because he had two digital converter units in his house. (*Id.*)

**\*7** Newman noticed fluctuations in his internet speed: during the day, the internet would be very slow, but early in the morning or late at night, he would not experience those problems. (Newman Dep. at 32-33.) Newman learned from his son, who is a computer programmer at Microsoft, that internet speed depends on amount of bandwidth available, how many users are on the internet at the same time, and the web sites that the user is accessing. (*Id.* at 33-34, 249-52.) Newman testified that what he minded was "paying ... an extra charge, " not the fluctuations in available speed itself. (*Id.* at 252.)

In November 2004, Newman decided to discontinue his RCN telephone service because he wanted to switch to another telephone service provider, Vonage. (Newman Dep. at 148, 153.)

Newman testified that he believed that, "[a]t some point in time," he called RCN to dispute the extra charge for Mach 7 service that appeared on his December 2004 bill. (Newman Dep. at 160-68.) Newman was not sure whether he requested that his Mach 7 service be discontinued during that call. (*Id.* at 168-69.) Sometime during 2005, an RCN representative called Newman and told him that RCN could save him money if he switched to a different package. (*Id.* at 164.) While on that phone call, Newman believes that he disputed the extra charge for Mach 10 service. (*Id.* at 164-65.)

Newman could not recall any particular advertisement regarding the promised speed of the Mach 7 and Mach 10 services, although he remembered looking on the RCN web site and at fliers that he received in the mail for information on

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 572345 (S.D.N.Y.)
**(Cite as: Slip Copy)**

the Mach 7 and Mach 10 services. (Newman Dep. at 229.) Newman's March 2005 bill contained a notation stating that "MegaModem Mach 10 is here! The FASTEST residential Internet service available with download speeds up to 10 Mbps. It's RCN's new, supercharged High-Speed Internet service that lets you download huge files like photos, music, and games in seconds. Get it for just $25 a month or get it FREE when you upgrade to one of RCN's qualifying Bundle Packages." (Arturi 2/8/06 Supp. Aff. Ex. B: Newman Dep. Ex. D-16.) Newman contends that this is one of the misrepresentations that RCN made about the speed of its internet service. (Newman Dep. at 229.)

Newman testified that none of the fliers that he received in the mail induced him to pay for RCN premium internet service because he never wanted the faster speed in the first place. (Newman Dep. at 233.) Newman stated that he tested whether he received 7 Mbps per second, but did not test whether he received 10 Mbps when he was paying for the Mach 10 service. (*Id.* at 234.)

Newman performed two internet speed tests on December 16, 2004, which showed that his internet speed was approximately 5 megabits per second. (Newman Dep. at 254-55; Newman Dep. Ex. D-19 at NEWMAN00003-00008.) This test was done at the time that Newman was using the modem that he purchased himself; Newman did not know what internet speed he had when he was using the RCN-supplied modem that he previously had used. (Newman Dep. at 259.) Newman testified that sometimes he would experience slow responses on the internet during normal working hours, but the response times would be better when he went on the internet at "oddball hours." (*Id.* at 260.) Newman did not have any written records of any other tests that he did, aside from the tests on December 16, 2004. (*Id.* at 261.) Newman did not know exactly how those tests were done. (*Id.* at 262.) Newman only tested the internet speeds in his house, and he was unaware of what internet speeds any other RCN subscribers experienced during the same time frame. (*Id.* at 263-64.)

**\*8** Newman used two different Dell computers while he was an RCN subscriber. (Newman Dep. at

241.) Newman did not know the processor speed of the first computer, although he knew that he bought it during 2000-2001. (*Id.* at 241-42.) Newman did not know what kind of ethernet card he used with his internet service with that first computer (*id.* at 242-43), and did not know any of the technical specifications for that first computer (*id.* at 244-45). Newman purchased his second computer around the end of 2003 or the beginning of 2004. (*Id.* at 245.) Newman did not know any of the technical specifications for that second computer. (*Id.* at 246.)

*ANALYSIS*

*CLASS CERTIFICATION SHOULD BE DENIED*

The Second Circuit requires a liberal, rather than restrictive, interpretation of Rule 23 of the Federal Rules of Civil Procedure. *See, e.g., Marisol A. v. Giuliani,* 126 F.3d 372, 377 (2d Cir.1997) (" 'Rule 23 is given liberal rather than restrictive construction, and courts are to adopt a standard of flexibility....' ").[FN4] Nevertheless, district courts must undertake a "rigorous analysis" to ensure that Rule 23's requirements have been satisfied. *Gen. Tel. Co. of the Sw. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 2372 (1982); *accord, e.g., Heerwagen v. Clear Channel Commc'ns,* 435 F .3d 219, 225 (2d Cir.2006); *In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 134-35 (2d Cir.2001), *cert. denied,* 536 U.S. 917, 122 S.Ct. 2382 (2002); *In re NTL, Inc. Sec. Litig.,* 2006 WL 330113 at *4; *Fogarazzo v. Lehman Bros., Inc.,* 232 F.R.D. at 179.

> FN4. *Accord, e.g., In re NTL, Inc. Sec. Litig.,* 02 Civ. 3013, 2006 WL 330113 at *4 (S.D.N.Y. Feb. 14, 2006) (Peck, M.J.); *In re Natural Gas Commodities Litig.,* 231 F.R.D. 171, 178 (S.D.N .Y.2005); *Fogarazzo v. Lehman Bros., Inc.,* 232 F.R.D. 176, 178-79 (S.D.N.Y.2005); *In re Initial Pub. Offering Sec. Litig.,* 227 F.R.D. 65, 90 (S.D.N.Y.2004); *In re Towers Fin. Corp. Noteholders Litig.,* 177 F.R.D. 167 (S.D.N.Y.1997) (Knapp, D.J.

Slip Copy                                                                                                              Page 8

Slip Copy, 2006 WL 572345 (S.D.N.Y.)
**(Cite as: Slip Copy)**

& Peck, M.J.); 5 *Moore's Federal Practice* § 23.03 (2005).

"In ruling on class certification, a district court may not simply accept the allegations of plaintiffs' complaint as true." *Fogarazzo v. Lehman Bros., Inc.,* 232 F.R.D. at 179.[FN5] "[S]ometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Gen. Tel. Co. v. Falcon,* 457 U.S. at 160, 102 S.Ct. at 2372. [FN6] "In deciding a certification motion, district courts must not consider or resolve the merits of the claims of the purported class." *Caridad v. Metro-North Commuter R.R.,* 191 F.3d 283, 293 (2d Cir.1999) (citing *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177, 94 S.Ct. 2140, 2152 (1974)), *cert. denied,* 529 U.S. 1107, 120 S.Ct. 1959 (2000); *accord, e.g., Heerwagen v. Clear Channel Commc'ns,* 435 F.3d at 225; *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 222 F.3d 52, 58 (2d Cir.2000); *In re NTL, Inc. Sec. Litig.,* 2006 WL 330113 at *4; *In re Initial Pub. Offering Sec. Litig.,* 227 F.R.D. at 93; *Bolanos v. Norwegian Cruise Lines Ltd.,* 212 F.R.D. 144, 154-55 (S.D.N.Y.2002) (Berman, D.J. & Peck, M.J.). "In order to pass muster, plaintiffs-who have the burden of proof at class certification-must make *'some showing'* [that the class comports with Rule 23]. That showing may take the form of, for example, expert opinions, evidence (by document, affidavit, live testimony, or otherwise), or the uncontested allegations of the complaint." *In re Initial Pub. Offering Sec. Litig.,* 227 F.R.D. at 93; *accord, e.g., Heerwagen v. Clear Channel Commc'ns,* 435 F.3d at 231; *In re NTL, Inc. Sec. Litig.,* 2006 WL 330113 at *4; *Fogarazzo v. Lehman Bros., Inc.,* 232 F.R.D. at 179.

> FN5. *Accord, e.g., In re NTL, Inc. Sec. Litig.,* 2006 WL 330113 at *4; *In re Initial Pub. Offering Sec. Litig.,* 227 F.R.D. at 91-93.

> FN6. *Accord, e.g., In re NTL, Inc. Sec. Litig.,* 2006 WL 330113 at *4; *Fogarazzo v. Lehman Bros., Inc.,* 232 F.R.D. at 179; *In re Initial Pub. Offering Sec. Litig.,* 227 F.R.D. at 91.

A. *The Requirements of Rule 23(a)*

**\*9** Rule 23(a) sets forth the requirements for class certification: "One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims ... of the representative parties are typical of the claims ... of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a).[FN7] "A class must satisfy all four requirements [of Rule 23(a) ] before it may be certified under Rule 23." 5 *Moore's Federal Practice* § 23.20 at 23-46 (2005); *accord, e.g., In re NTL, Inc. Sec. Litig.,* 2006 WL 330113 at *5.

> FN7. *See generally, e.g., In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 132-33 (2d Cir.2001), *cert. denied,* 536 U.S. 917, 122 S.Ct. 2382 (2002); *Robinson v. Metro-North Commuter R.R.,* 267 F.3d 147, 155-56 & n. 1 (2d Cir.2001), *cert. denied,* 535 U.S. 951, 122 S.Ct. 1349 (2002); *Caridad v. Metro-North Commuter R.R.,* 191 F.3d 283, 291 (2d Cir.1999), *cert. denied,* 529 U.S. 1107, 120 S.Ct. 1959 (2000); *Marisol A. v. Giuliani,* 126 F.3d 372, 375-76 & n. 3 (2d Cir.1997); *In re NTL, Inc. Sec. Litig.,* 02 Civ. 3013, 2006 WL 330113 at *5 (S.D.N.Y. Feb. 14, 2006) (Peck, M.J.); *Bolanos v. Norwegian Cruise Lines Ltd.,* 212 F.R.D. 144, 152 (S.D.N.Y.2002) (Berman, D.J. & Peck, M.J.); *In re Towers Fin. Corp. Noteholders Litig.,* 177 F.R.D. 167, 169 (S.D.N.Y.1997) (Knapp, D.J. & Peck, M.J.).

1. *Numerosity*

Rule 23(a) requires that the class be "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). "[J]oinder of all members need not be impossible, but only impracticable in the sense that joinder would 'needlessly complicate and hinder efficient resolution of the litigation." '

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 572345 (S.D.N.Y.)
**(Cite as: Slip Copy)**

*In re Avon Sec. Litig.,* 91 Civ. 2287, 1998 WL 834366 at *5 (S.D.N.Y. Nov. 30, 1998).[FN8]

> FN8. *Accord, e.g., In re NTL, Inc. Sec. Litig.,* 02 Civ. 3013, 2006 WL 330113 at *5 (S.D.N.Y. Feb. 14, 2006) (Peck, M.J.); *Fogarazzo v. Lehman Bros., Inc.,* 232 F.R.D. 176, 179 (S.D.N.Y.2005); *In re Indep. Energy Holdings PLC Sec. Litig.,* 210 F.R.D. 476, 479 (S.D.N.Y.2002); *see generally* 5 *Moore's Federal Practice* § 23.22[1].

"Although precise calculation of the number of class members is not required, and it is permissible for the court to rely on reasonable inferences drawn from available facts, numbers in excess of forty generally satisfy the numerosity requirement." *Fogarazzo v. Lehman Bros., Inc.,* 232 F.R.D. at 179; *see, e.g., Marisol A. v. Giuliani,* 126 F.3d 372, 376 (2d Cir.1997); *Consol. Rail Corp. v. Town of Hyde Park,* 47 F.3d 473, 483 (2d Cir.) ("numerosity is presumed at a level of 40 members"), *cert. denied,* 515 U.S. 1122, 115 S.Ct. 2277 (1995); *Korn v. Franchard Corp.,* 456 F.2d 1206, 1209 (2d Cir.1972). [FN9]

> FN9. *See also, e.g., In re NTL, Inc. Sec. Litig.,* 2006 WL 330113 at *5; *The Presbyterian Church v. Talisman Energy, Inc.,* 226 F.R.D. 456, 466 (S.D.N.Y.2005) ( "Numerosity is presumed when a class consists of forty or more members."); *In re Avon Sec. Litig,* 1998 WL 834366 at *5 (" In general, 'numbers in excess of forty, particularly those exceeding one hundred or one thousand have sustained the requirement." '); *In re Towers Fin. Corp. Noteholders Litig.,* 177 F.R.D. 167, 170 (S.D.N.Y.1997) (Knapp, D.J. & Peck, M.J.) (certifying class of "several thousand investors"); *Trief v. Dun & Bradstreet Corp.,* 144 F.R.D. 193, 198 (S.D.N.Y.1992); 5 *Moore's Federal Practice* § 23.22[1][b].

Newman asserts, without any record citation, that his claims have met the numerosity requirement because "there are 40,000-60,000 subscribers to defendants' bundled services in the New York area." (Dkt. No. 17: Newman Class Cert. Br. at 6; *id.* at 2-3.) However, defendants claim that plaintiff has greatly exaggerated RCN's subscriber numbers. (*See* Dkt. No. 38: 1/16/06 RCN Opp. Br. at 36-37; Dkt. No. 40: Cherniavsky Aff. & Ex. A: Subscriber Chart.) With respect to Newman's claim that subscribers to RCN's premium high speed internet service were paying for a higher speed than they were receiving, RCN contends that the appropriate class of subscribers consists of those people who paid an additional charge for the premium high speed internet service (those who subscribed to a bundle received the higher speed service for no additional cost). According to RCN's affidavits, the number of "[t]otal customers who had premium high speed internet service and paid [an] additional premium charge" was between 1,134 and 2,134 subscribers during the October 2003 to June 2005 time period. (Cherniavsky Aff. Ex. A: Subscriber Chart.) Because even RCN's figures clearly are over forty, Newman has demonstrated numerosity for his claim that subscribers to RCN's premium high speed internet service were paying for a higher speed than they were actually receiving.

**\*10** With respect to Newman's claim that RCN caused subscribers to pay for higher speed service without obtaining their prior consent, the appropriate class of subscribers consists of those people who unbundled and were subsequently charged extra for premium high speed internet service. According to RCN, "at most, there are only between 10 and 17 subscribers in the months that Plaintiff was charged who could ever be similarly situated to him with regard to the $25.00 'a la carte' charges." (1/16/06 RCN Opp. Br. at 37; *see also* Cherniavsky Aff. Ex. A: Subscriber Chart.) Even at 10-17 people per month, the Court assumes they were different people each month, and thus Newman (barely) has satisfied the numerosity requirement for his claim that RCN caused subscribers to pay for additional high speed internet service without obtaining their prior consent.

*2. Commonality and Predominance*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 572345 (S.D.N.Y.)
**(Cite as: Slip Copy)**

Commonality requires a showing that "there are questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). " 'The commonality requirement is met if plaintiffs' grievances share a common question of law or of fact." ' *Robinson v. Metro-North Commuter R.R.,* 267 F.3d 147, 155 (2d Cir.2001) (quoting *Marisol A. v. Giuliani,* 126 F.3d 372, 376 (2d Cir.1997)), *cert. denied,* 535 U.S. 951, 122 S.Ct. 1349 (2002).[FN10] This requisite "does not mean that all issues must be identical as to each member, but it does require that plaintiffs identify some unifying thread among the members' claims that warrants class treatment." *Kamean v. Local 363, Int'l Bhd. of Teamsters,* 109 F.R.D. 391, 394 (S.D.N.Y.), *appeal dismissed,* 833 F.2d 1002 (2d Cir.1986), *cert. denied,* 481 U.S. 1024, 107 S.Ct. 1911, 95 (1987). [FN11] The " commonality requirement [is] satisfied if the class shares even one common question of law or fact," and "factual differences in the claims of the class do not preclude a finding of commonality." 5 *Moore's Federal Practice* § 23.23[2]; *accord, e.g., Bolanos v. Norwegian Cruise Lines Ltd.,* 212 F.R.D. at 153. [FN12]

FN10. *See also, e.g., In re Agent Orange Prod. Liab. Litig .,* 818 F.2d 145, 166-67 (2d Cir.1987), *cert. denied,* 484 U.S. 1004, 108 S.Ct. 695 (1988); *In re NTL, Inc. Sec. Litig.,* 02 Civ. 3013, 2006 WL 330113 at *6 (S.D.N.Y. Feb. 14, 2006) (Peck, M.J.); *Bolanos v. Norwegian Cruise Lines Ltd.,* 212 F.R.D. 144, 153 (S.D .N.Y.2002) (Berman, D.J. & Peck, M.J.); *In re Towers Fin. Corp. Noteholders Litig.,* 177 F.R.D. 167, 170 (S.D.N.Y.1997) (Knapp, D.J. & Peck, M.J.).

FN11. *Accord, e.g., In re NTL, Inc. Sec. Litig.,* 2006 WL 330113 at *6; *Bolanos v. Norwegian Cruise Lines Ltd.,* 212 F.R.D. at 153; *In re Towers Fin. Corp. Noteholders Litig.,* 177 F.R.D. at 170; *In re Chase Manhattan Corp. Sec. Litig,* 90 Civ. 6092, 1992 WL 110743 at *1 (S.D.N.Y. May 13, 1992).

FN12. Courts often analyze the Rule

23(a)(2) "commonality" requirement along with the Rule 23(b)(3) predominance requirement. *See, e.g., In re Natural Gas Commodities Litig.,* 231 F.R .D. 171, 180 (S.D.N.Y.2005) ("Courts often consider the requirements of Rule 23(a)(2) in conjunction with Rule 23(b)(3)."); *In re Sumitomo Copper Litig.,* 182 F.R.D. 85, 89 (S.D.N.Y.1998) (Pollack, D.J.) (same); 5 *Moore's Federal Practice* § 23.23[6] (" [T]he commonality requirement of Rule 23(a) tends to merge with the predominance inquiry with regard to a class action maintainable under Rule 23(b)(3).").

"In order to meet the predominance requirement of Rule 23(b)(3), a plaintiff must establish that 'the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, ... predominate over those issues that are subject only to individualized proof.' ' *In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 136 (2d Cir.2001), *cert. denied,* 536 U.S. 917, 122 S.Ct. 2382 (2002); *accord, e.g., Heerwagen v. Clear Channel Commc'ns,* 435 F .3d 219, 225-26 (2d Cir.2006); *In re NTL, Inc. Sec. Litig.,* 2006 WL 330113 at *12; *Fogarazzo v. Lehman Bros., Inc.,* 232 F.R.D. 176, 181-82 (S.D.N.Y.2005). Ultimately, "[t]he Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods ., Inc. v. Windsor,* 521 U.S. 591, 623, 117 S.Ct. 2231, 2249 (1997).

For the reasons discussed in text, even if there were sufficient common questions of law or fact to satisfy the Rule 23(a)(2) commonality requirement, the predominance requirement of Rule 23(b)(3) is not satisfied.

Newman initially claimed that the common legal and factual issues in this case included: "(a) whether defendants violated §§ 349 and 350 of the New York General Business Law in that it engaged in deceptive acts and poor practices in the conduct of

**Slip Copy, 2006 WL 572345 (S.D.N.Y.)**
**(Cite as: Slip Copy)**

its business; (b) whether defendants breached their implied duty of good faith and fair dealing to members of the Class; [and] (c) whether defendants were unjustly enriched." (Dkt. No. 17: Newman Class Cert. Br. at 7.) However, in his reply papers, Newman dropped the class claim under General Business Law § 350, stating that he "seeks class status based on his claim that defendants violated New York General Business Law § 349. He limits his class claims on this motion to that section and not § 350 of the General Business Law." (Dkt. No. 35: Newman Class Cert. Reply Br. at 2.) Newman, however, personally retained the § 350 claim.[FN13] ( *See* Dkt. No. 43: 2/14/06 Letter to the Court.)

> FN13. General Business Law § 350 provides: "False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

**\*11** New York General Business Law § 349 " ' declares unlawful deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service." ' *In re Currency Conversion Fee Antitrust Litig.,* 230 F.R.D. 303, 310 (S.D.N.Y.2004) (quoting *Riordan v. Nationwide Mut. Fire Ins. Co.,* 977 F.2d 47, 51 (2d Cir.1992)), *modified on other grounds,* 2005 WL 1705285 (S.D.N.Y. July 22, 2005). " 'A plaintiff under section 349 must prove three elements: first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." ' *In re Currency Conversion Fee Antitrust Litig.,* 230 F.R.D. at 310 (quoting *Stutman v. Chem. Bank,* 95 N.Y.2d 24, 29, 709 N.Y.S.2d 892, 895 (2000)).[FN14] "Additionally, the allegedly deceptive acts, representations or omissions must be misleading to ' a reasonable consumer." ' *Goshen v. Mutual Life Ins. Co.,* 98 N.Y.2d 314, 324, 746 N.Y.S.2d 858, 863 (2002).[FN15] "The causation element is essential: 'The plaintiff ... must show that the defendant's "material deceptive act" caused the injury." ' *In re Currency Conversion Fee Antitrust Litig.,* 230 F.R.D. at 310.[FN16] " 'In addition, a plaintiff must prove "actual" injury to recover under

the statute, though not necessarily pecuniary harm." ' *In re Currency Conversion Fee Antitrust Litig.,* 230 F.R.D. at 310.[FN17] "However, assessment of specific causation often dissolves into a 'myriad of individualized causation inquiries." ' *In re Currency Conversion Fee Antitrust Litig.,* 230 F.R.D. at 310-11.

> FN14. *Accord, e.g., Maurizio v. Goldsmith,* 230 F.3d 518, 521-22 (2d Cir.2000); *Rabouin v. Metro. Life Ins. Co.,* 806 N.Y.S.2d 584, 585 (1st Dep't 2006).

> FN15. *See also, e.g., Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.,* 85 N.Y.2d 20, 26-27, 623 N.Y.S.2d 529, 533 (1995).

> FN16. *See also, e.g., Petitt v. Celebrity Cruises, Inc.,* 153 F.Supp.2d 240, 266 (S.D.N.Y.2001); *Stutman v. Chem. Bank,* 95 N.Y.2d at 29, 709 N.Y.S.2d at 896.

> FN17. *See, e.g., Stutman v. Chem. Bank,* 95 N.Y.2d at 29, 709 N.Y.S.2d at 896; *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.,* 85 N.Y.2d at 26, 623 N.Y.S.2d at 533.

With respect to Newman's claim that subscribers to RCN's premium high speed internet service were paying for a higher speed than they were receiving, to show causation, each plaintiff will have to show that RCN's disclosures of the approximate internet speeds were inadequate, thus deceiving plaintiffs into subscribing to RCN's premium high speed internet service, and that each plaintiff actually did not receive the advertised speeds. As RCN asserts, this showing will require an individualized inquiry into many different issues, including:
(1) Whether *each* class member saw the same two alleged misrepresentations that Plaintiff offers in his case; (2) Whether each was influenced to subscribe to Mach 7 or Mach 10 based on either of them; (3) Whether the proposed members were existing RCN subscribers when obtaining Mach 7 or Mach 10 service, and had signed RCN's Customer Agreement; (4) Whether any of those RCN

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 12

Slip Copy, 2006 WL 572345 (S.D.N.Y.)
**(Cite as: Slip Copy)**

subscribers had read and understood the limitations and disclaimers contained in any of RCN's Customer Agreements; (5) What independent investigation any proposed member made concerning internet networks or speeds prior to subscribing; (6) What alternative sources of information or knowledge each proposed member had concerning internet access services; (7) Given those sources of information and knowledge, whether each individual subscriber could " reasonably" have been misled by any representation; (8) Whether any proposed members even perceived a slowdown; (9) Whether any proposed members actually experienced a slowdown caused by RCN's network, as compared to other forces beyond RCN's control; (10) What hardware or software was used by each subscriber to connect to the RCN network; (11) What type of computer each subscriber used, and what was its CPU capability; (12) What antivirus or firewall protection each proposed member had; (13) What particular website or servers on the internet were contacted by each subscriber, when and how often; (14) What type and size of data was attempted to be transferred, when and how often; (15) When, how often and for how long any slowdown was noticed; (16) What were the conditions of the website attempting to be accessed by the user at the time of any perceived slowdown; (17) What were the conditions of RCN's network at the time of any perceived slowdown; and (18) What was the route of travel for data chosen by the website a subscriber sought to access; [and] (19) What were the overall conditions of the internet at the time.

**\*12** (Dkt. No. 38: 1/16/06 RCN Opp. Br. at 29-30.) While some common questions concerning RCN's internet speeds exist, individual questions regarding causation would overwhelm them. Accordingly, Newman's claim that subscribers to RCN's premium high speed internet service were paying for a higher speed than they were receiving is not appropriate for class certification.

With respect to Newman's claim that RCN caused subscribers to pay for additional high speed internet service without obtaining their prior consent, each plaintiff will have to show that RCN's disclosure of the automatic conversion to a la carte pricing upon

unbundling of services was misleading to a reasonable consumer. (*See* cases cited at pages 22-23 above.) Newman will have a difficult time showing that the disclosures that he received were inadequate. The RCN advertisements that Newman proffers specifically state that "If a portion of the package is canceled (by customer voluntarily or due to non-payment), remaining service charges will revert to a la carte rates.... All prices and packages are subject to change." (Dkt. No. 35: Newman Aff. Ex. 1 at RCN5145-46.) Indeed, Newman testified that he understood that if he did not buy the three services together as a bundle, the price of each service would be higher if he were paying for them a la carte. (Dkt. No. 26: Arturi Aff. Ex. B: Newman Dep. at 142.) Newman also testified that he understood that RCN could change its rates as long as they notified customers in advance. (*Id.* at 142-43.) To prove causation for each plaintiff on this claim would entail similar individual inquiries, including an examination of each subscriber's understanding of the a la carte pricing system and whether that understanding was reasonable. Therefore, while some common questions exist concerning RCN's conversion of subscribers to a la carte pricing upon their unbundling of services, individual questions would overwhelm them. Accordingly, Newman's § 349 claim that defendants caused subscribers to pay for additional service without obtaining their prior consent is not appropriate for class certification. *See, e.g., Moore v. Paine Webber, Inc.,* 306 F.3d 1247, 1255-56 (2d Cir.2002) (class certification of fraud claims inappropriate where plaintiffs could not show materially uniform misrepresentations); *In re Currency Conversion Fee Antitrust Litig.,* 230 F.R.D. at 311 (Section 349 claim not appropriate for class certification where individual questions about causation would overwhelm common questions of law and fact); *Rabouin v. Metro. Life Ins. Co.,* 806 N.Y.S.2d at 585 (class certification inappropriate for § 349 claim where issue of whether alleged deceptive acts were misleading in a material way would necessitate the resolution of individual issues); *DeFilippo v. Mut. Life Ins. Co.,* 13 A.D.3d 178, 180, 787 N.Y.S.2d 11, 14 (1st Dep't 2004) (class certification inappropriate where proving § 349 claim " 'would require individualized proof in the case of each class

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

member, which would in turn raise questions that would overwhelm any issues common to the class" '); *Gaidon v. Guardian Life Ins. Co.,* 2 A.D.3d 130, 130, 767 N.Y.S.2d 599, 599-600 (1st Dep't 2003) (class certification of § 349 claim not appropriate where plaintiffs would have to show individualized proof for each class member as to the alleged oral misrepresentations); *Hazelhurst v. Brita Prods. Co.,* 295 A.D.2d 240, 242, 744 N.Y.S.2d 31, 33 (1st Dep't 2002) (class certification of § 349 claim not appropriate where proof of injury would require individual determinations); *Carnegie v. H & R Block, Inc.,* 269 A.D.2d 145, 147, 703 N.Y.S.2d 27, 29 (1st Dep't 2000) (class certification of § 349 claim not appropriate where "questions of whether each individual was exposed to, and influenced by, the advertising would predominate"); *Small v. Lorillard Tobacco Co.,* 252 A.D.2d 1, 9-12, 679 N.Y.S.2d 593, 600-02 (1st Dep't 1998) (class certification not appropriate in tobacco lawsuit under § 349 where individual issues of causation and damages would predominate), *aff'd,* 94 N.Y.2d 43, 698 N.Y.S.2d 615 (1999).

### 3. *Typicality*

**\*13** Typicality under Rule 23(a) "requires that the claims of the class representatives be typical of those of the class, and 'is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'" *Marisol A. v. Giuliani,* 126 F.3d 372, 376 (2d Cir.1997) (quoting *In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d 285, 291 (2d Cir.1992), *cert. dismissed,* 506 U.S. 1088, 113 S.Ct. 1070 (1993)). FN18 "The commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Gen. Tel. Co. v. Falcon,* 457 U.S. 147, 158 n. 13, 102 S.Ct. 2364, 2371 n. 13 (1982). FN19

FN18. *Accord, e.g., Robinson v. Metro-North Commuter R.R.,* 267 F.3d 147, 155 (2d Cir.2001), *cert. denied,* 535 U.S. 951, 122 S.Ct. 1349 (2002); *In re NTL, Inc. Sec. Litig.,* 02 Civ. 3013, 2006 WL 330113 at \*7 (S.D.N.Y. Feb. 14, 2006) (Peck, M.J.); *Bolanos v. Norwegian Cruise Lines Ltd.,* 212 F.R.D. 144, 155 (S.D .N.Y.2002) (Berman, D.J. & Peck, M.J.); *In re Towers Fin. Corp. Noteholders Litig.,* 177 F.R.D. 167, 170 (S.D.N.Y.1997) (Knapp, D.J. & Peck, M.J.).

