IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE TRICOR INDIRECT PURCHASER ANTITRUST LITIGATION | ) ) ) ) | C.A. No. 05-360 (KAJ) (consolidated) |
| THIS DOCUMENT RELATES TO: | ) ) | |
| PAINTERS' DISTRICT COUNCIL NO. 30 HEALTH AND WELFARE FUND, et al. | ) ) ) | C.A. No. 05-360 |
| VISTA HEALTH PLAN, INC., et al. | ) ) | C.A. No. 05-365 |
| PENNSYLVANIA EMPLOYEES BENEFIT TRUST FUND | ) ) ) | C.A. No. 05-390 |
| ALLIED SERVICES DIVISION WELFARE FUND, et al. | ) ) ) | C.A. No. 05-394 |
| DIANA KIM | ) ) | C.A. No. 05-426 |
| ELAINE M. PULLMAN, et al. | ) ) | C.A. No. 05-450 |
| PHILADELPHIA FEDERATION OF TEACHERS HEALTH AND WELFARE FUND | ) ) | C.A. No. 05-467 |
| CINDY CRONIN | ) ) | C.A. No. 05 482 |
| CHARLES SHAIN, et al. | ) ) | C.A. No. 05-475 |
| LOCAL 28 SHEET METAL WORKERS | ) ) | C.A. No. 05-516 |
| ALBERTO LITTER | ) ) | C.A. No. 05-695 |

**COMPENDIUM OF UNREPORTED CASES CITED IN
REPLY MEMORANDUM IN SUPPORT OF END PAYOR PLAINTIFFS' MOTION
FOR CLASS CERTIFICATION AND ATTACHMENTS THERETO**

**CASE**                                                                                          **TAB**

*Bradburn Parent/Teacher Stores, Inc. v. 3M*, No. 02-7676, 2004 WL 1842987
(E.D. Pa. Aug. 18, 2004)................................................................................A

*Capp v. Microsoft Corp.*, No. 00-CV-0637
(Wis. Cir. Ct. Dane Co. Sept. 12, 2001) ..........................................................B

*In re Diet Drugs Products Liability Litig.*, No. 98-20626, 1999 WL 673066
(E.D. Pa. Aug. 26, 1999)................................................................................C

*Friedman v. Microsoft Corp.*, No. 2000-000722, slip op.
(Az. Super. Ct. Maricopa Cty. Nov. 14, 2000) .................................................D

*In re Florida Microsoft Antitrust Litig.*, No. 99-27340 CA 11, 2002 WL 31423620
(Fla. Cir. Ct. Miami-Dade Co. Aug. 26, 2002)..................................................E

*Gordon v. Microsoft Corp.*, 2001-1 Trade Cas. (CCH) ¶ 73,254, 2001 WL 366432
(Minn. Dist. Ct. Mar. 30, 2001). .....................................................................F

*Gordon v. Microsoft Corp.*, No. MC 00-5994, 2003 WL 23105552
(Minn. Dist. Ct. Mar. 14, 2003). .....................................................................G

*Melnick v. Microsoft Corp.*, Nos. CV-99-709, CV-99075, 2001 WL 1012261
(Me. Super. Ct. Aug. 24, 2001).......................................................................H

*In re New Motor Vehicles Canadian Export Antitrust Litig.*, MDL No. 1532,
2006 WL 623591 (D. Me. Mar. 10, 2006) ........................................................ I

*Nichols v. SmithKline Beecham Corp.,* No. 00-6222, 2003 WL 302352
(E.D. Pa. Jan. 29, 2003) .................................................................................J

*Sanofi-Syntholabo v. Apotex Inc.*, No. 02-2255, 2006 WL 2516486
(S.D.N.Y. Aug. 31, 2006) ...............................................................................K

*Sherwood v. Microsoft Corp.*, No. 99C-3562
(Tenn. Cir. Ct. Davidson Co. Dec. 20, 2002). ..................................................L

*Stutzle v. Rhonepoulenc S.A.,* No. 002768, 2003 WL 22250424
(Pa. Comm. Pl. Sept. 26, 2003) ......................................................................M

*In re Vitamins Antitrust Litig*, MDL 1285, 2001 WL 849928
(D.D.C. April 11, 2001)...................................................................................N

COMPENDIUM OF UNREPORTED CASES
CITED IN REPLY MEMORANDUM IN SUPPORT OF
END PAYOR PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

# TAB A

Westlaw.

Not Reported in F.Supp.2d                                                                                          Page 1
Not Reported in F.Supp.2d, 2004 WL 1842987 (E.D.Pa.), 2004-2 Trade Cases P 74,523
**(Cite as: 2004 WL 1842987 (E.D.Pa.))**

**H**

**Motions, Pleadings and Filings**

United States District Court,
E.D. Pennsylvania.
BRADBURN PARENT/TEACHER STORE, INC.
v.
3M (MINNESOTA MINING AND
MANUFACTURING COMPANY)
**No. Civ.A.02-7676.**

Aug. 18, 2004.

Charles M. Jones, Jones Osteen Jones & Arnold,
Hinesville, GA, Gregory Baruch, J. Daniel Leftwich,
Robert Stephen Berry, Berry & Leftwich,
Washington, DC, for Plaintiff.

Brent N. Rushforth, Kit A. Pierson, Martina M.
Stewart, Heller Ehrman White & McAuliffe, LLP,
Washington, DC, David W. Engstrom, Eleanor
Illoway, John G. Harkins, Jr., Harkins Cunningham
LLP, Philadelphia, PA, Paul Alexander, Heller,
Ehrman, White & McAuliffe, Menlo Park, CA, for
Defendant.

Elizabeth S. Campbell, Murray S. Levin, Pepper
Hamilton LLP, Philadelphia, PA, for Movant.

*MEMORANDUM*

PADOVA, J.

*1 Following the Court's denial of Plaintiff's original
Motion for Class Certification, Plaintiff has filed a
Renewed Motion for Class Certification seeking
certification of a modified class. Plaintiff asserts that
certification of this modified class will not trigger the
same infirmities which caused the Court to deny
Plaintiff's original Motion for Class Certification.
Defendant opposes certification of the proposed
modified class. For the reasons that follow, the Court
will grant Plaintiff's Renewed Motion for Class
Certification, and will certify Plaintiff's proposed
modified class, subject to the conditions which are set
forth in the accompanying order.

I. BACKGROUND

The conduct of Defendant which forms the basis of

this lawsuit was the subject of a prior lawsuit in this
Court, *LePage's, Inc. v. 3M*, Civ. A. No. 97-3983. In
that suit, a competing supplier of transparent tape,
LePage's, Inc. ("LePage's"), sued Defendant alleging,
*inter alia,* unlawful maintenance of monopoly power
in violation of Section 2 of the Sherman Act, 15
U.S.C. § 2. After a nine-week trial, the jury found in
favor of LePage's on its unlawful maintenance of
monopoly power claim, and awarded damages of
$22,828,899.00, which were subsequently trebled to
$68,486,697.00. *See LePage's, Inc. v. 3M*, Civ. A.
No. 97-3983, 2000 U.S. Dist. Lexis 3087 (E.D.Pa.
Mar. 14, 2000). This Court subsequently denied
Defendant's Motion for Judgment as a Matter of Law
with respect to this claim. *See id.* A panel of the
United States Court of Appeals for the Third Circuit
("Third Circuit") initially reversed this Court's Order
upholding the jury's verdict and directed this Court to
enter judgment for Defendant on LePage's' unlawful
maintenance of monopoly power claim. *LePage's,
Inc. v. 3M*, 277 F.3d 365 (3d Cir.2002) (*"LePage's I"*
). Upon rehearing *en banc,* the Third Circuit vacated
the panel decision and reinstated the jury verdict
against Defendant on LePage's' unlawful
maintenance of monopoly power claim. *LePage's,
Inc. v. 3M*, 324 F.3d 141 (3d Cir.2003) ( *"LePage's
II"* ), cert. denied *3M Co. v. LePage's, Inc.*, --- U.S. --
--, 124 S.Ct. 2932, 159 L.Ed.2d 835 (2004).

The Complaint in this matter alleges one count of
monopolization in violation of Section 2 of the
Sherman Act, 15 U.S.C. § 2. The Complaint alleges
that Defendant unlawfully maintained its monopoly
in the transparent tape market through its bundled
rebate programs [FN1] and through exclusive
dealing arrangements with various retailers. The
Complaint asserts that, as a result of Defendant's
conduct, Plaintiff and other members of the proposed
Class have "suffered antitrust injury." (Compl.¶ 27).
The damages period in this case runs from October 2,
1998 until the present. (Compl.¶ 2). Plaintiff seeks
declatory relief, permanent injunctive relief, treble
compensatory damages, attorney's fees, costs and
interest. (*See* Compl. ¶ ¶ A-F).

> FN1. As described at length in the LePage's
> litigation, Defendant's bundled rebate
> programs provided purchasers with
> significant discounts on Defendant's
> products. However, the availability and size
> of the rebates were dependant upon

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                              Page 2
Not Reported in F.Supp.2d, 2004 WL 1842987 (E.D.Pa.), 2004-2 Trade Cases P 74,523
**(Cite as: 2004 WL 1842987 (E.D.Pa.))**

purchasers buying products from Defendant from multiple product lines. *See LePage's II, 324 F.3d at 154-55.*

## II. LEGAL STANDARD

Before a class may be certified pursuant to Federal Rule of Civil Procedure 23, the plaintiff "must establish that all four requisites of Rule 23(a) and at least one part of Rule 23(b) are met." *Baby Neil v. Casey,* 43 F.3d 48, 55 (3d Cir.1994). The requirements of Rule 23(a) are as follows:

*2 (1) Numerosity (a "class [so large] that joinder of all members is impracticable");

(2) commonality ("questions of law or fact common to the class");

(3) Typicality (named parties' claims or defenses are "typical of ... the class"); and

(4) adequacy of representation (representatives "will fairly and adequately protect the interests of the class").

*Amchem Prods. v. Windsor,* 521 U.S. 591, 613, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (quoting Fed.R.Civ.P. 23(a)). The purpose of these procedural requirements is "so that the court can assure, to the greatest extent possible, that the actions are prosecuted on behalf of the actual class members in a way that makes it fair to bind their interests." *Newton v. Merrill, Lynch, Pierce, Fenner & Smith,* 259 F.3d 154, 182 n. 27 (3d Cir.2001).

A plaintiff must also satisfy the requirements found in one of the three sections of Rule 23(b). Plaintiff asserts that it satisfies the requirements of Rule 23(b)(3). The prerequisites for certification under Rule 23(b)(3) are as follows:

To qualify for certification under Rule 23(b)(3), a class must meet two requirements beyond the Rule 23(a) prerequisites: Common questions must "predominate over any questions affecting only individual members"; and class resolution must be "superior to other available methods for the fair and efficient adjudication of the controversy."

