**COMPENDIUM OF UNREPORTED CASES CITED IN REPLY MEMORANDUM IN SUPPORT OF END PAYOR PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

# TAB C

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 673066 (E.D.Pa.)
**(Cite as: 1999 WL 673066 (E.D.Pa.))**

Page 1

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
In re DIET DRUGS (PHENTERMINE, FENFLURAMINE, DEXFENFLURAMINE) PRODUCTS LIABILITY LITIGATION.
Barbara JEFFERS and Johnna Day, on behalf of themselves and all others similarly situated
v.
AMERICAN HOME PRODUCTS CORPORATION.
THIS DOCUMENT RELATES TO ALL ACTIONS.
**No. CIV. A. 98-20626.**

Aug. 26, 1999.

***MEMORANDUM AND PRETRIAL ORDER NO. 865***

LOUIS C. BECHTLE, J.

***1 END OF FRONT MATTER**

Presently before the court are plaintiffs Barbara Jeffers' ("Jeffers") and Johnna Day's ("Day") (collectively "Plaintiffs") Motions for Class Certification Pursuant to Federal Rule of Civil Procedure 23(b)(2) and Motion to Amend the Complaint and defendant American Home Products Corporation's ("AHP") responses thereto. For the reasons set forth below, the court will conditionally certify a medical monitoring class as follows.

**I. *BACKGROUND***

First, the court will review the history of the pharmaceutical products that are the subject of this civil action. Second, the court will review the history of the Diet Drug Litigation [FN1] and MDL No. 1203 generally. Third, the court will review the procedural history of the *Jeffers* civil action.

FN1. The court will use the term "MDL No. 1203" to refer to the consolidated federal cases before it, captioned as *In re: Diet Drugs (phentermine, fenfluramine, dexfenfluramine) Products Liability Litigation*. The court will use the term "Diet Drug Litigation" when referring to the federal and state cases collectively.

**A. *The Diet Drugs***

The Diet Drug Litigation involves three prescription pharmaceutical products-- phentermine, fenfluramine and dexfenfluramine (collectively, the "Diet Drugs")--which were approved by the Food and Drug Administration ("FDA") for use as appetite suppressants. (Stip. 1/5/99 ¶ 1.) Phentermine was approved by the FDA in 1959. [FN2] (Pls.' Mot. for Cert. at 7 n.2.) Fenfluramine was approved for use in 1973 and, between December 1989 and September 15, 1997, AHP, directly and/or through its subsidiaries, labeled and sold fenfluramine under the brand name Pondimin. (Pls.' Mot. for Cert. at 7; Stip. 1/5/99 ¶ ¶ 2 & 5.) Dexfenfluramine was approved in 1996 and, between June 1996 and September 15, 1997, AHP, directly and/or through its subsidiaries, promoted, marketed, labeled and sold dexfenfluramine under the brand name Redux. (Pls.' Mot. for Cert. at 8; Stip. 1/5/99 ¶ ¶ 3 & 5.) Fenfluramine and dexfenfluramine are chemically related. (Pls.' Mot. for Cert. at 7.) Estimates set the number of persons ingesting Pondimin at four million and the number of persons ingesting Redux at two million. (Stip. 1/5/99 ¶ 6; Pls.' Mot. for Cert. at 8-9 & Ex. 3; Tr. 3/17/99 at 9.)

FN2. Phentermine continues to have FDA approval and is currently sold as a "generic" drug by a number of manufacturers.

Plaintiffs allege that sales of Redux and Pondimin increased dramatically between 1992 and 1996, following a study published in May 1992 that analyzed the use of Pondimin in combination with phentermine and concluded that the combination of drugs, commonly called "Fen/Phen," facilitated weight loss. (Pls.' Mot. for Cert. at 7.) However, subsequent studies linked the use of the Diet Drugs to a number of health problems. For example, a study published in August 1996 in the New England Journal of Medicine concluded that the ingestion of fenfluramine and dexfenfluramine increased the incidence of Primary Pulmonary Hypertension

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

("PPH"), a rare and often fatal disease. (Stip. 1/5/99 ¶ 8, Ex. A.) Another study published in July 1997, also in the New England Journal of Medicine, concluded that the ingestion of fenfluramine and phentermine in combination increased the incidence of valvular heart disease. (Stip. 1/5/99 ¶ 9, Ex. B.) On September 15, 1997, AHP removed both Pondimin and Redux from the market pursuant to a request by the FDA. (Stip. 1/5/99 ¶¶ 6, 7.)

**B. *MDL No. 1203 and the Diet Drug Litigation***

***2** After Pondimin and Redux were withdrawn from the market, thousands of civil actions were filed in federal and state courts nationwide on behalf of Diet Drug users. The claims in individual Diet Drug Litigation actions vary, but they principally allege state law claims including product liability, negligence, misrepresentation and breach of warranty. Some of the cases request punitive damages. The plaintiffs in these actions allege that their ingestion of the Diet Drugs caused various illnesses, including, but not limited to PPH and valvular heart disease. In addition, many actions brought by plaintiffs without present injury request legal or equitable relief in the form of medical monitoring or refunds of purchase prices.

On December 12, 1997, this court received an order from the Judicial Panel on Multidistrict Litigation transferring a number of federal Diet Drug civil actions from other districts to the Eastern District of Pennsylvania for consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407. Since that time, the court has received over one thousand actions as part of MDL No. 1203. There are over seventeen pending motions for class certification in MDL No. 1203 actions, not including the instant motion.

In order to facilitate the administration of MDL No. 1203, the court has appointed a number of attorneys to serve on the Plaintiffs' Management Committee (the "PMC"). Pretrial Order No. 6. The defendants in the Diet Drug cases, including AHP, Interneuron Pharmaceuticals, Inc., Les Laboratories Servier, over two dozen phentermine manufacturers and distributors, health care providers, weight-loss centers, pharmacies and intermediaries, are represented by individual counsel and selected liaison counsel. The court has also appointed a Special Discovery Master to assist the court in facilitating discovery matters. Pretrial Order No. 36. The parties, the Special Master and the court continue to work toward completion of case-specific and MDL-wide discovery and to resolve related pretrial issues to facilitate the timely remand of individual civil actions to their respective transferor courts. *See* Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26, 40, 118 S.Ct. 956, 140 L.Ed.2d 62 (1998) (holding cases not disposed of during MDL process must be remanded to transferor courts at or before conclusion of pretrial proceedings). Presently, there are two blocks of cases involving plaintiffs that have a serious, diagnosed medical condition which have been designated for priority in the suggestion of remand process. The first group is scheduled for suggestion of remand on September 1, 1999 and the second group is scheduled for October 1, 1999. The PMC has completed the majority of its MDL-wide expert discovery. Individual plaintiffs have not yet completed case-specific causation expert discovery and defendants have not yet completed their expert discovery, although this discovery is on schedule in accordance with various pre-trial orders and is expected to be completed by the fall of this year.

