**COMPENDIUM OF UNREPORTED CASES
CITED IN REPLY MEMORANDUM IN SUPPORT OF
END PAYOR PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

# TAB I

Westlaw.

Slip Copy

Slip Copy, 2006 WL 623591 (D.Me.)
(Cite as: Slip Copy)

Page 1

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Maine.
In re NEW MOTOR VEHICLES CANADIAN
EXPORT Antitrust Litigation
**No. MDL 1532.**

March 10, 2006.

Robert S. Frank, Harvey & Frank, Portland, ME, for Plaintiffs, Liaison Counsel.
William J. Kayatta, Jr., Pierce Atwood, Portland, ME, for Defendants, Liaison Counsel.
Joseph J. Tabacco, Sharon T. Maier, R. Scott Palmer, Law Firm of Berman, DeValerio, Pease, Tabacco, Burt & Pucillo, San Francisco, CA, Michael M. Buchman, Law Firm of Milberg, Weiss, Bershad, Hynes & Lerach, LLP, New York, NY, Bernard Persky, Hollis L. Salzman, Chris McDonald, Goodkind Labaton, Rudoff & Sucharow, LLP, New York, NY, Robert J. LaRocca, William E. Hoese, Kohn, Swift & Graf, PC, Philadelphia, PA, Patrick E. Cafferty, Jennifer Winter Sprengel, Miller, Faucher & Cafferty, LLP, Chicago, IL, H. Adam Prussin, Don Davis, Pomerantz, Haudek, Block, Grossman & Gross, LLP, New York, NY, Samuel D. Heins, Alan I. Gilbert, Heins, Mills & Olsen, PLC, Minneapolis, MN, Stephen Lowey, Peter St. Phillip, Lowey, Dannenberg, Bemporad & Selinger, PC, White Plains, NY, Robert S. Frank, Harvey & Frank, Portland, ME, for Plaintiffs' Executive Committee.
Margaret M. Zwisler, William R. Sherman, Howrey Simon Arnold & White, LLP, Washington, D.C., Richard C. Godfrey, David J. Zott, Brett A. Bakke, Kirkland & Ellis LLP, Chicago, IL, Michael R. Lazerwitz, Cleary Gottlieb Steen & Hamilton, Washington, D.C., Robert A. Van Nest, Keker & Van Nest, L.L.P., San Francisco, CA, Peter Sullivan, Gibson Dunn & Crutcher LLP, Los Angeles, CA, Daniel L. Goldberg, Daniel S. Savrin, Bingham McCutchen LLP, Boston, MA, Glenn A. Mitchell,
Stein Mitchell & Mezines, Washington, D.C., Deborah A. Garza, Fried, Frank, Harris, Shriver & Jacobson LLP, Washington, D.C., for Defendants' Counsel.

ORDER ON MOTION FOR CLASS
CERTIFICATION
HORNBY, J.

Introduction

**\*1** On this motion for class certification, I certify a 23(b)(2) class of automobile buyers/lessees who seek injunctive relief against motor vehicle manufacturers, distributors and dealer associations. The 23(b)(2) class asserts that the manufacturers, distributors and dealer associations are conspiring, in violation of federal antitrust law, to prevent new Canadian cars from being imported into the United States.[FN1]

> FN1. I will rule separately and somewhat later on the motion to certify six, distinct, statewide 23(b)(3) damage classes where the claim is that the challenged conduct has violated a particular state's antitrust and/or consumer protection statutes.

Background

The named plaintiffs (the "plaintiffs")[FN2] claim that the defendants'[FN3] conspiracy to stem the flow of motor vehicle imports from Canada to the United States has stifled a potential discount distribution channel of cheaper motor vehicles, resulting in less price competition in the U.S. market.[FN4] They argue that, but for this conspiracy, the defendant automakers-who set the U.S. invoice prices and the nationwide suggested retail price for each particular model (Manufacturers Suggested Retail Prices or "MSRPs")[FN5]-would have lowered prices nationwide for most new vehicles sold in the United States.[FN6]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                        Page 2

**Slip Copy, 2006 WL 623591 (D.Me.)**
**(Cite as: Slip Copy)**

The plaintiffs assert that this conspiracy began at least as early as 2001,[FN7] but may have started even earlier.[FN8] They admit uncertainty about how long any antitrust injury has continued, recognizing that with a changing currency exchange rate (particularly in the years 2004-2005), "purchasers toward the end of the class period may not have been damaged by the ongoing conspiracy, because the opportunity for arbitrage ... (temporarily) disappeared."[FN9]

> FN2. According to the Motion for Class Certification, there are eleven named plaintiffs from six states who seek certification of this nationwide class for injunctive relief pursuant to Rule 23(b)(2). Exemplar State Pls.' Mot. for Class Certification Pursuant to Fed.R.Civ.P. 23 ("Pls.' Mot.") at 1 n. 1 (Docket Item 262). All of these named plaintiffs bought and/or leased at least one new motor vehicle in the United States through one of the defendant automobile companies' authorized dealers during the period from January 1, 2001 to the present. *Id. See also* Fourth Am. Consolidated Class Action Compl. for Violations of the Sherman Antitrust Act ("Fourth Am. Compl.") ¶¶ 8, 10, 19, 22, 24, 27-28, & 31-32 (Docket Item 261).

> FN3. The defendant automobile companies in the United States and Canada are: General Motors Corporation; General Motors of Canada, Ltd.; Ford Motor Company; Ford Motor Company of Canada, Ltd.; Toyota Motor Sales, U.S.A., Inc.; American Honda Motor Company, Inc.; Honda Canada, Inc.; DaimlerChrysler Corporation; DaimlerChrysler Canada, Inc.; DaimlerChrysler Motors Co., LLC; Mercedes-Benz USA, LLC; Mercedes-Benz Canada, Inc.; and Nissan North America, Inc. Fourth Am. Compl. ¶¶ 34-46. On February 24, 2006, the plaintiffs and defendant Toyota Motor Sales U.S.A., Inc. notified the court that they have entered into an agreement for

settlement of the claims in this case. *See* Notice of Settlement (Docket Item 336). This settlement is still pending. One defendant, BMW of North America, was dismissed from the action on August 9, 2005. *See* Stip. and Order Granting Mot. for Voluntary Dismissal of Def. BMW of North America, LLC (Docket Item 276). In addition to the defendant automobile companies, the plaintiffs have sued two dealer associations: the National Automobile Dealers Association ("NADA," consisting of U.S. Dealers) and the Canadian Automobile Dealers Association ("CADA"). Fourth Am. Compl. ¶¶ 48-49.

> FN4. Fourth Am. Compl. ¶ 1.

> FN5. Fourth Am. Compl. ¶ 56; Aff. of Robert E. Hall, Ph.D. re Pls.' Mot., Ex. A (Expert Report of Robert E. Hall, Ph.D.) ("Hall Report") ¶ 9 (Docket Item 272).

> FN6. *See* Hall Report ¶¶ 14-16, 47-59.

> FN7. Fourth Am. Compl. ¶ 1. In 2001, the value of the Canadian dollar declined to historic lows that, but for the conspiracy, the plaintiffs say, would have provided third-party brokers with a greater incentive to buy vehicles and bring them into the United States to take advantage of an even greater price difference. *See* Hall Report ¶ 35 & Ex. 3.

> FN8. *See, e.g.,* Fourth Am. Compl. ¶ 61 ("Beginning in approximately the 1990s, the [defendants] created and shared 'blacklists' of persons and entities known to export new vehicles from Canada to the United States for resale").

> FN9. Exemplar State Pls.' Reply Mem. of Law in Supp. of Pls.' Mot. ("Pls.' Reply") at 23 (Docket Item 323). *See also* Defs. Opp. to Pls.' Mot. ("Defs.' Mem.") at 12, 48-49 (Docket Item 305).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                  Page 3

Slip Copy, 2006 WL 623591 (D.Me.)
**(Cite as: Slip Copy)**

The defendants deny that there was any conspiracy among them. They say that there were only legal vertical agreements between an individual manufacturer and its dealers.[FN10] The defendants also dispute the plaintiffs' theory of causation, asserting that any conspiracy would not have affected the nationwide invoice price or MSRPs because the export threat from Canada was small, geographically isolated, and model-specific.[FN11] The automobile companies, they say, would have responded to any "grey market" with targeted regional incentives, not nationwide reductions in net dealer invoice prices and MRSPs.[FN12]

FN10. Defs.' Mem. at 5-7.

FN11. *See* Defs.' Mem. at 10-11 (noting that the "grey market" export trade of used vehicles at issue is "inherently transitory[,] ris[ing] and fall[ing] with arbitrary exchange rate fluctuations[, and] is limited to certain geographic areas and certain car models," and therefore has a "spotty" impact on new car sales); *see also, e.g., id.* at 10-15; *id.,* App. Vol. I, Tab 1 (Aff. of Joseph P. Kalt, Ph.D. & Expert Report of Joseph P. Kalt, Ph.D.) ("Kalt Report") at 5-7. The defendants also assert that "nearly all of the named class representatives" revealed in their depositions that they would not have purchased a grey market vehicle. Defs.' Mem. at 14. But the plaintiffs' argument is that the presence of such vehicles in the market would have lowered the price of new U.S. motor vehicles (which the plaintiffs did lease or buy). The plaintiffs do not claim that the class members would have bought a grey market car.

FN12. *See, e.g.,* Kalt Report at 6. The defendants also argue that certain states' emissions requirements and other states' requirement that new vehicles be sold only by franchised dealers prevented importing Canadian grey market vehicles, or at least certain models, into those states. *See* Defs.' Mem. at 15-16. This argument may limit

any damages recovery in a particular state if ultimately I certify a(b)(3) class for that state. The defendants have not, however, used this as an argument for narrowing the scope of the (b)(2) class.

