**REPLY DECLARATION OF CHRISTOPHER J. MCDONALD
IN FURTHER SUPPORT OF END-PAYOR PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION [PUBLIC VERSION]**

# Exhibit 67

# APPENDIX C

## PLAINTIFFS' PROPOSED
## TWO–PHASE TRIAL PLAN
## FOR IN RE PHARMACEUTICAL INDUSTRY
## AVERAGE WHOLESALE PRICE LITIGATION

Plaintiffs propose to try this matter on a Class-wide basis in two phases.

In Phase I of the trial, Plaintiffs will prove the elements of their causes of action **using evidence that is common to all Class members**. Liability will be demonstrated using documents, data and testimony from Defendants as well as expert testimony. Expert testimony and data from Plaintiffs will be used to demonstrate liability and Class injury.

Phase II determines the damages suffered by each Class member. The format of Phase II will differ slightly between the classes. Medicare Part B Class members will need only to present documentary evidence establishing co-payments made for AWPIDs. The RICO and End Payor Class members will present claims data demonstrating AWP-based reimbursements made for AWPIDs. For all Classes, Plaintiffs propose that a Special Master evaluate the individual damage claims and submit a report and recommendation to the Court.

Plaintiffs' bifurcated trial plan is well-grounded in class action jurisprudence. Indeed, it is very common for courts to try class actions in two phases, with the second phase resolving individual damage claims. *See, e.g., Carnegie v. Household Int'l, Inc.*, 2004 U.S. App. Lexis 14635, at *11 (7th Cir. July 16, 2004); *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 306 (5th Cir. 2003); *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124 (2d Cir. 2001); *Chisolm v. TranSouth Fin. Corp.*, 194 F.R.D. 538 (E.D. Va. 2000); 3 CONTE & NEWBERG, NEWBERG ON CLASS ACTIONS, § 9:53 at 429-30 (4th ed. 2002) (collecting cases); 7B CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY K. KANE, FEDERAL PRACTICE AND PROCEDURE § 1781 (2d ed. 1986); *see also* Fed. R. Civ. P. 23(e)(4) ("When appropriate . . . an action may be brought or maintained as a class action with respect to particular issues[.]").

Set forth below is an evidentiary outline demonstrating how this case will be tried as a class action.

## PHASE I:
## PROVING LIABILITY WITH COMMON EVIDENCE

In Phase I, the jury will be charged with determining whether Plaintiffs have proved the required elements of RICO set forth below (and, by definition, violations of state Unfair and Deceptive Trade Practices Acts) and the law of civil conspiracy. As to damages, the jury will be asked to (i) find that Defendants' actions proximately caused Plaintiffs and Class members injury, and (ii) assess the amount of aggregate class damage, or assess the amount of the illegal spread on a per drug basis, thereby allowing for proof in Phase II of an AWP-based purchase and the price paid over the legal maximum set by the jury in Phase I. Dr. Hartman's Declaration

establishes and provides a foundation for how this can be accomplished at trial. Hartman Decl., ¶¶ 34–39; and Attachment E.

## A.    Proving The Required RICO Elements Using Evidence Common To All Class Members

### 1.    Conduct of an Enterprise

Through the following common evidence, Plaintiffs will demonstrate in Phase I that (i) each enterprise constitutes an ongoing and continuous business organization separate and apart from the activity in which it engages, (ii) the participants shared a common purpose, and (iii) Defendants participated, directly or indirectly, in the enterprises' affairs:

- Defendants' communications with Publishers

- Contractual agreements between Defendants and PBMs, including provisions that govern payments made by Defendants to the PBMs

- Defendants' and PBMs' documents evidencing actual rebates, "administrative fees," and other payments made by Defendants to the PBMs

- Other documents from Defendants and PBMs evidencing communications between Defendants and PBMs, including e-mails and letters

- PBM contracts with private payers and with pharmacies, coupled with PBM testimony, establishing that PBMs utilize AWP as a pricing benchmark and can earn spreads based on AWPs

- Expert testimony about the relationships between Defendants and PBMs

- The jury would return a verdict on this issue that is common to each member of the Class.

### 2.    Pattern of Racketeering Activity

Through the following common evidence, Plaintiffs will demonstrate that Defendants (i) knowingly devised or participated in a scheme to defraud, (ii) obtained money or property by means of false or fraudulent pretenses, representations and promises, and (iii) used the mails or interstate wire facilities in carrying out the scheme:

- Defendants' communications with Publishers

1534.16 0085 MTN.DOC

- Defendants' documents and testimony, including documents and testimony evidencing Defendants' recognition of AWP as industry-wide reimbursement benchmark, and documents evidencing that Defendants marketed the spread

- Defendants' data/ASPs

- Dr. Hartman testimony demonstrating that Defendants inflated AWPs

- The jury would return a verdict on this issue that is common to each member of the Class.

3.   **Proximate Cause of Injury**

- Documents and testimony from Defendants showing that the injury to Class members in the form of the payment of higher prices was foreseeable and an intended consequence of AWP inflation

   o   Will include Defendants' communications with Publishers

   o   Will include Defendants' internal documents recognizing the impact of AWP inflation on Medicare and private reimbursement

- Expert testimony regarding the ubiquity of AWP as a reimbursement benchmark

- Examples of private payer contracts with PBMs and physician providers utilizing AWP as a benchmark

- PBM testimony that most contracts base reimbursement on AWP

- Dr. Hartman testimony demonstrating that (i) Defendants inflated AWPs and (ii) Plaintiffs and Class members reimbursed medical providers and pharmacies at a reimbursement rate based on the inflated AWPs (*i.e.*, a demonstration of class injury), and (iii) what payment levels would have been absent the conspiracy

- Dr. Hartman "overcharge" and "AWP profit" testimony establishing the aggregate amount of class damage or Dr. Hartman presenting an inflation figure per drug, leaving to the damage phase proof of the amount of damages

- The jury would return a verdict that would establish inflation per drug. Any Class member who paid an inflated amount is damaged, thus the verdict decides the issue for the class.

