**REPLY DECLARATION OF CHRISTOPHER J. MCDONALD
IN FURTHER SUPPORT OF END-PAYOR PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION [PUBLIC VERSION]**

# Exhibit 69

## UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| BARBARA SCHWAB, *et al.,* individually and on behalf of all others similarly situated, )<br><br>Plaintiffs, )<br><br>v. )<br><br>PHILIP MORRIS USA, INC., *et al.,* )<br><br>Defendants. ) | Civil Action No. CV 04-1945 (JBW) (SMG) |

## SECOND DECLARATION OF LAURENCE H. TRIBE

Laurence H. Tribe, being a resident of Cambridge, Massachusetts, of legal age, hereby declares under penalty of perjury:

### Qualifications

1.     I am the Carl M. Loeb University Professor at Harvard University and have taught at Harvard Law School since 1969.  I have argued 34 cases before the U.S. Supreme Court and dozens of other cases in state and lower federal courts throughout the United States, involving a wide range of legal issues.  In particular, I represented the States of Texas, Florida, and Mississippi, as well as the Commonwealth of Massachusetts, in medical care cost recovery and RICO actions against the cigarette companies.  In addition, I briefed and argued the last two mass tort class action cases to be resolved on the merits by the U.S. Supreme Court: *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999).  I also briefed

1

and argued the objections to class certification in *Georgine v. Amchem Products, Inc.*, 83 F.3d 610 (3d Cir. 1996), which the Supreme Court affirmed in *Amchem*.

2.    I am the author of the following books: <u>American Constitutional Law</u> (Foundation Press, 1978, 1988 (2d ed.), 2000 (3d ed.)); <u>On Reading The Constitution</u> (with Michael C. Dorf) (Harvard University Press, 1991); <u>Abortion: The Clash of Absolutes</u> (W.W. Norton & Co., 1990); <u>God Save This Honorable Court: How the Choice of Supreme Court Justices Shapes Our History</u> (Random House, 1985); <u>Constitutional Choices</u> (Harvard University Press, 1985); <u>When Values Conflict: Essays on Environmental Analysis, Discourse, and Decision</u> (ed. with C. Schelling & J. Voss) (Ballinger, 1976); <u>Channeling Technology Through Law</u> (Bracton Press, 1973); <u>Environmental Protection</u> (with Louis L. Jaffe) (Bracton Press, 1971); <u>Technology: Processes of Assessment and Choice</u> (U.S. Govt., 1969).

3.    I am also the author of over 60 articles in various scholarly journals and more than 70 magazine articles and Op-ed pieces. I have testified before Congress on more than 30 occasions and have participated in a significant number of professional conferences and seminars.

4.    I previously submitted a declaration in support of plaintiffs' opposition to defendants' motion for discovery relating to class certification. A copy of my CV is attached hereto.

**Materials Relied Upon**

5.    In preparing this declaration, I have reviewed pleadings and memoranda filed in this case, including the plaintiffs' Second Amended Class Action Complaint; the plaintiffs' Memorandum in Support of the Motion for Class Certification and

Appointment of Class Representatives and Co-Lead Counsel; the defendants' opposition thereto; the expert reports of Joel B. Cohen, PhD and Dr. John R. Hauser; transcripts of hearings held in this Court on the dates of April 6, 2005, May 26, 2005, and July 26, 2005; the memorandum issued by this Court on June 6, 2005; and plaintiffs' proposed litigation plan. In addition, I have examined the various authorities cited herein.

### Summary of Conclusions

6.     I have reviewed plaintiffs' proposed litigation plan, which provides for a three-phase trial to address the issues of: (i) liability, (ii) reliance and damages, and (iii) equitable relief. I believe that the litigation plan is eminently reasonable and provides an effective blueprint for trying this case.

7.     In particular, plaintiffs' approach to proving reliance and damages in Phase II is a reasonable one.  Plaintiffs propose to use a combination of legal presumptions, expert testimony, statistical evidence, and aggregate proof.  Defendants will have the opportunity to introduce rebuttal evidence. The jury will then determine the percentage of class members for whom defendants' fraud was a substantial contributing factor in their purchase of light cigarettes.

8.     This approach to reliance and damages is a manageable one.  Notably, this case is not a personal injury suit.  Rather, plaintiffs are suing for economic damages, based on the difference between what actually occurred in the "light" cigarette market and what would have happened in the absence of defendants' fraud.  From this perspective, there is nothing unique or particularly remarkable about plaintiffs' suit. Many antitrust, securities, consumer protection, and other class actions involve the calculation of aggregate economic damages sustained by numerous class members.

3

Surveys, statistical models, and expert testimony enable courts to project the behavior of both plaintiffs and defendants as a group and to determine reliance, causation, and damages on a class-wide basis.

9.    Aggregate proof of reliance is particularly appropriate in this case because the defendants targeted "light" cigarette purchasers as a class, rather than individually. This is not a situation where a single defendant defrauded a single plaintiff in a face-to-face transaction. Instead, the defendants treated class members as statistical units – as part of a larger aggregate entity, the "consuming public."

10.    The procedures proposed by plaintiffs raise no "manageability" issues for purposes of Rule 23(b)(3)(D). That is, regardless of defendants' criticisms of plaintiffs' litigation plan, nothing about the proposed procedures would interfere with the actual conduct of the trial. The plaintiffs' plan provides an effective means for resolving this case.

