# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FEDERAL TRADE COMMISSION,

　　　　Plaintiff,

　　　　v.

CEPHALON, INC.,

　　　　Defendant.

Civil Action No.  08-0244 (JDB)

## MEMORANDUM OPINION

Defendant Cephalon, Inc., is the manufacturer of the prescription wakefulness drug

known as Provigil. Cephalon also owns a patent relating to the "particle size composition" of

Provigil's active ingredient, modafinil. In late December 2002, Cephalon instituted a single

patent infringement case against four pharmaceutical companies that had applied to sell generic

modafinil products that would compete directly with Provigil. After more than two years of

litigation, Cephalon eventually reached independent settlements with each of those companies

whereby they agreed to forego entry into the market until 2012 in return for lucrative side

agreements with Cephalon. Those settlements are the subject of several consolidated antitrust

class actions currently pending against Cephalon in the Eastern District of Pennsylvania. On

February 13, 2008, the Federal Trade Commission ("FTC" or "Commission") filed this action

against Cephalon, claiming that it had unlawfully monopolized the market for wakefulness drugs

by impeding the entry of generic competitors to Provigil through the settlement arrangements.

Cephalon has now moved to transfer this case to the Eastern District of Pennsylvania pursuant to

28 U.S.C. § 1404(a). FTC opposes the motion, which is fully briefed and ripe for resolution.

-1-

Upon careful consideration, the Court will grant Cephalon's motion.

## **BACKGROUND**

Cephalon is a Delaware corporation that has its principal place of business in Frazer, Pennsylvania. See Def.'s Mot. Attach. Aff. of Randall J. Zakreski, Esq. (hereinafter "Zakreski Aff.") ¶¶ 3-5. In addition to its corporate headquarters located in Frazer, Cephalon has three other offices located within the geographic region that comprises the Eastern District of Pennsylvania. Id. ¶ 4. The majority of the company's 2,000 employees within the United States work and/or reside within that region. Id. ¶ 3. Cephalon also maintains a small government affairs office in Washington, D.C. consisting of four employees. Id. ¶ 4.

U.S. Patent No. RE37,516, owned by Cephalon, is "a particular size pharmaceutical composition patent for modafinil (the active ingredient in Provigil)." Id. ¶ 7. That patent covers Provigil and expires on October 6, 2014, although a "pediatric exclusivity" period extends the patent's effective life through April 6, 2015. Id. Provigil received FDA approval in December 1998, id. ¶ 6, and Cephalon immediately began marketing the drug, the sales of which grew to account for more than 46% of Cephalon's total sales in 2007, see Compl. ¶ 1. Provigil is a prescription wakefulness drug that combats narcolepsy and other sleep disorders. Id. ¶ 26. According to FTC, it has the most favorable "benefit and side-effect profile" among drugs of its kind and is thus considered the "'gold standard' for the treatment of excessive sleepiness associated with sleep disorders." Id. ¶ 27.

According to the provisions of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et seq., as amended by the Hatch-Waxman Act, drug manufacturers may seek to market a generic version of a brand-name drug prior to the expiration of the latter's governing patent if the

-2-

entrants can show "that either: (1) the generic version does not infringe the patents on the brand-name drug, or (2) the patents are invalid." Compl. ¶ 16. Such a showing is made to the FDA by means of a so-called "paragraph IV certification." Id. The Hatch-Waxman Act provides that the first generic company to file a paragraph IV certification obtains "a period of protection from competition with other generic versions of the drug." Id. ¶ 18. That period is referred to as the "180-day exclusivity" window, which begins to run when the generic manufacturer first markets the generic product or an appeals court finds "the patent(s) claiming the branded drug invalid or not infringed." Id. [1]

On December 24, 2002, four generic pharmaceutical companies -- Teva Pharmaceuticals USA, Inc., Mylan Pharmaceuticals, Inc., Barr Laboratories, Inc., and Ranbaxy Laboratories Limited -- filed applications with the FDA to sell generic modafinil, a product that would in effect amount to a generic competitor to Provigil. See Zakreski Aff. ¶ 8. Pursuant to FDA's interpretation of the governing law, all four were deemed to be "first filers" entitled to the 180-day exclusivity window. As such, if FDA approved all four certifications, each of those companies could have launched generic competitors to Provigil and each of those generic products would have enjoyed 180-day exclusivity vis-a-vis any other putative generic entrants. In response to this generic threat to Provigil, Cephalon filed a single patent infringement suit against those companies on March 28, 2003. By February 1, 2006, nearly three years after it instituted the action, Cephalon had reached separate settlement agreements with each of the generic manufacturers. Id. ¶ 9. Those settlement agreements are at the center of the present

---

[1] These provisions cover only paragraph IV filings made before December 2003, as is the case here.

controversy.

