## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: TRICOR DIRECT PURCHASER ANTITRUST LITIGATION ) ) ) | |
| ) | |
| THIS DOCUMENT RELATES TO: ALL ACTIONS ) ) ) | C.A. No. 05-340 (SLR) |
| | |
| IN RE: TRICOR INDIRECT PURCHASER ANTITRUST LITIGATION ) ) | |
| ) | C.A. No. 05-360 (SLR) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS ) ) ) | |

### REDACTED / PUBLIC VERSION

### COORDINATED PURCHASER PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON RELEVANT MARKET DEFINITION

Jeffrey S. Goddess (Del. Bar No. 630)
Jessica Zeldin (Del. Bar No. 3558)
Rosenthal, Monhait & Goddess, P.A.
919 Market Street, Suite 1401
P. O. Box 1070
Wilmington, DE 19899-1070
(302) 656-4433
jgoddess@rmgglaw.com
jzeldin@rmgglaw.com

### ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE

June 9, 2008

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................... i

INTRODUCTION ............................................................ 1

STATEMENT OF THE CASE ................................................... 2

SUMMARY OF ARGUMENT .................................................... 5

ARGUMENT ............................................................... 11

I.      PRODUCT MARKET DEFINITION AND MONOPOLY POWER PRESENT
        DISPUTED ISSUES OF FACT THAT CANNOT BE SUMMARILY DECIDED ......... 11

II.     COMPELLING EVIDENCE OF LOW CROSS-PRICE ELASTICITY OF DEMAND
        BETWEEN TRICOR AND NON-FENOFIBRATE DRUGS REQUIRES A TRIAL
        ON THE ISSUE OF RELEVANT PRODUCT MARKET (AND THUS MONOPOLY
        POWER) ........................................................ 12

        A.      Controlling Law Requires That Non-Fenofibrate Drugs Must
                Exhibit Practical Indicia of Substantial, Positive Cross-Price
                Elasticity of Demand with Tricor to Be Included In the Relevant
                Market With Market ..................................... 13

        B.      Plaintiffs' Experts Rely Upon Substantial Evidence That Non-
                Fenofibrate Drugs Exhibit Low Cross Elasticity of Demand With
                Tricor, and That AB-Rated Generic Versions of Tricor Would Have
                Exhibited High Cross Elasticity of Demand With Tricor ........... 21

                1.      Plaintiffs' experts have concluded that Tricor and non-
                        fenofibrate drugs exhibit low cross elasticity of demand ....... 22

                2.      Defendants' own experts have admitted that Tricor and
                        non-fenofibrate drugs exhibit low cross elasticity of
                        demand ......................................... 22

                3.      Plaintiffs' experts base their conclusions that there is
                        insignificant cross-price elasticity of demand between
                        Tricor and non-fenofibrate drugs on sworn testimony and
                        contemporaneous business documents of the market
                        participants ..................................... 24

|   | 4. | Plaintiffs' experts conclude that AB-rated generic versions of Tricor would have exhibited substantial cross-price elasticity of demand with branded Tricor ................... 26 |

|   | 5. | Evidence of high cross elasticity between branded Tricor and its AB rated generics, and low cross elasticity between Tricor and non-fenofibrate drugs, necessitates a relevant market limited to Tricor and its AB rated generics ................ 27 |

| C. | The Horizontal Merger Guidelines Demonstrate That The Relevant Market Is Limited To Tricor and AB-Rated Generic Versions of Tricor ...................................................... 32 |

| III. | SUBSTANTIAL EVIDENCE OF THE LACK OF THERAPEUTIC INTERCHANGE-ABILITY BETWEEN TRICOR AND NON-FENOFIBRATE DRUGS REQUIRES A TRIAL ON THE ISSUE OF RELEVANT PRODUCT MARKET (AND THUS MONOPOLY POWER) .................................................. 34 |

| IV. | SUBSTANTIAL DIRECT EVIDENCE OF DEFENDANTS' MONOPOLY POWER REQUIRES A TRIAL ............................................... 35 |

| A. | Plaintiffs Have Produced Abundant Direct Evidence of Defendants' Monopoly Power ................................... 36 |

| B. | Direct Evidence of Defendants' Monopoly Power Corroborates Plaintiffs' Proposed Product Market Definition ................... 39 |

CONCLUSION ........................................................... 40

# TABLE OF AUTHORITIES

## CASES

*Abbott Labs. v. Teva Pharms. USA, Inc.*,
  432 F. Supp.2d 408 (D. Del. 2006) ...........................................3

*Andrx Pharms. Inc. v. Elan Corp.*,
  421 F.3d 1227 (11th Cir. 2005) .........................................10, 28

*Auburn News v. Prov. Jnl. Co.*,
  504 F. Supp. 292 (D.R.I. 1980) ...........................................14

*Babyage.com, Inc. v. Toys "R" Us, Inc.*,
  2008 U.S. Dist. LEXIS 40476 (E.D. Pa. May 19, 2008) ...............14, 16, 32, 33

*Barr Laboratories, Inc. v. Abbott Laboratories*,
  1991 WL 322977 (D.N.J. July 29, 1991) ....................................20

*Barr Labs., Inc. v. Abbott Labs.*,
  978 F.2d 98 (3d Cir. 1992).................................................20

*Bogan v. Hodgkins*,
  166 F.3d 509 (2d Cir. 1999)................................................14

*Bradburn Parent Teacher Store, Inc. v. 3M*,
  2005 WL 1388929 (E.D. Pa. June 9, 2005) ..................................12

*Broadcom Corp. v. Qualcomm, Inc.*,
  501 F.3d 297 (3d Cir. 2007)...............................7, 12, 13, 36, 37, 39

*Brookins v. Int'l Motor Contest Ass'n*,
  219 F.3d 849 (8th Cir. 2000) ..............................................16

*In re Cardizem CD Antitrust Litig.*,
  105 F. Supp.2d 618 (E.D. Mich. 2000) .....................................28

*FTC v. Warner Chilcott Holds., Inc.*,
  2006 WL 3302862 (D.D.C. Oct. 23, 2006) ....................................3

*In re Ciprofloxacin Hydro. Antitrust Litig.*,
  363 F. Supp. 2d 514 (E.D.N.Y. 2005) ...................................10, 28

-i-

*Coastal Fuels Inc. v. Caribbean Petro. Co.*,
    79 F.3d 182 (1st Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Coca-Cola Bott. Co. of Shreveport, Inc. v. Coca-Cola Co.*,
    696 F. Supp. 97 (D. Del. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Columbia Metal Culvert Co., Inc. v. Kaiser Alum. & Chem. Corp.*,
    579 F.2d 20 (3d Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11, 17, 20, 21, 23

*Conwood Co. v. U.S. Tobacco Co.*,
    290 F.3d 768 (6th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Del. Health Care, Inc. v. MCD Holding Co.*,
    957 F. Supp. 53 (D. Del. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 20, 24, 26, 28

*F.T.C. v. H.J. Heinz Co.*,
    246 F.3d 708 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*FTC v. Staples*,
    970 F. Supp. 1066 (D.D.C. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 25

*FTC v. Swedish Match*,
    131 F. Supp. 2d 151 (D.D.C. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 21

*Federal Labs., Inc. v. Barringer Research*,
    696 F.2d 271 (3d Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 12

*Fineman v. Armstrong World Indus., Inc.*,
    980 F.2d 171 (3d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 11, 21

*Forsyth v. Humana, Inc.*,
    114 F.3d 1467 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*
    2005 WL 2132438 (S.D.N.Y. Sept. 6, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*,
    386 F.3d 485 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30, 31

*Gordon v. Lewistown Hosp.*,
    423 F.3d 184 (3d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Hayden Pub. Co. v. Cox Broad. Corp.*,
    730 F.2d 64 (2d Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Hill v. Lamanna*,
    2007 WL 777007 (W.D. Pa. Mar. 12, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Hynix Semiconductor Inc. v. Rambus Inc.*,
    2008 WL 73689 (N.D. Cal. Jan. 5, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*I.D. Sec. Sys. Canada, Inc. v. Checkpoint Sys., Inc.*,
    198 F. Supp. 2d 598 (E.D. Pa. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*,
    2008 WL 113987 (E.D. Ky. Jan. 7, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Knoll Pharma. Co., Inc. v. Teva Pharms. USA, Inc.*,
    2001 WL 1001117 (N.D. Ill. Aug. 24, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*In re Lorazepam & Cloraz. Antitrust Litig.*,
    467 F. Supp. 2d 74 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Louisiana Whole. Drug Co., Inc. v. Sanofi-Aventis*,
    2008 WL 169362 (S.D.N.Y. Jan. 18, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 28

*Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*,
    275 F.3d 762 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*,
    924 F.2d 1484 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Mutual Pharm. Co., Inc. v. Hoechst Marion Roussel, Inc.*,
    1997 WL 805261 (E.D. Pa. Dec. 17, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*NCAA v. Board of Regents of Univ. of Oklahoma*,
    468 U.S. 85 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Nilavar v. Mercy Health Sys.*,
    2007 WL 2264439 (6th Cir. Aug. 7, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Nobody in Partic. Presents, Inc. v. Clear Chan. Commc'ns, Inc.,*
     311 F. Supp.2d 1048 (D. Colo. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 20

*Pepsico, Inc. v. Coca-Cola Co.,*
     315 F.3d 101 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Pontius v. Children's Hosp.,*
     552 F. Supp. 1352 (E.D. Pa. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.,*
     124 F.3d 430 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 9, 13, 15

*Re/Max Int'l v. Realty One, Inc.,*
     173 F.3d 995 (6th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 39

*In re Remeron Antitrust Litig.,*
     367 F. Supp.2d 675 (D.N.J. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.,*
     792 F.2d 210 (D.C. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*SmithKline Corp. v. Eli Lilly & Co.*
     427 F. Supp. at 1089 (E.D. Pa. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16, 17, 18

*SmithKline Corp. v. Eli Lilly & Co.,*
     575 F.2d 1056 (3d Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 15, 19, 26

*T. Harris Young & Assoc., Inc. v. Marquette Elec., Inc.,*
     931 F.2d 816 (11th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.,*
     305 F.3d 1124 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 16

*In re Terazosin Hydro. Antitrust Litig.,*
     352 F. Supp. 2d 1279 (S.D. Fla. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 28, 30

*Times-Picayune Pub. Co. v. U.S.,*
     345 U.S. 594 (1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Town Sound & Custom Tops, Inc. v. Chrysler Motors Co.,*
     959 F.2d 468 (3d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*,
   7 F.3d 986 (11th Cir. 1993) ............................................... 15

*U.S. Healthcare, Inc. v. Healthsource, Inc.*,
   986 F.2d 589 (1st Cir. 1993) ............................................... 31

*U.S. v. Archer-Daniels-Midland Co.*,
   866 F.2d 242 (8th Cir. 1989) ............................................... 15

*U.S. v. Continental Can Co.*,
   378 U.S. 441 (1964) ...................................................... 20

*U.S. v. Dentsply Int'l, Inc.*,
   399 F.3d 181 (3d Cir. 2005) ................................................. 3

*U.S. v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) ........................................... 12, 16

*United States v. E.I. duPont de Nemours & Co.*,
   351 U.S. 377 (1956) ....................................................... 8

*Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*,
   375 F.3d 1341 (Fed. Cir. 2004) ........................................ 16, 34

*Valley Drug Co. v. Geneva Pharms., Inc.*,
   344 F.3d 1294 (11th Cir. 2003) ............................................ 39

*Wallace v. Int'l Bus. Mach. Corp.*,
   467 F.3d 1104 (7th Cir. 2006) ............................................. 39

*Weiss v. York Hosp.*,
   745 F.2d 786 (3d Cir. 1984) ............................................... 11

*Xerox Corp. v. Media Sciences Int'l, Inc.*,
   511 F. Supp. 2d 372 (S.D.N.Y. 2007) .................................... 3, 28

*Yeager's Fuel, Inc. v. Pa. P. & L. Co.*,
   953 F. Supp. 617 (E.D. Pa. 1997) ...................................... 12, 14

## MISCELLANEOUS

ABA, Model Jury Instructions in Civil Antitrust Cases C-7 (2005) ...................... 16

2A Areeda & Hovenkamp, ANTITRUST LAW ¶ 507 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

2A Areeda & Hovenkamp, ANTITRUST LAW ¶ 536-37 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Phillip E. Areeda & Herbert Hovenkamp, FUNDAMENTALS OF ANTITRUST LAW
(3d ed.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Dennis W. Carlton and Jeffrey M. Perloff, MODERN INDUSTRIAL ORGANIZATION
(2d ed. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Eric L. Cramer and Daniel Berger, "The Superiority of Direct Proof of Monopoly
Power and Anticompetitive Effects in Antitrust Cases Involving Delayed Entry of
Generic Drugs," 39 U.S.F. L. REV. 81 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Department of Justice and Federal Trade Commission, HORIZONTAL MERGER
GUIDELINES (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

R. Gilbert and S. Sunshine, Incorporating Dynamic Efficiency Concerns in Merger
Analysis: The Use of Innovation Markets, 63 ANTITRUST L.J. 569 (1995) . . . . . . . . . . . . . . . 14

1 H. Hovenkamp, et al., IP AND ANTITRUST § 12.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Landes & Posner, Market Power in Antitrust Cases, 94 HARV. L. REV. 937 (1981) . . . . . . . . . . 38

## INTRODUCTION

The Coordinated Purchaser Plaintiffs, consisting of the Direct Purchaser Class Plaintiffs, Individual Direct Plaintiffs, End-Payor Class Plaintiffs, and Pacificare ("Plaintiffs") oppose Defendants' motion for summary judgment on the issues of monopoly power and relevant market.

As detailed below, summary judgment is inappropriate here. Plaintiffs' and Defendants' experts use different methods and offer flatly contrary opinions as to monopoly power, and the appropriate relevant market for analyzing the claims in this case. Because controlling law provides that (a) market definition is almost always as a fact question for the jury, and (b) a Court should not pick which expert is correct on summary judgment, it would be error for the Court to reject Plaintiffs' experts and evidence in favor of Defendants' at this stage.[1]

Moreover, Defendants' approach here is fatally defective because it ignores the fundamental basis of assessing monopoly power and defining relevant markets under Supreme Court and Third Circuit precedent: price competition, as represented by cross-price elasticity of demand ("cross elasticity"). *E.g., Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 437-38 (3d Cir. 1997) ("products in a relevant market are characterized by a cross-elasticity of demand, in other words, the rise in price of a good within a relevant product market would tend to create a greater demand for other like goods in that market"). As Plaintiffs' experts show based on compelling record evidence, Tricor exhibited low cross elasticity with other drugs treating abnormal blood lipids (dyslipidemia), and would have exhibited high cross elasticity with AB-rated generic versions of

---

[1]In addition, to assist the Court, Plaintiffs have attached a Response to Defendants' Statement of Undisputed Facts, which systematically refutes, to the extent material, Defendants' so-called "Undisputed Facts." *See* "Opening Brief in Support of Defendants' Motion for Summary Judgment on Relevant Market Definition," dated May 5, 2008 ("Def. Br.") at 4.

