1 of 1 DOCUMENT

Antitrust Law Developments Sixth

Copyright 2007, American Bar Association.

CHAPTER 6 RELEVANT MARKET

*1-6 Antitrust Law Developments 6B*

**6B Product Market Definition**

Although courts have described the process of defining a relevant product market in a variety of ways, at the core of any such analysis is an effort to identify the products and the suppliers of those products that compete to some substantial degree with the product in question. As the Third Circuit explained, "defining a relevant product market is a process of describing those groups of producers which, because of the similarity of their products, have the ability-actual or potential-to take significant amounts of business away from each other."n29

Products may be included in the same market where there is effective demand-side substitution or, in some instances, effective supply-side substitution. In defining the relevant market in which Product A competes, demand-side substitution refers to a customer's decision to purchase Product B rather than A because B is an adequate substitute for A. Supply-side substitution refers to the ability of producers of Product B to switch to producing Product A. Thus, for example, cookies and cakes may be demand-side substitutes. By contrast, men's and women's apparel are usually not demand-side substitutes, although they may well be supply-side substitutes if the two are produced using common production facilities.

The case law does not provide a precise test for determining how attractive a demand-side substitute must be to be included in the relevant product market; rather, courts rely on numerous factors in making this assessment. The use of supply-side considerations to define markets is more rare and a consensus on the appropriate standards to be applied has not yet emerged.

*[1] Reasonable Interchangeability of Use*

**[a] IN GENERAL**

In *Brown Shoe Co. v. United States*,n30 the Supreme Court declared that "[t]he outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."n31 As an example, in *United States v. E.I. duPont de Nemours & Co.*,n32 the Court considered whether the relevant product market was cellophane (of which duPont had a 75 percent share) or all flexible packaging material (of which duPont's share was less than 20 percent). Inquiring into whether the existence of substitutes deprived duPont of the power to control price or exclude competition, the Court stated:

> When a product is controlled by one interest, without substitutes available in the market, there is monopoly power. Because most products have possible substitutes, we cannot ... give "that infinite range" to the definition of substitutes. Nor is it a proper interpretation of the Sherman Act to require that products be fungible to be considered in the relevant market. ... [W]here there are market alternatives that buyers may readily use for their purposes, illegal monopoly does not exist merely because the product said to be monopolized differs from others.n33

The Court found that "despite cellophane's advantages [over other flexible packaging materials], it has to meet competition from other materials in every one of its uses" and that "a very considerable degree of functional interchangeability exists between these products."n34 While not identical, cellophane and other flexible packaging materials were "reasonably interchangeable by consumers for the same purposes"n35 and were thus in the same relevant

1-6 Antitrust Law Developments 6B

market for purposes of Section 2 of the Sherman Act. The Court summarized this rule for relevant market definition as follows:

> The "market" which one must study to determine when a producer has monopoly power will vary with the part of commerce under consideration. The tests are constant. That market is composed of products that have reasonable interchangeability for the purposes for which they are produced-price, use and qualities considered.n36

Following *Brown Shoe* and *duPont*, courts generally have included products in the same market if they are reasonably interchangeable in use and have rejected proposed relevant markets that fail to include all products that are reasonably interchangeable in use.n37 Conversely, courts generally have not included products in the same market if they are not reasonably interchangeable in use.n38 In determining reasonable interchangeability, courts have considered a wide variety of evidence,n39 including customer views on the interchangeability of the products,n40 the relationship between the price of one product and the sales of another,n41 the presence or absence of specialized vendors,n42 industry or public perception of separate markets or submarkets,n43 views of firms regarding who their competitors are,n44 and the existence or absence of different customer groupsn45 or distribution channels.n46 In many cases, courts have relied on several of these factors in finding that products are in separate markets.n47 Perfect interchangeability is not required.n48 Frequently, courts will reject proposed relevant markets confined to a single class of purchasers or a single product,n49 but courts have found products to be in the same market despite considerable product differences where such factors were not sufficient to negate the existence of reasonable interchangeability of use.n50

Six interrelated methodologies that have emerged from courts' efforts to address the reasonable interchangeability of use criterion in defining product markets are discussed below.

### [b] CROSS-ELASTICITY OF DEMAND

The cross-elasticity of demand between two products measures the extent to which the quantity demanded of the first product will change in response to a change in the price of the second product-"the extent to which consumers will change their consumption of one product in response to a price change in another," all else being equal."n51 A high cross-elasticity value indicates that the products are good substitutes and are probably in the same product market.n52 Although cross-elasticity of demand has a mathematically precise meaning in economics,n53 courts often use the term in a more general, nonquantitative manner to refer to the tendency of an increase in the price of one product to increase the quantity demanded of a second product within a reasonably short time.n54 In effect, courts usually use the term as a synonym for "reasonable interchangeability of use" rather than as a mathematical measure that may help estimate how interchangeable the products are. As market definition analyses have become more sophisticated and expert-driven, however, courts increasingly look at quantitative measures of elasticity as well.

In *duPont*, the Supreme Court referred to the cross-elasticity of demand between cellophane and possible substitutes-which it described as measuring "the responsiveness of the sales of one product to price changes of the other"n55-in concluding that cellophane did not constitute a separate product market. The Court explained that "[i]f a slight decrease in the price of cellophane causes a considerable number of customers of other flexible wrappings to switch to cellophane, it would be an indication that a high cross-elasticity of demand exists between them; that the products compete in the same market."n56

Many lower courts and the FTC have relied on the concept of cross-elasticity of demand in defining relevant markets.n57 For example, in *FTC v. Staples, Inc.*,n58 the district court rejected the merging parties' claim that the relevant market was "the *overall* sale of office products"n59 in favor of a narrower "office superstores" market definition based on "cross-elasticity of demand" analysis-in this case, the responsiveness of the sales of consumable office supply products sold by other retailers to price changes in consumable office supply products sold through office supply superstores.n60 The *Staples* court relied heavily on documents of the merging parties and statistical analysis of price comparisons across geographic markets to find that prices were about 13 percent higher in cities with one chain superstore than where there were three chain superstores.n61 From these comparisons, the court inferred a high cross-elasticity of demand between consumable products offered by the three competing superstore chains, and a low cross-elasticity of demand between products offered at superstores and similar consumable office supply products offered by other retail sellers.n62

PJA-01426

In *AD/SAT v. Associated Press*,n63 the Second Circuit applied a version of the hypothetical monopolist testn64 to determine the cross-elasticity of demand between various newspaper advertisement delivery services.n65 The court concluded that if the providers of electronic newspaper advertisement delivery services were to form a cartel and charge supracompetitive prices for their rush delivery services, a sufficient number of their customers would shift to physical delivery or to nonrush electronic delivery such that "the hypothetical cartel's price increase would not prove profitable."n66 Consequently, the court found significant cross-elasticity of demand for rush and nonrush delivery services and held the two services part of the same product market.n67

In *United States v. Sungard Data Systems*,n68 the court found a relevant product market for "hotsite" services used as computer disaster recovery systems by companies that depend on mainframes and other high-end platforms. The court found evidence that the market was not limited to shared hotsite services for mainframe and midrange computer processing centers, but also included quick-ship services and internal hotsites.n69 In determining that internal hotsites, i.e., a hotsite facility owned by the company rather than by an external vendor, are within the same relevant product market as shared hotsites, the court noted that "what is significant ... is whether the customers that currently use shared hotsites would switch to an internal hotsite in response to a [small but significant and nontransitory price increase]."n70

Virtually all methods of market definition rely on criteria designed to focus, directly or indirectly, on cross-elasticity of demand-whether or not that specific nomenclature is used. However, opinions specifically relying on estimated mathematical cross-price elasticities, or estimating cross-elasticity in some other specific fashion, remain relatively infrequent, resulting from the practical difficulties of precisely measuring and interpreting the relevant data.n71

### [c] DIFFERENCES IN PRODUCT TYPE

Many courts have addressed the situation where two or more products or services have similar functions but different physical characteristics. These cases make clear that the relevant inquiry remains whether the differences in type render the products poor substitutes. In *duPont*, for example, the Court concluded that all flexible wrappings belonged in the same market, notwithstanding differences in burst strength, gas permeability, grease resistance, and other factors.n72 The Court based its conclusion upon the extensive competition that existed among cellophane and other pliable wrappings, despite cellophane's physical advantages.

In *Fineman v. Armstrong World Industries*,n73 the Third Circuit affirmed a jury's finding that the relevant market was limited to resilient floor covering products made from vinyl materials. Relying upon evidence that residential consumers prefer carpeting in bedrooms and resilient floor coverings in kitchens and bathrooms, the court concluded that the two products "are, by and large, not considered reasonably interchangeable by consumers."n74 The court excluded other hard floor coverings from the market, relying in part on the unique cushioning and spring-back characteristics of resilient floor coverings that rendered other hard floor coverings an inadequate substitute for many customers.n75 In the same case, by contrast, the Third Circuit upheld a jury determination that a magazine marketed in video format to the floor covering industry competed in the same relevant market as an individual manufacturer's video selling aids produced as a selling tool for its own products.n76

In *United States v. Gillette Co.*,n77 the court found a relevant product market for "premium writing instruments" priced between $40 and $400, including in the market not only fountain pens but also mechanical pencils, refillable ballpoint pens, and rollerball pens sold in that price range.n78 While recognizing that some customers desire only fountain pens and will not switch to other writing instruments even if prices rise, the court found evidence of "a much larger subset of fountain pen consumers who *will* substitute other modes of writing for fountain pens."n79

In *United States v. Visa U.S.A., Inc.*,n80 the Second Circuit affirmed the district court's holding that there were two "interrelated, but separate" product markets, one for general purpose charge and credit cards and the other for network services for general purpose cards.n81 After hearing "substantial expert testimony," the district court concluded that cash, checks, debit cards, proprietary charge cards, and other forms of payment were not reasonable substitutes for general purpose charge or credit cards. The government's expert testified that, even in the face of a significant increase in card fees, customers would continue to pay the fees rather than switch to other forms of payment. Both the district court and the Second Circuit found that this fact made general purpose charge and credit cards a distinct market for antitrust purposes.n82 As to the second market, the Second Circuit also affirmed the conclusion that the four major payment networks-Visa, MasterCard, American Express, and Discover-compete to sell network services to card issuers and merchants, the latter on the basis of the "merchant discount" paid by merchants when accepting a credit or charge

card transaction. Again, the district court's conclusion was based on expert evidence that there were no reasonably interchangeable products and confirmed by empirical evidence that, even in the face of price increases for Visa and MasterCard card acceptance, no merchant had stopped accepting their cards.n83

Courts have grappled with similar issues in cases involving health care and media-related markets in which the method of delivery differs among similar products. In *United States Healthcare, Inc. v. Healthsource, Inc.*,n84 for example, the First Circuit held that the health care financing market includes both health maintenance organizations (HMOs) and other types of financing methods, such as traditional insurance company policies, Blue Cross/Blue Shield plans, and preferred provider organizations.n85 In *Cable Holdings v. Home Video*,n86 the Eleventh Circuit affirmed a jury's determination that there is a relevant market for "passive visual entertainment" that includes both cable television and other media such as satellite television, video cassette recordings, and free over-the-air television.n87

### [d] DIFFERENCES IN GRADE OR QUALITY

High-priced, high-quality products may, or may not, be in the same relevant product market as lower-priced, lower-quality products depending on the extent to which buyers treat the products as reasonable substitutes. Whether products that vary in grade or quality should be included in the same product market is therefore a recurrent issue. The cases have produced widely divergent market definition results ranging from narrow submarkets for individual products that may be differentiated in the minds of discriminating consumers to broad markets including a wide variety of product grades and types that are reasonably interchangeable in ultimate use.

At one end of the spectrum are decisions such as *International Boxing Club v. United States*,n88 in which the Supreme Court identified a relevant product market consisting of only championship boxing contests. The Court upheld the lower court's finding that nonchampionship contests are not "reasonably interchangeable for the same purpose"n89 with championship contests because the latter drew more spectators at higher ticket prices, sold television rights for more money, had higher Nielsen ratings, and involved salable movie rights. Relying on *United States v. Paramount Pictures*,n90 which had found first-run showings of motion pictures to be a relevant market, the Court observed, "championship boxing is the 'cream' of the boxing business, and ... is a sufficiently separate part of the trade or commerce to constitute the relevant market for Sherman Act purposes."n91 Quality differences between products have similarly led lower courts to create narrow discrete markets-even where the differentiated products can serve the same basic use-especially where there is a wide disparity in prices.n92

At the other end of the spectrum are decisions that have included in a broad relevant market products that differ in perceived quality but fall along a single price-quality continuum. In *In re Super Premium Ice Cream Distribution Antitrust Litigation*,n93 for example, the court held that premium ice creams compete in the same relevant market as lower grade ice creams despite differences in butterfat content, air volume, and the use of natural ingredients. The court ruled that "[s]uch distinctions are economically meaningless where the differences are actually a *spectrum* of price and quality differences."n94

A similar conclusion was reached in *FTC v. Arch Coal, Inc.*n95 There, the court held that the relevant market was not limited to 8800 Btu coal from the Southern Powder River Basin (SPRB) of Wyoming, but also included 8400 Btu SPRB coal.n96 The court recognized that some customers can only purchase either 8800 or 8400 Btu SPRB coal, regardless of the economics, because of the construction or configuration of specific boilers.n97 Nonetheless, the court held that, in determining interchangeability, "the Court must consider the degree to which buyers treat the products as interchangeable, but need not find that all buyers will substitute one commodity for another."n98

In *United States v. Oracle Corp.*,n99 the court considered the differentiated market for enterprise resource planning system software,n100 but it found that there was "no reliable or articulable basis to distinguish a high function product market," despite some testimony of customer and industry witnesses to the contrary.n101 The court also noted that the government's expert testified to the lack of a quantitative metric that could be used to determine a distinction between a high function product and a mid-market product, and concluded that it could not draw product market boundaries "based upon the mere notion that there is 'something different' about the merging products and all others, especially when that 'something different' cannot be expressed in terms to make a judgment of the court have meaning."n102

### [e] PRICE DIFFERENCES

1-6 Antitrust Law Developments 6B

Courts often have considered price differences between products in evaluating whether the products are interchangeable substitutes for one another.n103 For example, in *United States v. Aluminum Co. of America,*n104 the Supreme Court relied heavily upon a greater than 50 percent price differential between copper and aluminum and held that aluminum cable constituted a submarket separate from copper cable even though "each does the job equally well" and "the class of customers is the same."n105

Similarly, in *United States v. Archer-Daniels-Midland Co.,*n106 the Eighth Circuit-in reversing a grant of summary judgment for the defendant in a case challenging the lease of two corn wet milling plants as violations of Section 1 of the Sherman Act and Section 7 of the Clayton Act-concluded that sugar and high fructose corn syrup (HFCS) were not part of a single relevant product market. The court noted that although sugar and HFCS were functionally interchangeable-from the perspective of uses and quality-the cross-elasticity of demand between them was not high because the statutory sugar program "artificially inflated the price of sugar" to a level 10 to 30 percent above the price of HFCS.n107 As a consequence, the court noted, "a monopolist of HFCS will be able to raise the price of HFCS to just below the supported price of sugar before being constrained by the competitive forces of sugar."n108 The court therefore concluded that sugar and HFCS were not reasonably interchangeable because of the artificial price differential between them.n109

The mere fact of price differences, however, will not preclude placing the products in the same market. In *duPont*, for example, the Court held that cellophane was in the same market as other flexible packaging materials despite costing two or three times more.n110 Because packaging accounted for a very small portion of the entire cost of the wrapped article-and because of quality differences among the packaging materials-the Court concluded that they were reasonably interchangeable notwithstanding the price difference.n111 Similarly, in *Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.,*n112 the Second Circuit determined that national and private label brands were in the same submarkets-despite persistent differences in price-where the products appear side-by-side in supermarket frozen food displays.n113

In certain situations, price discrimination may provide a basis for concluding that sales of a single product to a particular group of customers constitutes a relevant product market separate from sales of the same product to other customers. More particularly, if a seller or group of sellers can identify, in advance, different classes of customers based on their relative demand elasticities for the products of the sellers, and can earn substantially different returns from the separate classes, the class of customers with relatively inelastic demand may constitute a relevant market.n114

For example, in *Spirit Airlines v. Northwest Airlines,*n115 the plaintiff charged Northwest with monopolizing the Detroit-Boston and Detroit-Philadelphia air travel routes for leisure or price-sensitive travelers. The district court granted summary judgment in favor of Northwest, finding, among other things, that the relevant product market included *all* passengers on the two routes, not just the price-sensitive passengers.n116 The Sixth Circuit reversed, holding that "a reasonable trier of fact could find that leisure or price-sensitive passengers represent a separate and distinct market in this industry for Section 2 purposes."n117 The court relied on evidence, among other things, of separate Northwest fares for business travelers and leisure travelers, numerous Northwest internal documents, and an earlier antitrust action filed by Northwest against American Airlines in which Northwest's economic experts opined that business travelers and leisure travelers were distinct markets.n118

### [f] PRICE TRENDS

In addition to comparing the existing prices of two products, courts and the FTC sometimes have compared the movement of prices over time, reasoning that changes in price should be similar for products in the same market. For example, in *United States v. Aluminum Co. of America,*n119 the Supreme Court relied on the fact that "aluminum and copper conductor prices do not respond to one another" in concluding that aluminum and copper cable belonged in separate submarkets.n120 This kind of evidence can be difficult to interpret, however, especially because parallel price movements of different products may result from separate responses to common costs or marketing conditions.n121

### [g] DIFFERENCES IN PRODUCT AVAILABILITY OR CONDITION

The identification of products to be included in the relevant market may also depend upon the availability or condition of such products. Substitute products likely to be available only in the future may be excluded. In *United States v. Microsoft Corp.,*n122 for example, Microsoft argued that the relevant product market should include both the Windows operating system and middleware products that had the potential to perform in the future as computer operating systems. The D.C. Circuit acknowledged that middleware "could take over some or all of Windows's valuable platform functions"

in the future,n123 but affirmed the rejection of middleware as part of the relevant market because it was not yet available as a substitute operating system.n124

Courts also have considered whether the relevant product market should include firms that sell used or recycled products, or firms that lease rather than sell the products. In *Allen-Myland, Inc. v. IBM Corp.*,n125 for example, the Third Circuit considered whether the market for "large-scale mainframe computers," for which IBM was the largest manufacturer, included new and used computers offered by leasing companies. The court excluded new computers offered by leasing companies because the machines were initially purchased from the defendant or its competitors, and their inclusion in the market would therefore amount to "double counting."n126 With respect to used computers offered by leasing companies, the court drew a distinction between used IBM computers and used non-IBM computers. The court excluded used IBM computers from the market, citing the analysis in *United States v. Aluminum Co. of America* n127 and noting that "a powerful manufacturer like IBM was in a position to maximize its profits by carefully controlling the number of [IBM] mainframes that would later appear on the used leasing market."n128 The court included in the relevant market "used, non-IBM mainframes that have not already been counted in the sales market," noting that there was no allegation that the other manufacturers in question possessed "the market power to control prices."n129

### [2] Cross-Elasticity of Supply

Although courts traditionally have given greatest emphasis to cross-elasticity of demand in defining the relevant product market,n130 they also have considered the cross-elasticity of supply, defined by one court as "the extent to which producers of one product would be willing to shift their resources to producing another product in response to an increase in the price of the other product."n131

Courts have found products to be in the same market if firms readily can switch their production capabilities from one product to another,n132 but the relative ease of shifting production is a determinative factor.n133 For example, after noting that two products with a high degree of substitutability in use should be included in the same market, the Ninth Circuit in *Twin City Sportservice v. Charles O. Finley & Co.* n134 observed that "[a] like analysis applies when the market is viewed from the production rather than the consumption standpoint. ... Where the degree of substitutability in production is high, cross-elasticities of supply will also be high, and again the two commodities in question should be treated as part of the same market."n135

Similarly, in *Rebel Oil Co. v. Atlantic Richfield Co.*,n136 the Ninth Circuit relied on cross-elasticity of supply factors in concluding that sales of full-serve gasoline should be included in the market with self-serve because "sellers of full-serve gasoline can easily convert their full-serve pumps, at virtually no cost, into self-serve, cash-only pumps, expanding output and thus constraining any attempt by [the defendant] to charge supracompetitive prices for self-serve gasoline."n137

### [3] Submarkets

In *Brown Shoe Co. v. United States*,n138 a Clayton Act Section 7 case, the Supreme Court referred to the concept of submarkets within markets:

> The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. However, within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes. The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.n139

In *United States v. Grinnell Corp.*,n140 the Court confirmed that "[i]n § 2 cases under the Sherman Act, as in § 7 cases under the Clayton Act, there may be submarkets that are separate economic entities."n141

Although a number of cases have explicitly found submarkets to exist within broader relevant markets,n142 fewer cases have used the "submarket" terminology within the last two decades. In *Olin Corp. v. FTC*,n143 the respondent argued

that under the 1992 *Merger Guidelines* it was inconsistent for the FTC to recognize both a dry pool sanitizers market and a market limited to a particular type of dry pool sanitizer.n144 In effect, the respondent's argument was that if some products in the broader market did not compete sufficiently with products in the smaller market to merit inclusion in the smaller market, then the two groups of products did not compete enough to merit inclusion in the same broad market. The Ninth Circuit disagreed, observing that "[w]hile this may be true under the Department of Justice *Merger Guidelines*, it is not true as a matter of federal antitrust law."n145

Most recent cases use the term "submarket" in a manner with little or no distinction from the term "relevant market." In *FTC v. Staples, Inc.*,n146 the district court used the traditional *Brown Shoe* criteria to define the relevant market as a submarket composed of office supply superstores.n147 Citing these criteria, the court held that "well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes."n148 In particular, the court interpreted the FTC's pricing evidence as probative of an office supply superstore submarket under *Brown Shoe*'s sensitivity-to-price-change criterion.n149 The court also found that the FTC had demonstrated other *Brown Shoe* "practical indicia" of a product submarket by offering proof of the vastly larger number of consumable office supplies offered by superstores,n150 testimony on the uniqueness of the superstores, and company documents suggesting industry recognition of office supply superstores as a relevant submarket with distinctly lower prices in locations where there are other superstores.n151

Because identical criteria are typically used to define both markets and submarkets, some courts have questioned whether the "markets" at issue are submarkets (i.e., markets within markets) or simply markets defined too narrowly.n152 As the Third Circuit has remarked, "[t]he use of the term 'submarket' is somewhat confusing, and tends to obscure the true inquiry."n153 The Fourth Circuit has expressed similar sentiments, suggesting that "[t]he use of the term 'submarket' is to be avoided; it adds only confusion to an already imprecise and complex endeavor."n154 In *PepsiCo, Inc. v. Coca-Cola Co.*,n155 the court noted that the very term "submarket" can create the misconception that submarkets are more narrow than "markets" defined by accepted methodology: "ultimately, a 'submarket' definition turns on the same inquiry as a 'market' definition."n156

Demonstration of significant *Brown Shoe* elements of a submarket, however, have allowed litigants to survive summary judgment in some cases. For example, in *Brooks Fiber Communications v. GST Tucson Lightwave, Inc.*,n157 Lightwave alleged that competitive access providers were in a submarket separate from the local exchange carrier, US West. The district court held that evidence of price differences of 20 to 50 percent and differences in certain service characteristics, such as quality and reliability, raised sufficient factual issues to withstand summary judgment.n158 Also, in *CDC Technologies v. IDEXX Laboratories*,n159 the district court bolstered its denial of summary judgment on the issue of relevant market definition by pointing out that, even if in-clinic hematology instruments did not qualify as a relevant product market, they might qualify as a relevant product submarket.n160 The court cited potential differences in "a product's particular characteristics including its uses, its prices and its customers" to suggest that the criteria for a relevant submarket may be satisfied.n161

#### [4] Cluster Markets

Courts have recognized that a "cluster" of distinct products or services that are complements rather than substitutes may be combined into a single relevant market based upon consumer preference for purchasing the products in a group or upon cost savings or convenience attributable to joint sale of the products. In *United States v. Grinnell Corp.*,n162 for example, the Supreme Court aggregated various services and found that the relevant market comprised insurance company-accredited central station fire and burglary protective services. The Court recognized that fire protection and burglary protection do not compete with each other but it concluded that this "cluster of services" was, in effect, "a single basic service-the protection of property through use of a central service station."n163 The Court relied heavily upon the fact that customers typically shopped for the cluster of services rather than for individual services and that, as a result, "[c]entral station companies recognize that to compete effectively, they must offer all or nearly all types of service."n164

Similarly, in a series of bank merger cases, the Supreme Court held that a cluster of commercial banking services can be a relevant product market.n165 It found that commercial banks provided a unique cluster of products (various kinds of credit) and services (checking accounts and trust administration) and were insulated from competition from other financial institutions supplying one or more (but not all) of the same products and services because of cost advantages and a "settled consumer preference."n166

1-6 Antitrust Law Developments 6B

Other cases have recognized cluster markets in similar circumstances where there is an identifiable customer demand for the services or products furnished as a cohesive group. In *Image Technical Services v. Eastman Kodak Co.*,n167 for example, the Ninth Circuit upheld a jury verdict that Kodak violated Section 2 of the Sherman Act, finding a relevant cluster market consisting of all replacement parts for Kodak photocopiers and micrographics equipment.n168 The court rejected the defendant's argument that each of the many thousands of individual replacement parts constituted a separate relevant market. The court said that a ready supply of all Kodak parts is needed to satisfy service contracts, that independent service operators routinely stock all Kodak parts, and that "the *Brown Shoe* factors ... particularly the lack of consumer recognition of individual part markets, the unique and specialized nature of the equipment and the singular use of 'all parts' to service Kodak equipment, weigh in favor of an 'all parts' market."n169 The court also relied on *United States v. Grinnell Corp.* n170 for the proposition that all competitors need not offer the same precise cluster of goods or services to establish a relevant product market "where that combination reflects commercial realities."n171

In *JBL Enterprises v. Jhirmack Enterprises*,n172 the Ninth Circuit explained that "[a] cluster approach is appropriate where the product package is significantly different from, and appeals to buyers on a different basis from, the individual products considered separately."n173 The court thus held that complete lines of shampoos and conditioners sold to wholesalers were the relevant market because wholesalers usually purchased a complete line rather than individual products. Similarly, in hospital merger cases, a number of courts and the FTC have defined the relevant product market as the provision of all inpatient acute care hospital services.n174 Courts also have defined clusters of products or services as relevant product markets in cases involving educational services,n175 office supply superstores,n176 sporting equipment,n177 food retailing,n178 department stores,n179 tools,n180 and newspapers.n181

