1

ANTITRUST MODERNIZATION COMMISSION


PUBLIC HEARING


Tuesday, November 8, 2005



Federal Trade Commission Conference Center
601 New Jersey Avenue, N.W.
Washington, D.C.



The hearing convened, pursuant to notice, at 9:38 a.m.


PRESENT:

DEBORAH A. GARZA, Chairperson
JONATHAN R. YAROWSKY, Vice Chair
BOBBY R. BURCHFIELD, Commissioner
DENNIS W. CARLTON, Commissioner
MAKAN DELRAHIM, Commissioner
JONATHAN M. JACOBSON, Commissioner
DONALD G. KEMPF, JR., Commissioner
DEBRA A. VALENTINE, Commissioner
JOHN L. WARDEN, Commissioner


REPORTER: LORAINE L. MARCHANT, RPR, CSR, CM. NO. 10323

EXHIBIT: 15
Witness: Gilbert
Date: 1.25.07    # of pages:


MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

PJA-01685

2

ALSO PRESENT:

    ANDREW J. HEIMERT, Executive Director and General
        Counsel
    WILLIAM F. ADKINSON, JR., Counsel
    TODD ANDERSON, Counsel
    HIRAM ANDREWS, Law Clerk
    KRISTEN M. GORZELANY, Paralegal

PJA-01686

3

CONTENTS

PAGE

Panel I: Antitrust and the New Economy.....................5

      Panelists:

            DANIEL COOPERMAN, Oracle Corporation

            PROFESSOR RICHARD J. GILBERT, University of
                  California at Berkeley

            M. HOWARD MORSE, Drinker Biddle & Reath LLP

            JAMES J. O'CONNELL, JR., U.S. Department of
                  Justice, Antitrust Division

            JOHN E. OSBORN, Cephalon, Inc.

            PROFESSOR CARL SHAPIRO, Haas School of Business,
                  University of California at Berkeley


Panel II: Patent Law Reform..............................96

      Panelists:

            SUSAN DESANTI, Federal Trade Commission

            PETER DETKIN, Intellectual Ventures

            PROFESSOR MARK A. LEMLEY, Stanford Law School

            STEPHEN A. MERRILL, National Academies' Board on
                  Science, Technology and Economic Policy
                  (STEP).

            STEPHEN M. PINKOS, United States Patent and
                  Trademark Office

            STEPHEN A. STACK, JR., Dechert LLP


These proceedings were professionally transcribed by a court
reporter.  The transcript has been edited by AMC staff for
punctuation, spelling, and clarity, and each witness has been
given an opportunity to clarify or correct his or her
testimony.

                        PROCEEDINGS


            CHAIRPERSON GARZA:  I'd like to open the Antitrust

PJA-01687

4

Modernization Commission hearings for November 8, Antitrust and the New Economy. A hearty welcome to all of our panelists and our sincere thanks for your agreeing to be here and the submission of your very thoughtful papers.

Let me take a minute to explain the process, how this will work. I'll ask each of you, each of the panelists, to summarize your testimony in about five minutes. And because we have a large panel, and we do want to give adequate time for questions and answers, I'd ask you to really try hard to keep your summaries to about five minutes.

There's a box on your table and on our table with red, green, and yellow lights, and the red light means that the time is up, and if you see that light, if you haven't done so already, I ask you to please wrap it up. I'm not likely to say anything to you out of fear of being impolite, but I will be thinking to myself, will he wrap it up?

Then after that, we'll do that going across the table. After we've had all of your statements, then we will have a lead questioner for the Commission, and that's Commissioner Carlton this morning, take about 20 minutes to ask questions. And then after that, we will give an opportunity to each of our other Commissioners, limiting them to roughly five minutes each. So that's how the morning will

PJA-01688

5

proceed. And then we will start with Mr. O'Connell.

### Panel I: Antitrust and the New Economy

MR. O'CONNELL: Thank you, Madam Chairperson. Good morning. My name is Jim O'Connell, and I am Counsel to the Assistant Attorney General in the Antitrust Division of the Department of Justice. I'd like to thank the Commission for giving me the opportunity to be with you this morning to talk about the issues that you all have raised regarding antitrust analysis in new economy industries, or industries where innovation, intellectual property, and technological change are pervasive.

