IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TEVA PHARMACEUTICALS USA, INC., TEVA PHARMACEUTICAL INDUSTRIES LTD., and NOVOPHARM, LTD., | ) ) ) | **REDACTED PUBLIC VERSION** |
| | ) | |
| Counterclaim Plaintiffs, | ) | C.A. No. 02-1512 (SLR) |
| v. | ) ) | CONSOLIDATED |
| ABBOTT LABORATORIES, FOURNIER INDUSTRIE ET SANTÉ, and LABORATOIRES FOURNIER S.A., | ) ) ) ) | |
| Counterclaim Defendants. | ) ) | |
| IMPAX LABORATORIES, INC., | ) ) ) | |
| Counterclaim Plaintiff, | ) | |
| v. | ) | C.A. No. 03-120 (SLR) |
| ABBOTT LABORATORIES, FOURNIER INDUSTRIE ET SANTÉ, and LABORATOIRES FOURNIER S.A., | ) ) ) ) | CONSOLIDATED |
| Counterclaim Defendants. | ) ) | |
| IN RE TRICOR DIRECT PURCHASER ANTITRUST LITIGATION | ) ) ) | C.A. No. 05-340 (SLR) |
| | ) | |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | ) ) ) | CONSOLIDATED |
| IN RE TRICOR INDIRECT PURCHASER ANTITRUST LITIGATION | ) ) ) | C.A. No. 05-360 (SLR) |
| | ) | |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | ) ) | CONSOLIDATED |

**REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT ON RELEVANT MARKET DEFINITION**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Mary B. Graham (#2256)
James W. Parrett, Jr. (#4292)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
mgraham@mnat.com
jparrett@mnat.com

OF COUNSEL:

William F. Cavanaugh, Jr.
Thomas W. Pippert
Chad J. Peterman
Alexis Deise
PATTERSON, BELKNAP, WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036-6710
(212) 336-2000

*Attorneys for Defendant Abbott Laboratories*

RICHARDS, LAYTON & FINGER, P.A.
Frederick L. Cottrell, III (#2555)
Anne Shea Gaza (#4093)
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
(302) 651-7700
cottrell@rlf.com
gaza@rlf.com

OF COUNSEL:

William Baer
James L. Cooper
Anne P. Davis
ARNOLD & PORTER LLP
555 12th Street, N.W.
Washington, DC 20004
(202) 942-5000

Timothy C. Bickham
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, DC 20036-1795
(202) 429-5517

*Attorneys for Fournier Industrie Et Santé and
Laboratoires Fournier, S.A.*

Original Filing Date: June 16, 2008
Redacted Filing Date: June 24, 2008

<u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 2

I.  TRICOR COMPETES IN A RELEVANT PRODUCT MARKET INCLUDING OTHER DYSLIPIDEMIA DRUGS AND DOES NOT HAVE A MONOPOLY SHARE OF THAT MARKET ................................................ 2

    A.  Plaintiffs' Price-Based Arguments Do Not Raise A Material Fact Issue Regarding the Reasonable Interchangeability of Dyslipidemia Drugs ........................................................................................ 2

        1.  Therapeutic Interchangeability Defines The Relevant Market ...................................................................................... 2

        2.  Plaintiffs' Price-Based Arguments Are Not Relevant To Market Definition Because They Are Based Upon Prices For Generics Automatically Substituted For Branded Drugs .................... 7

            a.  Plaintiffs' Simvastatin Example Confirms That AB-Rated Drugs Do Not Compete On Price With Their Branded Counterparts, And Instead Gain Sales Through Automatic Substitution ...................................... 9

            b.  Plaintiffs' Other Examples Of the Absence Of Price Competition In The Dyslipidemia Market Confirm The Irrelevance of Plaintiffs' Price-Based Arguments ........................................................................ 11

    B.  Plaintiffs' Nonprice Arguments Do Not Raise A Material Fact Issue That TriCor Is Not Interchangeable With Other Dyslipidemia Drugs ......................................................................................... 11

        1.  The GE HealthCare Data Is The Most Reliable Evidence Of Competition And Is Corroborated By The Plaintiffs' IDC-9 Diagnoses Data ............................................................ 12

        2.  Plaintiffs' Physician Testimony Raises No Genuine Issue In the Face Of The GE Healthcare Data ........................................ 16

- i -

3.      Plaintiffs' Reliance On Abbott's "Marketing" Documents Confirms TriCor's Interchangeability With Other Dyslipidemia Drugs ................................................................ 19

C.     Plaintiffs' Attempt To Define The Relevant Market Through Their Own Allegations And Not Interchangeability Is Contrary To The Law ........................................................................................ 21

II.     PURCHASER PLAINTIFFS' PURPORTED "DIRECT EVIDENCE" DOES NOT SHOW MONOPOLY POWER ................................................... 22

CONCLUSION ............................................................................................ 26

TABLE OF AUTHORITIES

Page(s)

**CASES**

*Allen-Myland, Inc. v. IBM,*
  33 F.3d 194 (3d Cir. 1994)..........................................................................3, 5

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986).......................................................................................23

*Andrx Pharms., Inc. v. Elan Corp.,*
  421 F.3d 1227 (11th Cir. 2005) .....................................................................9

*Babyage.com, Inc. v. Toys "R" Us, Inc.,*
  Civ. A. Nos. 0-6792, 06-242, 2008 WL 2120493 (E.D. Pa. May 20, 2008) ...........9

*Broadcom Corp. v. Qualcomm Inc.,*
  501 F.3d 297 (3d Cir. 2007).................................................................3, 22, 24

*Brookins v. Int'l Motor Contest Ass'n,*
  219 F.3d 849 (8th Cir. 2000) .........................................................................5

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
  429 U.S. 477 (1977)................................................................................22, 24

*Check-mate Sys., Inc. v. Sensormatic Elecs. Corp.,*
  Civ. A. No. 83-1019, 1986 WL 6207 (E.D. Pa. June 2, 1986) ......................6

*Columbia Metal Culvert Co. v. Kaiser Aluminum & Chemical Corp.,*
  579 F.2d 20 (3d Cir. 1978)....................................................................*passim*

*Cont'l T.V., Inc. v. GTE Sylvania Inc.,*
  433 U.S. 36 (1977).........................................................................................25

*Eastman Kodak Co. v. Image Tech. Servs, Inc.,*
  504 U.S. 451 (1992).......................................................................................4

*Fineman v. Armstrong World Indus., Inc.,*
  980 F.2d 171 (3d Cir. 1992)...........................................................................3

*Fleer Corp. v. Topps Chewing Gum, Inc.,*
  501 F. Supp. 485 (E.D. Pa. 1980), *rev'd on other grounds,* 658 F.2d 139
  (3d Cir. 1981)...............................................................................................20

*FTC v. H.J. Heinz Co.,*
  246 F.3d 708 (D.C. Cir. 2001) ......................................................................4

*FTC v. Swedish Match,*
    131 F. Supp. 2d 151 (D.D.C. 2000) ....................................................................... 4-5

*FTC v. Whole Foods Market, Inc.,*
    502 F. Supp. 2d 1 (D.D.C. 2007) .......................................................................... 19

*Hayden Publ'g Co. v. Cox Broad. Corp.,*
    730 F.2d 64 (2d Cir. 1984) .................................................................................. 5-6

*In re Cardizem CD Antitrust Litig.,*
    105 F. Supp. 2d 618 (E.D. Mich. 2000) ................................................................ 9

*In re Ciprofloxacin Hydrochloride Antitrust Litig.,*
    363 F. Supp. 2d 514 (E.D.N.Y. 2005) .................................................................. 9

*In re Remeron Direct Purchaser Antitrust Litig.,*
    367 F. Supp. 2d 675 (D.N.J. 2005) ..................................................................... 23

*Knoll Pharms. Co. v. Teva Pharms. USA, Inc.,*
    No. 01 C 1646, 2001 WL 1001117 (N.D. Ill. Aug. 24, 2001) ............................ 9

*La. Wholesale Drug Co., Inc. v. Sanofi-Aventis,*
    No. 07 Civ. 7343(HB), 2008 WL 169362 ............................................................ 9

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.,*
    127 S. Ct. 2705 (2007) ........................................................................................ 25

*Morris Commc'n Corp. v. PGA Tour, Inc.,*
    364 F.3d 1288 (11th Cir. 2004) .......................................................................... 25

*Mut. Pharm. Co., v. Hoechst Marion Roussel, Inc.,*
    No. Civ. A. 96-1409, 1997 WL 805261 (E.D. Pa. Dec. 17, 1997) ..................... 9

*Olympia Equip. Leasing Co. v. W. Union Tel. Co.,*
    797 F.2d 370 (7th Cir. 1986) .............................................................................. 25

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.,*
    124 F.3d 430 (3d Cir. 1997) ................................................................................. 3