FN19. *Accord, e.g., Marisol A. v. Giuliani,* 126 F.3d at 376; *Caridad v. Metro-North Commuter R.R.,* 191 F.3d 283, 291 (2d Cir.1999), *cert. denied,* 529 U.S. 1107, 120 S.Ct. 1959 (2000); *In re NTL, Inc. Sec. Litig.,* 2006 WL 330113 at \*7; *Bolanos v. Norwegian Cruise Lines Ltd.,* 212 F.R.D. at 155; *In re Towers Fin. Corp. Noteholders Litig.,* 177 F.R.D. at 170.

" 'While it is settled that the mere existence of individualized factual questions with respect to the class representative's claim will not bar class certification, class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation .' " *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 222 F.3d 52, 59 (2d Cir.2000). FN20 "However, 'the rule barring certification of plaintiffs subject to unique defenses is not rigidly applied in this Circuit'; it has generally been applied only where a full defense is available against an individual plaintiff's action." *Koppel v. 4987 Corp.,* 191 F.R.D. at 365 (quoting *In re Frontier Ins. Group, Inc. Sec. Litig.,* 172 F.R.D. 31, 41 (E.D.N .Y.1997)). The unique defense rule is " intended to protect [the] plaintiff class-not to shield defendants from a potentially meritorious suit." *Trief v. Dun & Bradstreet Corp.,* 144 F.R.D. 193, 200-01 (S.D.N.Y.1992); *accord, e.g., In re NTL, Inc. Sec. Litig.,* 2006 WL 330113 at \*7; *Koppel v. 4987 Corp.,* 191 F .R.D. at 365.

FN20. *Accord, e.g., In re NTL, Inc. Sec.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Litig.,* 2006 WL 330113 at *7; *In re Initial Pub. Offering Sec. Litig.,* 227 F.R.D. 65, 95 (S.D.N.Y.2004); *Bolanos v. Norwegian Cruise Lines Ltd.,* 212 F.R.D. at 156; *Koppel v. 4987 Corp.,* 191 F.R.D. 360, 365 (S.D.N.Y.2000); 5 *Moore's Federal Practice* § 23.24[5].

Newman asserts that his "claims are typical of the claims of the class and he has the same interests as the other members of the class." (Dkt. No. 17: Newman Class Cert. Br. at 7-8.) RCN argues that Newman is atypical (a) because he cannot show that he and the other potential class members were exposed to one particular advertisement when they subscribed for RCN's high speed internet service (Dkt. No. 38: 1/16/06 RCN Opp. Br. at 18-26), and (b) because he continued to pay his bills after he knew that RCN was charging him $25.00 per month extra for premium internet service and after he knew that he might not be receiving the speed of internet service he was expecting (*id.* at 31-33, 39-40).

a. *Exposure to the Same Alleged Misrepresentation*

As discussed above, "to prevail in a cause of action under General Business Law §§ 349 and 350, the plaintiff must prove that the defendant made misrepresentations or omissions that were likely to mislead a reasonable consumer in the plaintiff's circumstances, that the plaintiff was deceived by those misrepresentations or omissions and that as a result the plaintiff suffered injury." *Solomon v. Bell Atl. Corp.,* 9 A.D.3d 49, 52, 777 N.Y.S.2d 50, 55 (1st Dep't 2004).[FN21] "In a class action alleging deceptive acts and practices ..., the proof must show that each plaintiff was reasonably deceived by the defendant's misrepresentations and was injured by reason thereof." *Solomon v. Bell Atl. Corp.,* 9 A.D.3d at 52, 777 N.Y.S.2d at 55. " Therefore, certification ... under General Business Law §§ 349 and 350 may be appropriate where the plaintiffs allege that all members of the class were exposed to the same misrepresentations." *Solomon v. Bell Atl. Corp.,* 9 A.D.3d at 52-53, 777 N.Y.S.2d at 55.[FN22] "However, class certification is not appropriate where the 'plaintiffs do not point to any

specific advertisement or public pronouncement by the [defendants] ... which was undoubtedly seen by all class members.' " *Solomon v. Bell Atlantic Corp.,* 9 A.D.3d at 53, 777 N.Y.S.2d at 55 (quoting *Small v. Lorillard Tobacco Co.,* 252 A.D.2d 1, 9, 679 N.Y.S.2d 593, 600 (1st Dep't 1998), *aff'd,* 94 N.Y.2d 43, 698 N.Y.S.2d 615 (1999)); *see also, e .g., Carnegie v. H & R Block, Inc.,* 269 A.D.2d 145, 147, 703 N.Y.S.2d 27, 29 (1st Dep't 2000).

> FN21. *See, e.g., Goshen v. Mut. Life Ins. Co.,* 98 N.Y.2d 314, 324, 746 N.Y.S.2d 858, 863 (2002); *see also* cases cited at pages 22-23 above.

> FN22. *See also, e.g., Broder v. MBNA Corp.,* 281 A.D.2d 369, 371, 722 N.Y.S.2d 524, 526 (1st Dep't 2001); *Taylor v. American Bankers Ins. Group,* 267 A.D.2d 178, 178, 700 N.Y.S.2d 458, 459 (1st Dep't 1999).

**\*14** Newman has not demonstrated that all members of the class were exposed to the same advertisements. Indeed, Newman testified during his deposition that no one particular advertisement influenced him to sign up for RCN service and that he did not remember the contents of any particular RCN advertisements that he received during 2003. (Dkt. No. 26: Arturi Aff. Ex. B: Newman Dep. at 130-32.) In addition, Newman stated that he could not recall any particular advertisement regarding the promised speed of Mach 7 and Mach 10 service, although he remembered looking on the RCN web site and fliers that he received in the mail. (*Id.* at 229.) Newman also testified that none of the fliers that he received in the mail induced him to pay for premium internet service from RCN because he never wanted the faster speed in the first place. (*Id.* at 233.) Newman has not alleged that the different RCN advertisements all included the same misrepresentation (despite having extensive discovery from RCN before the conclusion of briefing on the class certification motion). Therefore, Newman has not established typicality because he has not shown that he and other members of the class all relied on the same misrepresentation by RCN when subscribing to high

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Page 15

Slip Copy, 2006 WL 572345 (S.D.N.Y.)
**(Cite as: Slip Copy)**

speed internet service. *See, e.g., Small v. Lorillard Tobacco Co.,* 252 A.D.2d at 9, 679 N.Y.S.2d at 600 (class certification of § 349 claim inappropriate where " '[t]he complaint does not show any one misrepresentation, or group of misrepresentations, or common thread that may be applicable to substantially the entire group" '); *Solomon v. Bell Atl. Corp.,* 9 A.D.3d at 53, 777 N.Y.S.2d at 55 (class certification inappropriate in § 349 claim where plaintiffs could not demonstrate that all members of the class saw the same advertisements); *Carnegie v. H & R Block, Inc.,* 269 A.D.2d at 147, 703 N.Y.S.2d at 29 (class certification inappropriate where lead plaintiff was atypical of class because she was not exposed to any of the same advertising to which the class was exposed).

#### b. *The Voluntary Payment Doctrine*

The voluntary payment doctrine "bars recovery of payments voluntarily made 'with full knowledge of the facts." ' *Solomon v. Bell Atl. Corp.,* 9 A.D.3d 49, 55, 777 N.Y.S.2d 50, 56 (1st Dep't 2004) (quoting *Dillon v. U-A Columbia Cablevision of Westchester, Inc.,* 100 N.Y.2d 525, 526, 760 N.Y.S.2d 726, 727 (2003)). This doctrine would bar recovery by any RCN subscriber who, having experienced slower than advertised service, continued to pay for and use RCN's high speed internet service. *See Solomon v. Bell Atl. Corp.,* 9 A.D.3d at 55, 777 N.Y.S.2d at 56 (voluntary payment doctrine "would bar recovery by any subscriber who, having experienced slow service ..., continued to use defendants' DSL service."). This doctrine also would bar recovery by any RCN subscriber who paid his or her bill even though it contained an extra $25.00 per charge for premium high speed internet service. Newman falls squarely within these descriptions. After performing his internet speed tests on December 16, 2004 and seeing that he was only receiving data at approximately 5 Mbps (Dkt. No. 26: Arturi Aff. Ex. B: Newman Dep. at 255; Arturi 2/8/06 Supp. Aff. Ex. B: Newman Dep. Ex. D-19 at NEWMAN00003-08), Newman continued to pay his bills without dispute for premium high speed internet service for December 2004, January 2005, and February 2005 (Dkt. No. 39: Tyson Aff. ¶¶

71, 73, 80-82, 88-89). In addition, after an extra $25.00 per month charge for premium high speed internet service appeared on his bill, Newman continued to pay his bills without dispute. (*Id.*) Newman is therefore an atypical plaintiff because he is subject to an affirmative defense based on the voluntary payment doctrine that raises individual issues about his own claims. *See Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 903 F.2d 176, 179-80 (2d Cir.1990) (class certification properly denied because plaintiff was inappropriate class representative because its claim was subject to several unique defenses, including the fact that it continued to purchase the disputed CDs despite having knowledge of the alleged fraud), *cert. denied,* 498 U.S. 1025, 111 S.Ct. 675 (1991); *In re Currency Conversion Fee Antitrust Litig.,* 230 F.R.D. 303, 308 (S.D.N.Y.2004) (class certification of § 349 claim not appropriate where plaintiff was atypical because he continued to use his credit card after discovering that defendant was charging him an extra currency conversion fee every time he used it), *modified on other grounds,* 2005 WL 1705285 (S.D.N.Y. July 22, 2005); *Dillon v. U-A Columbia Cablevision of Westchester, Inc.,* 100 N.Y.2d at 526, 760 N.Y.S.2d at 727 (plaintiff's purported class action complaint barred based on voluntary payment doctrine when facts revealed that she paid defendant cable company the challenged extra fee with full knowledge of when and why the fee would be charged); *Solomon v. Bell Atlantic Corp.,* 9 A.D.3d at 55, 777 N.Y.S.2d at 56 (class certification of § 349 claim not appropriate where plaintiffs were atypical because they continued to subscribe to defendants' DSL service after experiencing slow service and/or frequent connectivity outages).

#### 4. *Solomon v. Bell Atl. Corp. Is Directly On Point and Requires Denial of Class Certification*

**\*15** The First Department's decision in *Solomon v. Bell Atlantic Corp.,* 9 A.D.3d 49, 777 N.Y.S.2d 50 (1st Dep't 2004), is directly on point, and requires denial of class certification. In *Solomon,* the First Department decertified a class of plaintiffs who claimed that Bell Atlantic's advertisements for its digital subscriber line ("DSL") internet access

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 16

**Slip Copy, 2006 WL 572345 (S.D.N.Y.)**
**(Cite as: Slip Copy)**

service, which described it as "126x faster than your 56K modem," were false and misleading in violation of General Business Law §§ 349-50. *Solomon v. Bell Atlantic Corp.*, 9 A.D.3d at 50-51, 777 N.Y.S.2d at 53.[FN23]

> FN23. Newman's reply brief asserts that *Solomon* "involved a GBL § 350 claim," and that "[f]or § 349 claims, *Solomon* does not apply." (Dkt. No. 35: Newman Class Cert. Reply Br. at 3.) Newman is simply wrong. *Solomon* clearly involved analysis of claims brought under *both* General Business Law § 349 and § 350. Newman correctly cites *Cox v. Microsoft Corp.*, 10 Misc.3d 1055(A), 2005 WL 3288130 at *4 (Sup.Ct.N.Y.Co. July 29, 2005), for the proposition that while reliance need be shown for a § 350 claim, it need not be shown under § 349. Causation, however, remains an element of a § 349 claim, and the issue of whether any deceptive ads as to RCN's internet speed caused injury to class members requires individual determinations, as described in *Solomon*.

It is worth quoting from *Solomon* at length:
Claims under General Business Law §§ 349 and 350 are available to "an individual consumer who falls victim to misrepresentations made by a seller of consumer goods through false or misleading advertising." To state such a claim, a plaintiff must allege that the defendant has engaged " 'in an act or practice that is deceptive or misleading in a material way and that plaintiff has been injured by reason thereof." ' Deceptive or misleading representations or omissions are defined objectively as those "likely to mislead a reasonable consumer acting reasonably under the circumstances," i.e ., the plaintiff's circumstances.
[T]o prevail in a cause of action under General Business Law §§ 349 and 350, the plaintiff must prove that the defendant made misrepresentations or omissions that were likely to mislead a reasonable consumer in the plaintiff's circumstances, that the plaintiff was deceived by those misrepresentations or omissions and that as a result the plaintiff suffered injury.

In a class action alleging deceptive acts and practices and false advertising, the proof must show that each plaintiff was reasonably deceived by the defendant's misrepresentations or omissions and was injured by reason thereof. Therefore, certification of a class for purposes of an action brought under General Business Law §§ 349 and 350 may be appropriate where the plaintiffs allege that all members of the class were exposed to the same misrepresentations.
However, *class certification is not appropriate where the "plaintiffs do not point to any specific advertisement or public pronouncement by the [defendants] ... which was undoubtedly seen by all class members."*
Plaintiffs have not demonstrated that all members of the class saw the same advertisements. Indeed, *the record shows that the individual plaintiffs did not all see the same advertisements; some saw no advertisements at all before deciding to become subscribers.* Moreover, the content of defendants' DSL advertising varied widely and not all the advertisements contained the alleged misrepresentations. Thus, *questions of individual members' exposure to the allegedly deceptive advertising predominate.*
The motion court found that the variety of advertisements in different media using varying language presents no obstacle to class certification because "the various advertisements convey the same substantial message to the consuming public-speed and ease of DSL service." This conclusion ... fails to address the uncontested fact that some subscribers saw none of these advertisements but learned of DSL through word of mouth....
**\*16** *Even assuming that all the members of the class saw the same advertisements, questions as to whether each individual was reasonably misled by them predominate, given the alternative sources of information about DSL service that each may have had.* One of the individual plaintiffs who learned about DSL service through word of mouth testified that he spoke to three or four people who were using the service and he heard both "good things" and "complaints" about it. Another testified that he read articles in computer magazines comparing DSL service to cable modem service. Other sources of information include the terms and conditions in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 17

**Slip Copy, 2006 WL 572345 (S.D.N.Y.)**
**(Cite as: Slip Copy)**

the service agreement containing disclaimers "that address the very service glitches plaintiffs cite," and the 30-day trial period, during which subscribers could cancel with no obligation. Thus, individual trials would be required to determine whether a reasonable consumer acting reasonably in each plaintiff's circumstances would have been misled by defendants' representations.

*As to proof of injury, individual trials would be required to determine which plaintiffs experienced either slower than advertised Internet download speeds* or connectivity outages *and the nature, cause and extent of those adverse experiences.* It is uncontested, for example, that *DSL speed is dependent on a number of factors,* including the subscriber's own computer and network elements that are unrelated to the service itself, such as the server on which the Web site sought to be accessed resides.

*Individual trials also would be required to determine damages based on the extent of each plaintiff's injuries, i.e., the slowness of service* and/or the frequency and duration of connectivity outages, if any. *The determination of the degree to which an individual consumer's service was slow requires consideration of many factors,* such as whether the consumer's speed was already limited by the Web site accessed or congestion on the Internet.

Defendants also assert certain affirmative *defenses that raise individual issues.* One such defense is the *voluntary payment doctrine,* which bars recovery of payments voluntarily made "with full knowledge of the facts" and would bar recovery by any subscriber who, having experienced slow service and/or frequent connectivity outages, continued to use defendants' DSL service. *One of the three individual plaintiffs who have continued to subscribe to the service despite their complaints testified that he believed that DSL service is presently worth more than he is paying for it....*

*Additional defenses are the terms and conditions* and the 30-day trial period discussed above in connection with the various sources of information available to consumers apart from defendants' advertisements. While some of the individual plaintiffs testified that they accepted the terms and conditions after reading them, others testified that they accepted the terms and conditions without

reading them, and one plaintiff testified that, although she did not remember reading the terms and conditions, she "must have agreed" to them. *To determine actual injury, individual trials would be required to demonstrate which statements and/or disclaimers each plaintiff read* and why he or she continued to receive the service even after the 30-day trial period.

**\*17** As to the third prerequisite for class certification, the seven individual plaintiffs have not demonstrated that they are typical of the class. Indeed, they would appear to have demonstrated that *there is no typical plaintiff.* The record reflects differences among the individual plaintiffs as to which advertisements they saw, whether they saw any ads or obtained information by which to evaluate DSL service from other sources, whether they received billing credits, whether they read the terms and conditions and agreed to them, the nature and extent of their injuries, and the damages they claim.

*Solomon v. Bell Atlantic Corp.,* 9 A.D.3d at 52-56, 777 N.Y.S.2d at 54-57 (citations omitted & emphasis added).

Here, as in *Solomon,* Newman has not pointed to any common advertisement seen by all class members, or common misrepresentations in different advertisements. Moreover, as in *Solomon,* individual determinations of why each class member subscribed to RCN's internet service would predominate (*e.g.,* Newman himself did not rely on the representations as to speed in signing up for RCN's internet service). Here, as in *Solomon,* proof of injury and damages would require individual trials as to which class members received slower than advertised speeds and why. Indeed, since bundled RCN customers received RCN's highest internet speed (currently, Mach 10) for *no* additional cost, the only customers who could claim damages are those who bought the higher speed at a la carte prices.[FN24] Here, as in *Solomon,* the voluntary payment doctrine defense will raise individual issues, as will issues concerning the applicability of RCN's Terms and Conditions and other customer agreements, including the information about a la carte pricing where a customer cancels part of a bundled package.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 18

**Slip Copy, 2006 WL 572345 (S.D.N.Y.)**
**(Cite as: Slip Copy)**

FN24. Indeed, by the time Newman's counsel filed his reply brief, the claims may have morphed again-to a claim that RCN's ads claimed that Mach 7 (and Mach 10) were faster than the speed of other internet providers. (*See* Dkt. No. 35: Newman Class Cert. Reply Br. at 3.) If that is Newman's current position (which is not clear from the reply brief), it comes too late, and is not at all supported by any record information, and the Court will not consider it.

Here, as in *Solomon,* the correct result is denial of class certification. [FN25]

FN25. The fourth Rule 23(a) factor is adequacy of representation, which includes the adequacy of class counsel. Fed.R.Civ.P. 23(a), 23(g); *see generally In re NTL, Inc. Sec. Litig.,* 02 Civ. 3013, 2006 WL 330113 at *11 (S.D.N.Y. Feb. 14, 2006) (Peck, M.J.) ( & cases cited therein). While the Court has some concerns as to how Newman's counsel has litigated this case so far (including the changes in Newman's own claims from the complaint to his deposition testimony, and the dropping of the § 350 class claim), the Court need not address this issue because there are sufficient other reasons, discussed above, to deny class certification. "In addition to satisfying Rule 23(a)'s prerequisites, parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 614, 117 S.Ct. 2231, 2245 (1997) ; *accord, e.g., In re NTL, Inc. Sec. Litig.,* 02 Civ. 3013, 2006 WL 330113 at *12 (S.D.N.Y. Feb. 14, 2006) (Peck, M.J.) ( & cases cited therein). Rule 23(b)(3) states that: "An action may be maintained as a class action if the prerequisites of [Rule 23(a) ] are satisfied, and in addition ... the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b); *see generally Amchem Prods., Inc. v. Windsor,* 521 U.S. at 715-16, 117 S.Ct. at 2246. Because plaintiff Newman has not satisfied the prerequisites of Rule 23(a), the Court need not further discuss the requirements of Rule 23(b), except to the extent already discussed above as to predominance.

*CONCLUSION*

For the reasons set forth above, the Court should deny class certification. Because jurisdiction in this case is based solely on its maintenance as a class action under 28 U.S.C. § 1453, Newman's individual case should be remanded to state court upon denial of class certification.

*FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION*

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Victor Marrero, 40 Centre Street, Room 414, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Marrero (with a courtesy copy to my chambers). Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466 (1985); *IUE AFL-CIO Pension Fund v. Herrmann,* 9 F .3d 1049, 1054 (2d Cir.1993), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86 (1994); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825 (1992); *Small v. Secretary of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57-59 (2d Cir.1988);

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                                Page 19

Slip Copy, 2006 WL 572345 (S.D.N.Y.)
**(Cite as: Slip Copy)**

*McCarthy v. Manson,* 714 F.2d 234, 237-38 (2d Cir.1983); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

S.D.N.Y.,2006.
Newman v. RCN Telecom Services, Inc.
Slip Copy, 2006 WL 572345 (S.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 1434212 (Trial Motion, Memorandum and Affidavit) Joint Memorandum of Rcn Corp. and Rcn Telecom Services, Inc., in Response to Plaintiff's Objection to the Report and Recommendation of the Hon. Andrew J. Peck, U.S.M.J. (Apr. 28, 2006) Original Image of this Document (PDF)
• 2006 WL 1434211 (Trial Motion, Memorandum and Affidavit) Plaintiff's Objection to the Report and Recommendations of Magistrate Judge Peck (Apr. 3, 2006) Original Image of this Document (PDF)
• 2006 WL 548681 (Trial Motion, Memorandum and Affidavit) Plaintiff's Reply Memorandum (Jan. 25, 2006)
• 1:05cv04816 (Docket) (May 18, 2005)
• 2005 WL 3881653 (Trial Motion, Memorandum and Affidavit) Joint Memorandum of Rcn Corp. and Rcn Telecom Services, Inc., in Opposition to Plaintiff's Motion to certify a Class of Rcn Subscribers to Mach 7 and/or Mach 10 Internet Service (Jan. 16, 2005)
• 2005 WL 3832250 (Trial Motion, Memorandum and Affidavit) RCN Corp.'s Memorandum in Opposition to Plaintiff's Motion to Certify A Class of Rcn Subscribers to Mach 7 and/or Mach 10 Internet Service (Jan. 6, 2005) Original Image of this Document (PDF)
• 2005 WL 3832251 (Trial Motion, Memorandum and Affidavit) RCN Telecom Services, Inc.'s Memorandum in Opposition to Plaintiff's Motion to Certify a Class of RCN Subscribers to Mach 7 and/or Mach 10 Internet Service (Jan. 6, 2005) Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT Q



Not Reported in N.W.2d                                                                 Page 1

Not Reported in N.W.2d, 2000 WL 673933 (Minn.Dist.Ct.), 2000-1 Trade Cases P 72,816
**(Cite as: Not Reported in N.W.2d)**

**District Court of Minnesota.**
PERIDOT, INC., and Vernon Inc., on behalf of
themselves and all others similarly situated
v.
KIMBERLY-CLARK CORP., Scott Paper Co.,
Inc., Georgia Pacific Corp., Fort Howard Corp.,
Bay West Paper Corp., Cascades Industries Inc.,
Encore Paper Co., James River Corp. of Virginia,
Marcal Paper Mills, Inc., and Wisconsin Tissue
Mills, Inc.
**No. MC 98-012686.**

Feb. 7, 2000.

*Minnesota Antitrust Law*

Class       Certification-State       Laws-Indirect
Purchasers-Class       Identification-Experts-Tissue
Products.-Indirect purchasers of commercial tissue
products were denied class certification in a price
fixing conspiracy action under Minnesota Antitrust
Law. The indirect purchasers defined their class as
first-tier business entities that purchased
commercial tissue products from distributors that
purchased directly from the manufacturers. No
adequate means of ascertaining the identity of the
proposed class members was available under the
definition of the class. In order for a court to certify
a class, the class must be ascertainable, based on
definite standards and capable of being identified
without difficult managerial and administrative
problems. The only way to ascertain the class would
be to trace back along the distribution chain the
actual tissue products that are shipped to first-tier
business entities. It was highly unlikely that the
distributors tracked which of their customers were
sent stock that came from another distributor rather
than from the defendant manufacturers. Also, the
indirect purchasers' expert's proposed mechanical
calculations to determine the amount of the price
increase were so insubstantial as to amount to no
method at all.
See ¶ 9410.25.

MEMORANDUM

LEVY, D.J.
**\*1** Plaintiffs Peridot, Inc. and Vernon Incorporated
are   two   commercial   entities   that   purchased
commercial tissue products from commercial tissue
distributors from 1993 to the present. Plaintiffs
allege that Kimberly-Clark Corporation, Scott Paper
Company, Inc., Georgia Pacifica Corporation, Fort
Howard Corporation, Bay West Paper Corporation,
Cascades Industries, Inc., Encore Paper Company,
Inc., James River Corporation of Virginia, Marcal
Paper mills, Inc., and Wisconsin Tissue Mills, Inc.
(a division of Chesapeake Corporation) (hereafter "
defendant manufacturers") began a price-fixing
endeavor in the commercial tissue products industry
in 1993. The defendant manufacturers are the top
producers of commercial tissue products in this
country maintaining 74-75% of the national
commercial tissue market. Defendant manufacturers
sell their product to distributors who then sell that
product to others including putative plaintiff class.
There are approximately forty distributors in
Minnesota that purchased commercial tissue from
defendant manufacturers. These forty Minnesota
distributors also purchased commercial tissue from
other distributors when needed to fill an order. *See*
e.g. Isaksen Aff. p. 1 (Jordan Lewis Aff. sec. D).
Plaintiffs contend that defendant manufacturers
conspired and sold commercial tissue products at an
inflated price to the first-tier distributors and that
these first-tier distributors then passed on the price
increases to plaintiffs.

There is a parallel case in federal district court in
Florida that is based upon the underlying facts of
the price-fixing conspiracy alleged by plaintiffs
Peridot, Inc. and Vernon Incorporated. *See In re
Commercial Tissue Products* [1998-2 TRADE
CASES ¶ 72,275], 183 F.R.D. 589 (N.D.Fla.1998)
. In the federal case, the plaintiff class, which has
been certified, consists of the distributors that
bought directly from the defendant manufacturers
designated in this case. The federal class does not
include indirect purchasers [FN1] of commercial

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d, 2000 WL 673933 (Minn.Dist.Ct.), 2000-1 Trade Cases P 72,816
**(Cite as: Not Reported in N.W.2d)**

tissue products like the plaintiffs in this case. Such indirect purchasers are barred from making claims under federal antitrust laws. *Illinois Brick Co. v. Illinois* [1977-1 TRADE CASES ¶ 61,460], 431 U.S. 720 (1977).

> FN1. Indirect purchasers refers to those individuals or entities that purchase products down the chain of distribution, and not directly from the manufacturer of a product.

**\*2** Unlike federal antitrust law, Minnesota antitrust law expressly permits claims by indirect purchasers for antitrust violations like price-fixing. Minn.Stat. § 325D.57. There is no special allowance for such suits to be brought as class actions-suits filed under the antitrust chapter as class actions still must meet all requirements for class certification as specified by the Minnesota Rules of Civil Procedure and relevant case law. Originally the class proposed by plaintiffs in their complaint included all indirect purchasers from all levels of the distribution chain. As part of their motion to certify, plaintiffs have significantly narrowed their class. No Minnesota court has certified a class of indirect purchasers; in each case the court found that the action involved complex individualized pricing systems and plaintiffs in multiple levels of the distribution chain requiring mini-trials to determine damages. *See Keating v. Philip Morris, Inc.* [1987-2 TRADE CASES ¶ 67,801], 417 N.W.2d 132, 137 (Minn.App.1987); *See also Kerr v. Abbott Laboratories,* 1997-1 TRADE CASES ¶ 71,776 (Minn. Dist. Ct. Hennepin Cty., 1997); *Fischenich v. Abbott Laboratories, Inc.,* No. 94-6868 (Minn. Dist. Ct., Hennepin Cty., 1995). Because determination of damages becomes much too individualized a process, Minnesota Courts have held that a class action is not the superior method of adjudication.

Plaintiffs move this Court to certify the plaintiff class which plaintiffs define as first-tier business entities that purchased commercial tissue products from forty Minnesota distributors that purchased directly from defendant manufacturers during the years from 1993 to the present.

*Prerequisites for a Class Action under Minnesota Rule of Civil Procedure 23.01*

In considering whether to allow one or more members of a class to sue as representative parties of an entire class, i.e. whether to certify a plaintiff class, Minnesota Rule of Civil Procedure 23.01 requires a finding that:
(a) the class is so numerous that joinder of all members is impracticable;
(b) there are questions of law or fact common to the class;
(c) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(d) the representative parties will fairly and adequately protect the interests of the class.

These four factors are commonly referred to as numerosity, commonality, typicality, and adequacy. Plaintiffs contend that these four factors are easily met in this case because:1. the class of persons or entities that purchased commercial tissue products from a distributor that bought commercial tissue products directly from defendant manufacturers is a class too numerous in quantity to make joinder practicable;
2. the question of whether there was a conspiracy to fix prices for purposes of liability are common to the class;
3. the claims by named plaintiffs are representative of the class even if the amount of claim is variable; and
**\*3** 4. the representative parties' interest are not in conflict with the class and the plaintiffs' lawyers are adequate to defend the interests of the class.

Defendants offer no argument on this issue and this Court finds that plaintiffs have met the burden on the requirements of Minnesota Rule of Civil Procedure 23.01.