*Amchem Prods.,* 521 U.S. at 615.

Class certification rests within the District Court's discretion. *Eisenberg v. Gagnon,* 766 F.2d 770, 785 (3d Cir.1985). In determining whether the class should be certified, the Court examines only the requirements of Rule 23 and does not look at whether the Plaintiffs will prevail on the merits. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177-78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1973) (" 'In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause

of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." ') (quoting *Miller v. Mackey Int'l,* 452 F.2d 424, 427 (5th Cir.1971)). However, the Court must also "carefully examine the factual and legal allegations" made in the Complaint. *Barnes v. American Tobacco Co.,* 161 F.3d 127, 140 (3d Cir.1998).

## III. PRIOR OPINION

In its first Motion for Class Certification, Plaintiff sought certification of:

a class of persons ... directly purchasing from the Defendant invisible and transparent tape between October 2, 1998 and the present.

(Compl.¶ 10.) In an Order and Memorandum dated March 1, 2004, this Court denied Plaintiff's Motion. *See Bradburn Parent/Teacher Store v. 3M,* No. 02-7676, 2004 WL 414047 (E.D.Pa. Mar.1, 2004). The Court specifically found that Plaintiff failed to satisfy the requirements of Federal Rule of Civil Procedure 23(a)(4), in that Plaintiff failed to show that it could adequately protect the interests of all of the proposed class members. Specifically, the Court found that Plaintiff's position as a sole purchaser of 3M branded transparent tape resulted in a conflict of interest between Plaintiff and those class members who purchased "private label" tape. [FN2] Those members of the proposed class who purchased significant quantities of private label tape, the Court found, would likely be interested in pursuing a "lost profits" theory of damages, and would accordingly seek to present evidence that maximized a shift in market share from 3M branded to private label tape in the absence of 3M's anti-competitive conduct. Plaintiff, by contrast, was solely pursuing an overcharge theory of damages, and therefore would attempt to demonstrate that the price of 3M branded tape would have fallen in the absence of 3M's anti-competitive conduct. The court found that these two competing positions resulted in an apparent and imminent conflict among members of the proposed class. The Court reserved decision on the question of whether Plaintiff's proposed class satisfied the requirements of Federal Rule of Civil Procedure 23(b)(3).

> FN2. Private label tape was defined by the Third Circuit in *Lepage's II* as "tape sold under the retailer's name rather than under the name of the manufacturer." *LePage's II,* 324 F.3d at 144.

## IV. DISCUSSION

*3 Plaintiff now seeks certification of the following

Not Reported in F.Supp.2d                                    Page 3
Not Reported in F.Supp.2d, 2004 WL 1842987 (E.D.Pa.), 2004-2 Trade Cases P 74,523
(Cite as: 2004 WL 1842987 (E.D.Pa.))

modified class:

> All persons who directly purchased invisible or transparent tape from 3M Company between October 2, 1998 and the present, who met not purchased, for resale under the class member's own label, any "private label" invisible or transparent tape from 3M Company or any of 3M Company's competitors at any time from October 2, 1988 to the present.

(*See* Docket # 141). Plaintiff proposes to pursue an overcharge theory of damages for the proposed class, and seeks to recover the difference between the price that class members paid for transparent tape during the damages period in this case and the price that they would have paid in a but-for world absent 3M's anti-competitive conduct. Plaintiff argues that, because all purchasers of private label tape from 1988 until the present are excluded from the modified class, the conflicts that caused the Court to deny class certification in the first instance have now been eliminated. Plaintiff further asserts that the proposed modified class satisfies all of the other requirements of Rule 23.

A. *Numerosity and Commonality*

"Generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the [numerosity] prong of Rule 23(a) has been met." *Stewart v. Abraham,* 275 F.3d 220, 226-27 (3d Cir.2001) (citation omitted). Plaintiff asserts that the proposed modified class exceeds 200 members. (Pl's Renewed Mot. Class Cert. at 11.) While Defendant contests the methodology that Plaintiff has used to arrive at this figure, Defendant never specifically contests Plaintiff's assertion that the modified class satisfies the numerosity requirement. Moreover, Defendant argues that Plaintiff's methodology for determining the number of members of the proposed class is flawed because Plaintiff utilized 3M customer lists which did not include all of 3M's customers. (Def's Opp. Mem. at 23.) Accordingly, if Defendant's argument is correct, Plaintiff has likely underestimated the number of members of the proposed class. The Court therefore finds that the class is so large that the joinder of all members is impracticable. Fed.R.Civ.P. 23(a)(1). Accordingly, the numerosity requirement is satisfied.

"The commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Baby Neil,* 43 F.3d at 56. Defendant has not contested commonality, and the Court finds that numerous common questions of law and fact are present in this

case. The Court, therefore, finds that the commonality requirement is satisfied.

B. *Adequacy of Representation*

"The adequacy of the class representative is dependant on satisfying two factors: 1) that the plaintiffs' attorney is competent to conduct a class action; and 2) that the class representatives do not have interests antagonistic to the interests of the class." *In re Linerboard Antitrust Litig.,* 203 F.R.D. 197, 207 (E.D.Pa.2001) (citations omitted). Defendant does not challenge the ability of Plaintiff's law firm to litigate this class action. Rather, Defendant continues to assert that Plaintiff is not an adequate class representative because it has interests which are in direct conflict with the interests of many of the potential class members. "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods.,* 521 U.S. at 625. Thus, "a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *East Tex. Motor Freight Sys. v. Rodriguez,* 431 U.S. 395, 403, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977) (quoting *Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 216 (1974)); *see also Georgine v. Amchem Prods., Inc.,* 83 F.3d 610, 630 (3d Cir.1996), *aff'd sub nom Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (finding class representative inadequate where proposed settlement made "important judgments on how recovery is to be *allocated* among different kinds of plaintiffs, decisions that necessarily favor some claimants over others.") (emphasis in original).

*4 Consequently, the adequacy of representation requirement is not satisfied where "the named representative's interest in maximizing its own recovery provides a strong incentive to minimize the recovery of other class members." *Yeager's Fuel v. Pennsylvania Power & Light Co.,* 162 F.R.D. 471, 478 (E.D.Pa.1995) ("Yeager's Fuel II"). For example, in *Yeager's Fuel II,* this Court refused to certify a class of competing retail fuel dealers who competed with each other in a limited market for retail fuel sales, and who argued that they lost business as a result of the defendant's anti-competitive conduct. *Id.* The Court noted that "the named representative's interest in maximizing its own recovery provides a strong incentive to minimize the recovery of other class members, which may be accomplished by showing that any business lost by other class

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                          Page 4
Not Reported in F.Supp.2d, 2004 WL 1842987 (E.D.Pa.), 2004-2 Trade Cases P 74,523
(Cite as: 2004 WL 1842987 (E.D.Pa.))

members, as opposed to itself, was caused by some factor independent of the defendant's anti-competitive conduct." *Id.; see also Pennsylvania Dental Assn. v. Medical Service Assn. of Pennsylvania,* 745 F.2d 248, 263 (3d Cir.1984)(affirming the district court's decision to certify class containing dentists who did and did not participate in a challenged dental fee program, because of "inherent conflicts" between the two groups); *Glictronix Corp. v. AT & T Co.,* 603 F.Supp. 552, 586 (D.N.J.1994) ("cases in the Third Circuit consistently support the view that where the class members are competitors in a limited market, the named plaintiff's attempts to maximize its damage recovery will conflict with the interests of the other class members and class certification should be denied.")

However, "[M]ost courts hold that [a] conflict [between class members] must be more than merely speculative or hypothetical" before a named representative can be deemed inadequate. 5 James Wm. Moore, et al., Moore's Federal Practice 23.25 [4][b][ii] (3d ed.2003); *see also Blackie v. Barrack,* 524 F.2d 891, 909 (9th Cir.1975)("[C]ourts have generally declined to consider conflicts, particularly as they regard damages, sufficient to defeat class action status at the outset unless the conflict is apparent, imminent, and on an issue at the very heart of the suit."); *Audrev v. Federal Kemper Ins. Co.,* 142 F.R.D. 105, 111-13 (E.D.Pa.1992) (proposed class representatives held to be adequate where plaintiffs had presented persuasive evidence that all class members had been injured by defendant's conduct, and defendant had failed to present any evidence of potential antagonism between class members); *In re South Central States Bakery Prods. Antitrust Litig.,* 86 F.R.D. 407, 418 (M.D.La.1980) ("A naked allegation of antagonism cannot defeat class certification; there must be an actual showing of a real probability of a potential conflict which goes to the subject matter of the suit.").

*1. Premium brand vs. second tier brand purchasers*

Defendant maintains that there are conflicts of interest between members of the proposed class, rendering class certification inappropriate. Specifically, Defendant argues that the market includes purchasers of two types of transparent tape products from 3M, premium tape, sold under the name "Scotch Magic," and "second tier" brand tapes, sold under the name "Scotch" or "Highland." According to Defendant, premium brand tape and second tier tapes occupy different segments of the transparent tape market. Because of this, the prices of premium and second tier brand tapes would not have responded in a similar fashion in response to any increased competition that might have occurred in a world absent 3M's anti-competitive conduct. In support of this theory, Defendant has presented the expert testimony of Dr. Daniel Rubinfeld, who previously testified on behalf of Defendant in connection with its opposition to Plaintiff's first motion for class certification. According to Dr. Rubinfeld, because of "differences between consumers in terms of their relative attachment to a brand," prices for premium brand products do not always fall in response to competition from private label products and other low cost substitutes. (4/15/04 Rubinfeld Decl. ¶ 9). Rather, it is sometimes the case that a company will respond to competition by cutting the price of its second tier brand in response to competition, while maintaining the same price, or even raising the price, of the premium brand product. (4/15/04 Rubinfeld Decl. ¶ 10). Dr. Rubinfeld describes a second tier brand which is utilized by a company to provide an alternative to lower priced products provided by competitors as a "fighting brand." (4/15/04 Rubinfeld Decl. ¶ 8.) According to Dr. Rubinfeld, the reason for this phenomenon is that, in some markets, "demand consists of two segments: brand-loyal purchasers who value the premium branded product and price sensitive purchasers for whom the fighting brand and the private label product are close substitutes." (4/15/04 Rubinfeld Decl. ¶ 10). Dr. Rubinfeld labels this underlying phenomenon market segmentation.