***3** In addition to the federal cases, the court is aware of many civil actions presently in state courts throughout the nation. Some states, including Pennsylvania, New York, New Jersey and California, have consolidated the Diet Drug Litigation in their respective state courts, through processes similar to MDL No. 1203. The court is aware of only a limited number of state civil actions which have proceeded to trial as of this date and is aware of only one case in which a jury verdict has been returned. The court is also aware of six states which have certified some form of medical monitoring class action. Those states include, in chronological order of certification, Texas, Washington, Illinois, New Jersey, West Virginia and Pennsylvania. [FN3]

FN3. *Earthman v. American Home Prods. Corp.,* No. 97-10-03790-CV, slip op. at 2 (Tex.Dist.Ct. Oct. 14, 1998); *St. John v. American Home Prods. Corp.,* No. 97-2-06368-4, slip op. at 4-5 (Wash.Super.Ct. Dec. 4, 1998); *Rhyne v. American Home Prods. Corp.,* No. 98-CH-04099, slip op. at 1 (Ill.Cir.Ct. Jan. 26, 1999); *Vadino v. American Home Prods. Corp.,* No. MID-L-425-98, slip op. at 31 (N.J.Super.Ct. Jan. 26, 1999); *Burch v. American Home Prods. Corp.,* No. 97-C-204[1-11], slip op. at 35-38 (W.Va.Cir.Ct. Feb. 11, 1999); *In re Pa. Diet Drugs Litig.,* Master Docket No. 9709-3162, slip op. at 39 (Pa.Super.Ct. Mar. 12, 1999).

**C. *Procedural History of the Jeffers Civil Action***

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The court will now set forth the basic background of the *Jeffers* civil action. On September 14, 1998, Plaintiffs filed their original class action Complaint, naming only AHP as a defendant. Plaintiffs allege that they ingested Pondimin and Redux. (Compl. ¶ ¶ 4 & 5.) [FN4] They both allege that, due to such ingestion, they are "at risk for developing valvular heart disease, cardiopulmonary dysfunction and/or primary pulmonary hypertension." *Id.* In their original Complaint, Plaintiffs seek to represent a "nationwide class of persons who were prescribed and who have taken the drugs Redux and/or Pondimin which were manufactured, marketed, sold, distributed and/or placed in interstate commerce by defendant and who either lack health coverage or who have been denied health coverage for medical monitoring and medical diagnostic procedures and testing that are necessary and appropriate." (Compl. ¶ 42.) Plaintiffs allege claims under theories of: (a) strict product liability (failure to warn); (b) strict product liability; (c) negligence; and (d) breach of implied warranty. They request injunctive relief in the form of a "court approved medical monitoring program" which would include "echocardiograms, electrocardiograms, chest x-rays and perfusion lung scans." *Id.* at 78.

FN4. In the Complaint, Plaintiffs allege that they both ingested "dexfenfluramine, and/or fenfluramine." *Id.* In her deposition, Day stated that she ingested Pondimin, but never ingested Redux. (AHP Mot. Opp. Ex. LL-18.) Jeffers stated in her deposition that she ingested a combination of Pondimin and phentermine and then ingested Redux for a short period. (AHP Mot. Opp. Ex. LL-18.)

*4 On October 27, 1998, AHP filed its Answer. On November 6, 1998, AHP filed a Third-Party Complaint against a number of phentermine manufacturers and distributors ("Phentermine Defendants"). [FN5] Subsequently, Plaintiffs and a number of Phentermine Defendants filed motions to dismiss or sever the Third-Party Complaint. On February 10, 1999, the court stayed AHP's Third-Party Complaint pending the resolution of the motion for class certification. Pretrial Order No. 461. On March 3, 1999, AHP filed its opposition to Plaintiffs' Motion for Class Certification. On March 15, 1999, Plaintiffs filed their Motion for Medical Monitoring Class Certification under Federal Rule of Civil Procedure 23(b)(2). On March 17, 1999 the court held a hearing on class certification issues.

FN5. These Third-Party Defendants include Camall Company, which is presently in Chapter 11 Bankruptcy, Century Pharmaceuticals, Duramed Pharmaceuticals, Eon Laboratories Manufacturers, Fisons Corporation, Gate Pharmaceuticals, Geneva Pharmaceuticals, H.L. Moore Drug, Ion Laboratories, Incorporated, Jones Medical Industries, King Pharmaceuticals, Harvard Drug Group, Medeva Pharmaceuticals, Parmed Pharmaceuticals, Pennwalt Corporation, Qualitest Products, Rd-Rx Pharmaceuticals, Rexar Pharmacal Corporation, Richwood Pharmaceuticals, Shire Richwood, Incorporated, Roberts Pharmaceuticals, Rosemont Pharmaceuticals, Rugby Laboratories, Seatrace, Incorporated, Smithkline Beecham, United Research Laboratories and Zenith Goldline Incorporated.

On June 24, 1999, Plaintiffs filed a Motion to Amend the Complaint together with a second motion for class certification. The Motion to Amend seeks to modify the original Complaint in a number of ways. First, the proposed Amended Complaint would limit the proposed class to those persons who have taken Pondimin or Redux "for at least thirty cumulative days during the period between May 1, 1992 and September 15, 1997 and who have not filed a claim for personal injuries." (Pls.' Mot. Am. Compl., Ex. A ¶ 1.) Second, it would include in the class those persons with health insurance as well as those without. *Id.* Third, it specifies in greater detail the equitable relief sought, including:

(a) creating a medical "registry" for class members in which relevant demographic, medical and scientific information concerning class members is recorded; (b) performing state-of-the-art echocardiograms for each class member; (c) performing full cardiopulmonary examinations including a chest x-ray and electrocardiogram for each class member; (d) gathering and analyzing relevant medical demographic information from class members including but not limited to the results of echocardiograms and cardiopulmonary examinations performed on class members; (e) conducting medical research concerning the incidence, prevalence, natural course and history, diagnosis and treatment of diet drug induced valvular heart disease; and (f) publishing and otherwise disseminating such information to members of the class and their physicians.

*5 *Id.* at ¶ 49. On July 12, 1999, AHP filed its opposition to the Motion to Amend the Complaint and for Class Certification.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d Page 4
Not Reported in F.Supp.2d, 1999 WL 673066 (E.D.Pa.)
**(Cite as: 1999 WL 673066 (E.D.Pa.))**

## II. *DISCUSSION*

First, the court will discuss whether the court has jurisdiction. Second, the court will analyze Plaintiffs' claims under Federal Rule of Civil Procedure 23(b)(2). Third, the court will define the scope of the class it will conditionally certify.

### A. *Jurisdiction*

This court has subject matter jurisdiction over these proceedings pursuant to 28 U.S.C. § 1332. [FN6] Diversity of citizenship is present between the named class representative and the defendant. *In re School Asbestos Litig.*, 921 F.2d 1310, 1317 (3d Cir.1990) (requiring complete diversity between named class representatives and defendants to support diversity jurisdiction). Jeffers is a citizen of the state of Pennsylvania and Day is a citizen of the state of Kentucky. (Compl. ¶ ¶ 4 & 5.) AHP is a Delaware corporation whose principal place of business is located in Madison, New Jersey. (Stip. 1/5/99 ¶ 4.) Thus, the court finds that the parties are citizens of different states.