I have previously ruled on a number of defense motions to dismiss. As a result, there is no longer any federal antitrust damages claim .[FN13] The federal injunctive relief claim for an antitrust violation survives.[FN14] The plaintiffs seek certification of a Rule 23(b)(2) injunctive class of all people [FN15] who:

FN13. I dismissed the federal damages claim on the basis of *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 730-31 (1977). *In re New Motor Vehicles Canadian Exp. Antitrust Litig.,* 307 F.Supp.2d 136, 142-44 (D.Me.2004). The plaintiffs have reasserted that claim in their Fourth Amended Complaint only to preserve their appellate rights on my ruling. *See* Fourth Am. Compl. ¶ 101.

FN14. I also dismissed a large number of state statutory claims. I eliminated the state common law claim for restitution as a separate substantive claim, but retained it as a potential measure of recovery if the plaintiffs recover on their state statutory claims. I permitted a number of state antitrust and consumer protection damage claims to survive.

FN15. Excluding governmental entities, this Court, the defendants, their corporate parents, subsidiaries, affiliates, and their co-conspirators.

purchased or leased or intend to purchase or lease a new motor vehicle manufactured by a Defendant from a United States dealer during the period from January 1, 2001 to the present.[FN16]

FN16. Pls.' Mot. at 1-2.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 4

Slip Copy, 2006 WL 623591 (D.Me.)
**(Cite as: Slip Copy)**

They seek affirmative injunctive relief that would:
(i) require the defendants to honor warranties in the United States on all new motor vehicles sold in Canada;
(ii) enjoin the defendants from blacklisting Canadian exporters and individuals suspected of exporting new motor vehicles;
(iii) enjoin the defendants from exchanging certain information with competitors, *i.e.* blacklists, "best practices" to avoid export sales and VIN data transfer;
**\*2** (iv) enjoin chargebacks to Canadian dealers for export sales;
(v) enjoin the tracking of Canadian new vehicle VINs for the purposes of affecting exports;
(vi) enjoin U.S. manufacturers from penalizing U.S. dealers for buying or selling Canadian Export Vehicles;
(vii) enjoin CADA and NADA from encouraging or suggesting that their member-dealers not buy or sell Canadian exports or act to prevent Canadian exports; and
(viii) enjoin the defendants from withholding safety recall information from Registered Importers and/or United States consumers based on a vehicle's status as an export from Canada.[FN17]

> FN17. *See* Exemplar State Pls.' Mem. of Law in Supp. of Pls.' Mot. ("Pls.' Mem.") at 2-3 n. 3, 17 n. 33 (Docket Item 263) (providing an overview of the relief requested).

Analysis

The First Circuit requires "a rigorous analysis of the prerequisites established by Rule 23 before certifying a class." *Smilow v. Southwestern Bell Mobile Sys.,* 323 F.3d 32, 38 (1st Cir.2003). "To obtain class certification, the plaintiff[s] must establish the four elements of Rule 23(a) and one of the several elements of Rule 23(b)." *Id.* (citing *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 614 (1997)).

Therefore, I examine first whether the plaintiffs have met their burden of proving each of Rule 23(a)

's requirements-numerosity, commonality, typicality, and adequacy.[FN18] Then I turn to the additional, and distinct, requirements for the proposed 23(b)(2) federal injunctive class. I am " entitled to look beyond the pleadings" in order to make an informed certification decision. *In re Polymedica Corp. Sec. Litig.,* 432 F.3d 1, 6 (1st Cir.2005).

> FN18. Rule 23(a) lays out four prerequisites applicable to all class actions: "One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a).

*(A) Rule 23(a) Threshold Requirements*

*(1) Numerosity*

"The most obvious consideration [in assessing numerosity] is the size of the class itself." 7A Charles Alan Wright et al., *Federal Practice and Procedure: Civil 3d* § 1762 (3d ed.2005). There is no dispute that the members of the proposed 23(b)(2) class here are "so numerous that joinder of all members is impracticable," Fed.R.Civ.P. 23(a)(1) . Given the large number of cars sold in the United States each year, it is reasonable to infer that the proposed federal injunctive class numbers in the millions.[FN19] Since I "may draw reasonable inferences from the facts presented to find the requisite numerosity," *McCuin v. Sec'y of Health & Human Servs.,* 817 F.2d 161, 167 (1st Cir.1987), and since there is no dispute, I conclude that the numerosity requirement is satisfied.

> FN19. The defendants themselves say that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 623591 (D.Me.)
**(Cite as: Slip Copy)**

"the proposed class [for injunctive relief] includes more than a hundred million American consumers ... who purchased or leased or intend to purchase or lease a new mother vehicle manufactured by a Defendant." Defs.' Mem. at 2-3 (internal citation omitted).

*(2) Commonality*

There also is no dispute that there are "questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2).[FN20] Two issues plainly common to the class are whether some or all of the defendants in fact agreed to restrict Canadian car imports so as to protect United States prices and, if they did, whether such an agreement was unlawful under federal antitrust law. "[A]llegations concerning the existence, scope, and efficacy of an alleged conspiracy present questions adequately common to class members to satisfy the commonality requirement." 6 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 18:5 (4th ed.2002). *See also, e.g., id.* ("The antitrust plaintiff can normally satisfy this [commonality] requirement in the complaint."); *In re Rubber Chems. Antitrust Litig.,* 232 F.R.D. 346, 351 (N.D.Cal.2005) (" Courts consistently have held that the very nature of a conspiracy antitrust action compels a finding that common questions of law and fact exist.") (quoting *In re Sugar Indus.,* 1976 WL 1374, at *13 (N.D.Cal. May 21, 1976)).

FN20. Nothing in the language of the Rule suggests that *every* question need be common for this requirement to be satisfied. *See In re Relafen Antitrust Litig.,* 231 F.R.D. 52, 69 (D.Mass.2005) ("The rule does not require that all issues of fact and law be common[.] The threshold of commonality is not a difficult one to meet." ) (internal citations omitted).

*(3) Typicality*

*3 Fed.R.Civ.P. 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." The language of 23(a)(3) does not mandate that the claims of the class representative be *identical* to those of class members. Instead, the typicality " requirement is satisfied 'if the representative plaintiff[s'] claims are based on the same legal theory and arise from the same practice or course of conduct as the other class members." ' *In re Compact Disc Minimum Advertised Price Antitrust Litig.,* 216 F.R.D. 197, 204-05 (D.Me.2003) (quoting *In re Playmobil Antitrust Litig.,* 35 F.Supp.2d 231, 241 (E.D.N.Y.1998)). A class representative needs to "possess the same interest and suffer the same injury shared by all members of the class he represents." *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 216 (1974). The focus in the typicality inquiry is on "whether the named plaintiff[s'] claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 157 n. 13 (1982).[FN21] Plaintiffs are not "typical" if they are "subject to unique defenses that would divert attention from the common claims of the class." *In re Bank of Boston Corp. Sec. Litig.,* 762 F.Supp. 1525, 1532 (D.Mass.1991).

FN21. The central concern of typicality is connected to Rule 23(a)(4)'s requirement that class representatives "fairly and adequately protect the interests of the class, " a requirement I discuss in more detail below. *See Amchen Prods.,* 521 U.S. at 626 n. 20 ("The adequacy-of-representation requirement ' tend[s] to merge' with the commonality and typicality criteria of Rule 23(a).") (citation omitted).

The defendants argue that the typicality standard is unsatisfied here because not all class members have suffered the same injury, some class members have suffered no injury at all, and at least two named plaintiffs allegedly paid lower prices because of the import restriction.[FN22] The defendants maintain that named plaintiffs who did not pay an overcharge do not even have standing to pursue a claim.[FN23] I address the standing argument first.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 6

Slip Copy, 2006 WL 623591 (D.Me.)
**(Cite as: Slip Copy)**

FN22. Defs.' Mem. at 48.

FN23. *Id.* In making this argument, the defendants contend that the import restrictions worked both ways, *i.e.,* American vehicle exports to Canada were also curtailed. Thus, they hypothesize, during times when the value of the Canadian dollar strengthened, Canadian cars were more expensive than their American counterparts, and therefore the two named plaintiffs buying cars in the United States during this time were in essence protected from the market effect of more expensive Canadian prices by the two-way import restriction. When posed this scenario as a hypothetical at his deposition, the plaintiffs' expert agreed that a restriction on American imports to Canada during such a time could keep prices lower for American consumers. *See id.,* App. Vol. V, Tab 31 (Dep. of Robert E. Hall (excerpts)) ("Hall Dep.") at 242-45, 248-49.

"[T]hreshold individual standing is a prerequisite for all actions, including class actions", and class representatives must meet this standing requirement. 1 Conte & Newberg, *supra,* § 2:5. But standing for an antitrust *injunctive* claim is different from standing for an antitrust *damages* claim. *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 110-11 (1986) (identifying and analyzing differences). Injunctive antitrust standing requires that the plaintiff demonstrate only "threatened loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26. *See Cargill,* 479 U.S. at 111; *Hawaii v. Standard Oil. Co.,* 405 U.S. 251, 260-61 (1972). As the First Circuit has noted, "[p]lainly, Congress empowered a broader range of plaintiffs to bring § 16 [15 U.S.C. § 26 injunction] actions because the standards to be met are less exacting than those under § 4; under § 16, a plaintiff need show only a threat of injury rather than an accrued injury." *Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.,* 754 F.2d 404, 407-08 (1st Cir.1985).

A plaintiff needs to "demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." *Mid-West Paper Prods. Co. v. Continental Group, Inc.,* 596 F.2d 573, 591 (3d Cir.1979) (internal quotation marks and citation omitted). Therefore, to show injunctive antitrust standing a plaintiff need not have suffered actual injury in the past; the *threat* of loss or damage is enough. Of course, like a damages claim under 15 U.S.C. § 15, "the threatened loss or damage" must be "of the type the antitrust laws were designed to prevent and that flows from that which makes the defendants' acts unlawful." *Cargill,* 479 U.S. at 113 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489 (1977)). Higher prices for consumers resulting from antitrust violations are antitrust injuries. *See In re Warfarin Sodium Antitrust Litig.,* 214 F.3d 395, 400-01 (3d Cir.2000) (drug manufacturer's efforts to deny consumers access to cheaper versions of product is antitrust injury that proximately causes threatened loss or injury); *Campos v. Ticketmaster Corp.,* 140 F.3d 1166, 1172 (8th Cir.1998) (monopolist defendant's imposition of additional fees is sufficient to establish injunctive relief standing for consumers who paid them); *see also SAS of Puerto Rico, Inc. v. Puerto Rico Tel. Co.,* 48 F.3d 39, 44 (1st Cir.1995) (consumer in threatened market is a " presumptively 'proper' [antitrust] plaintiff") (citing *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 538-39 (1983)).