**B.    Proving The Elements Of State Unfair And Deceptive Trade Practices Acts and Conspiracy Using Evidence Common To All Class Members**

- "Mail and wire fraud, the predicate acts underlying Plaintiffs' RICO claims, are by definition unfair and deceptive acts. If Plaintiffs are able to prove any one or more of their RICO claims, their ability to satisfy the elements of a consumer protection act claim under any of the referenced statutes will follow almost as a matter of course." *In re Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 181 (D. Mass. 2003).

- Therefore, additional evidence will not be necessary to prove Defendants' violations of state UDTPAs and the law of civil conspiracy.

- As discussed in Section B7 of Plaintiffs' opening memorandum, Plaintiffs propose national Subclasses applying the law of each Defendant's home state. In the alternative, Plaintiffs have grouped the consumer protection and conspiracy claims into manageable subclasses as set forth in Appendices A and B to Plaintiffs' Memorandum in Support of Class Certification.

- As in the RICO claim, the jury verdict as to the elements of state law claims would be applicable on a Class-wide basis.

4

## PHASE II:
### INDIVIDUALIZED DAMAGE DETERMINATIONS

Fed. R. Civ. P. 53 authorizes the Court to appoint a Special Master "to perform an accounting or resolve a difficult computation of damages" with the consent of the parties or where issues are to be decided by the Court without a jury. Indeed, Special Masters are frequently employed for this purpose in class actions. *See, e.g., Chisolm,* 194 F.R.D. at 553; ALBA CONTE & HERBERT NEWBERG, NEWBERG ON CLASS ACTIONS, § 9:55 at 438-41 (4th ed. 2002) (collecting cases); *Klay v. Humana, Inc.*, 2004 U.S. App. Lexis 18494, at *82 (11th Cir. Sept. 1, 2004) (approving use of management tool such as a special master in second phase). In Phase II, a Special Master will be charged with determining each individual Class member's damage based on proofs of claim and data provided by the Class members. The Special Master evaluates each damage claim pursuant to a formulaic calculation provided by Plaintiffs' expert and that will have been approved by the jury. Defendants have the opportunity to contest individual damage proofs. The Special Master decides the individual damage amounts in a recommendation to the Court. If material issues of fact remain, the Court submits the report to the jury, which considers argument and evidence submitted by Defendants. Otherwise, the Court makes individual damage determinations via summary judgment.

A.    **Medicare Part B Co-Pay Class**

- Notice to the Class is provided of the liability determination in Phase I.

- Class members submit documentation showing amount of 20% co-pays made for AWPIDs.

- Plaintiffs' expert reports damage amount for each class member to Special Master.

- Defendants can submit evidence contradicting damage proofs.

- Special Master rules on damage amounts and makes recommendation to Court.

- If necessary, the jury can evaluate the Special Master's recommendation, considering argument and evidence submitted by Defendants.

- Accounting firm runs calculation of class members' damages based upon Phase I damage numbers returned by jury.

B.    **Third-Party Payor and Co-Pay Class RICO Class**

- Notice to Class is provided of the liability determination in Phase I.

- Class members submit documentation of AWP-based reimbursement for AWPIDs. The documentation will primarily consist of:

    o   Contracts with PBMs and providers

- o   Claims data showing each reimbursement made for AWPIDs on the basis of AWP, along with the reimbursement amount

- Plaintiffs' expert calculates damages based on methodology submitted by Dr. Hartman in Phase I and ruled on by the jury.

- Plaintiffs' accounting expert reports damage amount for each class member to Special Master.

- Defendants can submit evidence contradicting proofs but cannot dispute issues decided in Phase I.

- Special Master decides damages amount and makes recommendation to Court.

- If necessary, the jury can evaluate the Special Master's recommendation, considering argument and evidence submitted by Defendants.

1534.16 0085 MTN.DOC

**REPLY DECLARATION OF CHRISTOPHER J. MCDONALD
IN FURTHER SUPPORT OF END-PAYOR PLAINTIFFS'
<u>MOTION FOR CLASS CERTIFICATION [PUBLIC VERSION]</u>**

# Exhibit 68

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| BARBARA SCHWAB, et al.,<br>individually and on behalf of a class<br>of all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>PHILIP MORRIS USA, INC. et al.,<br><br>    Defendants. | Case No. CV- 0401945 (JBW) (SMG) |

## CLASS PLAINTIFFS' PROPOSED LITIGATION PLAN

### I. Notice of Certification to Class Members

In a case such as this which consists of a large number of unidentifiable class members, published notice, consisting of paid media notice, is both necessary and appropriate. The adequacy of paid media notice pursuant to Rule 23(b) of the Federal Rules of Civil Procedure is supported by substantial case law in consumer, mass tort, product liability and human rights litigation. *See generally* Report of Katherine Kinsella, Kinsella /Novak Communications, Ltd. at 1-2. Direct mail notice would not be adequate or reasonable in this case, for the reasons set forth in detail in the Kinsella Report.

The paid media notice program would provide due process notice within weeks of the Court's approval of the notice program. This would allow for a sufficient opt-out period of, for example, 45 days, permitting trial of Plaintiffs' claims to occur within 90 days of the Court's certification of the class.

1

## II.    Overview of Trial

Plaintiffs' claims and the scope and complexity of this trial are substantially the same as similar trials that also have addressed -- either solely or in combination with other cigarette-related claims – Defendants' "light" and low-tar cigarette fraud.  For example:

\*    The *United States v. Philip Morris* case[1] was a complex civil RICO case tried to a district court judge.  It involved identical claims and evidence regarding the "light" cigarette fraud that exist here, with the one exception being the issue of proof of reliance.