11.    Further, there is no realistic alternative to plaintiffs' litigation plan. The option of resolving reliance or damages on a smoker-by-smoker basis would obviously not be cost-effective, nor would it be a feasible use of the Court's limited resources. A class action is plainly "superior to other available methods for the fair and efficient adjudication of the controversy." Rule 23(b)(3). Indeed, a class action is the only means of vindicating the plaintiffs' right of access to court. To deny plaintiffs a forum for the redress of their grievances would be tantamount to giving defendants a free pass simply because of the immense scope of their fraudulent scheme. Such reasoning would turn the purposes of Rule 23 upside down.

12.     Finally, the plaintiffs' proposed litigation plan would not interfere with any of defendants' due process rights.   Due process is a flexible command that does not preclude the aggregate or statistical determination of reliance and damages, particularly where, as here, it would produce more accurate results than proceeding smoker-by-smoker.

## Analysis

### A.    Plaintiffs' Three-Phase Plan Is Eminently Reasonable.

13.     The litigation plan proposed by plaintiffs contains procedures that have commonly been used in cigarette and many other kinds of civil litigation.   The plaintiffs' proposal to separate the trial into distinct phases is routine for cigarette litigation and well within this Court's authority to implement.   Indeed, this Court has already addressed the issues of bifurcation and severance at length in the context of cigarette litigation. *Simon v. Philip Morris, Inc.*, 200 F.R.D. 21, 45-50 (E.D.N.Y. 2001). "The decision to bifurcate a trial into phases is a matter that lies within the sound discretion of the trial court." *Svege v. Mercedes-Benz Credit Corp.*, 329 F.Supp.2d 283, 284 (D. Conn. 2004); *see also Amato v. City of Saratoga Springs*, 170 F.3d 311, 316 (2d Cir. 1999).

14.     In this case, plaintiffs' proposal for three separate phases provides a manageable way of addressing issues relating to liability, reliance, damages, and equitable relief.   Defendants' liability is plainly a common question suitable for resolution on a class-wide basis, and it would be tried to a jury in Phase I.

15.     The same jury would also determine issues of reliance and damages in Phase II. Notably, at the reliance stage, plaintiffs will invoke certain legal presumptions entitling them to an inference that all class members can be said to have relied on the

defendants' misrepresentations. Plaintiffs will also present aggregate and statistical evidence on a class-wide basis. At that point, plaintiffs will have met their burden of showing reliance, and it will be up to the defendants to show what percentage (if any) of the class *did not rely* on the fraud. The jury will not be limited to returning an "up or down" verdict on reliance regarding the class as a whole, but instead will be able to determine the percentage of class members for whom defendants' fraud was a substantial contributing factor in their purchase of light cigarettes. The Court has ample power, under Rule 49 and other authority, to instruct the jury to return a special verdict in that regard.

16.    Once the jury has awarded aggregate damages in Phase II, the defendants have no interest in how those damages are apportioned among the members of the class. Thus, the Court would be free to use an administrative method or some other mechanism for distributing damages to members of the class. As one commentator has observed, "[a]ggregate proof of the defendant's monetary liability is no more unfair than class treatment of other elements of liability. Under these circumstances, there is no room for the defendant to complain of any litigation unfairness by use of the aggregate proofs of the defendant's monetary liability to the class. On the contrary, it is not unusual, and probably more likely in many types of cases, that aggregate evidence of the defendant's liability is more accurate and precise than would be so with individual proofs of loss." 3 NEWBERG ON CLASS ACTIONS § 10:2 (4th ed.). *See also In re Mercedes-Benz Antitrust Litig.*, 213 F.R.D. 180, 192 (D.N.J. 2003) (an aggregate judgment of liability, "it might be argued, would leave allocation between class members as an internal class issue to which defendants would have no right to insist on a jury"); *In re Sugar Indus. Antitrust Litig.*,

73 F.R.D. 322, 353 (E.D.Pa.1976) ("Upon the establishment of such aggregate damages as may be assessed against defendants, the problem of allocations among classes and distribution within each class largely becomes a plaintiffs' problem, which should not militate against the certification of these classes."). Thus, plaintiffs' litigation plan raises no due process, Seventh Amendment, or Rule 23 issues regarding the distribution of aggregate damages to the class.

17.   In Phase III, plaintiffs will request equitable relief from the Court, pursuant to § 1964 and the Court's inherent equitable powers. The Court will determine the proper remedies in light of the Phase I verdict, regardless of the jury's finding in Phase II. It is important to recognize that, even if the jury were to find for the defendants in Phase II on class-wide reliance and aggregate damages, a final judgment should be entered in favor of the class on the jury's Phase I finding of liability, for that finding may enjoy collateral estoppel effect in any subsequent proceedings brought by class members to recover individual damages.

18.   Therefore, I believe that plaintiffs' proposed separation of the trial into three phases is a sensible and practicable way of adjudicating this case.

B.   **The Procedures Proposed By Plaintiffs Have Been Widely Used In Cigarette Litigation.**

19.   It is widely recognized that aggregate proof and statistical evidence are permissible trial management tools. In fact, this Court has already approved the use of statistical evidence and aggregate proof to establish causation and damages in the cigarette context, and experience has shown that such procedures are manageable and practical. For example, in *Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris,*

7

*Inc.*, 178 F. Supp.2d 198 (E.D.N.Y. 2001), *rev'd on other grounds*, 344 F.3d 211 (2d Cir.