The agreements provide that each of the generic manufacturers may not introduce generic versions of modafinil until April 2012. Id. Cephalon insists that those settlement agreements were negotiated exclusively via phone conversations (and e-mail communications) that took place at the company's corporate headquarters in Frazer, Pennsylvania. Id. ¶ 10. Meanwhile, "[c]ontemporaneous with the Settlements, Cephalon also entered into certain other business transactions with the Generics and other entities." Id. ¶ 11. As Cephalon would have it, those side agreements are simply typical business arrangements. The FTC and a litany of private plaintiffs in the Pennsylvania action see it differently. According to the FTC, during the course of the patent litigation it became evident to Cephalon that generic entry by one or more of the manufacturers was all but certain to occur at some point in 2006, thereby "decimat[ing] [Provigil's] sales." Compl. ¶ 1. Cephalon does not own a patent on modafinil itself; the RE37,516 patent covers only the particular size composition of modafinil used in Provigil. But the FTC maintains that "Cephalon's Particle Size Patent could be easily circumvented." Id. ¶ 36. Put another way, Cephalon was unlikely to prevail in its patent infringement suit against the four generic manufacturers -- and that lawsuit was the only impediment to the introduction of generic competition to Provigil.

Faced with that reality, the FTC argues, "Cephalon bought off all four of its potential competitors" in order to maintain its monopoly position in Provigil. Id. ¶ 3. Under this view, the side arrangements reached contemporaneously with the settlement agreements were not the product of ordinary business necessities; rather, they were effectively lucrative pay-outs to the generic manufacturers designed to "handsomely compensate[]" them in lieu of introducing

generic competitors to Provigil. Id. Hence, in the words of Cephalon's CEO: "We were able to get six more years of patent protection. That's $4 billion in sales that no one expected." Id. ¶ 4.

Moreover, the settlement agreements in effect preclude generic entry by other manufacturers as well. Because the four first filers enjoy a 180-day exclusivity period, FDA is "prevented by law from approving any other generic version of Provigil until the 180-day exclusivity period has been triggered and run." Id. ¶ 85. But under the settlement agreements that window will not start to run until April 2012, when the first filers may finally begin to market generic Provigil. Significantly, the other trigger for starting the 180-day exclusivity period -- an appeals court decision concerning whether Provigil's patents were either infringed upon or invalid -- will also not come to pass with respect to the first filers owing to the settlements. And the FTC maintains that "Cephalon has taken further steps to ensure that no court decision will trigger the 180-day exclusivity period, including settling or refusing to litigate with other generic companies that could trigger the exclusivity period." Id. ¶ 88.

The FTC began investigating this transaction in April 2006. See FTC Opp'n Attach. Decl. of Saralisa C. Brau, Esq. ¶ 2. Meanwhile, a direct purchaser of Provigil filed an antitrust suit against Cephalon and the four generic manufacturers in the Eastern District of Pennsylvania on April 27, 2006, alleging that the agreements violated Sections 1 and 2 of the Sherman Act. See FTC Opp'n Attach. Decl. of Barry S. Taus, Esq. ¶ 2. Several additional plaintiffs filed putative class actions in that same district, and the cases were eventually consolidated into two separate prospective classes: the Direct Purchaser Class and the End-Payor Class. Id. ¶ 3. Cephalon filed a motion to dismiss those actions, which became ripe for decision on January 11, 2007. Id. ¶ 8. Resolution of that motion is currently pending.

The FTC filed this action on February 13, 2008. Although the complaint alleges violations of Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b), the action is premised upon the same operative facts and events that form the basis for the private Sherman Act cases pending in the Eastern District of Pennsylvania. In light of that fact, Cephalon moved this Court to transfer the case to that district. FTC opposes transfer on three broad grounds: (1) that Cephalon has failed to make an adequate case for transfer; (2) that the United States is entitled to deference in choosing its forum for antitrust actions; and (3) that transfer to the Eastern District of Pennsylvania would unduly delay the government's prosecution of this case to the detriment of consumers nationwide.