-1-

Tricor had Defendants' not impeded generic entry through their conduct.  Thus, Defendants'

assertion that the relevant market must include all dyslipidemia drugs – in the face of contrary price-

based evidence –  is fatally flawed, and Plaintiffs' experts' view that the relevant market includes

only Tricor and its AB-rated generic equivalents is well founded.  At all events, expert opinions that

define a market in conflict with well-established antitrust law, as Defendants' economist does here,

cannot be a basis for ignoring the opinions of Plaintiffs' experts or dismissing Plaintiffs' antitrust

claims.  Defendants' motion must therefore be denied.

## STATEMENT OF THE CASE

Defendants' economist, Prof. Richard Gilbert, correctly testified that "

."[2]  Plaintiffs thus begin

by summarizing what Defendants *did* to maintain and enhance their monopoly power.

Defendants introduced fenofibrate capsules in the U.S. under the brand-name Tricor in 1998.

Without the "exclusivity"protection afforded by a compound patent, Tricor soon faced a substantial

threat from generics.[3]  Defendants expected that

.[4]

---

[2]Gilbert Deposition ("Dep.") at 248:16-250:3 (*see* Appendix of Coordinated Purchaser
Plaintiffs on Market Definition Issue filed concurrently herewith ("PJA") at 1562-63; *see also id.*
at 252:7-253:6 (                                                    ) (PJA1563).

[3]*See* Abbott_Tricor0718 (PJA1492); Schond. Rpt. ¶¶ 32-33 (PJA570).  *See infra* note 10 for
a list of pertinent expert reports cited in this brief and the abbreviations used to refer to them.

[4]*See* Leitz. Rpt. at 29-39, 49-50, 62-65 (PJA484-94, 504-05, 517-20); King Decl. ¶¶ 37-61
(PJA122-36); Schond. Rpt. ¶¶ 111-13, 128-38 (PJA600-01, 605-09); Leitz. Rpt. ¶¶ 45-50 (PJA500-
05); King Decl. ¶¶ 38-47 (PJA123-29). Even Defendants' economist admits the consumer savings
and benefits of generics. Gilbert Dep. at 68:10-70:8 (PJA1517-18); *id.* at 184:20-185:5 (PJA1546).

-2-

In response to this generic threat, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[6] Defendants did this not once, but twice.[7]

Defendants' conduct ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Leitz. Rpt. at 37-39 (PJA492-94). Defendants even expected s▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[5]Despite his having asked Defendants to supply it, Defendants' economist said ▮▮▮▮▮▮
▮▮▮

Gilbert Dep. at 277:15-24 (PJA1569).

[6]Schond. Rpt. ¶¶ 15-21, 128-57 (PJA562-65, 605-18); King Decl. ¶¶ 6-15 (PJA105-12). Restricting rivals' access to cost-efficient means of distribution is anticompetitive. *See Abbott Labs. v. Teva Pharms. USA, Inc.*, 432 F. Supp.2d 408, 423 (D. Del. 2006) (citing, *inter alia, U.S. v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191 (3d Cir. 2005)).

[7]This conduct has been described as "product-hopping." *See* 1 H. Hovenkamp, *et al.*, *IP and Antitrust* § 12.5, at p. 12-45 - 12-48 (2008 Supp.) (PJA1468); *Abbott Labs.*, 432 F. Supp.2d at 423 ("[s]uch a restriction on competition, if proven, is sufficient to support an antitrust claim in this case"). *Cf. FTC v. Warner Chilcott Holds., Inc.*, 2006 WL 3302862 (D.D.C. Oct. 23, 2006) (stipulated injunction restricting withdrawal of original product following release of reformulated version). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Gilbert Dep. at 121:23-122:7 (PJA1530-31). *See also Xerox Corp. v. Media Sciences Int'l, Inc.*, 511 F. Supp. 2d 372, 381-82 (S.D.N.Y. 2007) (Xerox's redesign of printer to be incompatible with rival's ink is antitrust injury of "exactly the type that antitrust laws were designed to prevent").

-3-

██████████████████████████s. *Id*; Leffler Rpt. ¶¶ 48-49 (PJA329-30).  Compounding

these expected █████████████████████████████████████████████████████

██████████████████████████████. Guerin-Calvert Rpt. ¶ 164 (PJA1295).

So what did Defendants get for their money?  Defendants' own documents reveal that ██

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████. *See* Leitz.

Rpt. at 29-40, 45-52, 62-65 (PJA484-95, 500-07, 517-20); Leffler Rpt. ¶¶ 52-54, 61-62 (PJA331-33,

337-38); King Decl. ¶ 6 n.14 (PJA105).[8]  Defendants recognized that this scheme allowed them to

maintain a nearly 100% share of what they themselves called t████████████████████████

██████████:

████████████████████████████████████████████████████████████

Abbott_Tricor0718 (emphasis added) (PJA1492).  Abbott even quantified the ████████████

████████████████████████████████████████":

---

[8]One Fournier memorandum candidly states, ████████████████████████████

████████"  *See* Schond. Rpt. ¶ 39 (citation omitted) (PJA572).

███████████████████████████████████████

*Id.* at -719) (emphasis added) (PJA1493).[9]

It would have been irrational for Defendants to ████████████████████ on a scheme

not intended to expand the market for fenofibrate unless they could, through such efforts, impede

competition, and thereby extend their ability to charge premium prices for fenofibrate without losing

nearly all of their sales. That is precisely what the scheme did – earning Defendants billions from

the pockets of purchasers. As detailed below, the ability to exclude rivals and maintain premium

prices without losing sales is the hallmark of conduct that extends monopoly power.

## SUMMARY OF ARGUMENT

The Court is faced with the following two competing interpretations of the factual and expert

record in this case on the monopoly power element of Plaintiffs' antitrust claims:

***Defendants' Expert's Position.*** Defendants claim that the relevant product market must

include an entire class of prescription drugs that treat a wide variety of different conditions caused

by abnormal blood lipid levels – namely all "dyslipidemia" drugs. This drug class includes disparate

types of drugs such as statins (like Lipitor, Zocor, and Pravachol), niacins (Niacor), and fibrates

(Lopid), as well as fenofibrates (Tricor). Defendants assert that this Court should overlook what they

████████████████████) *admit* is a lack of substantial price competition, and low cross

elasticity, between non-fenofibrate dyslipidemia drugs and Tricor – despite binding law requiring

---

[9]Defendants essentially admit that their conduct successfully impeded generic competition, describing this case as involving "a situation where the alleged substitute – the AB-rated generic – is not on the market." Def. Br. at 30. *See also* Guerin-Calvert Rpt. at 10 ¶ 28 (Defendants' witness asserts████████████████████████████████████) (PJA1293).

-5-

assessment of cross elasticity in defining markets. Def. Br. at 25; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

(PJA1300); ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (PJA1561-62, 1564).

Based on the foregoing, Defendants conclude that, because they control only a small share of this broad "dyslipidemia class" of drugs, that the conduct challenged in this case could not have involved maintenance of monopoly power.

***Plaintiffs' Experts' Position.*** Plaintiffs have four economic experts who opine on monopoly power and relevant market: Drs. Leitzinger, Leffler, King, and Schondelmeyer.[10] Unlike Defendants' expert, Plaintiffs' experts focused on the key factors identified by the controlling cases and standard economic texts regarding monopoly power and market definition: price competition and cross elasticity. Each expert concludes, based on voluminous record evidence, that ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Dr. Schondelmeyer, who is also a licensed pharmacist, and two other Plaintiffs' experts – Drs. Schwartzbard and Grimm, both physicians specializing in cardiology[11] – point further to evidence

that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Finally, Drs. Leitzinger and Leffler rely upon *direct* evidence that the exclusionary scheme

[10]Dr. Leitzinger's reports for the Direct Purchaser Class appear at PJA1 ("Leitz. Decl."), PJA455 ("Leitz. Rpt."), and PJA1104 ("Leitz. Reb."). Dr. Leffler's reports for the Individual Direct Plaintiffs appear at PJA303 ("Leffler Rpt.") and PJA1048 ("Leffler Reb."); Dr. King's reports for the End-Payor Class (and, contrary to Defendants' suggestion (at Def. Br. at 8 n.9), also for Pacificare (*see* PJA1285-90)) appear at PJA98 ("King Decl.") and PJA893 ("King Surreb."). Dr. Schondelmeyer's reports for the Individual and Class Direct Purchasers appear at PJA556 ("Schond. Rpt.") and PJA1200 ("Schond. Reb.").

[11]Dr. Schwartzbard's reports for the Individual and Class Direct Purchasers appear at PJA717 ("Schwartzbard Rpt.") and PJA879 ("Schwartzbard Reply"). Dr. Grimm's reports for the End-Payors appear at PJA42 ("Grimm Rpt.") and PJA861 ("Grimm Reb.").

challenged here allowed Defendants to maintain monopoly power, such as the evidence recounted

below showing that, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[12] All of this evidence supports the

conclusion that Defendants' conduct allowed them to maintain monopoly power in a market properly

limited to Tricor and its AB-rated generic equivalents.[13]

Defendants' motion invites this Court to: (a) choose between the above two hotly-disputed

interpretations of the factual and expert record; and (b) reject outright the opinions of Plaintiffs' four

distinguished economic experts and two expert physicians, and ignore disputed material facts. The

Court should decline both invitations. Summary judgment is improper given the multiple disputed

facts in the record. Moreover, even if the Court were going to choose at this stage, it is Plaintiffs'

and not Defendants' conclusions that are consistent with binding law, record evidence, the realities

of the marketplace, and standard economics. Defendants' motion is fatally flawed for the following

reasons:

---

[12]Monopoly power can be proven using either (or both) of two methods: with direct evidence of control over prices (which does not require proof of a relevant product market), or, alternatively, with indirect evidence of a relevant market in which the defendants have dominant shares. *Broadcom Corp. v. Qualcomm, Inc.*, 501 F.3d 297, 307 & n.3 (3d Cir. 2007).

[13]Defendants claim that there are some minor differences among the definitions of the product markets identified by Plaintiffs' various experts in this case, because some phrase the definition as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and others say "▮▮▮▮▮▮▮▮." Def. Br. at 8 n.10. However, the definitions are not meaningfully different. As Dr. Leitzinger and others have explained, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* Leitz. Rpt. at 56 (PJA511); Leffler Reb. at 5 n.8 (PJA1052); King Decl. ¶ 22 n.50 (PJA115). Small differences in markets without competitive significance are legally irrelevant. *See* Phillip E. Areeda & Herbert Hovenkamp, FUNDAMENTALS OF ANTITRUST LAW § 5.02e at 5-14 (3d ed.) (2008 Supp.) ("[o]n occasion, the defendant's share is large enough or too small for legal concern in every plausible market. In that event, choosing among such markets is legally irrelevant") (PJA1466).

-7-

*First*, determinations regarding relevant market and monopoly power are normally reserved for the finder of fact. *E.g.*, *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 199 (3d Cir. 1992). Moreover, these issues are the subject of conflicting expert opinions, which should not be resolved on summary judgment. *E.g.*, *Federal Labs., Inc. v. Barringer Research*, 696 F.2d 271, 275 (3d Cir. 1982). The fact and expert disputes here are many and varied and require a jury to resolve.

*Second*, Defendants' motion contains a fatal fallacy. Defendants acknowledge, as they must, that they are seeking summary judgment on the issue of *monopoly power* – and whether Defendants "wield" or "lack" such power with respect to their branded fenofibrate product, Tricor. Def. Br. at 1, 2. Yet, while the premise of Defendants' motion is that price relationships can be ignored, monopoly power and market definition are undeniably, and fundamentally, about *price*. Indeed, the Supreme Court defines monopoly power as "the power to control price or exclude competition,"[14] and has held that its hallmark is "the ability to raise prices above those that would be charged in a competitive market" profitably without losing substantial sales.[15]

As the law recognizes, a relevant market is defined to help determine whether the challenged conduct allowed the defendant to maintain or enhance monopoly power (*i.e.*, profitably inflate prices above competitive levels).[16] Accordingly, defining a relevant market must focus centrally on price. Specifically, product markets are defined with reference to "reasonable interchangeability" of demand, which involves assessing *both* substitutability of use *and* economic substitutability.

[14]*United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 391 (1956).

[15]*NCAA v. Board of Regents of Univ. of Oklahoma*, 468 U.S. 85, 109 n.38 (1984).

[16]*E.g.*, *Coastal Fuels Inc. v. Caribbean Petro. Co.*, 79 F.3d 182, 197 (1st Cir. 1996) ("[t]he definition of relevant market depends upon economic restraints which prevent sellers from raising prices above competitive levels").

-8-

Determining whether products are properly deemed economic substitutes, and not merely therapeutic ones, is done by assessing cross-price elasticity of demand. *Queen City Pizza, Inc.*, 124 F.3d at 437-38 & n.6. Thus, there is no getting around Defendants' central fallacy: a motion seeking judgment as a matter of law on the issue of monopoly power – which is fundamentally about control over price – cannot hope to succeed by focusing on everything *but* price.

*Third*, focusing on price, as required by controlling law, necessitates *excluding* non-fenofibrate products from the relevant market. This is because, as Defendants have admitted, "the physician . . . is the primary decision maker when it comes to deciding which drug to prescribe," but "a physician's main concern is safety and therapeutic efficacy, not cost." Def. Br. at 4. Accordingly, Defendants' economist has conceded that

. Gilbert Dep. at 245:14-16; *id.* at 245:22-246:1; *id.* at 257:15-16 (PJA1561-62, 1564).

Defendants ask this Court, in effect, to ignore the legal and economic definition of monopoly power, and traditional methods of market definition, *because* price competition is muted between branded dyslipidemia drugs. Def. Br. at 25. However, Defendants' central premise has already been refuted by controlling Third Circuit law. *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056 (3d Cir. 1978) rejected Defendants' argument explicitly. Indeed, *SmithKline* held that a court *must consider* the presence or absence of cross elasticity even when decision-makers are not cost-conscious, and even if functionally similar products would thereby be excluded from the relevant market. *See also Columbia Metal Culvert Co., Inc. v. Kaiser Alum. & Chem. Corp.*, 579 F.2d 20, 28 n.22 (3d Cir. 1978). In other words, the fact that Tricor and other dyslipidemia drugs do not exhibit substantial cross elasticity with each other is *not* a reason to include them in the relevant market – rather, that fact *requires their exclusion*.