Courts have rejected cluster markets in other contexts. For example, in *Thurman Industries v. Pay 'N Pak Stores*,n182 the Ninth Circuit ruled that the cluster approach did not justify treating full-service home remodeling stores as the relevant market because the individual products sold at such stores (e.g., tools, electrical supplies, and plumbing supplies) were commonly sold at hardware, specialty, department, and other stores that did not offer full lines of home supplies, and "the record is inadequate to support a finding that consumers ... are lured to home centers and away from specialty vendors or department stores solely because of the home center product and service package."n183

### [5] Service Markets

The principles that are used to define a relevant market for products are also used to define a relevant market for services, whether provided by manufacturers, professionals, or others.n184 In *Blue Cross & Blue Shield United v. Marshfield Clinic*,n185 for example, the Seventh Circuit considered claims involving an alleged market for health services in which HMOs compete with so-called "fee-for-service" plans. The court concluded that the two types of services are in the same relevant market because "[t]he services offered by HMOs and by various fee-for-service plans are both provided by the same physicians, who can easily shift from one type of service to another if a change in relative prices makes one type more lucrative than others."n186

Courts have evaluated the relevant markets for many different types of services, including cellular telephone services,n187 "one-stop" shopping,n188 trade shows,n189 facilities, credit services,n190 cardiology,n191 and radiology,n192 services, services providing for the delivery,n193 and sale of advertising,n194 athlete/player services,n195 and trademark searches.n196

### [6] Innovation Markets

Antitrust jurisprudence has long recognized that stimulating innovation is among the many benefits of competition.n197 However, "innovation markets" (also known as "research and development markets") did not receive attention as a distinct subject of analysis until the mid-1990s, when the DOJ and FTC jointly issued the *Antitrust Guidelines for the Licensing of Intellectual Property* (*Intellectual Property Guidelines*).n198 In the *Intellectual Property Guidelines*, the agencies describe an innovation market and explain when this analytical tool should be used in reviewing transactions and licensing arrangements:

> An innovation market consists of the research and development directed to particular new or improved goods or processes, and the close substitutes for that research and development. The close substitutes are research and development efforts, technologies, and goods that significantly constrain the exercise of market power with respect to the relevant research and development. ... The Agencies will

delineate an innovation market only when the capabilities to engage in the relevant research and development can be associated with specialized assets or characteristics of specific firms.n199

Innovation markets are not markets in the traditional sense; they do not involve the buying or selling of products or services. Rather, rivals in innovation markets strive to invent, patent, and perfect products or services that may or may not come to market. Innovation market analysis stems from a concern-at the agencies at least-that transactions occurring even in relatively unconcentrated markets may nevertheless have an adverse impact on competition if they eliminate close competitors in the research and development needed to bring "next generation" products or processes to market.n200 The agencies limit the potential impact of innovation market analysis in the licensing context by establishing a five-firm "safe harbor."n201

To date, no court has invalidated a transaction solely because it reduced competition in an innovation market.n202 Nonetheless, the agencies have brought numerous cases asserting, in part, that a merger or acquisition is illegal because it will lead to a reduction in innovation. Such complaints have resulted in the abandonment of transactions,n203 divestiture of assets,n204 licensing requirements,n205 and conduct requirements.n206

A notable example of the agencies using innovation market analysis is the *ZF Friedrichshafen* case. In 1993, the United States brought suit to enjoin the proposed acquisition of General Motors' Allison Division by ZF Friedrichshafen. The government alleged that the firms were two of three competitors involved in "technological innovation in the design and production of automatic transmissions for medium and heavy duty commercial and military vehicles."n207 The government also alleged that GM and ZF were fierce rivals, such that eliminating this rivalry could result in "higher prices," "poorer service," and would "reduce technological innovation that [the parties] currently conduct on an independent basis."n208 Faced with the government's challenge, GM and ZF abandoned the deal.n209

### [7] Limiting a Market to a Single Manufacturer's Product or a Single Customer

Relevant markets generally cannot be limited to a single manufacturer's products.n210 As the Supreme Court recognized in the *United States v. E.I. duPont de Nemours & Co.*,n211 manufacturers ordinarily should not be deemed to have "monopolized" their own products. The Court explained that the "power that, let us say, automobile or soft-drink manufacturers have over their trademarked products is not the power that makes an illegal monopoly. Illegal power must be appraised in terms of the competitive market for the product."n212

In some cases, however, courts have found a relevant product market consisting of the aftermarket servicing of a single manufacturer's products. In *Eastman Kodak Co. v. Image Technical Services*,n213 independent service organizations brought suit after Kodak adopted a policy of selling its replacement parts only to customers using Kodak service (or servicing their own machines). The Supreme Court upheld the denial of defendant Kodak's motion for summary judgment on relevant market grounds. The Court held that while Kodak faced substantial competition in the sale of copiers, there could be relevant markets confined to the servicing of Kodak copiers (as opposed to all copiers) and the sale of Kodak spare parts because the parts and servicing of Kodak copiers were unique. In effect, the Court explained that the market could be limited to customers that owned Kodak copiers because once they bought a Kodak copier they were locked into buying only Kodak parts and service for that copier.n214

A number of other cases have reached similar results in the wake of *Kodak*.n215 Some lower courts also have found markets to be limited to the products of a single supplier where they are unique and have no reasonably interchangeable substitutes.n216 *Kodak* itself cited prior Supreme Court decisions as "support[ing] the proposition that, in some instances, one brand of a product can constitute a separate market."n217

Several subsequent lower court "aftermarket" decisions, however, have declined to find separate aftermarket relevant markets. These cases generally have relied on factual findings that aftermarket pricing was disciplined by competition in the market for the initial sale of the product. In *SMS Systems Maintenance Services v. Digital Equipment Corp.*,n218 for example, the First Circuit included both the sale of certain Digital Equipment computer equipment and the aftermarket servicing of this equipment in the same relevant product market.n219 The court explained that reputation is important to a firm that constantly competes for new customers and that a manufacturer's behavior in the aftermarket could influence customer purchases in the primary market. The court said that "the aftermarket is the relevant market for antitrust analysis only if the evidence supports an inference of monopoly power in the aftermarket that competition in the primary market appears unable to check."n220 Because it found no such evidence in the record, the court rejected the

plaintiff's proposed relevant product market, ruling that the market must include "the complete package of primary equipment, parts, and [aftermarket] services."n221

The Fifth Circuit distinguished *Kodak* in *Alcatel USA, Inc. v. DGI Technologies* n222 and affirmed the dismissal of a monopolization claim for failure to prove a relevant product market.n223 The court rejected the plaintiff's alleged "capacity expansion products market" consisting solely of devices designed to boost the capacity of Alcatel predecessor DSC's telephone switching systems.n224 The court emphasized that, unlike *Kodak*, this case was decided after a jury trial; the plaintiff failed to prove that DSC's customers faced substantial information and switching costs; DSC's customers routinely engaged in "life-cycle pricing," calculating the post-acquisition costs of operation, maintenance, and expansion at the time of initial purchase; and DSC did not change the terms of its pricing, warranty, or other policies after customers made the initial decision to purchase DSC's telephone switching systems.n225

Some recent cases have distinguished *Kodak* in a different context-franchising-where numerous plaintiffs have argued that the relevant market should be confined to the franchise of a single brand. For example, in *Queen City Pizza v. Domino's Pizza*,n226 the plaintiff franchisees claimed that Domino's monopolized an alleged market "for ingredients, supplies, materials and distribution services used in the operation of Domino's stores."n227 Distinguishing *Kodak*, the Third Circuit stated that Domino's franchisees knew before they committed to the contract that their ability to purchase cheaper supplies from alternative sources would be subject to the control of Domino's; consequently, they were deemed to have elected voluntarily to invest in a franchise that limited their choices.n228 The court held that competition occurred at the "pre-contract stage," and the franchisor's subsequent exercise of control over products sold in its franchised outlets did not violate the antitrust laws.n229

*Brokerage Concepts v. United States Healthcare* n230 reached a similar result in the health care context. There, the plaintiff alleged a "single brand market consisting solely of United States Healthcare members with prescription drug benefits."n231 The Third Circuit rejected this market definition, finding that unlike in *Kodak*, the plaintiff failed to demonstrate sufficiently high "switching costs" to show that members were locked in to the United States Healthcare health plan.n232 The court also noted that the plaintiff neglected to allege that pharmacies were locked into participation in the United States Healthcare network, as the plaintiff's case theory required.n233 Likewise, in *Continental Orthopedic Appliances v. Health Insurance Plan of Greater New York*,n234 the district court rejected a relevant product market limited to the patients of a single HMO, principally based on disagreement with "the plaintiffs' assertion that a single firm's product can constitute a relevant product market."n235

In rare cases, there may be only a single customer in the relevant market. For example, in *FTC v. Alliant Techsystems*,n236 the relevant market was all training and tactical 120mm tank ammunition, and the sole purchaser of such ammunition was the Department of Defense. Courts, however, generally have rejected relevant markets encompassing sales to only one or a few customers absent evidence that other customers do not exist or that economic factors allow sellers to sort customers by the valuation they place on the product and prevent resale. For example, in *Total Benefit Services v. Group Insurance Administration*,n237 the plaintiff sought to include in the product market only health care financing services provided to "governmental, quasi-governmental, and municipal entities utilizing self-funded health plans in the City of New Orleans,"n238 a group of just eight customers. The court rejected this proposed market, noting that although the plaintiff and the defendant may compete only for those customers, other customers sought substantially similar services and could not be arbitrarily excluded from the market. Another example of judicial skepticism of single purchaser markets is *Discon Inc. v. NYNEX Corp.*,n239 where the court rejected the plaintiff's relevant market definition limited to "telephone equipment removal services for NYNEX."n240 The court stated that "it is firmly settled that a product market ordinarily cannot be defined in terms of the purchases of a single buyer"n241 but instead "must encompass all the sellers of the particular product at issue, as well as reasonable substitutes, regardless of who the sellers of those competing offerings currently have as their customers."n242

The mere fact that a product is protected by a patent does not create a product market for antitrust purposes.n243 In *Illinois Tool Works v. Independent Ink, Inc.* n244 the Supreme Court held that a patent does not create a presumption of market power in a case involving a tying arrangement, and that a plaintiff in such a case must define the relevant market and prove the existence of market power.n245 Similarly, the DOJ's and FTC's *Intellectual Property Guidelines* do not presume that a patent confers market power.

*[8] The Agencies' Approaches to Product Market Definition*

1-6 Antitrust Law Developments 6B

The 1992 *Merger Guidelines* focus on the concept of buyer substitution as the underlying principle for defining relevant markets.n246 Under the 1992 *Merger Guidelines*, the agencies define a relevant product market by identifying each product produced or sold by both merging firms and then attempting to predict whether a hypothetical monopolist of that product-with the terms of sale of all other products held constant-"likely would impose ... a small but significant and nontransitory" price increase. If such a price increase would cause enough buyers to shift to other products so that the increase would be unprofitable for the hypothetical monopolist, the DOJ or the FTC expands the market to include the closest substitutes for the initial product and repeats the analysis until a group of products is identified for which the price increase would be profitable for the hypothetical monopolist. The smallest group of such products constitutes the relevant product market.n247

In most contexts, a "small but significant and nontransitory" price increase will be defined to be "a price increase of five percent lasting for the foreseeable future."n248

Precise econometric data of the type necessary to measure price-driven shifts in demand are rarely available, and even when econometric studies are performed, they may be subject to criticism for methodological shortcomings.n249 In these circumstances the federal antitrust agencies most frequently seek the views of market participants, including both sellers and their customers.n250 The 1992 *Merger Guidelines* provide:

> In considering the likely reaction of buyers to a price increase, the Agency will take into account all relevant evidence, including, but not limited to, the following:
>
> (1) evidence that buyers have shifted or have considered shifting purchases between products in response to relative changes in price or other competitive variables;
>
> (2) evidence that sellers base business decisions on the prospect of buyer substitution between products in response to relative changes in price or other competitive variables;
>
> (3) the influence of downstream competition faced by buyers in their output markets; and
>
> (4) the timing and costs of switching products.n251

The 1992 *Merger Guidelines* do not look to cross-elasticity of supply-that is, supply substitution factors-as a determinant of the relevant product market. Instead, they consider cross-elasticity of supply in a later stage, in the course of identifying the firms that currently participate in or could enter the relevant product market.n252 With respect to identifying producers to be included in the relevant product market, the 1992 *Merger Guidelines* state that the agency will begin with firms that currently produce and sell the relevant product.n253 The agency may include other firms in the market, however, referred to as "uncommitted entrants," if including them "would more accurately reflect probable supply responses."n254 Moreover, if a firm has existing assets that likely would be shifted or extended into production and sale of the relevant product within one year, and without incurring significant sunk costs of entry and exit, in response to a small but significant and nontransitory increase in price for only the relevant product, the Agency will treat that firm as a market participant.n255

In addition, the agencies will treat as market participants "new firms or existing firms without closely related products or productive assets, [that] likely would enter into production or sale in the relevant market within one year without the expenditure of significant sunk costs of entry and exit."n256

Although the *Guidelines* do not use the term "submarket," they in effect contemplate the limited use of a submarket-type analysis, both in terms of the smallest market principle and in recognizing that the ability to engage in price discrimination will result in recognition of a narrower market.n257

Courts often rely on the *Guidelines* approach in defining product markets.n258 For example, the district court in *FTC v. Staples, Inc.* n259 adopted the FTC's approach to market definition. Staples sought to acquire its retail office supply rival, Office Depot, but the FTC successfully challenged the transaction under Section 7 of the Clayton Act. In granting a preliminary injunction, the court relied on the fact that Staples and Office Depot were two of only three office supply superstore chains in the United States even though office supplies are sold through a variety of retail channels. The court adopted the FTC's market definition of "the sale of consumable office supplies through office superstores,"n260 concluding that a slight but significant nontransitory price increase by Staples would not cause a considerable number of

1-6 Antitrust Law Developments 6B

Staples customers to purchase consumable office products from nonsuperstore alternatives, but instead would cause customers to turn to another office superstore such as Office Depot.n261

In contrast with *Staples*, the DOJ's reliance on the *Merger Guidelines* criteria to prove a relevant market was unsuccessful in *United States v. Engelhard Corp.*n262 One of the DOJ's expert witnesses interviewed existing customers of the merging parties and asked whether they would switch to another product in response to a 5 or 10 percent increase in the price of the product at issue. In general, the customers said they would not.n263 The court explicitly disagreed with this approach, and rejected what it characterized as the DOJ's "formalistic application of the 5%-10% test" in this case.n264 The court found that, because of product testing and potential reformulation costs, it would take more than a 5 to 10 percent price increase to make some customers switch between the merging parties' own products.n265 Thus, the court ruled that the 5 to 10 percent test was inadequate for determining whether those products in general were substitutable with other products.n266

**FOOTNOTES:**

(n1)Footnote 29.  *SmithKline Corp. v. Eli Lilly & Co., 575 F.2d 1056, 1063, 1978-1 Trade Cas. (CCH) P62007 (3d Cir. 1978)* ;  *Harrison Aire, Inc. v. Aerostar Int'l, 423 F.3d 374, 383, 2005-2 Trade Cas. (CCH) P74930 (3d Cir. 2005)* ;  *Spanish Broad. Sys. v. Clear Channel Communs., 376 F.3d 1065, 1074, 2004-1 Trade Cas. (CCH) P74469 (11th Cir. 2004)* . Similarly, relying on the 1992 *Merger Guidelines*, the FTC and DOJ seek to identify products that are in substantial competition with one another by focusing on the consequences for pricing behavior in the market if such competition were to cease. Thus, the FTC has defined the relevant product market as "the smallest grouping of products whose sellers, if unified by a hypothetical cartel or merger, could profitably increase prices significantly above the competitive level." *R.R. Donnelley & Sons Co., 120 F.T.C. 36, 153 (1995)* .

(n2)Footnote 30.  *370 U.S. 294, 1962 Trade Cas. (CCH) P70366 (1962)* .

(n3)Footnote 31.  *Id. at 325* .

(n4)Footnote 32.  *351 U.S. 377, 1956 Trade Cas. (CCH) P68369 (1956)* .

(n5)Footnote 33.  *Id. at 394* (citing  *Times-Picayune Publ'g Co. v. United States, 345 U.S. 594, 612 n.13 (1953))* ; *see also*  *Telex Corp. v. International Business Machines Corp., 510 F.2d 894, 919, 1975-1 Trade Cas. (CCH) P60127, 184 U.S.P.Q. 521 (10th Cir. 1975)* (including in the relevant market products that "although not fungible, are fully interchangeable and may be interchanged with minimal financial outlay"), *cert. dismissed,   423 U.S. 802, 96 S. Ct. 8, 46 L. Ed. 2d 244 (1975)* .

(n6)Footnote 34.  *duPont, 351 U.S. at 399* .

(n7)Footnote 35.  *Id. at 395* .

(n8)Footnote 36.  *Id. at 404* .

(n9)Footnote 37.  Sherman Act cases: *See, e.g.,   National Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club, 419 F.3d 462, 472, 2005-2 Trade Cas. (CCH) P74896 (6th Cir. 2005)* (relevant market was 16- to 20-year-old hockey players in North America who could be readily substituted by the NHL and other North American hockey leagues); *Unitherm Food Systems v. Swift-Eckrich, Inc., 375 F.3d 1341, 1363, 2004-2 Trade Cas. (CCH) P74470 (Fed. Cir. 2004)* (relevant market is made up of products that are reasonably interchangeable), *rev'd on other grounds,   126 S. Ct. 980, 2006-1 Trade Cas. (CCH) P75100 (2006)* ;  *Geneva Pharms. Tech. Corp. v. Barr Labs., 386 F.3d 485, 500, 2004-2 Trade Cas. (CCH) P74583 (2d Cir. 2004)* ; (branded drug product Coumadin not reasonably interchangeable with its generic version); *Todd v. Exxon Corp., 275 F.3d 191, 200, 2001-2 Trade Cas. (CCH) P73518 (2d Cir. 2001)* ("[t]o survive a[] motion to dismiss, an alleged product market must bear a 'rational relation to the methodology courts prescribe to define a market for antitrust purposes-analysis of the interchangeability of use or the cross-elasticity of demand'") (citation omitted); *Hack v. President & Fellows of Yale Coll., 237 F.3d 81, 86-87, 2000-1 Trade Cas. (CCH) P73127, 2001-1 Trade Cas. (CCH) P73127 (2d Cir. 2000)* (affirming lower court's dismissal because the plaintiff's proposed relevant market-student housing at Yale-excluded interchangeable substitutes such as student housing at other universities); *Big Bear Lodging Ass'n v. Snow Summit, Inc., 182 F.3d 1096, 1105, 1999-2 Trade Cas. (CCH) P72577 (9th Cir. 1999)* (complaint dismissed because it failed to allege that there were no other goods or services that were reasonably interchangeable with ski lodging accommodations or ski packages offered in the Big Bear Valley ski area); *U.S. Healthcare, Inc. v. Healthsource, Inc., 986 F.2d 589, 591, 599, 1993-1 Trade Cas. (CCH) P70142 (1st Cir. 1993)* (health care financing market includes both health maintenance organizations and other financing methods, including preferred provider organizations); *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.,*

*924 F.2d 1484, 1489, 1991-1 Trade Cas. (CCH) P69315 (9th Cir. 1991)* ("We find ... insufficient evidence for a jury to conclude that University and osteopathic radiologists cannot compete with private medical radiologists."); *McLaughlin Equip. v. Newcourt Credit Group, 2004-2 Trade Cas. (CCH) P74546, 2004 U.S. Dist. LEXIS 13939 (S.D. Ind. Feb. 18, 2004)* (reasonable interchangeability, not perfect substitution, is proper test for market); *Creative Copier Servs. v. Xerox Corp., 344 F. Supp. 2d 858, 864, 2004-2 Trade Cas. (CCH) P74618 (D. Conn. 2004)* (service of Xerox high volume copiers is a relevant market from the perspective of demand interchangeability); *Dooley v. Crab Boat Owners Ass'n, 2004-1 Trade Cas. (CCH) P74421, 2004 U.S. Dist. LEXIS 7117 (N.D. Cal. Apr. 26, 2004)* (reasonable factfinder could conclude that San Francisco Bay Area crab was not reasonably interchangeable with crab caught in other areas or with frozen crab); *Defiance Hosp. v. Fauster-Cameron, Inc., 344 F. Supp. 2d 1097, 1109, 2004-2 Trade Cas. (CCH) P74625 (N.D. Ohio 2004)* (relevant product market is anesthesia services because defendants had "produced no evidence of any other service that is a reasonable substitute for anesthesia services in terms of use and cross-elasticity of demand"); *Yellow Page Solutions v. Bell Atl. Yellow Pages Co., 2002-1 Trade Cas. (CCH) P73556, 2001 U.S. Dist. LEXIS 18831 (S.D.N.Y. Nov. 14, 2001)* (rejecting relevant product market limited to "Yellow Pages directories" because "plaintiffs do not show why other forms of advertising, such as television, radio, or other print media, are not reasonably interchangeable with Yellow Pages advertising"); *Commercial Data Servers, Inc. v. IBM Corp., 166 F. Supp. 2d 891, 897, 2001-2 Trade Cas. (CCH) P73515 (S.D.N.Y. 2001)* (rejecting "mainframe computers" as relevant market because plaintiff failed to explain why "other types of computers would not be functionally interchangeable with, and/or exhibit cross-elasticity of demand for 'mainframes'"); *Mathias v. Daily News, 152 F. Supp. 2d 465, 481-82, 2001-2 Trade Cas. (CCH) P73393 (S.D.N.Y. 2001)* (rejecting New York Daily News home delivery as relevant market in part because plaintiff "does not even reference the rule of reasonable interchangeability" or discuss other, potentially competing products; court stated "[t]his failure to reference the rule of interchangeability is alone grounds for dismissal"); *United Magazine Co. v. Murdoch Magazines Distrib., 146 F. Supp. 2d 385, 398, 2001-1 Trade Cas. (CCH) P73319 (S.D.N.Y. 2001)* (rejecting relevant market confined to certain specified magazine titles, in part because plaintiffs "fail[ed] to make reference to the rule of reasonable interchangeability"); *Carter v. Variflex, Inc., 101 F. Supp. 2d 1261, 1267, 2000-1 Trade Cas. (CCH) P72813 (C.D. Cal. 2000)* (instant and piece-together canopies in same market despite "differences in price and quality"); *Adidas Am., Inc. v. NCAA, 64 F. Supp. 2d 1097, 1103, 1999-2 Trade Cas. (CCH) P72695 (D. Kan. 1999)* (dismissing plaintiff's complaint because "Adidas has failed to explain or even address why other similar forms of advertising, namely sponsorship agreements with teams or individuals competing in the National Football League, the National Basketball Association, the Women's National Basketball Association, Major League Baseball, Major League Soccer, or the Olympics, are not reasonably interchangeable with NCAA promotion rights or sponsorship agreements"); *Subsolutions, Inc. v. Doctor's Assocs., 62 F. Supp. 2d 616, 625, 1999-2 Trade Cas. (CCH) P72677 (D. Conn. 1999)* (granting motion to dismiss because the complaint, which alleged a franchise sandwich market that excluded fast food franchises specializing in other fast food products (e.g., hamburgers, chicken, tacos, or pizza), contained "no allegations regarding substitute products, [did] not differentiate the Subway franchise from comparable franchise opportunities, and [did] not include any facts regarding cross-elasticity of demand"); *America Online, Inc. v. GreatDeals.Net, 49 F. Supp. 2d 851, 858, 1999-1 Trade Cas. (CCH) P72534 (E.D. Va. 1999)* (granting America Online's motion to dismiss because GreatDeals.Net failed to address the availability of interchangeable substitutes for e-mail advertising, including the World Wide Web, direct mail, billboards, television, newspapers, and radio); *In re Super Premium Ice Cream Distrib. Antitrust Litig., 691 F. Supp. 1262, 1268, 1988-2 Trade Cas. (CCH) P68162 (N.D. Cal. 1988)* (relevant market is all ice cream, rather than "premium" ice cream only, because all grades compete for customer preference and for retailers' freezer space), *aff'd sub nom. Haagen-Dazs Co. v. Double Rainbow Gourmet Ice Creams, Inc., 895 F.2d 1417 (9th Cir. 1990)* ; *Theatre Party Assocs. v. Shubert Org., 695 F. Supp. 150, 154-55, 1988-2 Trade Cas. (CCH) P68251 (S.D.N.Y. 1988)* (advance sales of selected tickets to "theater party hits" is not a relevant market absent evidence that other forms of entertainment are not adequate substitutes).

Clayton Act cases: *See, e.g., United States v. Continental Can Co., 378 U.S. 441, 453-57, 1964 Trade Cas. (CCH) P71146 (1964)* (glass jars and metal cans sufficiently interchangeable to be in the same market); *Chicago Bridge & Iron Co., 138 F.T.C. 1392, 1515-22 (2003)* (initial decision) (addressing harm in four relevant markets in the design and construction of various types of field-erected, specialty, and industrial storage tanks in the United States, and excluding products that are not functional equivalents of products in those markets), *aff'd, 138 F.T.C. 1024 (2004)* ; *FTC v. Libbey, Inc., 211 F. Supp. 2d 34, 45, 2002-1 Trade Cas. (CCH) P73650 (D.D.C. 2002)* (relevant market includes food service glassware); *FTC v. Staples, Inc., 970 F. Supp. 1066, 1074, 1997-2 Trade Cas. (CCH) P71867 (D.D.C. 1997)* (holding that even though consumable office supplies are sold through a variety of channels including office superstores, mass merchandisers, smaller office supply stores, and mail order houses, a relevant market including only office supply superstores presents "an example of perfect 'functional interchangeability'"); *United States v. Baker Hughes Inc., 731 F. Supp. 3, 7, 1990-1 Trade Cas. (CCH) P68930 (D.D.C. 1990)* (relevant market includes "not only the three types of new hydraulic rigs but also suppliers of spare parts, rig components, used rigs and accessories"), *aff'd, 908 F.2d 981, 1990-1*

*Trade Cas. (CCH) P69084 (D.C. Cir. 1990)* ; *FTC v. Owens-Illinois, Inc., 681 F. Supp. 27, 47, 1988-1 Trade Cas. (CCH) P67899 (D.D.C.) , vacated as moot, 850 F.2d 694 (D.C. Cir. 1988)* .