What I'd like to do in this opening statement is lay a couple of background points out, briefly address just a couple of the questions that you have asked, and I'll try to keep it as brief as I can, because I do recognize there are a number of us here on the panel.

Many of the topics that we're here to discuss this morning carry with them the suggestion that new industries should perhaps be treated differently under the antitrust laws than old industries, or that at least they should not be subjected to the same analytical process, for example, during merger review. It should perhaps not surprise anyone here that the Antitrust Division does not share that view. A

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C. 20003-2802
(202) 546-6666

6

former Assistant Attorney General at the Antitrust Division pointed out that when it comes to antitrust enforcement, the new "new thing" often isn't so new after all, and the core principles of antitrust reflected in the Sherman Act are enduring rules that can and should be applied to new situations.

Now, it is true that the federal antitrust laws, at least some of them, have been around for over 100 years, but during that time they have repeatedly demonstrated the flexibility and resiliency necessary to deal effectively with rapid, indeed, sometimes dramatic changes in the American economy. They've served the American public well, we believe, from the industrial age right up through the information age, and we believe they will continue to do so in the future.

They are flexible enough, we believe, to work in all industries, including those that are constantly evolving through the introduction of new technologies. Of course, while the antitrust laws are the same for all industries, with the exception of per se violations antitrust analysis requires that we evaluate conduct and, most particularly, mergers in light of the specific facts that are involved and the characteristics of the industry that is before us. This

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

7

is a flexible fact-based analysis that's supported by sound economic principles that don't change from industry to industry, and it enables us to deal with industries that experience fast-paced changes while serving the primary goal of protecting competition in rapidly evolving markets.

With that as a background, I'd like to touch briefly on a couple of the questions that the Commission has put forth this morning. First, the Commission has asked whether there should be a presumption of market power in tying cases where the defendant holds a patent or a copyright or some other form of intellectual property. This is obviously a very timely question. Since the Commission put it out for public comment, the Supreme Court agreed to hear the *Independent Ink* case, which is going to be argued in just a couple of weeks.

The United States has submitted an *amicus* brief in that case that is publicly available, and I'd be happy to provide that to the Commission if it doesn't already have it. The brief thoroughly explains the government's position on these issues.

In short, though, for purposes of this morning's hearing, I'll just say that the Division does not believe that there should be a presumption of market power in such

PJA-01691

8

cases.  The government's brief in *Independent Ink* explains
that there is no economic basis for inferring market power
from the mere fact that the defendant holds a patent.  And
while the existence of a patent can, of course, be relevant
to the question of market power, as Professor Hovenkamp said,
"A patent grant creates an antitrust 'monopoly' only if it
succeeds in giving the exclusive right to make something for
which there are not adequate market alternatives, and for
which consumers would be willing to pay a monopoly price."

     The Division does not believe that those relatively
rare instances where a patent actually confers significant
market power support a sweeping presumption of the existence
of that power whenever the tying product is patented.

     In the interest of time, let me skip ahead to one
of the other questions that you have asked: should antitrust
law be concerned with innovation markets, and if so, how
should the enforcers analyze innovation markets?

     I'd like to say as a principal, as an initial
matter, I'm not sure that the innovation markets issue
presents much of a practical problem, at least at the
Division.  It is a theory that we apply rarely in our merger
analysis, and indeed, in the last ten years, we've only
brought one case where we alleged innovation markets.

PJA-01692

Innovation effects, of course, are something else. The Department does care about the effects of a merger on innovation, and the Horizontal Merger Guidelines specifically state that sellers with market power may lessen competition on non-price dimensions, such as innovation. But separately defining an innovation market, which is to say, a market for research and development that is not connected to a specific product market, is only necessary, we believe, if a merger may affect innovation in a way that cannot be adequately addressed through the analysis of a goods or product market. In 2004, I believe actually in this very room, the FTC and the DOJ held a joint merger workshop that had a panel devoted to this topic, where the issue was discussed in some detail. The general consensus at that discussion was that innovation markets is a potentially useful theory, but one that should be applied with caution for a number of reasons, including the fact that it presents particular predictive challenges, because after all, in those cases, we're talking about products that don't yet exist. Also, it can be difficult outside of certain industries, such as pharmaceuticals, to ascertain all the potential sources of innovation if one is conducting an innovation markets analysis.