*SmithKline Corp. v. Eli Lilly & Co.,*
    427 F. Supp. 1089, *aff'd,* 575 F.2d 1056 (3d Cir. 1978) ..................................... 8

*SmithKline Corp. v. Eli Lilly & Co.,*
    575 F.2d 1056 (3d Cir. 1978) ............................................................................ 2-4

*Spectrum Sports, Inc. v. McQuillan,*
    506 U.S. 447 (1993) ........................................................................................... 21

*Telecor Commc'ns, Inc. v. Sw. Bell Tel., Co.,*
    305 F.3d 1124 (10th Cir. 2002) .........................................................................5, 8

*United States v. Archer-Daniels-Midland Co.,*
    866 F.2d 242 (8th Cir. 1988) ..............................................................................5

*United States v. Continental Can Co.,*
    378 U.S. 441 (1964)............................................................................................4

*United States v. E.I. du Pont de Nemours & Co.,*
    351 U.S. 377 (1956)............................................................................................3

*United States v. Microsoft Corp.,*
    253 F.3d 34 (D.C. Cir. 2001) .........................................................................4, 15

*Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.,*
    375 F.3d 1341 (Fed. Cir. 2004), *rev'd on other grounds,* 546 U.S. 394 (2006).........................5

*White & White, Inc. v. Am. Hosp. Supply Corp.,*
    723 F.2d 495 (6th Cir. 1983) .........................................................................21, 22

**RULES**

Fed. R. Civ. P. 56(e) .........................................................................................23

## INTRODUCTION

Plaintiffs' opposition briefs do not dispute the material evidence that compels summary judgment on relevant market. The parties do not dispute that physicians choose which dyslipidemia drug to prescribe and that physicians are not price sensitive. The controlling case law on determining the relevant market, starting with the Supreme Court's landmark *du Pont* opinion and continuing through all of the Third Circuit's relevant product market opinions, holds that it is consumers' perception of interchangeability among products that determines whether those products are in the same relevant product market. The cases Plaintiffs cite, including cases involving the pharmaceutical industry, do not hold otherwise. Here, two sets of empirical data – one from Plaintiffs and one from Defendants – answer this question. The data establish that

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████

Plaintiffs' chief argument against summary judgment is that the jury should determine the relevant market for TriCor only on the basis of price cross-elasticity between TriCor and other dyslipidemia drugs. Yet there is no genuine dispute that price is not a principal dimension of competition among dyslipidemia drugs. Although price cross-elasticity may be a relevant factor in assessing some product markets, the case law makes clear that it is never determinative and, in markets like this where the decision makers, i.e., the prescribing doctors, are not price sensitive, it is no factor at all. Thus, because they ignore critical empirical market data, the opinions of Plaintiffs' experts regarding price cross-elasticity are irrelevant and do not create a dispute over material facts. Plaintiffs' other arguments are equally unavailing, ultimately undermining Plaintiffs' position that there are material factual disputes for a jury to resolve.

## ARGUMENT

### I.   TRICOR COMPETES IN A RELEVANT PRODUCT MARKET INCLUDING OTHER DYSLIPIDEMIA DRUGS AND DOES NOT HAVE A MONOPOLY SHARE OF THAT MARKET

#### A.   Plaintiffs' Price-Based Arguments Do Not Raise A Material Fact Issue Regarding the Reasonable Interchangeability Of Dyslipidemia Drugs

In response to the powerful evidence of interchangeability of dyslipidemia drugs cited in Defendants' opening brief, Plaintiffs argue that the jury's determination of the relevant market should turn on whether dyslipidemia drug manufacturers engage in price competition. Because it is undisputed that physicians are not price sensitive, price cross-elasticity is not the proper measure of market definition as a matter of law.[1]

#### 1.   Therapeutic Interchangeability Defines The Relevant Market

All Plaintiffs erroneously argue that the absence of price-driven substitution between TriCor and other dyslipidemia drugs requires the Court to ignore the substantial and uncontroverted evidence that physicians interchangeably prescribe other dyslipidemia drugs with TriCor. The Purchaser Plaintiffs go so far as to contend that consideration of nonprice competition would be "directly contrary to binding law," citing the Third Circuit's opinions in *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1063-64 (3d Cir. 1978) and *Columbia Metal Culvert Co. v. Kaiser Aluminum & Chemical Corp.*, 579 F.2d 20 (3d Cir. 1978).[2] The Manufacturer Plaintiffs use less dramatic language but, citing the same opinions, also argue that

---

[1]   Exhibit A to this brief contains Defendants' reply to Plaintiffs' responses (in exhibits "A" to both opposition briefs) to the undisputed facts set forth in pages 4-5 of the Opening Brief in Support of Defendants' Motion for Summary Judgment on Relevant Market Definition (CA. No. 02-1512, D.I. 604; CA. No. 03-120, D.I. 512; CA. No. 05-340, D.I. 397; CA. No. 05-360, D.I. 391) (hereinafter "Defs.' Opening Br.").

[2]   Coordinated Purchaser Pls.' Br. In Opp'n to Defs.' Mot. For Summ. J. on Relevant Market Definition (CA. No. 05-340, D.I. 410; CA. No. 05-360,  D.I. 403) (hereinafter "Purchasers' Br."), at 17.

the absence of price-driven substitution by itself creates a material factual dispute.[3]  Their

position is incorrect.

All of the controlling decisions, including those Plaintiffs cite, define a relevant market in

terms of the reasonable interchangeability of the products by consumers.  The source of this

standard is *United States v. E.I. du Pont de Nemours & Co.,* where the Supreme Court held: "In

considering what is the relevant market for determining the control of price and competition, no

more definite rule can be declared than that commodities reasonably interchangeable by

consumers for the same purposes make up that 'part of the trade or commerce,' monopolization

of which may be illegal." 351 U.S. 377, 395 (1956).  The Third Circuit opinions, all of which

quote this "definite rule," use their own language to say the same thing.  *See, e.g., SmithKline,*

575 F.2d at 1063 ("[D]efining a relevant product market is a process of describing those groups

of producers which, because of the similarity of their products, have the ability – actual or

potential – to take significant amounts of business away from each other."); *id.* at 1065 (defining

a "relevant product market" as "the market where there is true economic rivalry because of

product similarity"); *Columbia Metal,* 579 F.2d at 26 (in determining the relevant market "judges

must attempt to ascertain the flow of commercial interactions").[4]  To be sure, those opinions

---

3    Teva's and Impax's Answering Br. In Opp'n to Defs.' Mot. For Summ. J. on Relevant
     Market Definition (CA. No. 02-1512, D.I. 623; CA. No. 03-120, D.I. 526) (hereinafter
     "Teva/Impax Br."), at 9.

4    Other authorities cited by Plaintiffs recognize interchangeability as the standard for
     determining the bounds of the relevant market.  *See, e.g., Queen City Pizza, Inc. v.
     Domino's Pizza, Inc.,* 124 F.3d 430, 437 (3d Cir. 1997) ("[T]he outer boundaries of a
     relevant market are determined by reasonable interchangeability of use."); *Fineman v.
     Armstrong World Indus., Inc.,* 980 F.2d 171, 198-200 (3d Cir. 1992) (quoting
     "reasonably interchangeable" language from *du Pont* and discussing interchangeability of
     resilient flooring, hard surface floor coverings, and carpeting); *Broadcom Corp. v.
     Qualcomm Inc.,* 501 F.3d 297, 307 (3d Cir. 2007) ("Competing products are in the same
     market if they are readily substitutable for one another; a market's outer boundaries are
     determined by the reasonable interchangeability of use between a product and its
     substitute, *or* by their cross-elasticity of demand.") (emphasis added); *Allen-Myland, Inc.*

mention price, and specifically price cross-elasticity, as one factor that courts should consider in defining a market. Indeed, *du Pont* is again the source of including price in the list of pertinent factors: "This interchangeability is largely gauged by the purchase of competing products for similar uses considering the price, characteristics and adaptability of the competing commodities." *E.I. du Pont de Nemours,* 351 U.S. at 380-81. But, as that language makes clear, the determinative issue is interchangeability – "the purchase of competing products for similar uses" – and price is just one of the considerations bearing on whether interchangeability exists. *Id.* Price, or price elasticity, is not determinative. *See also United States v. Continental Can Co.,* 378 U.S. 441, 455 (1964) ("That there are price differentials between the two products or that the demand for one is not particularly or immediately responsive to changes in the price of the other are relevant matters but not determinative of the product market issue.").