*Prerequisites for a Class Action under Minnesota Rule of Civil Procedure 23.02*

Minnesota Rule of Civil Procedure 23.02 requires that plaintiffs meet one of three additional prongs for class certification; plaintiffs claim they meet

Not Reported in N.W.2d                                                                 Page 3

Not Reported in N.W.2d, 2000 WL 673933 (Minn.Dist.Ct.), 2000-1 Trade Cases P 72,816
**(Cite as: Not Reported in N.W.2d)**

prong three. *See* Minn.Civ.R.Pro. 23.02(c). Minnesota Rule of Civil Procedure 23.02(c) requires that the court find that "questions of law or fact common to the members of the class predominate over questions affecting only individual members of the class" and a class action is the best method for the fair and efficient adjudication of the controversy. This rule also instructs the Court to look to: 1) the interest of individuals included in the class to control the prosecution of a separate action; 2) extent of any other litigation involving the same controversy already commenced by members of the class; 3) the appropriateness of concentrating the litigation of the controversy in the particular forum; and 4) the difficulties likely to be encountered in managing the class action. *Id.; See also Streich v. American Family Mut. Auto. Ins. Co.,* 399 N.W.2d 210, 217 18 (Minn.App.1987) ("in determining whether a class action is appropriate, factors to consider include manageability, fairness, efficiency and available alternatives").

In order to determine whether common questions of law or fact predominate over individual questions, it is first necessary to look at what is needed to establish a private antitrust suit. To maintain a private antitrust suit, plaintiff must show a violation of the antitrust law, the fact that damage occurred as a result of the violation, and "some indication of the amount of the damage." *Keating v. Philip Morris, Inc.,* 417 N.W.2d 132, 137 (Minn.App.1987). To maintain a private antitrust suit as a class action, a plaintiff also must show that the common questions raised by the class action constitute a significant part of each individual's potential cause of action, i.e., plaintiff must establish that common questions of law or fact predominate for all plaintiffs and the class is manageable. *See Streich,* 399 N.W.2d at 217-18. If there is "generalized evidence" that proves the elements of the claim applicable to the entire class, the predominance requirement will be met. *See In re Potash Antitrust Litig.* [1995-1 TRADE CASES ¶ 70,885], 159 F.R.D. 682, 693 (D.Minn.1995); *see also In re Workers' Compensation* [1990-1 TRADE CASES ¶ 68,975], 130 F.R.D. 99, 108 (D.Minn.1990) (quoting *In re Indus. Gas* [1983-2 TRADE CASES ¶ 65,535], 100 F.R.D. 280, 288 (N.D.Ill.1983)).

Plaintiffs argue that the common question of fact and law in this case is whether defendant manufacturers violated antitrust laws by participating in a price-fixing conspiracy. Each individual member of the putative class would have to establish this antitrust violation if class members proceeded on an individual basis. This would mean that without a certification of the putative class, each prospective plaintiff would have to call the same witnesses and present the same evidence in numerous individual trials. Absent further consideration, this potential multiplicity of cases would make a class action the more efficient way for this matter to proceed. Defendant manufacturers, however, contend that the class is unmanageable because the damages issue predominates and plaintiffs cannot prove impact or provide a means to measure the quantity of damage on each putative class member.

**\*4** Antitrust actions are typically well suited to proof of damages on a large class-wide basis. *See* Newberg on Class Actions § 18.53. A putative class member's individualized impact can be "presumed in an antitrust case on a showing of conspiracy only when defendants control the relevant market." Newberg on Class Actions § 18.27, n. 153 citing *In re Electric Weld Steel Tubing Antitrust Litigation,* 1980-81 TRADE CASES ¶ 63,783 (E.D.Pa. Nov.7, 1980). In cases where evidence shows that defendant's alleged price-fixing action was not always "passed on" to all putative class members, however, proof of impact and damages as to each plaintiff becomes too individualized a task to make a class action feasible-the class is unmanageable. *In re Alcoholic Beverages Litigation,* 1982-1 TRADE CASES ¶ 63,783 (E.D.N.Y. Mar 11, 1982). Mere existence of individual damage questions will not preclude certification as long as there is some "common proof" to adequately demonstrate some damage to each plaintiff. *In re Workers' Compensation,* 130 F.R.D. at 108.

Generally, surveys and statistical evidence can provide supplemental or alternative means of proving class-wide damages. Newberg on Class Actions § 18.53 *citing Superior Beverage Co. v. Owens-Illinois, Inc.,* 1987-1 TRADE CASES ¶ 67,461 (N.D. Ill. Jan 30, 1987). *Potash Antitrust*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d, 2000 WL 673933 (Minn.Dist.Ct.), 2000-1 Trade Cases P 72,816
**(Cite as: Not Reported in N.W.2d)**

*Litigation,* 159 F.R.D. at 697. As discussed in *Keating,* however, the problem of determining damages on a class-wide basis is magnified in an indirect purchase case often making the determination of the affect of a price-fixing conspiracy too complex for a class action. 417 N.W.2d at 137. This is especially true when the distributors use non-uniform discounts and pricing. *Id.* Other factors such as the elasticity of the market, quantities of amounts ordered, and even how loudly someone complains, also affect the rates paid by indirect purchasers. Although all of the law cited above regarding proof of damages on a class-wide basis only involved direct purchasers, individualized impact and damages for a class can be established by use of a mechanical calculation using common proof rather than through separate mini-trials in an indirect purchaser case. *Keating,* 417 N.W.2d at 137 (*quoting Windham v. American Brands, Inc.* [1977-2 TRADE CASES ¶ 61,670], 565 F.2d 59, 68 (4th Cir.1977)). Defendants' expert Gordon C. Rausser, Ph.D. not only argues that plaintiffs' expert Mark E. Meitzen, Ph.D. ("Meitzen") does not offer a viable mechanical calculation, but additionally claims that due to all of the complications present in this case, no mechanical calculation is possible.

Disputes between experts are usually for the trier of fact to resolve. *Potash Antitrust Litigation,* 159 F.R.D. at 697. Despite this, at the certification stage a court necessarily must assess whether plaintiffs offer a viable method for calculating class-wide damages. That judicial assessment, however, is limited to whether the proposed method(s) for calculation are "so insubstantial as to amount to no method at all." *Id. citing In re Screws Antitrust Litigation* [1981-2 TRADE CASES ¶ 64,211], 91 F.R.D. 52, 57 (D.Mass.1981). Additionally, the law does not require plaintiffs to establish a specific determination of damage amount as to each class member, only that a mechanical calculation is available for such determinations. *In re Antibiotic Antitrust Actions* [1971 TRADE CASES ¶ 73,482], 333 F.Supp. 278, 281 (S.D.N.Y.1971); *see also Windham,* 565 F.2d at 68. The specific amount claimed by each putative class member from the total quantum of damages is more properly addressed later as a part of a claims procedure. *In re*

*Antibiotic Antitrust Actions,* 333 F.Supp. at 281.

**\*5** Plaintiffs have shown that manufacturer defendants have 74-75% of the commercial tissue market allowing the presumption of damage impact by the putative class. While the pricing by distributors is highly individualized and increases are not always passed through to all putative class members in a consistent manner, price increases were always eventually passed on to all putative class members to some degree. Plaintiffs have shown that all putative class members would have presumably suffered at least some, if not the same amount of damage from the alleged price-fixing conspiracy suggesting class wide impact. The problem is whether Meitzen provides a viable means of calculating the quantity of damages for the class as a whole.

Meitzen believes that by using various economic methods of regression analysis or markup analysis he can devise a method to determine the amount of the price increases passed through to the putative class. Dep. of Mark E. Meitzen 3/24/99, p. 163. Meitzen admits, however, that he has never before devised such a method. *Id.* at p. 166. Additionally, Meitzen admitted that he is unaware of anyone else devising a model for calculating the amount of a price increase passed through to others in a distribution chain using his proposed economic methods. *Id.* In all models, Meitzen stated that it would be necessary to control for nonconspiratorial factors to produce an accurate model. *Id.* at p. 139-p. 145. Unfortunately, Meitzen also admitted that he was not sure how or whether he could control for these nonconspiratorial factors in a model. *Id.* Plaintiffs must do more than offer an expert that states he thinks he *might* be able to devise a mechanical calculation if he can figure out a way to control for all the nonconspiratorial factors, which he is not certain can be done. This Court finds that Meitzen's proposed mechanical calculations are "so insubstantial as to amount to no method at all." Even if Meitzen had offered a sufficient mechanical calculation for figuring class-wide damages, plaintiffs have a far larger problem with class certification in this case.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d, 2000 WL 673933 (Minn.Dist.Ct.), 2000-1 Trade Cases P 72,816
**(Cite as: Not Reported in N.W.2d)**

*Ascertaining the Members of the Proposed Class*

Under the definition of the class Plaintiffs offer in this motion, there is no adequate means of ascertaining the identity of proposed class members. Plaintiffs argue that although this case shares with *Keating* and *Kerr* indirect purchase status and complex pricing systems, and Minnesota courts have refused to certify these kinds of indirect classes, the proposed class in this case does not involve multiple levels of the distribution chain of indirect purchasers. Plaintiffs' contention of only one level of the distribution chain is misleading, however, because at least some of these forty Minnesota distributors also purchased stock from other distributors; multiple levels of the distribution chain of indirect purchasers are then involved in the current case. *See* e.g., Isakson Aff. p. 1 (w/in Jordan Lewis Aff. sec. D). Multiple levels of the distribution chain are not only problematic for devising a mechanical calculation to determine class-wide damages as discussed above, but its impact on ascertaining class membership is even stronger. By the definition of the putative class proposed by plaintiffs, there is no feasible method to determine who is in the class and who is not.

**\*6** In order for a court to certify a class, the class must be ascertainable, based on definite standards and capable of being identified without difficult managerial and administrative problems. *See Esler v. Northrop Corp.,* 86 F.R.D. 20, 33 (W.D.Mo.1979); *See also* Newberg on Class Actions, v. 2 § 6.14. In order to ascertain the class proposed by plaintiffs, it would be necessary to trace back along the distribution chain the actual commercial tissue products that were shipped to the first-tier business entities. This tracing back would be the only way to establish whether the distributor acquired the product from one of the defendant manufacturers or from another distributor, a required determination to ascertain class membership. Under the definition proposed by plaintiffs there would be no way for prospective plaintiffs to know if they were in the class and virtually impossible for anyone else to determine class membership. Even if a business entity purchased commercial tissue products from one of the forty Minnesota distributors, the entity still might not be in the putative class if the specific stock the entity was shipped came from another distributor rather than from defendant manufacturers.

Additionally, it is highly unlikely that the forty Minnesota distributors tracked which of their customers were sent stock that came from another distributor rather than from the defendant manufacturers. *See* Isakson Aff. p. 2. In his affidavit, Isakson states that although his company Trio Supply Co. tracks what is sold to its vendors some of whom distribute commercial tissue products, Trio Supply Co. does not track sales of specific products. *Id. See also* David W. Simon Affidavit, sec. 3, Potter Dep. P. 93 (Potter who works at Alliant Foodservice, Inc., a distributor of commercial tissue products, stated that there are no records "available at the individual product and individual transaction" level). Plaintiffs' class definition, however, requires the tracking of specific products to identify whether a putative class member bought a product that a distributor acquired from a defendant manufacturer or another distributor. Even if the forty Minnesota distributors had tracked what stock went to what customer, each sale during the relevant time period would have to be individually analyzed to determine class membership.[FN2] Such analysis would require a series of mini-trials just to determine whether a business entity was in the class before this case could proceed to the issues of liability and damages. Thus even if plaintiffs could offer a viable mechanical calculation, ascertaining the class would be a highly complex and difficult, if not impossible, task, neither managerially nor administratively feasible.

> FN2. For example, distributor Alliant indicated that it had computer records only from 1998. To gather any other information beyond general summaries, Alliant would have to go through hundreds of boxes for each individual year. The purchasing invoices and customer invoices are boxed separately. Purchasing invoices are organized by month and customer invoices are organized by invoice number.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d, 2000 WL 673933 (Minn.Dist.Ct.), 2000-1 Trade Cases P 72,816
**(Cite as: Not Reported in N.W.2d)**

> In order to make any attempt to determine from where a customer received product, it would be necessary to examine each customer invoice and try to find a corresponding purchasing invoice. To locate the corresponding purchasing invoice, someone from Alliant would have to compare the prices charged to a customer against the prices paid on the purchasing invoice. Even if Alliant could successfully locate the purchasing invoice upon which the customer's price was based, this would not guarantee that the product actually sent to the customer was necessarily from that lot. *See* David W. Simon Affidavit, sec. 3, Potter Dep. P. 93-96.

### Conclusion

For these reasons, this Court finds that the class proposed by plaintiffs is impossible to define or identify, that the class is not manageable within the meaning of Minnesota Rule of Civil Procedure 23.02(c), and that a class action is not the superior adjudication method. Plaintiffs' motion for class certification is denied.

Minn.Dist.Ct.,2000.
Peridot, Inc. v. Kimberly-Clark Corp.
Not Reported in N.W.2d, 2000 WL 673933 (Minn.Dist.Ct.), 2000-1 Trade Cases P 72,816

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT R



Not Reported in N.W.2d, 2002 WL 1839983 (Mich.Cir.Ct.), 2002-2 Trade Cases P 73,743
**(Cite as: Not Reported in N.W.2d)**

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Michigan Circuit Court.
Jon REN and Steven Ren, on behalf of themselves and all others similarly situated, Plaintiffs
v.
PHILIP MORRIS INC., R.J. Reynolds Tobacco Co., Brown & Williamson Tobacco Corp., Lorillard Tobacco Co., Liggett Group, Inc., and Brooke Group, Ltd., Defendants.
**No. 00-004035-CZ.**

June 11, 2002.

For plaintiffs: E. Powell Miller of Mantese, Miller & Shea, Troy, Mich.
For defendants: Richard Bisio of Honigman, Miller, Schwartz & Cohn, Detroit, Mich., Mary Kalmink of Clark Hill, Detroit, Mich., James G. Derian of Butzel Long, Detroit, Mich., and Frank Brochert of Plunkett & Cooney, Detroit, Mich.

OPINION
TORRES, Cir. J.

*1. Introduction.*

**\*1** The present case is an action for damages brought by numerous individuals against the defendants who are manufacturers of cigarettes. The action alleges that the defendants engaged in a conspiracy to fix the price of cigarettes and that this had the anti-competitive effect of maintaining the retail price of cigarettes at an artificially high level throughout Michigan. As result of these anti-competitive activities, plaintiffs maintain, they paid more for their cigarettes than they would have in the absence of the defendants' actions.

Before this court is plaintiffs' motion for class certification. They seek class certification for that part of the complaint that seeks relief under the Michigan Antitrust Reform Act (MARA), M.C.L. § 445 .771, *et seq.* Complaint, ¶ ¶ 92-100. The proposed class would be comprised of persons residing in Michigan (excluding several specific groups) who purchased cigarettes Indirectly from the defendants at any time from November 1, 1993 to the present. Complaint, ¶ ¶ 84-91.

MCR 3.501 governs motions for class certification. Plaintiffs have the burden of establishing the requirements for class certification under the court rule. *Zine v. Chrysler Corp,* 236 Mich.App 261, 287, n 12 (1999). A finding that the plaintiff has failed to satisfy any one of the factors under MCR 3.501(A) must result in the denial of the motion for class certification. *Salesin v State Farm Fire & Casualty Co,* 229 Mich.App 346, 372, n 13 (1998); *Wetzel v. Liberty Mutual Ins Co,* 508 F.2d 239, (CA 3), *cert den,* 421 U.S. 1011; 95 S Ct 2415; 44 L.Ed.2d 679 (1975).[FN1]

> FN1. As pointed out in 5 Martin, Dean and Webster, Michigan Court Rules Practice (3rd ed., 1990), 16, 19, n 10, the provisions of MCR 3.501(A) mirror those found in the rule of federal civil procedure that governs class actions brought in the federal courts, FR Civ P 23(b)(3). Thus, it is appropriate to consider federal cases construing the federal court rule for guidance. *Brenner v. Marathon Oil Co,* 222 Mich.App 128, 133 (1997).

In our case, the court assumes without deciding, that the plaintiffs could satisfy the requirements of MCR 3.501(A)(1)(a),(c), and (d) concerning numerosity, typicality and adequacy of representation. Instead, the court focuses on the other two requirements of Rule 3.501(A)(1)(b),(e) and (2)(c) which provide:
(1) One or more members of a class may sue or be sued as representative parties on behalf of all members in a class action only if:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d, 2002 WL 1839983 (Mich.Cir.Ct.), 2002-2 Trade Cases P 73,743
**(Cite as: Not Reported in N.W.2d)**

(b) there are questions of law or fact common to the members of the class that predominate over questions affecting only individual members;

(e) the maintenance of the action as a class action will be superior to other available methods of adjudication in promoting the convenient administration of justice.

2) In determining whether the maintenance of the action as a class action will be superior to other available methods of adjudication in promoting the convenient administration of justice, the court shall consider among other matters the following factors:

(c) whether the action will be manageable as a class action.

Consideration of motions for class certification should not be conditioned on the ultimate merits of the case. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177-78; 94 S Ct 2140, 2152-53; 40 L.Ed.2d 732 (1974), Yet, "[w]hile it is true that a trial court may not property reach the merits of a claim when determining whether the class certification is warranted, this principle should not be talismanically invoked to artificially limit a trial court's examination of the factors necessary to a reasoned determination of whether a plaintiff has met ... [the] burden of establishing each of the ... class action requirements." *Love v. Turlington,* 733 F.2d 1562, 1564 (CA 11,1984). A court may go beyond the pleadings to the extent necessary "to understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues, " *Castano v. American Tobacco Co,* 84 F3d 734, 744 (CA 5, 1996); and may examine depositions, affidavits and expert reports in determining whether class certification is appropriate. *Insolia v. Philip Morris Inc,* 186 FRD 535, 537 (WD Wis, 1998).

**\*2** As more fully explained below, after a full consideration of the parties' briefs and exhibits, the court finds that the plaintiffs have not satisfied their

burden to show that common issues of law or fact will predominate or that treatment of the action as a class action would be a superior form of adjudication since the case would not be manageable as. *[sic.]* Accordingly, the court denies plaintiffs' motion for class certification.

## 2. Predominance.

In *Zine, supra,* 288, the Court noted: "The common question factor is concerned with whether there 'is a common issue the resolution of which will advance the litigation' ... [Sub rule(A)(1)(b) ] requires that 'the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof.' " "To predominate, '[i]t is not enough that the claims arise out of a common nucleus of operative fact. Instead, the common questions must be central to all the claims.... [C]ommon issues are predominant only if their resolution would provide a definite signal of the beginning of the end.' " *Puerto Rico v. M/V Emily S,* 158 FRD 9, 15 (D PR, 1994). In contrast, predominance is not determined merely by engaging in a quantitative analysis of comparing the number of individual issues with common issues. *Buford v. H & R Block, Inc,* 168 FRD 340, 356 (SD Ga, 1996).

Plaintiffs maintain that the predominating question of law or fact is whether the defendants conspired among themselves to fix the prices of cigarettes at the wholesale level. Additionally, plaintiffs argue that injury in fact can be shown through common proofs. Defendants, however, maintain that the individual issues predominate because both the fact of damage and the quantum of damages suffered by any particular class member can only be shown on an individual basis.

MCL 445.778(2) provides for a private cause of action under the MARA, and states, in pertinent part: "Any other person ... directly or indirectly in his or her business or property by a violation of this act may bring an action for ... actual damages sustained by reason of a violation this act ..." In establishing liability under similar statutes, courts

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d, 2002 WL 1839983 (Mich.Cir.Ct.), 2002-2 Trade Cases P 73,743
**(Cite as: Not Reported in N.W.2d)**

hold that private antitrust liability requires a showing of (1) a violation of the antitrust laws, (2) the fact of damage, and (3) some indication of the amount of damage. *Keating v. Philip Morris, Inc.,* 417 NW2d 132, (Minn App, 1987); *In re NASDAQ Market-Makers Antitrust Litigation,* 169 FRD 493, 518 (SD NY, 1996). Plaintiffs' burden in this motion for class certification "is to establish that common proof will predominate at trial with respect to these three essential elements of antitrust liability. " *Id.* In the instant case, for the reasons explained below, the court finds that while the plaintiffs have met their burden with respect to the first two elements, nonetheless, they have not met it with respect to the third element. Hence, the court finds that the plaintiffs have not shown predominance of common issues of law or fact. [FN2]

> FN2. Because the parties fully briefed whether the plaintiffs had established predominance relative to all three elements, for the sake of a full adjudication of the issues raised in the plaintiffs' motion for class certification, the court proceeds to determine the merits of the parties' arguments relative to each of the elements notwithstanding that the court's analysis of the predominance factor relative to the third element is dispositive.

*A. Violation of Antitrust Laws.*

**\*3** Turning to the first element, namely proof of a violation of the antitrust laws, in our case, plaintiffs have alleged that the defendants, manufacturers of cigarettes, engaged in a conspiracy to fix the wholesale price of cigarettes in excess of the level that would have been charged but for their conspiracy to fix prices. These allegations, if proven, amount to a horizontal price-fixing conspiracy, which, in general, is a *per se* violation of antitrust laws. *NCAA v Board of Regents of University of Oklahoma,* 468 U.S. 85, 100; 104 S Ct 2948; 82 L.Ed.2d 70 (1984) (horizontal price fixing is "perhaps the paradigm of an unreasonable restraint of trade"); MCL 445.772; [FN3] 445.773. [FN4] The court agrees with plaintiffs that the proofs of a conspiracy among the defendants to control

wholesale prices of cigarettes, i,e, proof that they violated the antitrust laws, will not differ between class members. As set forth in the plaintiffs' Brief, pp 1-12, the proofs of the conspiracy will be derived from the defendants' own records and actions. The court therefore finds that plaintiffs have established that common questions of law or fact will predominate over individual ones relative to the issue of whether plaintiffs can establish that the defendants violated the MARA.

> FN3. MCL 445.772 states, "A contract, combination or conspiracy between 2 or more persons in restraint of, or to monopolize trade or commerce in a relevant market is unlawful."

> FN4. MCL 445.773 states, "The establishment, maintenance, or use of a monopoly, or any attempt to establish a monopoly, of trade or commerce in a relevant market by any person, for the purpose of excluding or limiting competition or controlling, fixing or maintaining prices, is unlawful."

Plaintiffs, however, maintain that this common liability issue predominates over any other individual questions relating to the fact or quantum of damages, indeed, as accurately noted by plaintiffs, there is support for this proposition in federal case law. See, e.g., *In re NASDAQ Market-Makers Antitrust Litigation, supra,* 518 (" the existence of a conspiracy is the predominant issue in price fixing cases, warranting certification of the class even where significant individual Issues are present"). Yet, federal case law on this issue is not uniform. In *Butt v Allegheny Pepsi-Cola Bottling Co,* 116 FRD 486 (ED Va, 1987), the plaintiffs sought class certification of an antitrust claim in which the defendants were alleged to have engaged in a conspiracy to fix and raise retail soft-drink prices. The Court, in the course of denying class certification, noted, "In a private antitrust action, '[t]he gravamen of the complaint is not the conspiracy; the crux of the action is injury, individual injury.' " *Id.,* 491. The Court, after conceding that the plaintiff could show the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d, 2002 WL 1839983 (Mich.Cir.Ct.), 2002-2 Trade Cases P 73,743
**(Cite as: Not Reported in N.W.2d)**

existence of the alleged conspiracy through common proofs, nonetheless denied class certification due to the failure of the plaintiff to show how the fact and quantum of damages could be ascertained through common proof. Indeed, in *NASDAQ Market-Makers,* the Court's certification decision did not rest on the mere fact that the plaintiffs could establish a violation of antitrust laws through common proof, but instead, the Court proceeded to examine the extent to which the fact and quantum of injury could be established by common proofs. Therefore, this court rejects plaintiffs' argument that because the case involves a conspiracy to fix prices, that fact, *per se,* entitles the plaintiffs to class certification.

*B. Fact of Injury.*

**\*4** The court next examines whether there are common issues of law or fact that will predominate relative to the establishment of the fact of injury. The fact of injury, or the fact of "impact," which must be proven on a class-wide basis, is separate and distinct from the Issue of actual damages. As stated pointed out in *Zenith Radio Corp v. Hazeltine Research,* 395 U.S. 100, 114, n 9; 89 S Ct 1562; 23 L.Ed.2d 129 (1969), an antitrust plaintiff's "burden of proving the fact of damage ... is satisfied by its proof of some damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damage." "Fact of damage pertains to the existence of injury, as a predicate to liability; actual damages involve the quantum of injury, and relate to the appropriate measure of individual relief." *Martino v. McDonald's System, Inc,* 86 FRD 145, 147 (ND Ill, 1980). However, class treatment of fact of damage presumes the ability to prove the class as a whole was injured without becoming enmeshed in individual questions of actual damage. *Id.*

In federal antitrust cases involving alleged horizontal conspiracies to fix prices at an artificially high level, courts often find that proof of such a conspiracy will give rise to an inference or even presumption that the price fixing scheme impacted all purchasers in the affected market. *In re Lorazepam & Clorazepate Antitrust Litigation,* 202 FRD 12, 30 (D.C.Cir.2001) (and cases cited therein). The inference or presumption of impact alluded to in many of the federal cases can be traced to the holdings of the United States Supreme Court in *Hanover Shoe, Inc v United Shoe Machinery Corp.,* 392 U.S. 481; 88 S Ct 2224; 20 L.Ed.2d 1231 (1968), and *Illinois Brick Co v. Illinois,* 431 U.S. 720; 97 S Ct 2061; 52 L.Ed.2d 707 (1977). In *Hanover Shoe, supra,* the Court held that a defendant in a treble-damages action could not escape liability, except in very limited circumstances, by proof that the plaintiff had passed on illegal overcharges to others farther along in the chain of distribution. Thus, to make its *prima facie* case, the direct purchaser antitrust plaintiff would need only show an Illegal overcharge and the amount of the overcharge. *Id.,* 392 U.S. 489; see also *Hawaii v. Standard Oil Co .,* 405 U.S. 251, 262 n 14; 92 S Ct 885; 31 L.Ed.2d 184 (1972) (" [D]amages are established by the amount of the overcharge ... courts will not go beyond the fact of this Injury to determine whether the victim of the overcharge has partially recouped its loss in some other way...."). *Illinois Brick* announced a corollary to *Hanover Shoe:* the indirect purchaser cannot sue to recover the part of the overcharge that the buyer passed on to, for example, the ultimate consumer. Thus, in private federal antitrust actions, only direct purchasers have standing to sue.

Our case, however, is brought by indirect purchasers, namely the ultimate consumers of the defendants' products. This is possible due to M.C.L. § 445.778(2)'s express inclusion of those indirectly injured by violations of the MARA as proper plaintiffs. Indeed, the legislative history behind the enactment of this section of the MARA reflects that it, like similar provisions in other states' antitrust laws, was meant to avoid or "repeal" the holding of *Illinois Brick.*[FN5] See, House Legislative Analysis Section to HB 4994, Third Analysis (January 14, 1985), p 3.

> FN5. See, Page. "The Limits of State Indirect Purchaser Suite: Class Certification in the Shadow of Illinois Brick," 67 Antitrust L J 1, 2, n 8 (1999)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d, 2002 WL 1839983 (Mich.Cir.Ct.), 2002-2 Trade Cases P 73,743
**(Cite as: Not Reported in N.W.2d)**

for a compilation of these state statutes, In *Callfornia v. ARC America Corp,* 490 U.S. 93; 109 S Ct 1661; 104 L.Ed.2d 86 (1989), the United States Supreme Court upheld the validity of these type of statutes in the face of a challenge that federal antitrust law preempted them.

**\*5** Courts have recognized that proof of injury in fact in indirect purchaser suits can be problematic since, notwithstanding economic theory, it cannot be presumed that intermediaries will, in fact, always pass through antitrust overcharges or that price increases by middlemen to ultimate consumers might not be attributable to upstream overcharges. In *Hanover Shoe, supra,* the Court rejected allowing the pass through defense, at least in part, based on the difficulties of proof in this regard, and explained:

We are not impressed with the argument that sound laws of economics require recognizing this defense. A wide range of factors influence a company's pricing policies. Normally the impact of a single change in the relevant conditions cannot be measured after the fact; indeed a businessman may be unable to state whether, had one fact been different (a single supply less expensive, general economic conditions more buoyant, or the labor market tighter, for example), he would have chosen a different price. Equally difficult to determine, in the real economic world rather than an economist's hypothetical model, is what effect a change in a company's price will have on its total sales. Finally, costs per unit for a different volume of total sales are hard to estimate. Even if it could be shown that the buyer raised his price in response to, and in the amount of, the overcharge and that his margin of profit and total sales had not thereafter declined; there would remain the nearly insuperable difficulty of demonstrating that the particular plaintiff could not or would not have raised his prices absent the overcharge or maintained the higher price had the overcharge been discontinued.

*Id.* 392 U.S. 481, 492-493.

The Supreme Court's comments demonstrates that proof that a middleman, in fact, did pass on an antitrust overcharge to the ultimate

consumer-plaintiff can involve murky issues of fact and that reference to economic theory alone is insufficient to establish a pass on of an overcharge. [FN6] Hence, as explained by the Court in *Melnick v. Microsoft Corp.,* unpublished decision of the Maine Superior Court, dated August 24, 2001 (No. CV-99-709, CV-99-752); 2001 WL 1012261, \*7:

> FN6. Yet, it has been observed that calculation of a "but for" price for ultimate consumers in price-fixing cases may be simpler than supposed by the Court in *Hanover Shoe,* and that "the complexities associated with a "top-down" pass-on analysis are greatly overblown." *In re Cardizem CD Antitrust Litigation,* 200 FRD 326, 344 (ED Mich.2001).