*5 According to Dr. Rubinfeld, his preliminary research suggests that 3M utilized its second tier tapes, such as Highland tape, as fighting brands to respond to competition from other sources and to provide an alternative for those customers seeking a lower-priced tape. (5/17/04 Rubinfeld Decl. ¶ ¶ 9-10). By contrast, according to Dr. Rubinfeld's research, 3M generally did not respond to competitive threats by lowering the price of its premium Scotch Magic Tape. (*Id.*) According to Dr. Rubinfeld, this provides evidence that the market for transparent tape is segmented, and that 3M would, therefore, have lowered the price of its second tier tapes, but not its premium tape, in response to competition in a world absent 3M's anti-competitive conduct. (*Id.*)

3M argues that the possibility that the transparent tape market is segmented in turn creates an imminent and apparent conflict between members of the proposed class. 3M notes that, if the market for

Not Reported in F.Supp.2d                                                          Page 5
Not Reported in F.Supp.2d, 2004 WL 1842987 (E.D.Pa.), 2004-2 Trade Cases P 74,523
**(Cite as: 2004 WL 1842987 (E.D.Pa.))**

transparent tape were segmented, the price of premium Scotch Magic tape would fall insignificantly, if at all, in response to competition. Accordingly, members of proposed class who purchased mainly premium Scotch Magic tape will have an incentive to reject the market segmentation theory described by Dr. Rubinfeld. These class members would instead wish to argue that the prices of both premium and second tier tapes would have fallen in a similar fashion, in order to maximize the amount of their recovery in this case. Plaintiff is pursuing this theory of damages, which Plaintiff labels a "one market" theory, and is seeking to recover overcharge damages on its purchases of both premium and second tier 3M transparent tape. (*See* Pl's Reply Mem. at 2-3.) By contrast, according to 3M, those class members who mainly or only purchased second tier transparent tape would have an incentive to pursue the market segmentation theory, because it is possible that under such a theory the price decrease in second tier tapes would be larger if the market were segmented than if the prices of premium and second tier tapes responded to competition in a similar fashion. (5/17/04 Rubinfeld Decl. ¶ 14.)

Plaintiff argues that the conflict described by 3M is illusory, as it is not at all clear that those class members who purchased primarily second tier transparent tape would be harmed by the pursuit of a one market theory. Indeed, according to Plaintiff's expert, Dr. Morton Kamien, the amount of overcharge damages based upon purchases of second tier tape would be no different under a market segmentation theory than it would be under a one market theory. (5/6/04 Kamien Decl. ¶ ¶ 9-11.) This is because, according to Dr. Kamien, the price of second tier tape would be lowered the same amount in response to competition regardless of whether 3M chose to lower the price of both premium brand tape and second tier tape in response to competition, as would be the case under a one market theory, or chose only to lower the price of second tier tape, as would be the case under a market segmentation theory. (*Id.*) Dr. Kamien testified that "[3M] would have at least as much incentive to reduce [second tier tape prices] if the entire market is price sensitive as it would have if the market is 'segmented' (that is, if only part of the market is price-sensitive)." (5/6/04 Kamien Decl. ¶ 10.) Moreover, Dr. Rubinfeld does not explain, and it is not immediately apparent to the Court, why the amount of the price cut on 3M's second tier tape would necessarily vary inversely with the amount of the price cut made to 3M's premium tape under a "one market" theory. Indeed,

while Dr. Rubinfeld certainly argues that such a phenomenon is possible, Dr. Rubinfeld does not appear to argue that such a phenomenon would be likely to occur in this case. Dr. Rubinfeld merely states that

*6 it may be that the decrease in the price of a fighting brand product such as Highland could be larger under a segmentation theory than it could be under what Plaintiff labels a "one market" theory. In other words, by pursuing a segmentation theory, a class member might credibly argue for a larger overcharge on Highland purchases than they could by pursuing a "one market" theory.

(5/17/04 Rubinfeld Decl. ¶ 14.)    [FN3] Accordingly, the Court finds that the mere possibility that the price decrease in second tier tape could be larger under a segmentation theory than under a one market theory does not create an apparent and imminent conflict of interest between members of the proposed class. [FN4]

> FN3. At a subsequent hearing, Dr. Rubinfeld testified that "I think it's likely that this [the market segmentation theory] would be a successful approach," for substantial purchasers of second tier tapes. (6/9/04 N.T. at 60.) However, Dr. Rubinfeld did not testify that the damages for substantial purchasers of second tier tapes would likely be higher under a market segmentation theory than they would under a one market theory.

> FN4. The Court agrees with Plaintiff's assertion that the potential conflict in the instant case is quite similar to the conflict presented to the court in *In re Visa Check/Master Money Antitrust Litig., 280 F.3d 124 (2d Cir.2001)*. In that case, the United States Court of Appeals for the Second Circuit ("Second Circuit") considered the certification of a proposed class of merchants who accepted Visa and Mastercard credit and debit cards as a form of payment. Plaintiff argued that Defendant had created an illegal tying arrangement by forcing retailers who accepted Visa and Mastercard credit cards to also accept Visa and Mastercard debit cards for payment. The class included retailers who primarily conducted credit card transactions, as well as retailers who primarily conducted debit card transactions. Defendant argued that the potential for conflict between class members was high, as those class members who

Case 1:05-cv-00360-SLR    Document 252    Filed 10/04/2006    Page 9 of 25

Not Reported in F.Supp.2d                                                                    Page 6
Not Reported in F.Supp.2d, 2004 WL 1842987 (E.D.Pa.), 2004-2 Trade Cases P 74,523
(Cite as: 2004 WL 1842987 (E.D.Pa.))

mainly conducted credit card transactions would have the incentive to argue that the cost of credit card transactions would not have risen in the absence of the tie, in order to maximize their recovery. By contrast, retailers who mainly conducted debit card transactions would have far less interest in pursuing such a strategy, and would instead wish to concentrate their efforts in demonstrating that the price of debit card transactions would have fallen in the absence of the tie. The Second Circuit, with one judge dissenting, rejected this argument, reasoning that, while the price of credit card transactions absent the tie would be less relevant to the recovery of retailers who predominantly conducted debit card transactions, *all* potential class members would benefit from a showing that the prices for credit card transactions would have stayed the same, or risen negligibly, in the absence of the tie. *Id.* at 144-45. The court wrote

It may be less vital for merchants with predominantly debit card sales to prove the credit cards would be no more expensive without the tie.... [However], it would seem to maximize the potential recovery of all three groups to argue, as they do here, that credit card prices would not increase without the tie.
*Id.* at 144.

3M further argues that, based upon the evidence presented in the *LePage's* trial and during preliminary discovery related to the instant motion for class certification, it will be easier for the Plaintiff class to pursue damages based upon overcharges on second tier tape than it will be to pursue damages based upon overcharges on 3M's premium tape. 3M relies upon documents which it claims strongly suggest that 3M responded to competitive threats by lowering the price of second tier tapes, and not by lowering the price of Scotch Magic tape. According to 3M, its analysis of 82 "meeting competition" forms demonstrates that, in all but a handful of the 82 instances, 3M responded to competitive threats by lowering the price of its second tier tapes, as opposed to its premium tape. (5/17/04 Rubinfeld Decl. ¶ ¶ 9-10.) According to 3M, the "uphill battle" faced by class members who primarily or only purchased 3M's premium tape, and therefore must pursue overcharge damages based upon sales of 3M's premium tape, can be avoided by class members who primarily or only purchased 3M's second tier tapes, and who can

therefore pursue overcharge damages based solely upon their purchases of second tier tapes. Thus, according to Dr. Rubinfeld,

in the face of evidence such as that contained in the meeting competition forms, it would be easier to credibly argue that the prices of Highland and lower-end Scotch tapes would have declined significantly than it will be to credibly argue that Scotch Magic prices declined significantly. Thus, by attempting to claim significant overcharges on Scotch Magic purchases, Highland purchasers may damage the credibility of their arguments with respect to Highland purchases.
(5/17/04 Rubinfeld Decl. at ¶ 14.)

According to 3M, therefore, the mere risk that the theory proposed by Plaintiff will be less well received than a competing theory which could be put forward by other potential class members is sufficient for the Court to find the existence of an imminent and apparent potential conflict. The Court rejects this argument. In order to determine whether Plaintiff's pursuit of overcharge damages on both premium and second tier transparent tape would work to the detriment of other class members by "damag[ing] the credibility" of their case, the Court would be required to evaluate the underlying viability of Plaintiff's one market theory. Accordingly, Defendant's argument is, at bottom, an attack on the merits of Plaintiff's "one market" theory of damages. However, as will be discussed, *infra,* a court may not weigh conflicting expert testimony or economic theories, and may not determine which of two competing theories is more appropriately applied to the facts of the instant case, at the class certification stage. *See* In re Visa Check/Master Money Antitrust Litig., 280 F.3d at 135. [FN5]

FN5. The Court made this point in its prior Memorandum denying Plaintiff's original motion for class certification. In that Memorandum, the Court noted that "the Court cannot find as fact on a motion for class certification that either one of [two competing] theories is correct." *Bradburn Parent/Teacher Store v. 3M,* No. 02-7676, 2004 WL 414047, at *7 (E.D.Pa. Mar.1, 2004). Of course, a plaintiff must still present a credible theory of damages which will demonstrate impact upon all class members through the use of common proof. *See Newton v. Merrill Lynch, Pierce, Fenner and Smith, Inc.,* 259 F.3d 154, 189 (3d Cir.2001) ("While obstacles to calculating damages may not preclude class

Not Reported in F.Supp.2d                                                    Page 7
Not Reported in F.Supp.2d, 2004 WL 1842987 (E.D.Pa.), 2004-2 Trade Cases P 74,523
**(Cite as: 2004 WL 1842987 (E.D.Pa.))**

certification, the putative class must first demonstrate economic loss on a common basis.") This issue is discussed *infra* in connection with the Court's analysis of whether Plaintiff has satisfied the requirements of Rule 23(b)(3).

**\*7** The alleged conflicts identified by 3M in its opposition to certification of the modified class are fundamentally different than the previously identified conflicts between members of the original proposed class. In its prior Memorandum denying certification of the original class, this Court found that an imminent and apparent conflict existed between those class members who purchased private label tape and those class members who only purchased 3M branded tape. That conflict was based upon the fact that Plaintiff's proposed overcharge theory of damages, which was necessarily predicated on the assumption that prices for 3M branded tape would fall in response to competition, ran a serious risk of minimizing the recovery of those class members who would wish to pursue a lost profits theory of damages based upon a shift in sales to private label tape, and who would therefore wish to argue that the price of 3M branded tape would have risen as a result the same in response to competition. *See* 2004 WL 414047, at \*4. By contrast, in this case, there is nothing in the record to indicate that Plaintiff's one market theory will work to the detriment of purchasers of second tier tape, with the exception of Dr. Rubinfeld's unsupported assertion that the price decrease of a second tier product "could be larger" under a market segmentation theory (5/17/04 Rubinfeld Decl. ¶ 14.), an assertion that Dr. Kamien categorically rejects.