FN6. That statute states: "[t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between ... citizens of different States." 28 U.S.C. § 1332(a)(1).

The $75,000 jurisdictional amount is also met in this action. When a claim primarily seeks equitable or injunctive relief, "it is well established that the amount in controversy is measured by the object of the litigation." *Hunt v. Washington State Apple Adver. Comm'n.*, 432 U.S. 333, 347, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). In addition, the "longstanding rule in [the United States Court of Appeals for the Third Circuit] is that, for purposes of determining the amount in controversy, the value of the equitable relief must be determined from the viewpoint of the plaintiff rather than the defendant." *Pierson v. Source Perrier, S.A.*, 848 F.Supp. 1186, 1188 (E.D.Pa.1994). Also, in a diversity based class action, "[i]t is well settled that ... members of the class may not aggregate their claims in order to reach the requisite amount in controversy." *Packard v. Provident Nat'l Bank*, 994 F.2d 1039, 1044-45 (3d Cir.1993) (citing *Snyder v. Harris*, 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969)).

***6** Here, Plaintiffs seek a comprehensive medical monitoring program that:

a. Notifies individuals who use or used Redux and/or Pondimin of the potential harm from Redux and/or Pondimin;
b. Aides them in the early diagnosis and treatment of resulting injuries through ongoing testing and monitoring of Redux and Pondimin;
c. Provides for state-of-the-art echocardiograms for all members of the class;
d. Provides for [complete] cardiopulmonary examinations including a chest x-ray and electrocardiogram for all members of the class;
e. Provides for accumulation and analysis of relevant medical and demographic information from class members including, but not limited to the results of echocardiograms performed on class members;
f. Provides for the creation, maintenance, and operation of a "registry" in which relevant demographic and medical information concerning all class members is gathered, maintained, and analyzed;
g. Provides for medical research concerning the incidence, prevalence, natural course and history, diagnosis and treatment of diet drug induced valvular heart disease; and
f.[sic] Publishes and otherwise disseminates all such information to members of the class and their physicians.

(Pls.' Mot. Am. Compl., Ex. A ¶ 82.) Such request for relief in this action is equitable in nature. *See Barnes v. American Tobacco Co.*, 161 F.3d 127, 132 (3d Cir.1998) (stating that plaintiffs seeking establishment of court-supervised program through which class members would undergo periodic medical examinations in order to promote early detection of diseases caused by smoking was "paradigmatic request for injunctive relief"), *cert. denied*, 526 U.S. 1114, 119 S.Ct. 1760, 143 L.Ed.2d 791 (1999); *Katz v. Warner-Lambert Co.*, 9 F.Supp.2d 363, 364 (S.D.N.Y.1998) (stating that "a claim for a medical monitoring and research fund is injunctive in nature"); *Gibbs v. E.I. DuPont de Nemours & Co.*, 876 F.Supp. 475, 479 (W.D.N.Y.1995) (stating that relief in form of common, court-supervised fund which would provide medical monitoring was injunctive in nature). [FN7]

FN7. Plaintiffs' request for medical monitoring is truly equitable in nature and, thus, differs from those situations in which courts reject attempts to turn "what is essentially a legal claim into an equitable one merely by demanding an injunction

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

requiring the payment of money." Packard, 994 F.2d at 1050 (citations omitted). *Packard* was a class action involving "sweep fees" charged to bank trust accounts. Sweep fees are charged by banks for the service of looking daily for idle cash and investing it in interest-bearing vehicles until the cash is either invested long-term or distributed to the beneficiary. *Id.* at 1043. In *Packard,* the Third Circuit held that the plaintiffs could not meet the jurisdictional amount. The Third Circuit stated: "[h]ere, virtually all the relief sought is remediable by money damages. The only truly equitable relief sought in this case is an order requiring [the defendant] to provide adequate notice of its sweep fees to trust beneficiaries and to tie future sweep fees to the cost of providing the service." *Id.* at 1050. Thus, the relief requested in *Packard* is distinguishable from the claim for relief in *Jeffers* which includes ongoing medical studies.

*7 In addition, the value of the litigation to each class member in obtaining the benefits of diagnostic testing and medical research is reasonably likely to exceed $75,000. In *Katz,* the court held that class action claims for a medical monitoring and research fund met the jurisdictional amount. Katz, 9 F.Supp.2d at 364. *Katz* involved litigation over the health risks associated with Rezulin, a drug used for treating diabetes. *Id.* The court found that the class request for a medical monitoring and research fund was injunctive in nature. *Id.* Next, the court proceeded to determine the value of the object of the litigation from the plaintiffs' viewpoint. *Id.* In holding that the class's request for medical research satisfied the jurisdictional amount, the court stated:

> But what is the value to an individual user of Rezulin of the medical monitoring and research fund that is the object of this litigation? In one sense, it is speculative, because no one knows how much ultimate benefit any given Rezulin user will derive from such a fund. But in another sense it is appropriately measurable as the cost to defendant of creating such a fund, or at least the research portion of it, for without such research expenditure, no plaintiff would be likely to receive any research benefit. Put another way, in order to receive the putative benefits of the contemplated medical research, a plaintiff would either have to fund the research herself or to prevail in this lawsuit.
>
> This reasoning is applicable not only to the individually named plaintiff ... but also to each member of the rest of putative class. Whatever may be the case as to the proposed monitoring, as to the research component of the proposed relief there is no question of dividing the cost by the number of plaintiffs in the putative class to determine the value to each plaintiff, because ... the full amount of the research, rather than some fraction of it, must be funded to benefit any single member of the contemplated class. Indeed, plaintiff demands that the full amount of research be undertaken regardless of the number of members of the class because each and every member is entitled ... to the protection against Rezulin's hazards that only fully funded future research can hope to achieve.

*Id.* at 364-65. Here, Plaintiffs request similar medical monitoring relief, including a research fund. The court agrees with and adopts the reasoning in *Katz* and finds that it has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332.

**B. *Class Action Certification***

*8 To qualify for class treatment, an action must satisfy the requirements of Federal Rule of Civil Procedure 23(a) and must fit into one of the three subsections of Rule 23(b). *Barnes,* 161 F.3d at 140. The court will review Plaintiffs' claims under Rule 23(a) and (b) in order.

**1. Requirements of Federal Rule of Civil Procedure 23(a)**

Under Rule 23(a) the court must find that:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). Thus, Rule 23(a) requires numerousity, commonality, typicality and adequacy of representation.

The first two conditions, numerousity and commonality, are clearly satisfied in the *Jeffers* action. Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). As discussed above, millions of prescriptions for Redux and Pondimin were written. Joinder of hundreds of thousands, if not millions, of claimants would certainly qualify as impracticable. Under Rule 23(a)(2), there must be "questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2); *see Lake v. First Nationwide Bank,* 156 F.R.D. 615, 624

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Page 6
Not Reported in F.Supp.2d, 1999 WL 673066 (E.D.Pa.)
**(Cite as: 1999 WL 673066 (E.D.Pa.))**

(E.D.Pa.1994) (noting that "a single common question is sufficient to satisfy Rule 23(a)(2)"). There are a number of common issues among class members, including the chemical composition and biological effects of Pondimin and Redux, the labeling and warnings included with the drugs and AHP's knowledge of the alleged side effects. Thus, the court finds the requirements of numerousity and commonality are satisfied.