*4 Here, the named plaintiffs assert that they purchased or leased cars (or that they intend to do so) in the context of an ongoing conspiracy by the defendants to keep Canadian cars from increasing price competition in the United States market.FN24 Whether a particular plaintiff was such a good bargainer that in the past he/she obtained a price that would not be lowered by more competition, or whether exchange rates during some periods temporarily made Canadian cars more expensive and therefore not price-competitive, does not affect the standing of these plaintiffs to seek an injunction against continuation of such of a conspiracy. They confront or confronted a threatened loss or damage resulting from restrictions on competition, precisely of the type the antitrust laws were designed to prevent. There is no indication that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 7

Slip Copy, 2006 WL 623591 (D.Me.)
**(Cite as: Slip Copy)**

exchange-related arbitrage opportunities have permanently ended.

> FN24. The complaint does not state explicitly that any one of the named plaintiffs intends to purchase a motor vehicle in the future. Rather, it asserts more generally that "[b]ecause Defendants' combination and conspiracy is ongoing, Plaintiffs and members of the Class are threatened with similar injury in the future. " Fourth Am. Compl. ¶ 81. Given that the defendants have not challenged this aspect of the plaintiffs' complaint, I read it liberally to infer the direct assertion.

Turning from standing to typicality, I conclude that the claims of the named plaintiffs are also typical. These plaintiffs claim that an unlawful conspiracy has existed and continues to exist, and that it affects price competition. They want to bring it to a halt by injunctive relief. Such claims are typical of the class. Individuals seeking injunctive standing need not have *sustained* the actual injury; that is, they need not have actually paid a higher price themselves. Instead, as *Cargill, Standard Oil,* and *Cia. Petrolera* teach, this anti-competitive injury must be "threatened" by the defendants' antitrust violation. Under the plaintiffs' antitrust theory the threat of reduced price competition continues for the class.[FN25] Therefore, the named plaintiffs for the (b)(2) federal injunctive class meet the typicality standard.

> FN25. In my Order of March 4, 2004 denying the defendants' Motion to Dismiss as to the injunctive claims, I held that "the Amended Complaint ... allege[s] that ' violations are continuous and will continue unless enjoined by this Court', which constitutes "irreparable injury" remediable by an injunction. *In re New Motor Vehicles,* 307 F.Supp.2d at 144 n. 10.

### (4) Adequacy

The final requirement under Rule 23(a)(4) is that "

the representative parties ... fairly and adequately protect the interests of the class." "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods.,* 521 U.S. at 625. The First Circuit has emphasized the importance of this final threshold requirement:
One of the most important of these requirements is that the representative party fairly and adequately represent the interests of the class. Rule 23(a)(4). This requirement is particularly important because the due process rights of absentee class members may be implicated if they are bound by a final judgment in a suit where they were inadequately represented by the named plaintiff.

*Key v. Gillette Co.,* 782 F.2d 5, 7 (1st Cir.1986).

The defendants argue that the named plaintiffs here are not adequate class representatives because " there are inherent conflicts that go to the heart of the case."[FN26] These alleged conflicts are:

> FN26. Defs.' Mem. at 49.

1. several named plaintiffs were not injured because they purchased or leased 2004 or 2005 model year vehicles when exchange rates made Canadian car prices higher than American;[FN27]

> FN27. This argument of no past injury may be a more significant issue for the 23(b)(3) state law damages class certifications. However, the defendants do *not* argue that these named representatives will never lease or buy (or do not intend to lease or buy) vehicles in the future, or that an American-Canadian exchange rate reversal has permanently cured the problem. Therefore, these named representatives are not disqualified from representing this injunctive class.

**\*5** 2. some purchasers benefited from the alleged antitrust conspiracy (an economic argument based upon "re-equilibration");
3. those purchasers who traded in a vehicle gained

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 8

Slip Copy, 2006 WL 623591 (D.Me.)
**(Cite as: Slip Copy)**

from the higher prices (*i.e.,* higher trade-in value); and

4. the conspiracy promotes dealer investment and interbrand competition and therefore is good for purchasers who value dealership services.

In the context of an injunctive class, these four arguments [FN28] can be treated as one: that the class representatives are not adequate because some purchasers in the past were not harmed by, or may have benefited from, the defendants' alleged antitrust conspiracy. I conclude that the named plaintiffs nevertheless will fairly and adequately represent the interests of the absent class members. The issues for this (b)(2) class are whether the defendants conspired to violate the federal antitrust laws, and whether any violation creates a " threatened loss or damage" under 15 U.S.C. § 26, such as to warrant an injunction. Whether a particular plaintiff turns out to have benefited in the past from the allegedly illegal conduct does not determine whether he or she confronts "a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." *Mid-West Paper Prod. Co.,* 596 F.2d at 591. The class representatives are adequate, and no conflict exists, because all potential class members are subjected to future " threatened loss or damage." [FN29]

> FN28. *See* Defs.' Mem. at 49-50. The defendants refer to the "vertical restrictions." The plaintiffs have not challenged independent vertical restrictions, but a horizontal agreement that enhanced and strengthened the vertical restrictions. It is the horizontal agreement that is allegedly illegal. Presumably the defendants will argue on the merits that the conduct here is not per se illegal, but subject to a rule of reason approach (they said so at oral argument), and will seek to justify any horizontal agreement on that basis.

> FN29. *Valley Drug Co. v. Geneva Pharmaceuticals, Inc.,* 350 F.3d 1181

(11th Cir.2003), cited by the defendants, does not compel a different result. The antitrust class certified in that case was a 23(b)(3) damages class, not a 23(b)(2) injunctive class. *Id.* at 1184. A federal damages claim involves proof of actual economic injury. *See* 15 U.S.C. § 15 (" injur[y] in [ ] business or property"). By contrast, as I have already noted, an injunctive claim involves proof of threatened injury. *See* 15 U.S.C. § 26 (" threatened loss or damage"). The court's statement in *Valley Drug* that a " fundamental conflict exists where some party members claim to have been harmed by the same conduct that benefited other members of the class," *Valley Drug,* 350 F.3d at 1189, applies to damage recovery.

The defendants also argue that the named plaintiffs are not adequate class representatives because they do not sufficiently understand the core allegations of the complaint and have little understanding of their duties as class representatives.[FN30] Plainly, " [a]n antitrust litigant is not expected to appreciate the finer points of the Sherman Act, Clayton Act, or the Federal Rules of Civil Procedure governing class action certification." *In re Catfish Antitrust Litig.,* 826 F.Supp. 1019, 1037 (N.D.Miss.1993); *see also In re Playmobil,* 35 F.Supp.2d at 242 (" Courts do not require the representative plaintiff to be the best of all possible plaintiffs or to be especially knowledgeable, intelligent, or possessing a detailed understanding of the legal or factual basis on which a class action can be maintained."). Excerpted portions of the named plaintiffs' depositions provided by both parties [FN31] demonstrate sufficient knowledge of the case and full participation in discovery.[FN32]

> FN30. Defs.' Mem. at 50.

> FN31. *See* Defs.' Mem., Ex. B; Pls.' Reply, Ex. W.

> FN32. The defendants submitted deposition excerpts from all of the named plaintiffs except Jason and Cynthia Sengel.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 9

Slip Copy, 2006 WL 623591 (D.Me.)
**(Cite as: Slip Copy)**

Defs.' Mem., Ex. B. The plaintiffs submitted deposition excerpts from all of the named plaintiffs except Cynthia Sengel and Arlene Berke. Pls. Reply, Ex. W. Given that all but one of the named plaintiffs (Cynthia Sengel) have deposition excerpts filed with the Court, I will accept the plaintiffs' assertions that "every plaintiff [has] fully participated in discovery," and "[a]ll named plaintiffs responded to defendants' document requests and made themselves available for depositions." Pls.' Reply at 26, 26 n. 48.

I next determine whether this case fits within Rule 23(b)(2).

### (B) Class Certification Under Rule 23(b)(2)

To obtain certification under Rule 23(b)(2), the plaintiffs must demonstrate that the "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2). Paradigmatic Rule 23(b)(2) cases involve "various actions in the civil-rights field", but the subdivision is "not limited to [such] cases." Rule 23(b)(2) Advisory Committee Notes (1966 Rule Amendment). The Advisory Committee also recognized that antitrust cases may be appropriate for Rule 23(b)(2) certification, *see id.* (appropriate for action by purchasers against seller for illegal pricing scheme, or for class action involving illegal "tying" in violation of antitrust law).

**\*6** Rule 23(b)(2) contains two requirements for certification. I address each individually.

### (1) "Acted ... on grounds generally applicable to the class."

The plaintiffs must show that "the party opposing the class has acted or refused to act on grounds generally applicable to the class". Fed.R.Civ.P. 23(b)(2). *See also Amchem Prods.,* 521 U.S. at 614.

The First Circuit has characterized this prong of the 23(b)(2) test as essential to class certification, for the "conduct complained of is the benchmark for determining whether a subdivision (b)(2) class exists," and a 23(b)(2) class "is defined by the actions which a defendant has taken toward the class, and which should arguably be enjoined." *Yaffe v. Powers,* 454 F.2d 1362, 1366, 1367 (1st Cir.1972).

This focus on the defendants' conduct means that "[a]ction or inaction is directed to a class within the meaning of this subdivision even if it has taken effect or is threatened only as to one or a few members of the class, provided it is based on grounds which have general application to the class." Rule 23(b)(2) Advisory Committee Notes (1966 Rule Amendment); *see also* 5 James Wm. Moore et al., *Moore's Federal Practice* § 23.43[2][a] (3d ed. 2004) ("A defendant's conduct ... need not be directed specifically at each individual member of the class seeking certification. Rather, the court will assess whether the defendant's behavior similarly affected all members of the prospective class.")