\*    The *Price* case[2] was a class action under Illinois state consumer fraud law tried to judgment in the amount of $10 billion dollars.[3]  The plaintiffs there were required to, and successfully did, present class-wide evidence on Defendants' conspiracy, the scheme to defraud "light" cigarette smokers, the impact of the fraud and the resulting damage.

\*    The *Blue Cross/Blue Shield* case,[4] as this Court is aware, was a complex civil RICO and state statutory fraud action tried to jury verdict in the amount of over $17 million.[5]  Again, the "light" cigarette fraud was a component of this case, and the presentation to the jury was based on common evidence.

\*    The *Scott* case[6] was a class action under Louisiana state common and statutory law, including fraud and conspiracy, which included allegations involving the "light" cigarette fraud.  It was tried based on common evidence to a jury verdict in the amount of $591 million.

All of these cases involved either "light" cigarette class claims or "light" cigarette RICO claims, both of which are presented in this case.  These cases and their adept management by the trial courts demonstrate unequivocally that the instant claims are manageable and that this Court has the ability to effectively manage this class trial and to enable a jury to reach a reasonable verdict based on the evidence presented to them.

---

[1]  *United States v. Philip Morris USA, Inc.*, No. 99-CV-02498 (GK) (D.D.C.).

[2]  *Price v. Philip Morris, Inc.*, No. 00-L-112, 2003 WL 22597608 (Ill. Ct. Cl. Mar. 21, 2003).

[3]  Several other state consumer fraud cases involving "light" cigarettes also are moving their way through state courts in several jurisdictions, including a number in which state courts have certified state "light" smoker classes.

[4]  *Blue Cross and Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.*, 178 F. Supp. 2d 198 (E.D.N.Y. 2001) *rev'd on other grounds sub nom.*, *Empire Healthchoice, Inc. v. Philip Morris USA, Inc.* 393 F.3d 312 (2d Cir. 2004).

[5]  The RICO and state law claims were fully tried to a jury, which held for plaintiffs only on the state law claims.  It is ironic that Defendants assert that the instant RICO class action is too complex to be tried to a jury, given that the one jury to issue a ruling involving "light" cigarettes in a complex RICO action held in favor of Defendants on the RICO count.

[6]  *Scott v. American Tobacco Co.*, No. 96-8461, Judgment (La. Dist. Ct. June 30, 2004).

Phased Trial. Plaintiffs propose a multi-phased trial. The first two phases would be conducted before the same jury. *See* Manual for Complex Litigation Fourth § 11.632 (2004) ("Generally when issues are severed for separate trials, they should be tried before the same jury . . . .").

In Phase One, the parties will submit common evidence on the issues of the enterprise and the existence of the conspiracy, the pattern of racketeering activity, the scheme to defraud, and the intended deception caused by the fraud (as judged by the reasonable person standard). *See infra* at __-__. The jury will render a verdict on those issues and, if they find for Plaintiffs, the trial will move to Phase Two.

This phased approach will permit the jury to address all of the issues relating to Defendants' liability – enterprise, racketeering activities, the scheme to defraud and intent to deceive – at one time. All of these liability issues are common to the class and appropriate for the jury to address on a class-wide basis.[7]

In Phase Two of the trial, the jury will be presented with evidence relating to reliance (evidence that Plaintiffs would submit as a rebuttable presumption or on an aggregate and statistical basis for all members of the class), damages and special defenses such as statute of limitations. *See infra* at __-__. These issues also will be determined based on common proofs.

If the jury finds for Plaintiffs in Phase One, but regardless of what the jury concludes in Phase Two, in Phase Three Plaintiffs will present their case for equitable relief to the Court.[8] The Court will determine the remedies that are appropriate given the finding for Plaintiffs in

---

[7] In this way, even if the jury subsequently determined that Plaintiffs had failed to prove either reliance or damages, individual plaintiffs would have the benefit of a final jury determination on the issues relating to liability, which would enable them to seek recovery in individual cases in which they would be entitled to the benefits of collateral estoppel on the liability issues decided by the jury.

[8] Where common issues exist between legal claims and claims for equitable relief, the legal claims with their attendant right to trial by jury must be determined prior to any final court determination of the equitable claims. *See Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 472 (1962).

Phase One. These remedies may include, but are not limited to, disgorgement of ill-gotten gains, injunctive relief, or any other equitable relief that the Court has authority to grant under 28 U.S.C. § 1964 or pursuant to the Court's inherent equitable powers.

Scope and Length. Plaintiffs believe that they can present their Phase One case to the jury in approximately 2-3 weeks.[9] At this time, Plaintiffs estimate that they would call live witnesses, with additional witness testimony presented by video or deposition transcript designation. The number of witnesses will vary depending on pre-trial rulings and other circumstances that either require or eliminate the need for certain witnesses' testimony. A number of the live witnesses will be expert witnesses, possibly including, but not limited to, experts in epidemiology, toxicology, cigarette design, compensation, economics, consumer psychology, marketing, survey research, finance, and corporate ethics. Other witnesses may include current and/or former corporate officials of Defendants; former scientists or other employees of Defendants; U.S. government officials; and doctors, scientists, and other members of the public health community.

Plaintiffs anticipate that, given the large number of contemporaneous internal corporate documents detailing the fraud, Plaintiffs will submit a substantial number of documents to the jury in the course of their case. Some of these documents will be admitted through experts, some through witnesses with contemporaneous knowledge of the events therein described, and some through other established rules of evidence.

---

[9] Plaintiffs originally informed the Court that they believed they would need two weeks to present their case to the jury. Since that time, however, it has become abundantly clear to Plaintiffs that Defendants intend to contest even the most fundamental issues in this case. For example, Defendants apparently will contend that "light" cigarettes are, in fact, less harmful than "regular" cigarettes, despite the fact that: (1) an overwhelming worldwide scientific consensus exists that "light" and other low-tar cigarettes are no less harmful than regular cigarettes; and (2) Defendants publicly have admitted, including on their official corporate websites, that "light" cigarettes are no safer than regular cigarettes.