2003), the plaintiffs developed a damages model linking Blue Cross' damage estimates to

a "low tar fraud." *Id.* at 267. "The jury was provided with expert testimony to permit a

reasonable and principled basis for calculating and apportioning damages." *Id.* "The

damage model was sufficiently flexible for the jury to account for or to discount these

[low-tar] damages. Models isolated damages based on defendants' deceptive practices

from damages that resulted from the failure to produce real low tar yielding cigarettes as

smoked by real people.   These models were also subject to lengthy cross examination

and critique by defense experts." *Id.* at 268.  In an exhaustive analysis, this Court held

that "the use of statistical evidence in the instant case violates neither the constitutional

guarantee of due process nor the constitutional right to a jury trial." *Id.* at 252.  "To

accept defendants' . . . . contention [regarding the use of aggregated proof] . . . would

require concluding that the Constitution establishes fixed limitations on the methods of

proof a particular party may offer.   Welding such a horse and buggy interpretation into

trials in the computer-guided-rocket age seems somewhat far-fetched.   Courts cannot

ignore and deny themselves what the rest of the world relies upon in fact-finding." *Id.* at

255-56.  The Second Circuit held that the use of aggregate evidence to prove causation

and damages did not violate the cigarette companies' rights to jury trial and due process

with respect to Blue Cross' direct claim.  344 F.3d at 225-27.[1]  *See also In re DES Cases*,

789 F. Supp. 548 (E.D.N.Y.1992) (market share liability applied in suits for defective

---

[1] Defendants are simply wrong in suggesting that the Second Circuit held that they had the right to challenge the subrogation claims on an individualized basis. The Court of Appeals expressly did not reach the defendants' argument on that issue. 344 F.3d at 227 n.12 ("we need not address Appellants' argument that allowing the subrogation claim to proceed would violate their due process rights").

design of diethylstilbestrol (DES)); *In re Joint E. & S. District Asbestos Litig.*, 726

F.Supp. 426 (E.D.N.Y.1989) (computation of damages for Brooklyn Navy Yard asbestos

victims); *In re "Agent Orange" Product Liability Litig.*, 689 F.Supp. 1250

(E.D.N.Y.1988) (distribution scheme for victims of Agent Orange).

      **20.**    In the *In re Simon II Litigation*, 211 F.R.D. 86 (E.D.N.Y. 2002), *vacated*

*on other grounds*, 407 F.3d 125 (2d Cir. 2005), which involved a suit for consumer fraud

by victims of smoking-related illnesses, this Court explained that "[t]hree years of

coordinated discovery among nine related tobacco cases and two full trials, has

strengthened the conclusion that statistical proof combined with other evidence is a

necessary, pragmatic and evidentiary approach that reflects full due process in this and

many other massive tort cases." *Id.* at 146-47. The Court concluded that, without the use

of aggregate proof, the case would be impossible to try. *Id.* Indeed, statistical analysis

might "provide a more accurate and comprehensible form of evidence than would the

testimony of millions of individual smokers." *Id.* at 148. Although the Second Circuit

vacated the *Simon II* decision on other grounds, it did not disturb this Court's holding

with respect to the proposed statistical aggregation of proof. 407 F.3d at 140.

      **21.**    Other cigarette class actions have proven reliance and damages on a class-

wide, aggregate basis using statistical evidence and expert testimony. *E.g., Price v.*

*Philip Morris, Inc.*, 2003 WL 22597608, *15-16 (Ill. Ct. Cl. Mar. 21, 2003).

      **22.**    Statistical evidence and aggregate forms of proof were included in the trial

plans for the state medical cost recovery actions filed by Texas, Florida, Mississippi, and

other states as well. The defendants made the same "individualized reliance" objection as

they have raised in this case, and that objection was rejected. For example, the

Minnesota Supreme Court ruled that the State could show reliance and damages by

aggregate proof:

> [W]here the plaintiffs' damages are alleged to be caused by a lengthy
> course of prohibited conduct that affected a large number of consumers,
> the showing of reliance that must be made to prove a causal nexus need
> not include direct evidence of reliance by individual consumers of
> defendants' products. Rather, the causal nexus and its reliance component
> may be established by other direct or circumstantial evidence that the
> district court determines is relevant and probative as to the relationship
> between the claimed damages and the alleged prohibited conduct. . . .
> [W]e are confident that the legislature would not have authorized private
> damages actions such as this, where the alleged misrepresentations are
> claimed to have affected a large number of consumers, while retaining a
> strict burden of proof that depends on evidence of individual consumer
> reliance.

*Group Health Plan, Inc. v. Philip Morris, Inc.*, 621 N.W.2d 2, 14-15 (Minn. 2001)

## C.     The Procedures Proposed By Plaintiffs Are Well-Established Trial Tools Outside Cigarette Litigation As Well.

23.     The procedures proposed by plaintiffs are especially well-suited to this

case, which significantly does not involve personal injury claims based on the health

effects of cigarettes. Rather, plaintiffs seek economic damages for the reduced value they

received as defrauded purchasers of "light" cigarettes.     Accordingly, the trial

management issues presented by this case are not conceptually different from those in

garden-variety antitrust, consumer protection, and securities fraud class actions. In all of

these contexts, defendants have invariably argued that, because each member of the class

has engaged in a separate commercial transaction, there are insuperable difficulties that

prevent the resolution of causation, reliance, and damages on a class-wide basis.

Typically, the courts have rejected such objections, on the ground that statistical

evidence, expert testimony, and aggregate proof can be used to determine economic damages suffered by large numbers of individual class members.