## STANDARD OF REVIEW

The governing statute, 28 U.S.C. § 1404(a), provides: "For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it may have been brought." "The Court has 'broad discretion' to order transfer under this standard." Rosales v. United States, 477 F. Supp. 2d 213, 215 (D.D.C. 2007) (quoting In re Scott, 709 F.2d 717, 720 (D.C. Cir. 1983)). "[T]he proper technique to be employed is a factually analytical, case-by-case determination of convenience and fairness." SEC v. Savoy Indus., 587 F.2d 1149, 1154 (D.C. Cir. 1978) (citing Van Dusen v. Barrack, 376 U.S. 612, 622 (1964)). "As a general matter, the burden is on the party seeking transfer to demonstrate that the 'balance of convenience of the parties and witnesses and the interest of justice are in [its] favor." Thayer/Patricof Educ. Funding LLC v. Pryor Res., 196 F. Supp. 2d 21, 31 (D.D.C. 2002) (quoting Armco Steel Co. v. CSX Corp., 790 F. Supp. 311, 323 (D.D.C. 1991)). There are several relevant factors to consider in this analysis, among them:

The private interest considerations include: (1) the plaintiffs' choice of forum, unless the balance of convenience is strongly in favor of the defendants; (2) the defendants' choice of forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses . . . , but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) the ease of access to sources of proof. The public interest considerations include: (1) the transferee's familiarity with the governing laws; (2) the relative congestion of the calendars of the potential transferee and transferor courts; and (3) the local interest in deciding local controversies at home.

Id. at 31-32 (quoting Shapiro, Lifschitz & Schram, P.C. v. R.E. Hazard, Jr., 24 F. Supp. 2d 66, 71 (D.D.C. 1998)).

## DISCUSSION

The threshold question here is whether the FTC could have brought this case in the Eastern District of Pennsylvania as an initial matter. This issue is not seriously disputed because it is plainly evident that the FTC could have done so. FTC's venue provision provides, in relevant part, that "[a]ny suit may be brought where . . . [the] corporation resides or transacts business, or wherever venue is proper under section 1391 of title 28." See 15 U.S.C. § 53(b)(2). Cephalon both "resides," see 28 U.S.C. § 1391(c), and transacts business at its principal place of business in Frazer, Pennsylvania, which is within the Eastern District of Pennsylvania. Moreover, the operative settlement agreements were all negotiated from that location (at least on Cephalon's part), and thus the bulk of the events giving rise to this claim also occurred within the Eastern District of Pennsylvania. There is no doubt, then, that this lawsuit "may have been brought" in the Eastern District of Pennsylvania for purposes of 28 U.S.C. § 1404(a).

Turning next to the related inquiries of convenience and fairness, the parties both vigorously maintain that their preferred venues, respectively, are superior to the alternative forum. The FTC argues that a plaintiff's choice of venue is ordinarily entitled to substantial

-7-

deference, and that deference is particularly heightened when the government brings an antitrust suit. The Commission also postulates that Cephalon's ultimate goal in seeking this transfer is to achieve consolidation of the FTC's action with the private lawsuits currently pending in the Eastern District of Pennsylvania. Because it is immune from any such consolidation without its consent -- and the FTC would presumably not consent here -- it is argued that there are very few efficiencies associated with transferring this case to that district.

Cephalon counters that this case simply has no connection to the District of Columbia. It also points out that it is not presently seeking consolidation and consequently that issue is not before this Court. In any event, Cephalon asserts, there are efficiencies associated with having one district judge decide these cases even apart from consolidation. After all, the private suits and the FTC's action all involve the same operative set of facts and, indeed, raise substantially the same questions of law. Moreover, according to Cephalon the general public policy concern that counsels against consolidation of government and private antitrust suits has no application to this case because the private parties here are not "tagging along" on the government's action. And proceeding with litigation in the Eastern District of Pennsylvania would be more convenient for the witnesses because they are, for the most part, located there. Most importantly, Cephalon forcefully contends that if this case is not transferred to the Eastern District of Pennsylvania then Cephalon will face a serious risk of inconsistent judgments arising out of exactly the same conduct. Finally, Cephalon proffers that the FTC's actual motive for bringing this case in the District of Columbia was to maximize the number of courts of appeals weighing in on the legality of so-called "reverse payment" Hatch-Waxman settlements, thereby increasing the chance of a circuit split that will persuade the Supreme Court to take up the issue. But that goal

-8-

should not be achieved by subjecting specific defendants to the risk of inconsistent judgments, Cephalon argues. As explained below, Cephalon has the better of this debate.

## I.     Section § 1404(a) Transfer Criteria

### a.     *Private Interest Considerations*

The FTC is correct that a plaintiff's choice of forum is ordinarily a "paramount consideration" that is entitled to "great deference" in the transfer inquiry. See Thayer/Patricof Educ. Funding, 196 F. Supp. 2d at 31. The Commission is also correct that some courts have found that the government's choice of venue in an antitrust case is "entitled to heightened respect." United States v. Brown Univ., 772 F. Supp. 241, 242 (E.D. Pa. 1991) (citing cases from the Second and Ninth Circuits).[2]  But the FTC overlooks one critical limitation on such deference. This Court has previously stated: "If the particular controversy has meaningful ties to the forum, and the plaintiff is a resident of that forum, the plaintiff's choice of forum is given substantial deference." Thayer/Patricof Educ. Funding, 196 F. Supp. 2d at 31 (emphasis added) (citing Wilderness Soc'y v. Babbitt, 104 F. Supp. 2d 10, 12-13 (D.D.C. 2000)).  Here, apart from the fact that many of the FTC's prosecuting attorneys are located in this area, there are no meaningful ties between the District of Columbia and the events (or parties) that gave rise to this action.