-9-

***Fourth***, Defendants' argument that price can be disregarded in assessing monopoly power rests on their assertion that application of controlling law here would lead to "implausible and absurd results." Def. Br. at 2. Once again, the opposite is true:

(a) Defendants do not seriously dispute that, by impeding the entry of generic Tricor, and no other drugs, Defendants successfully interfered with the process by which purchasers would have rapidly substituted the cheaper generic for the brand, causing purchasers to pay more for fenofibrates than they otherwise would have paid. Even Defendants' economist has admitted that ▊▊▊▊▊

▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊. Gilbert Dep. at 68:10-70:8, 98:18-99:15

(PJA1517-18, 1525). Given that the definition of monopoly power is the ability to exclude rivals and charge prices above those which would have prevailed in a competitive market, and given that there is direct evidence showing that Defendants' conduct here allowed them to do just that, settling upon a market definition that implied no consumer harm from Defendants' exclusionary conduct would be fundamentally incoherent. *E.g.*, Leitz. Reb. at 29-30 (PJA1133-34).

(b) Several courts in addition to *SmithKline* have upheld a relevant antitrust market limited to branded and AB-rated generic versions of a single drug. This is so even though, in each of those cases, as here, the drugs at issue typically had small shares of broad therapeutic categories. *E.g.*, *Andrx Pharms. Inc. v. Elan Corp.*, 421 F.3d 1227, 1235-36 (11th Cir. 2005) (controlled release pain medication, naproxen); *Louisiana Whole. Drug Co., Inc. v. Sanofi-Aventis*, 2008 WL 169362, \*7 (S.D.N.Y. Jan. 18, 2008) (branded and generic arthritis drug, Arava); *In re Ciprofloxacin Hydro. Antitrust Litig.*, 363 F. Supp. 2d 514, 522-23 (E.D.N.Y. 2005) ("*Cipro*") (branded and generic antibiotic, ciprofloxacin); *In re Terazosin Hydro. Antitrust Litig.*, 352 F. Supp. 2d 1279, 1319 n.40 (S.D. Fla. 2005) ("*Terazosin*") (branded and generic blood pressure and prostate medication,

-10-

terazosin). On the other hand, ***Defendants can cite no similar case in which summary judgment was granted for the Defendants***.

***Fifth***, multiple genuine issues of material fact exist as to whether fenofibrate could reasonably be considered therapeutic substitutes with a wide array of drugs including statins, niacins, and fibrates. There is a raging debate among the medical and other experts in this case about whether these products – which have different indications, benefits, side-effects, and are marketed to different niche groups of patients – can all be considered reasonably interchangeable. Whether they are, or are not, is for a jury to decide.

Plaintiffs' evidence creates triable questions of fact on the issues of relevant product market and Defendants' possession of monopoly power. Moreover, Defendants' motion is premised on a fundamental error of law and economics, *i.e.*, that ***price*** can be ignored in defining markets and assessing monopoly power. The motion must therefore be denied.

## **ARGUMENT**

## I. **PRODUCT MARKET DEFINITION AND MONOPOLY POWER PRESENT DISPUTED ISSUES OF FACT THAT CANNOT BE SUMMARILY DECIDED**

There is no basis here to depart from the normal rule that "[t]he determination of a relevant product market or submarket . . . is a highly factual one best allocated to the trier of fact." *Fineman*, 980 F.2d at 199; *see also Weiss v. York Hosp.*, 745 F.2d 786, 825 (3d Cir. 1984) ("[m]arket definition is a question of fact"); *Columbia Metal*, 579 F.2d at 28 ("a pronouncement as to market definition is not one of law, but of fact . . . , and as such, a party in a private action may allocate it to the jury").[17]

_____

[17]*See also T. Harris Young & Assoc., Inc. v. Marquette Elec., Inc.*, 931 F.2d 816, 823 (11th (continued...)

-11-

Moreover, the issues of monopoly power and relevant product market here are the subject of intensely disputed expert evidence from economists and physicians. Conflicting expert opinions cannot and should not be resolved by the Court on summary judgment. *See Hill v. Lamanna*, 2007 WL 777007, at *12 (W.D. Pa. Mar. 12, 2007). A court may not resolve "disputed and relevant factual issues on conflicting affidavits of qualified experts." *Federal Labs.*, 696 F.2d at 274. "Nor is it at liberty to disbelieve the good faith statements of experts contained in depositions or affidavits and presented by the non-moving party." *Id.* Simply put, "[w]ho is correct in this battle of experts" should not be decided on summary judgment. *Hill*, 2007 WL 777007, at *12.

## II.    COMPELLING EVIDENCE OF LOW CROSS-PRICE ELASTICITY OF DEMAND BETWEEN TRICOR AND NON-FENOFIBRATE DRUGS REQUIRES A TRIAL ON THE ISSUE OF RELEVANT PRODUCT MARKET (AND THUS MONOPOLY POWER)

"[A] firm is a monopolist if it can profitably raise prices substantially above the competitive level." *Bradburn Parent Teacher Store, Inc. v. 3M*, 2005 WL 1388929, *4 (E.D. Pa. June 9, 2005) (quoting *U.S. v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001)); *Broadcom*, 501 F.3d at 307. Here, monopoly power can be proven using either or both of two distinct methods: (a) direct evidence of Defendants' ability to price fenofibrate above competitive levels, or (b) indirect evidence

---

[17](...continued)

Cir. 1991) (market definition a jury question); *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1489 (9th Cir. 1991) (same). *Town Sound & Custom Tops, Inc. v. Chrysler Motors Co.*, 959 F.2d 468 (3d Cir. 1992) (Def. Br. at 26), is not to the contrary, as the plaintiff there had failed to adduce *any evidence* to rebut defendant's demonstration that other products engaged in *price competition* with defendant's products. *Id.* at 480 & n.16. Here, Defendants have conceded, even insisted, on the absence of price-based switching between fenofibrate and other dyslipidemia drugs.      Moreover, Plaintiffs have rebutted all of Defendants' evidence of therapeutic interchangeability. In *Yeager's Fuel, Inc. v. Pa. P. & L. Co.*, 953 F. Supp. 617, 645 (E.D. Pa. 1997) (Def. Br. at 32 n.81), the court held that relevant market *was* for the jury, and remarked that the defendant's burden of convincing the court otherwise was "substantial."

of Defendants' dominant share of a properly defined relevant market. *Broadcom*, 501 F.3d at 307.

Parts II and III of this brief pertain to the *indirect* evidence of monopoly power upon which Plaintiffs' experts rely. In Part IV, Plaintiffs discuss their experts' un-rebutted findings regarding the *direct* evidence of Defendants' monopoly power. Either form of proof, standing alone, suffices to defeat Defendants' motion.

## A.    Controlling Law Requires That Non-Fenofibrate Drugs Must Exhibit Practical Indicia of Substantial, Positive Cross-Price Elasticity of Demand With Tricor To Be Included In the Relevant Market With Tricor

Defendants admit and even *insist* that cross elasticity between Tricor and other dyslipidemia drugs is low. Because application of binding law would require excluding those drugs from an appropriately defined relevant market, Defendants ask this Court, in effect, to *nullify* the law. Their basis is that physicians are the persons who decide which dyslipidemia drugs to prescribe, but physicians tend not to be cost conscious. Def. Br. at 25. But, cross elasticity cannot be ignored in defining relevant markets – even in the pharmaceutical industry and even if the persons making the purchase decisions are not cost conscious.

Defendants provide no basis for departing from the well-accepted standard for deciding what products belong in a relevant product market: "reasonable interchangeability." *See Queen City Pizza*, 124 F.3d at 436. By law, "reasonable interchangeability" means that products are both close substitutes for the same use (here, therapeutic substitutes) *and* must also be *economic* substitutes. *Id.* at 438 n.6 ("[c]ross elasticity is a measure of interchangeability" and is "the economic tool most commonly referred to in determining what should be included in the market"); *Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 305 F.3d 1124, 1131 (10th Cir. 2002) ("[t]he basic relevant product market test is 'reasonable interchangeability.' *Interchangeability may be measured by, and is substantially*

-13-

*synonymous with, cross-elasticity*") (emphasis added); *Babyage.com, Inc. v. Toys "R" Us, Inc.*, 2008 U.S. Dist. LEXIS 40476, \*4-6 (E.D. Pa. May 19, 2008); *SmithKline*, 427 F. Supp. at 1096, 1100, 1118-19, *aff'd*, 575 F.2d at 1063-65; *Coca-Cola Bott. Co. of Shreveport, Inc. v. Coca-Cola Co.*, 696 F. Supp. 97, 131 (D. Del. 1988) (equating reasonable interchangeability with cross elasticity of demand).[18] Indeed, refuting the entire premise of their motion, Defendants' own economist has recognized that "[p]roduct market boundaries are typically drawn with reference to price elasticities,"[19] and that "[a]ntitrust analysis typically does not dwell on the nonprice aspects of competition." *Id.* at 260:1-12 (PJA1565) (quoting from *id.*, 63 ANTITRUST L.J. at 572 (PJA1655)).

The teaching of all of these cases, learned treatises, and other authorities is that the factfinder may include in the relevant product market *only* those products that exhibit indicia of significant,

---

[18]*See also Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 275 F.3d 762, 767 (9th Cir. 2001) (same); *Bogan v. Hodgkins*, 166 F.3d 509, 516 (2d Cir. 1999) (same); *Auburn News v. Prov. Jnl. Co.*, 504 F. Supp. 292, 302 (D.R.I. 1980) ("almost all products have substitutes: even buses, skywriters and road signs compete with newspapers for advertising. Antitrust law, however, is only concerned with products reasonably interchangeable with one another, in other words, products for which there is some cross elasticity of demand"). Authorities Defendants cite are not to the contrary. *See* ABA Section of Antitrust Law, Antitrust Law Developments 558-61 (6th ed. 2007), *reprinted in* 1-6 Antitrust Law Developments 6B (Lexis) (PJA1425), at notes 53-56 (Def. Br. at 9 n.11) (noting that "reasonable interchangeability of use" is a synonym for cross elasticity); *id.* at note 71 ("[v]irtually all methods of market definition rely on criteria designed to focus, directly or indirectly, on cross-elasticity of demand – whether or not that specific nomenclature is used"); *Nobody in Partic. Presents, Inc. v. Clear Chan. Commc'ns, Inc.*, 311 F. Supp.2d 1048, 1075 (D. Colo. 2004) ("[a]vailable substitutes are demonstrated if, when prices are appreciably raised or volume appreciably curtailed for the product within the geographic area, supply from other sources can be expected to enter promptly enough or in large enough amounts to restore the old price and volume") (Def. Br. at 20 n.43); *Yeager's Fuel, Inc.*, 953 F. Supp. at 645 ("the products in a relevant product market would be characterized by a cross-elasticity of demand") (Def. Br. at 32 n.81).

[19]Gilbert Dep. at 302:11-18 (PJA1576) (quoting from R. Gilbert and S. Sunshine, *Incorporating Dynamic Efficiency Concerns in Merger Analysis: The Use of Innovation Markets*, 63 ANTITRUST L.J. 569, 598 & n.68 (1995) (PJA1681)).

positive cross elasticity. *See Queen City Pizza*, 124 F.3d at 437-38.[20]

Products that are functional substitutes *may* also be economic substitutes, but that is not

always the case. Even Defendants' economist acknowledged that in the pharmaceutical industry,

. *See* Gilbert Dep. at 526:8-11 (Q.

A.                                          ") (PJA1633).

As Plaintiffs' experts discuss at length, Defendants' central mistake is equating the simple fact that

physicians may have a variety of drugs to choose from in treating a myriad of lipid disorders with

a determination that those products are necessarily *economic* substitutes, and thus belong in the same

relevant market.[21]

The law has long recognized that functional similarity is only one of two tests of reasonable

interchangeability – and *not* the one that ultimately matters for market definition.[22] Indicia of cross

---

[20]Moreover, the degree of cross elasticity of demand must be "significant" for products to be in the same relevant market. *See Pontius v. Children's Hosp.*, 552 F. Supp. 1352, 1366 (E.D. Pa. 1982) (citing *Times-Picayune Pub. Co. v. U.S.*, 345 U.S. 594, 612 n. 31 (1953) and *SmithKline,* 575 F.2d at 1063). *See also Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1483 (9th Cir. 1997) ("[a] high cross elasticity of demand indicates that products are close substitutes, and should probably be treated as part of the same market. A low or zero cross elasticity of demand is evidence that products do not compete in the same relevant market").

[21]*E.g.*, Leffler Reb. ¶ 8; *id.* ¶ 13 (
                                                    ) (PJA1053, 1055-57); Leitz. Reb. at 32-33
(PJA1136-37); Schond. Reb. ¶ 10 (
            (PJA1205); King Surreb. ¶ 7 ("
            "); *id.* ¶¶ 33-37 (same) (PJA900-01, 916-19).

[22]*E.g.*, *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 995-99 (11th Cir. 1993) (even though products were interchangeable in the sense that they functioned in the same way, absence of cross elasticity of demand between them prevented products from residing in same market); *U.S. v. Archer-Daniels-Midland Co.*, 866 F.2d 242, 248 & n.1 (8th Cir. 1989) (even though consumers would substitute high fructose corn syrup for sugar, they did not reside in same market because "a (continued...)

-15-

elasticity are crucial in defining markets because "[w]hat constrains the defendant's ability to raise prices . . . is the elasticity of demand faced by the defendant – the degree to which its sales fall as its price rises." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 470 n.15 (1992) ("*Kodak*"). Thus, reasonable interchangeability depends, at root, on whether the products are *economic* substitutes for one another. *See SmithKline*, 427 F. Supp. at 1096, 1100, 1118-19, *aff'd*, 575 F.2d at 1063-65; *Babyage.com*, 2008 U.S. Dist. LEXIS 40476, at *7-8; *Microsoft*, 253 F.3d at 53 ("[t]he test of reasonable interchangeability . . . required the District Court to consider only substitutes that constrain pricing").[23] At trial, that is how the jury would be instructed based on the ABA's most recent model jury instructions.[24] Because cross elasticity is *the* bottom-line measure

---

[22](...continued)
small change in the price of HFCS would have little or no effect on the demand for sugar" and cross elasticity was therefore low); *Hayden Pub. Co. v. Cox Broad. Corp.*, 730 F.2d 64, 70 (2d Cir. 1984) (district court erred in "neglect[ing] the factor of cross-elasticity of demand"). *See also FTC v. Swedish Match*, 131 F. Supp. 2d 151, 158-60 (D.D.C. 2000) ("[f]inding two products to be functionally interchangeable, however, does not end the analysis" and recognizing that cross elasticity of demand is the essential consideration); *FTC v. Staples*, 970 F. Supp. 1066, 1074 (D.D.C. 1997) (finding, on basis of absence of cross elasticity of demand, that products reside in separate product markets despite functional interchangeability).