(n10)Footnote 38. Sherman Act cases: *See, e.g., Telecor Communs. v. Southwestern Bell Tel. Co., 305 F.3d 1124, 1136, 2002-2 Trade Cas. (CCH) P73801 (10th Cir. 2002)* (cellular and pay telephone services not reasonably interchangeable); *Lucas Auto. Eng'g v. Bridgestone/Firestone, Inc., 275 F.3d 762, 768, 2002-1 Trade Cas. (CCH) P73524 (9th Cir. 2001)* (genuine issue of fact existed as to whether relevant market was limited to original equipment major brand vintage tires); *United States v. Microsoft Corp., 253 F.3d 34, 52, 54, 2001-1 Trade Cas. (CCH) P73321 (D.C. Cir. 2001)* (middleware excluded from operating systems market in part because "consumers could not now abandon their operating systems and switch to middleware in response to a sustained price for Windows above the competitive level ... [n]or is middleware likely to overtake the operating system ... any time in the near future"; court also excluded Macintosh operating systems from market because "costs of acquiring the new hardware" and "effort involved in learning the new system" would deter switching); *Full Draw Prods. v. Easton Sports, 182 F.3d 745, 756, 1999-2 Trade Cas. (CCH) P72563 (10th Cir. 1999)* (plaintiff sufficiently pled a relevant market for archery trade shows where the complaint described "the distinct nature of the archery trade shows, their difference from gun shows, which focus only in limited part on archery, and their ability to draw a customer base of archery manufacturers, distributors, and dealers"); *United States Anchor Mfg. Co. v. Rule Indus., 7 F.3d 986, 996, 1993-2 Trade Cas. (CCH) P70426 (11th Cir. 1993)* (holding relevant market limited to lightweight generic and economy fluke anchors and excluding branded "Danforth" anchors); *United States v. Syufy Enters., 903 F.2d 659, 665 n.9, 1990-1 Trade Cas. (CCH) P69018 (9th Cir. 1990)* (where chain of movie theaters is alleged to have monopsony power, home video and cable television are not in the same market as those because distributors do not view them as alternatives to a first run in theaters); *United States v. Visa U.S.A., Inc., 163 F. Supp. 2d 322, 338, 2001-2 Trade Cas. (CCH) P73440 (S.D.N.Y. 2001)* (finding "general purpose cards" to constitute relevant market, in part because "neither consumers nor the defendants view debit, cash and checks as reasonably interchangeable with credit cards"), *aff'd, 344 F.3d 229, 2003-2 Trade Cas. (CCH) P74151 (2d Cir. 2003)* ; *Home Health Specialists, Inc. v. Liberty Health Sys., 1994-2 Trade Cas. (CCH) P70699, 1994 U.S. Dist. LEXIS 11947 (E.D. Pa. Aug. 23, 1994)* (relevant product market was home health care services or hospital services; plaintiff's effort to define relevant product market as "Delaware county residents, discharged from Delaware County hospitals, who need home health care" rejected because it did not take interchangeability or cross-elasticity into account), *aff'd mem., 65 F.3d 162 (3d Cir. 1995)* .

Clayton Act cases: *See, e.g., FTC v. Warner Communications, Inc., 742 F.2d 1156, 1163, 1984-2 Trade Cas. (CCH) P66192 (9th Cir. 1984)* (per curiam) (prerecorded music and home tapes are not sufficiently interchangeable to be in same market); *Beatrice Foods Co. v. FTC, 540 F.2d 303, 308, 1976-2 Trade Cas. (CCH) P61036 (7th Cir. 1976)* (limited interchangeability in use between paint rollers and brushes on one hand and paint aerosols and sprayers on other did not prevent FTC from properly finding that rollers and brushes constituted a separate submarket appropriate for analyzing merger); *Ansell, Inc. v. Schmid Labs., 757 F. Supp. 467, 472-73, 1991-1 Trade Cas. (CCH) P69379 (D.N.J.) , aff'd mem., 941 F.2d 1200 (3d Cir. 1991)* .

(n11)Footnote 39. Courts have considered this evidence in defining both markets and submarkets, and many of the listed factors were identified in *Brown Shoe Co. v. United States, 370 U.S. 294, 1962 Trade Cas. (CCH) P70366 (1962)* , the seminal decision on submarket analysis. Courts apply essentially the same analysis whether defining markets or submarkets. *See part 6B(3)* of this chapter.

(n12)Footnote 40. *See, e.g., Fineman v. Armstrong World Indus., 980 F.2d 171, 199, 1992 U.S. App. LEXIS 27898 (3d Cir. 1992)* (evidence of consumer preference for different types of floor coverings in different rooms); *R.D. Imports Ryno Industries, Inc. v. Mazda Distributors (Gulf), Inc., 807 F.2d 1222, 1225, 1986-2 Trade Cas. (CCH) P67414 (5th Cir. 1987)* (market includes cars, foreign and domestic, that consumers view as substitutes); *FTC v. Arch Coal, Inc., 329 F. Supp. 2d 109, 121-122, 2004-2 Trade Cas. (CCH) P74513 (D.D.C. 2004)* (customers acknowledged that they purchased both 8800 and 8400 BTU coal; court did not find 8800 BTU market); *Coventry Health Care v. Via Christi Health Sys., 176 F. Supp. 2d 1207, 1230-31, 2002-1 Trade Cas. (CCH) P73569 (D. Kan. 2001)* (rejecting alleged market of HMOs because alternative health insurance products were substitutes); *Visa U.S.A., 163 F. Supp. 2d at 338* (finding "general purpose cards" to constitute relevant market, in part because "neither consumers nor the defendants view debit, cash and checks as reasonably interchangeable with credit cards"); *Moecker v. Honeywell Int'l, 144 F. Supp. 2d 1291, 1303, 2001 U.S. Dist. LEXIS 12098 (M.D. Fla. 2001)* ("extent to which consumers consider various categories of sellers [of seatbelts] as substitutes"); *New York v. Kraft Gen. Foods, 926 F. Supp. 321, 359, 1995-1 Trade Cas. (CCH) P70911 (S.D.N.Y. 1995)* (evidence of retailer and consumer perspectives on interchangeability of ready-to-eat cereals); *Total Benefit Servs. v. Group Ins. Admin., 875 F. Supp. 1228, 1235-36, 1995-1 Trade Cas. (CCH) P70978 (E.D. La. 1995)* (finding product market not limited to self-funded health plans because consumers

recognize interchangeability of various health care products). *But see United States v. Oracle Corp., 331 F. Supp. 2d 1098, 1131, 2004-2 Trade Cas. (CCH) P74542 (N.D. Cal. 2004)* (finding testimony of customer witnesses to be unhelpful in defining a market where the testimony was based largely on customers' preferences and stating that "[c]ustomer preferences towards one product over another do not negate interchangeability").

The mere fact that *some* customers view products as substitutes-or equivalently, that there is *some* positive cross-elasticity of demand between the products-does not require their inclusion in the same market. For example, in *Kraft General Foods*, the court limited the product market to ready-to-eat breakfast cereals although there was evidence that some customers viewed frozen bagels, oatmeal, and snacks as alternatives. *926 F. Supp. at 333 ; see also United States v. Aluminum Co. of Am., 377 U.S. 271, 1964 Trade Cas. (CCH) P71116 (1964)* (recognizing separate markets for copper and aluminum insulated wire, despite fact that some customers used both for similar purposes); *Photovest Corp. v. Fotomat Corp., 606 F.2d 704, 714, 1979-2 Trade Cas. (CCH) P62869 (7th Cir. 1979)* (despite customer overlap, drive-thru and other photoprocessing are in separate markets); *United States v. Gillette Co., 828 F. Supp. 78, 81, 1993 Trade Cas. (CCH) P70210, 1993-1 Trade Cas. (CCH) P70210 (D.D.C. 1993)* (market "must exclude those items to which 'only a limited number of buyers will turn'") (quoting *Times-Picayune Publ'g Co. v. United States, 345 U.S. 594, 612 n.31 (1953))* . Alternatively, that some customers do not view a product as a substitute does not require its exclusion from the relevant market. *See, e.g., Oracle Corp., 331 F. Supp. 2d at 1131* .

(n13)Footnote 41. *See, e.g., United States v. E.I. duPont de Nemours & Co., 351 U.S. 377, 400, 1956 Trade Cas. (CCH) P68369 (1956)* (noting lower court's finding of "'[g]reat sensitivity of customers in the flexible packaging markets to price or quality changes"'); *Microsoft, 253 F.3d at 51-52* (upholding lower court's definition of the relevant market, citing the inability of consumers to utilize substitute products in response to price increase without incurring substantial costs); *United States Anchor Mfg., 7 F.3d at 996* (finding customers "unwilling to switch away from the prestigious branded product in response to price increases above competitive levels"); *Yoder Bros. v. California-Florida Plant Corp., 537 F.2d 1347, 1368, 1976-2 Trade Cas. (CCH) P61047 (5th Cir. 1976)* (referring to evidence that "consumer demand was responsive to price"); *FTC v. Swedish Match, 131 F. Supp. 2d 151, 164, 2000-2 Trade Cas. (CCH) P73122 (D.D.C. 2000)* ("[M]oist snuff is incapable of inducing substitution sufficient ... to render loose leaf price increases unprofitable and cannot, therefore, be included in the relevant market on this basis.").

(n14)Footnote 42. *See, e.g., Seabury Mgmt. v. Professional Golfers Ass'n, 1995-1 Trade Cas. (CCH) P70991, 1995 U.S. App. LEXIS 9538 (4th Cir. Apr. 26, 1995)* (product market limited to golf trade shows; excludes other marketing techniques such as direct mail, door-to-door solicitation, and catalog sales); *Henry v. Chloride, Inc., 809 F.2d 1334, 1342-43, 1987-1 Trade Cas. (CCH) P67419 (8th Cir. 1987)* (delineating separate market for automotive replacement batteries sold by route salespersons as distinct from batteries sold by retail stores); *United States v. Mrs. Smith's Pie Co., 440 F. Supp. 220, 228-29, 1977-1 Trade Cas. (CCH) P61518 (E.D. Pa. 1976)* (difference in vending between frozen and fresh pies).

(n15)Footnote 43. *See, e.g., PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 107, 2003-1 Trade Cas. (CCH) P73914 (2d Cir. 2002)* (former CEO would "[n]ever ever ... refer to a delivery method as a market"); *Fineman, 980 F.2d 171, 199* (industry perceived carpeting and resilient floor covering as separate markets); *FTC v. PPG Indus., 798 F.2d 1500, 1504, 1986-2 Trade Cas. (CCH) P67235 (D.C. Cir. 1986)* (market definition based on both buyers' and sellers' perceptions); *FTC v. Warner Communications, Inc., 742 F.2d 1156, 1163, 1984 U.S. App. LEXIS 18639 (9th Cir. 1984)* (per curiam) (record industry recognized prerecorded music as a market separate from recorded music market); *Beatrice Foods Co. v. FTC, 540 F.2d 303, 308, 1976-2 Trade Cas. (CCH) P61036 (7th Cir. 1976)* (industry recognized brushes and rollers as separate market); *Oracle Corp., 331 F. Supp. 2d at 1160-61* (rejecting proposed market defined as "high function" software, a term that had no meaning in the industry); *United States v. Sungard Data Sys., 172 F. Supp. 2d 172, 189, 2001-2 Trade Cas. (CCH) P73493 (D.D.C. 2001)* ("the *Brown Shoe* factors-especially industry recognition and the peculiar characteristics and uses of the product-support a finding that internal hotsites fall within the same product market as shared hotsite services"); *Vitale v. Marlborough Gallery, 1994-1 Trade Cas. (CCH) P70654, 1994 U.S. Dist. LEXIS 9006 (S.D.N.Y. July 1, 1994)* (Jackson Pollock paintings found to be submarket in broader market for "contemporary and modern paintings"); *Grumman Corp. v. LTV Corp., 527 F. Supp. 86, 90, 1981-2 Trade Cas. (CCH) P64330 (E.D.N.Y.)* ("aerospace industry distinguishes between [land-based and carrier-based aircraft] ... in terms of the products and their producers") (emphasis omitted), *aff'd, 665 F.2d 10, 1981-2 Trade Cas. (CCH) P64364 (2d Cir. 1981)* . *But see Kraft Gen. Foods, 926 F. Supp. at 361* (holding all ready-to-eat cereals to be in same market, despite subcategories used by industry).

(n16)Footnote 44. *See, e.g., United States v. Continental Can Co., 378 U.S. 441, 453-55, 1964 Trade Cas. (CCH) P71146 (1964)* (can and bottle makers consider each other's prices); *Geneva Pharms. Tech. Corp. v. Barr Labs. 386*

1-6 Antitrust Law Developments 6B

*F.3d 485, 498, 2004-2 Trade Cas. (CCH) P74583 (2d Cir. 2004)* (employee testimony that pricing decisions were based on generic competition was relevant to market definition); *Microsoft, 253 F.3d at 53* (rejecting Microsoft's contention that middleware products should be included in the relevant market, noting that Microsoft simply considered middleware to be a "potential" competitor); *AD/SAT v. Associated Press, 181 F.3d 216, 227-29, 1999-1 Trade Cas. (CCH) P72561 (2d Cir. 1999)* (noting that the plaintiff and its management and marketing consultants believed that rush electronic delivery services for newspaper advertisements competed with nonrush electronic delivery services and with physical delivery services, and holding that this evidence indicated that the various delivery services were in the same relevant product market); *Fineman, 980 F.2d 171, 199* (carpet distributors do not focus on competition from resilient floor coverings when planning their pricing or marketing); *Beatrice Foods, 540 F.2d at 309* (manufacturers of brushes and rollers do not consider aerosols or spray paints when setting price); *United States v. Sungard Data Sys., 172 F. Supp. 2d 172, 181-83, 191-93, 2001-2 Trade Cas. (CCH) P73493 (D.D.C. 2001)* (internal company and industry analyses included internal hotsites as competing with shared hotsites for data disaster recovery solutions); *FTC v. Swedish Match, 131 F. Supp. 2d 151, 164, 2000-2 Trade Cas. (CCH) P73122 (D.D.C. 2000)* (finding loose leaf and moist snuff tobacco products in separate markets, relying in part on internal memo stating that "[t]he company does not view moist snuff as a direct competitor to its loose leaf ... products because of product taste and use differences"); *United States v. Syufy Enters., 712 F. Supp. 1386, 1400, 1989-1 Trade Cas. (CCH) P68478 (N.D. Cal. 1989)* (distributors of movies consider other channels of distribution when making decisions for release dates), *aff'd, 903 F.2d 659, 1990-1 Trade Cas. (CCH) P69018 (9th Cir. 1990)* ; *FTC v. Coca-Cola Co., 641 F. Supp. 1128, 1133, 1986-2 Trade Cas. (CCH) P67208 (D.D.C. 1986)* (noting that "pricing and marketing decisions [were] based primarily on comparisons with rival carbonated soft drink products, with little if any concern about competition from other beverages"), *vacated as moot, 829 F.2d 191, 1987 U.S. App. LEXIS 17849 (D.C. Cir. 1987)* . *But see H.J., Inc. v. International Tel. & Tel. Corp., 867 F.2d 1531, 1540, 1989 U.S. App. LEXIS 1246 (8th Cir. 1989)* (conclusory statements by businessmen).

(n17)Footnote 45. *See, e.g., NCAA v. Board of Regents, 468 U.S. 85, 111, 1984-2 Trade Cas. (CCH) P66139 (1984)* (approving market limited to Saturday afternoon college football broadcasts because they generate an audience uniquely attractive to advertisers in terms of demographics); *Spirit Airlines v. Northwest Airlines, 431 F.3d 917, 933 (6th Cir. 2005)* (holding that a reasonable trier of fact could find that leisure or price-sensitive airline passengers represent a distinct market); *MCM Partners v. Andrews-Bartlett & Assocs., 62 F.3d 967, 976, 1995-2 Trade Cas. (CCH) P71088 (7th Cir. 1995)* (market for rental of forklifts, material handling, and personnel moving equipment limited to rentals to exhibition contractors in the convention and trade show industry, in the absence of record evidence supporting uses in a broader market); *Tunis Bros. Co. v. Ford Motor Co., 952 F.2d 715, 724-25, 1991-2 Trade Cas. (CCH) P69668 (3d Cir. 1991)* (mushroom farmers often owned both Ford and non-Ford tractors, suggesting there were not separate markets); *FTC v. University Health, 938 F.2d 1206, 1210-11, 1991-2 Trade Cas. (CCH) P69508 (11th Cir. 1991)* (relevant product market is the provision of inpatient acute care hospital services); *United States v. Waste Mgmt., 743 F.2d 976, 980, 1984-2 Trade Cas. (CCH) P66190 (2d Cir. 1984)* (customer preference for waste removal method depended upon quantity of trash produced); *A&E Prods. Group v. Accessory Corp., 2002-1 Trade Cas. (CCH) P73575, 2001 U.S. Dist. LEXIS 20245 (S.D.N.Y. Dec. 7, 2001)* (finding a plausible market for molded plastic garment hangers that met specifications set by retail chains and department stores); *Kraft Gen. Foods, 926 F. Supp. at 333-35* (lack of distinct customer groups evidence that "adult" and "kid" cereals in same market); *Ansell, Inc. v. Schmid Labs., 757 F. Supp. 467, 473-74, 1991-1 Trade Cas. (CCH) P69379 (D.N.J.)* (distinct markets for brand name and wholesale condoms), *aff'd mem., 941 F.2d 1200 (3d Cir. 1991)* ; *United States v. Rockford Mem'l Corp., 717 F. Supp. 1251, 1260, 1989-1 Trade Cas. (CCH) P68462 (N.D. Ill. 1989)* (distinct markets for inpatient and outpatient care because of differing severity of illnesses), *aff'd, 898 F.2d 1278, 1990-1 Trade Cas. (CCH) P68978 (7th Cir. 1990)* . *But see Invacare Corp. v. Respironics, Inc., 2006 U.S. Dist. LEXIS 77312, at *16 (N.D. Ohio 2006)* (rejecting relevant market limited to one type of customer because a product market cannot be divided by type of customer unless the plaintiff can identify a difference in the product supplied to that group of customers).

(n18)Footnote 46. *See, e.g., United States v. Dentsply Int'l, 399 F.3d 181, 188, 2005-1 Trade Cas. (CCH) P74706 (3d Cir. 2005)* (affirming district court's finding that relevant market for artificial teeth included distribution directly to dental laboratories and through intermediary dental dealers; rejecting argument that a relevant market "cannot include sales both to the final consumer and a middleman"), *cert. denied, 126 S. Ct. 1023 (2006)* ; *PepsiCo, Inc. v. Coca-Cola Co., 114 F. Supp. 2d 243, 249-50, 2000-2 Trade Cas. (CCH) P73036 (S.D.N.Y. 2000)* (rejecting a market confined to fountain syrup delivered through independent foodservice distributors; court commented that "while customers view fountain syrup delivered through independent foodservice distributors as preferential and advantageous, they view fountain syrup delivered through other means as acceptable," and concluded that "the mere preference for one form of delivery over another does not create separate markets for the same product"), *aff'd, 315 F.3d 101, 2003-1 Trade Cas.*

1-6 Antitrust Law Developments 6B

*(CCH) P73914 (2d Cir. 2002)* ; *FTC v. Cardinal Health, 12 F. Supp. 2d 34, 48-49, 1998-2 Trade Cas. (CCH) P72226 (D.D.C. 1998)* (because certain buyers of prescription drugs, particularly large prescription drug retailers, purchase the vast majority of their prescription drugs through the wholesale distribution channel and are unlikely to switch to other distribution channels, drug wholesaling is a relevant product market despite the existence of other distribution channels that serve other groups of customers); *FTC v. Staples, Inc., 970 F. Supp. 1066, 1074-75, 1997-2 Trade Cas. (CCH) P71867 (D.D.C. 1998)* (office supply superstores constituted a market distinct from other sellers of consumable office supplies based largely on pricing evidence); *see also NicSand, Inc. v. 3M Co., 457 F.3d 534, 547 (6th Cir.)* (noting allegation of distinct distribution channels as supportive of alleged relevant market including do-it-yourself products but excluding professional-grade products), *reh'g en banc granted*, No. 05-3431 (6th Cir. Nov. 22, 2006); *Paladin Assocs. v. Montana Power Co., 328 F.3d 1145, 1156 n.10, 2003-1 Trade Cas. (CCH) P74029 (9th Cir. 2003)* (noninterruptable transportation rights through natural gas pipeline constituted the relevant market since buyers of Canadian gas have no other way of transporting noninterruptable gas into Montana).

(n19)Footnote 47. *See, e.g., Warner Communs., 742 F.2d 1156, 1163* (prerecorded music is a product market separate from home tapes based on industry recognition, distinct characteristics, 300% price difference, and evidence that price increase "would not cause a massive shift to home taping"); *RSR Corp. v. Federal Trade Com., 602 F.2d 1317, 1320-22, 1979 U.S. App. LEXIS 12835 (9th Cir. 1979)* (primary lead and secondary lead were found to constitute separate markets after court considered the *Brown Shoe* indicia; *Abex Corp. v. Federal Trade Com., 420 F.2d 928, 931-32, 1970 U.S. App. LEXIS 11305 (6th Cir. 1970)* (sintered metal friction materials were distinguished from friction materials generally on the basis of price, technology, production facilities, and peculiar characteristics and uses); Nobody In *Particular Presents, Inc. v. Clear Channel Communs., 311 F. Supp. 2d 1048, 1083, 2004-1 Trade Cas. (CCH) P74367 (D. Colo. 2004)* (finding that (1) industry and public recognition and (2) a product's unique and distinct uses, qualities, price, price sensitivity, production facilities, customers, and vendors can be sufficient to determine market definition); *Remington Products, Inc. v. North American Philips Corp., 717 F. Supp. 36, 43, 1989 U.S. Dist. LEXIS 7116 (D. Conn. 1989)* (finding submarket based on evidence of "separate market reports for electric shaver and wet blades, that the defendants always refer in their documents to the electric shaver market, that the two products are distinct in their appearance and operation, that the products are produced in distinct facilities, that the prices of the two are distinct, and that the two products are sold through different distribution networks").

(n20)Footnote 48. *See, e.g., Commercial Data Servs. v. IBM Corp., 262 F. Supp. 2d 50, 72, 2003-1 Trade Cas. (CCH) P74022 (S.D.N.Y. 2003)* ("'[I]nterchangeability' in antitrust analysis does not refer only to products [that] can be seamlessly swapped for each other. ... only 'reasonable interchangeability' is required."); *Fraser v. Major League Soccer, 284 F.3d 47, 62, 2002-1 Trade Cas. (CCH) P73620 (1st Cir. 2002)* (rejecting argument that jury should have been instructed that the relevant market included only those leagues that were "sufficiently attractive" and "practically available" to players).

(n21)Footnote 49. *See part 6B(7)* of this chapter.

(n22)Footnote 50. *See, e.g., United States v. Continental Can, 378 U.S. 441, 456-57, 1964 Trade Cas. (CCH) P71146 (1964)* (glass jars and metal cans sufficiently interchangeable to be in the same market); *Fineman v. Armstrong World Indus., 980 F.2d 171, 200-01, 1992 U.S. App. LEXIS 27898 (3d Cir. 1992)* (product market includes general video magazine for floor covering industry and a single manufacturer's video selling aids produced as a selling tool for its own products); *Cable Holdings v. Home Video, 825 F.2d 1559, 1563, 1987-2 Trade Cas. (CCH) P67690 (11th Cir. 1987)* (upholding judgment on jury's finding that product market encompassed passive visual entertainment, including cable television, satellite television, video cassette recordings, and free over-the-air television); *FTC v. PPG Indus., 798 F.2d 1500, 1504-06, 1986-2 Trade Cas. (CCH) P67235 (D.C. Cir. 1986)* (glass and plastic aircraft transparencies in same market, based on sellers' and buyers' perceptions and competition at request-for-proposal stage); *In re High Fructose Corn Syrup Antitrust Litig., 261 F. Supp. 2d 1017, 1018-19, 2003-1 Trade Cas. (CCH) P74034 (C.D. Ill. 2003)* (different grades of corn syrup in same market despite different chemical properties and grades); *Commercial Data Servers, Inc. v. IBM Corp., 262 F. Supp. 2d 50, 72, 2003-1 Trade Cas. (CCH) P74022 (S.D.N.Y. 2003)* (finding mainframes in same market despite fact that software could only run on one mainframe); *Golan v. Pingel Enter., 310 F.3d 1360, 2002-2 Trade Cas. (CCH) P73857 (Fed. Cir. 2002)* (finding high-end performance motorcycles and lower-performance motorcycles in same market despite affidavits of dealers stating existence of considerable product differences); *Nobel Scientific Indus. v. Beckman Instruments, 670 F. Supp. 1313, 1987-2 Trade Cas. (CCH) P67808 (D. Md. 1986)* (market includes all reagents, not merely those designed for defendant's chemical analysis machines), *aff'd, 831 F.2d 537, 1987-2 Trade Cas. (CCH) P67809, 1987-2 Trade Cas. (CCH) P67809 (4th Cir. 1987)* ; *Liggett & Myers, Inc., 87 F.T.C. 1074, 1163 (1976)* (all dog food found to be in the same market in view of interchangeability of use and cross-elasticity of supply), *aff'd, 567 F.2d 1273, 1977-2 Trade Cas. (CCH) P61782 (4th Cir. 1977)* .

(n23)Footnote 51.  *Eastman Kodak Co. v. Image Technical Servs., 504 U.S. 451, 469, 1992-1 Trade Cas. (CCH) P69839 (1992)* .