The Division generally agrees with those views

PJA-01693

regarding the innovation markets theory, and I'd be happy to discuss that further. With that, I will yield the floor to my co-panelists, and I look forward to discussing these and the other issues the Commission has raised further.

CHAIRPERSON GARZA: Thank you very much. Professor Shapiro.

PROF. SHAPIRO: Well, thank you for inviting me to be here today. A great deal of attention has been paid in the last ten years or longer to antitrust and innovative industries, certainly going back to the '95 Intellectual Property Licensing Guidelines. I'm delighted the Commission is looking at it. At the same time, I think we can ask what is new that we want to address, given all the attention that's been paid to this? I think we've come a long way in the last 30 years, for example. Rich Gilbert and I actually wrote a paper comparing the way these issues were treated in the late '90s, to the days of the nine no-noes in the '70s, and I think the balance is much better in terms of recognizing, for example, the many ways in which various provisions in intellectual property licenses can be procompetitive without having rigid rules.

At the same time, I think the Commission can clarify some areas here without necessarily suggesting any

11

changes in legislation—areas and important principles, where
you could focus both the agencies and in general and in
present, sort of, views on things, including the courts, in
some areas that I think are tricky, not necessarily new, but
where I sense some confusion, and I think you can maybe make
an important statement.

So let me, in addition to—focus on some of the
things I said in my written statement; let me make four
points in this short introductory thing here, and they're all
keyed in various ways to the questions that you've posed.
First, price-cost margins.  The fact is, a margin between
price and cost, let's say marginal cost, is a necessary and
desirable feature of an innovative market.  That's the only
way companies can get a return on their R&D, having such
margins to pay back those fixed costs and other costs
associated with their R&D projects, and you talk to just
about any firm, they'll tell you, well, yeah, our operating
profits are such and such, and we return a certain fraction
of it to our R&D, so it also, as a practical matter, funds
future R&D, as well.  As an incentive matter, it's a return
to previous successful projects.  So the notion that a gap
between price and marginal cost is some sort of indication
that the market isn't performing well or that there's—

PJA-01695

12

monopoly power is mistaken, and you could help clarify that. I think that does crop up sometimes in an unhelpful way.

And I would just point out the Lerner Index, price-cost margins in percentage terms, if you have a very competitive market where the firms are not earning any extra profits, the Lerner Index will equal the ratio of the fixed cost to the revenues, as a simple rule of thumb, and so it certainly should not be zero if the fixed costs are significant because there are R&D expenses.  So that's price-cost margin.

The second point, complements.  Antitrust I think has learned a lot and should continue to be flexible and learn about the importance of cooperation between companies that are providing complementary products.  So that could be hardware and software.  Any time there's a system that has different elements and components, it could be content and distribution, and the economic theory here is very clear and rather straight forward, that that sort of cooperation could lead to lower prices and basically be a win-win situation. And I think there is a tendency for antitrust to, with its inherent suspicion of cooperation based on collusion and the lack of desirability of certain types of cooperation, namely collusion between competitors, to have that spill over when

PJA-01696

13

it's cooperation among different component suppliers, and that's undesirable. And I don't think it's—I think it's well understood in some circles, but it's an important message to continue to emphasize.

Third point, disruptive technology, and I emphasize this in my written statement. The mere fact that technology is changing rapidly, that products are getting better, does not mean that there can be no monopoly power. And I think the same way we've just heard, these core principles, going back to the Sherman Act, if a company has had a very large share of a well defined market for a considerable period of time, that is a suggestion, and I don't mean more than suggestion, but a suggestion that they really have monopoly power.

If the other conditions are met, of course, we have to look at entry barriers, the ability to control price, exclude competition, but the mere fact that technology is changing does not undermine that, okay, particularly if it's changing for exogenous reasons; maybe their inputs are becoming cheaper, or technologies are being developed in the scientific community that are causing this rather than even the firm itself being the generator of the technological innovation. So I think there is some danger of ignoring the

PJA-01697

14

concerns of monopoly power just because an industry happens to be innovative. And I labeled this disruptive technology because I think really one of the fundamental concerns here is, we want to prevent—well, "entrenched" is a leading word—a company with a considerable vested interest in the status quo, from protecting that from would-be competitors with new technologies, disruptive technologies, who would like to topple that *status quo*, and that is a very important role of antitrust, and it fits squarely within the Sherman Act, and so I want to emphasize that, and that's not just about Section 2; that's also about mergers, as far as I'm concerned.