The Third Circuit's analytical approach in *SmithKline* and *Columbia Metal* confirms that consumer interchangeability is determinative. In *SmithKline,* the court did not stop after it affirmed "the district court's conclusion that there is a lack of price sensitivity between" the drugs at issue, but instead proceeded to review the district court's conclusion that on the facts of that case the drugs at issue there "lack[ed] interchangeability with antibiotics in general." *SmithKline,* 575 F.2d at 1064. *Columbia Metal* even more clearly does not support Plaintiffs'

---

*v. IBM,* 33 F.3d 194, 201 (3d Cir. 1994) ("The outer boundaries of a product market are determined by the reasonable interchangeability of use *or* the cross elasticity of demand between the product itself and substitutes for it.") (emphasis added); *Eastman Kodak Co. v. Image Tech. Servs, Inc.,* 504 U.S. 451, 482 (1992) (quoting "reasonable interchangeability" language in *du Pont* and noting that market definition must take into account "commercial realities"); *FTC v. H.J. Heinz Co.,* 246 F.3d 708, 718 (D.C. Cir. 2001) (quoting interchangeability language from *du Pont*); *United States v. Microsoft Corp.,* 253 F.3d 34, 52 (D.C. Cir. 2001) ("The relevant market *must include* all products 'reasonably interchangeable by consumers for the same purposes'") (emphasis added); *FTC v. Swedish Match,* 131 F. Supp. 2d 151, 157 (D.D.C. 2000) ("The court *must* determine whether [products] are similar in character or use to [the product in question] . . . .") (emphasis added).

argument that price elasticity is the only proper consideration. "No figures were presented on cross-elasticity of demand" in that case. *Columbia Metal*, 579 F.2d at 29 n.30.

The Third Circuit's interchangeability analysis in *Columbia Metal* parallels the circumstances here: The "consumers" there were engineers, who like the physician "consumers" here, were not price sensitive. *Id.* at 28 ("[P]rice was not the crucial variable in the choice . . . among the materials."). Accordingly, the court looked instead to "consumer" perception of interchangeability, including evidence of actual substitution. *Id.* at 28-30. In that case, the evidence did not support a broader market because there was evidence of non-interchangeability among a significant group of customers. *Id.* Here, by contrast, there is no genuine dispute that prescription decisions by physicians show interchangeable use of dyslipidemia drugs among all patient groups. Physician price insensitivity and the data – from both Plaintiffs' and Defendants' expert witnesses – showing actual prescription decisions by doctors also distinguish the other cases Plaintiffs cite[5] for the proposition that price cross-elasticity is the *sine qua non* of defining the relevant market.[6]

---

[5]    Teva/Impax Br. 5-6, 8; Purchasers' Br. 16.

[6]    *See United States v. Archer-Daniels-Midland Co.*, 866 F.2d 242, 246 (8th Cir. 1988) (finding purchasers would not substitute commodities due to "the price differential between products"); *Allen-Myland, Inc. v. IBM Corp.*, 33 F.3d at 207 (finding "no evidence from which to conclude whether peripheral and software upgrades [to mainframe computers] were reasonably interchangeable with either [a memory] upgrade or a different mainframe computer in enough cases that those alternate upgrades could properly be termed substitutes"); *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1364 (Fed. Cir. 2004) (antitrust plaintiff failed to produce evidence of actual substitution where its expert testified that there had never been a "transaction in his proposed relevant market"), *rev'd on other grounds*, 546 U.S. 394 (2006); *Brookins v. Int'l Motor Contest Ass'n*, 219 F.3d 849, 854 (8th Cir. 2000) (rejecting plaintiffs' proffered market definition that included one auto racing sanctioning body because of evidence of "other auto racing sanctioning bodies."); *Telecor Commc'ns, Inc. v. Sw. Bell Tel., Co.*, 305 F.3d 1124, 1132-33 (10th Cir. 2002) (recognizing that pay phones and cell phones are not, as defendant argued, "interchangeable at the location-owner level" where location owners were the consumer for the purposes of defining the relevant market); *Swedish Match*, 131 F. Supp. 2d at 164-65 (noting evidence that loose leaf and moist snuff tobacco have distinct customer bases); *Hayden Publ'g Co. v. Cox Broad. Corp.*,

Purchaser Plaintiffs attempt to bolster their price-based test for the relevant market by pointing to a paragraph from the ABA model jury instructions and the federal antitrust agencies' Merger Guidelines. Plaintiffs' reference to a single paragraph in the ABA's model jury instructions conspicuously ignores the beginning of the instruction stating, in accordance with controlling law, that *interchangeability* is the standard for determining the bounds of the relevant market:

> [T]he relevant product market includes the products that a consumer [in this case, the physician] believes *are reasonably interchangeable or reasonable substitutes for each other*. This is a practical test with reference to *actual behavior* [shown here by the GE Healthcare data] of [physicians] and marketing efforts of sellers. Products need not be identical or precisely interchangeable as long as they are reasonable substitutes.[7]

Similarly, Plaintiffs have altered the Merger Guidelines to fit their own theory of the case. As Defendants noted in their opening brief, applied correctly, the Merger Guidelines test would result in the conclusion that TriCor is in its own relevant market, separate from any generic.[8] In any event, none of the cases Purchaser Plaintiffs cite as support for their use of the Merger Guidelines hold that this price-based test is required in a monopolization case. *See Check-mate Sys., Inc. v. Sensormatic Elecs. Corp.*, Civ. A. No. 83-1019, 1986 WL 6207, at *4 (E.D. Pa. June 2, 1986) ("[T]he merger guidelines . . . are not the law, [rather they] merely indicate when the Department of Justice is likely to challenge mergers. They are, as the title

---

730 F.2d 64, 71 (2d Cir. 1984) (no indication that customers were price insensitive); *see also id.* (recognizing that the consumer's "willingness or readiness to substitute one [product] for the other" determines the bounds of the relevant market) (quoting *United States v. Chas. Pfizer & Co.*, 246 F. Supp. 464, 468 (E.D.N.Y. 1965)).

[7] ABA, MODEL JURY INSTRUCTIONS IN CIVIL ANTITRUST CASES C-7 (2005) (emphasis added), PJA1423. ("PJA" refers to the Appendix to Coordinated Purchaser Pls.' Br. In Opp'n to Defs' Mot. For Summ. J. on Relevant Market Definition, CA. No. 05-340, D.I. 412; CA. No. 05-360, D.I. 404).

[8] Defs.' Opening Br. 30-31.

says, only guidelines, not binding on the Justice Department and surely not binding on the courts.").

Because interchangeability is the appropriate legal standard and because the undisputed evidence on that standard shows a market in which TriCor does not maintain a monopoly share, summary judgment should be granted.

> ## 2.    Plaintiffs' Price-Based Arguments Are Not Relevant To Market Definition Because They Are Based Upon Prices For Generics Automatically Substituted For Branded Drugs

Although Plaintiffs are not able to agree amongst themselves as to which products should be in the relevant market,[9] they generally argue that ███████████████████████████ ███████████ Notwithstanding Plaintiffs' legal arguments, their proposed market definition is not based on price cross-elasticity of TriCor and AB-rated substitutes.   Instead, Plaintiffs' definition is based on the automatic substitution of AB-rated generic drugs for prescriptions written by physicians for TriCor – the ██████████████████████████ ████████ Purchasers' Br. 26 (conceding that substitution would have been "████████ ███████████████████████████); *id.* at 3 ("███████████ ██████████████"); Teva/Impax Br. 16 ("██████████████").

"Automatic" substitution is not the result of competition – as seen from the perspective of the consumer-physician – but rather of two things.  First, there is free riding by Plaintiffs on Defendants' promotional efforts, which creates demand for the drug.   Second, automatic substitution of an AB-rated generic for a brand name drug is a function of state regulations.  As one of the Plaintiffs' experts described the automatic AB-rated generic substitution mechanism:

"██████████████████████████████████████████████████

---

[9]    *Id.* at 7-8, n.9 & 10 (discussing inconsistency in Plaintiffs' proposed market definitions).

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████ ,"[10]    Although Plaintiffs characterize this as price

competition, there is no *genuine* dispute over the fact that █████████████████████████

███████████████████████.[11]    Because interchangeability is determined from the

perspective of the physician, and physicians are not price sensitive, a price-based test for the

relevant antitrust market leads to untenable results.[12]    Accordingly, if the Court were to adopt

Plaintiffs' strained view of market definition and examine only the price elasticity for

dyslipidemia products, a reasonable juror's only conclusion would be that TriCor and its AB-

rated substitutes are in separate product markets.[13]

None of the seven opinions Purchaser Plaintiffs characterize as having "upheld a relevant

antitrust market limited to branded and AB-rated generic versions of a single drug" support their

position here.[14]    Four of those cases involved motions to dismiss, where the court had to accept

as true the alleged relevant market definition, unlike here where the Court's decision is based on

---

[10]    Expert Report of Dr. Stephen Schondelmeyer ("Schondelmeyer Rpt."), ¶ 15, DJA-Reply-118-119 (emphasis added) ("DJA-Reply" Refers to Defendants' Joint Appendix filed herewith).