[T]he presumption engaged in by some courts regarding injury to direct purchasers is not available in an Indirect purchaser case:

"Because indirect purchasers must demonstrate that any overcharges resulting from the illegal action of the defendants have been passed on to them, an entirely separate level of evidence and proof is injected into litigation of indirect purchaser claims. Proof of antitrust conspiracy may logically lead to a conclusion that the subject of the conspiracy, the retailers, have each been harmed. No such conclusion logically follows without specific proof tracing that overcharge on to consumers."

Our case, as noted above, involves indirect purchasers of cigarettes. Hence, because our case involves a suit by indirect purchasers, establishment of injury in fact cannot be accomplished through the use of the presumptions or inferences that might otherwise prevail in direct purchaser federal antitrust cases. Instead, plaintiffs' burden in their motion for class certification remains to be shown through actual proofs that establishment of injury in fact can be accomplished through common proofs.

**\*6** Beyond relying on inferences or presumptions, plaintiffs attempt to demonstrate proof of injury in fact to the class through the Affidavit and Supplemental Affidavit of Dr. Robert McCormick.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                    Page 6

Not Reported in N.W.2d, 2002 WL 1839983 (Mich.Cir.Ct.), 2002-2 Trade Cases P 73,743
**(Cite as: Not Reported in N.W.2d)**

To provide context to his opinions, Dr. McCormick described the characteristics of the chain of distribution of cigarettes from the defendants to the ultimate consumers:

Manufacturers sell directly to wholesalers or Jobbers. Some internal trade may occur at the wholesale level, such as large wholesalers selling to smaller, regional wholesalers, however, wholesalers generally sell the bulk of their merchandise to retail outlets. Retail outlets in turn sell to the end-users who are smokers themselves. This selling arrangement thus makes smokers indirect purchasers of cigarettes with respect to cigarette manufacturers.

Dr. McCormick Aff't., ¶ 16.

In his Affidavit, Dr. McCormick opined that the alleged price fixing conspiracy had impacted on all class members in that all class members paid higher prices than they would have paid absent the defendants' unlawful conduct. *Id.,* ¶ ¶ 18, 39. His opinion was premised on his analysis of the market structure of the cigarette industry, observation of the exercise of market power, the transparent nature of defendants' pricing practices, and by compelling economic theory of the costs in a vertical chain of production and distribution, as well as his conclusions based on actual market data. *Id.*

However, the court notes that his observations concerning the market structure of the cigarette industry, the exercise of defendants' market power and the transparent nature of defendants' pricing programs, *Id.,* ¶ ¶ 19-25, all relate to pricing by the defendants and not at the two intermediate levels (i.e., wholesaler to retailer, retailer to consumer) and are not particularly germane to the impact that defendants' price increases may have had on the consumers.

Nonetheless, Dr. McCormick, relying on data summarized in several tables, [FN7] opined that increases in the defendants' list price "did indeed raise the transaction prices paid by direct customers, " and that they showed a strong correlation between prices received by producers and prices paid at retail. In general, the higher transaction prices paid by direct customers were passed on to the final

consumer through higher retail prices. *Id.,* ¶ ¶ 31, 32, pp 117.

> FN7. These tables chart wholesale list prices, Dr. McCormick Aff't, ¶ 28, p 15, compare the producer price index with the list wholesale price, *Id.,* ¶ 31, p 17, and compare the producer price index and consumer price index, *Id.,* ¶ 32, p 18.

Notably, Dr. McCormick also recognized that the actual retail price paid by a consumer might vary due to discounts or rebates. Yet, he opined that these disparities would not detract from a finding of common impact since "these discounts and promotional programs were based on list prices. Thus, if list prices were inflated by a price-fixing conspiracy, then transaction prices, to the extent that they were based on discounts off the list prices, were also inflated by the price-fixing conspiracy." *Id.,* ¶ 29.

Finally, he opined that his findings were consistent with economic theory. He stated that "[c]ompetition and solvency requires that wholesalers and intermediaries pass through their higher costs of business to their customers" and that the extent to which this would occur would depend on the elasticity of demand (i.e ., the degree to which consumption was sensitive to price; inelastic demand would imply that consumption was not sensitive to price changes). *Id.,* ¶ 34. Having previously demonstrated that the demand for cigarettes by consumers was inelastic, *id.,* ¶ 20, he opined that this would imply that "a significant portion of any conspiratorial overcharge could be passed on to the end users of cigarettes." *Id.,* ¶ 35.

**\*7** Additional support for Dr. McCormick's conclusion that increases in the wholesale price were passed on to the ultimate consumer on a class wide basis was opined to be derived from examining the extent to which Increases in the excise tax at the wholesale level were passed down to the retail level. He referred to data that reflected that the pass down rate for cigarettes based on the changes in state or federal excise taxes were calculated to be in excess of 100 percent and as

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d, 2002 WL 1839983 (Mich.Cir.Ct.), 2002-2 Trade Cases P 73,743
**(Cite as: Not Reported in N.W.2d)**

high as 200 percent and concluded that this showed that the wholesalers and retailers had a historical ability to pass down price increases, and was thus supportive of his conclusion that actual data would show that in Michigan there had indeed been a pass down of wholesale list price increases to the consumer. *Id.,* ¶ 36.

Dr. McCormick conceded in the Affidavit that he had not examined data specific to Michigan, but opined, based on the foregoing, that the data relevant to Michigan would show a "strong positive correlation between manufacturers' list and retail prices for cigarettes." *Id.,* 38.

In response, defendants attempted to show that the fact of damages or impact, could not be shown by common proofs largely through the affidavit of Dr. Edward Snyder. He opined, in pertinent part, that a conspiracy to increase wholesale list prices would not have had a common impact on Michigan consumers. Snyder Aff't., ¶ 11. He based his conclusions on information and data about how cigarette manufacturers, wholesalers and retailers have operated in Michigan during the proposed class period. *Id.,* ¶ 12. Specifically, he utilized data that showed weekly store level prices from approximately 144 stores in Michigan from January 1996 to March 1999 and from approximately 84 stores that were collected from December 1998 to May 2000.

Dr. Snyder initially opined that calculating a price pass-on to the ultimate consumer from the defendants was problematic since the intermediate buyers, the wholesalers and retailers could "choose to absorb entirely, diminish, or magnify any alleged manufacturer overcharge and may do so differently across class members." *Id.,* 24. He noted, "When either the wholesaler or retailer do not change their price or even lower their price following a manufacturer list price increase that is assumed to embody an overcharge, the pass-on is zero. In such a case, the individual consumer buying from that retailer is not impacted by the manufacturer overcharge." *Id.,* ¶ 28.

Through the examination of retail pricing of cigarettes that occurred at specific stores in Michigan during an approximate two year period within the class period he notes that the data reflects that there is no correlation between the rise of wholesale list prices and retail list prices. For example, in one store, the data shows the wholesale list price began to increase around May 1996 and was subject to four additional price increases between May 1996 and August 1998. Yet, the chart also shows that between approximately April 1997 and November 1998, the retail price of that cigarette actually fell below the wholesale list price increase in May 1996. *Id.,* exhibit 1.1, p 15. Dr. Snyder also details similar findings with respect to other stores. *Id.,* ¶ 36-39. He does concede that some stores appear to have fully passed on any increase in the wholesale price. *Id.,* ¶ 40. However, the point he makes through an examination of this set of data is that "[t]he retail behavior varies across stores and over time;" from which he concludes, "[T]here is no consistent relationship between manufacturer list price changes and retail price changes in Michigan from which one could claim common impact from the alleged manufacturer conspiracy on Michigan indirect purchasers." *Id.,* ¶ 41.

**\*8** Additionally, Dr. Snyder examined the extent to which wholesale price increases were passed on by examining across store data for a given cigarette brand over a six week period. *Id.,* ¶ ¶ 42-46. The charts showed the percentage of retail stores in Michigan that passed on a wholesale price increase. Based on this data, he concluded that for the brand in question six weeks after a list price increase took effect, "the median fraction of stores with no pass-on ... was approximately 41.4%." *Id.,* ¶ 43.

Another set of data collated by Dr. Snyder involved computing the fraction of stores with no pass-on for at least one of these set of seven brands for which he had information. His examination of this data led him to conclude, "For 9 of the 10 price increases analyzed, more than half of the Michigan retailers included in the study did not raise their prices at all (for one or more of the seven brands) 5 weeks after a list price increase." *Id.* ¶ 46.

Dr. Snyder posited reasons why actual retail prices and wholesale list prices diverge. First,

Not Reported in N.W.2d, 2002 WL 1839983 (Mich.Cir.Ct.), 2002-2 Trade Cases P 73,743
**(Cite as: Not Reported in N.W.2d)**

manufacturers offered various promotional practices that lowered retail prices but were not reflected in manufacturer list prices. Second, retailers' individual pricing strategies showed that individual retailers at different times did not pass on increases in their wholesale cigarette costs at all due to their own particular pricing strategies. This variation could depend upon the store type, its location, its local competition, its cigarette retail strategy and the specific cigarettes purchased by the consumer." *Id.,* ¶ 47.

On this later point the defendants attached as exhibits the affidavits of some eighteen owners or operators of retail stores that sell cigarettes in various locations in Michigan. A perusal of these affidavits reflects various reasons why a retailer might not match a wholesale price increase with a retail price increase or why the actual retail price is lower: a desire to keep prices set at an even nickel, Ambro Aff't., ¶ 5; store participation in special promotions, such as "buy 1 get 1 free" programs or buy-downs, that significantly cut the retail cost to consumers, Buckner Aff't., ¶ 11, Hill Aff't., ¶ ¶ 8-10; [FN8] avoidance of the hassle of repricing cigarettes, Faulk Aff't., ¶ 9; beating a competitor's price, *Id.,* 10; Hill Aff't., ¶ 4, Bahoura Aff't., ¶ 9; the use of lower price cigarettes as a loss leader, *Id.;* and negative reaction from customers, Majewski Aff't. Some of these affidavits reflect that prices were raised independent of the manufacturers' list price increases when a store owner decided to make an additional profit on the sale of cigarettes and that the market could bear the increase. *Id.,* ¶ 16, Buckner Aff't., ¶ 8. The consistent theme of these affidavits is that pricing of cigarettes at the retail level is very much an individual matter decided by the store owners, and that not all or even some of the wholesale price increases were passed on by the retailers. Dr. Snyder Aff't., ¶ 75.

> FN8. Dr. Snyder described in greater detail how manufacturers' pricing programs to both wholesalers and retailers dramatically reduced or negated the effect of a price increase. From the records before him, he concluded that participation in these programs was not consistent and hence

further led to a non-uniform rate at which an increase in the manufacturers' list price was passed on to the consumer. Dr. Snyder Aff't., ¶ ¶ 59.

**\*9** Returning to Dr. Snyder's affidavit, he also illustrated how various actions of individual consumers affect the extent to which they purchased cigarettes which contained an illegal over charge. He opined, "As a result of a change in [purchasing] behavior and for that reason alone, such a consumer would therefore not necessarily be impacted." *Id.,* ¶ 81.

Dr. Snyder also critiqued Dr. McCormick's opinions. *Id.,* ¶ ¶ 96-103. Among other things, it was pointed out that Dr. McCormick did not use data that was specific to Michigan, and thus, absent further information, this data would not tend to indicate what was the actual experience in Michigan relative to wholesalers and retailers passing on increases in the manufacturers' list prices. *Id.,* ¶ 98. Also, Dr. Snyder criticized the use of correlation analysis to measure the degree to which pass-on had occurred. After noting that correlation analysis, as applied to our case, simply measured the degree to which retail prices moved with manufacturers' prices, he demonstrated that a high correlation coefficient could be attained "even when a notable percentage of stores did not pass-on manufacturer list price changes." *Id.,* ¶ 103. He also demonstrated that significant deviations from unity could be shown even where all stores passed on manufacturers' list price increases, where, for example, the stores not only passed on the amount of the list price increase, but also raised the sale price of the cigarette beyond the amount of the list price increase. *Id.,* ¶ 104. He therefore opined, " Correlation analysis is simply not a reliable methodology to demonstrate individual impact or damages on a class-wide basis". *Id.,* ¶ 105.

Dr. McCormick responded in his Supplemental Affidavit. The major point made by Dr. McCormick was that reference to the actual behavior of retailers or consumers was irrelevant to the issue of common impact because of his opinion that the price paid by consumers was one in which was imbedded the illegal increase of the manufacturers' list price.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d, 2002 WL 1839983 (Mich.Cir.Ct.), 2002-2 Trade Cases P 73,743
**(Cite as: Not Reported in N.W.2d)**

Because this price Increase was imbedded into the price charged by wholesalers and by retailers, consumers could not avoid being impacted by the manufacturers' price increases. His opinion is based on the theory that a retailer's pricing strategy would always reflect an imbedded charge, even when the retailer chose to sell cigarettes below the manufacturers' list price as a loss leader, since if the manufacturers' prices were lower, the price paid by the consumer would be even lower. McCormick Supplemental Aff't., ¶¶ 6-15.

McCormick sought to factually support his theory of Imbedded overcharges by resorting to a correlation analysis based on the same data relied on by Dr. Snyder. Preliminarily, Dr. McCormick noted, with citation to authorities, that correlation analysis is commonly used in economic literature. Dr. McCormick calculated the correlation coefficients for each of the seven brands at the stores that were utilized by Dr. Snyder. *Id.,* ¶ 30, Table 2, p 13. Table 2 demonstrates that the range of correlation coefficients for these seven brands across all stores was between .7774 and .8702, with the average being approximately .8381.[FN9] Based on this data, he further estimated that there was over a 96% chance that when there was movement on price at the manufacturers' level, a movement in price at the retail level would occur. *Id.,* ¶ 32-34. In conducting his analysis, he noted that he was able to account for manufacturers' buy downs. *Id.,* ¶ 30, n 10.

FN9. As explained by Dr. McCormick, correlation analysis attempts to determine whether "two variables measured over time move predictably in the same direction, in opposite directions or in no discernable manner with respect to each other ... if the correlation coefficient were zero, then the factors affecting the two prices cannot be the same, and in fact must be unrelated to each other. At the other end of the extreme, if the correlation were 1.0 (the maximum possible value), the factors that Impact prices, and the magnitude of their impact, must be identical." McCormick Supplemental Aff't., ¶¶ 26,

28.

**\*10** Additionally, he examined the average prices for cigarettes in the period following several price increases at the manufacturers' level. His results are stated in Table 4, and show that the average retail price charge was equal to or greater than the average wholesale price increase. *Id.,* ¶ ¶ 35, Table 4, p 16.

Based on this analysis he concluded, "I have found evidence of a strong statistical connection between the list prices and retail prices ... Analysis of these price data ... indicate that there is a reliable and strong positive relation between manufacturer list prices and retail prices." *Id.,* ¶ ¶ 25, 20. In response to Dr. Snyder's opinions concerning variability of pricing behavior at the retail level, Dr. McCormick concluded that these were irrelevant because, "[w]hen all prices are higher than they would otherwise be by a price conspiracy, then no matter what any customer might do, he or she will bear the cost of that overcharge." *Id.,* 17.

In determining whether the plaintiff has succeeded in showing that fact of damages is a common issue of fact or law, and can be established on class wide proofs, it should be recalled that in ruling on plaintiffs' motion for class certification a court should not resolve the merits of the controversy. *Eisen, supra.* Nor should a court engage in weighing the merits of conflicting expert opinions. *Caridad v. Metro-North Commuter RR,* 191 F3d 283, 293 (CA 2, 1999), *cert den,* 529 U.S. 1107; 120 S Ct 1959; 146 L.Ed.2d 791 (2000). Nonetheless, the court should not certify a class action where the foundation for doing so rests on the basis of an expert opinion so flawed that it is inadmissible as a matter of law. *In re Visa Check/Mastermoney Antitrust Litigation,* 192 FRD 68, 77 (ED NY, 2000). Hence, at this stage in the proceedings, the court's role is limited to determining whether the plaintiffs have set forth a valid methodology for proving antitrust impact common to the class, not that they will prove it. *In re Magnetic Audiotape Antitrust Litigation* unpublished decision of the United States District Court for the Southern Division of New York, issued on June 6, 2001 (NO. 99 CIV. 1580); 2001

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d, 2002 WL 1839983 (Mich.Cir.Ct.), 2002-2 Trade Cases P 73,743
**(Cite as: Not Reported in N.W.2d)**

WL 619305, *6.

Consistent throughout both parties' briefs are arguments that appear to attack the underlying legal sufficiency of the opinions of each other's experts. One of defendants' points, and indeed that of Dr. Snyder in critiquing the opinion of Dr. McCormick, appears to be the fact that in his Affidavit, Dr. McCormick did not rely on data from Michigan to support his thesis that embedded within the retail price was an illegal surcharge. Yet this deficiency has been remedied in Dr. McCormick's Supplemental Affidavit where, as explained above, he has conducted correlation analyses based on the same Michigan data used by Dr. Snyder.

Another criticism of Dr. Snyder related to the use of correlation analysis as a method to generally prove class wide injury in fact or impact. The examples provided by Dr. Snyder to show that correlation analysis was inherently unreliable, however, would appear to apply where the correlation coefficients did not approach unity. Finally, Dr. Snyder asserted that correlation could not prove causation.

**\*11** The court is not convinced that Dr. Snyder's critique of the use of correlation analysis would be valid where an average correlation coefficient is as high as those reported in Dr. McCormick's analysis. Moreover, while correlation might not conclusively prove causation, courts recognize, "[w]ith proper scientific interpretation, ... correlations provide an inference of causation." *Smith v. Ortho Pharmaceutical Corp,* 770 F Supp 1561, 1573 (ND Ga, 1991). Moreover, this critique misses the point of the correlation analysis performed by Dr. McCormick. As the court views it, the purpose of his analysis is to show that, with a very high degree of probability, whenever the manufacturers raised prices, for whatever reason, inevitably this would be passed on to the consumer. Causation would not be shown through correlation analysis, but instead through other proofs that showed that certain price increases by the manufacturers were, in part or in whole, attributable to their Implementation of a illegal price fixing scheme.

Finally, as recounted above, much of the thrust of Dr. Snyder's opinions and the various exhibits

attached to his affidavit was that pricing on the retail level differed significantly. The various charts that he compiled show, in contrast to the results of the correlation analysis of Dr. McCormick, that there is no special link between the movement of prices at the manufacturers' level and the retail level. Thus, under Dr. Snyder's opinion, if believed by the trier of fact, there was no necessary class wide injury in fact or antitrust impact because variability of pricing behavior by retailers at the retail level would preclude a generalized showing of class wide injury in fact or antitrust impact. However, the correlation analysis performed by Dr. McCormick shows how, regardless of the actual price paid by the consumer, the price contained an increase in price at the manufacturers' level. Thus, individual differences in pricing behavior would not be dispositive.

It would appear to the court, therefore, that the objections of defendants to the underlying validity of Dr. McCormick's opinions thus have been met. Beyond reviewing these arguments, the court deems the parties' attacks on each other's experts as mainly going to the weight that a trier of fact might give them, and hence should not be presently addressed.

In reviewing the various opinions of Dr. McCormick, the court agrees with the plaintiffs that, at least standing alone, he has shown a method based on common proofs from which it could be concluded that there was class wide injury or impact; namely his correlation analysis. Through this method he would attempt to persuade the trier of fact that the overcharges, otherwise shown to have been illegal, were imbedded into whatever price that consumers ultimately paid for cigarettes. As noted above, his examination of the data showed that there was an approximately 96% chance that the manufacturers' price increases (for what ever reason) would be matched or exceeded at the retail level. To be sure, Dr. McCormick's analysis does not show that each and every member of the class was necessarily subjected to paying an illegal overcharge and hence was impacted. Yet, this is not necessary. "The courts have routinely observed that the inability to show injury as to a few does not defeat class certification where the plaintiffs can show widespread injury to the class." *In re*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d, 2002 WL 1839983 (Mich.Cir.Ct.), 2002-2 Trade Cases P 73,743
**(Cite as: Not Reported in N.W.2d)**

*Cardizem CD Antitrust Litigation,* 200 FRD 297, 321 (ED Mich.2001).

**\*12** Accordingly, the court concludes that the plaintiffs have succeeded in showing that common issues of law or fact would likely predominate relative to the issue of the existence of injury in fact.

### C. Amount of Damages.

Having found that plaintiffs meet their burden to show that an antitrust violation and fact of injury or impact are susceptible to class-wide proof, the court proceeds to determine whether plaintiffs have showed, as they must, "that the computation of damages is susceptible to common proof." *In re Domestic Air Transp. Antitrust Litigation,* 137 FRD 677, 692 (ND Ga, 1991).

Preliminarily, the plaintiffs argue that courts never view the presence of differences in damages between individuals as a basis for determining mining that individual issues predominate. There is language to be found in case law, as cited by the plaintiffs, that suggests that merely because damages must be determined separately or the level of damage may differ individually is not a basis for denying class certification. *Entral Power and Light Co v. City of San Juan,* 962 S.E.2d 602 (Tex App, 1998); *Bittinger v. Tecumseh Products Co,* 123 F3d 877 (CA 6, 1997). Yet, differences in the amount of damages can cause courts to decline class certification. As noted in 5 Moore's Federal Practice § 23.46[2][b], p 23-209,
The presence of individual damages issues ... may require that certification ... be denied. Courts have denied certification in cases in which the calculation of damages *is complex or otherwise burdensome.[FN 17].* 17. *See, Windham v American Brands, Inc.,* 565 F.2d 59, 66-67 (CA 4, 1977), *cert den,* 435 U.S. 968 (1978) (certification denied because of overwhelming predominance of thousand of individualized damage questions); *Butt v Allegheny Pepsi-Cola Bottling Co.,* 116 FRD 486, 492 (ED Va, 1987) (certification denied in price-fixing case because calculation of damages required examination of hundreds of thousands of transactions).

In *Windham, supra,* 68, the Court reconciled these two seemingly divergent lines of authority as follows:
Thus in cases where the fact of injury and damage breaks down in what may be characterized as " virtually a mechanical task,"] ... "capable of mathematical or formula calculation," the existence of individualized claims for damages seems to offer no barrier to class certification on grounds of manageability. On the other hand, where the issue of damages and impact does not lend itself to such a mechanical calculation, but requires "separate ' mini-trial,(s)" of an overwhelming large number of individual claims, courts have found that the " staggering problems of logistics" thus created " make the damage aspect of (the) case predominate," and render the case unmanageable as a class action.

Indeed, more recent case law bears out *Windham* 's distinction. In *Cardizem CD Antitrust Litigation, supra,* 200 FRD at 348, the Court summarized what the plaintiff must do in the context of antitrust litigation:
**\*13** "Antitrust plaintiffs have a limited burden with respect to showing that individual damages issues do not predominate. Plaintiffs do not need to supply a precise damage formula at the certification stage of an antitrust action. Instead, in assessing whether to certify a class, the Court's inquiry is limited to whether or not the proposed methods are so insubstantial as to amount to no method at all."

Thus, in the case at hand, the court examines the proofs presently adduced by the parties to determine whether some method exists in determining individual damages that can be determined on the basis of a formulaic basis.

In the instant case, plaintiffs again refer to the affidavits submitted by Dr. McCormick to establish that damages could "easily be computed in a systematic way." Plaintiffs' Brief, p. 18. In his Affidavit, he stated that the calculation of damages would begin by ascertaining the amount of the overcharge that direct customers had paid. This would be done by determining the extent to which prices to direct customers of the defendants during the conspiracy were higher than they would have

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d, 2002 WL 1839983 (Mich.Cir.Ct.), 2002-2 Trade Cases P 73,743
**(Cite as: Not Reported in N.W.2d)**

been absent the conspiracy, which is measured by a percentage overcharge. Dr. McCormick Aff't., ¶ ¶ 41, 43. Once the overcharge has been estimated for direct customers, one could then determine what portion of the overcharge was passed on to final consumers. He proposed a formula that could be developed that would measure the "aggregate damages" of the class, namely Indirect Purchaser Damages (I) would be equal to defendants' cigarette sales in Michigan (M$) multiplied by the overcharge percentage for direct purchasers (P) and the rate of pass through of overcharge by retailers to customers (R), or I = M$ x P x R. *Id.*, ¶ 49.

In Dr. McCormick's deposition it was made clear that this formula would only lead to the computation of class-wide aggregate damages, as the following colloquy reflects:
Q.... [H]ow do you take that aggregate number and apply it to the class? Do you divider [sic] it by the members of the class?
A.... If we did it, then we would have to identify the members of the class and the Judge Torres would offer us some guidance to how he wanted it apportioned among the members of the class. If he wanted it apportioned equally, we would simply divide by the members of the class and portion it out to them on that basis.
Q. Do you have a methodology you are proposing how the aggregate number that is representing "I," indirect purchasers damages, would be allocable to each individual class member?
A. I would look to the court on guidance of that. Absent that I would apportion it to all members of the class equally. There may be issues of age, someone who has just recently become a smoker and you might apportion it on-there is a lot of rules that the court might offer us to deal with that problem, and I would have-I would be amenable to any suggestions there that were appropriate.
*14 Q. Would you agree that under the formula in paragraph 49, that if the indirect purchaser damage, if the aggregate amount is divided by the number of smokers for the time period involved, that comes up with an average number?
A. Comes up with an average amount of money to be paid them, that's correct.

Dr. McCormick dep., pp 137-139.

Dr. McCormick further made it clear that his formula only purported to show class wide damages, and not the quantum of damages to any one individual. *Id.,* 140-139.

Defendants focus on this portion of Dr. McCormick's deposition testimony and argue that, in fact, the plaintiffs cannot establish a method to determine individual damages on the basis of some formula that can be applied to all the members of the class. Relying principally on the reasoning of *Wood v. Abbott Laboratories,* unpublished decision of the Sixth Judicial Circuit Court, Michigan, issued September 11, 1997 (No. 96-512561-CZ); 1997 WL 824019, they maintain in light of the MARA's requirement that a plaintiff suffer "actual damages" in order to be entitled to relief, the method suggested by Dr. McCormick of simply distributing class wide damages to the members of the class on an average basis is legally impermissible.

In *Wood,* plaintiffs alleged that the defendant pharmaceutical companies engaged in price fixing which affected the prices charged by retail pharmacies, and thus the prices paid by the consumers, such as plaintiffs. The Court denied class certification based on the inability of the plaintiffs' expert to determine a methodology for ascertaining individual damages, because. In the Court's opinion, "[i]n Michigan, however, the law permits an indirect purchaser to recover only actual damages. MCL 445.778(2)." Because each individual would be required to show his or her actual damages, in order to be entitled to a recovery under M.C.L. § 445.778(2), the Court reasoned, " calculating each class members actual damages ... would require examination of the drugs each class member purchased from which retailer, the discount applicable to each retailer for each drug at the time of purchase, and other relevant factors, resulting in thousands of mini-trials." *Id,* 1997 WL 824019 * 2.

Even in the absence of a finding that each plaintiff must show "actual damages" similar logic was employed in *Keating v. Philip Morris, Inc, supra* at 137 to deny class certification of a proposed class similar to the one proposed in the case at bar. Also

Not Reported in N.W.2d                                                                 Page 13

Not Reported in N.W.2d, 2002 WL 1839983 (Mich.Cir.Ct.), 2002-2 Trade Cases P 73,743
**(Cite as: Not Reported in N.W.2d)**

see, *Windham, supra;* (denying class certification to purported class of consumers of soft drinks); *City of Philadelphia v. American Oil Co,* 53 FRD 45, 71-73 (D NJ, 1971) (denying class certification in an action against gasoline manufacturers where the purported class consisted of ordinary consumers of gasoline); *Mekani v. Miller Brewing Co,* 93 FRD 506 (ED Mich.1982) (in a price fixing action against distributors of beer, denying class certification to the purported class comprised of beer retailers where the retailers bought different brands and amounts of beer at different prices at different times from different distributors).

**\*15** In contrast, however, other courts have certified indirect purchaser price fixing cases where, for example, there is only one defendant, and the plaintiffs of the class made only one or a very small number of products on limited occasions such as in the purchase of computer operating systems where there is limited price variation on the retail level. See for example, *Gordon v. Microsoft Corp,* unpublished decision of the District Court of Minnesota, issued, March 30, 2001 (No. 00-5994); 2001 WL 366432 \* 4; also see, *A & M Supply Co v. Microsoft Corp,* unpublished decision of the Third Judicial Circuit Court, Michigan, issued August 21, 2001 (No. 00 031123-NZ) (certifying class of purchasers of computer operating systems). In such a case, ascertainment of damages for each individual plaintiff would be amenable to formulaic treatment because the number of products and number of purchases by any one plaintiff in such a case is very limited, and the range of retail price a finite quantity. Another type of indirect purchaser case that might not founder on the issue of computation of individual damages is where the number of purchasers of the product are readily identifiable and reliable records for individual purchases exist. See, *City of Philadelphia supra,* 69-71 (certifying two separate classes comprised of governmental agencies and cab companies who purchased gasoline at retail in a price fixing case brought against the producers of gasoline); *Cardizem CD Antitrust Litigation, supra,* 350 (certifying class comprised of purchasers of a prescription drug where there existed computerized records of individual transactions and claims forms that would establish the amount paid for the drugs);

*B W I Custom Kitchen v. Owens-Illinois, Inc,* 191 Cal App 3d 1341; 235 Cal Rptr 228 (1987) (certifying class comprised of businesses who purchased glass containers where there were a limited number of class members and there existed business records of the transactions); *NASDAQ Market-Makers, supra,* 169 FRD 526 (class certified, in part, based on finding that since the defendants maintained detailed computerized records of their transactions, those records could be used to establish damages on a class wide basis without the need for a fluid recovery) .[FN10]

> FN10. Based on the foregoing cases in which indirect purchaser price fixing cases were certified, this court declines to find, as a matter of law, that indirect purchaser price fixing claims could never be certified as a class action.