The Court further notes that Plaintiff itself purchased significant quantities of second tier tape. Indeed, according to Dr. Rubinfeld, 3M's own expert, 30% of Bradburn's tape purchases were purchases of Highland Tape. (4/15/04 Rubinfeld Decl. ¶ 16.) Thus, if the evidence were to demonstrate that the one market theory could not be feasibly applied to the market for transparent tape, and that the market segmentation theory could properly be applied to this market, there is no reason to believe that Plaintiff would simply ignore the market segmentation theory and instead continue to pursue a one market theory. Furthermore, if the one market theory proved to provide a poor description of the market for transparent tape, and if Plaintiff nevertheless continued to pursue this theory, class members would have the right to opt out of the class pursuant to Federal Rule of Civil Procedure 23(c)(2). [FN6]

FN6. In denying Plaintiff's previous motion for class certification, the Court held that the opt out procedure described in Rule 23(c)(2) failed to cure the conflicts inherent in the proposed class, because, the Court noted, the conflict between class members would exist "from the moment that the class were certified." This was due to the fact that there were two competing theories relevant to proving damages in the case, and Plaintiff's pursuit of one theory in order to maximize its damages would likely work to minimize the recovery available to other class members. By contrast, in this case, as discussed, *supra,* Plaintiff's one market theory of damages runs a serious risk of minimizing the recovery of other members of the modified class only if the theory is rejected by a fact-finder on the merits.

In its prior opinion, the Court also found the opt out procedure in Rule 23(c)(2) inappropriate because many of the class members who traded in private label tape were among the largest members of the proposed class. The Court noted that, despite their size and apparent ability to pursue an individual action for damages, none of the proposed class members had shown any interest in doing so. By contrast, in this case, there has been no showing that a substantial number of members of the modified class who purchased mainly or solely second tier 3M transparent tape did a sufficiently large business in transparent tape to justify the costs of an individual suit.

## 2. Beneficiaries of Bundled Rebates

Defendant also argues that Plaintiff cannot represent a class containing members who benefitted from 3M's anti-competitive conduct which formed the basis of the LePage's lawsuit (i.e., the bundled rebates). "A class cannot be certified when its members have opposing interests or when it consists of members who benefit from the same acts alleged to be harmful to other members of the class." *Pickett v. Iowa Beef Processors,* 209 F.3d 1276, 1280 (11th Cir.2000) (citations omitted). Defendant argues that the rebate recipients may have a strong interest in maintaining the position that 3M's conduct was lawful, and therefore will oppose this suit. However, as the Court has previously noted, Plaintiff contends that *every* member of the proposed class paid too much for 3M branded tape, regardless of whether they received any bundled rebates from 3M. *See*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1842987 (E.D.Pa.), 2004-2 Trade Cases P 74,523
(Cite as: 2004 WL 1842987 (E.D.Pa.))

*Bradburn v. 3M,* No. 02-7676, 2000 WL 34003597, at *4 (E.D.Pa. Jul.25, 2003). Accordingly, at this point in the proceedings, the Court cannot determine whether there are any members of the proposed class who have benefitted from 3M's anti-competitive conduct, and the fact that there may be class members who received the challenged rebates is not a sufficient basis on which to deny class certification.

### 3. Breaches of Fiduciary Duty by Bradburn's Corporate Executives

**\*8** 3M also argues that Plaintiff is an inadequate representative of the proposed class by virtue of alleged prior breaches of fiduciary duty by its corporate officers. 3M asserts that this prior conduct establishes that Plaintiff's executive officers do not possess the honesty and integrity required of a class representative. Specifically, Defendant alleges that Elizabeth Parkinson, who is currently Chief Executive Officer of Bradburn, and Brad Parkinson, who is Elizabeth Parkinson's son and currently owns 90% of the company, engaged in a practice of charging personal expenses on company credit cards. Mr. Parkinson was also accused of improperly taking out personal loans from the company. (Def's Mot. Ex. N., Arthur Larson Dep. at 20). When the allegedly improper credit card charges were discovered, other corporate officers of Bradburn demanded that Elizabeth and Brad Parkinson repay these charges. However, according to Arthur Larson, who was until recently also a corporate officer of Bradburn, while Elizabeth Parkinson did pay back all of her disputed charges, Brad Parkinson only paid back some of his disputed charges. (Larson Dep. at 154). Arthur Larson, along with his brother, David, subsequently filed an action to dissolve Bradburn as a corporate entity. This suit, which was filed in Missouri state court in the year 2001, was eventually settled by an agreement that Bradburn would sell off its catalogue business, while Brad and Elizabeth Parkinson would retain ownership and control of the remaining assets. (*See* Pl's Mot. Class Cert. Ex. 21.) Importantly, there is no evidence that the court considering the Larsons' action for dissolution of Bradburn, or any other court, ever made a determination that either Brad or Elizabeth Parkinson engaged in any wrongdoing. Moreover, while Brad and Elizabeth Parkinson's improper expenses and loans were a factor in the Larsons' decision to dissolve the company, the decision was also based upon various disagreements between the Parkinsons and the Larsons concerning the management of the company which do not call the Parkinsons' integrity into question. (*See* Def's Opp. Mem. Ex. T.)

There are no bright line rules to follow in determining whether a proposed class representative has sufficient integrity to fulfill his role. However, courts which have found that a class representative lacks the requisite integrity to serve as class representative have been faced with conduct significantly more serious than the conduct faced here. *See Folding Cartons v. American Can Co.,* 79 F.R.D. 698, 703 (N.D.Ill.1978) (proposed named plaintiff who had been found by court in prior, unrelated action to have engaged in deliberately deceptive behavior held to be inadequate representative.) Courts have generally been unwilling to find a representative inadequate based upon behavior which is not related, in time or subject matter, to the case at hand. *See Koppel v. 4897 Corp.,* 191 F.R.D. 360, 368 (S.D.N.Y.2000) (fact that named plaintiff filed frivolous lawsuit some fifteen years earlier attempting to extort money from the defendant was "too unsubstantiated and attenuated, in time and subject matter, to seriously call into question his ability to pursue this litigation and protect the interests of the proposed class."); *Jane B. v. New York City Dept. Of Social Serv.,* 117 F.R.D. 64, 71 (S.D.N.Y.1987) ("The inquiry, then, into the representatives' personal qualities is not an examination into their moral righteousness, but rather an inquiry directed at improper or questionable conduct arising out of or touching upon the very prosecution of the lawsuit."); *Randle v. Spectran,* 129 F.R.D. 386, 392 (D.Mass.1988) (proposed representative who had been indicted for arson more than ten years prior to the suit, and had admitted during his deposition that he had filed no tax return for two separate years, not disqualified from serving as representative.) [FN7]

> FN7. Based upon *Koppel* and *Jane B.,* as well as other cases arising out of the Southern District of New York, Plaintiff argues that the Court should announce a bright line rule that prior bad acts of a proposed class representative are only relevant to class certification if either 1) the questionable conduct of which the proposed class representative is accused is related to the proposed representation, or, 2) if there has been a prior judicial finding of misconduct. Although these two factors are highly relevant to a court's determination of the adequacy of a class representative, the Court declines to hold that these factors, or any other factors, must be established before a class representative's integrity is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00360-SLR    Document 252    Filed 10/04/2006    Page 12 of 25

Not Reported in F.Supp.2d                                                                                                                                                       Page 9
Not Reported in F.Supp.2d, 2004 WL 1842987 (E.D.Pa.), 2004-2 Trade Cases P 74,523
**(Cite as: 2004 WL 1842987 (E.D.Pa.))**

sufficiently called into question to defeat class certification. For example, requiring a prior judicial finding of misconduct might be inappropriate in a case where a defendant admits to engaging in the conduct in question in the current proceedings before the court.

*9 The prior conduct of Elizabeth and Brad Parkinson that Defendant has identified does not indicate to the Court they lack the honesty and integrity required of class representatives. First, both Elizabeth and Brad Parkinson dispute the contention that any of the questionable credit card charges they made were indeed improper, [FN8] and no court has ever so found. Indeed, according to Ms. Parkinson, she repaid the credit card charges to the company in an effort to keep peace with the other directors, some of whom are apparently members of her family, and not because she believed that she had engaged in any wrongdoing. (8/13/03 N.T. at 49.) Thus, absent a finding from any judicial body that these charges were fraudulent or otherwise violated the law, the Court would be forced to engage in a thorough analysis of both the underlying circumstances of each of the disputed charges as well as of Missouri corporations law in order to determine whether any of these charges were indeed improper. The Court declines to engage in such an analysis, which would waste valuable judicial resources and unnecessarily delay this litigation.

> FN8. For example, Ms. Parkinson testified during the class certification hearing that her vacation trip to Maine was charged to the company card because she had visited stationary stores in the New England area during the trip to determine the manner in which they were run. (8/13/03 N.T. at 63.)

Furthermore, while Ms. Parkinson does admit that the personal loans she received from the company were improper, Ms. Parkinson noted during her hearing testimony that these loans were taken out in response to a family emergency, and that when she took out the loans she had every intention of repaying them at a later date, which she eventually did. (8/13/03 N.T. at 61-62.) Lastly, it should be noted that Arthur Larson, one of the persons who accused Ms. Parkinson of impropriety, still asserts that he believes that she is an honest person. (Pl's Reply Mem. Ex. 6, 2nd Larson Dep. at 95-99.) Accordingly, the Court finds that Brad and Elizabeth Parkinson possess the requisite honesty and integrity to serve as class representatives.

*4. The relationship between Brad Parkinson and Terry Parkinson*

3M also argues that Bradburn is an inadequate class representative by virtue of the fact that Brad Parkinson, who owns 90% of the company, is the husband of one of the attorneys representing Bradburn, Terry Parkinson, and further that Elizabeth Parkinson, who is currently an officer at the company, is Brad Parkinson's mother and the mother-in-law of Terry Parkinson. Terry Parkinson works for the law firm of Welsh and Hubble, and Plaintiff admits that Ms. Parkinson has a financial interest in any fees earned by the firm. (8/13/03 N.T. at 21.) Defendant cites to a long line of cases which have refused to certify a class representative who was a close relative of one of the class counsel. *See Zlotnick v. Tie Communications, Inc.,* 123 F.R.D. 189, 193-94 (E.D.Pa.1988); *In re Microsoft Corp. Antitrust Litig.,* 214 F.R.D. 371, 374- 75 (D.Md.2003). The rationale behind these courts' determinations is the obvious risk that the class representative's interests will be aligned with the interests of the representatives' attorneys, and not with the interests of the other members of the class.

*10 However, the mere presence of a familial relationship between a class representative and class counsel is not generally sufficient in itself for the court to find that the class representative is inadequate. Rather, courts generally will only find inadequacy if other factors which call into question a class representative's loyalty to other members of the class are present. For example, in *Zlotnick,* the court refused to certify the class because, in addition to the fact that the proposed class representative was the father of class counsel, the father admitted during his deposition that he knew nothing about the case and deferred to his son's decisions on the matter. 123 F.R.D. at 193-94.