Rule 23(a) also requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3); *see Barnes,* 161 F.3d at 141 (stating that "typicality requirement is designed to align the interests of the class and the class representatives so that the latter will work to benefit the entire class through the pursuit of their own goals"). The class members have a strong common interest in establishing the fund at issue. Both of the named class representatives and the class as a whole will benefit from the relief requested here. The class members allege that they all ingested Pondimin or Redux and that those drugs increased their risk of contracting PPH or valvular injury. They request medical monitoring in the form of diagnostic testing and the collection and research of medical data for all members. Thus, it can be said that the class representatives' interests are aligned with those of the entire class and that the representatives will work to benefit the entire class.

***9** Lastly, Rule 23(a) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). This requirement has two components, one which requires an inquiry into whether class counsel is qualified and will advance the interests of the entire class and a second which asks whether the named class representatives' interests are "sufficiently aligned with those of the absentees". *Georgine v. Amchem Prods., Inc.,* 83 F.3d 610, 630 (3d Cir.1996), *aff'd sub nom., Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *see also Barnes,* 161 F.3d at 141 (stating Rule 23(a)(4) "serves to uncover conflicts of interest between named parties and the class they seek to represent"). The class counsel in this action are also members of the PMC. *See* Pretrial Order No. 6. These attorneys are both experienced and qualified in handling mass tort cases such as this. The court finds that class counsel is both able and competent to represent the class. Additionally, the named representatives' interests are sufficiently aligned with those of the class members such that there is no conflict of interest between them. As discussed, the class representatives have a strong individual interest in obtaining the requested diagnostic testing and that interest is sufficiently aligned with the common interests of the absentee class members. Moreover, the class as a whole has a strong common interest in the collection of medical data and research into the cause and treatment of the illnesses alleged to be caused by the ingestion of fenfluramine and dexfenfluramine. The court finds no conflict of interest which would render Plaintiffs inadequate representatives of the class. To the extent that AHP asserts that there are differences between the factual and legal claims of the class members, the court will address such differences under its Rule 23(b)(2) analysis below. The court finds that the Rule 23(a) requirements of numerousity, commonality, typicality and adequacy of representation are satisfied in this case.

**2. Federal Rule of Civil Procedure 23(b)(2)**

Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2). Thus, there are two elements implicit in Rule 23(b)(2), first that the defendant is alleged to have acted in some uniform way toward the class that would make relief appropriate and, second, that the injunctive relief requested is applicable to the entire class. Unlike the requirements of Rule 23(b)(3), there is no "superiority" or "predominance" requirement for Rule 23(b)(2) classes. *Compare* Fed.R.Civ.P. 23(b)(2), *with* Fed.R.Civ.P. 23(b)(3) (requiring "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy"). However, because a 23(b)(2) class is dependent on the uniformity of both the defendant's actions toward the class and the injunctive relief applicable to the class, an analysis of whether individual issues exist among class members which would destroy the "cohesive nature" of the class claims is required. In *Barnes,* the Third Circuit stated the reasoning for requiring such cohesion:

> ***10** Because of the cohesive nature of the class, Rule 23(c)(3) contemplates that all members of the class will be bound. Any resultant unfairness to the members of the class was thought to be outweighed by the purposes behind class actions: eliminating the possibility of repetitious litigation and providing small claimants with a means of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Page 7
Not Reported in F.Supp.2d, 1999 WL 673066 (E.D.Pa.)
**(Cite as: 1999 WL 673066 (E.D.Pa.))**

obtaining redress for claims too small to justify individual litigation.

Barnes, 161 F.3d at 143 (quoting *Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 248-49 (3d Cir.1975)). Furthermore, the non-opt out nature of a Rule 23(b)(2) class further requires that there be cohesiveness of the class members' claims. *Id.* at 142 (stating that "a (b)(2) class may require more cohesiveness than a (b)(3) class"). Thus, the court must determine whether the class claims alleged in *Jeffers* are cohesive.

Plaintiffs assert that the claims in this action are cohesive. They note that several published studies have linked the use of fenfluramine and dexfenfluramine to unusually high incidences of PPH and heart valve injury and they proffer expert discovery to support this conclusion. (Pls.' Proposed Findings of Fact App. I, Decl. of John Farquhar, M.D. at 9.) (concluding that "it appears that significant heart valve damage emerges even with a relatively brief exposure to these drugs" and that "the possibility that even minor valve damage may progress over time after cessation of diet drug use has not been excluded"); (Pls.' Proposed Findings of Fact App. IV. A, Expert Report of John Farquhar, M.D. at 2.) (stating that "[b]rief exposures of one month or more are probably sufficient to cause harm"). Thus, Plaintiffs assert that the proposed class members have all been placed at an increased risk of contracting PPH and heart valve damage. They also set forth expert discovery which supports their assertion that the relief requested applies to the class as a whole. (Pls.' Proposed Findings of Fact App. I, Decl. of Dean Karalis, M.D. at 7.) (stating that "based on the recommendations of the [Department of Health and Human Services, the American College of Cardiology and the American Heart Association,] the standard of care for evaluating patients exposed to Dexfenfluramine and Fenfluramine includes a thorough history and physical exam" and that "echocardiography should be performed in all patients exposed to these diet drugs"). They further assert that AHP is liable to the entire class under theories of strict product liability, negligence and breach of implied warranty. Specifically, Plaintiffs allege that AHP had knowledge of these side effects prior to the withdrawal of the drugs and failed to warn the proposed class of those dangers or take other appropriate action. (Pls.' Proposed Findings of Fact App. IV. F, Decl. James Oury, M.D. at 11.) (concluding that AHP failed to conduct appropriate review of clinical data concerning persons ingesting fenfluramine and dexfenfluramine and that labeling failed to contain warnings regarding PPH and heart valve injury at appropriate times). Based on Plaintiffs' allegations that AHP acted in such a way as to create liability to the class as a whole and that injunctive relief is applicable to the class as a whole, the court finds that the class claims are cohesive.

***11** However, AHP asserts that the claims are incapable of Rule 23(b)(2) class treatment. First, AHP asserts that there are factual issues that differ from class member to class member that destroy cohesiveness. Second, AHP argues that the state law applicable to each class member varies to such a degree that class treatment is inappropriate. The court will address these issues and will also address a third issue, which is that a number of state courts have already certified medical monitoring classes applicable to residents of their states.

**a. Individual Factual Issues**

As noted above, Rule 23(b)(2) contains two components, one which requires the defendant to have acted in some uniform way toward the class so as to require relief and a second which requires the class be entitled to the same relief. AHP argues that there are a number of factual issues which vary from class member to class member. AHP believes that these individual issues make class treatment inappropriate under Rule 23(b)(2).