The defendants do not seem to dispute that the plaintiffs' allegations meet this requirement of Rule 23(b)(2). Here, the plaintiffs allege that the defendants conspired "to eliminate the import of new vehicles from Canada into the United States," and that this "restrained trade and maintained the retail price of new motor vehicles sold in the United States ... at artificially high levels," in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 16 of the Clayton Act, 15 U.S.C. § 26.[FN33] To promote this conspiracy, the plaintiffs say that the defendants required their American dealers not to honor warranties or install certain American automobile parts on new Canadian imports, and required their Canadian dealers to utilize "No Export" agreements and to conduct "due diligence" investigations.[FN34] The plaintiffs also allege that the Automobile Companies penalized Canadian dealers that sold vehicles that were exported, threatened to withhold popular inventory from and terminate the dealerships of non-compliant Canadian dealerships, refused to provide owners with recall information, and tried to persuade parts suppliers not to provide parts that would convert

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 10

Slip Copy, 2006 WL 623591 (D.Me.)
**(Cite as: Slip Copy)**

Canadian vehicles to American standards.[FN35] Finally, the plaintiffs allege that the dealer associations NADA and CADA "facilitated this conspiracy" by sponsoring information exchange meetings, promoting the development of industry-wide anti-export practices, and assisting the Automobile Companies' enforcement efforts. [FN36] All these actions, the plaintiffs contend, violated federal antitrust law by limiting the export of cheaper Canadian cars into the United States, thus maintaining artificially high prices for American purchasers of new cars.[FN37]

> FN33. Fourth Am. Compl. ¶¶ 91, 96.

> FN34. *Id.* ¶¶ 92-93.

> FN35. *Id.* ¶ 94.

> FN36. *Id.* ¶ 95.

> FN37. *Id.* ¶ 96; *see also* Pls.' Mem. at 17-18.

*7 This case, therefore, satisfies the standard. It is one where the defendants allegedly acted on grounds generally applicable to the class by limiting the export of cheaper vehicles from Canada to the United States, thereby maintaining, the plaintiffs say, artificially high prices for the class of American consumers.

*(2) "Thereby making appropriate final injunctive relief ... with respect to the class as a whole."*

Rule 23(b)(2) next requires a court to examine the appropriateness of injunctive relief with respect to the class as a whole. In this case, the statute makes an injunction available: under Section 16 of the Clayton Act, plaintiffs may receive injunctive relief "against threatened loss or damage by a violation of the antitrust laws", 15 U.S.C. § 26. The plaintiffs contend that the defendants' conduct is "continuing and will continue unless enjoined." [FN38] If the plaintiffs succeed in proving that the defendants' conduct violates the antitrust laws, and that the violation threatened or threatens loss or damage and

is likely to continue, then injunctive relief is appropriate, and appropriate to the class as a whole. *See generally Vendo Co. v. Lektro-Vend Corp.,* 433 U.S. 623, 635 (1977) (the injunctive relief authorized by § 16 "undoubtedly embodies congressional policy favoring private enforcement of the antitrust laws, and undoubtedly there exists a strong national interest in antitrust enforcement").

> FN38. Fourth Am. Compl. ¶ 97.

The defendants have raised three arguments that I interpret to be directed at this prong of the Rule 23(b)(2) requirements; I address each in turn.

*(a) Predominance of Money Damages*

The defendants argue that the 23(b)(2) class here may not be certified because it involves primarily money damages, rather than injunctive relief.[FN39] The Advisory Committee Notes for Rule 23 state that subdivision (b)(2) "does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages." Fed.R.Civ.P. 23(b)(2) Advisory Committee Notes (1966 Rule Amendment). However, the plaintiffs' federal damages claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, has been dismissed. *In re New Motor Vehicle Canadian Exp. Antitrust Litig.,* 307 F.Supp.2d 136, 137 (D.Me.2004). Thus, the federal antitrust claim is no longer one where the relief " relates exclusively or predominantly to money damages." As Judge Easterbrook of the Seventh Circuit has recognized, certification of separate classes for the injunctive aspects and the damages aspects of a lawsuit (such as is requested here) can ensure that money damages do not predominate over injunctive relief in a Rule 23(b)(2) class, for it "achiev[es] both consistent treatment of class-wide equitable relief and an opportunity for each affected person to exercise control over the damages aspects. " *Jefferson v. Ingersoll Int'l Inc.,* 195 F.3d 894, 898 (7th Cir.1999).

> FN39. Defs.' Mem. at 44-45.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 623591 (D.Me.)
**(Cite as: Slip Copy)**

If that were not enough (and I believe that it is), state law damage claims also have been dismissed for all but 23 states and the District of Columbia. *In re New Motor Vehicle Canadian Export Antitrust Litig.,* 350 F.Supp.2d 160, 168 (D.Me.2004). Therefore, not only does no member of the class have a federal damage claim, but members of the proposed 23(b)(2) class who reside in the other 27 states have absolutely no claim for money damages, whether federal or state. For these proposed class members, it is impossible to argue that the "appropriate final relief relates exclusively or predominantly to money damages." [FN40]

FN40. The case cited by the defendants to support their argument, *Christiana Mortg. Corp. v. Delaware Mortg. Bankers Ass'n,* 136 F.R.D. 372, 376 (D.Del.1991), is inapposite. There the plaintiffs were suing for "compensatory damages, treble damages, and punitive damages" under three federal antitrust claims. Here, I have dismissed all federal damages claims. Therefore, the statement that "it is generally inappropriate in an antitrust suit seeking treble damages to certify a class under Rule 23(b)(2)," *id.* at 382, has no bearing. In addition, the plaintiffs' interest in injunctive relief in *Christiana Mortgage Corp.* was problematic. They did not allege that the defendants' acts were continuing: in fact, they could not, for the underlying violation stemmed from a one-time-only circulation of materials calling for a boycott of the plaintiffs. *Id.* In this case, the plaintiffs do allege that the defendants' conduct is continuing. Fourth Am. Compl. ¶ 97.

*(b) The Necessity of a Class Action*

**\*8** The defendants argue that certification of an injunctive class is unnecessary here because "any single plaintiff could seek the identical relief as the purported class." [FN41]

FN41. Defs.' Mem at 47. I construe this

argument as a challenge to Rule 23(b)(2)'s requirement that "final injunctive relief ... for the class as a whole" be appropriate.

Contrary to the defendants' argument, the Supreme Court has held that a Rule 23(b)(2) class may be certified even if there is no absolute need for a class action. *Califano v. Yamasaki,* 442 U.S. 682, 699-700 (1979). The First Circuit has expressly rejected a strict rule of necessity for Rule 23(b)(2) classes: "we do not accept the concept of a strict 'necessity requirement' under Rule 23(b)(2)." *Dionne v. Bouley,* 757 F.2d 1344, 1356 (1st Cir.1985). Although stating that a district court may consider whether the same relief could be afforded without certification, the First Circuit held that the proper test remains anchored in the language of the Rule: "[t]he language of Rule 23(b)(2) is reasonably clear: whether the action should be maintained as a class action depends on the *appropriateness* of injunctive or corresponding declaratory relief with respect to the class as a whole." *Id.* (emphasis in original); *see also Yaffe,* 454 F.2d at 1367 ("[T]he availability of other methods of resolution which might be superior to a class action are not criteria of a subdivision (b)(2) class, but ... of a(b)(3) class [.]"). Rejection of a rule of necessity makes sense, "because a need requirement finds no support in Rule 23 and, if applied, would entirely negate any proper class certifications under Rule 23(b), a result hardly intended by the Rules Advisory Committee." 2 Conte & Newberg, *supra,* § 4:19. [FN42]

FN42. *See also* Michael J. Murphy & Edwin J. Butterfoss, Note, *The "Need Requirement": A Barrier to Class Actions Under Rule 23(b)(2),* 67 Geo. L.J. 1211, 1228 (1978-1979) (arguing that need requirement "is not supported by the language or the intent" of Rule 23(b)(2), and that such a requirement poses several problems, both pre- and post-judgment); Daniel Tenny, Note, *There is Always a Need: The "Necessity Doctrine" and Class Certification Against Government Agencies,* 103 Mich. L.R. 1018, 1028 (2005) (arguing that district courts are not well positioned to determine whether

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 623591 (D.Me.)
**(Cite as: Slip Copy)**

injunctive relief afforded to one plaintiff will inure to the future benefit of all similarly situated individuals, and that therefore the necessity doctrine should not be used by district courts to deny class certification).

*(c) The "Cohesiveness" of the Class*

The defendants argue that the proposed class is not "cohesive." FN43 They contend that there are "multiple categories of plaintiffs that would be demonstrably worse off" if the defendants were enjoined from the alleged conduct; these potential class members allegedly benefited from the defendants' export restrictions.FN44

> FN43. Defs.' Mem. at 46 (citing *Barnes v. American Tobacco Co.,* 161 F.3d 127, 142 (3d Cir.1998)).

> FN44. Defs.' Mem. at 46.

A requirement of "cohesiveness" is generally associated more with Rule 23(b)(3) classes than with (b)(2) classes. The cohesiveness requirement stems from the Supreme Court's statement in *Amchem Products, Inc. v. Windsor:* "[t]he Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." 521 U.S. at 623. The majority of federal appellate decisions addressing "cohesiveness" tie the concept to 23(b)(3), not 23(b)(2), classes, citing *Amchem Products, Inc. See, e.g., In re Cmty. Bank of N. Virginia,* 418 F.3d 277, 308-09 (3d Cir.2005); *In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 136 (2d Cir.2001); *Lienhart v. Dryvit Systems, Inc.,* 255 F.3d 138, 147 (4th Cir.2001).FN45

> FN45. In two very recent opinions the First Circuit linked "cohesiveness" to the Rule 23(b)(3) predominance requirement. *SeeIn re PolyMedica Corp.,* 432 F.3d at 3 n. 5 (" [The Rule 23(b)(3) predominance] requirement, although reminiscent of the commonality requirement of Rule 23(a), is

far more demanding because it tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.") (citing *Unger v. Amedisys Inc.,* 401 F.3d 316, 320 (5th Cir.2005)) (internal quotation marks omitted); *In re Xcelera.com Sec. Litig.,* 430 F.3d 503, 506 n. 5 (1st Cir.2005) (same) (citing *Polymedica* ).