4

The length and extent of Plaintiffs' presentation to the jury could be dramatically reduced depending on the Court's rulings on certain of Plaintiffs' Motions for Summary Judgment/Motions in Limine that currently are before the Court. For example, if the Court rules that Defendants are estopped from relitigating issues involving their creation of and participation in a conspiracy,[10] Plaintiffs could significantly reduce or even eliminate the amount of time necessary to present this evidence to the jury. Similarly, if the Court were to conclude that no reasonable juror could find in favor of Defendants on their "the public health community made me do it" defense,[11] Plaintiffs would not need to present a substantial quantity of evidence on that issue. Finally, if the Court precludes Defendants from contesting in litigation what Defendants *concede publicly*, *i.e.*, that "light" cigarettes are no less harmful than regular cigarettes, an enormous amount of trial time and resources would be saved. Such rulings would result in a significantly narrower trial in both scope and length.

## III. Presentation of Plaintiffs' Claims -- Meeting the Legal Requirements Through Common Proof

Plaintiffs will prove the elements of a civil RICO claim based on mail and/or wire fraud, including that:

1. a person
2. employed by or associated with
3. an enterprise
4. that is engaged in or affects interstate commerce
5. conducted or participated in the conduct of the enterprise's affairs
6. through a pattern of racketeering activity (here mail and wire fraud)
7. with the necessary intent
8. resulting in injury to the plaintiffs' business or property.

---

[10] *See* Plaintiffs' Motion for Partial Summary Judgment Regarding the Existence of Defendants' Conspiracy.

[11] Defendants contend that they are not responsible for the fraud that enabled them to reap hundreds of billions of dollars over thirty years because, they argue, it was the public health community that urged smokers to smoke "light" and low-tar cigarettes. As set forth in Plaintiffs' summary judgment motion on this issue, the evidence is overwhelming that, instead of doing what some members of the public health community suggested, *i.e.*, making cigarettes that delivered significantly lower tar and nicotine when smoked by actual human smokers, the cigarette companies conspired to create the "illusion" of a lower delivery and, thus, less harmful cigarette, even though they knew that their products were neither lower delivery nor less harmful.

Gregory P. Joseph, *Civil RICO: A Definitive Guide*, American Bar Assoc. Section of Litigation (2d ed. 2000) at 125. Importantly for purposes of predominance, seven out of eight of these elements focus *exclusively on Defendants' conduct*, which Plaintiffs will prove on behalf of the entire class with common evidence. Common proof will predominate in all of the proposed Phases of this case.

## Phase I

**The Enterprise and the Conspiracy.** Defendants engaged in a conspiracy involving many smoking and health-related issues. There is a substantial amount of evidence to prove the existence and extent of this conspiracy, much of which is already well known to this Court from previous litigations. This evidence includes documents and fact testimony that will show that:

- Defendants created the Tobacco Institute as a public relations front to coordinate the cigarette industry's joint response to smoking and health issues;[12]

- Defendants created the Center for Tobacco Research as a front to give the appearance that the cigarette industry was actually seeking to conduct research to reduce the hazards of cigarette smoking;[13]

- Defendants agreed to create a "united front" and "rule[s] of the road" on smoking and health issues worldwide;[14]

---

[12] *See, e.g.*, Memo to File, Sept. 3, 1963, LG2006235-40 ("It was unanimously agreed that those in attendance would recommend to their respective principals that if there was to be a statement after the Surgeon General's report was made public, it should be an industry statements rather than separate statements by one or more companies.").

[13] *See* 1003718428-432 at 429 (CTR "set up as an industry 'shield' in 1954: . . . On these projects, CTR has acted as a 'front.'"). (Attached as Ex. 33 to Pls.' Mem. Supp. Mot. Partial Summ. J. Regarding the Existence of Defs.' Conspiracy).

[14] *See* Outline for TI Meeting on May 19, 1981 at 680543063 ("We are attaching (sic) this meeting of the Executive Committee to discuss the significance of one member's studied departure from the rule of the road which is essential to the existence of the Institute. The rule is that open good faith discussion among all members precedes any company action on a major industry issue.").

- Defendants made a "gentlemen's agreement" that reduced the incentives for any company to create a "safer" cigarette;[15]

- Defendants suppressed marketing of potentially "less harmful" cigarettes;[16]

- Defendants deliberately engineered "light" cigarettes by increasing the elasticity of delivery such that "light" cigarettes would deliver no less tar and nicotine to actual human smokers than do regular cigarettes, and Defendants concealed this deliberate engineering from the public health community and consumers;[17]

- Defendants sought to conceal that inaccuracy of the FTC Method as it related to the amount of tar and nicotine that smokers would actually get from their "light" cigarettes.[18]

---

[15]   In 1981, scientists at Temple University made a research proposal to R.J. Reynolds entitled "Selective Removal of Oxidants from the Tobacco Mainstream Smoke Aerosol." In an October 26, 1981 memorandum concerning the Temple proposal, Frank Colby of RJR wrote:

> There is a clear-cut agreement among all U.S. cigarette manufacturers that any scientific discovery made within the companies, or otherwise sponsored by a single company, which might have a positive impact on the smoking and health controversy, would have to be freely shared, without any costs to the other manufacturers. There would, therefore, be no incentive for [R.J. Reynolds] to sponsor the Cohen project. This applies to any other product development oriented research by a medical institution to be sponsored by a U.S. tobacco company.

500534388-4389 (Ex. 114 to Plaintiffs' Mem. Supp. Mot. for Class Certification ("Plaintiffs' Class Cert. Mem.")).