(i)    **The Procedures Have Been Used In Product Defect, Fraud, and Other Consumer Protection Actions.**

24.    "For decades, courts have certified product defect class actions" seeking recovery for economic damages. *Shaw v. Toshiba American Information Systems, Inc.*, 91 F. Supp. 2d 942, 957 (E.D. Tex. 2000) (certifying national class action composed of five million purchasers of Toshiba laptop computers residing throughout the United States). "Courts have been reluctant to certify personal injury classes but have consistently certified classes involving economic harms. Class certification in securities cases is practically routine." *Id.*

25.    "Class action complaints have been filed in cases involving economic damage from defective or toxic products include school asbestos and formaldehyde claims, as well as economic claims from defective products that result in fires or toxic wastes. Finally, class actions for product-related torts which are not of toxic nature include consumer fraud and breach of warranty claims." 5 Herbert B. Newberg and Alba Conte, NEWBERG ON CLASS ACTIONS § 17.26 (4th ed. ).

26.    Courts have recognized that, in the class action context, claims for economic damages present fewer obstacles than do personal injury claims. *See Grove v. Principal Mut. Life Ins. Co.*, 200 F.R.D. 434, 441 (S.D. Iowa 2001) (certifying class action seeking damages against life insurance company for a fraudulent scheme and common course of deceptive sales practices with respect to sale of life insurance policies and annuities: "Unlike the asbestos plaintiffs in *Amchem*, the money damages sought in

this case are subject to objective quantification, calculable through standardized formulas."); *Rivera v. Wyeth-Ayerst Labs.*, 197 F.R.D. 584, 592 (S.D. Tex. 2000) ("In this case for economic loss, damages are more readily ascertainable than in many types of cases that have been certified as class actions."), *rev'd on other grounds*, 283 F.3d 315 (5th Cir. 2000); *In re Synthroid Marketing Litig.*, 188 F.R.D. 295, 300 (N.D. Ill. 1999) (noting that "the plaintiffs in the case at bar are suing only for economic damages, not personal injury" and that plaintiffs had presented economic expert reports to enable calculation of damages).

27.    Consumer fraud class actions seeking economic damages are routinely certified. *E.g., Arrington v. Colleen, Inc.,* 2001 WL 34117734, *7 (D. Md. 2001) (certifying Truth-in-Lending Act class action as manageable even though "individual class members have engaged in transactions with the defendants over varying time periods and for differing sums of money"); *In re Great Southern Life Ins. Co. Sales Practices Litig.*, 192 F.R.D. 212, 215 (N.D. Tex. 2000) (granting certification in class action involving "vanishing premium" insurance policies and opining that "the Supreme Court holds that consumer protection issues are largely suited for class treatment") (citing *Amchem Prods. v. Windsor*, 521 U.S. 591, 624 (1997)).

(ii)    **The Procedures Have Been Used In Antitrust Actions.**

28.    Similarly, in the antitrust context, courts have long used the class action device and expert testimony to calculate financial losses on a statistical or aggregate basis. The courts have held that variations among individual plaintiffs do not prevent class treatment of such claims. "Although the evidence establishing damages usually varies from class member to class member, this fact alone does not defeat certification."

II Phillip E. Areeda et al., ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND

THEIR APPLICATION ¶ 331d, at 282 (2d ed. 2000). *See also* 8 Julian O. von Kalinowski et

al., ANTITRUST LAWS AND TRADE REGULATIONS § 166.03[3][a][i] (2d ed. 1997). Indeed,

any other rule would eliminate antitrust class actions: "[I]f defendants' argument (that the

requirement of individualized proof on the question of damages is in itself sufficient to

preclude class treatment) were uncritically accepted, there would be little if any place for

the class action device in the adjudication of antitrust claims." *In re Alcoholic Beverages*

*Litig.,* 95 F.R.D. 321, 327-28 (E.D.N.Y.1982) (internal quotation marks omitted); *see*

*also In re Catfish Antitrust Litig.,* 826 F.Supp. 1019, 1044 (N.D.Miss.1993) (same); *In re*

*Fine Paper Antitrust Litig.,* 82 F.R.D. 143, 154 (E.D.Pa.1979), *aff'd,* 685 F.2d 810 (3d

Cir.1982) (same).

29.     Thus, in *In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124 (2d

Cir. 2001), *cert. denied,* 536 U.S. 917 (2002), the Second Circuit upheld a district court's

determination that an antitrust suit against credit card issuers by a varied group of four

million large and small retailers would be manageable as a class action: "[t]here are a

number of management tools available to a district court to address any individualized

damages issues that might arise in a class action." *Id.* at 141.  In particular, the Court of

Appeals noted that "it appeared at this preliminary stage that damages could be

determined with the aid of a class-wide formula" and that plaintiffs had "proffered a

damages formula to assist with the calculation of damages." *Id.* at 141, 142.  The Second

Circuit warned that "failure to certify an action under Rule 23(b)(3) on the sole ground

that it would be unmanageable is disfavored and should be the exception rather than the

rule." *Id.* at 140 (citation and internal quotation marks omitted).  "[D]ismissal for

management reasons, in view of the public interest involved in class actions, should be

the exception rather than the rule." *Id.* (citation and internal quotation marks omitted).

"[F]or a court to refuse to certify a class ... because of vaguely-perceived management

problems ... discount[s] too much the power of the court to deal with a class suit flexibly,

in response to difficulties as they arise." *Id.* (citation and internal quotation marks

omitted).

   **D.**   <u>**Aggregate Calculation of Damages Is Well-Settled.**</u>

   **30.**   Courts have frequently adopted procedures such as those proposed by

plaintiffs here to permit the computation of class-wide damages in aggregate form:

   • *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 161 n.6 (2d Cir.