Cephalon's primary base of operations is in the Eastern District of Pennsylvania. It is a Delaware corporation that merely maintains a very small public affairs office in the District of

---

[2] Notwithstanding the Commission's sweeping assertion that antitrust plaintiffs should be afforded "heightened respect" in their forum selections, see FTC Opp'n at 10, the FTC points to no cases from this Circuit that support that assertion. Nonetheless, the Court is willing to accept that premise as a general matter because it does not alter the result because this case lacks any significant connection to the selected forum.

Columbia. None of the negotiations that led to the settlement agreements at the heart of this controversy took place in, or were in any other way related to, the District. See Zakreski Aff. ¶¶ 10-11. Moreover, the patent infringement suit filed by Cephalon, which, in turn, resulted in the settlement agreements, was filed in the District of New Jersey, id. ¶ 8. That lawsuit was also not related in any way to the District of Columbia. Indeed, neither Cephalon nor the four generic manufacturers maintain their corporate citizenship or principal places of business within the District of Columbia. In short, neither the operative events of this lawsuit nor the parties that were involved in those events have any meaningful connection to this District.

To be sure, the FTC "resides" in the District of Columbia in the sense that the agency's headquarters is located here. But beyond that, there is essentially no nexus between the District of Columbia and this controversy. Cephalon seizes on that fact and argues that because "there is no connection between the underlying facts and this forum . . . the FTC's choice to bring suit here therefore carries no weight." Def.'s Mot. at 10. In support of that assertion, Cephalon cites to numerous cases that assertedly stand for that proposition. See, e.g., SEC v. Roberts, 2007 U.S. Dist. LEXIS 49301 at *7 (D.D.C. July 10, 2007) ("While plaintiffs in securities cases normally receive a strong presumption in favor of their forum choice, such a presumption is misplaced here because the district is unconnected to the facts of this case other than being the destination of the SEC filings, which would occur in the mine run of cases brought by the SEC."); Rosales v. United States, 477 F. Supp. 2d 213, 216 (D.D.C. 2007) ("Indeed, the District of Columbia has no meaningful nexus to the dispute, other than the fact that it is the seat of the federal government."); SEC v. Ernst & Young, 775 F. Supp. 411, 416 (D.D.C. 1991) ("Texas is the site of nearly all of the facts underlying the filings here. 'Despite the presumption in favor of

-10-

plaintiff's forum choice, that choice should not be allowed to stand where the forum chosen bears

virtually no relation to the occurrences giving rise to the cause of action.'") (citing Oakley v.

Trans World Airlines, Inc., 14 Fair Empl. Prac. Cas. 1231, 1232 (D.D.C. 1976)). Although it is

true that the cited cases are not antitrust actions, many of them are securities cases brought by the

SEC, which is normally entitled to the same sort of enhanced forum selection deference as are

antitrust authorities. See Ernst & Young, 775 F. Supp. at 416. If other enforcement actions

brought by the federal government in the District of Columbia may be transferred when the case

lacks any real connection to the District, the Court is aware of no reason -- and the FTC does not

provide one -- why that result should be any different with respect to antitrust cases.[3]

The Commission does not seriously contest that the District of Columbia has no

meaningful connection to this action. Nevertheless, it maintains that its decision "to sue in the

District of Columbia is neither remarkable nor unusual." See FTC Opp'n at 11. That may be so,

but that is no reason to deny transfer; some defendants, after all, may be amenable to defending

against a suit in the District, but Cephalon is evidently not. Moreover, the FTC's broad assertion

that it "routinely files antitrust enforcement actions in the District of Columbia, particularly when

the challenged conduct, such as here, is felt by consumers on a nationwide scale," id.,  proves too

---

[3] In fact, Cephalon correctly points out that the very provision that the FTC cites in
support of its heightened deference argument -- the FTC's "liberal" venue provision, 15 U.S.C. §
53(b)(2) -- is substantially similar in all material aspects to the SEC's venue selection clause.
Compare 15 U.S.C. § 78aa ("Any suit or action to enforce any liability or duty created by this
title . . . may be brought in any such district or in the district wherein the defendant is found or is
an inhabitant or transacts business. . . .") with 15 U.S.C. § 53(b)(2) ("Any suit may be brought
where . . . [the] corporation resides or transacts business, or wherever venue is proper under
section 1391 of title 28."). This lends further support to the conclusion that forum transfer
questions should be addressed in the same manner in both securities and antitrust actions brought
by the government.

much. The logical conclusion of that line of argument suggests that a manufacturer, such as Cephalon here, may be subject to suit in any forum where its products are ultimately sold. It is difficult to conclude that the Commission implies otherwise, because the mere fact that the District of Columbia is the nation's capital does not mean that decisions from this Court have any additional nationwide effect beyond that of other district courts.