[23]*See also Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1364 (Fed. Cir. 2004) (expert's "reliance upon technological, rather than economic, substitution is . . . a fatal flaw in establishing his proposed market definition"); *Telecor*, 305 F.3d at 1132 ("[r]easonable interchangeability does not depend on product similarity"); *F.T.C. v. H.J. Heinz Co.*, 246 F.3d 708, 718 (D.C. Cir. 2001) (market definition "focuses solely on demand substitution factors," that is, whether consumers will switch between two products "in response to a small but significant and nontransitory increase in price" for one of them); *Brookins v. Int'l Motor Contest Ass'n*, 219 F.3d 849, 854 (8th Cir. 2000) (same).

[24]*See* ABA, MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES C-7 (2005)("[t]o determine whether products are reasonable substitutes for each other, you should consider whether a small but significant permanent increase in the price of one product would result in a substantial number of consumers switching from that product to another. Generally speaking, a small but significant permanent increase in price is approximately a five percent increase in price[.] * * * *If* you find that such switching *would* occur, *then* you may conclude that the products are in the same (continued...)

of reasonable interchangeability, it would constitute a fundamental legal error to include in the relevant market any non-fenofibrate pharmaceuticals that lack indicia of substantial, positive cross elasticity with Tricor.

Defendants counter all of this authority by proposing a pharmaceutical industry exception essentially out of whole cloth. Defendants' position is not only completely devoid of legal support, but it has been *explicitly rejected* by the Third Circuit in its seminal *SmithKline* decision. Indeed, in *Columbia Metal*, the Third Circuit relied upon *SmithKline* for the proposition that cross elasticity is *the* critical factor in market definition, even where purchasers may be insensitive to price differences and *despite* functional similarities of the products. The court noted that *SmithKline* held that "[m]arket definition *must* take into account the fact that physicians, who regulate use of drugs are not cost-conscious." 579 F.2d at 28 n.22 (emphasis added). And, by "take into account," the Third Circuit meant that the lack of cross elasticity implied by physician price insensitivity required *exclusion* of even therapeutically substitutable drugs from the relevant market. Defendants' suggestion that price insensitivity can be ignored here, therefore, is *directly contrary to binding law*.

Indeed, in *SmithKline,* the district court held that the relevant market was limited to "cephalosporins," and did not include, as Lilly (the defendant) had argued, the entire therapeutic class of antibiotics or anti-infectives, or even the closely related penicillins and other like drugs. 427 F. Supp. at 1092 n.5, 1096. Just as Plaintiffs here state that the relevant product market is (at most) fenofibrate-containing products, SmithKline (the plaintiff) argued that the relevant product market was limited to antibiotics containing cephalosporin. *Id*. at 1116. To defeat SmithKline's case, the

---

[24](...continued)
product market") (emphasis added) (PJA1423).

-17-

defendant argued – much like Defendants do here – that the relevant market should include all of the drugs in the therapeutic class of anti-infectives because "each infectious disease or condition treatable with a cephalosporin is also successfully treatable with at least one other anti-infective drug." *Id.*

The district court rejected the defendant's argument, not because it was untrue that other antibiotics treated the same conditions that cephalosporins did, but rather because that fact was not sufficient to include products in the same relevant market. 427 F. Supp. at 1096. The district court found that:

- "Cross elasticity of demand and price sensitivity do not exist, to any significant degree, between the cephalosporins and other antibiotic or anti-infective drugs." *Id.* at 1096; *id.* at 1100; *id.* at 1118-19.

- "A prescription for a cephalosporin cannot be filled with a non-cephalosporin, such as penicillin, ampicillin or tetracycline. Thus, the hospital physician population, in practice, does not view other antibiotics as reasonably interchangeable with the cephalosporins." *Id.* at 1097.

Instead, the district court limited the market definition to the branded and generic cephalosporins:

- *despite* the existence of obvious functional and therapeutic similarities between cephalosporins and, for instance, penicillin (*id.* at 1097-98);

- *despite* its finding – *refuting Defendants' sole attempt to distinguish SmithKline (Def. Br. at 20, n.43)* – that "[t]here is a certain degree of interchangeability among *all* antibiotic drugs" (*id.* at 1097 (emphasis added); *see also id.* at 1116 ("for certain conditions the cephalosporins and the penicillins are equally effective")); and,

- *despite* the undisputed fact that purchasers *could have chosen* to turn from the higher-priced cephalosporins to penicillin, which was priced several times cheaper and was frequently substituted for cephalosporins (*id.* at 1098, 1100; *id.* at 1116-17).

The district court ultimately held that "there is no ambit of discretion for any rational conclusion other than that cephalosporins per se constitute the relevant product market[.]" *Id.* at 1119.

The Third Circuit affirmed. The court found that, since market definition is "an economic task put to the uses of the law," a court's analysis of the issue must be "directed to basic economic concepts." 575 F.2d at 1063. The court discussed the basic economic concept that underlies market definition: cross elasticity, defined as "the degree by which the amount of a product purchased will change in response to changes in its price." *Id.*

The Third Circuit thus agreed that the relevant market was limited to cephalosporins because it was clear that buyers of cephalosporins would *not* switch to other antibiotics (such as penicillin) in the event of above-competitive-level pricing. As the Third Circuit noted, "[p]rescribing physicians are not cost-conscious in their choices of an antibiotic for a hospitalized patient, and so do not opt for a less expensive over a more costly medication." *Id.* at 1063. Therefore, despite Lilly's evidence showing that "for virtually every purpose for which hospital physicians use cephalosporins, they also use other antibiotics" (*id.* at 1064),[25] the Third Circuit found that "the cephalosporins and non-cephalosporin anti-infectives do not demonstrate significant positive cross-elasticity of demand insofar as price is concerned," and therefore could not be placed in the relevant product market. *Id.* The court held (*id.* at 1065):

> We therefore conclude that the relevant product market, the market where there is true economic rivalry because of product similarity, is that composed of cephalosporin antibiotics; there is neither appropriate interchangeability, price sensitivity, nor cross-elasticity of demand in the broader market of antibiotics.

Thus, the exception Defendants propose does not exist: binding law requires assessing cross elasticity in defining relevant markets in all industries – including pharmaceuticals.

_____

[25]The data on which Lilly relied in *SmithKline* bear a striking resemblance to the irrelevant GE Healthcare data – which ignores price entirely – upon which Defendants place so much reliance here. *See* Def. Br. at 11 n.16.

Defendants assert, wrongly, that *U.S. v. Continental Can Co.*, 378 U.S. 441 (1964), holds that price elasticity is not determinative. Def. Br. at 20. But, as set out above, the Supreme Court and the Third Circuit have repeatedly held that cross elasticity is the critical factor in defining markets. *E.g.*, *Kodak*, 504 U.S. at 470 n.15.[26] And, in *Columbia Metal*, the Third Circuit explicitly criticized (and rejected) the very interpretation of *Continental Can* that Defendants urge here (579 F.2d at 27 n.15), in holding that the absence of substantial priced based switching between aluminum culvert and steel culvert, without more, was sufficient to permit a reasonable jury to exclude steel culvert from the relevant market. *Id.* at 28.[27]

Finally, Defendants' assertion that cross elasticity can be ignored here in favor of other measures of reasonable interchangeability because cross elasticity is "difficult to assess" (Def. Br. at 20) is factually wrong and legally unsupportable. *First,* Defendants have no authority in support of this proposition.[28] *Second,* as shown below, Plaintiffs' experts have provided compelling,

---

[26]*Continental Can* reasons that, in assessing a merger, even though substantial price competition between the products of the merging firms might not *presently* exist, the possibility of *future* price competition warrants including them together in a relevant product market. That is because evaluation of whether the merger will, by diminishing that future price competition, cause prices to rise, is the main point of analyzing a proposed merger. *See id.* at 465-66. Accordingly, *Continental Can* does *not* support ignoring price in defining markets. It stands for the *opposite* proposition.

[27]Nor does *Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98 (3d Cir. 1992), help Defendants. Def. Br. at 10 n.15. The disputed issue of market definition there was tried to a jury, not summarily decided. In fact, Abbott's motion for summary judgment there was *denied* because of the factual dispute. 1991 WL 322977, *1-2 (D.N.J. July 29, 1991). Further, the pertinent issue on appeal was simply whether the pharmacist or the physician was the entity making the ultimate purchase decision, which took on special significance there because the case was about the ability of a manufacturer's *contracts with pharmacies* to exclude or foreclose rivals. *Id.* at 116. That issue is simply not present here, and thus *Barr Labs.* is inapplicable.

[28]Contrary to Defendants' suggestion (Def. Br. at 20 n.43), the *Brown Shoe* factors considered
(continued...)

-20-

empirical, and other formal evidence of cross elasticity – of the same type credited by the Third

Circuit in *SmithKline* and *Columbia Metal* and by countless other decisions. Moreover, Defendants'

own expert has affirmatively conceded that Plaintiffs' experts' conclusions about cross elasticity *are*

*correct*. *Third*, the "practical indicia" of the presence or absence of cross elasticity Plaintiffs'

experts additionally analyze here – *e.g.*, evidence of physician price insensitivity, lack of priced-

based switching between different dyslipidemia drugs – are sufficient and often preferred.[29]  And,

*fourth*, at minimum, there is a genuine issue of material fact in the record regarding the strength of

Plaintiffs' experts' cross elasticity evidence.

In sum, binding law *requires* assessing cross elasticity, and not merely functional similarity,

in defining antitrust product markets in all industries, including the pharmaceutical industry.

**B.    Plaintiffs' Experts Rely Upon Substantial Evidence That Non-Fenofibrate Drugs Exhibit Low Cross Elasticity of Demand With Tricor, and That AB-Rated Generic Versions of Tricor Would Have Exhibited High Cross Elasticity of Demand With Tricor**

Plaintiffs' experts point to a mountain of evidence showing that (a) Tricor exhibits *none* of

the indicia of significant, positive cross elasticity with non-fenofibrate dyslipidemia drugs, and (b)

AB-rated generic versions of Tricor (had they entered unimpeded by Defendants' conduct) would

have exhibited substantial, positive cross elasticity with branded Tricor. All of this evidence clearly

refutes Defendants' assertion that the antitrust market relevant to this case must include all

---

[28](...continued)

in *Nobody in Partic. Presents*, 311 F. Supp.2d at 1082-83, are *proxies for* (not a departure from) cross elasticity. *See Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 219 & n.4 (D.C. Cir. 1986).

[29]*See Fineman*, 980 F.2d at 199-200 ("practical indicia" sufficient); *Columbia Metal*, 579 F.2d at 29 n.30 (mathematical measurements of cross elasticity not presented); *Swedish Match*, 131 F. Supp. 2d at 162-65 (surrogates for cross elasticity preferred over formal measures).

dyslipidemia drugs. Thus, there is no basis to enter summary judgment for Defendants.

**1.    Plaintiffs' experts have concluded that Tricor and non-fenofibrate drugs exhibit low cross elasticity of demand**

All four of Plaintiffs' economists have concluded, based upon compelling record evidence,

that ████████████████████████████████████████████████████. *E.g.,*

Schond. Rpt. ¶¶ 196-207, 213 (PJA633-38, 641); Leffler Rpt. ¶¶ 34-38 (PJA321-24); King Decl. ¶¶

88, 90 (PJA149-50); King Surreb. ¶¶ 33-37 (PJA916-19).   Dr. Schondelmeyer explains that

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████. Schond. Rpt. ¶¶ 158-95 (PJA618-32).

**2.    Defendants' own experts have admitted that Tricor and non-fenofibrate drugs exhibit low cross elasticity of demand**

Defendants' own economist has admitted ████████████████████████

████████████████. Gilbert Dep. at 245:22-246:1 (" ████████████ ") (PJA1561-

62); *id.* at 257:15-16 (" ████████████████████ ") (PJA1564);

*id.* at 245:14-16 (" ████████████████████████████████

████████████████████████████ ") (PJA1461); Gilbert Rpt. ¶¶

21-22 ( ████████████████████████████

████████████████ ) (PJA1300-01).

---

[30]*See also* Leitz. Rpt. at 10 (" ████████████████████
████ ") (PJA465); Leffler Rpt. ¶ 33 (PJA320-31) (same); Schond. Rpt. ¶ 158 (" ████████████

████████████████████████████████ "); *id.* ¶ 164 (PJA618-19, 621); *see also* King Decl.
¶¶ 38-47 (PJA123-29).

-22-

Furthermore, Defendants have recognized that "[i]t is the physician, not the patient/end-user of the product, who is the primary decision maker regarding which drug to prescribe" and "physicians' main concern is safety and therapeutic efficacy, not cost[.]" Def. Br. at 9 & nn. 12-13. Such physician price insensitivity is a primary source of the low cross elasticity between Tricor and non-fenofibrate dyslipidemia drugs. Indeed, Defendants' physician witness, Dr. Jones, testified that

███████████████████████████████████████████████████████

███████████████████████████. P. Jones Dep. at 25:2-15 (PJA1725); *see also* Expert Report of Dr. P. Jones ¶ 15 (DJA-852). To put this evidence in context, the Merger Guidelines of the DOJ/FTC provide that if price increases of greater than 5% do not induce sufficient switching away from the product to make that price increase unprofitable, cross elasticity is insignificant and the products do not belong in the same relevant market.[31] Thus, the evidence – including from Defendants' own witnesses – reveals that cross elasticity between Tricor and non-fenofibrate drugs is clearly below the level sufficient to place all of these disparate drugs in the same relevant market.[32]

---

[31]*See infra* note 44.

[32]Defendants also make the contradictory argument that "[s]ellers of dyslipidemia drugs are careful not to price their products out of line with other branded products in the therapeutic category" and assert that Abbott had to "discount the price of Tricor (through rebates) to managed care organizations in the face of competitive threats such as the launches of new non-fenofibrate dyslipidemia drugs." Def. Br. at 25-26. But, the mere fact that a firm might be "careful not to price their products out of line with" other products does not imply price competition or sufficient (or any) cross elasticity to warrant inclusion in the relevant market. *E.g.*, *Columbia Metal*, 579 F.2d at 29-30 & n.31 (evidence that aluminum culvert manufacturers set prices in relation to prices of steel culvert could not compel conclusion that steel culvert was in the relevant market). Even Defendants' economist agrees that ███████████████████████████████████████████████

██████████████████████████████████████████." Gilbert Dep. at 257:11-16 (PJA1564). *See also* Leitz. Rpt. at 11-12 (PJA466-67). Finally, Defendants' argument falls prey to the "cellophane fallacy," and confuses the economic fact that even monopolists have limits to the prices they can charge (and thus always face price constraints at some point), with (continued...)