(n24)Footnote 52.  *See, e.g.,   United States v. E.I. duPont de Nemours & Co., 351 U.S. 377, 400, 404, 1956 Trade Cas. (CCH) P68369 (1956)* ;  *Forsyth v. Humana, Inc., 114 F.3d 1467, 1483, 1997-1 Trade Cas. (CCH) P71818 (9th Cir. 1997)* , *aff'd, 525 U.S. 299 (1999)* ;  *United States v. Archer-Daniels-Midland Co., 866 F.2d 242, 248, 1988-2 Trade Cas. (CCH) P68362 (8th Cir. 1988)* ;  *Rothery Storage & Van Co. v. Atlas Van Lines, 792 F.2d 210, 218, 1986-1 Trade Cas. (CCH) P67121 (D.C. Cir. 1986)* ;  *SmithKline Corp. v. Eli Lilly & Co., 575 F.2d 1056, 1063, 1978-1 Trade Cas. (CCH) P62007 (3d Cir. 1978)* ;  *United States v. Empire Gas Corp., 537 F.2d 296, 303, 1976-1 Trade Cas. (CCH) P60907 (8th Cir. 1976)* ;  *Coca-Cola Co., 117 F.T.C. 795, 925 & n.48 (1994)* , *modified, 119 F.T.C. 724 (1995)* .

(n25)Footnote 53.  The cross-elasticity of demand between two products is the percentage increase in the quantity demanded of the second product divided by the percentage increase in the price of the first product, holding all else constant. Thus, if a 5% increase in the price of $A$ leads to a 10% increase in the quantity demanded of $B$, the cross-elasticity would be 10% divided by 5%, or 2. *See  Coca-Cola Co., 117 F.T.C. 795, 925 & n.48 (1994)* .

(n26)Footnote 54.  There is relatively little judicial discussion of the time period during which the switch in demand must be made in order to be meaningful. In  *United States v. Continental Can Co., 378 U.S. 441, 455, 1964 Trade Cas. (CCH) P71146 (1964)* , the Supreme Court considered customer responses to competitive conditions over the "long run." In  *United States Anchor Manufacturing Co. v. Rule Industries, 7 F.3d 986, 996, 1993-2 Trade Cas. (CCH) P70426 (11th Cir. 1993)* , the Eleventh Circuit found two types of anchor products to be in separate markets despite some evidence correlating one of the product's rising prices with falling sales over a five-year measuring period. The court held that the plaintiff's correlation evidence failed to "take account of factors other than price (or quality) which may have affected demand" over the five-year period. The 1992 *Merger Guidelines* do not specify a fixed time period for measuring shifts in demand. The *Guidelines* use one year, however, as the period for determining whether the hypothetical monopolist's price increase will lead to a supply-side production shift. 1992 MERGER GUIDELINES, *supra* note 3, § 1.321.

(n27)Footnote 55.  *351 U.S. at 400* ; *see also   Telecor Communs. v. Southwestern Bell Tel. Co., 305 F.3d 1124, 1131, 2002-2 Trade Cas. (CCH) P73801 (10th Cir. 2002)* (explaining that a market is "*elastic* if demand goes down as price goes up" and that a market is "*cross-elastic* if rising prices for product A cause consumers to switch to product B");  *Todd v. Exxon Corp., 275 F.3d 191, 201-02, 2001-2 Trade Cas. (CCH) P73518 (2d Cir. 2001)* (explaining that, in economists' terms, cross-elasticity of demand "exists if consumers would respond to a slight increase in the price of one product by switching to another product");  *H.J., Inc. v. International Tel. & Tel. Corp., 867 F.2d 1531, 1538, 1989 U.S. App. LEXIS 1246 (8th Cir. 1989)* ("[c]ritical to the determination whether certain products move in the same market is their cross-elasticity of demand-the degree that buyers of one product switch to the other in response to price changes");  *Spectrofuge Corp. v. Beckman Instruments, 575 F.2d 256, 277 n.75, 1978-1 Trade Cas. (CCH) P62109 (5th Cir. 1978)* ("Cross-elasticity of demand is the responsiveness of the consumer to price changes among products which are reasonably interchangeable.").

(n28)Footnote 56.  *351 U.S. at 400* . Courts have warned against the "*Cellophane [duPont]* fallacy," cautioning that cross-elasticity of demand should be measured at a competitive price level, rather than at a higher market price that may reflect the presence of some degree of pre-existing market power. For example, in  *Eastman Kodak Co. v. Image Technical Services, 504 U.S. 451, 1992-1 Trade Cas. (CCH) P69839 (1992)* , the Court indicated that the fact that the price of a product is currently restrained by the ability of buyers to substitute other goods or services does not necessarily disprove the existence of market power in the market for that product because its sellers may already be charging a monopoly price. *Id. at 471* ; *cf.* Santa Cruz Med. Clinic v. Dominican Santa Cruz Hosp., 1995-2 Trade Cas. (CCH) P 71,254, at 76,096-97 & n.10 (N.D. Cal. 1995) (discussing *Cellophane* fallacy in context of geographic market definition).

(n29)Footnote 57.  Sherman Act cases: *See, e.g.,   Worldwide Basketball & Sport Tours v. NCAA, 388 F.3d 955, 962, 2004-2 Trade Cas. (CCH) P74612 (6th Cir. 2004)* ("[P]roducts need not be fungible to be market competitors for the purposes of antitrust analysis. ... Rather than fungibility, the proper analysis 'is an appraisal of the "cross-elasticity" of demand in the trade.'") (citation omitted); *cert. denied,   126 S. Ct. 334 (2005)* ;  *Brookins v. International Motor Contest Ass'n, 219 F.3d 849, 854, 2000-2 Trade Cas. (CCH) P72985 (8th Cir. 2000)* (rejecting a proposed relevant market for "transmissions used in modified car racing sanctioned" by the association in the absence of proof that "there is no cross-elasticity of demand between this game and other games that modified car racers might choose to play");  *Rebel Oil Co. v. Atlantic Richfield Co., 51 F.3d 1421, 1435, 1995-1 Trade Cas. (CCH) P70952 (9th Cir. 1995)* (The market definition dispute "focused on cross-elasticity of demand: whether consumers view the products as substitutes

1-6 Antitrust Law Developments 6B

for each other ... . If consumers view the products as substitutes, the products are part of the same market."); *H.J., Inc., 867 F.2d 1531, 1538-40* (submergible liquid manure pumps are in same market as other manure pumps because plaintiff did not introduce sufficient evidence on the cross-elasticity of demand to show that submergible pumps form a separate market); *Syufy Enters. v. American Multicinema, 793 F.2d 990, 994, 1986-1 Trade Cas. (CCH) P66966 (9th Cir. 1986)* (assessment of relevant market must take into account reasonable interchangeability and demand cross-elasticity); *Pennsylvania Dental Ass'n v. Medical Serv. Ass'n, 745 F.2d 248, 260, 1984-2 Trade Cas. (CCH) P66214 (3d Cir. 1984)* ("boundaries of a product market are determined by the reasonable interchangeability or cross-elasticity of demand"); *Hayden Publ'g Co. v. Cox Broad. Corp., 730 F.2d 64, 71, 1984-1 Trade Cas. (CCH) P65897 (2d Cir. 1984)* (defining relevant market requires consideration of demand cross-elasticity); *SmithKline Corp., 575 F.2d at 1064* ("cephalosporins and non-cephalosporin anti-infectives do not demonstrate significant positive cross-elasticity of demand"); *Moore v. Jas. H. Matthews & Co., 550 F.2d 1207, 1218-19, 1977-1 Trade Cas. (CCH) P61376 (9th Cir. 1977)* (plaintiff failed to demonstrate the extent of cross-elasticity of demand among different types of grave memorials and thus made it "impossible" for the court to identify the product market's boundaries); *HDC Med. v. Minntech Corp., 411 F. Supp. 2d 1096, 1103-04, 2006-1 Trade Cas. (CCH) P75157 (D. Minn. 2006)* (finding single relevant market constituting both single- and multiple-use dialysis dialyzers in part because price drop caused customers to switch from multiple-use to single-use dialyzers); *In re Visa Check/MasterMoney Antitrust Litig., 2003-1 Trade Cas. (CCH) P73995, 2003 U.S. Dist. LEXIS 4965 (E.D.N.Y. Apr. 1, 2003)* (Because there was no cross-elasticity of demand at the merchant level between general purpose credit charge cards and other forms of payment, "the relevant market at its broadest, is the provision of general purpose credit and charge card services").

Clayton Act cases: *See, e.g., United States v. Dairy Farmers of Am., 2001-1 Trade Cas. (CCH) P73,136, 2000 U.S. Dist. LEXIS 19979 (E.D. Pa. Nov. 1, 2000)* (cross-elasticity of demand between branded stick and branded whipped butter supported inclusion of both in same relevant product market); *New York v. Kraft Gen. Foods, 926 F. Supp. 321, 333, 1995-1 Trade Cas. (CCH) P70911 (S.D.N.Y. 1995)* (relying in part on cross-elasticity studies to find "adult" and "kid" cereals in the same market); *United States v. Ivaco, Inc., 704 F. Supp. 1409, 1416, 1989-1 Trade Cas. (CCH) P68439 (W.D. Mich. 1989)* (low cross-elasticity of demand and cross-elasticity of supply in tamper market); *Grumman Corp. v. LTV Corp., 527 F. Supp. 86, 90, 1981-2 Trade Cas. (CCH) P64330 (E.D.N.Y.)* (cross-elasticity of demand for two aircraft nonexistent), *aff'd, 665 F.2d 10, 1981-2 Trade Cas. (CCH) P64364 (2d Cir. 1981)* ; *United States v. United Techs. Corp., 1977-2 Trade Cas. (CCH) P61647, 1977 U.S. Dist. LEXIS 18122 (N.D. Ohio Sept. 9, 1977)* (gas turbine generating systems and fossil or nuclear steam generating systems not in same market where econometric model showed "zero cross-elasticity" between them); *R.R. Donnelley & Sons Co., 120 F.T.C. 36, 175-76 (1995)* (high-volume gravure printing market rejected, inter alia, because buyers of printing services could and did use either offset or gravure printing services for a wide range of printing jobs; as a result, a price increase to all gravure customers would not be sustainable because too many purchasers would switch to offset printing); *Coca Cola Bottling Co., 118 F.T.C. 452, 540-41 (1994)* ("[T]he Commission has recognized the utility of evidence of cross-elasticity of demand such as the 5% test is designed to elicit, despite some of the difficulties in calculating such elasticities."); *Coca-Cola Co., 117 F.T.C. 795, 925 & n.48 (1994)* , *modified, 119 F.T.C. 724 (1995)* .

(n30)Footnote 58.    *970 F. Supp. 1066, 1997-2 Trade Cas. (CCH) P71867 (D.D.C. 1997)* .

(n31)Footnote 59.    *Id. at 1073* (emphasis added).

(n32)Footnote 60.    *Id. at 1080* . Although ostensibly relying on economic concepts rather than intuition, the court did note that "it is difficult to overcome the first blush or initial gut reaction of many people to the definition of the relevant product market as the sale of consumable office supplies through office supply superstores." *Id. at 1075* .

(n33)Footnote 61.    *Id. at 1076-80* .

(n34)Footnote 62.    *Id. at 1078* .

(n35)Footnote 63.    *181 F.3d 216, 1999-1 Trade Cas. (CCH) P72561 (2d Cir. 1999)* .

(n36)Footnote 64.    *See part 6B(8)* of this chapter.

(n37)Footnote 65.    *181 F.3d at 228-30* .

(n38)Footnote 66.    *Id. at 229* .

(n39)Footnote 67. *Id.*

(n40)Footnote 68.    *172 F. Supp. 2d 172, 2001-2 Trade Cas. (CCH) P73493 (D.D.C. 2001)* .

1-6 Antitrust Law Developments 6B

(n41)Footnote 69.  *Id. at 183* .

(n42)Footnote 70.  *Id. at 187* .

(n43)Footnote 71.  *See generally  Worldwide Basketball & Sport Tours v. NCAA, 388 F.3d 955, 962, 2004-2 Trade Cas. (CCH) P74612 (6th Cir. 2004)* (when the relevant product is not fungible, failure to examine cross-elasticity of demand is not fatal to claim as long as plaintiff presents evidence of distinctive price, use, and qualities), *cert. denied, 126 S. Ct. 334, 2005 U.S. LEXIS 5528 (2005)* ;  *Brokerage Concepts v. United States Healthcare, Inc., 140 F.3d 494, 513-14, 1998-1 Trade Cas. (CCH) P72099 (3d Cir. 1998)* (rejecting relevant product market confined to drugs purchased by members of a single health maintenance organization (HMO) because cross-elasticities study failed to rule out alternative explanation for lack of pharmacy switching out of HMO in response to reduced HMO payments to pharmacies);  *United States Anchor Mfg. Co. v. Rule Indus., 7 F.3d 986, 996, 1993-2 Trade Cas. (CCH) P70426 (11th Cir. 1993)* (evidence that over five-year period sales of some anchors increased when price of other anchors increased insufficient to include them in same market; timing of changes was not close enough to establish that the two phenomena were causally related as opposed to merely correlated in time);  *Buyer's Corner Realty, Inc. v. Northern Ken. Ass'n of Realtors, 410 F. Supp. 2d 574, 583, 2006-1 Trade Cas. (CCH) P75112 (E.D. Ky. 2006)* (finding that interchangeability of use must typically be demonstrated by a "cross-elasticity" economic study);  *JamSports & Entm't v. Paradama Prods., 336 F. Supp. 2d 824, 841, 2004-2 Trade Cas. (CCH) P74524 (N.D. Ill. 2004)* (studies based on cross-elasticities of demand are helpful but not essential for defining a relevant market);  *Defiance Hosp. v. Fauster-Cameron, Inc., 344 F. Supp. 2d. 1097, 1109, 2004-2 Trade Cas. (CCH) P74625 (N.D. Ohio 2004)* (finding that defendants had "produced no evidence of any other service that is a reasonable substitute for anesthesia services in terms of use and cross-elasticity of demand");  *Olin Corp., 113 F.T.C. 400, 595 (1990)* ("direct cross-elasticity data are 'generally unavailable' and ... product markets may be defined by less direct evidence"), *aff'd,  986 F.2d 1295, 1993-1 Trade Cas. (CCH) P70137 (9th Cir. 1993)* ;  *B.A.T. Indus., 104 F.T.C. 852, 931 (1984)* (rejecting cross-elasticity study as flawed);  *United States v. Mrs. Smith's Pie Co., 440 F. Supp. 220, 227-28, 1977-1 Trade Cas. (CCH) P61518 (E.D. Pa. 1976)* (the government's attempted proof of "low price elasticity" was "completely useless," primarily because there was "no basis for evaluating what a particular elasticity coefficient means");  *Coca-Cola Co., 117 F.T.C. 795, 927* ("The Commission appreciates both the utility of using cross-elasticity of demand, and the difficulty of calculating such elasticities ... and [it] therefore considers all available relevant evidence in delineating relevant markets.").

(n44)Footnote 72.  *United States v. E.I. duPont de Nemours & Co., 351 U.S. 377, 411, 1956 Trade Cas. (CCH) P68369 (1956)* .

(n45)Footnote 73.  *980 F.2d 171, 1992 U.S. App. LEXIS 27898 (3d Cir. 1992)* .

(n46)Footnote 74.  *Id. at 199; see also* Chicago Bridge & Iron Co., 138 F.T.C. 1392, 1403 (2003) (initial decision) (finding the relevant product market to include the design and construction of LIN/LOX industrial storage tanks and to exclude spheres, "which are constructed in a different manner, serve different functions, and are not a substitute for LIN/LOX tanks"), 138 F.T.C. 1024 (2004); Nobody In  *Particular Presents, Inc. v. Clear Channel Communs., 311 F. Supp. 2d 1048, 1083, 1091, 2004-1 Trade Cas. (CCH) P74367 (D. Colo. 2004)* (rock concerts have distinct qualities from non-rock concerts).

(n47)Footnote 75.  *980 F.3d 171, 199.*

(n48)Footnote 76.  *Id. at 200-01.*

(n49)Footnote 77.  *828 F. Supp. 78, 1993 Trade Cas. (CCH) P70210, 1993-1 Trade Cas. (CCH) P70210 (D.D.C. 1993)* .

(n50)Footnote 78.  *Id. at 82-84* .

(n51)Footnote 79.  *Id. at 83* ; *see also  Allen-Myland, Inc. v. IBM Corp., 33 F.3d 194, 201-07, 1994-2 Trade Cas. (CCH) P70685 (3d Cir. 1994)* (remanding for a fact determination as to whether large-scale mainframe computers compete in same market as peripheral computers and software upgrades).

(n52)Footnote 80.  *344 F.3d 229, 2003-2 Trade Cas. (CCH) P74151 (2d Cir. 2003)* .

(n53)Footnote 81.  *Id. at 238-39* .

(n54)Footnote 82.  *Id. at 239* .

(n55)Footnote 83.  *Id. at 239-40* .

(n56)Footnote 84.    *986 F.2d 589, 591, 599, 1993-1 Trade Cas. (CCH) P70142 (1st Cir. 1993)* .

(n57)Footnote 85.    *See    Blue Cross & Blue Shield United v. Marshfield Clinic, 65 F.3d 1406, 1410-11, 1995-2 Trade Cas. (CCH) P71120 (7th Cir. 1995)* (rejecting HMO-only market and holding that "the definition of a market depends on substitutability on the supply side as well as on the demand side. ... The services offered by HMOs and by various fee-for-service plans are both provided by the same physicians, who can easily shift from one type of service to another if a change in relative prices makes one type more lucrative than others."). *But see    United States v. Aetna, Inc., 64 Fed. Reg. 44,946, 44,955 (N.D. Tex. 1999)* (consent decree) (relevant product market is HMO and HMO-POS plans).

(n58)Footnote 86.    *825 F.2d 1559, 1987-2 Trade Cas. (CCH) P67690 (11th Cir. 1987)* .

(n59)Footnote 87.    *Id. at 1563* . In    *Reilly v. Hearst Corp., 107 F. Supp. 2d 1192, 2000-02 Trade Cas. (CCH) P72992, 2000-2 Trade Cas. (CCH) P72992 (N.D. Cal. 2000)* , the district court identified a relevant market for news, features, and opinion content, but expressed doubt as to whether newspapers would be the only products in the relevant market given the growing number of information services available, including radio, television, and the Internet. *Id. at 1200.* Similarly, in    *America Online, Inc. v. GreatDeals.Net, 49 F. Supp. 2d 851, 1999-1 Trade Cas. (CCH) P72534 (E.D. Va. 1999)* , the district court rejected e-mail advertising as a relevant market, finding that there are "numerous substitutes ... including use of the World Wide Web, direct mail, billboards, television, newspapers, radio, and leaflets." *Id. at 858* . Conversely, however, in    *Omni Outdoor Advertising v. Columbia Outdoor Advertising, 891 F.2d 1127, 1142, 1989-2 Trade Cas. (CCH) P68872 (4th Cir. 1989)* , *rev'd on other grounds sub nom.    City of Columbia v. Omni Outdoor Advertising, 499 U.S. 365, 1991-1 Trade Cas. (CCH) P69378 (1991)* , the Fourth Circuit upheld the jury's finding of a narrow relevant market for advertising on billboards that excluded other modes of advertising delivery such as newspapers, television, and radio. *See    Menasha Corp. v. News Am. Mktg. In-Store, 354 F.3d 661, 665, 2004-1 Trade Cas. (CCH) P74254 (7th Cir. 2004)* (seller failed to show at-shelf coupon dispensers were distinct market in which competitor had market power); *Berlyn Inc. v. Gazette Newspapers, 73 Fed. Appx. 576, 582-83, 2003 U.S. App. LEXIS 16814 (4th Cir. 2003)* (newspaper publishers improperly excluded other forms of print advertising and nonprint media advertising from product market); *Ad-Vantage Tel. Directory Consultants v. GTE Directories Corp., 849 F.2d 1336, 1341-42, 1987-2 Trade Cas. (CCH) P67683 (11th Cir. 1987)* (holding that "yellow pages advertising" is a market distinct from advertising in other media, including newspapers, consumer magazines, and business publications); *Community Publishers v. Donrey Corp., 892 F. Supp. 1146, 1153 n.6, 1995-1 Trade Cas. (CCH) P71049 (W.D. Ark. 1995)* (separate relevant markets for advertising in local daily newspapers as opposed to national and state newspapers or weekly newspapers), *aff'd sub nom.    Community Publishers v. DR Partners, 139 F.3d 1180, 1998-1 Trade Cas. (CCH) P72093 (8th Cir. 1998)* ; *Advo, Inc. v. Philadelphia Newspapers, 854 F. Supp. 367, 373-74, 1994-1 Trade Cas. (CCH) P70663 (E.D. Pa. 1994)* (segmenting the market for "high density distribution of printed Advertising Circulars" into two separate markets consisting of run-of-press advertising and preprinted advertising), *aff'd,    51 F.3d 1191, 1995-1 Trade Cas. (CCH) P70964 (3d Cir. 1995)* . *But see    Yellow Page Solutions v. Bell Atl. Yellow Pages Co., 2002-1 Trade Cas. (CCH) P73556, 2001 U.S. Dist. LEXIS 18831 (S.D.N.Y. Nov. 14, 2001)* (rejecting proposed relevant market of yellow pages directories absent proof that all other forms of electronic and print media are not interchangeable).

(n60)Footnote 88.    *358 U.S. 242, 1959 Trade Cas. (CCH) P69231 (1959)* .

(n61)Footnote 89.    *Id. at 251* .

(n62)Footnote 90.    *334 U.S. 131, 172-73, 1948 U.S. LEXIS 2850 (1948)* .

(n63)Footnote 91.    *358 U.S. at 252* .

(n64)Footnote 92.    *See, e.g.,    United States v. Dairy Farmers of Am., 2001-1 Trade Cas. (CCH) P73,136, 2000 U.S. Dist. LEXIS 19979 (E.D. Pa. Nov. 1, 2000)* (relevant product markets are branded stick and branded whipped butter, which possess different quality characteristics, both real and perceived, than private label equivalents); *United States Anchor Mfg. Co. v. Rule Indus., 7 F.3d 986, 995-99, 1993-2 Trade Cas. (CCH) P70426 (11th Cir. 1993)* (although functionally interchangeable with less expensive anchors, Danforth anchors constitute a separate market because of customer perception that they are of much higher quality); *FTC v. Warner Communications, Inc., 742 F.2d 1156, 1163, 1984 U.S. App. LEXIS 18639 (9th Cir. 1984)* (per curiam) (prerecorded music found to be market separate from home tapes market based on quality differences); *Vitale v. Marlborough Gallery, 1994-1 Trade Cas. (CCH) P70654, 1994 U.S. Dist. LEXIS 9006 (S.D.N.Y. July 1, 1994)* (finding discrete relevant product market for Jackson Pollock paintings within broader market for "contemporary and modern paintings"); *United States v. Gillette Co., 828 F. Supp. 78, 82-84, 1993 Trade Cas. (CCH) P70210, 1993-1 Trade Cas. (CCH) P70210 (D.D.C. 1993)* (finding a market for premium writing instruments selling in the $40-400 range based on "image, prestige and status"); *Ansell, Inc. v. Schmid Labs., 757 F. Supp. 467, 473-74, 1991-1 Trade Cas. (CCH) P69379 (D.N.J.)* (defining submarket of

1-6 Antitrust Law Developments 6B

brand name condoms, based on differences of price and quality with other condoms), *aff'd mem.*, *941 F.2d 1200 (3d Cir. 1991)* ; *Monfort of Colo., Inc. v. Cargill, Inc., 591 F. Supp. 683, 698, 1985-1 Trade Cas. (CCH) P66575 (D. Colo. 1983)* , *aff'd*, *761 F.2d 570, 1985-1 Trade Cas. (CCH) P66576 (10th Cir. 1985)* (boxed beef in a separate market from other beef), *rev'd on other grounds*, *479 U.S.104, 1986-2 Trade Cas. (CCH) P67366 (1986)* ; *Donald B. Rice Tire Co. v. Michelin Tire Corp., 483 F. Supp. 750, 755, 1980-1 Trade Cas. (CCH) P63249 (D. Md. 1980)* (radial tires in separate market from nonradial tires), *aff'd*, *638 F.2d 15, 1980-81 Trade Cas. (CCH) P63720 (4th Cir. 1981)* ; *United States v. Black & Decker Mfg. Co., 430 F. Supp. 729, 739, 1976-2 Trade Cas. (CCH) P61033 (D. Md. 1976)* (separate markets for different classes and sizes of chain saws).

(n65)Footnote 93. *691 F. Supp. 1262, 1988-2 Trade Cas. (CCH) P68162 (N.D. Cal. 1988)* , *aff'd sub nom. Haagen-Dazs Co. v. Double Rainbow Gourmet Ice Creams, Inc., 895 F.2d 1417 (9th Cir. 1990)* .