So fourth, patent settlements, I have written a number of things about this, as have others. I think there's—I'm increasingly concerned with where the courts are going in terms of giving—allowing the settlements of patent disputes that may be—that are anticompetitive. The Eleventh Circuit decision in *Schering-Plough* worries me. I understand there's a recent Second Circuit decision, as well. So I'm very concerned about these reverse payments. I've done some research on this lately, and I'm concerned where the courts are going.

This could open possibilities to a range of

PJA-01698

anticompetitive settlements of patent disputes, particularly in a context where there really are concerns about the quality of the patents, as you will hear about this afternoon. Thank you.

CHAIRPERSON GARZA: Thank you. Mr. Osborn.

MR. OSBORN: Thank you very much for inviting me here today. I know you have my written testimony, so I will focus on the business perspective of mergers and acquisitions, in the life sciences industry.

My company, Cephalon, is a small company by the standards of Pfizer, Merck, or the other major pharmaceutical companies, but it is a relatively successful commercial enterprise from the standards of the many hundreds of biotechnology companies that have been established in the United States over the last 20 years. We have about 2,500 employees at this point, we are focused on central nervous system disorders, including sleep, pain, addiction, and anxiety, as well as cancer, and we market products in the United States and in Europe. We have a little more than one billion dollars in annual revenue.

My experience in this area largely comes from a Federal Trade Commission review of Cephalon's proposal to acquire CIMA Labs. We were under review by the Commission

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C. 20003-2802
(202) 546-6666

PJA-01699

16

during late 2003 and much of 2004.  Having said that, I certainly don't want to be seen as coming here to criticize the FTC, but rather to provide some perspective so that this Commission might consider whether our experience reflects that of other firms, and if it warrants any policy changes. I will make three points.

I strongly believe that mergers are an integral part of the innovative process in life sciences.  Although there are well over 1,000 research-stage biotechnology companies in the United States that employ wonderfully creative and energetic teams of scientists who develop promising research approaches and innovative compounds, it is quite rare for a research-stage company to develop into a mature, commercial-stage firm.  It is very difficult for a research-stage company to develop or acquire the kinds of functional expertise, whether regulatory, clinical, marketing, sales, medical, to be able to take those promising research leads and develop them, gain FDA approval, and commercialize them.  Without commercialization, research innovation does not lead to consumer benefit.

An example of this process may be seen in a deal that we did back in the early 1990s, before my time at the company, when Cephalon obtained an exclusive license for a

PJA-01700

17

compound known as modafinil.  At the time, a small firm in France was close to obtaining approval to be able to market it in that country, but they had no ability to do anything in the United States.  Following an investment of hundreds of millions of dollars in clinical studies, Cephalon now has a product that is sold under the trade name Provigil® for a variety of sleep disorders, and it has just received an approvable letter from the FDA to treat attention-deficit disorder.  Thus, the combination of clinical, regulatory, medical, and marketing resources that we engaged has resulted in a very important product for consumers in this country.

Similarly, Cephalon regarded CIMA Labs, which was primarily a drug-development and manufacturing company, as an interesting firm because of its efforts to develop a product known as OraVescent Fentanyl, which we saw as an opportunity to expand an existing line of products.  As we struggled through our review process with the FTC staff, a couple of things became apparent to me that perhaps would be of interest to this Commission.

First is the question of how to properly appraise risk in evaluating a merger.  I certainly do not suggest that merger review in an innovation industry is itself problematic or unimportant, but I do think that if you tend to discount

PJA-01701

substantially the probability of other market entry, it will lead you to oppose the proposed acquisition. Second, this approach suggests that you are not really putting a lot of value on the consumer benefits that may flow from the ultimate consummation of the deal. And as I've said, I think acquisitions, in fact, ultimately add to consumer value, if they would increase the odds of successful commercialization of the product.