[11]    *See* Defs.' Opening Br. 29 n.72 (█████████████████████████████); *see also* Deposition of Dr. Iain Cockburn ("Cockburn Dep."), at 58:5-13, DJA-Reply-41 .

[12]    *Columbia Metal*, 579 F.2d at 30 (citing *SmithKline Corp v. Eli Lilly & Co.*, 427 F. Supp. 1089, 1115 ("[I]t is not the perceptions of manufacturers but those of consumers which are the most salient in the determination of market boundaries."), *aff'd*, 575 F.2d 1056 (3d Cir. 1978)); *Telecor Commc'ns, Inc.*, 305 F.3d at 1136 (defining relevant market from the perspective of the "relevant customers" not the end users of the product); *cf. Geneva Pharm. Tech. Corp. v. Barr Labs Inc.*, 386 F.3d 485, 496 (2d Cir. 2004) ("The emphasis [in determining the bounds of the relevant market] *always* is on the actual dynamics of the market rather than [the] rote application of any formula." (emphasis added)).

[13]    Defs.' Opening Br. 28-31.

[14]    Purchaser Br. 10-11, 28.

the factual record.[15]  In two of those cases the evidence, unlike here, showed no therapeutic

substitution.[16]  The remaining case involved a per se violation where "there was no need to

define a relevant market."[17]

> a.    **Plaintiffs' Simvastatin Example Confirms That
> AB-Rated Drugs Do Not Compete On Price With
> Their Branded Counterparts, And Instead Gain
> Sales Through Automatic Substitution**

Manufacturer Plaintiffs distort the facts of the entry of generic simvastatin (AB-rated to

Zocor, a statin) to support their contention that price competition exists in the dyslipidemia

market, but not as to between TriCor and other dyslipidemia drugs.[18]  Plaintiffs omit that when

generic simvastatin entered the market, branded Zocor's manufacturer took the "unprecedented"

step to reduce its price below that of its AB-rated counterpart.[19]  If Plaintiffs' contention were

---

15    *See Andrx Pharms., Inc. v. Elan Corp.,* 421 F.3d 1227, 1235-36 (11th Cir. 2005)
(accepting plaintiffs' alleged relevant market of controlled release pain medication,
naproxen, as true for the purposes of testing the sufficiency of the complaint); *La.
Wholesale Drug Co., Inc. v. Sanofi-Aventis,* No. 07 Civ. 7343(HB), 2008 WL 169362, at
*7 (accepting plaintiffs' alleged relevant market as "potentially viable" for the purposes
of a motion to dismiss but not deciding the "appropriate circumscription of the relevant
market"); *Knoll Pharms. Co. v. Teva Pharms. USA, Inc.,* No. 01 C 1646, 2001 WL
1001117, at *3-4 (N.D. Ill. Aug. 24, 2001) (relevant market allegation "sufficient at the
pleading stage."); *In re Cardizem CD Antitrust Litig.,* 105 F. Supp. 2d 618, 680-81 (E.D.
Mich. 2000) (accepting plaintiffs' alleged market definition on motion to dismiss); *see
also Babyage.com, Inc. v. Toys "R" Us, Inc.,* Civ. A. Nos. 0-6792, 06-242, 2008 WL
2120493, at *2 (E.D. Pa. May 20, 2008) (denying motion to dismiss where plaintiffs did
not fail to reference reasonable interchangeability and price elasticity in alleging their
relevant market and noting that that plaintiffs must not allege a relevant market that
"clearly fails to encompass all 'interchangeable substitute products.'").

16    *See Mut. Pharm. Co., v. Hoechst Marion Roussel, Inc.,* No. Civ. A. 96-1409, 1997 WL
805261, at *2 (E.D. Pa. Dec. 17, 1997) (focusing on interchangeability of use, not price,
and noting evidence that defendant's drug was the only drug used by a distinct set of
patients); *In re Ciprofloxacin Hydrochloride Antitrust Litig.,* 363 F. Supp. 2d 514, 522-23
(E.D.N.Y. 2005) (no discussion of therapeutic substitution evidence).

17    *Terazosin Hydrochloride Antitrust Litig.,* 352 F. Supp. 2d 1279, 1319 (S.D. Fla. 2005).

18    Teva/Impax Br. 10-12.

19    Cockburn Dep. 42:1-5, DJA-Reply-40. ██████████████████████████
████████████████████████████████████████████ Expert Report of
Margaret Guerin-Calvert ("Guerin-Calvert Rpt."), ¶ 131 n.79, DJA-995 (citing articles

true – that price can affect demand between different dyslipidemia drugs – one would expect branded Zocor's share to remain high because it was priced lower than its AB-rated generic. Nevertheless, branded Zocor continued to lose market share precipitously following generic entry *despite its lower price*.[20]  As Manufacturer Plaintiffs' expert Dr. Cockburn conceded at deposition, ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████.[21]  In fact, Plaintiffs' expert Dr. Cockburn explained that ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████[22]

    The Zocor/simvastatin experience does not show evidence of price competition and, in fact, shows that it is the regulatory regime rather than open price competition that shifts market share from branded drugs to AB-rated drugs.  Thus, Dr. Cockburn admitted that ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████[23]

---

████████████████████████████████████████; *see also* Deposition of Dr. Stephen Schondelmeyer ("Schondelmeyer Dep."), at 197:12-198:9, DJA-Reply-47-48 (████████████████████████████████).  ("DJA" refers to Defendant's Joint Appendix to Defs.' Opening Br., CA. No. 05-340, D.I. 398; CA. No. 05-360, D.I. 392; CA. No. 02-1512, D.I. 607; CA. No. 03-120, D.I. 513).

[20]    Cockburn Dep. 40:19-41:1, DJA-Reply-39.

[21]    *Id.* at 42:6-13, DJA-Reply-40.

[22]    *Id.* at 43:7-44:14, DJA-Reply-40.

[23]    *Id.* at 43:7-16, DJA-Reply-40. ████████████████████████████

████████████████████████████████████████████████████████████

   b.  **Plaintiffs' Other Examples Of the Absence Of Price Competition In The Dyslipidemia Market Confirm The Irrelevance of Plaintiffs' Price-Based Arguments**

The Manufacturer Plaintiffs point to a number of circumstances from which they argue that there is low price cross-elasticity in the dyslipidemia market. These circumstances include that TriCor was able to grow in sales notwithstanding the availability of a less expensive generic version of Gemfibrozil (a fibric acid that shares some characteristics with fenofibrates like TriCor), and that Defendants' expert witness Margaret Guerin-Calvert testified that ███████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████.[24] These observations are consistent with the fact that █████████████████████████████████████████████████████████ ████████████████████.[25] These observations do not change the undisputed fact that physicians are not price sensitive and choose among dyslipidemia drugs for reasons other than price.

  **B.**  **Plaintiffs' Nonprice Arguments Do Not Raise A Material Fact Issue That TriCor Is Not Interchangeable With Other Dyslipidemia Drugs**

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

[24] Teva/Impax Br. 12-13.

[25] Defs.' Opening Br. 10. ████████████████████████████████ ████████   Guerin-Calvert Rpt. ¶¶ 53-54, DJA-Reply-133.

that ████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████[26]    These results of Dr. Gilbert's analysis are consistent with the

undisputed facts that nine non-fenofibrate drugs share TriCor's FDA-approved indications for

the treatment of these lipid levels, and the leading treatment guidelines on which physicians rely

do not instruct that TriCor (or fenofibrate) is the most preferred treatment for any particular lipid

condition.[27]  Plaintiffs do not dispute that these shares are too low, as a matter of law, for a jury

to find that Defendants have market power.

Defendants' promotion of TriCor has been consistent with the reality of the marketplace

shown by the ████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████. Defendants' attempt to ████████████████████

███████████████████████████████████████████████████████

████████████████████████ is the essence of competition, not evidence of

monopoly.[28]

        1.     **The GE HealthCare Data Is The Most Reliable Evidence Of Competition And Is Corroborated By The Plaintiffs' IDC-9 Diagnoses Data**

████████████████████████████████████████████████████

████████████████████████████████████████████████[29]    In their

---

[26]    Defs.' Opening Br. 11-14.

[27]    *Id.* at 15-17.

[28]    *Id.* at 21-26.

[29]    *Id.* at 11-21.

oppositions,[30] Plaintiffs attempt to discredit Dr. Gilbert's analysis of the ███████████
██████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████████
██████████████████████." Based on these criticisms, Plaintiffs argue that a jury could draw different conclusions (although they do not say what the conclusion could be) ███████████████████. For the reasons discussed below, these criticisms, however, do not raise a *genuine* issue of fact.