Our case does not involve a discrete number of products, transactions or purchasers. Unlike the *Microsoft* cases, our case relates to a dizzying number of products, retail prices, individual transactions and purchasers over a multi-year period. Thus, these two cases, upon which plaintiffs rely, are distinguishable from our case. Compounding the problem is that, unlike for example, the government or business entities in *City of Philadelphia, supra,* or the prescription drug purchasers in *Cardizem CD Antitrust Litigation, supra,* or the business purchasers of glass containers in *B W I Custom Kitchen, supra,* purchasers of securities in *NASDAQ Market-Makers,* the ordinary purchaser of cigarettes at the retail level is unlikely to have kept records of purchases of individual packs or cartons of cigarettes. The cases relied on by the plaintiffs, such as the *Microsoft* cases, and *NASDAQ Market-Makers,* are thus factually distinguishable from our case. Instead, the court finds that the proofs of this case more closely resemble those in cases where class certification was denied because individual issues overwhelmed the common elements of proof of actual damages. See *Keating, supra; Windham, supra; City of Philadelphia, supra,* and *Mekani, supra.*

**\*16** It is unlikely that any sort of ascertainment of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                    Page 14

Not Reported in N.W.2d, 2002 WL 1839983 (Mich.Cir.Ct.), 2002-2 Trade Cases P 73,743
**(Cite as: Not Reported in N.W.2d)**

individual damages can be made under some systematic or formulaic basis that avoids the necessity of individualized proofs regarding the brands of cigarettes purchased, and the particular retail prices paid. Thus, it appears to the court that unless some system can be devised of aggregating the damages for the class and then simply awarding each member of the class the average of the class wide damages, the court must conclude that the plaintiffs have failed to meet their burden to show predominance with respect to the last element.

Michigan case law concerning class actions has addressed the possibility of maintaining a class action through the aggregation of class wide damages and the distribution of those damages based on the "fluid recovery" theory. *Ciceiski v. Sears, Roebuck & Co,* 132 Mich.App 298 (1984), *Iv den,* 422 Mich. 916 (1985). In *Cicelski, supra,* 304-305, the Court explained the dimensions of the fluid recovery theory:

The terms "cy pres" and "fluid recovery", in the context of class action suits, have been employed interchangeably and embrace this central concept: " [T]hat where distribution to the class who should ideally receive a fund is impracticable or inappropriate, the distribution should be made in the 'next best' fashion in order as closely as possible to approximate the intended disposition."... The fluid recovery mechanism seeks to avoid manageability problems by use of the following general format: (1) the amount of damages incurred by the class as a whole is determined in a single adjudication, creating a damage fund; (2) individual member claimants capable of proving valid claims obtain their share of the fund; and (3) the unclaimed portion of the fund is applied to the class's benefit ... The third procedural characteristic above is the actual fluid recovery, and it commonly assumes one of two forms. The remainder of the fund is either distributed through the market, "usually in the form of a reduced charge for an item the defendant previously overpriced", or it is "given to the state to use on a project likely to be of interest to class members or, if that is not possible, for general purposes."
(Citations omitted).

The Court of Appeals in *Cicelski, supra,* 306-307, did not *per se* prohibit or endorse the use of fluid recovery theory in class actions, but, instead, made application of the doctrine dependent on whether use of a fluid recovery fund would further the legislative intent behind the statute being invoked by the plaintiffs as the basis for imposing liability upon the defendant. Thus, to determine whether the court can use the fluid recovery fund to avoid problems with ascertaining individual assessment of damages for a large number of class members in this case, the court turns to examine the legislative intent behind M.C.L. § 445.778(2).

As noted above, M.C.L. § 445.778(2) gives the indirect purchasers a cause of action against one who has violated the MARA, but recovery is limited by the express terms of the statute to "actual damages sustained by reason of a violation." The key phrase is "actual damages." The MARA does not define the term "actual damages." According to Garner, Black's Law Dictionary (7th [* * * * *]d), " actual damages" are: "an amount awarded to a complainant to compensate for a proven injury or loss; damages that repay actual losses."

**\*17** The "actual damages" requirement of the statute codifies the common law requirement in actions for damages for unfair competition that the plaintiff is limited to actual damages. See, *Socony-Vacuum Oil Co v. Rosen,* 108 F.2d 632, 636 (CA 6, 1940). In *Socony-Vacuum, supra,* the Court noted, "The rule prevails in Michigan that damages for unfair competition in a suit in equity must be confined to the loss actually sustained by the plaintiff as the direct and natural consequence of such acts and damages which are uncertain or speculative cannot form the basis of recovery." Finally, damages cannot be presumed where a statute limits recovery to "actual damages." See for example, *Greisz v. Household Bank (Illinois),* 8 F Supp 2d 1031, 1043 (ND Ill, 1998). It necessarily follows then that a defendant is only liable to a plaintiff for the "actual damages" sustained by that plaintiff as the result of a violation of the MARA.

Based on the common understanding of what constitutes "actual damages", resort to a fluid recovery fund theory as a means for avoiding

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                Page 15

Not Reported in N.W.2d, 2002 WL 1839983 (Mich.Cir.Ct.), 2002-2 Trade Cases P 73,743
**(Cite as: Not Reported in N.W.2d)**

individual predominance problems with respect to the amount of damages is precluded under the MARA, since under the fluid recovery fund theory, damages are not awarded to only those who are actually damaged.[FN11] Hence, this court agrees with the result reached in *Wood;* the requirement that plaintiffs can only be those who suffer "actual injury" precludes finding that the amount of damages could be an issue about which common issues of fact or law predominate, at least under circumstances present in our case which require the analysis of highly unique individual transactions, class member by class member, to determine the extent to which a class member may have suffered any damage.

>        FN11. Indeed, as advocated by some, the recipient of a fluid recovery fund could be an entity wholly unrelated to the injured plaintiffs. For example, in Vauter, "The Next Best Thing," 80 Mich. Bar J 68 (July, 2001), the author advocated that the State Bar of Michigan Access to Justice Fund be a repository for unclaimed class action settlement funds.

As noted above, Dr. McCormick's only suggestion concerning how to ascertain individual damages was to divide the aggregate amount of class wide damages by the number of plaintiffs. However, the court agrees with the defendants that this amounts to "no method" at all since it necessarily permits an award of something other than actual damages.

Previously, this court observed that a standard for determining whether common issues predominate over individual issues entails a common sense evaluation of whether, for example, the resolution of the common questions "provide a definite signal of the beginning of the end." *Puerto Rico, supra.* Given the vast number of potential class members, the large number of different products produced by different manufacturers which were purchased and consumed over a lengthy period of time, resolution of the common issues of violation of the MARA, and class wide antitrust impact or injury in fact would indeed not provide a definite signal of the beginning of the end of this litigation. Instead, after

the resolution of the common issues, the court would be faced with potentially an indefinite number of mini-trials to ascertain a class member's actual damages. Proof of actual damages, moreover, could not be determined on the basis of any formula or systematic method, at least none which were proposed by the plaintiffs. Accordingly, the court finds that the plaintiffs have not succeeded in establishing that common issues of fact or law predominate.

**\*18** The foregoing considerations also would lead to the finding that the class action would not be manageable, and hence lead to the conclusion that the maintenance of the action as a class action will not be superior to other available methods of adjudication in promoting the convenient administration of justice. MCL 3.501(A)(2)(c). *City of Philadelphia, supra,* 73. As noted In *Keating, supra,* 417 NW2d 137, "Where proof of damage must be established on an individual basis for thousands of class members, the suit is unmanageable and class action treatment is inappropriate ."

To avoid this result, the plaintiffs argue that this court should relax the requirements for showing predominance due to the Legislature's authorization in MARA for suits by indirect purchasers. Plaintiffs contend that if the court does not certify the action the Legislature's intent will be frustrated since it is unlikely that individual claims for antitrust violations will be maintained because the amount of controversy involved in individual claims is not great, and as a consequence the defendants will be able to retain their allegedly ill-gotten gains.

The short answer to this argument is that the Legislature in enacting the MARA, unlike for example the Consumer Protection Act, M.C.L. § 445.910, did not expressly attempt to provide for class actions for violations of MARA or otherwise indicate that attempts to certify class actions under the MARA should be governed by a more lenient standard.

Additionally, the plaintiffs' contention that defeat of class certification may result in the retention by the defendants of illegal overcharges is somewhat

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d, 2002 WL 1839983 (Mich.Cir.Ct.), 2002-2 Trade Cases P 73,743
**(Cite as: Not Reported in N.W.2d)**

overstated. As discussed above, under federal antitrust statutes, defendants can still be held liable by those who directly dealt with the defendants.

Finally, in *City of Philadelphia, supra* at 73, after noting the merits of the same argument now asserted by the plaintiffs in our case, the Court observed,
Although this Court recognizes the importance of private antitrust actions to help enforce the antitrust laws ... It is not believed that Rule 23 was intended to permit a redress for all wrongs committed under the antitrust laws. This Court is cognizant of the complexities involved in suing on behalf of such large groups of people and entitles as well as the laudable purpose sought to be achieved by class representation. However, the basic requirements of Rule 23 must be established before there can be class certification.

For all the foregoing reasons, the court denies plaintiffs' renewed motion for class certification.


                              ORDER

At a session of said Court held in the Coleman A. Young Municipal Center, Detroit, Wayne County, Michigan, on this:
JUN 11 2002
PRESENT: ISIDORE TORRES Circuit Judge


The Court being advised in the premises and for the reasons stated in the foregoing Opinion,

IT IS ORDERED that plaintiffs' renewed motion for class certification is DENIED.

Mich.Cir.Ct.,2002.
Ren v. Philip Morris Inc.
Not Reported in N.W.2d, 2002 WL 1839983 (Mich.Cir.Ct.), 2002-2 Trade Cases P 73,743

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT S



Briefs and Other Related Documents

United States District Court, E.D. Pennsylvania.
Matilda ROSENSTEIN, Mildred Chadwick and
Lynne Gitman, individually and on behalf of all
others similarly situated
v.
CPC INTERNATIONAL, INC.
**Civ. A. No. 90-4970.**

Jan. 8, 1991.

James R. Malone, Jr., C. Oliver Burt, III, Greenfield
& Chimicles, Haverford, Pa., Phyllis C. Kaufman,
Dianne M. Nast, Kohn, Savett, Klein and Graf,
P.C., Philadelphia Pa., for plaintiff.
Christine C. Levin, Joseph A. Tate, Schnader,
Harrison, Segal & Lewis, Philadelphia, Pa., Andrew
B. Weissman, Gail A. Robinson, John Rounsaville,
Jr., Wilmer, Cutler & Pickering, Washington, D.C.,
for defendant.
Gilbert H. Weil, Amicus Curiae, Assoc. of National
Advertisers, Inc.
Charles J. Bloom, Kleinbard, Bell & Brecker,
Philadelphia, Pa., for Grocery Manufacturers of
America, Inc.
Richard Cleland, Des Moines, Iowa, for State of
Iowa.
David S. Versfelt, Donovan, Leisure, Newton &
Irvine, New York City, for American Association of
Advertising Agencies, Inc.

*MEMORANDUM AND ORDER*

BECHTLE, Chief Judge.

*INTRODUCTION*

**\*1** Presently before the court is plaintiffs' motion
for class certification pursuant to Rule 23 of the
Federal Rules of Civil Procedure. For the reasons
set forth below, plaintiffs' motion will be denied.

*BACKGROUND*

Plaintiffs brought this action on behalf of
themselves and as a class pursuant to Fed.R.Civ.P.
23. Defendant CPC International, Inc. ("CPC"), a
Delaware Corporation, manufactures consumer
food products sold under different brand names,
including Mazola corn oil and margarine ("Mazola"
). Plaintiffs claim that beginning on a date which is
currently unknown, but believed to be before
January 1, 1990, CPC began to market Mazola
under the allegedly fraudulent claim that an
individual's consumption of Mazola would reduce
his or her existing serum cholesterol levels.
Plaintiffs' complaint refers to two advertisements in
particular as illustrations of the alleged fraudulent
marketing scheme. One advertisement depicts a
man saying, "Mazola does what? They said it
could turn back my cholesterol. I didn't believe it
till my level dropped 17%." The other
advertisement states in large bold print, "Add
Mazola, *reduce* cholesterol." (emphasis in original).

Plaintiffs assert that CPC's claims that Mazola
reduces existing serum cholesterol levels are false
and misleading. Plaintiffs charge that because of
Mazola's supposed serum cholesterol lowering
capability, CPC has generally marketed Mazola at
higher prices than other cooking oils and
margarines. According to the complaint, the
marketing scheme enticed plaintiffs and other
consumers to purchase Mazola in lieu of other
similar products and to pay more for Mazola than
they would have paid for cooking oils and
margarines that did not claim to reduce serum
cholesterol levels. The complaint also alleges that
CPC did not publish "corrective advertisements"
declaring that Mazola, in and of itself, will not
lower an individual's existing serum cholesterol
level, despite having signed a consent agreement in
which CPC agreed not to imply such claims in the
future.

Counts One and Two of the complaint were brought

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1991 WL 1783 (E.D.Pa.),   RICO Bus.Disp.Guide 7659
**(Cite as: Not Reported in F.Supp.)**

under the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1961 *et seq;* Count Three alleges common law fraud; Count Four alleges negligent misrepresentation; Count Five alleges breach of warranty; and Count Six alleges violations of state consumer protection statutes.

### CLASS CERTIFICATION

As this court has recently noted, "The Supreme Court has emphasized that a class action may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Strain v. Nutri/System, Inc.,* ( "*Strain* ") No. 90-2772 (E. D.Pa. Dec. 12, 1990) (1990 WL 209325, 1990 U.S.Dist. Lexis 17031) (citing *General Telephone v. Falcone,* 457 U.S. 147, 161, 102 S.Ct. 2364, 2372 (1982)). Although the merits of the case are not at issue in a motion for class certification, the court must look beyond bald allegations in the complaint when determining whether the requirements of Rule 23 have been satisfied. *Curley v. Cumberland Farms Dairy, Inc.,* 728 F.Supp. 1123, 1128 (D.N.J.1989).

**\*2** Plaintiffs define the proposed class as:

All persons in the United States who purchased at retail Mazola corn oil or Mazola corn oil margarine produced and marketed by defendant, or any of its subsidiaries or affiliates, between February 1, 1990 and the date of certification of the class, excluding from the class defendant, its subsidiaries and affiliates, and all persons and entities who purchased the products for resale.

First Amended Complaint ¶ 6. Fed.R.Civ.P. 23(a) provides prerequisites for certification of a class action. Rule 23(a) states:

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative

parties will fairly and adequately protect the interests of the class.

A proposed class action that satisfies all four components of Rule 23(a) must also satisfy one of three subsections of Rule 23(b). Although plaintiffs' complaint alludes to the provisions of both Rule 23(b)(3) and 23(b)(1)(A), plaintiffs' motion for class certification and supporting memorandum of law refer only to Rule 23(b)(3). Accordingly, the court will only address Rule 23(b) claims. Rule 23(b)(3) is satisfied when:

the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3).

Assuming *arguendo* that the Rule 23(a) prerequisites are satisfied, the court concludes that the requirements of Rule 23(b)(3) have not been met, and, therefore, class certification is not appropriate. Rule 23(b)(3) requires a two-pronged showing that common questions of law and fact predominate over individual questions of law and fact and that class treatment is superior to other available procedures. *See generally Strain, supra.* The court finds that class certification is not appropriate because individual issues of law and fact predominate over common issues of law and fact.

#### a. *RICO claims*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                  Page 3

Not Reported in F.Supp., 1991 WL 1783 (E.D.Pa.),  RICO Bus.Disp.Guide 7659
**(Cite as: Not Reported in F.Supp.)**

Count One of plaintiffs' complaint alleges that:

CPC engaged in a fraudulent scheme which included using or causing the use of the mails and interstate wires. By so doing it engaged in multiple commissions of mail and wire fraud within the last ten years, in violation of 18 U.S.C. §§ 1341 and 1343, respectively, and conspiracy to misrepresent and fraudulently conceal the true nature of its Mazola corn oil products, which conduct constitutes predicate acts of racketeering activity within the meaning of 18 U.S.C. § 1961(1).

**\*3** Count One further alleges that defendant has used or invested income derived from a pattern of racketeering in violation of 18 U.S.C. § 1962(a), and that plaintiffs were thereby injured in their business or property. Count Two alleges violations of 18 U.S.C. § 1962(c). Section 1962(c) states:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

RICO authorizes a private suit by "any person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). The "by reason of" language imposes a proximate cause requirement on the plaintiffs. *Haroco Inc. v. American Nat'l Bank & Trust Co.,* 747 F.2d 384, 398 (7th Cir.1984), *aff'd,* 473 U.S. 606 (1985). This court has recently stated that:

In order to prevail on a civil action for damages under RICO, private plaintiffs must establish that there was a violation of § 1962, allege an injury to their business or property, and most importantly, plead the requisite causal connection between the injury and the violation of § 1962. *Brandenburg v. Seidel,* 859 F.2d 1179, 1187 (4th Cir.1988). *See Nodine v. Textron, Inc.,* 819 F.2d 347, 348 (1st Cir.1987).

The above requirements serve to confine standing to those who can show an actual injury and limits

liability for treble damages only to those individuals who have been injured by a violation of § 1962. The mere showing of a violation of § 1962 does not establish that its intended victims were injured or that any injury suffered by them was sufficiently caused by the acts to create RICO liability. Without the proximate cause requirement of § 1964(c), a violator of § 1962 would be liable to all who could show some sort of injury, even one unrelated to a § 1962 relation. [*Sedima, SPRL v. Imrex Co.,* 473 U.S. 470, 496-97, 105 S.Ct. 3275 (1985) ]; *Roberts v. Tandy Corporation,* 1990 WL 69090, 1990 U.S.Dist. LEXIS 6208 (citing *Shearin v. E.F. Hutton Group, Inc.,* 885 F.2d 1162, 1167 (3d Cir.1990)).

*Strain, supra,* 1990 WL 209325 at 5, 1990 U.S.Dist. Lexis at 13-14.

Plaintiffs' RICO claims are based on the predicate acts of mail and wire fraud. Since § 1964(c) requires a showing of actual injury, plaintiffs must show that all recovering members of the class reasonably relied upon the alleged fraudulent acts. *Brandenburg,* 859 F.2d at 1188 n. 10. Reliance must be proved on an individual basis, because, as both sides recognize, not all class members purchased Mazola in reliance of CPC's claim that Mazola consumption could lower their serum cholesterol level. Thus, for example, it may be relevant to determine for each class member whether they saw the advertisements; whether they believed the advertisements; whether they would have purchased Mazola notwithstanding the advertisements; whether they were concerned about their serum cholesterol levels; whether they interpreted the advertisements similarly to named plaintiffs; and/or whether they purchased Mazola for reasons unrelated to the cholesterol lowering claims. Proof of these issues would be complex and highly individualized as each class member must prove he or she did in fact rely upon the advertisements. Each plaintiff's testimony would doubtlessly be contested by CPC. Both sides would likely use marketing surveys, expert witness and the like to supplement or dispute individual class members' claims. Individual issues of reliance, thus, would predominate over common issues at trial. *See Strain, supra,* 1990 WL

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 4

**Not Reported in F.Supp., 1991 WL 1783 (E.D.Pa.),   RICO Bus.Disp.Guide 7659**
**(Cite as: Not Reported in F.Supp.)**

209325, 1990 U.S.Dist. Lexis at 22 (class certification denied where "determination of liability of the defendant requires individualized proof...."); *In Re Bexar County Health Facility Development Corp,* 125 F.R.D. 625, 636 (E.D.Pa.1989) (necessity of proving individualized questions of reliance precludes class certification of common law claims for fraud and negligent misrepresentation); *Curely v. Cumberland Farms Dairy, Inc.,* 728 F.Supp. at 1133 (Rule 23(b) not satisfied when importance of details outweighs determination that alleged wrongful acts are actionable); *Zlotnick v. The Communications, Inc.,* 123 F.R.D. 189, 194-95 (E.D.Pa.1988) (class certification inappropriate where proof of reliance highly individualized); *Cf. Eisenberg v. Gagnon,* 766 F.2d 770, 786 (3d Cir.1985) (individual issues did not predominate where case "did not present extraordinarily complex questions of causation or reliance...."); *McMahon Books, Inc. v. Willow Grove Associates,* 108 F.R.D. 32, 88 (E.D.Pa.1985) (class action appropriate despite need for individualized proof of reliance but that "further development of the record may demonstrate that establishing reliance will require such extensive individualized proof that common issues of law and fact no longer predominate.") *But see Heastie v. Community Bank of Greater Peoria,* 125 F.R.D. 669 (N.D.Ill.1989) (class certification granted due to fixed set of fraudulent statements presumed to be made to each class members); *Smith v. MCI Telecommunications, Corp.,* 124 F.R.D. 665, 671 (D.Kan.1989) (court presumed plaintiffs relied on uniform compensation agreement presented to all class members).

**\*4** Plaintiffs suggest that there is some question as to whether individual class members will have to prove reliance in order to recover. They claim that the Fifth Circuit has held that reliance need not be proven to establish a RICO violation based on the underlying predicate act of mail fraud in *Armco Industrial Credit Corp. v. SLT Warehouse Co.,* 782 F.2d 475, 482 (5th Cir.1986). This court demonstrated in *Strain* that this interpretation of *Armco* is imprecise. The court in *Armco* merely stated that reliance need not be proven to establish the predicate act of mail fraud. The court did not examine RICO's "by reason of" requirement. It is

this "by reason of" language which imputes the reliance requirement in the mail and wire fraud context. The clear weight of authority holds that reliance is necessary to establish injury to business or property "by reason of" the predicate acts of mail and wire fraud within the meaning of § 1964(c). *See e.g. O'Malley v. O'Neill,* 887 F.2d 1557, 1561 (11th Cir.1989), *cert. denied,* 110 S.Ct. 2620 (1990) ; *Reynolds v. East Dyer Dev. Co.,* 882 F.2d 1249, 1253 (7th Cir.1989); *Brandenburg v. Seidel,* 859 F.2d 1179, 1188 n. 10 (4th Cir.1988); *Grantham and Mann, Inc. v. American Safety Products,* 831 F.2d 596, 606 (6th Cir.1987); *MGIC Indemnity Corp. v. Weisman,* 803 F.2d 500, 504-05 (9th Cir1986); *Ferdinand Drexel Invest. Co. v. Alibert,* 723 F.Supp. 313, 334 (E.D.Pa.1989), *aff'd,* 904 F.2d 694 (3d Cir.), *cert. denied,* 111 S.Ct. 154 (1990).

Plaintiffs recognize the impracticability of having to prove that each member of their proposed class relied on the alleged fraudulent advertising scheme on an individual basis. Instead, plaintiffs maintain that proof of reliance could be established on a class wide basis via alternative means. First, plaintiffs claim that marketing surveys combined with expert testimony could provide the jury with sufficient evidence to conclude that a readily identifiable segment of the class was induced to purchase Mazola by the alleged fraudulent scheme. This method, however, would not be adequate. It would fail to identify the particular plaintiffs who actually suffered a RICO injury. Such a generalized method of determination would not eliminate the possibility that a non-injured class member would recover. *See Haroco Inc.,* 747 F.2d at 398 (defendant who violates § 1962 not liable to those who have not been injured). Second, plaintiffs attempt to draw an analogy to securities fraud cases where courts have utilized various devices of presuming reliance. For example, plaintiffs rely heavily on *Sharp v. Coopers & Lybrand,* 649 F.2d 175, 188-89 (3d Cir.1981), *cert. denied,* 455 U.S. 938, 102 S.Ct. 1427 (1982), where the Third Circuit held that because of the difficulty in proving reliance upon a material omission in an accountant's opinion letter, reliance could be presumed and the burden of proof placed on the defendant to show nonreliance. The court reasoned that because the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                     Page 5

Not Reported in F.Supp., 1991 WL 1783 (E.D.Pa.),   RICO Bus.Disp.Guide 7659
**(Cite as: Not Reported in F.Supp.)**

opinion letters were intended to influence potential investors and were uniform in nature and broadly disseminated, it was likely that investors would rely upon them. *Id.* Here, plaintiffs argue that because the advertisements were uniform in their nature and broadly disseminated to the public, reliance should, likewise, be presumed.[FN1] *Sharp* foreshadowed the Third Circuit's eventual adoption of the "fraud on the market" theory. *Peil v. Speiser,* 806 F.2d 1154, 1161 n. 11 (3d Cir.1986). This theory, however, has been generally limited to the securities law context where courts can presume "that there is a nearly perfect market in information". *Id.* at n. 10. *See e.g. Lipton v. Documation, Inc.,* 734 F.2d 740 (11th Cir.1984), *cert. denied,* 469 U.S. 1132, 105 S.Ct. 814 (1985); *Shores v. Sklar,* 647 F.2d 462 (5th Cir.1981) (*en banc* ), *cert. denied,* 459 U.S. 1102, 103 S.Ct. 722 (1983). *In Re Bexar County,* 125 F.R.D. at 631. *See also* Note, *The Fraud-on-the-Market-Theory,* 95 Harv.L.Rev. 1143, 1154-56 (1982). Such presumptions cannot be made with respect to "non-perfect" markets, such as the consumer market.

**\*5** Notwithstanding the court's aversion to extend " fraud on the market" theory to a consumer market, the court notes that reliance should only be presumed in exceptional cases. As the Third Circuit has recognized, "A steadfast rule requiring the defendant to refute a presumption of reliance would be neither equitable nor logical. The plaintiff traditionally assumes the burden of demonstrating causation". *Sharp,* 649 F.2d at 188. Courts applying "fraud on the market" theory must make three assumptions: that the misrepresentations affected the market price; that the purchaser did in fact rely on the price of the stock as an indication of its value; and that the reliance was reasonable. *In Re Bexar County,* F.2d at 631 (citing *Zlotnick,* 836 F.2d at 822). Thus, " fraud on the market theory" does not eliminate the need for plaintiffs to show reliance; it simply recognizes that reliance may be *presumed* in certain circumstances. *Lipton,* 734 F.2d at 747.

The court is not intimating that class certification should be denied solely because of practical difficulties which may arise from having to establish reliance within a large class. Nor, as plaintiff implies, are we "essentially cloak[ing] a manageability concern in the clothing of a predominance argument." [FN2] This is not a case where reliance can be presumed and the court's primary task, albeit substantial, is to determine the amount of individual class members' recovery. Quite the contrary is true. If anything can be presumed, it is that a substantial amount of class members did *not* rely upon CPC's advertising scheme. Plaintiffs' proposed class consists of "[a]ll persons in the United States who purchased at retail [Mazola]" during a specified time period. By not limiting the class to consumers who purchased Mazola in reliance of the allegedly fraudulent marketing scheme, plaintiffs necessarily include within the class consumers who purchased Mazola without any knowledge of CPC's claims that Mazola lowers serum cholesterol levels. Reliance cannot be presumed because certain class members, having not relied upon the advertisements, have not suffered a RICO injury, and, therefore, are not entitled to recovery. Individual issues of reliance predominate because plaintiffs must establish which members of a class, which may include millions of people, reasonably relied upon the advertisements at issue.[FN3]

Lastly, plaintiffs suggest that the court could hold a series of "mini-trials" to determine whether individual class members relied upon the advertisements. In light of the potential size of the prospective class, however, such a method would not be practicable in the present case. *See e.g. MCI,* 124 F.R.D. at 677 ("if the computation of damages will require separate 'mini trials,' then the individualized damages determination predominates over common issues, and a class should not be certified." [citation omitted] ).

### b. *State Law Claims*

**\*6** The remaining counts allege common law fraud, negligent misrepresentation, breach of warranty, and violation of state consumer protection statutes. As in *Strain,* the pendent state law claims of fraud and negligent misrepresentation are predicated on an allegations of false and misleading advertising. In *Strain,* this court stated:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 6

Not Reported in F.Supp., 1991 WL 1783 (E.D.Pa.),   RICO Bus.Disp.Guide 7659
**(Cite as: Not Reported in F.Supp.)**

The successful maintenance of a cause of action for fraud includes, *inter alia,* a showing that the plaintiff acted in reliance on the defendant's misrepresentation ... Because such a showing would normally vary from person to person, the fraud cause of action is not generally appropriate for resolution in a plaintiff-class action ... In light of the fact that reliance is an essential element that must be proven in a fraud case, the court finds that individual questions of reliance predominate over any common questions with respect to the pendent fraud cause of action precluding certification pursuant to Rule 23(b)(3).

*Strain, supra,* 1990 WL 209325 at 9, 1990 U.S.Dist. Lexis at 28. [citations omitted]. Likewise, here, individual issues of reliance predominate over common issues with respect to the state law claims based on fraud and negligent misrepresentation.

Plaintiffs' breach of warranty and consumer protection claims, in addition to the fraud and misrepresentation claims, provide a number of substantive state law issues. Since the plaintiffs allege a national class action under the laws of various states, the court will likely be required to apply the laws of several states.[FN4] Faced with the prospect of having to apply different laws to different plaintiffs, and based on the parties' present submissions, the court is not satisfied that common issues of state law will predominate over individual issues of state law. As a result, the court will deny certification of the state law claims at this time, without prejudice. Plaintiffs have 30 days from the entry of the accompanying order to satisfy the court that common issues of state law predominate over individual issues of state law.