Most courts have also found a class representative inadequate where that class representative maintained a financial interest in an award of attorney's fees to the class counsel. *See Sussman v. Lincoln American Corp.,* 561 F.2d 86 (7th Cir.1977); *Fischer v. Int'l Tel. & Tel. Corp.,* 72 F.R.D. 170, 174 (E.D.N.Y.1976). [FN9]

> FN9. On the other hand, a judge in this district certified a class in spite of the fact that one of the named class representatives was a partner in the law firm that represented the class (the other named

Case 1:05-cv-00360-SLR     Document 252     Filed 10/04/2006     Page 13 of 25

Not Reported in F.Supp.2d                                                                    Page 10
Not Reported in F.Supp.2d, 2004 WL 1842987 (E.D.Pa.), 2004-2 Trade Cases P 74,523
**(Cite as: 2004 WL 1842987 (E.D.Pa.))**

representatives were siblings of the law partner). See *Umbriac v. American Snacks, Inc.,* 388 F.Supp. 265 (E.D.Pa.1975). The court in *Umbriac* reasoned that, although the potential for attorney's might cloud the judgment of the class representatives, because all compromises and settlements would require court approval (see Fed R. Civ. P. 23(e)), the interests of the other class members would be protected. This decision has not been followed by other courts. See *Flamm v. Eberstad,* 72 F.R.D. 187, 189 (E.D.Ill.1976) (refusing to follow *Umbriac,* and noting that in its research it had found only one other case which had allowed a class representative to serve as class counsel.) Moreover, while the Court recognizes its power to disapprove settlement agreements which are not in the best interest of the class as a whole, the Court considers this power to be an additional protection of the interests of the class members, and not a substitute for the requirement that a class representative's interests align with the interests of other members of the class and not with the interests of its attorneys.

Defendant has pointed to no evidence that Elizabeth Parkinson is a mere pawn of her daughter-in-law in this litigation, or that Elizabeth Parkinson will directly benefit from any award of attorney's fees to Terry Parkinson or her law firm, Welsh and Hubble, P.C. As the spouse of Terry Parkinson, however, it is highly likely that Brad Parkinson would directly benefit from any benefit that Terry Parkinson would receive by virtue of her representation of Bradburn in this case. Plaintiff vehemently argues, however, that Brad Parkinson's 90% ownership of Bradburn should not play a factor in the Court's analysis, because only Bradburn Parent Teacher Store, Inc., and not Brad Parkinson himself, seeks to be appointed class representative. Thus, according to Plaintiff, unless and until Defendant is able to "pierce the corporate veil" of Bradburn and establish that Bradburn is a mere "alter ego" of Brad Parkinson himself, Mr. Parkinson's stake in Bradburn is essentially irrelevant. The Court disagrees. Plaintiff has not presented, and the Court has not found, any authority which supports Plaintiff's proposition that majority ownership of a company is irrelevant in determining potential conflicts of interest between class representatives and other class members. Moreover, the Court finds that there is a substantial risk that Brad Parkinson, who is a 90% owner of the company

and the son of the Chief Executive Officer, could have substantial influence over the company's decision-making with respect to the instant litigation. The Court further notes that the volume of tape purchases made by Bradburn only amounted to approximately $12,000 per year. (8/13/03 N.T. at 81.) Thus, by Bradburn's own analysis its individual damages in this case only total approximately $11,000. (Pl's Mot. Class Cert. at 20.) The attorney's fees that Terry Parkinson's firm will receive from this litigation could easily dwarf this amount. Plaintiff admits that Terry Parkinson has a financial interest in any fees earned by Welsh and Hubble, P.C. (8/13/03 N.T. at 21.)

**\*11** Accordingly, the Court finds that Bradburn Parent Teacher Store cannot adequately represent the proposed modified class if Terry Parkinson or her law firm, Welsh and Hubble, P.C., continue to represent Bradburn as class counsel. Accordingly, Terry Parkinson and her law firm, Welsh and Hubble, P.C., cannot serve as class counsel and cannot otherwise receive any attorney's fees or other sums which the Court may award in this action.

C. *Typicality*

In order for Plaintiff to satisfy the typicality requirement, Plaintiff must show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a). "The typicality requirement is intended to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with those of the absentees." *Georgine,* 83 F.3d at 631 (citation omitted). Accordingly, "The inquiry assesses whether the named plaintiffs have incentives that align with those of absent class members so that the absentees' interests will be fairly represented." *Id.* (citation omitted). The typicality requirement is therefore quite similar to the adequacy of representation requirement, in that "both look to the potential for conflicts in the class." *Id.* On the other hand, the mere existence of factual differences between the claims of class members does not preclude a finding of typicality. Rather, " '[f]actual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory." ' *Barnes,* 161 F.3d at 141 (quoting 1 Newberg on Class Actions, § 3.15, at 3-78); *see also Baby Neal,* 43 F.3d at 58 ("[E]ven relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal

Not Reported in F.Supp.2d, 2004 WL 1842987 (E.D.Pa.), 2004-2 Trade Cases P 74,523
**(Cite as: 2004 WL 1842987 (E.D.Pa.))**

theories.")

In this case, the claims of Plaintiff are typical of the claims of members of the proposed class. Plaintiff asserts that all members of the proposed modified class have been injured by the same anticompetitive conduct engaged in by 3M that was the subject of the prior *LePage's* litigation, and will seek to recover overcharge damages on behalf of these class members. Accordingly, Plaintiff's claim in this case " 'arises from the same event or practice or course of conduct that gives rise to claims of the class members," ' and it is based upon the same legal theory. *Barnes,* 161 F.3d at 141 (quoting 1 Newberg on Class Actions, § 3.15, at 3-78). Moreover, as discussed, *supra,* the Court finds that the legal theory proposed by Plaintiff will not work to limit or foreclose the recovery of the absent class members. Accordingly, the Court finds that the typicality requirement is satisfied.

### D. *Rule 23(b)(3) Requirements*

Plaintiff asserts that it satisfies the requirements of Rule 23(b)(3). The prerequisites for certification under Rule 23(b)(3) are as follows:
**\*12** To qualify for certification under Rule 23(b)(3), a class must meet two requirements beyond the Rule 23(a) prerequisites: Common questions must "predominate over any questions affecting only individual members"; and class resolution must be "superior to other available methods for the fair and efficient adjudication of the controversy."
*Amchem Prods.,* 521 U.S. at 615.

In order to succeed in this antitrust action, Plaintiff must prove: 1) a violation of the antitrust laws; 2) antitrust injury resulting from the violation; and 3) the amount of the damages suffered. *See Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc.,* 63 F.3d 1267, 1270-71 (3d Cir.1995). Defendant argues that Plaintiff cannot establish that common questions of fact regarding impact predominate over individual questions. [FN10] The Third Circuit has held that common issues do not predominate under Rule 23(b)(3) unless impact upon all class members can be established through the use of common proof. *See Newton v. Merrill Lynch, Pierce, Fenner and Smith, Inc.,* 259 F.3d 154, 189 (3d Cir.2001) ("While obstacles to calculating damages may not preclude class certification, the putative class must first demonstrate economic loss on a common basis."); *see also In re Linerboard Antitrust Litig.,* 203 F.R.D. at 220 (finding predominance requirement satisfied

where "Plaintiffs have shown that they plan to prove common impact by introducing generalized evidence that will not vary among individual class members."). One court has described the requirement as follows:

> FN10. Defendant does not appear to dispute Plaintiff's claim that common questions regarding Defendant's alleged violation of the antitrust laws predominate over individual questions. Furthermore, it appears that under Plaintiff's theory of the case this element will be established through common proof, and specifically through the proposed use of collateral estoppel and the findings from the *LePage's* litigation. (*See* Compl. ¶ 17.) The Court therefore finds that common questions predominate over individual questions with respect to Defendant's alleged violation of the antitrust laws.

On a motion for class certification, the issue confronting the court is whether the proof necessary to demonstrate impact as to each class member is particular to that class member, in which case individual questions concerning impact would overwhelm the common questions concerning the existence and scope of [the alleged antitrust violation], or whether the necessary proof of impact would be common to all class members and sufficiently generalized that class treatment of their claims would be feasible.
*In re. Industrial Diamonds Antitrust Litig.,* 167 F.R.D. 374, 382 (S.D.N.Y.1996). On the other hand, it is well settled that, if impact car be established by the use of common proof, the fact that individualized determinations of the amount of the damages that each individual class member suffered will be needed does not, in itself, preclude class certification. *See In re. Mercedes Benz Antitrust Litig.,* 213 F.R.D. 180, 190 (D.N.J.2003) (collecting cases); *see also Newton,* 259 F.3d at 189 ("[T]he issue is not the calculation of damages but whether or not class members have any claims at all.") Defendant argues that Plaintiff's expert, Dr. Kamien, has not produced a theory of damages which will allow him to establish the fact of injury for each class member through the use of common proof.

In his expert report, Dr. Kamien opines that,
If 3M's conduct is proven to have restrained competition-by excluding LePage's as a meaningful competitor, and discouraging entry by new competitors or expansion by existing ones-it is economically reasonable to conclude that this has the effect of raising or maintaining prices for all

Case 1:05-cv-00360-SLR    Document 252    Filed 10/04/2006    Page 15 of 25

Not Reported in F.Supp.2d                                                                    Page 12
Not Reported in F.Supp.2d, 2004 WL 1842987 (E.D.Pa.), 2004-2 Trade Cases P 74,523
(Cite as: 2004 WL 1842987 (E.D.Pa.))

purchasers in the market above what they would have been otherwise. In the transparent tape market, the dimensions of competition are price and quality. In that setting, it is standard economic theory that the price will be driven down to the level at which the supplier realizes a reasonable or normal rate of return, taking into account the distinctive quality dimension of his product.

*13 (6/9/03 Kamien Decl. ¶ 9.) Dr. Kamien's theory is fully supported by the *en banc* decision of the Third Circuit in *LePage's II*. In *LePage's II*, the Court wrote:

> Once a monopolist achieves its goal by excluding potential competitors, it can then increase the price of its product to the point at which it will maximize its profit. This price is invariably higher than the price determined in a competitive market.

*LePage's II*, 324 F.3d at 164. Under this line of reasoning, when a monopolist unlawfully maintains its monopoly power in violation of Section 2 of the Sherman Act, as is asserted in this case, it is logical, at least as a general rule, to presume that all class members have suffered injury as a result of the conduct, in the form of supra-competitive prices. [FN11]

> FN11. The Court does not read *LePage's II* as precluding a defendant in a case brought under Section 2 of the Sherman Act from challenging the existence of common proof with respect to impact by presenting evidence tending to show that, under the particular circumstances of the case, impact cannot be demonstrated by common proof. *See Industrial Diamonds*, 167 F.R.D. at 382 (noting that, while, as a general rule, an illegal price fixing conspiracy presumptively impacts all purchasers of the product in the affected market, a defendant in such a case is always free to argue that factors peculiar to the specific industry and market involved rebut any presumption that all class members have been impacted and preclude the use of common proof to establish such impact).