The primary individual issues AHP raises include: (1) differences in the class members' duration of, amounts of and combinations of the drugs ingested; (2) AHP's varying knowledge of alleged side effects and the changing contents of warning labels over the times of ingestion; (3) differences in the prescribing physicians' knowledge, conditions and warnings under which the drugs were prescribed; (4) differences in class members' actual need for the form of monitoring requested; (5) differences among class members involving pre-existing injuries or non-Diet Drug related conditions that already require the monitoring requested; and (6) differences in affirmative defenses available to AHP against individual class members. (AHP Mem. Opp. at 68.) AHP believes that these issues will present grounds for it to challenge, on an individual basis, either liability or the need for the equitable relief requested and that class treatment would prevent AHP from having the opportunity to make such challenges.

The court agrees with AHP's assertion that these individual issues may present some difficulty in treating the claims in a single class, particularly as to the affirmative defenses AHP may seek to assert. However, the court is presently of the view that these

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

difficulties are not insurmountable and could be dealt with through either the development of subclasses or through exclusions to the class. For example, the issue of the duration of ingestion has already been corrected for in the proposed Amended Complaint in that persons who ingested the drugs for less than thirty cumulative days will be excluded from the class. (Pls.' Mot. Am. Compl., Ex. A ¶ 1.) This comports with the Plaintiffs' position, supported by expert discovery, that exposure to the drugs for one month or more may cause harm and that anyone ingesting the drugs for that period of time is at an increased risk of contracting PPH or valvular damage. (Pls.' Proposed Findings of Fact App. IV. A, Expert Report of John Farquhar, M.D. at 2.)

***12** Also, AHP alleges that some of the proposed class members have ingested phentermine in combination with Pondimin or Redux, while others have not. (AHP's Mem. Opp. at 47.) If AHP can demonstrate through expert evidence that the use of phentermine in combination with Pondimin or Redux alters the liability analysis or the applicable relief to the class, a subclass mechanism could be utilized to address those factual differences between class members.

In addition, AHP asserts that the directions for Pondimin stated that the drug should only be taken for a few weeks. *Id.* at 49. Presumably, AHP could attempt to raise a defense of misuse or contributory negligence against those persons who ingested the drug for longer periods of time. As the litigation develops, should this issue warrant it, the class could be divided into subclasses based upon the particular drug ingested and the duration of such ingestion. Such a subclass would allow AHP to assert such a defense against those persons ingesting Pondimin.

AHP also asserts that the warning labels on Pondimin varied as to PPH over time, creating individual issues of when the drug was prescribed and ingested. *Id.* at 51-52. Again, if necessary, subclasses based on these differences would be appropriate to preserve this defense.

AHP claims that some class members may have non-Diet Drug related reasons for the diagnostic monitoring requested and, thus, should not be granted that relief. *Id.* at 55. If it appears that this issue does become one which AHP will assert, AHP's position could be preserved by excluding those persons from the diagnostic portion of the overall equitable relief requested.

In sum, the factual issues that AHP raises should be further explored and, to the extent that they alter the liability analysis or the applicable relief to the class, subclasses or exclusions should be applied accordingly. Because many of the issues would apply across potential subclasses, it cannot be said that each individual issue will spawn its own distinct subclass. The court finds that, at this time, these individual issues do not present insurmountable difficulties which would destroy cohesion.

Along these lines, AHP further argues that the Third Circuit's holding in *Barnes* forecloses the possibility of class treatment here. (AHP's Mem. Opp. at 43.) In *Barnes,* the Third Circuit affirmed the District Court in decertifying a medical monitoring fund of tobacco smokers. The court stated that "[w]e believe that addiction, causation, the defenses of comparative and contributory negligence, the need for medical monitoring and the statute of limitations present too many individual issues to permit certification." Barnes, 161 F.3d at 143. However, a comparison with the class at hand and that in the *Barnes* tobacco litigation reveals some significant differences. *Barnes* involved numerous defendants who, in turn, manufactured hundreds of brands of cigarettes, many of which contained different ingredients at different times. *Id.* at 135. Plaintiffs asserted that the levels of nicotine and other "toxic substances" were altered to induce addiction, which they claimed caused their exposure to the tobacco products. *Id.* at 144-45. Thus, nicotine addiction and levels of nicotine in cigarettes constituted individual issues which destroyed cohesion in the class. In the Diet Drug Litigation, there are only two related chemical compounds, fenfluramine and dexfenfluramine, which were sold as only two brands, Pondimin and Redux, which Plaintiffs allege cause the illnesses for which they request monitoring. Plaintiffs do not allege that the chemical compounds of these pharmaceutical products were altered in any way during the course of the products' market lives. Also, there are no claims of addiction in the *Jeffers* action as there were in *Barnes.* The court finds that the claims of the proposed *Jeffers* class are far more cohesive claims than those found in *Barnes.*

***13** Furthermore, the individual issues which AHP raises, including duration of use and combination of drugs, are more susceptible to subclass treatment than the claims relating to tobacco use or, to take another example of recent mass tort class litigation, claims stemming from asbestos exposure. In those cases, exposure is often difficult to quantify and confirm as the exposure levels could vary greatly from claimant

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to claimant and, in many cases, exposure extended over decades. In the case of asbestos, there are several possible forms of exposure with varying degrees of danger and, notably, there could be persons who are not aware if they have been exposed. Conversely, the class members' ingestion of the Diet Drugs is discrete and ascertainable. The dates, duration and amounts of ingestion and the combination of drugs ingested can be confirmed through the use of fact sheets and medical records. If individual issues in the Diet Drug Litigation arise and subclasses are created, the members of those subclasses which do not qualify for the monitoring requested will be readily identifiable from the registration forms and the supporting documentation which will be required. The court finds that the proposed class here is more cohesive than those which would generally be found in tobacco or asbestos cases.

If and when AHP asserts its challenges or affirmative defenses to liability based on the individual issues discussed above, the court will evaluate them. If the issues alter the liability analysis or the applicable relief to the class, the court could utilize subclass mechanisms to allow the defenses to be properly raised at trial. However, at this point, evaluating the merits of the defenses AHP claims it could make is premature. For instance, in its Answer, AHP raises thirty-nine affirmative defenses to the *Jeffers* Complaint. (Answer at 14-22.) Experience has demonstrated that defendants do not raise every affirmative defense asserted in their Answer at trial. It is unlikely that AHP will raise every one of these defenses at trial, just as it is unlikely that every conceivable factual distinction between the class members will alter the liability analysis or the appropriate relief. Many of these defenses could be asserted against the class as a whole and cohesion would not be diminished.

If the individual issues, as a whole, destroy cohesion or deprive the parties of their constitutional right to due process, then the court will exclude parts of the class or decertify the class in its entirety accordingly. However, it would be premature for the court at this point to delve into the merits of AHP's potential defenses to liability and the applicability of the equitable relief on these sorts of issues before they are fully raised and challenged. For instance, the court expects that AHP will not raise those defenses which are unsupported by the still developing expert evidence. Also, Plaintiffs may move to strike any of the defenses which are raised. Many of the above issues necessarily involve competing expert evidence regarding both the alleged side effects of Pondimin and Redux, as well as the diagnostic techniques to evaluate whether those side effects are present in individual class members and the scope and necessity of ongoing medical monitoring. The court will hear and evaluate such evidence when the parties set forth a briefing and hearing schedule as is contemplated in the accompanying Order. At present time, the court finds that Plaintiffs' claims are sufficiently cohesive to warrant conditional certification.