The defendants rely for their 23(b)(2) cohesiveness requirement upon cases such as *Allison v. Citgo Petroleum Corp.,* 151 F.3d 402 (5th Cir.1998) and *Barnes v. American Tobacco Co,* 161 F.3d 127 (3d Cir.1998). In *Allison* the Fifth Circuit recognized that "because of the group nature of the harm alleged and the broad character of the relief sought, the (b)(2) class is, by its very nature, assumed to be a homogeneous and cohesive group with few conflicting interests among its members." *Allison,* 151 F.3d at 413. For that reason, according to *Allison,* the underlying premise of a(b)(2) class is " that its members suffer from a common injury properly addressed by class-wide relief." *Id.* The Fifth Circuit said that this "presumption of cohesiveness" breaks down when individualized remedies predominate (such as those associated with money damages claims). *Id.; see also In re Monumental Life Ins. Co.,* 365 F.3d 408, 415-16 (5th Cir.2004) (following *Allison* ); *McManus v. Fleetwood Enters., Inc.,* 320 F.3d 545, 553 (5th Cir.2003) (same).

**\*9** The Third Circuit, in *Barnes v. American Tobacco Co.,* also referred to the cohesiveness of a(b)(2) class: "it is well established that the [ (b) (2) ] class claims must be cohesive," and indeed, "a (b)(2) class may require more cohesiveness than a(b)(3) class." 161 F.3d at 142-43. *Barnes* is a case where the district court first denied class action status under both (b)(2) and (b)(3) and called the (b)(2) claim (injunctive relief of medical monitoring in a cigarette smoking case) "merely a thinly disguised claim for future damages", *id.* at 131. However, the court did suggest that a claim limited solely to medical monitoring might qualify for (b)(2) certification. The plaintiffs then proceeded to dismiss all their claims except for medical monitoring, seeking as their only relief "a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 13

Slip Copy, 2006 WL 623591 (D.Me.)
**(Cite as: Slip Copy)**

court-supervised fund that would pay for medical examinations designed to detect latent diseases caused by smoking", *id.* at 132. Although at first the district court certified this (b)(2) class, it later decertified it. The Third Circuit affirmed the decertification, finding that "addiction, causation, the defenses of comparative and contributory negligence, the need for medical monitoring and the statute of limitations present too many individual issues" and therefore defeat cohesiveness. *Id.* at 143. The Eighth Circuit followed *Barnes* in *In re St. Jude Medical, Inc.,* 425 F.3d 1116 (8th Cir.2005), observing that "medical monitoring classes suffer from cohesion difficulties" and that certification of a number of such classes had been denied. *Id* . at 1122. [FN46]

> FN46. In *In re MTBE Products Liability Litigation,* 209 F.R.D. 323 (S.D.N.Y.2002), cited by the defendants at oral argument, the district court reached a similar conclusion where the requested "injunctive" relief related to clean-up of individual wells exposed to a chemical contaminant, situated in numerous states nationwide, presenting individualized issues such as varying sensitivities to taste and odor, varying levels of contamination, varying sources of contamination, and differing effects on well-owners.

What *Allison, Barnes,* and *St. Jude Medical* teach is that when a class of individuals alleges a group harm, and seeks a broad, class-wide, injunctive remedy, there is an "underlying premise" of cohesiveness that makes (b)(2) certification appropriate. But when that injunctive remedy must be individualized (as is the case with money damages, or with court-ordered medical monitoring), the cohesiveness is lost, and (b)(2) certification becomes inappropriate.

These principles do not call for denial of class certification here. The differences are obvious. The plaintiffs in *Allison* sought money damages. The so-called injunctive relief in *Barnes* and *St. Jude Medical* was actually money that would have to be paid for future medical procedures specific to

individual members of the class. Qualification for these benefits would raise all the issues the courts noted. Here, the requested injunctive relief does not involve money. Nor does the requested injunctive relief vary according to the characteristics of, or the effect of, the defendants' conduct on individual members of the class. Instead, the Fourth Amended Complaint makes clear that the requested relief is a general injunction barring the defendants from conduct found to be in violation of the antitrust laws. [FN47] That relief does not vary according to the individual; instead, it is a broad-based, class-wide, group remedy. Therefore, if there is a cohesiveness requirement for a(b)(2) class, it is met here.

> FN47. Fourth Am. Compl. at 29. I provide a synopsis of the requested relief in this Order's Background Section, *supra.*

**\*10** In fact, this case is more like *Griffin v. Burns,* 570 F.2d 1065 (1st Cir.1978). There, the First Circuit affirmed certification of a class of voters who had their votes invalidated because of how they voted (*i.e.* via absentee or "shut-in" votes). In doing so, the court refused to disqualify the class merely because some members were happy with the election outcome. *Id.* at 1073. Instead, the court focused squarely on the direct result of the defendants' conduct: "every member of the plaintiff class had his vote quashed simply because it was cast by absentee or shut-in ballot. The injunctive relief referred to in the rule does not require that the district court look into the particular circumstances of each member of the class." *Id.* at 1074. (citing 3B Charles Alan Wright et al., *Federal Practice and Procedure: Civil 3d* ¶ 23.40 (1977)) (internal quotation marks and brackets removed). Thus, it did not matter that some of the class members were not " aggrieved" at the ultimate election outcome because their candidate still had been elected; "having suffered the loss of their ballots, [they] shared with the other class members the legal injury complained of here." *Id.* at 1073.

*Griffin'* s reasoning is consistent with the thrust of Rule 23(b)(2). *See also* 7AA Wright et al., *supra,* § 1775 ("All the class members need not be aggrieved by or desire to challenge defendant's conduct in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 14

Slip Copy, 2006 WL 623591 (D.Me.)
**(Cite as: Slip Copy)**

order for some of them to seek relief under Rule 23(b)(2)). What is necessary is that the challenged conduct or lack of conduct be premised on a ground that is applicable to the entire class."). As the First Circuit observed, "[a]ctions under Rule 23(b)(2) may be more rough-hewn than those in which the court is asked to award damages [under Rule 23(b)(3) ]." *Griffin,* 570 F.2d at 1074.

Thus, even if I accept the defendants' contention that there are potential class members who were not harmed or who actually benefited from the export restrictions, I find that this fact, just as in the case of the voters whose ballots were invalidated improperly but whose candidate was elected in *Griffin,* does not destroy the cohesiveness of the (b)(2) class.

Conclusion

I conclude that the named plaintiffs have satisfied all the requirements of 23(a) and (b)(2). I therefore Certify the proposed injunctive class pursuant to Rule 23(b)(2). The plaintiffs have demonstrated that the "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."

So Ordered.

D.Me.,2006.
In re New Motor Vehicles Canadian Export
Slip Copy, 2006 WL 623591 (D.Me.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 4708392 (Trial Motion, Memorandum and Affidavit) Exemplar State Plaintiffs' Reply Memorandum of Law in Support of Their Motion for Class Certification Pursuant to Rule 23 of the Federal Rules of Civil Procedure (Dec. 21, 2005) Original Image of this Document (PDF)
• 2005 WL 4701590 () Affidavit of Robert E. Hall, Ph.D. (Dec. 20, 2005) Original Image of this Document (PDF)
• 2005 WL 3725975 (Trial Motion, Memorandum

and Affidavit) Defendants' Opposition to Exemplar State Plaintiffs' Motion for Class Certification (Sep. 30, 2005) Original Image of this Document (PDF)
• 2005 WL 3725978 (Trial Pleading) Toyota Motor Sales, U.S.A., Inc.'s Answer to Plaintiffs' Fourth Amended Consolidated Class Action Complaint (Aug. 17, 2005) Original Image of this Document (PDF)
• 2005 WL 3725979 (Trial Pleading) Answer of Defendants Daimlerchrysler Corporation and Daimlerchrysler Motors Co., LLC to Plaintiffs' Fourth Amended Consolidated Class Action Complaint for Violations of the Sherman Antitrust Act, and Demand for Jury Trial (Aug. 17, 2005) Original Image of this Document (PDF)
• 2005 WL 3725980 (Trial Pleading) Answer of Defendant Daimlerchrysler Canada Inc. to Plaintiffs' Fourth Amended Consolidated Class Action Complaint for Violations of the Sherman Antitrust Act, and Demand for Jury Trial (Aug. 17, 2005) Original Image of this Document (PDF)
• 2005 WL 3725981 (Trial Pleading) Answer of Defendant Mercedes-Benz USA, LLC to Plaintiffs' Fourth Amendedd Consolidated Class Action Complaint for Violations of the Sherman Antitrust Act, and Demand for Jury Trial (Aug. 17, 2005) Original Image of this Document (PDF)
• 2005 WL 3725982 (Trial Pleading) Defendants General Motors Corporation and General Motors of Canada, Ltd.'s Answer to Plaintiffs' Fourth Amended Consolidated Class Action Complaint for Violations of the Sherman Antitrust Act, and Demand for Jury Trial (Aug. 17, 2005) Original Image of this Document (PDF)
• 2005 WL 3725974 (Trial Motion, Memorandum and Affidavit) The Exemplar State Plaintiffs' Motion for Class Certification Pursuant to Rule 23 of the Federal Rules of Civil Procedure (Jul. 29, 2005) Original Image of this Document (PDF)
• 2005 WL 2098153 (Trial Pleading) Fourth Amended Consolidated Class Action Complaint for Violations of the Sherman Antitrust Act (Jul. 28, 2005) Original Image of this Document (PDF)
• 2005 WL 3725977 (Trial Pleading) Fourth Amended Consolidated Class Action Complaint for Violations of the Sherman Antitrust Act (Jul. 28, 2005) Original Image of this Document (PDF)
• 2005 WL 4701589 () Affidavit of Robert E. Hall, Ph.D. (Jul. 28, 2005) Original Image of this

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 623591 (D.Me.)
**(Cite as: Slip Copy)**