R.J. Reynolds was found briefly to have violated the Agreement in the late 1960s, when it established a facility (known as the "Mouse House") to perform certain animal studies. When Philip Morris discovered and complained about R.J. Reynold's violation of the Agreement, R.J. Reynolds abruptly closed the "mouse house" and fired 26 scientists. RJR 503950745-0750 (Ex. 117 to Plaintiffs' Class Cert. Mem.). The closure of the "mouse house" was related to the "tacit agreement between the heads of the US companies" not to conduct "in-house biological research." 110315968-5971 (Ex. 118 to Plaintiffs' Class Cert. Mem.); *Blue Cross and Blue Shield*, 178 F.Supp.2d at 221, 223 (internal citations omitted).

[16]   *See* 524007145-7151 at 7148-49 (Ex. 101 to Plaintiffs' Class Cert. Mem.).

[17]   For example, the R&D group at BATCo recommended that BATCo design cigarettes that would make it easier for smokers to compensate, but not in an obvious way: "Irrespective of the ethics involved, we should develop alternative designs (that do not invite obvious criticism) which allow the smoker to obtain significant enhanced deliveries should he so wish." 109869437-9440 at 9437 (Ex. 32 to Plaintiffs' Class Cert. Mem.).

[18]   *See* BATCO 400015688-5690 at 5690 (Ex. 107 to Plaintiffs' Class Cert. Mem.) ("If the industry permits the attack upon Barclay to continue . . . then we would propose to put these threats into operation and to publicise to consumers, consumer organizations and national regulators the true scientific position concerning the measurement of tar and nicotine deliveries of all ventilated products.").

Expert testimony.  Plaintiffs may present expert testimony on the issues of the enterprise and the conspiracy.  For example, Nobel Laureate economist Joseph Stiglitz will testify that the industry engaged in a conspiracy on smoking and health-related issues, including low-tar and "light" cigarettes.

**The Scheme to Defraud.**  Plaintiffs will present evidence that Defendants engaged in a scheme to defraud smokers and the public with regard to issues relating to smoking and health, one of the key components of which was the "light"/low-tar cigarette fraud.  Notably, this Court already has stated that "I assume, based on other litigation, that the plaintiffs are going to be able to establish that light cigarettes are dangerous, and without so the [sic] finding, and that the defendants were sufficiently aware and perhaps were misleading about it. . . .  That seems to be the easiest part of the case, that people were misled." *See* July 26, 2005 Hr'g Tr. at 11.  Again, there is substantial evidence in support of Plaintiffs' claims, much of which the Court already is familiar.

Contemporaneous internal corporate documents.  For example, a December 4, 1968 letter from R.A. Sanford, Brown & Williamson Director of Research and Development, to Dr. S. J. Green, BATCo scientist, acknowledged that low tar cigarettes are not less harmful, but merely perceived by the public as such, stating: "It was also recognized that there are two types of health products possible and that they should be distinguished:  (a) Health image (health reassurance cigarette) such as a low tar - low nicotine cigarette which the public accepts as a healthier cigarette and (b) Health-oriented cigarette which has minimal biological activity; for example, one which would yield a near zero reading in a mouse skin painting test."  689033184-3185 at 3184 (Ex. 16 to Plaintiffs' Class Cert. Mem.).

8

An August 11, 1967 Philip Morris USA document from Helmut Wakeham, then Director

of Research and Development at Philip Morris USA, to Paul D. Smith, then Vice President and

General Counsel of Philip Morris USA, stated that human smokers increased their smoke intake

when switching from non-filter to filter cigarettes, and in the process received the same amount

of tar and nicotine from filter cigarettes as from non-filter cigarettes.  He noted that this rendered

machine-smoking tar and nicotine yields for low tar cigarettes "erroneous and misleading:"

> Two tests conducted at Product Opinion Laboratories demonstrate
> that in smoking a dilution filter cigaret [sic.], the smoker adjusts
> his puff to receive about the same amount of 'undiluted' smoke in
> each case. . . . In the smoking machine the puff volume is constant
> so that with dilution the quantity of 'equivalent undiluted smoke'
> delivered to the Cambridge filter is reduced.  Not so with the
> human smoker who appears to adjust to the diluted smoke by
> taking a larger puff so that he still gets about the same amount of
> equivalent undiluted smoke. . . .  The smoker is, thus, apparently
> defeating the purpose of dilution to give him less 'smoke' per puff.
> **He is certainly not performing like the standard smoking
> machine; and to this extent the smoking machine data appear
> to be erroneous and misleading.**  It has probably always been so
> for diluted smoke cigarettes, whether dilution is obtained by
> porous paper or holes in the filter.

1000322554-2555 at 2554 (Ex. 27 to Plaintiffs' Class Cert. Mem.) (emphasis added).

A March 28, 1972 memorandum marked "RJR SECRET" from Claude Teague, Jr., to

E.A. Vassallo and Murray Senkus entitled "A Gap in Present Cigarette Product Lines and an

Opportunity to Market a New Type of Product," gives insight on how Defendants planned to

exploit these habits:

> [R]egardless of which cigarette the smoker chooses, in obtaining
> his daily nicotine requirement he will receive about the same daily
> amount of 'tar.'  **If, as claimed by some anti-tobacco critics, the
> alleged health hazard of smoking is directly related to the
> amount of 'tar' to which the smoker is exposed per day, and
> the smoker bases his consumption on nicotine, then a present
> 'low tar, low nicotine' cigarette offers zero advantage to the
> smoker over a 'regular' filter cigarette, but simply costs him**

> more money and exposes him to substantially increased
> amounts of allegedly harmful gas phase components in
> obtaining his desired daily amount of nicotine . . . . [t]he
> thoughts and philosophies expressed above come from many
> sources and certainly are not solely those of the writer.

500790776-0784 at 0778, 0782-0783, 0784 (Ex. 35 to Plaintiffs' Class Cert. Mem.) (emphasis

added).