2001), *cert. denied*, 122 S. Ct. 1349 (2002) (explaining in employment discrimination

context that "some cases may require class-wide, rather than individualized, assessments

of monetary relief.");

   • *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 454-55 (3d Cir. 1977), *cert. denied*,

434 U.S. 1086 (1978) (no impediment as a rule of law to classwide proof of causation or

damage in antitrust case);

   • *In re Mercedes-Benz Antitrust Litig.*, 213 F.R.D. 180, 192 (D.N.J. 2003)

("[T]here are a number of devices that may be used to avoid the threat of 'over a hundred

thousand mini trials' surmised by defendants. Variables such as optional equipment

packages and financing incentives may be accounted for by damages formulae which

allow for these factors to determine the anti-competitive overcharge for the particular

claimant. The Special Master may be pressed into service, with a final damage report to

be confirmed by a jury. Another avenue may be available if this case is amenable to proof of an aggregate judgment of liability. . . .");

• *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 268 (D.D.C. 2002) ("Plaintiffs' expert, Dr. Beyer, has offered two viable methodologies by which it is possible to calculate damages on a class-wide basis -- multiple regression analysis and industry benchmark analysis.");

• *DeLoach v. Philip Morris Cos.*, 206 F.R.D. 551, 566 (M.D.N.C. 2002) (certifying antitrust suit by tens of thousands of cigarette sellers against cigarette manufacturers: plaintiffs "have made a sufficient threshold showing that what proof they offer will be sufficiently generalized in nature that even as to the impact issue the class action device will provide a tremendous savings in time and effort to the judiciary and to the parties. The weight to be given to each expert's statistical and economic proof is for the trier of fact.") (citation and internal quotation marks omitted);

• *Allapattah Services, Inc. v. Exxon Corp.*, 157 F. Supp.2d 1291, 1314 (S.D. Fla. 2001) (upholding plaintiffs' proof of aggregate monetary damages based on a finding of cents per gallon, in class action brought by dealers against oil refiner for breach of contract in which jury returned special verdict form finding a common damage factor to measure individual compensatory damages for refiner's failure to reduce wholesale prices charged to dealers as promised in order to offset credit-card fees imposed on dealers: "The proof was sufficiently reliable to permit a just determination of Exxon's liability within recognized standards of admissible and probative evidence in response to what Exxon, itself, represented to the Class Dealers.");

15

• *Chisholm v. Trans South Financial Corp.*, 184 F.R.D. 556, 566-67 (E.D. Va. 1999) (certifying RICO mail fraud class action by more than 2,500 used car buyers against auto financing company and suggesting that reliance and damages issues could be resolved by reference to defendant's computer data base);

• *Long v. Trans World Airlines, Inc.*, 761 F. Supp. 1320, 1323 (N.D. Ill. 1991) (class proof of aggregate damages in labor case was permissible with statistical sampling proofs: "The Court finds initially that sampling is a permissible procedure. . . . In other class actions, courts have not required absolute precision as to damages and have allowed damages to be proven by reference to a class as a whole, rather than by reference to each individual class member.");

• *In re Sugar Indus. Antitrust Litig.*, 73 F.R.D. 322, 353 (E.D.Pa.1976) ("The price effects of the alleged conspiracy may be established by economic analysis of the consistent marketing process in the market. The amount that prices were raised by the purported conspiracy may be developed by formulae based on the aforementioned devices to obtain reliable statistical and market data.");

• *Chmieleski v. City Products Corp.*, 71 F.R.D. 118, 160-63 (W.D. Mo. 1976) (permitting aggregate proof through expert statistical evidence for certain claims in franchisee antitrust action);

• *In re Antibiotic Antitrust Actions*, 333 F. Supp. 278, 289 (S.D.N.Y.1971) ("Most important management decisions in the business world in which these defendants operate are made through the intelligent application of statistical and computer techniques and these class members should be entitled to use the same techniques in proving the elements of their cause of action. The court is confident that they can be successfully

16

utilized in the courtroom and that their application will allow the consumers to protect their rights while freeing the court and the defendants of the specter of unmanageability.");

    • 3 NEWBERG ON CLASS ACTIONS § 10:2 (4th ed.) ("Proof of aggregate monetary relief for the class is feasible and reasonable under various circumstances. In fact, the ultimate goal in class actions is to determine the aggregate sum, which fairly represents the collective value of claims of individual class members. The evidentiary standard for proof of monetary relief on a classwide basis is simple -- the proof submitted must be sufficiently reliable to permit a just determination of the defendant's liability within recognized standards of admissible and probative evidence.").

    31.    The courts have found that, if any difficulties or exceptional circumstances arise, they can be resolved through the appointment of a special master or other means. *Rios v. Enter. Ass'n Steamfitters Local Union,* 860 F.2d 1168, 1174 (2d Cir. 1988) (special master appointed to compute and distribute back pay in civil rights class action); *Wachtel v. Guardian Life Ins.,* 223 F.R.D. 196, 217 (D.N.J. 2004) ("If the computation of damages becomes difficult and if exceptional conditions arise, the Court may consider whether this is an appropriate case for appointment of a special master to submit a damage report.").

    32.    Statistical methods and aggregate proof have been used in ways that are more ambitious than the plaintiffs' proposal. In *Hilao v. Estate of Marcos,* 103 F.3d 767, 782-87 (9th Cir.1996), for example, the Ninth Circuit allowed the use of aggregation and statistical analysis to determine compensatory damages in a lump sum for the entire class. The district court heard the testimony of a statistics expert, who represented that "the

examination of a random sample of 137 claims would achieve a 95 percent statistical probability that the same percentage determined to be valid among the examined claims would be applicable to the totality of the claims filed." *Id.* at 782 (internal quotation marks omitted). Proceeding upon the expert's recommendations, the district court held a jury trial on compensatory damages for 137 claimants whose claims had been randomly selected. The jury awarded damages for 135 of the claimants, and the court utilized the expert's calculations to determine an aggregate damages award for the entire class.