Turning to the convenience of the parties and witnesses, Cephalon argues that the Eastern District of Pennsylvania is the more appropriate forum because Cephalon's corporate headquarters is located there as well as many of the material fact witnesses in this case. See Def.'s Mot. at 14. Those witnesses include the principal negotiators of the settlement agreements and other employees familiar with Cephalon's business operations. Moreover, Cephalon maintains that "not one of [its] likely fact witnesses resides in the District of Columbia," and indeed "none of the Generics, whose employees may also be called to testify, is either incorporated in or has its principal place of business in the District of Columbia." Id. Finally, to the extent that "access to sources of proof," see Thayer/Patricof Educ. Funding, 196 F. Supp. 2d at 31-32 (citations omitted), is an issue in this case, Cephalon presumably maintains records and documents regarding the settlement agreements and underlying patent litigation at its corporate headquarters located in the Eastern District of Pennsylvania.

The FTC correctly responds by pointing out that the proper inquiry with respect to the convenience of witnesses is "not whether certain witnesses may be located outside the chosen forum, but instead whether those 'witnesses would be unwilling to testify in the District of Columbia.'" See FTC Opp'n at 12-13 (quoting FC Inv. Group LC v. Lichtenstein, 441 F. Supp. 2d 3, 14 (D.D.C. 2006)). The employee witnesses located at Cephalon's headquarters are under

-12-

the control of Cephalon and could most likely be compelled to testify here; indeed, as the FTC

points out, "nine Cephalon employees [have already] appeared voluntarily at investigational

depositions held at the Commission's office in Washington, D.C." Id. at 13 n. 16. Cephalon

does not suggest that those employees would be unwilling to testify in the District. Similarly,

Cephalon has not demonstrated that any of the third-party witnesses employed by the generic

manufacturers -- who are located in neither forum -- would be unwilling to testify here but

willing to do so in the Eastern District of Pennsylvania. And with respect to accessing sources of

proof, the FTC has been investigating this case for nearly two years and presumably already has

access to the bulk of the evidence it needs to present its case. In any event, this matter does not

involve the sort of cumbersome physical evidence that would be difficult to transport from one

location to another; the mere fact that some documents may be located in Pennsylvania does not

counsel against holding a trial in the District of Columbia.

Nevertheless, the "convenience" factor tips slightly in Cephalon's favor. Cephalon is

correct that "the only reason this forum is convenient to the FTC is that its lawyers are located

here," see Def.'s Mot. at 14, and that factor "carries little, if any, weight in an analysis under §

1404(a)." Reiffin v. Microsoft Corp., 104 F. Supp. 2d 48, 52 n. 7 (D.D.C. 2000) (quoting Vencor

Nursing Centers, L.P. v. Shalala, 63 F. Supp. 2d 1, 6 n. 4 (D.D.C. 1999)). The FTC offers no

reason why it could not conduct this litigation just as effectively in the Eastern District of

Pennsylvania; presumably the government has the resources and capacity to do so. And it would

be somewhat more convenient for Cephalon's witnesses, who are likely to comprise a large

portion of the fact witnesses in this case, to conduct the trial in that location. Taken alone, this

factor would not warrant transferring the case, but viewed collectively it modestly aids

-13-

Cephalon's showing.

The most compelling point in Cephalon's favor is the risk of inconsistent judgments that would arise if this case is not transferred. Although there are some differences between the private parties' claims against Cephalon and the government's case -- namely that the private litigants must demonstrate antitrust injury and prove damages -- at the core the two matters involve identical issues of fact and law. Hence, absent transfer to the Eastern District of Pennsylvania, Cephalon would be forced simultaneously to litigate two cases in two different courts arising out of precisely the same conduct. That obviously presents a serious risk of inconsistent judgments. If this Court, for instance, were to find that reverse-payment settlements are lawful while the district court in Pennsylvania reached the opposite result, or vice versa, Cephalon would face a classic case of conflicting judgments. That is exactly the sort of inconsistent result that transfer can ameliorate.