3. **Plaintiffs' experts base their conclusions that there is insignificant cross-price elasticity of demand between Tricor and non-fenofibrate drugs on sworn testimony and contemporaneous business documents of the market participants**

Plaintiffs' experts have relied upon testimony of Abbott, Teva, and Impax employees

demonstrating the minimal cross elasticity between Tricor and non-fenofibrate dyslipidemia drugs.

For instance, they cite testimony of Abbott and Teva employees who say

. Schond. Rpt. ¶¶ 163, 197, 199,

202, 207 (PJA620, 633-36, 638); King Surreb. ¶¶ 23-24 (PJA910-11). The experts also cite

testimony of Abbott employees who admitted that Tricor

Leffler Rpt. ¶ 38 (PJA324); *e.g.*, M. Jones Dep. at 466:5-19 (PJA1721).

Plaintiffs' economic experts additionally cite Defendants' contemporaneous internal business

documents, which show, for instance, that

. Schond. Rpt. ¶ 198 (PJA634-35). They also cite

Defendants' forecasts which show that s

. *See*

Leitz. Rpt. at 60 (PJA515). This evidence shows that

---

[32](...continued)

competitive pricing. *Kodak*, 504 U.S. at 471 ("the existence of significant substitution in the event of further price increases or even at the current price does not tell us whether the defendant already exercises significant market power"). But, a product can only be included in a relevant market where "the availability of one effectively limited the price of the other *to the competitive level* or something slightly above." AREEDA & HOVENKAMP ¶ 507a (PJA1474-75) (emphasis added). And, the "competitive level" here is

. Schond. Reb. ¶ 7 (PJA1203-04); Leffler

Reb. at 10 n.22 (PJA1057); King Decl. ¶ 31 (PJA119-20). Thus, the mere fact that Tricor *might* face some small amount of price discipline from other drugs is irrelevant to market definition.

▓▓▓▓▓▓▓▓▓▓▓▓▓. Leffler Rpt. ¶ 38 (PJA324); Schond. Rpt. ¶ 198 (PJA634-35).

Plaintiffs' experts also cite Tricor sales data, which further demonstrates that ▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. *See* Leffler Rpt. ¶¶ 36-37 & Charts

1-2 (PJA322-23, 390-91); Schond. Reb. ¶ 3 & Exhibit A (PJA1202, 1234) (▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓); King Decl. ¶¶ 74-75 & Ex. D.2 (▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓; *id.* ¶ 78 (PJA142-44, 178).

Finally, Plaintiffs' experts cite evidence from employees of Teva and Impax, (a) showing that

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓ Schond. Rpt. ¶¶ 200, 203-204 (PJA635-37); Leffler Rpt. ¶ 38 (PJA324);

King Decl. ¶¶ 23-24, 73 (PJA115-16, 141-42).[33]

In sum, as the plaintiff did in *SmithKline*, Plaintiffs here have proffered substantial evidence

_____

[33]Corporate employees often refer to "markets" for business purposes that are different from relevant product markets defined for antitrust purposes. *See* Dennis W. Carlton and Jeffrey M. Perloff, MODERN INDUSTRIAL ORGANIZATION 804 n.11 (2d ed. 1994) (PJA1342); *FTC v. Staples*, 970 F. Supp. at 1075 ("the mere fact that a firm may be termed a competitor in the overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes"); Leitz. Rpt. at 54. Even so, in several contemporaneous documents, Defendants clearly describe the market relevant to this case as ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓. Therefore, Defendants' citations to documents that say that Tricor "competes" with non-fenofibrate drugs (*e.g.*, Def. Br. at 23 n. 56), are both unpersuasive (because they are not referring to price competition) and disputed.

-25-

demonstrating the lack of "appropriate interchangeability, price sensitivity, [and] cross-elasticity of demand in the broader market of all [dyslipidemia drugs]," 575 F.2d at 1065, and have shown that "changes in the relative amounts of [Tricor] and [non-fenofibrate dyslipidemia drugs] purchased . . . are not directly related to the relative costs thereof." *Id.* at 1064. Thus, the evidence here shows that Tricor and non-fenofibrate dyslipidemia drugs cannot be in the same relevant market.

### 4.    Plaintiffs' experts conclude that AB-rated generic versions of Tricor would have exhibited substantial cross-price elasticity of demand with branded Tricor

Plaintiffs' experts have also concluded that there would have been very high price-based substitution between Tricor and its AB-rated generics had generics not been impeded. Again, cross elasticity measures the "the extent to which consumers will change their consumption of one product in response to a price change in another." *Kodak*, 504 U.S. at 570 n.15. Unimpeded entry of less expensive AB-rated generics – due to the functioning of the AB-rated automatic substitution mechanism[34] – would have involved massive substitution from more expensive Tricor to the lower-priced generics – which is the definition of cross elasticity.[35]   Thus, Plaintiffs' experts have

---

[34]The role AB-rated generic drugs have in bringing price competition to drug markets that were formerly exclusively populated only by brands is unique. Leitz. Reb. at 31 (PJA1135); King Decl. ¶ 40 (PJA123-24); Schond. Rpt. at ¶¶ 86-94 (PJA591-94); *id.* at ¶¶ 15-21 (PJA562-65). Indeed, the Hatch-Waxman Act and the regulatory regime that included this AB-rated substitution mechanism were designed, in material part, as a means to bring substantial price competition, and cross elasticity, to the pharmaceutical marketplace. *See* Leitz. Rpt. at 12-17 (PJA467-72); Leitz. Reb. at 21-23 (PJA1125-27); King Surreb. ¶¶ 33-37 (PJA916-19).

[35]Leitz. Rpt. at 63-65 (█████████████
██████) (PJA518-20); Leffler Rpt. ¶¶ 65-70 (same) (PJA339-44); Leffler Reb. at 4 n.6 (███████████████
███████████████████) (PJA1051);
*see also* King Decl. ¶¶ 58-61 (PJA134-36).

concluded that █████████████████████████████████████████████████████████

████.[36]  Defendants' experts have not rebutted this evidence.[37]

> **5.    Evidence of high cross elasticity between branded Tricor and its AB rated generics, and low cross elasticity between Tricor and non-fenofibrate drugs, necessitates a relevant market limited to Tricor and its AB rated generics**

As recounted above, Defendants have conceded that cross elasticity between Tricor and

non-fenofibrate drugs is low, and do not dispute that cross elasticity between Tricor and AB rated

generics would have been high.  Based on the evidence described above and in their reports,

Plaintiffs' experts have each concluded that █████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████. *See* Leitz. Rpt.

at 54 (" ████████████████████████████████████████████████████

████████████████████████") (PJA509); *id.* at 62 (PJA509, 517); Leffler

Rpt. at ¶¶ 7A, 27 (PJA304, 316-17); Schond. Rpt. ¶¶ 213-214 (PJA641); King Decl. ¶¶ 90-93

---

[36]*E.g.*, Schond. Rpt. ¶¶ 208-212 ████████████████████████
████████████████████████████ ) (PJA638-40); King Decl. at ¶¶ 33-35 (same); *see also id.* ¶¶ 48-57, ¶¶ 58-61 (PJA120-21, 129-136); Leitz. Rpt. at 29-30 & nn. 68-69 (███████
██████████); *id.* at 47 n.125 (█████████████████████) (PJA484-85, 502).

[37]Defendants suggest that Plaintiffs' expert reports are lacking in factual foundation and ignore "real-world" evidence. Def. Br. at 18 & n.36. As the copious references to the discovery record cited in Plaintiffs' expert reports show, that is clearly false. Defendants also argue that their evidence about how physicians "actually prescribe[]" drugs is more "empirical" than Plaintiffs' evidence.  *Id.* at 1, 2, 12, 36 & n.87.  Defendants say that their expert's "empirical data" is "conclusive and flatly contradicts Plaintiffs' claims." *Id.* at 13.  But, Defendants do not even contest the absence of cross elasticity between Tricor and non-fenofibrate drugs. Moreover, Plaintiffs' experts present abundant empirical and other evidence on the subject of cross elasticity. *See, e.g.*, Schond. Rpt. at ¶¶ 197-98 (PJA633-35); King Decl. ¶¶ 76-84 (PJA143-48). Finally, as shown above, "practical indicia" of cross elasticity are more than sufficient. *See supra* note 29.

(PJA150-53).[38]  Such high shares indisputably show substantial monopoly power.

Plaintiffs' experts' findings are not merely consistent with controlling Third Circuit law and record evidence, but also with the decisions of every other court to have reviewed relevant markets in cases involving anticompetitive efforts by manufacturers to impede generic competition.[39]  All of these recent decisions have found relevant markets limited to a brand and its AB rated generics cognizable and/or worthy of going to a jury – even though all of these cases, like this one, involved drugs with only small shares of broad therapeutic categories.  *No case or authority supports resolving this issue in Defendants' favor on summary judgment.*

Defendants object to Plaintiffs' experts' conclusions about the appropriate relevant market – and by inference to all seven of the decisions just cited – on the ground that "it is rare for a branded drug to compete on price with its AB-rated generic" (Def. Br. at 28), and thus if price mattered in defining markets, the relevant market would not include Tricor (and only include Tricor's AB-rated generics).  Def. Br. at 29-30; *see also id*. at 30.  Defendants are wrong as a matter of fact and law.

As discussed above, what matters in defining markets is cross elasticity: *i.e.*, the effect of a price increase of product A on the sales volume of product B.  Here, as reviewed in Part II.B.4 above, the evidence shows that the unimpeded market entry of lower-priced, AB-rated generic fenofibrate

---

[38]Defendants falsely imply that Plaintiffs impermissibly seek a "single brand" as a relevant product market. But, the relevant market advocated by Plaintiffs' experts includes all firms that would have and did supply branded and generic Tricor, which is thus not a "single brand." *Xerox Corp.*, 511 F. Supp. 2d at 384-85 & n.7. Even if Plaintiffs had alleged a "single brand" product market, that would not have been impermissible. *See Kodak,* 504 U.S. at 481-82.

[39]*See Andrx Pharma.*, 421 F.3d at 1235-36; *Louisiana Whole. Drug Co., Inc.*, 2008 WL 169362 at *7; *Cipro*, 363 F. Supp.2d at 522-23; *Terazosin*, 352 F. Supp.2d at 1319 n.40; *Knoll Pharma. Co., Inc. v. Teva Pharms. USA, Inc.*, 2001 WL 1001117, *3-4 (N.D. Ill. Aug. 24, 2001); *In re Cardizem CD Antitrust Litig.*, 105 F. Supp.2d 618, 680-81 (E.D. Mich. 2000); *Mutual Pharm. Co., Inc. v. Hoechst Marion Roussel, Inc.*, 1997 WL 805261 (E.D. Pa. Dec. 17, 1997).

would have caused rapid substitution of less-expensive generic fenofibrate for branded fenofibrate (Tricor), such that Defendants would have lost nearly all of the fenofibrate market in a matter of months. A brand company might *choose*, for business reasons, not to lower its price to try to prevent losses to the AB-rated generic (Def. Br. at 28-29 & n.72), and instead sell the brand at premium prices to a vanishingly small core of "brand loyal" patients. *Id.* at 29 & n.73. *See also* Lloyd Dep. at 61:12-62:4 (PJA1727-28) (                                                                    ). But that strategy does not indicate the absence of cross elasticity: in fact, given that the market shifts almost entirely to the cheaper product upon entry, it shows just the opposite. Schond. Rpt. ¶¶ 210-11 (PJA639-40); King Surreb. ¶¶ 28-29 (PJA913-15).[40]

*Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485 (2d Cir. 2004), which Defendants cite in support of their assertion that brands and AB-rated generics do not "compete" and thus cannot be in the same market (Def. Br. at 31 n. 80), *supports Plaintiffs*, not Defendants. *Geneva* involved a generic manufacturer's (Geneva's) antitrust claim against a rival generic manufacturer (Barr), alleging an unlawful agreement to block access to the active ingredient needed to manufacture warfarin. The district court had granted summary judgment for the defendant, holding that the relevant market included both Coumadin (the brand) and generic warfarin. *Id.* at 494. The

---

[40]Moreover, Plaintiffs' economic experts review abundant evidence that

. King
Surreb. ¶¶ 44-47 (                         ) (PJA925-28); Leitz. Class Decl. at 37 n.80 (PJA38). *See also*
Gilbert Dep. at 523:11-530:6 (
) (PJA1632-34). In any event, there is no functional difference, from a consumer welfare perspective, whether impeding competition keeps prices high because it allows the incumbent to avoid having to compete on price with rivals or simply prevents the incumbent from ceding nearly all of the market to lower priced rivals. Either way, a brand's efforts to impede AB-rated generic competition keeps prices artificially high and harms consumer welfare,
. Gilbert Dep. at 68:10-70:8, 98:18-99:15 (PJA1517-18, 1525).

-29-

Second Circuit reversed, holding that the market was even narrower than the district court believed: "the relevant market for our purposes is the market for generic warfarin sodium tablets." *Id.* at 500.[41]

*First*, and critically, *Geneva* rejected the entire premise of Defendants' motion, *i.e.*, the notion that price does not matter in pharmaceutical cases and that markets must be defined based on therapeutic substitutability alone. In *Geneva*, the court excluded even a perfect *therapeutic* substitute from the relevant market (the branded form of the drug molecule) based on price-based evidence.

*Second*, *Geneva* is a good example of why "



" *See* Gilbert Dep. at 248:16-250:3

(PJA1562-63); *see also id.* at 248:12-24 (

") (PJA1562).[42] In *Geneva*, it makes

---

[41]Notably, on remand, the question of whether the market comprised only generics or also included the brand was deemed a triable dispute. *See Geneva*, 2005 WL 2132438 (S.D.N.Y. Sept. 6, 2005).

[42]Defendants themselves acknowledge this same fundamental point in their own attempt to distinguish *Geneva*. Def. Br. at 31 n.80 (explaining that "the allegations in that case were much different than those at bar" as a reason to reject that court's narrow relevant market). By inconsistently applying this principle, however, Defendants find purported contradictions and "absurdities" where none exists. For instance, Defendants argue that (a) Plaintiffs' experts' proposed market definition here somehow means that mergers between branded companies could never be found to harm competition (Def. Br. at 32), and (b) Dr. Leitzinger somehow acted inconsistently when, in a different case, involving different conduct (a dominant brand's exclusion of *another brand*) and different alleged effects, found the relevant market included multiple brands. Def. Br. at 19 n.42. But, again, one assesses a relevant market only with reference to the conduct and claims at issue (and the facts in particular cases), and there is nothing problematic or contradictory about a relevant market including only generics in one case (*Geneva*), the brand and its AB rated equivalents in others (*e.g.*, *Cipro*, *Terazosin*), and all brands in still another (*e.g.*, a merger case involving all statin manufacturers). It was for this reason that Prof. Gilbert testified that he

(continued...)

sense to limit the relevant market to the generic versions of warfarin because the anticompetitive conduct there involved one generic manufacturer impairing another generic rival *after the brand had already effectively ceded the market to the AB-rated generics*. As the court stated, "the totality of the evidence convinces us that *once Barr entered the market*, the market *became* segmented so that Coumadin [the brand] and Barr each had smaller, distinct customer groups. *After the initial segmentation*, Barr's price was impacted much more by Geneva's entry than by Coumadin [the brand]." *Id.* at 500 (emphasis added).