(n66)Footnote 94. *Id. at 1268* ; *see Murrow Furniture Galleries v. Thomasville Furniture Indus., 889 F.2d 524, 528, 1989-2 Trade Cas. (CCH) P68850 (4th Cir. 1989)* (rejecting market limited to high-quality furniture); *H.J., Inc. v. International Tel. & Tel. Corp., 867 F.2d 1531, 1540, 1989 U.S. App. LEXIS 1246 (8th Cir. 1989)* (rejecting submersible liquid manure pumps as a separate submarket of general manure pump market); *Thurman Industries, Inc. v. Pay 'N Pak Stores, Inc., 875 F.2d 1369, 1375-77, 1989 U.S. App. LEXIS 7160 (9th Cir. 1989)* (rejecting home center stores as a separate submarket); *City of Mt. Pleasant v. Associated Elec. Coop., 838 F.2d 268, 279, 1987-2 Trade Cas. (CCH) P67871, 1988-1 Trade Cas. (CCH) P67871 (8th Cir. 1988)* (subsidized electrical energy cannot be a submarket of electrical energy as a whole simply because it costs less); *Carter v. Variflex, Inc., 101 F. Supp. 2d 1261, 1266-67, 2000-1 Trade Cas. (CCH) P72813 (C.D. Cal. 2000)* (rejecting argument that the differences in price and quality between instant and piece-together canopies were so substantial as to make instant canopies a separate market); *Western Parcel Express v. UPS, 65 F. Supp. 2d 1052, 1059, 1999-2 Trade Cas. (CCH) P72622 (N.D. Cal. 1998)* (holding that the relevant market should include the full spectrum of commercial shipping services, and noting that "WPX's attempt to define the market on the basis of price or product variances is contrary to case law holding that '[s]uch distinctions are economically meaningless where the differences are actually part of a spectrum of price and [product options].'" (citations omitted) (alterations in original), *aff'd*, *190 F.3d 974, 1999-2 Trade Cas. (CCH) P72623 (9th Cir. 1999)* ; *New York v. Kraft Gen. Foods, 926 F. Supp. 321, 333, 1995-1 Trade Cas. (CCH) P70911 (S.D.N.Y. 1995)* (ready-to-eat cereals "are so highly differentiated, and compete with one another along so many different dimensions, that there is no clear break in the chain of substitutes among cereals that would permit definition of a market smaller than all RTE cereals"); *Pennsylvania v. Russell Stover Candies, Inc., 1993-1 Trade Cas. (CCH) P70224, 1993 U.S. Dist. LEXIS 6024 (E.D. Pa. May 6, 1993)* (relevant market encompasses both branded gift boxed chocolates and other chocolates and candies available to consumers); *United States v. Ivaco, Inc., 704 F. Supp. 1409, 1416-17, 1989-1 Trade Cas. (CCH) P68439 (W.D. Mich. 1989)* (high technology and conventional automatic tampers in same market despite quality differences resulting in limited substitutability for some customers; price differential offsets quality difference); *Frank Saltz & Sons v. Hart Schaffner & Marx, 1985-2 Trade Cas. (CCH) P66768, 1985 U.S. Dist. LEXIS 16243 (S.D.N.Y. Sept. 5, 1985)* (declining to find a "better quality suit" market after finding that consumers purchase suits in multiple quality categories); *United States v. Tracinda Inv. Corp., 477 F. Supp. 1093, 1103, 1979-2 Trade Cas. (CCH) P62889 (C.D. Cal. 1979)* (rejecting claim that motion picture market should be narrowed on the basis of pictures' quality or gross at box office); *United States v. Joseph Schlitz Brewing Co., 253 F. Supp. 129, 145-46, 1966 Trade Cas. (CCH) P71725 (N.D. Cal.)* (premium and nonpremium beer part of same market, despite existence of some customers who will purchase only one type and persistent price differential, in light of substantial overlap in sales), *aff'd*, *385 U.S. 37, 1966 Trade Cas. (CCH) P71916 (1966)* . *But see* Nestle Holdings, 136 F.T.C. 791, 794 (2003) (consent order defining relevant market as "sale of superpremium ice cream products to the retail channel").

(n67)Footnote 95. *329 F. Supp. 2d 109, 2004-2 Trade Cas. (CCH) P74513 (D.D.C. 2004)* .

(n68)Footnote 96. *Id. at 123* .

(n69)Footnote 97. *Id. at 122* .

(n70)Footnote 98. *Id.*

(n71)Footnote 99. *331 F. Supp. 2d 1098, 2004-2 Trade Cas. (CCH) P74542 (N.D. Cal. 2004)* .

(n72)Footnote 100. *Id. at 1113* .

(n73)Footnote 101. *Id. at 1158* .

1-6 Antitrust Law Developments 6B

(n74)Footnote 102. *Id. at 1159 ; see JES Props. v. USA Equestrian, Inc., 253 F. Supp. 2d 1273, 1282, 2003-2 Trade Cas. (CCH) P74072 (M.D. Fla. 2003)* (declining to find that market consisted of only "A" rated competitions because plaintiffs failed to articulate why "A" rated competitions were not a part of a larger market for competitions).

(n75)Footnote 103. *See, e.g., CDC Techs. v. IDEXX Lab., 7 F. Supp. 2d 119, 126, 1998 U.S. Dist. LEXIS 15125 (D. Conn. 1998)* (denying defendants' motion for summary judgment as to the relevant product market because the significant price difference between in-clinic hematology analyzers for veterinarians and outside laboratory services providing the same information raised a material issue of fact whether outside laboratory services belonged in the same product market as in-clinic analyzers), *aff'd on other grounds, 186 F.3d 74, 1999-2 Trade Cas. (CCH) P72594 (2d Cir. 1999)* .

(n76)Footnote 104. *377 U.S. 271, 1964 Trade Cas. (CCH) P71116 (1964)* .

(n77)Footnote 105. *Id. at 276-77 ; see Rebel Oil Co. v. Atlantic Richfield Co., 51 F.3d 1421, 1436, 1995-1 Trade Cas. (CCH) P70952 (9th Cir. 1995)* ("A price differential between two products may reflect a low cross-elasticity of demand, if the higher priced product offers additional service for which consumers are willing to pay a premium.").

(n78)Footnote 106. *866 F.2d 242, 1988-2 Trade Cas. (CCH) P68362 (8th Cir. 1988)* .

(n79)Footnote 107. *Id. at 246* .

(n80)Footnote 108. *Id.* Without explanation, the court added in dictum that "generally a price differential, even a substantial one, is irrelevant for purposes of determining reasonable interchangeability." *Id.*

(n81)Footnote 109. *Id.; see Geneva Pharms. Tech. Corp. v. Barr Labs., 386 F.3d 485, 497, 2004-2 Trade Cas. (CCH) P74583 (2d Cir. 2004)* (finding that generic drug and branded drug were not in the same product market where the price of the branded drug was substantially higher than that of the generic drug); *Forsyth v. Humana, Inc., 114 F.3d 1467, 1477, 1997-1 Trade Cas. (CCH) P71818 (9th Cir. 1997)* (observing that while price difference alone may not be dispositive, two commodities are probably not in the same relevant market "when demand for the commodity of one producer shows no relation to the price for the commodity of another producer"), *aff'd on other grounds, 525 U.S. 299 (1999)* ; *United States Anchor Mfg. Co. v. Rule Indus., 7 F.3d 986, 996, 1993-2 Trade Cas. (CCH) P70426 (11th Cir. 1993)* (holding that relevant market was generic and economy fluke anchors, and did not include brand name anchors); *FTC v. Warner Communications, Inc., 742 F.2d 1156, 1163, 1984 U.S. App. LEXIS 18639 (9th Cir. 1984)* (prerecorded music, excluding home tapes, found to be separate market based on 300% price difference) (per curiam); *Photovest Corp. v. Fotomat Corp., 606 F.2d 704, 713-14, 1979-2 Trade Cas. (CCH) P62869 (7th Cir. 1979)* (20% higher price for drive-thru film processing supported finding of a separate market); *RSR Corp. v. Federal Trade Com., 602 F.2d 1317, 1322, 1979 U.S. App. LEXIS 12835 (9th Cir. 1979)* (secondary lead sold for 10% less than primary lead); *Beatrice Foods Co. v. FTC, 540 F.2d 303, 308-09, 1976-2 Trade Cas. (CCH) P61036 (7th Cir. 1976)* ("brushes and rollers were found to possess prices distinct from aerosols or sprayers"); *Avnet, Inc. v. FTC, 511 F.2d 70, 77, 1975-1 Trade Cas. (CCH) P60184 (7th Cir. 1975)* (separate market for rebuilt or reconditioned used components sold at 25-50% below the prices for comparable new components); *FTC v. Swedish Match, 131 F. Supp. 2d 151, 161 n.8, 2000-2 Trade Cas. (CCH) P73122 (D.D.C. 2000)* (price difference between moist snuff and loose leaf chewing tobacco supported finding that the two products were not in the same relevant market); *Ansell, Inc. v. Schmid Labs., 757 F. Supp. 467, 474, 1991-1 Trade Cas. (CCH) P69379 (D.N.J.)* (price discrepancy supported finding of separate market), *aff'd mem., 941 F.2d 1200 (3d Cir. 1991)* ; *United States v. Black & Decker Mfg. Co., 430 F. Supp. 729, 738-40, 1976-2 Trade Cas. (CCH) P61033 (D. Md. 1976)* (professional and occasional user chain saws distinguished based on price differential); *B.A.T. Indus., 104 F.T.C. 852, 931-32 (1984)* ("a substantially and persistently higher price [for one of two products at issue] ... indicates that a small price change for either product would be unlikely to induce [switching]"). *But cf. Kennecott Copper Corp. v. FTC, 467 F.2d 67, 78-79, 1972 Trade Cas. (CCH) P74157 (10th Cir. 1972)* (concluding that price competitiveness between coal and other energy sources alone is insufficient basis for finding product market that includes more than coal). Other courts have created submarkets to account for price differences between branded and unbranded products or premium and lower-priced brands. *See, e.g., C.E. Servs. v. Control Data Corp., 759 F.2d 1241, 1985-1 Trade Cas. (CCH) P66605 (5th Cir. 1985)* ; *Carlock v. Pillsbury Co., 719 F. Supp. 791, 1989-2 Trade Cas. (CCH) P68833 (D. Minn. 1989)* ; *In re Super Premium Ice Cream Distrib. Antitrust Litig., 691 F. Supp. 1262, 1988-2 Trade Cas. (CCH) P68162 (N.D. Cal. 1988)* , *aff'd sub nom. Haagen-Dazs Co. v. Double Rainbow Gourmet Ice Creams, Inc., 895 F.2d 1417 (9th Cir. 1990)* .

(n82)Footnote 110. *United States v. E.I. duPont de Nemours & Co., 351 U.S. 377, 401, 1956 Trade Cas. (CCH) P68369 (1956)* .

1-6 Antitrust Law Developments 6B

(n83)Footnote 111. *Id.*; *see also   United States v. Continental Can Co., 378 U.S. 441, 455, 1964 Trade Cas. (CCH) P71146 (1964)* ("That there are price differentials ... [is] relevant ... but not determinative of the product market issue."); *Nifty Foods Corp. v. Great Atl. & Pac. Tea Co., 614 F.2d 832, 840-41, 1980-1 Trade Cas. (CCH) P63160 (2d Cir. 1980)* (despite price differential brand name frozen waffles and private label frozen waffles are in the same product market); *Twin City Sportservice v. Charles O. Finley & Co., 512 F.2d 1264, 1274, 1975-1 Trade Cas. (CCH) P60195 (9th Cir. 1975)* (citing *duPont*); *Buehler AG v. Ocrim S.p.A., 836 F. Supp. 1305, 1325, 1993-2 Trade Cas. (CCH) P70384 (N.D. Tex. 1993)* (relevant market included both United States and European roller mills in the United States, because while the United States mills had higher labor costs, the European mills had higher capital costs, so that both types of mills "perform the same function at about the same overall cost"), *aff'd mem.,   34 F.3d 1080, 1994 U.S. App. LEXIS 23260, 1994 U.S. App. LEXIS 31958 (Fed. Cir. 1994)* . *But see   Geneva Pharms. Tech. Corp. v. Barr Labs., 386 F.3d 485, 498, 2004-2 Trade Cas. (CCH) P74583 (2d Cir. 2004)* (rejecting district court holding that relevant market included generic and branded warfarin sodium).

(n84)Footnote 112.  *614 F.2d 832, 1980-1 Trade Cas. (CCH) P63160 (2d Cir. 1980)* .

(n85)Footnote 113.  *Id. at 840* ; *see also   AD/SAT v. Associated Press, 181 F.3d 216, 228, 1999-1 Trade Cas. (CCH) P72561 (2d Cir. 1999)* (holding that the price difference between one-hour delivery services for newspaper advertisements ($40) and overnight transmission services ($8) was insufficient to demonstrate that the two delivery services were in different product markets); *Tarrant Serv. Agency v. American Standard, Inc., 12 F.3d 609, 614-15, 1994-1 Trade Cas. (CCH) P70489 (6th Cir. 1993)* (generic heating, ventilating, and air conditioning parts and branded products); *William Inglis & Sons Baking Co. v. Continental Baking Co., 942 F.2d 1332, 1991-2 Trade Cas. (CCH) P69524 (9th Cir. 1991)* , *vacated in part,   970 F.2d 639, 1992-2 Trade Cas. (CCH) P69929 (9th Cir.)* , *superseded, 981 F.2d 1023 (9th Cir. 1992)* (private label bread and branded bread); *Liggett & Myers, Inc. v. FTC, 567 F.2d 1273, 1274-75, 1977-2 Trade Cas. (CCH) P61782 (4th Cir. 1977)* (economy and premium dog foods in single market); *Acme Precision Prods. v. American Alloys Corp., 484 F.2d 1237, 1240-44, 1973-2 Trade Cas. (CCH) P74711 (8th Cir. 1973)* (various alloys in same product market despite price differences); *United States v. Joseph Schlitz Brewing Co., 253 F. Supp. 129, 133, 1966 Trade Cas. (CCH) P71725 (N.D. Cal.)* ("premium beer" is in same product market as "popularly priced beer" and "private label beer"), *aff'd   385 U.S. 37, 1966 Trade Cas. (CCH) P71916 (1966)* .

(n86)Footnote 114. *See, e.g.,   United States v. Grinnell Corp., 384 U.S. 563, 571-75, 1966 Trade Cas. (CCH) P71459, 1966 Trade Cas. (CCH) P71789 (1966)* (finding a relevant price discrimination product market for class of inelastic buyers); *United States v. Rockford Mem'l Corp., 898 F.2d 1278, 1283-84, 1990-1 Trade Cas. (CCH) P68978 (7th Cir. 1990)* (Posner, J.) (explaining that each category of customers identified with a specific hospital service (i.e., a specific medical indication) could represent a separate relevant product market if a hypothetical monopolist could discriminate in price (or other terms of competition) between such categories based on identified demand elasticities); *R.R. Donnelley & Sons Co., 120 F.T.C. 36, 153 (1995)* (under the standards set forth in § 1.11 of the 1992 *Merger Guidelines*, the FTC will define a relevant market for a group of buyers for which a hypothetical monopolist could profitably impose a "small but significant and nontransitory" increase in price); *Owens-Illinois, Inc., 115 F.T.C. 179, 295-96 (1992)* (same); *Midcon Corp., 112 F.T.C. 93 (1989)* . *But see   AD/SAT v. Associated Press, 181 F.3d 216, 228, 1999 U.S. App. LEXIS 13760 (2d Cir. 1999)* ("where a 'market' itself is insubstantial, made up of only a few buyers with extremely strong preferences, antitrust law is not implicated"). In *R.R. Donnelley*, the FTC concluded that a profitable discriminatory price increase would be possible, and therefore sufficient to define a relevant market, if three conditions were satisfied: (1) the hypothetical monopolist can identify gravure customers with sufficiently inelastic demand for gravure printing (i.e., those who will not switch to offset printing in response to a five percent price increase); (2) the hypothetical monopolist can selectively and profitably increase prices to those gravure customers; and (3) arbitrage of gravure printing (resale by favored elastic customers to targeted inelastic customers) would not be sufficient to undermine the price increase.

*120 F.T.C. 36, 158*. After evaluating these factors, the FTC concluded that because a significant and nontransitory increase in gravure prices for high-volume printing would likely expand use of offset printing, "high volume publication gravure printing" did not constitute a relevant market. *Id. at 176.*

(n87)Footnote 115.  *431 F.3d 917 (6th Cir. 2005)* .

(n88)Footnote 116.  *Id. at 921* .

(n89)Footnote 117.  *Id. at 935* .

(n90)Footnote 118.  *Id. at 933-34* .

(n91)Footnote 119.   *377 U.S. 271, 1964 Trade Cas. (CCH) P71116 (1964)* .

(n92)Footnote 120.   *Id. at 276* ; *see also United States Anchor Mfg. Co. v. Rule Indus., 7 F.3d 986, 996, 1993-2 Trade Cas. (CCH) P70426 (11th Cir. 1993)* ("If changes in relative prices had been more closely correlated in time with shifting purchases then it might have been reasonable to infer that the demand shifts were caused by the price differences."); *Ad-Vantage Tel. Directory Consultants v. GTE Directories Corp., 849 F.2d 1336, 1342, 1987-2 Trade Cas. (CCH) P67683 (11th Cir. 1987)* (fact that increases in prices of yellow pages advertising were not commensurate with increases in prices for other forms of advertising supported jury finding that yellow pages advertising was a relevant product market) (applying Sherman Act precedent to state law claim); *Avnet, Inc. v. FTC, 511 F.2d 70, 77, 1975-1 Trade Cas. (CCH) P60184 (7th Cir. 1975)* (noting the lack of "substantial interaction in price" between reconditioned and new parts); *FTC v. Swedish Match, 131 F. Supp. 2d 151, 165, 2000-2 Trade Cas. (CCH) P73122 (D.D.C. 2000)* ; *cf. Yoder Bros. v. California-Florida Plant Corp., 537 F.2d 1347, 1368, 1976-2 Trade Cas. (CCH) P61047 (5th Cir. 1976)* (consumer responsiveness to price differences between chrysanthemums and carnations was not negated by facts that prices of carnations did not change at "same instant" as chrysanthemum prices and that prices for the two ornamental flowers did not change by "precisely the same amounts"). *But see Gordon v. Lewistown Hosp., 272 F. Supp. 2d 393, 2003-2 Trade Cas. (CCH) P74197 (M.D. Pa. 2003)* (finding products in same market despite no cross elasticity of demand on the ground that price is an insufficient measure of consumer preference in medical markets), *aff'd, 423 F.3d 184, 2005-2 Trade Cas. (CCH) P74923 (3d Cir. 2005)* , *cert. denied, 126 S. Ct. 1777 (2006)* .

(n93)Footnote 121.   *See, e.g., Coca-Cola Co., 117 F.T.C. 795, 936 n.67, 940 (1994)* (finding separate product markets for branded and nonbranded carbonated soft drink concentrate despite evidence that prices "have trended together over time," noting that the parallel price trends could be attributable to other factors such as "changes in the costs of common ingredients"), *modified, 119 F.T.C. 724 (1995)* .

(n94)Footnote 122.   *253 F.3d 34, 2001-1 Trade Cas. (CCH) P73321 (D.C. Cir. 2001)* .

(n95)Footnote 123.   *Id. at 53* .

(n96)Footnote 124.   *Id. at 53-54* .

(n97)Footnote 125.   *33 F.3d 194, 1994-2 Trade Cas. (CCH) P70685 (3d Cir. 1994)* .

(n98)Footnote 126.   *Id. at 202* ; *accord In re IBM Peripheral EDP Devices Antitrust Litig., 481 F. Supp. 965, 979, 1979-2 Trade Cas. (CCH) P62989 (N.D. Cal. 1979)* (excluding leasing companies, service bureaus, and time-sharing companies from market for general equipment computer systems), *aff'd sub nom. Transamerica Computer Co. v. IBM Corp., 698 F.2d 1377, 1982-83 Trade Cas. (CCH) P65218 (9th Cir. 1983)* .

(n99)Footnote 127.   *148 F.2d 416, 1945 Trade Cas. (CCH) P57342 (2d Cir. 1945)* . The *Alcoa* court excluded "secondary ingot derived from scrap" from the virgin aluminum ingot market based on a finding that Alcoa's power over the supply of virgin ingot allowed the company to "indirectly control the supply of secondary ingot as well." *Allen-Myland*, 33 F.3d 194, 203 (citing *Alcoa, 148 F.2d 416, 425*).

(n100)Footnote 128.   *33 F.3d at 203* .

(n101)Footnote 129.   *Id.*; *accord In re Wang Labs., 1996 U.S. Dist. LEXIS 879 (D. Mass. Jan. 4, 1996)* (approving bankruptcy court finding that relevant market included all brands of mid-range computer systems, including both new and used equipment). *But cf. Avnet, Inc. v. FTC, 511 F.2d 70, 77, 1975-1 Trade Cas. (CCH) P60184 (7th Cir. 1975)* (excluding rebuilt and reconditioned used components from relevant market for new automotive electrical units based on 25-50% difference in price and "the absence of any substantial interaction in price between the two lines"). The 1992 *Merger Guidelines* provide that "[t]o the extent that the analysis under § 1.1 [Product Market Definition in the Presence of Price Discrimination] indicates that used, reconditioned or recycled goods are included in the relevant market, market participants will include firms that produce or sell such goods and that likely would offer those goods in competition with other relevant products." 1992 MERGER GUIDELINES, *supra* note 3, § 1.31.

(n102)Footnote 130.   *See, e.g., PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105, 2003-1 Trade Cas. (CCH) P73914 (2d Cir. 2002)* (finding that a relevant product market consists of products that have reasonable interchangeability for the purposes for which they are produced and consumers treat them as acceptable substitutes); *Virtual Maint., Inc. v. Prime Computer, Inc., 11 F.3d 660, 664-65, 1993-2 Trade Cas. (CCH) P70446 (6th Cir. 1993)* (in remanding case for new trial, court rescinded conclusion in earlier decision that the alleged tying market could not be predicated on the "demand side" alone), *cert. dismissed, 512 U.S. 1216 (1994)* ; *United States v. Archer-Daniels-Midland Co., 866 F.2d 242, 246, 1988-2 Trade Cas. (CCH) P68362 (8th Cir. 1988)* ; *Borden, Inc. v. FTC, 674 F.2d*

1-6 Antitrust Law Developments 6B

*498, 507-10, 1982-1 Trade Cas. (CCH) P64558 (6th Cir. 1981)* (product market analyzed principally in terms of demand cross-elasticity to determine interchangeability), *vacated & remanded for entry of consent judgment, 461 U.S. 940, 1983-1 Trade Cas. (CCH) P65383 (1983)* ; *Columbia Metal Culvert Co. v. Kaiser Aluminum & Chem. Corp., 579 F.2d 20, 29-30, 1978-1 Trade Cas. (CCH) P62064 (3d Cir. 1978)* (perceptions of consumers, not manufacturers, are most salient in determination of market boundaries); *Auburn News Co. v. Providence Journal Co., 504 F. Supp. 292, 302, 1980-81 Trade Cas. (CCH) P63640 (D.R.I. 1980)* (product markets primarily defined with reference to cross-elasticity of demand), *rev'd on other grounds, 659 F.2d 273, 1981 U.S. App. LEXIS 17424 (1st Cir. 1981)* ; *Donald B. Rice Tire Co. v. Michelin Tire Corp., 483 F. Supp. 750, 755, 1980-1 Trade Cas. (CCH) P63249 (D. Md. 1980)* (same), *aff'd, 638 F.2d 15, 1980-81 Trade Cas. (CCH) P63720 (4th Cir. 1981)* ; *Murphy Tugboat Co. v. Shipowners & Merchs. Towboat Co., 467 F. Supp. 841, 849, 1979-1 Trade Cas. (CCH) P62527 (N.D. Cal. 1979)* (relevant product market consists of commodities or services reasonably interchangeable by consumers for the same purpose), *aff'd sub nom. Murphy Tugboat Co. v. Crowley, 658 F.2d 1256, 1981-1 Trade Cas. (CCH) P64000, 1981-2 Trade Cas. (CCH) P64000 (9th Cir. 1981)* .

(n103)Footnote 131.  *AD/SAT v. Associated Press, 181 F.3d 216, 227, 1999-1 Trade Cas. (CCH) P72561 (2d Cir. 1999)* ; *see also  United States v. Columbia Steel Co., 334 U.S.495, 510-11, 1948 Trade Cas. (CCH) P62260 (1948)* (relying on supply substitution);  *Brown Shoe Co. v. United States, 370 U.S. 294, 325 n.42, 1962 Trade Cas. (CCH) P70366 (1962)* (acknowledging relevance of supply substitutability but finding record insufficient to establish it); *Rebel Oil Co. v. Atlantic Richfield Co., 51 F.3d 1421, 1436, 1995-1 Trade Cas. (CCH) P70952 (9th Cir. 1995)* ("[D]efining a market on the basis of demand considerations alone is erroneous. ... A reasonable market definition must also be based on 'supply elasticity.'"); *Lucas Auto. Eng'g v. Bridgestone/Firestone, Inc., 275 F.3d 762, 768, 2002-1 Trade Cas. (CCH) P73524 (9th Cir. 2001)* (genuine issue of fact existed as to whether the relevant market was limited to original equipment major brand vintage tires or included all tire manufacturing capacity that can be used to produce replacement tires for vintage automobiles); *Virtual Maint., 11 F.3d at 664* ;  *In re Municipal Bond Reporting Antitrust Litig., 672 F.2d 436, 441, 1982-1 Trade Cas. (CCH) P64656 (5th Cir. 1982)* (claimed limitation to relevant market "fails to give due accord to the significance of elasticity of supply"); *Kaiser Aluminum & Chem. Corp. v. FTC, 652 F.2d 1324, 1330, 1981-1 Trade Cas. (CCH) P64149 (7th Cir. 1981)* ("Cross-elasticity of supply, or production flexibility among sellers, is another relevant factor ... in defining a product market."); *Calnetics Corp. v. Volkswagen of Am., Inc., 532 F.2d 674, 691, 1976-1 Trade Cas. (CCH) P60757 (9th Cir. 1976)* (in claim under § 7 of the Clayton Act, district court's failure to consider cross-elasticity of production was error); *United States v. Empire Gas Corp., 537 F.2d 296, 303, 1976-1 Trade Cas. (CCH) P60907 (8th Cir. 1976)* ("The cross-elasticity of supply would seem to be as important as the demand factor in determining the relevant product market."); Nobody In  *Particular Presents, Inc. v. Clear Channel Communs., 311 F. Supp. 2d 1048, 1085, 2004-1 Trade Cas. (CCH) P74367 (D. Colo. 2004)* (low cross-elasticity of supply supported plaintiffs' allegations of relevant market); *Creative Copier Servs. v. Xerox Corp., 344 F. Supp. 2d 858, 864-65, 2004-2 Trade Cas. (CCH) P74618 (D. Conn. 2004)* (plaintiff alleged sufficient facts to support inference that supply interchangeability is not possible);  *United States v. Syufy Enters., 712 F. Supp. 1386, 1398, 1989-1 Trade Cas. (CCH) P68478 (N.D. Cal. 1989)* (although the vast majority of cases have used only cross-elasticity of demand in determining the relevant product market, it is appropriate to use both cross-elasticity of demand and cross-elasticity of supply), *aff'd, 903 F.2d 659, 1990-1 Trade Cas. (CCH) P69018 (9th Cir. 1990)* ;  *In re Air Passenger Computer Reservations Sys. Antitrust Litig., 694 F. Supp. 1443, 1457-58, 1988-2 Trade Cas. (CCH) P68316 (C.D. Cal. 1988)* (analyzing both demand and supply cross-elasticity), *aff'd sub nom.  Alaska Airlines v. United Airlines, 948 F.2d 536, 1991-2 Trade Cas. (CCH) P69624 (9th Cir. 1991)* ;  *United States v. AT&T Corp., 524 F. Supp. 1336, 1375-76 n.163, 1981-2 Trade Cas. (CCH) P64277 (D.D.C. 1981)* ("Supply cross-elasticity, no less than demand cross-elasticity, is an important factor in the definition of economic markets."); *Science Prods. v. Chevron Chem., 384 F. Supp. 793, 798, 1974-2 Trade Cas. (CCH) P75404 (N.D. Ill. 1974)* (considering production facilities). *But see  L.G. Balfour Co. v. FTC, 442 F.2d 1, 9, 11, 1971 Trade Cas. (CCH) P73542 (7th Cir. 1971)* (production flexibility rejected as basis for defining product market).