I am out of time, so I will conclude by encouraging the Commission to consider the ways in which risks are appraised in evaluating possible market entry, and in evaluating the scope of the relevant product market. Thank you very much.

CHAIRPERSON GARZA:  Thank you.

Mr. Morse?

MR. MORSE:  Thank you. I'm honored to have been asked to testify before this Commission. I'm currently a partner in the Washington, D.C. office of Drinker, Biddle & Reath. Before joining the firm, I was Assistant Director in the Federal Trade Commission's Bureau of Competition. I'll offer my perspective this morning based on my ten years at the FTC, enforcing the antitrust laws against transactions in high-tech industries, as well as my years in private practice

PJA-01702

representing companies in the computer hardware and software, pharmaceutical, biotech, and medical device industries.

My message this morning is that antitrust law must focus on dynamic effects to be relevant in the 21st century. Others have argued that innovation is king for good reason. Everyone should understand that small increases in productivity from innovation dwarf even significant reductions in static efficiency over time.

This reality can be grasped by considering Moore's Law, which teaches that computer chip capabilities double every one to two years. Slowing the introduction of new and improved products in that environment can harm consumers far more than even a significant increase in price. That said, I agree that the broad language of the Sherman and Clayton Acts, the antitrust laws are sufficiently flexible to take innovation concerns into account. Moreover, our economic learning continues to progress. It would, therefore, be a mistake to codify today's theories into statute, even if there was consensus.

It is time, however, to update the government's Merger Guidelines, which today focus primarily on the ability to maintain prices above competitive levels. The only mention of innovation in the Guidelines is in a footnote,

PJA-01703

20

which states that sellers with market power may also lessen competition on dimensions other than price, such as product quality, service, or innovation.

And it's far from clear that the models set forth in the Guidelines to analyze price competition, including the close-substitutes paradigm, translate to innovation competition. I understand that debate continues among economists as to whether there is correlation between concentration and innovation. But it is increasingly accepted that a firm's size and position in a market may effect its incentive to innovate.

Certainly, in my experience, dominant firms have less incentive than a new entrant to pursue disruptive leapfrog or paradigm shifting technologies. Mergers of the only two firms in a market pursuing R&D would appear to raise serious antitrust concern. At the same time, the acquisition by a leading firm of an entrant with promising technology may well hasten commercialization of the technology, as long as there are other firms to ensure the market leader won't suppress or delay the introduction.

Theories of competitive harm to innovation in markets where there are several competitors require further elucidation. Collusion or coordination or coordinated

PJA-01704

21

interaction in R&D seems unlikely as R&D is often secret and the rewards from innovation great. A unilateral theory might be articulated where the merging firms control the most advanced R&D efforts and others are well behind, so the merged firm may slow its efforts and still be the first to market.

But while the Guidelines explain why mergers of firms with products that are close substitutes may lead to higher prices, it's not at all clear that that theory applies to innovation. Combining similar research efforts may lead to efficiencies, and the merged firm, dropping one research path, may result in cost savings and still leave several firms in a race to innovate.

It is important to distinguish between research and development, which is input and innovation. A merger that leads to a reduction in R&D, but no reduction in innovation, should be considered efficient. In fact, I was member of the FTC-DOJ Task Force that drafted the revised efficiencies language in the current Merger Guidelines, along with Commissioner Valentine and others. With respect to innovation efficiencies, the 1997 Guidelines took only a small step forward, noting that efficiencies relating to R&D are potentially substantial, but generally less susceptible

PJA-01705

22

to verification than other efficiencies.  In private practice, I found that it is just such efficiencies from the combination of complementary expertise, while not easily measured, that drive many transactions and have great potential consumer benefit.  Further consideration should be given to efficiencies that lead to more rapid or enhanced innovation, including development of new or improved products.  Thank you.

CHAIRPERSON GARZA:  Thank you.

Professor Gilbert?

PROF. GILBERT:  I'm grateful for the opportunity to be here today.  I also would caution against special antitrust enforcement rules for new economy industries. While dynamic, innovation-driven industries have a number of characteristics that challenge conventional approaches to antitrust enforcement, there is nothing in antitrust policy that prevents a sound analysis of competitive effects in the new economy.