Plaintiffs' primary argument as to why ██████████████████████████████
██████████████████████████████████████████████████████████████████████████
███████████.[31] As Defendants showed in their opening brief, however, *Plaintiffs' own expert's* ██████████████████████████████████████████████████████████████████
███████████████████████████████ analysis conducted by Manufacturer Plaintiffs' expert, Dr. Cockburn – the only empirical analysis conducted by any of the Plaintiffs in this case – ███████████████████████████████████████████████████
███████.[33] Indeed, Dr. Cockburn conceded ████████████████████████████
██████████████████████████████████████████████████████████████████████████
██████████████████.[34] Plaintiffs do not contest that, as a matter of law, this market

---

[30]     Purchaser Plaintiffs do not address the GE Healthcare data directly in their briefs, but incorporate the Manufacturer Plaintiffs' arguments as their own. Purchasers' Br., Ex. A, ¶ 4.

[31]     Teva/Impax Br. 33-34.

[32]     Defs.' Opening Br. 36-37.

[33]     *Id.* at 36-37 & n.91; Expert Report of Dr. Richard Gilbert ("Gilbert Rpt."), ¶ 68, DJA-Reply-127-28.

[34]     Cockburn Dep. 92:3-22, DJA-106.

share[35] requires that the Court find Defendants do not possess, nor do they have the dangerous probability of achieving, monopoly power.[36]

    As Dr. Gilbert explained, ██████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████ [37] Nevertheless, as discussed above, Plaintiffs' expert's analysis shows that █████████████████████████████

███████████████████████████████████████████████████████

    Manufacturer Plaintiffs also cite testimony that ████████████████████████

████████████████████████████████████████████████ .[38] But Plaintiffs do not argue that the other factors physicians consider ████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████ .  In fact, Plaintiffs do not explain why their contention that "a factfinder reasonably could find that doctors choose different dyslipidemia drugs to achieve different

---

35    Plaintiffs claim these market shares are ████████████████████████████
███████████ .  Teva/Impax Br. 33 n.37.  Of course, Defendants have shown through the
███████████████████████████████████████████████████████████████ The
purpose of looking at market shares by categories of lipid profiles is to demonstrate that,
even within ████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████

36    Defs.' Opening Br. 33 (citing cases holding that a firm with market share below 50% does not possess monopoly power).

37    Gilbert Dep. 386:16-392:22, PJA01599.

38    Teva/Impax Br. 34-35.

- 14 -

therapeutic purposes, even for patients who have lipid profiles that fall within a particular category . . ." would tend to prove their proposed relevant market at all.[39]

Plaintiffs specifically point to evidence suggesting that Zetia should not be prescribed for patients with low HDL and high TGs, which is the so-called "TriCor patient type."[40] This evidence, however, does not question the fact that ███████████████████████████████ ████████████████████████████████████████████[41] Indeed, as Defendants noted in their opening brief, Abbott recognized that █████████████████ ████████████████████████████████████████████████████ ███████[42]

Plaintiffs' attempts to challenge the conclusions ██████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████ These facts, to which there is no *genuine* dispute, compel summary judgment.

---

[39]    *Id.* at 35.

[40]    *Id.* at 36-37.  Plaintiffs attempt to create confusion by arguing that TriCor ███████ ████████████████████████████ Defs.' Opening Br., Section II.A.  The fact that TriCor can be prescribed alone *or* adjunct to a stain distinguishes this case from the handheld devices (e.g., PDAs) discussed in *United States v. Microsoft Corp.*, 253 F.3d at 53.

[41]    Defs.' Opening Br. 1, 23-24.

[42]    *Id.* at 23-24.

2.    **Plaintiffs' Physician Testimony Raises No Genuine Issue In the Face Of The GE Healthcare Data**

Plaintiffs also try to create a material fact issue regarding how TriCor actually is used by submitting expert opinion regarding how TriCor *should* be used.[43]  But actual use (actual interchangeability) is what defines the relevant market, and the Plaintiffs have not proffered any evidence to dispute Dr. Gilbert's findings as to actual interchangeability.  They instead rest their argument on efficacy and side effect differences between *identically indicated* dyslipidemia drugs, even though the leading treatment guidelines and manuals offer multiple options for the treatment of abnormal lipids – including statins, fibrates, niacin, Zetia, bile acid sequestrants, or omega-3 fatty acids.[44]  Plaintiffs' physician experts – all researchers or cardiologists – provide opinions as to what *they* would prescribe given a particular lipid profile or what treatment option *they* think is most optimal, but that cannot answer the critical question for the purposes of determining the relevant market – how do physicians *as a group* actually prescribe dyslipidemia drugs?[45] ████████████████████████████████████████████ ████████████████████████████████████████████.

Furthermore, the differences in opinion among the Plaintiffs' own physician experts in this case on the appropriate use of different dyslipidemia drugs, rather than creating an issue of fact regarding the bounds of the relevant market, serve to show that doctors have different views

---

[43]    Teva/Impax Br. 21-22; Purchasers' Br. 34-35.

[44]    *See* Defs.' Opening Br. 14-17.

[45]    Plaintiffs' experts concede ████████████████████████ *See* Deposition of Dr. Sander Robins ("Robins Dep."), at 95:1-15, DJA-Reply-33 ████████████████████████████████████████ █████████████████████ ); Deposition of Dr. Richard Grimm ("Grimm Dep."), at 153:2-12, DJA-Reply-66 ("████████████████████████████████████████████████████████████████████ ); Deposition of Dr. Rodolfo Soto ("Soto Dep."), at 211:1-10, DJA-Reply-74 (████████████████████████████████████████████████ ).

- 16 -

on the appropriate treatment for any given patient.[46]  These varied views on the appropriate

treatment for lipid disorders confirm ████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████

For example, the Manufacturer Plaintiffs argue that due to insulin resistance and glucose

control issues in diabetic or metabolic syndrome patients, as well as the "flushing" effect, there is

a genuine issue of material fact as to whether niacin is reasonably interchangeable with

fenofibrate even though "*niacin has comparable efficacy to fenofibrate in lowering TG and*

*raising HDL . . . .*"[47]  In fact, both the empirical data and the testimony of Plaintiffs' experts

establish that ██████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████[49]  By comparison,

Dr. Grimm testified that ██████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████████

---

[46]    *See* Teva/Impax. Br. 22-23.

[47]    *Id.* at 22 (emphasis added).

[48]    Plaintiffs' experts, including Dr. Grimm, Dr. Soto, and Dr. Schwartzbard, all testified ████
        ███████████████.  *See, e.g.*, Grimm Dep. 83:1-6; 171:3-11, DJA-Reply-65, 67; Soto
        Dep. 198:24-195:5, 196:7-198:22, 204:4-8, DJA-Reply-71-73; Deposition of Dr. Arthur
        Schwartzbard ("Schwartzbard Dep."), at 70:4-12, DJA-Reply-51.

[49]    *See* Robins Dep. 121:18-122:17, 123:9-17, 145:21-146:1, DJA-Reply-34-37.  Dr. Robins
        testified that ███████████████████████████████████████████████ Robins Dep. 28:7-29:7, DJA-
        Reply-32.

[50]    *See* Grimm Dep. 82:5-83:6, 171:7-11, DJA-Reply-65, 67.

████████████████████████████████████████

████████████████████████████████████████ [51]

Another example of physician choice involves Plaintiffs' arguments about TriCor's strengths *vis á vis* statins is also irrelevant.[52]   Plaintiffs contend that fenofibrate "has greater efficacy in lowering TG and raising HDL than other dyslipidemia drugs, including the statins (such as Lipitor and Zocor), Zetia, and bile acid sequestrants," such that fenofibrate is not a reasonable substitute for those drugs.[53]   But Plaintiffs' own experts testified that some ████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

---

[51]   The Manufacturer Plaintiffs argue that gemfibrozil is not reasonably interchangeable with fenofibrate because of possible adverse interactions when taken together with statins. Teva/Impax Br. 22.  While it is true that every expert in this case ████████████ ████████████████  *See* Supplemental Expert Report of Dr. Richard Gilbert ("Gilbert Supp."), Table 2b, DJA-1114.  To be sure, ████████████ ████████   *See* Schwartzbard Dep. 69:21-22, DJA-Reply-50.  As discussed in the Defendants' Opening Brief, gemfibrozil, as part of the fibrates class, is listed by leading guidelines as a treatment option for dyslipidemia. Defs.' Opening Br. 16-17.

[52]   TriCor shares indications to treat high low density lipoprotein ("LDL"), low HDL, and high triglycerides with all but one statin-class drug. Defs.' Opening Br. 14-15.

[53]   Teva/Impax Br. 22.

[54]   Schwartzbard Dep. 364:14-366:4, DJA-Reply-52-53.

[55]   Grimm Dep. 177:10-22, DJA-Reply-68; *see also* Soto Dep. 135:7-14, DJA-Reply-70.

[56]   *See* Defs.' Opening Br. 13, 16-17.