*CONCLUSION*

For the foregoing reasons, plaintiffs' motion for class certification of Counts One, Two, Three and Four will be *denied.* Plaintiffs' motion for class certification of Counts Five and Six will be *denied,* without prejudice.

An appropriate order will be entered.

*ORDER*

AND NOW, TO WIT, on this 8th day of January, 1991, upon consideration of plaintiffs' motion for class certification, IT IS ORDERED that plaintiffs' motion for class certification of Counts One, Two, Three and Four is *denied.* Plaintiffs' motion for class certification of Counts Five and Six is *denied,* without prejudice. Plaintiffs' have 30 days from the entry of this order to satisfy the court that common issues of state law predominate over individual issues of state law with respect to Counts Five and Six.

> FN1. The reasoning in *Sharp* pertains to reliance upon material omissions only. According to the court, "[t]he reason for shifting the burden on the reliance issue has been an assumption that the plaintiff is generally incapable of proving that he relied on a material omission." *Sharp,* 649 F.2d at 188. The same assumption cannot be made with respect to misrepresentations. *Id.* Plaintiffs' complaint, nevertheless, makes no allegation that CPC made material omissions in their advertising of Mazola, despite their attempt to turn this into an omission case in their Reply Memorandum.

> FN2. Although the court must take manageability concerns into consideration under Rule 23(b)(3)(D).

> FN3. Given the court's holding that individual issues of reliance predominate over common issues of reliance, it is not necessary to discuss whether individual issues of damages predominate over common issues of damages. The court is not expressing any view on this matter.

> FN4. Plaintiffs' complaint merely makes broad based references to state laws. For example, plaintiffs' state consumer protection count makes the broad allegation that CPC violated "statutes of Pennsylvania and other states."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 7

Not Reported in F.Supp., 1991 WL 1783 (E.D.Pa.),   RICO Bus.Disp.Guide 7659
**(Cite as: Not Reported in F.Supp.)**


      Complaint, ¶ 6.
E.D.Pa.,1991.
Rosenstein v. CPC Intern., Inc.
Not Reported in F.Supp., 1991 WL 1783
(E.D.Pa.),   RICO Bus.Disp.Guide 7659

Briefs and Other Related Documents (Back to top)

• 2:90cv04970 (Docket) (Jul. 30, 1990)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT T



Not Reported in A.2d, 2003 WL 22250424 (Pa.Com.Pl.)
**(Cite as: Not Reported in A.2d)**

C
Only the Westlaw citation is currently available.Harry STUTZLE, et. al., Individually and on behalf of all others Similarly Situated, Plaintiffs,
v.
RHONEPOULENC S.A.(n/k/a/Aventis S.A.), et. al.
**No. 002768OCT.TERM2002, CONTROL 062165.**

Sept. 26, 2003.

ORDER and MEMORANDUM OPINION

COHEN, J.
**\*1** AND NOW, this 26th day of September, 2003, upon consideration of Defendants' Preliminary Objections to Plaintiffs' complaint, all responses in opposition, all matters of record, and in accordance with the Memorandum Opinion being filed contemporaneously with this Order, it is hereby Ordered and Decreed that Defendants' preliminary objections are Sustained. Plaintiffs' complaint is dismissed.

MEMORANDUM OPINION

Before this Court are defendants' preliminary objections pursuant to Pa. R. Civ. P. 1028(a)(4) to plaintiffs' class action complaint. For the reasons set forth below, this Court sustains defendants' preliminary objections.

DISCUSSION

Defendants attempt to have each of the two claims in plaintiffs' class action complaint dismissed. These claims, which the court will address in order, are unjust enrichment and conspiracy.

A. Unjust Enrichment

In the complaint, plaintiffs allege that defendants have engaged in activities that caused the plaintiffs and the class members to pay more for Methoinine FN1 than they should have absent the illegal conduct. (Plts. Complaint ¶ 68). Plaintiffs also allege that defendants received excessive and unreasonable profits by virtue of the higher prices paid by plaintiffs and that equity and good conscious requires that defendants return these excess profits to the plaintiffs and the class members. (Id.). Defendants argue that the claim is legally insufficient because plaintiffs as indirect purchasers did not confer a benefit upon defendants.

FN1. Methionine is sold as an animal feed additive, including DL-methionine, calcium salt of methionine hydroxy analog and any product that contains methionine sold as an animal feed additive. (Plts complaint ¶ 2).

To state a claim for unjust enrichment, the plaintiffs must allege that they conferred a benefit on the defendant, that defendant appreciated the benefit under the circumstances and that the defendant accepted and retained the benefit without payment for value. *BurgettstownSmith Twp. Joint Sewage Auth. v. Langeloth Townsite Co.,* 403 Pa.Super. 84, 588 A.2d 43, 45 (Pa.Super.1991).

In the case *sub judice,* plaintiffs did not confer a benefit upon defendants. Plaintiffs are indirect purchasers and had no direct dealings with defendants. (Plts. Compliant ¶ 1). Perhaps defendants appreciated the value of the benefits, but any unjust enrichment claim would belong to the direct purchasers, not to indirect purchasers such as plaintiffs. See e. g. *Phillips v. Selig,* 2001 WL 1807951, \*8 (Sept. 19, 2001) (Sheppard).

Notwithstanding the fact that plaintiffs did not confer a benefit upon defendants, the plaintiffs have also failed to allege how the enrichment is unjust.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2003 WL 22250424 (Pa.Com.Pl.)
**(Cite as: Not Reported in A.2d)**

The most significant element of the unjust enrichment doctrine is whether the enrichment of the defendant is unjust; the doctrine does not apply simply because the defendant may have benefited as a result of the actions of the plaintiff. *Styler v. Hugo,* 422 Pa.Super. 262, 610 A.2d 347, 350 (Pa.Super.1993). Plaintiffs allege that defendants were unjustly enriched from excessive and unreasonable profits which resulted from defendant's illegal conduct. (Plts. Complaint ¶ 68). The "illegal conduct" described in the complaint is " a horizontal agreement and conspiracy between defendants and their co-conspirators to fix or maintain the price of Methionine and/or allocate markets and customers in connection with the sale of Methionine." (Plts complaint ¶ 1). In essence, plaintiffs allege that defendant's illegal conduct amounts to an antitrust violation. To date, no court in Pennsylvania has held that a private remedy is available for damages under Pennsylvania's common law on antitrust violations. *XF Enterprises, Inc. v. BASF Corp.,* 47 Pa. D. & C. 4th 147, 150 (2000) (Levin). Additionally, Pennsylvania has no legislation which provides for these damages. *Id.*
**\*2** "The common law doctrines relating to contracts and combinations in restraint of trade were well understood long before the enactment of the Sherman Law ... Such contracts were deemed illegal and were unenforceable at common law. But the resulting restraints of trade were not penalized and gave rise to no actionable wrong."

*XF Enterprises Inc. v. BASF Corp.,* 47 Pa. D & C. 4 [th] 147, 150 (2000)(quoting *Apex Hosiery Co. v. Leader,* 310 U.S. 469, 497 (1940)). Since the Pennsylvania legislature and the courts have not created a cause of action for damages sustained as a result of the antitrust violations, than plaintiffs failed to allege within their complaint how the benefit to defendants was unjust. Moreover, to allow plaintiffs to use a claim for unjust enrichment as a means for collecting damages which are not allowable by Pennsylvania's antitrust law, is not a proper use of the claim and can only lead to mischief. *XF Enterprises,* supra. 152 (use of a civil conspiracy claim as a means of collecting damages which are not allowable by Pennsylvania's antitrust law is not a proper use of the claim). Accordingly, plaintiff's unjust enrichment claim is dismissed with

prejudice.

### B. Civil Conspiracy

Defendants also assert preliminary objections to plaintiffs' cause of action for civil conspiracy. Plaintiffs allege that defendants engaged in an unlawful combination and conspiracy to fix, raise, maintain and stabilize at artificial and non competitive levels the price of Methionine and to conceal this unlawful activity. (Plts. Complaint ¶ 69). In their brief, plaintiffs argue that the civil conspiracy claim is legally sufficient because unjust enrichment is the predicate act for the conspiracy. (Plts. memorandum of law pp. 12-13). Since the court sustained defendants' preliminary objection with respect to plaintiffs' cause of action for unjust enrichment, the court also sustains defendants preliminary objections plaintiffs cause of action for civil conspiracy count.

### CONCLUSION

For these reasons, this court finds that defendants' preliminary objections are sustained. Plaintiffs' complaint is dismissed.

Pa.Com.Pl.,2003.
Stutzle v. Rhone-Poulenc S.A.
Not Reported in A.2d, 2003 WL 22250424 (Pa.Com.Pl.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT U



Not Reported in F.Supp.2d                                                                                                    Page 1

Not Reported in F.Supp.2d, 2001 WL 849928 (D.D.C.), 2001-1 Trade Cases P 73,280
**(Cite as: Not Reported in F.Supp.2d)**

Briefs and Other Related Documents

United States District Court, District of Columbia.
In re: VITAMINS ANTITRUST LITIGATION
GREENE
v.
F. HOFFMAN-LAROCHE, LTD., et al.
**Nos. MISC NO. 99-197, MDL 1285.**

April 11, 2001.

*MEMORANDUM OPINION Re: Greene Motions to
Dismiss*

HOGAN, J.

**\*1** Pending before this Court are various motions to dismiss filed by Defendants in the above captioned action.[FN1] Based upon careful consideration of Plaintiff's Complaint, Defendants' Motions to Dismiss, Plaintiff's opposition thereto, Defendants' Reply, and the entire record herein, the Court will grant Defendants' Motions to Dismiss and accordingly will dismiss Plaintiff's Complaint in its entirety.

> FN1. Defendants Hoffmann-LaRoche, Inc. and Roche Vitamins, Inc. have filed a joint reply memorandum "on behalf of all defendants who have moved to dismiss this action," J. Reply Mem. at 1, including BASF Corp.; DuCoa, L.P.; Hoffmann-LaRoche, Inc.; and Roche Vitamins, Inc.

## I. BACKGROUND

Plaintiff, Judy Greene, brings the instant action on behalf of herself and other indirect purchasers similarly situated ("Proposed Class" or "Class"), [FN2] pleading six separate causes of action. In her Complaint, Plaintiff alleges: (1) violations of the Tennessee Trade Practices Act ("TTPA"),

Ten.Code Ann. §§ 47-25-101, *et seq.;* (2) violations of the Tennessee Consumer Protection Act of 1977 ( "TCPA"), Ten.Code Ann. § 47-18-101, *et seq.;* (3) common law fraud; [FN3] (4) money had and received; (5) unjust enrichment; and (6) civil conspiracy. Plaintiff purports to bring this action pursuant to the Tennessee Trade Practices Act, Ten.Code Ann. §§ 47-25-101, 105, and 106; the Tennessee Consumer Protection Act of 1977, Ten.Code Ann. § 47-18-109; and *Blake v. Abbot Laboratories,* No. 03A01-9509-CV-00307, 1996 WL 134947 (Tenn.Ct.App. March 27, 1996). Compl. ¶ 12 at 8. Plaintiff alleges that Defendants engaged in a conspiracy to fix prices, allocate markets, and "commit other unlawful practices designed to inflate the price of vitamin supplements sold to Plaintiff and other purchasers in Tennessee and the other class jurisdictions," *Id.* ¶ 1 at 2, thereby causing "members of the [ ] Class [to pay] millions of dollars more for vitamins supplements than they would have paid in the absence of the illegal combination and conspiracy." *Id.* ¶ 62 at 25.

> FN2. Greene brings this action on behalf of herself and other indirect purchasers of Defendants' vitamin products in Alabama, Arizona, California, the District of Columbia, Florida, Kansas, Maine, Michigan, Minnesota, Mississippi, New Mexico, North Carolina, North Dakota, South Dakota, Tennessee, West Virginia, and Wisconsin.

> FN3. Plaintiff has voluntarily withdrawn this claim. *See* Pl.'s Opp. Mem. at 1 n. 4 (explaining that "[b]ecause Defendants' alleged fraudulent conduct may sufficiently be challenged by Plaintiffs under the antitrust and consumer protection laws of the Class Jurisdictions, Plaintiffs have thus voluntarily abandoned their common law fraud claim against all of the Defendants").

Not Reported in F.Supp.2d, 2001 WL 849928 (D.D.C.), 2001-1 Trade Cases P 73,280
**(Cite as: Not Reported in F.Supp.2d)**

This action, originally filed in state court in Tennessee, was removed to federal court and then transferred to this Court. After transfer, nine Defendants separately moved for dismissal. In their Motions to Dismiss, Defendants raise issues pertaining to personal jurisdiction over four of the individual Defendants; the scope of the Tennessee Trade Practices Act and the Tennessee Consumer Protection Act of 1977; whether Plaintiff, as an indirect purchaser, has standing to sue under those statutes; whether Plaintiff may bring claims on behalf of non-Tennessee class members; whether Plaintiff has pleaded various claims with sufficient particularity; whether Plaintiff has failed to state a claim for money had and received, unjust enrichment, and civil conspiracy; whether Plaintiff's claims are barred by the applicable statute of limitations; and whether Plaintiff's action should dismissed, or in the alternative stayed, due to prior cases filed in Tennessee state courts.

## II. DISCUSSION

### A. Applicable Standard for Evaluating Rule 12(b)(6) Motions to Dismiss

In a motion to dismiss under Rule 12(b)(6), the moving party has the burden of demonstrating that the non-movant can prove no set of facts in support of his claims. Fed. R. Civ. P. 12(b)(6); *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957) (stating that a complaint may not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [the complaint] which would entitle him to relief"). The Court must presume all factual allegations of the Complaint to be true and draw all reasonable inferences in favor of the nonmoving party. *Windsor v. The Tennessean,* 719 F.2d 155, 158 (6th Cir.1983). "However, neither legal conclusions nor unwarranted factual inferences constitute material allegations, and the Court is not obliged to accept such statements as true." *Sanders v. Prentice-Hall Corp. Sys.,* 969 F.Supp. 481, 483 (W.D.Tenn.1997) (citing *McBride v. Village of Michiana,* No. 93-1641, 1994 U.S.App. LEXIS 19679, at [*]7 (6th Cir. July 28, 1994) (per curiam)). The issue is "not

whether Plaintiff will prevail, but whether, on the strength of the Complaint, the claimant is entitled to offer evidence to support his claims." *Id.* (citing *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)).

### B. Counts I and II-Violations of the TTPA and TCPA

**\*2** In her first cause of action, Plaintiff alleges that Defendants have pursued a course of conduct " constitut[ing] an unlawful arrangement, contract, trust, or combination in violation of the Tennessee Trade Practices Act [,][w]ith the specific intent to restrain, lessen, or tend to lessen competition from producers of vitamin supplements or components thereof sold to Plaintiff and other indirect purchasers in the Class Jurisdictions." Compl. ¶ ¶ 64, 65 at 26. Plaintiff alleges that members of the Proposed Class have paid more for vitamin products than they otherwise would have were it not for Defendants' alleged wrongful conduct. *Id.* ¶ 49 at 21. Plaintiff seeks "full consideration paid for the price-fixed products, and all other damages available under the antitrust statutes of the Class Jurisdictions." *Id.* ¶ A at 38.

With respect to her second cause of action, Plaintiff relies upon the same facts supporting her TTPA claims and asserts that "[t]he conduct ... constitutes unfair or deceptive trade practices predominately and substantially affecting the conduct of trade or commerce in the State of Tennessee in violation of [the TCPA]." *Id.* ¶ 89 at 32. In relation to this cause of action, Plaintiff seeks actual damages, treble damages, and appropriate restitution. *Id.* ¶ B. at 38.

Defendants argue that "Plaintiff's Complaint fails to state a claim upon which relief can be granted as the Tennessee Trade Practices Act ... and the Tennessee Consumer Protection Act apply only to transactions which are predominately intrastate and the allegations contained in Plaintiff's Complaint involve interstate transactions." DuCoa Mem. at 3. Defendants place great emphasis on this Court's decisions in *FTC v. Mylan Labs., Inc.,* 62 F.Supp.2d 25 (D.D.C.1999) (*Mylan I* ) and *FTC v. Mylan Labs., Inc.,* 99 F.Supp.2d 1 (D.D.C.1999) (

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2001 WL 849928 (D.D.C.), 2001-1 Trade Cases P 73,280
**(Cite as: Not Reported in F.Supp.2d)**

*Mylan II* ), in which this Court dismissed claims for violations of the TTPA and the TCPA because plaintiff in that action "allege[d] a price-fixing conspiracy that operated on a national level and affected at least 32 states [and therefore] concern[ed] conduct that was predominately interstate, and outside the ambit of Tennessee's antitrust laws." *Mylan II,* 99 F.Supp.2d at 9. Plaintiff in the instant action "respectfully submit[s] that the Court would have benefitted from a more extensive analysis of Tennessee antitrust law than that evidently provided to it in [*Mylan* ]." Pl's. Opp. Mem. at 4-5. Although this Court twice ruled in the *Mylan* decisions that the TTPA and the TCPA reach only that conduct which is predominately intrastate in character, the Court will expound upon its rationale for so ruling and further explain why that same rationale mandates dismissal of Plaintiff's TTPA and TCPA claims.[FN4]

> FN4. The Court deals simultaneously with Plaintiff's TTPA and TCPA claims, because the same intra/interstate limitations that apply to the TTPA apply with equal force to the TCPA. *See Blake v. Abbott Labs., Inc.,* No. 03A01-9509-CV-00307, 1996 WL 13947, at *7 (Tenn.Ct.App. March 27, 1996). The *Blake* court noted that "the same limitations must apply to the [TCPA] as those applied to the [TTPA]. If it is determined that the acts complained of predominately affect interstate commerce, the defendants must prevail. It is a well-settled principle of law that one cannot do indirectly what cannot be done directly." *Id.*

"[T]he current rule is that Tennessee's prohibition on restraints of trade will apply to transactions which are 'predominately' *intrastate* in character. [A] transaction does not have to be exclusively intrastate to fall within the [prohibitions of the TTPA]. Obviously, this is to be read together with the well-established rule that allegations of unlawful restraints of trade in the *interstate* context gives [sic] rise to a claim within the reach of the Sherman Act in which there is exclusive jurisdiction." *Dzik &*

*Dzik, P.C. v. Vision Serv. Plan,* 1989 Tenn.App. LEXIS 25, at *5 (Tenn.Ct.App. Jan. 20, 1989) (emphasis added). This principle evolved from the seminal decision *Standard Oil Co. v. State,* 100 S.W. 705 (Tenn.1906).[FN5]

> FN5. The pertinent facts of *Standard Oil* are as follows:
> Standard Oil Company, a Kentucky corporation, was in competition with Evansville Oil Company, an Indiana corporation. *See Standard Oil Co. v. State,* 100 S.W. 705, 707 (Tenn.1906). Standard Oil maintained oil storage tanks in Gallatin, Tennessee, from which it stored and sold oil imported from other states. *See id.* at 708. Standard Oil conducted business through various agents, including C.E. Holt, O'Donnell Rutherford, and their superior J.E. Comer. *See id.* Evansville Oil also sold oil in Tennessee, but prior to the facts giving rise to the dispute, Standard Oil had no competition in the Gallatin market. *See id.* When Rosemon, an agent of Evansville Oil, procured orders from S.W. Love and other Standard Oil customers, Comer directed Holt to procure the countermand of the orders that had been given Evansville Oil. *See id.* In order to induce Love and others to countermand the Evansville Oil orders, Holt arranged to have one hundred gallons of oil delivered from the Standard Oil Gallatin storage tanks to customers who countermanded their orders. *See id.*

**\*3** In *Standard Oil,* Standard Oil and two of its employees, C.E. Holt and O'Donnell Rutherford, were indicted and charged with unlawfully contracting with S.W. Love "for the purpose and with a view to lessen full and free competition in the sale of coal oil, an article of sale imported into [the state of Tennessee], and carrying out said contract in [Sumner] county" in violation of Tennessee antitrust laws. *Id.* at 706. The antitrust statute provided in relevant part:
Section 1. Be it enacted ... that ... all arrangements, contracts, agreements, trusts, or combinations

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2001 WL 849928 (D.D.C.), 2001-1 Trade Cases P 73,280
**(Cite as: Not Reported in F.Supp.2d)**

between persons or corporations made with a view to lessen, or which tend to lessen full and free competition in the importation or sale of articles imported into this State, or in the manufacture or sale of article of domestic growth or of domestic raw material, and all arrangements, contracts, agreements, trusts, or combinations between persons or corporations designed, or which tend to advance, reduce, or control the price or the cost to the producer or the consumer of any such product or article, are hereby declared to be against public policy, unlawful and void.

*Id.* At trial, Standard Oil and Holt were found guilty and Rutherford was acquitted. On appeal, Standard Oil and Holt first urged the court to read the statute as applying to interstate commerce, thus attacking the constitutionality of the statute by asserting that it was preempted, at least in part, by federal antitrust laws. Apparently focusing on the "importation language" of the statute, the parties argued that "the arrangement which the plaintiffs ... are alleged to have made was one relating to property to be thereafter imported into the State." *Id.* at 709. Relying on principles of statutory construction and legislative intent, the court rejected plaintiffs' statutory attack. The court also explained that:We give no force to the work, "importation," appearing in section 1, because we think it was inaccurately used in referring to articles already imported; that is, that the phrase "importation or sale of articles imported into this state" was intended to include and describe, among the article of commerce to be protected, those which had been imported from other states and countries, commingled with the common mass of property in this state, and no longer articles of interstate commerce. It is well settled that commerce in such imported articles may be regulated by state legislation. It is certain that merchandise of this character was intended to be included within the provisions of this act, otherwise commerce, in the vast amount of valuable property of foreign production and manufacture that was then and is now in the state, would be wholly unprotected from the abuses legislated against. [ ... ] The legislature clearly intended to prohibit trusts, combinations, and agreements affecting all commerce not covered by the federal statute, and upon which it had a right to legislate. It did not

intend to stop short of its power or to exceed it.

**\*4** *Id.* at 710-11. The court also cautioned against giving broad meaning to the words of the statute and concluded that:It is evident, from what we have already said, that the prevention of unlawful contracts in relation to the importation of articles was not the inducement of the enactment of this statute, but that the primary and chief purpose of the legislature, beyond all question, was to protect commerce within this state. Its provisions upon this subject are to no extent and in no manner dependent upon one protecting the importation of merchandise from other States and countries.

*Id.* at 711. In addition, the court explained that the plaintiffs mischaracterized the charge against them as an indictment for lessening competition of oil to be imported into the state. The court clarified that the plaintiffs were charged with making an unlawful contract to lessen competition "in the sale of coal oil which the Standard Oil Company had imported in this state *and had, at the time of the agreement, stored in its storage tanks at Gallatin,* and there offered for sale." *Id.* at 712 (emphasis added). The court acknowledged that at one time the oil had been an article of interstate commerce, but pointed out that the oil "was not [an article of interstate commerce] when the agreement with S.W. Love was made. It was then at rest in this state, and was subject to its revenue laws and the police power of the state." *Id.* And therein lies the critical distinction upon which *Mylan* and the instant action lie.

In *Mylan I* and *Mylan II,* this Court distinguished the facts in *Mylan* from those in *Standard Oil,* explaining that [t]he challenged conduct ... in Standard Oil was deemed intrastate because it occurred after the product had been imported, not before as in the instant case." *Mylan I,* 62 F.Supp.2d at 51. This Court further explained that " [w]hen the challenged conduct occurs before the products arrive in Tennessee, the conduct is considered interstate in nature and the [T]TPA and TCPA should not apply." *Id.* In deciding *Mylan,* the Court also had occasion to consider *Blake v. Abbott Labs., Inc.,* No. 03A01-9509-CV-00307, 1996 WL 13947 (Tenn.Ct.App. March 27, 1996). In *Blake,* the Tennessee Court of Appeals found that the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 5

**Not Reported in F.Supp.2d, 2001 WL 849928 (D.D.C.), 2001-1 Trade Cases P 73,280**
**(Cite as: Not Reported in F.Supp.2d)**

complaint stated a cause of action under the TTPA because the court could not determine from the record whether the allegedly wrongful acts predominately affected interstate commerce. The court explained that:

We have carefully examined the complaint. Contrary to the defendants' assertions, we fail to find an allegation that the alleged conspiracy took place outside the state or that the transactions complained of occurred outside the state. It is alleged that the principal offices of the defendants are located outside the state ... and that the defendants intended their actions to artificially maintain high wholesale levels of infant formula in the entire United States. From that information, alone, however, we cannot infer that the conspiracy, if any, occurred outside the state or that the transactions occurred outside the state.

**\*5** *Blake,* 1996 WL 134947, at [\*]4. The instant action is distinguishable from *Blake* insofar as Plaintiff alleges a conspiracy hatched and implemented through meetings that took place in Ludwigshafen, Germany; Germany's Black Forest; Atlanta, Georgia; and various other non-specified locations. Although the alleged conduct may have a demonstrable effect in Tennessee, this effect is clearly incidental in comparison to the interstate character of the alleged conspiracy.

Plaintiff alleges that "Defendants' conspiracy has involved an astonishing array of uniform illegal conduct by a cartel that has deliberately targeted, and severely burdened, consumers in Tennessee and the other Class Jurisdictions." Compl. ¶ 2 at 2. While Plaintiff asserts that "[a] substantial part of the trade and commerce, as well as the arrangement, contract, agreement, trust, conspiracy, unfair or deceptive practices, and/or uniform and common course of conduct giving rise to Plaintiff's claims, occurred within and predominantly [a]ffected the state of Tennessee," *Id.* ¶ 9 at 7, the Court does not find that the facts pleaded by Plaintiff support her allegations as to the *predominantly* intrastate effect of the alleged wrongful conduct. Although inferences are to be drawn in Plaintiff's favor, this Court is not in the position of the *Blake* court, which "could not infer that the conspiracy ... occurred outside the State." *Blake,* 1996 WL

134947, at [\*]4. In the instant action, the Court need not draw inferences as to the inter- or intrastate character of the alleged conspiracy, because Plaintiff explicitly alleges meetings that took place in Ludwigshafen, Germany; Germany's Black Forest; Atlanta, Georgia; and various other non-specified locations.

The Court would also direct Plaintiff to *Lynch Display Corp. v. Nat'l Souvenir Center, Inc.,* 640 S.W.2d 837 (Tenn.Ct.App.1982). In *Lynch,* the subject of dispute was "a lease between [Historical Reviews, Inc. (HRI)] a Tennessee corporation [operating a wax museum in Gatlinburg] and [Lynch Display Corporation (Lynch),] a Maryland corporation [manufacturing and leasing wax figures for museums] and an associated franchise agreement between [HRI and National Historical Museum, Inc. (NHM),] a District of Columbia corporation." *Id.* at 840. Appellants argued that the lessee wax museum "ha[d] been established in Gatlinburg for 17 years and regularly [sold] tickets to customers in exchange for admission and that this fact establishes significant intrastate commerce." *Id.* at 841. The court rejected this argument and reasoned that "[a]lthough this is unquestionably intrastate commerce, it is of a nature incidental to the predominant agreements in this dispute." *Id.*

Similarly in the instant action, although Plaintiff alleges that BASF executives located in Tennessee implemented the pricing decisions of BASF officials in Germany, Compl. ¶ 7(a) at 6, Plaintiff's allegations do not persuade this Court that this modicum of intrastate activity was more than incidental to the predominant agreement, which was a world-wide price fixing conspiracy. *See, e.g., Dzik,* 1989 Tenn.App. LEXIS 25, at [\*]5-6 (acknowledging the intrastate implications arising from an agreement between a Tennessee corporation and a Georgia corporation, but ultimately reasoning that "the critical point is that to the extent intrastate commerce is affected ... it is of a nature only incidental to the predominant agreement between [the parties]"); *Valley Products Co., Inc. v. Landmark,* 877 F. Supp 1087, 1094-95 (W.D. Tenn 1994) (stating that "[a]lthough the dispute need not be exclusively intrastate to fall within the statute, it must more than incidentally

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2001 WL 849928 (D.D.C.), 2001-1 Trade Cases P 73,280
**(Cite as: Not Reported in F.Supp.2d)**

affect intrastate commerce" and dismissing plaintiff's antitrust claim because "HFS franchisees are located in every state in the country and the sale of guest amenities necessarily implicates many different geographic regions"). As stated above, the current Tennessee rule requires Plaintiff to allege transactions that are *predominately* intrastate in character.

**\*6** In sum, Plaintiff asserts a cause of action based not only on Tennessee law, but also on the law of fifteen other states plus the District of Columbia. While the multi-state nature of this conspiracy is not dispositive as to whether violations could have occurred in Tennessee that might be actionable under Tennessee law, the Court finds that Plaintiff's combined allegations of a conspiracy affecting numerous states and secret meetings held world-wide, and the notable lack of allegations regarding any part of the conspiracy that took place in Tennessee, other than the purchase of vitamin supplements by indirect purchasers and the actions of certain BASF executives located in Tennessee, compel this Court to cast Plaintiff's claims as predominately interstate in character. Plaintiff has not pleaded a cause of action that is sufficiently intrastate in character so as to fall within the ambit of the Tennessee statutes. Accordingly, the Court will grant Defendants' Motions to Dismiss Plaintiff's TTPA and TCPA claims.[FN6]

> FN6. In rendering this decision, the Court acknowledges that at least one other federal district court has disagreed with the rationale underlying the interstate/intrastate distinction as articulated in *Lynch, Blake, Dzik & Dzik,* and *Mylan. See In re Cardizem CD Antitrust Litigation,* 105 F.Supp.2d 618, 667 (E.D.Mich.2000). However, this Court respectfully disagrees with *Cardizem's* predictions regarding the approach that the Tennessee Supreme Court might take with respect to the TTPA and TCPA, as well as with *Cardizem's* interpretation of *Blake.*

C. Count III-Common Law Fraud

As previously noted, Plaintiff has voluntarily withdrawn this claim against all of the Defendants. However, Plaintiff has not formally amended her Complaint to reflect the withdrawal of this claim. Given the procedural oddity created by Plaintiff's failure to formally amend her Complaint to withdraw the allegation of fraud, the Court notes that even if Plaintiff had not voluntarily withdrawn this claim, the fraud count would nonetheless be subject to dismissal.