However, Dr. Kamien relies upon far more than a mere theoretical presumption of impact in this case. To the contrary, Dr. Kamien opines that there is a method of economic analysis which can establish the existence of impact upon all potential class members. Dr. Kamien opines that an appropriate measure of damages for the class can be determined in this case using a benchmark, or yardstick, theory. (6/9/03 Kamien Decl. ¶ 10.) A benchmark theory of

damages attempts to determine the price that would have been paid for a product in a but-for world absent the defendant's anti-competitive conduct by considering the price actually charged for a different product in a market with similar characteristics unaffected by the anti-competitive conduct, or by considering the price charged for the product in question during a time period when the defendant did not engage in the anti-competitive conduct in question. (*See* 6/9/03 Kamien Decl. ¶ ¶ 10-11). Dr. Kamien opines that two potential benchmarks exist in this case. The first benchmark is the market for transparent tape during the early 1990's, before 3M's anti-competitive conduct commenced. Dr. Kamien opined that, during this period, 3M offered price reductions to a number of customers in response to competition from other suppliers, and that these price reductions can be used as a proxy for the prices that 3M would have charged during the damages period of this case absent its anti-competitive conduct. (6/9/03 Kamien Decl. ¶ 14.) According to Dr. Kamien, data regarding 3M's price reductions during this period should be available from 3M's own records. (6/9/03 Kamien Decl. ¶ 15.) The second benchmark is the market for "wrap and mail" tape during the year 1993. Dr. Kamien opines that during the early 1990's, in response to competition from Manco and other competitors and a resulting loss of market share, Defendant significantly reduced its prices for wrap and mail tape. (6/9/03 Kamien Decl. ¶ 16.) Dr. Kamien bases this proposition on 3M's strategic business plan for the year 1995, which states that a decrease in 3M's market share in the wrap and mail market "was turned in '93, mainly due to a 25% price decrease in mailing tapes and the launch of its mailing supply line." (6/9/03 Kamien Decl. Ex. F at 23.) According to Dr. Kamien, "it should be possible to determine from 3M's cost data in the wrap and mail and transparent tape markets if a similar or greater price decline would have occurred in the transparent tape market." (6/9/03 Kamien Decl. ¶ 17.) Dr. Kamien further opines that "all of the data necessary to determine and apply the benchmarks described above will be available from 3M's own records." (6/9/03 Kamien Decl. ¶ 18.) The two benchmarks proposed by Dr. Kamien are "standard methods for proving damages in an antitrust case." *Nichols v. Smithkline Beecham Corp.*, Civ. A. No. 00-6222, 2003 U.S. Dist. Lexis 2049, at * 24 (E.D.Pa. Jan.29, 2003).

*14 Defendant argues that Dr. Kamien's proposed benchmarking theories fail to adequately account for the fact that many of the large-volume retailers were the recipients of bundled rebates and other discounts

Not Reported in F.Supp.2d                                                        Page 13
Not Reported in F.Supp.2d, 2004 WL 1842987 (E.D.Pa.), 2004-2 Trade Cases P 74,523
**(Cite as: 2004 WL 1842987 (E.D.Pa.))**

provided by Defendant, and therefore may have benefitted from the conduct that was challenged in the LePage's litigation. Defendant further argues that an individualized determination of the rebates received by each of Defendant's customers would be necessary before the Court could even determine that the class member had suffered any injury as a result of Defendant's conduct. Thus, Defendant argues, Dr. Kamien has made no showing that impact can be proven in this case on a common basis.

Dr. Kamien opines in his expert report that "while 3M provides rebates to some customers, 3M's expert witness in the LePage's case testified that '3M's rebate programs are readily convertible into price.' " (6/9/03 Kamien Decl. ¶ 18.) Dr. Kamien further opined that common proof of antitrust injury is available from 3M's own records, which contain data concerning the prices actually charged to 3M's customers as well as 3M's average unit pricing and factory cost. (6/9/03 Kamien Decl. ¶ 18.) For example, Dr. Kamien notes that, according to testimony from 3M's employees, 3M maintains a database which tracks the rebates received by each customer. (See Broderick Dep. at 18; see also Rubinfeld Dep. at 177-78). Based upon his proposed benchmark theory and the availability of this evidence, Dr. Kamien testified at the hearing that "the magnitude of the damage [suffered by each class member] can be calculated in a common way." (8/13/03 N.T. at 92.)

Defendant argues that Dr. Kamien has merely assumed the existence of impact in this case, without any empirical or theoretical basis for this assumption. Dr. Kamien did admit at the hearing that, for purposes of his research, he assumed the existence of common impact among class members. However, Dr. Kamien explained that this assumption was based upon the allegations made in Plaintiff's Complaint, which he assumed to be true for purposes of his research. [FN12] (11/4/03 N.T. at 108-11.) Dr. Kamien's admission is in no way fatal to class certification, because Plaintiff is not required at this stage of the litigation to establish, as fact, that each class member has suffered economic injury. [FN13] See Lumco Indus., Inc. v. Jeld-Wen, Inc., 171 F.R.D. 168, 173-74 (E.D.Pa.1997) ("At this stage of litigation, however, the Court need not concern itself with whether Plaintiffs can prove their allegations regarding common impact; the Court need only assure itself that Plaintiffs' attempt to prove their allegations will predominantly involve common issues of fact and law."); see also Nichols, 2003 U.S. Dist. Lexis 2049, at *20 ("In order to show impact is

susceptible to class-wide proof, Plaintiffs are not required to show that the fact of injury actually exists for each class member. If Plaintiffs are able to establish the existence of generalized evidence which will prove or disprove this injury element on a simultaneous class-wide basis, then there is no need to examine each class members' individual circumstance.") (internal quotation marks omitted.) Rather, it is Plaintiff's burden to "make a threshold showing that the element of impact will predominantly involve generalized issues of proof, rather than questions which are particular to each member of the proposed class." Lumco, 171 F.R.D. at 174. Plaintiff maintains that it has met this burden by presenting, through Dr. Kamien, a theory of damages which will prove or disprove the existence of impact for all members of the class by the use of common benchmarking formulas and generalized proof.

> FN12. The Complaint in this action alleges that "3M's unlawful maintenance of its tape monopoly has suppressed competition and has maintained tape prices paid by direct purchasers to 3M well above competitive levels after any 3M rebates (if any) attributable to tape purchases." (Compl.¶ 27.)

> FN13. Defendant relies heavily upon Newton, 259 F.3d 154, a securities class action in which Plaintiff alleged that broker-dealers breached their duty of best execution when trading their customers' securities on the NASDAQ exchange. In Newton, the Third Circuit held that the predominance requirement was not satisfied where an inquiry into the circumstances of hundreds of millions of individual stock trades would be required to determine whether or not each member of the proposed class failed to receive the best available price and was therefore injured by the alleged improper conduct. See id. at 187-88. The Newton court wrote that "because it is clear that at least some of the plaintiffs have not suffered economic injury, individual questions remain that would have to be adjudicated separately." Id. at 190. The Court finds the facts of the instant case easily distinguishable from those in Newton. First, unlike in Newton, it is not at all clear in this case that there are class members who have not suffered economic injury. To the contrary, the trial court record in LePage's lends support to Plaintiff's allegation that all

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 14
Not Reported in F.Supp.2d, 2004 WL 1842987 (E.D.Pa.), 2004-2 Trade Cases P 74,523
(Cite as: 2004 WL 1842987 (E.D.Pa.))

members of the proposed class were harmed by Defendant's anti-competitive conduct. Indeed, the Third Circuit noted in its *en banc* opinion that, "LePage's expert testified that the price of Scotch-brand tape increased since 1994, after 3M instituted its rebate program." *LePage's II, 324 F.3d at 164.* Second, and more importantly, in this case Plaintiff has pointed to the existence of common proof, specifically Defendant's internal databases, which will affirmatively establish the impact of Defendant's conduct upon each of the members of the proposed class. Thus, this Court will not likely be faced with anything approaching the "herculean" task of examining hundreds of millions of individual transactions that would have been required of the Court in *Newton.*

*15 Defendant argues, however, that Dr. Kamien's opinion lacks foundation, because he has not made an adequate demonstration that he has studied the market for transparent tape, or the market for wrap and mail tape, in the United States. Furthermore, Defendant argues that, given the complexities inherent in these markets, the methodologies that Dr. Kamien proposes for proving classwide impact cannot feasibly be applied to the facts of this case.

Defendant relies upon *In re Linerboard Antitrust Litig.,* in which the Third Circuit highlighted the need for expert witnesses to support their expert opinions with supporting data and collaborating opinions. The *Linerboard* court credited the testimony of the plaintiff's expert witnesses, who opined that an alleged conspiracy among producers of linerboard to reduce their inventories would have had a common, class-wide impact. The court did so in large part because the experts' opinions "were supported by charts, studies and articles from leading trade publications." *Linerboard,* 305 F.3d at 153. Specifically, the expert witnesses had conducted "extensive empirical investigation[s]" into the market for linerboard and corrugated boxes. *Id.* Thus, the expert's conclusions were not generalized theories, but were instead based upon a specific analysis of the actual conditions present in the relevant market. *Linerboard,* therefore, teaches that at least some analysis of the relevant market and other facts unique to the particular case is required before an expert can opine that all class members have suffered antitrust injury. Compare *Weisfeld v. Sun Chemical Corp., 210 F.R.D. 136, 143 (D.N.J.2002)* (finding that Plaintiff had failed to satisfy the predominance

requirement where Plaintiff offered "no ... support for his claim of classwide impact, only the naked conclusions of his expert.") with *Daniel v. American Bd. of Emergency Medicine, 269 F.Supp.2d 159, 201 (W.D.N.Y.2003)* (predominance requirement satisfied where expert's "opinion is based upon a substantial body of independently created data tending reasonably to confirm his preliminary conclusions as to the classwide impact of Defendants' [alleged unlawful conduct] upon the compensation of the proposed class.")