**b. Variance of State Law**

***14** AHP points out that not all states have explicitly recognized an asymptomatic plaintiff's claim for medical monitoring and that those states which recognize such a cause of action have varying legal elements. (AHP's Mem. Opp. at 84 & 88.) AHP also argues that some states have rejected asymptomatic plaintiffs' claims under medical monitoring theories. *Id.* at 89-90. AHP argues that the variance of state law makes the class claims unmanageable. Plaintiffs asserts that the law of Pennsylvania should be applied to the class as a whole because Pennsylvania has the greatest interest in applying its law to the claims at issue.

First, the Rules Enabling Act presents an obstacle to Plaintiff's proposed method of adjudicating these claims. The Rules Enabling Act states that the Federal Rules of Civil Procedure "shall not abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b); *see also* *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, ----, 119 S.Ct. 2295, 2314, 144 L.Ed.2d 715, ---- (1999) (citing *Guaranty Trust Co. v. York*, 326 U.S. 99, 105, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945), for proposition that " '[i]n giving federal courts 'cognizance' of equity suits in cases of diversity jurisdiction, Congress never gave, nor did the federal courts ever claim, the power to deny substantive rights created by State law or to create substantive rights denied by State law' "). Essentially, Plaintiffs request that Federal Rule of Civil Procedure 23 act as the conduit through which Pennsylvania's medical monitoring cause of action extend to all class members, regardless of whether a given class member's claim arises in a jurisdiction which does not recognize such a legal theory absent injury. Such an action would violate the Rules Enabling Act.

Furthermore, Plaintiffs' view contradicts the choice of law principles in Pennsylvania. [FN8] Pennsylvania choice of law rules require a determination of whether there is a false conflict in the law of the states at issue. *LeJeune,* 85 F.3d at 1071. Where the laws of two states are in opposition

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Page 10
Not Reported in F.Supp.2d, 1999 WL 673066 (E.D.Pa.)
**(Cite as: 1999 WL 673066 (E.D.Pa.))**

and the jurisdictions have a governmental interest in applying their respective laws, there is not a false conflict. *See id.* (stating "[a] false conflict exists where 'only one jurisdiction's governmental interests would be impaired by the application of the other jurisdiction's law.' ") (quoting *Lacey v. Cessna Aircraft Co.*, 932 F.2d 170, 187 (3d Cir.1991)). If a false conflict does not exist, the court must make a second determination of which state has the greater interest in the application of its law. *Id.*

FN8. The Third Circuit has stated: "[i]n choosing which law applies, a federal court sitting in diversity must apply the choice-of-law rules of the forum state." *LeJeune v. Bliss-Salem, Inc.*, 85 F.3d 1069, 1071 (3d Cir.1996). As this action originated in the United States District Court for the Eastern District of Pennsylvania, Pennsylvania's choice of law rules apply.

***15** Those states which recognize a medical monitoring claim have a governmental interest in protecting its citizens from exposure to toxic substances. *See, e.g., Redland Soccer Club, Inc. v. Department of the Army and Dep't of Defense of the U.S.*, 548 Pa. 178, 696 A.2d 137, 145 (Pa.1997) (setting forth "several important reasons to recognize claims for medical monitoring"). Conversely, those states which do not recognize a claim for medical monitoring also have a governmental interest for doing so, whether it be to encourage the development of new pharmaceutical products or to avoid the burden of increased litigation state courts would face in abandoning the traditional tort requirement that plaintiffs demonstrate a physical injury. For example, on July 9, 1999 the Louisiana Legislature enacted a modification to the Louisiana civil code regarding tort damages, to prevent asymptomatic plaintiffs from recovering for medical monitoring claims. 1999 La. Sess. Law Serv. 989 (West) (modifying statute to include language that "[d]amages do not include costs for future medical treatment, services, surveillance, or procedures of any kind unless such treatment, services, surveillance, or procedures are directly related to a manifest physical or mental injury or disease") (amending La. Civ.Code Ann. art. 2315 (West 1999)). In doing so, the Legislature explicitly overruled the Louisiana Supreme Court's holding in *Bourgeois v. A.P. Green Indus.*, 716 So.2d 355, 361 (La.1998). Thus, the court finds that no false conflict exists, at least in those jurisdictions that do not recognize medical monitoring claims absent injury or in those with medical monitoring claim elements significantly different than Pennsylvania's.

Next, the court must determine whether Pennsylvania has a greater interest in the application of its law over the interests of the states in which class members were prescribed and ingested the Diet Drugs. The ingestion and prescription of these Diet Drugs occurred on a nationwide basis. Most of the proposed class members have no ties whatsoever with Pennsylvania. Although AHP's subsidiary, Wyeth-Ayerst Laboratories Division, has its principal offices in St. David's Pennsylvania and many of AHP's activities regarding the drugs at issue occurred in Pennsylvania, AHP conducted its FDA contacts and various marketing efforts in other jurisdictions as well. In light of all the circumstances, the court finds that the jurisdictions in which each class member was prescribed and ingested the Diet Drugs have a strong interest in applying their applicable law to the sale, prescription and ingestion of pharmaceuticals within its borders, which is the conduct which gave rise to the class members' claims. *See LeJeune*, 85 F.3d at 1072 (stating that "[w]here the site of an accident is not fortuitous, the place of injury assumes much greater importance, and in some instances may be determinative") (quotation omitted); *see also Petrokehagias v. Sky Climber, Inc.*, No. 96-6965, 1998 WL 227236, at *7 (E.D.Pa. May 4, 1998) (holding in product liability suit that Massachusetts law applies where plaintiffs were residents of Pennsylvania and New Jersey and product at issue was leased from defendant situated in New Jersey, but plaintiffs' injuries occurred in Massachusetts). Thus, the court will apply the law of the state in which each class member's claim arose rather than apply Pennsylvania substantive law to all class members.

***16** In addition to requiring a review of the state law regarding medical monitoring, the court will also need to analyze the law of any underlying cause of action, for example negligence or strict liability, which is required under the applicable state law to succeed on a claim for medical monitoring. *See, e.g., Redland Soccer Club, Inc. v. Department of the Army and Dept. of Defense of the U.S.*, 548 Pa. 178, 696 A.2d 137, 145 (Pa.1997) (requiring that exposure to toxic substances be "caused by the defendant's negligence" as element of medical monitoring); *Hansen v. Mountain Fuel Supply Co.*, 858 P.2d 970, 979 (Utah 1993) (requiring that "exposure was caused by the defendant's negligence"); *Potter v. Firestone Tire & Rubber Co.*, 6 Cal.4th 965, 25 Cal.Rptr.2d 550, 863 P.2d 795, 822 (Cal.1993) (requiring that "liability [be] established under traditional tort theories of recovery").