Document (PDF)
• 2005 WL 2098152 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply Memorandum in Support of Their Motion to Stay GM's Motion for Summary Judgment (Jul. 11, 2005)
• 2005 WL 3725976 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply Memorandum in Support of Their Motion to Stay Gm's Motion for Summary Judgment (Jul. 11, 2005)
• 2005 WL 2098151 (Trial Motion, Memorandum and Affidavit) General Motors' Opposition to Plaintiffs' Motion to Stay A Response to General Motors' Motion for Summary Judgment (Jul. 5, 2005) Original Image of this Document (PDF)
• 2005 WL 3725973 (Trial Motion, Memorandum and Affidavit) General Motors' Opposition to Plaintiffs' Motion to Stay A Response to General Motors' Motion for Summary Judgment (Jul. 5, 2005) Original Image of this Document (PDF)
• 2005 WL 3725972 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Motion to Stay a Response to GM's Motion for Summary Judgment with Incorporated Memorandum of Law (Jun. 24, 2005) Original Image of this Document (PDF)
• 2005 WL 3725971 (Trial Motion, Memorandum and Affidavit) Defendants General Motors Corporation and General Motors of Canada Limited's Motion for Summary Judgment with Incorporated Memorandum of Law (Jun. 10, 2005) Original Image of this Document (PDF)
• 2005 WL 3725970 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Opposition to the Motion by Defendant Canadian Automobile Dealers' Association for Partial Reconsideration of Order on Defendants' Motion to Dismiss Certain Claims in Plaintiffs' Second Amended Complaint and Memorandum of Points and Autho rities in Support Thereof (Jan. 21, 2005) Original Image of this Document (PDF)
• 2004 WL 3682611 (Trial Motion, Memorandum and Affidavit) Defendants' Reply in Support of Their Motion to Dismiss Certain Claims in Plaintiffs' Second Amended Complaint (Aug. 3, 2004) Original Image of this Document (PDF)
• 2004 WL 3682610 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss Certain Claims in Plaintiffs' Second Amended Complaint (Jul. 16, 2004) Original Image of this

Document (PDF)
• 2004 WL 3682609 (Trial Motion, Memorandum and Affidavit) Defendants' Motion Incorporating Memorandum to Dismiss Certain Claims in Plaintiffs' Second Amended Complaint (Jun. 10, 2004) Original Image of this Document (PDF)
• 2003 WL 24251817 (Trial Motion, Memorandum and Affidavit) Defendants' Reply Memorandum in Support of Their Motion to Dismiss Plaintiffs' Complaints (Dec. 19, 2003) Original Image of this Document (PDF)
• 2003 WL 24251815 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss Plaintiffs' Complaints (Dec. 4, 2003) Original Image of this Document (PDF)
• 2003 WL 24251816 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum of Law in Opposition to the Motions of Defendants BMW Canada, Inc., Mercedes-benz Canada, Inc., Daimlerchrysler Canada, Inc., Nissan Canada, Inc., Toyota Canada, Inc., and Canadian Automobile Dealers Association to Dismiss for Lack of Personal Jurisdiction (Dec. 4, 2003) Original Image of this Document (PDF)
• 2003 WL 24251811 (Trial Motion, Memorandum and Affidavit) Defendant Toyota Canada Inc.'s Motion to Dismiss Under Rules 12(b)(2) and 12(b)(5) of the Federal Rules of Civil Procedure, or, in the Alternative, to Dismiss Under Rule 12(b)( 6) (Oct. 31, 2003) Original Image of this Document (PDF)
• 2003 WL 24251812 (Trial Motion, Memorandum and Affidavit) Defendant Daimlerchrysler Canada inc.'s Motion to Dismiss the Transferred Complaints and the Amended Consolidated Complaint for Lack of Personal Jurisdiction or in the Alternative to Dismiss for Failure to State A Cause of Action and Incorporated Mem orandum in Support (Oct. 31, 2003) Original Image of this Document (PDF)
• 2003 WL 24251813 (Trial Motion, Memorandum and Affidavit) Nissan Canada's Motion to Dismiss Plaintiffs' Amended Class Action Complaint for Lack of Personal Jurisdiction With Incorporated Memorandum of Law (Oct. 31, 2003) Original Image of this Document (PDF)
• 2003 WL 24251814 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of BMW Canada Inc.'s Motion to Dismiss for Lack of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Page 16

Slip Copy, 2006 WL 623591 (D.Me.)
**(Cite as: Slip Copy)**

Personal Jurisdiction and Insufficient Service of
Process (Oct. 31, 2003) Original Image of this
Document (PDF)
• 2003 WL 24251819 (Trial Pleading) Amended
Consolidated Class Action Complaint for Violations
of the Sherman Antitrust Act (Oct. 1, 2003)
Original Image of this Document (PDF)
• 2:03md01532 (Docket) (Jul. 10, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**COMPENDIUM OF UNREPORTED CASES**
**CITED IN REPLY MEMORANDUM IN SUPPORT OF**
**END PAYOR PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

# TAB J


Westlaw.

Not Reported in F.Supp.2d                                                                            Page 1
Not Reported in F.Supp.2d, 2003 WL 302352 (E.D.Pa.), 2003-1 Trade Cases P 73,974
**(Cite as: 2003 WL 302352 (E.D.Pa.))**

H

**Motions, Pleadings and Filings**

United States District Court, E.D. Pennsylvania.
Robert NICHOLS, et al.
v.
SMITHKLINE BEECHAM CORP.,
**No. CIV.A. 00-6222.**

Jan. 29, 2003.

JOHN R. PADOVA, Judge.

*MEMORANDUM*
**\*1** Plaintiffs have brought this antitrust suit against SmithKline Beecham Corporation pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, alleging that Defendant has violated the federal antitrust laws, particularly Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, by stockpiling and causing patents to be listed with the Food and Drug Administration ("FDA") in a manner which has enabled Defendant to indefinitely extend its market monopoly for Paxil by delaying FDA approval of generic paroxetine hydrochloride. Before the Court is Defendant's "Motion to Strike the Affidavit and Preclude the Testimony of Plaintiffs' Proffered Expert" (Docket No. 97). For the reasons which follow, Defendants' Motion is denied.

I. BACKGROUND

The Consolidated Amended Class Action Complaint (the "Complaint") alleges that Defendant was issued U.S. Patent No. 4,721,723 (the " '723 Patent") on January 26, 1988, which patent claims crystalline paroxetine hydrochloride hemihydrate and its use in treating depression. (Compl.¶ ¶ 40-41.) On December 29, 1992, the FDA approved Defendant's New Drug Application ("NDA") for a drug containing paroxetine hydrochloride hemihydrate which Defendant markets as Paxil. (Compl.¶ ¶ 42-43.) Pursuant to the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301, *et seq.,* once the FDA approved Defendant's NDA for Paxil, Defendant obtained a five-year statutory monopoly in the market for that drug. (Compl.¶ 45.)

The Complaint alleges that in 1995, Defendant began to apply for patents on new anhydrous polymorphs of paroxetine hydrochloride, which patents began to issue in 1999 and which were submitted by Defendant to the FDA. (Compl.¶ 46.) The Complaint further alleges that, once competitors of Defendant began to file Abbreviated New Drug Applications ("ANDA") for generic bioequivalents of Paxil in 1998, Defendant filed baseless patent infringement actions against those competitors, which alleged that the bioequivalent drugs infringed on the '723 Patent and the other, more recently issued patents on forms of paroxetine hydrochloride owned by Defendant. (Compl.¶ ¶ 47-100.) Pursuant to the Hatch-Waxman Act, 21 U.S.C. § 355, the filing, by a branded drug patent owner, of a patent infringement suit against a generic competitor automatically blocks the FDA's approval of the competitor's ANDA for up to 30 months. (Compl.¶ ¶ 38-39.) The Complaint alleges that Defendant has violated the antitrust laws by filing fourteen baseless patent infringement actions against generic competitors in order to block FDA approval of its competitors' ANDAs and, thus, indefinitely extend its market monopoly for Paxil. (Compl.¶ 1.) The Complaint further alleges that, because Defendant unlawfully extended its market monopoly on Paxil, the class members paid higher prices for paroxetine hydrochloride than they would have otherwise paid and that Defendant was unjustly enriched by their overpayments.

Plaintiffs have filed a motion to certify a class of persons who purchased or paid for Paxil for consumer use from January 1, 2001 to the present, and a subclass of persons who purchased or paid for Paxil for personal use in certain states from January 1, 2001 to the present. A hearing has been scheduled on Plaintiffs' Motion for Class Certification for February 12, 2003. Plaintiffs have offered the opinion of Dr. Gary L. French to establish the existence of class-wide impact of Defendant's alleged violations of Section 2 of the Sherman Antitrust Act and to establish that this impact may be established by common proof and methodology.

II. DISCUSSION

**\*2** To obtain class certification, Plaintiffs must meet all four requirements of Federal Rule of Civil Procedure 23(a) and at least one part of Federal Rule of Civil Procedure 23(b). *Baby Neal v. Casey,* 43 F.3d 48, 55 (3d Cir.1994) (citing *Wetzel v. Liberty*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 2
Not Reported in F.Supp.2d, 2003 WL 302352 (E.D.Pa.), 2003-1 Trade Cases P 73,974
(Cite as: 2003 WL 302352 (E.D.Pa.))

*Mutual Ins. Co.,* 508 F.2d 239 (3d Cir.1975)). The four requirements of Rule 23(a) are satisfied only if:

1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a).

Plaintiffs allege that the proposed class satisfies the requirements of Rule 23(a) and is maintainable pursuant to Rule 23(b)(2) which requires that: "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole" and Rule 23(b)(3) which requires that: "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(2) and (3).