Fact witness testimony. Plaintiffs may present fact witnesses who will testify, for

example, that Defendants sought to suppress science relating to the creation of a "safer"

cigarette; that Defendants sought to suppress research into the link between smoking and health;

that Defendants sought to suppress the marketing and sale of "safer" cigarettes; and that

Defendants had far greater knowledge than the public health community and the general public

about the design of low-tar and "light" cigarettes, which allowed Defendants to manipulate the

elasticity of delivery so that actual human smokers would receive more tar and nicotine from

"light" cigarettes.

Expert witness testimony. Plaintiffs may present expert testimony on many aspects of the

Defendants' fraudulent scheme. They may present medical doctors, scientists and other

members of the public health community who will testify that the cigarette companies knew far

more than they made known to the public about the actual tar and nicotine deliveries of their

"light" cigarettes; that Defendants had a knowledge of cigarette design superior to that of the

public health community and the public, which they exploited to design their cigarettes

specifically to achieve low ratings according to the FTC Method, yet deliver much higher levels

of tar and nicotine when actually smoked by people; and that at no time prior to or after the

introduction and marketing of "lights" did the industry establish or investigate whether there was

a medical or scientific basis to support a claimed health benefit from smoking "lights" as compared to regular cigarettes.

Plaintiffs will present economic experts who will testify that, as a result of their conspiracy not to create a truly safer cigarette (which Defendants concluded they could not market because of the massive exposure to litigation that such a development would entail), Defendants' only alternative to keep people smoking was to create the "illusion" of a safer cigarette, a cigarette that Defendants could imply was less harmful without conceding the danger of their existing cigarettes.

**Deception**.  Plaintiffs' burden is merely to demonstrate a scheme to defraud that involves misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension. *See Walters v. First Nat'l Bank, N.A.,* 855 F.2d 267 (6th Cir. 1988), *cert. denied,* 489 U.S. 1067 (1989).

Plaintiffs may present evidence such as the following at trial.

Documentary Evidence.  A number of internal documents indicate that Defendants intentionally sought to deceive smokers into believing that "light" and low tar cigarettes were less harmful.

For example, in a memorandum dated August 26, 1977, S. J. Green, Scientist, Manager, and Director of BATCo Research & Development from 1961-1979, posed the following questions to be discussed at a Chairman's Advisory Conference with Mr. Sheehy, then Chairman of BATCo:

> Should we market cigarettes intended to re-assure the smoker that they are safer without assuring ourselves that indeed they are so or are not less safe?  For example should we 'cheat' smokers by 'cheating' League Tables?  If we are prepared to accept that government has created league tables to encourage lower delivery cigarette smoking and further if we make league table claims as

11

> implied health claims – or allow health claims to be so implied –
> should we use our superior knowledge of our products to design
> them so that they give low league table positions but higher
> deliveries on human smoking?  Are smokers entitled to expect that
> cigarettes shown as lower delivery in league tables will in fact
> deliver less to their lungs than cigarettes shown higher?

110072259 at 2259 (Ex. 10 to Plaintiffs' Class Cert. Mem.).

Expert Witnesses.  Plaintiffs may present expert testimony demonstrating that Defendants

targeted smokers as a group with marketing, including the use of the "light" and "lights"

descriptors, that was designed to provide "health assurance" to smokers.

**Defenses.**  During Phase One, the only defenses that would be presented to the jury are

those that relate to the common liability issues.  As such, those defenses also would be presented

through proof common to the class.

At this point, the jury will deliberate and return a verdict on the liability issues.  If the

jury finds in Plaintiffs' favor, the trial will move to Phase Two.

### Phase Two

Assuming the jury returns a verdict in favor of Plaintiffs on the liability issues, the trial

will then proceed to a presentation of evidence on the issues of reliance, damages, and any

special defenses that Defendants intend to raise.

Reliance.  Plaintiffs will present aggregate and statistical evidence to the jury to

demonstrate class-wide reliance.  Plaintiffs also will be entitled to certain legal presumptions

based on the nature and extent of Defendants' fraud.

Documentary Evidence.  Defendants' internal documents demonstrate that the cigarette

companies intended smokers to rely on the implicit health representations that they conveyed

through their marketing and their use of the "light" and "lights" descriptors.  Defendants were

successful in this scheme, as evidenced by the millions of people who purchased "light"

cigarettes and their own internal studies, wherein they acknowledged that consumers were attracted to "light" cigarettes for the perceived "health reassurance." *See, e.g.,* Ryan, F. J., *Exit Brand Cigarettes: A Study of Ex-Smokers* (prepared for Philip Morris), March 1978, 1000368057-8081 at 8059, 8062 (Ex. 153 to Plaintiffs' Class Cert. Mem.) (emphasis added) ("[P]eople who are concerned about their health have already shown their concern by shifting to low delivery. [. . .] It is likely, for example, that the popular belief that low-tar cigarettes are 'healthier' than full-flavor cigarettes means that people who are concerned about their health will be more likely to switch to low-tar products than people who are not concerned about their health. [. . .] **The very fact, then, that a smoker has decided to switch from a full-flavor cigarette to a low-delivery cigarette tells us something very important about him: he is concerned about his health and he is willing to do something about it.**").

A July 25, 1977 Brown & Williamson Internal Marketing Study entitled "Low 'Tar' Satisfaction, Step 1 Identification of Perceived and Underperceived Consumer Needs" recited the percentage of starters and quitters from 1969-1976, stating: "HEALTH REASSURANCE: **Almost all smokers agree that the primary reason for the increasing acceptance of low 'tar' brands is based on the health reassurance they seem to offer** . . . . It must be assumed that Full Taste smokers come down to 'low tar' expecting less taste . . . **[t]hey are willing to compromise taste expectations for health reassurance.**"  775036039-6067 at 6047, 6052 (Ex. 154 to Plaintiffs' Class Cert. Mem.) (emphasis added);   A November 11, 1976 document produced from American Tobacco Co. files by Fay Enis Creative Research Services, entitled *An Exploration of Two Cigarette Approaches "Laser Technology" and "No Fake Flavors,"* states: "Reasons for Smoking Low Tar Cigarettes ... Some of the reasons given for switching to a low

tar cigarette were: **All switched because they felt that low tar cigarettes are healthier than high tar cigarettes**" (emphasis added).