33.    Similarly, in *In re Chevron U.S.A., Inc.,* 109 F.3d 1016, 1019-20 (5th Cir. 1997), the court of appeals permitted the use of statistics to draw inferences about the claims of 3,000 plaintiffs and intervenors who claimed wrongful death, personal injury, and property contamination from defendant's storage of hazardous substances which had leaked from crude oil waste pits and migrated into the plaintiffs' drinking water supply. *See also Watson v. Shell Oil Co.,* 979 F.2d 1014, 1018 (5th Cir.1992) (approving trial court's proposal to determine punitive damages in a mass-tort class-action suit by fully trying 20 sample claims on *compensatory* damages to the jury and then asking the jury to "establish the ratio of punitive damages to compensatory damages for each class member").

34.    In short, the wide range of tools available to a district court ensures that the present case can be tried effectively in class form – just as securities fraud, antitrust, consumer protection, and other cases can be tried in class form.

E.    **Aggregate Proof of Reliance Is Appropriate Here.**

35.    Aggregate proof of reliance is especially warranted here because the defendants targeted purchasers as a class, rather than individually. "[N]o proposed class

member was singled out by the defendants," but rather each "was subjected to a scheme or course that is common to the class as a whole." *Iron Workers Local Union No. 17 Ins. Fund v. Philip Morris*, 182 F.R.D. 523, 532 (N.D. Ohio 1998) (certifying RICO claims against cigarette companies). As this Court has commented, "a case in which one person sues another person is quite different from a case in which a large mass of people, where you use large numbers, sues another person or group of persons." Tr. 5/26/05 at 26.

36.    Therefore, reliance and causation, as well as damages, may be proven on an aggregate basis. This Court has explained that "the nature of the reliance is not a constant. Where the fraudulent scheme is limited in scope and specifically targeted at only one or a few individuals, organizations, or entities, the establishment of causation should require reliance on identifiable misrepresentations." *Falise v. American Tobacco Co.*, 94 F. Supp.2d 316, 335 (E.D.N.Y. 2000). "Where, however, the fraudulent scheme is targeted broadly at a large proportion of the American public the requisite showing of reliance is less demanding. Such sophisticated, broad-based fraudulent schemes by their very nature are likely to be designed to distort the entire body of public knowledge rather than to individually mislead millions of people." *Id.* "To require reliance on specific misrepresentations where indirect channels of communication were integral to the success of the scheme would produce the perverse result of having the most massive and sinister fraudulent schemes be the ones that must escape civil-RICO liability." *Id.*

37.    Statistical calculation of reliance, as well as damages, would produce a more accurate measure than proceeding smoker-by-smoker. "When, as in the case at bar, the plaintiffs are a widely spread group suffering injury from a common action of defendants, statistical analysis may provide a more accurate and comprehensible form of

evidence than would the testimony of millions of individual smokers." *Simon II,* 211 F.R.D. at 148. *See also Consorti v. Armstrong World Industries,* 72 F.3d 1003, 1006 (2d Cir.1995) ("consolidation permits the federal court to furnish trials in hundreds, even thousands of cases it might otherwise not reach for many years. If carefully and properly administered ... consolidation is also capable of producing, with efficiency and greatly reduced expense for all parties, a fairer, more rational and evenhanded delivery of justice."), *rev'd on other grounds,* 518 U.S. 1031 (1996); *Blue Cross & Blue Shield of N.J., Inc.,* 36 F.Supp.2d at 575 (E.D.N.Y.1999) ("The aggregation of millions of alleged injuries in the instant suit can be expected to yield more accurate results with respect to the causation issue since projections based upon a large statistical base will be available, thus reducing the size of the possible error").

38.    By analogy, in securities cases, the "fraud-on-the-market" principle means that a plaintiff class may satisfy its reliance burden through a rebuttable presumption that the price of a publicly traded share reflects a material misrepresentation and that plaintiffs have relied upon that misrepresentation as long as they would not have bought the share in its absence. *Basic Inc. v. Levinson,* 485 U.S. 224, 248-49 (1998). The Supreme Court has upheld the "fraud-on-the-market" theory, explaining that "[t]here is . . . more than one way to demonstrate the causal connection" of reliance. *Id.* at 243. "The modern securities markets, literally involving millions of shares changing hands daily, differ from the face-to-face transactions contemplated by early fraud cases, and our understanding of Rule 10b-5's reliance requirement must encompass these differences." *Id.* at 243-44. The same reasoning is apposite here.

F.    **Statistical Methods of Proof Are Widely Used.**

39.     There can be no objection to the use of statistical evidence and expert testimony to prove reliance and damages on an aggregate basis, because the Supreme Court and appellate courts have repeatedly affirmed the propriety of statistical methods of proof. For example, in *Texaco, Inc. v. Hasbrouck*, 496 U.S. 543 (1990), an antitrust case involving the sale of gasoline, the Supreme Court approved the proof of antitrust damages through statistical evidence. *See id.* at 572 ("the expert testimony nevertheless provided a sufficient basis for an acceptable estimate of the amount of damages"). The Court explained that "damage issues in these cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts." *Id.* at 573 n.31 (citation and internal quotation marks omitted).

40.     In *Utah v. Evans*, 536 U.S. 452 (2002), the Supreme Court noted that Congress itself has approved of the use of statistical techniques in certain circumstances. *See id.* at 469 (quoting congressional reports concluding that "proper use of sampling methods can result in substantial economies in census taking" and that "use of sampling procedures and surveys [are] urged for the sake of economy and reducing respondent burden").