There is ample authority to support the conclusion that the interest of justice dictates that transfer is appropriate to avoid subjecting a defendant to the grave risk of inconsistent judgments deriving from the same conduct. "Courts in this district have clearly stated, 'The interests of justice are better served when a case is transferred to the district where related actions are pending.'" Reiffin, 104 F. Supp. 2d at 56 (quoting Martin-Trigona v. Meister, 668 F. Supp. 1, 3 (D.D.C. 1987)). Prior` decisions have recognized that there is a "compelling public interest in avoiding duplicative proceedings (and potentially inconsistent judgments) [that] warrants transfer of venue." Id. at 58. Indeed, "the most significant factor weighing in favor of transferring [a] case is the presence of closely related litigation." Barham v. UBS Fin. Servs., 496 F. Supp. 2d 179, 180 (D.D.C. 2007). "[T]he fact that there is an ongoing case dealing with similar issues in

-14-

another jurisdiction weighs very heavily in favor of a transfer under § 1404(a)." Holland v. A.T.
Massey Coal, 360 F. Supp. 2d 72, 77 (D.D.C. 2004) (citing In re Scott, 709 F.2d at 721 n. 10);
see also California Farm Bureau Fed'n v. Badgley, 2005 U.S. Dist. LEXIS 12861 at *7 (D.D.C.
June 29, 2005) ("[A] significant risk that this court and the California court would issue
inconsistent orders subjecting [defendant] to inconsistent obligations . . . weigh[s] heavily in
favor of transfer.").

Tellingly, the FTC does not dispute that its proposed course of action would create a
serious risk of inconsistent judgments. Instead, the Commission urges the Court to disregard
entirely that concern. After all, the FTC argues, "courts routinely deny such transfer requests
when related cases are pending in different districts, even though inconsistent results are always
possible." See FTC Opp'n at 9. In support of that proposition, the FTC cites to five cases (the
most recent of which is over ten years old) that all involve factors or circumstances that
distinguish them from the present case.[4] See AT&T Corp. v. PAB, Inc., 935 F. Supp. 584 , 593
(E.D. Pa. 1996) (transfer declined where corporate defendants were both "Pennsylvania
corporations with their principal places of business in the Eastern District of Pennsylvania," and
thus there were efficiencies associated with proceeding in that district because "[d]efendants'
witnesses and documentary evidence [was] accessible" there); Combs v. Adkins & Adkins Coal
Co., Inc., 597 F. Supp. 122, 125 (D.D.C. 1984) (transfer declined because the litigation
concerned pension funds administered in the District of Columbia and the putative transferee
district was engaged in litigation that involved separate entities); Star Lines, Ltd. v. Puerto Rico

---

[4] The Court notes that it is a bit of a stretch to refer to five decisions spanning over forty
years as reflecting a "routine" practice.

-15-

Mar. Shipping Auth., 442 F. Supp. 1201, 1208 (S.D.N.Y. 1978) (transfer declined where

transferee case was commenced after the case at bar and was at a less advanced stage of

litigation); SEC v. Hart, 1978 U.S. Dist. LEXIS 17506 at *5 (D.D.C. May 26, 1978) (transfer

declined where calendar conditions in putative transferee district made prompt resolution more

likely by retaining the case); Polychrome Corp. v. Minnesota Mining & Mfg. Co., 259 F. Supp.

330, 333-34 (S.D.N.Y. 1966) (transfer declined where putative transferee case involved "broader

area [of law] than the case at bar" and also did not involve a "substantial" issue presented by the

case at bar). In any event, the fact that some courts in some instances have seen fit in their

discretion to deny transfer in the face of parallel litigation does not significantly aid the FTC's

position here because the transfer inquiry is inherently tied to the specific circumstances of a

given case.

Indeed, the FTC would likely be content if this case did result in inconsistent judgments.

That is because, as Cephalon points out, the Commission is rather openly[5] shopping for a circuit

split on the issue of reverse-payment Hatch-Waxman settlements, and all the better if the FTC

could potentially arrange for two courts of appeals -- the Third and D.C. Circuits -- to decide that

question in the context of what is essentially the same case. To be sure, the Commission is free

to exercise its prosecutorial judgment to pursue a strategy that it believes will ultimately result in

Supreme Court review. But it strikes this Court as both odd and unreasonable to do so at the

---

[5] In its filings before this Court, the Commission has not admitted that it brought this
action in the District of Columbia to further its goal of obtaining a circuit split. At least one
Commissioner, however, has conceded that it is "a matter of public knowledge that [FTC is]
looking to bring a case that will create a clearer split in the circuits." See Oral Statement of
Commissioner Jon Leibowitz, Hearing of the Senate Judiciary Committee (January 17, 2007) at
3, available at http://www.ftc.gov/speeches/leibowitz/071701oralstatement.pdf.

expense of exposing a single defendant (engaged in a single course of conduct) to conflicting

judgments in order to advance the agency's enforcement goals. The danger, and burden, of

inconsistent judgments against one defendant based on the same events, in short, outweighs

whatever legitimate interest the FTC may have in achieving that result for strategic reasons.