This case is markedly different from *Geneva*. *Geneva* involved one generic impeding competition from *another generic*. Here – just like the seven decisions cited above where a brand impedes the entry of generics (*see supra* note 39) – a brand's conduct blocked generic competition *with the brand* by impeding AB-rated generic substitution. Moreover, Defendants' conduct here *preceded* the segmentation that would have occurred upon unimpeded generic entry. As a result, the markets never had a chance to become segmented into (a) the small band of brand loyalists, and (b) the vast majority who benefit from the price benefits of generics.

Accordingly, the logic of *Geneva* does *not* suggest that Tricor is in a separate market from its own AB-rated generics for purposes of assessing the conduct challenged in this case. Rather, the reasoning of *Geneva* refutes Defendants' argument that the product market must include all brands in a therapeutic class. And, *Geveva* supports Plaintiffs' experts' findings that the market appropriate for assessing the competitive effects of conduct occurring *prior to* "segmentation" – and indeed

---

[42](...continued)

■■■■■■■■" Gilbert Dep. at 248:25-249:7 (PJA1562). *See also, e.g., U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 598 (1st Cir. 1993) (courts must ask "what is the antitrust question in this case that market definition aims to answer?").

-31-

conduct taken to *prevent* segmentation of the fenofibrate into brands and generics – *is* Tricor and its

AB rated generics, just as the seven prior cases have found.[43]

## C.    The Horizontal Merger Guidelines Demonstrate That The Relevant Market Is Limited To Tricor and AB-Rated Generic Versions of Tricor

Plaintiffs' experts also support their analyses with the well-accepted method adopted in the

DOJ/FTC Horizontal Merger Guidelines. *See Babyage.com, Inc.*, 2008 U.S. Dist. LEXIS 40476,

*5-6 (endorsing use of Merger Guidelines in relevant market analysis in monopolization case).[44] The

Merger Guidelines employ a structured approach to using cross elasticity to define markets. *See*

Schond. Reb. ¶ 9(PJA1205)

). Dr. Leitzinger explains the method as follows:



Leitz. Rpt. at 54-55 (PJA509-10). The "competitive level" for fenofibrate prices in this case is that

which                                                                                    Schond. Reb. ¶ 7

(PJA1203-04); *see also* Leffler Reb. at 10 n.22 (

) (PJA1057);

---

[43]*See also In re Lorazepam & Cloraz. Antitrust Litig.*, 467 F. Supp. 2d 74, 81-82 (D.D.C. 2006) (though identical, branded lorazepam not in same relevant market with generic lorazepam, and branded clorazepate not in same relevant market with generic clorazepate, because "[t]he fact that products are just functionally interchangeable does not compel a finding that they belong in the same market"). For the reasons stated above, *Lorazepam*, too, supports *Plaintiffs* and not Defendants.

[44]*See* DEPARTMENT OF JUSTICE AND FEDERAL TRADE COMMISSION, HORIZONTAL MERGER GUIDELINES § 1.11 (1997) (available at http://www.usdoj.gov/atr/public/guidelines/hmg.htm) (PJA1343); *see also* 2A Areeda & Hovenkamp, ANTITRUST LAW ¶¶ 536-37 (describing method) (PJA1478-86).

King Decl. ¶ 31 (PJA119-20).

Using the evidence reviewed above, Plaintiffs' economic experts have concluded that



.[45] As Defendants themselves predicted,

*E.g.*,

Abbott_Tricor718 (PJA1492). Under the Merger Guidelines, therefore, Tricor and its AB-rated generics is the appropriate relevant market for this case.

Defendants' contention that the Merger Guidelines are inapplicable because they only apply to mergers (Def. Br. at 28-32) is simply incorrect. In addition to the recent *Babyage.com* decision cited above, courts have frequently followed the Merger Guidelines in defining markets in non-merger cases. *See also, e.g., Hynix Semiconductor Inc. v. Rambus Inc.*, 2008 WL 73689, *3, 10-11 (N.D. Cal. Jan. 5, 2008) (stating that Merger Guidelines are used to derive "traditional product market definition of close economic substitutability," and criticizing Defendants' expert here, Prof. Gilbert, for failing to use Merger Guidelines' "price increase [test] to determine if the technologies are close economic substitutes such that they constitute a relevant market").[46]

---

[45]*E.g.*, Leitz. Rpt. at 55 (

) (PJA510); Schond. Reb. ¶ 3 (    ) (PJA1202); King Decl. ¶¶ 62-84; *see also id.* ¶¶ 71, 88 (PJA137-49); King Surreb. ¶¶ 18-30 (PJA908-15).

[46]*See also Del. Health Care, Inc. v. MCD Holding Co.*, 957 F. Supp. 53, 543 (D. Del. 1997) (continued...)

-33-

In sum, Plaintiffs' experts' use of the Merger Guidelines to bolster their relevant market analyses, at minimum, raises disputed issues of fact.

## III. SUBSTANTIAL EVIDENCE OF THE LACK OF THERAPEUTIC INTERCHANGEABILITY BETWEEN TRICOR AND NON-FENOFIBRATE DRUGS REQUIRES A TRIAL ON THE ISSUE OF RELEVANT PRODUCT MARKET (AND THUS MONOPOLY POWER)

As shown above, evidence that one drug is therapeutically interchangeable with another is *insufficient*, standing alone, to include both together in a relevant antitrust market. *Economic* substitutability must also be shown. Proof of therapeutic interchangeability is, nonetheless, a necessary condition of reasonable interchangeability. Fatal to Defendants' motion, however, the evidence concerning whether non-fenofibrate drugs are therapeutically interchangeable with Tricor is hotly disputed. Therefore, summary judgment on the issue of therapeutic interchangeability, as well as economic substitutability, is unwarranted.[47]

Plaintiffs have adduced substantial evidence – including evidence from Defendants' own internal documents – showing that Tricor ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ *See* Schwartzbard Rpt. ¶¶ 56-63 (expert cardiologist details basis for his

opinion that ▮▮▮▮▮▮

---

[46](...continued)

(denying summary judgment where plaintiff's expert's analysis was "consistent with the Merger Guidelines" test); *see also I.D. Sec. Sys. Canada, Inc. v. Checkpoint Sys., Inc.*, 198 F. Supp. 2d 598, 605-09 (E.D. Pa. 2002); *Nilavar v. Mercy Health Sys.*, 2007 WL 2264439, *7 (6th Cir. Aug. 7, 2007); *Unitherm Food Sys., Inc.*, 375 F.3d at 1364; *Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 2008 WL 113987, *3-4 (E.D. Ky. Jan. 7, 2008).

[47]Plaintiffs incorporate by reference Part IV.C. of Teva's and Impax's Answering Brief in Opposition to Defendants' Motion for Summary Judgment on Relevant Market Definition.



") (PJA737-

39); Schwartzbard Reply ¶¶ 27-31(further support for his opinion that Tricor ▮

) (PJA889-90); Grimm Rpt. at 10-12 (explaining

(PJA53-55);[48] Schond. Rpt. ¶¶ 172-195 (p▮

) (PJA624-32).

Plaintiffs' economists have also evaluated Defendants' internal marketing documents and

related testimony in support of their respective findings that ▮

. *See* Leitz. Rpt. at 59-62 (PJA514-17); Leffler Rpt. ¶ 39 (PJA324-25);

King Decl. ¶¶ 23-27 (PJA115-18). For instance, one such document states flatly that Tricor ▮

Tricor 2005 Marketing Plan, Executive Summary, at

Abbott_Tricor000010 (PJA1809). Plaintiffs' proffered evidence thus creates genuine issues of

material fact on therapeutic interchangeability that cannot be decided on summary judgment.

## IV.    SUBSTANTIAL DIRECT EVIDENCE OF DEFENDANTS' MONOPOLY POWER REQUIRES A TRIAL

As an alternative to the "indirect" method of proving monopoly power by defining a relevant

market (and assessing whether Defendants had a dominant share of it), the Third Circuit permits

Plaintiffs to prove monopoly power without defining a relevant market at all, and instead using

**direct evidence** of Defendants' ability to control prices and exclude competitors. "If a firm can

---

[48]Defendants cite Dr. Grimm's testimony that ▮
▮. Def. Br. at 18-19. But, this supports *Plaintiffs'* point that
the differences between these drugs are real, that they each have unique properties, and thus that they
are *not* freely interchangeable as Defendants suggest.

profitably raise prices without causing competing firms to expand output and drive down prices, that firm has monopoly power." *Broadcom*, 501 F.3d at 307. Because the whole purpose of market definition is to help identify monopoly power and identify whether the conduct would have anticompetitive effects,[49] market definition is superfluous when direct proof of monopoly power and anticompetitive effects exists. *Id.* at 307 n.3 ("direct proof of monopoly power does not require a definition of the relevant market"); *see also id.* ("market share and barriers to entry are merely surrogates for determining the existence of monopoly power").[50] Accordingly, Defendants' motion for summary judgment should be denied based on Plaintiffs' direct proof *alone*.[51]

## A.   Plaintiffs Have Produced Abundant Direct Evidence of Defendants' Monopoly Power

Through their experts, Plaintiffs have produced three interrelated types of direct evidence of monopoly power, and have therefore at the very least created a triable dispute.[52]

*First*, Plaintiffs have produced substantial evidence that Defendants, through their scheme

---

[49]*Gordon v. Lewistown Hosp.*, 423 F.3d 184, 210 (3d Cir. 2005) (*cited in* Def. Br. at 6 n.7) ("Market power, the ability to raise prices above those that would otherwise prevail in a competitive market, is essentially a surrogate for [anticompetitive] effects.").

[50]*See also Pepsico, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 107-108 (2d Cir. 2002). *See generally* Eric L. Cramer and Daniel Berger, "The Superiority of Direct Proof of Monopoly Power and Anticompetitive Effects in Antitrust Cases Involving Delayed Entry of Generic Drugs," 39 U.S.F. L. REV. 81, 104-14 (2004) (PJA1380).

[51]*E.g., Re/Max Int'l v. Realty One, Inc.*, 173 F.3d 995, 1016 (6th Cir. 1999) (even where, unlike here, "the plaintiffs failed to define the relevant market with precision and therefore failed to establish the defendants' monopoly power through circumstantial evidence," summary judgment inappropriate because "there does exist a genuine issue of material fact as to whether the plaintiffs' evidence shows direct evidence of a monopoly, that is, actual control over prices or actual exclusion of competitors").

[52]Notably, Defendants' economist, Prof. Gilbert,

Gilbert Dep. at 49:21-50:11 (PJA1512-13).

-36-

to suppress AB-rated generic competition, possessed and maintained the power to prevent fenofibrate prices from falling to competitive levels (*i.e.*, to the price that would have prevailed had generic competition been unimpeded). *See, e.g.,* Leitz. Rpt. at 42 (PJA497) (███████████████

████████████████████████████████████████████████████████████

███████).[53]

A mountain of evidence, including from Defendants' own files, confirms Plaintiffs' experts' findings that,███████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████[54] Only by impeding generic competition were Defendants able to maintain their supracompetitive prices without losing substantial sales.[55]

***Second***, Plaintiffs have produced substantial evidence that, through the challenged conduct,

---

[53]*See* Leitz. Rpt. at 45-53; *id.* at 48; *id.* at 50 (PJA500-08); Leitz. Reb. at 22 (PJA1126); Leffler Reb. ¶ 7 (PJA1052-53).

[54]*E.g.*, Leitz. Rpt. at 67-82 (PJA522-37); Leffler Rpt. ¶¶ 64-99 (PJA339-55); King Damages Decl. at 3-7 (PJA191-95); Guerin-Calvert Rpt. at Ex. 1 (PJA1297) (████████████████
███████████████).

[55]Defendants' citation to *In re Remeron Antitrust Litig.*, 367 F. Supp.2d 675 (D.N.J. 2005) (Def. Br. at 38-40), does not help them. ***First***, that court denied plaintiffs' motion for summary judgment; it did *not* grant summary judgment for defendants or find direct evidence inadmissible. ***Second***, the court in *Remeron* said that mere price differential between a brand and a generic does not imply the brand has monopoly power. *Id.* at 683. But, that is *not* what Plaintiffs' experts *here* have opined. Rather, Plaintiffs' experts here point to███████████████████████████
████████████████████████████████████████████████████████
██████████████████). Thus, Plaintiffs' experts here are *not* pointing to a "mere" price differential between two products, but rather to the fact that the brand would not be able to maintain premium prices without losing substantial sales absent the challenged conduct – the very definition of monopoly power. ***Third***, *Remeron* was decided *before* the Third Circuit issued *Broadcom*, which has now clarified that direct evidence is indeed admissible and cognizable in this Circuit as sufficient proof of monopoly power.

Defendants were able to █████████████████████████████████████████████████

██████████████████████████████████████████. Leffler Rpt. ¶ 22 (PJA313-14).

Had AB-rated generic entry been unimpeded, the evidence is that Defendants ████████████

████████████████████████. That is classic direct evidence of monopoly power, because prices

in a competitive market fall to marginal cost or something slightly above.[56] Indeed, Prof. Gilbert

himself previously endorsed a similar direct method of "investigating when market power is an issue

for antitrust purposes." Gilbert Dep, Ex. 15 at 33 (PJA1717). As he stated, "antitrust asks . . . in a

unilateral conduct case, is there conduct that leads to either higher price-cost margins or sustains

price-cost margins in ways that are anticompetitive." *Id.*[57] Thus, evidence that the challenged

conduct preserved Defendants' ability to sustain high price-cost margins is direct proof of the

maintenance of monopoly power.

*Third*, Defendants correctly point out that it is improper to simply *presume* that the power

to exclude generic rivals flowing from a patent confers monopoly power. Def. Br. at 6, 39.

Accordingly, Plaintiffs have followed a direct evidentiary approach for assessing monopoly power

███████████████████████████: comparing (a) Defendants' profits and revenues in a world with

infringing competition, to (b) their profits and revenues in a world without such competition. █████

███████████████████████). Applied here, that methodology provides powerful direct evidence that

Defendants maintained monopoly power by impeding AB-rated generics. Indeed, in one internal

analysis, Defendants found ████████████████████████████████████████████████

---

[56]Landes & Posner, *Market Power in Antitrust Cases*, 94 HARV. L. REV. 937, 939 (1981)
(PJA1304); *see also* Leitz. Reb. at 26-27 (PJA1130-31).