(n104)Footnote 132.  *See, e.g.,  Blue Cross & Blue Shield United v. Marshfield Clinic, 65 F.3d 1406, 1410-11, 1995-2 Trade Cas. (CCH) P71120 (7th Cir. 1995)* ("Even if two products are completely different from the consumer's standpoint, if they are made by the same producers an increase in the price of one that is not cost-justified will induce producers to shift production from the other product to this one in order to increase their profits by selling at a supracompetitive price."); *Yoder Bros. v. California-Florida Plant Corp., 537 F.2d 1347, 1367-68, 1976-2 Trade Cas. (CCH) P61047 (5th Cir. 1976)* (ability of growers to switch among different types of flowers precludes a chrysanthemum-only market); *Calnetics Corp., 532 F.2d at 691* (lower court erred by failing to consider cross-elasticity of production facilities or capacity in defining product market); *Telex Corp. v. International Business Machines Corp., 510 F.2d 894, 915-17, 1975 U.S. App. LEXIS 16395 (10th Cir. 1975)* (cross-elasticity of supply requires that relevant

market not be limited to peripherals plug-compatible with IBM's central processing unit), *rev'g 367 F. Supp. 258, 338-39, 1973-2 Trade Cas. (CCH) P74774 (N.D. Okla. 1973)* (supply substitutability rejected), *cert. dismissed, 423 U.S. 802 (1975)* ; *New York v. Kraft Gen. Foods, 926 F. Supp. 321, 361, 1995-1 Trade Cas. (CCH) P70911 (S.D.N.Y. 1995)* (conclusion that relevant product market includes all "ready to eat" cereals is "reinforced by the court's consideration of supply substitutability in the RTE cereal industry"); *Community Publishers v. Donrey Corp., 892 F. Supp. 1146, 1164, 1995-1 Trade Cas. (CCH) P71049 (W.D. Ark. 1995)* (all local daily papers have potential to compete in regional market and should be included in market definition), *aff'd sub nom. Community Publishers v. DR Partners, 139 F.3d 1180, 1998-1 Trade Cas. (CCH) P72093 (8th Cir. 1998)* ; *Nobody In Particular Presents, 311 F. Supp. 2d at 1085* (inability of suppliers to switch supported relevant market for rock concert tickets); *United States v. Calmar, Inc., 612 F. Supp. 1298, 1304, 1985-1 Trade Cas. (CCH) P66588 (D.N.J. 1985)* (rejecting proposed market and including several kinds of consumer-product sprayers and dispensers made with almost identical procedures); *FTC v. Occidental Petroleum Corp., 1986-1 Trade Cas. (CCH) P 67071, 1986 U.S. Dist. LEXIS 26138 (D.D.C. 1986)* (attempted price increase by copolymer producers would cause homopolymer producers to switch); *Frank Saltz & Sons v. Hart Schaffner & Marx, 1985-2 Trade Cas. (CCH) P66768, 1985 U.S. Dist. LEXIS 16243 (S.D.N.Y. Sept. 5, 1985)* (rejecting "better quality" men's suits market based, in part, on finding of an unspecified level of supply-side substitutability in suit market); *Carter Hawley Hale Stores v. Limited, Inc., 587 F. Supp. 246, 253, 1984-1 Trade Cas. (CCH) P66046 (C.D. Cal. 1984)* (garment manufacturers can easily switch production to different quality and sizes of clothing and retailers can similarly change types of clothing sold); *J.H. Westerbeke Corp. v. Onan Corp., 580 F. Supp. 1173, 1186, 1984-1 Trade Cas. (CCH) P65886 (D. Mass. 1984)* (modification of production facilities "could be performed easily by any reasonably competent mechanic"); *ITT Corp., 104 F.T.C. 280, 411 (1984)* (captive bakers included in market with wholesale bakers since former could readily divert production to other retail groceries in response to an increase in wholesale baker prices); *cf. Kaiser Aluminum & Chem., 652 F.2d at 1330* (noting that while "economic theory would envisage defining a market solely on the basis of cross-elasticity of supply ... such [a] possibility is not meaningful") (citations omitted); *Slocomb Indus. v. Chelsea Indus., 1984-1 Trade Cas. (CCH) P65932, 1984 U.S. Dist. LEXIS 19368 (E.D. Pa. Feb. 17, 1984)* (supply substitutability not established because of unique production facilities that would take three to six months to change).

(n105)Footnote 133. *See, e.g., NicSand, Inc. v. 3M Co., 457 F.3d 534, 547 (6th Cir.)* ("Both supply substitution and demand substitution ... factor into the ultimate definition of an economic market. ... [If], on a motion for summary judgment, [plaintiff] does not put forth facts supporting its alleged market that account for the possibility of supply substitution, its claims will have to be dismissed."), *reh'g en banc granted,* No. 05-3431 (6th Cir. Nov. 22, 2006); *Ansell, Inc. v. Schmid Labs., 757 F. Supp. 467, 475-76, 1991-1 Trade Cas. (CCH) P69379 (D.N.J.)* (product market limited to retail brand name condoms despite production flexibility where shift in production would not be profitable), *aff'd mem., 941 F.2d 1200, 1991 U.S. App. LEXIS 18595 (3d Cir. 1991)* ; *United States v. Ivaco, Inc., 704 F. Supp. 1409, 1416-17, 1989-1 Trade Cas. (CCH) P68439 (W.D. Mich. 1989)* (product market properly limited to automatic tampers where manufacturers of maintenance of way equipment could not be expected to switch quickly to production of automatic tampers due to differences in technology and engineering); *B.A.T. Indus., 104 F.T.C. 852, 932 (1984)* (separate markets where there were "unique facilities, custom-designed equipment, specialized raw materials, specially trained personnel, extensive research efforts, and rigorous quality control and testing procedures"); *Tenneco, Inc., 98 F.T.C. 464, 580-81 (1981)* (original equipment and replacement shock absorbers in separate markets despite production flexibility because of differences in the marketing and distribution of the products), *rev'd on other grounds, 689 F.2d 346, 1982-2 Trade Cas. (CCH) P64948 (2d Cir. 1982)* ; *cf. United States Anchor Mfg. Co. v. Rule Indus., 7 F.3d 986, 997, 1993-2 Trade Cas. (CCH) P70426 (11th Cir. 1993)* (supply substitutability does not justify broader market where company that produced premium product could switch to produce generic product but where it would be economically irrational for it to do so).

(n106)Footnote 134. *512 F.2d 1264, 1975-1 Trade Cas. (CCH) P60195 (9th Cir. 1975)* (50% share of market consisting of major league baseball concessions reduced on remand to 24% of relevant market consisting of concession franchises of major league baseball, football, basketball, hockey, auto racing, and certain other activities).

(n107)Footnote 135. *Id. at 1271* .

(n108)Footnote 136. *51 F.3d 1421, 1995-1 Trade Cas. (CCH) P70952 (9th Cir. 1995)* .

(n109)Footnote 137. *Id. at 1436* (citation omitted). Courts have also considered cross-elasticity of supply and interchangeability in the context of employment markets. In *National Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club, 419 F.3d 462, 2005-2 Trade Cas. (CCH) P74896 (6th Cir. 2005)* , the Sixth Circuit considered an employment market for hockey players to be a "supplier market" that can be defined in part by whether "substitute [employees] can perform the same function." *Id. at 472* .

(n110)Footnote 138.    *370 U.S. 294, 1962 Trade Cas. (CCH) P70366 (1962)* .

(n111)Footnote 139.    *Id. at 325* (citation omitted).

(n112)Footnote 140.    *384 U.S. 563, 1966 Trade Cas. (CCH) P71459, 1966 Trade Cas. (CCH) P71789 (1966)* .

(n113)Footnote 141.    *Id. at 572* .

(n114)Footnote 142.    *See, e.g.,*   *In re Visa Check/MasterMoney Antitrust Litig, 2003-1 Trade Cas. (CCH) P73995, 2003 U.S. Dist. LEXIS 4965 (E.D.N.Y. Apr. 1, 2003)* (finding that debit card services is a well-defined submarket within the broader market, which includes all forms of payment);   *United States v. Mrs. Smith's Pie Co., 440 F. Supp. 220, 228, 1977-1 Trade Cas. (CCH) P61518 (E.D. Pa. 1976)* (frozen dessert pies a submarket within a broader relevant market);   *United States v. American Tech. Indus., 1974 Trade Cas. (CCH) P74873, 1974 U.S. Dist. LEXIS 12922 (M.D. Pa. Jan. 8, 1974)* (artificial Christmas trees a submarket within Christmas tree market); *cf.   United States v. Continental Can Co., 378 U.S. 441, 457-58, 1964 Trade Cas. (CCH) P71146 (1964)* (finding containers made of metal or glass to be a relevant market even if there was a broader product market including plastic and other containers);   *Forsyth v. Humana, Inc., 114 F.3d 1467, 1477, 1997-1 Trade Cas. (CCH) P71818 (9th Cir. 1997)* (finding sufficient evidence to allow jury to determine whether there is a relevant submarket limited to major for-profit acute care hospitals in a single county in Nevada), *aff'd on other grounds,   525 U.S. 299 (1999)* ;   *Olin Corp. v. FTC, 986 F.2d 1295, 1304, 1993-1 Trade Cas. (CCH) P70137 (9th Cir. 1993)* (dry sanitizer products used for cleaning swimming pools are a submarket distinct from liquid pool bleach; one type of dry sanitizer is a further submarket);   *Photovest Corp. v. Fotomat Corp., 606 F.2d 704, 712-14, 1979-2 Trade Cas. (CCH) P62869 (7th Cir. 1979)* (drive-thru photo processing is appropriate submarket);   *Greyhound Computer Corp. v. IBM Corp., 559 F.2d 488, 494-95, 1977-2 Trade Cas. (CCH) P61603 (9th Cir. 1977)* (leasing general-purpose computers for commercial applications constituted a submarket);   *Heatransfer Corp. v. Volkswagenwerk, AG, 553 F.2d 964, 980-81, 1977-1 Trade Cas. (CCH) P61473 (5th Cir. 1977)* (air conditioning units for a single brand of automobiles found to be a submarket);   *United States v. Empire Gas Corp., 537 F.2d 296, 304, 1976-1 Trade Cas. (CCH) P60907 (8th Cir. 1976)* (liquified petroleum gas was submarket within the broader energy market).

(n115)Footnote 143.    *986 F.2d 1295, 1993-1 Trade Cas. (CCH) P70137 (9th Cir. 1993)* .

(n116)Footnote 144.    Although the smaller market was embraced in the larger market, both the FTC and the court characterized them as two markets, not as a market and a submarket. *Id. at 1297* . This is consistent with *Owens-Illinois, Inc., 115 F.T.C. 179 (1992)* , in which the FTC observed that use of the term "submarkets" "merely sows unnecessary confusion." *Id. at 299* .

(n117)Footnote 145.    *986 F.2d at 1301* ; *see also   FTC v. Cardinal Health, 12 F. Supp. 2d 34, 47, 1998-2 Trade Cas. (CCH) P72226 (D.D.C. 1998)* (concluding that the wholesale distribution channel for prescription drugs was a "distinct submarket within the larger market of drug delivery").

(n118)Footnote 146.    *970 F. Supp. 1066, 1997-2 Trade Cas. (CCH) P71867 (D.D.C. 1997)* .

(n119)Footnote 147.    *Id. at 1075* (quoting   *Brown Shoe Co. v. United States, 370 U.S. 294, 325, 1962 Trade Cas. (CCH) P70366 (1962))* .

(n120)Footnote 148.    *Id.*

(n121)Footnote 149.    *Id. Brown Shoe*'s "practical indicia" for determining a "submarket" include "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe, 370 U.S. at 325* .

(n122)Footnote 150.    For example, the court noted that office superstores carried over 5,000 stock keeping units (SKUs), while K-Mart carried only *250 SKUs. Staples, 970 F. Supp. at 1078* .

(n123)Footnote 151.    *Id. at 1079* .

(n124)Footnote 152.    For instance, in   *United States v. Oracle Corp., 331 F. Supp. 2d 1098, 1119, 2004-2 Trade Cas. (CCH) P74542 (N.D. Cal. 2004)* , the court noted that "defining a narrow 'submarket' tends to require a relatively long laundry list of factors, which creates the danger of narrowing the market by factors that have little economic basis." *See also   Worldwide Basketball & Sport Tours v. NCAA, 388 F.3d 955, 963, 2004-2 Trade Cas. (CCH) P74612 (6th Cir. 2004)* (school-scheduled games for Division I men's college basketball not a submarket), *cert. denied,   126 S. Ct. 334, 2005 U.S. LEXIS 5528 (2005)* ;   *T. Harris Young & Assocs. v. Marquette Elecs., 931 F.2d 816, 824-25, 1991-1*

1-6 Antitrust Law Developments 6B

*Trade Cas. (CCH) P69440 (11th Cir. 1991)* (hospitals with more than 200 beds not a submarket); *Thurman Industries, Inc. v. Pay 'N Pak Stores, Inc., 875 F.2d 1369, 1375, 1989 U.S. App. LEXIS 7160 (9th Cir. 1989)* (home center stores not a submarket when they face substantial competition from other stores); *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, 508 F.2d 547, 553-54, 1974 Trade Cas. (CCH) P75424, 1974-2 Trade Cas. (CCH) P75424 (1st Cir. 1974)* (pipeless and conventional pool recirculation systems not separate submarkets); *Moore Corp. v. Wallace Computer Servs., 907 F. Supp. 1545, 1580, 1996-1 Trade Cas. (CCH) P71287 (D. Del. 1995)* (sale of business forms to large multilocation customers not a submarket); *Pennsylvania v. Russell Stover Candies, Inc., 1993-1 Trade Cas. (CCH) P70224, 1993 U.S. Dist. LEXIS 6024 (E.D. Pa. May 6, 1993)* (market "is not limited to the combination of the gift boxed chocolates and promotional boxed chocolates markets"); *G. Heileman Brewing v. Anheuser-Busch, Inc., 676 F. Supp. 1436, 1463, 1988-1 Trade Cas. (CCH) P67881 (E.D. Wis. 1987)* (rejecting low-alcohol beer submarket), *aff'd, 873 F.2d 985 (7th Cir. 1989)* ; *Gemini Concerts, Inc. v. Triple-A Baseball Club Assocs., 664 F. Supp. 24, 26, 1987-1 Trade Cas. (CCH) P67645 (D. Me. 1987)* (indoor and outdoor concerts not separate submarkets); *United States v. Central State Bank, 621 F. Supp. 1276, 1291-92, 1985-2 Trade Cas. (CCH) P66818 (W.D. Mich. 1985)* , *aff'd per curium,    817 F.2d 22, 1987-1 Trade Cas. (CCH) P67549 (6th Cir. 1987)* . *Compare   Kennecott Copper Corp. v. FTC, 467 F.2d 67, 78-79, 1972 Trade Cas. (CCH) P74157 (10th Cir. 1972)* (finding coal to be submarket of energy fuels), *with   United States v. General Dynamics Corp., 341 F. Supp. 534, 555-56, 1972 Trade Cas. (CCH) P73927 (N.D. Ill. 1972)* (finding product market to be all energy fuels, given competition among types of fuels), *aff'd on other grounds, 415 U.S. 486, 1974-1 Trade Cas. (CCH) P74967 (1974)* .

(n125)Footnote 153.   *Allen-Myland, Inc. v. IBM Corp., 33 F.3d 194, 208 n.16, 1994-2 Trade Cas. (CCH) P70685 (3d Cir. 1994)* (citation omitted); *accord   Geneva Pharms. Tech. Corp. v. Barr Labs., 386 F.3d 485, 496, 2004-2 Trade Cas. (CCH) P74583 (2d Cir. 2004)* ("The term 'submarket' is somewhat of a misnomer, since the 'submarket' analysis simply clarifies whether two products are in fact 'reasonable' substitutes and are therefore part of the same market."); *United States Anchor Mfg. Co. v. Rule Indus., 7 F.3d 986, 995, 1993-2 Trade Cas. (CCH) P70426 (11th Cir. 1993)* ("As the Supreme Court's language [in *Brown Shoe*] itself suggests, defining a 'submarket' is the equivalent of defining a relevant product market for antitrust purposes."); *Olin Corp., 986 F.2d at 1299* ("Because every market that encompasses less than all products is, in a sense, a submarket, these factors [the *Brown Shoe* 'practical indicia'] are relevant even in determining the primary market to be analyzed for antitrust purposes."); *H.J., Inc. v. International Tel. & Tel. Corp., 867 F.2d 1531, 1540, 1989 U.S. App. LEXIS 1246 (8th Cir. 1989)* (citing PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW P 518.1, at 311-15 (1987 Supp.)); *AD/SAT v. Associated Press, 920 F. Supp. 1287, 1296 n.6, 1996-1 Trade Cas. (CCH) P71341 (S.D.N.Y. 1996)* ("The required analysis does not change whether a particular product market is deemed a market or a submarket."), *aff'd,   181 F.3d 216, 1999-1 Trade Cas. (CCH) P72561 (2d Cir. 1999)* ; *cf.   Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd., 924 F.2d 1484, 1490, 1991-1 Trade Cas. (CCH) P69315 (9th Cir. 1991)* (noting, when discussing geographic submarkets, that "[a] submarket exists if it is sufficiently insulated from the larger market so that supply and demand are inelastic with the larger market"); *Greyhound Computer Corp. v. IBM Corp., 559 F.2d 488, 493, 1977-2 Trade Cas. (CCH) P61603 (9th Cir. 1977)* (submarkets must be "sufficiently distinct in commercial reality to permit a company that dominated these submarkets to exclude competition and control prices").

(n126)Footnote 154.   *Satellite Television & Associated Res. v. Continental Cablevision, 714 F.2d 351, 355 n.5, 1983-2 Trade Cas. (CCH) P65541 (4th Cir. 1983)* ; *accord   Community Publishers v. Donrey Corp., 892 F. Supp. 1146, 1154 n.9, 1995-1 Trade Cas. (CCH) P71049 (W.D. Ark. 1995)* ("the emerging consensus of antitrust scholars and case law seems to be that the term 'submarket' is unnecessary"), *aff'd sub nom.   Community Publishers v. DR Partners, 139 F.3d 1180, 1998-1 Trade Cas. (CCH) P72093 (8th Cir. 1998)* ; *In re Air Passenger Computer Reservations Sys. Antitrust Litig., 694 F. Supp. 1443, 1458 n.9, 1988-2 Trade Cas. (CCH) P68316 (C.D. Cal. 1988)* ("the prefix 'sub' merely creates confusion and is superfluous"), *aff'd sub nom.   Alaska Airlines v. United Airlines, 948 F.2d 536, 1991-2 Trade Cas. (CCH) P69624 (9th Cir. 1991)* .

(n127)Footnote 155.      *1998-2 Trade Cas. (CCH) P72257, 98-2 Trade Cas. (CCH) P72257, 1998 U.S. Dist. LEXIS 13440 (S.D.N.Y. Aug. 27, 1998)* .

(n128)Footnote 156.   *Id. at 82,636* . In a subsequent proceeding, the court colorfully characterized Pepsi's narrow relevant market as a "'strange red-haired, bearded, one-eyed man-with-a-limp classification.'"   *114 F. Supp. 2d 243, 249, 2000-2 Trade Cas. (CCH) P73036 (S.D.N.Y. 2000)* (quoting   *United States v. Grinnell Corp., 384 U.S. 563, 590-91, 1966 Trade Cas. (CCH) P71459, 1966 Trade Cas. (CCH) P71789 (1966)* (Fortas, J., dissenting), *aff'd,   315 F.3d 101, 2003-1 Trade Cas. (CCH) P73914 (2d Cir. 2002)* .

(n129)Footnote 157.   *992 F. Supp. 1124, 1998-2 Trade Cas. (CCH) P72323 (D. Ariz. 1997)* .

(n130)Footnote 158.  *Id. at 1128* .

(n131)Footnote 159.  *7 F. Supp. 2d 119, 1998-2 Trade Cas. (CCH) P72376 (D. Conn. 1998)* , *aff'd on other grounds*,  *186 F.3d 74, 1999-2 Trade Cas. (CCH) P72594 (2d Cir. 1999)* .

(n132)Footnote 160.  *Id. at 127* .

(n133)Footnote 161.  *Id.* The concept of submarkets sometimes appears in the context of markets defined by the ability of sellers to price discriminate among customers with varying product preferences. *See supra* text accompanying notes 114-18; MERGER GUIDELINES, *supra* note 3, § 1.11.

(n134)Footnote 162.   *384 U.S. 563, 1966 Trade Cas. (CCH) P71459, 1966 Trade Cas. (CCH) P71789 (1966)* .

(n135)Footnote 163.  *Id. at 572* ; *see also*  *Green Country Food Mkt. v. Bottling Group, 371 F.3d 1275, 1283-84, 2004-1 Trade Cas. (CCH) P74454 (10th Cir. 2004)* (recognizing that "cluster market" may exist where a seller provides a full line of products or services that collectively constitute a separate product market);  *General Indus. v. Hartz Mountain Corp., 810 F.2d 795, 805, 1987-1 Trade Cas. (CCH) P67428 (8th Cir. 1987)* (rejecting argument that each pet product constitutes a market; court upheld jury finding that all pet supplies and products are within a single relevant market because they are used by the same customers and are capable of distribution through the same channels);  *Weiss v. York Hosp., 745 F.2d 786, 826, 1984-2 Trade Cas. (CCH) P66211 (3d Cir. 1984)* (amalgam of patient health care service held to be a relevant market);  *California v. Sutter Health Sys., 130 F. Supp. 2d 1109, 1119, 2001-1 Trade Cas. (CCH) P73255); (N.D. Cal. 2001)* (affirming relevant product market comprising a cluster of acute inpatient care services);  *United States Football League v. NFL, 644 F. Supp. 1040, 1057, 1986-2 Trade Cas. (CCH) P67305 (S.D.N.Y. 1986)* (professional football is an appropriate product cluster), *aff'd,   842 F.2d 1335, 1988-1 Trade Cas. (CCH) P67930 (2d Cir. 1988)* ;   *United States v. AT&T Corp., 524 F. Supp. 1336, 1375-76, 1981-2 Trade Cas. (CCH) P64277 (D.D.C. 1981)* (aggregating defendants' various products into a single market, although they were not substitutable from a consumer's perspective, because much of defendants' conduct transcended individual products and applied to entire telecommunications equipment system); United   *States v. Healthco, Inc., 387 F. Supp. 258, 260-61, 1975-1 Trade Cas. (CCH) P60113 (S.D.N.Y.)* (relevant markets were dental equipment and dental sundries), *aff'd, 1975-2 Trade Cas. (CCH) P 60,655 (2d Cir. 1975)*.

(n136)Footnote 164.  *384 U.S. at 572* ; *see also*  *Green Country Food Mkt., 371 F.3d at 1283-85* (rejecting "cluster" product market because there was no evidence that the 155 products sold were, as a whole, an object of consumer demand, and also because there was no evidence that the group of products sold together appealed to grocery stores on a different level than each brand sold individually);  *Flash Elecs. v. Universal Music & Video Distrib. Corp., 312 F. Supp. 2d 379, 391-92, 2004-1 Trade Cas. (CCH) P74395 (E.D.N.Y. 2004)* (rejecting claim that Universal videos as a group were a relevant market).

(n137)Footnote 165.  *See  United States v. Connecticut Nat'l Bank, 418 U.S. 656, 664-66, 1974-1 Trade Cas. (CCH) P75124 (1974)* ;  *United States v. Phillipsburg Nat'l Bank & Trust, 399 U.S. 350, 360-61, 1970 Trade Cas. (CCH) P73245 (1970)* ;  *United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 356-57, 1963 Trade Cas. (CCH) P70812 (1963)* ; *see also  United States v. Central State Bank, 621 F. Supp. 1276, 1291-92, 1985-2 Trade Cas. (CCH) P66818 (W.D. Mich. 1985)* (upholding merger based on effect in commercial banking cluster market, refusing to define market as transactional accounts and small loans), *aff'd per curiam,   817 F.2d 22, 1987-1 Trade Cas. (CCH) P67549 (6th Cir. 1987)* ;  *United States v. First Nat'l State Bancorp., 499 F. Supp. 793, 811, 1980-2 Trade Cas. (CCH) P63445 (D.N.J. 1980)* ; *cf.  United States v. Household Fin. Corp., 602 F.2d 1255, 1259-60, 1979-2 Trade Cas. (CCH) P62799 (7th Cir. 1979)* (finance companies held to offer a unique cluster of products and services to a class of higher risk customers that were not serviced by other financial institutions). In subsequent cases, the DOJ modified its traditional "banking cluster market" product market approach, defining the market as the provision of "business banking services." *See, e.g., United States v. Fleet/Norstar Fin. Group, 56 Fed. Reg. 33,458 (1991)* (consent decree); *United States v. First Hawaiian, Inc., 56 Fed. Reg. 10,916 (1991)* (consent decree). More recently, in announcing several "fix it first" divestitures (unaccompanied by complaints and consent decrees), the DOJ has specified "small business banking services" and "commercial lending services" as the product markets of concern. *See, e.g.*, DOJ Press Release, Justice Department Requires BB&T Corporation and F&M National Corporation to Make Divestitures in Virginia and West Virginia (June 19, 2001); DOJ Press Release, Justice Department Requires Divestitures in Centura Banks and Triangle Bancorp Merger (Jan. 24, 2000).

(n138)Footnote 166.  *Philadelphia Nat'l Bank, 374 U.S. at 356-57* .

(n139)Footnote 167.   *125 F.3d 1195, 1997-2 Trade Cas. (CCH) P71908 (9th Cir. 1997)* .

1-6 Antitrust Law Developments 6B

(n140)Footnote 168. *Id. at 1204-06* . Earlier in this litigation, in *Eastman Kodak Co. v. Image Technical Services, 504 U.S. 451, 1992-1 Trade Cas. (CCH) P69839 (1992)* , the Supreme Court held that the record disclosed sufficient factual disputes to preclude summary judgment on both Sherman Act § 1 and § 2 claims that Kodak unlawfully tied the sale of service for Kodak photocopier and micrographic machines with the sale of parts and monopolized or attempted to monopolize the sale of service for these Kodak machines.