The composition of the new economy is itself somewhat ambiguous.  Some would say the new economy consists of computers, communications, and the Internet.  Others would include, I'm sure John would include, biotech and pharmaceuticals.  In any case, we can be confident that the

PJA-01706

23

composition of the new economy is going to morph into new fields as innovations change the ways that we think about old activities. In some respects, advocates of an antitrust exemption for the new economy, if there are any such advocates, are a special interest group whose members are likely to change over time. Antitrust policy has served the interest of consumers by resisting pressures to apply special rules and enforcement standards to individual industries.

Innovation is a critical determinant of market performance in both the new and the old economies, and it's correct for the antitrust agencies to take likely impacts on innovation into account when reviewing mergers or other firm conduct. There are two polar views of the effects of competition on innovation. One view, typically associated with the writings of Joseph Schumpeter back in the 1940s, is that large and dominant firms provide a superior platform for innovation and that new discoveries arrive in frequent gales of creative destruction to eliminate entrenched market power.

In this view, antitrust need not be concerned about monopolies in innovation intensive industries, because monopolies promote innovation, and whatever market power may exist would only be temporary. The other polar view is that competition promotes innovation, both because firms and

PJA-01707

24

competitive industries have more to gain by innovating and because protection from rivalry in monopolistic industries makes managers slow to adopt new technologies.  In this view, antitrust concerns about innovation roughly parallel concerns about traditional static market power.  The importance of innovation, which I think we all agree is very important for market performance, is not well served by enforcement actions that adhere categorically to one or the other polar view. The relationship between competition and innovation is complex, and neither economic theory nor empirical evidence supports a general conclusion that competition always increases or always decreases incentives for innovation.

This complexity, however, does not justify a policy of denial.  Antitrust enforcers should not presume that because the forces of innovation are complex, enforcement decisions should not even try to account for the likely impacts on innovation.  Instead, a reasonable antitrust enforcement policy would begin with a presumption that competition promotes innovation.  This presumption, in my view, is justified, because it is consistent with a large body of empirical evidence showing that competition and innovation are positively correlated.

However, this is only a presumption, and the

PJA-01708

presumption should be rebuttable. Economic theory shows that competition can discourage innovation under some circumstances, particularly in industries in which it is difficult for firms to approximate the value of their innovative efforts. And there is empirical evidence that is consistent with this economic theory. A rebuttable presumption that competition promotes innovation would align antitrust policy with the substantial body of empirical evidence that shows a synergy between competition and innovation while preserving the ability to present contrary evidence when warranted by particular circumstances. Thank you.

        CHAIRPERSON GARZA: Thank you.

        Mr. Cooperman?

        MR. COOPERMAN: Good morning. I would like to focus my remarks this morning on some practical aspects of antitrust enforcement that affect transactions proposed by software companies and others in the new economy. At the outset, I'd like to emphasize that time is precious in the software industry. Competition in our markets develops with extraordinary speed. New entrants can quickly displace incumbents.

        The cycle of innovation in the software industry is

PJA-01709

measured in days, in months, and not in years.  When a transaction is held up, product design decisions, the core of innovation, may come to a complete halt, because the merging companies cannot predict which resources from each company will be at their disposal and when.  The resulting delay may deal a fatal blow to an otherwise procompetitive merger transaction.

For that reason, the fragmentation of the merger clearance process internationally has become a critical issue for new economy companies.  Because their business does not depend on significant physical facilities, new economy companies often do business in a large number of jurisdictions.  That is especially true for companies involved in software or software-driven services, where a product can be distributed and sold anywhere in the world with relatively little additional expense.  About 60 nations have some form of premerger clearance systems.  The wide divergence in rules, procedures, and standards presents significant hurdles to any company that is trying to close a deal without violating any nation's laws, especially because failing to file a required notification can result in a fine or even in a divestiture or unwinding order.

Now, let me be clear; I completely understand that

with the proliferation of premerger clearance regimes around

the world inevitably come differences in substantive

antitrust standards of consideration and approval; that is as

it should be. Each nation has its own legal standards, and

conflicts of some kind are almost inevitable when different

jurisdictions apply differing analysis to the same

transactions. Transacting parties have to hope that the

conflicts do not reach the core of the deal and that one's

jurisdictions cure is not another's harm.