- 18 -

Any disputes about the best prescription for treatment of a dyslipidemia patient cannot obscure the undisputed fact that physicians perceive several drugs as reasonably interchangeable for treatment of the same condition.

### 3. Plaintiffs' Reliance On Abbott's "Marketing" Documents Confirms TriCor's Interchangeability With Other Dyslipidemia Drugs

Plaintiffs argue that Defendants' "positioning" of TriCor shows that there is a separate fenofibrate market limited to consumers of TriCor.[57] Plaintiffs confuse "marketing" with "market." It bears repeating that TriCor entered the U.S. market only ten years ago. In order to succeed Abbott needed to distinguish TriCor from statins and other available dyslipidemia drugs that then were being prescribed.[58] 



. See, e.g., FTC v. Whole

---

[57]    Teva/Impax Br. 25-29; Purchasers' Br. 34-35.

[58]    Defs.' Opening Br. 22-23. The Manufacturer Plaintiffs argue that because TriCor did not share indications with the statins at the time of TriCor's U.S. launch in April 1998, there is a genuine issue of material fact as to whether Abbott promoted "TriCor as a competitor to statins at the time of launch." Teva/Impax Br. 30. The irrefutable facts show, however, that TriCor and statins shared indications since the year of TriCor's launch. For example, only months after TriCor launched, Warner-Lambert received approval from the FDA to include an indication for treatment of "elevated serum triglyceride levels (Frederickson Type IV)" on the label of its blockbuster statin Lipitor, *see* Teva and Impax Joint Appendix to their Br. In Opp'n to Defs.' Mot. For Summ. J. on Relevant Market Definition ("TIJA") (CA. No. 02-1512, D.I. 624-627; CA. No. 03-120, D.I. 527-530), at 5001, meaning that Warner-Lambert could now market and promote Lipitor as treatment for high triglycerides – the same condition TriCor was indicated to treat. Other statin class drugs quickly followed suit. For example, Merck applied to the FDA to add a Fredrickson Type IV indication to Zocor in January 1999 (approved in November 1999, *see* DJA-Reply-137-39), and Bristol-Myers Squibb applied to add a Fredrickson Type IV indication to Pravachol in March 1999 (approved January 2000). *See* TIJA 5003.

[59]    Defs.' Opening Br. 25.

- 19 -

*Foods Market, Inc.,* 502 F. Supp. 2d 1, 26 (D.D.C. 2007) ("Differentiation . . . does not equate to a unique relevant product market for antitrust purposes."); *Fleer Corp. v. Topps Chewing Gum, Inc.,* 501 F. Supp. 485, 506 (E.D. Pa. 1980) ("[P]roducers seeking to increase their market share often differentiate their products, to try to gain a larger slice of a fixed pie. A monopolist['s] . . . incentive to differentiate is not nearly as strong as it would be in a competitive market."), *rev'd on other grounds,* 658 F.2d 139 (3d Cir. 1981). In fact, the documents Plaintiffs cite show that

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

---

[60]  *See, e.g.,* Abbott_Tricor00003312, at 330, TIJA-3072 (█
████ TIJA-3304, 3306, 3307 (Teva/Impax Br. 26, TJIA 3300)
██████████████████████ Abbott_Tricor00015244, at 247, TIJA-3240 (Teva/Impax. Br. 27, TJIA 3240)
██████████████ Abbott_Tricor 00006853, at 870, TIJA 3192 (Teva/Impax Br. 13, 27, TIJA 3193, TIJA 3189)█
█████████████ Abbott_Tricor 00003108, at 139 DJA-Reply-82 (Teva/Impax. Br. 26 n.30, TIJA 3053) █████; Abbott_Tricor00012660, at 674, DJA-Reply-89 (Purchasers' Br., Ex. A, at 5, PJA1827)████████ Abbott_Tricor00000007, at 10, PJA1809 (Purchasers' Br. Ex. A, at 6) ██
██████████ Abbott_TriCor00003084, at 93, DJA-Reply-80 (Teva/Impax Br. 26 n.30, TIJA 3042)█
██████████ Abbott_Tricor 00003906, at 941-42, DJA-Reply-84-85 (Teva/Impax Br. 27, TIJA 3107)█
█████████████ Abbott_Tricor00006665, at 668, DJA-Reply-87 (Teva/Impax Br. 26, TIJA 3175)█
█████████████ Abbott_Tricor00013266, at 272, DJA-Reply-91 (Teva/Impax Br. at 28, TIJA 3224)█████ Abbott_Tricor00277879, at 881, PJA-01498 (Purchasers' Br., Ex. A, at 8)█
███████ Abbott_TriCor00002566, at 571, DJA-Reply-78 (Teva/Impax Br., 15, TIJA 3049)█
███████ Abbott_TriCor00016332, at 353, TIJA-3258 (Teva/Impax Br. 31)██████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████[62]

For the same reasons, Plaintiffs' attempt to create fact issues by citing to ██████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

### C.    Plaintiffs' Attempt To Define The Relevant Market Through Their Own Allegations And Not Interchangeability Is Contrary To The Law

Plaintiffs argue that since the alleged exclusionary conduct is aimed at the specific competition between TriCor and generic forms of TriCor, the competition shown by the GE Healthcare data between TriCor and other dyslipidemia drugs is irrelevant. Plaintiffs' argument ignores the fact that this is a monopolization case, which "requires inquiry into the relevant product and geographic market and the defendant's economic power in that market." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993). Both the reason for defining a relevant market, and the test for determining the bounds of that market, are legal questions. *White &*

---

[61]    Purchasers' Br. 25 n.33 & Ex. A, ¶ 5.

[62]    Furthermore, Purchaser Plaintiffs note that such remarks in business documents provide little illumination of the relevant antitrust market. *Id.* at 25 n.33 (citing authority). *See also Columbia Metal*, 579 F.2d at 30 ("[I]t is not the perceptions of manufacturers but those of consumers which are the most salient in the determination of market boundaries."). ████████████████████████████████████████

████████████████████████████████████████

[63]    Teva/Impax Br. 24.

*White, Inc. v. Am. Hosp. Supply Corp.,* 723 F.2d 495, 500 (6th Cir. 1983). Therefore, Plaintiffs'
reliance on expert testimony to tell this Court how it should address the relevant market
question[64] is misplaced. Furthermore, Plaintiffs' attempt to limit the relevant competition to that
between TriCor and the Manufacturer Plaintiffs' fenofibrate products is inconsistent with the
Supreme Court's instruction that the antitrust laws "protect competition, not competitors."
*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 488 (1977). Market definition
requires the Court to include in the market all competing products a doctor can reasonably turn to
that would negate Defendants' ability to exercise market power. *See E.I. du Pont de Nemours &
Co.,* 351 U.S. at 391-95 ("[W]here there are market alternatives that buyers may readily use for
their purposes, illegal monopoly does not exist merely because the product said to be
monopolized differs from others."). Defendants' evidence of the many drugs available for
doctors to prescribe, not just Teva's and Impax's fenofibrate products, properly define the
relevant market.

## II.    PURCHASER PLAINTIFFS' PURPORTED "DIRECT EVIDENCE" DOES NOT SHOW MONOPOLY POWER

Only Purchaser Plaintiffs contend that "direct evidence" of monopoly power exists to
defeat Defendants' motion.[65] *Broadcom Corp. v. Qualcomm Inc.* – the case on which Plaintiffs
rely – identifies two types of evidence for proving monopoly power through "direct evidence":
supracompetitive prices and restricted output. 501 F.3d 297, 307 (3d Cir. 2007). Plaintiffs have
no such evidence. Unlike *Broadcom*, which was decided on a motion to dismiss, Plaintiffs must
put forward *facts* demonstrating supracompetitive prices or restricted output in response to

---

[64]    *See* Teva/Impax Br. 38; Purchasers' Br. 10 & 31.

[65]    Purchasers' Br. 35-40; Teva/Impax Br. 1 n.2 (explicitly not addressing direct evidence of monopoly power).

Defendants' motion. *See* Fed. R. Civ. P. 56(e)(2); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). They have not met their burden as to either supracompetitive prices or restricted output.

Purchaser Plaintiffs offer two arguments that TriCor's prices are "supracompetitive": ■

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████

The fact that generic prices are lower than brand prices does not prove that the brand prices are above the competitive level but instead reflect the fact that the generics do not incur the substantial research and development and promotional expenses of brand name pharmaceutical companies.[66] Indeed, it is relatively undisputed that even after such generic entry

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

---

[66]    Schondelmeyer Rpt. ¶ 142, DJA-Reply-120-21 █████████████████

████████; Leitzinger Rpt. 16, DJA-Reply-109 ████████████████████████

█████████████████████████████████████████████████████████

[67]    *See* Defs.' Opening Br. 29 n.72 (citing Plaintiffs' experts' testimony acknowledging that ██████████████████████████████████████████████).