Plaintiff's fraud count is set out in very general terms, asserting that Defendants' alleged wrongful conduct constitutes "a uniform course of illegal and fraudulent conduct." Compl. ¶ 97 at 34. As Plaintiff does not specify whether her fraud claim is based on silence or concealment of some supposedly material facts, or whether the action lies in some affirmative misrepresentations by the Defendants, Plaintiff's broad allegations leave this Court left to speculate as to the basis for Plaintiff's fraud cause of action. Accordingly, the Court will briefly discuss various theories of fraud and why Plaintiff has failed to state a claim under any of these theories.

As explained by the Tennessee Supreme Court, Tennessee recognizes three types of tortious misrepresentations:

The first is set forth in Restatement of Torts 2d, § 402B, and provides that a purchaser may recover damages from a seller or manufacturer of a product for economic loss sustained by the buyer as a result of the misrepresentations. [Section] 402B applies, however, only to persons engaged in the selling or manufacturing of chattels and does not apply to individual or private sales.

*Jasper Aviation, Inc. v. McCollum Aviation, Inc.,* 497 S.W.2d 240, 242 (Tenn.1972). Plaintiff is a private consumer and an indirect purchaser of the Defendants' vitamin products and thus cannot state a claim for fraud under this first theory. However, the Tennessee Supreme Court has articulated two additional theories of suit.

**\*7** The second theory is found in the Restatement of Torts (Second), § 552. *See id.* However, this theory is rooted in negligent misrepresentation, and this

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2001 WL 849928 (D.D.C.), 2001-1 Trade Cases P 73,280
**(Cite as: Not Reported in F.Supp.2d)**

Court cannot infer an allegation of negligent misrepresentation from any set of facts pleaded by Plaintiff. *See, e.g., Bethlehem Steel Corp. v. Ernst & Whinney,* 822 S.W.2d 592, 595 (Tenn.1991) (discussing an action for negligent misrepresentation and noting that "Tennessee has adopted the Restatement (Second) of Torts § 552 as the guiding principle in negligent misrepresentation actions against other professionals and business persons"). In addition, § 552 liability arises only in connection with "business or professional persons who negligently supply false information for the guidance of others in their business transactions." *Id.* As with the previous theory, Plaintiff is precluded from bringing a cause of action based on § 552, because she does not allege that her purchases were business-related transactions.

"The third theory of actionable misrepresentation is a plaintiff's suit for fraud and deceit." *Jasper Aviation,* 497 S.W.2d at 242. The elements of fraud are "an intentional misrepresentation with regard to a material fact; knowledge of the representation's falsity, *i.e.,* it was made 'knowingly' or 'without belief in its truth' or 'recklessly' without regard to its truth or falsity; the plaintiff reasonably relied on the misrepresentation and suffered damages; and the misrepresentation relates to an existing or past fact." *Menuskin v. Williams,* 145 F.3d 755, 764 (6th Cir.1998); *see also Stacks v. Saunders,* 812 S.W.2d 587, 592 (Tenn.Ct.App.1991). Stated another way:
When a party intentionally misrepresents a material fact or produces a false impression in order to mislead another or to obtain an undue advantage over him, there is a positive fraud. The representation must have been made with the knowledge of its falsity and with a fraudulent intent. The representation must have been to an existing fact which is material and the plaintiff must have reasonably relied upon that representation to his injury.

*Haynes v. Cumberland Builders, Inc.,* 546 S.W.2d 228, 232 (Tenn.Ct.App.1976) (citations omitted). As noted by Defendants, Plaintiff "has not alleged what representations were made to her by which Defendant, when or where the alleged representations were made, or what representations she relied on which resulted in injury to her."

DuCoa Mem. at 11-12.

However, "[i]t is [also] well-settled that fraud can be an intentional misrepresentation of a known, material fact or it can be the concealment or nondisclosure of a known fact when there is a duty to disclose." *Justice v. Anderson County,* 955 S.W.2d 613, 616 (Tenn.Ct.App.1997). "The tort of fraudulent concealment is committed *when a party who has a duty to disclose* a known fact or condition fails to do so, and another party reasonably relies upon the resulting misrepresentation, thereby suffering injury." *Chrisman v. Hill Home Dev., Inc.,* 978 S.W.2d 535, 539 (Tenn.1998) (emphasis added). In the instant action, if Plaintiff's claim lies in Defendants' silence and concealment of their price fixing and other allegedly unlawful activities, then this cause of action fails as well. In order to state a claim for fraud based upon silence or concealment, "one must show that the defendant owed a duty to speak or disclose the information." *McConkey v. McGhan Medical Corp.,* No. 3:98-CV-003, 2000 U.S. Dist. LEXIS 19895, at *15 (E.D.Tenn. July 6, 2000). " Such a duty may be created where there is a fiduciary or contractual relationship between the parties creating a duty of trust and good faith." *Id.* " All the instances in which the duty to disclose exists and in which a concealment is therefore fraudulent, may be reduced to three distinct classes: (1) where there is a previous definite fiduciary relation between the parties; (2) where it appears one or each of the parties to the contract expressly reposes a trust and confidence in the other; (3) where the contract or transaction is intrinsically fiduciary and calls for perfect good faith." *Justice,* 955 S.W.2d at 616-17. All of these elements speak to either privity or a fiduciary relationship between the parties. Plaintiff does not plead any set of facts to support such a relationship and thus fails to demonstrate why any Defendant owed a duty of disclosure to Plaintiff.

**\*8** To summarize, Plaintiff cannot state a claim for fraud under either of the two Restatement theories adopted by Tennessee courts, because those particular sections pertain to business transactions, and Plaintiff does not allege that she was defrauded by Defendants in any such type of transaction. In

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 8

Not Reported in F.Supp.2d, 2001 WL 849928 (D.D.C.), 2001-1 Trade Cases P 73,280
**(Cite as: Not Reported in F.Supp.2d)**

addition, Plaintiff cannot bring an action for affirmative fraud or deceit because she pleads no set of facts to indicate what type of representations were made by which Defendants, nor does Plaintiff adequately allege any reliance. Moreover, Plaintiff cannot sustain a cause of action for fraudulent concealment because she has not adequately pleaded facts that demonstrate a relationship between herself and Defendants that gives rise to a duty of disclosure. Based on the foregoing reasons, the Court will dismiss Plaintiff's cause of action for fraud.

### D. Counts IV and V-Money Had and Received / Unjust Enrichment

In support of her claim for money had and received, Plaintiff asserts that Defendants' "fraudulent, illegal, unfair or deceptive conduct ... and the resulting overpayments made by Plaintiff and the Proposed Class," Compl. ¶ 100 at 35, entitles the Plaintiff and the Proposed Class to "compensatory damages to the extent of the money had and received by the Defendants." *Id.* ¶ D at 39. Defendants argue that Plaintiff, as an indirect purchaser, cannot maintain this cause of action because there are no direct dealings between Plaintiff and Defendants. DuCoa Mem. at 10-11; J. Reply Mem. at 9-10.

In support of her action for unjust enrichment, Plaintiff alleges that "Defendants have benefitted from their illegal restraints of trade and acts which lessen or tend to lessen competition through the overpayment by Plaintiff and the Proposed Class for vitamin supplements [and][i]t would be inequitable for the Defendants to ... retain any ... overpayment ... derived from their unfair or deceptive trade practices." *Id.* ¶¶ 102, 103 at 35. Plaintiff seeks "disgorgement [of] all such monies acquired through defendants' illegal and inequitable conduct," *Id.* ¶ 104 at 35, plus interest and costs. *Id.* ¶ E. at 39. Defendants respond by once again arguing that there were no direct dealings between Plaintiff and thus assert that Plaintiff cannot maintain an action for unjust enrichment. Plaintiff counters that Tennessee law has not directly addressed the issue as to whether a plaintiff must directly confer a benefit on a defendant in order to maintain an action

for unjust enrichment. Pl.'s Opp. Mem. at 52.

As stated by the Supreme Court of Alabama, "the essence of ... unjust enrichment or money had and received is that facts can be proved which show that defendant holds money which in equity and good conscience belongs to plaintiff or was improperly paid to the defendant because of mistake or fraud." *Foshee v. General Telephone Co. of the Southeast,* 322 So.2d 715, 717 (Ala.1975). Under Tennessee law, both unjust enrichment and money had and received are equated with quasi-contract actions. *See, e.g., Blake Corp. v. Diversified Sys., Inc.,* 2000 U.S.App. LEXIS 22291, at [*]25 (stating that "[u]nder Tennessee law, 'actions brought upon theories of unjust enrichment, quasi-contract, contracts implied in law, and quantum meruit are essentially the same' ") (quoting *Paschall's, Inc. v. Dozier,* 407 S.W.2d 150, 154 (Tenn.1966)); *Bonham Group, Inc. v. Memphis,* No. 02A01-9709-CH-00238, 1999 Tenn.App. LEXIS 237, at [*]18 (Tenn.Ct.App. April, 16, 1999) (stating that "unjust enrichment is a quasi-contractual theory or is a contract implied-in-law in which a court may impose a contractual obligation where one does not exist"); *Steelman v. Ford Motor Credit Co.,* 911 S.W.2d 720, 723 (Tenn.Ct.App.1995) (stating that "[a]n action for money had and received is based upon an implied assumpsit"). As noted in *Luithly v. Cavalier Corp.:*

**\*9** Actions brought under these common law doctrines are essentially the same and the names are used interchangeably in the case law. In the past, such actions were also known as actions in assumption for money had and received, an ' equitable action to recover ... money which the defendant in justice ought not retain ... where defendant has moneys of the plaintiff which, ex equo et bono, he ought to refund."

No. 98-5507, 1999 U.S.App. LEXIS 10653, at [*]11 n. 2 (6th Cir. May 20, 1999) (quoting *Nash v. Towne,* 72 U.S. 689 (1866)).

Privity is not required to maintain such actions. *See Paschall's,* 407 S.W.2d at 154 (stating that "[i]t is well established that want of privity between parties is no obstacle to recovery under quasi contract"). However, Tennessee courts have articulated a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2001 WL 849928 (D.D.C.), 2001-1 Trade Cases P 73,280
**(Cite as: Not Reported in F.Supp.2d)**

general standard that a plaintiff must meet in order to bring such a claim. As stated in *Haynes v. Dalton:* "Each case must be decided according to the essential elements of quasi-contract to wit: A benefit conferred upon the defendant by the plaintiff, appreciation by the defendant of such benefit, and acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof. The most significant requirement for a recovery on a quasi-contract is that the enrichment to the defendant be unjust."

848 S.W.2d 664, 665-66 (Tenn.Ct.App.1992) (quoting *Paschall's,* 407 S.W.2d at 155).

Because Plaintiff is an indirect purchaser and had no direct dealings with Defendants, the Court is left to query whether Plaintiff satisfies the first prong of the standard, *i.e.,* a benefit conferred on Defendants by Plaintiff. In speaking to whether a plaintiff must directly confer a benefit upon a defendant, the court in *Lawyers Title Ins. Corp. v. United Am. Bank of Memphis* held that plaintiff did not state a claim for unjust enrichment because there was no direct transaction between plaintiff and defendant. 21 F.Supp.2d 785, 806 (W.D.Tenn.1998) (relying on the principle articulated in *Boyd v. Black,* 248 F.2d 156 (6th Cir.1957)). In addressing the plaintiff's claim for money had and received, the *Lawyers Title* court did not inquire into whether plaintiff conferred a direct benefit on the defendant but rather stated that "[u]nder Tennessee law, an action for money had and received 'is maintainable in all cases where one person has received money or its equivalent under such circumstances that in equity and good conscience he ought not retain it and ex aequo bono it belongs to another.' " 21 F.Supp.2d at 807 (*quoting Interstate Life & Accident Co. v. Cook,* 86 S.W.2d 887, 891 (Tenn.Ct.App.1935)). This analysis seems merely to restate the general principle underlying all implied contract actions, without stating a separate test for an action for money had and received. However, the Court does note that *Interstate Life,* upon which the *Lawyers Title* court relies, explicitly states that an action for money had and received is based upon implied assumpsit. *See Interstate Life,* 86 S.W.2d at 891. Moreover, as discussed previously, *Haynes v.*

*Dalton* and *Paschell's* require consideration of the three factors pertaining to the benefit conferred by plaintiff and received by defendant for all types of quasi/implied contract actions.[FN7] Therefore, based upon the lack of facts supporting a finding of a direct benefit conferred upon Defendants by Plaintiff, the Court will dismiss Plaintiff's claims for unjust enrichment and money had and received.

> FN7. As yet another factor warranting dismissal, the court in *Bonham* states that " before recovery can be had against the defendant on the theory of unjust enrichment, the provider of the benefit must have exhausted his remedies against the person with whom he had contracted." 1999 Tenn.App. LEXIS 237, at [*]20. The record is devoid of any evidence suggesting that Plaintiff first pursued claims against the retailers or other persons from whom she directly purchased vitamin supplements. This is yet another factor that weighs against Plaintiff's recovery under the unjust enrichment theory.

### E. Count VI-Civil Conspiracy

**\*10** Plaintiff alleges that Defendants engaged in a conspiracy to fix prices, allocate markets, and " commit other unlawful practices designed to inflate the price of vitamin supplements sold to Plaintiff and other purchasers in Tennessee and the other class jurisdictions." Compl. ¶ 1 at 2. Plaintiff asserts that "[t]he intended common purpose of this conspiracy was to deceive Proposed Class members and the public as to the true cost of vitamin supplements," *Id.* ¶ 110 at 36, and that "[t]he further effect of this conspiracy was to violate state law." *Id.* ¶ 111 at 36. Plaintiff also alleges that " Defendants have conspired to purposely conceal the practice by which they artificially inflated the price of vitamin supplements." *Id.* ¶ 108 at 36.

"In Tennessee, a civil conspiracy is defined as a combination between two or more persons to accomplish by concert an unlawful purpose, or to accomplish a purpose not in itself unlawful by unlawful means. Necessary elements for such a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2001 WL 849928 (D.D.C.), 2001-1 Trade Cases P 73,280
**(Cite as: Not Reported in F.Supp.2d)**

claim include common design, concert of action, and an overt act." *McConkey,* 2000 U.S. Dist. LEXIS 19895, at *14 (citations omitted); *see also Tennessee Publ'g Co. v. Fitzhugh,* 52 S.W.2d 157 (Tenn.1931); *Braswell v. Carothers,* 863 S.W.2d 722, 727 (Tenn.Ct.App.1993).

Tennessee courts considering the issue are nearly uniform in holding that conspiracy in and of itself is not a free-standing cause of action and that there must exist an underlying colorable claim. *See, e.g., Blake Corp. v. Diversified Sys., Inc.,* No. 98-5396, 2000 U.S.App. LEXIS 22291, at *18 (6th Cir. Aug. 24, 2000) (holding that when the determinative legal theory fails, "then the claim for conspiracy must also fail, for it cannot be that a conspiracy to do a thing is actionable where the thing itself would not be") (internal citation and quotation omitted); *Jackson v. Bohan,* 861 S.W.2d 241, 247-48 (Tenn.Ct.App.1993) (citing *Kirskey v. Overton Pub, Inc.,* 739 S.W.2d 230 (Tenn.Ct.App.1987)); *Pusser v. Gordon,* 684 S.W.2d 639, 642 (Tenn.Ct.App.1984) (holding that plaintiff could not recover for conspiracy to defraud because fraud could not be established, and stating that "[a] mere conspiracy to commit a fraud is never of itself a cause of action; it must be proved that there was a conspiracy to defraud and a participation in the fraudulent purpose, ... which worked injury as a proximate consequence"). Moreover, "the primary purpose of the agreement must be to cause injury to another; incidental injuries resulting from a pursuit of the parties' own fair interest are not actionable." *Nat'l Med. Care, Inc. v. Gardiner,* No. 85-154-II, 1986 WL 3157, at *3 (Tenn.Ct.App. March 12, 1986).

In *Fitzhugh,* the court explained that actionable damage must be alleged, and that "[t]he damage being the gist of the action, and the 'gist' being ' the cause for which an action will lie-the ground or foundation of a suit, without which it would not be maintainable,' actionable damages must be alleged, and must be shown at the time of the bringing of the action." *Fitzhugh,* 52 S.W.2d at 157 (citation omitted). The court further stated that:
**\*11** It is a general rule, that a conspiracy cannot be made the subject of a civil action, unless something is done which, without the conspiracy, would give a

right of action. The damage done is the gist of the action, not the conspiracy. When the mischief contemplated is accomplished, the conspiracy becomes important, as it may affect the means and measure of redress. [B]ut the simple act of conspiracy does not furnish a substantive ground of action.

*Id.* at 158.

As discussed above, Plaintiff cannot sustain a claim for violations of either the TTPA nor the TCPA. Nor does Plaintiff state a claim for fraud. The dismissal of these counts eliminates any probable underlying cause of action on which to base a claim for civil conspiracy.[FN8] Because Plaintiff fails to state a claim for violations of either the TTPA or TCPA and further fails to state a claim for any other alleged unlawful conduct at common law, this Court will grant Defendants' Motions to Dismiss Plaintiff's claim for civil conspiracy.

> FN8. Plaintiff directs the Court's attention to *Prism Partners v. Figlio,* No. 01A01-9703-CV-00103, 1997 Tenn.App. LEXIS 777 (Tenn.Ct.App. Nov. 7, 1997), to support her suggestion that "a conspiracy claim may survive dismissal even when the remaining causes of action have been dismissed." Pl's. Opp. Mem. at 54 n. 54. In *Prism Partners,* the court stated that dismissal of the underlying fraud claim did not automatically dispose of the conspiracy charge. The court made this determination based on the fact that the plaintiff had pleaded two separate torts, fraud and conspiracy. Therefore, this Court interprets *Prism Partners* to hold that the conspiracy charge could survive in that case based on one of the tort claims. However, to the extent that *Prism Partners* results in a holding that states, implicitly or otherwise, that conspiracy can be maintained as a separate cause of action, it is clearly contrary to existing precedent.

F. Alternative Grounds for Dismissal

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2001 WL 849928 (D.D.C.), 2001-1 Trade Cases P 73,280
**(Cite as: Not Reported in F.Supp.2d)**

Because the Court has found grounds to dismiss all six counts of Plaintiffs Complaint, the Court will dismiss the Complaint in its entirety. Accordingly, the Court need not address Defendants' alternative grounds for dismissal, including personal jurisdiction, the applicable statutes of limitations, and the existence of prior pending state actions. Nor need the Court decide whether or not to allow this action to proceed as a class action, because there are no viable causes of action left to pursue.

### III. CONCLUSION

Plaintiff has failed to state a claim for violations of the TTPA and the TCPA, because she has not alleged a cause of action that predominately affects intrastate commerce. In addition, Plaintiff purports to voluntarily withdraw her action for fraud, but has failed to so amend her Complaint. The Court nonetheless finds that Plaintiff has failed to state a cause of action for either affirmative fraud or fraudulent concealment. Moreover, Plaintiff has also failed to state a claim for both unjust enrichment and money had and received because she has not pleaded facts that demonstrate that she directly conferred a benefit on any of the Defendants, as required by Tennessee law. And because all other causes of action are subject to dismissal, Plaintiff cannot bring an action for civil conspiracy, because Tennessee law does not recognize civil conspiracy as a free-standing cause of action. For the foregoing reasons, Defendants' Motions to Dismiss the Complaint in its entirety will be granted. An Order will accompany this Opinion.

D.D.C.,2001.
In re Vitamins Antitrust Litigation
Not Reported in F.Supp.2d, 2001 WL 849928 (D.D.C.), 2001-1 Trade Cases P 73,280

Briefs and Other Related Documents (Back to top)

• 2004 WL 3682686 (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Further Support of Certain Defendants' Motions to Dismiss or for Judgment on the Pleadings (Aug. 25, 2004) Original Image of this Document (PDF)

• 2004 WL 3682685 (Trial Motion, Memorandum and Affidavit) Memorandum of Points and Authorities in Support of Certain Defendants' Motions to Dismiss or for Judgment on the Pleadings (Jul. 6, 2004) Original Image of this Document (PDF)

• 2004 WL 3682684 (Trial Motion, Memorandum and Affidavit) Class Plaintiffs' Memorandum in Support of Motion for Final Approval of Settlements with the Sumitomo, Tanabe, Lonza, Degussa, Nepera, and Reilly Defendants and for Entry of Final Judgment (Jan. 16, 2004) Original Image of this Document (PDF)

• 2003 WL 24251856 (Trial Motion, Memorandum and Affidavit) Reply of Cargill and Tyson Plaintiffs in Support of Their Motion to Intervene (Dec. 11, 2003) Original Image of this Document (PDF)

• 2003 WL 24251853 (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Support of Class Plaintiffs' Motion for Preliminary Approval of Settlement and form and Manner of Notice to the Classes (Dec. 4, 2003) Original Image of this Document (PDF)

• 2003 WL 24251854 (Trial Motion, Memorandum and Affidavit) Class Plaintiffs' Opposition to Cargill and Tyson Plaintiffs' Motion to Intervene (Dec. 4, 2003) Original Image of this Document (PDF)

• 2003 WL 24251855 (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Support of Class Plaintiffs' Motion for Preliminary Approval of Settlement and form and Manner of Notice to the Classes (Dec. 4, 2003) Original Image of this Document (PDF)

• 2003 WL 24251871 (Trial Pleading) Answer of Defendant Mitsui & CO., Ltd. to Plaintiffs' Fourth Amended Complaint (Nov. 25, 2003) Original Image of this Document (PDF)

• 2003 WL 24251872 (Trial Pleading) Answer of Defendant Mitsui & Co. (U.S.A.), Inc. to Plaintiffs' Fourth Amended Complaint (Nov. 25, 2003) Original Image of this Document (PDF)

• 2003 WL 24251852 (Trial Motion, Memorandum and Affidavit) Motion of Cargill and Tyson Plaintiffs to Intervene (Nov. 21, 2003) Original Image of this Document (PDF)

• 1:99mc00197 (Docket) (May 27, 1999)

• 1999 WL 33988058 (Trial Motion, Memorandum and Affidavit) Memorandum of Points and Authorities in Opposition to Certain Defendants'

Not Reported in F.Supp.2d                                                    Page 12

Not Reported in F.Supp.2d, 2001 WL 849928 (D.D.C.), 2001-1 Trade Cases P 73,280
**(Cite as: Not Reported in F.Supp.2d)**

Motions to Dismiss or for Judgment on the Pleadings (1999) Original Image of this Document (PDF)
• 1998 WL 34368140 (Trial Pleading) Class Action Antitrust Complaint (Sep. 30, 1998) Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT V



Not Reported in F.Supp.                                                                                    Page 1

Not Reported in F.Supp., 1992 WL 245540 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

**C**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
Mark H. WALL, on his own behalf and on behalf of
all other persons similarly situated, Plaintiffs,
v.
MERRILL LYNCH, PIERCE, FENNER &
SMITH, Defendant.
**No. 92 C 1642.**

Sept. 21, 1992.

*MEMORANDUM OPINION AND ORDER*
HART, District Judge.
**\*1** In this putative class action, named plaintiff
Mark Wall claims that defendant Merrill Lynch,
Pierce, Fenner & Smith Incorporated committed
fraud in providing advice regarding partnership
investments. Presently pending is plaintiff's motion
for class certification.

For purposes of considering the motion for class
certification, the substantive allegations of the
complaint are assumed to be true and it is also
assumed that cognizable claims are stated. *Eisen v.
Carlisle & Jacquelin,* 417 U.S. 156, 178 (1974);
*Harman v. Lyphomed, Inc.,* 122 F.R.D. 522, 524
(N.D.Ill.1988); *Thillens, Inc. v. Community
Currency Exchange Association of Illinois, Inc.,* 97
F.R.D. 668, 676 (N.D.Ill.1983). According to the
complaint, plaintiff used Merrill Lynch's services to
purchase 10 units of Capital Realty Investors-IV for
$10,000 and 25 units of ML Delphi Premier
Partners IV for $25,000. In this transaction,
Merrill Lynch was acting as both plaintiff's
investment advisor and the broker for the syndicator
of the limited partnerships. Plaintiff relied on the
advice of Merrill Lynch in deciding to purchase
these partnership interests. Merrill Lynch also
provided advice regarding maintaining these
investments.

The focus of plaintiff's allegations of fraud are the
monthly account statements provided by Merrill
Lynch. The allegations concern the format of the
statements through November 1991. Regarding
each security or investment owned by the individual
investor, the account statement reflected quantity,
estimated current price per unit, and estimated
current market value for all units held. Plaintiff
complains that Merrill Lynch's practice was to list
as the estimated current market value for limited
partnership investments, the price originally paid
for the investment. That, however, was not an
accurate estimate of the current market value of the
partnership investments and Merrill Lynch knew
this. Nevertheless, with Merrill Lynch's
knowledge, these values were used by clients in
determining net worth; making other investments;
determining when to sell the interests; in
determining if any fraudulent activity was
occurring; and in determining whether to obtain
loans, make expenditures, or to employ other
financial planning vehicles.

Subsequent to November 1991, Merrill Lynch
changed its format. The allegations regarding the
new format are unclear. Apparently, if the issuer of
the partnership did not provide information as to
current market price, no current market price or
value would be reflected. Otherwise, Merrill
Lynch apparently would provide the figure supplied
by the issuer. In the case of plaintiff's investment
in Delphi, the listed value dropped from $25,000 in
the November 1991 statement to $20,950 in the
December 1991 statement. The current price for
the Capital investment was listed as unavailable.

The complaint is based on both federal jurisdiction
and diversity jurisdiction (or, alternatively,
supplemental jurisdiction).FN1 The only federal
claim is Count I, which claims a violation of the
Racketeer Influenced and Corrupt Organizations
Act ("RICO"), 18 U.S.C. § 1961 *et seq.* The
alleged predicate acts are mail fraud. Counts II
through IV are state common law claims of breach

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 2

Not Reported in F.Supp., 1992 WL 245540 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

of fiduciary duty, fraud, and negligent misrepresentation. The remaining five counts are for various state statutory violations: New York Deceptive Acts and Practices Statute; Illinois Consumer Fraud and Deceptive Business Practices Act; Texas Deceptive Trade Practices Act; Connecticut Unfair Trade Practices Act; and California Consumer Legal Remedies Act. Defendant contends most, if not all, potential class members have customer agreements making New York law applicable to their common law claims. Plaintiff concedes this is most likely true.

**\*2** Pursuant to Fed.R.Civ.P. 23(b)(3), plaintiff seeks to certify the following class: [FN2]
All individuals, partnerships, corporations, and other entities who are residents of the United States and who invested in limited partnerships through Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), or any of its affiliates, during the period January 1, 1983 to the date of the filing of the class action complaint [March 5, 1992], excluding Merrill Lynch, entities owned or controlled by Merrill Lynch, and Merrill Lynch's employees or agents and their immediate family.

For a class to be certified, the four requirements of Rule 23(a) must be satisfied:
One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a).

In the present case the requirements of Rule 23(b)(3) also must be satisfied:
(b) An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
* * *
(3) the court finds that the questions of law or fact common to the members of the class predominate

over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b).

Defendant contends that a class should not be certified because common issues of law do not predominate; a class action would not be a superior method for efficient adjudication because it would not be manageable; typicality of the named plaintiff is not satisfied; and named plaintiff and his counsel are not adequate representatives.

The parties agree that numerosity is satisfied. Defendant has tens of thousands (or perhaps more than 100,000) customers who invest in limited partnerships. Joinder of all members of the class in a single action would be impracticable. Rule 23(a)(2)'s numerosity requirement is satisfied. *See Harman,* 122 F.R.D. at 524.

Defendant also does not dispute that there are questions of law or fact common to the class, only whether such questions predominate. The format of Merrill Lynch's account statements are common to the class. Whether use of the purchase price as the estimated current value was an intentionally or negligently false statement is also common to the class. Whether the estimated market values could *reasonably* be relied upon is, to at least some extent, a common question. Whether the enterprise and pattern requirements of RICO are satisfied is another common question. The fiduciary duties owed by Merrill Lynch to its customers will also be a common question. Rule 23(a)(2)'s requirement of common questions of fact or law is satisfied.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                            Page 3

Not Reported in F.Supp., 1992 WL 245540 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

**\*3** Defendant contends that Rule 23(b)(3) will not be satisfied because individual questions of fact will predominate over common questions of fact or law. In particular, defendant argues that individual questions of reliance, causation, and damages will predominate. Plaintiff does not claim "fraud on the market" where there is a general effect on the market price of a security and where individual reliance on fraudulent statements need not be shown. *See Harman,* 122 F.R.D. at 525. Here, any falsity in the current market value column of an account statement form will have a different effect on each class member depending on the circumstances of that class member. Presumably, some Merrill Lynch clients will have recognized that only the purchase price was being used and will not have relied at all on the market value figures. Others will have information as to the true market value of the partnership interests independent of what is reported on the account statement. The particular advice received from each customer's particular Merrill Lynch representative (or other investment advisor) will also vary so that the market value listed on the account statement may or may not have been relied upon in making investment decisions. Others will make investment decisions without even considering the account statements. Presumably, there will also be others who actually relied on the figures. As plaintiff concedes, the actual damages resulting from any fraud contained in the account statements will be different for each individual customer.