The Court finds that Dr. Kamien has sufficiently augmented his conclusion that classwide impact can be established through the use of common proof with supporting documentation and economic theory. The Court further finds that this supporting documentation demonstrates that Dr. Kamien has conducted at least a preliminary study of the market for transparent tape and the feasibility of applying his economic theory to this market. For example, in support of his assertion that the market for "wrap and mail" tape represents a valid competitive benchmark for this case which may be used to calculate damages on a common basis for the entire class, Dr. Kamien utilized Defendant's own internal strategic business plan, which states that 3M regained market share lost in the early 1990's from emerging competition by lowering the price of its wrap and mail products substantially. (6/9/03 Kamien Decl. ¶ 16 & Ex. F.) Dr. Kamien's analysis of the market for transparent tape prior to 3M's anti-competitive conduct similarly cites to both deposition testimony of 3M employees and *LePage's* trial testimony to support Dr. Kamien's assertion that the discounts offered by 3M during this period can be used as a proxy for determining the prices that 3M would have charged for its tape in the absence of its anti-competitive conduct. The Court therefore finds that Dr. Kamien has supported his expert opinion with "sufficient evidence and a plausible theory to convince the Court that class-wide impact ... may be proven by evidence common to all class members." *Mercedes Benz, 213 F.R.D. at 190.*

*16 Defendant also points out several characteristics of the markets for transparent tape and wrap and mail tape that it alleges Dr. Kamien failed to consider, and which demonstrate that Dr. Kamien's proposed methods for establishing impact through the use of common proof will not work in this case. For example, Defendant notes that Dr. Kamien was unaware that Defendant actually utilized bundled rebates in the wrap and mail market, making it an inadequate competitive benchmark. (Def's Opp. Class Cert at 51). Plaintiff notes, however, that bundled

Not Reported in F.Supp.2d                                                                                    Page 15
Not Reported in F.Supp.2d, 2004 WL 1842987 (E.D.Pa.), 2004-2 Trade Cases P 74,523
**(Cite as: 2004 WL 1842987 (E.D.Pa.))**

rebates were used in the wrap and mail market for the first time in 1993 as part of a pilot program. Plaintiff further notes that the bundled rebate test program only applied to thirteen purchasers during the year 1993. Dr. Kamien testified that, because the bundled rebate programs took a number of years to achieve an effect upon pricing in the markets in which they were used, the market for wrap and mail tape during the year 1993 could still be used as a benchmark notwithstanding the existence of the bundled rebate program. (Kamien Dep. at 100.) Defendant also argues that, according to its research, and contrary to Dr. Kamien's assertions, there was no general 25% decrease in the price of wrap and mail tape in the year 1993. Rather, according to Dr. Rubinfeld, 3M decreased the price of only two of the products in its wrap and mail line in January 1993. (5/17/04 Rubinfeld Decl. ¶ 18.) According to Dr. Rubinfeld, the prices of other wrap and mail products were left unchanged in 1993. (Id.) Furthermore, according to Dr. Rubinfeld, in January 1995, the prices of these two tape products were further reduced, while the prices of other wrap and mail tapes were increased slightly. (Id.) According to 3M, this evidence demonstrates that the price trends in the wrap and mail market in response to competition were not consistent or uniform. Accordingly, 3M argues, because there was no common impact from competition on price in the wrap and mail market, this market cannot provide an adequate competitive benchmark. Dr. Kamien responds that he does not believe that this new information, in itself, indicates that the wrap and mail market cannot serve as an appropriate benchmark in this case. Dr. Kamien notes specifically that he does not yet have access to the gross margins on wrap and mail products. (6/4/04 N.T. at 19.)  [FN14] It is the gross margins for products in the wrap and mail market, Dr. Kamien argues, that will allow him to determine 3M's response to the entry of competitors in a competitive market, not movements in the price charged to the end user. (Id.) This is because, without the gross margin data, it is not possible to determine if the price fluctuations on certain wrap and mail products were caused by, for example, fluctuations in the cost of production, as opposed to 3M's decision to selectively reduce prices in response to competition. (Id.) Moreover, Dr. Kamien points out that he does not yet know the market share of the two wrap and mail products for which 3M reduced prices 25%. (6/4/04 N.T. at 18.) Dr. Kamien notes that, if these two products were the "big sellers" in this market, it would make sense for 3M to lower the price of these two products, as opposed to the price on products which sold in smaller volumes, in order to regain

market share. (Id.)

> FN14. In a prior order, the Court denied Plaintiff's request seeking "discovery regarding pricing, profits and competitive information for Defendant's office products other than invisible and transparent tape since 1992." (See 3/31/03 Order, Docket # 32.)

*17 The Court finds that Dr. Kamien's testimony provides a sufficient rebuttal to Defendant's argument that factors unique to the transparent tape market would render Dr. Kamien's proposed benchmarking analysis inadequate in this case. Accordingly, the dispute between Plaintiff and Defendant as to whether Dr. Kamien's benchmarking analysis will work in this case is not appropriately considered at this time. See In re Visa Check/Master Money Antitrust Litig., 280 F.3d at 135 (noting that, at class certification stage of litigation, a court "may not weigh conflicting expert evidence or engage in statistical dueling of experts.") (citation omitted). It will be for a jury deciding the merits of this litigation, after the parties have had the full benefit of discovery, to evaluate the conflicting testimony of Plaintiff's and Defendant's experts and determine the weight that Dr. Kamien's expert opinion deserves. See In re Domestic Air Transp. Litig., 137 F.R.D. 677, 692 (N.D.Ga.1991) ("It is not the function of the Court at [the class certification stage] to determine whether [the expert witness] is correct. The weight to be given his testimony and its effect is for the fact finder in assessing the merits of plaintiffs' claims at a later date.")

Defendant also attacks Dr. Kamien's proposed use of the market for transparent tape before Defendant's conduct began as a benchmark because, according to Defendant, Plaintiff has made no showing that the data needed to do this benchmarking analysis is available. (Def's Opp. Class Cert. at 49-50.) However, as the parties are well aware, Defendant objected to the disclosure of pricing and competitive information for 3M's invisible and transparent tape for the period from 1989 through 1991 during the class certification phase of this action, and the Court thereafter denied Plaintiff's Motion seeking this information before the commencement of merits discovery. (See 3/31/03 Order, Docket # 32.) Furthermore, Defendant has not alleged that this data, which ostensibly would allow Dr. Kamien to conduct his analysis, is not available, nor has it provided a credible reason to explain why such data would not be available. Defendant further attacks Dr. Kamien's

Not Reported in F.Supp.2d, 2004 WL 1842987 (E.D.Pa.), 2004-2 Trade Cases P 74,523
(Cite as: 2004 WL 1842987 (E.D.Pa.))

benchmarking methodology for failing to take into account the complexities of the market for transparent tape. Specifically, Defendant relies upon the fact that there are more than 1,000 different tape products in the market definition of transparent tape, and that the prices for each product vary greatly depending upon the customer and the time period. However, while it may be true that Defendant produces nearly 2,000 different product stock keeping units ("SKU's") that would be included in the transparent tape market definition, Mr. Kaplan, one of Defendant's expert witnesses, testified that only 100 of these SKU's comprise approximately 80% of 3M's sales. (11/4/03 N.T. at 75.) Dr. Kamien opines that one can approximate the pricing behavior of the remaining 1,900 SKU's by examining the pricing behavior of the top 100 SKU's, because one would expect that the prices of the remaining SKU's would have behaved in a similar manner. (8/13/03 N.T. at 161- 62.) Furthermore, Dr. Rubinfeld has admitted that Defendant maintains databases which track the prices that Defendant charges each individual customer for each product it sells, and that these databases contain promotional allowances and rebates, as well as other discounts offered to each customer. (Rubinfeld Dep. at 177-78). Furthermore, the existence of market complexity does not in itself necessarily mandate the use of individualized proof of impact. Rather, courts have granted class certification in cases where many of the proposed class members payed individually negotiated prices. For example, in *Industrial Diamonds,* the court certified a class of plaintiffs who paid individually negotiated prices for industrial grade diamonds for which a list price was set. *167 F.R.D. at 383-84.* The *Industrial Diamonds* court rejected the defendant's argument that the individually negotiated prices made an individualized determination of damages necessary, noting that, if plaintiffs could prove at trial that the "[the] list prices were the basis for individual price negotiations between defendants and their customers, a jury could reasonably conclude that purchasers of list-price products were impacted by the alleged [price fixing] conspiracy." *Id.* at 384; *see also In re Flat Glass Antitrust Litig.,* 191 F.R.D. 472, 486 (W.D.Pa.1999) ("even though some plaintiffs negotiated prices, if plaintiffs can establish that the base price from which these negotiations occurred was inflated, this would establish at least the fact of damage, even if the extent of the damage [suffered] by each plaintiff varied.") (citations omitted); *Mercedes Benz,* 180 F.R.D. at 189 (crediting expert's conclusion that common proof of impact would be possible even where putative plaintiffs each negotiated individual prices for their automobiles);

*Rosack v. Volvo of America Corp.,* 131 Cal.App.3d 741, 182 Cal.Rptr. 800, 811 (Cal.App.1982) ("The good negotiator in the fixed market would presumably have gotten an even better deal in the competitive market.") In this case, Plaintiff has asserted that the discounts that individual customers received were discounts off of a monopoly price. (*See* Compl. ¶ 27.)

**\*18** Accordingly, the Court finds that Plaintiff has adduced sufficient evidence and a plausible theory to support its proposition that common evidence is available which will establish the existence of impact for each potential class member. The Court therefore finds that common questions predominate over individual questions with respect to Defendant's violation of the antitrust laws and with respect to impact.

The Court further finds that a class action is the superior method for the fair and efficient adjudication of this dispute. Rule 23(b)(3) provides a list of four factors which are relevant in determining this issue. The factors are:

> (A) The interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed. R. Civ. P. 23(b)(3). As Plaintiff points out, there are a substantial number of potential class members whose recovery in this case would be dwarfed by litigation costs associated with bringing this suit. Accordingly, bringing this suit as a class action "provides an efficient alternative to individual claims, ... because individual Class members are unlikely to bring individual actions given the likelihood that their litigation expenses would exceed any potential recovery." *Orloff v. Syndicated Office Sys., Inc.,* 00-CV 5355, 2004 WL 870691, at *5 (E.D.Pa. Apr.22, 2004) (citation omitted). To be sure, the modified class may include members who have purchased a sufficiently large quantity of tape from 3M to justify the commencement of an individual suit. However, the class also contains many members whose potential damage awards would be dwarfed by their potential litigation expenses. Indeed, as noted, *supra,* Plaintiff's potential damages in this case are estimated to be only approximately \$11,000. Furthermore, many of the largest purchasers of 3M tape were also purchasers of private label tape, and

Not Reported in F.Supp.2d                                                                    Page 17
Not Reported in F.Supp.2d, 2004 WL 1842987 (E.D.Pa.), 2004-2 Trade Cases P 74,523
**(Cite as: 2004 WL 1842987 (E.D.Pa.))**

would, therefore, not be included in the modified class. (*See* Pl's Renewed Mot. Class Cert. Ex. B, "Kaplan Dep.", Ex. 10.) 3M argues that class certification is not appropriate in light of the fact that two purchasers of 3M tape have already publicly stated their opposition to this lawsuit. However, Plaintiff contends that neither of these purchasers would be included in the modified class, and Defendant has pointed to nothing which refutes Plaintiff's contention. (*See* Pl's 5/7/04 Reply Mem. at 21.) Defendant also argues that the fact that no member of the class has sought to file an individual action in this case weighs against class certification. However, as Plaintiff points out, this is as likely the result of the fact that potential class members cannot afford the costs of an individual suit as it is the result of class members' disinterest in the underlying lawsuit. Finally, 3M argues that concerns over the adequacy of Bradburn's representation of the proposed class militate against a finding that a class action is the superior method of proceeding with this litigation. However, as discussed, *supra,* the Court has already found that Bradburn is an adequate representative of the class. Accordingly, it would not be appropriate to revisit this issue in considering whether the superiority requirement is met.