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Page 11
Not Reported in F.Supp.2d, 1999 WL 673066 (E.D.Pa.)
**(Cite as: 1999 WL 673066 (E.D.Pa.))**

The court finds that the application of the laws of the states does not necessarily render class treatment unmanageable. Nor does it destroy cohesion of the class claims. Rather, it requires the establishment of subclasses dependent on whether the elements of medical monitoring or the underlying legal action significantly differ. While some states recognize a claim for medical monitoring absent injury, other states require some injury for a tort claim to proceed. *See, e.g., Wood v. Wyeth-Ayerst Labs.*, No. 97-CI-5873, slip op. at 2-4 (Ky. Cir. Ct. June 17, 1999) (granting AHP's motion for judgment on pleadings in class action for medical monitoring in state Diet Drug Litigation because "cause of action cannot be maintained, absent an allegation of physical injury or harm"); 1999 La. Sess. Law Serv. 989 (West) (requiring that claim for medical monitoring be "directly related to a manifest physical or mental injury or disease"). The class which the Plaintiffs seek to certify is not comprised only of persons who ingested Pondimin or Redux who have no present injury. Rather, Plaintiffs bring this litigation on behalf of those persons "who have not filed a claim for personal injuries." (Pls.' Mot. Am. Compl., Ex. A ¶ 1.) Thus, some persons in the class may have some injury which is unknown at present time, which is precisely why they request diagnostic testing. Others may have some known injury but have simply not filed suit, whether it be because their injuries were minor and not likely to be worth the expense of individual litigation or for other reasons. If those with known injury demonstrate that monitoring relief is appropriate, such as to determine if their condition worsens, then subclass treatment may be appropriate. Such a subclass would permit recovery for medical monitoring in those states requiring some injury, such as Louisiana and Kentucky. [FN9] *See, e.g., In re Telectronics Pacing Sys., Inc.*, 172 F.R.D. 271, 287 (S.D.Ohio 1997) (stating in Rule 23(b)(3) class action that "[i]n some states, medical monitoring is only recoverable if the plaintiff shows physical injury" and dividing the class into subclasses based on state law accordingly). Thus, the conditional class will include a subclass of persons with known injury who have not filed a personal injury claim. However, class members who are asymptomatic and whose claims arise in jurisdictions that adhere to the traditional requirement of an injury for a tort action to proceed would have to be excluded from the class entirely.

FN9. AHP also contends that Oregon and North Carolina have rejected medical monitoring for asymptomatic plaintiffs. (AHP Mem. Opp. at 89-90.) It also contends that Maryland, Mississippi and Vermont have not yet reached the issue. *Id.* at 91.

*17 Because Plaintiffs have been proceeding under the view that Pennsylvania law would apply to the entire class, they have not had opportunity to brief the issue of varying state law, nor has AHP fully addressed the issue. The court will require such briefing within thirty days from this conditional certification and will then modify the class as required. The court expects that it will create a number of subclasses based upon the variance of both medical monitoring law and variances in the underlying claims of strict liability, negligence and breach of warranty. Furthermore, to the extent that a different legal standard may apply to certain members of the class, the factfinder at trial could make alternate findings in accordance with those standards. Thus, the court finds that the variance in state law does not render the class claims non-cohesive.

**c. Existing Class Actions**

As noted above, a number of state courts have certified statewide medical monitoring classes in the Diet Drug Litigation. These states include Texas, Washington, Illinois, New Jersey, West Virginia and Pennsylvania. Plaintiffs request that this court certify a nationwide class action despite the fact that these state courts have already certified similar classes. (Pl.'s Reply Mem. at 5 n.7.)

The civil actions in MDL No. 1203 are before the court on diversity jurisdiction and so there is overlapping jurisdiction over the Diet Drug Litigation. Furthermore, the court has in the past and will in the future conduct MDL No. 1203 in a manner that encourages coordination between state and federal courts, rather than in a manner which results in conflicting deadlines and discovery requirements for parties. In this light, the court will exclude from the conditional class those persons who are, on the date of this Order, class members of a certified class action in a state court for medical monitoring and they shall remain excluded for as long as they are members of such class. *See, e.g.,* Manual for Complex Litigation 3d § 30.15, at 221 (1995) (stating that "to the extent a state court class action has progressed further than the federal action, the court may want to consider an appropriate definition to exclude the members of that class").

**C. *Conditional Certification of Class***

Having found that the elements of Rule 23(a) are

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

satisfied and that the medical monitoring claims are proper for class treatment under Rule 23(b)(2), the court will now undertake to define the scope of the class. The court begins with the proposition that in defining the class structure the class is subject to modifications through further inclusion, exclusion and subclass treatment of class members. *See* Fed.R.Civ.P. 23(c)(1) (stating that an order certifying a class "under this subdivision may be conditional, and may be altered or amended before the decision on the merits"); *Barnes,* 161 F.3d at 140 (stating that "District Courts are required to reassess their class rulings as the case develops"). However, the court also notes that in certifying a class, the court should take care to certify the class as close as reasonably possible to that which satisfies Rule 23. *See, e.g.,* Manual for Complex Litigation 3d § 30.11, at 215 (1995) (stating that "[u]ndesirable consequences may follow when an expansive class, formed on insufficient information, is later decertified or redefined"). Thus, the court will define the class as close as reasonably possible to what is required by Rule 23 under its present understanding of the nature of this litigation.

***18** Plaintiffs' motion to amend the Complaint alters the scope of the proposed class in several key aspects. AHP, in its opposition memorandum, notes that the proposed amendments were made long after the deadlines established by this court regarding motions for class certifications and significantly after the issue was briefed and argued. However, the court itself is under a duty to modify any class it conditionally certifies as the case develops. *Barnes,* 161 F.3d at 140. Thus, the closer the scope of the conditionally certified class is to what the final class certified class will be, the better for the court, the parties and the class members. The court will grant Plaintiffs' motion to amend and will conditionally certify the class in accordance with the proposed amendments and the preceding discussion as they best represent the court's understanding of the case as it presently stands. Furthermore, the court will expect further briefing, in which AHP and the Plaintiffs may make such objections to the class definition as it sees fit.

With these concerns in mind, the court outlines the scope of the class as follows: first, the conditional class will consist of all persons who were prescribed and ingested either fenfluramine or dexfenfluramine for at least thirty cumulative days during the period between May 1, 1992 and September 15, 1997 and who have not filed a claim for personal injuries in a court of competent jurisdiction. Second, the conditional class will exclude persons who are, and for so long as they continue to be, class members of a certified state class action for medical monitoring. Third, the conditional class will exclude those class members who are asymptomatic and whose claims arose under the law of a state which does not recognize claims for medical monitoring absent injury.

Furthermore, the court envisions a number of subclasses which would assist the court in its management of the class and the resolution of the claims therein. The court will invite additional briefing regarding the creation of subclasses or redefinitions of the class to address the factual and legal issues which may vary within the class and a discussion of proposed representatives for such subclasses as may be appropriate. This would necessarily include a breakdown of state law regarding medical monitoring and the underlying causes of action on strict liability, negligence and breach of implied warranty as it stands in the various states in which the class members' claims arise.