Dr. French has reached the following conclusions in support of his opinion that Defendant's activity has had class-wide impact which may be established by common proof and methodology:

a. The relevant antitrust product market in this matter is likely limited to Paxil® and its generic bioequivalents;

b. Each member of both the proposed class and the proposed sub-class has paid or will pay higher prices for Paxil®, regardless of whether the class member would have purchased Paxil® or a generic equivalent after January 1, 2001, than a class member would have paid absent defendant's allegedly illegal conduct;

c. Because each class member has overpaid or will overpay for Paxil®, each class member has or will be adversely impacted or economically injured;

d. A feasible methodology exists to calculate the aggregate overcharge damages to the indirect purchaser class;

e. A feasible methodology exists to calculate the amount by which defendant has allegedly been unjustly enriched; and

*3 f. The data required to implement the methodologies to quantify the overcharge damages and the unjust enrichment damages are available from IMS America or Scott Levin, and from defendant in discovery.

(French Am. Aff. ¶ 14.)

Defendant argues that the Court should strike Dr. French's Amended Affidavit and preclude his testimony at the hearing on Plaintiff's Motion for Class Certification because his opinion does not satisfy the requirements of Federal Rule of Evidence 702. Federal Rule of Evidence 702 states as follows:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. In determining whether expert testimony is admissible pursuant to Rule 702, the court must determine: "pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 592-93, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The Court must make this determination in all cases where the "testimony reflects scientific, technical, or other specialized knowledge." *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

Under *Daubert,* the Court must perform the following inquiry: "First of all, the proffered 'expert' must be qualified to express an expert opinion.... Secondly, the proffered expert opinion must be reliable." *In re TMI Litig.,* 193 F.3d 613, 664 (3d Cir.1999). In determining the reliability of the expert testimony, the Supreme Court and the United States Court of Appeals for the Third Circuit ("Third Circuit") have provided a number of factors to offer guidance to the Court's inquiry. These factors include:

(1) whether a method consists of a testable hypothesis; (2) whether the method has been subjected to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the

Not Reported in F.Supp.2d                                                        Page 3
Not Reported in F.Supp.2d, 2003 WL 302352 (E.D.Pa.), 2003-1 Trade Cases P 73,974
**(Cite as: 2003 WL 302352 (E.D.Pa.))**

technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*In re Paoli Railroad Yard PCB Litigation,* 35 F.3d 717, 742 n. 8 (3d Cir.1994) ("Paoli II"). This list is not exhaustive, and the inquiry under *Daubert* remains flexible; each factor need not be applied in every case. *See, e.g., Elcock v. Kmart Corp.,* 233 F.3d 734, 746 (3d Cir.2000); *Schieber v. City of Philadelphia,* Civ.A.No. 98-5648, 2000 U.S. Dist LEXIS 17952, at *6-7 (E.D.Pa. Dec. 13, 2000) ("These factors are non-exclusive and no one of the factors weighs more heavily than another; the approach to determining the admissibility of expert testimony is a flexible one.") (citing *Daubert, 509 U.S. at 594).*

*4 Defendant argues that Dr. French's opinion, as demonstrated in his Amended Affidavit and deposition testimony, fails to satisfy the requirements of Rule 702 and *Daubert* because, in reaching his opinion, Dr. French ignored key facts regarding the impact of insurance coverage on injury to the class; failed to present a methodology for determining which class members have been injured by Defendant's conduct (which Defendant proposes would require a highly individualized examination of each class member's benefit plan, buying habits, and likelihood of receiving prescriptions for Paxil); relied on an unsupported assumption that Defendant would have dropped the price of Paxil upon the entry into the market of a generic competitor; and offered no method for identifying which class members would switch to a generic form of Paxil if one were available. Defendant also argues that Dr. French's benchmark methodology for calculating aggregate damages is not reliable because there are members of the proposed class who may not have suffered any injuries and because Dr. French has not selected the benchmarks he would use to calculate damages or explained what factors he would consider in choosing benchmarks.

Dr. French's opinion need not, however, satisfy the requirements of *Daubert* to be admissible with respect to class certification. At this stage of the proceeding, the Court does not consider whether an expert witness's opinion would be admissible pursuant to *Daubert,* "the Court simply examines whether [the expert's] methodology, as proposed, will comport with the basic principles of econometric theory, will have any probative value, and will primarily use evidence that is common to all

members of the proposed class." *In re Polypropylene Carpet Antitrust Litigation,* 996 F.Supp. 18, 26 (N.D.Ga.1997). The United States Court of Appeals for the Second Circuit has explained that the district court's function at this stage is "not to determine whether plaintiffs had stated a cause of action or whether they would prevail on the merits, but rather whether they had shown, based on methodology that was not fatally flawed, that the requirements of Rule 23 were met." *In re Visa Check/Master Money Antitrust Litig.,* 280 F.3d 124, 135 (2d Cir.2001), *cert. denied* 536 U.S. 917, 122 S.Ct. 2382, 153 L.Ed.2d 201 (2002); *see also, In re Monosodium Glutamate Antitrust Litigation,* 205 F.R.D. 229, 234-235 (D.Minn.2001) ("Even assuming that there are problems with Dr. Beyer's methodology, however, Defendants' attack on that methodology is premature. The *Daubert* inquiry requires a more searching analysis than is appropriate at this preliminary stage") (citations omitted); *Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives and Composites, Inc.,* 209 F.R.D. 159, 162-63 (C.D.Ca.2002) ("It is clear to the Court that a lower *Daubert* standard should be employed at this stage of the proceedings. Courts have declined to engage in a *Daubert* analysis at the class certification stage of an action on the ground that an inquiry into the admissibility of the proposed expert testimony under *Daubert* would be an inappropriate consideration of the merits of the plaintiff's claims.") (citations omitted); *Midwestern Machinery v. Northwest Airlines, Inc.,* Civ.No. 97-1438, 2001 WL 34049897, at * 2 (D.Minn. Jan.18, 2001) ("The application of the *Daubert* test, however, is somewhat limited at the stage of class certification. *Daubert* is helpful to the extent that it can assist the Court in preventing the entrance of methodology so apparently flawed. It would be inappropriate, however, for a court to look beyond the methodology and critique the prospective results of its application to a complete set of data. A party and its experts should not be expected to have fully evaluated all data at the preliminary stage of class certification.") (citations omitted). The Court finds, accordingly, that Dr. French's opinion, as presented in his Amended Affidavit and testimony, need not satisfy a full *Daubert* examination at this stage of the litigation. In determining whether Dr. French's Amended Affidavit should be stricken and his testimony precluded, in connection with Plaintiff's Motion for Class Certification, the Court will examine whether Dr. French has identified a generally accepted methodology for determining impact which is applicable to the class, whether this methodology uses evidence common to all class members, and whether his opinion has probative value. *See In re*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 4
Not Reported in F.Supp.2d, 2003 WL 302352 (E.D.Pa.), 2003-1 Trade Cases P 73,974
(Cite as: 2003 WL 302352 (E.D.Pa.))

*Polypropylene Carpet Antitrust Litig.*, 996 F.Supp. at 26; *In re Visa Check/Master Money Antitrust Litig.*, 280 F.3d at 135.

Dr. French opines that Defendant's prevention of the sale of generic bioequivalents to Paxil resulted in the following common impact to members of the nationwide end-payer class and the indirect purchaser sub-class:

*5 29. Based on the above descriptions of pricing in the pharmaceutical industry and the literature on the impact of generic entry into pharmaceutical markets, the impact on members of the nationwide end-payer class and the indirect purchaser sub-class can be explained. Both classes include consumers and TPPs [Third Party Payers] which [sic] pay for Paxil®. Consumers in both classes also include individuals who would have switched from Paxil® to generic paroxetine hydrochloride, as well as individuals who would have continued to use Paxil® even after the introduction of generics. The large price differential between Paxil® and even Apotex's first generic would have provided a powerful economic incentive for Paxil® users to switch to the generic. In addition, formulary management by TPPs, as well as state laws requiring, encouraging, or allowing switching without a new prescription, also mean that most Paxil® users would have switched to the generics.

30. In the absence of SmithKline's patent infringement lawsuits against Apotex and other generic drug manufacturers, first Apotex and then others would have introduced bioequivalents to Paxil®....

31. In the absence of SmithKline's allegedly illegal conduct, Apotex would have entered the market for paroxetine hydrochloride on or about January 1, 2001, with prices to direct purchasers (*i.e.*, wholesalers and large chain retailers) significantly lower than SmithKline's Paxil® prices to the same direct purchasers. Given the highly competitive nature of wholesale and retail markets for pharmaceutical products, much, if not all, of the savings wholesale and retail markets would have achieved by purchasing from Apotex would have been passed through to consumers and TPPs. All those who would have switched to generic paroxetine hydrochloride were obviously adversely affected because SmithKline's conduct deprived them of the opportunity to have purchased substantially lower priced generics in place of Paxil®.

32. Even those class members who would have continued to purchase Paxil® after generic entry in January 2001 have also been economically injured, although to a lesser extent. As explained above, current manufacturers of brand-name drugs lower their prices, or at least do not increase them as much, when competitive generics are introduced. Thus, in all likelihood, SmithKline would have lowered its prices for Paxil® or not increased them as much in response to actual or impending generic entry in order to limit the sales it would have lost to Apotex initially and to all generic manufacturers eventually. Because SmithKline's patent lawsuits have allowed it to avoid generic competition and the need to restrain its Paxil® prices, it has not restrained them. Thus even those class members who would have remained loyal purchasers of Paxil® after generic availability in January 2001 have also been adversely impacted by paying higher Paxil® prices than would have existed absent delayed generic entry.

(French Am. Aff. ¶¶ 30-32.) At his deposition, Dr. French based these conclusions upon economic literature and the fact that the entry of generic competitors into the markets for other brand name drugs has resulted in similar effects. He also stated that he would need to have additional information obtained through merits discovery to determine whether Defendant would lower its price in response to generic entry into the market. (French Dep. at 140-165.)