<u>Testimony and Statistical Evidence</u>. Plaintiffs may present fact testimony from, among other witnesses, representative class members who will testify that they believed that the "light" descriptors meant that these cigarettes were less harmful than regular cigarettes. Plaintiffs also will present expert testimony from consumer and marketing experts who will testify that all members of the class relied, in whole or in substantial contributing part, on the implicit health reassurance that Defendants sought to convey by creating and marketing "light" cigarettes.

Plaintiffs also will present statistical evidence indicating that almost all members of the class value health in the selection of a "light" cigarette, and would, therefore, have relied on Defendants' "health reassurance" message in purchasing "lights." This statistical evidence also indicates that *health is the most important factor* other than price in the selection of "light" cigarettes for an overwhelming majority of the class.

<u>Legal Presumptions</u>. In Phase Two, Plaintiffs will be entitled to certain legal presumptions based on the extent of the scheme to defraud and the jury's verdict in Phase One.

For example, in order to find that there was a scheme to defraud in Phase One, the jury must conclude that Defendants' misrepresentations or omissions were reasonably calculated to deceive persons of ordinary prudence and comprehension. *See, e.g., Walters v. First Nat'l Bank, N.A.,* 855 F.2d 267 (6th Cir. 1988), *cert. denied*, 489 U.S. 1067 (1989). Having reached that conclusion, in Phase Two Plaintiffs are entitled to the presumption that, as a class, they *are* persons of such ordinary prudence and comprehension. The burden should then shift to Defendants to prove that some percentage of the class is not "reasonable," and what that percentage is.

14

Similarly, in *Falise*, this Court determined that Plaintiffs were entitled to certain presumptions in proving reliance because Defendants' fraud was so massive that it distorted the entire body of public knowledge with regard to smoking and health. *Falise v. Am. Tobacco Co.*, 94 F. Supp. 2d 316, 335 (E.D.N.Y. 2000). Plaintiffs are entitled to those same legal presumptions in this case for all members of the class.

Moreover, the jury also should be instructed that, if they find that "light" cigarettes are a "complete sham," they are entitled to presume that all persons who purchased the product relied on the Defendants' fraud. *See, e.g. Cullen v. Whitman Med. Corp.*, 188 F.R.D. 226 (E.D. Pa. 1999).

The Jury's Verdict on Reliance. Based both on the presumptions to which Plaintiffs will be entitled as a result of a verdict in their favor in Phase One, and the class-wide reliance evidence that Plaintiffs will present, Plaintiffs will be entitled to a rebuttable presumption that all members of the class relied on Defendants' scheme to defraud. At that point, Defendants would bear the burden of presenting evidence showing what percentage of the class did *not rely* on the fraud. On that basis, the jury would be instructed to return a verdict in which it determined the percentage of class members that the jury found relied on the Defendants' fraud in whole or as a substantial contributing factor in their purchase of light cigarettes. That percentage would be applied to the total aggregate damages to which the jury concluded the entire class would have been entitled.

**Damages.** Plaintiffs have identified four different damage methodologies. Plaintiffs' economic experts, Drs. Harris and Beyer, have opined that all members of the class would have been harmed as a result of Defendants' fraud and, thus, all class members also would have been damaged. These experts' damage calculations are applicable to the class in the aggregate, and

will establish the basis from which the jury will determine a damage award to the class as a whole.[19]

In Phase Two, Defendants would also present their evidence relating to statute of limitations and any other special defenses they are permitted to raise.

## IV.    Possible Procedures to Simplify Presentation to Jury

Numerous devices are available both to speed the trial of this matter and to make the presentation of evidence more easily understood by the jury. Some of these are described in more detail herein.

Time Allocation and Movement of Trial. Some courts have implemented the use of a chess clock to ensure an efficient allotment of time among the parties in their presentations.

Pre-Admission of Exhibits and Demonstratives. The parties should agree to a process through which all potential exhibits and demonstratives go through a pretrial screening process. For example, the parties should agree that all documents produced from a party's files (or websites) that do not, on their face, appear to have been authored by a third party are authentic, and that a procedure be developed for stipulating to the business record nature of much of the material produced. To the extent that contested issues arise, they can be resolved by a Special Master, to determine admissibility in advance of trial. This would enable trial documents to be placed into evidence without a sponsoring witness whenever possible. *See* Manual for Complex Litigation (Fourth) § 11.642 (2004).

---

[19] A plaintiff is permitted to present alternative damage methodologies and amounts to a jury to allow the jury to determine which is most appropriate based on the evidence. *See, e.g., Colorado Coal Furnace Distrib., Inc. v. Prill Mfg. Co.*, 605 F.2d 499 (10th Cir. 1979) (affirming jury's damage award after plaintiffs presented four alternative methods for computing damages, each one of which resulted in different damage amount); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979) (Second Circuit did not object to presentation of multiple damage theories in determining the validity of a jury verdict).

Screening Deposition Designations, Use of Narrated Deposition Summaries and Edited Videotape Deposition Testimony.  Plaintiffs envision a similar approach in this regard.  *See* Manual for Complex Litigation (Fourth) § 11.64, § 12.33 (2004).

Juror Aids.  Ways to assist the jury include the use of Preliminary Instructions, Interim Argument, and Jury Notebooks.  *See* Manual for Complex Litigation (Fourth) § 12.4 (2004). The parties can also supply the jurors with a Glossary of Terms and a Cast of Characters.

Use of Summary Witnesses.  Plaintiffs envision the use of experts or summary witnesses to explain the structure and history of the cigarette industry, as well as the scope of the conspiracy.  This process should considerably streamline presentation of the case and will enhance the jury's ability to understand and recall the evidence.  Fed. R. Evid. 702, 703, 1006.