41.     In *United States v. Fior D'Italia, Inc.*, 536 U.S. 238 (2002), the Court upheld an IRS policy of aggregate estimation for determining, assessing, and collecting a restaurant's share of Federal Insurance Contribution Act (FICA) taxes on tips received by its employees. The Court opined that the fact that an aggregate estimate will sometimes include tips that should not count in calculating the FICA tax the employer owes did not render use of that method unreasonable. *Id.* at 248.

42.     The Second Circuit has repeatedly approved statistical techniques as well.
For example, in *Yorktown Medical Laboratory v. Perales*, 948 F.2d 84 (2d Cir.1991), a
clinical laboratory mounted a due process challenge to the state's use of sampling in an
audit of the laboratory's Medicaid payment claims. The Court of Appeals rejected that
objection: "Yorktown claims that any determination of overcharges by extrapolation
violates its due process rights. Yorktown's claim overlooks the fact that the process due
depends on balancing various circumstances and factors. Given the low risk of error and
the government interest in minimizing administrative burdens, the balance of interests
favors DSS. To rule otherwise would hamstring DSS's attempts to eliminate fraud,
without materially advancing Yorktown's interest." *Id.* at 90.

43.     The Court of Appeals has approved the use of statistical evidence in other
contexts, too. *E.g., Tsombanidis v. West Haven Fire Dept.*, 352 F.3d 565, 575-76 (2d Cir.
2003) ("To establish a prima facie case for employment discrimination, plaintiffs are
ordinarily required to include statistical evidence to show disparity in outcome between
groups.     Statistical evidence is also normally used in cases involving fair housing
disparate impact claims."); *United States v. Alameh*, 341 F.3d 167, 173 (2d Cir. 2003)
(holding that selective prosecution claim may be established through statistical evidence);
*Malave v. Potter*, 320 F.3d 321, 326 (2d Cir. 2003) (holding that district court erred in
rejecting plaintiff's statistical evidence).

G.     **Plaintiffs' Plan Is The Only Practicable Way of Trying This Case**

44.     My conclusion that plaintiffs' plan is manageable is buttressed by the fact
that there is no practicable alternative to it.  Requiring reliance, causation, and damages
to be proven on an individual basis, smoker-by-smoker, would be preposterous.  Such a

22

proceeding would span several decades, would cost tens of millions of dollars (if not more), and would constitute an egregious waste of judicial resources.

45.    Thus, in the *Blue Cross* case, this Court properly rejected defendants' argument that they were entitled to call as a witness every smoker whose costs were part of the plaintiff's damages calculations. "In mass exposure cases with hundreds of thousands or millions of injured, however, the cost of [defendants' proposed] one-on-one procedures is insuperable and unsuitable for either a jury or a bench trial.    The consequence of requiring individual proof from each smoker would be to allow defendants who have injured millions of people and caused billions of dollars in damages, to escape all liability." 178 F. Supp.2d at 247. "Examining each of the grains of sand on the beach is too burdensome." *Id.* at 254 (internal quotation marks and citation omitted). *See also Upshaw v. Georgia (GA) Catalog Sales, Inc.*, 206 F.R.D. 694, 702 (M.D. Ga. 2002) ("[T]he only alternatives to a class action are either no recourse for hundreds of potentially injured consumers or, in the unlikely event that these consumers became aware of their rights and could locate counsel, a multiplicity of suits raising essentially the same claims. Balancing the manageability challenges involved in this litigation with the potential denial of any relief to hundreds [let alone millions] of allegedly injured consumers and/or the clogging of our court system with multiple actions involving the same factual and legal issues, the Court finds that a class action is superior to any other available method for the fair and efficient adjudication of this controversy.").

46.    More realistically, of course, such a proceeding would never be attempted. Although each plaintiff's damages are not trivial, they are not sufficient to warrant individual trial of cases. The costs of litigation are simply too great. Therefore, whatever

manageability issues might be presented by trying this case in class form, such a procedure is the only practical remedy for the redress of plaintiffs' grievances.

47.    In this regard, it is important to recognize the constitutional interests implicated by denying plaintiffs a forum for their claims.  The right of access to court – an ancient liberty traceable to the Magna Carta -- is protected as a matter of due process. *Tennessee v. Lane*, 541 U.S. 509, 523 (2004); *id.* at 531 (discussing "the constitutional right of access to the courts"); *see also Boddie v. Connecticut*, 401 U.S. 371 (1971) (divorce filing fee); *M.L.B. v. S.L. J.*, 519 U.S. 102 (1996) (record fee in parental rights termination action); *Smith v. Bennett*, 365 U.S. 708 (1961) (filing fee for habeas petitions); *Burns v. Ohio*, 360 U.S. 252 (1959) (filing fee for direct appeal in criminal case).  In addition, the right to petition is one of "the most precious of the liberties safeguarded by the Bill of Rights." *BE&K Constr. Co. v. NLRB*, 536 U.S. 516, 526 (2002).

48.    To reject plaintiffs' litigation plan would therefore deny them a meaningful remedy and would give a green light to defendants to commit wrongdoing on a massive scale – perversely, the more massive, the greater the probability that defendant will be able to escape liability.  *See In re Sugar Indus. Antitrust Litig.*, 73 F.R.D. 322, 354 (E.D. Pa. 1976) ("If this court were to adopt defendants' argument and deny these class actions because the computation of damages on even an individual basis destroys the 'predominance' requirement of Rule 23(b)(3), it would be tantamount to encouraging wrongdoers to commit great antitrust violations on many consumers in small amounts so as to raise the spectre of unmanageability to defeat a class action.").