Hence, this factor strongly weighs in favor of transfer "in the interest of justice."

            b.      Public Interest Considerations

Of the three "public interest" factors identified in Thayer/Patricof Educ. Funding, two

support transfer and one has no real application to this case. To begin with, the first factor --

familiarity with the governing laws -- cuts in Cephalon's favor here. The district court in

Pennsylvania, of course, is not a specialty court and thus it would not ordinarily have any more or

less familiarity with the legal issues concerning reverse-payment Hatch-Waxman settlements

than does this Court. That is, after all, a general question of federal law. This is a special case,

however. Here, the district court in Pennsylvania has had litigation pending before it for two

years that involves the precise factual and legal situation raised by the FTC in this proceeding.

Indeed, there is a fully briefed motion to dismiss awaiting resolution in that forum. That court's

familiarity with these facts -- and the law as applied to these facts -- supports transfer to the

Eastern District of Pennsylvania for judicial efficiency purposes.

The second public interest factor -- the relative congestion of the transferee and transferor

courts -- is closely related to the first and similarly supports transfer. According to the latest

federal judicial caseload statistics, although there were far more cases pending in the Eastern

-17-

District of Pennsylvania than there were before this Court (25,758 vs. 3,936 cases, respectively),[6]

civil cases in the Eastern District of Pennsylvania had a somewhat shorter median filing-to-

disposition period (5.7 months vs. 9 months, respectively). See Federal Court Management

Statistics, District Courts 2007, available at http://www.uscourts.gov/cgi-bin/cmsd2007.pl. That

is not an especially significant difference in time to decision, but as noted above, there is another

reason to believe that this case may be resolved more expeditiously in the Eastern District of

Pennsylvania: that court is already familiar with the facts and legal issues presented by way of

managing the private cases (that are admittedly at a more advanced stage of litigation than this

proceeding). Thus, one of the FTC's chief concerns regarding transfer, "the substantial

likelihood of delay in the government case," see FTC Opp'n at 8, appears to be unfounded. The

FTC has offered no reason why transferring this case to the Eastern District of Pennsylvania --

before, it bears repeating, there has even been a litigation schedule entered in this proceeding --

would result in such delay. See Reiffin, 104 F. Supp. 2d at 57 ("It is not evident that a transfer

. . . will lead to unnecessary delay . . . [because] this court has neither dealt with other issues in

the suit nor has it familiarized itself with the underlying merits of the case. Since this case is in

its earliest stages, there would be no delay associated with [transfer].") (quoting Trout Unlimited

v. U.S. Department of Agriculture, 944 F. Supp. 13, 19 (D.D.C. 1996)); see also Holland, 360 F.

Supp. 2d at 77 ("Simply stated, judicial economy would not be best served by having similar

claims proceed on parallel tracks in neighboring jurisdictions.").

Finally, the third public interest factor -- the interest in deciding local controversies at

---

[6] These figures are exaggerated by the massive volume of consolidated MDL cases
pending in the Eastern District of Pennsylvania.

-18-

home -- has little application here. The use of reverse-payment settlements to preclude generic

entry into the pharmaceutical market is not an issue unique to either the District of Columbia or

the Eastern District of Pennsylvania; in fact, it is not a local issue at all. See Reiffin, 104 F.2d at

52 n. 8. Instead, it is a question that has nationwide significance, the resolution of which will

have the same effect if rendered by this Court or the district court for the Eastern District of

Pennsylvania. Beyond the general, and minimal, interest in deciding issues relating to Cephalon

in its "home" federal district court, then, this factor is of no relevance.

In sum, Cephalon has carried its burden to show that "the balance of convenience of the

parties and witnesses and the interest of justice are in [its] favor." Thayer/Patricof Educ.

Funding, 196 F. Supp. 2d at 31. The FTC's selection of the District of Columbia as its chosen

forum is not entitled to substantial deference because it has no significant connection to the

events giving rise to this case. Instead, the Eastern District of Pennsylvania is the more

appropriate forum because the operative events arose there and the defendant and several

significant fact witnesses reside there. The public interest factors -- namely, judicial efficiency --

favor transfer as well due to the essentially identical cases currently pending before the court in

the Eastern District of Pennsylvania. Most importantly, transfer is especially appropriate here to

avoid the risk that Cephalon will be subject to inconsistent judgments arising out of the same

conduct.

## II.    Consolidation and 28 U.S.C. § 1407

The FTC devoted a large portion of its opposition brief to arguing that its case may not be

consolidated with the private antitrust actions pending in the Eastern District of Pennsylvania.