[57]Dr. Gilbert also testified that ████████████████████████████████
████████████████████████ Gilbert Dep. at 240:12-14 (PJA1560).

(PJA585-86) (citing Abbott_Tricor718-19 (PJA1492-93)); Leitz. Rpt. at 45-53 (PJA500-08).

Thus, Defendants' own economist's methodology for assessing monopoly power directly reveals that Defendants possessed substantial monopoly power.[58] The jury would be entitled to hear that direct evidence of monopoly power even if Plaintiffs' experts had not defined a relevant market at all. *E.g., Broadcom*, 501 F.3d at 307 n.3; *Re/Max, supra* note 51.

## B. Direct Evidence of Defendants' Monopoly Power Corroborates Plaintiffs' Proposed Product Market Definition

Finally, the evidence supports limiting the relevant market to Tricor and its AB-rated generics because it is the only market that makes sense of the direct economic evidence of competitive harm:

---

[58]Seeking to rebut the direct evidence of the anticompetitive character of their conduct, Defendants argue – *without support from any of their experts* – that there is "no evidence that defendants have restricted output of fenofibrate." Def. Br. at 5 ¶ 10, 38. That is both incorrect and immaterial. *First*, Plaintiffs have produced substantial evidence that Defendants' challenged conduct dramatically suppressed sales of less-expensive AB-rated generic versions of Tricor. The anticompetitive character of such conduct, regardless of what happens to output, "cannot be seriously debated." *Valley Drug Co. v. Geneva Pharms., Inc.*, 344 F.3d 1294, 1311 & n.27 (11th Cir. 2003). *Second*, Defendants' argument is premised on their assertion that overall fenofibrate sales volume (brand plus generic) would have dropped had generics entered unimpeded. But that is a question of fact ▮▮▮▮▮▮▮▮▮▮. *E.g.*, Leitz. Rpt. at 70-72 (PJA525-27); Singer Reply Decl. ¶¶ 7-12 (PJA1246-50); Leffler Reb. ¶¶ 40-49 (PJA1074-84); Leitz. Reb. at 42-52, 65-66 (PJA1146-56, 1169-70). *Third*, there is compelling evidence that consumers benefit from the lower prices conferred by unimpeded generic competition. Such lower prices by themselves constitute an unalloyed benefit that the antitrust laws are designed to protect. *E.g., Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 789 (6th Cir. 2002) (evidence of higher prices and reduced consumer choice, despite reduced output, each sufficiently supported jury finding of anticompetitive effect). ▮▮▮▮▮▮▮▮▮▮. To argue that conduct that prevents lower prices is not anticompetitive – because output might go down as well as prices – is a perverse misuse of antitrust law. "[T]he goal of antitrust law is to use rivalry to keep prices low for consumers' benefit. Employing antitrust law to drive prices up would turn the Sherman Act on its head." *Wallace v. Int'l Bus. Mach. Corp.*, 467 F.3d 1104, 1107 (7th Cir. 2006) (Easterbrook, J.).



Leitz. Reb. at 29-30 (PJA1133-34).

## CONCLUSION

Given Defendants' admissions regarding the absence of cross elasticity between Tricor and non-fenofibrate dislipidemia drugs, it is *Defendants'* proposed relevant market that is inconsistent with the facts and controlling law. Further, Plaintiffs' direct proof of monopoly power – most of it completely unrefuted – would be sufficient, by itself, to require a trial. Finally, there are genuine issues of material fact about whether all of the disparate drugs in the dyslipidemia class are medically interchangeable. Respectfully, for all of the foregoing reasons, Defendants' motion must be denied.

Respectfully submitted,

*/s/ Jeffrey S. Goddess*
Jeffrey S. Goddess (Del. Bar No. 630)
Jessica Zeldin (Del. Bar No. 3558)
Rosenthal, Monhait & Goddess, P.A.
919 Market Street, Suite 1401
P.O. Box 1070
Wilmington, DE 19899-1070
jgoddess@rmgglaw.com
jzeldin@rmgglaw.com
(302) 656-4433
Liaison Counsel for Direct Purchaser Class

*/s/ Elizabeth M. McGeever*

Elizabeth M. McGeever (Del. Bar No. 2057)
Prickett Jones & Elliott, P.A.
1310 King Street
P.O. Box 1328
Wilmington, DE 19899
emmcgeever@prickett.com
(302) 888-6521
Counsel for Walgreen Co., Eckerd Corporation,
The Kroger Co., Maxi Drug, Inc. d/b/a Brooks
Pharmacy, Albertson's Inc., Safeway, Inc.,
Hy-Vee, Inc., American Sales Company, Inc.
CVS Pharmacy, Inc., Rite Aid Corporation and Rite
Aid Hdqtrs. Corp.


*/s/ A. Zachary Naylor*

A. Zachary Naylor (Del. Bar No. 4439)
Chimicles & Tikellis LLP
One Rodney Square
P.O. Box 1035
Wilmington, DE 19899
zacharynaylor@chimicles.com
(302) 656-2500
Liaison Counsel for Indirect Purchaser Class


*/s/ Jonathan L. Parshall*

Jonathan L. Parshall (Del. Bar No. 3247)
Murphy & Landon
1011 Centre Road, Suite 210
Wilmington, DE 19805
jonp@msllaw.com
(302) 472-8100
Attorneys for Pacificare Health Systems, Inc.

-41-

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

IN RE: TRICOR DIRECT PURCHASER )
ANTITRUST LITIGATION )
                                  )
THIS DOCUMENT RELATES TO: )      C.A. No. 05-340 (SLR)
ALL ACTIONS )      CONSOLIDATED
                                    )

IN RE: TRICOR INDIRECT PURCHASER )
ANTITRUST LITIGATION )
                                  )
THIS DOCUMENT RELATES TO: )      C.A. No. 05-360 (SLR)
ALL ACTIONS )      CONSOLIDATED
                                    )

## COORDINATED PURCHASER PLAINTIFFS' RESPONSE
## TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS
## ON RELEVANT MARKET DEFINITION

For purposes of clarifying the evidentiary record, the Coordinated Purchaser Plaintiffs,

consisting of the Direct Purchaser Class Plaintiffs, the Individual Direct Purchaser Plaintiffs

(composed of Walgreen Co., Eckerd Corporation, The Kroger Co., Maxi Drug, Inc. d/b/a Brooks

Pharmacy, Albertson's, Inc., Safeway, Inc., Hy-Vee, Inc., CVS Pharmacy, Inc., Rite Aid Corporation,

Rite Aid Hdqtrs. Corp., and American Sales Company, Inc.), the End-Payor Class Plaintiffs, and

Pacificare Health Systems, Inc. ("Plaintiffs") respond as follows to the Statement of Undisputed Facts

contained in the Opening Brief in Support of Defendants' Motion for Summary Judgment on Relevant

Market Definition:

**1.** **The physician, not the patient/end-user of the product, is the primary decision maker when it comes to deciding which drug to prescribe. In making prescribing decisions, a physician's main concern is safety and therapeutic efficacy, not cost.**

PLAINTIFFS' RESPONSE:

1.    Undisputed. By way of further response, this statement compels denial of Defendants' motion, because under controlling Third Circuit law this statement means that Tricor does not exhibit sufficient cross-price elasticity of demand with any non-fenofibrate drugs used to treat dyslipidemia to permit inclusion of such non-fenofibrate drugs in the relevant antitrust product market with Tricor. Even Defendants' own economist admits that physicians are not price sensitive. Expert Report of Richard J. Gilbert, Ph.D. ("Gilbert Rpt.") ¶¶ 21-22 (

) (PJA1300-01).[1]

By way of further response, even if Defendants had not admitted it, Plaintiffs have adduced substantial record evidence from which a reasonable jury could find that physicians are not price-sensitive, and that this contributes to low cross-price elasticity of demand between Tricor and non-fenofibrate drugs. Expert Report of Stephen W. Schondelmeyer, Pharm.D., Ph.D. ("Schond. Rpt.")

¶ 158 (

)

(PJA618-19); *id.* ¶ 164

) (PJA621); *id.* ¶¶ 159-63 (PJA619-20). *See also* Expert Report

of Jeffrey J. Leitzinger, Ph.D. ("Leitz. Rpt.") at 10 (

---

[1]References to "PJA___" cite the Appendix of Coordinated Purchaser Plaintiffs on Market Definition Issue, filed concurrently herewith.



) (PJA465); Report of Keith B. Leffler ("Leffler Rpt.") ¶ 33

) (PJA320-21).

Illustrating this lack of physician price sensitivity, Defendants' own testifying physician, Peter

Jones, M.D., testified that

. Deposition of Peter Howard Jones at 25:2-25 (PJA1725); Expert Report of Dr.

Peter Howard Jones ¶ 15 (same) (DJA-852).

**2.     Since launching TriCor in 1998, Abbott has invested**
**. Abbott's**
**promotional spending for TriCor in the first four years after its initial launch alone**
**.**

PLAINTIFFS' RESPONSE:

2.     Undisputed. By way of further response, this statement militates toward denial of

Defendants' motion, because such promotion tends to *lower* cross-price elasticities of demand

between Tricor and non-fenofibrate drugs, since it increases the perception that Tricor and non-

fenofibrate drugs are significantly differentiated and thus not therapeutically interchangeable.

Schond. Rpt. ¶¶ 183-87 (PJA628-29).

**3.     Physicians make prescribing decisions for their dyslipidemia patients by assessing**
**a wide variety of factors, with emphasis on the patients' lipid profiles.**

PLAINTIFFS' RESPONSE:

3.     Undisputed in part and disputed in part. It is disputed that physicians necessarily

emphasize lipid profiles in selecting a treatment for abnormal blood lipids (dyslipidemia). Plaintiffs

incorporate by reference Part IV.C. of Teva's and Impax's Answering Brief in Opposition to

-3-

Defendants' Motion for Summary Judgment on Relevant Market Definition as though fully set forth at length herein.

Still by way of further response, this statement, even if true, militates toward denial of Defendants' motion, for at least two reasons. First, Plaintiffs have adduced substantial record evidence from which a reasonable jury could find that physicians make prescribing decisions for patients with dyslipidemia on bases other than price, which renders cross-price elasticity of demand between Tricor and non-fenofibrate drugs low. *See* ¶ 1, *supra*. Second, Plaintiffs have adduced substantial record evidence from which a reasonable jury could find that Tricor was uniquely suited to particular patient types, and so was not reasonably interchangeable, even in the therapeutic sense, with non-fenofibrate drugs, for substantial numbers of patients.

For instance, Plaintiffs have adduced substantial evidence showing that Tricor – even in Defendants' view – is unique and *not* reasonably interchangeable with non-fenofibrate drugs. Plaintiffs' evidence includes testimony from a medical doctor and a licensed pharmacist. *See* Expert Report of Dr. Arthur Schwartzbard, M.D., F.A.C.C. ("Schwartzbard Rpt.") ¶¶ 56-63 (expert medical doctor details basis for his opinion that Tricor

) (PJA737-39); Reply Report of Dr. Arthur Schwartzbard, M.D., F.A.C.C. ("Schwartzbard Reply Rpt.") ¶¶ 27-31

) (PJA889-90); Expert Report of Richard H. Grimm, M.D., M.P.H., Ph.D. ("Grimm Rpt.") at 10-12 (

(PJA53-55); Schond. Rpt. ¶ 170 (setting forth chart containing

-4-

████████████████████████████████████████████████████████████ )

(PJA623); Schond. Rpt. ¶¶ 172-195 (pharmacist and pharmacoeconomist details Defendants'

documentary admissions regarding Tricor's ██████████████████████████████████

██████████████████████████████████████████ ) (PJA624-32). *See*

*also* Leitz. Rpt. at 59-60(█████████████████████████ ) (PJA514-15) ; *id.* at 61-62

(█████████████████████████████████████████████████████████ )

(PJA516-17); Leffler Rpt. ¶ 39 (citing Abbott admissions that ███████████████████

█████████████████████████████ ) (PJA324-25) ; Declaration of

Charles King III Concerning Liability and Product Market Definition ("King Decl.") ¶¶ 23-27 (citing

Abbott admissions concerning Tricor's ██████████████████████████████████████

████████ ) (PJA115-18).

   Defendants' own documents show that even they did not believe that ██████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████ Abbott_Tricor12671 (emphasis added) (PJA1827). As another

example, ████████████████████████████████████████████████████████████

████████████████████████████████ :

████████████████████████████████████

-5-



Tricor 2005 Marketing Plan, Executive Summary, at Abbott_Tricor10 (PJA1809). As this document

clearly shows, Tricor ███████████████████████████████████████████



PLAINTIFFS' RESPONSE:

4.    Disputed. Plaintiffs incorporate by reference Part IV.C. of Teva's and Impax's

Answering Brief in Opposition to Defendants' Motion for Summary Judgment on Relevant Market

Definition as though fully set forth at length herein.

But even if these statements were true, they are immaterial because, as Defendants admit and

the evidence otherwise cited in ¶ 1, *supra*, shows, physicians do not prescribe dyslipidemia drugs

based on their relative prices, and accordingly these data do not demonstrate that any non-fenofibrate

drug has any (much less substantial) positive cross-price elasticity of demand with Tricor. Even

Defendants' economist 

t. Videotaped Deposition of Professor Richard J. Gilbert ("Gilbert

Dep.") at 526:8-11 (

) (PJA1633).

**5.     The dyslipidemia market is dominated by statins which constitute approximately 80% of all prescriptions to treat dyslipidemia.**

PLAINTIFFS' RESPONSE:

5.     Disputed. Because Tricor does not and did not exhibit practical indicia of cross-price

elasticity of demand with non-fenofibrate drugs used for dyslipidemia, and because Defendants

needed to control only drugs AB-rated to Tricor and did not need to control any non-fenofibrate drugs

used to treat dyslipidemia in order to maintain fenofibrate prices above the competitive levels that

would have been reached following unfettered generic entry,[2] there is no antitrust "dyslipidemia

market" that is relevant to this case.

In fact, Defendants, particularly when analyzing the effects of the AB-rated generic

competition they are accused of suppressing in this case, often referred to themselves as competing

in the                              *E.g.*, Abbott_Tricor5099 (emphasis added) ("

") (PJA1813). *See also* Leitz. Rpt. at 54 n. 148 (citing documents and testimony) (PJA509).

---

[2]The competitive level for fenofibrate prices in this case is that which
Rebuttal Expert Report of Stephen W.
Schondelmeyer, Pharm. D., Ph.D. ("Schond. Reb.") ¶ 7 (PJA1203-04); *see also* Rebuttal Report of
Keith B. Leffler, Ph.D. ("Leffler Reb.") at 10 n.22 ("
") (PJA1057);
King Decl. ¶ 31 (PJA119-20).