(n141)Footnote 169. *Image Technical Servs., 125 F.3d at 1204* .

(n142)Footnote 170. *384 U.S. 563, 572, 1966 Trade Cas. (CCH) P71459, 1966 Trade Cas. (CCH) P71789 (1966)* .

(n143)Footnote 171. *Image Technical Servs., 125 F.3d at 1205* (quoting *Grinnell, 384 U.S. at 572* ).

(n144)Footnote 172. *698 F.2d 1011, 1982-83 Trade Cas. (CCH) P65199 (9th Cir. 1983)* .

(n145)Footnote 173. *Id. at 1016-17* .

(n146)Footnote 174. *See, e.g., FTC v. University Health, 938 F.2d 1206, 1211, 1991-2 Trade Cas. (CCH) P69508 (11th Cir. 1991)* ; *United States v. Rockford Mem'l Corp., 717 F. Supp. 1251, 1260, 1989-1 Trade Cas. (CCH) P68462 (N.D. Ill. 1989)* , aff'd, *898 F.2d 1278, 1990-1 Trade Cas. (CCH) P68978 (7th Cir. 1990)* ; *American Medicorp v. Humana, Inc., 445 F. Supp. 589, 605, 1978-1 Trade Cas. (CCH) P61901 (E.D. Pa. 1977)* ; *In re Advetist Health System/West, 117 F.T.C. 224, 288 (1994)* ; *American Med. Int'l, 104 F.T.C. 1, 192-94 (1984)* ; *see also Hospital Corp. of Am., 106 F.T.C. 361, 366 (1985)* (relevant product market was inpatient psychiatric treatment services excluding substance abuse treatment services and long-term treatment of chronic mental illnesses), aff'd, *807 F.2d 1381, 1986-2 Trade Cas. (CCH) P67377 (7th Cir. 1986)* . But cf. *United States v. Carilion Health Sys., 707 F. Supp. 840, 844-45, 1989-1 Trade Cas. (CCH) P68451 (W.D. Va.)* (acute care services and some outpatient services in same market), aff'd mem., *892 F.2d 1042, 1989 U.S. App. LEXIS 17911 (4th Cir. 1989)* .

(n147)Footnote 175. *See, e.g., Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton Coll., 106 F. Supp. 2d 406, 412, 2000-2 Trade Cas. (CCH) P73030 (N.D.N.Y. 2000)* (prospective students, in selecting a college, consider a cluster of services including academic, health, financial aid, and residential services).

(n148)Footnote 176. *FTC v. Staples, Inc., 970 F. Supp. 1066, 1080, 1997-2 Trade Cas. (CCH) P71867 (D.D.C. 1997)* ; *see also part 6B(1)(b)* of this chapter.

(n149)Footnote 177. *See, e.g., United States v. Wilson Sporting Goods, 288 F. Supp. 543, 546-57, 1968 Trade Cas. (CCH) P72514 (N.D. Ill. 1968)* ; *A.G. Spalding & Bros., 56 F.T.C. 1125, 1160 (1960)* , aff'd, *301 F.2d 585, 1962 Trade Cas. (CCH) P70266 (3d Cir. 1962)* .

(n150)Footnote 178. *See, e.g., California v. American Stores, 697 F. Supp. 1125, 1129, 1988-2 Trade Cas. (CCH) P68258 (C.D. Cal. 1988)* (convenience stores and other small food retailers not in same market with supermarkets), aff'd in part & rev'd in part, *872 F.2d 837, 1989-1 Trade Cas. (CCH) P68505 (9th Cir. 1989)* , rev'd on other grounds, *495 U.S. 271, 1990-1 Trade Cas. (CCH) P69003 (1990)* . But cf. *Grand Union Co., 102 F.T.C. 812, 1042-47 (1983)* (rejecting "supermarket" cluster market in favor of "all retail grocery stores").

(n151)Footnote 179. *See, e.g., Bon-Ton Stores v. May Dep't Stores Co., 881 F. Supp. 860, 869, 1994-2 Trade Cas. (CCH) P70800 (W.D.N.Y. 1994)* . But see Federated Dep't Stores/May Dep't Stores Co., [2001-2005 Transfer Binder] Trade Cas. (CCH) P 15,790, at 22,978 (Aug. 29, 2005) (Statement of the Commission; explaining that other retail stores in shopping malls, in which department stores served as "anchors," provided real competition to the department stores, as did mass market, mail order and Internet retailers).

(n152)Footnote 180. *See, e.g., United States v. Hughes Tool Co., 415 F. Supp. 637, 640-41, 1976-2 Trade Cas. (CCH) P61046 (C.D. Cal. 1976)* (relevant market consists of a cluster of specialized surface rotary drilling tools).

(n153)Footnote 181. *See, e.g., United States v. Times Mirror Co., 274 F. Supp. 606, 617, 1967 Trade Cas. (CCH) P72240 (C.D. Cal. 1967)* (daily newspapers a separate market from other products in light of cluster of services provided in a single package), aff'd, *390 U.S. 712, 88 S. Ct. 1411, 20 L. Ed. 2d 252, 1968 Trade Cas. (CCH) P72422 (1968)* .

(n154)Footnote 182. *875 F.2d 1369, 1989-1 Trade Cas. (CCH) P68592 (9th Cir. 1989)* .

(n155)Footnote 183. *Id. at 1377* ; *see also Lucas Auto. Eng'g v. Bridgestone/Firestone, Inc., 275 F.3d 762, 768, 2002-1 Trade Cas. (CCH) P73524 (9th Cir. 2001)* (affirming summary judgment for the defendants where evidence did

1-6 Antitrust Law Developments 6B

not support a cluster-market theory); *Forsyth v. Humana, Inc., 114 F.3d 1467, 1477, 1997-1 Trade Cas. (CCH) P71818 (9th Cir. 1997)* (citing *Thurman Industries* for the proposition that "[s]pecialty shops which offer only a limited range of goods are generally considered in the same market with larger, more diverse, 'one-stop shopping' centers"), *aff'd on other grounds, 525 U.S. 299 (1999)* ; *Westman Comm'n Co. v. Hobart Int'l, 796 F.2d 1216, 1221-22, 1986-1 Trade Cas. (CCH) P67152 (10th Cir. 1986)* (rejecting the "cluster or package" approach to "one-stop" distributor offering a package of restaurant equipment because competition in that industry did not occur at the "full-line-of-services" level); *Kellam Energy v. Duncan, 668 F. Supp. 861, 889-90, 1987-2 Trade Cas. (CCH) P67731 (D. Del. 1987)* (rejecting "cluster of services" approach as applied to convenience stores); *Hittman Nuclear & Dev. v. Chem-Nuclear Systems, Inc., 1980-1 Trade Cas. (CCH) P 63140 (D. Md. 1979)* (rejecting argument that relevant market is cluster of services provided to nuclear industry for "radioactive waste"). *But see FTC v. Staples, Inc., 970 F. Supp. 1066, 1076-80, 1997-2 Trade Cas. (CCH) P71867 (D.D.C. 1997)* (finding office supply superstores to be relevant product market, excluding other types of retail stores carrying consumable office supplies).

(n156)Footnote 184. *See, e.g., Photovest Corp. v. Fotomat Corp., 606 F.2d 704, 712 n.11, 1979-2 Trade Cas. (CCH) P62869 (7th Cir. 1979)* ; *see also Spirit Airlines v. Northwest Airlines, 431 F.3d 917, 933 (6th Cir. 2005)* (finding that reasonable interchangeability can be used as a method for defining the relevant market for either products or services).

(n157)Footnote 185. *65 F.3d 1406, 1995-2 Trade Cas. (CCH) P71120 (7th Cir. 1995)* .

(n158)Footnote 186. *Id. at 1411* ; *see also United States v. AMR Corp., 335 F.3d 1109, 1111, 2003-2 Trade Cas. (CCH) P74078 (10th Cir. 2003)* (relevant market consisted of four city-pair airline markets connected to Dallas/Fort Worth International Airport hub, and included major airlines and low-cost carriers); *Levine v. Central Fla. Med. Affiliates, 72 F.3d 1538, 1552-53, 1996-1 Trade Cas. (CCH) P71279 (11th Cir. 1996)* (internist failed to show that relevant market was limited to physician members of preferred provider organization; evidence indicated that "enrollees are allowed to switch plans"); *United States Healthcare, Inc. v. Healthsource, Inc., 986 F.2d 589, 598-99, 1993-1 Trade Cas. (CCH) P70142 (1st Cir. 1993)* (rejecting proposed submarket limited to HMOs in favor of market for health care financing services).

(n159)Footnote 187. *See, e.g., Sunshine Cellular v. Vanguard Cellular Sys., 810 F. Supp. 486, 493-497, 1992-2 Trade Cas. (CCH) P70026 (S.D.N.Y. 1992)* .

(n160)Footnote 188. *See Thurman Indus. v. Pay 'N Pak Stores, 709 F. Supp. 985, 988-990, 1987-1 Trade Cas. (CCH) P67591 (W.D. Wash. 1987)* , *aff'd, 875 F.2d 1369, 1989-1 Trade Cas. (CCH) P68592 (9th Cir. 1989)* .

(n161)Footnote 189. *See, e.g., Seabury Mgmt. v. Professional Golfers Ass'n, 1995-1 Trade Cas. (CCH) P70991, 1995 U.S. App. LEXIS 9538 (4th Cir. Apr. 26, 1995)* (affirming product market limited to golf trade shows and excluding other marketing techniques such as direct mail, door-to-door solicitation, and catalog sales) (unpublished opinion).

(n162)Footnote 190. *See, e.g., E.T. Barwick Indus. v. Walter E. Heller & Co., 692 F. Supp. 1331, 1988-1 Trade Cas. (CCH) P68046 (N.D. Ga. 1987)* , *aff'd mem., 891 F.2d 906 (11th Cir. 1989)* ; *National Bus. Lists, Inc. v. Dun & Bradstreet, Inc., 552 F. Supp. 99, 1982-2 Trade Cas. (CCH) P64848 (N.D. Ill. 1982)* .

(n163)Footnote 191. *See, e.g., Morgenstern v. Wilson, 29 F.3d 1291, 1296, 1994-1 Trade Cas. (CCH) P70645 (8th Cir. 1994)* .

(n164)Footnote 192. *See, e.g., Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd., 924 F.2d 1484, 1489-90, 1991-1 Trade Cas. (CCH) P69315 (9th Cir. 1991)* .

(n165)Footnote 193. *See, e.g., AD/SAT v. Associated Press, 920 F. Supp. 1287, 1996-1 Trade Cas. (CCH) P71341 (S.D.N.Y. 1996)* , *aff'd, 181 F.3d 216, 1999-1 Trade Cas. (CCH) P72561 (2d Cir. 1999)* .

(n166)Footnote 194. *See, e.g., Thompson Everett, Inc. v. National Cable Adver., 57 F.3d 1317, 1325, 1995-1 Trade Cas. (CCH) P71052 (4th Cir. 1995)* (finding that the relevant market for selling services by advertising representatives must include sales to both cable companies and "other media for advertising dollars").

(n167)Footnote 195. *NHL Players Ass'n v. Plymouth Whalers, 419 F.3d 462, 472, 2005-2 Trade Cas. (CCH) P74896 (6th Cir. 2005)* (the market for player services is the pool of players from which sports league draws its players-i.e., "the market for sixteen- to twenty-year-old hockey players").

(n168)Footnote 196. *See Corsearch, Inc. v. Thomson & Thomson, 792 F. Supp. 305, 324-25, 1992-1 Trade Cas. (CCH) P69819 (S.D.N.Y. 1992)* (relevant market limited to comprehensive trademark searches; excludes "knock-out" searches and online services).

(n169)Footnote 197. *See, e.g., United States v. Aluminum Co. of Am., 148 F.2d 416, 427, 1945 Trade Cas. (CCH) P57342 (2d Cir. 1945)* (Hand, J.) (noting that "possession of unchallenged economic power deadens initiative, discourages thrift and depresses energy ... immunity from competition is a narcotic, and rivalry is a stimulant, to industrial progress."); *United States v. Automobile Mfrs. Ass'n, 307 F. Supp. 617, 618, 1970 Trade Cas. (CCH) P73070 (C.D. Cal. 1969)* (approving DOJ consent decree in a case alleging that automobile manufacturers had engaged in an unlawful conspiracy "to eliminate competition in research, manufacture and installation of motor vehicle air pollution control equipment."); *General Motors Corp., 103 F.T.C. 374 (1984) , set aside,  116 F.T.C. 1276 (1993)* .

(n170)Footnote 198. UNITED STATES DEP'T OF JUSTICE & FEDERAL TRADE COMM'N, ANTITRUST GUIDELINES FOR THE LICENSING OF INTELLECTUAL PROPERTY (1995), *reprinted in  4 Trade Reg. Rep. (CCH) P 13,132 and reprinted in* Appendix E to this treatise.

(n171)Footnote 199. *Id.* § 3.2.3.

(n172)Footnote 200. *See id.* ("A licensing arrangement may have competitive effects on innovation that cannot be adequately addressed through the analysis of goods or technology markets. For example, the arrangement may affect the development of goods that do not yet exist.").

(n173)Footnote 201. *Id.* § 4.3 (explaining that the agencies will not challenge a restraint that may affect competition in an innovation market if, among other things, "four or more independently controlled entities in addition to the parties to the licensing arrangement possess the required specialized assets or characteristics and the incentive to engage in research and development that is a close substitute of the research and development activities of the parties to the licensing agreement").

(n174)Footnote 202. One older decision, *SCM Corp. v. Xerox Corp., 645 F.2d 1195, 1981-1 Trade Cas. (CCH) P63876 (2d Cir. 1981)* , appears inconsistent with the concept as applied to acquisitions of patent rights. *See  id. at 1209* ("the policies of the patent laws preclude the imposition of antitrust liability" for an acquisition of patents prior to emergence of a relevant market for the patented product).

(n175)Footnote 203. *See United States v. General Motors Corp., 6 Trade Reg. Rep. (CCH) P 45,093, at 44,660 (D. Del. 1993)* ; United States v. Lockheed Martin Corp., No. 98CV00731 (D.D.C. 1998) (complaint) (parties abandoned acquisition after DOJ alleged a likely reduction in innovation for military aircraft, including stealth technology); *United States v. Flow Int'l Corp., 6 Trade Reg. Rep. (CCH) P 45,094, at 44,682 (E.D. Mich. 1994)* (parties abandoned transaction after DOJ filed Complaint alleging anticompetitive effects due to elimination of competition in innovation for waterjet pumps and related components).

(n176)Footnote 204. *See United States v. Allied Signal, Inc., 64 Fed. Reg. 69,784 (Dec. 14, 1999)* (requiring divestiture of certain aerospace products as condition of merger); *Pfizer Inc., 2000 FTC LEXIS 88 (FTC 2000)* (FTC challenged merger of two firms believed furthest along in the FDA approval process for development of EGFr-tk inhibitors for treatment of solid tumor cancers; consent order required Pfizer to divest its relevant research program to a rival); *Baxter Int'l, 123 F.T.C. 904, 906 (1997)* (consent order required divestiture of assets and licensing of rights relating to the research and development of Factor VIII Inhibitor treatments and Fibrin sealants, where "Baxter and Immuno are the only two suppliers of Factor VIII Inhibitor Treatments in the United States" and two of the few developing Fibrin sealants); *Glaxo PLC, 119 F.T.C. 815 (1995)* (consent order allowed merger of Glaxo and Wellcome, the two firms furthest along in developing oral drug for treatment of migraine headaches, provided Wellcome divests its worldwide research and development assets for noninjectible drugs); *In re Americam Home Prods. Corp., 119 F.T.C. 217 (1995)* (requiring divestiture of AHP's assets relating to the research and development of diphtheria and tetanus vaccines); *Upjohn Co., 121 F.T.C. 44, 46 (1996)* (where "Upjohn and Pharmacia are two of only a very small number of firms currently in the advanced stages of developing topoisomerase I inhibitors for the treatment of colorectal cancer in the United States," consent order required merging parties to divest Pharmacia's relevant R&D assets).

(n177)Footnote 205. *See* United States v. 3D *Sys., 2002-2 Trade Cas. (CCH) P73738, 2002 U.S. Dist. LEXIS 18377 (D.D.C. Apr. 17, 2002)* (defendants to extend, among other things, royalty-free licenses for their patents and copyrights relating to certain technology to a third-party competitor); *United States v. Miller Indus., 2001-1 Trade Cas. (CCH) P73132, 2000 U.S. Dist. LEXIS 19542 (D.D.C. Dec. 12, 2000)* (requiring licensing of patent rights relating to improvements in light-duty tow trucks and light-duty car carriers); *Amgen, Inc., 134 F.T.C. 333, 368-69 (2002)*

1-6 Antitrust Law Developments 6B

(consent order requiring licensing of patents); *In re Summit Tech.*, 127 F.T.C. 208 (1999) (dissolving patent pool and ordering cross licensing of patents relating to technology employed in photorefractive keratectomy for use in laser eye surgery); *Baxter Int'l*, 123 F.T.C. 904 (1997) (requiring licensing of rights on a nonexclusive, royalty-free basis); *Ciba-Geigy Ltd.*, 123 F.T.C. 842 (1997) (consent order resolving complaint alleging merger would reduce innovation competition in research and development of gene therapy products); *Sensormatic Elec. Corp.*, 119 F.T.C. 520 (1995) (consent agreement forbidding acquisition of certain patents but allowing a nonexclusive license); *Roche Holding*, 113 F.T.C. 1086 (1990), modified, 1996 FTC LEXIS 45 (FTC 1996).

(n178)Footnote 206. *See United States v. Northrop Grumman Corp.*, 2003-1 Trade Cas. (CCH) P74057, 2003 U.S. Dist. LEXIS 10636 (D.D.C. June 10, 2003) (imposing nondiscriminatory conduct restrictions on merged firm).

(n179)Footnote 207. *See United States v. General Motors Corp.*, 6 Trade Reg. Rep. (CCH) P 45,093, at 44,661 (D. Del. 1993).

(n180)Footnote 208. *Id.*

(n181)Footnote 209. *Cf.* FTC Press Release, FTC Closes Its Investigation of Genzyme Corporation's 2001 Acquisition of Novazyme Pharmaceuticals, Inc. (Jan. 13, 2004) (closing its investigation of an already consummated merger between the only rivals with active pre-clinical research programs relating to Pompe disease, but not requiring proof of an existing product market).

(n182)Footnote 210. *See, e.g., Green Country Food Mkt. v. Bottling Group*, 371 F.3d 1275, 1283, 2004-1 Trade Cas. (CCH) P74454 (10th Cir. 2004) (Pepsi branded products not a relevant market); *Tanaka v. University of S. Cal.*, 252 F.3d 1059, 1065, 2001-1 Trade Cas. (CCH) P73297 (9th Cir. 2001) ("[b]y attempting to restrict the relevant market to a single athletic program in Los Angeles based solely on her own preferences, [plaintiff] has failed to identify a relevant market for antitrust purposes"); *Elliot v. United Ctr.*, 126 F.3d 1003, 1004-06, 1997-2 Trade Cas. (CCH) P71941, 1997-2 Trade Cas. (CCH) P71941 (7th Cir. 1997) (affirming dismissal of vendor's claim against stadium because single arena food sales could not, as matter of law, qualify as relevant market); *Tarrant Serv. Agency v. American Standard, Inc.*, 12 F.3d 609, 614-15, 1994-1 Trade Cas. (CCH) P70489 (6th Cir. 1993) (in sustaining judgment as matter of law for defendant, court rejected plaintiff's proposed relevant market consisting only of genuine Trane repair parts for heating, ventilation, and air conditioning equipment); *Smalley & Co. v. Emerson & Cuming, Inc.*, 13 F.3d 366, 368, 1994-1 Trade Cas. (CCH) P70493 (10th Cir. 1993) (single sale of single product rejected as a proposed relevant market); *TV Communs. Network v. Turner Network Television*, 964 F.2d 1022, 1025, 1992-1 Trade Cas. (CCH) P69825 (10th Cir. 1992) (rejecting allegation that relevant market was "the market for [defendant's] TNT channel in Metropolitan Denver"); *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 479, 1992-1 Trade Cas. (CCH) P69773 (3d Cir. 1992) (en banc) (rejecting single-brand market for Chrysler cars); *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 723-26, 1991-2 Trade Cas. (CCH) P69668 (3d Cir. 1991) (refusing to limit market to Ford tractors); *International Logistics Group v. Chrysler Corp.*, 884 F.2d 904, 908, 1989-2 Trade Cas. (CCH) P68744 (6th Cir. 1989) (market cannot be limited to Chrysler parts); *Key Fin. Planning Corp. v. ITT Life Ins. Corp.*, 828 F.2d 635, 643, 1987-2 Trade Cas. (CCH) P67685 (10th Cir. 1987) (no evidence to show that ITT life insurance is different from other life insurance); *Invacare Corp. v. Respironics, Inc.*, 2006 U.S. Dist. LEXIS 77312, at *16 (N.D. Ohio 2006) (rejecting relevant market limited to one type of customer because a product market cannot be divided by type of customer unless the plaintiff can identify a difference in the product supplied to that group of customers); *Coast to Coast Entm't v. Coastal Amusements, Inc.*, 2005 U.S. Dist. LEXIS 26849 (D.N.J. 2005) (no single-product market because plaintiff failed to demonstrate single product was unique and not interchangeable with other products); *Mathias v. Daily News*, 152 F. Supp. 2d 465, 479-82, 2001-2 Trade Cas. (CCH) P73393 (S.D.N.Y. 2001) (rejecting home delivery of New York Daily News as relevant market, in part because "courts have consistently held that a brand name product cannot define a relevant market"); *Carell v. Shubert Org.*, 104 F. Supp. 2d 236, 264-66, 2000-2 Trade Cas. (CCH) P72980 (S.D.N.Y. 2000) (rejecting claim that make-up designs and other intellectual property for the musical "Cats" constituted a relevant product market); *Godix Equip. Exp. v. Caterpillar Inc.*, 948 F. Supp. 1570, 1580, 1996-2 Trade Cas. (CCH) P71651 (S.D. Fla. 1996) (dismissing claim because the relevant product market of replacement parts for Caterpillar machines includes both genuine and nongenuine "will fit" parts, and Caterpillar does not have market power in that market), aff'd mem. sub nom. *Gonzalez v. Caterpillar Inc.*, 144 F.3d 55 (11th Cir. 1998); *Kramer v. Pollock-Krasner Found.*, 890 F. Supp. 250, 255 (S.D.N.Y. 1995) (relevant market is not Jackson Pollock paintings sold at auction); *Gall v. Home Box Office*, 1992-2 Trade Cas. (CCH) P69949, 1992 U.S. Dist. LEXIS 13020 (S.D.N.Y. Aug. 31, 1992) ("the natural monopoly every manufacturer has in its own product simply cannot serve as the basis for antitrust liability"), aff'd mem., 9 F.3d 1538 (2d Cir. 1993); *Regency Oldsmobile, Inc. v. General Motors Corp.*, 723 F. Supp. 250, 267-68, 1989-2 Trade Cas. (CCH) P68825 (D.N.J. 1989) (General Motors' products did not constitute relevant market); *Carlock v. Pillsbury Co.*, 719 F. Supp. 791, 843, 1989-2 Trade Cas. (CCH) P68833 (D.

*Minn. 1989)* (Haagen-Dazs ice cream is not so distinctive that no other ice cream can be a reasonable substitute); *Coca-Cola Bottling Co. v. Coca-Cola Co., 696 F. Supp. 97, 131-32 (D. Del. 1988)* (Coca-Cola products do not constitute relevant market).

(n183)Footnote 211.    *351 U.S. 377, 1956 Trade Cas. (CCH) P68369 (1956)* .

(n184)Footnote 212.    *Id. at 393* (citation omitted);    *Green Country Food Mkt. v. Bottling Group, 371 F.3d 1275, 1282-85, 2004-1 Trade Cas. (CCH) P74454 (10th Cir. 2004)* (Pepsi beverages not a relevant product market);    *HCI Techs., Inc. v. Avaya, Inc., 446 F. Supp. 2d 518, 522 (E.D. Va. 2006)* (market for sales of defendant's own products not an appropriate relevant market). *But see    American Needle, Inc. v. New Orleans La. Saints, 385 F. Supp. 2d 687, 693-94, 2005-1 Trade Cas. (CCH) P74819 (N.D. Ill. 2005)* (denying motion to dismiss and rejecting argument that relevant market confined to a particular firm's trademarks was insufficient as a matter of law where, for a large segment of consumers, the product was the trademarked logo itself).

(n185)Footnote 213.    *504 U.S. 451, 1992-1 Trade Cas. (CCH) P69839 (1992)* . The Court noted that several of its prior cases, which did not involve aftermarkets, "support the proposition that in some instances one brand of a product can constitute a separate market." *Id. at 482* (citing    *NCAA v. Board of Regents, 468 U.S. 85, 101-02, 111-12, 1984-2 Trade Cas. (CCH) P66139 (1984)* ;    *International Boxing Club of New York v. United States, 358 U.S. 242, 249-52, 1959 Trade Cas. (CCH) P69231 (1959)* ;    *IBM Corp. v. United States, 298 U.S. 131 (1936))* .

(n186)Footnote 214.    *504 U.S. at 481-82* ; *see also    Heatransfer Corp. v. Volkswagenwerk, AG, 553 F.2d 964, 979-81, 1977-1 Trade Cas. (CCH) P61473 (5th Cir. 1977)* (air conditioning units for a single brand of automobiles found to be a relevant submarket);    *Dauro Adver. v. General Motors Corp., 75 F. Supp. 2d 1165, 1169, 2000-1 Trade Cas. (CCH) P72747 (D. Colo. 1999)* (plaintiff sufficiently pled a relevant market consisting of General Motors (GM) automobiles sold to GM dealers, noting that "GM dealers have no interest in purchasing cars or trucks from any other manufacturer," and therefore, "cars and trucks from manufacturers other than GM are not reasonably interchangeable");    *Sunshine Cellular v. Vanguard Cellular Sys., 810 F. Supp. 486, 494 n.6, 1992-2 Trade Cas. (CCH) P70026 (S.D.N.Y. 1992)* (for assessing monopsony power, it may be appropriate in some circumstances to limit the relevant market to one particular group of customers);    *Fox v. Comprehensive Accounting Corp., 1984-1 Trade Cas. (CCH) P65993, 1984 U.S. Dist. LEXIS 17560 (N.D. Ill. Apr. 16, 1984)* (submarket consisting of data processing services provided to defendant could be a relevant market);    *Lucas Indus. v. Kendiesel, Inc., 1995 U.S. Dist. LEXIS 7979 (D.N.J. 1995)* (refusing to dismiss monopoly claims against seller of diesel fuel injection systems because aftermarket exists for replacement pumps and parts for use in such systems).