Today, however, I'd like to address a problem that

I hope can be fixed more easily, that is the procedural mine-

field that awaits any party that engages in a merger or

acquisition that implicates multiple jurisdictions around the

world. Merging parties commonly need to file in a dozen or

more different jurisdictions. We suggest closer

international coordination to produce streamlined premerger

notification, a coordinated investigation protocol, and

depositions that occur within a single agreed upon limited

time. I will explain our perspective on the problem along

with the solutions we propose. Some countries require

filings as soon as a week after the execution of the merger

agreement. Different countries also have different rules

about follow-up information requests, so that companies must

PJA-01711

engage in a series of search and production exercises over a period that may extend to several months.

The enforcement agencies also start and finish their investigations according to different timetables, so that the jurisdiction with the closest connection to the deal may not be the first to rule on the transaction. For example, in mergers between U.S. companies, the European Commission may issue a decision that includes recommended dispositions or licenses that address a perceived competition issue even before the responsible U.S. agency has even completed its review.

Moreover, software companies may be uniquely susceptible to substantive variations between jurisdictions. Because software products increasingly are offered for purchase and download directly over the Internet, it is virtually impossible to refrain from doing business in any jurisdiction. As a result, the jurisdiction with the strictest antitrust review procedures or the lowest jurisdictional standards may dictate the timing and the substantive result for all other jurisdictions, leading to what I call a highest common denominator solution that may not be the most efficient or economically sound. But the hardest part is knowing where to file. The economic

thresholds for a jurisdiction, and the filing scope, often are not confined to the transaction's effect in a particular country, and the filing thresholds often do not clearly distinguish between worldwide economic activity and activity within a jurisdiction. The complexities of modern business transactions can combine with the complexities of jurisdictional rules to produce compliance traps.

This regulatory disarray imposes real costs on productive commerce. The combination of expense, legal risk, uncertainty, and delay will deter procompetitive transactions on the margin. The deterrence because of substantive competitive concerns may benefit consumers, because the deterred transactions are at least arguably anticompetitive, but by contrast, deterring substantively procompetitive transactions based on mere procedural impediments creates a deadweight loss.

We would call on the Commission and on the federal enforcement authorities to spearhead procedural reform of the international merger investigation regime by enlisting the involvement of the United States Trade Representative, if necessary. We believe that the filing, information gathering, and statutory review periods for merger investigations could be substantially coordinated by taking

PJA-01713

30

just a few simple steps.  First, there should be a standard form for information requests with a single set of filing dates for initial and follow-up submissions.  Companies should be able to file one set of information to which all interested jurisdictions have access.  Second, the antitrust enforcement agency of the domicile of the acquiring company should be the primary investigating agency.  Other countries would channel additional information requests through that agency to reduce duplication.  That would permit companies to provide fewer but more comprehensive responses, reducing the risk of inadvertent non-compliance, without reducing the volume and quality of relevant information.

Third, the investigations of various antitrust authorities should take place concurrently.  The common information submissions would feed into a multiplicity of merger review processes on a coordinated schedule.  And finally, the primary investigating agency should complete its investigation and any resulting enforcement activity first, before other non-primary agencies within a strictly limited time frame could bring enforcement actions for additional relief.

The agencies in the non-primary states accordingly could focus on regional and local issues that were less

PJA-01714

31

likely to be adequately addressed by the primary agency.  In

conclusion, these modest steps and procedural streamlining

could render the procedural aspects of merger review less ad

*hoc*, more efficient, and more predictable, with far fewer

traps for the unwary.  I note that antitrust law aims at

preserving the innovation and efficiency provided by

competition in the marketplace.  Antitrust enforcement itself

should aim to be just as efficient and nimble as the

companies it regulates.  I thank you for your attention.

      CHAIRPERSON GARZA:  Thank you.

      Commissioner Carlton?

      COMMISSIONER CARLTON:  Okay.  Thank you, and I want

to thank the panelists.  I read all your statements, and I

appreciate all the hard work that went into them.  I only

have 20 minutes to ask you questions, and there are six of

you, and I have 20 minutes of questions for each of you, so I

would ask you to try and keep your responses to my questions,

if you can, short, so we can cover more topics.