[68]    *See id.* 39-40 (citing *In re Remeron Direct Purchaser Antitrust Litig.,* 367 F. Supp. 2d 675, 682-83 (D.N.J. 2005)); *see also* Gilbert Rpt. ¶ 65, DJA-Reply-125-26 (████████

████████████████████████████████[69] It is no surprise, given these irrefutable

market realities, that Teva and Impax did not advance this argument in opposition to Defendants'

motion. Purchaser Plaintiffs' approach was rejected in *In re Remeron Direct Purchaser Antitrust

Litigation*, 367 F. Supp. 2d at 683 and no reasonable juror could find the unremarkable fact that

████████████████████████████████████████████

████████████████████████████████████

Plaintiffs' attempt to contest the undisputed fact that Defendants did not restrict the

output of fenofibrate is limited to a footnote.[71] At best, their argument amounts to the allegation

that Defendants' alleged actions prevented Teva and Impax from benefiting from automatic

generic substitution laws to increase *their* output. Thus, Plaintiffs simply seek to replace

Defendants' output with that of Teva and Impax. But, as discussed above, the antitrust laws

protect competition, not competitors.[72] As Defendants demonstrated in their opening brief,

Defendants' alleged conduct did not restrict output of fenofibrate.[73]

As supposed "direct evidence" of monopoly power, Purchaser Plaintiffs further offer a

fundamentally flawed argument that Defendants' alleged conduct excluded competition, which is

not one of the methods identified by *Broadcom* for proving monopoly power through direct

---

█████████████████████████████████████████

[69]  *See* Gilbert Rpt. ¶ 66, DJA-Reply-126-27 ███████████████████████

[70]  █████████████████████████████████████████████
      ██████████████████████████████████████████████
      ████████████████ Teva/Impax Br. 17. In any event, Manufacturer Plaintiffs' argument
      fails for the same reasons Purchaser Plaintiffs' "profit margin" argument fails as
      discussed above.

[71]  Purchasers' Br. 39 n.58.

[72]  *Brunswick Corp.*, 429 U.S. at 488.

[73]  Defs.' Opening Br. 38.

- 24 -

evidence.  In fact, despite Plaintiffs' claims of monopolistic behavior, Teva, Impax, and others

have entered the market with fenofibrate products.[74]  Moreover, Defendants' conduct has not in

any way impaired the ability of Teva, Impax, and the other sellers of fenofibrate to sell their

products at a price that is lower than TriCor's.[75]  Plaintiffs seek a free ride for fenofibrate on

TriCor prescriptions through the AB-rated substitution mechanism, not competition on the

merits.[76]

The fact that TriCor has not lost a considerable amount of sales due to this competitive

entry only serves to show: (1) physicians are not price sensitive; and (2) dyslipidemia

manufacturers primarily compete through innovation, marketing, and promotion.[77]  The lack of

success the competing fenofibrate drugs have experienced is explained by the lack of marketing

and promotional support they receive and by Abbott's product improvements.  Indeed, Direct

Purchaser Plaintiffs' expert, Dr. Leitzinger, testified that ███████████████████████████

███████████████████████████████████████████████████████████████.

---

[74]    *See* Teva/Impax Br. 1 n.3 (listing fenofibrate drugs on the market).

[75]    *Cf.* Deposition of Dr. Jeffrey Leitzinger, March 13, 2008 ("Leitzinger Dep."), at 74:16-20, DJA-Reply-76 ███████████████.

[76]    *See Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 55 (1977) (holding that prevention of "free-riding" by competitors is a legitimate business purpose in a rule of reason case); *Morris Commc'n Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1295 (11th Cir. 2004) (prevention of "free riding" a legitimate business justification under the rule of reason); *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 377 (7th Cir. 1986) (finding that competitors are "expected to make their own way in the market, by advertising or other means of promotion."); *id.* at 377-78 (finding that "[a rival has] no right under antitrust law to take a free ride on its competitors' sales force. You cannot conscript your competitor's salesmen to sell your product even if the competitor has monopoly power and you are a struggling new entrant").

[77]    Defs.' Opening Br. 9-10.  The Supreme Court has cautioned against presuming that higher prices are the result of anticompetitive conduct. *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 127 S. Ct. 2705, 2718-19 (2007) ("The antitrust laws do not require manufacturers to produce generic goods that consumers do not know about or want.  The manufacturer strives to improve its product quality or to promote its brand because it believes this conduct will lead to increased demand despite higher prices.").



Plaintiffs' argument that Defendants' alleged conduct proves it possess monopoly power is mere gainsaying in light of the facts of this case.

## CONCLUSION

For the reasons set forth above and in Defendants' opening brief, the Court should grant Defendants' motion for summary judgment and dismiss Plaintiffs' federal and state law claims.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/ James W. Parrett, Jr.

Mary B. Graham (#2256)
James W. Parrett, Jr. (#4292)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
mgraham@mnat.com
jparrett@mnat.com

RICHARDS, LAYTON & FINGER, P.A.

/s/ Anne Shea Gaza

Frederick L. Cottrell, III (#2555)
Anne Shea Gaza (#4093)
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
(302) 651-7700
cottrell@rlf.com
gaza@rlf.com

[78]    Leitzinger Dep. 75:4-76:18, DJA-Reply-76.

OF COUNSEL:

William F. Cavanaugh, Jr.
Thomas W. Pippert
Chad J. Peterman
Alexis Deise
PATTERSON, BELKNAP, WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036-6710
(212) 336-2000

*Attorneys for Defendant Abbott Laboratories*

2370258
Original Filing Date: June 16, 2008
Redacted Filing Date: June 24, 2008

OF COUNSEL:

William Baer
James Cooper
Anne P. Davis
ARNOLD & PORTER LLP
555 12th Street, N.W.
Washington, DC 20004
(202) 942-5000

Timothy C. Bickham
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, DC 20036-1795
(202) 429-5517

*Attorneys for Fournier Industrie Et Santé and Laboratoires Fournier, S.A.*

- 27 -

<u>**EXHIBIT A**</u>

**DEFENDANTS' REPLY TO PLAINTIFFS'
RESPONSES TO THE UNDISPUTED FACTS**

Defendants submit the following reply to the exhibits A appended to both briefs filed by Plaintiffs' in opposition to Defendants' motion. Plaintiffs' exhibits attempt to respond to Defendants' list of undisputed facts set forth in pages 4-5 of the Opening Brief in Support of Defendants' Motion For Summary Judgment On Relevant Market Definition (CA. No. 02-1512, D.I. 604; CA. No. 03-120, D.I. 512; CA. No. 05-340, D.I. 397; CA. No. 05-360, D.I. 391).

1.      The physician, not the patient/end-user of the product, is the primary decision maker when it comes to deciding which drug to prescribe. In making prescribing decisions, a physician's main concern is safety and therapeutic efficacy, not cost. (Defs.' Opening Br., Section II).

        **Manufacturer Plaintiffs' Response:** Undisputed

        **Purchaser Plaintiffs' Response:** Undisputed

        **Manufacturer Plaintiffs' Response:** Not contested.

        **Purchaser Plaintiffs' Response:** Undisputed.

3.      Physicians make prescribing decisions for their dyslipidemia patients by assessing a wide variety of factors, with emphasis on the patients' lipid profiles. (Defs.' Opening Br., Section II.B).

**Manufacturer Plaintiffs' Response:** Disputed (in part).

**Purchaser Plaintiffs' Response:** Undisputed in part and disputed in part.

**Defendants' Reply:** Plaintiffs do not raise a genuine issue of fact as to whether physicians assess a patients' lipid profile when deciding which dyslipidemia drug to prescribe a patient. Their acknowledgement of other factors physicians may consider is immaterial. (Defs.' Reply Br., Section I.B.2). Purchaser Plaintiffs' lengthy response to this fact goes to their legal arguments that the Court should ignore physician practices when determining the bounds of the relevant market and focus instead on prices and Defendants' promotional efforts for TriCor, all of which is addressed in Defendants' reply brief *passim.*



**Manufacturer Plaintiffs' Response:** Disputed

**Purchaser Plaintiffs' Response:** Disputed

**Defendants' Reply:** Although Plaintiffs attempt to create issues of fact as to the

███(Defs.' Opening Br., Section II.A.3). Defendants address Plaintiffs attempts to raise issues of fact with respect to the GE Healthcare data in their opening (Sections II.A & IV.A) and reply (Section I.B) briefs.

5.     The dyslipidemia market is dominated by statins which constitute approximately 80% of all prescriptions to treat dyslipidemia. (Defs.' Opening Br., Sections II.A).