Generally, the fact that damages are specific to each individual class member is not a basis for denying class certification. *See Harman,* 122 F.R.D. at 527 . If common questions as to liability predominate, then the issue of liability can be determined on a classwide basis and, if necessary, damages can then be determined on an individual basis. *Heastie v. Community Bank of Greater Peoria,* 125 F.R.D. 669, 675 (N.D.Ill.1989)

A "class action will not be defeated solely because of some factual variations among class members' grievances." *Heastie,* 125 F.R.D. at 675 (quoting *Patterson v. General Motors Corp.,* 631 F.2d 476, 481 (7th Cir.1980), *cert. denied,* 451 U.S. 914 (1981)). Still, if individual questions predominate

over common questions, certification will not be appropriate. In *Heastie,* a RICO case cited by plaintiff, the individual questions of reliance and damages were simple and therefore would not have predominated over common questions. *See Heastie,* 125 F.R.D. at 675. In *Riordan v. Smith Barney,* 113 F.R.D. 60 (N.D.Ill.1986), the alleged securities fraud involved the sale of a single partnership and the misrepresentations were specific facts regarding that partnership and the same for each member of the class. In *Gorsey v. I.M. Simon & Co.,* 121 F.R.D. 135, 138-39 (D.Mass.1988), the claims centered on the sale of particular revenue notes and class members would have received either a written disclosure with alleged misrepresentations or oral statements with similar misrepresentations. *In re Boardwalk Marketplace Securities Litigation,* 122 F.R.D. 4, 6 (D.Conn.1988), involved investments in nine related partnerships and written prospectuses that were uniformly misleading. Moreover, it was held that this was a case where reliance could be presumed. *See id.* at 7. *Boardwalk* also notes that class certification is more likely to be appropriate when there are common written misrepresentations in contrast to individualized, oral sales pitches. *Id.* at 6.

**\*4** Here the form of the account statement is the same for all putative class members. The effect of the fraud, however, depends on how the account statement is used along with individualized investment advice from a Merrill Lynch representative or another investment advisor. Also, the claims of the putative class members involve valuations of hundreds or thousands of different partnerships. As to each different partnership, the limited partners may have received information about that partnership in addition to information contained in the account statement. In this case, common questions cannot predominate because it is not possible to determine in the abstract whether the representations in the account statements are fraudulent RICO predicate acts since injury to business or property is an essential element of a civil RICO claim and, under the circumstances of this case, such determinations must be made on an individual basis. Whether any misstatements were material, were relied upon, or had any damaging effect, and whether individual account

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                      Page 4

Not Reported in F.Supp., 1992 WL 245540 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

representatives corrected the misinformation or used the information in a fraudulent manner, would all have to be determined on an individual basis. Given the individual factors involved in the RICO claims, common questions cannot be found to predominate. *See Sunbird Air Services, Inc. v. Beech Aircraft Corp.,* 1992 WL 193661 at *4-5 (D.Kan. July 15, 1992); *Truckway, Inc. v. General Electric,* 1992 WL 70575 at *5-6 (E.D.Pa. March 30, 1992); *Parnes v. Mast Property Investors, Inc.,* 776 F.Supp. 792, 799-800 (S.D.N.Y.1991); *Matjastic v. Quantum Pharmics, Ltd.,* 1991 WL 238304 at *4-6 (E.D.Pa. July 22, 1991); *Rosenstein v. CPC International, Inc.,* 1991 WL 1783 at *3 (E.D.Pa. Jan. 8, 1991); *Strain v. Nutri/System, Inc.,* 1990 WL 209325 (E.D.Pa. Dec. 12, 1990); *Eszlinger v. The Bradford Exchange, Ltd.,* 1991 WL 62301 at *3 (N.D.Ill. April 18, 1991); *Curley v. Cumberland Farms Dairy, Inc.,* 728 F.Supp. 1123, 1131-32 (D.N.J.1989); *Maguire v. Sandy Mac, Inc.,* 138 F.R.D. 444, 450-51 (D.N.J.1991).

Similar individualized issues of reliance and causation would also predominate over common questions on the common law counts. *Cf. Matjastic,* 1991 WL 238304 at *6. It is also possible that individualized questions would predominate on the state law statutory counts. In any event, this court would not certify a class on the state law statutory counts. It would be unmanageable to consider potentially 50 different state statutes (or perhaps more if some states have more than one applicable statute).

Since common questions would not predominate, this action is inappropriate for certification of a Rule 23(b)(3) class. It is, therefore, unnecessary to consider the other grounds defendant raises for denying class certification.

IT IS THEREFORE ORDERED that plaintiff's motion for class certification is denied. Ruling date of September 24, 1992 is stricken.

FN1. Wall is a resident of Colorado. Defendant apparently is a Delaware corporation with its principal place of business in New York. (The complaint

alleges and the answer admits that defendant is a citizen of Delaware and New York without specifying which, if either, of those states is the place of incorporation and the principal place of business. At the present time, the allegations need not be made more specific since the court otherwise has federal jurisdiction over Count I and supplemental jurisdiction, *see* 28 U.S.C. § 1367(a), over the other claims.)

FN2. In his opening brief, plaintiff suggests a class definition limited to investments in real estate partnerships. The complaint, however, refers to all types of limited partnerships. Plaintiff's reply indicates he is seeking the broader definition, not one limited to real estate partnerships.

N.D.Ill.,1992.
Wall v. Merrill Lynch, Pierce, Fenner & Smith
Not Reported in F.Supp., 1992 WL 245540 (N.D.Ill.)

Briefs and Other Related Documents (Back to top)

• 1:92cv01642 (Docket) (Mar. 05, 1992)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT W



Not Reported in N.W.2d, 1997 WL 824019 (Mich.Cir.Ct.), 1997-2 Trade Cases P 72,014
**(Cite as: Not Reported in N.W.2d)**

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Circuit Court of Michigan.
Shirley WOOD
v.
ABBOTT LABORATORIES, et al.
**No. 96-512561-CZ.**

Sept. 11, 1997.

Elwood Simon, Birmingham, Mich., for plaintiff.
David Ettinger, Detroit, Mich., for defendant.

**OPINION AND ORDER**
Andrews, Circuit J.
**\*1** This matter came before the Court for an
evidentiary hearing on plaintiff's motion for class
certification pursuant to MCR 3.501(B). Having
heard the testimony of the witnesses and arguments
of counsel, and having reviewed the voluminous
submissions of the parties, the Court makes the
following findings of fact and conclusions of law.

Plaintiff filed this potential class-action suit alleging
that the defendant pharmaceutical companies
engaged in price-fixing which affected the prices
charged by retail pharmacies and thus the prices
paid by consumers such as the plaintiff.
Specifically, she contends that defendants have
conspired to charge higher prices to independent
and chain retail pharmacies (disfavored purchasers)
than to institutional pharmacies such as HMOs,
hospitals, nursing homes, and mail-order
pharmacies (favored purchasers). She seeks to
represent the class of persons who purchased
brand-name prescription drugs from retail
pharmacies in Michigan, which drugs were
manufactured and distributed by the defendants
herein since January 26, 1992.

One of the factors determinative of the issue of

class certification is whether there are questions of
law or fact common to the members of the class that
predominate over questions affecting only
individual members. MCR 3.501(A)(1)(b).
Included in this factor is the consideration of
whether the class members sustained common
injury or damage and the amount of the damages
sustained. *Keating v. Phillip Morris Inc* [1987-2
Trade Cases ¶ 67,801], 417 N.W.2d 132, 137
(Minn.App.1987). The issue is whether the proof
necessary to demonstrate impact as to each class
member is particular to that class member, in which
case individual questions concerning impact would
overwhelm the common questions concerning the
existence and scope of the alleged conspiracy, or
whether the necessary proof of impact would be
common to all class members and sufficiently
generalized that class treatment of their claims
would be reasonable. *In re Industrial Diamonds
Antitrust Litigation* [1996-2 Trade Cases ¶
71,548], 167 F.R.D. 374, 382 (S.D.N.Y., 1996). If
the amount of injury cannot be proved on a
class-wide basis, the individual injuries could pose
a great burden on the court and render the case
unmanageable as a class action. *Mekani v. Miller
Brewing Co.* [1982-1 Trade Cases ¶ 64,563], 93
F.R.D. 506, 511 (E.D.Mich.1982).

Plaintiff's expert, Michael Sattinger, has done some
studies on antitrust matters, but has little real
experience in the field. It is his opinion that the
class sought to be represented by plaintiff suffered
an injury by paying higher prices for brand name
drugs than what they would have paid in the
absence of the alleged conspiracy and that there are
damages methodologies that would provide a
reasonable estimate of damages to the class
members. Sattinger stated that a common impact
or injury consists of two elements: the existence of
an overcharge by the manufacturers to the
disfavored purchasers and the passing on of that
overcharge by the disfavored purchasers to the class
members. He determined that an overcharge does
exist based on three things; (1) that was the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d, 1997 WL 824019 (Mich.Cir.Ct.), 1997-2 Trade Cases P 72,014
**(Cite as: Not Reported in N.W.2d)**

conclusion reached in a September 29, 1995 report issued by the plaintiffs' experts in a federal antitrust case brought by retail pharmacies against the drug manufacturers, (2) application of the discount method, which involves comparing the prices paid by favored purchasers to the prices paid by the disfavored purchasers; if the disfavored purchasers paid more for the same drug, it must be due to the alleged conspiracy, but for which they would have paid less, and (3) it would be pointless for the defendant manufacturers to engage in a conspiracy if they did not derive a profit from doing so. He determined that the existence of a pass-on could be found based on three things: (1) the "regression analysis" used in the September 29, 1995 report, a statistical technique for isolating the influence of cost on the retail price, (2) the tax incidence theory, which postulates that the overcharge is akin to a tax, and, absent exceptional circumstances, a retailer will usually pass on a portion of that to the consumer, and (3) standard economic analysis indicates that it is optimal for a pharmacy to pass on some portion of its cost increases to the consumer. Sattinger admitted that he has no evidence that any given pharmacy operates optimally.

**\*2** Sattinger testified that damages methodologies consist of two parts: determining the amount of the overcharges to the disfavored purchases and determining the amount of the pass-on by the disfavored purchasers to their customers. The amount of the overcharge can be determined in one of two ways: (1) the method posited by the experts in the September 29, 1995 report, and (2) the discount method, which would involve comparing prices paid for the same drugs by favored and disfavored purchasers based on actual Michigan data. [FN1] The amount of the pass-on can likewise be determined in one of two ways: (1) application of the regression analysis to empirical data, and (2) application of an economic analysis Sattinger developed, which indicates that 50% of cost increases are passed on if one assumes the existence of a downward sloping demand curve and constant incremental costs. Sattinger admitted that the regression analysis will not give the actual pass-on, but will give a range of rates in which the actual pass-on rate will fall. He did not know if the pass-on rate differs between different brands of

drugs and stated that if it did, a separate analysis would have to be conducted for each kind of drug. He also admitted that many pharmacies operate at volumes where they do not have constant incremental costs.

> FN1. In the exhibits (Plaintiff Ex. 14-16) Sattinger prepared to demonstrate the discount method, he assumed that the overcharge was equal to the difference in prices paid by the favored and disfavored purchasers even though the difference in prices paid can be affected by differences in buying power.

Defendants' expert, Edward Snyder, an economist with experience in the antitrust division of the Department of Justice, studied actual pricing and discounting practices of various manufacturers and the actual pricing strategies of various retailers in Michigan. He found a tremendous variation in pricing and discounting by manufacturers. [FN2] He found similar variation in the approach of retailers to the pass-on issue. [FN3] In fact, he found that even a single retailer may handle the pass-on issue differently with respect to different drugs. By analyzing the actual data, he found that the 50% pass-on rate postulated by Sattinger's theory did not comport with the facts. [FN4] Examining seven drugs over two different time periods, he found that when the manufacturers increased their list prices, 24.4% of the retailers did not increase their prices to consumers. Of the remaining 65.6% of retailers, 31.8% increased their prices by a percentage less than that of the manufacturers and 43.8% increased their prices by a percentage equal to or greater than that of the manufacturers. [FN5] Because of these variations in pricing and discounting practices, Snyder opined that (1) one cannot determine overcharges to disfavored purchasers simply by calculating the difference in the price they paid and the price paid by favored purchasers and (2) determining damages becomes an individualized issue for each member of the class.

> FN2. Regarding pricing, for example, during the week of April 26, 1996, retail

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d, 1997 WL 824019 (Mich.Cir.Ct.), 1997-2 Trade Cases P 72,014
**(Cite as: Not Reported in N.W.2d)**

prices for Zantac, which carried a manufacturer's list price of $83.90, varied from $65.40 to $148.80, with the majority of retailers charging anywhere between $71.53 and $109.72 (Defendant Ex. 3A). Snyder found the same type of variation in pricing for nine other common drugs. Snyder also found that some manufacturers do not discount prices on certain drugs to any purchasers, whether favored or disfavored. Some manufacturers provide discounts to both favored purchasers and retailers; these discounts vary in amount among different drugs and between members of the same class of purchaser. For example, retailers of Upjohn's Ansaid could qualify for discounts of three to 20 percent, while retailers of Upjohn's Lincocin could qualify for discounts of 10 to 38 percent (Defendant Ex. 7). Four favored purchasers of Ansaid qualified for discounts of zero, 5.0%, 8.04%, and 17.3% respectively (Defendant Ex. 8, 9).

FN3. Snyder found that a $1.87 manufacturer's price increase on Zoloft prompted one retailer to raise its price by $2.70, whereas another retailer did not raise its price at all (Defendant Ex. 4A, 4B).

FN4. Examining retailers' responses to a manufacturer price increase, he found that the pass-on rate ranged anywhere from zero percent to 100% or more, not just 50% or more as postulated by Sattinger (Defendant Ex. 13).

FN5. In other words, if a manufacturer increased its list price by five percent, 31.8% of retailers increased their price by less than five percent and 43.8% of retailers increased their price by five percent or more.

Aside from the fact that Sattinger's theories are not consistent with the facts regarding pricing, discounting, and passing on, those theories at best provide a method for calculating the existence of

injury and damage on a class-wide basis. In Michigan, however, the law permits an indirect purchaser to recover only actual damages. MCL 445.778(2); MSA 28.70(8)(2). Sattinger's theories do not provide a method for calculating each class member's actual damages and thus calculation of injury and actual damages would require examination of the drugs each class member purchased from which retailer, the discounts applicable to each retailer for each drug at the time of purchase, and other relevant factors, resulting in thousands of mini-trials and rendering the class unmanageable. For this reason, other jurisdictions to consider this issue have denied certification to the class of indirect purchasers of brand name prescription drugs. See *e.g., Kerr v. Abbott Laboratories* [1997-1 Trade Cases ¶ 71,776], Docket No. 96-002837 (Hennepin Co, Minn, 2/14/97); *In re Brand Name Prescription Drug Antitrust Litigation,* 1994 U.S. Dist Lexis 16658 (NDIll, 11/15/94). The only cases in which class certification was approved were *Goda v. Abbott Laboratories* [1997-1 Trade Cases ¶ 71,730], Docket No. 01445-96 (DC, 2/3/97), and *Preciado v. Abbott Laboratories,* Docket No. 962294 (San Francisco Co, Cal, 8/16/95). The *Goda* decision, however, was predicated upon a unique District of Columbia statute which permits the fact of injury and the amount of damages to be proven on a class-wide basis without requiring proof of such matters by each individual member of the class. DC Code § 28-4508(c). The Michigan statute contains no such provision and thus the Court declines to follow *Goda.* The *Preciado* decision, as noted by the *Goda* court, is of little persuasive authority " because it rests entirely on ultimate conclusions of commonality and predominance without a reasoned basis of support." Accordingly, the Court declines to follow *Preciado.*

**\*3** Based on the record and the applicable case law, the Court finds that individual questions of fact as to both injury and damages predominate over the one theory common to the class, that being the existence of the alleged conspiracy, and that these individual questions render the case unmanageable as a class action.

Now, therefore,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                                    Page 4

Not Reported in N.W.2d, 1997 WL 824019 (Mich.Cir.Ct.), 1997-2 Trade Cases P 72,014
**(Cite as: Not Reported in N.W.2d)**


IT IS ORDERED that plaintiff's motion for class certification be, and the same hereby is, denied.

Mich.Cir.Ct.,1997.
Wood v. Abbott Laboratories
Not Reported in N.W.2d, 1997 WL 824019 (Mich.Cir.Ct.), 1997-2 Trade Cases P 72,014

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT X



Not Reported in F.Supp.2d, 2000 WL 1644539 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
Judy ZAPKA, on behalf of itself and all others
similarly situated, Plaintiffs,
v.
THE COCA-COLA COMPANY, a Delaware
Corporation, Defendant.
**No. 99 CV 8238.**

Oct. 27, 2000.

*MEMORANDUM OPINION AND ORDER*
DARRAH, J.
**\*1** Plaintiff, Ms. Judy Zapka, filed a class action
against defendant, The Coca-Cola Corporation, in
Cook County, Illinois, removed to federal court,
alleging that it violated the Illinois Consumer Fraud
and Deceptive Business Practices Act and the
consumer fraud acts of all other jurisdictions by
misrepresenting that soda fountain Diet Coke and
bottled Diet Coke are a single, unified product
although bottled Diet Coke is sweetened with only
aspartame and fountain Diet Coke is sweetened with
both aspartame and saccharin. Currently before the
Court is plaintiff's motion for class certification.

### I. BACKGROUND

Plaintiff's complaint alleges the following facts.
Prior to November of 1984, Diet Coke products
were sweetened by saccharin or a mixture of
saccharin and aspartame. In November 1984,
defendant announced in a press release that it would
"replace the saccharin in Diet Coke with the
sweetener aspartame" and that "for now" the
fountain version of Diet Coke would not be changed
to aspartame only. From November 1984 until
sometime in 1992 or 1993, defendant marketed Diet
Coke as a diet beverage sweetened with the
NutraSweet brand sweetener and displayed the
NutraSweet trademark, a "pinwheel", on bottled
Diet Coke and Diet Coke advertisements. During
this time, some of defendant's advertisements
contained print indicating that Diet Coke with 100%
NutraSweet was not available at soda fountains, and
some of the advertisements flashed a brief subtitle
indicating the same. In the late 1980's or early
1990's, defendant ceased using NutraSweet, instead,
using a generic aspartame. Defendant then stopped
advertising Diet Coke as having NutraSweet in its
contents and stopped using the NutraSweet
trademark. Cans and bottles of Diet Coke indicated
it was sweetened with aspartame. From sometime in
1992 or 1993 to the present, defendant advertised
Diet Coke as a single, unified product and has not
advertised that bottled or canned Diet Coke is
different than fountain Diet Coke, in that fountain
Diet Coke contains saccharin.

Plaintiff alleges that defendant misled consumers
into believing fountain Diet Coke and bottled and
canned Diet Coke were the same product and that
fountain Diet Coke did not contain saccharin. Based
on her belief that all forms of Diet Coke no longer
contained saccharin, plaintiff continued to drink
fountain Diet Coke although she believed she had
eliminated saccharin from her diet because she
feared health risks associated with its intake.

Plaintiff seeks injunctive relief: ordering defendant
to cease advertising, marketing, or otherwise
representing that Diet Coke from a fountain and
bottled or canned Diet Coke are the same products;
requiring defendant market the products under
different names and logos; enjoining defendant
from advertising that Diet Coke is sweetened with
only aspartame; requiring all advertisements to
disclose that fountain Diet Coke contains saccharin;
and ordering corrective advertising. She also seeks
disgorgement of all of defendant's profits and actual
damages to herself for the fountain Diet Coke she
would not have purchased had she known it
contained saccharin.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 1644539 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

## II. PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

**\*2** Plaintiff seeks national class certification under Rule 23(b)(2) or Rule 23(b)(1) or, in the alternative, multi-state or Illinois class certification. Defendant argues class certification should be denied because; the proposed class is not adequately defined; plaintiff seeks primarily monetary rather than injunctive relief; common issues of law and fact do not predominate over individual issues; plaintiff fails to meet the criteria of Rule 23(b)(1); and a class action is not superior to other available administrative proceedings.

In her Amended Complaint, plaintiff initially states that the class action is "brought on behalf of all individuals who consumed diet Coke from the fountain, deceived by the marketing practices employed by Coca-Cola Company into believing that fountain diet Coke does not contain saccharin." In the same complaint, under the heading "THE CLASS", plaintiff states that she "brings this action on behalf of herself and all others similarly situated as representative of the proposed class of all individuals who consumed fountain diet Coke after November of 1984." In her motion for class certification, plaintiff proposes a new class, defined as "All residents of the fifty states and the District of Columbia, other than employees, officers and directors of the Coca-Cola Company, who purchased or consumed fountain diet Coke after November 30, 1984."

## III. ANALYSIS

Allegations made in support of class certification are considered true (*Hardin v. Harshbarger,* 814 F.Supp. 703, 706 (N.D.Ill.1993)); and, as a general matter, this Court does not examine the merits of the case (*Retired Chicago Police Ass'n v. City of Chicago,* 7 F.3d 584, 598 (7th Cir.1993)). However, a court "may look beyond the pleadings to determine whether the requirements of Rule 23 have been satisfied." *Dhamer v. Bristol-Myers Squibb Co.,* 183 F.R.D. 520, 529-30 (N.D. Ill 1998), citing *Castano v. American Tobacco Co.,* 84 F.3d 734, 744 (5th Cir.1996). "A court must understand

the claims, defenses, relevant facts and applicable substantive law in order to make a meaningful determination of certification issues." *Dhamer,* 183 F.R.D. at 530.

To receive class certification, plaintiff must satisfy all four elements of the Federal Rules of Procedure Rule 23(a), which include: numerosity, commonality, typicality, and adequacy of representation. Fed.R.Civ.P. 23(a). Plaintiff must also satisfy at least one of the three provisions under Rule 23(b). The parties do not dispute that the enumerated requirements of Rule 23(a) are met; therefore, this Court will not address these points. The Court also need not address whether plaintiff meets the requirements of Rule 23(b) based on the below findings.

### A. Definiteness of Class

Rule 23(a) does not expressly require that a class be "definite" in order to be certified; however, a requirement that there be an identifiable class has been implied by the courts. *Alliance to End Repression v. Rochord,* 565 F.2d 975, 977 (7th Cir.1977); *Elliot v. ITT Corp.,* 150 F.R.D. 569, 573-74 Ill.1992). There are two primary purposes of properly identifying the proposed class. First, a properly identified class alerts the parties and the court to the burdens that such a process might entail; and second, proper identification of the class insures that those individuals actually harmed by a defendant's wrongful conduct will be recipients of the relief eventually provided. *Simer v. Rios,* 661 F.2d 655, 670 (7th Cir.1981).

**\*3** An identifiable class exists if its members can be ascertained by reference to objective criteria. The class can be defined by reference to the defendant's conduct. *Roberson v. Citibank Fed. Sav. Bank,* 162 F.R.D. 322, 328 (N.D.Ill.1995). An identifiable class does not exist if membership in the class is contingent on the state of mind of the prospective members. *Elliot,* 150 F.R.D. at 574; *Simer,* 661 F.2d at 669. A class may be certified although the initial definition includes members who have not been injured or do not wish to pursue claims against the defendant (*Elliott,* 150 F.R.D. at 575); however,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 1644539 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

the exact membership of the class must be ascertainable at some point of the case (*Clay v. American Tobacco Co.,* 188 F.R.D. 483, 490 (S.D.Ill.1999)).

Plaintiff first defines the proposed class in paragraph 1 of her amended complaint as "all individuals who consumed diet Coke from the fountain, deceived by the marketing practices employed by Coca-Cola Company into believing that fountain diet Coke does not contain saccharin." If the class is defined to include only those consumers who were allegedly deceived by defendant's marketing practices into believing that fountain Diet Coke does not contain saccharin, the membership of each class is contingent on each class member's state of mind. Plaintiff admits that she purchased fountain Diet Coke "based on her belief that it was sweetened with aspartame and not saccharin." Plaintiff has not identified any particular advertisements that allegedly deceived her into such a belief; therefore, defendant would need to examine each class member as to which, if any, allegedly deceptive advertisements they saw. Plaintiff's initial proposed class fails to adequately identify a class because membership in the class is contingent on the state of mind of the prospective members. *Elliot,* 150 F.R.D. at 574; *Simer,* 661 F.2d at 669.

Plaintiff then defines the class in paragraph 10 of her amended complaint as "herself and all others similarly situated as representative of the proposed class of all individuals who consumed fountain Diet Coke after November of 1984." Defining the class to include "others similarly situated" would again make membership of each class member contingent on each class member's state of mind because plaintiff alleges she was deceived by defendant's allegedly deceptive advertisements and marketing practices and relied on those representations. As stated above, such a class is inadequately identified because membership in the class is contingent on the state of mind of the prospective members. *Elliot,* 150 F.R.D. at 574; *Simer,* 661 F.2d at 669.

In response to this analysis raised by defendant, the plaintiff abandons this class definition as set out in plaintiff's amended complaint. In her reply, [FN1]

plaintiff asserts that the class is defined as: "all who purchased or consumed fountain diet Coke after November 30, 1984." The same definition also appears in plaintiff's motion for class certification. This definition includes all present and future individuals who purchased or consumed fountain Diet Coke. As defined, a new set of plaintiffs would be added to the class each day, including individuals that either purchase or consume fountain Diet Coke and irrespective if they saw the allegedly deceptive advertising. The actual number of the potential class is enormous and constantly growing. At no time during the litigation would the exact membership of the class be ascertainable, resulting in an insufficiently defined class. See *Clay,* 188 F.R.D. at 490. In addition, the proposed class includes individuals that consumed or purchased fountain Diet Coke but were not deceived by any advertisements or marketing and, therefore, improperly includes individuals who were not harmed. See *Simer,* 661 F.2d at 670.

> FN1. See Plaintiff's Reply In Support Of Her Motion For Class Certification, P. 2, n. 2.

**\*4** Acknowledging that her class may not be adequately defined, plaintiff invites this Court to exercise its discretion and redefine an adequate class. However, even if this Court were to utilize its broad discretionary powers and attempt to redefine the membership of the class, such efforts would be futile because, in addition to the above analysis, plaintiff's claim is unmanageable as a class action due to variations in state law and the significant number of individualized elements of proof as discussed below.

*B. Manageability of the Case*

While all sections of 23(b) do not expressly contain a predominance and superiority requirement, the court is still obligated to determine whether the existence of individual issues preclude certification. *Clay,* 188 F.R.D. at 495. The court does not consider the merits of the claims at the class certification stage; however, it must take into

Not Reported in F.Supp.2d                                                          Page 4

Not Reported in F.Supp.2d, 2000 WL 1644539 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

account the substantive elements of plaintiff's claims so as to envision the form the trial on the issues would take. *Elliott,* 150 F.R.D. at 579; *Clay,* 188 F.R .D. at 495.

Plaintiff alleges defendant's conduct is actionable under the Illinois Consumer Fraud Act and the consumer fraud acts of all other jurisdictions. Plaintiff seeks nationwide class certification with seven subclasses to account for different jurisdictions consumer fraud act proofs. In the alternative, she seeks multi-state or Illinois certification.

Under the Illinois Consumer Fraud Act, plaintiff must prove: (1) a deceptive act or practice by defendant; (2) an intent on defendant's part that plaintiff rely on the deception; and (3) the deception occurred in the course of conduct involving trade or commerce. 815 ILCS § 505/2; *Connick v. Suzuki Motor Co.,* 174 Ill.2d 482, 501 (1996). Plaintiff need not prove reliance; however, she must show that the consumer fraud proximately caused her injury. *Connick,* 174 Ill.2d at 501. Proofs similar to Illinois' consumer fraud act exist in other state consumer fraud acts, *i.e.,* Delaware (Del.Code tit. 6, § 2513(a)) and Iowa (Iowa Code § 714.16.2(a)). Other state consumer fraud acts require that the defendant knew or should have known the statements were false or misleading, *i.e.,* Colorado ( Colo.Rev.Stat. § 6-1-105(1)); while other state statutes require actual knowledge that the statements were false or misleading, *i.e.,* Arkansas ( Ark.Code Ann. § 4-88-107(a)(1)). Plaintiff's 10 pages of discussion and analysis in her motion for class certification, including 50 footnotes identifying and explaining the different consumer protection statutes that would be involved in nationwide class, demonstrate the myriad of complicated and sometimes conflicting proofs that would be required with such a class. The differences in the required proofs of the states statutes demonstrate that a nationwide certification would not be manageable because of the multiple and different variables that would have to be proved as to each class member.

**\*5** In conclusion, under either definition of the class set out by the plaintiff, multi-state or Illinois

classification would also not be manageable because of the reasons discussed above. Therefore, plaintiff's motion for class certification is denied.

N.D.Ill.,2000.
Zapka v. Coca-Cola Co.
Not Reported in F.Supp.2d, 2000 WL 1644539 (N.D.Ill.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.