### V. CONCLUSION

**\*19** For the foregoing reasons, Plaintiff's Motion for Class Certification will be granted, subject to the condition that Terry Parkinson and her law firm, Welsh and Hubble, P.C., will not serve as class counsel in this action and will not otherwise be entitled to any attorney's fees or other sums which the Court may award in this action.

An appropriate order follows.

### ORDER

AND NOW, this ___ day of August, 2004, upon consideration of Plaintiff's Motion for Certification of Modified Class (Doc. # 140), all related submissions, and the hearings held on June 4, 2004 and June 9, 2004, IT IS HEREBY ORDERED that Plaintiff's Motion is GRANTED. The following class of Plaintiffs shall be certified:

All persons who directly purchased invisible or transparent tape from 3M Company between October 2, 1998 and the present, who have not purchased, for resale under the class member's own label, any "private label" invisible or transparent tape from 3M Company or any of 3M Company's competitors at any time from October 2, 1988 to the present.

IT IS FURTHER ORDERED that the class claims and issues shall be those set forth in the Complaint, and that the following shall serve as class counsel pursuant to Fed.R.Civ.P. 23(g):

R. Steven Berry, Berry and Leftwich J. Daniel Leftwich, Berry and Leftwich Gregory Baruch, Berry and Leftwich Charles M. Jones, Jones, Osteen, Jones and Arnold

The law firm of Welsh & Hubble, P.C. shall not serve as class counsel.

IT IS FURTHER ORDERED that the parties shall confer as to a plan of Class notice and shall submit such plan within twenty (20) days from the date of this Order.

Not Reported in F.Supp.2d, 2004 WL 1842987 (E.D.Pa.), 2004-2 Trade Cases P 74,523

**Motions, Pleadings and Filings** (Back to top)

• 2006 WL 1357783 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Motion in Limine (Apr. 28, 2006)Original Image of this Document (PDF)

• 2006 WL 1760137 (Trial Motion, Memorandum and Affidavit) Motion in Limine to Preclude Bradburn from Introducing Videotape Reenactments of Testimony (Apr. 28, 2006)Original Image of this Document (PDF)

• 2006 WL 2068019 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Objections and Counter-Designations to Defendant's Designation of Deposition Testimony (Apr. 28, 2006)Original Image of this Document (PDF)

• 2006 WL 2068020 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Objections to Defendant's Exhibits (Apr. 28, 2006)Original Image of this Document (PDF)

• 2006 WL 2068021 (Trial Motion, Memorandum and Affidavit) Defendant 3M's Counter Designations and Objections to Plaintiff's Designations (Apr. 28, 2006)Original Image of this Document (PDF)

• 2006 WL 2068022 (Trial Motion, Memorandum and Affidavit) Defendant 3M's Counter Designations and Objections to Plaintiff's Designations from Lepage's Inc. v. 3M (Apr. 28, 2006)Original Image of this Document (PDF)

• 2005 WL 2682789 (Trial Motion, Memorandum

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1842987 (E.D.Pa.), 2004-2 Trade Cases P 74,523
(Cite as: 2004 WL 1842987 (E.D.Pa.))

and Affidavit) Third Parties Henkel Corporation and Henkel Consumer Adhesives Inc.'s Consolidated Memorandum in Opposition to 3m's Motion to Modify Protective Order (Aug. 2, 2005)Original Image of this Document (PDF)

• 2005 WL 2682792   (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Support of 3M's Motion for Certification of the Court's June 9, 2005 Collateral Estoppel Order Pursuant to 28 U.S.C. § 1292(b) (Aug. 1, 2005)Original Image of this Document (PDF)

• 2005 WL 4428917   (Trial Motion, Memorandum and Affidavit) Class's Opposition to 3M's Motion for Certification of the Court's June 9, 2005 Collateral Estoppel Order (Jul. 8, 2005)Original Image of this Document (PDF)

• 2005 WL 4428915   (Trial Motion, Memorandum and Affidavit) Class' Reply in Support of Proposed Scheduling Order and in Opposition to 3M Proposed Scheduling Order (Jun. 9, 2005)Original Image of this Document (PDF)

• 2005 WL 4428916   (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Support of 3M's Motion for Reconsideration of March 30, 2005 Order or Certification of Interlocutory Appeal (May 10, 2005)Original Image of this Document (PDF)

• 2005 WL 4428914   (Trial Motion, Memorandum and Affidavit) 3M'S Memorandum in Opposition to the Motion to Quash of Henkel Corporation and Henkel Consumer Adhesives, Inc. and in Support of its Motion to Compel (Jan. 20, 2005)Original Image of this Document (PDF)

• 2004 WL 3770562   (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Meijer, Inc. and Meijer Distribution Inc.'s Motion for Reconsideration (Nov. 5, 2004)Original Image of this Document (PDF)

• 2004 WL 4443219   (Trial Motion, Memorandum and Affidavit) Class Representative's Opposition to Meijer's Motion to Intervene (Oct. 18, 2004)Original Image of this Document (PDF)

• 2004 WL 4443222   (Trial Motion, Memorandum and Affidavit) 3M'S Memorandum in Opposition to Meijer, Inc. and Meijer Distribution Inc.'s Motion to Intervene (Oct. 18, 2004)Original Image of this Document (PDF)

• 2004 WL 3770561   (Trial Pleading) Complaint-Class Action Tury Trial Demanded (Feb. 23, 2004)Original Image of this Document (PDF)

• 2003 WL 24309663   (Trial Motion, Memorandum and Affidavit) Plaintiff's Reply in Support of Motion for Partial Summary Judgment (Sep. 30, 2003)Original Image of this Document (PDF)

• 2003 WL 24309662   (Trial Pleading) Defendant 3M Company's Answer to Plaintiff Bradburn Parent/Teacher Store, Inc.'s Complaint (Aug. 28, 2003)Original Image of this Document (PDF)

• 2003 WL 25150748   (Partial Expert Testimony) Hearing Before the Honorable John R. Padova United States District Court Judge (Aug. 13, 2003)Original Image of this Document (PDF)

• 2003 WL 25151055   (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum in Support of Motion for Partial Summary Judgment (Aug. 11, 2003)Original Image of this Document (PDF)

• 2003 WL 25151054   (Trial Motion, Memorandum and Affidavit) Defendant 3M Company's Reply Memorandum (Jun. 13, 2003)Original Image of this Document (PDF)

• 2003 WL 24309661   (Trial Motion, Memorandum and Affidavit) Opposition to Motion to Dismiss (May 29, 2003)Original Image of this Document (PDF)

• 2003 WL 24309660   (Trial Motion, Memorandum and Affidavit) Memorandum of Points and Authorities in Support of 3M Company's Motion to Dismiss Plaintiff's Complaint (Apr. 29, 2003)Original Image of this Document (PDF)

• 2003 WL 25151053   (Trial Motion, Memorandum and Affidavit) 3M Company's Response to Plaintiff's Further Demand for Profit Margin Data (Apr. 24, 2003)Original Image of this Document (PDF)

• 2003 WL 25151052   (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum Regarding Need for Discovery Regarding Competitive Benchmark Information (Feb. 14, 2003)Original Image of this Document (PDF)

• 2002 WL 33849125   (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Support of 3M'S Motion to Transfer Venue (Dec. 2, 2002)Original Image of this Document (PDF)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 1842987 (E.D.Pa.), 2004-2 Trade Cases  P 74,523

**(Cite as: 2004 WL 1842987 (E.D.Pa.))**

• <u>2002 WL 33849124</u>  (Trial Motion, Memorandum and Affidavit) Complaint-Class Action (Nov. 27, 2002)Original Image of this Document (PDF)

• <u>2002 WL 33849123</u>  (Trial Motion, Memorandum and Affidavit) Plaintiff's Opposition to Defendant 3M'S Motion to Transfer Venue (Nov. 22, 2002)Original Image of this Document (PDF)

• <u>2:02cv07676 </u>(Docket) (Oct. 02, 2002)

• <u>2002 WL 33009233</u>  (Trial Pleading) Complaint-Class Action (Oct. 1, 2002)Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

COMPENDIUM OF UNREPORTED CASES
CITED IN REPLY MEMORANDUM IN SUPPORT OF
END PAYOR PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

# TAB B

STATE OF WISCONSIN                    CIRCUIT COURT                    DANE COUNTY
                                          BRANCH 9

TOM CAPP,

      Plaintiff,

    v.                                                    Case No. 00 CV 0637

MICROSOFT CORPORATION,
a Washington corporation,

      Defendant.



FILED
JUL 2 5 2001
CIRCUIT COURT DANE COUNTY, WI

## ORDER CERTIFYING CLASS ACTION

The Plaintiff's Motion to Certify Action as Class Action (the "Class Certification

Motion") filed on March 7, 2000, came on for hearing before this Court on June 29, 2001, at

9:00 a.m.; Plaintiff Tom Capp having appeared by his counsel, Turner & Maasch, by Mark A.

Maasch, of San Diego, California; Defendant Microsoft Corporation ("Microsoft") having

appeared by its counsel, Quarles & Brady, by Stuart Parsons, of Milwaukee, Wisconsin, Sullivan

& Cromwell, by Justin Daniels, of New York, New York, and Montgomery, McCracken, Walker

& Rhoads, by Peter Breslauer, of Philadelphia, Pennsylvania; and the Court having thoroughly

reviewed and considered the memoranda and materials submitted by the parties together with the

statements and arguments of counsel and all of the records on file, and after doing so, finding

and concluding, for the reasons more fully stated in my bench decision which has been

transcribed, that the requirements of Wis. Stats. § 803.08 have been satisfied and that the class

proposed in Plaintiffs' First Amended Complaint dated March 15, 2000, should be certified.

QBMKE\5089005.1

EXB 13

NOW, THEREFORE, IT IS HEREBY ORDERED, as follows:

1.    That Microsoft's Motion to Compel and Motion for Evidentiary Hearing are denied;

2.    That Plaintiffs' Motion to Certify Action as Class Action shall be and is GRANTED;

3.    That the class certified shall be and is as follows:  All end user licensees of Windows 98 residing in the State of Wisconsin as to whom Microsoft has an electronic mail address that is computer-accessible by Microsoft;

4.    That Tom Capp be certified as the class representative;

5.    That John L. Cates and Mark A. Maasch be appointed as lead counsel for the class; and

6.    That an appropriate notice be sent to the members of the class as soon as practicable after the class certification issue is decided in Milwaukee, and this Court has had an opportunity to consider consolidating actions within this state.

Dated this 25 day of July, 2001.

_Gerald Nichol_
Hon. Gerald Nichol
Dane County Circuit Court Judge

QBMILCE\5089005.1