**D.** ***Summary***

The class members' claims are such that individual ligation would not result in achieving the appropriate relief for the class members. Absent class treatment, the class members will be unable to obtain the benefit of collection and research of medical data and thereby better understand issues such as latency periods and techniques of diagnosis of the diseases which the class believes are caused by the ingestion of the drugs. While Plaintiffs will ultimately have to prove that they and the class are, in fact, at a risk of contracting these diseases, the court notes that there is sufficient medical study and research at this time to warrant conditional certification. There exist individual issues which will be a challenge to the court and the parties in resolving the class claims, including individual factual issues and variance of applicable state law. Rather than turn its back on these challenges, the court will conditionally certify the class as outlined above and will continue to review the class and redefine it as necessary until it can be said with some certainty that class treatment is unacceptable under *Barnes,* Rule 23 or the parties' constitutional rights.

***19** As the accompanying Order directs, the court will expect the parties to further brief and present to the court their views on issues of developing scientific studies, potential class structures to address variance of state law and individual issues. However,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Page 13
Not Reported in F.Supp.2d, 1999 WL 673066 (E.D.Pa.)
**(Cite as: 1999 WL 673066 (E.D.Pa.))**

the court finds that certification is appropriate at this juncture as it has found the requirements of Rule 23(a) and (b) are met under Plaintiffs' theory that the class members are entitled to uniform, equitable relief. That theory is founded on such scientific studies and findings which would at least present a triable issue of fact for a factfinder. Thus, in the interests of granting the equitable relief requested and noting that the class itself is unable to perform those equitable tasks on an individual basis, the court certifies a conditional medical monitoring class as outlined above.

**III. *CONCLUSION***

For the foregoing reasons, the court will grant the motion for class certification as discussed above.

An appropriate Order follows.

***PRETRIAL ORDER NO. 865***

AND NOW, TO WIT, this 26th day of August, 1999, upon consideration of plaintiffs Barbara Jeffers' and Johnna Day's Motions for Class Certification Pursuant to Federal Rule of Civil Procedure 23(b)(2) and Motion to Amend the Complaint and defendant American Home Products Corporation's responses thereto, IT IS ORDERED that:

1. the plaintiffs' Motion for Class Certification filed March 15, 1999 (Document # 200709) is DENIED AS MOOT;
2. the plaintiffs' Motion to Amend the Complaint (Document # 200940) is GRANTED;
3. the plaintiffs' Motion for Class Certification filed June 24, 1999 (Document # 200940) is GRANTED as stated in the accompanying Memorandum and below;
4. the plaintiffs shall, within ten (10) days from the date of this Order, submit to the court a proposed form of notice to the class;
5. the plaintiffs and defendant American Home Products Corporation shall, within seven (7) days from the date of this Order, submit to the court a proposed briefing schedule to resolve the outstanding issues discussed in the accompanying memorandum, with such schedule to conclude preliminary briefing within thirty (30) days from the date of this Order; and
6. the court will, upon approval of the briefing schedule, conduct a hearing on the above issues to follow shortly after the close of briefing.

IT IS FURTHER ORDERED THAT the court hereby CONDITIONALLY CERTIFIES a class under Federal Rule of Civil Procedure 23(b)(2) consisting of all persons who were prescribed and ingested either fenfluramine (marketed under the brand name Pondimin) or dexfenfluramine (marketed under the brand name Redux) for at least thirty cumulative days during the period between May 1, 1992 and September 15, 1997 and who have not filed a claim for personal injuries in a court of competent jurisdiction.

***20** IT IS FURTHER ORDERED that the above conditional class shall exclude all persons who are, and for so long as they continue to be, class members of a certified state class action for medical monitoring.

IT IS FURTHER ORDERED that the above conditional class will exclude those class members who are asymptomatic and whose claims arise under the law of a state which does not recognize claims for medical monitoring absent injury.

SO ORDERED.

Not Reported in F.Supp.2d, 1999 WL 673066 (E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

• 2000 WL 34611050 (Expert Report and Affidavit) Affidavit of Victor F. Tapson, M.D. (Apr. 7, 2000)Original Image of this Document (PDF)

• 1999 WL 34002441 (Expert Report and Affidavit) Declaration of James H. Oury, M.D. (Dec. 9, 1999)

• 1999 WL 33740491 (Trial Motion, Memorandum and Affidavit) American Home Product Corporation's Objections and Responses to the Proposed Findings of Fact Regarding the Motions for Class Certification of the Non-PMC Plaintiffs (Feb. 12, 1999)

• 1999 WL 33740553 (Trial Pleading) American Home Products Corporation's Proposed Findings of Fact on the Motions for Class Certification (Feb. 12, 1999)

• 1998 WL 34299129 (Trial Pleading) Complaint (Sep. 14, 1998)

• 2:98CV20626 (Docket) (Sep. 14, 1998)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**COMPENDIUM OF UNREPORTED CASES
CITED IN REPLY MEMORANDUM IN SUPPORT OF
END PAYOR PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

# TAB D

COPY

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

11/14/2000

CLERK OF THE COURT
FORM V000

HON. MICHAEL J. O'MELIA

A. Beery
Deputy

CV2000-000722

FILED: NOV 15 2000

CHARLES I. FRIEDMAN, P.C., ET AL.

v.

MICROSOFT CORPORATION

ANDREW S. FRIEDMAN

LEONARD B SIMON
MILBERG WEISS BERSHAD
HYNES & LERACH LLP
600 W BROADWAY
STE 1800
SAN DIEGO CA 92101

DAVID J BERSHAD
ONE PENNSYLVANIA PLAZA
NEW YORK NY 10119-0165

KENNETH J VIANALE
MILBERG WEISS BERSHAD HYNES &
LERACH LLP
THE PLAZA STE 900
5355 TOWN CENTER RD
BOCA RATON FL 33486

MARK D BOGEN
1761 W HILLSBORO BLVD
STE 328
DEERFIELD BEACH FL 33442

BRIAN MICHAEL GOODWIN

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

11/14/2000

CLERK OF THE COURT
FORM V000

HON. MICHAEL J. O'MELIA

A. Beery
Deputy

CV2000-000722

JOHN J. BOUMA

CHRISTOPHER A. O'HARA

STEVE W BERMAN
HAGENS BERMAN
1301 FIFTH AVE
STE 2900
SEATTLE WA 98101

MINUTE ENTRY

The Court has considered all of the memoranda and cases submitted by both parties. The Court will not give an appellate-type ruling, as I would only be repeating what is set forth in the moving papers. The Court therefore makes the following rulings:

1. Microsoft's Motion to Dismiss is denied. The Court finds that Arizona residents can bring this action, and *Illinois Brick* does not apply.

2. The Plaintiff's Motion to Certify the Class is granted.

3. Microsoft's Motion to Stay is denied.



SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

COPY

11/14/2000

CLERK OF THE COURT
FORM V000

HON. MICHAEL J. O'MELIA

A. Beery
Deputy

CV2000-000722

The Court will rule on Microsoft's Motion to Consolidate and Lucero's Motion to Intervene when the pleadings are complete.