*6 Defendant contends that Dr. French's assumption that all class members were damaged by Defendant's conduct because the price of Paxil would drop after generic entry into the market is baseless. Defendant relies on the opinion of its own expert, Dr. Richard T. Rapp, that it does not intend to drop the price of Paxil, or raise it more slowly than otherwise, after the entry of a generic bioequivalent into the market. Dr. Rapp bases his opinion on a review of Defendant's business plans and the testimony of its personnel. (Rapp Rpt. at 18.) He also concludes that Defendant's intention is consistent with economic theory. (Rapp Rpt. at 19.) Dr. French maintains that Dr. Rapp's criticisms of his opinions are "unfounded and/or inappropriate." (French Reply Aff. ¶ 3.) The fact that Dr. Rapp and Dr. French disagree about whether Defendant would reduce the price of Paxil, or raise the price more slowly, after the entry of generic competitors, is not sufficient reason to strike Dr. French's affidavit or disallow his testimony at the class certification hearing, as, at this stage of the litigation, the Court "may not weigh conflicting expert evidence or engage in statistical dueling of experts." *In re Visa Check/Master Money Antitrust Litig.*, 280 F.3d at 135 (citation omitted).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 5
Not Reported in F.Supp.2d, 2003 WL 302352 (E.D.Pa.), 2003-1 Trade Cases P 73,974
(Cite as: 2003 WL 302352 (E.D.Pa.))

Defendant also argues that the aggregate method of calculating damages proposed by Dr. French is inappropriate in this case because there is an unknown percentage of class members who have not been injured. Defendant suggests that there are four classes of class members who were not injured by its conduct: (1) class members whose insurance plans provide the same co-pay for brand name and generic drugs; (2) class members whose benefit plans have different co-pays for generic and brand name drugs but who would not have switched to a generic version of Paxil (Dr. French estimated that 20-50% of consumers stay with the brand name drug after a generic enters the market); (3) class members who pay cash but would not switch to a generic version of Paxil; and (4) class members who would not be prescribed Paxil after generic entry into the market because of a decrease in promotional efforts by Defendant. Defendant relies on *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154 (3d Cir.2001), in which the Third Circuit affirmed the denial of class certification in a Section 10(b) securities case in which individual issues regarding whether class members suffered economic losses from the manner in which their trades were transacted predominated over issues common to the class. The Third Circuit found, in *Newton,* that "[t]he ability to calculate the aggregate amount of damages does not absolve plaintiffs from the duty to prove each investor was harmed by the defendants' practice." *Id.* at 188. In *Newton,* class certification was denied because "[d]etermining which class members were economically harmed would require an individual analysis into each trade and its alternatives. The individual questions, therefore, are overpowering." *Id.* at 89. Defendant argues that, like in *Newton,* an unknown, but substantial, number of class members in this case have not been injured and, therefore, Dr. French's attempt to calculate damages on a class-wide basis would not help the Court in determining whether to certify the class.

The issue presently before the Court, however, is not whether each of the millions of sales of Paxil to indirect purchasers during the proposed class period resulted in damage to each individual indirect purchaser, but whether Dr. French has a sufficient basis for opining that the class members suffered a common impact from Defendant's alleged attempts to indefinitely prolong its monopoly power in the market for paroxetine hydrochloride. Dr. French's opinion has not been offered in support of an assessment of individual damages but, rather, to assist the Court in determining, for purposes of class certification, whether there exists common evidence

available to the class as a whole with respect to the issue of class-wide impact of Defendant's allegedly anti-competitive activity. "In order to show impact is susceptible to class-wide proof, Plaintiffs are not required to show that the fact of injury actually exists for each class member." *In re Cardizem CD Antitrust Litig.,* 200 F.R.D. 297, 307 (E.D.Mich.2001). If Plaintiffs are able to establish the existence of generalized evidence "which will prove or disprove this injury element on a simultaneous class-wide basis, then there is no need to examine each class members' individual circumstance as Defendant claims. Such an examination will relate to the quantum of damages; not the fact of the injury." *Id.* (citation omitted). Therefore, the Court cannot find that the possibility that some class members may not have been damaged by Defendant's alleged anticompetitive activity means that Dr. French's opinion would not be probative of any of the issues before the Court with respect to Plaintiff's Motion for Class Certification.

**\*7** Defendant also argues that Dr. French's benchmark damages calculation methodology is flawed because he has not specifically stated the percentage of class members who would switch to a generic form of Paxil and because he does not identify all of the benchmarks he would use in estimating damages. (Def.'s Mem. at 15-17.) Dr. French describes his methodology in his Amended Affidavit as follows:

37. The damages to class members equal the sum of the overcharges they have and will pay from January 1, 2001 until such time as generic manufacturers are allowed to sell generic paroxetine hydrochloride and establish their market shares. Such damages would be calculated by applying an overcharge percentage or amount per unit to the dollar or unit volume of purchases by class members. The overcharge amount or percentage can be determined by comparing actual Paxil® prices to the lower Paxil® and generic retail and TPP prices that would have existed since January 1, 2001. The physical or dollar volumes of Paxil® purchases since January 1, 2001 can be obtained from SmithKline and then forecast to the end of the damage period. The proportions of such Paxil® volumes that would have been transferred to generics because of switching can also be determined. All of these estimates and calculations can be made by using a competitive benchmark, which is a well accepted practice in antitrust cases.
38. Generally in situations involving overcharges, the determination of the extent to which prices were higher than they would have been in the

Not Reported in F.Supp.2d
Page 6
Not Reported in F.Supp.2d, 2003 WL 302352 (E.D.Pa.), 2003-1 Trade Cases P 73,974
(Cite as: 2003 WL 302352 (E.D.Pa.))

absence of anticompetitive activities, the shares of the market the various sellers would have had absent the anticompetitive conduct, and other circumstances that would have existed but for the wrongdoing is done by means of a competitive benchmark. There are well established approaches or typical benchmarks for determining the characteristics of the "but-for" world. One benchmark consists of a comparable market not affected by the anticompetitive activity. Another would be the market in which the anticompetitive conduct occurred, but in a period of time either before or after the effects of the conduct.

**8 39. Either of these standard benchmarks might be employed to calculate damages in this case. If, before trial, generic manufacturers are able to introduce generic paroxetine hydrochloride and begin establishing their market positions, then an after-period benchmark would be created. A number of comparable markets could also serve as benchmarks for calculating damages. These markets reflect the price and market share effects of generic entry on brand-name drugs over time.

(French Am. Aff. ¶ ¶ 37-39.) Dr. French also opined that benchmarks could be obtained from data provided by Defendant with respect to its own sales and marketing forecasts and material which can be obtained from outside data sources IMS America or Scott Levin. (French Am. Aff. ¶ ¶ 40-41, French Dep. at 21-23.) He further states that Defendant currently prepares similar studies of comparable markets for use in market forecasting:

40. In her 30(b)(6) deposition, Ms. Bonnie Rossello, who has had product management responsibilities fox Paxil® for many years, essentially explained how the experience of one product or group of products can be employed to predict or forecast what another product might do in its market. She did not refer to the other products as competitive benchmarks, but rather described them as "market analogs" and indicated that the Marketing Analytics department of GlaxoSmithKline has historically developed and continually develops market analogs by which to forecast the sales, prices, and market shares of GlaxoSmithKline products. Moreover, exhibits to Ms. Rossello's deposition illustrate the decline in sales or market shares of brand-name drugs when generics were introduced. Thus, defendant's own documents provide considerable insight into which other pharmaceutical markets could serve as competitive benchmarks in calculating damages. (French Am. Aff. ¶ 40, footnotes omitted.)

The two benchmarks proposed by Dr. French for

calculating damages in this case, (1) a comparable market not affected by anticompetitive activity and (2) the market in which the anticompetitive activity occurred in a period of time either before or after the effects of the conduct (French Am. Aff. ¶ 38), are standard methods for proving damages in an antitrust case. *Park v. El Paso Board of Realtors,* 764 F.2d 1058, 1068 (5th Cir.1985) ("Generally, an antitrust plaintiff can prove lost profits by two methods: (1) the before and after method, which involves comparing records of profits earned by the plaintiff prior to the impact of the violation with those subsequent to it; and (2) the yardstick test, which consists of studies of the profits of firms closely comparable to plaintiff's.") (citations omitted). Moreover, Plaintiffs are not required to have chosen one particular method for calculating damages, or a particular benchmark product, or to have determined the exact percentage of consumers who would have switched to generic paroxetine hydrochloride, at this stage in the litigation. *In re Linerboard Antitrust Litigation,* 203 F.R.D. 197, 217 (E.D.Pa.2001), *aff'd,* 305 F.3d 145 (3d Cir.2002) (determining that plaintiffs are not required "to have selected a particular econometric model for demonstrating impact (or proving damages) at the class certification stage."). Dr. French has, therefore, demonstrated the existence of evidence common to the class which can be utilized to determine the appropriate benchmark.

The Court finds that Dr. French has identified a generally accepted methodology for calculating impact in an antitrust suit and that Dr. French proposes the use of evidence common to the class to determine impact and damages in the nature of overcharges or unjust enrichment on a class-wide basis. The Court further finds that Dr. French's opinion has probative value with respect to class certification. Accordingly, Defendant's Motion is denied.

*9 An appropriate order follows.

*ORDER*
AND NOW, this 29th day of January, 2003, upon consideration of Defendant's Motion to Strike the Affidavit and Preclude the Testimony of Plaintiff's Proffered Expert (Docket No. 97) and the papers filed by both parties with respect thereto, IT IS HEREBY ORDERED that the Motion is DENIED.

Not Reported in F.Supp.2d, 2003 WL 302352 (E.D.Pa.), 2003-1 Trade Cases P 73,974

**Motions, Pleadings and Filings** (Back to top)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 7
Not Reported in F.Supp.2d, 2003 WL 302352 (E.D.Pa.), 2003-1 Trade Cases  P 73,974
**(Cite as: 2003 WL 302352 (E.D.Pa.))**

• 2001 WL 34847511  (Expert Report and Affidavit)
Affidavit of Gary L. French, Ph.D. Regarding
Plaintiff's Motion for Final Approval of Settlement
(Oct. 1, 2001)Original Image of this Document
(PDF)

• 2001 WL 34848180  (Expert Report and Affidavit)
Second Declaration of Gary L. French, Ph.D. (Oct. 1,
2001)Original Image of this Document (PDF)

• 2000 WL 34417256 (Trial Pleading) Class Action
Complaint (Dec. 08, 2000)

• 2:00cv06222 (Docket) (Dec. 08, 2000)

END OF DOCUMENT