Coordination of Experts.  Each side should coordinate their testimonial experts to reduce the number of experts at trial and avoid cumulative testimony.

Collateral Estoppel Rulings.  A good deal of evidence relating to the Enterprise and the conspiracy in this case need not be presented to the jury if the Court were to find that Defendants were collaterally estopped from contesting the existence of the conspiracy based on final judgments by the finders of fact in other cases against these same defendants.  *See supra* at ___.

Summary Judgment/Motion in Limine Rulings.  The parties have submitted a number of motions for summary judgment/motions in limine.  Advance rulings on these issues could dramatically streamline the presentation of evidence in this case.  For example, Defendants' two main (but completely unsupported) "defenses" are that: (1) the public health community told them to make cigarettes that registered as reduced tar on the FTC machine but delivered far more when actually smoked by their customers; and (2) the FTC mandated that they use deceptive tar and nicotine numbers on their packages, as well as descriptors that implied that these cigarettes

17

were less harmful even though they were not when actually smoked.  If the Court were to agree

that no factual support exists for these "defenses," and precluded Defendants from presenting

these defenses to the jury, the scope and length of the trial would be reduced dramatically.

 Burden-Shifting.  Particularly on the issue of the class members' reliance, there are

numerous legal and factual bases supporting the creation of a presumption in favor of the class

members, thereby significantly reducing the amount of time spent demonstrating reliance by

members of the class.  *See supra* at ___.

 Interim Summations.  These would be particularly important in a case of this complexity

and size.  Although the basic issues are not necessarily complicated, it is anticipated that an

orderly presentation of the evidence would be furthered through the use of interim summations.

*See, e.g., United States v. Philip Morris USA, Inc.,* No. 99-2496 (D.D.C.).

## V. Post-Judgment Distribution/Claims Proceedings

 Plaintiffs intend to seek to have the judgment amount divided proportionally among the

class members.  This will entail the involvement of an experienced notice and claims

administrator to administer a claims process that ensures fairness and effective notification to all

potential claimants.  *See* Submissions of Kathy Kinsella, Kinsella Communications; Richard

Redfern of Rust Consulting.  To the extent that the Court were to determine that the expenses of

the distribution program would excessively reduce the amount of the total award to the class, the

Court has numerous remedies at its disposal, including the award of some or all of the funds on a

cy pres basis, or other aggregate distribution that would either directly or indirectly benefit the

members of the class.

Further details and the possible alternatives for the distribution plan are included in the

Affidavit of Richard Redfern, on behalf of Rust Consulting.

Dated:  August ___, 2005

<div style="margin-left:40%">

Respectfully submitted,


_____/s/ Michael D. Hausfeld_____
Michael D. Hausfeld
Herbert E. Milstein
Michael D. Hausfeld
Lisa M. Mezzetti
Paul T. Gallagher
Douglas J. McNamara
Benjamin D. Brown
James J. Pizzirusso
Brent W. Landau
Andrea L. Hertzfeld
COHEN, MILSTEIN, HAUSFELD
    & TOLL, P.L.L.C.
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, D.C. 20005
Phone:  (202) 408-4600
Fax:  (202) 408-4699

Burton H. Finkelstein
William P. Butterfield
Richard M. Volin
Hilary K. Ratway
FINKELSTEIN, THOMPSON & LOUGHRAN
1050 30th Street, N.W.
Washington, DC  20007
Phone:  (202) 337-8000
Fax: (202) 337-8090

LEAD ATTORNEYS FOR PLAINTIFFS

</div>

OF COUNSEL

Jonathan Alpert
THE ALPERT LAW FIRM
5920 River Terrace
Tampa, FL 33604
Phone: (813) 223-4131
Fax: (813) 228-9612

David F. Sorenson
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Phone: (215) 875-5705
Fax: (215) 875-4604

Van Bunch
BONNETT, FAIRBOURN,
    FRIEDMAN & BALINT, P.C.
57 Carriage Hill
Signal Mountain, TN 37377
Phone: (423) 886-9736
Fax: (602) 274-1199

Gary M. Farmer, Jr.,
FREEDLAND, FARMER,
    RUSSO & SHELLER
2665 Executive Park Dr., Suite 3
Weston, FL 33331
Phone: (954) 467-6400
Fax: (954) 670-2530

G. Martin Meyers
LAW OFFICES OF G. MARTIN MEYERS
35 West Main Street, Suite 106
Denville, NJ 07834
Phone: (973) 625-0838
Fax: (973) 625-5350

Lisa J. Rodriguez
TRUJILLO, RODRIGUEZ & RICHARDS, LLC
8 Kings Highway West
Haddonfield, NJ 08033
Phone: (856) 795-9002
Fax: (856) 795-9887

Thomas V. Urmy, Jr.
Edward F. Haber
SHAPIRO, HABER & URMY, LLP
53 State Street
Boston, MA 02109
Phone:  (617) 439-3939
Fax:  (617) 439-0134

Stephen Sheller
SHELLER, LUDWIG & BADEY
1528 Walnut Street, 3rd Floor
Philadelphia, PA  19102
Phone:  (215) 790-7300
Fax: (215) 546-0942

Russell Smith
R. Bryan Nace
A. RUSSELL SMITH LAW OFFICE
503 Key Building
159 S. Main Street
Akron, Ohio 44308
Phone:  (330) 434-7167
Fax:  (330) 434-1795

Gerson Smoger
SMOGER & ASSOCIATES, L.L.P.
3175 Monterey Blvd., Suite 3
Oakland, CA 94602
Phone:  (510) 531-4529
Fax:  (510) 531-4377

Esther Berezofsky
WILLIAMS, CUKER & BEREZOFSKY
210 Lake Drive East, Suite 101
Cherry Hill, NJ 08002
Phone:  (856) 667-0500
Fax:  (856) 667-5133

221220