**49.** For this reason, the current class action is precisely the kind of suit for which Rule 23 was designed – the aggregation of individual economic damages claims that will proceed either in class form or not at all. The Advisory Committee Notes provide that "a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class." 39 F.R.D. 69, 103 (1966). "This is precisely the kind of case that class actions were designed for, with small or statutory damages brought by impecunious plaintiffs who allege similar mistreatment by a comparatively powerful defendant, one that, if the fact alleges were proved, otherwise might get away with piecemeal highway robbery by committing small violations that were not worth the time and effort of individual plaintiffs to redress or were beyond their ability or resources to remedy." *Jackson v. Check'N Go of Illinois, Inc.*, 193 F.R.D. 544, 547 (N.D. Ill. 2000).

**50.** As one district court has observed in a nationwide class action involving millions of purchasers of a defective product,

> Class actions are superior to multiple, individual actions when the individual actions are economically infeasible to litigate because of the small size of the individual claims, or when the common issues would be extremely expensive to litigate because they would require extensive discovery. . . . The class-action procedure is appropriate for the pursuit of consumer protection claims since it allows consumers to aggregate small claims and bring them on behalf of the class when the amount at stake for an individual consumer would not warrant filing suit and when they might not be able to do so on an individual basis. That is, it permits consumers to pursue their claims in the aggregate – consumers who, standing alone, would lack both the incentive and the ability to act with such curative effect.

*Shaw v. Toshiba American Information Systems, Inc.*, 91 F. Supp. 2d 942, 952 (E.D. Tex. 2000).

**H.**    **Plaintiffs' Plan Would Not Violate Defendants' Due Process Rights**

**51.**    In *Simon II* and *Blue Cross*, this Court has already made clear that due process permits the use of statistical evidence and the trial of issues in aggregate form. This Court's reasoning in these previous cases was correct. It is "well established that 'due process,' unlike some legal rules, 'is not a technical conception with a fixed content unrelated to time, place and circumstances.' '[D]ue process is flexible and calls for such procedural protections as the particular situation demands.'" *Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (citations omitted). In this case, defendants will have the opportunity to respond fully to plaintiffs' statistical evidence and aggregate proof, and plaintiffs' proposed plan will allow for a fairer and more accurate resolution than proceeding smoker-by-smoker.

**52.**    Numerous federal statutes expressly or implicitly provide for aggregate proof of monetary liability of a defendant in favor of an affected class, including the federal Hart-Scott-Rodino Antitrust Improvements Act of 1976, Pub. L. No. 94-435, Tit III, 301, 90 Stat 1383, 15 U.S.C. § 15; Truth In Lending Act of 1968, 15 U.S.C. §§ 1601 *et seq.*; Equal Credit Opportunity Act, 15 U.S.C. §§ 1691 *et seq.*; Magnuson-Moss Warranty -- Federal Trade Commission Improvement Act, Pub. L. No. 93-637, 88 Stat 2183, 15 U.S.C. §§ 2301 *et seq.* None of these statutory procedures has ever been thought to be unconstitutional.

**53.**    In addition, any due process objection would be foreclosed by the fact that the Second Circuit has approved of aggregate class proofs of monetary damages in appropriate circumstances. In *Van Gemert v. Boeing Co.*, 553 F.2d 812 (2d Cir. 1977), the Court of Appeals approved the recovery of a gross damage award to holders of

convertible subordinated debentures, with subsequent distribution according to statements of claim filed by class members.

54. On certiorari, the Supreme Court did not expressly decide the propriety of an aggregate judgment in a class action context, because that issue was not raised on appeal. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 481 n. 6 (1980). Nevertheless, the Court discussed the simplicity of the mathematical computation of the aggregate class judgment. *Id.* at 479. In addition, the Court necessarily relied on the validity of the aggregate judgment in its basic ruling that, for determination of a reasonable fee from a common fund, the court should measure the benefit conferred, i.e., the common fund, based on the total recovery potentially available to class members, regardless of the number of claims actually filed by individual class members for recovery from the common fund.

55. Three years later, the Supreme Court noted that the Hart-Scott-Rodino Antitrust Improvements Act permits consumer antitrust actions with damages capable of calculation through aggregation techniques. *Illinois v. Abbott & Associates, Inc.*, 460 U.S. 557, 573 n.29 (1983). The Court did not suggest any constitutional infirmity with such a procedure.

56. Any due process objection would fly in the face of the principle that a defendant should not be heard to complain when any uncertainty regarding the measure of damages is attributable to the defendants' own wrongdoing. As the Supreme Court has explained, "[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Bigelow v. RKO Pictures*, 327 U.S. 251, 265 (1946). "[W]hile the damages

may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 563 (1931). "'To deny the injured party the right to recover any actual damages in such cases, because they are of a nature which cannot be thus certainly measured, would be to enable parties to profit by, and speculate upon, their own wrongs, encourage violence and invite depredation.'" *Id.* at 564 (citation omitted). "Trial and appellate courts alike must also observe the practical limits of the burden of proof which may be demanded of a treble-damage plaintiff." *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 123 (1969).

57.    For all these reasons, there could be no serious due process objection to plaintiffs' proposed litigation plan.

## Conclusion

The plaintiffs' proposed litigation plan should be approved.


I affirm, under applicable penalties, that the foregoing Declaration is true and correct.


August 19, 2005                         /s/
                                   Laurence H. Tribe


29