At first glance, that seems a bit odd because Cephalon is not presently seeking consolidation.

-19-

Nevertheless, the FTC insists that Cephalon's transfer request is in fact part of a "two-step" consolidation process. The first step, the argument goes, is transfer under 28 U.S.C. § 1404(a). The second is consolidation under Fed. R. Civ. P. 42(a). But the Commission states that Congress has expressed a strong public policy interest in exempting government antitrust suits from consolidation with private actions. Thus, the Commission claims that it will not consent to consolidation and that it is exempt from compulsory consolidation. And, it asserts, because the only efficiencies associated with transferring this case would come from consolidation, but it will not permit such consolidation to occur, there is nothing to be gained by transferring this case to the Eastern District of Pennsylvania. Indeed, the Commission argues that the only result of transfer would be needless delay of the government's action.

The Court is not persuaded. The short answer to FTC's contention is that consolidation is not the sole efficiency associated with transferring this case. In fact, the most compelling reason to grant this transfer -- the need to avoid the risk of inconsistent judgments -- is entirely independent from the prospect of consolidation. The legal question raised by the two actions is the same: whether reverse-payment settlements run afoul of the antitrust laws. Having a single district judge decide that legal question, even in two unconsolidated cases, significantly mitigates -- indeed, effectively eliminates -- the risk of conflicting legal interpretations. It is even possible that the question may only need to be decided once, as the doctrines of collateral estoppel or issue preclusion may apply in the subsequent case. And the fact that the Eastern District of Pennsylvania is Cephalon's home district (as well as the location of many of its fact witnesses and sources of proof) helps to ease any hardship that Cephalon might have encountered in defending against this action in the District of Columbia. Those benefits make the Eastern

-20-

District of Pennsylvania the superior forum for this case quite apart from the prospect of consolidation.

The Commission is correct that the multidistrict litigation statute specifically exempts from transfer for pretrial consolidation "any action in which the United States is a complainant arising under the antitrust laws," see 28 U.S.C. § 1407(g). But the question of multidistrict transfer and consolidation is simply not before this Court. In the event that Cephalon moves for consolidation post-transfer pursuant to Fed. R. Civ. P. Rule 42(a)[7] -- which is mere speculation at this juncture -- the FTC may argue to that court that consolidation of government and private antitrust actions is inappropriate and contrary to public policy, but it is premature to make that argument now before this Court.[8]

---

[7] The Commission's reliance on United States v. Dentsply Int'l, Inc., 190 F.R.D. 140 (D. Del. 1999), is misplaced. That case involved a motion to consolidate a government antitrust case with two private "tag-along" suits, all three of which were already pending before the same district court. Id. at 141. Drawing on the government antitrust exemption found in 28 U.S.C. § 1407(g), the court concluded that consolidation was also inappropriate under Rule 42(a). Id. at 145. Simply put, that case involved consolidation not transfer; this case presents the opposite scenario. There is no suggestion in Dentsply that transfer of a government antitrust action pursuant to 28 U.S.C. § 1404(a) for reasons unrelated to consolidation is somehow prohibited or inappropriate.

[8] To the extent that 28 U.S.C. § 1407(g) may be read to embody a general congressional policy disfavoring transfer of government antitrust actions, the Court agrees with Cephalon that the "concerns animating Section 1407(g) are not present here." See Def.'s Reply at 9. As the court in Dentsply noted, § 1407(g) was designed to prevent private antitrust plaintiffs from "fil[ing] actions merely to ride along on the Government's cases . . . almost certainly caus[ing] delay" in the government's prosecution of antitrust violations. 190 F.R.D. at 144 (citing H.R. Rep. No. 90-1130 at 5 (1968)). Here, however, the private actions pending in the Eastern District of Pennsylvania are not "riding along" the FTC's case; in fact, those cases were brought two years before the FTC instigated its case and are already at a more advanced stage of litigation. There is no reason to believe that transfer to the Eastern District of Pennsylvania will result in any delay in the FTC's case. In fact, as explained above, there are reasons to think that transfer will result in more efficient resolution of the FTC's complaint. Moreover, although transfer pursuant to § 1407 and § 1404(a) can serve related goals, the two provisions have somewhat

-21-

## CONCLUSION

For the foregoing reasons, the Court will grant Cephalon's motion to transfer this action

to the Eastern District of Pennsylvania. A separate Order accompanies this Memorandum

Opinion.

                                    /s/
                               JOHN D. BATES
                          United States District Judge

Date:    April 28, 2008

---

distinct purposes and inquiries. Whereas multidistrict litigation is primarily concerned with
judicial efficiency in deciding large numbers of related cases, the transfer inquiry under § 1404(a)
is oriented more towards the private interests of the individual parties in a given case (in addition
to public considerations).