Defendants also repeatedly asserted that ████████████████████████████. For instance,

in a 2005 slide presentation bearing the imprint "Abbott Dyslipidemia," an Abbott employee wrote:



Abbott_Tricor268095 (emphasis added) (PJA1812). *See also* Tricor 2006 Strategic Marketing Plan,

Executive Summary, Abbott_Tricor277882 ("███████████████████████████████

██████████████████████████") (emphasis added) (PJA1498).

As another example of Defendants' own designation of the relevant market as limited to

fenofibrate-containing products, in their "License, Development and Supply Agreement" that

permitted Abbott to introduce Tricor in the first place, Defendants ████████████████

███████████████. *See* Abbott/Teva 07140 (████████████████████

████████████████████████) (PJA1757).

Defendants' testifying economist has admitted that ████████████████████

████████████████. Gilbert Dep. at 245:22-246:1(████████████████

████) (PJA1564); *id.* at 245:14-16("██████████████████████████

████████████████████████████████") (PJA1561).

Abbott, Teva, and Impax employees have all given testimony demonstrating the absence of

indicia of cross-price elasticity of demand between Tricor and non-fenofibrate dyslipidemia drugs.

-8-

Specifically, Abbott and Teva employees have testified that ███████████████████

████████████████████████████████████████████████████████████

*See* Schond. Rpt. ¶¶ 163, 197, 199, 202, 207 (PJA620, 633-36, 638); Surrebuttal of Charles King III

Concerning Liability and Product Market Definition ("King Surreb.") ¶¶ 23-24 (PJA910-11). Instead,

Abbott employees admitted that Tricor ██████████████████████████████████. *See*

Leffler Rpt. ¶ 38 (PJA324). This testimony is, by definition, a demonstration of the absence of cross-

price elasticity of demand between Tricor and non-fenofibrate drugs.

For instance, Robert Bennett, who performed sales forecasting for Abbott, testified about his

sales forecasting for Tricor in 2005. In his forecast, ██████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████. Deposition of Robert Auburn Bennett ("Bennett Dep.")

at 122:7-133:11 (PJA1488-90); *see also* Leitz. Rpt. at 60 (PJA515).

As another example, Michael Jones, the Abbott employee who had overall responsibility for

Tricor, confirmed that ████████████████████████████████████

████████████████████████████████████████████████████████████

███████s:

Q. ██████████████████████████████████████

A. ██████████████████████████

Q. ██████.

A. ████████████



Continued Deposition of Michael Jones ("M. Jones Dep.") at 466:5-19 (PJA1721) (emphasis added).



shows the absence of cross-price elasticity of demand between Tricor and those drugs.

Actual Tricor sales data further demonstrates that Tricor did not lose sales (nor did Defendants have to lower Tricor pricing to avoid losing sales) in response to the market entry of other cholesterol-lowering drugs, thus demonstrating Tricor's lack of cross-price elasticity of demand with such other drugs. *See* Leffler Rpt. ¶¶ 36-37 & Charts 1-2 (

) (emphasis in original) (PJA322-23, 390-91); Schond. Reb. ¶ 3 & Exhibit A (

) (PJA1202, 1234) ; King Decl. ¶¶ 74-75 & Ex. D.2 (

) (PJA142, 178); *id.* ¶ 78 (

██████ ") (PJA143-44); *id.* ¶¶ 76-84 (statistical analysis)  (PJA143-48).

Defendants' contemporaneous internal business documents further demonstrate Defendants' own perceptions that Tricor exhibited low cross-price elasticity of demand with other dyslipidemia drugs.  For instance, in forecasting the effects of a sudden drop in fenofibrate molecule price (occasioned by AB-rated generic entry), Defendants████████████████████████

████████████████████████.  Schond. Rpt. ¶ 198 (PJA634-35).

Likewise, employees of the generic companies, Teva and Impax, wrote in contemporaneous business documents and testified under oath that███████████████████████

████████████████████████████████

████████████████████████████████

Moreover, they forecasted the effects of market entry of generic versions of Tricor as ████████

████████████████████.  Schond. Rpt. ¶¶ 200, 203-204 (PJA635-37); Leffler Rpt. ¶ 38 (PJA324); King Decl. ¶¶ 23-24, 73 (PJA115-16, 141-42).

Finally, several of Plaintiffs' experts testified, consonant with the FTC/DOJ Horizontal Merger Guidelines, that███████████████████████

████████████████████████████████

████████████████████.  *E.g.*, Leitz. Rpt. at 55

████████████████████████████████

████████████████████████)  (PJA510);

---

[3]Even Defendants' testifying economist agrees with the████████ principle espoused by the Merger Guidelines.  *See* Gilbert Dep. at 249:13-14(████████████████
████████ ") (PJA1562) .

-11-



Schondlemeyer Reb. ¶ 3 ("███████████████████████████

███████████████████████████████████████████████████

███████") (PJA1202); King Decl. ¶¶ 62-84 (███████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████) (PJA

137-48); *id.* ¶ 71 (███████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████") (PJA140-41); *id.* ¶ 88 ("██████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████") (PJA149); King

Surreb. ¶¶ 18-27 (███████████████████████████████████████

███████████████████) (PJA908-13).

When properly limited, Defendants enjoyed shares of nearly 100% at all relevant times in the

relevant market. *See* Leitz. Rpt. at 54 (███████████████████████████████████

███████████████████████████████████████████████████) (PJA509);

*id.* at 62 (PJA517); Leffler Rpt. at ¶¶ 7A, 27 (PJA304, 316-17); Schond. Rpt. ¶¶ 213-214 (PJA641);

King Decl. ¶¶ 90-93 (PJA150-53).

**6.    TriCor is indicated in its FDA-approved product label to reduce LDL and triglycerides and to increase HDL. No fewer than nine other non-fenofibrate drugs in the dyslipidemia market – including Lipitor, Zocor, Pravachol, and Crestor (all statins), Niaspan**

(a niacin), Advicor (a niacin/statin combination drug), and Lopid (gemfibrozil) – share TriCor's indications for the treatment of all three lipid levels. Four remaining non-fenofibrate branded drugs – Lovaza, Mevacor, Welchol, and Zetia – share indications with TriCor for the treatment of at least one lipid abnormality.

PLAINTIFFS' RESPONSE:

6.    Undisputed in part and disputed in part. This statement is disputed to the extent it suggests that Tricor shared any indications with statin drugs at its time of its launch. By way of further response, these statements are immaterial, both because Plaintiffs have produced substantial record evidence from which a reasonable jury could find that Tricor lacks practical indicia of substantial, positive cross-price elasticity of demand with non-fenofibrate drugs (*see* ¶ 5 above), but also because Plaintiffs have produced substantial record evidence from which a reasonable jury could find that Tricor is not reasonably therapeutically interchangeable with non-fenofibrate dyslipidemia drugs (*see* ¶ 3 above).

**7.    Fenofibrate is not singled out as the only viable treatment for any particular lipid condition by the leading clinical guidelines for cholesterol testing and management.**

PLAINTIFFS' RESPONSE:

7.    Undisputed. By way of further response, these statements are immaterial, both because Plaintiffs have produced substantial record evidence from which a reasonable jury could find that Tricor lacks practical indicia of substantial, positive cross-price elasticity of demand with non-fenofibrate drugs (*see* ¶ 5 above), but also because Plaintiffs have produced substantial record evidence from which a reasonable jury could find that Tricor is not reasonably therapeutically interchangeable with non-fenofibrate dyslipidemia drugs (*see* ¶ 3 above).

**8.    TriCor's initial pricing and subsequent price increases were in line with other branded drugs in the dyslipidemia market.**

-13-

PLAINTIFFS' RESPONSE:

8.    Disputed as stated. There is no antitrust "dyslipidemia market" that is relevant to this case. *See ¶ 5, supra.* Moreover, Defendants do not define what they mean by "in line with other branded drugs." Finally, even if true, this statement would be immaterial, because according to controlling law, and even Defendants' own testifying economist, the mere fact that a firm might be "careful not to price their products out of line with" other products does not imply price competition or sufficient cross-price elasticity of demand to warrant including those other products in the relevant market. Gilbert Dep. at 257:11-16 (

▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌") (PJA1564); *see also* Leitz. Rpt. at

11-12 ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

▌▌▌▌▌▌▌▌▌▌▌▌) (PJA466-67) . Defendants have admitted

low cross-price elasticity of demand between Tricor and non-fenofibrate drugs used to treat

dyslipidemia. *See ¶ 5, supra.*

**9.    It is rare for a branded drug to compete on price with its AB-rated generic because physicians or patients who would prefer a brand drug in a "but for" world in which there is an AB-rated generic on the market are the least price sensitive purchasers. The branded drug has the ability in the 'but for" world to increase or maintain its price without risking further loss of profitability.**

PLAINTIFFS' RESPONSE:

9.    Disputed as stated. As one Abbott witness explained, ▌▌▌▌▌▌▌▌

▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌. *See*

Deposition of Ronald K. Lloyd at 61:12-62:4 (PJA1727-28). By using the phrase "further loss of

-14-

profitability," this statement presumes that the branded drug subjected to generic competition has already suffered a catastrophic loss of sales and profitability because an AB-rated generic entered the market and the branded drug company chose not to lower its price to try to avoid losing those sales. Thus, this statement appears to pertain only to the very small number of patients whose demand for a branded version of a drug is already price inelastic (*i.e.*, patients who, for whatever reason, would not switch to a cheaper generic version of a branded drug no matter what).

With that clarification, this statement is nevertheless disputed. There is abundant evidence in the record that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* King Surreb. ¶¶ 44-47(citing evidence) (PJA925-28) ; Declaration of Jeffrey J. Leitzinger, Ph.D. ("Leitz. Class Decl.") at 37 n.80 (PJA38). *See also* Gilbert Dep. at 523:11-530:6 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮)

(PJA1632-34). In his deposition, Prof. Gilbert agreed that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Gilbert Dep. at 523-25; *see also id.* at 527-528 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮) (PJA1632-33). The implication that Abbott would have increase the average net transaction price of TriCor to counter generic competition is contradicted by (1) Abbott's own actions when confronted by generic competition, (2) Abbott's own market forecasts, (3) responses of other brand name pharmaceutical manufacturers to generic competition as, for example, recently with the drug▮▮▮, and (4) analyses of generic competition in the scientific and professional literature. *See* King Surreb. ¶ 44 (PJA925-26).

By way of further response, to the extent that by this statement Defendants seek to imply that Tricor would not have faced price competition from AB-rated generics in the but-for world, it is

-15-

disputed.  Plaintiffs have produced substantial record evidence from which a reasonable jury could find that branded Tricor would have, but-for the conduct alleged in this case, exhibited substantial, positive cross-price elasticity of demand with AB-rated generic versions of Tricor (*i.e.*, would have faced head-to-head price competition from generic fenofibrate absent the challenged conduct). *See* Leitz. Rpt. ¶¶ 63-65 (██████████████████████████████████████████████ ██████████████████████████████) (PJA518-20); Leffler Rpt. ¶¶ 65-70 (same)  (PJA339-44) ; Leffler Reb. at 4 n.6 (████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████) (PJA1051); Schond. Rpt. ¶¶ 208-212 (████████████ ████████████████████████████████████████████████████) (PJA 638-40); King Decl. ¶ 20 (██████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████) (PJA114); *id.* ¶¶ 33, 35 (████████████████████ ████████████████████████████████████████) (PJA120-22) ; *id.* ¶¶ 48-57 (████████ ████████████████████████████████████████████████████████ ████████████████████████████) (PJA129-34); *id.* ¶¶ 58-61 (████████ ████████████████████████████████████████████████████████ ██████████) (PJA134-36); King Surreb. ¶¶ 28-29 (PJA913-915).

Defendants themselves forecast such price-driven substitution of AB-rated generic versions of Tricor for branded Tricor owing to the automatic substitution mechanism. *See* Leitz. Rpt. at 29-30

& nn. 68-69 (█████████████████) (PJA484-85); *id.* at 47 n.125 (███████████)

(PJA502); Leitz. Class Decl. at 26-29 (████████████) (PJA27-30) ; *see also* Leitz. Rpt. at 28-29

& n.67 (████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████████████████████████████) (PJA483-84).

**10.    Sales of fenofibrate would have been no greater in the "but for" world where AB-rated generics entered the market than they were in the actual world.**

PLAINTIFFS' RESPONSE:

10.    Disputed.    Plaintiffs have produced substantial record evidence from which a

reasonable jury could find that sales of fenofibrate would have been greater in the "but for" world.

*E.g.*, Leitz. Rpt. at 70-72 (PJA525-27); Reply Declaration of Dr. Hal Singer ("Singer Reply Decl.")

¶¶ 7-12 (PJA1246-50); Leffler Reb. ¶¶ 40-49 (PJA1074-84); Leitz. Reb. at 42-52, 65-66 (PJA1146-

56, 1169-70).

By way of further response, this statement, even if true, is immaterial, because the lower prices

that AB-rated generic competition affords to consumers unambiguously increase consumer welfare,

even according to Defendants' own testifying economist.    Defendants' own economist admits those

benefits.    Gilbert Dep. at 68:10-70:8 (██████████████████████████████

██████████████████████) (PJA1517-18); *id.* at 184:20-185:5 (█████████████

██████████████████████) (PJA1546); *id.* at 98:18-99:15 ███████████

██████████████████████) (PJA1525) ; *id.* at 260:1-14

-17-

( ████████████████████████████████████████████████████████ )

(PJA1565).

**11.    In the pharmaceutical industry, both brand name companies and generic companies price above marginal cost.**

PLAINTIFFS' RESPONSE:

11.    Disputed. Not all generic drug companies are able to price above marginal cost. AB-rated generic competition drives prices toward, and sometimes down to, marginal cost. By way of further response, it is immaterial that a company that markets an AB-rated version of a branded drug product might be able to profitably price above marginal cost and might therefore enjoy some market power. Plaintiffs have produced substantial record evidence from which a reasonable jury could find that an AB-rated version of a branded drug substantially constrains the ability of its corresponding brand to continue to price profitably above the competitive level without losing virtually all of its sales to the less-expensive generic, and thereby increases consumer welfare and substantially reduces the ability of the branded drug company to exercise its market power. *See* ¶¶ 9-10, *supra*. Defendants' economist, Prof. Gilbert, testified that, ████████████████████████████

████████████████████████████████████████████████████████

████. Gilbert Dep. at 236:3-11 (PJA1559). That the firm marketing the generic might enjoy some market power does not detract from the consumer welfare increases occasioned by its entry and the consequent reduction of the branded drug company's monopoly power over its formerly-exclusive product.

-18-