(n187)Footnote 215.    *Red Lion Med. Safety v. Ohmeda, Inc., 63 F. Supp. 2d 1218, 1237 (E.D. Cal. 1999)* (refusing to grant summary judgment to defendant because plaintiffs had raised a triable issue whether aftermarket service is a separate and distinct product from sales of anesthesia equipment and parts);    *Mitel Corp. v. A&A Connections, Inc., 1998-1 Trade Cas. (CCH) P72120, 1998 U.S. Dist. LEXIS 3576 (E.D. Pa. Mar. 19, 1998)* (under *Kodak*, counterclaimant's single product market consisting of replacement Mitel parts, upgrades, repairs, and add-ons was sufficiently pled to withstand a motion to dismiss). *But see    Newcal Indus. v. IKON Office Solutions, 2005-1 Trade Cas. (CCH) P74682, 2004 U.S. Dist. LEXIS 26229 (N.D. Cal. Dec. 23, 2004)* (granting motion to dismiss, finding customer contracts for photocopying services did not create a parts market for leased photocopy machines);    *Carolina Indus Prods. v. Learjet, Inc., 189 F. Supp. 2d 1147, 1169-70, 2002-1 Trade Cas. (CCH) P73681 (D. Kan. 2001)* (rejecting Learjet service and repair market because plaintiff failed to present any evidence regarding the number of authorized repair facilities and the relationship between Learjet and those facilities).

(n188)Footnote 216.    *See, e.g.,    United States Anchor Mfg. Co. v. Rule Indus., 7 F.3d 986, 997-98, 1993-2 Trade Cas. (CCH) P70426 (11th Cir. 1993)* (particularly expensive anchor excluded from broader market of functionally similar but up to 50% less expensive anchors);    *Woods Exploration & Producing Co. v. Aluminum Co. of America, 438 F.2d 1286, 1307, 1971 Trade Cas. (CCH) P73422 (5th Cir. 1971)* (relevant market limited to single natural gas field);    *Hewlett-Packard Co. v. Arch Assocs. Corp., 908 F. Supp. 265, 270, 1995-2 Trade Cas. (CCH) P71201 (E.D. Pa. 1995)* (complaint adequately pled a relevant market limited to Hewlett-Packard printers);    *National Communs. Ass'n v. AT&T Corp., 808 F. Supp. 1131, 1135, 1992-2 Trade Cas. (CCH) P70090 (S.D.N.Y. 1992)* (on motion to dismiss, held that a monopolist-or one attempting to monopolize-"can be found liable in regard to distribution of its own product if it is (1) illegally attempting to destroy competition by refusing to deal or (2) controlling an essential service or bottleneck");    *Brownlee v. Applied Biosystems, 1989-1 Trade Cas. (CCH) P68425, 1989 U.S. Dist. LEXIS 5960 (N.D. Cal. Jan. 9, 1989)* (on motion to dismiss, held that plaintiffs are entitled to show that there is a narrow submarket consisting only of separators using the capillary electrophoresis method of which defendant is sole supplier);    *In re Air Passenger Computer Reservations Sys. Antitrust Litig., 694 F. Supp. 1443, 1988-2 Trade Cas. (CCH) P68316*

1-6 Antitrust Law Developments 6B

*(C.D. Cal. 1988)* (market could be limited to one airline's system), *aff'd sub nom. Alaska Airlines v. United Airlines, 948 F.2d 536, 1991-2 Trade Cas. (CCH) P69624 (9th Cir. 1991)* ; *Cutters Exchange, Inc. v. Durkoppwerke Gmbh, 1986-1 Trade Cas. (CCH) P 67039 (M.D. Tenn. 1986)* (market can be limited to manufacturer's products only if they are "so unique or so dominant in the market in which they compete that any action by the manufacturer to increase his control over his product virtually assures that competition in the market will be destroyed").

(n189)Footnote 217. *504 U.S. at 481-82* (citing *NCAA v. Board of Regents, 468 U.S. 85, 101-02, 1984-2 Trade Cas. (CCH) P66139 (1984)* ; *International Boxing Club v. United States, 358 U.S. 242, 249-52, 1959 Trade Cas. (CCH) P69231 (1959)* ; *IBM Corp. v. United States, 298 U.S. 131 (1936))* .

(n190)Footnote 218. *188 F.3d 11, 1999-2 Trade Cas. (CCH) P72617 (1st Cir. 1999)* .

(n191)Footnote 219. In affirming summary judgment, the court found no genuine issue of material fact as to the defendant's lack of monopoly power or as to lock-in. *Id. at 23* .

(n192)Footnote 220. *Id. at 17* .

(n193)Footnote 221. *Id. at 18* .

(n194)Footnote 222. *166 F.3d 772, 1999-1 Trade Cas. (CCH) P72433 (5th Cir. 1999)* .

(n195)Footnote 223. *Id. at 777* .

(n196)Footnote 224. *Id. at 781-83* .

(n197)Footnote 225. *Id. at 783* ; *see also Harrison Aire, Inc. v. Aerostar Int'l, 423 F.3d 374, 381-85, 2005-2 Trade Cas. (CCH) P74930 (3d Cir. 2005)* , *cert. denied, 126 S. Ct. 1581 (2006)* ; *PSI Repair Servs. v. Honeywell Inc., 104 F.3d 811, 1997-1 Trade Cas. (CCH) P71674 (6th Cir. 1997)* (distinguishing *Kodak* and finding the relevant market was control equipment and aftermarket parts); *Digital Equip. Corp. v. Uniq Digital Tech., 73 F.3d 756, 763, 1996-1 Trade Cas. (CCH) P71260 (7th Cir. 1996)* (rejecting aftermarket claim because Digital Equipment "is selling a fungible commodity ... to customers who can substitute brands without changing operating systems"); *ID Sec. Sys. Can. v. Checkpoint Sys., 249 F. Supp. 2d 622, 647, 2003-1 Trade Cas. (CCH) P74004 (E.D. Pa. 2003)* (rejecting aftermarket because the foremarket was characterized by low information costs, lively competition, and a lack of post-lock-in exploitation in alleged aftermarket).

(n198)Footnote 226. *124 F.3d 430, 1997-2 Trade Cas. (CCH) P71909 (3d Cir. 1997)* .

(n199)Footnote 227. *Id. at 437* .

(n200)Footnote 228. *Id. at 440-41* . The court noted that if the plaintiffs' narrow product market definition were accepted, franchisors would lose control of brand quality and could not prevent franchisees from offering substandard products. *Id.*

(n201)Footnote 229. *Id.; see also Ajir v. Exxon Corp., 1999-2 Trade Cas. (CCH) P72609, 1999 U.S. App. LEXIS 11046 (9th Cir. May 26, 1992)* (ability to extract concessions attributable to franchise method of doing business, not uniqueness of product); *Mumford v. GNC Franchising, 437 F. Supp. 2d 344 (W.D. Pa. 2006)* (finding that a relevant market is determined based on the interchangeability of use by consumers generally and not by the contractual requirements relating to pricing and supply that a franchisor imposes on its franchisees). *But see Collins v. International Dairy Queen, 939 F. Supp. 875, 883, 1996-2 Trade Cas. (CCH) P71583 (M.D. Ga. 1996)* (declining to follow *Queen City Pizza* and finding that plaintiffs had "produced sufficient evidence of economic loss, overpriced products, and refusal to consider alternative sources of comparable products to preclude the entry of partial summary judgment based on the existence of a franchisor-franchisee relationship").

(n202)Footnote 230. *140 F.3d 494, 1998-1 Trade Cas. (CCH) P72099 (3d Cir. 1998)* .

(n203)Footnote 231. *Id. at 513* .

(n204)Footnote 232. *Id. at 515* .

(n205)Footnote 233. *Id.*

(n206)Footnote 234. *40 F. Supp. 2d 109, 1999-1 Trade Cas. (CCH) P72430 (E.D.N.Y. 1999)* .

(n207)Footnote 235. *Id. at 118* . The court, however, denied a motion to dismiss directed to a broader product market consisting of patients of all HMOs. *Id. at 120.*

1-6 Antitrust Law Developments 6B

(n208)Footnote 236.   *808 F. Supp. 9, 1992-2 Trade Cas. (CCH) P70047 (D.D.C. 1992)* .

(n209)Footnote 237.   *875 F. Supp. 1228, 1995-1 Trade Cas. (CCH) P70978 (E.D. La. 1995)* .

(n210)Footnote 238.   *Id. at 1234-35* .

(n211)Footnote 239.   *86 F. Supp. 2d 154, 2000-1 Trade Cas. (CCH) P72892 (W.D.N.Y. 2000)* .

(n212)Footnote 240.   *Id. at 160* .

(n213)Footnote 241.   *Id.*; *cf.  Apani Sw., Inc. v. Coca-Cola Enters., 128 F. Supp. 2d 988, 1002, 2001-1 Trade Cas. (CCH) P73162 (N.D. Tex. 2001)* , *aff'd,   300 F.3d 620, 2002-2 Trade Cas. (CCH) P73769 (5th Cir. 2002)* .

(n214)Footnote 242.   *86 F. Supp. 2d at 161* ; *see also  Invacare Corp. v. Respironics, Inc., 2006 U.S. Dist. LEXIS 77312 at *16 (N.D. Ohio 2006)* (rejecting relevant market limited to a particular type of customer because "a product market cannot be divided by type of customer unless the plaintiff can identify a 'difference in the product supplied to that group of customers.'").

(n215)Footnote 243.   *See, e.g.,  CCPI, Inc. v. American Premier, Inc., 967 F. Supp. 813, 817-18, 1998-2 Trade Cas. (CCH) P72344 (D. Del. 1997)* (dismissing antitrust claim because "'merely obtaining a patent for a product does not create a product market for antitrust purposes'" (citation omitted) and because a plaintiff "cannot adequately plead a relevant market with a bare assertion that a commodity is unique in some way") (citation omitted).

(n216)Footnote 244.   *126 S. Ct. 1281, 2006-1 Trade Cas. (CCH) P75144 (2006)* .

(n217)Footnote 245.   *Id. at 1293* .

(n218)Footnote 246.  1992 MERGER GUIDELINES, *supra* note 3, § 0.1. The *Merger Guidelines* issued by the National Association of Attorneys General (NAAG) apply a consumer perception test, defining the product market to include the products sold by the merging firms together with those comparably priced goods that customers accounting for 75% of the purchases from the merging firms consider to be "suitable substitutes." NATIONAL ASS'N OF ATTORNEYS GENERAL, HORIZONTAL MERGER GUIDELINES § 3.1 (1993), *reprinted in  4 Trade Reg. Rep. (CCH) P 13,406* .

(n219)Footnote 247.  1992 MERGER GUIDELINES, *supra* note 3, § 1.11.

(n220)Footnote 248.  *Id.* The federal antitrust agencies have not, however, bound themselves to the 5% level: "[w]hat constitutes a 'small but significant and nontransitory' increase in price will depend on the nature of the industry, and the Agency at times may use a price increase that is larger or smaller than five percent." *Id.* In some cases, the DOJ has tested both a 5% and a 10% price increase. *See, e.g.,   United States v. Oracle Corp., 331 F. Supp. 2d 1098, 2004-2 Trade Cas. (CCH) P74542 (N.D. Cal. 2004)* (DOJ market definition rejected notwithstanding court's acceptance of DOJ's suggested 10% test);   *United States v. Engelhard Corp., 970 F. Supp. 1463, 1467-70, 1997-1 Trade Cas. (CCH) P71773 (M.D. Ga. 1997)* , *aff'd,   126 F.3d 1302, 1997-2 Trade Cas. (CCH) P71955 (11th Cir. 1997)* ;   *United States v. Country Lake Foods, 754 F. Supp. 669, 675, 1990-2 Trade Cas. (CCH) P69113 (D. Minn. 1990)* .

(n221)Footnote 249.  *See, e.g.,  Swedish Match, 131 F. Supp. 2d at 161* (rejecting econometric analyses offered by both plaintiff's and defendant's experts after detailed review of underlying data and assumptions);  *New York v. Kraft Gen. Foods, 926 F. Supp. 321, 358, 361, 1995-1 Trade Cas. (CCH) P70911 (S.D.N.Y. 1995)* (describing criticisms of plaintiff's computations); *B.A.T. Indus., 104 F.T.C. 852, 931 (1984)* (rejecting cross-elasticity study); *see also part 6B(1)(b)* of this chapter.

(n222)Footnote 250.  *See, e.g.,  Oracle Corp., 331 F. Supp. 2d at 1125-33* , 1136-45;   *FTC v. Arch Coal, Inc., 329 F. Supp. 2d 109, 120-24, 2004-2 Trade Cas. (CCH) P74513 (D.D.C. 2004)* ;   *Owens-Illinois, Inc., 115 F.T.C. 179, 301 (1992)* ;   *Weyerhauser Co., 106 F.T.C. 172, 275 (1985)* .

(n223)Footnote 251.  1992 MERGER GUIDELINES, *supra* note 3, § 1.11. The federal antitrust agencies also consider the documented views of the merging firms as expressed in their ordinary course of business documents. When firms routinely concentrate on some presumptively competitive products and ignore others, they may be providing a practical assessment of the products that are inside or outside the relevant product market. *See, e.g.,   Community Publishers v. Donrey Corp., 892 F. Supp. 1146, 1153-54, 1995-1 Trade Cas. (CCH) P71049 (W.D. Ark. 1995)* , *aff'd sub nom.   Community Publishers v. DR Partners, 139 F.3d 1180, 1998-1 Trade Cas. (CCH) P72093 (8th Cir. 1998)* .

(n224)Footnote 252.  1992 MERGER GUIDELINES, *supra* note 3, § 1.0.

PJA-01461

(n225)Footnote 253. *Id.* § 1.31. This group includes "vertically integrated firms to the extent that such inclusion accurately reflects their competitive significance in the relevant market prior to the merger," and firms that produce or sell used, recycled, or reconditioned products within the relevant product market. *Id.*

(n226)Footnote 254. *Id.* § 1.32. The 1992 *Merger Guidelines* further provide: These supply responses must be likely to occur within one year and without the expenditure of significant sunk costs of entry and exit, in response to a "small but significant and nontransitory" price increase. If a firm has the technological capability to achieve such an uncommitted supply response, but likely would not (*e.g.*, because difficulties in achieving product acceptance, distribution, or production would render such a response unprofitable), that firm will not be considered to be a market participant. The competitive significance of supply responses that require more time or that require firms to incur significant sunk costs of entry and exit will be considered in entry analysis.

*Id.* Sunk costs are defined as: "the acquisition costs of tangible and intangible assets that cannot be recovered through the redeployment of these assets outside the relevant market, *i.e.*, costs uniquely incurred to supply the relevant product and geographic market." *Id.* § 1.32.

(n227)Footnote 255. *Id.* § 1.321.

(n228)Footnote 256. *Id.* § 1.322.

(n229)Footnote 257. *Id.* §§ 1.11 (smallest market principle), 1.22 (price discrimination markets).

(n230)Footnote 258. *See, e.g., H.J., Inc. v. International Tel. & Tel. Corp., 867 F.2d 1531, 1537, 1989-1 Trade Cas. (CCH) P68431 (8th Cir. 1989)* (must define a market in which "'sellers, if unified by a hypothetical cartel or merger, could raise prices significantly above the competitive level'") (citation omitted); United States v. Connors Bros. Income Fund, No. 1:04CV01494 (D.D.C. 2004) (finding a "small but significant increase in the price of sardine snacks would not cause enough consumers to switch to premium or ethnic sardines to make such a price increase unprofitable."); *Coca Cola Bottling Co., 118 F.T.C. 452, 540 (1994)* ; *see also United States v. UPM-Kymmene Oyj, 2003-2 Trade Cas. (CCH) P74101, 2003 U.S. Dist. LEXIS 12820 (N.D. Ill. July 25, 2003)* (finding that, despite a showing that some customers of paper labels "could and might use products that are functionally similar to paper labels, there has not been a showing that this would occur enough to defeat the profitability of a small, but significant, nontransitory price increase"); *United States v. Sungard Data Sys., 172 F. Supp. 2d 172, 181-83, 191-93, 2001-2 Trade Cas. (CCH) P73493 (D.D.C. 2001)* (evidence did not support DOJ's contention that a significant number of customers would not switch to a substitute product in response to a small but significant nontransitory increase in price); *United States v. Visa U.S.A., Inc., 163 F. Supp. 2d 322, 336, 2001-2 Trade Cas. (CCH) P73440 (S.D.N.Y. 2001)* (applying *Merger Guidelines* to find that a 5% price increase by a hypothetical monopolist of "general purpose" credit cards would be profitable and that such cards therefore constitute a relevant product market), *aff'd, 344 F.3d 229, 2003-2 Trade Cas. (CCH) P74151 (2d Cir. 2003)* ; *FTC v. Swedish Match, 131 F. Supp. 2d 151, 160-61, 2000-2 Trade Cas. (CCH) P73122 (D.D.C. 2000)* (discussing use of "critical loss" test to determine if hypothetical monopolist's 5% price increase for products in proposed market would be profitable; court commented that test requires proper analysis of both profit margins and demand elasticities because both volume of switching to substitutes and impact on profits need to be considered); *California v. Sutter Health Sys., 130 F. Supp. 2d 1109, 1128, 2001-1 Trade Cas. (CCH) P73255 (N.D. Cal. 2001)* (citing the critical loss test as an analytical tool for addressing the question of whether the geographic market has been properly defined by analyzing the number of consumers that must leave the market, if faced with price increases, before a hypothetical monopolist would abandon such increases).

(n231)Footnote 259. *970 F. Supp. 1066, 1997-2 Trade Cas. (CCH) P71867 (D.D.C. 1997)* .

(n232)Footnote 260. *Id. at 1073* . The court found that the definition of consumable office supplies did not include "capital goods such as computers, fax machines, and other business machines or office furniture, but does include such products as paper, pens, file folders, post-it notes, computer disks, and toner cartridges." *Id.*

(n233)Footnote 261. The court explicitly adopted the 1992 *Merger Guidelines'* 5% price increase benchmark for establishing the relevance of an alleged market. *Staples, 970 F. Supp. at 1076 n.8* . The 1992 *Merger Guidelines* methodology would define a relevant market for "the sale of consumable office supplies through office superstores" if a small but significant and nontransitory increase in price of consumable office supplies by a hypothetical office superstore monopolist would be profitable.

(n234)Footnote 262. *970 F. Supp. 1463, 1997-1 Trade Cas. (CCH) P71773 (M.D. Ga.)* , *aff'd, 126 F.3d 1302, 1997-2 Trade Cas. (CCH) P71955 (11th Cir. 1997)* (district court ruling was not clearly erroneous in holding that DOJ

PJA-01462

1-6 Antitrust Law Developments 6B

failed to carry its burden of establishing the relevant product market). The district court in *Engelhard* based its legal analysis on the same cases relied on by the district court in *Staples*, as well as *Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 612 n.32 (1953)* and *United States Anchor Manufacturing Co. v. Rule Industries, 7 F.3d 986, 995, 1993-2 Trade Cas. (CCH) P70426 (11th Cir. 1993)* . *See  Engelhard, 970 F. Supp. at 1466-67* .

(n235)Footnote 263.   *970 F. Supp. at 1467-70* . A number of customers also testified directly to this effect at trial.

(n236)Footnote 264.   *Id. at 1468* .

(n237)Footnote 265.   *Id.*

(n238)Footnote 266.   *Id. at 1470-72* . The DOJ's market definition was also rejected in   *United States v. Oracle Corp., 331 F. Supp. 2d 1098, 2004-2 Trade Cas. (CCH) P74542 (N.D. Cal. 2004)* . The DOJ challenged Oracle's proposed acquisition of Peoplesoft on the theory that it would combine two of only three competitors in the U.S. market for "high function" financial management systems (FMS) and human relations management (HRM) software used by "large enterprises," and would allow Oracle to raise prices unilaterally.   *Id. at 1123* , 1169-70. The district court rejected the proffered market definition, finding that "high function software" was not a recognized industry category and there was no clear way to distinguish large, up-market customers from smaller, mid-market users.   *Id. at 1139* , 1158-61. The court found customer testimony offered by the government was unhelpful because, while it revealed preferences for certain products over others, it did not shed light on what products customers could and would turn to in response to an anticompetitive price increase.   *Id. at 1131* .

ASPEN PUBLISHERS

**Phillip E. Areeda**
*Late Langdell Professor of Law*
Harvard University

**Herbert Hovenkamp**
*Ben V. & Dorothy Willie*
*Professor of Law*
University of Iowa College of Law

# Fundamentals of
# Antitrust Law
# Third Edition

 **Wolters Kluwer**
Law & Business

AUSTIN   BOSTON   CHICAGO   NEW YORK   THE NETHERLANDS

**2008 SUPPLEMENT**

PJA-01464

This publication is designed to provide accurate and authoritative information in regard to the subject matter covered. It is sold with the understanding that the publisher is not engaged in rendering legal, accounting, or other professional services. If legal advice or other professional assistance is required, the services of a competent professional person should be sought.

—From a *Declaration of Principles* jointly adopted by a Committee of the American Bar Association and a Committee of Publishers and Associations

© 2008, 2007–2004 Aspen Publishers. All Rights Reserved.

No part of this publication may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopying, recording, or any information storage and retrieval system, without permission in writing from the publisher. Requests for permission to reproduce content should be directed to the Aspen Publishers website at *www.aspenpublishers.com*, or a letter of intent should be faxed to the permissions department at 212-771-0803.

Printed in the United States of America

ISBN 978-0-7355-5034-6

1 2 3 4 5 6 7 8 9 0

**2008 SUPPLEMENT**

PJA-01465

generally or a narrow focus on each few blocks within the city.[28] Similarly, in judging the merger of two shoe retailers, the Court focused on their shares in communities with a population exceeding 10,000, ignoring smaller areas.[29] Nevertheless, no general minimum threshold for an economically significant market has appeared.

**5.02e. Aggregating separate markets; materiality.** On occasion, the defendant's share is large enough or too small for legal concern in every plausible market. In that event, choosing among such markets is legally irrelevant. For example, the Supreme Court avoided choosing among several possible geographic markets because it believed a challenged merger unlawful in each of them.[30]

Also on occasion, a court combines several different markets. For example, the *Grinnell* Court erroneously lumped together local markets for central station protective services into a national market.[31] However, it hardly mattered to the defendant's liability, for amalgamating local markets assigns the defendant a lower average market share than in some of the localities.[32] However, misdefining a market as national might misdirect the remedy—for example, breaking up a national integration without affecting each local monopoly.

Aggregations can yield entirely misleading results, as illustrated by Alcoa's acquisition of Rome Cable.[33] With undisputed markets for (1) uninsulated aluminum conductor (wire and cable) and (2) insulated and uninsulated aluminum and copper conductor, the Supreme Court held that insulated aluminum conductor

28. Id. at 361.

29. *Brown Shoe*, note 24 at 339. See also *United States v. Phillipsburg Natl. Bank*, 399 U.S. 350, 365 (1970) (relatively small city can be economically significant); *United States v. County Natl. Bank of Bennington*, 339 F. Supp. 85, 90-91 (D. Vermont 1972) (area with population under 24,000 not "insignificant"). *United States v. Idaho First Natl. Bank*, 315 F. Supp. 261, 268 (D. Idaho 1970), erred in holding that a city with population of 25,000 was not "sufficiently significant economically."

30. *United States v. Pabst Brewing Co.*, 384 U.S. 546, 549-550 (1966). That is all the Court meant when it said that failure to establish a market is insufficient ground for dismissing a merger challenge. See *United States v. Marine Bancorporation*, 418 U.S. 602, 621 n.20 (1974) (statutory reference to "section of the country" refers to a "relevant geographic market").

31. *United States v. Grinnell Corp.*, 384 U.S. 563 (1966), affirming except as to decree 236 F. Supp. 244 (D. R.I. 1964). See 2B Antitrust Law ¶550.

32. The defendant would be prejudiced on the liability issue only where the exclusionary conduct necessary to establish unlawful monopolization occurred in a local market in which it lacked monopoly power.

33. *United States v. Aluminum Co. (Rome Cable)*, 377 U.S. 271, 275-277 (1964).

was a market separate from insulated copper conductor because they were mainly used in different applications and the prices of one did not respond to price changes in the other. The lack of response of insulated copper prices to the rapid encroachment of cheaper aluminum indicates that copper cable would be an ineffective check to market power in the insulated aluminum conductor industry.[34] However, the Court's aggregation into one "market" of bare and insulated aluminum conductor in order to show large shares for the merging firms was indefensible.[35]

## §5.03   Meaning of Market Shares; Relation to Market Definition

**5.03a.  Introduction; importance of well-defined market.** Identifying a market and computing market shares provide an indirect means for estimating market power. If a dominant firm appears, it may have market power. Alternatively, the distribution of shares may reveal whether tacit price coordination is possible or whether collaborators have the ability to reduce output, enhance prices, or otherwise impair competition.

Although the connection between market share and market power is hardly linear, it is reasonable to presume, subject to rebuttal by other facts, that high shares of a properly defined relevant market indicate individual firm power and that high concentration indicates a significant danger of tacit price coordination among oligopolists, and vice versa. To examine the connection between shares and power, let us begin with an unambiguous market from which nothing arguable has been included or excluded.

Although nothing approaching a "sliding scale" can be managed, the selection of a minimum market share for a certain offense depends greatly on the degree of confidence that the market has been properly defined. If the court's confidence is high that a relevant market has been identified that properly groups close substitutes, excludes non-substitutes, and is protected by high entry

---

34.  Producers, however, might be able shift their inputs readily between copper and aluminum. See 2B Antitrust Law ¶561.

35.  These and related issues are taken up in 2B Antitrust Law ¶565 on "cluster" markets and the critical importance of distinguishing substitutes and complements.

PJA-01467