      I want to start out really following up on

something that Professor Shapiro, Carl, said, and that is,

there's often a confusion between price above marginal cost,

and market power, rates of return, and I want to explore that

a little bit, and I want to really focus on the economists on

PJA-01715

the panel to answer the question.

We don't need new economic principles, I think both of you would agree, to analyze a high-tech industry versus a low-tech industry, the application will differ obviously. What a high-tech industry puts in stark contrast, though, is that there are high fixed costs, and low or zero marginal costs. So the question is, what do you mean by market power? If price is above marginal cost, both of you point to that would seem like a funny definition to say that's market power because every industry would have market power. And both of you in your statements say that's not market power in an antitrust sense. And I think, Carl, you used the language— it's not durable monopoly power; it's not genuine monopoly power. And I really want to make sure I understand the distinction that you're drawing.

I know you're not proposing that price above marginal cost be the screen for market power. It sounds to me like, since I'm an economist, as you are—I know marginal cost; I know rates of return—it sounds like you're saying that there's not market power, durable market power, unless the level of profit, the rate of return, is above the competitive level; is that what you guys are saying, and if so, over what length of time would you calculate this rate of

PJA-01716

return?  So why don't I start with Rich and then Carl?

PROF. GILBERT:  Well, I think antitrust policy has
been generally correct in the way it's looked at the market
power issue, in that it's not really so much—antitrust has
not been so much concerned about actually measuring the
Lerner Index or rates of return, but rather investigating
when market power is an issue for antitrust purposes, and so
the absence of market power, is a good starting point, for
there is not an antitrust problem.  So if we don't see any
market power, we can say there's no antitrust problem.  Now,
of course, in many industries, and particularly high-tech
industries, you're always going to see high price-cost
margins and always some theoretical evidence of market power.
But then antitrust asks the correct question, I believe,
which is, in a merger case, is the merger going to raise
prices substantially or limit output or reduce innovation?
And in a unilateral conduct case, is there conduct that leads
to either higher price-cost margins or sustains price-cost
margins in ways that are anticompetitive?

So the use of market power as a screen seems to me
to be the right thing, and then applying market power to the
relevant questions seems to be done in the correct way by
antitrust enforcement agencies for new and old economy

34

industries.

COMMISSIONER CARLTON:  Yeah, so let me—I think that's exactly right.  The way I think about it is that the antitrust laws are trying to see, in a merger case, is the price going to go up as a result of the merger?  And in a monopolization case, as a result of a bad act, is price going up, meaning, is there an increase in elevation of price above marginal cost?

The reason we have market power and focus on market power is, we want to throw out cases, not clog up our administrative system.  It really doesn't raise significant issues.  And for that, we define a market, and we want to say that if a person doesn't have market power, let's forget about the case.  And my question is, both you and Carl are saying that durable market power has to be a high rate of return, and that suggests that you're going to have to start measuring rates of return, and to do that, you're going to have to have some time interval over which you measure it, and so I think that's my thinking on—my interpretation of what you guys are saying.  It sounds right; that's similar to my thinking on the topic, I just wanted to—what do you think, Carl?

PROF. SHAPIRO:  Well, I think if you were just

PJA-01718

35

doing it conceptually, that's right, if you're not going to compare price to marginal cost. Is it some sort of average cost? Is there a rate of return? How are you going adjust for risk? That gets to be difficult, and it raises the time-frame issue, no question. But in practice, let me give you an example. I had a case once for Apple Computer, and it was accused of being a monopolist over basically Apple computers. And I think most people think, well, that's crazy; they have to compete against Microsoft; they've got to compete against machines or whatever it is. That doesn't make any sense.

But, in fact, they had authorized some cloning of Apple computers, and then they withdrew allegedly, so now the question was, had they done something that had actually allowed them to get a higher price at reduced—eliminated some type of maybe called localized competition that would have pushed down price. So then you get to the practical question, well, did the conduct actually lead to significantly higher prices, whether or not they were getting—regardless of just how good their return on their R&D investments was? So you start to pose that practical question. You don't really need to necessarily get into measuring risk-adjusted rates of return, and in a merger case it's the same thing. You may have very large R&D

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C. 20003-2802
(202) 546-6666

PJA-01719

# PJA 1720 - 1827

# REDACTED IN THEIR

# ENTIRETY