**Manufacturer Plaintiffs' Response:** Disputed.

**Purchaser Plaintiffs' Response:** Disputed.

**Defendants' Reply:** Plaintiffs dispute that a "dyslipidemia market" exists, but they do not contest the fact that statins constitute 80% of all prescriptions to treat dyslipidemia. Defendants address the substance of Purchaser Plaintiffs' response in Defendants' opening brief (Section II.B ) and reply brief (Section I.B).

6.     TriCor is indicated in its FDA-approved product label to reduce LDL and triglycerides and to increase HDL. No fewer than nine other non-fenofibrate drugs in the dyslipidemia market – including Lipitor, Zocor, Pravachol, and Crestor (all statins), Niaspan (a niacin), Advicor (a niacin/statin combination drug), and Lopid (gemfibrozil) – share TriCor's indications for the treatment of all three lipid levels. Four remaining non-fenofibrate branded drugs – Lovaza, Mevacor, Welchol, and Zetia – share indications with TriCor for the treatment of at least one lipid abnormality. (Defs.' Opening Br., Section II.A.1).

**Manufacturer Plaintiffs' Response:** Disputed (in part).

**Purchaser Plaintiffs' Response:** Undisputed in part and disputed in part.

**Defendants' Reply:** Plaintiffs do not dispute TriCor's indications and that the drugs listed currently share TriCor's indications as stated. Defendants address Plaintiffs'

-iii-

arguments regarding whether TriCor shared these indications with statin drugs at the time of TriCor's launch in their reply brief (Section I.B.3).

7.    Fenofibrate is not singled out as the only viable treatment for any particular lipid condition by the leading clinical guidelines for cholesterol testing and management.    (Defs.' Opening Br., Section II.A.2).

**Manufacturer Plaintiffs' Response:**  Disputed.

**Purchaser Plaintiffs' Response:**  Undisputed.

**Defendants' Reply:**    Manufacturer Plaintiffs dispute this fact claiming that "leading clinical guidelines" is not defined.  Defendants, however, discuss the guidelines for the Detection, Evaluation, and Treatment of High Blood Cholesterol in Adults ("ATP III Guidelines"), and the Standards of Medical Care in Diabetes promulgated by the ADA in the cited portion of their opening brief.  Manufacturer Plaintiffs raise no genuine issue of fact with respect to these guidelines in their brief.  Defendants address Manufacturer Plaintiffs' arguments regarding TriCor's strength within a specific patient type in their opening brief (Section II.A.2 & II.B.2) and reply brief (Section I.B).

8.    TriCor's initial pricing and subsequent price increases were in line with other branded drugs in the dyslipidemia market.  (Defs.' Opening Br., Section II.B.2).

**Manufacturer Plaintiffs' Response:**  Disputed.

**Purchaser Plaintiffs' Response:**  Disputed as stated.

**Defendants' Reply:**  Defendants have put forward irrefutable facts that TriCor's price increases were in line with other banded drugs in the dyslipidemia market.  Manufacturer Plaintiffs dispute the existence of a "dyslipidemia market" and that TriCor's price was either higher or lower than other dyslipidemia drugs, but they do dispute that TriCor's price increases

were "in line" with those of other dyslipidemia drugs.    Accordingly, Manufacturer Plaintiffs' contention is immaterial.   Purchaser Plaintiffs question the phrases "dyslipidemia market" and "in line with" but do not raise a genuine dispute with respect to this fact except to argue it is immaterial.    Defendants address Manufacturer and Purchaser Plaintiffs' arguments in Defendants' opening brief (Section II.B.2).

        9.    It is rare for a branded drug to compete on price with its AB-rated generic because physicians or patients who would prefer a brand drug in a "but for" world in which there is an AB-rated generic on the market are the least price sensitive purchasers.   (Defs.' Opening Br., Section III.B.1) █████████████████████████████

████████████████████ (Defs.' Opening Br., Section III.B.1.)

        **Manufacturer Plaintiffs' Response:**  Disputed.

        **Purchaser Plaintiffs' Response:**  Disputed as stated.

        **Defendants' Reply:**  As discussed in Defendants' opening brief (Section III.B.1), Plaintiffs' experts' concessions show that there is no *genuine* dispute over this fact.

        10.    Sales of fenofibrate would have been no greater in the "but for" world where AB-rated generics entered the market than they were in the actual world.   (Defs.' Opening Br., Section IV.C.1).

        **Manufacturer Plaintiffs' Response:**  Not disputed.

        **Purchaser Plaintiffs' Response:**  Disputed.

        **Defendants' Reply:**  As discussed in Defendants' opening brief (Section IV.C.1), Purchaser Plaintiffs' experts' concessions show that there is no *genuine* dispute over this fact.

        11.    ████████████████████████████████████████████████

████████████████████ (Defs.' Opening Br., Section IV.C.2).

**Manufacturer Plaintiffs' Response:**  Disputed.

**Purchaser Plaintiffs' Response:**  Disputed.

**Defendants' Reply:**  Manufacturer Plaintiffs' attempt to create an issue of fact by suggesting Defendants' statement is too broad.  As Defendants have shown, however, ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Defs.' Reply Br., Section II).

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 24, 2008, the foregoing was caused to be electronically filed with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to all registered participants.

In addition, the undersigned hereby certifies that true and correct copies of the foregoing were caused to be served via electronic mail on June 24, 2008 upon the following parties:

| | |
|---|---|
| REPRESENTING DIRECT PURCHASER CLASS PLAINTIFFS (LOUISIANA WHOLESALE, ROCHESTER DRUG, MEIJER)<br><br>(C.A. 05-340) | Jeffrey S. Goddess<br>**jgoddess@rmgglaw.com**<br>Bruce E. Gerstein<br>**bgerstein@garwingerstein.com**<br>Barry S. Taus<br>**btaus@garwingerstein.com**<br>Adam M. Steinfeld<br>**asteinfeld@garwingerstein.com**<br>Daniel Berger<br>**danberger@bm.net**<br>Eric L. Cramer<br>**ecramer@bm.net**<br>Peter Kohn<br>**pkohn@bm.net**<br>Linda P. Nussbaum<br>**lnussbaum@kaplanfox.com**<br><br>Stuart Des Roches<br>**stuart@odrlaw.com** |
| REPRESENTING WALGREEN, ECKERD, KROGER, MAXI<br><br>(C.A. 05-340) | Elizabeth M. McGeever<br>**emmcgeever@prickett.com**<br>Scott E. Perwin<br>**sperwin@kennynachwalter.com** |
| REPRESENTING CVS, RITE AID<br><br>(C.A. 05-340) | Elizabeth M. McGeever<br>**emmcgeever@prickett.com**<br>Joseph T. Lukens<br>**jlukens@hangley.com**<br>Steve D. Shadowen<br>**sshadowen@hangley.com** |

REPRESENTING AMERICAN SALES COMPANY INC.

(C.A. 05-340)

Elizabeth M. McGeever
**emmcgeever@prickett.com**
Scott E. Perwin
**sperwin@kennynachwalter.com**

REPRESENTING INDIRECT PURCHASER
CLASS PLAINTIFFS

(C.A. 05-360)

A. Zachary Naylor
Pamela S. Tikellis
Thomas M. Sobol
Patrick E. Cafferty
Jeffrey L. Kodroff
Bernard J. Persky
Mike Gottsch
Brian Clobes
Michael Tarringer
Tim Fraser
David Nalven
Greg Matthews
Christopher McDonald
Kellie Safar
Theodore M. Lieverman
Pat Howard
**tricor@chimicles.com**

REPRESENTING PACIFICARE

(C.A. 05-360)

Jonathan L. Parshall
**jonp@msllaw.com**
William Christopher Carmody
**bcarmody@susmangodfrey.com**
John Turner
**jturner@susmangodfrey.com**
Shawn Rabin
**srabin@susmangodfrey.com**
Justin Nelson
**jnelson@susmangodfrey.com**
Ken Zylstra
**kzylstra@faruqilaw.com**
Mark Sandman
**mms@rawlingsandassociates.com**
Jeffrey Swann
**js5@rawlingsandassociates.com**

REPRESENTING TEVA PHARMACEUTICALS

(C.A. 02-1512)

Josy W. Ingersoll
Karen E. Keller
Bruce M. Gagala
Christopher T. Holding
Ken Cohen
Elaine Blais

**tricor@ycst.com**

REPRESENTING IMPAX LABORATORIES

(C.A. 03-120)

Mary Matterer
**mmatterer@morrisjames.com**

Asim Bhansali
**abhansali@kvn.com**

REPRESENTING FOURNIER

(ALL CASES)

Frederick L. Cottrell, III
Anne Shea Gaza
Steven C. Sunshine
Matthew P. Hendrickson
Bradley J. Demuth
Maggie DiMoscato
Timothy C. Bickham

**tricor@rlf.com**

*/s/ James W. Parrett, Jr.*

_____

James W. Parrett, Jr. (#4292)

520842

- 3 -